# In the United States Court of Federal Claims

No. 02-1078L
(Filed August 10, 2007)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * *<br>**GARY BAILEY,**<br>Plaintiff,<br>v.<br>**THE UNITED STATES,**<br>Defendant.<br>* * * * * * * * * * * * * * * * * * * * * * * | Fifth Amendment; regulatory takings; summary judgment; ripeness; Section 404 of the Clean Water Act, 33 U.S.C. § 1344; final agency decision; validity of government action; contract for deed under Minnesota law; Anti-Assignment Act, 31 U.S.C. § 3727; *Dow* rule; owners entitled to just compensation; liens as property interests. |

*Alan B. Fish*, Roseau, Minnesota, for plaintiff.

*Elsie B. Kappler*, General Litigation Section, Environmental and Natural Resources Division, Department of Justice, with whom was *Thomas L. Sansonetti*, Assistant Attorney General, Washington, D.C., for defendant. *Steven P. Adamski*, United States Army Corps of Engineers, St. Paul, Minnesota, of counsel.

## OPINION AND ORDER

WOLSKI, Judge.

The plaintiff, Gary Bailey, alleges that the United States, acting through the Army Corps of Engineers ("Corps"), has taken his property without payment of just compensation. The matter concerns the application of the Clean Water Act ("the Act") to a platted subdivision located in Lake of the Woods, Minnesota. Plaintiff contends that actions of the Corps, including the denial of an after-the-fact permit under section 404 of the Act, 33 U.S.C. § 1344, and the ordered restoration of land upon which a road was constructed, have resulted in a taking of the subject property. The government has moved to dismiss his complaint under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") for lack of subject matter jurisdiction, to the extent that the claims are based on the restoration order -- which it contends would not be ripe for review. It has also moved for summary judgment, under RCFC 56, arguing, among other things, that Mr. Bailey did not own the property affected by the Corps's actions and can prove no compensable damages caused by these actions. For the reasons explained below, the Court DENIES the motion to dismiss, and GRANTS-IN-PART and DENIES-IN-PART the motion for summary judgment.

# I. BACKGROUND[1]

In June 1989, plaintiff and his then-wife purchased, for $135,000, land in Lake of the Woods County, Minnesota, including the property that is at the center of this dispute. *See* Def.'s App. 142; Pl.'s Prop. Facts ¶¶ 3-5.[2] This purchase included two forty-acre parcels (or "quarters of quarters" under the Public Land Survey System ("PLSS")), one eighty-acre parcel (or a "half of a quarter"), and an irregularly-shaped, non-aliquot lot. *See* Def.'s App. 142; *see also id.* 320-21 (Nelson Decl. ¶¶ 6-7). The shores of Lake of the Woods form the eastern border of the irregular lot, which is designated under the PLSS as Government Lot 3 of Section 21 in Township 163 North, Range 33 West. *See id.* 142.[3] The platted subdivision at issue, now known as "Sunny Beach," *see* Pl.'s App. 35, is mostly located within Government Lot 3.[4] *See* Def.'s App. 219; Pl.'s App. 11, 29.[5]

## A. The Platting of the Subdivision

Mister Bailey's initial plan for the Sunny Beach property was to build a marina or harbor on the property, by enlarging a drainage ditch, removing fill, and placing the fill on an upland location to create a parking area and a roadbed. *See* Pl.'s Prop. Facts ¶¶ 13-14; Def.'s App. 128,

---

[1] The facts recited in this section come from Defendant's Proposed Findings of Fact Pursuant to RCFC 56(h)(1) ("Def.'s Prop. Facts"), plaintiff's response ("Pl.'s Prop. Facts"), the appendix in support of defendant's motions ("Def.'s App."), plaintiff's appendix in response to defendant's motions ("Pl.'s App.") and the affidavit submitted by plaintiff with his opposition papers ("Bailey Aff.") (filed March 16, 2005).

[2] The property was initially owned jointly by the couple, but Kathryn Bailey's interest in the property was terminated in connection with their divorce, on August 5, 2002. Pl.'s Prop. Facts ¶ 10; Def.'s App. 199.

[3] Because of the presence of the lake, the land in Section 21 does not occupy a full square under the rectangular survey system. *See* Def.'s App. 327. This irregular portion is expressed in terms of a lot number rather than the "quarters of quarters" that it would occupy but for the lake. *See id.* 321 (Nelson Decl. ¶ 6).

[4] The southernmost portion of the southernmost lot (lot number one) appears to be within Government Lot 4 of Section 21, and a sliver of this portion within the SE 1/4 of the SW 1/4 of Section 21. *See* Def.'s App. 219; *see also* Pl.'s App. 35 (description of subdivision in County board minutes). No documents have been brought to the attention of the Court that would indicate when plaintiff acquired these two other portions of Section 21.

[5] The platted subdivision property is nevertheless at times referenced as if it were an aliquot portion of the grid, as either in the NE 1/4 of the SW 1/4 of Section 21, *see* Def.'s App. 251, 308, or the NW 1/4 of the SE 1/4 of Section 21. *See id.* 133; *see also id.* 128.

329; Bailey Aff. ¶ 4. He applied to the Corps for a permit to allow the dredging in February 1990, and the Corps approved the dredging under the authority of a general permit. Pl.'s Prop. Facts ¶¶13-14; *see also* Def.'s App. 130, 204 (Whiting Decl. ¶ 4); Pl.'s App. 1. The project did not come to fruition. Bailey Aff. ¶ 4. Three years later, the Corps sent Mr. Bailey a letter, dated August 18, 1993, which referenced the previously-issued approval for the harbor project and informed him:

> It has now come to our attention that this harbor is apparently located in a wetland area and that you propose to place fill and/or dredged material into this wetland area to develop residential lots. Therefore, you will need another Department of the Army permit for this activity. Please note that harbor dredging can still be done provided all dredged material is placed directly on an upland area and not sidecast into the adjoining wetlands, even temporarily. As requested, we have also enclosed a copy of the National Wetlands Inventory map and its legend that shows the wetlands in this area. However, you should use caution while relying upon this map as it may not be accurate in showing all the wetlands in this area.

Def.'s App. 130 (underscoring in original).

The following Spring, the Corps visited the site and discussed the matter further with Mr. Bailey. A letter from the Corps dated May 13, 1994 referenced the visit and stated, "[a]s discussed on-site, you may wish to hire a qualified, private consultant to help you delineate this highly diverse site and prepare the required application that was previously provided to you." *Id.* 132. No wetlands delineation was done at that time, by either Mr. Bailey or the government. Over two years later, in December 1996, plaintiff applied to Lake of the Woods County to have a 13.2 acre strip of land in Government Lot 3, along the lakeshore, platted as a subdivision. Pl.'s Proposed Facts ¶ 18. In December 1998, Lake of the Woods County Board approved the Sunny Beach fourteen-lot subdivision, and re-zoned the land from "natural resource" to "residential" use. *Id.*; *see also* Pl.'s App. 35; Def.'s App. 329; Bailey Aff. ¶¶ 6-7.[6]

**B. The Access Road**

It appears that the County normally requires public access to any platted areas, *see* Pl.'s App. 49, and to meet this requirement plaintiff began, in the Spring of 1998, preparations to construct an extension of an existing county road. Pl.'s Prop. Facts ¶ 19. The existing road, Sandy Shores Drive, at that time terminated just north of the western edge of the platted subdivision. *See* Def.'s App. 318. Over the next several months, construction of the road extension began, starting with land clearing activities. Pl.'s Prop. Facts ¶¶ 19-20. As plaintiff described it, a contractor he had hired "roughed in a road." Def.'s App. 123; *see also id.* 121-22. According to a Corps official, on June 15, 1998, an unspecified Corps representative visited the

---

[6] In his application to plat the property, plaintiff initially sought a subdivision of twenty-nine lots covering forty-six acres. Pl.'s App. 11-12.

site and "advised Mr. Bailey to perform no additional work unless he obtained a Corps permit." Def.'s App. 204-05 (Whiting Decl. ¶ 7); *see* Def.'s Prop. Facts ¶ 20. No written order appears to have been issued formally directing plaintiff or the County to cease the road building activity. *See* Pl.'s Prop. Facts ¶ 20.

Mister Bailey filled out and signed an application, dated June 17, 1998, for an after-the-fact permit for the access road. Def.'s App. 133-34; Pl.'s App. 21-22. The project notification form he used was designed for applications to the state, county, and local government, as well as the Corps, and he signed on a specific line allowing it to be considered an application for a Section 404 permit under the Clean Water Act. *See* Def.'s App. 134; Pl.'s App. 22. Plaintiff submitted this application to the County, along with a Wetland Replacement Plan Application pursuant to the Minnesota Wetland Conservation Act. *See* Pl.'s App. 24-27. After evaluating the application under the state act, the County forwarded it to the Corps. *See* Def.'s App. 355. The Corps filed the application on August 17, 1998. *See id.*; *see also* Pl.'s App. 19, 28. The next month, the Corps sent plaintiff a letter dated September 17, 1998, stating that the Corps "underst[oo]d the road was completed" and believed it was "in a forested wetland" requiring a Corps permit. Def.'s App. 208. The letter acknowledged receipt of Mr. Bailey's permit application, and directed:

> No additional work requiring Department of the Army authorization may be performed prior to obtaining that authorization[;] this includes any additional landclearing of this wetland area.

*Id.* The letter was received September 24, 1998. *See id.* 212.

Despite this letter, plaintiff -- having been informed, in a letter from the County dated September 16, 1998, Pl.'s App. 29-30, that the access road suffered from ten deficiencies that "would have to be addressed" before the road could be accepted "as an unorganized Township Road," *id.* 30 -- continued to have work performed on the road. *See* Pl.'s Prop. Facts ¶ 23; Def.'s App. 205 (Whiting Decl. ¶ 10). After the initial plat approval in November 1998, the County sent Mr. Bailey a letter dated November 30, 1998, recommending four corrections to the road to bring it into compliance and requiring that a $10,000 bond be posted to cover this work. Pl.'s App. 31-32; Bailey Aff. ¶ 8. Several months after the final plat was approved, the County inspected the road and identified three final items for correction to meet County requirements for compliance. Pl.'s App. 44-45. On August 3, 1999, the County determined that the access road complied with County standards. Pl.'s App. 48. While the after-the-fact application was still pending, the County apparently contacted the Corps and informed it that the access road was a public road and that the "[p]ermit should be addressed to the County" because the "County has taken the road over." *Id.* 50 (Nov. 5, 1999 facsimile transmittal sheet); *see also id.* 49 (another Nov. 5, 1999 facsimile transmittal sheet). After reviewing the Corps's response, a Lake of the Woods County Highway Department official asked whether it would be possible that plaintiff and the County be considered "co-permit[t]ees." *Id.* 51 (Nov. 8, 1999 facsimile transmittal sheet).

The Corps conducted a wetlands delineation of the Sunny Beach site in August 2000 and determined that a majority of the 13.2 acres was wetland. Pl.'s Prop. Facts ¶¶ 24-25. On the basis of this delineation, on October 4, 2000, the Minnesota Pollution Control Agency revoked the water quality certification that it had previously issued for the project under Section 401 of the Clean Water Act. Def.'s App. 137-39; *see* Pl.'s Prop. Facts ¶ 26; *see also* Def.'s App. 135-36 (Dec. 17, 1999 certification). The Corps denied the after-the-fact permit application for the access road on June 12, 2001. *See* Pl.'s Prop. Facts ¶ 27; Def.'s App. 213-14. The letter denying the permit was addressed to the plaintiff,[7] signed by the Corps's district engineer, and stated, *inter alia*:

> I have determined that issuance of this permit would be contrary to the public interest. Therefore, I must deny the request.
>
> Retention of the dredged and fill material would contribute to unacceptable degradation of a valuable wetland resource and the adjacent Lake of the Woods, an international waterbody with substantial recreational, ecological and economic values. The hardwood swamp impacted by the project has high functional values for water quality protection, shoreline protection, wildlife habitat, and floristic diversity/integrity. It is hydrologically connected to Lake of the Woods through surface water and groundwater flows. The approximately 1,370 linear feet of unauthorized road fill is perpendicular to surface water and groundwater flows. It has altered wetland hydrology both upgradient and downgradient of the fill. Other adverse wetland impacts caused by the unauthorized road are also substantial -- approximately 7.04 acres of fill, excavation and drainage. Your proposal for compensatory mitigation utilizing a gravel pit and ditch plug would fail to offset these adverse impacts because it consists of out-of-kind replacement with lower quality wetlands that are not adjacent to Lake of the Woods.
>
> The purpose of the unauthorized road is to facilitate potential residential development in a hardwood swamp. Thirteen of the 14 proposed lots are composed of wetlands with the exception of a small upland island in lots 3 and 4. Roads and residential development are not water-dependent activities and the presumption that less environmentally-damaging alternatives exist (e.g., upland sites) has not been rebutted.

Def.'s App. 213-14. The letter referenced an "enclosed Evaluation and Decision Document," and stated that public notice would be distributed "seeking input from all interested parties" concerning three potential remedies -- completely removing the road, partially removing the road,

---

[7] Mister Bailey notes that the form attached to the denial letter explaining the appeal process identified Lake of the Woods County as the applicant. Pl.'s Prop. Facts ¶ 27 (citing Def.'s App. 215). This fact is immaterial to the present motions.

or mitigation alone or in addition to road removal. *Id.* 214. The recommendation of the Corps staff, in the Evaluation and Decision Document, was "complete restoration by removing the road and filling the associated ditches to restore important wetland functions and values including water quality protection and shoreline protection of Lake of the Woods." *Id.* 246.

This recommendation was adopted four months later, when the Corps issued a restoration order, which it "directed to [Mr. Bailey] as the responsible party who conducted the unauthorized fill activities in construction of the road." Def.'s App. 308-09. This order, dated October 22, 2001, directed the removal of the fill material used to construct the road, except for the portion of the road adjacent to lot 1 and to the southernmost portion of lot 2, and the backfilling of the ditches adjacent to the removed portions of the road. *Id.* 309; *see also id.* 311. This work was to "be completed between July 1 and August 15, 2002." *Id.* 309. The Corps justified the ordered restoration as "confer[ring] maximum environmental benefits by reestablishing wetland functions and values of high quality wetlands adjacent to an internationally important waterbody." *Id.* 308. The Corps believed this "would be equitable" since plaintiff "continued to do unauthorized work" after being told of the need for a Section 404 permit, and since plaintiff "profited from the sale of lots associated with the unauthorized work." *Id.*

### C. Plaintiff's Transactions Involving the Sunny Beach Lots

The fourteen lots platted for the Sunny Beach subdivision are numbered consecutively -- with one being the southernmost lot and fourteen the northernmost lot of the subdivision. *See* Def.'s App. 219. While the after-the-fact permit application was pending, Mr. Bailey sold thirteen of the fourteen lots to other parties. *See* Pl.'s Prop. Facts ¶ 10. Each lot was sold for a price of $25,000. *See*, *e.g.*, Def.'s App. 154, 158, 162, 169, 175, 184, 190. Four of the lots (chronologically, lots 9, 12, 2, and 3) were sold in late December 1998, in contract for deed transactions. *See* Pl.'s Prop. Facts ¶ 10. In these transactions, under Minnesota law, the buyer agrees to pay for the land in installments, and the seller retains legal title as security until all payments have been received.[8] A fifth lot (lot 8) was conveyed by warranty deed on January 27, 1999. *See id.*; *see also* Def.'s App. 166-67. In February 1999, three lots (lots 4, 5, and 6) were sold under a contract for deed, *see* Def.'s App. 168-71, and a fourth (lot 7) was conveyed by warranty deed. *See id.* 172-73. Additional lots were sold under contracts for deed in April (lot 10), May (lot 14) and June 1999 (lot 11). *See* Pl.'s Prop. Facts ¶ 10; Def.'s App. 174-80, 183-92. Lot 13 was conveyed by warranty deed on May 7, 1999, financed by a mortgage held by the Baileys. Def.'s Prop. Facts ¶ 10.[9]

---

[8] *See*, *e.g.*, *Summers v. Midland Co.*, 167 Minn. 453, 454-55 (1926).

[9] Although plaintiff contended, with no supporting citation, that the sale of lot 13 was by a contract for deed, *see* Pl.'s Prop. Facts ¶ 10, this was erroneous. *See* Bailey Aff. ¶ 16 (stating he "holds a lienholder interest in" lot 13 "by way of a mortgage"). In briefing and at the oral argument, plaintiff's counsel acknowledged that Mr. Bailey financed the sale as a mortgagee, and not as a contract for deed vendor. *See* Pl.'s Opp. at 18; Tr. (Apr. 7, 2005) ("Tr.") at 50-51; *see*

In June 1999, the Baileys conveyed a warranty deed to the purchasers of lots 4, 5, and 6, *see* Pl.'s Prop. Facts ¶ 10; Def.'s App. 193, the latter presumably having paid in full the $75,000 purchase price. *See* Def.'s App. 169 (¶ 4 of contract for deed selling the lots to David J. and Charmaine C. Wolf). On May 29, 2000, lot 11 was conveyed by warranty deed to the purchasers, who apparently fully performed their obligations under the contract for deed. *See* Pl.'s Prop. Facts ¶ 10; Def.'s App. 194-95. After the Corps's denial of the after-the-fact permit, on September 1, 2001, the purchasers of lots 4, 5, and 6 conveyed these lots back to Mr. Bailey by warranty deed. Pl.'s Prop. Facts ¶ 10; Def.'s App. 196-97. According to plaintiff, in response to a state court lawsuit brought by these purchasers and precipitated by the Corps's permit denial, he returned the purchase price and voided the sale of these three lots. Bailey Aff. ¶¶ 21-22. On October 18, 2001 -- four days before the restoration order was issued -- the purchaser of lot 10 conveyed to the Baileys by quitclaim deed his interest in the property. Pl.'s Prop. Facts ¶ 10. This apparently was the result of the cancellation of the contact for deed, *see* Def.'s App. 349; Tr. at 12-13, 28, one week after the County denied the purchaser's application for a land use permit to build a residence and septic system. *See* Pl.'s App. 271.

**D. Procedural History**

Mister Bailey filed his complaint in this Court on August 29, 2002. He alleges that "the restrictions" on the Sunny Beach property imposed by defendant "have deprived plaintiff of all economically beneficial and productive use of his land, or, in the alternative ha[ve] substantially diminished the value of plaintiff's property, requiring just compensation" under the Fifth Amendment.[10] Compl. ¶ II. The complaint is somewhat ambiguous in relating exactly what "restrictions" allegedly accomplished this taking. Paragraph two can be read as suggesting that the after-the-fact permit denial is either an example of these restrictions or a different matter altogether. *See id.* The sixth paragraph describes the after-the-fact permit application and denial, and states: "This is *a* final agency decision." *Id.* ¶ VI (emphasis added).

The next paragraph begins by discussing the restoration order, and alleges that "[d]efendant inexplicably ordered full restoration of the access road placing responsibility on plaintiff alone to restore the road and[,] in effect, denied plaintiff and individual lot owners access to the above described residential lots." *Id.* ¶ VII. The next sentence states that:

> Defendant's final agency decision also placed such restrictions on the property that there remains no economical[ly] viable use of the property or[,] in the alternative[,] substantially diminished the value of the property from residential

---

*also* Def.'s App. 181-82 (warranty deed conveying lot 13 to Thomas L. and Vivian B. Woitalla).

[10] "[N]or shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. As this provision mandates the payment of money damages, our Court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1). *See United States v. Causby*, 328 U.S. 256, 267 (1946).

> lakeshore property to property that has no access nor value as residential lakeshore property.

*Id.* It is not clear whether plaintiff intended this to mean that the after-the-fact permit denial eliminated access to the subject properties, or that the restoration order was also a final agency decision, or both.

The matter is further confused by a succeeding paragraph, which initially references "the defendant's final agency decision,"[11] and later describes lot owners as having suffered "an uncompensated taking as a result of the defendant[']s final agency decision to declare the property a wetland, deny access to their property and place restrictions on their property." *Id.* ¶ IX. That paragraph concludes by attributing a taking to "*[t]he* final agency decision of the defendant." *Id.* (emphasis added). The next paragraph discusses "the road which the [d]efendant denied and ordered restored," and remarks that the County "did not appeal *the* final agency decision." *Id.* ¶ X (emphasis added). Perhaps the most that can be said of the complaint in this regard -- other than the observation that brevity can be the enemy of clarity -- is that plaintiff seems to be claiming that the after-the-fact permit denial resulted in a taking of his property; and may be claiming that the restoration order and, possibly, the wetland delineation, may have done so as well, separately or cumulatively.

The complaint is similarly opaque in describing the property of plaintiff that was allegedly taken. It describes the Sunny Beach subdivision. Compl. ¶ IV. It states that Mr. Bailey "is the record title owner of eight (8) of the unimproved, residentially zoned parcels of real property located in the Sunny Beach subdivision," *id.* ¶ VIII, but then identifies ten lots for which he holds the record title. *See id.* ¶ IX (identifying Mr. Bailey as fee simple owner of lots 1, 4, 5, 6, and 10, and record title holder for lots 2, 3, 9, 12, 13).[12] Regarding the lots sold via contract for deed transactions, Mr. Bailey noted his obligation "to deliver marketable title at such point the agreed upon payments for the property have been paid in full." *Id.* He then stated, without further elaboration, that he "possesses an interest in the property possessed by [these] individual lot owners," who he claimed were "necessary and indispensable parties to this action." *Id.* The complaint alleges a taking of the property owned by these third party purchasers. *Id.* And concerning the access road constructed along the subdivision, it is alleged that the County "took ownership . . . as of the date of the plat's approval," *id.* ¶ IV, that the County "has an interest in the road," *id.* ¶ X, and that the "parcel" making up the road "has also been taken without just compensation as a result of the restrictions placed on the property by the [d]efendant." *Id.*

---

[11] Mister Bailey alleges that "as a result of" this decision, he was "required to purchase back" lots 4, 5, 6, and 10, "resulting in lost profits and damage to the plaintiff." Compl. ¶ IX.

[12] The ownership interest in lot 14 -- the title to which Mr. Bailey apparently holds as the vendor in a contract for deed transaction, *see* Pl.'s Prop. Facts ¶ 10 -- is not specifically described in the complaint. And as was discussed in note 9, *supra*, Mr. Bailey was mistaken in claiming to be the holder of record title for lot 13.

Concurrent with the filing of the complaint, plaintiff filed a motion under RCFC 14(b) requesting an order notifying interested parties -- the purchasers of the lots sold by Mr. Bailey -- of the pendency of this lawsuit. *See* Pl.'s Mot. for Notice. After some delay, the government moved for a stay of the case pending the resolution of a parallel action brought by the plaintiff. *See* Def.'s Mot. to Stay. In March 2002, Mr. Bailey had filed a lawsuit against the Corps, the County, and state agencies, in the Minnesota federal district court, challenging the after-the-fact permit denial, the restoration order, the state's revocation of the Section 401 certification, and other actions. Def.'s Ex. 1 to Def.'s Mot. to Stay. Over the opposition of plaintiff, a stay was granted, *see* Order (Nov. 27, 2002), and ultimately extended indefinitely pending resolution of the district court matter. *See* Order (Jan. 7, 2003).

After judgment was entered against Mr. Bailey in the district court case, the stay was lifted. *See* Order (Dec. 2, 2003).[13] The government filed its answer, and then filed a response to the RCFC 14(b) motion, expressing no opposition to the notice to interested parties. The motion for notice to interested parties was granted, *see* Order (May 7, 2004), and the purported owners of lots 2, 3, 7, 8, 9, 11, 12 and 13, and the County (to represent any interest it retained in the access road), were notified of the case and given the opportunity to intervene. *See id.*; *see also* Notice (July 12, 2004); Notice (Sept. 7, 2004); Pl.'s Prop. Facts ¶ 10. Neither the County nor any of the individuals notified filed a complaint to intervene in this matter.

Plaintiff's claims were clarified slightly during the discovery process. He explained that he contends that the June 12, 2001 denial of the after-the-fact permit application was a final agency decision which ripened his takings claim, *see* Def.'s App. 340 (Pl's Am. Answer to Interrog. No. 1), but that a number of other actions, in the alternative, could have constituted the taking of his property -- including the August 2000 wetland delineation, the revocation of the Section 401 certification, and the restoration order. *See id.* 340-41. To describe the property allegedly taken, plaintiff repeated his purported description of the Sunny Beach subdivision, and added in the alternative that the taken property comprised the access road and lots 1 through 13 of the subdivision. *Id.* 341 (Pl.'s Am. Answer to Interrog. No. 2). He also explained his

---

[13] On November 21, 2002, Mister Bailey's takings claims against the County and state entities were dismissed as unripe, *Bailey v. United States Army Corps of Eng'rs*, 2002 U.S. Dist. LEXIS 23272 *34-36, 43 (D. Minn. 2002); his challenges to the state entities' actions were dismissed as barred by the Eleventh Amendment, *id.* *28-34; and his common law claims against the County were dismissed as precluded by the settlement of the lawsuit brought by the purchasers of lots 4, 5 and 6. *Id.* *36-42. Plaintiff's claim concerning the Corps's restoration order was dismissed on the ground that a pre-enforcement challenge to such orders could not be brought under the Administrative Procedures Act ("APA"). *Id.* *21-26. The district court reviewed the denial of the after-the-fact permit under the APA, and on August 7, 2003 upheld that decision. *Bailey v. United States Army Corps of Eng'rs*, 2003 U.S. Dist. LEXIS 13753 (D. Minn. 2003).

contention that the access road was abandoned by the County, with ownership reverting to the owners of the adjacent lots. *Id.* 342 (Pl.'s Am. Answer to Interrog. Nos. 6 & 7).[14]

The government has moved under RCFC 12(b)(1) to dismiss Mr. Bailey's claims to the extent the claims are based on the October 22, 2001 restoration order. Defendant argues that such claims were not yet ripe and thus not within the Court's jurisdiction. *See* Def.'s Mot. at 1; Def.'s Mem. at 14-16.[15] The government in the alternative has also moved for summary judgment, under RCFC 56, to the extent Mr. Bailey's claims rest on the restoration order, arguing that his dispute of the order's validity precludes the claims. *See* Def.'s Mot. at 2; Def.'s Mem. at 17-18. Defendant further moved for summary judgment on the grounds that plaintiff did not own the property that was allegedly taken and suffered no damages that are compensable under the Fifth Amendment. *See* Def.'s Mot. at 2; Def.'s Mem. at 18-26.

After the filing of plaintiff's memorandum in opposition to the motions ("Pl.'s Opp. Mem.") and the government's reply in support of the motions ("Def.'s Reply"), the motions were the subject of oral argument. During this argument, it became apparent to the Court that additional briefing was needed concerning Minnesota property law. *See* Tr. at 110-12. Supplemental briefing was requested by the Court,[16] and was submitted by the parties ("Pl.'s Supp." & "Def.'s Supp."). After careful and thorough consideration of the papers submitted and the applicable precedents, this Opinion and Order is issued.

## II. DISCUSSION

### A. Applicable Legal Standards

The government labels its motion to dismiss on ripeness grounds as one based on lack of subject matter jurisdiction, under RCFC 12(b)(1). Whether a challenge to the ripeness of a takings claim is properly viewed as a question of jurisdiction or instead a failure to properly state a claim is a point of difference between courts. The Supreme Court has rather clearly explained that the "final decision" requirement adopted in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), is a matter of *prudential* ripeness, and not jurisdictional ripeness. *See Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 733-34 (1997); *see also White & Case LLP v. United States*, 67 Fed. Cl. 164, 168 (2005) (explaining difference between prudential and Article III ripeness). The Federal Circuit,

---

[14] *See also* Pl.'s App. 217 (County denying ownership of access road; ¶ X to answer filed in state court).

[15] Defendant's memorandum supporting the motions began at what would have been page four of the motion paper, but the page was numbered "one" instead, as numbering re-commenced. The Court will cite these portions of the document as "Def.'s Mem."

[16] *See* Order (Apr. 8, 2005).

on the other hand, in opinions that are more recent than *Suitum*, has termed this particular ripeness concern a matter of jurisdiction. *See*, *e.g.*, *Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004); *Howard W. Heck, & Assocs. v. United States*, 134 F.3d 1468, 1471 (Fed. Cir. 1998).

Under such circumstances this Court is, of course, obligated to follow the Federal Circuit precedents, *see Strickland v. United States*, 423 F.3d 1335, 1338-39 n.3 (Fed. Cir. 2005), and will consider the question one of jurisdiction. In any event, under either RCFC 12(b)(1) or 12(b)(6), the Court normally accepts as true all factual allegations made by the pleader and draws all reasonable inferences in a light most favorable to that party. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Reynolds v. Army & Air Force Exchange Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). A difference between the two motions arises when a motion to dismiss due to lack of subject matter jurisdiction is based on *disputed facts* bearing on the issue of jurisdiction -- in which case evidence beyond the pleadings may be considered and the plaintiff must demonstrate jurisdiction by a preponderance of the evidence. *Reynolds*, 846 F.2d at 747-48; *see also Bolduc v. United States*, 72 Fed. Cl. 187, 192 (2006); *Englewood Terrace Ltd. P'ship v. United States*, 61 Fed. Cl. 583, 584 (2004). Since the government's ripeness motion does not turn on facts in dispute, *see* Pl.'s Prop. Facts ¶¶ 30, 32, but on a question of law, this difference between motions under RCFC 12(b)(1) and 12(b)(6) is irrelevant to these proceedings.

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562-63 (Fed. Cir. 1987); *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 743 (2005).

Material facts are those "that might affect the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248. A dispute over facts is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* To demonstrate a genuine dispute over a material fact, the nonmoving party need not "produce evidence in a form that would be admissible at trial." *Celotex*, 477 U.S. at 324. The moving party, however, must file with the Court the documentary evidence, such as exhibits, that supports its assertions that material facts are beyond genuine dispute, *see* RCFC 56(h), unless it is basing its motion for summary judgment on the "absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also Anchor Savings Bank, FSB v. United States*, 59 Fed. Cl. 126, 140 (2003).

**B. May a Takings Claim Be Based on the Restoration Order?**

The government has, "to the extent that Plaintiff's takings claim is predicated on the Restoration Order," moved to dismiss the claim as unripe or, in the alternative, moved for summary judgment on the ground that Mr. Bailey disputes the order's legality. Def.'s Mot. at 1-2. As was recounted in Section I.D., *supra*, the extent to which Mr. Bailey bases his claim on the restoration order is far from obvious. Based on his amended answer to interrogatory number one, it appeared that he was contending that the takings claim ripened when the after-the-fact permit was denied, but that the issuance of the restoration order may be an alternative date upon which a taking occurred. *See* Def.'s App. 340-41. Mister Bailey's efforts to explain his position during the briefing and argument only served to confuse matters further. He first argued that "*[s]olely because of*" the after-the-fact permit denial, a taking of property resulted. Pl.'s Opp. Mem. at 10 (emphasis added). He soon elaborated that:

> these facts demonstrate a "taking" of private property as the entire residential lakeshore development project has been defeated through government[']s determination the property consisted of highly valuable wetlands that should not be disturbed *and its decision access to individual lots should be removed* because of the wetland's 'high functional' characteristics.

*Id.* at 11 (emphasis added). He added that "[t]he restoration order is an integral part of the facts that establish the taking," and argued that the determination of the actual date of the taking required the finding of facts at trial. *Id.* at 12.

Mister Bailey summed up his position as follows:

> To clarify, Plaintiff is not basing his taking claim on the issuance of the Restoration Order. He is basing his claim on *the effect the government's regulation has had on of* [sic] *his property*, which the Defendant has conceded is ripe, and *this regulation includes a restoration order*, therefore the Defendant cannot argue a dismissal of the claim.

*Id.* at 13 (emphasis added).[17] In his initial brief, then, plaintiff's position appeared to be that any aspect of the government's application of the Act to the property in question may have resulted in a taking of property, and since one instance of this application (the after-the-fact permit denial) would make a ripe claim, any other event -- even subsequent ones -- must also present a ripe claim.

---

[17] In its answer, the government conceded that the June 12, 2001 after-the-fact permit denial was "a final agency decision, but state[d] that the decision is limited to the project scope outlined in Plaintiff's application for an after-the-fact permit." Answer ¶ VI; *see also id.* ¶ IX. This concession does not extend to the "effect" of "regulation" of the property under the Act, in general.

During the argument on the motion, however, plaintiff's counsel initially seemed to take the position that the taking claim is "actually" based on the after-the-fact permit denial, Tr. at 5, and that the restoration order did not ripen a takings claim. *See* Tr. at 6. He later seemingly retreated from this position, stating that a regulatory taking claim was "[i]n part" based on the after-the-fact permit denial, but suggesting that the extent and use of the subject property might have been determined by the "subsequent restoration orders." Tr. at 23.[18] He subsequently explained that the takings claim was based on "more than just the permit denial for the road," as the "lots themselves are deemed useless -- a direct result of the road being ordered to remove." Tr. at 37. Plaintiff's counsel later clarified that the restoration order showed the futility of further attempts to develop the subject property. Tr. at 41-42.

The matter was confused even further by plaintiff's supplemental memorandum. In that paper, Mr. Bailey unveiled "the theory that a physical taking of property occurred through the government's final decision to order the access road in a legally platted subdivision removed." Pl.'s Supp. at 3. This combined two new assertions of the plaintiff -- that the restoration order resulted in a physical taking, and that it was a final decision.

Looking at the former point first, Mr. Bailey attempts to sidestep the question of whether the restoration order could be the basis of a ripe regulatory taking claim by recasting the taking as one of the *physical* variety. The Court notes that the Supreme Court has recognized that whether a taking was due to regulatory impact or to physical occupation can be a question of separate *arguments* supporting the same alleged taking, and not necessarily separate takings claims. *See Yee v. City of Escondido*, 503 U.S. 519, 534-35 (1992). Thus, Mr. Bailey is free to argue different legal theories based on the factual allegations that a taking occurred, as ambiguous as those allegations may be. But plaintiff's argument must square with the Supreme Court's express holding that "[t]he government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Yee*, 503 U.S. at 527. Viewed in this light, Mr. Bailey's argument makes little sense.

Plaintiff bases his physical invasion argument on the right of access that is recognized as a property interest under Minnesota law. *See* Pl.'s Supp. at 14-16. When a road or highway is built alongside private property, an easement is automatically created for the benefit of the owners of the abutting property entitling them to convenient and suitable access to the road or highway. *See Burnquist v. Cook*, 220 Minn. 48, 54 (1945); *State by Spannaus v. Northwest Airlines, Inc.*, 413 N.W.2d 514, 518 (Minn. App. 1987) (explaining that access rights are created upon the dedication and acceptance of land for a public street).[19] Although it may be

---

[18] "Orders" was stated in the plural, presumably because in November 2001 Mr. Bailey (concerning lot 5) and the purchasers of lots 8, 10, 11 and 12 were each separately ordered by the state to remove fill placed on the lots. *See* Pl.'s App. 261-70.

[19] *But see Thomsen v. State*, 284 Minn. 468, 471 (1969) (holding that right of access is not taken when a fence prevents access to a new highway abutting the property, when "there

accomplished by physical means, such as the erection of fences, medians, curbs, and the like, the extinguishment of this easement does not usually involve a physical *invasion* by the government -- since the burdened land, the road, is already in the hands of the government and the public.[20] *See*, *e.g.*, *Schmidt v. Village of Mapleview*, 293 Minn. 106, 107-09 (1972) (finding that utility pole and fire hydrant on right-of-way infringed right of access to driveway and garage); *Cook*, 220 Minn. at 55 (explaining that access rights are "rights not in lands outside of said highway, but rather within the limits thereof"); *Thomsen v. State*, 284 Minn. 468, 471 (1969) (evaluating claim that right of access was taken due to a fence preventing access to and from new highway, where "[n]either the roadway itself nor the right-of-way actually encroached upon plaintiff's property" and thus "none of plaintiff's property was actually physically appropriated"); *Beer v. Minnesota Power & Light Co.*, 400 N.W.2d 732, 734 (Minn. 1987) (stating there was "no actual . . . physical occupation of the land"); *Grossman Investments v. State by Humphrey*, 571 N.W.2d 47, 50 (Minn. App. 1997) ("[N]o property is actually physically appropriated.").

Indeed, the access easement is not a tangible piece of property that can be occupied by the government, but is instead the right to use the land of others -- an "incorporeal hereditament." *Burnquist v. Miller Home Dev't, Inc.*, 243 Minn. 1, 9 (1954).[21] The right is not fixed upon any tangible portion of the burdened road. When existing access is curtailed -- even through physical means -- substitute (or the remaining) access might suffice to avoid a compensable taking. *See*, *e.g.*, *Dale Properties, LLC v. Minnesota*, 638 N.W. 2d 763, 767 (Minn. 2002) (holding that access in one direction was sufficient); *Grossman Investments*, 571 N.W.2d at 51 (finding remaining access was adequate); *State by Mondale v. Gannons Inc.*, 275 Minn. 14, 23-24 (1966) (explaining that restrictions on particular lanes or directions do not take the access easement); *Hendrickson v. State*, 267 Minn. 436, 445-46 (1964) (holding that relevant question is whether new location of point of access is reasonably suitable and convenient); *Johnson v. City of Plymouth*, 263 N.W.2d 603, 607 (Minn. 1978) (finding that curb cuts provided reasonable

---

never had previously been an opened street or highway along this side of plaintiff's property," even though the highway used a right-of-way previously dedicated for a public street).

[20] The taking of this easement could be associated with a physical taking, where the private property upon which the existing access to a thoroughfare is located is condemned by the government to widen a highway, for instance. *See Burnquist v. Miller Home Dev't, Inc.*, 243 Minn. 1, 9 (1954) (explaining that "if the entire dominant tenement is condemned, the right of access is taken too"); *cf. County of Anoka v. Blaine Bldg. Corp.*, 566 N.W.2d 331, 334-37 (Minn. 1997) (concerning the loss of access due to the construction of a median in an existing right-of-way coincidental to a partial taking).

[21] As plaintiff acknowledges, *see* Pl.'s Supp. at 16, this intangible property interest is compensable separately from the dominant estate to which it is appurtenant. *See Miller Home*, 243 Minn. at 9.

access).[22] Even if the construction of the access road under the authority of the County -- but without Corps approval -- could somehow create the access easement appurtenant to the abutting lots,[23] the elimination of this access easement is not a physical taking. Moreover, Mr. Bailey has not alleged that the loss of access was the result of a physical invasion of his real property, such as would occur were the Corps to build a fence within its perimeter. *Cf. Armijo v. United States*, 229 Ct. Cl. 34, 37 (1981) (explaining that a taking due to "the actual cutting off of access" can be found "without any . . . physical invasion," and citing several cases for the proposition).

Instead, Mr. Bailey inaptly analogizes the decision to order removal of a road, which otherwise would allow public access, to the government's determination, at issue in *Kaiser Aetna v. United States*, 444 U.S. 164 (1979), that the public should not be excluded from a privately-created marina. Pl.'s Supp. at 14. He characterizes as "physical invasion[s]" a speculative "clear plan" of the government "to remove the access road," and "a servitude the government has imposed on the property for the benefit of the public." *Id.*[24] Plaintiff explains that "the government's presence on the property is clear to this day as there is in existence an administrative determination the road is to be completely removed." *Id.* at 15. But merely calling something a physical invasion does not make it so, and the *possibility* of physical occupation is not the same thing as occupation itself. Simply put, an order that the *plaintiff* remove a road (which, incidentally, has yet to be removed) is not a requirement that the plaintiff suffer the physical presence of *others* on his land. He cannot wish away the ripeness requirement for his regulatory taking claim by slapping a "physical appropriation" label on the Corps's determination that he should remove a road it believed he should never have built, absent allegations of any physical invasion whatsoever.

In the supplemental brief, however, plaintiff also appears to argue the more conventional position that the restoration order resulted in a regulatory taking. He states that "the final determination of the use of the property was not determined until the restoration order was issued as the Corp[s] received public comments on what should be done as a result of the permit denial and considered keeping the access road." Pl.'s Supp. at 13. Thus, no matter the confusing and roundabout path taken by plaintiff, he ultimately articulates the alternative claim that the restoration order might have been the government action that took his property. This articulation, combined with the second new assertion from the supplemental brief, mentioned *supra* -- that the restoration order itself was a "final decision" of the Corps, *see id.* at 3 -- means

---

[22] *Cf. Laney v. United States*, 228 Ct. Cl. 519, 525 (1981) (explaining it is "well established" that "a deliberate cutoff of access by all feasible routes is a taking").

[23] This merits question is not an issue currently before the Court.

[24] Mister Bailey also hypothesizes that *if* the Corps ordered *the County* to remove the road, this would "amount to a physical appropriation of a road." Pl.'s Supp. at 15. But speculation that a physical invasion *may* happen does not establish that it *has* happened.

that the government's two motions concerning the restoration order are neither moot nor conceded, and to these the Court now turns.

*1. The Restoration Order as the Basis for a Ripe Takings Claim*

The Supreme Court has clearly and often held that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson County*, 473 U.S. at 186; *see also*, *e.g.*, *Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001); *Suitum*, 520 U.S. at 737-38; *MacDonald, Sommer & Frates v. County of Yolo*, 477 U.S. 340, 349 (1986); *Morris*, 392 F.3d at 1376 (quoting *Williamson County*, 473 U.S. at 186). Absent such a final decision, the extent to which the regulated property may be used is not known, and the impact of the regulations is difficult to measure. For an agency decision to ripen a property owner's takings claim, it must possess two basic characteristics -- that it be a *final* decision, and that it demonstrate the extent to which use of the subject property will be allowed under the applicable regulations.[25]

As was explained above, plaintiff appears to be making at least two arguments in the alternative concerning the restoration order -- it either reflects the restriction on the use of property which the Corps already determined in denying the after-the-fact permit application, or it goes further than that determination and itself constitutes a final decision regarding the extent of allowed use of the property at issue. To be considered a separate basis for a taking, the restoration order cannot rest upon the final decision status of the Section 404 permit denial, but must on its own terms ripen a takings claim.[26] Mister Bailey's position is that the restoration order is a final decision for this purpose. *See* Pl.'s Supp. at 13.

The government's motion to dismiss Mr. Bailey's claims to the extent they are based on the restoration order does not involve the substance of that order. Whether that order should be interpreted as more restrictive than the after-the-fact permit denial is not the issue. Nor does the government directly argue that the order is not a final decision. Rather, the government argues that the restoration order is not the *type* of decision which may be considered ripe for takings claim purposes. *See* Def.'s Mem. at 14-16. It rests this argument on the Minnesota district

---

[25] This second characteristic may be either explicit or implicit in the decision, or established by showing the futility of further attempts by the property owner to obtain permission to use the property. *See Palazzolo*, 533 U.S. at 619-22; *Morris*, 392 F.3d at 1376; *Cooley v. United States*, 324 F.3d 1297, 1302 (Fed. Cir. 2003).

[26] Moreover, unless the after-the-fact permit denial concerned property interests different from those affected by the restoration order, the former logically could not have been a final decision as to the *extent* of allowed use of property if the latter restricted this use even further.

court's decision, in Mr. Bailey's other federal proceeding, that the validity of the restoration order could not be challenged under the APA.[27] *Id.* at 15.

The district court dismissed Mr. Bailey's attempt to challenge the restoration order under the APA, finding that the statutory scheme adopted by Congress under the Clean Water Act implicitly precluded judicial review of such orders. *Bailey v. United States Army Corps of Eng'rs*, 2002 U.S. Dist. LEXIS 23272 *21-26 (D. Minn. 2002). The court reasoned that the Act's provisions allow the order to be challenged by its target when the Corps brings a civil action to enforce it, and to allow the target to bring his own action to challenge the order "would effectively negate the discretion Congress had reposed with the agency to decide whether or not to bring an enforcement action." *Id.* at *25. The district court relied on the precedents of two federal appellate courts in its ruling. *See id*. at *23-24 (citing *Hoffman Group, Inc. v. EPA*, 902 F.2d 567 (7th Cir. 1990) and *Southern Pines Assocs. v. United States*, 912 F.2d 713 (4th Cir. 1990)); *see also* Def.'s Mem. at 15 (citing same).

But whether a challenge to the validity of the restoration order may be brought under the APA has nothing to do with whether the order may be the basis of a takings claim. What matters in the latter exercise is whether the order constitutes a final decision as to the extent of allowed use of property -- in this case, that the property may not be used for an access road. *See Suitum*, 520 U.S. at 743-44 (holding APA ripeness concerns are "not on point" in a takings case, and that a takings claim is ripe when "[t]he only discretionary step left to an agency . . . is enforcement, *not determining applicability*") (emphasis added). Any affirmative obligations imposed upon plaintiff by a civil enforcement action are entirely beside the point. Had the district court determined that the restoration order could not be challenged because it was not a final agency decision due to the enforcement scheme, that would be another matter. But the district court expressly avoided ruling upon the Corps's argument that the order was "not a final agency action," *Bailey*, 2002 U.S. Dist. LEXIS 23272 at *26 n.10, and the government fails to raise that issue directly in this proceeding.

The government also argues that "this Court would not be able to assess the compensation due to the Plaintiff for his liability to restore, when no restoration has taken place, the Plaintiff has not, in fact, lost access, and has not incurred any losses as a result of the Restoration Order." Def.'s Mem. at 16. This argument would have some relevance were Mr. Bailey seeking compensation for the actual costs of removing the road and restoring the wetlands -- if, perhaps, he had paid a bill sent by the Corps for these costs and challenged the assessment as an illegal exaction. *See Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (explaining Tucker Act jurisdiction over illegal exaction claims). But, as the Court understands plaintiff's case, it is not the potential costs imposed by the restoration order, but the

---

[27] 5 U.S.C. §§ 701 *et seq.*

order's decision *that no access road shall be on the property*, that is the basis for the takings claim.[28]

Neither the inability to challenge the restoration order under the APA nor the difficulty in predicting removal and restoration costs are grounds for finding Mr. Bailey's takings claim -- to the extent it is based on the restoration order -- unripe. The government's motion to dismiss is accordingly DENIED.

*2. The Question of the Restoration Order's Validity*

The government also moves for summary judgment "on the basis that Mr. Bailey may not, as a matter of law, predicate an action on the Restoration Order because he also disputes the legality of that Order." Def.'s Mot. at 2. According to defendant, "[w]ell settled law bars a plaintiff from asserting a takings claim that is based on an action the legality of which he continues to challenge," and thus Mr. Bailey "must concede the validity of the predicate government action." Def.'s Mem. at 2. The government contends that by alleging in the complaint that "the Defendant inexplicably ordered full restoration of the access road placing responsibility on plaintiff alone to restore the road," Compl. ¶ VII, Mr. Bailey was "challenging the effectiveness and legality of the Order as it applies to him." Def.'s Mem. at 12; *see also id.* at 17. Due to the presence of these nineteen words among plaintiff's allegations, the government concludes that it "appears" that Mr. Bailey "base[s] his taking claim on the alleged illegitimacy of the government's action" in ordering the removal of the road and restoration of the wetlands. *Id.* at 18.

To be sure, Mr. Bailey persists in believing that the restoration order was invalid, despite (or perhaps because of) his inability to get the district court to hear his challenge to that order. *See* Pl.'s Prop. Facts ¶ 32 (denying plaintiff is responsible for road restoration); Bailey Aff. ¶ 20 ("I am disputing the validity of that Restoration Order due to the County's actions."). But must he yield, to avoid judgment on the ground raised by the government? The Court concludes not, as it seems that the government misunderstands not only the claims contained in Mr. Bailey's complaint but also this area of the law.

A claim in our court for just compensation due to a taking is not defeated merely because a property owner believes that the government action that allegedly took his property was for other reasons invalid -- or even because he goes so far as to challenge its validity. As the Federal Circuit has explained, "a court's conclusion that government agents acted unlawfully does not defeat a Tucker Act takings claim if the elements of a taking are otherwise satisfied." *Del-Rio*

---

[28] Moreover, the Court notes that in the case cited by the government to support this argument, the restoration costs portion of a physical takings claim was not dismissed as unripe or otherwise outside our jurisdiction, but was instead stayed. *See Bassett, New Mexico LLC v. United States*, 55 Fed. Cl. 63, 68-69 (2002). This hardly supports the contention that a claim based on the restoration order is *not ripe*.

*Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1363 (Fed. Cir. 1998). A property owner is free to attempt to invalidate a government decision and also to seek compensation if he alleges that decision resulted in a taking. *See*, *e.g.*, *Creppel v. United States*, 41 F.3d 627, 633 (Fed. Cir. 1994) (holding that both suits may be brought contemporaneously); *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1555-56 (Fed. Cir. 1994) (en banc). If the government action otherwise would have been a permanent taking, its invalidation would still entitle the property owner to compensation for the temporary taking of his property. *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 319-22 (1987). Thus, not only may validity *not* be conceded, but invalidity may well reduce the damages owed by the government. *Cf. Cooley v. United States*, 324 F.3d 1297, 1305-06 (Fed. Cir. 2003) (recognizing that an agency decision to reverse course and issue a valid permit would convert a permanent takings claim to a temporary one).

Although the government's motion and initial argument on this point expressly states that the reason summary judgment should be granted was merely because Mr. Bailey "disputes" or "challenges" the "validity" or "legality" of the restoration order, *see* Def.'s Mot. at 2; Def.'s Mem. at 2, 17, it also includes the less extreme position that a plaintiff "cannot, as a matter of law, *base* his takings claim *on the alleged illegitimacy* of the government's action," Def.'s Mem. at 18 (emphasis added). The government's reply paper sticks to this second argument, *see* Def.'s Reply at 4, summing up its motion on this point as seeking judgment "to the extent Plaintiff's claim is predicated on the . . . alleged wrongfulness of the government in issuing the Order against him." *See id*. But even this statement of the law is not quite right.

The government relies on two Federal Circuit precedents. One opinion, *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796 (Fed. Cir. 1993), contains dicta stating a "claimant must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act." *Id.* at 802. In *Tabb Lakes*, the Corps had issued a cease and desist order which purported to require the property owner to obtain a Section 404 permit before using property. *Id.* at 798. The property owner challenged the assertion of Corps jurisdiction in the district court -- which determined that the Corps could not base its jurisdiction on an internal ruling that was not issued in compliance with the APA's notice and comment provisions, and thus never obtained jurisdiction over the subject land. *Id.* at 798-99. The Fourth Circuit affirmed, and the property owner then sought compensation for the temporary period during which it was improperly subjected to the permit requirement. *Id.* The Federal Circuit's discussion of *validity* concerned the question of whether the Corps had the *authority* to perform the action which allegedly resulted in the taking. *See id*. at 802-03 (citing and discussing precedents concerning whether action was authorized); *see also Del-Rio*, 146 F.3d at 1363.

The Federal Circuit then determined that even though the Corps was mistaken as to its jurisdiction, its attempt to regulate what it believed were wetlands under its "prima facie" authority "cannot be considered ultra vires." *Tabb Lakes*, 10 F.3d at 803. It was, after all, the Army Corps asserting authority over purported wetlands and not, say, the Secretary of Education. Thus, the action was "authorized" for Takings Clause purposes. The Federal Circuit

subsequently explained that for purposes of determining if a government action was "invalid" (as in "unauthorized"), an "ultra vires" action was one that was "either explicitly prohibited or was outside the normal scope of the government officials' duties." *Del-Rio*, 146 F.3d at 1363. After finding the requisite authority, the Federal Circuit somewhat summarily concluded that the mistaken assertion of jurisdiction "may give rise to a due process claim, not a taking claim." *Tabb Lakes*, 10 F.3d at 803. Thus, the ultimate conclusion of the court was that the mere making of a *mistake* in asserting jurisdiction is not, per se, grounds for a takings claim.[29] But even though a "mistake" may not result in a taking merely because it is a mistake, this does not mean that the impact of the mistake must be ignored for takings purposes, or that the matter about which the government was mistaken has no relevance to the takings equation.

The government also relies on *Rith Energy, Inc. v. United States*, 247 F.3d 1355 (Fed. Cir. 2001), which it quotes parenthetically: "Rith is thus required to litigate its takings claim on the assumption that the administrative action was both authorized and lawful." *See* Def.'s Mem. at 18 (quoting *Rith Energy*, 247 F.3d at 1366). But the reason that the property owner was "thus required" to assume lawfulness was that it could have litigated the issue of lawfulness "in the congressionally mandated administrative review proceeding." *Id*. Because there was another judicial forum in which the invalidity of the action could be established -- a forum in which the issue was, in fact, pursued, but then dismissed voluntarily with prejudice, *see id.* at 1360 -- the claimant could not use a takings claim as the vehicle to establish this. *Id.* at 1365-66. As the Federal Circuit explained, in the sentence preceding the one quoted by the defendant, "having foregone its challenge to [the government's] administrative actions, Rith is not free to renew its challenge to those actions under the cover of a takings claim in the Court of Federal Claims." *Id.* at 1366. This is a far cry from the statement that the actions must always be assumed lawful. To the contrary, the Federal Circuit maintained that, in a takings case, "to the extent that the plaintiff claims it is entitled to prevail *because* the agency acted in violation of statute or regulation," that predicate determination must occur in the forum provided by Congress -- when there is one. *Id.*

While, as was discussed above, Mr. Bailey's allegations are somewhat vague regarding the restoration order, there is no suggestion in his pleadings and papers that the Corps acted without the requisite jurisdiction or authority.[30] Rather, the dispute over the restoration order appears to be a question of whose dirt filled the wetlands. *See*, *e.g.*, Pl.'s Opp. Mem. at 6

---

[29] The oft-repeated test that a regulation of private property "effects a taking if [it] does not substantially advance legitimate state interests," *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980), might have suggested otherwise. But this test has since been abandoned by the Supreme Court. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 548 (2005).

[30] Thus, there is no claim of a lack of "validity" as that term was used in *Tabb Lakes*. *See Tabb Lakes*, 10 F.3d at 802-03; *Del-Rio*, 146 F.3d at 1363, 1365. To avoid confusion, the Court will use terms such as "unlawful" or "illegal" in the remainder of this discussion -- as distinguished from "invalid," which was given this specific meaning of "unauthorized" or "without jurisdiction" in the precedents upon which the defendant relies.

(contending the Corps knew that the "County actually placed fill in the wetlands"); *id.* at 22 (stating "it is undisputed other parties contributed to the fill"); Bailey Aff. ¶ 20 (declaring that the "County placed fill in the wetland area"). And while confusion over his claims is certainly understandable, it does not appear that Mr. Bailey is basing a takings claim on the allegedly improper determination that *he* is the one who must remove the road and restore the wetlands.

The Court cannot rule out the possibility, however, that an issue relating to the legality of the restoration order may become relevant to Mr. Bailey's takings claim. Were the government to pursue enforcement, the district court or the Eighth Circuit may find the action unlawful for a (presently unappreciated) reason that bears on the takings claim. Moreover, the Federal Circuit has held that the lawfulness of government determinations as to the scope of a plaintiff's property interests -- when these were not the products of a Congressionally-mandated agency adjudication -- may be litigated in our court in the context of a takings claim. *See Del-Rio*, 146 F.3d at 1364-67. In that opinion, the Circuit specifically discussed the situation, also presented here, where the property owner's attempt at APA review of the determination is dismissed by the district court without a ruling on the merits. *Id.* at 1367 (discussing *United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed. Cir. 1990)). Accordingly, if Mr. Bailey does not get the opportunity to resolve them in the district court, questions of the restoration order's legality could possibly be raised in this forum de novo.[31]

The lawfulness of the restoration order need not be assumed for Mister Bailey to base a takings claim on its impact. If an APA challenge to the order ripens and is successfully pursued, any relevant determinations will be taken into account in these proceedings. If one never ripens, but the government itself relies on the legality of the restoration order in defense of Mr. Bailey's takings claim, then the plaintiff is entitled to the opportunity to challenge its lawfulness. The government's motion for summary judgment on this ground is DENIED.

**C. What Property of the Plaintiff Was Allegedly Taken?**

The government also moves for summary judgment on the ground that "Mr. Bailey cannot establish that he was the undisputed owner of the property he claims was taken from him on the date of the permit denial." Def.'s Mot. at 2. Although this aspect of the motion focuses on the denial of the after-the-fact permit, the same argument would apply if the restoration order were the cause of a taking, and the Court will consider that alternative as well. Before analyzing

---

[31] If an order were unlawful because of an incorrect factual determination regarding jurisdiction, for instance, but was not ultra vires, this illegality could bear on the government's nuisance defense to a categorical *Lucas*-type taking, *see Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1029-30 (1992), or the "character of the governmental action" factor under *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). *See Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360, 1370 (Fed. Cir. 2004); *Creppel*, 41 F.3d at 631.

the legal issues, the Court again notes that Mr. Bailey's complaint is hardly more clear as to the property allegedly taken than it was as to the government's vehicle for the taking.

Without question, Mr. Bailey alleges the taking of property located within the Sunny Beach subdivision. But whether he seeks compensation for the entire subdivision, or just portions of it, is harder to discern. The subject property is initially called "plaintiff's residentially zoned property." Compl. ¶ I. After providing what appears to be one legal description of the Sunny Beach subdivision, the complaint notes there are fourteen residential lots, and alleges that the County took ownership of the access road. *Id.* ¶ IV. Some subsequent references are to "the property," without elaboration. *See id.* ¶¶ VI-VII. Mister Bailey then identifies himself as "record title owner" of eight lots, acknowledging that four "are also subject to executory contracts held by individual lot owners," *id.* ¶ VIII, and explaining that four of thirteen lots that he sold were since "purchase[d] back" by him." *Id.* ¶ IX. The complaint identifies owners of eight (of the other nine) lots sold by him, maintains they "are necessary and indispensable to this case," and alleges that lots 1 through 13 "are accessible only through the denied access road." *Id.* The complaint alleged that Mr. Bailey retained a property interest in several lots which were sold by a contract for deed transaction. *Id.* Mister Bailey also "assume[d] the [access] road has been abandoned by Lake of the Woods County." *Id.* ¶ X.

The complaint, then, is somewhat ambiguous as to the taken property for which Mr. Bailey seeks compensation -- is it the whole 13.2 acre subdivision, the thirteen lots identified, or just the lots owned by him? He later clarified that he was alleging the entire Sunny Beach subdivision was taken, but that in the alternative the property taken was the access road and lots 1 through 13. *See* Def.'s App. 341 (Pl's Am. Answer to Interrog. No. 2); *see also* Pl.'s Prop. Facts ¶¶ 1-2. Although the complaint omitted a specific mention of lot 14 and its owner, Mr. Bailey admitted that this lot is among the property allegedly taken by the government. *See* Def.'s App. 350-51 (Pl.'s Am. Resp. to Req. for Adm. No. 16). This admission, though, ambiguously covered both *more* and *less* than the Sunny Beach subdivision, stating Mr. Bailey seeks compensation for property which "includes interest *in all or some* of [lots 1-14] *together with other lands* which are fact issues to be determined by the Court." *Id.* 350 (emphasis added).[32]

From the foregoing, it appears that Mr. Bailey seeks compensation for the entire Sunny Beach subdivision. The Court will thus review the undisputed facts to identify plaintiff's ownership interests in each separate portion of the subdivision, with particular reference to the

---

[32] Mister Bailey confuses matters further by purporting to move, in his opposition memorandum, "to amend the complaint to include all 26 acres of wooded wetland, as described by the Corp[s], be determined as taken by the government." Pl.'s Opp. Mem. at 8; *see also id.* at 7, 19 (discussing a taking of 26 acres); Pl.'s Supp. at 1, 3-4 (same). The plaintiff fails to make clear exactly which 26 acres he is referencing. In any event, the plaintiff has not yet properly moved to amend the complaint, and has provided no justification for leave to do so. The Court will accordingly not consider the claim to extend beyond the Sunny Beach subdivision, but will follow the complaint's allegations.

two alternative dates of the alleged taking,[33] before considering the government's legal argument as to this ground for summary judgment.

*1. Plaintiff's Ownership Interests as of the Key Dates*

On August 17, 1998, when the after-the-fact permit application was filed with the Corps, Mr. Bailey was the undisputed owner of Government Lot 3, from which the vast majority of the subdivision was to be carved.[34] After the plat was approved in December 1998, he began selling interests in the subdivision. As of June 12, 2001, the day the after-the-fact permit for the access road was denied, Mr. Bailey was the outright owner in fee simple of just lot 1 of the subdivision.[35] Lots 4, 5, 6, 7, 8, and 11 were owned outright by the individuals who purchased them from Mr. Bailey. *See* Pl.'s Prop. Facts ¶ 10; Def.'s App. 166-67, 172-73, 193-95 (warranty deeds).[36] Lot 13 was owned by the couple who purchased it from Mr. Bailey, *see* Def.'s App. 181-82, but was subject to a mortgage securing the purchase price owed to the plaintiff, as mortgagee. *See* Def.'s Prop. Facts ¶ 10; Bailey Aff. ¶ 16. The other six lots -- lots 2, 3, 9, 10, 12, and 14 -- had been sold in contract for deed transactions in which the buyers had not yet paid the full amounts owed to Mr. Bailey. *See* Pl.'s Prop. Facts ¶ 10; Def.'s App. 153-65, 174-80, 183-88 (contracts for deed). Although the purchasers were the equitable owners of these lots, titles to these properties were still in the name of Mr. Bailey. Under Minnesota law, Mr. Bailey "retain[ed] the legal title as security for the purchase price," and also retained a "vendor's lien" on the real property. *Shields v. Goldetsky* (*In re Butler*), 552 N.W.2d 226, 229 (Minn. 1996).

After the denial of the Section 404 permit, but before the restoration order was issued, Mr. Bailey resumed full ownership of lots 4, 5, 6, and 10. *See* Pl.'s Prop. Facts ¶ 10; Def.'s App. 196-98 (deeds). Mister Bailey apparently settled a state court lawsuit brought by the purchasers

---

[33] Although the plaintiff has suggested eight alternative dates (other than the June 12, 2001 denial of the Section 404 permit) upon which the taking may have occurred, only the date of the restoration order appears arguably to involve a final decision by a federal agency with respect to the extent of use of the subject property. *See* Def.'s App. 340-41 (Pl's Am. Answer to Interrog. No. 1) (listing dates corresponding to a "verbal request to cease," to determinations of agency jurisdiction, to the wetland delineation, and to the State's revocation of the Section 401 certification).

[34] *But see* note 4, *supra*.

[35] All of plaintiff's ownership interests in the Sunny Beach properties were held jointly with Kathryn Bailey until August 5, 2002, when her interests were terminated. *See* note 2, *supra*; *see also* Pl.'s Prop. Facts ¶ 10; Def.'s App. 199-202.

[36] Lots 4, 5, 6, and 11 were sold in contract for deed transactions in which the buyers had by that date apparently fully performed their obligations. *See* Pl.'s Prop. Facts ¶ 10; Def.'s App. 168-71, 189-92 (contracts for deed).

of lots 4, 5, and 6 by returning the purchase price and voiding the sale, *see* Bailey Aff. ¶¶ 21-22, and cancelled the contract regarding lot 10 at the request of the buyer. *See* Def.'s App. 349 (Pl.'s Am. Resp. to Req. for Adm. No. 11). Thus, on October 22, 2001 -- when the restoration order was issued -- plaintiff owned outright lots 1, 4, 5, 6, and 10; was the mortgagee of lot 13; and held a vendor's lien, and legal title as security, for lots 2, 3, 9, 12, and 14.

Concerning the strip of land serving as the access road, the facts are disputed. According to an official with the County's highway department, the road was "public" and the County "ha[d] taken the road over" by November 5, 1999. *See* Pl.'s App. 49-50; *see also* Def.'s App. 217. In a state court pleading filed in October 2004, however, the County denied the access road was a "public road" and denied that the road was County property. Pl.'s App. 217 (Answer ¶ X). The plaintiff alleges that the County became owner of the access road once the plat was approved, *see* Compl. ¶ 4, but also contends that he owned a reversionary interest in the access road. *See* Def.'s App. 346-47 (Pl.'s Am. Resp. to Req. for Adm. Nos. 1-2).[37] With no legal documentation reflecting any change in ownership interest in this portion of Government Lot 3, the defendant seeks to establish that the County owned the access road by relying not on any factual concessions concerning a land transaction, but instead on the opinions of Mr. Bailey. *See* Def.'s Prop. Facts ¶ 31. But the government has conceded that "whether Lake of the Woods County became the owner of the road" is a "legal determination[]." Answer ¶ IV. The Court cannot at this time determine who owned the access road as of June 12, 2001, October 22, 2001, or even today.

*2. Regulatory Takings Claims Concerning Real Property Interests Obtained After the Alleged Date of the Taking*

From the foregoing, it can be seen that on the day the restoration order was issued, Mr. Bailey was the fee simple owner of five lots, and retained a lesser interest in six other lots. Whether the lesser, security interest in the latter lots is compensable under the Takings Clause will be addressed in the next section. But if the taking were the result of the earlier denial of the after-the-fact permit, as the plaintiff appears to primarily contend, a different aspect of the government's motion for summary judgment is implicated. For at that time, Mr. Bailey was the fee simple owner of just one lot of the fourteen, and held a lesser interest in seven others. The government argues that if the Section 404 permit denial caused the alleged taking, then the plaintiff may base his claim only on the property interests he held in lots on the date of the denial, and not the interests he acquired (or increased, in the case of lot 10) subsequent to that date. Def.'s Mem. at 18; Def.'s Reply at 6-7.

---

[37] On this point, the plaintiff is characteristically unclear. He also contends that all adjacent lot owners have a reversionary interest in the access road. *See* Pl.'s Prop. Facts ¶ 10; Def.'s App. 342 (Pl's Am. Answer to Interrog. Nos. 6-7). According to the plat drawings submitted to the Court, it does not appear that the lots ever encompassed the adjacent access road. *See*, *e.g.*, Def.'s App. 141, 219, 311, 318.

To support this proposition, the government relies on one Supreme Court opinion, *United States v. Dow*, 357 U.S. 17 (1958), and two Federal Circuit decisions. *See* Def.'s Mem. at 18. The most recent of the latter contains language which, as quoted, sounds pretty conclusive on the subject: "It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001). But when the actual holdings of these opinions are examined and the doctrine they rely on is traced to its sources, the issue is not as simple as the government would make it seem. And when the issue is considered in light of some more recent doctrinal developments in takings law, one cannot but conclude that the rule has no application in regulatory takings cases involving restrictions on the use of real property.

The rule restricting compensation to those owning property on the date of a taking resulted from the convergence of two separate lines of cases -- those concerning the date of permanent, physical takings of land by the government, and those interpreting the Anti-Assignment Act.[38] *See Dow*, 357 U.S. at 20-21. Each will be examined, in turn.

**a. Permanent physical takings of real property.**

In *Dow*, the Supreme Court reaffirmed the rule that when the government physically possesses and uses private property before obtaining title to the property through condemnation proceedings, this possession constitutes a taking of the property. *See Dow*, 357 U.S. at 21-22. The case concerned an easement through property for the purpose of laying a pipe line, and the Court was presented with a procedural anomaly. When the condemnation petition was filed, the government obtained an order allowing immediate possession of the land, and proceeded to enter the property and install the pipe line. Over three years later, in the still-pending condemnation suit, the government filed a declaration of taking and deposited estimated compensation with the court. *See id.* at 18-19. The property in question had changed hands in the meantime, and its acquirer (Mr. Dow) argued that he should be the one receiving the payment of just compensation. *Id.* He based his argument on the language of the Declaration of Taking Act, which provided

---

[38] The name "Anti-Assignment Act" appears to have been unofficially bestowed upon two statutory provisions -- one concerning claims against the United States generally and the other concerning government contracts -- now found at 31 U.S.C. § 3727 and 41 U.S.C. § 15, respectively. *See Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344, 1349 (Fed. Cir. 2002). Both these provisions (earlier versions of which were found at Revised Statutes sections 3477 and 3737) were amended by the Assignment of Claims Act of 1940, *see* Pub. L. No. 811, ch. 779, 54 Stat. 1029-30, and are sometimes referenced by that name, as well. The relevant provision for this matter -- 31 U.S.C. § 3727 -- traces back to two antebellum statutes, and for our purposes has not materially changed since 1853. The primary semantic difference is that assignments were previously termed "absolutely null and void" unless the conditions precedent were met, and now "may be made only" when the conditions precedent are satisfied, which makes them "valid for any purpose." *Compare* Act of Feb. 26, 1853, ch. 81, § 1, 10 Stat. 170 *with* 31 U.S.C. § 3727(a)-(b).

that upon the filing of the declaration and the deposit of estimated compensation, title to the property taken "shall vest in the United States," and "the right to just compensation . . . shall vest in the persons entitled thereto." *Id.* at 22-23.[39] Mister Dow contended that, since he was the owner of the property when this vesting occurred, he should get the money.

The Supreme Court disagreed, expressly holding "that the 'taking' did not occur in 1946 when the Government filed its declaration of taking, but rather when the United States entered into *possession* of the land in 1943." *Dow*, 357 U.S. at 21 (emphasis added). As a consequence, it concluded "that the landowners in 1943 were entitled to receive the compensation award," not Mr. Dow. *Id.* This conclusion rested on the premise, which was "undisputed" in the case, "that '[since] compensation is due at the time of the taking, the owner at that time, not the owner at an earlier or later date, receives the payment.'" *Id.* at 20-21 (quoting *Danforth v. United States*, 308 U.S. 271, 284 (1939)). Perhaps because the premise was "undisputed," the reasoning behind and purposes served by this rule were not addressed in *Dow*, and must be discovered by investigating its provenance. This premise, however, was merely dicta in the authority cited by the Court -- a case which had nothing to do with *who* should receive just compensation, but rather *when* and *whether* the taking occurs. *See Danforth*, 308 U.S. at 284. In *Danforth*, the Supreme Court concluded that the taking of property does not occur until condemnation proceedings have completed and the government pays the money awarded, "[u]nless a taking has occurred in actuality or by a statutory provision, which fixes the time of taking by an event such as the filing of an action." *Id.* The case did not involve a special statutory provision, and the Court found that there was no taking "in actuality" -- the flooding caused by the government's construction of a levee was deemed insufficiently burdensome as to amount to a taking. *See id.* at 286-87. Thus, the taking was accomplished not by physical invasion, but by the completion of the condemnation proceedings.

The *Danforth* dicta rested on two cases applying:

> the general rule, that where a railroad company *enters upon the land* of another *and constructs* a railroad thereover under a statute entitling it so to do on condition that compensation be made to the owner, and the latter permits the road to be constructed and put into operation without a compliance with that condition, a subsequent vendee of the owner takes the land subject to the burden of the right of way, and the right to exact payment therefor from the railroad company belongs to the owner at the time the company *entered and constructed the road*.

*Kindred v. Union Pac. R.R. Co.*, 225 U.S. 582, 596-97 (1912) (emphasis added) (*citing Roberts v. Northern Pac. R.R. Co.*, 158 U.S. 1 (1895)); *see Danforth*, 308 U.S. at 284 n.12 (*citing Kindred*, 225 U.S. at 597, and *Roberts*, 158 U.S. at 10). Both of these precedents described the rule as one applying to railroad companies. *Kindred*, 225 U.S. at 596-97; *Roberts*, 158 U.S. at

[39] The Court quoted from the Declaration of Taking Act, which was then found at 40 U.S.C. § 258a and is now found, in slightly modified form, at 40 U.S.C. § 3114.

10-11. Their subsequent citation in *Danforth* could give the impression that the Supreme Court was taking a rule specifically designed for situations when *railroads* wield the eminent domain power and applying it generally -- laundering the rule through a footnote appended to dicta without so much as a smidgen of inductive reasoning. *See Danforth*, 308 U.S. at 284 n.12. But a close examination of the *Roberts* opinion reveals that the rule rests on a broader foundation than the condemnation power of railroads. Indeed, the first authority cited in *Roberts* to explain this rule concerned not a railroad, but the construction of a canal. *See Roberts*, 158 U.S. at 10 (citing and quoting from *Schuylkill & Susquehanna Navigation v. Decker*, 2 Watts 343 (Pa. 1834)). The passage quoted from that authority bases the rule on the similarity between compensation for a physical taking and trespass damages, which are personal and do not run with the land. *Id.*

Decisions from other courts demonstrate that this rule -- that the owner of property at the time it is physically invaded and used is the one to whom just compensation is owed -- did not turn on the exercise of the eminent domain power for railroad purposes. *See*, *e.g.*, *City of Tulsa v. Southwestern Bell Telephone Co.*, 75 F.2d 343, 349 (10th Cir. 1935) (telephone right of way); *Stone v. City of Waukegan*, 205 F. 495, 498 (7th Cir. 1913) (sewer system); *Maffet v. Quine*, 93 F. 347, 349 (C.C.D. Ore. 1899) (flume for a lumber mill); *Smith v. Collins*, 199 Ky. 770, 772, 251 S.W. 979 (Ky. Ct. App. 1923) (flooding due to construction of dam); *Turnpike Road v. Brosi*, 22 Pa. 29, 32 (Pa. 1853) (road construction); *Edwards v. Roberts*, 26 Colo. App. 538, 549, 144 P. 856 (Colo. Ct. App. 1914) (explaining that the rule from *Roberts* applies to all "having the right of eminent domain and who entered upon the land of a remote grantor"); *see also* HENRY E. MILLS, A TREATISE UPON THE LAW OF EMINENT DOMAIN § 66 (1879); *cf. Miller v. Board of Miss. Levee Comm'rs*, 78 Miss. 201, 204, 28 So. 834 (Miss. 1900) (land sold for levee construction).[40] The mutual predecessor of our court and the Federal Circuit applied the rule to lands flooded by a lock, a quarter-century prior to the *Danforth* opinion. *See Ferrell v. United States*, 49 Ct. Cl. 222, 223-24 (1914). Thus, it appears that the rule did not depend on the identity of the entity using the condemnation power, but instead on the way this power was used.

The manner in which the eminent domain power was exercised is critical to understanding the rule concerning who has the right to receive compensation. Once property owners voluntarily sell an interest in property to another party, the interest is, obviously, no longer theirs to sell. Similarly, once the involuntary "transaction" accomplished by the eminent domain process is completed, with the condemning authority paying for title to the interest condemned, that interest is no longer the property owner's to sell. But until that point, the government is not committed to a taking, and can use the process merely to calculate the value of the land that the government *may* -- at its option, if the price is right -- take. *See Danforth*, 308 U.S. at 284. As was mentioned above, the Supreme Court explained two exceptions to this rule in *Danforth.* One is when a special statutory process might irrevocably transfer the property interest at an earlier stage in the proceedings than when the payment for title is made. *Id.* (giving

---

[40] A lower court opinion cited for the rule in *Dow*, *see* 357 U.S. at 22, concerned property flooded by dams and reservoirs. *See 23 Tracts of Land v. United States*, 177 F.2d 967, 970 (6th Cir. 1949).

as an example "fix[ing] the time of taking by an event such as the filing of an action"); *see*, *e.g.*, *id.* at 285 (discussing *Brown v. United States*, 263 U.S. 78 (1923), in which "the date of the summons," under state law, was the date of the taking for valuation purposes); *Rand v. Town of Townshend*, 26 Vt. 670, 671-72 (Vt. 1854) (applying a Vermont statute that provides that a taking occurs "at the time the road is laid out" on paper, although damages are not paid "till the road is laid open for work"); *Allyn v. Providence, Warren & Bristol R.R. Co.,* 4 R.I. 457, 458-61 (R.I. 1857) (applying a statute under which a taking occurs when the course of the railroad is located).

The second exception that was discussed but not found in the circumstances presented was a taking "in actuality," *see Danforth*, 308 U.S. at 284, which the Supreme Court further described as "such construction as would put upon this land a burden, actually experienced," of a physical nature, such as greater flooding. *Id.* at 286. The discussion in *Danforth* aimed at determining when a taking may have occurred, for purposes of valuation and the accumulation of interest, and the statement that "the owner at that time, not the owner at an earlier or later date, receives the payment," *id.* at 284, was nothing more than dicta (as was noted earlier). But the elaboration on what a taking "in actuality" entails hit on two elements that were central to the "owner at the time" rule -- a *physical* invasion of a *permanent* nature, such as through the construction of some structure. A review of the case law demonstrates that the reason those circumstances were treated the same as the consummation of condemnation proceedings was that the owner was physically and permanently dispossessed of the taken interest, which would thus no longer be his to sell.

This can be seen in the some of the authorities upon which *Roberts* relied. The first Pennsylvania Supreme Court opinion cited explained that compensation for the construction of a canal would be "the price of a *perpetual* easement," which made it "impossible to imagine a title to it in a subsequent grantee of the land subject to the easement." *Roberts*, 158 U.S. at 10 (quoting *Schuylkill & Susq. Nav.*, 2 Watts at 344).[41] The second opinion cited from that court -- *McFadden v. Johnson*, 72 Pa. 335 (Pa. 1873) -- held that the right to compensation for a railroad company's entering, cutting, and filling land for a railroad track was "personal, belonging to the owner of the land when the entry and injury took place, and could pass only by her assignment." *McFadden*, 72 Pa. at 337; *see Roberts*, 158 U.S. at 10-11. The *McFadden* opinion relied in turn on, *inter alia*, the aforementioned canal case, as well as *Reese v. Addams*, 16 Serg. & Rawle 40 (Pa. 1827). *See McFadden*, 72 Pa. at 337. In *Reese* -- which concerned land flooded due to dam construction -- the Pennsylvania Supreme Court explained why the compensation at issue was personal to the owner at the time the property was taken, and did not run with the land. The court focused on the difference between "the case of a mere trespass or *temporary injury* to the

---

[41] Although it appears that the canal company involved in the case abandoned condemnation efforts and never took the property in question, *see Schuylkill & Susq. Nav.*, 2 Watts at 345, the Pennsylvania Supreme Court assumed for purposes of that issue that the canal was constructed, and the Supreme Court understood the case to involve "damages caused to land by the construction of a canal." *Roberts*, 158 U.S. at 10.

freehold," and "an *occupation* of the land, or an injury or privilege permanent as the land itself." *Reese*, 16 Serg. & Rawle at 42 (emphasis in original). In the latter circumstances, entities with the power of eminent domain "become *pro tanto*, purchasers" of an interest which "may be co-extensive with, and permanent as the land itself." *Id.* Thus, by obtaining the privilege of permanently flooding the land, this property interest was permanently removed from the owner by the navigation company, which "substituted the money for the land." *Id.* at 43.[42]

The *Roberts* opinion also cites a treatise on railroads to support the rule "that the damages belong to the owner at the time of the taking, and do not pass to a grantee of the land under a deed made subsequent to that time, unless expressly conveyed therein." *Roberts*, 158 U.S. at 11 (citing 2 H.G. WOOD, A TREATISE ON THE LAW OF RAILROADS 994 (2d ed. 1894) ("WOOD")). A review of the authorities cited in the referenced treatise passage supports the conclusion that the reason the owner at the time of the taking was the one entitled to compensation was because the taking was accomplished in a manner that necessarily resulted in the permanent use of an interest that had been part of that person's property. *See*, *e.g.*, *Pomeroy v. Chicago & Milw. R.R. Co.*, 25 Wis. 641, 643-44, 646 (Wisc. 1870) (holding that compensation for railroad constructed on land belonged to owner at the time of construction, where the road constituted "an obvious existing easement or burden," as the "entire damage to the tract" was owed "upon the assumption that it was to continue"); *Chicago & Alton R.R. Co. v. Maher*, 91 Ill. 312, 316-18 (Ill. 1878) (holding that the owner of property at the time a bridge was constructed was the person with the right to damages, as an action accrued for "all the damages" upon construction, because structure was "permanent in its character" and it was "more than probable that it will continue perpetually"); *cf. Paducah & Mem. R.R. Co. v. Stovall*, 59 Tenn (12 Heisk.) 1, 6-7 (Tenn. 1873) (holding that construction of the railroad through property was the taking, not the entry and survey of the land which occurred before the land was acquired by the present owner); *see also* WOOD at 994-95 n.3 (citing the aforementioned cases). The permanent nature of railroad structures also explains the corollary to this rule, discussed in *Roberts*, that if the landowner did not seek to enjoin or eject a railroad company before construction began, the landowner is "restricted to a suit for damages." *Roberts*, 158 U.S. at 11; *see*, *e.g.*, *Harlow v. Marquette, Houghton & Ontonagon R.R. Co.*, 41 Mich. 336, 339, 2 N.W. 48 (Mich. 1879) (basing decision on fact of "the work done being of that permanent nature that it could not well be abandoned or removed"); *Roberts*, 158 U.S. at 11 (citing, *inter alia*, *Harlow*).

Thus, the rationale for finding claims to be personal to those owning property at the time the property became burdened is that, by physically using or physically interfering with the use of the property, the entity operating under the eminent domain power was permanently removing

---

[42] The *Reese* decision relied on an earlier opinion of the Supreme Court of Pennsylvania, which explained the difference between the continuing damage of a nuisance, and a "privilege to swell the water [flooding one's property] to a particular height for an indefinite time," as for the latter "compensation was to be prospective, as well as retrospective." *Schuylkill Nav. Co. v. Thoburn*, 7 Serg. & Rawle 411, 421 (Pa. 1821); *see Reese*, 16 Serg. & Rawle at 44 (citing and explaining *Thoburn*).

that interest from the private owner, and substituting a full measure of compensation in its stead. The consideration of other precedents confirms this explanation. In *Ferrell*, for instance, the Court of Claims found that when a lock resulted in the submerging of land, an action "for the entire damages" accrued and the right to compensation belonged to the owner of the land at the time the lock was constructed. *Ferrell*, 49 Ct. Cl. at 224. The Court relied on an Alabama Supreme Court opinion, *see id*., which explained that when a railroad is constructed an "action accrues once for all to recover the total damages," with the railroad company obtaining "the right to continue this construction or use." *Birmingham Belt Ry. Co. v. Lockwood*, 150 Ala. 610, 617, 43 So. 819 (Ala. 1907) (quoting "Lewi[s] on Eminent Domain (2d Ed.) § 653b" and citing, *inter alia*, *Roberts* and *McFadden*). The rule was explained by Kentucky's highest court as applying when "permanent structures" are the cause of a physical invasion of private property. *Smith*, 199 Ky. at 772. And the Pennsylvania Supreme Court held that when a dam permanently caused the flooding of property, the right to retrospective and prospective damages accrued to the person owning the flooded property at that time, as the privilege to flood the land for an indefinite time had thereby been obtained. *See Zimmerman v. Union Canal Co.*, 1 Watts & Serg. 346, 355 (1841) (adopting the reasoning of the lower court). As the Supreme Court explained, a "permanent flooding" of property resulted in a taking when "there was a physical invasion of the real estate of the private owner, and a *practical ouster* of his possession." *Northern Transp. Co. v. City of Chicago*, 99 U.S. 635, 642 (1879) (emphasis added); *see also United States v. Cress*, 243 U.S. 316, 327-29 (1917) (finding that the "permanent condition" of "intermittent but inevitably recurring overflows" onto property due to construction of a lock and dam resulted in taking of an easement). It was this ouster of possession, this permanent removal of the property interest, which swapped a suit for compensation, or "chose in action" not running with the land, in place of a real property interest. *See Vroman v. United States*, 147 Ct. Cl. 285, 287-88 (1959).

The Supreme Court's opinion in *Dow* must be read with the reason behind the rule in mind. Significantly, although the *Dow* opinion was issued over thirty-five years after the Supreme Court had first held, in the *Pennsylvania Coal* decision,[43] that a regulatory taking had occurred, in *Dow* the Court discusses only "two ways" by which the government may take property -- by straightforward condemnation, or by physical possession. *Dow*, 357 U.S. at 21. The Supreme Court obviously was not thinking about regulatory takings, and instead discussed physical takings cases such as *United States v. Lynah*, 188 U.S. 445 (1903). *See Dow*, 357 U.S. at 22 (citing, *inter alia*, *Lynah*, 188 U.S. at 470-71). In *Lynah*, consistent with the authorities discussed above, land which was "permanently flooded" due to the construction of a dam and related structures was found to have been taken by the government. *Lynah*, 188 U.S. at 469-70, 474. The Court also cited opinions concerning land appropriated by the government via flooding

---

[43] *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 414-16 (1922). The Supreme Court recognized the possibility of a regulatory taking at least fifteen years earlier. *See Martin v. District of Columbia*, 205 U.S. 135, 139 (1907) (stating, in dicta, that certain height restrictions would result in a taking requiring just compensation). The concept had been applied in the Court of Claims several years before *Dow*. *See Idaho Maryland Mines Corp. v. United States*, 122 Ct. Cl. 670, 680 (1952).

under a reclamation project, and land seized and possessed for use by the Army. *See Dow*, 357 U.S. at 22 (citing *United States v. Rogers*, 255 U.S. 163 (1921) and *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299 (1923)). Thus, in the course of its analysis, the Supreme Court more narrowly stated the relevant rule as follows: "The owner at the time *the Government takes possession* 'rather than the owner at an earlier or later date, is the one who has the claim and is to receive payment.'" *Dow*, 357 U.S. at 22 (quoting *23 Tracts of Land*, 177 F.2d at 670) (emphasis added).

In *Dow*, the rule was explained and justified with respect to just the "two ways" of taking property by physical invasion or condemnation. The Court observed that although the *title* to the property would not pass to the government until it paid compensation (either directly to the private owner or deposited with the court), the "usual rule is that if the United States has entered into possession of the property prior to the acquisition of the title, it is the former event which constitutes the act of taking." *Dow*, 357 U.S. at 22. Mister Dow contended that the Declaration of Taking Act, used by the government to obtain title to the easement, "vitiated the effect of the earlier entry, and rendered the filing date the time of the taking." *Id.* The Court rejected this argument, stating "it would certainly be bizarre to hold that there were two different 'takings' of the same property . . . ." *Id.* at 24. Since the same property can be temporarily taken numerous times, *see, e.g.*, *Kimball Laundry Co. v. United States*, 338 U.S. 1, 3 (1949), this statement can only be understood to mean that when a property interest has already been permanently removed from the private sphere by the government's physical occupation, it cannot be removed again.

The Court explained that Mr. Dow's proposed approach would allow the government to avoid paying interest, would create valuation problems and encourage strategic behavior on the part of both the government (which might wait for property values to fall before filing the declaration) and the property owner (who might assemble property to increase its value). *See Dow*, 357 U.S. at 24-25. The Court eschewed the "manipulations" allowed by this "uncertainty," specifically "in cases where the Government has already entered into possession." *Id.* at 25. The Court concluded that "certainty is not lacking under the rule advocated by the Government, which fixes the 'taking' a the time of *entry into physical possession* -- a fact *readily ascertainable* whether or not the Government makes use of condemnation proceedings, and whether or not it ever files a declaration of taking." *Id.* (emphasis added). And the Court rejected the suggestion that "total compensation should be divided between the first and second owners of the property," explaining that a complex division of the award "might severely impede the orderly progress of *condemnation proceedings* and would conflict with the policies underlying the Anti-Assignment Act." *Id.* at 26 (emphasis added).[44]

---

[44] The only discussion of takings of a non-permanent nature was found in the Court's rejection of Mr. Dow's seemingly self-defeating argument that the government could abandon property after possession but before payment and thereby "prejudice" an owner. *Dow*, 357 U.S. at 26. Of course, if the property were thus abandoned, then Mr. Dow's proposed takings trigger would never have been pulled, either. The Court explained that compensation is owed for temporary takings, after citing two cases in which the physical use of property was not of a

If, as has been shown, the government's permanent physical displacement of a private property owner from the exercise of a property interest irrevocably removes that interest, and replaces it with a legal action for compensation, the property interest in question is no longer that individual's to convey.[45] Attempts to transfer the right to the compensation, then, implicate the Anti-Assignment Act.

**b. Assignments of claims against the federal government.**

The Anti-Assignment Act provides, in relevant part, that "a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim . . . may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued." 31 U.S.C. § 3727(a)-(b) (2000). This effective bar on the transfer of causes of action against the government has existed in this or a similar form since 1853, and thus predates our predecessor court.[46] The act has its origins in an 1846 statute concerning claims against the United States that "have been allowed by a resolution or act of Congress, and thereby directed to be paid." Act of July 29, 1846, ch. 66, 9 Stat. 41. Under the 1846 act, persons who were not the claimant or the claimant's executors or administrators could be paid only if they produced a "warrant of attorney" that identified the source and amount of the claim; that was "attested by two competent witnesses" and acknowledged by the parties executing it; and that was certified by "an officer having authority to take the acknowledgment of deeds," after the officer explained the legal significance of the warrant to the parties. *Id.*

In 1852, a special committee of the House of Representatives was appointed to investigate whether certain claims awarded by the Mexican War Claims Commission were fraudulent, and the connection of the then-Secretary of the Treasury -- who had obtained interests

---

permanent nature. *Id.* (citing *O'Connor v. United States*, 155 F.2d 425 (9th Cir. 1946) (rejecting takings claim concerning gravel when the government occupied the land but abandoned plan to remove the gravel) and *Moody v. Wickard*, 136 F.2d 801 (D.C. Cir. 1943) (holding that the government could not be required to condemn a permanent interest in land it occupied temporarily for forest purposes)). From this dicta, one cannot discern the type of alleged "prejudice" upon which Mr. Dow based his argument.

[45] *See also Brooks Inv. Co. v. City of Bloomington*, 305 Minn. 305, 315, 232 N.W.2d 911 (Minn. 1975) (explaining the *Dow* rule as applying when a "governmental body does take possession of the property or damages it so as to deprive the owner of possession," as "the owner has lost a part of his interest in the real property" and "[s]ubstituted for the property loss is the right to compensation").

[46] *See* note 38, *supra*. The Court of Claims was created almost exactly two years later. *See* Act of February 24, 1855, ch. 122, 10 Stat. 612; *see also United States v. Gillis*, 95 U.S. 407, 413-16 (1877) (explaining that the pre-existing act concerning assignments applied to actions in the Court of Claims).

in the claims when serving as the claimant's counsel (and while a member of the Senate) -- to the claims. *See* H.R. Rep. No. 32-1 (1852). The committee determined that the claims were fraudulent, having rested on false testimony and forged documents; that no evidence showed that Secretary Corwin was aware of the fraud; and that prior to becoming Secretary, Corwin had ended his participation in the matter and negotiated the sale of his interests in the claims. *Id.* at 6-7. This investigation inspired the 1853 statute, entitled "An Act to prevent Frauds upon the Treasury of the United States," which was primarily concerned with banning federal officials and members of Congress from representing claimants, and with punishing the destruction or removal of public records and the bribery of federal officials and members of Congress. *See* Act of Feb. 26, 1853, ch. 81, 10 Stat. 170-71.

Two sections of the 1853 act are the direct ancestors of the modern Anti-Assignment Act. The first section made "absolutely null and void" all transfers and assignments of claims against the United States, and all powers of attorney to receive payment for such claims, "unless the same shall be freely made and executed in the presence of at least two attesting witnesses, after the allowance of such claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof." *Id.* § 1, 10 Stat. 170. The seventh section made the 1846 act applicable "to all claims against the United States, whether allowed by special acts of Congress, or arising under general laws or treaties, or in any manner whatever." *Id.* § 7, 10 Stat. 171. Ultimately, section one of the 1853 statute was combined with the certification procedure required by the 1846 statute, with the result becoming section 3477 of the Revised Statutes of the United States. *See* R.S. § 3477 (1878).

The Supreme Court has long interpreted the Anti-Assignment Act in light of the express fraud-prevention purpose of the 1853 act. In an 1878 opinion, the Supreme Court inferred from the text of the act that one of the "frauds and mischiefs" which "led to its enactment" was "probably . . . the possible presentation of a single claim by more than a single claimant, the original and his assignee, thus raising the danger of paying the claim twice, or rendering necessary the investigation of the validity of an alleged assignment." *Spofford v. Kirk*, 97 U.S. 484, 489-90 (1878). The Court further speculated that "[a]nother and greater danger was the possible combination of interests and influences in the prosecution of claims which might have no real foundation," a scheme that is accomplished by assigning interest in claims "to numerous persons." *Id.* at 490.[47] A few weeks later, it held that the "passing of claims to . . . assignees in bankruptcy [is] not within the evil at which the statute aimed." *Erwin v. United States*, 97 U.S. 392, 397 (1878). The Court explained that the act "applies only to cases of voluntary assignment of demands against the government" and "does not embrace cases where there has been a transfer

[47] The Court was careful (and candid) to "not say that the passage of the act was induced by these considerations." *Spofford*, 97 U.S. at 490.

of title by operation of law." *Id.* It gave as examples of the latter claims that passed by death to heirs or devisees, as well as those assigned in bankruptcy proceedings. *Id.*[48]

These two 1878 opinions fixed the contours for the Supreme Court's subsequent, somewhat uneven application of the Anti-Assignment Act. The context and manner in which claims were transferred or assigned would be scrutinized to determine if they could facilitate the two types of fraud identified by the Supreme Court -- when influential persons or combinations of persons are paid for claims that lacked merit; or when a legitimate claim is paid to someone who falsely asserts they were assigned it, which could result in a double-payment if the real claimant subsequently surfaces.[49] These could, perhaps, be referred to as fraud in the claim, and fraud in the transfer. The former, sometimes described as resulting from the "trafficking" in claims, *see Patterson v. United States*, 173 Ct. Cl. 819, 823 (1965), was associated with the direct, voluntary sale of claims, and was not expected to be accomplished in roundabout and contingent schemes involving wills or bankruptcy proceedings. The latter (fraud in the transfer) was assumed to be more likely when the government was faced with an expensive and complicated investigation to determine the ancillary issue of the legitimacy of the assignment or chain of assignments. As an aside, when the Supreme Court in 1877 applied the Anti-Assignment Act to cases before the Court of Claims, it explained that "[i]f it be said the danger the act sought to provide a guard against was that fraudulent assignments of just claims might be imposed upon the accounting officers, so that the government, after one payment to a pretended assignee, might find itself confronted by the real creditor and be called upon to pay again . . . the same danger would attend payment or allowance to an assignee, after a trial in court." *United States v. Gillis*, 95 U.S. 407, 414 (1877). It is hard, however, to see how the *other* danger of fraud in the claim -- that is, the payment of baseless claims to persons or groups exerting improper influence upon the decision maker -- could be expected to occur in judicial proceedings. Nevertheless, the notion soon found its way into Supreme Court dicta. *See Goodman v. Niblack*, 102 U.S. 556, 560 (1881) (warning of "improper influences in prosecuting the claim before the departments, *the courts*, or the Congress") (emphasis added).[50]

---

[48] Perhaps the Court was mindful of the need to reconcile the meaning of "transfers and assignments" as used in the 1853 act, with that act's extension and re-affirmation of the 1846 act, which expressly allowed a decedent's representatives to be paid for the decedent's claims. *See* Act of July 29, 1846, ch. 66, 9 Stat. 41 (allowing payments to "the claimant or claimants, his or their executor or executors, administrator or administrators").

[49] A third purpose for the act, not connected with fraud, is sometimes added in dicta -- to preserve defenses and counterclaims which are particular to the original claimant. *See*, *e.g.*, *Kingsbury v. United States*, 215 Ct. Cl. 136, 144 (1977). But rather than adopting this purpose, the Supreme Court explicitly attributed it to "[o]ther courts." *See United States v. Shannon*, 342 U.S. 288, 291-92 (1952).

[50] Moreover, while the "introduction of a party who was a stranger to the original transaction," *Goodman*, 102 U.S. at 560, in place of the initial claimant, would have raised the

In any event, the Supreme Court embarked on the mission of distinguishing transfers of "naked claims," *see Hager v. Swayne*, 149 U.S. 242, 247-48 (1893) (explaining intent behind Anti-Assignment Act), which were productive of fraud, from ownership changes by operation of law and analogous situations, in which the would-be assignors' "exigencies" (such as death or bankruptcy) justified the transfer, *see Goodman*, 102 U.S. at 560, and the involvement of court officers reduced the opportunity for assignees to traffic in specific claims. *See United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 375-76 & n.12 (1949) (holding that transfers by operation of law are categorically exempt from the Anti-Assignment Act, even when the transfers complicate the proceedings by multiplying the number of parties). Transfers of claims which did not run afoul of the act were often transactions in which the claims themselves were not the objects of the assignee's desire. Thus, the assignment of claims through a voluntary petition of insolvency, *see Butler v. Goreley*, 146 U.S. 303, 311-13 (1892), and their assignment, along with all assets, by an insolvent debtor to trustees to benefit his creditors, *Goodman*, 102 U.S. at 560-61, were not void under the act. Nor was the transfer of claims incident to corporate merger and consolidation, *Seaboard Air Line Ry. v. United States*, 256 U.S. 655 (1921), as the Court found "no probability that the United States could suffer injury" of the sort prevented by the act. *Id.* at 657.

On the other hand, when claims were among the property used to secure a debt owed to just one group of creditors -- the company's bondholders -- and then were sold through a judicial foreclosure sale, the Court found the assignment void, because "[i]t [was] a voluntary transfer, by way of mortgage, for the security of a debt, and finally completed and made absolute by a judicial sale." *St. Paul & Duluth R.R. Co. v. United States*, 112 U.S. 733, 736 (1885). Even though it appeared that all the assets of the company were involved, and were purchased by a group consisting of some bondholders, other creditors, and shareholders who then reorganized into a new corporation, *see St. Paul & Duluth R.R. Co. v. United States*, 18 Ct. Cl. 405, 413 (1883), the transfer was not allowed. The Court explained, without further elaboration, that if the Anti-Assignment Act did not apply, "it would be difficult to draw a line of exclusion which leaves any place for the operation of the prohibition." *St. Paul & Duluth R.R. Co.*, 112 U.S. at 736. A later decision clarified that the reason the assignment was forbidden was that it was "to secure a *specific* debt." *Price v. Forrest*, 173 U.S. 410, 422 (1899). Similarly, two creditors could not receive the payments for claims that were purportedly assigned to them to secure loans to a

---

complicating (or in 19th Century parlance "embarrassing") matter of determining whether an assignment was legitimate, the courts still required competent evidence proving a claim. If this were missing due to the absence of the initial claimant, the claim should have been thwarted. Incidentally, the absence of the initial claimant from court proceedings would have had minimal impact on claim determinations in the nineteen years immediately preceding the Tucker Act, during which claimants lacked the right to testify in support of their own claims. *Compare* Act of June 25, 1868, ch. 71, § 4, 15 Stat. 75 (prohibiting claimants from being witnesses before the Court of Claims unless called by the government) *with* Tucker Act of March 3, 1887, ch. 359, § 8, 24 Stat. 505, 506 (allowing testimony by interested parties). Thus, the evils the Supreme Court believed the Anti-Assignment Act addressed were mostly alien to court proceedings.

subsequently-bankrupt firm. *National Bank of Commerce v. Downie*, 218 U.S. 345, 349-50, 356 (1910). The assignment of the claims to these two banks was found void, and the claims were instead assigned to a bankruptcy trustee to be used to pay all creditors of the firm. *Id.* at 356-57.[51]

While existing claims against the government could not be assigned to secure debt, the Supreme Court has enforced a partnership agreement to share prospective profits from a contract which had not yet been awarded when the agreement was executed. *Hobbs v. McLean*, 117 U.S. 567, 575-76 (1886). Thus, the transfer of a property interest based on an agreement predating the accrual of a claim does not violate the Anti-Assignment Act, even if the claim is thereby assigned. *See also Foster v. United States*, 221 Ct. Cl. 412, 417-20 & n.6 (1979) (holding that Anti-Assignment Act does not apply where a lessor with an option to buy property exercises the option after property is permanently taken by the government, as this purchase is "not the acquisition or 'trafficking' of a claim covered by the Act, but, rather, the perfection of the preexisting interest in the land claim against the Government"). The act has been applied to nullify assignments in cases between assignors and assignees, where the government is not a party. *See*, *e.g.*, *National Bank of Commerce*, 218 U.S. at 350-51, 356-57; *Ball v. Halsell*, 161 U.S. 72, 82-84 (1896); *Spofford*, 97 U.S. at 489. But despite the act's language, the Supreme Court has held that it does not absolutely nullify all transfers of claims, but merely gives the government the option to recognize assignments and make payments to assignees or representatives. *See Martin v. National Surety Co.*, 300 U.S. 588, 594-95 (1937) (contract payments made to individual with power of attorney); *Freedman's Savings & Trust Co. v. Shepherd*, 127 U.S. 494, 506 (1888) (lease payments made to assignees); *Bailey v. United States*, 109 U.S. 432, 440 (1883) (claims paid to attorney who absconded).

In *Dow*, the Supreme Court stated that it was "well established . . . that the Assignment of Claims Act prohibits the voluntary assignment of a compensation claim against the Government for the taking of property." *Dow*, 357 U.S. at 20. It might be open to question how "well established" this principle was at the time, for the only opinion cited in support was one which concerned the assignment of a *tort* claim, not a takings claim. *See United States v. Shannon*, 342 U.S. 288, 289-90 (1952); *Dow*, 357 U.S. at 20 (citing *Shannon*).[52] But the applicability of the act to takings claims is certainly implicit in the *Spofford* decision, which concerned claims for the use of supplies and occupation of land by the Army, and in which the Court explained the act "embraced every claim against the United States, however arising, of whatever nature." *See*

---

[51] Under the subsequently-enacted Assignment of Claims Act of 1940, certain contract payments may now be assigned to banks or other financing institutions. *See* Pub. L. No. 811, ch. 779, 54 Stat. 1029-30; 31 U.S.C. § 3727(c); 41 U.S.C. § 15(b).

[52] In *Shannon*, the court of appeals allowed the assignment of both tort claims and claims for damage to property under the Tucker Act, *see United States v. Shannon*, 186 F.2d 430, 434-35 (4th Cir. 1951), and only the former was challenged in the Supreme Court. *See Shannon*, 342 U.S. at 290 n.5.

*Spofford*, 97 U.S. at 489 (citing *Gillis*). In any event, the proposition became well established by *Dow* itself, which held that because an easement was permanently physically taken by the government before Mr. Dow acquired the property subject to this easement, the Anti-Assignment Act prevented him from receiving the condemnation award. *Dow*, 357 U.S. at 20-21. But although the voluntary assignment of a takings claim may be prohibited by the act, the context and circumstances of any challenged transaction must still be scrutinized to determine if the transfer occurred by operation of law or might otherwise be deemed not to pose the dangers the act seeks to address.

**c. Regulatory takings of real property interests.**

To recap, when the government permanently and physically displaces a private property owner from the exercise of a property interest, that interest is irrevocably severed from the rest of the real estate. In its place is the right to receive money -- a personal right that does not run with the land, and the assignment of which is restricted by the Anti-Assignment Act. What the Court will now consider is how these principles apply to regulatory takings of real property interests.

As Mr. Bailey points out, *see* Pl.'s Supp. at 13, the Supreme Court has recently cautioned that physical takings precedents are not necessarily applicable in the context of regulatory takings. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323 (2002) (explaining it may be "inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa") (internal footnote omitted). As the Supreme Court explained, "[w]hen the government condemns or physically appropriates the property, the fact of a taking is typically obvious and undisputed," but when a regulatory taking is alleged, "the predicate of a taking is not self-evident, and the analysis is more complex." *Id.* at 322 n.17. As we have seen, the *Dow* opinion concerned a physical taking and highlighted these same distinctions -- the rule was justified because "the time of the entry into physical possession" was "a fact readily ascertainable," and the alternative was rejected because its complexity "might severely impede the orderly progress of condemnation proceedings." *Dow*, 357 U.S. at 25-26. Moreover, the logic of the rule -- that a person acquiring property after a portion of it has been taken cannot receive compensation -- is based on the permanent, physical occupation of the taken portion.

Neither of the Federal Circuit precedents cited by the government involve a regulatory taking and a post-taking acquirer. The *Wyatt* case concerned a property owner whose interest terminated more than three years *before* the denial of the permit that was the basis of the regulatory takings claim. *Wyatt*, 271 F.3d at 1096. The *Cavin* case concerned the government's physical use of property it contended was in the public domain, and specifically left open the possibility that a takings claim could be based on the use of a road which continued *after* the owner obtained title to the land. *Cavin v. United States*, 956 F.2d 1131, 1134-35 (Fed. Cir. 1992). Nor do either of these cases rely upon precedents of the Supreme Court, the Federal Circuit, or the Court of Claims applying the rule to the acquirers of property following an alleged regulatory taking. *Wyatt* cites *Cavin*, as well as a Supreme Court opinion regarding the

condemnation of a lease. *See Wyatt*, 271 F.3d at 1096 (citing *Cavin* and *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473-74 (1973)).[53] Interestingly enough, the latter opinion recognizes that just compensation should reflect the prospect of a property interest that *might have been* obtained by the lessor *after* condemnation -- a renewed lease. *Almota*, 409 U.S. at 474. *Cavin* relies on *Dow*, as well as an avigation easement case in which the taking was based on the physical use of airspace. *See Cavin*, 956 F.2d at 1134 (citing *Dow*, 357 U.S. at 20-21, and *Lacey v. United States*, 219 Ct. Cl. 551 (1979)). The avigation easement opinion relies upon *Dow*, and another physical airspace case -- which in turn rests upon the *Ferrell* case concerning lands flooded by a lock, and yet another avigation easement case. *See Lacey*, 219 Ct. Cl. at 560 (citing *Dow*, 357 U.S. at 20, and *Vroman*, 147 Ct. Cl. at 287-88); *Vroman*, 147 Ct. Cl. at 287-88 (citing *Dow*, *Ferrell*, 49 Ct. Cl. at 224, and *Highland Park, Inc. v. United States*, 142 Ct. Cl. 269 (1958)). None of these cases concerns a regulatory taking.[54]

Indeed, the Court has not found any binding precedents that apply the rule in the context of a regulatory taking claim raised by a subsequent acquirer. It appears that all broad statements (such as the purported axiom described in *Wyatt*, 271 F.3d at 1096), to the effect that only owners at the time of any taking are permitted to recover compensation, go well beyond the circumstances of the cases containing them, with no rationale provided for extension beyond the matter at hand. They are thus, in a word, dicta.[55] But the central feature of the reason discovered for the rule -- that physical takings are typically permanent in nature, and thus property interests are completely removed from the private sphere when the government builds upon or otherwise invades property through the use of permanent structures -- is confirmed by binding precedent.

---

[53] The opinion also cites a decision from another court of appeals that does apply the rule to a regulatory taking claim brought by a post-taking acquirer, *Pro-Eco, Inc. v. Board of Comm'rs of Jay County*, 57 F.3d 505, 509 (7th Cir. 1995), which the Court does not find persuasive (as the issues discussed in the present subsection are not at all addressed).

[54] While avigation easement takings might be based on the imposition of an uncompensated nuisance, as well as on a direct physical invasion, *see Argent v. United States*, 124 F.3d 1277, 1282-84 (Fed. Cir. 1997), the resulting taking still more resembles a physical than a regulatory taking -- accomplished as it is by the government's physical use of real property, airspace, and aircrafts, and not by regulatory restrictions.

[55] "Broad language . . . unnecessary to the Court's decision . . . cannot be considered binding authority." *FEC v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652, 2670 n.8 (2007) (opn. of Roberts, C.J.) (quoting *Kastigar v. United States*, 406 U.S. 441, 454-55 (1972)); *see also Central Va. Cmty. College v. Katz*, 546 U.S. 356, 363 (2006); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 127 S. Ct. 2738, 2762 (2007) (plurality opn.); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399-400 (1821) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.").

In *Eyherabide v. United States*, 170 Ct. Cl. 598 (1965), the Court of Claims found a physical taking of property by the Navy's use of a neighboring gunnery range. *Id.*, 170 Ct. Cl. at 605-08. Although physical, this particular taking was found to be a *temporary* one -- beginning on March 19, 1954 and ending at the close of 1959. *See id.* at 607. As a consequence, the Court of Claims determined that parties who had "acquired their interest in the tract on December 24, 1956 -- about 33 months after March 19, 1954," were prevented by the Anti-Assignment Act from "recover[ing] for any part of the claim accruing prior to that time." *Id.* at 608 (citing the Anti-Assignment Act, *Shannon*, and *Dow*). These subsequent owners, however, received just compensation based on "rent" for the period beginning December 24, 1956, *id.* at 608 -- which would not have been permitted under the Anti-Assignment Act if the total damages for a permanent taking accrued when the property was first physically taken, on March 19, 1954. Thus, because the physical invasions that displaced the owners from use and occupancy were temporary in nature, owners who obtained an interest *after* the taking were not prohibited from sharing in the just compensation awarded.[56]

That the rule determining which owners are entitled to compensation turns on the permanence of the type of taking in question has acquired added significance due to more recent developments in Supreme Court takings doctrine. In *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304 (1987), the Supreme Court held that property owners are entitled to just compensation for temporary regulatory takings, and that it would thus be unconstitutional were the available remedies for regulatory takings to be restricted to invalidation of the government action. *First English*, 482 U.S. at 318-19. In so holding, the Court emphasized that a government actor whose regulatory actions are found to have taken property cannot be required to obtain the full, permanent interest in the property, but retains the option of converting the taking into a temporary one. *See id.* at 321 ("Once a court determines that a taking has occurred, the government retains the whole range of options already available -- amendment of the regulation, withdrawal of the invalidated regulation, or exercise of eminent domain."). But "no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." *Id.* The Federal Circuit has frequently recognized that the government may change course when faced with liability for a

[56] The pivotal importance of the *permanent* nature of takings for the rule to apply is also suggested by the opinion in *Foster*, in which the Court of Claims explained that "[s]ince [it] finds defendant's action constituted a permanent taking . . . it is important to show the inapplicability of defendant's argument" concerning the Anti-Assignment Act. *Foster v. United States*, 221 Ct. Cl. 412, 420 n.6 (1979). When the permanent taking accrued, the plaintiffs had only a leasehold interest in the reserved mineral rights at issue, and later acquired the full interest in the property. *See id*. at 417-19. The Court found this "perfection of the preexisting interest in the land and claim against the Government" to not be "covered by the [Anti-Assignment] Act." *Id.* at 420 n.6. The Court analyzed the takings claim as akin to a physical taking, based on the government's ownership and use of the rest of the property, the incompatibility of mining operations with that use, and the government's denial to plaintiffs of use of its roads through the property. *See id.* at 425-26.

regulatory taking, and reduce the compensation owed to the amount corresponding to a temporary taking, by granting a permit that was previously denied. *See*, *e.g.*, *Seiber v. United States*, 364 F.3d 1356, 1365 (Fed. Cir. 2004); *Cooley*, 324 F.3d at 1305-06; *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1347 (Fed. Cir. 2002); *see also Caldwell v. United States*, 391 F.3d 1226, 1234 n.8 (Fed. Cir. 2004). Regulatory takings in a sense occupy an intermediate position between physical invasions, which are normally treated as a purchase of the full extent of the property used, owed as of the date of the invasion, *see Dow*, 357 U.S. at 23; and the use of eminent domain procedures, in which the price of condemnation is calculated but the government retains the choice not to obtain the property. *See*, *e.g.*, *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 4-5, 11-12 (1984); *Danforth*, 308 U.S. at 284. When a regulatory taking occurs, the government can be said to rent with the option to buy -- as regulatory takings are all *potential temporary takings*. Compensation is owed, starting with the date of the taking, but it may end up being for less than the purchase price of the property.[57]

Two other post-*Dow* Supreme Court opinions warrant mentioning. Three weeks after issuing *First English*, the Court announced its decision in *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987). In *Nollan*, lessors of property with an option to buy applied for a permit to build a new house on the property, and the relevant government body granted a permit subject to the condition that the applicants dedicate an easement allowing the public to use a portion of the property. *Id.* at 827-28. After a state trial court had struck down the condition, but while that decision was on appeal, the lessors exercised the option to buy the lot and built the new house, using the permit shorn of the condition. *Id.* at 829-30. The appellate court reversed the lower court and reinstated the condition, and the applicants, as owners of the property, brought their takings challenge to the Supreme Court. *Id.* at 830-31. Although the challenged condition on use of the property was imposed when the Nollans were just lessors, the Supreme Court explained that "[s]o long as the Commission could not have deprived the prior owners of the easement without compensating them, the prior owners must be understood to have transferred their full property rights in conveying the lot." *Id.* at 834 n.2.

The *Nollan* opinion figured prominently in the Supreme Court's decision in *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001), in which the Court held that a property owner may base a takings claim on the application, to his property, of a regulation that existed prior to his ownership. *See Palazzolo*, 533 U.S. at 629-30. The Court explained that "[f]uture generations, too, have a right to challenge unreasonable limitations on the use and value of land," *id.* at 627, and that the "claim is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction." *Id.* at 630. The Court characterized the rule "that any award goes

---

[57] The Court limits the present discussion, as is appropriate given the circumstances of this case, to regulatory takings involving interests in real property. Of course, "[p]roperty interests are about as diverse as the human mind can conceive," *Florida Rock Industries, Inc. v. United States*, 18 F.3d 1560, 1572 n.32 (Fed. Cir. 1994), and it may well be the case that certain intangible property interests by their nature, once taken, are necessarily taken permanently, precluding a government from choosing to convert the taking into a temporary one.

to the owner at the time of the taking" and "is not passed to a subsequent purchaser" as applying "[i]n a direct condemnation action, or when a State has physically invaded the property," where "the fact and extent of the taking are known." *Id.* at 628 (*citing*, *inter alia*, *Danforth*, 308 U.S. at 284).

Of course, there are reasons why *Nollan* and *Palazzolo* are not precisely on point. Neither case had to reckon with the Anti-Assignment Act, as the relevant government actors were at the state level. Where *Palazzolo* contrasted the "owner at the time" rule for physical takings and direct condemnation proceedings with the approach followed in regulatory takings, its focus was on the need to ripen regulatory takings claims, and the transfer of property after a claim ripened was not discussed. *See Palazzolo*, 533 U.S. at 628 (describing situation "where the steps necessary to make the claim ripe were not taken, or could not have been taken, by a previous owner").[58] And *Nollan* contains the metaphysical complication of a permit condition that was stricken at the time the permit was utilized and the property was purchased by the applicants, but was subsequently resurrected by the appellate court. *See Nollan*, 483 U.S. at 829-31. But both opinions underscore the right of owners to make reasonable use of their property, and to pass this same right of use to successors. *See id.* at 834 n.2; *Palazzolo*, 533 U.S. at 627. Appreciating this is critical to understanding why the rule limiting compensation to those owning property at the time of a physical invasion or the completion of eminent domain proceedings is restricted, by its nature, to those two categories of takings. For owners of property have a right to use it, and when a government restriction on that use is so severe as to result in a taking, the owner is suing for *his* loss of use, and does not seek compensation for the loss of use of his predecessor.

In contrast, when the government makes physical use of private property, by flooding it, or running a road or a pipe line through it, or burdening it with the interference from a squadron of jets, this is presumed permanent and the damage is done at that point in time. This is as much a question of the laws of physics, perhaps, as the law of takings, the result of the "practical ouster" of the former owner. *See Northern Transp. Co.*, 99 U.S. at 642. Just as if condemnation were complete and title passed or an easement were recorded, this physical appropriation is "a fact readily ascertainable." *Dow*, 357 U.S. at 25. By physically using or invading the property, the government is declaring, by its actions, that the property now belongs to it, and can no longer be conveyed by the previous private owner. It is as if, for instance, the government removed an egg from a carton before your grocer sold the carton to you -- there are only eleven left to buy, and compensation for the twelfth is the grocer's business with the government, not yours. In place of the property taken is the right to compensation, which does not run with the land (or the carton). And while the government may be chagrined by the bill, the law does not presume that it will remove a dam, or relocate a pipeline or a squadron, in response.

[58] At least one justice, however, believed that the opinion stood for the proposition that "a succeeding owner may obtain compensation for a taking of property from her predecessor in interest." *Palazzolo*, 533 U.S. at 638 (Stevens, J., concurring in part and dissenting in part).

As we have seen, regulatory takings are scrutinized under a different assumption. The government does not accomplish these by building permanent structures, but by words on paper. And unlike the words of, say, a recorded deed or easement, there is nothing about them that irrevocably commits the government. The existence or application of a regulatory restriction on property is not notice that a property interest belongs to the government, unlike the presence of a government structure or the physical results of one (such as flooding). The government does not intend to, and cannot be forced to, purchase property by regulating it, although it will be liable in the least for a form of "rent" once a taking has been found. *See First English*, 482 U.S. at 321; *see also Yuba Natural Resources, Inc. v. United States*, 821 F.2d 638, 642 (Fed. Cir. 1997). The government *does* intend to restrict use when it regulates property, but when this restriction is found to go too far, it has the option of cutting its losses by loosening its restriction. *See*, *e.g.*, *Seiber*, 364 F.3d at 1365 (discussing "the rescission of a regulation or the eventual grant of a permit" resulting in a temporary taking). Thus, the restriction can never be assumed to be permanent for purposes of compensation, and a purchaser of property cannot expect to be permanently deprived of use, even if this deprivation would have been a taking of his predecessor's property. *See Palazzolo*, 533 U.S. at 627. The easement upon which a pipe line rests cannot be purchased from the prior owner because, even if the government had not yet paid for it, it has been permanently appropriated. But the right to use land runs with the land, and a regulatory restriction on use does not make the property the government's when the government does not pay for it. The logic of *Palazzolo* thus should govern equally after a regulation had been applied to property as it does when the regulation merely existed in the form of an enactment.[59] Since a permanent regulatory taking cannot be forced upon the government, the "entire damages" are not owing until the government decides not to rescind the action which results in the taking, and until that point (or the point at which the judgment becomes final and beyond appeal) the taking is potentially temporary. But just compensation is still required, even if the taking ends up being temporary. The applicable rule as to who is entitled to compensation, though, in either circumstance should be the one employed in the context of temporary takings.

And that rule, as we have seen in *Eyherabide*, is that whoever happens to own property while the temporary taking continues is entitled to compensation. *See Eyherabide*, 170 Ct. Cl. at 608. The circumstances of a temporary taking are analogous to a condemnation of a leasehold of a finite duration, with government options for extensions, in which case the annual rent would be paid to any subsequent owners of the property. *See Southern California Financial Corp. v. United States*, 225 Ct. Cl. 104, 105-06 (1980). Indeed, the Supreme Court has held that the transfer of "a lease of real estate to be used for public purposes, under which the lessor is not

---

[59] Indeed, there is no reason why a subsequent acquirer could not ripen a new takings claim by making his or her own application for use of the subject property. Otherwise, "[f]uture generations" would lose the "right to challenge unreasonable limitations on the use and value of land," *Palazzolo*, 533 U.S. at 627, and the government would receive the windfall of property without payment of just compensation, merely because one owner chose not to pursue damages for the potentially-temporary imposition upon his use of the land. This type of "expiration date on the Takings Clause" was rejected by the Supreme Court. *See id.*

required to perform any service for the government, and has nothing to do . . . except to receive from time to time the rent agreed to be paid," does not come within the prohibition of the Anti-Assignment Act provision concerning government contracts. *Freedman's Savings & Trust Co*., 127 U.S. at 505; *see also Chicago & Alton*, 91 Ill. at 315 (explaining that the "conveyance of land transfers or assigns leases on the land, as a general rule"). That describes the position of a landowner whose real property is the subject of a regulatory taking.

When the government continues to occupy real estate that it has chosen not to take permanently, the individual who is displaced is the owner at that time, not the owner when a leasehold interest was first condemned or obtained.[60] Similarly, while a government-imposed restriction on the use of private property persists, the owner at any particular time is the one who is inconvenienced by the restriction. If that inconvenience is severe enough to amount to a taking, any owner of the property while the restriction continues should be compensated for the interest taken.[61] Such an action is not a claim for the compensation the government would owe any predecessors, whose conveyance of the subject property truncates their claims to ones for temporary takings (the amount of which would be subtracted from the permanent taking compensation owing to the ultimate or, as a result, penultimate owner were the government to choose to allow the taking to be permanent). Thus, there is no assignment or transfer of any claim, but rather of real property -- which brings with it the right of use and, thus, the right to maintain one's own claim against the government if use is so severely restricted as to be a taking. *Cf. Rochester Gas & Elec. Corp. v. United States*, 65 Fed. Cl. 431, 442 (2005) (recognizing "it may be that both the assignor and assignee have separate takings claims" based on government's failure to dispose of spent nuclear fuel and radioactive waste (*citing Palazzolo*, 533 U.S. at 626-28)).

Recognition of the right of subsequent owners to obtain compensation for restrictions on their use of real property eliminates some anomalies that would otherwise result. If a former owner of the property were the only person who may bring a takings claim, his success in the litigation may result in the government removing the restriction on use of the subject property (given the government's option of loosening a restriction to convert a permanent taking into a temporary one). But the beneficiary of this reversal is the *current* owner, who thus would receive

---

[60] For examples of this, see, e.g., *Ginsberg v. Austin*, 968 F.2d 1198, 1200 (Fed. Cir. 1992) (explaining settlement of takings claim by subsequent owner when government occupied space in a building beyond the expiration of the lease); *Sampson v. United States*, 208 Ct. Cl. 656, 660-61, 665 (1976) (explaining that assignee of owner of building at the time additional lease was condemned received award).

[61] That is, unless the statute of limitations has run on damages based on the final agency decision as to the extent of use permitted. But since regulatory takings are all potentially temporary (courtesy of the government's options, *see First Church*, 482 U.S. at 321), subsequent owners cannot presume that the final decision is permanent, and would be able to apply anew for the permit or variance that would enable reasonable use of their property. *See* note 59, *supra*.

the sort of "windfall" that was once used as a justification for denying subsequent owners' takings claims.[62] When it is recognized, however, that the right to sue for a regulatory taking is derived from the right to use property, which unquestionably runs with the land, then it is clear that this result is not at all a windfall.

But splitting the benefits of a successful takings suit between a former and a current owner, while not allowing the latter to sue, results in a disconnect between the expected value of a takings claim and the incentive of the claimant to bring it.[63] By way of (simplified) example, if a $1 million property were valueless if a particular government use restriction were to remain in place, but potential buyers believed there was a ten percent chance that a takings lawsuit would result in the government lifting the restriction, the property could sell for $100,000.[64] Once the former owner sells the property, the prospect for restoration of use drops out of his calculation of the expected value of a takings suit -- his potential benefits are now just the permanent takings compensation (discounted by the likelihood of that outcome) and the temporary takings compensation (similarly discounted), which he must balance against the costs of a lawsuit (also discounted, since these are reimbursed when he is successful, under 42 U.S.C. § 4654(c)). As a consequence, takings claims for which the expected value to private citizens is positive may end up not being brought, with the government (which should be indifferent as to *who* receives the compensation when private property is taken) receiving a windfall of its own. Recognizing that the permanent taking of the subject property displaces the *current* owner, and correspondingly recognizing *that* owner's right to just compensation, avoids this dilemma. Moreover, the rule that temporary takings compensation would be owed to the prior owner for the period of time up to the date of conveyance, and to the subsequent owner after that date, is an easily administered, bright-line rule that also avoids the anomaly of a prior owner receiving "rent" for a period of time when he or she no longer owned the property in question.

---

[62] See, for instance, the discussions in pre-*Palazzolo* opinions such as *Palm Beach Isles Assocs. v. United States*, 231 F.3d 1354, 1363 (Fed. Cir. 2000), or *Creppel*, 41 F.3d at 632.

[63] Whether this disconnect can be bridged in the bargain between former and current owner is not clear.

[64] This example also illustrates why the government's temporary taking option must be taken into account when determining whether a restriction results in a categorical *Lucas*-type taking. If all economically beneficial use of property were denied under a restriction, *see Lucas*, 505 U.S. at 1015-19, any residual value to the property due to this government option does not change this fact. And in a non-*Lucas* situation, the effect of this residual value on economic impact suggests that courts should place greater emphasis on the other *Penn Central* factors. For instance, in assessing the character of the government action, *see Penn Central*, 438 U.S. at 124, a court could consider whether this action accomplished something that could have been achieved by purchasing a commonly-recognized property interest, such as an easement. *Cf. Falconwood Corp. v. United States*, 422 F.3d 1339, 1349-51 (Fed. Cir. 2005) (explaining the step transaction doctrine of tax law, where the substantive result is given significance).

For the foregoing reasons, the Court holds that just compensation for the regulatory taking of real property interests may be owed to owners who have acquired their property interests after the onset of the taking, due to the government's ability to transform regulatory takings into temporary ones. As a consequence, Mr. Bailey may seek compensation for the alleged taking of the fee simple interest in lots 4, 5, 6, and 10,[65] even were the Section 404 permit denial the basis for the takings claims (although temporary takings compensation for the time periods prior to his reacquisition of these lots would have to be subtracted from any award). The Anti-Assignment Act is not implicated, as he has not been assigned his predecessors' takings claims, but is bringing his own based on the restrictions on use of the lots while he owns them.

Moreover, the Court notes that even were the transfer of these lots to Mr. Bailey to be considered a transfer of claims against the government, the Anti-Assignment Act would not bar his claims. Regarding the return of lot 10, had the contract for deed been terminated under the default provisions of Minn. Stat. section 559.21, the lot would have been transferred to Mr. Bailey by operation of law. Instead, the cancellation of the contract for deed was accomplished by the agreement of Mr. Bailey and his buyer. *See* Def.'s App. 349 (Pl.'s Am. Resp. to Req. for Adm. No. 11). But this makes the transaction similar to the exercise of an option, which the Court of Claims in *Foster* allowed when linked to a "preexisting interest in the land." *Foster*, 221 Ct. Cl. at 420 n.6.[66] Although, unlike *Foster*, plaintiff was not the tenant with the right to use the property at the time of the Section 404 permit denial, his interest as title holder, and the similarity of his rights as contract for deed vendor to the rights of creditors in bankruptcy, combine to provide a sufficient preexisting interest to support the conclusion that the transaction was not the "trafficking" of a claim. And the fact that the property, and the corresponding takings claim, was obtained in connection with a specific debt owed to just one creditor is not a problem, as the transaction in which the security interest was created actually preexisted any takings claims, and thus it was not the *claim* which secured the debt. *Cf. Hobbs*, 117 U.S. at 575-76 (transfer of property interest pursuant to agreement predating accrual of claim does not violate act, even if its purpose was to assign potential claims).

---

[65] In addition to the taking of the fee simple interest in lot 1, which he owned continuously.

[66] In *Foster*, dicta supplied an additional reason why the Anti-Assignment Act would not apply -- the mineral reservation language of the deed conveying the rest of the real property to the government, which "include[d] grantors, successors and assigns." *Foster*, 221 Ct. Cl. at 420 n.6; *see also id.* at 415 (reciting the reservation language). But this language did not specifically address claims against the government, and instead carved out a fee interest in the right to use minerals. The absence of such language can hardly be important, when no such reservation is required to establish the basic right of owners to use their private property. *But see Burkey v. United States*, 25 Cl. Ct. 566, 581 n.11 (1992) (reading the reservation language dicta as a holding).

The policies and purposes behind the Anti-Assignment Act cannot be frustrated or impaired by transactions such as the return of these four lots to the plaintiff. It is clearly not the "trafficking" of a claim, *see Foster*, 221 Ct. Cl. at 420 n.6, when a prior owner reacquires property. There is no problem caused by introducing "a stranger to the original" claim, *see Nutt v. Knut*, 200 U.S. 12, 20 (1906); *Goodman*, 102 U.S. at 560, as plaintiff was the owner of these lots at the time he applied for the Section 404 permit. *See* Def.'s App. 133-34; Pl.'s App. 21-22; Pl.'s Prop. Facts ¶ 10. Nor are there any difficulties or uncertainties introduced relating to the transfer of the property, since the transfer of real property interests are officially recorded. *See* Def.'s App. 196-98 (deeds for lots 4, 5, 6, and 10).[67]

Three lots -- numbers 7, 8, and 11-- were conveyed by plaintiff to third parties by way of warranty deeds, prior to the denial of the Section 404 permit, and no interest in them had subsequently been reacquired by Mr. Bailey. *See* Pl.'s Prop. Facts ¶ 10; Def.'s App. 166, 172, 194-95. Plaintiff attempts to justify the inclusion of these lots among his claims, on the basis that by warranting good title, he is somehow exposed to lawsuits from the buyers due to the government's actions. *See* Tr. at 47-52; Pl.'s Opp. Mem. at 18. But under Minnesota law it is clear that a "good marketable title" does not mean one that is impervious to government takings. *See Summers v. Midland Co.*, 167 Minn. 453, 454-56 (1926). Plaintiff neither held a property interest in lots 7, 8, and 11 at the various times he alleged that a taking had transpired nor since, and accordingly the government's motion for summary judgment is GRANTED as to those three lots.

**D. Plaintiff's Security Interests in the Lots Sold**

At the time of the denial of the after-the-fact permit application, in addition to lot 1, title was still recorded in the name of the plaintiff for six other lots. These lots (numbers 2, 3, 9, 10, 12 and 14) were sold in contract for deed transactions, in which the buyers agreed to pay certain sums to Mr. Bailey over time, and he agreed to deliver a warranty deed conveying marketable title once all of the payments have been made. *See* Def.'s App. 153-65, 174-80, 183-88 (contracts for deed). In these sorts of transactions, title to the property is held in trust by the vendor to secure the payments owed under the contract, and the vendees obtain equitable title. *See, e.g.*, *Shields*, 552 N.W. 2d at 229; *State ex rel. Blee v. City of Rochester*, 260 Minn. 151, 153-54, 109 N.W. 2d 44 (Minn. 1961); *Summers*, 167 Minn. at 455. Under these contracts, the seller "retains a vendor's lien on the property," which "is an implied equitable lien upon real property for the amount of the unpaid purchase price." *Shields*, 552 N.W. 2d at 229. The position of a vendor holding legal title under a contract for deed is analogous to that of a mortgagee. *See S.R.A., Inc. v. Minnesota*, 327 U.S. 558, 565 (1946) ("In substance [the vendor]

---

[67] And even if the government's ability to preserve counterclaims or defenses were considered a purpose served by the Anti-Assignment Act, *see Kingsbury*, 215 Ct. Cl. at 144 (dicta), these considerations are unlikely to arise in the context of takings claims as opposed to, for instance, contract or tax refund claims.

is in the position of a mortgagee."); *Blee*, 260 Minn. at 153. Mister Bailey was also the mortgagee of lot 13. *See* Def.'s Prop. Facts ¶ 10; Bailey Aff. ¶ 16.

The government argues that a regulatory taking claim based on a restriction on the use of real property may not be brought by the owner of security interests in the property. *See* Def.'s Mem. at 21-24; Def.'s Supp. at 7-10. It further maintains that plaintiff has not identified damages that are either caused by the after-the-fact permit denial or are compensable under the Fifth Amendment. *See* Def.'s Mem. at 24-26; Def.'s Reply at 7-11; Def.'s Supp. at 10-15. Defendant moves for summary judgment on both these grounds.

*1. A Lien is Property under the Fifth Amendment*

Without question, a mortgagee's lien is "a compensable property interest within the meaning of the Fifth Amendment." *Shelden v. United States*, 7 F.3d 1022, 1026 (Fed. Cir. 1993) (citing *Murray v. United States*, 817 F.2d 1580, 1583 (Fed. Cir. 1987) and *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 602 (1935)). Thus, a mortgagee's interest in property, as well as the analogous interest of a contract for deed vendor, may be the subject of a claim under the Takings Clause. The government, however, contends that such interests are not compensable when a taking of the type alleged by plaintiff is at issue.

Defendant argues that when land in Minnesota is sold under a contract for deed, only the vendee has a real property interest. *See* Def.'s Mem. at 21-22; Def.'s Supp. at 3-4, 7. The vendor is owed the balance of purchase money due under the contract, which is considered personal property. *See* Def.'s Mem. at 22 (citing *Summers*, 167 Minn. at 456); Def.'s Supp. at 7 (same). And were the property to be condemned, the vendee would be considered the one selling the property to the government, with the vendor's lien attaching to the award. Def.'s Mem. at 22 (citing *Summers*, 167 Minn. at 456, and *Hampel v. Gleason*, 303 Minn. 55, 225 N.W.2d 844, 846-47 (Minn. 1975)).[68] The government acknowledges that the vendor has the statutory right to cancel the contract upon default, under Minn. Stat. § 559.21, in which case "the vendee forfeits all payments made and the vendor is restored with full legal and equitable title in the property." Def.'s Supp. at 5. Yet it maintains that, once Mr. Bailey sold the lots, he "did not have the right to use or possess them," and his "interest was only in receiving the amounts owed to him by the vendees and mortgagor." *Id.* at 8. Since the government's actions that are the basis of this lawsuit "only affected the interests of the persons who had the right to use the Property," it argues that the vendees and mortgagor, not Mr. Bailey, are the ones whose property was allegedly taken. *Id.*

---

[68] In Minnesota, if a mortgagee is left out of eminent domain proceedings, the condemning authority owes him an award of compensation even if it has already paid the mortgagor. *See Stemper v. County of Houston*, 187 Minn. 135, 135-37, 244 N.W. 690 (Minn. 1932).

For his part, in addition to making the unusual arguments concerning physical invasion and loss of access that were discussed above (*see* Section II.B, *supra*), Mr. Bailey rejects the argument that vendors retain only the right to receive payment of money -- underscoring the right of statutory cancellation of the contracts. *See* Pl.'s Supp. at 6. He notes that the definition of an "owner" entitled to participate in Minnesota eminent domain proceedings is broad enough to include holders of liens on the subject property. *See* Pl.'s Opp. Mem. at 18 (quoting Minn. Stat. § 117.025). And, perhaps most importantly, plaintiff explains that were he to exercise the statutory right of cancellation, "he would obtain all rights in the land which he has asserted is now valueless," Pl.'s Supp. at 7, as "the value of the property [to] which [he] owns title has been destroyed." *Id.* at 12.

Whether the interest of a vendor in a contract for deed transaction is considered personal property or real property is, quite frankly, not so "clear" and "simple" as the government would make it. *Cf.* Def.'s Supp. at 7. Defendant relies on the statement in *Summers* that "[t]he *balance of the purchase money* is treated as a part of the personal estate of the vendor and goes to his personal representative, but the interest of the vendee is regarded as real estate passing to his heirs." *Summers*, 167 Minn. at 456 (emphasis added); *see* Def.'s Mem. at 22; Def.'s Supp. at 7. But this does not explain the status of the security interest in the property. The lien on the property that secures the contract debt is different from the contract debt itself.

The difference between the lien and the money owed, perhaps, explains this language, in another opinion of the Minnesota Supreme Court concerning contracts for deeds and issued sixty-four years after *Summers*:

> A few state courts have begun to take the position that the vendor's interest is simply a personal property interest -- the right to receive the installment payments. This is a minority position and not the law in Minnesota.

*Trondson v. Janikula*, 458 N.W.2d 679, 682 (Minn. 1990). In *Trondson*, the Minnesota Supreme Court held that the assignee of a vendor's interest was not limited to receipt of payments due under the contract, but included "whatever rights" the assignors "had in the property as vendors, including recourse against the property for the purchase price." *Id.* at 683. As a consequence, the assignees were allowed to exercise the right to cancel the contract. *Id.*

Merely because the vendees have a real property interest does not mean that the vendors do not -- the existence of two distinct yet complementary real property interests, such as lessor and lessee, is not uncommon. Thus, the decision of our Court in which it was determined that the vendee in a contract for deed transaction owned land for purposes of a regulatory takings claim, *Cooley v. United States*, 46 Fed. Cl. 538, 546 (2000), *aff'd in part*, *vacated in part*, 324 F.3d 1297 (Fed. Cir. 2003), does not preclude the possibility of a claim brought by a vendor.[69]

---

[69] Incidentally, despite its present claim that the 1926 *Summers* opinion makes it "clear" that the vendor has no real property interests, *see* Def.'s Supp. at 7, in *Cooley* the government

The Court notes that federal courts have held that the interests of vendors in Minnesota contract for deed transactions are real property interests in at least two contexts. *See Shuster v. Doane* (*In re Shuster*), 784 F.2d 883, 884-85 (8th Cir. 1986) (holding that assignment of vendor's interest is a real estate transfer for purposes of perfecting the security interest prior to a bankruptcy filing); *Rodeck v. United States*, 697 F. Supp. 1508, 1512-14 (D. Minn. 1988) (determining that interest is in real property for purposes of the notice required when a federal tax lien is asserted).

But regardless of whether the mortgagee's or vendor's lien on real property is itself given the label of real property or is instead called personal property, this property interest consists of the *use* of real property. Before foreclosure or cancellation, the real property is used to secure payment of the loan or the remainder of the purchase price -- reducing the risk in the debt and accordingly allowing a lower interest rate to be charged.[70] After foreclosure, the mortgagee gets the use of the sale proceeds, to the extent of the remaining debt. After statutory cancellation, the vendor owns the property outright, even if its value exceeds the debt remaining on the cancelled contract (and gets to keep the payments received, too). *See Shields*, 552 N.W.2d at 230; Minn. Stat. § 559.21; *see also*, *e.g.*, Def's App. 155 (¶16 of contract for deed, explaining default remedy, including that "all payments made . . . shall belong to Seller as liquidated damages for breach of this contract"). Thus, the vendor is not limited to the value of the "personal property" of the debt owed, but gets the full use of the property upon default.[71] Whether the lien is held by a vendor or a mortgagee, its value as security directly depends on the value of the real property -- which in turn is derived from its use. *Cf. Lucas*, 505 U.S. at 1017 ("[F]or what is the land but the profits thereof[?]") (*quoting* 1 E. COKE, INSTITUTES, ch. 1, § 1 (1st Am. ed. 1812)). The Court concludes that this interest -- the lien on each lot mortgaged or sold under a contract for deed -- is dependent on the use of the lots, and thus may be taken by government restrictions on this use.

---

argued that the vendor, not the vendee, was the owner of the land for Fifth Amendment purposes. *See* Cooley, 46 Fed. Cl. at 546.

[70] Indeed, "the vendor's security interest or lien provides the critical security to a seller that is essential for an installment land sale contract to be a commercially reasonable way of selling real estate." *Shields*, 552 N.W.2d at 230 (*quoting Butler v. Wilkinson*, 740 P.2d 1244, 1256 (Utah 1987)). On the impact of security on interest rates see, e.g., Michael S. Knoll, *A Primer on Prejudgment Interest*, 75 TEX. L. REV. 293, 312 (1996) ("Thus, because secured debt is more likely to be paid in bankruptcy than unsecured debt, secured debt pays a lower interest rate than unsecured debt."); Alan Schwartz, *The Continuing Puzzle of Secured Debt*, 37 VAND. L. REV. 1051, 1054 (1984) (explaining that "[s]ecured creditors will charge lower interest rates because security reduces their risks").

[71] When the property is worth less than the amount owed under the contract, however, a vendor choosing the statutory cancellation remedy forfeits other breach of contract remedies, *see Rudnitski v. Seely*, 452 N.W.2d 664, 666-67 (Minn. 1990), and is thus in a worse position than a mortgagee in a comparable situation, who retains the prospect of a deficiency judgment. *See* Minn. Stat. § 582.30.

The government argues that the cases in which liens were found to have been taken all involve circumstances in which the government precluded the enforcement of the liens, and that this common feature should be viewed as a necessary element of such claims. *See* Def.'s Supp. at 12-15. Absent this element, defendant contends, a lienholder like the plaintiff is asserting the taking of a mere run-of-the-mill contract right, which can only be taken by a government action that "was aimed directly at" or "abrogated" the contracts or mortgage, *see id.* at 12, 15, under the *Cienega Gardens* gloss on the Supreme Court's decision in *Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923). *See Cienega Gardens v. United States*, 331 F.3d 1319, 1334-35 (Fed. Cir. 2003) (discussing *Omnia*).

The Court rejects this argument for a couple of reasons. First, it simply is not the case that liens are just contract rights to payment -- even liens on *personal property*. Supreme Court "cases recognize, as did the common law, that the contractual right of a secured creditor to obtain repayment of his debt may be quite different from the property right of the same creditor in the collateral." *United States v. Security Ind'l Bank*, 459 U.S. 70, 75 (1982) (citations omitted); *see also Louisville Joint Stock Land Bank*, 295 U.S. at 589-90 (explaining that effect of bankruptcy law on mortgagee's lien was "not the discharge of [his] personal obligation" but "the taking of substantive rights in specific property"). The Court doubts that the approach followed in *Omnia* has any application to lien interests. *Cf. T.O.F.C., Inc. v. United States*, 231 Ct. Cl. 182, 190-92 (1982) (noting that the "[p]laintiff had no lien on any of the properties" before applying *Omnia* to a joint venture contract). And, second, the government overlooks the key point of the lien takings decision by focusing on the cause, rather than the effect.

In *Armstrong v. United States*, for instance, it is true that valid materialmen's liens could not be enforced once property was transferred to the government. 364 U.S. 40, 46 (1960). As a consequence, government possession of the property "*destroyed the value of the liens*," which was something "no private purchaser could have done" -- and thus a taking had occurred. *Id.* at 48 (emphasis added). The Federal Circuit in *Murray*, in analyzing the effect of the government's refusal to allow the holders of a second mortgage to redeem the property, recognized that the elements of a taking were present -- based on the *Armstrong* holding concerning "the total destruction by the Government of *all value* of" liens. *Murray*, 817 F.2d at 1583-84 (quoting *Armstrong*, 364 U.S. at 48) (emphasis added).[72] And in *Shelden*, the Federal Circuit applied "the rule that when the government *destroys the value of a mortgage*, the mortgagee has suffered a taking and must be compensated." 7 F.3d at 1027-28 (emphasis added). The court concluded

[72] Based on North Dakota law, the lien in *Murray* was described as "a separate contract right distinct from the title to the real estate itself." *Murray*, 817 F.2d at 1583. Under Minnesota law, the vendor's lien "exists independently of any express agreement at the time of the conveyance," and is rooted in the estate being conveyed. *See Shields*, 552 N.W. 2d at 229 (recognizing the property rights of vendors and mortgagees). In *Murray*, the taking of the lien was contrasted with "the taking of the real estate itself," by which the Circuit meant the fee simple interest, since foreclosure had not occurred. *Murray*, 817 F.2d at 1583. Similarly, here Mr. Bailey cannot seek compensation for the fee simple interests of his vendees and mortgagor.

that "[b]ecause the mortgage was no longer enforceable, *its value had been destroyed*, resulting in a taking." *Id.* at 1028 (emphasis added). It explained that the debt "was no longer secured by the value of the" subject property, and thus "the United States turned the Sheldens into unsecured creditors who must be compensated for the taking." *Id.* at 1029.

While the inability to enforce liens may have been the cause of the taking of the liens in question (or, in the case of *Murray*, the basis for a properly stated claim), it was so because of the effect this had on their value. Since the properties to which the liens attached could not be foreclosed upon and sold (or redeemed), their value was of no service to the lienholders. But the same result is accomplished if, instead of preventing the lienholders from enforcing the liens, the government renders them valueless by restrictions on use of the property rendering *it* valueless. *Cf. Louisville Joint Stock Land Bank*, 295 U.S. at 590-602 (finding that a bankruptcy act amendment that replaced an immediate right to foreclosure with delayed payments at potentially less than fair market value violated the Takings Clause); *E-Systems, Inc. v. United States*, 2 Cl. Ct. 271, 278 (1983) (explaining in a case based on the government's delay in permitting a possessory lienholder to foreclose upon property that "[i]f plaintiff's security has lost all substantial economic value during the interim period, it is not apparent why its loss is remote or incidental rather than a direct result of defendant's action or inaction"). The Court thus holds that a taking of a vendor's or mortgagee's lien interest in property may be based on allegations of a regulatory taking of the underlying property. *Cf. Hansen v. United States*, 65 Fed. Cl. 76, 130 (2005) (holding that, under South Dakota law, a vendor in a contract for deed transaction "[a]s holder of legal title to the [property] . . . maintains a significant property interest that permits him to pursue" a takings claim based on the physical invasion of the property).[73]

<u>*2. Plaintiff's Claimed Damages are Cognizable*</u>

The government also moves for summary judgment on the basis that Mr. Bailey would be unable to prove any cognizable damages caused by the denial of the after-the-fact permit application. *See* Def.'s Mem. at 24-26; Def.'s Reply at 7-12; *see also* Def.'s Supp. at 10-15. Mister Bailey, with some cause, objects that this portion of the government's motion strays from the ambit of "threshold issues" to which the motion was to be confined. Pl.'s Opp. Mem. at 22.[74]

---

[73] The government cursorily argues that a mortgagee interest is an insufficient basis for a regulatory taking claim, based on an unspecified "suggest[ion]" allegedly in the *S.R.A.* opinion, and the statement in *Cienega Gardens* that a security interest "confers no right to possession." *See* Def.'s Mem. at 23 (citing *S.R.A.*, 327 U.S. at 565; quoting *Cienega Gardens*, 331 F.3d at 1329 n.17). The Court finds the former "suggested" no such thing, *see S.R.A.*, 327 U.S. at 565, and that the latter concerned whether a mortgagor was an owner of property, not a mortgagee. *See Cienega Gardens*, 331 F.3d at 1329 n.17; *see also id.* at 1329 (explaining that "[p]resent possessory rights are, thus, not necessary" in order to state a takings claim).

[74] *See*, *e.g.*, Scheduling Order (Dec. 10, 2004); Joint Status Report (Dec. 7, 2004); Order (July 13, 2004); Joint Prelim. Status Report (Apr. 9, 2004).

This portion may, nevertheless, be a useful vehicle for narrowing issues as the case moves forward.

The Court does not believe that it can be said, as a matter of law, that Mr. Bailey cannot prove damages caused by the Section 404 permit denial or by the restoration order. For instance, Mr. Bailey contends that the assessed value of each lot is now less than $5,000, Bailey Aff. ¶ 25, and the lots had been sold at a price of $25,000 each. *See*, *e.g.*, Def.'s App. 154, 158, 162, 169, 175, 184, 190. This alone creates a genuine issue of material fact as to whether the government's actions took Mr. Bailey's property interests in the lots. As the government notes, Mr. Bailey in his opposition paper argued that the taking he alleges includes the loss of his contract rights to receive payment from the vendees -- who stopped payment when use of the lots was restricted by the government. *See* Def.'s Reply at 7-12; Pl.'s Opp. Mem. at 16-17. The Court agrees with the government that this sort of claim would fall squarely under the Supreme Court's decision in *Omnia*. *See Omnia*, 261 U.S. at 510-14. But a careful review of the complaint does not yield any allegation of a taking of plaintiff's contract rights to payment, and thus the issue is not relevant to our proceedings.

The government also argues that Mr. Bailey appears to be seeking the full value of the lots, even though some of them are equitably owned by the vendees or mortgagor. *See* Def.'s Reply at 11. Again, while the complaint is the source of great perplexity, *see* Section I.D., *supra*, the Court does not find it to be the case that Mr. Bailey seeks compensation for the interests of others. He expressly requests just compensation for the "taking of *his property* for public use," Compl. at 8 (Prayer for Relief ¶ 1) (emphasis added), and notes that the "persons who purchased real property from plaintiff have *also suffered* an uncompensated taking." *Id.* ¶ IX (emphasis added). Mister Bailey should realize, however, that while the government's liability for a taking of his lien interests may be based on the determination of whether the impact of the relevant government actions on the lots was severe enough to have taken them, the value of the lots is not the measure of his damages. Rather, his damages would be based on the concomitant taking of his lien interests, turning him from a secured to an unsecured creditor. It is not necessary at this stage to definitively determine how the value of a security interest in real property would be calculated -- one supposes that one measure of this value might be the difference between the net present value (as of the date of the taking) of the debt outstanding based on the interest rate charged, and the (necessarily lower) net present value of the debt based upon a higher interest rate that would reflect a debt that is unsecured. In any event, just compensation may be awarded Mr. Bailey were he to prove the taking of his fee simple or lien interests in the subject lots, and thus the government's motion for summary judgment on this ground is DENIED.

### E. The Absence of the Equitable Owners is No Obstacle to Resolution of Plaintiff's Claims

One final matter should be briefly addressed by the Court. As was mentioned earlier, notice under RCFC 14(b) was sent out to the owners of lots 2, 3, 7, 8, 9, 11, 12, and 13. None of the individuals notified decided to file a complaint to intervene. Mister Bailey contends that they are "necessary and indispensable parties to this action," as they possess the lots in which he also

allegedly maintains an interest.[75] Compl. ¶ IX; *see also* Pl.'s Supp. at 12. He also curiously suggests that the owners of lots 7 and 8 "should be interpled as Plaintiffs as there is no guarantee these parties will not seek legal remedies against the Plaintiff in the future." Pl.'s Opp. Mem. at 18. The government, for its part, contends that Mr. Bailey's action would "pose[] a procedural and due process challenge" if it resulted in the government obtaining the fee simple interest in the lots without the participation of the equitable owners. Def.'s Reply at 11-12.

The Court concludes that neither party has provided sufficient cause to impress these other individuals into service in this cause. If Mr. Bailey were to succeed on the merits, then the property interests obtained by the government will be limited to the ones currently held by him, and not the other individuals (assuming that the government does not change its position on use of the subject properties, in which case no permanent interest would be obtained). A determination that the government's actions have had the result of taking the lots owned by third parties will neither transfer the fee simple interest in these lots to the government, nor obligate the government to pay just compensation for such a taking. Nor does it appear that the contrary determination would bind those third parties in any way. This matter may proceed between just Mr. Bailey and the government.

## III. CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is **DENIED** and its motion for summary judgment is **GRANTED** as to any claims based on a taking of lots 7, 8, and 11 and **DENIED** in all other respects. The parties shall file a joint status report within twenty-eight days of the date of this order suggesting a schedule for further proceedings.

**IT IS SO ORDERED.**

s/ Victor J. Wolski

**VICTOR J. WOLSKI**
Judge

[75] The Court says "allegedly," as it has already determined that Mr. Bailey has no interest in lots 7, 8, and 11.