**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **GARY BAILEY,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil No. 02-1078L** |
| | ) | **Honorable Victor J. Wolski** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BASED UPON BACKGROUND PRINCIPLES OF STATE LAW**

Defendant, the United States of America, moves for summary judgment in its favor on the grounds that the Plaintiff cannot show that he possessed the property interest which he alleges was taken in this case. For this reason as more fully set forth in the following memorandum, the Defendant requests that the Court enter summary judgment in its favor pursuant to Rule 56 of the Rules of the Court of Federal Claims.

# TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . 1

II. BACKGROUND . . . . . . . . . . 2

A. Sunny Beach Subdivision . . . . . . . . . . 2

B. Plaintiff's Application for a Section 401 Certification . . . . . . . . . . 3

C. Revocation of Plaintiff's Section 401 Certification . . . . . . . . . . 6

D. Plaintiff's Takings Claims . . . . . . . . . . 7

E. Plaintiff's Appeal of the Revocation of the Section 401 Certification . . . . . . . . . . 7

III. ARGUMENT . . . . . . . . . . 10

A. Standard of Review . . . . . . . . . . 10

B. Background Principles of State Law Define the Contours of Plaintiff's Property Interest . . . . . . . . . . 11

1. As a Threshold Matter, Plaintiff Must Demonstrate the Existence of a Protected Property Right Before a Taking Can Be Considered . . . . . . . 11

2. Plaintiff Bears the Burden of Demonstrating That a Property Interest Exists. . . . . . . . . . . 13

3. State Law Routinely Defines the Scope of a Plaintiff's Property Interest . . . . . . . . . . 14

C. Plaintiff Has No Property Interest in Development that Is Prohibited Under Background Principles of Minnesota Law . . . . . . . . . . 18

1. Minnesota Common and Statutory Laws of Nuisance Prohibit Development that Includes Inadequate Septic Systems . . . . . . . . . . 18

2. Residential Development of Plaintiff's Property Is Prohibited Under Background Principles of Minnesota Law of Nuisance . . . . . . . . . . 21

a. The State of Minnesota Has Conclusively Determined that Installation of Septic Systems in the Saturated Sunny Beach Soils Would Create a Nuisance . . . . . . . . . . . . . . . . . . . . . . . . . . 22

b. The State of Minnesota Has Determined that Many of the Sunny Beach Lots Are Too Small to Support Septic Systems . . 23

3. Because the Taking Alleged by Plaintiff Goes No Further Than Limitations Under Minnesota's Background Principles of Nuisance, There Can Be No Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## CASES

*Air Pegasus of D.C., Inc. v. United States*,
424 F.3d 1206 (Fed. Cir. 2005) . . . . . . . . . . 12, 13

*Allied-General Nuclear Servs. v. United States*,
839 F.2d 1572 (Fed. Cir.) . . . . . . . . . . 11

*Am. Pelagic Fishing Co. v. United States*,
379 F.3d 1363 (Fed. Cir. 2004), *cert. denied* 545 U.S. 1139 (2005) . . . . . . . 11-13, 14, 24

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) . . . . . . . . . . 10

*Bailey v. United States*,
78 Fed. Cl. 239 (2007) . . . . . . . . . . 2, 3, 6

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972) . . . . . . . . . . 14

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) . . . . . . . . . . 10

*Colvin Cattle Co. v. United States*,
468 F.3d 803 (Fed. Cir. 2006) . . . . . . . . . . 11

*Conti v. United States*,
291 F.3d 1334 (Fed. Cir. 2002) . . . . . . . . . . 11, 12, 14

*County of Pine v. State Dep't. of Natural Res.*,
280 N.W.2d 625 (Minn. 1979) . . . . . . . . . . 19

*Erb v. Maryland Dept. of Environment*,
676 A.2d 1017 (Md. App. 1996) . . . . . . . . . . 24

*Goldblatt v. Town of Hempstead*,
369 U.S. 590 (1962) . . . . . . . . . . 16

*Hall v. Stokely-Van Camp Inc.*,
106 N.W.2d 8 (Minn. 1960) . . . . . . . . . . 19

*Highview North Apartments v. County of Ramsey*,
323 N.W.2d 65 (Minn. 1982) . . . . . . . . . . 19

*Huber v. City of Blue Earth*,
6 N.W.2d 471 (Minn. 1942) . . . . . . . . . . 18

*Hughes v. Village of Nashwauk*,
225 N.W. 898 (Minn. 1929) . . . . . . . . . . 19

*John R. Sand & Gravel Co. v. United States*,
62 Fed. Cl. 556 (2004), *aff'd on other grounds*, 457 F.3d 1345 (2006),
*aff'd* 128 S.Ct. 750 (2008) . . . . . . . . . . 1, 18, 25

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470 (1987) . . . . . . . . . . 16, 24

*Knieper v. United States*,
38 Fed. Cl. 128 (1997) . . . . . . . . . . 11

*Lucas v. South Carolina Coastal Council*,
505 U.S. 1003 (1992) . . . . . . . . . . 1, 13,15-17

*M&J Coal Co. v. United States*,
47 F.3d 1148 (Fed. Cir. 1995) . . . . . . . . . . 11-14, 15

*Maritrans v. United States*,
342 F.3d 1344 (Fed. Cir. 2003) . . . . . . . . . . 12, 13

*McKay v. United States*,
199 F.3d 1376 (Fed. Cir. 1999) . . . . . . . . . . 1

*Members of Peanut Quota Holders Ass'n, Inc., v. United States*,
421 F.3d 1323 (Fed. Cir. 2005), *cert. denied*, 548 U.S. 904 (2006) . . . . . . . . . . 11

*Miller v. Schoene*,
276 U.S. 272 (1928) . . . . . . . . . . 16

*Minnesota Energy & Econ. Dev. Auth. v. Printy*,
351 N.W.2d 319 (Minn. 1984) . . . . . . . . . . 19

*Mugler v. Kansas*,
123 U.S. 623 (1887) . . . . . . . . . . 15

*Nelson v. Swedish Evangelical Lutheran Cemetery Assoc.*,
126 N.W. 723 (Minn. 1910) . . . . . . . . . . 18

*Nienow v. Village of Mapleton*,
174 N.W. 517 (Minn. 1919) . . . . . . . . . . 19

*Penn Central Transp. Co. v. City of New York*,
438 U.S. 104 (1978) . . . . . . . . . . 16

*Rith Energy, Inc. v. United States*,
44 Fed. Cl. 108 (1999) . . . . . . . . . . 17, 25

*Satren v. Hader Co-op. Cheese Factory*,
279 N.W. 361 (Minn. 1938) . . . . . . . . . . 18

*Sweats Fashions, Inc. v. Pannill Knitting Co.*,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . 10

*Tabb Lakes, Ltd. v. United States*,
10 F.3d 796 (Fed. Cir. 1993) . . . . . . . . . . 11

*United States v. Gen. Motors*,
323 U.S. 373 (1945) . . . . . . . . . . 14

**STATUTES**

33 U.S.C. § 1341 . . . . . . . . . . 3, 4

33 U.S.C. § 1344 . . . . . . . . . . 3, 6

Mason's Minn. St. 1927 . . . . . . . . . . 19

Minn. Stat. Ann. § 115.01 . . . . . . . . . . 20

Minn. Stat. Ann. § 115.07 (2008) . . . . . . . . . . 4

Minn. Stat. Ann. § 115.071 . . . . . . . . . . 20

Minn. Stat. Ann. § 115.44 . . . . . . . . . . 20

Minn. Stat. Ann. § 561.01 (2008) . . . . . . . . . . 19

Minn. Stat. § 14.69 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

The Minnesota Water Pollution Control Act (Minn. Stat. Ch. 115) . . . . . . . . . . . . . . . . . . . . . . 20

**RULES**

RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

RCFC 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**REGULATIONS**

Minn. R. 6120.3500 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Minn. R. 7001.1400-1470 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Minn. R. 7050.0210 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 20-22

Minn. R. 7060.0100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Minn. R. 7060.0600 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 21, 22

Minn. R. 7080.0010 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Minn. R. 7080.0065 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 21, 22

Minn. R. 7080.0170 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Minn. R. 7080.0305 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Minn. R. Chap. 7080 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 20

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BASED UPON BACKGROUND PRINCIPLES OF STATE LAW**

## I. INTRODUCTION

"[T]he Fifth Amendment protects rather than creates property interests." *McKay v. United States*, 199 F.3d 1376, 1381 (Fed. Cir. 1999). Instead, in most instances, the right and power to define property interests is reserved to the states. As Justice Scalia intoned in *Lucas v. South Carolina Coastal Council*, "'takings' jurisprudence . . . has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the 'bundle of rights' that they acquire when they obtain title to property." 505 U.S. 1003, 1027 (1992). As such, "Federal courts look to state law to 'define the range of interests that qualify for protection as "property," under the Fifth and Fourteenth Amendments.'" *John R. Sand & Gravel Co. v. United States*, 62 Fed. Cl. 556, 562 (2004), *aff'd on other grounds*, 457 F.3d 1345 (2006), *aff'd* 128 S.Ct. 750 (2008), citing *Lucas*, 505 U.S. at 1030.

In the instant case, the state of Minnesota has considered the application of its statutory property law as well is its common law of nuisance to residential development of the very lake shore lots at issue in this case.[1/] Applying its own intrinsic law, the state determined that neither plaintiff, nor any other owner, could possess a stick in their bundle of property rights that would allow them to locate residential development on the lake front lots at issue in this case. As the

[1/]Background principles of property law can also derive, in certain circumstances, from federal law. *See, e.g., Lucas*, 505 U.S. 1003 (referring to the federal navigational servitude).

State of Minnesota found, to do so would have negative health and safety consequences because of the inherent inability to safely install septic systems on the property.

Given that the lake shore lots at issue here cannot be developed as residential properties under state law, Plaintiff has no property interest in their development of sale as residential lake front lots. Plaintiff enjoys no property right to develop the lots or sell them for residential development, ergo that non-existent right cannot be taken. As such, Plaintiff's claim – that his right to develop the lots for residential purposes or to alienate the lots for residential development by others was destroyed by the United States Army Corps of Engineers' denial of a permit to fill wetlands – cannot constitute a taking.

## II. BACKGROUND

### A. Sunny Beach Subdivision

Plaintiff claims that 13.2 acres of property immediately adjacent to Lake of the Woods in Minnesota have been taken from him by Defendant.[2/] Complaint (Dkt. 1), ¶¶ IV, VII. The property, which is commonly known as "Sunny Beach," was platted by plaintiff as a residential subdivision containing 14 residential parcels.[3/] *Id.* ¶ IV. To provide access to the individual lots, from the fall of 1998 through August, 1999, Plaintiff had a road constructed through Sunny

---

[2/]Defendant asserts that the relevant parcel for purposes of this case is a much larger tract of land totaling approximately 206.15 acres, which was purchased in a single transaction by Plaintiff and his former wife, Kathryn Bailey, in June, 1989. *See Bailey v. United States*, 78 Fed. Cl. 239, 241 (2007) ("*Bailey I").* The size of the parcel, however, is not relevant to the present motion for summary judgment and, as such, any dispute over the relevant parcel need not be addressed by the Court at this time.

[3/]"As approved by the County Board in late 1998, the plat had 14 lots, averaging 33,700 square feet each, with roughly 100' of shorefront each being roughly 300 feet deep." *See* Findings of Fact, Conclusion and Recommendation of the State of Minnesota Office of Administrative Hearings for the Minnesota Pollution Control Agency ("ALJ's Report"), at ¶ 4 (attached hereto as Ex. A).

Beach. *See Bailey I*, 78 Fed. Cl. at 242-43. At the time the road was installed, Plaintiff had not obtained the necessary authorizations to construct the road from the United States Army Corps of Engineers ("Corps of Engineers") or from the State of Minnesota. *Id*. at 243; Deposition of Gary Bailey ("Bailey Dep.") (Dec. 1, 2004), Ex. 16 (attached hereto as Ex. B). In December 1998, the subdivision plat was approved by Lake of the Woods County. Complaint (Dkt. 1), ¶ IV; *see also Bailey I*, 78 Fed. Cl. at 242.

From December, 1998 through the first half of 1999, Plaintiff sold lots 2 through 14, retaining lot 1 for himself. *Id*. at 244-45. Some time thereafter, Plaintiff reacquired seven of the lots (4, 5, 6, 9, 10, 12 and 13). Bailey Dep. (Feb. 22, 2008), Ex. 51 (attached hereto as Ex. C); *Bailey I*, 78 Fed. Cl. at 245. In its August 10, 2007 decision granting, in part, Defendant's prior Motion for Summary Judgment, the Court ruled that Plaintiff held no property interest in three of the lots (7, 8, and 11), which have, therefore, not been taken from Plaintiff for purposes of his Fifth Amendment takings claim. *See Bailey I*, 78 Fed. Cl. at 275. The remaining three lots (2, 3, and 14) remain subject to contracts for deed for which the purchasers are essentially current with their payments. Bailey Dep. (Feb. 22, 2008), 47:4-11, 50:3-6 (attached hereto as Ex. D).

**B. Plaintiff's Application for a Section 401 Certification**

Plaintiff was required to obtain both a Section 404 permit from the Corps of Engineers as well as a Section 401 Certification from the Minnesota Pollution Control Agency ("MPCA") before developing Sunny Beach as a residential development. 33 U.S.C. §§ 1344, 1341. Section 401 provides for state-issued certifications for activities that may result in a pollutant discharge to surface waters (*Id*. at § 1341(a)) and addresses the proposed development's compliance with the state's water quality standards and other requirements of state law. *Id*. at § 1341(d). The

Minnesota Pollution Control Agency ("MPCA") has adopted rules to implement the Section 401 certification program. Minn. R. 7001.1400-1470 (2007). Under its own rules, MPCA can issue a certification only if "there is [a] reasonable assurance that the activity will be conducted in a manner that will not violate applicable water quality standards." *Id.* at 1470, subp. 1.C. The MPCA has also adopted standards for the revocation of a certification. *Id.* at 1450, subp. 1.B.

In August, 1998, the Corps of Engineers received an application for an after-the-fact permit for the Road. Bailey Dep. (Dec. 1, 2004), Ex. 9 (attached hereto as Ex. E).[4/] On June 24, 1999, the Corps of Engineers issued a public notice regarding Plaintiff's after-the-fact Section 404 permit application. Bailey Dep. (Dec. 1, 2004), Ex. 11 (attached hereto as Ex. G). As a result of the public notice, the MPCA became aware of Plaintiff's Sunny Beach project. Testimony of Larry Zdon ("Zdon Test."), CCH Tr. 31-32 (attached hereto as Ex. H). As is its customary procedure, MPCA treated the public notice as an application for a Section 401 Certification. *Id.* Under the Clean Water Act, Section 401 Certifications address surface water quality issues. 33 U.S.C. § 1341. Minnesota has included protection of groundwater as part of its certification requirements, which requirement goes above and beyond any requirements imposed by the federal Clean Water Act. Minn. R. 7060.0100 *et seq.* Minnesota's review also goes above and beyond the federal requirements by including in its certification review consideration of the specific type of septic system that may be installed to treat sewage under state law (Minn. Stat. Ann. § 115.07 (2008); Minn. R. ch. 7080.0170 (2007)), and the

---

[4/]On June 12, 2001, the Corps of Engineers denied Plaintiff's Section 404 permit application. MPCA Contested Case Hearing ("CCH"), Ex. 17 (attached hereto as Ex. F). The Section 404 permit addresses the impact and appropriateness of placing fill material in wetlands. The 404 permit denial is only relevant to the instant motion for summary judgment to the extent that its impact is coterminous with background principles of Minnesota law of nuisance.

requirement that the property owner be able to install two separate standard septic systems (Minn. R. 7080.0305, subp. 4.F (2007); Minn. R. 6120.3500 subp. 3 (2007).

Initially, the MPCA had concerns regarding residential development at Sunny Beach because it was unclear whether individual sewage treatment systems ("ISTS" or "septic systems") could be installed on the property in compliance with MPCA's ISTS rules (Minn. R. Chap. 7080). Zdon Test., CCH Tr. 36-37 (Ex. H).[5] Thus, the MPCA issued a request for information ("RFI") to Plaintiff on July 23, 1999, requesting additional information regarding septic system compliance and wetland impacts. CCH Tr. Ex. 6 (attached hereto as Ex. I); *see also* ALJ's Report at ¶ 9 (Ex. A). The RFI requested that Plaintiff describe how compliance with the MPCA's ISTS rules would be achieved, a layout showing wetlands on the property, and an evaluation to determine total wetland impacts. CCH Tr. Ex. 6 (Ex. I); *see also* ALJ's Report at ¶ 11 (Ex. A). Bailey did not respond to the RFI. Zdon Test., CCH Tr. 50, 94-95, 147 (Ex. H); *see also* ALJ's Report at ¶ 12 (Ex. A).

On December 19, 1999, the MPCA issued a Section 401 Certification to Plaintiff for the Sunny Beach project. Zdon Test., CCH Tr. 77 (Ex. H); *see also* ALJ's Report at ¶ 20 (Ex. A). The initial granting of the Section 401 Certification was based upon representations made by local government officials indicating that the 100 feet of land closest to Lake of the Woods on

---

[5] To meet the health and safety requirements of Minnesota state law, septic systems require three feet of unsaturated soils in order to fulfill the two basic functions of an ISTS: sewage treatment and hydraulic performance. Testimony of Mark Wespetal ("Wespetal Test."), CCH Tr. 396-400 (Ex. H). A mound can be created to provide a portion of the three feet of unsaturated soil for a mound system, but even a mound system is required to have at least 12 inches of unsaturated original or natural soil in the absorption area. Zdon Test., CCH Tr. 63-64 (Ex. H); Wespetal Test., CCH Tr. 401-06 (Ex. H); Minn. R. 7080.0170, subp. 5.A.(2) (2007).

each lot was not saturated and would, therefore, support the installation of septic systems. *See* ALJ's Report at ¶¶ 14-21 (Ex. A).

**C. Revocation of Plaintiff's Section 401 Certification**

The information provided by the local government officials later proved to be inaccurate. *Id*. at ¶ 24. In August, 2000, experts from the Corps of Engineers and the U.S. Department of Agriculture's Natural Resources Conservation Service ("NRCS") conducted a formal on-site wetland delineation at Sunny Beach. *Bailey I*, 78 Fed. Cl. at 243; *see also*, ALJ's Report at ¶ 23 (Ex. A). The on-site investigation demonstrated the inaccuracy of the conclusion that the first 100-feet of land closest to Lake of the Woods was not saturated and could adequately support septic systems. *Id.* ¶ 24. The MPCA was now aware of the true soil conditions on the property, including the saturated nature of the soil, which had not previously been disclosed by Plaintiff. As the Minnesota State Administrative Law Judge ("ALJ") stated in his findings:

> By the early fall of 2000, MPCA's deliberations and evaluations centered on four main areas[, including] . . . (4) because virtually the entire plat was wetland, the lack of assurance that ISTSs could be installed that would comply with the MPCA rules. Given the lack of information and uncertainty on these issues, MPCA determined it could not modify the existing Section 401 certification to address these unknowns and uncertainties, and decided that the certificate should be revoked.

ALJ's Report at ¶ 28 (Ex. A). As a result of the new information and new analysis, the MPCA revoked Plaintiff's 401 Certification for the Sunny Beach Subdivision. CCH Tr. Ex. 16 (attached hereto as Ex. J); *see also Bailey I*, 78 Fed. Cl. at 243. On June 12, 2001, the Corps of Engineers denied Plaintiff's application for an after-the-fact section 404 permit. *Id*. The Corps of Engineers was required to deny the application given that Plaintiff's Section 401 Certification had been revoked by the State of Minnesota. 33 U.S.C. § 1344.

**D. Plaintiff's Takings Claims**

As a result of the Corps of Engineers' denial of the permit, Plaintiff claims that he was unable to maintain the road at Sunny Beach, which, in turn, interfered with his sale of the lots as residential lake shore lots. In his Complaint, Plaintiff variously describes his claims related to the Corps of Engineers' alleged interference with the development of residential lake shore lots. Plaintiff claims, for example, that the actions of the Corps of Engineers "diminished the value of [the] property from highly valuable residential lakeshore property to property in which the soils cannot be disturbed and has no access required for residential development." Complaint (Dkt. 1), ¶ IX (emphasis added); *see also* ¶ III (claiming the Sunny Beach property "is highly valuable, sought after largely by summer residents . . . seeking lake cabins as second homes. . . . Sunny Beach is appropriate for construction of homes."); ¶ VII ("Defendant's final agency decision also places such restrictions on the property that there remains no economical [sic] viable use of the property or in the alternative substantially diminished the value of the property from residential lakeshore property to property that has no access nor value as residential lakeshore property.") (emphasis added). In short, Plaintiff claims that his ability to alienate the lake shore lots for residential development has been taken. *Id*.

**E. Plaintiff's Appeal of the Revocation of the Section 401 Certification**

Plaintiff appealed the MPCA's revocation of the Section 401 Certification through a contested case hearing, which was conducted by an ALJ from the Minnesota Office of Administrative Hearings. ALJ's Report (Ex. A). For three days, from July 23-25, 2003, the ALJ heard testimony regarding Plaintiff's challenge to the Section 401 Certification. *Id*.

At the hearing, Mark Wespetal, who is MPCA's chief ISTS expert and a licensed professional soil scientist, testified extensively regarding the Property's wetland soil and how those soils were not adequate for the septic systems that Bailey proposed. Wespetal Test., CCH Tr. 382-466 (Ex. H). Wespetal analyzed the soils at all of the transect locations identified in the Corps of Engineers' August 2000 wetlands delineation. None of the soils analyses showed soil adequate for standard mound septic systems. *Id*., CCH Tr. 419, 426 (Ex. H). Wespetal testified that, given these inadequate soils, mound systems would weep and seep untreated or partially treated sewage to the ground surface and nearby ground and surface waters. *Id*., CCH Tr. 406-07, 446-49 (Ex. H). Wespetal further testified that these conditions posed an imminent public health threat and could result in untreated pathogens entering the groundwater and nearby lake creating public health problems. *Id*., CCH Tr. 447-48 (Ex. H). The witness concluded that several MPCA rules would be violated, including rules prohibiting sewage discharges to ground surface; and nuisance conditions would be created if residential development were permitted in the Sunny Beach subdivision. *Id*., CCH Tr. 406-07, 449 (Ex. H).

Wespetal further analyzed the property to determine whether there was sufficient area on each lot for two standard ISTS systems. *Id*., CCH Tr. 426-42 (Ex. H); MPCA Lot Size Assessment, CCH Tr. Ex. 50 (attached hereto as Ex. K). Information relevant to the siting of septic systems in the Sunny Beach subdivision had come to the attention of the MPCA following its initial granting of a Section 401 Certification and even after the revocation. Through the review of other agencies' records, MPCA learned that substantial portions of Sunny Beach was in a floodplain. Zdon Test., CCH Tr. 103-04 (Ex. H). Siting of septic systems in the floodplain

increases the likelihood of ISTS failure, thereby endangering public health. As such, installation of septic systems in the floodplain is prohibited. *Id*.

Both MPCA ISTS rules and the Minnesota Department of Natural Resources' shoreland rules require non-wetland area sufficient for two standard systems. Westpetal Test., CCH Tr. 428 (Ex. H). This two-system requirement is needed because even well-designed, properly maintained septic systems have a finite life (e.g. 25-50 years before plugging occurs), so replacement land area is needed. *Id*., CCH Tr. 428-29 (Ex. H). Westpetal's evaluation showed that six lots did not have sufficient area and that another four lots were very small and required additional site-specific investigation work to determine whether those four lots complied with the area requirement. *Id*., CCH Tr. 433-34 (Ex. H); *see also* MPCA Lot Size Assessment (Ex. K).

On October 3, 2003 the ALJ issued his findings of fact, conclusions and recommendation, in which he "recommended that the [MPCA's] revocation of the Section 401 Certification be affirmed." ALJ's Report at p. 15 (Ex. A). On January 16, 2004, Sheryl Corrigan, Commissioner of the MPCA, issued a Statement of Issue, Findings of Fact and Order, in which she "agree[d] with the ALJ's Recommendation that MPCA's revocation of the Section 401 Certification issued to Gary Bailey be affirmed." *See* Statement of Issue, Findings of Fact and Order ("Commissioner's Order"), p. 6 (attached hereto as Ex. L). As the Commissioner found:

> The [MPCA] has proven, by a preponderance of the evidence, that the proposed Sunny Beach project endangers human health and the environment that the danger cannot be eliminated by modifying the Section 401 certification. In particular, sewage is likely to be discharged without adequate treatment. This situation exists because there is no evidence of the existence of soil conditions at

> the Sunny Beach project site that comply with MPCA's individual sewage treatment system (ISTS) rules. The discharge of sewage without adequate treatment will create nuisance conditions and an imminent public health threat and violate other MPCA rules (e.g., Minn. R. 7050.0210, subps. 1-2, Minn. R. 7060.0600, sup. 2, Minn. R. 7080.0065, Subp. 4). Even if compliant ISTS soil existed (they do not), several lots in the Sunny Beach plat do not have adequate area to comply with the two-standard ISTS system requirements of MPCA ISTS rules and the MDNR shoreland regulations and these conditions endanger human health and the environment.

Commissioner's Order at ¶ 15 (Ex. L).[6/]

## III. ARGUMENT

### A. Standard of Review

Summary judgment is a "salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) (internal quotation marks omitted). In this regard, the summary judgment procedure "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

Summary judgment is appropriate under RCFC 56 when there are no genuine issues of material fact in dispute, and the moving party is entitled to a judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude entry of

[6/]Plaintiff was informed, in the Commissioner's Order, that the "Order may be appealed to the Minnesota Court of Appeals in the manner provided in Minn. Stat. § 14.69 (2002). . . ." Commissioner's Order at p. 6 (Ex. L). Plaintiff did not appeal or otherwise challenge the Commissioner's Order.

summary judgment." *Id.* at 248; *see also Knieper v. United States*, 38 Fed. Cl. 128, 134 (1997) ("Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment."). Moreover, summary judgment may be awarded in a takings case. *See Allied-General Nuclear Servs. v. United States*, 839 F.2d 1572 (Fed. Cir.) (affirming summary judgment of takings claim), *cert. denied*, 488 U.S. 819 (1988); *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796 (Fed. Cir. 1993) (same).

### B. Background Principles of State Law Define the Contours of Plaintiff's Property Interest

#### 1. As a Threshold Matter, Plaintiff Must Demonstrate the Existence of a Protected Property Right Before a Taking Can Be Considered

The Federal Circuit has established a two part test to evaluate whether governmental action amounts to a taking of private property for Fifth Amendment purposes. *Conti v. United States*, 291 F.3d 1334, 1339 (Fed. Cir. 2002); *M&J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed. Cir. 1995). The need for this two part test stems from the realization that the Court must first determine whether the property owner has the right to put the property to the owner's proposed use. There are limitations to use inherent in all property, which preclude an owner from deriving specific benefits from their property. *See Members of Peanut Quota Holders Ass'n, Inc., v. United States*, 421 F.3d 1323, 1334-35 (Fed. Cir. 2005), *cert. denied*, 548 U.S. 904 (2006) (holding that the government's unilateral right to revoke peanut quotas established by federal statute is inherent in the property owner's rights); *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1374-77 (Fed. Cir. 2004), cert. denied 545 U.S. 1139 (2005) (fishing boat owner and operator has no protected property interest in fishery permits granted by the government); *Colvin Cattle Co. v. United States*, 468 F.3d 803, 808 (Fed. Cir. 2006) (reduction

in value of property resulting from cancellation of grazing lease on adjacent federal lands does not represent a cognizable property interest). Thus, before turning to the question of whether the government's actions have effectuated a taking, "[f]irst, a court must evaluate whether the claimant has established a 'property interest' for purposes of the Fifth Amendment. [Then], [s]econd, once a court has determined that a property interest exists, it must determine whether a taking occurred." *Conti*, 291 F.3d at 1339; *see also M&J Coal*, 47 F.3d at 1154. As noted by the Federal Circuit in *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005), "we do not reach this second step without first identifying a cognizable property interest."

Therefore, in every Fifth Amendment takings case, the issue of whether the Plaintiff possesses a protected property interest is a threshold element of the Plaintiff's claim. *See Air Pegasus*, 424 F.3d at 1212 ("First, as a threshold matter, the court must determine whether the claimant has established a property interest for the purposes of the Fifth Amendment.") (quoting *Am. Pelagic*, 379 F.3d at 1372; *Maritrans v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003) ("First, a court must evaluate whether the claimant has established a 'property interest' for purposes of the Fifth Amendment.") (citation omitted). If a plaintiff cannot establish a cognizable property interest, plaintiff's takings claim fails. *See Am. Pelagic*, 379 F.3d at 1372 ("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the court[']s task is at an end"); *Conti*, 291 F.3d at 1339 ("However, if a claimant fails to demonstrate that the interest allegedly taken constituted a property interest under the Fifth Amendment, a court need not even consider whether the government regulation was a taking under the analysis set forth in *Penn Central*").

According to this legal framework, the Court's inquiry into whether Plaintiff possessed a protected property interest at the time of the alleged taking must begin with identifying the property right alleged to have been taken and examining any limitations that are placed on the use of the property by state background principles. *See Air Pegasus*, 424 F.3d at 1217 (limiting review to the right alleged by plaintiff). In this manner, the court determines whether plaintiff's claimed property right is "a stick in the bundle of property rights" possessed by the plaintiff. *Am. Pelagic*, 379 F.3d at 1376; *M&J Coal Co.*, 47 F.3d at 1154, citing *Lucas*, 505 U.S. at 1027 (noting that the threshold inquiry before the court must be to "inquire into the nature of the land owner's estate to determine whether the use interest proscribed by the governmental action was part of the owner's title to begin with, i.e., whether the land use interest was a 'stick in the bundle of property rights' acquired by the owner").

Plaintiff alleges, in this action, that his right to develop and sell the property for residential development has been taken. As will be demonstrated below, Plaintiff has not demonstrated that he possessed the right to develop or sell the property for residential development. Indeed, state nuisance law specifically prohibited residential development of Plaintiff's property because septic systems could not safely be installed on the property.

### 2. Plaintiff Bears the Burden of Demonstrating That a Property Interest Exists

The Federal Circuit has repeatedly said that the burden of proving the existence of a compensable property interest rests with the claimant. *See Am. Pelagic*, 379 F.3d at 1372 ("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the court's task is at an end")(emphasis added); *Maritrans*, 342 F.3d at 1351 ("First, a court must evaluate whether the claimant has established a 'property interest' for purposes of the Fifth

Amendment.") (citation omitted)(emphasis added); *Conti*, 291 F.3d at 1339 ("However, if a claimant fails to demonstrate that the interest allegedly taken constituted a property interest under the Fifth Amendment, a court need not even consider whether the government regulation was a taking under the analysis set forth in *Penn Central*.")(emphasis added).

In the instant case, not only has Plaintiff failed to demonstrate a compensable property interest in the development of his property for residential use, but the unrefuted evidence is to the contrary. A manifest determination by the State of Minnesota that installation of septic systems on the property would represent a public nuisance precludes Plaintiff, or any purchaser, from developing the property for residential use.

### 3. State Law Routinely Defines the Scope of a Plaintiff's Property Interest

In determining whether a plaintiff possesses a property right that is protected by the Fifth Amendment, courts begin with the maxim that

> [t]he Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L.Ed.2d 548 (1972). Instead, "existing rules and understandings" and "background principles" derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking. *Lucas*[, 505 U.S. at] 1030 [(1992)]. These existing rules often involve and define "the citizen's relation to the physical thing, as the right to possess, use and dispose of it." *United States v. Gen. Motors*, 323 U.S. 373, 378, 65 S. Ct. 357, 89 L.Ed. 311 (1945).

*Conti*, 291 F.3d at 1340. Stated another way, the threshold inquiry into whether a plaintiff possesses a protected or cognizable property interest requires the court to determine whether the particular property interest that a plaintiff contends has been taken is "a stick in the bundle of property rights" possessed by the plaintiff. *Am. Pelagic*, 379 F.3d at 1376; *M&J Coal*, 47 F.3d

at 1154 (noting that the court must first determine whether the use proscribed by the governmental action was part of the owner's title to begin with) (citing *Lucas*, 505 U.S. at 1027).

Background principles of state law have served to defeat takings claims for over a century, dating back to the Supreme Court's determination that a law prohibiting the use and sale of alcohol did not result in the taking of the plaintiff's brewery. *Mugler v. Kansas*, 123 U.S. 623 (1887). As the Court recognized:

> A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the state that its use by any one, for certain forbidden purposes, is prejudicial to the public interests. . . . The power which the states have of prohibiting such use by individuals of their property, as will be prejudicial to the health, the morals, or the safety of the public, is not, and, consistently with the existence and safety of organized society, cannot be, burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by noxious use of their property, to inflict injury upon the community.

*Id.* at 668-69.

The Supreme Court has oft relied upon the avoidance of deleterious property uses, through the application of background principles of state nuisance and property law, as a basis for finding that the government is not obligated to compensate a property owner when governmental action restricts or prevents activities that constitute, or are similar to, a public nuisance. The Court has affirmed that

> [l]ong ago it was recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community,' . . . and the Takings Clause

> did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it.

*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491-92 (1987) (internal citations omitted). As such, the Court found that

> since no individual has a right to use his property so as to create a nuisance or otherwise harm others, the State has not 'taken' anything when it asserts its power to enjoin the nuisance-like activity.

*Id*. at 491 n. 20; *see also Miller v. Schoene*, 276 U.S. 272 (1928) (holding that Virginia was not required to compensate owners of trees that were ordered destroyed to prevent a dendrologic disease from spreading); and *Goldblatt v. Town of Hempstead*, 369 U.S. 590 (1962) (holding that a duly enacted ordinance limiting mining within town limits did not result in the taking of the plaintiff's property, even if it deprived the property of its most beneficial, where those restrictions were designed to prevent nuisance-like consequences).[7/]

Justice Scalia reiterated the importance of state law in defining and limiting the property interest held by a plaintiff in a takings action when he found it to be well established that "independent source[s] such as state law" define "the range of interests that qualify for protection as 'property' under the Fifth . . . Amendment[]." *Lucas*, 505 U.S. at 1030 (citations omitted). As such, before imposing liability on the government for a taking, Justice Scalia recognized the need to determine what pre-existing limitations inhere in a plaintiff's property interest.

---

[7/]Justice Rehnquist also recognized this "nuisance exception" in the context of the just compensation clause when the proposed property "use is dangerous to the safety, health, or welfare of others." *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 145 (1978). He further wrote that "[a]s early as 1887, the Court recognized that the government can prevent a property owner from using his property to injure others without having to compensate the owner for the value of the forbidden use." *Id*. at 144.

> It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercises of its police powers; "[a]s long recognized, some values are enjoyed under an implied limitation that must yield to the police power."

*Id.* at 1027.[8] As the Court observed:

> A law or decree with such an effect must, in other words, do no more than duplicate the result that could have been achieved in the courts – by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally, or otherwise.

*Id.* at 1029 (footnote omitted).

The "nuisance exception" shield to the just compensation clause is not limited in its application to state governments. In instances in which a federal action does nothing more than duplicate the limitations inherent in property ownership, as defined by background principles of state law, the federal government is also shielded from liability. For example, in *Rith Energy*, the court found that a state-law statutory restriction on the creation of water pollution was a bar to a takings claim against the United States. *Rith Energy, Inc. v. United States*, 44 Fed. Cl. 108, 115 (1999) (affirming that a state public health and safety statute is considered to be part of the background principles of state nuisance and property law to which all property ownership is subject), *aff'd on other grounds*, 247 F.3d 1355 (Fed. Cir. 2001). A similar result was reached in *John R. Sand & Gravel Co.*, where the Court found that when the federal government's

---

[8] In *Lucas*, the plaintiff challenged application of South Carolina's Beachfront Management Act, which prevented the erection of a house on coastal property. The Court held that a regulation which deprives an owner of all "economically beneficial use" of his or her property is, "categorically," a taking that requires compensation. Justice Scalia noted, however, that no compensation would be due if the limitation on property use was one which "inhere[s] in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Lucas*, 505 U.S. at 1029 (citations omitted).

prohibition has done no more than duplicate the result that could have been achieved under state law nuisance principles, there has been no taking. *John R. Sand & Gravel Co. v. United States*, 62 Fed. Cl. 556, 589 (2004), *aff'd on other grounds*, 457 F.3d 1345 (2006), *aff'd* 128 S.Ct. 750 (2008).

In short, Plaintiff's property ownership does not give him the right to develop his property in a way so as to endanger the public health or safety. Given the inability to install septic systems in a safe manner on Plaintiff's property, as determined by the relevant state agency charged with making such determinations, the proposed development constitutes a "public nuisance." Thus, the right to sell the property at issue for residential development was never a stick in the bundle of rights possessed by Plaintiff.

### C. Plaintiff Has No Property Interest in Development that Is Prohibited Under Background Principles of Minnesota Law

#### 1. Minnesota Common and Statutory Laws of Nuisance Prohibit Development that Includes Inadequate Septic Systems

The right to be free from nuisance created by water pollution, including sewage discharge, has long been recognized as actionable under Minnesota common and statutory law. *Nelson v. Swedish Evangelical Lutheran Cemetery Assoc.*, 126 N.W. 723 (Minn. 1910) (actionable nuisance may result if cemetery is situated such that burials will contaminate water of wells or springs); *Satren v. Hader Co-op. Cheese Factory*, 279 N.W. 361, 364 (Minn. 1938) (discharge of manufacturing waste into river created an actionable nuisance); *Huber v. City of Blue Earth*, 6 N.W.2d 471 (Minn. 1942) (city's sewage discharge into stream created actionable

nuisance).[9] Indeed, as far back as 1927, the state legislature explicitly granted to the state courts the jurisdiction to abate private nuisances arising from water pollution.

> Anything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance. An action may be brought by any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance . . . .

Mason's Minn. St. 1927, § 9580 (Minn. Stat. Ann. § 561.01 (2008)). And, the Minnesota Supreme Court has held that the statutory law of nuisance is simply declaratory of the common law definition of nuisance. *Hall v. Stokely-Van Camp Inc.*, 106 N.W.2d 8, 10 (Minn. 1960) (holding that canneries discharge of "waste liquids" into river that passed the plaintiff's farm constituted an actionable nuisance). In addition, the Minnesota Supreme Court has held that the state's police power appropriately extends to the disposal of sewage and control of pollution. *Minnesota Energy & Econ. Dev. Auth. v. Printy*, 351 N.W.2d 319, 341-42 (Minn. 1984); *County of Pine v. State Dep't. of Natural Res.*, 280 N.W.2d 625, 629 (Minn. 1979) (holding that the limitation of pollution is a valid exercise of the State's police power).

The Minnesota Water Pollution Control Act (Minn. Stat. Ch. 115), as well as the Minnesota Pollution Control Agency's ("MPCA") water quality standards and sewage treatment rules have now codified the prevention of nuisance situations long recognized in Minnesota's

---

[9] A classic nuisance is created where sewage discharges onto neighboring properties. *Highview North Apartments v. County of Ramsey*, 323 N.W.2d 65, 71 (Minn. 1982) (sewage deposits on neighboring property is a classic example of a nuisance); *Hughes v. Village of Nashwauk*, 225 N.W. 898 (Minn. 1929) (sewage discharges to premises is actionable nuisance); *Nienow v. Village of Mapleton*, 174 N.W. 517 (Minn. 1919) (sewage discharge onto the plaintiff's land constitutes an actionable nuisance). Groundwater contamination resulting from human waste has also been found to constitute an actionable nuisance. *Nelson*, 126 N.W. 723.

common law.[10] Indeed, the water quality regulations define water pollution with reference to nuisance:

> 'Pollution of water,' 'water pollution,' or 'pollute the water' means: (a) the discharge of any pollutant into any waters of the state or the contamination of any waters of the state so as to create a nuisance or render such waters, unclean, or noxious, or impure so as to be actually or potentially harmful or detrimental or injurious to public health, safety or welfare . . . .

*See* Minn. Stat. Ann. § 115.01, subd. 13 (2008) (emphasis added).[11] The MPCA regulatory program is specifically designed to establish water quality and purity standards that will avoid actual or potential deleterious effects. *See* Minn. Stat. Ann. § 115.44, subds. 3-4 (2008); Minn. R. 7050.0210, subp. 2 (2007) (nuisance conditions prohibited). Specifically, Minnesota has determined that improper location of Individual Sewage Treatment Systems (or septic systems) will adversely affect the public health, general welfare and safety by creating the potential for discharge of inadequately treated sewage to the ground surface, surface water, and ground water and have codified rules to prevent such nuisances. *See* Minn. R. 7080.0010 (2007). Most importantly, because of the public health issues involved, the Minnesota Legislature has determined that violation of the MPCA rules or standards constitutes a public nuisance that may be enjoined. Minn. Stat. Ann. § 115.071, subd. 4.

---

[10] *See* discussion of Individual Sewage Treatment System (ISTS) rules, *supra* at pp. 4-10; Minn. R. ch. 7080.

[11] Waters of the state include both surface and ground waters. *See* Minn. Stat. Ann. § 115.01, subd. 22 (2008).

### 2. Residential Development of Plaintiff's Property Is Prohibited Under Background Principles of Minnesota Law of Nuisance

Based primarily upon the testimony of two experts in waste treatment and soil hydrology, the ALJ and MPCA Commissioner determined that development of the Sunny Beach Subdivision, including both installation of the road and development of residential lots, created a nuisance under Minnesota law. As the Commissioner of the MPCA found in 2004,

> The [MPCA] has proven, by a preponderance of the evidence, that the proposed Sunny Beach project endangers human health and the environment that the danger cannot be eliminated by modifying the Section 401 certification. In particular, sewage is likely to be discharged without adequate treatment. This situation exists because there is no evidence of the existence of soil conditions at the Sunny Beach project site that comply with MPCA's individual sewage treatment system (ISTS) rules. The discharge of sewage without adequate treatment will create nuisance conditions and an imminent public health threat and violate other MPCA rules (e.g., Minn. R. 7050.0210, subps. 1-2, Minn. R. 7060.0600, sup. 2, Minn. R. 7080.0065, Subp. 4). Even if compliant ISTS soil existed (they do not), several lots in the Sunny Beach plat do not have adequate area to comply with the two-standard ISTS system requirements of MPCA ISTS rules and the MDNR shoreland regulations and these conditions endanger human health and the environment.

Commissioner's Order at ¶ 15 (Ex. L). The decision was based upon two separate, but related, determinations made by the ALJ and confirmed by the Commissioner. First, and most importantly, the MPCA determined that the saturated wetland soils in the Sunny Beach subdivision could not safely sustain septic systems. Second, even if the soils in the Sunny Beach subdivision could sustain septic systems, the MPCA determined that the majority of the lots in the Sunny Beach subdivision had inadequate land outside of the floodplain to locate two separate septic systems.

**a. The State of Minnesota Has Conclusively Determined that Installation of Septic Systems in the Saturated Sunny Beach Soils Would Create a Nuisance**

MPCA's licensed soil scientist analyzed the wetland soils in the Sunny Beach subdivision to determine whether ISTS could be installed in compliance with the State's health and safety standards. Westpetal Test., CCH Tr. 382-466 (Ex. H). The state expert determined that the soils were not adequate for a mound system, the type of system commonly used in areas with wet soils. *Id.*, 419, 426. Given these inadequate soils, mound systems would be expected to weep or seep untreated sewage to the ground surface, the surface water and the ground water, resulting in nuisance conditions and violations of MPCA rules. *Id.* 406-07, 446-49.

Based upon the testimony provided by the experts, the ALJ found conclusively that the Sunny Beach project endangered human health and the environment because "sewage is likely to be discharged without adequate treatment." ALJ's Report at ¶ 6 Ex. A). As the ALJ concluded, the potential for danger to public health resulting from inadequate soil conditions on site prevented the safe installation of septic systems. Commissioner's Order at ¶ 15 (Ex. L). MPCA found that the anticipated sewage discharges violated the following MPCA rules:

- Minn. R. 7050.0210, subps. 1-2, which prohibits untreated sewage discharges and nuisance conditions;
- Minn. R. 7060.0600, subp. 2, which prohibits sewage discharges that pollute ground water; and
- Minn. R. 7080.0065, subp. 4, which prohibits ISTS seepage to ground surface and sewage or sewage tank effluent discharges to ground surface or surface waters.

*Id.*

**b. The State of Minnesota Has Determined that Many of the Sunny Beach Lots Are Too Small to Support Septic Systems**

The MPCA scientists evaluated the complications of siting septic systems in the Sunny Beach lots, where significant portions of the property are in the floodplain, to determine whether sufficient land area existed for mound systems. Westpetal Test., CCH Tr. 426-446 (Ex. H). The analysis was done based upon the hypothetical assumption that soil conditions were adequate for the installation of septic systems. As set forth above, soil conditions were not acceptable in the Sunny Beach subdivision. A significant portion of the Sunny Beach subdivision lies within the 100-year floodplain.[12/] ALJ's Report at ¶¶ 35-36 (Ex. A). As a result, the MPCA determined that six of the Sunny Beach lots definitively do not have sufficient land area to meet the MPCA and MDNR rule that residential lots must be able to accommodate two standard septic systems. *Id.* ¶ 37. Another four lots were very small and may not contain adequate land area to meet the requirement. *Id.* Additional site-specific investigation would be required to determine whether these four lots could meet the two-system requirement. *Id.* As with the inadequate soil conditions, the MPCA determined that, given the inadequate lot sizes, the installation of septic systems would endanger human health and the environment. Commissioner's Order at ¶ 15 (Ex. L).

[12/]The MPCA did not learn that much of the Sunny Beach subdivision was within the floodplain until after the Section 401 Certification was revoked, because Plaintiff had failed to apprise the agency of this fact when submitting his permit application or in response to the Request for Information sent to Plaintiff by the MPCA in July 1999. ALJ's Report at ¶ 5 (Ex. A).

**3. Because the Taking Alleged by Plaintiff Goes No Further Than Limitations Under Minnesota's Background Principles of Nuisance, There Can Be No Taking**

In the instant case, Plaintiff fundamentally alleges that the Corps of Engineers took his right to develop the Sunny Beach subdivision for residential purposes or alternatively his right to alienate the lots within the Sunny Beach subdivision for the same purpose. Because background principles of Minnesota's law of nuisance – both the judicially created common law as well as the law as codified by the legislature – prohibit the development of the Sunny Beach lots for residential purposes, Plaintiff lacks any right to develop the lots or to alienate them for such development. Plaintiff simply does not have such a stick in his bundle of property rights.

As the Supreme Court held in *Keystone*, the states exercise of its police power to prevent a nuisance does not represent a taking, because property owners simply do not possess a right to use their property so as to create a nuisance. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491-92 (1987). Put simply, the government cannot take something that was never a stick in the property owner's bundles of rights. *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1374-77 (Fed. Cir. 2004), cert. denied 545 U.S. 1139 (2005)

Indeed, a Maryland appellate court has addressed thes issue now before this Court in a case with strikingly similar facts. *Erb v. Maryland Dept. of Environment,* 676 A.2d 1017, 1026-28 (Md. App. 1996). The court found that a regulatory agency's denial of an ISTS permit was in accordance with a regulatory program designed to prevent nuisances and, accordingly, the permit denial did not constitute a taking. *Id*. Private nuisance law can abate discharges from sewage disposal systems that are or may be detrimental to the public health; consequently, public regulations designed to prevent these same nuisances do not constitute a taking. *Id.* Like *Erb*,

the MPCA's actions to prevent acts that contravene public health and safety do not constitute a taking. Nor do federal limitations that go no farther than the restrictions imposed under state background principles. *Rith Energy, Inc. v. United States*, 44 Fed. Cl. 108, 115 (1999), *aff'd on other grounds*, 247 F.3d 1355 (Fed. Cir. 2001); *John R. Sand & Gravel Co. v. United States*, 62 Fed. Cl. 556, 562 (2004), *aff'd on other grounds*, 457 F.3d 1345 (2006), *aff'd* 128 S.Ct. 750 (2008).

The actions of the Corps of Engineers, at most, did nothing more than limit the use of the Sunny Beach property to the same uses allowed under background principles of Minnesota law. As such, the actions taken by the Corps of Engineers cannot be seen as a taking. In short, the Corps of Engineers could not have taken something that Plaintiff never had.

## III. CONCLUSION

Because Plaintiff did not and does not have a property right to develop the Sunny Beach subdivision for residential purposes as proscribed by background principles of state law, no such interest could have been taken by the United States Army Corps of Engineers. Thus, Defendant respectfully requests, pursuant to Rule 56 of the Rules of the Court of Federal Claims, that its

motion for summary judgment be granted and that Plaintiff's Complaint be dismissed in its entirety with prejudice.

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

*/s/ James D. Gette*

JAMES D. GETTE
Natural Resources Section
Environment & Natural Resources Division
Department of Justice
P.O. Box 663
Washington, DC 20044-0663
Tel: 202-305-1461
Fax: 202-305-0267
Email: james.gette@usdoj.gov

Of Counsel:

Steven P. Adamski
Deputy District Counsel
U.S. Army Corps of Engineers
St. Paul District
190 East 5th Street, Suite 401
St. Paul, Minnesota 55101