IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GARY BAILEY,
Plaintiff,
v.
THE UNITED STATES,
Defendant.

Civil No. 02-1078L
Honorable Victor J. Wolski

ORIGINAL

DEPOSITION OF GARY BAILEY

February 22, 2008

. . . The following is the Deposition of GARY BAILEY, taken at the request of the Defendant in the above-entitled cause, pending in the United States Court of Federal Claims, pursuant to Notice and the Federal Rules of Civil Procedure, before Ruth Ann Johnson, RPR, a Notary Public within and for the State of Minnesota, at the AmericInn, Highway 11 West, Roseau, Minnesota, on Friday, February 22, 2008, at 9:25 o'clock a.m., at which time counsel appeared as hereinbefore set forth .

Page 2

APPEARANCES

On Behalf of the Plaintiff:

ALAN FISH, P.A.
102 2nd Avenue Northwest
Roseau, Minnesota 56751
By: ALAN B. FISH, ATTORNEY AT LAW

On Behalf of the Defendant:

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
P. O. Box 663
Washington, DC 20004
By: JAMES D. GETTE, TRIAL ATTORNEY

Taken By: Ruth Ann Johnson, RPR

Page 3

CONTENTS


| DEPONENT: | PAGE |
|---|---|
| GARY BAILEY | |
| Examination by . . . Mr. Gette | 4 |


EXHIBITS*


| EXHIBITS | MARKED |
|---|---|
| No. 48 -- Copy of letter to Gary Bailey from Gary Lockner, 4-27-94 | 15 |
| No. 49 -- Copy of letter Gary Lockner from Gary Bailey, 7-12-90 | 28 |
| No. 50 -- Copy of Lake of the Woods County Application to Plat, with attached letter from Scott A. Seeley | 31 |
| No. 51 -- Copy of list of lots | 44 |


(*Exhibits attached to transcript.)

Page 4

PROCEEDINGS

GARY BAILEY,

the Plaintiff, of Williams, Minnesota, called as a witness by the Defendant, being first duly sworn by Ruth Ann Johnson, RPR, a Notary Public within and for the State of Minnesota, was examined and deposed on his oath as follows:

EXAMINATION

BY MR. GETTE:

Q. Mr. Bailey, my name is Jim Gette, we met just before we started. I know that you've had your deposition taken several times previously, once previously in this case, so I'll forego all the instructions. I have a feeling you've got them down pretty good by now.

I just want to inquire about a couple of different areas related to your use and purchase of some property.

Now in 1989, I believe it was, you purchased some property, about 206 acres out on Lake of the Woods. Is that correct?

A. That's correct.

Q. Okay. And that was purchased from the Lewises?

Page 5

A. Lewises, yes.

Q. Okay. Now at the time you purchased that 206 acres, that was purchased all in one purchase from the Lewises, correct?

A. It was.

Q. And when you bought that 206 acres, what was your intention in terms of the intended use of the property?

A. It was investment for, for the lakeshore.

Q. Now a good bit of that land is not lakeshore property. Is that correct?

A. Yes.

Q. Okay. What was your intention with respect to that portion of the property?

A. That was, that was sold off.

Q. And there's a County Road 53 that runs through the middle of that property. Is that correct?

A. Property on both sides of the road, yes.

Q. Okay. Fair enough. It's not, it doesn't quite split it evenly, correct?

A. That's correct.

Q. All right. To the, to the west of


©2008

Page 6

Route 53 there were three 40s, correct?
A. Not, not on Lewises' land there wasn't. But to the west, west of 53, yeah, yeah, you're right.
Q. Okay. All right. Let's just make sure we have the record clear.
So west of Route 53 there were three 40s that were purchased as part of that 206 acres purchased from the Lewises, correct?
A. That's correct.
Q. And ultimately did you sell all three of those 40s to a man by the name of Jeff Dahl?
A. Yes, I did.
Q. Was that in one or two separate sales?
A. Two sales. One was an option to buy the other 40.
Q. Okay. So you initially did a sale of 80 acres with an option to buy the final 40?
A. Yes.
Q. Is that correct?
A. That's correct.
Q. I'll show you what was previously marked as Exhibit 28 for your deposition. Is

Page 7

that the initial sale of the 80 acres to Mr. Dahl?
A. I believe so.
Q. Okay. And did you execute a deed when you sold the final 40 to him?
A. I believe when it was paid off I executed a deed.
Q. I'm not sure I followed that. When what was paid off?
A. We had a contract for deed, you know, for the property.
Q. That's right.
So this, this Exhibit 28 was a contract for deed, but this was a contract for deed only for 80 acres, correct?
A. I believe so.
Q. With respect to those other 40 acres, did you execute a separate deed or contract for deed with Mr. Dahl?
A. I believe I did.
Q. Would you have a copy of that in your files?
A. I don't know. I guess I -- (no further response.)
Q. It indicates on Exhibit 28 that the

Page 8

sales price for this initial 80 acres was 33,000. Is that correct?
A. I believe so.
Q. Okay. Do you know what the sales price was for the final 40 acres?
A. I, I don't. I don't remember, I guess.
Q. Now did you make any use of those 120 acres before you sold them to Mr. Dahl?
A. No.
Q. And the property sold to Mr. Dahl, pursuant to Exhibit 28, did that include a residential structure?
A. Yes, there was a small house on it.
Q. Were there any other structures?
A. I believe a, an older garage.
Q. Anything else?
A. Not to my knowledge.
Q. Now I want to go back to, go over, now, to the area that is east of County Road 53.
When you first purchased this whole 206 acres, how were you going to use that chunk of property, the 86 acres that were east of County Road 53?

Page 9

A. Part of that was a, a farm field, but the, the lots were, the investment part was the lakeshore itself, be developed the same way everything else was on, on the shore.
Q. Early, after the purchase of the property, had you contemplated developing a portion of the property into five-acre lots?
A. The difference I was told between platting and plotting is that I, I could, if a lot was bigger than five acres you didn't have to plat it.
Q. Okay. So if you wanted to cut these into five-acre lots and sell them off for residential construction, it wouldn't have to be an approved plat by the county. Was that your understanding?
A. That was my understanding.
Q. Okay. How many, at the time you were thinking about developing as, as five-acre lots, so you could avoid the platting process, how many lots did you anticipate on selling off?
A. It would have remained the same, it still would have been 14 lots, they just would have been bigger.

 ©2008

Page 10

Q. And would each of the 14 lots have had beachfront?
A. Yes.
Q. So these would have been fairly long but narrow lots?
A. Yes.
Q. Did you ever have a survey done for the, designating those five-acre lots?
A. No.
Q. And, ultimately, why did you decide to plat the property instead of selling them as five-acre lots?
A. County planner just said that would be a better idea.
Q. Who was that county planner?
A. Gary Lockner.
Q. Did he explain to you why he thought it was a better idea?
A. I'm sure he did. I, I don't remember.
Q. Now at the time you were considering plotting the lots, were you -- let me get some background to this.
Were you also, in the early period of owning the property, considering developing

Page 11

an inland harbor?
A. Yes, I got a permit for that.
Q. And at the time you were considering the five-acre lots, were you still considering, at that point, inclusion of an inland harbor?
A. I, I can't recall.
Q. I want to talk a little bit about the harbor.
What, what, would this have been a harbor that had boat slips in it?
A. That's what it was for. I talked to the people that were along shore there and the way the wind is, even though they had docks out, they really couldn't park their boats there, it was -- they needed inland harbor.
Q. So is it fair to say several people expressed an interest in, in inland harbor space?
A. Yes.
Q. And how many boat slips did you envision in the harbor you were considering?
A. I can't remember.
Q. Can you give me a ballpark?
A. I, I can't remember. I can't recall.

Page 12

Q. Okay. Now at the time you were considering the inland harbor, was it your intention, if you built it, to rent these boat slips?
A. Yes.
Q. And from the location of your property there along Lake of the Woods, what's the next closest harbor available on the lake?
A. Zippel Bay, I suppose.
Q. And how far is that about from your property?
A. I'd just be guessing if I told you. I -- (no further response.)
Q. Okay. We can look on a map and figure that out.
Do you own a boat?
A. Yes.
Q. Okay. And do you own or rent any slips on Lake of the Woods?
A. No, I don't.
Q. Have you ever?
A. Yes, I did.
Q. Okay. When did you have a boat slip?
A. Must have been late '80s.

Page 13

Q. And where was that slip?
A. On Rainy River.
Q. Rainy River?
A. Yes.
Q. Okay. And did you own or lease that slip?
A. Leased it.
Q. And what did you pay for that slip?
A. That was yearly and I, I don't remember.
Q. Would you have any records related to your lease of that boat slip?
A. I, I doubt it.
Q. And is that a harbor, an inland harbor at Rainy River?
A. No. It's just docks on the river.
Q. But given that it's on the river, it's off of the lake?
A. Yes.
Q. So I'm assuming it provides some additional protection?
A. Protected, yeah.
Q. Can you guesstimate about how many slips they have there available for lease?
A. I, I don't.


©2008

Page 14

Q. Okay. Do they have a boat ramp there at Rainy River?
A. Yes.
Q. And when you were considering installation of an inland harbor on your property, did you envision including a boat ramp?
A. Yes.
Q. Now when you -- do you frequently still put your boat into Lake of the Woods?
A. Yes.
Q. Where do you typically put in?
A. Public access on Rainy River.
Q. And is that a, when you say public access, is that a free public put in?
A. Yes.
Q. Are there other boat ramp, boat ramps along Lake of the Woods that are for fee boat ramps?
A. Yes.
Q. Have you ever used any of those?
A. Yes.
Q. How much do they charge to put in at those places?
A. They go up every year. I,

Page 15

Arneson's, I think, is at $10 a -- (no further response.)
Q. Which one was that?
A. Arneson's Rocky Point.
Q. Are they at the high end or is that about the normal fee that most places charge?
A. I, I haven't gone any, any other place except that one.
Q. Okay.
MR. GETTE: Can I ask you a favor, is that Mr. Bailey's first deposition?
MR. FISH: This is the December 1, 2004, one.
MR. GETTE: Okay. In this case?
MR. FISH: Yes.
MR. GETTE: Can you tell me where we left off with exhibits? That way I won't duplicate.
MR. FISH: Looks like Exhibit 47.
MR. GETTE: Okay. We'll pick up with Exhibit 48?
MR. FISH: Yeah.
MR. GETTE: If you could mark this as Exhibit 48, please.
(Whereupon, Deposition Exhibit No.

Page 16

48, Bailey, was marked for identification.)
Q. (By Mr. Gette) Mr. Bailey, I'm handing you what's been marked as Exhibit 48 to your deposition and first I'd just ask you to take a little time, take a look at that document.
Have you had a chance to look at that?
A. Yes.
Q. Do you recognize this document?
A. It's one of many, I guess.
Q. Is that a yes?
A. Yes.
Q. Okay. I'd, I'd like to focus mainly, and you've turned there already, to the last page of that document. Is that a, a layout plan that you had prepared for your property?
A. It's one Gary Lockner made up.
Q. Okay. And Gary Lockner was involved with the Lake, or Lake of the Woods County planning. Is that correct?
A. That's correct.
Q. Okay. You see he's drawn a harbor on, on that plot, or on that design layout. Is

Page 17

that where you had envisioned placing the harbor when you sought a permit to, to build a harbor?
A. Actually, I think it was farther back from the lake, but it was on the same south end of the property.
Q. Okay. And why did you choose the south end of the property?
A. I guess there was a drainage ditch there already and -- (no further response.)
Q. Okay. So the existence of the drainage ditch, would it be fair to say that that would have made construction of the inland harbor a little easier?
A. It already had access to the lake, I guess.
Q. I'm not sure I understand what you mean by that.
A. Looking at coming inland to the harbor, it would have used, used part of the ditch as access to the harbor, I guess, is what I'm trying to say.
Q. So would it be fair to say that the existence of the ditch would have meant less, less ground would have had to have been dug out

Page 18

to, to create the inlet into the harbor?
A. It would have been less lakeshore property used for the development of the harbor, I guess, is what I was looking at.
Q. And you'll see on that drawing that Mr. Lockner has also drawn an access road on what would be the southern edge of your property. Is that correct?
A. That's correct.
Q. Okay. Have you ever installed an access road there?
A. It's always been there.
Q. Okay. And the road that is, always been there, is that a road that would be acceptable for county purposes?
A. I don't know.
MR. FISH: Object, lack of foundation, vague.
Q. (By Mr. Gette) You can answer, Mr. Bailey.
A. No.
Q. Have you ever sought a permit to upgrade that road to a level that would make it exceptional for county purposes?
A. No.

Page 19

Q. Have you ever discussed the possibility of seeking a permit to upgrade that road with anyone at the county?
A. I don't believe so.
Q. Have you ever discussed the possibility of upgrading that road and obtaining a permit with any government official?
A. I might have. I just don't remember.
Q. Do you know whether the land on which that road traverses is wetlands?
A. I don't.
Q. You reference a drainage ditch. Does that drainage ditch run along the southern border of your property?
A. Yes, it does.
Q. Okay. Is there also a drainage ditch or -- strike that.
At the time you purchased the property, was there also a drainage ditch along the northern border of your property?
A. I'm not sure there.
Q. Is there a public access road that runs along the northern edge of your property,

Page 20

from Sandy Shores down to the edge of the lake?
A. I believe so.
Q. Did you ever discuss the possibility of placing an inland harbor on the northern edge of your property with any government officials?
A. No.
Q. When you were considering the installation of the harbor on the southern border of your property, how did you anticipate that individuals using the harbor would gain access to it?
A. By building the same road that we did build, I guess.
Q. At the time you were considering the harbor, did you consider a road that would have run along the southern border of your property?
A. No.
Q. Since the late '80s have you considered leasing any boat slips for your boat on Lake of the Woods?
A. I guess I might have.
Q. Have you ever gone out and priced out any slips along Lake of the Woods since then?

Page 21

A. No. No, I haven't.
Q. Did you have any design plans actually drawn for the harbor that you had obtained a permit for?
A. I had to send that in to, to get the permit.
Q. Who prepared those design drawings?
A. I believe I drew them up or Gary Lockner helped.
Q. Ultimately, why did you decide not to build the harbor?
A. Just the economics of, and costs, I guess.
Q. Did you actually sit down and do a, a revenue versus expenses type of comparison?
A. I might have.
Q. You don't recall today?
A. No. I think I extended the permit a couple times and then -- I, I can't recall.
Q. Now you had obtained this permit in the early '90s, correct?
A. I believe so.
Q. And when did you ultimately plat the property for residential development?
A. It must have been in, in the '90s, I

 ©2008

Page 22

believe.
Q. Was it in the late '90s?
A. I believe so.
Q. Okay. And sometime between the acquisition of the permit to build the harbor and the platting, had you allowed that, that permit to lapse?
A. Yes. I guess it wasn't extended, because they extended it a couple times and then they wouldn't, wouldn't do it.
Q. Who wouldn't do it?
A. I'm not sure. I think it was just the DNR, because the Corps was a blanket permit.
Q. So at some point did you attempt to extend it and DNR refused your request?
A. I, I can't recall, but I, I -- it might have been it.
MR. FISH: Can we go off the record?
MR. GETTE: Let's go off the record.
(Whereupon, there was discussion off the record.)
MR. FISH: Go back on the record, that's fine.
A. Can I tell you why they refused it?

Page 23

Q. (By Mr. Gette) Absolutely.
A. Zippel Bay had a problem with, with their harbor and they had the Corps come out and put a jetty in, and whatnot, and they had a problem with what they call longshore drift, the sand filled up everything.
After doing that, the last time my permit was going to be extended, they said they wouldn't do it, because they, they thought I'd have a, a problem that I couldn't handle with longshore drift.
Q. Now do you know how they addressed the issue of longshore drift up at Zippel Bay?
A. They, they dredge it out all the time.
Q. And is that a, is Zippel Bay a public facility or is that a private facility?
A. Both.
Q. Okay. Do you know who does the dredging?
A. At the, only at the private place, the resort has to get a permit and, and dredge it out.
Q. Do you know how often they do that?
A. I don't.

Page 24

Q. Okay. That's fine.
So you say resort, is this a hotel resort type area?
A. Cabins.
Q. And that resort includes an inland harbor, does it?
A. Yes.
Q. And is that inland harbor like the one that you were considering?
MR. FISH: I guess I'll object to vague, Counsel. You mean size, natural or man-made?
Q. (By Mr. Gette) You can answer if you can.
A. I don't know.
Q. Do you know how, how many slips they have in that harbor?
A. I don't. Just docks base.
Q. So they don't actually have slips there?
A. Just docks base, like I said.
Q. Now is there, there's also a public harbor area at Zippel Bay, did I understand that correctly?
A. There's also a park.

Page 25

Q. And is there a separate inland harbor for that public park?
A. No. Zippel, Zippel is a bay, Zippel Bay, and then to get out to the lake was through this area where they had to dredge and put up a, a jetty out, rock jetty.
Q. Okay. So this is a natural inland bay?
A. Yes.
Q. Okay. Did you ever seek any bids or cost estimates for the installation of the harbor?
A. No.
Q. Now when the issue of longshore drift came up, was there any discussion of jetties and how that might impact the longshore drift effect?
A. They, that's where it became economically nonfeasible, just the cost of the jetty at Zippel Bay was done with public money.
Q. Have any idea how much it would cost to build a, a jetty along your property?
A. It was hundreds of thousands of dollars.
Q. And how did you come to know that it


©2008

Page 26

would be hundreds of thousands to do that?
A. That was the cost of the jetty at Zippel Bay.
Q. Am I right that an alternative to building the jetty would be to, to dredge the channel periodically?
A. No. Along with saying that I need a jetty there, they said they wouldn't allow a jetty because it would affect spawning areas of the fish, so even though the only alternative was a jetty, they wouldn't allow it anyway.
Q. Now did you submit any paperwork to obtain this final extension of the permit from the DNR?
A. I believe I did.
Q. Do you have copies of that paperwork?
A. I don't know if I do.
Q. Do you recall receiving a, a written rejection of your permit from the DNR?
A. I don't know if I did.
Q. Did you have any conversations with folks at DNR at the time you were seeking this extension of the permit that was rejected?
A. I believe I did.

Page 27

Q. Do you know who you spoke to there?
A. No, I don't.
Q. And the folks that you dealt with at the DNR, are they local or they downstate somewhere?
A. Regional. Would be in Waters.
Q. Waters?
A. Waters, that was the division, I believe.
Q. Did you ever seek any bids or cost estimates regarding construction of a jetty along your property?
A. No.
Q. Did you ever calculate how much income you could expect from rental of boat slips in the harbor?
A. I did originally.
Q. And did you also anticipate obtaining revenue from use of the boat ramp?
A. Yes.
Q. Do you know whether you have those documents where you estimated those revenues?
A. I, I don't.
MR. GETTE: I'll have this marked as Bailey Exhibit 49.

Page 28

(Whereupon, Deposition Exhibit No. 49, Bailey, was marked for identification.)
Q. (By Mr. Gette) Mr. Bailey, I'm showing you what's been marked as Exhibit 49 to your deposition. If you'd take a second and look over that document.
Do you recognize that document?
A. It's been a, it's been awhile, but it's my signature on it.
Q. Okay. So that is your signature on the document.
Do you recall writing this letter to Mr. Lockner?
A. No, I don't.
Q. Okay. In the first sentence there you talked about requiring a commitment on the marina. Do you know what you were referring to there?
A. I think the county board can make a commitment on marinas based upon how far they are parked on, on a particular body of water, I believe. It's for protection, protection of boats.
Q. And did you understand that to be a necessary requirement for you to have

Page 29

permission to build that harbor?
A. I, I don't know how I got into asking that question, I guess I don't remember.
Q. In the second paragraph you indicate that with the marina you could build nicer and bigger homes on five-acre lot properties. Do you see that?
A. Yes.
Q. So at this point in time were you still considering the concept of, of larger lots on the property?
A. Just one of many things, I guess, I was deciding what to do with it.
Q. Now previously you said, when you were considering five-acre lots, you were considering them the same width as the current lots, just longer from east to west, correct?
A. Correct. That was correct.
Q. Okay. Now given the setback requirements for building, would the extension of the lots to five acres from their current size have allowed you to build any bigger house on them?
A. I'm not sure why I said that, I just took (indicating).

 ©2008

Page 30

Q. Okay. Putting aside why you said it, just focusing on the question that I asked, given the building setback requirements, would you be able to build a larger house on a 100-foot wide parcel that is long enough to be five acres versus one that is the length of the lots as they're platted currently?
A. You could build any size house as long as you kept within the setback.
Q. Finally, in the final sentence you say, It seems like any expansion later would have to have a permit also, so the need to know exactly what my plans are is really not that relevant.
That's the last paragraph, the first sentence of that paragraph. What were you referring to in that sentence?
A. I don't know. The letter is 18 years old, I, I don't really recall.
Q. Do you know what you meant by later expansion?
A. I don't.
Q. Okay.
MR. GETTE: Let's have this marked as Bailey Exhibit 50.

Page 31

(Whereupon, Deposition Exhibit No. 50, Bailey, was marked for identification.)
Q. (By Mr. Gette) Mr. Bailey, I'm handing you what's been marked as Exhibit 50 to your deposition. If you could take a look at that, then we can talk about it a bit.
Okay. Mr. Bailey, you see that the first page of that Exhibit 50 is a Lake of the Woods County Application to Plat. Is this an application to plat the property that you own along Lake of the Woods?
A. I believe so.
Q. And it says the application was submitted by you in care of the Taylor Investment Corporation. What was the Taylor Investment Corporation?
A. They were thinking of purchasing the land from me.
Q. How much land were they thinking of purchasing from you?
A. I, I don't recall.
Q. Okay. You'll see it indicates on that application that the overall dimensions of the proposed plat was approximately 46 acres. Do you know if that's the amount of property

Page 32

that they were proposing to buy from you?
A. Could have been.
Q. You're just not sure?
A. I'm not sure.
Q. Okay. Now you'll see that that application is signed by an individual by the name of Scott Seeley. Do you know who Mr. Seeley is?
A. He was an individual from Taylor Investment.
Q. And did you actually meet Mr. Seeley?
A. I believe I did.
Q. Was he the individual at Taylor that you dealt with in terms of their proposal to buy your property?
A. I, I believe so.
Q. Now if you turn to the second page of Exhibit 50, this is a letter from Mr. Seeley to Gary Lockner back in December of 1996, and the first sentence says, Enclosed please find a completed Lake of the Woods County Application to Plat the property we have on a signed purchase agreement with Gary Bailey.
Had you executed a purchase

Page 33

agreement for the sale of property along Lake of the Woods to Taylor?
A. I, I don't remember.
Q. Did you ever actually execute a deed to sell any of the property to them?
A. I don't believe so.
Q. Were you dealing with any real estate agent in this proposed sale of property to Taylor?
A. I don't recall.
Q. Where was this Taylor Investment company from, where were they located?
A. I, I don't recall that either.
Q. Was Mr. Seeley a local person?
A. No.
Q. Do you know whether you ever received a down payment on a purchase agreement for any of that property from Taylor?
A. I don't believe I did, ever did, no.
Q. Do you know what the proposed sale price of your property to Taylor was?
A. No.
Q. Had you discussed a price with them?
A. I might have.
Q. You just don't recall?

 ©2008

Page 34

A. I don't recall.
Q. Now you said ultimately you understood that, your recollection is you did not execute a deed to actually sell the property to them. Do you know why you ultimately decided not to sell the property to them?
A. I just don't remember.
Q. Do you recall what Taylor Investment Corporation was proposing to do with your property once they bought it?
A. They, they would, they were going to develop it.
Q. Residential development?
A. I believe so.
Q. Aside from this platting application that we've marked as Exhibit 50, did you, on behalf of Taylor, submit any other applications or permits with any governmental entities?
A. I don't recall.
Q. Do you know whether Taylor on its own submitted any applications for permits to any governmental entities related to your property?
A. I, I don't know.

Page 35

Q. Do you ever recall talking about your proposed sale and development of the property by Taylor Investment Corporation with any of the county officials?
A. Might have been with Gary Lockner.
Q. Okay. Do you recall any specific conversations?
A. No, I don't.
Q. At this point, with respect to the 86 acres that are east of County Road 53, have you retained anyone to advise you on how you might develop that property that you still own?
A. No.
Q. Do you have any current development plans in mind?
A. No.
Q. Now I know that in the past a few times you've hayed that field that is part of that 86 acres. Is that correct?
A. I worked it up and mowed it, I never made hay on it.
Q. So you've never let anyone come in and bale hay off that property since you've owned it?
A. No.

Page 36

Q. Okay. Could you do that?
A. It's, it would have to be planted, it's rough, it's just been disked.
Q. So if it was planted, it could be hayed?
A. I would imagine it, it had been hayed in the past.
Q. And it definitely had been planted in the past, correct?
A. Correct.
Q. Your neighbor Mr. Peeper (phonetic) used to rent it from the Lewises to plant. Is that correct?
A. Pieper, yes.
Q. Pieper, thank you.
Have you ever approached Mr. Pieper about him renting that property from you to, to plant it at this point?
A. Just recently I did.
Q. Okay. And what was the outcome of that conversation?
A. They wanted to rent it, but since they're in the farm program, they had to go up and NRCS said they couldn't rent it unless there's a wetland determination made on the

Page 37

property.
Q. And I've already forgotten again. Is it Pieper or Peeper (phonetic)?
A. Pieper.
Q. Pieper.
Was it Mr. Pieper who approached you about that or did you approach him?
A. I, I believe I -- he always wanted to rent it, I just never -- I, I called -- his, his son now farms his property.
Q. And so you actually talked to, to Mr. Pieper's son?
A. Yes.
Q. Okay. What is his son's first name?
A. Danny.
Q. Okay. And did, did Danny Pieper indicate that he would be interested in renting that property from you?
A. Yes.
Q. Now you said that somebody went to the NRCS about farming that property. Was that you or Mr. Pieper?
A. I'm, I'm not in the farm program, the -- Danny is.
Q. Okay. My question, though, is who


©2008

Page 38

actually contacted the NRCS?
A. Danny has to do that, just being in the farm program, if he's going to rent anything, he has to make sure it's, it's not wetland.
Q. Okay. So it was Danny that contacted them.
A. Um-hum.
Q. And did you then have a conversation with Danny Pieper after he contacted NRCS?
A. No. I had -- FSA sent out a letter for me to sign so they can make a wetland determination on the property.
Q. Okay. And when did you receive that letter from FSA?
A. A couple months ago.
Q. Okay. Do you have a copy of that letter?
A. I don't know if I had to sign it and send it back, I'm not too sure.
Q. Okay. Did you sign that letter and send it back?
A. Yes, I did.
Q. Okay. And that letter, then, gives an, an authorization to someone to conduct a

Page 39

wetland determination?
A. Yes.
Q. Okay. And who does it give that authorization to?
A. NRCS, I believe.
Q. Okay. Now if ultimately the NRCS says that this property can be farmed, is it your intention to rent it to Mr. Danny Pieper?
MR. FISH: Object to the form of the question. What do you mean by this property, Counsel?
Q. (By Mr. Gette) If the NRCS approves farming on any of the 86 acres that you own between County Road 53 and Lake of the Woods, is it your intention to rent that property to Mr. Pieper for farming purposes?
A. It's an option I have.
Q. Is it your current intention?
A. If, if he does rent it, he's going to have to summer fallow it for about a year or two before he can plant it or anything, so just, moneywise, I'd have to look at it.
Q. Do you know what kind of rental fee would be required for it to make economic sense for you?

Page 40

A. I, I don't.
Q. Did you discuss a rental fee with Mr. Danny Pieper?
A. No, I haven't.
Q. Do you have any knowledge of what rental fees per acre for farmland are going for in that general vicinity?
A. I, I don't.
Q. Okay. Have you ever discussed the possibility of renting any of your property east of Route 53 for farming with anyone else?
A. No.
Q. Now you said just a moment ago that you're not in the farm program. Is that right?
A. That's correct.
Q. Okay. Were you previously in the farm program?
A. I've never been a farmer per se, but -- (no further response.)
Q. Okay. And whether you actively acted as a farmer or not, my question is whether or not you were in the farm program?
A. Some of my land was in the Conservation Reserve Program.
Q. Okay. That was called the

Page 41

Conservation Reserve Program?
A. Um-hum.
Q. Was any portion of the 86 acres that you own between County Road 53 and Lake of the Woods in that program?
A. No.
Q. Do you have to submit applications to put property into that program?
A. Yes.
Q. And do you have copies of the applications that you submitted for your property for that program?
A. No.
Q. You've destroyed all those documents?
A. I, I don't have them.
Q. When you submitted those applications did you keep copies?
A. I might have.
Q. But your testimony is that today you don't have those copies?
A. There's no need to. I'm not in that program anymore.
Q. Do you specifically recall discarding those documents?

Page 42

A. No, I don't.
Q. So is it possible that they're still in your files somewhere?
A. I'm not sure.
Q. I'm assuming that it's the Farm Service Agency that runs that program. Is that correct?
A. Yes.
Q. And I'm assuming they're part of U.S. Department of Agriculture, do you know, is that correct?
A. I believe so.
Q. Have you ever considered selling off any of the property that's part of that 86 acres that fronts County Road 53 for residential development?
A. No.
Q. Do you know whether you could?
A. I am not too sure what it's zoned.
Q. Do you know whether the portion of the property, say the first 500 feet from County Road 53, whether that's wetland or not?
A. It was farmed, it was prior converted.
Q. All right.

Page 43

MR. GETTE: We've been going for a while, let's take a few minute break.
MR. FISH: Sure.
(Whereupon, a brief recess was taken.)
MR. GETTE: All right. Back on the record.
Q. (By Mr. Gette) Mr. Bailey, now I'd like to go through the, several of the 14 platted lots that you either own or sold down there --
A. Okay.
Q. -- on Lake of the Woods.
And I want to start with Lot 1, which is one that you never did sell. Is that correct?
A. That's correct. I kept it for my daughter.
Q. And at this point have you deeded that over to your daughter?
A. No, I haven't.
Q. Is it still your intention to do that?
A. Yes. I just have one daughter, so everything would go to my daughter when I

Page 44

croak, anyway, I guess.
Q. Now is it your understanding that, that Lot 1 there, that you still own, that that could be developed with residential development?
A. They said that was drained by the drainage ditch, so it, it's, apparently is developable. However, if you went, looked up there, they're all identical. I mean, the ground is identical to the Lot 1.
Q. Have you had any plans drawn up for development, residential development of Lot 1?
A. No.
Q. Do you have any current plans to build a house on Lot 1?
A. No.
Q. Now I'm going to go through a few of the other properties and ask you about the status of those and, actually, you've, you've got a paper in front of you --
MR. GETTE: Mark a copy of that as Exhibit 51, I believe.
(Whereupon, Deposition Exhibit No. 51, Bailey, was marked for identification.)
Q. (By Mr. Gette) And I'll show you,

Page 45

Mr. Bailey, what's been marked as Exhibit 51 to your deposition. Is that a document that you recognize?
A. Yes.
Q. Okay. Did you prepare that document?
A. I believe so.
Q. Okay. When did you prepare that?
A. I'm not positive.
Q. Okay. If you notice across the top there's a fax information line across there that is, indicates a date of February 15 of 2008. Would it have been on or around February 15 of this year that you prepared that document?
A. I could have done, done it previous to that.
Q. Okay. Do you believe it was sometime this year, during 2008?
A. I'm not too sure when I got the last, last lot back. That's probably when I -- I probably did it for taxes too. I'm not too sure.
Q. Okay. And there's also on that fax information line something that says, Custom

Page 46

Building Logs?
A. Yes.
Q. What is Custom Building Logs?
A. That's my, my corporation's name.
Q. And does that corporation -- what is, what does that corporation do?
A. We broker pulp to, to mills and, and the States from Canada.
Q. How long have you had that company?
A. Since 1978.
Q. Okay. And has it always been in the brokerage business?
A. No. It was set up as a, a log home builder.
Q. Now in addition to brokering pulp, do you also actually do logging?
A. I contract it out.
Q. And do you do that through the same corporation?
A. Yes.
Q. Okay. Now it looks like you've got a copy of this Deposition Exhibit 51 in front of you as well. Is that right?
A. That's correct.
Q. Okay. I'm going to hold onto this

Page 47

one just so I can ask you some questions about it. If you want to see this copy, just let me know.
With respect to the Thomsons, they own Lots 2 and 3, correct?
A. That's correct.
Q. And is it your understanding, Mr. Thomson was here yesterday and he indicated that while he's a few payments behind, that he's basically current in his payments to you?
A. That's correct.
Q. And he further indicated that for the few payments he's behind, that you, you and he have reached an agreement that he'll come current as he's able to. Is that correct?
A. That's correct.
Q. Now the next one I want to ask you about is Lot Number 9, that was previously owned by Raynard Lundgren and his wife. Is that right?
A. I believe so. I have never met any of the people that own, or own lots up there.
Q. Okay. When you prepared this sheet, how did you match the lots up with the names?
A. I, I got folders on each individual

Page 48

that bought on a contract for deed or fee title. Had to do that for tax purpose.
Q. Okay. So you went to those folders that you had and then from that you were able to match up the owners with the lot numbers. Is that correct?
A. Well, it's always been that way. I mean, if an individual sold a lot, a real estate agent, they're the ones that sold all the lots.
Q. Okay. But my question specifically was, to prepare this sheet, you went to those folders and you were able to see what individuals owned what lots. Is that correct?
A. That's correct.
Q. Okay. Now with respect to the Lundgrens, it appears that they had a contract for deed and they had been making payments of 297 -- $297.34 to you initially under the contract for deed. Is that right?
A. That's correct.
Q. And it also indicates that they made a last payment in April of 2001, correct?
A. That's, that's correct.
Q. Now given when they purchased this

Page 49

property, they would have begun paying, it indicates, in January 1999, correct?
A. Yes.
Q. All right. Now the money that you received from them from January 1999 through April of 2001, have you ever refunded that money to them?
A. No. It just, it was part of the contract.
Q. So they made those payments to you as part of the contract and you've retained those funds, correct?
A. That's correct.
Q. Okay. And at this point in time, though, you now own Lot Number 9 again, correct?
A. That's correct. But I never got a commission back or anything like that.
Q. Right.
Okay. Now I also want to talk about Lot Number 11, the Perssons. And they've now made all of the payments called for under the contract for deed, correct?
A. I believe so.
Q. Okay. So they own that property

 ©2008

Page 50

outright now. Is that correct?
A. They'd have title to it, yes.
Q. Okay. Okay. And with respect to Lot Number 14, the Fish Trust, are they current in their payments to you?
A. Yes.
Q. Now with respect to Lot Number 13, Woitallas, they had a contract for deed with you, correct?
A. That's correct.
Q. And at some point they stopped making payments under the contract for deed. Is that right?
A. That's correct.
Q. Okay. Do you know when they stopped making their payments?
A. I don't.
Q. Okay. Have you taken that property back?
A. I believe so. We went through the process of, of canceling the contract.
Q. Okay. Actually, let me, let me correct that. I'm now remembering myself.
That was the one property that wasn't a contract for deed, you actually held a

Page 51

mortgage on that, correct?
A. It was a mortgage on it, yes.
Q. Okay. Did you foreclose on that mortgage?
A. Yes, we did.
Q. Okay. Now did you pay any refunds to the Woitallas that they had made under that mortgage?
A. No.
Q. Okay. And, finally, Lot Number 12, that was Mr. Washburn. He was under a contract for deed, correct?
A. Yes.
Q. And he stopped making payments to you?
A. Yes.
Q. Okay. Do you know when he stopped making payments?
A. I, I don't. I remember the reason I got involved is he, he had -- he didn't pay his taxes, so I, also, besides that, I paid four years' back taxes on the property.
Q. Okay. So when you reacquired the property you had to pay the back taxes?
A. Four years, yes.

Page 52

Q. Do you know how much that was, those four years of back taxes?
A. I, I got -- I don't know if I have them here or not.
MR. FISH: It's been disclosed, Counsel, in that packet that we gave you.
THE DEPONENT: It's here.
MR. FISH: We can make another copy.
A. This is the -- total you want?
Q. (By Mr. Gette) Yeah.
Okay. You've handed me a document, it looks like a collection receipt from Lake of the Woods County, and I think you've indicated this is for back taxes that you paid on the property that had previously been held by Mr. Washburn. Is that correct?
A. Lot 12, yes.
Q. Okay. And it looks like you paid a total of $865.38. Is that correct?
A. That's what it looks like, yes.
Q. Okay. Did you have to pay back taxes on any of the other properties that you took back? Specifically, the, the Lundgren property.
A. I, I, I'm not sure if I did.

Page 53

Q. Okay. It looks like you brought some documents with you today, Mr. Bailey. Is that correct?
A. Just in my file, yes.
Q. And are these documents that all relate to your property down on Lake of the Woods?
A. They're all ones that you should have.
Q. Okay. Can I -- we'll go off the record in just a second, but I'll ask you if I can just take a look at that just to confirm that I have everything that's in there, if that's okay?
MR. FISH: I'll take a look at it first.
Q. (By Mr. Gette) Okay. Let me just finish up the questions that we had here.
With respect to Mr. Washburn and Lot Number 12, he had been paying under his contract for deed for some period of time, correct, before he ceased payments?
A. I think he did.
Q. Okay. And did you refund any of that money that he had paid you back to him?


©2008

Page 54

A. No.
Q. Okay. Okay.
MR. GETTE: I don't think I have any further questions pending a look at the documents you brought with you.
(Whereupon, there was discussion off the record.)
MR. GETTE: Okay. Let's go back on the record.
Q. (By Mr. Gette) Okay. Mr. Bailey, while we were off the record I looked at the documents you brought today and I previously received copies of all of those documents.
One of the documents you had made some markings on and that was the document which was the same as Deposition Exhibit 51. Is that correct?
A. That's correct.
Q. Okay. Now I've gone through and marked in pen on Exhibit 51 the same markings that you have on your copy. Is that correct?
A. That's correct.
Q. Okay.
MR. GETTE: Okay.
MR. FISH: I have no questions.

Page 55

We'll read and sign.
(Whereupon, the deposition was concluded at 11:01 o'clock a.m.)

Page 56

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA )
) ss
COUNTY OF POLK )

I, RUTH ANN JOHNSON, a Notary Public within and for the County of Polk and State of Minnesota do hereby certify:

That prior to being examined the afore-named witness was by me sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition, consisting of 55 pages of typewritten materials, was taken down by me in Stenotype at the time and place therein named, and was thereafter reduced to typewriting under my direction.

I further certify that I am neither related to any of the parties or counsel nor interested in this matter directly or indirectly.

WITNESS my hand and seal this day of

Ruth Ann Johnson
Notary Public
Polk County, Minnesota
My Commission expires January 31, 2012.

Page 57

ACKNOWLEDGEMENT OF DEPONENT

I, GARY BAILEY, do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes or corrections, if any, appear in the attached errata sheet signed by me.

Date GARY BAILEY


©2008

Alan Fish
102 Second Avenue, Northwest
Roseau, Minnesota 56751
IN RE: Gary Bailey vs. The United States
Dear Mr. Fish:

Enclosed please find your copy of the deposition of GARY BAILEY, along with the original signature page. As agreed, you will be responsible for contacting the witness regarding signature.

Within 30 days of receipt, please forward errata sheet and original signed signature page to James D. Gette.

If you have any questions, please do not hesitate to call. Thank you.

Yours,

Ruth Ann Johnson
Reporter/Notary

cc: James D.Gette



Capital Reporting Company
1821 Jefferson Place, Northwest
Third Floor
Washington, D.C. 20036
(202) 857-DEPO

ERRATA SHEET

Case Name: Gary Bailey vs. The United States
Witness Name: Gary Bailey
Deposition Date: Friday, February 22, 2008

| Page No. | Line No. | Change/Reason for Change |
|---|---|---|

Signature ______________________ Date ______________

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA )
) ss
COUNTY OF POLK )

I, RUTH ANN JOHNSON, a Notary Public within and for the County of Polk and State of Minnesota do hereby certify:

That prior to being examined the afore-named witness was by me sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition, consisting of 46 pages of typewritten materials, was taken down by me in Stenotype at the time and place therein named, and was thereafter reduced to typewriting under my direction.

I further certify that I am neither related to any of the parties or counsel nor interested in this matter directly or indirectly.

WITNESS my hand and seal this 5th day of March

Ruth Ann Johnson
Notary Public
Polk County, Minnesota

My Commission expires January 31, 2012.



©2008