STATE OF MINNESOTA
OFFICE OF ADMINISTRATIVE HEARINGS
100 Washington Square, Suite 1700
100 Washington Avenue South
Minneapolis, MN 55401-2138

---

In the Matter of Gary Bailey -
MPCA Section 401 Certification

File No. 6-2200-15413-2

VOLUME I

---

DATES: July 23-25, 2003
LOCATION: Lake of the Woods County Courthouse
Baudette, Minnesota

ADMINISTRATIVE LAW JUDGE: Allan W. Klein

APPEARANCES:

Mr. Rick Cool
Assistant Attorney General
Suite 900 - NCL Tower
445 Minnesota Street
St. Paul, Minnesota 55101-2127
In behalf of the MPCA.

Mr. Alan B. Fish
Attorneys and Counselors at Law
109 Second Street Northeast
Roseau, Minnesota 56751
In behalf of Gary Bailey.

COURT REPORTER: Stefanie Lamppa Olson
Registered Professional Reporter



INDEX


| WITNESS: | EXAMINED BY: | PAGES: |
|---|---|---|
| Day 1 | | |
| Lawrence Zdon | Cool - Direct | 17 - 109 |
| | Fish - Cross | 109 - 146 |
| | Cool - Redirect | 147 - 148 |
| Dale Krystosek | Cool - Direct | 148 - 160 |
| | Fish - Cross | 161 - 167 |
| Leslie Lemm | Cool - Direct | 167 - 190 |
| | Fish - Cross | 190 - 206 |
| Walter Leu | Fish - Direct | 207 - 222 |
| | Cool - Cross | 222 - 227 |
| | Fish - Redirect | 227 - 230 |


EXHIBITS


| EXHIBIT IDENTIFICATION: | PAGE RECEIVED: |
|---|---|
| Zdon No. 1 - 7050.0185 Waters of the State | -- |
| Zdon No. 2 - June 24, 1999 Public Notice | 33 |
| Zdon No. 3 - National Wetlands Inventory | 38 |
| Zdon No. 4 - July 8, 1999 Letter from Hauger to Bailey | 41 |
| Zdon No. 5 - July 14, 1999 Letter from Hauger to Zimney | 41 |
| Zdon No. 6 - July 23, 1999 Letter from Holck to Hauger and Bailey | 44 |
| Zdon No. 7 - August 3, 1999 Letter from Hauger to Bailey | 49 |
| Zdon No. 8 - August 9, 1999 Letter From Bailey to Hauger w/ Fax Cover Sheet | 51 |
| Zdon No. 9 - 8/20/99 Handwritten notes of Zdon | 61 |




INDEX (cont'd)


| EXHIBIT IDENTIFICATION: | PAGE RECEIVED: |
|---|---|
| Zdon No. 10 - October 14, 1999 Letter from Lockner, Lemm and Krystosek To Zdon | 70 |
| Zdon No. 11 - Fax from Koschak to Zdon and Accompanying Documents | 72 |
| Zdon No. 12 - December 17, 1999 Letter from Raudys to Hauger | 78 |
| Zdon No. 13 - September 2000 E-mails | 91 |
| Zdon No. 14 - September 2000 E-mails | 91 |
| Zdon No. 15 - Fax Cover Sheet from Koschak to Zdon and Accompanying Documents | 93 |
| Zdon No. 16 - October 4, 2000 Letter from Lewis to Hauger | 102 |
| Zdon No. 17 - June 12, 2001 Public Notice | 108 |
| Zdon No. 18 - January 10, 2003 Letter from Fish to Lewis | 109 |
| Zdon No. 19 - February 18, 2003 Letter from Fish to MPCA | 109 |
| Zdon No. 20 - February 27, 2003 Letter from Lewis to Fish and Bailey | 109 |
| Zdon No. 21 - March 3, 2003 from Fish to Lewis, Corrigan and Cool | 109 |
| Zdon No. 22 - March 7, 2003 Letter from Cool to Fish | 109 |
| Zdon No. 23 - May 2, 2001 E-mail from Denton to Koschak | 374 |
| Lemm No. 24 - July 31, 1998 Notice of Wetland Conservation Act Application | 171 |
| Lemm No. 25 - May 19, 1999 Notice of Wetland Conservation Act Application | 175 |




INDEX (cont'd)


| EXHIBIT IDENTIFICATION: | PAGE RECEIVED: |
|---|---|
| Lemm No. 26 - September 17, 1999 Letter from Lemm and Lockner to Bailey | 178 |
| Lemm No. 27 - July 24, 2000 Letter from Lockner to Bailey | 180 |
| Leu No. 28 - Mary 27, 1999 Letter from Sindelir to Bailey | 217 |
| Leu No. 29 - September 16, 1998 Letter from Leu to Bailey | 217 |
| Leu No. 30 - November 30, 1998 Letter from Leu to Bailey | 217 |
| Leu No. 31 - July 31, 1998 Sequencing Findings of Fact | 230 |

THE JUDGE: Why don't we get started. We're beginning a hearing in the Matter of Gary Bailey and the MPCA's Section 401 Certification. This bears my office file number of 6-2200-15413-2. My name is Allan Klein, I am an Administrative Law Judge from the State Office of Administrative Hearings. My office is independent of any of the groups that are participating in today's hearing, and it is my job to conduct it in a manner which is fair and impartial.

I would note that the Rules of Professional Conduct and the Professionalism Aspirations adopted by the Minnesota Supreme Court are observed during this hearing, and the rules of our office govern the conduct of the hearing. In this case both parties are represented by an attorney, we've had a prehearing conference by telephone. I'm not going to go through a lot of those rules because I don't think it's necessary. I'm just going to touch on a couple, though, to make sure there's no misunderstanding about them. First of all, both parties have the right to present evidence, testimony, exhibits, rebuttal testimony and argument with respect to the issues. Obviously all witnesses are subject to cross-examination.



The Rules of Evidence that apply in a case like this are not as strict as the rules that apply in a typical District Court proceeding with a jury. In this case I may admit all evidence which possesses probative value, including hearsay, so long as it is the type of evidence in which prudent persons are accustomed to rely in the conduct of their serious affairs. I will give effect to the Rules of Privilege recognized by law and evidence which is unduly repetitious or incompetent or irrelevant or immaterial may be excluded.

I think at this point what I would do is ask the attorneys to note their appearances, please. I should -- oh, before we do that, let me just mention one other thing. As you can see, we're using a court reporter today. In order to permit her to make an accurate record, it's important that we spell out a few words that are going to come up that are not commonly known words. Typically those are things like people's names and place names. If you're talking about the name of a road that's not an obvious spelling, please just spell it out so she doesn't have to try to track you down after the hearing and figure out how to spell it because it's important that her transcript be accurate. Either of



you can request a copy of the transcript; there's a charge for that.

After the hearing is over today -- I shouldn't say today. After the hearing is over and after any posthearing submissions are received, I will prepare a report consisting of Findings of Fact, Conclusions and a Recommendation to the agency. A copy of my report will be mailed to each party or their attorney. My report is not the final decision in this matter. The final decision is made by the Minnesota Pollution Control Agency, and the law requires that they must wait at least ten days after my report is issued and afford either side an opportunity to file exceptions and present argument to them. Once they have made their final decision, a copy of that final decision will be sent to both parties.

Okay. At this point why don't we have the attorneys note their appearances for the record, please.

MR. COOL: My name is Rick Cool. I'm an Assistant Attorney General with the Minnesota Attorney General's Office, and I am representing the Minnesota Pollution Control Agency staff in this proceeding.



MR. FISH: Your Honor, Alan Fish, Attorney at Law, Roseau, Minnesota representing the Petitioner, Gary Bailey.

THE JUDGE: All right. I asked the attorneys if they would please do brief opening statements just because the material that I have so far is relatively limited and they have agreed to do that, and so why don't we proceed with that at this point. Mr. Cool, do you want to begin?

MR. COOL: Thank you, Your Honor. May I do this from a sitting position?

THE JUDGE: Yes.

MR. COOL: Thank you. This proceeding is taking place under the Minnesota Pollution Control Agency's rules regarding the Section 401 certification process that is authorized by the Federal Clean Water Act. Under Section 401 applicants for any federal license or permit must also make application to the state regarding, excuse me, that project's compliance with State Water Quality Standards. That is the process that we are in with this proceeding.

My opening comments are going to be limited to what I believe the PCA will introduce in terms of factual information. In June of 199 -- excuse me.

Prior to June of 1999 and based on the evidence, the applicant, Gary Bailey, built a road in a wetland here in Lake of the Woods County without obtaining a Section 404 permit from the U.S. Army Corps of Engineers or obtaining a Section 401 Certification from the Minnesota Pollution Control Agency.

In June of 1999 the Corps of Engineers issued a Public Notice for an After-the-Fact Section 404 Permit. That notice, the evidence will show, indicated that the wetland impact was expected to be approximately 2.91 acres. And that Mr. Bailey, as the applicant, had agreed to implement a replacement plan under the state's Wetland Conservation Act as compensation for some of the wetlands that were to be affected by the dredge and fill, the placement from the road and the drainage ditches.

The facts will show that in July of 1999 the agency issued a request for information to the U.S. Army Corps and to the applicant because of concerns of the project related not only to wetland impact, but the developability of the plats; that the information showed that the entire plat appeared to be wetland and the PCA was concerned about the placement of individual sewage treatment systems or ISTS's in wetlands.



The evidence will show that Mr. Bailey did not respond to the agency's informational request with any substantive information regarding wetland impacts or the placement of these septic systems. However, based upon some information obtained from the Lake of the Woods Environmental Services Office, the PCA was at least on a preliminary basis satisfied at one point that there was a representation of adequate land to address the septic systems.

In December of 1999 the evidence will show that PCA certified the road project as noticed in the Corps' Public Notice. The evidence will show that in August of 2000, the Army Corps of Engineers in consultation with other professionals conducted a wetland delineation of Mr. Bailey's plat and identified that the impacts of the road construction and construction of the ditches was much greater than originally identified in the Corps's Public Notice. That wetland delineation also refuted the information that had been previously provided to the agency about the availability of land for the installation of septic systems.

Based on those concerns and others in the record, the agency revoked the certification in October of 2000. The Corps subsequently denied Mr. Bailey's



application for the After-the-Fact Permit in June of 2001.

That's what the evidence will show in this proceeding, and that evidence and additional evidence adduced after the revocation will show that the MPCA staff had under its permitting Rule 7001.0140 the appropriate factual basis and concerns justifying the revocation as it took place in October of 2000.

That concludes my opening remarks, Your Honor.

THE JUDGE: Okay, thank you. Mr. Fish?

MR. FISH: Your Honor, the evidence will show that Gary Bailey, an owner of this land for many years, originally obtained and received approval from the county as well as the Army Corps of Engineers in the early 1990's to do substantial excavation and removal of soil, vegetation and other elements from the area for the purpose of building a marina. Due to financial reasons this permit was never followed through with by Mr. Bailey and he allowed it to expire.

He approached the County Board in December of 1996, Your Honor, for the purpose of platting this parcel as residential real estate to sell it as it consisted of approximately a quarter mile of lakeshore, valuable lakeshore property. Mr. Bailey



worked closely with Gary Lockner, the Environmental Services Officer for Lake of the Woods, as well as Les Lemm of the Board of Water and Soil and received their recommendation after on-site inspections and approval for platting the development.

Prior to the approval the County of Lake of the Woods set out additional preconditions which involved Mr. Bailey excavating certain portions of this land, installing culverts, purchasing gravel from the county for the purpose of installing on the land. Mr. Bailey as well had to post a bond of $10,000 to ensure compliance with these conditions. Mr. Bailey proceeded to perform everything as requested by Lake of the Woods County, and ultimately his plat was approved in December of 1998.

At this time Lake of the Woods County, now the owner of the road, took over ownership and maintenance and continued its own work of pouring and installing culverts. Subsequently, the county continued to issue culvert pit permits to individual landowners who were developing their lots and allowed them to put fill in the ditches that were -- the county ditches that were -- were approved for culvert installation.

The MPCA, as indicated by the attorney, Mr. Cool,

in December 1999 did issue its blessing on this project based upon the work of the county, of Erik Mohring, who was a groundwater specialist that works for the Board of Soil and Water, as well as Les Lemm, the local county official, Gary Lockner. At that point Mr. Bailey was essentially out of this picture as he no longer had any ownership interest in the platted road, had sold virtually all of the lots involved in this plat and merely retained the lot -- one of the end lots for himself.

Subsequently, the Army Corps of Engineers conducted their own wetland delineation on the parcel and issued a decision very similar to that of the local officials in their findings. However, found that there was a couple of more acres, I think it was slightly over six or seven that were impacted in some manner by this project.

As part of the preconditions of acceptance of this plat by Lake of the Woods County, the county made a determination that it was suitable for septic systems. The law prohibits them from accepting a plat that's not suitable for septic systems. Mr. Lockner developed and devised a plan where nonconventional septic systems would be allowed, Your Honor. The Army Corps of Engineers, it is unknown



whether they were aware of that land or whether they took that into consideration. However, apparently they felt in their delineation that it was not suitable for septic systems.

Within a matter of weeks thereafter, the MPCA without input from any parties revoked it's 401 Certification. And in its revocation, the sole basis, Your Honor, for this revocation and I'll read verbatim from its Revocation Notice, "The MPCA revokes this 401 Certification based upon the information provided by the Corps of Engineers in a September 26, 2000 submittal indicating the true impact of the road project is 6.55 acres of impact consisting of 4.97 acres of drainage impact in addition to 1.5 acres of fill associated with the road construction." And that's it, that was the sole basis of this denial, Your Honor.

The Army Corps of Engineers subsequently, based on the revocation of the 401(k) (sic) Certification, issued Mr. Bailey to tear out the road and restore it to its natural state without any input from Mr. Bailey, without any investigation as to whether Mr. Bailey actually did any of the road construction or what extent of the road construction rather Mr. Bailey did and what extent the private landowners



did, what the extent of the fill the county put in and its -- the Army Corps of Engineers merely cited the MPCA's decision to revoke the 401 Certification as its basis for its decision.

As far as the issues as I see them here today, Your Honor, first of all is whether the revocation by the MPCA, whether they even have authority and power to revoke this based on the local government unit's approval of the plat, the ownership of this property by multiple entities, their previous approval of the plat -- of the -- the project, Your Honor, the availability of sewer systems onsite as determined by a plan by the local government officials.

I believe in part the revocation is based on Rule 7001 Subpart 0180, which lays out some specific factors. And from what I can understand, they believe -- I believe the revocation is based in part on a violation of other rules or -- rules of other governmental agencies, Your Honor, in particular the Army Corps of Engineers.

As we sit here today, Your Honor, the Army Corps of Engineers' wetland delineation and subsequent restoration order are being litigated. There is no final determination of that. There is no determination as to whether Mr. Bailey has violated



any rules or whether this wetland delineation is even valid. Despite that, in a matter of a few weeks after receiving this information from the Corps, we believe the MPCA concluded it was a violation despite this ongoing litigation and we believe that's arbitrary and capricious, as well as a violation of their own rules.

Also at issue, Your Honor, is whether the -- we believe the difference is if the Court does accept the Corps's version of how the delineation plays out, whether these minor differences are sufficient to justify a 401(k) (sic) revocation. That's how we see the issues, Your Honor.

THE JUDGE: Okay. Is there anything we should do before we begin with the witnesses? All right, not hearing anything, why don't you -- you may call your first witness.

MR. COOL: Thank you, Your Honor. I'd call Larry Zdon.

THE JUDGE: Mr. Zdon. Come up here please and sit next to the court reporter. Before you sit down, I'd like you to raise your right hand please.

LAWRENCE ZDON,

after having been duly sworn, testified as follows:

DIRECT EXAMINATION

THE JUDGE: You may proceed, Mr. Cool.

BY MR. COOL:

**Q Mr. Zdon, would you please state your full name and spell your last name for the record.**

A Lawrence Stanley Zdon, spelling Z-D-O-N.

**Q And by whom are you employed?**

A State of Minnesota, the Pollution Control Agency.

**Q And how long have you been employed by the MPCA?**

A Approximately 26 years.

**Q Prior to your employment, could you discuss your college education?**

A I have a Bachelor's of Science in civil engineering from the University of Minnesota in 1976.

**Q And did you do any postgraduate work?**

A During my employment with the Pollution Control Agency I've done a number of workshops and courses -- course works. Specifically, in 1991 I attended the wetland delineation training course put on by Lyndon Lee & Associates in association with the Corps of Engineers. In 1992 I attended the wetland delineation course with the Wetland Conservation Act as sponsored by the Board of Water and Soil Resources



and the Corps of Engineers. I've attended the individual sewage treatment system courses in the early '80s and then again in the past year, in 203 -- 2003.

THE JUDGE: Excuse me, Linda -- what was the name of the sponsor and could you spell her last name?

THE WITNESS: This was a Lyndon, L-Y-N-D-O-N, Lee & Associates.

THE JUDGE: Okay, thank you.

BY MR. COOL:

**Q Was Steve Eggers from the U.S. Army Corps of Engineers ever an instructor during any of your wetland training?**

A Steve Eggers was one of the instructors representing the Corps of Engineers at both the Lyndon Lee wetland delineation course and the one sponsored by the Board of Water and Soil Resources.

**Q Have you had any training from the U.S. Environmental Protection Agency regarding wetlands?**

A Also in '99 I attended the wetland regulatory workshop in Atlantic City sponsored by the U.S. EPA and the Corps of Engineers working with regulatory 404 program issues.

**Q Have you participated in any other**



**organizations regarding wetlands?**

A In terms of --

**Q Have you assisted in the development of any methods used to evaluate wetlands?**

A During my period of time working with the 401 Program I worked with the Interagency Wetland Group, which is a local, state and federal group of regulators working on guidances and interpretation of wetland law and development of guidances for interpreting the law.

**Q And any other taskforce that you've worked on on wetland evaluation methods?**

A Also in the development of the Minnesota Routine Assessment Methodology, which is a methodology for assessing wetland functions, I participated in that group, too.

**Q Looking back at your work duties with the MPCA, when you first joined the MPCA what were your duties?**

A Initially working in the water division, I worked with municipal wastewater treatment facilities doing engineering review of planning documents and technical plans and specifications, review and approval.

**Q And from what time periods did you do that**



**work?**

A This is from the period of about 1977 to 1989. I also worked with what we called at that time the Small Community Assistance Team, which specialized in the review and implementation of individual sewage treatment systems for small communities.

**Q What were your functions that you did in that ISTS program?**

A Working with the communities that were developing either individual or cluster drain field type systems, and in putting on the workshops in conjunction with the University of Minnesota Extension Division. I also participated in teaching some of the course work for the ISTS workshops.

**Q And is the teaching part of understanding how ISTS systems work?**

A Yes.

**Q When did you begin your work in the MPCA's 401 Certification Program?**

A Approximately 1989 began working with the Clean Water Section 401 Program at our agency after reorganization.

**Q And for how long did you work in the 401 Program?**

A Until about the year 2001.
**Q And what tasks did you perform in your capacity in that program?**
A In that program I was responsible to receive the application for 401 Certification, review them for completeness, for technical acceptability, for compliance with state water quality rules and other state rules, look at the feasibility of the proposals, that they would have a reasonable assurance in meeting those water quality rules and make a draft determination on a certification decision.
**Q So part of your responsibilities were making determinations of whether the Water Quality Standards were going to be complied with or not --**
A Yes.
**Q -- is that correct?**
THE JUDGE: Please wait until Mr. Cool finishes his question before you answer. Thank you.
BY MR. COOL:
**Q Just to make it clear, part of your responsibilities were making determinations of whether projects were going to comply with the Water Quality Standards, is that correct?**
A Yes.



**Q Moving to a program overview of the Section 401 Program, what is its main purpose?**
A The Federal Clean Water Act Section 401 Program requires that any permit application -- applicant for a federal permit or license first receive a certification or a waiver from the state where the water impact is involved that the state indicates whether or not there is reasonable assurance that the project as proposed will comply with the Water Quality Standards of the state.
**Q And does the agency have specific procedural rules for addressing 401?**
A Specifically, the rules in Minnesota Rules Chapter 7001.1400 to .1470 contain the rules of the procedures for issuing 401 determinations.
**Q Now, what types of typical federal permits and licenses does the agency do 401 Certifications on?**
A The typical federal licensing and permits come from the U.S. Coast Guard for bridge crossings or structures in waters, of navigable waters; the Federal Energy Relicensing Commission, FERC, that issues licenses for energy-producing facilities and specifically when water's involved hydropowered dams; the U.S. Army Corps of Engineers for their Clean



Water Act Section 404 Program, which issues permits for the placement of dredged or fill material in waters of the United States; and federal projects themselves that may be authorized by the Federal Government in the state.
**Q Where does the PCA get most of its 401 work from?**
A By far the greatest percentage in numbers of permits that we review each year are the Army Corps 404 permits for the placement of dredged and fill material in waters.
**Q During the period of 1988 to 2000, approximately, how many section 401 applications was the agency addressing at that time?**
A During that period of time there's, oh, approximately maybe 1500 to 2000 activities a year that require some form of Corps of Engineers 404 permitting to be accomplished.
**Q And would you address all of those individually?**
A Most of those activities are usually permitted by general permits or nationwide permits if they are applicable, if they have minor impacts or insignificant impacts, nonaccumulative-type impacts. Approximately 60 to 80 per year are the number of



projects that require individual public notice from the Corps of Engineers and then individual 401 Certification from our agency.
**Q Would you give a brief overview of the 401 application process as it applies to individual Corps permits?**
A The application process starts with an application of the project from the applicant or, most commonly, a notice from the Corps of Engineers, their Public Notice will initiate the transmittal of the project application to our agency. This is done for permit streamlining purposes so that the applicant doesn't have to specifically contact our agency, rather they can through the contact with the Corps, the Corps will transmit that information to our agency.
That public notice applicant information is then reviewed for completeness in terms of project description, project impact, to which waters and what kind of waters that are being impacted, its evaluated against the water quality classifications of waters, the designated use of those waters and whether or not they might be impaired, degraded by the proposed project. There's an examination of compliance with other state rules and water quality issues.

**Q In regard to the agency's Water Quality Standards, do you evaluate them against the nondegradation provisions?**

A The provisions in the Water Quality Standards that would most likely be applicable to this type of situation would be the use designation of the waterways, and for projects that impact wetlands by some form of alteration, the nondegradation clauses of the Water Quality Standards.

**Q Would you also review for compliance with groundwater standards of the agency?**

A Also included would be issues associated that -- if the water quality would impact groundwater and surface water.

**Q Now, you've mentioned nondegradation standards. Does the agency have nondegradation water quality standards for wetlands?**

A Specifically in Chapter 7050.0186 it talks about nondegradation of all waters, including wetlands. And in order to satisfy the nondegradation of wetlands that are being altered in some way, the rules allow for procedural evaluation that can be accomplished on the project that basically looks at the potential for avoidance of the impact, if there



are prudent and feasible alternatives, minimization of any impacts that might be associated with the project. And then if there are unavoidable impacts remaining after that evaluation, a wetland compensatory mitigation plan that replaces the functions of the wetland and the designated uses can satisfy nondegradation.

(Exhibit No. 1 was marked.)

BY MR. COOL:

**Q Handing you what has been marked as Exhibit 1. Do you recognize that document?**

A Yes. This is -- this is an excerpt from the State Water Quality Standards Minnesota Rule 7050.

**Q And which ones, specifically?**

A Specifically it starts at the initiation of 7050.0186 entitled Wetland Mitigation.

**Q And could you briefly point out the highlights of this particular rule?**

A 7050 --

MR. FISH: Your Honor, I've got to object to this line of questioning. I don't know that we're here for a legal theory class. This isn't fact relevant or -- at all, I guess getting to the points of this case, and I don't know whether an excerpt of a legal rule book is, in fact, an exhibit or whether



it should be read from without being introduced and offered and -- and really where this line of questioning is going.

THE JUDGE: Okay, here's -- here's my thought about it. I don't know that rules that are validly adopted rules or statutes have to be exhibits, they don't have to be. They're admitted for all purposes whether you like it or not. And I don't know it's necessary for him to highlight the rule either. It's fairly straightforward. I'm acquainted with it. It's not that complicated. There sometimes are situations that require technical explanations and I think that's legitimate, but for a straightforward rule I don't know that it's necessary.

You can -- you can put in your brief your evaluation of the rule without having any testimony about it unless it's terribly technical, but for straightforward stuff I don't think it's necessary to have him go into it.

MR. COOL: I was merely having the witness attempt to lay some groundwork for the application of this particular rule, which is relevant to this particular case. But in light of the fact that the Judge is already familiar, I'll dispense with that



particular thing and not move its admission.

BY MR. COOL:

**Q I would ask you, Mr. Zdon, how does the agency coordinate implementation of its Wetland Mitigation Rule with other governmental entities that may have similar wetland sequencing requirements or guidelines?**

A There are other levels of government that also have different protections of wetlands and waters, including local units of government through the Wetland Conservation Act; the Department of Natural Resources through their Work in the Bed Permit Program; the Pollution Control Agency through their Water Quality Standards in permitting; and the certification in the Federal Corps of Engineers.

In an attempt to permit streamline, the Interagency Wetland Group has developed a combined local, state and federal application so that, first off, that the applicant can come into the local unit of government, fill out an application and then that application can be transmitted to all potential local, federal and state governments without having to be retranscribed on separate forms. So similar information is requested from all agencies for this activity.

When appropriate and feasible, site evaluations are conducted in unison, preconstruction conferences may be held, and communication between the agencies to try to not duplicate or tear the applicant in two different directions if possible are conducted in the review of the application.

**Q What informational sources are typically relied upon in conducting PCA's review of 401 applications?**

A We will look at the application and the information, specifically the project proposed and its impact to the waters of the state and how that impact might either comply or be in conflict with Water Quality Standards. We will look at all available information, soil maps, wetland mapping from the National Wetland Inventory, U.S. quad maps, aerial photography, any information that may have been generated by other agencies, experts in terms of determinations on the project or the resource involved.

**Q What are the typical agencies that might share information with the agency?**

A Very typically the local unit of government, the county government, the Soil and Water Conservation District, members of the Board and Water



Soil Resources, the U.S. Fish and Wildlife Service, the nation -- the Corps of Engineers, any of these folks who may have had activities in their -- may have information that's helpful to our decision also.

**Q Now, in your role as a 401 individual or one working in the 401 Program, do you rely on other parts of the PCA for assistance?**

A Within the PCA we have multiple programs that deal with different types of media and different types of pollutant issues. And specifically, if there's issues associated with septic systems, we would work with the individual sewage treatment systems experts in our agency; if there are issues associated with groundwater, we would contact our groundwater folks; if there's issues associated with either solid waste, hazardous waste or toxic sediments, we have specialists that work with that to assure that those issues are addressed completely and -- in the decision that we make.

MR. FISH: Your Honor, I hate to object again, but we're dealing with a general -- general description of the MPCA and this could go on a long time. We have witnesses here from the Cities, Cloquet, afar. I don't believe this is relevant information. I don't know if the Court wants to hear



it. But if we could have some substantive testimony, I guess that's the nature of my objection here.

THE JUDGE: Well, I think if he can limit it to stuff that's relevant to this application would be good. As far as I know there's no suggestion there's any hazardous waste or anything like that associated with this. So I know you talk with those people on other applications, but if you'd try to limit it to this application, it would be helpful.

BY MR. COOL:

**Q Mr. Zdon, is it typical to do a site visit for a 401 process?**

A It would be typical to do a site visit when it's appropriate, applicable, if there's information that can be gained from that and if the manpower and timing allow for it.

**Q Is it done routinely or is it not routine to do site visits?**

A I would say sometimes we do them; sometimes we don't. It's -- a percentage, maybe 50/50 in terms of the sites we have an opportunity to get out and need to get out on and those that we don't.

**Q How did you first become aware of the Bailey project?**

A The first notification of the Gary Bailey



project was through the Public Notice that was issued by the Corps of Engineers for the After-the-Fact Permit for the road construction in the Sunny Beach plat.

**Q And what do you recall about what was in that Corps Public Notice?**

A In that initial 1999 notice it gave a project description that there was an access road built approximately 1500 feet by 66 feet wide; that the road and adjoining ditches would impact the wetland approximately 2.91 acres; and that there was a mitigation plan that had been approved by the Soil and Water Conservation District that utilized a letter of credit that the mitigations as proposed in that plan would be completed off site by Mr. Bailey.

**Q Now, does the Public Notice itself act as the application to the PCA for the 401 application?**

A Yes, it can.

**Q Did it in this case?**

A Yes.

(Exhibit No. 2 was marked.)

BY MR. COOL:

**Q Handing you what has been marked as Exhibit 2, do you know what that document is?**

A This is the Corps of Engineers Clean Water

Act 404 Public Notice dated June 24, 1999 regarding
the Gary Bailey project.
**Q And is this the notice that the agency**
**received?**
A Yes, it is.
MR. COOL: I move its admission.
THE JUDGE: Is there any objection to
Exhibit 2?
MR. FISH: No objection.
THE JUDGE: It will be received.
BY MR. COOL:
**Q The notice is identified as an**
After-the-Fact document. Could you explain that?
A Yes. If there's a situation where a person
conducts an activity that should have required a
Federal Corps 404 permit but did not obtain that
permit in advance, typically the Corps of Engineers
has options in enforcement against that activity.
One of the options is to evaluate the proposal in
terms of its permit acceptance, and they refer to
that as After-the-Fact Permit and they go through a
permit process to determine whether or not a permit
should or should not be issued and then determine
enforcement as an additional issue after that.
**Q Looking at the attachments of this notice**



**and specifically Page 2 of 5, could you describe**
**that?**
A Page 2 of 5 indicates a plat map of the
Sunny Beach plat of the Gary Bailey project with the
14 lots along Lake of the Woods.
**Q And what was PCA's interpretation of this**
**particular plat map?**
A Indications on the plat map indicate that
this area is a Type 7 wetland and it has designation
that it run -- the Type 7 wetland runs from the
lakeshore area to approximately 800 feet back beyond
the road to the west. It indicates where the new
road location is and the road fill, and it indicates
that from the north boundary to the south boundary is
Type 7 wetlands.
**Q And do you see any indication of floodplain**
**on this particular map?**
A No.
**Q And would floodplain be an important factor**
**for PCA's 401 review?**
A Floodplain on a property would be important
specifically if there's proposals to install septic
systems because that would be a limiting factor for
location of septic systems, yes.
THE JUDGE: Excuse me, could I just



interrupt? I don't -- it's not obvious to me where
the road is. Mr. Zdon, could you tell me where the
road is on this exhibit?
MR. COOL: Well, --
THE JUDGE: Oh, maybe I'm getting ahead of
you. If it's coming up, that's okay.
MR. COOL: Would you typically want this
offered as an exhibit?
THE JUDGE: Not -- is it just a copy of
this?
MR. COOL: Yes.
THE JUDGE: No, it's not necessary to
offer that.
BY MR. COOL:
**Q Looking at this placard, Mr. Zdon, do you**
**recognize this placard?**
A Yes.
**Q What is it?**
A It's a copy of the Page 2 of 5 that was
contained in the Public Notice by the Corps.
**Q Would you point out to the Court where the**
**new road is depicted on this particular map?**
A The new road is indicated running basically
from north to south along this alignment here
(indicating).



THE JUDGE: All right. So it's -- I'm
sorry, it's the thing that says New Road Fill. All
right, thank you very much.
BY MR. COOL:
**Q Just again for orientation, where is the**
**lake?**
A Lake of the Woods is indicated by the title
out here, this being the lakeshore (indicating).
**Q And that would be sitting east of the road,**
**is that correct?**
A Correct.
**Q Now, what, if any, concern did this**
**information raise with PCA?**
A Specifically with the plat map that was
indicating the entire area was covered with wetlands,
there was concern raised on whether or not acceptable
compliant septic systems could be installed on these
properties in compliance with our Minnesota rule on
septic systems, Minnesota Rule 7080. And also the
purpose of the road was indicated to be access for
development of the lots and with the entire lot being
wetland, there would be expected secondary develop --
secondary impact to wetlands on those lots for the
construction of driveways, building pads and then, if
found to be able to work, septic systems. So

secondary impacts that were not described in the Public Notice in the application had not been addressed.

**Q Upon receipt of the notice, what type of information did you review?**

A After the notice we looked at the Water Quality Standards, the designated uses for the wetlands involved. We looked at the National Wetland Inventory to also get another view of what the wetlands in that area might be.

**Q And what is the National Wetland Inventory?**

A National Wetland Inventory is a mapping that is done by the U.S. Fish and Wildlife Service. From aerial photography they interpret wetland boundaries on the surface and then map them on U.S. quad map quadrants.

**Q And is this a resource that PCA typically uses?**

A Yes.

**Q And have you typically used this in your 401 review work?**

A Yes.

**Q And you indicated that you did so for this particular project, is that correct?**

A Yes.



(Exhibit No. 3 was marked.)

BY MR. COOL:

**Q Handing you what has been marked as Exhibit 3, do you recognize this document?**

A Yes. This is the National Wetland Inventory mapping for the Williams Northwest Quad, Minnesota.

**Q Is this the map that you used to review in regard to the Bailey project?**

A Yes.

MR. COOL: I would move its admission.

THE JUDGE: All right. Is there any objection to Exhibit 3?

MR. FISH: No, there's no objection, Your Honor.

THE JUDGE: It will be received.

BY MR. COOL:

**Q Could you please -- let me hold this up. And would you please point out to the Court where the Bailey project is identified or located on this map?**

A Basically in Section 21 located almost midway up the map. Right to the east of the Section 21 notation is an area that has a wetland outline labeled PF10 -- PF -- PF01Bg and basically that's the area of the project.

**Q And what is the designation stamp for?**



A The designation for the wetland PF01Bg is the type of wetland that is classified by the U.S. Fish and Wildlife Service using what they call the Cowerdin Classification System.

**Q Does the map itself explain what the notations are?**

A On the lower end of the map is the table indicates the classification system and what it means in code. And it basically means that the P is for palustrine wetland type system; the FO is indicative of a forested wetland; and the modifier No. 1 indicates that it's a broad-leaved deciduous type forested area. The water regime code indicates that it is a B, saturated condition. And the soil code indicates that it's g, organic soil.

**Q Now, did the B classification for saturated conditions raise any concerns with the PCA?**

A It did because it indicated that this area as indicated on the map and as indicated in the Public Notice was all wetland and had saturated conditions. And one of the restrictions for citing septic tank systems is that it not be in saturated conditions, that there be at least one foot of natural unsaturated soil in order to install a standard system.



**Q Did the small g designation for organic soils raise any concerns with PCA?**

A That also raised concern because one of the soil limitations for standard systems is that it be in mineral soil, not organic.

**Q Now, the PCA typically gets information from other sources, you've indicated that, is that correct?**

A Yes.

**Q And is one of the sources public comments received from the Corps' process?**

A Yes.

**Q And did you receive any comments or copies of comments from the Corps' process?**

A We received two comments that were addressed to the Corps of Engineers that the Corps of Engineers transmitted to us for our information also.

(Exhibit Nos. 4 and 5 were marked.)

BY MR. COOL:

**Q Handing you what have been marked as Exhibits 4 and 5, do you recognize those documents?**

A Yes.

**Q And what are they?**

A These are the letters that were copied to our agency, myself, from the Army Corps of Engineers

transmitting copies of a comment that was sent to the Corps from a Mr. Grunz and Mr. Zimney.
**Q And again, it's typical for the agency to receive these types of materials?**
A Yes.
**Q And do you review these materials?**
A Yes, we do. We review them for any implications that might be associated with our water quality determination.
MR. COOL: Let me move the admission of these documents.
THE JUDGE: Is there any objection to 4 or 5?
MR. FISH: No, Your Honor.
THE JUDGE: They will be received.
BY MR. COOL:
**Q Was there anything significant in either of those public comments?**
A The comment by Mr. Grunz supported the issue that there was all wetland on site, and also commented that he was concerned on how viable septic systems could be installed in such an area that had wetland soils.
MR. FISH: Your Honor, I'd move to strike that. That's assuming some type of a foundation for



his opinion. This is a layman, a neighbor, a retired neighbor who is against development in the area because of his aging years. Had nothing to do with the nature of the land up there, Your Honor. I believe this type of an opinion has no type of foundation whatsoever or relevance.
THE JUDGE: Well, okay, you know, I think it's legitimate for you to point out his apparent lack of expertise, but it is what he said. I think it's legitimate to have in the record. It can stay in the record. We deal with public comments all the time.
BY MR. COOL:
**Q Did the agency, after reviewing the variety of sources you've discussed, seek any additional information from the applicant?**
A Yes, we did. We put together a comment letter that we sent out mid-July of '99 that we sent to the Corps of Engineers and to Mr. Bailey asking for additional information to address some of the issues that we had concerns with.
**Q And what were the specific concerns that you raised in that informational request?**
A Specific issues that we were looking to have addressed were, number one, given the fact that the



information we had indicated the entire site was wetland, we believed that the secondary impacts that would be caused by lot development must be identified and addressed according to the water quality standards and not be a segmentable portion of the permit, segmented out from this permit, but must be part of this permit review for the total impacts to the water.
We also indicated that there was concern that we had that if the entire area was wetland, we didn't believe that septic systems could be installed according to code and asked how septic systems would be installed in accordance with the code.
**Q Could you briefly describe the agency's concern regarding the segmentation issue here?**
A The initial Corps' Public Notice indicated that this was a project to permit the access road fill, but the entire purpose of the road was to provide access for those lots to be developed. Therefore, we believed that the secondary and accumulative impacts associated with the lot development were very much part of this permit issue and decision and should be taken into account in the entire review of Minnesota Rule 7050.0186, which is the avoidance, minimize and mitigation.



(Exhibit No. 6 was marked.)
BY MR. COOL:
**Q Handing you what has been marked as Exhibit No. 6, do you recognize that document?**
A Yes.
**Q And what is it?**
A This is the July 23, 1999 letter from the Pollution Control Agency to Mr. Bailey and the Corps of Engineers identifying our comments with the proposal.
MR. COOL: I move the admission, Your Honor.
MR. FISH: No objection.
THE JUDGE: It will be received.
BY MR. COOL:
**Q Do you recall receiving any other public comments from the Corps' process?**
A The Corps of Engineers did send us a copy of their transmittal of these comments to Mr. Bailey.
(Exhibit No. 7 was marked.)
BY MR. COOL:
**Q Handing you what has been marked as Exhibit 7, do you recognize that document?**
A Yes.
**Q And what is it?**

A This is an August 3, 1999 letter from the Corps of Engineers addressed to Mr. Bailey, transmitting the comments that they had received regarding the project from the Public Notice to him and asking for response at a specific date, August 17, 1999, and indicated that -- specifically that the MPCA comments must be responded to also.

**Q Now, this particular document as it resides in the MPCA's files did not contain the attached PCA comment letter, is that correct?**

A No, it did not contain our copy of the letter.

MR. COOL: I move the admission.

MR. FISH: I need some clarification on what's being -- what was the official record. We're talking about some attachments that were missing now on the document?

MR. COOL: That are not part of the document as it now exists in the PCA file. We have no reason to believe it wasn't in the original, but this is the document as it exists today.

MR. FISH: Okay, I'm still confused. When was something missing from the document?

MR. COOL: I think when the agency produced the file to you this -- the attachments, the



full set of attachments to the Corps' letter was not stapled to the Corps' letter. So, for example, it indicates that the PCA's letter is enclosed and that was not stapled to the Corps' letter, Corps' cover letter.

THE JUDGE: Well, isn't the important thing the fact that the Corps sent a letter to Mr. Bailey on August 3rd and then Mr. Bailey apparently wrote material on the bottom of Mr. Zimney's letter? The other stuff we've already seen. I mean whether -- whether -- have you seen -- have you seen the material that Mr. Bailey wrote on the bottom of Mr. Zimney's letter?

MR. FISH: I see that now, and this letter refers to four responses to Public Notice are being enclosed and I'm seeing two, I think. I guess I'm becoming more confused now. In the center of the letter is says, We initially -- We did not initially forward Mr. Zimney's letter to you as it indicated a copy was sent to you. We have enclosed all four responses to our Public Notice and we will forward you any others, and this document now has two responses.

MR. COOL: I can only speak to the fact that these are the two that the agency's original



file had to the Corps' letter, is that correct, Mr. Zdon?

MR. ZDON: Yes.

THE JUDGE: Let's just read this for a moment. Just a moment, let me just read this. It refers to Grunz, Zimney and the PCA and I don't think there's -- we have not seen and this letter does not suggest there's anything more than those three. So I mean -- we don't -- if there's a fourth one, I don't know where it is, it's not in my exhibits.

MR. COOL: Are you aware of a fourth letter, Mr. Zdon?

MR. ZDON: No.

MR. COOL: The agency staff is merely offering the letter to show that consistent with its past practice in 401 it receives comments from the Corps and reviews them.

MR. FISH: I guess my concern, Your Honor, is we don't have a complete record here. It looks like there's been a lot of errors on the part of this agency in communicating with Mr. Bailey and this seems to reinforce it, indicating there's more letters that were in this particular letter, indicating four responses and in the letter they're acknowledging failing to provide comments earlier.



That seems to be a couple of errors in the same letter; at least an acknowledgement of an error and then a new error.

THE JUDGE: Well, if they've made mistakes, they've made mistakes. The question is whether or not this is a reliable document and I think it is. I think it can be in the record. If there's something -- if you want to establish for some reason that they didn't send it to your client or something, you can do that with your client, but I think it's a reliable thing and it can be in the record.

MR. FISH: I just want to clarify for my objection, Your Honor. It's not that he didn't receive it, it's just -- it's just that we don't know what we didn't receive. It appears documents continually are omitted and this letter acknowledges or seems to establish that once again that we do not have a complete record.

THE JUDGE: We're going to have people here from the Corps. If you want to require as to whether there's some other public responses, you can inquire of them. Mr. Zdon said this is all he's aware of, the two public ones plus the PCA letter. If there's a fourth one somewhere, he doesn't know

about it, so I don't know what we can do at this time. So Exhibit 7 is received.
BY MR. COOL:
**Q Mr. Zdon, did you receive any information from the Corps?**
A Regarding our comments, the Corps of Engineers also submitted to us a copy of a letter that Mr. Bailey had sent to the Corps responding to some of the PCA issues.
**Q And who did you receive that letter from?**
A The Army Corps of Engineers, I believe it was Jeff Koschak that signed the letter or it might have been Char Hughes. I can't recall the signatory.
(Exhibit No. 8 was marked.)
BY MR. COOL:
**Q Handing you what has been marked as Exhibit 8, do you recognize that document?**
A Yes.
**Q And what is it?**
A This is a transmittal -- facsimile transmittal from Jeff Koschak of the Army Corps of Engineers sending to myself a copy of a letter that Mr. Bailey had submitted to Char Hauger of the Corps of Engineers, and it specifically addresses one of



the issues we brought up in our comment letter.
**Q Now, do you know Mr. Koschak?**
A Yes.
**Q And how do you know him?**
A Over the years of working with the 401 Program and the 404 permit issuances that were in the region that Jeff works in, I've worked with him numerous times on different projects.
**Q And have you exchanged information with him in these various projects?**
A Yes, frequently.
**Q And so the receipt of this type of information is consistent with that past practice?**
A Yes.
**Q Did Mr. Bailey ever respond to the agency directly?**
A Not directly to the agency, no.
**Q Is this the only response regarding the informational request that was sent to Mr. Bailey?**
A This is the only response we received regarding Mr. Bailey's response to our comment letter.
**Q Now, Mr. Bailey raises a concern about the letter, the PCA's letter, making some comments about trout waters. Could you explain that situation?**



A In our -- yes. In our July comment letter we indicated the classification of Lake of the Woods was designated a trout waters by our Water Quality Standards. This was an error on my part. It is not a trout waters, it is a Class what we refer to as a 2B water, but not trout waters. And this indicated when we double checked it that that was an error.
**Q Now, did that error change the PCA's views or concerns regarding this project?**
A No. The issues associated with the project dealt a lot with the wetland that were on the shoreline side of the lake and those issues remained the same.
**Q Did Mr. Koschak ever contact you again regarding this project?**
A Yes.
THE JUDGE: Did you want to offer Exhibit 8?
MR. COOL: Yes. I was just stopping, hesitating and realized, yes, I'd like to offer Exhibit 8, please.
MR. FISH: There's no objection.
THE JUDGE: Okay, it will be received.
BY MR. COOL:
**Q What were the additional contacts you had**



**with Mr. Koschak?**
A Later we received e-mail from Jeff Koschak regarding the Corps' preparing to make a decision on the 404 permit.
**Q But prior to any e-mails regarding the Corps' permitting process, did you have any conversations with Mr. Koschak?**
A We had phone conversations also talking about the aspects of the project, the wetland on the project, the potential to reduce the impacts associated with the ditching on the project and the concerns we had with the septic systems that would be built on the project and whether or not the project should be segmented or not.
**Q Do you remember anything specific about what Mr. Koschak said about this particular wetland?**
A Mr. Koschak's --
MR. FISH: I'll object to hearsay, Your Honor. There's got to be -- there's nothing in the record relating to this. This is straight hearsay he's going to be reciting.
THE JUDGE: Is this backed up by any sort of documentation?
MR. COOL: Yes, it is, Your Honor.
THE JUDGE: Okay. I will allow it to come

in and we'll see what kind of documentation there is. So you can proceed.

MR. ZDON: In regards to the wetland, Mr. Koschak indicated that the area appeared to be all Type 7 wetland.

BY MR. COOL:

**Q And what were Mr. Koschak's concerns about the ditches?**

A In terms of the ditches alongside the new road, Mr. Koschak indicated that he was thinking at this time of perhaps requiring the filling in of the ditches which would eliminate the impact to the wetland from the excavation and eliminate the impact of the lateral drainage effect from the ditches alongside the road. And that the Corps of Engineers believed that the feasibility of the road still existed without the use of the ditches and that would lessen the impact of the proposal.

**Q Now, at this point in time do you recall whether you had knowledge of who in the county was involved with this project?**

A At this point, no. Mr. Koschak had been dealing with Gary Lockner of the Environmental Services and shared with me that he was a contact person for the Environmental Services at the county



level and also gave me a phone contact.

(Exhibit No. 9 was marked.)

BY MR. COOL:

**Q Handing you what's been marked Exhibit 9, do you recognize that document?**

A Yes.

**Q And what is it?**

A This is a phone memorandum of my conversations with Jeff Koschak dated 8 -- starting date 8/20/1999.

MR. COOL: I move the admission, Your Honor.

THE JUDGE: These are your notes, is that correct?

MR. ZDON: Yes.

THE JUDGE: They were made when?

MR. ZDON: 8/20/99.

THE JUDGE: Contemporaneous with the phone conversation?

MR. ZDON: During the phone conversation, yes.

THE JUDGE: Is there any objection to what's been marked as Exhibit 9?

MR. FISH: My main concern, Your Honor, is I don't believe this has been disclosed to me. I



made multiple requests under the Freedom of Information Act. I think quite of few of these exhibits, quite frankly, Your Honor, are being shown to me for the first time today. If Counsel's made any comparison of what previously was disclosed to me as that was the representation as to -- it was a representation earlier in this matter that what I requested under the Freedom of Information Act would constitute his full record in lieu of formal discovery, Your Honor, and I don't know if there's been any comparison by counsel as to whether any of these documents have ever been requested or whether they actually would be subject to disclosure under the method I used to obtain them.

THE JUDGE: Do you want to respond, Mr. Cool?

MR. COOL: Well, I'm only aware of one government data practices request. Mr. Zdon, do you recall that request?

MR. ZDON: I recall the request, yes.

MR. COOL: Do you remember approximately what date that was?

MR. ZDON: Not specifically. It was either earlier this year or even before the turn of the year, I can't recall, but earlier this year, I



thought.

MR. COOL: My recollection, Your Honor, is that it was prior to the time that Mr. Bailey initiated federal litigation against the PCA, and while I have not compared what the PCA produced at that time with this particular exhibit or the exhibits that were offered, so I can't speak to exactly what was provided, which I believe was a data practices request that was made in, the best I can recall, would have been November or late 2001 because it's my recollection litigation was started against the state in 2002. We had the October motion practice up in Fergus Falls I believe in October of 2002, so I suspect, as I recall, the PCA had made a government data practices -- responded to that request much prior to that.

THE JUDGE: But it would have included material from 1999 presumably.

MR. COOL: Presumably it would have. It would have included all the information available in the PCA's file to the extent it was public data.

THE JUDGE: Well, my concern is that there not be surprises which leaves one party unprepared. And that's the point of doing discovery in advance of the hearings, that you know what's coming.

MR. FISH: Your Honor, the representation made to me was the public -- the request for public data I made was the file, period. And I don't know whether each individual entity or each individual employee physically goes through their personal files and digs out their personal notes of phone calls and submits it to the official record. However the recordkeeping is done in these agencies, I really don't know how that is done and I don't know if anybody here has some explanation for that either, how that's kept. Perhaps the witness may have an idea whether his personal notes are placed in some type of a file. But this is information that I'm seeing for the first time, Your Honor.

THE JUDGE: Have you seen -- have you seen this -- did you get a book like this, the book of exhibits that I have, that I'm holding up in front of me?

MR. COOL: No, Your Honor. I gave you that book and I'm giving Mr. Fish individually as I introduce them.

THE JUDGE: Well, my concern is if there's more things here that weren't disclosed because of representation that he'd already had, but you were going to offer as exhibits.



MR. COOL: Your Honor, with all due respect to Mr. Fish, I don't know what representation he's relying upon, because it's my recollection that he never called formally and asked me about what was the agency's files. There has been no formal discovery. I mean to the extent of my knowledge, and I think Mr. Zdon would confirm, this particular document resides -- and let me just for clarification, Mr. Zdon, there are a number of exhibits that are being introduced today, is that correct, from the agency's file?

MR. ZDON: Yes.

MR. COOL: And this was in the agency's file?

MR. ZDON: Yes.

MR. COOL: You know, I can't speak to what Mr. Fish recalls or doesn't recall about what was produced in the earlier Government Data Practices Act. I just don't have the specifics.

MR. FISH: I guess the question of the witness wasn't whether this was in the file -- whether this complied with -- whether this was disclosed in the government data request I made, but the question was whether it was in the file and those are two entirely distinct questions as the government



regularly excludes information in the file that it would consider sensitive or preparatory in nature. This is something that I would deem as preparatory in nature, Your Honor, that they would consider not subject to the Data Practices Act. And I did have a conversation with Mr. Cool and it was represented you don't need to do any discovery, you've got everything I have under your earlier requests. And now we seem to see information that is not normally disclosed under the Government Data Act being introduced as exhibits.

MR. COOL: Well, Your Honor, I deny I made that representation to Mr. Fish with regard to that.

THE JUDGE: Well, I don't think -- you know, so far what we've seen is not any bombshell. I don't know what's in these other exhibits, obviously I just saw this for the first time myself.

MR. FISH: That's my point, Your Honor, I should have the opportunity -- I may have no objection to this document, but my point is it should have been disclosed. Informal discovery is promoted in these administrative hearings. Mr. Cool complains I conducted no formal discovery, which is, I felt, entirely inappropriate given the fact that I'd done a government data disclosure request. And this is just



the type of information and some of the continued problems we have with, I guess, the organizational structure of these entities, of getting information and making sure documents are attached to letters. It's showing up repeatedly here, Your Honor.

THE JUDGE: Here's my concern. You acknowledge and I think it's my understanding that when you make a data practices act request you don't automatically get everything within the walls of that building, there's certain items which are not provided. And a lot of time is spent haggling over whether something should have been or isn't under that thing. I certainly don't want to get into that today. My concern is that you not be surprised by any of this. In light of the fact that we're not going to finish today and are, in fact, probably going to go for three days, I think the appropriate remedy is for you to go through this stuff tonight and figure out whether you think there is a problem with any of it. And if there is, bring it to our attention tomorrow and we'll try to figure some remedy. It may be risky to rely on a Government Data Practices Act request as a substitute for a discovery request, but I did not tape record our telephone conversation. We had a telephone prehearing

conference at some point, and I did not tape record that so I cannot independently tell you what representations were made by Mr. Cool with regard to whether you had been provided with everything he was going to introduce or not. Just checking my file. No, there's no tape.

So I think at this point we can just go ahead and admit these documents with the understanding that you can come back tomorrow or at some point and say hey, this is serious, this particular one here or that one or these two or whatever creates serious problems for me; had I known about them, I would have done something differently, and then we're going to have to fashion some sort of remedy if it appears that you should have been provided them. But I don't want to face that until we make sure -- most of these -- to be honest with you, most of these things are fairly innocuous and aren't going to make that much difference to you. But I think you have to have some time to look at them and figure out whether it is or not and so I think we better just proceed with the understanding that you can come back and revisit the admissibility of some of these if it creates real problems for you. Okay. So 9 is conditionally admitted.



BY MR. COOL:

**Q Mr. Zdon, in regard to Exhibit No. 9, there are some names provided. Were those names provided by Mr. Koschak?**

A Yes.

**Q And who are -- who's identified on that document?**

A At the bottom of the page it indicates that Gary Lockner is the County Zoning Administrator with his phone number, and an indication that Mr. Walter Leu was the previous LGU administrator in Lake of the Woods County.

**Q Now, did you have any telephone conversations with Mr. Lockner?**

A Yes, I did.

**Q And what was the nature of those discussions?**

A To discuss the Gary Bailey project, the findings that the county had in terms of whether or not it was all wetlands or whether or not there was any suitable areas for septic tank installation.

**Q And what, if anything, do you recall specifically about what Mr. Lockner said about unsaturated soils at the site?**

A Mr. Lockner had indicated that he believed



there was at least one foot of unsaturated soils in the area towards the lakeshore that would be a suitable site for installation of mound systems.

**Q And do you recall whether he indicated any further evaluation was going to be done?**

A Mr. Lockner indicated that he was going to invite the Technical Evaluation Panel, the TEP panel, which is a group of individuals associated with the Wetland Conservation Act comprised of a Board of Water and Soil Representative, a Soil and Water Conservation District representative and a representative of the county to evaluate the site.

**Q And do you recall whether in this process you were ever informed that actually the TEP did a wetland delineation?**

A The TEP did not complete an evaluation. Later in conversations with Gary Lockner he indicated that they did visit the site, they evaluated the site for groundwater depth, but they did not complete a prescribed wetland delineation on the site.

**Q Now, what is the significance of having a foot of unsaturated soil?**

A One foot of unsaturated soil is important because in our Minnesota Rules 7080 for installation of standard systems you must have at least one foot



unsaturated soil in order to have a working system, a compliant system.

THE JUDGE: Mr. Cool, when you reach a logical stopping place, I'd like to take a short break.

MR. COOL: I think right now would be a logical stopping place.

THE JUDGE: Okay, good. Let's take a ten-minute break and then come back.

(A break was taken at this time.)

THE JUDGE: All right. We are now resuming after a break. You may proceed, Mr. Cool.

BY MR. COOL:

**Q Mr. Zdon, where we left off I believe you had talked to Mr. Lockner, is that correct?**

A Yes, by phone.

**Q And again, could you reiterate what you and Mr. Lockner discussed?**

A Our conversation centered around the issue of the Gary Bailey plat, whether or not there was suitable sites for septic systems on those plats. Mr. Lockner felt that there was at least a 100-foot band of drawdown effect from the lakeshore going back on the lots that would provide an area for suitable building sites and septic tank installation, septic

system installation. He indicated that he was going to call the Technical Evaluation Panel out on the site to do a delineation sometime soon and then that information should confirm the suitability of the site and the exact locations of either all wetland or some upland.

**Q Now, did you subsequently receive any written communication from Mr. Lockner?**

A Yes.

**Q And what was that?**

A After the site evaluation that was conducted by the TEP, the Technical Evaluation Panel, Mr. Lockner indicated that they did find at least one foot of unsaturated soil on a 100-foot band behind the -- or back to the west of the lakeshore area and that he was going to send a letter in there to confirm it. And subsequently I received a letter that was signed by the three members of the TEP panel: Gary Lockner from the County, Mr. Dale Krystosek from the Board of Water and Soil Resources and Mr. Les Lemm from the Soil and Water Conservation District that indicated they had visited the site, they did not do a wetland delineation, but they explored the site for groundwater conditions and that they found 30 inches of -- they went down 30 inches



of soil boring examination, found gravelly soils, made the conclusion that there was at least one foot of unsaturated soils and that it would be suitable for building sites of houses, structures and location of septic systems.

**Q With regard to this letter, did you have a concern or were you surprised by the fact that no wetland delineation had been done?**

A I was expecting a wetland delineation by the TEP and would hope that that had been conducted, but from the conclusions raised by the TEP, had -- even though they did not do a full procedural delineation on the site, they made clear their determinations of wetland and upland on the site.

**Q Now you've taken the wetland delineation training, is that correct?**

A Yes, I have.

**Q And you've participated in wetland delineations?**

A Yes.

**Q Could you briefly describe what a wetland delineation is?**

A A wetland delineation is a procedural activity to specifically identify the boundaries of a wetland as compared to upland, which is non-wetland.



The procedures that are prescribed in Minnesota are done in accordance with the 1987 U.S. Army Corps of Engineer's Manual on Wetland Delineation for both Wetland Conservation Act approval and Clean Water Act determination. The 1987 manual has been the accepted method in Minnesota to do this. It requires evaluations of soils to their conditions and hydric classification, which means they are wet soils, to the determination of hydrology, how high the groundwater is in the soil or indicators on where the groundwater is during a period of time during the growing season, and a classification of the plants in the area that they are basically and predominantly hydrophytic, which means they are plants that are adapted to living in wet conditions.

(Exhibit No. 10 was marked.)

BY MR. COOL:

**Q Handing you what has been marked as Exhibit 10, do you recognize that document?**

A Yes.

**Q And what is it?**

A This is a letter sent to myself from the three members of the site evaluation team, the TEP panel, Gary Lockner, Les Lemm, Dale Krystosek, which identifies their evaluation of the site and the



conclusions on the Gary Bailey site.

THE JUDGE: I should indicate for the record that the October 14th letter which the witness is referring to is identified as Exhibit 12 or at least a tab 12 in my book. The preceding items are notes of telephone conversations. You don't have to introduce them, I mean --

MR. COOL: And we're not going to introduce them, Your Honor.

MR. FISH: I guess procedurally, I don't have all the information that is sitting in front of you that was supplied by the state, which is highly unusual, and you having an opportunity to review this stuff without the benefit of my having any of these documents is somewhat concerning.

THE JUDGE: Okay, I can understand that. Apparently they've made a decision based on your earlier concerns not to introduce some stuff that had not been produced to you earlier and I have no desire to have it, so I'm certainly willing to take it out. The last one we had was 9, so that means 10 and 11 are not in.

MR. COOL: If there's a preference, I could take all the exhibits back and merely hand everybody the exhibits at the same time if that's

going to be a concern.

THE JUDGE: Are there going to be some some others, do you think?

MR. COOL: I don't know.

MR. FISH: As far as the numbering, Your Honor, are we going by the number in your book or another number?

THE JUDGE: We're just arriving at that. This has just come up as a result of the earlier nondisclosure issue. I think the thing to do is to only number the items you intend to introduce into the record and so if you don't intend to introduce the items that were provided to me under 10 and 11, let's not introduce them and I'll just take -- in fact, I think the one by one is the cleanest maybe, do it one by one. So this will be become Exhibit 10. Exhibit 10 is the letter, October 14th, and she's going to end up with a book -- she's going to end up with the final documents anyway, isn't she, the court reporter? Let's go off the record for a moment.

(An off-the-record discussion was held.)

THE JUDGE: So this is Exhibit 10, the 10/14/99 letter. Is there any -- did you offer it?

MR. COOL: I move for admission.



MR. FISH: No objection.

THE JUDGE: Okay, it will be received.

BY MR. COOL:

**Q Mr. Zdon, I don't know that I've asked you this, but did you know Mr. Krystosek?**

A Yes.

**Q From where?**

A From dealings with the Interagency Wetland Group and his involvement with the Board of Soil and Water Resources as a board conservationist, worked with him in the past.

**Q At this time did you know Mr. Lemm?**

A No, I did not.

**Q I'm going to refer you back to the plat map that appeared in the Corps' Public Notice. And if you could explain to us, based on this letter, what your interpretation was of where Mr. Lockner was referring to soils available for ISTS systems.**

A The letter indicates that their site evaluation looked at a band of soil between what would be a 50-foot setback from the lakeshore, which would be the minimum distance that septic systems could be placed, and a 75-foot band, which would be the structure setback distance. They did boring that indicated there was at least 30 inches of -- they



went down 30 inches to look at the soils and came to the conclusion that there was at least one foot of unsaturated soils in that band, that the drawdown effect from the lake would extend potentially no further back than 100 feet, which meant that the structures and septic systems would have to be within that 100-foot distance, and that that area was acceptable for building pads of homes, garages and septic systems.

**Q And what did Mr. Lockner's letter indicate about land further inland than the 100-foot area?**

A The inference was that beyond the 100-foot drawdown effect from the lake, the water table would be higher and then the land would not be suitable for building sites, nor septic systems.

**Q Now is there any indication in this letter that only one soil sample was taken?**

A No, there's no indication on how many samples were taken, but none that there was only one.

**Q Did you have any further communications with the Corps regarding this site?**

A Subsequently we did receive e-mail from the Corps of Engineers that talked about the status of this project.

**Q Did you receive any facsimiles regarding**



**communications that the Corps was having with the county or regarding Wetland Conservation Act matters?**

A Also in that period of time we did receive a facsimile of the county's statement regarding taking over the road. There was some correspondence regarding the county's determination on when and if they would take over the road; a statement of notes from the county regarding the acceptance of the plat and some letters from the local unit of government regarding wetland violations on lots that had been filled by some of the individual lot owners now.

(Exhibit No. 11 was marked.)

BY MR. COOL:

**Q Handing you what has been marked as Exhibit 11, do you recognize that document?**

A Yes, this is a facsimile from the Army Corps of Engineers, Jeff Koschak, containing information regarding the Gary Bailey project.

MR. COOL: I move the admission.

MR. FISH: Give me a minute to get through this, Your Honor, I don't know that I've seen this.

THE JUDGE: Sure.

MR. FISH: There's no objection.

THE JUDGE: All right. Then what's been marked as Exhibit 11 will be received.

BY MR. COOL:
Q **With regard to the discussions on Lake of the Woods Highway Department letterhead, had the agency been given any reason to direct the decision that they were going to make on 401 to any other individual other than the original applicant?**
A No. We were aware that the county and Mr. Bailey were in discussions on the county at some point taking over the road, making it a public road. This was -- the concern with us was who was the applicant for the road fill project, and even though this was ongoing and bantering back and forth, at each point the Corps was still referring that Gary Bailey had filled the road -- fill for the road before the permit, he was still the permit applicant and would still be the person that the Corps of Engineers would be directing the permit action against.
Q **What, if any, significance did PCA attach to the letters in this facsimile from the Lake of the Woods Soil and Water Conservation District?**
A The letters indicated that there were some activities going on by the individual lot owners, filling driveways and ditch crossings to their -- to the individual lots at this point, so at this point



we were aware that there was additional violations occurring of both the Wetland Conservation Act and the U.S. Clean Water Act 404 Program of these activities being conducted without permit.
Q **And did that raise any concern?**
A That raised a concern. It reinforced our concern that this permit should not be segmented and we should be looking at those projects as one permit, and that there were ongoing violations that were not being addressed at this time.
Q **Now, this facsimile is dated November 5, '99, is that correct?**
A Yes.
Q **Did you receive any further information from Mr. Koschak regarding the Corps permitting process?**
A Yes, about that time we also received e-mail indicating the status on this and other projects, but regarding to this project, an e-mail indicating that the Corps was getting ready to finalize their decision on the permit. Basically that the Corps was planning to issue what they call a provisional individual permit regarding the road fill that a condition of the Corps permitting would be that the applicant fill in the road ditches to reduce that impact from the excavation of the road ditches and



eliminate the drainage effect from the road ditches. So that the permit would be issued for an impact of approximately 1.58 acres of road fill only. And that any subsequent permitting required for the individual lot owners that were going to be filling on that would be handled through subsequent Corps permitting.
Q **Now, could you explain your understanding of a provisional permit?**
A The Corps of Engineers issues their determination when they are ready in a draft determination to the applicant to be signed. One of the conditions before they can issue a final permit is that the determination from the state either has to have been certified or waived before they can issue their permit. In situations where they're ready to make their determination before the state has acted, they will issue what they call a provisional permit, meaning their determination is complete except for the action of the PCA, the state in this case, and that that has to be taken care of before a final permit could be issued.
Q **Now, at this point in time what was PCA's deliberations regarding the certification decision?**
A The issues that we had raised regarding the septic tank installation were that indeed if there



was a 100-foot band of unsaturated soil from the lakeshore going back, that their -- according to the county there was adequate room for siting of individual septic tank systems there in compliance with our Minnesota Rule 7080, that building sites would not cause further impact, secondary impact, because there was within that 100-foot band location for suitable building sites, that the individual accesses would be permitted through most likely general permitting or nationwide permitting which would control the insignificant and noncumulative impacts from the access roads, and that the road ditch impact itself had been reduced to just 1.58 acres because the road ditches would be filled.
Q **And that was the understanding at the time -- excuse me, you were going to say something?**
A I'm sorry. And one last point was that the mitigation plan that had been approved by the Soil and Water Conservation District to supply at least one -- or 2.91 acres of wetland replacement would be acceptable for at least the 1.58 acres of fill that was being permitted, and that would satisfy our requirements for nondegradation that the wetland functions are being replaced elsewhere.
Q **Now, this summary you've just provided is**

**basically the premise for the agency's consideration of the certification decision, is that correct?**
A Yes.
**Q And did the agency then certify the road project?**
A Yes, we subsequently sent a letter of certification to the Corps of Engineers and Mr. Bailey identifying those issues with the project that we were certifying for the road fill description, 1.58 acres of fill. We conditioned the permit that the mitigation plan that had been previously approved by the Soil and Water Conservation District was acceptable to us, and that we also required that an erosion plan be developed so that if there was further work associated with either Mr. Bailey or the county or any agent completing road work, that an erosion plan be put in place to protect the surrounding wetland.
(Exhibit No. 12 was marked.)
BY MR. COOL:
**Q Handing you what has been marked as Exhibit 12, do you know what that document is?**
A Yes, this is the December 17, 1999 Letter of Certification, 401 certification from our agency.
**Q In regard to the issue of the applicant at**



**that time, what was PCA's view?**
A At this point PCA expected that Gary Bailey was still the applicant for the permit, that he would complete the conditions of both our consideration and whatever might come into the permit decision from the Corps of Engineers.
MR. COOL: I move the admission of this document, Your Honor.
MR. FISH: No objection, Your Honor.
THE JUDGE: It will be received. Did you move -- yes, you did, never mind. Exhibit 11 was received as well. Okay, fine.
BY MR. COOL:
**Q Postcertification the agency went through a reorganization, is that correct?**
A Yes, we did.
**Q How did that affect the 401 program?**
A Right around the period of time of late '99, early 2000 our agency went through a reorganization where we re-assigned some of the programs to include involvement, direct involvement, of our regional staff located in our regional offices. The 401 Program was one of these programs that we began to get the regional staff involved from their closer proximity to the projects and include them in the 401



review and determination of projects that would be in their regions.
**Q And so did -- who became the team then that continued regarding the Bailey project?**
A Out of our Detroit Lakes office, which includes Lake of the Woods County, a Lisa Kraemer, was the staff involved, her supervisor Jim Ziegler and their office manager, Jeff Lewis, were the basically team that was involved with concerns in the entire region, including the activities with the Gary Bailey project.
**Q Now, postcertification did you ever receive a provisional permit?**
A No, we did not receive any permit from the Corps.
**Q To the extent you can remember, what was going on or what was being conveyed to PCA regarding the Corps' permitting decision?**
A Nothing specifically until later summer when the Corps of Engineers contacted the PCA again to talk about the Gary Bailey project and the fact that it -- the permit hadn't been issued yet but they were still looking at some issues associated with the project.
**Q And what, if anything, do you recall about a**



**discussion about a wetland delineation?**
A The Corps of Engineers indicated that they were going to perform a wetland delineation on the project, that a member of their central office, Steve Eggers, who is expert in doing wetland delineations, was going to be coming up with some other team members to perform a wetland delineation in the late August period.
**Q And did you subsequently receive information that indicated the Corps had, in fact, done a wetland delineation?**
A Yes. After -- after the delineation had been completed by the team members, Jeff Koschak kept us informed on the deliberations that were going on within the Corps of Engineers regarding the conclusions of that delineation and information that was derived from the site visits by both the delineation that was performed, a routine assessment methodology, evaluation of the wetland conditions, and measurements of the fill that had taken place on the individual lots that was related from the different members of the Corps.
**Q Did you receive any actual communications from the Corps regarding the delineation?**
A We received a number of e-mails and e-mail

trains from the Corps relating to this, yes.

**Q And what do you recall about the information conveyed in those e-mails?**

A Specifically regarding the wetland was that it was determined that the entire site was wetland, less a small upland island that was located somewhere between Lot 3 and 4, approximately 140 feet back from the shoreline; that the wetland was determined to be an exceptional quality wetland; and that other than that island and some previously drained wetland from the southern ditch, the entire site was wetland.

**Q Did you receive any information regarding the effects of the ditches?**

A Also the Corps of Engineers did work with the NRCS, National Resource Conservation Service, to do calculations on the potential impacts from the lateral effect of the drainage ditches that were built next to the road, and they indicated that the initial calculation of a little over 2.91 acres for the road and the ditches was not correct, that there was actually about 4.97 acres of lateral effect drainage from those ditches, which --

MR. FISH: Your Honor, I'm going to object to this line of questioning at this time. We're getting into, I guess, double and triple hearsay



here. We don't know who did these technical evaluations, what their foundation was, what criteria they used, where they were relayed to and how the witness came into knowing this information. And we believe this is -- constitutes quite unacceptable hearsay given the nature of the testimony.

THE JUDGE: Are we going to be hearing more directly from Eggers or somebody else about this?

MR. COOL: With regard to the lateral effect we're going to introduce the e-mail from Mr. Koschak where this information was conveyed to the agency.

MR. FISH: Your Honor, we've subpoenaed Mr. Koschak and had an off-the-record discussion that he will not be available. His conclusions will not be subject to examination according to counsel representing the Army Corps of Engineers. Essentially, we have a witness whose conclusions and analysis are being relied on by the MPCA. He is not going to be subject to cross-examination, the findings are not going to be subject to any type of inquiry by this Court or myself and we believe any reference to work done by the Army Corps of Engineers, the wetland delineation or any e-mails,



documents or otherwise, should all be excluded from these proceedings as it would be unfair to even acknowledge their existence without our ability to explore them.

THE JUDGE: But we're going to have Eggers, aren't we?

MR. COOL: Yes, we are, Your Honor.

THE JUDGE: Okay. And Eggers does what?

MR. FISH: My understanding is we may have him in physical presence, Your Honor, but we don't know what he's going to testify to and counsel for state off the record prior to this hearing acknowledged he's only going to be allowed to do very limited testimony. It's been made very clear to me by the Army Corps' attorney that we will simply not be able to get any testimony as to these witnesses' conclusion whatsoever, Your Honor, and what is being asked of the witness on the stand now are the conclusions of the Army Corps of Engineers. And this is the exact type of testimony that the Federal Government is now saying they are going to trump this Court and preempt any testimony on.

THE JUDGE: Well, I think we better wait until we see Eggers before we decide what he's going to testify to. I think he's going to testify on the



delineation of the wetland and I don't -- let's wait until we see Eggers. Is Eggers going to talk about this 4.97 acre figure, do we think, or anybody else in the Corps? Is Eggers the only one from the Corps we're getting?

MR. COOL: No, Your Honor, I will call Mr. Koschak to discuss the 4.97 acre lateral effect.

MR. FISH: Your Honor, as an offer of proof I would submit a letter dated July 22nd of 2003 by -- drafted by Steve Adamski, the acting district counsel, that specifically states I do not have authority to allow Mr. Koschak to provide expert or lay opinion testimony. In the event Mr. Koschak is allowed to testify, the testimony must be limited to factual matters relating to Mr. Bailey's permit application for the road, and it goes on to lay out other limitations on his testimony. And I don't know that Mr. Rick Cool has obtained any specific waiver of this that I haven't. He indicated he did not subpoena Mr. Koschak to these proceedings and the Army has made it very clear they're not going to let him up here unless all of their preconditions are made. So if Mr. Cool has information he hasn't disclosed about this -- this representation by the Army Corps of Engineers on Mr. Koschak's appearance

here today, I guess I don't know about it.
THE JUDGE: It's my understanding what the Corps of Engineers is concerned about is attempting to use Mr. Koschak to draw conclusions other than he drew himself. He came up here apparently, I don't even know if he was up here, but he came up here and said I've looked at this situation, there's going to be 4.97 acres of lateral drainage and that's what he's going to testify to, and I think he -- I don't see what their concern is with regard to whether or not he can testify to that fact. I think he can testify and I think that's what the agency presumably and you both want -- you want to know what he said. It's my understanding what the Corps is concerned about is if you said well, if we -- typically how would this work? Well, I'm not going to speculate. What -- if we -- do you think we can get Koschak up here?
MR. COOL: He is here, Your Honor.
THE JUDGE: He's here?
MR. COOL: Yes.
THE JUDGE: I didn't even know that.
MR. FISH: Your Honor, the letter specifically says no lay opinion, no expert opinion. Mr. Adamski told me over the phone if you want him to



testify I saw water on the ground, I saw a green leaf, he can testify to that, but as to any conclusions, there would be no testimony relating to that allowed. And that is exactly what Mr. Cool is trying to elicit from this witness are the Army Corps of engineers' conclusions.
MR. COOL: Your Honor, again in the off-the-record conversations I indicated that the PCA had followed the Corps procedures for obtaining access, limited access to these witnesses. And I believe that they, under the conditions set forth for the PCA, will be allowed to testify to the factual matters in the Corps' determinations, including the conclusions they've reached. What we have here is a situation where the MPCA following what the Federal Government demanded did the right thing and got access. And for whatever reason, Mr. Fish hasn't followed a process apparently to form or -- in conformance with what the Corps has requested and has not received approval under the subpoena to put Mr. Koschak on independent of whatever the PCA puts him on for.
MR. FISH: Your Honor, it's interesting Mr. Cool has not made one reference of what conditions or limitations he has. You apparently



have those in some type of written format and it would be interesting to know what they are. And why -- Mr. Adamski said I can subpoena him up here but these are the conditions. And if the state is getting different conditions than Mr. Bailey, I would be interested to know what the relationship the Army Corps has with Mr. Cool's office.
MR. COOL: Well, the process that we went through was one that the Corps laid down to get access and to outline through conversations with the Corps what the agency wanted in terms of testimony. What the Corps indicated to the agency is that they did not want people being used as their own experts, so that you would put an expert on and start going through a series of hypotheticals that would then basically be substituting a federal government employee for what a party should have done through either their own employees or hiring a private expert contracts. That is the primary condition that the agency has to live under. As far as the discussions between the agency and the Corps, it is my belief that I'm -- that the agency would be within the Corps' limitations if the testimony of these witnesses is limited to the documents regarding the wetland delineation and the questions both factual



and conclusions reached regarding those documents.
THE JUDGE: I didn't even understand Mr. Koschak was here. If he's here, then I think he's the best source of whether 4.97 is correct or not. And I think if he's going to testify to that, which presumably he is, then we don't need to get 4.97 out of Mr. Zdon other than to say this is the basis on which I proceeded, I took Koschak's conclusions and assumed they were correct and went forward with them, and that I think you can do. Whether Mr. Koschak's conclusion is correct or not, we will find out with Mr. Koschak, but I think -- so with regard to whether 4.97 is the correct number, I think that has to come from Mr. Koschak. And I'm glad to see he's here, you saved us a lot of trouble. Now is Mr. Adamski here as well, by the way?
MR. COOL: No, Adamski is not.
THE JUDGE: I don't know who's here. All right. So you -- I think it's legitimate to -- for Mr. Zdon to say he took certain facts from Mr. Koschak and assumed they were correct and based on that did certain things. You're entitled to find out how the agency reached its decision and so I think you can do that. Whether 4.97 is correct or not we're going to have to find out from Mr. Koschak.

Okay.
BY MR. COOL:
**Q Mr. Zdon, I'm not quite sure where we left off, but you did receive communications in the form of e-mails from Mr. Koschak regarding the 4.97 acres, is that correct?**
A Yes.
**Q Did you receive any other information from Mr. Koschak regarding the delineation?**
A We received the correspondence that was going between Corps members discussing the delineation and the conclusions. The conclusions being that the site was virtually all wetlands, 99 percent wetlands as they commented, with just one small island inclusion of upland located between Lots 3 and 4; that the wetland was as assessed by the Minnesota Routine Assessment Methodology a high quality wooded swamp; and the calculations that establish the predicted ditch effect of the ditches associated with the wetland would be -- increase the impact to 4.97 acres of lateral ditch drainage effect.
**Q Did you obtain any information regarding fill or clearing on the lots themselves?**
A Also transmitted from the Corps of Engineers



was a plat sketch that indicated where measurements were taken to show the driveway and ditch crossings that have been put in place by individual lot owners that had not been permitted yet, but that existed on the lots.
(Exhibit Nos. 13 and 14 were marked.)
BY MR. COOL:
**Q Handing you what have been marked as Exhibits 13 and 14, do you recognize those documents?**
A Yes, these are the e-mails that I received from Jeff Koschak regarding these issues we just discussed.
THE JUDGE: Which is 13? Is it the single page or the double page?
MR. COOL: Single page.
THE JUDGE: Single is marked 13, thank you.
BY MR. COOL:
**Q For clarification, what's the time on that September 25th e-mail?**
A The time is 3:44 p.m. The double-sheeted e-mail has a time of 3:59 p.m. at the top.
THE JUDGE: Okay.
MR. COOL: Move the admission, Your Honor.
MR. FISH: Your Honor, I would only submit the same objections of nondisclosure which seem to be



cropping up repeatedly and understand the Court's already ruled on that.
THE JUDGE: Subject to that, these are received.
(Exhibit No. 15 was marked.)
BY MR. COOL:
**Q Handing you what has been marked as Exhibit 15, what is that?**
A This is a facsimile submitted to myself and Lisa Kraemer of our Detroit Lakes office from Jeff Koschak dated September 25, 2000.
**Q And as you look through that document, this is the information that was faxed to you from Mr. Koschak, is that correct?**
A Yes.
MR. COOL: Move its admission.
MR. FISH: I would object, you know, this is hearsay and apparently expert analysis and data gathered by some other entity, the means of which are unknown to us. The conclusions or how the conclusions were reached are unknown to us at this time. And again on the nondisclosure issue, which is repeatedly cropping up, I'd object on that separate ground.
THE JUDGE: Let me take a look at this. I



don't know what this is yet.
BY MR. COOL:
**Q Mr. Zdon, maybe you can describe what was conveyed to you in this document?**
A In this fax there is a plat map of the Sunny Beach plat that shows the locations of driveway fill that had been placed by the individual lot owners on the lot, including one parking pad fill on Lot No. 14. It has an indication in the plat map of where the small island of upland is located between Lots 3 and 4, and an indication of the existing ditch along the southern border of the entire area. The next page includes tabulations and measurements of the fills as they were -- as indicated on the front page of the driveways and ditch crossings that were placed by the individual lot owners. The remaining pages is a copy of the original Public Notice by the Corps of Engineers on the project dated June 24, '99.
**Q Now, does this map that you have in here say anything about a floodplain?**
A No, there's no indication of floodplain lying on this map.
THE JUDGE: All right. Is it your understanding that Mr. Koschak or somebody working under his control prepared the first substantive page

of the document, the plat map, and the dimensions entitled Lot Developments at Sunny Beach, do you know?

MR. COOL: It's the agency's understanding that Mr. Koschak prepared at least some of the work in this document. I can't speak for all of it.

THE JUDGE: He's going to be testifying and he can testify as to those, I would think. And the Public Notice -- the remainder of the document, haven't we already seen this?

MR. COOL: You have, but this was the entire document that was faxed to the PCA by Mr. Koschak. Is that correct, Mr. Zdon?

MR. ZDON: That's correct.

THE JUDGE: Okay. I think Mr. Koschak is going to be available to testify about the document, I think it's legitimate to have it in the record. It's evidence of what the agency relied on. Whether or not Mr. Koschak's drawings are correct or not, we'll have to ask Mr. Koschak.

MR. COOL: I believe this was Exhibit 16, is that correct?

THE JUDGE: 15, I believe.

MR. COOL: 15.

THE JUDGE: So 15 is received.



MR. COOL: Thank you, Your Honor.

BY MR. COOL:

**Q Subsequent to the receipt of this information, what were the deliberations in PCA?**

A The concerns with the PCA were that, number one, we had already issued a determination based on the information that was provided in the initial application for the project. Our 401 determination had been sent out the previous year certifying it. We were concerned that now with this information the earlier determination by the TEP letter proved incorrect due to the more scientific evaluation of the wetlands, doing the wetland delineation by the Corps of Engineers, that all the site was wetland. There would be increased wetland impact from the road and the lateral effect from the ditches. We were still concerned that there -- this project should not be segmented and that the lot development should be incorporated into this review. And we were unsure how complying septic systems could be installed in these areas when the entire plat was wetland. And also the mitigation that had been provided in the original certification condition was for 2.91 acres regarding the initial project description and for this increased amount of wetland impact would not be



acceptable to compensate for the wetland that was being lost at this point.

**Q Now at the time had you -- or excuse me, had the agency ever received any further communications from Gary Bailey regarding the July 1999 request for information?**

A No direct contact from Mr. Bailey.

**Q Did you, after reviewing this information, confirm any of this information with the Corps on prior -- on subsequent discussions?**

A Subsequently as we were determining what we should do, whether revocation of the permit was an appropriate action, I called the Corps of Engineers, both Jeff Koschak and Steve Eggers, to get a confirmation that the conclusions we were reading in the e-mail correspondence were the final conclusions of the Corps regarding the wetland delineation and the fact that there was no wetland -- or upland band of 100 feet between the shoreline and the -- from the shoreline west.

**Q And was anything -- was the information that was conveyed earlier deemed consistent with what you were being told at the time?**

A Both Jeff Koschak and Steve Eggers confirmed that that was the conclusions of their wetland



delineation as -- as in the e-mails.

**Q Now, in regard to the Section 401 Program and the specific procedural rules you've identified earlier, the agency has procedural rules for revoking both permits and 401 Certifications, isn't that correct?**

A Yes.

**Q And those rules are found in 7001.0140, is that correct?**

A Yes.

**Q At this point in time what did the agency determine with regard to Mr. Bailey and his disclosure of facts regarding this particular project?**

A The agency determined that there was a lack of full disclosure in terms of the conditions and facts surrounding the project. Specifically, that the wetland on the site was more extensive than was originally proposed, that the entire site was wetland; that there was more impact associated with the road than originally proposed, increasing the impact from 1.5 acres for the road fill and a total of 2.91 acres for the lateral effect to almost 5 acres now of wetland impact from the lateral effect.

**Q And based on the PCA's understanding that**

**if this project would go forward, what dangers, if any, did they identify to public health and the environment?**

A Potential endangerment to public health would come from one, if the septic systems were to be installed in an area of saturated soil, it is very likely that they would fail, blow out at the toe, untreated sewage would flow over the surface and have potential of human contact, pets, other animals that could transmit disease and be a nuisance condition. The flow could flow to the lake and contaminate the lake and be a potential harmful effect for swimmers or fishermen out in the lake. If the untreated sewage flows and mingles with the groundwater, groundwater could be contaminated and the potential for contamination of nearby wells would be a health problem for the drinking water in that area.

**Q The letter that the agency received from the County Environmental Services Office in October 1999 made reference to mound systems, is that correct?**

A Yes.

**Q And you've made reference just now to a blow out of the toe. Could you please explain that statement?**

A A mound system, as the name indicates, is a



septic drain field system that is built above ground. The ground surface is typically roughly prepared and sand, anywhere from one foot to three feet of sand is run in on top of that to act as a conduit for the waste water to spread out over the area of the mound and above that sand are placed the drain tiles where the septic tank effluent is typically pumped into and spread out over a period and different frequency to allow the septic fluid to percolate through the sand and then percolate into the ground. When there is not at least a foot of unsaturated soil below that mound, the water will take the path of least resistance which will basically be to exit the mound at the toe of the sand slope.

**Q When you talk about the toe, we're talking about the area of the mound that is on the ground surface, the original ground surface, is that correct?**

A Yes.

**Q Why couldn't these issues be resolved with modification of the original -- excuse me, with the original certification?**

A There are situations where the PCA can condition a permit to address certain issues in order to make the determination that the project is -- has



a reasonable assurance of complying with Water Quality Standards. However, the issues associated about where and how septic systems could be installed is not something that could be directed by the PCA. We would certainly need a proposal from the applicant, the lot owner on whether or not -- where they're going to locate them, whether or not they're going to go to individual systems or cluster systems that are off site, and also have the required soil investigation to indicate that that site is appropriate for septic systems.

In terms of the road, the 7050 Water Quality Standards require an evaluation of avoidance, which is a look to see whether or not there are any opportunities to conduct the project with less or no impacts to wetlands, and this is something that has to be proposed by the applicant in terms of potential, prudent and feasible alternatives of where or how that road could be constructed to impact less, and that had not been performed.

And in terms of the mitigation for all of the impacts that might be included, the agency couldn't dictate how to complete a mitigation, it has to have the site that's selected by the applicant that's either owned or has some sort of interest in it, it



has to be an appropriate site that's within the technical feasibility of becoming a wetland, and it's not something that could be dictated by a condition.

**Q So in essence are you saying the agency needs more certainty in order to do a modification?**

A Yes. If indeed the applicant decided to reapply, those issues could be reevaluated for 401 certification.

**Q Based on those concerns, the agency revoked the certificate, is that correct?**

A Yes.

(Exhibit No. 16 was marked.)

BY MR. COOL:

**Q Handing you what has been marked as Exhibit 16, do you recognize that document?**

A Yes.

**Q What is it?**

A This is the October 4, 2000, 401 Certification Revocation letter that was sent by our agency to the Corps of Engineers and Mr. Bailey.

**Q And again did the agency reiterate concern about segmentation?**

A Yes. The concerns in the letter indicated that we were concerned that the secondary impacts caused by the lot development should not be segmented