out into separate permit review but be a part of this permit application. We were concerned that the entire project area was wetland and that this increase amount of wetland impact had not been evaluated for impact.

**Q And did the -- on the Page 2 of the letter there's informational requests. What was the purpose of those informational requests?**

A The bottom of Page 2 we indicated that the 401 certification was being revoked and that if the applicant chose to reapply, that the -- based on the updated wetland delineation that there were at least three pieces of information that would be required to review that application: specifically, number one, that the applicant indicate all the wetland that's on site and the extent of the wetland that was going to be impacted from both the road drainage and lot development; that the applicant indicate how in this situation compliant septic systems could be installed either on site or wherever that they might choose; and that because of the increased impact, that those impacts be evaluated for compliance with our sequence mitigation contained in 7050.0186 of avoidance, minimization and mitigation.

**Q Now, has Mr. Bailey ever responded to this**



**particular letter and provided any additional information to the agency on these issues?**

A No.

MR. COOL: I move the admission of this document, Your Honor.

MR. FISH: No objection whatsoever.

THE JUDGE: It will be received.

BY MR. COOL:

**Q Now, subsequent to the revocation, is there any other information the agency has received as a result of both this proceeding and the federal litigation regarding the site that is of relevance to PCA's 401 process?**

A Yes. Subsequent to this one piece of information was that the mitigation plan that was originally approved and would authorize construction under a letter of credit by Gary Bailey had expired and was no longer valid. And subsequent correspondence indicated that Mr. Bailey didn't intend to complete that mitigation for the road impact.

**Q And was that of concern to the PCA?**

A That was a concern. As a condition of the original certification, the mitigation was expected to satisfy the nondegradation portions of our Water



Quality Standard and replace the wetlands that were being lost by the road fill and at this point it was understood that was not going to occur.

**Q And did the agency receive any other information about the site that was of significance?** Do you recall any --

A I'm trying to recall.

**Q Do you recall receiving information about the existence of a floodplain on the plat?**

A The floodplain issue, yes. Subsequent to that through review of other agencies' documents on the plat map was projected a floodplain line that hadn't been previously indicated to the PCA. The floodplain line followed from north to south on the lakeshore. This is of concern because presence of floodplain further complicates the locations of installation of standard septic systems. They can't be installed in a floodplain.

**Q Now, was the information regarding Mr. Bailey's position on the replacement plan ever conveyed by Mr. Bailey to the PCA?**

A No.

**Q Did Mr. Bailey ever convey to the PCA the presence of a floodplain on the Sunny Beach plat?**

A No.



**Q Would the failure to have disclosed these two pieces of information been considered by the PCA at the time of revocation had they been known to PCA?**

A They would have been additional issues of problems with the project that were not resolved during the review, yes.

**Q And would they have been considered by PCA to be additional factors for purposes justifying the revocation?**

A Yes.

**Q Now based on this new additional information, had any of the agency's concerns regarding the danger to public health and the environment previously discussed been altered at all?**

A Nothing that we were aware of had been done to alter them.

**Q How did this new information weigh in to those concerns though?**

A The endangerment to the public health would have been problematic if the septic system would have been built in the floodplain, that would have been an increased opportunity for mound failure and if the -- excuse me, I lost track.

**Q You were talking about the floodplain impact on mound failure. Did the replacement plan issue and**

**the apparent nonvalidity of it or the fact it hadn't been implemented, did that -- would that have weighed in?**
A The issue of the mitigation plan would have weighed in in that the condition of the original certification requiring mitigation was now found that it wasn't going to be implemented and this would have been a violation of that condition.
**Q Does the failure of implementation of that replacement plan also violate PCA's wetland nondegradation rule?**
A It also violates 7050.0186 regrading mitigation. Mitigation is required to be provided at or during the time of the impact itself, and we were seeing now at this point that that wasn't going to be provided.
**Q Was the fact that the replacement plan was not going to be implemented result in any other violations regarding the existing road fill?**
A Well, the road fill itself had not been mitigated, and at this point the implications of the mitigation plan being void and not going to be implemented by the applicant indicated that the lost functions and designated uses of that would continue and continue to be a degradation in the waters.



**Q And what specific rules are affected by the loss of designated uses?**
A The designated uses of wetlands are summarized in our Rule 7050.0210 Subpart 13(a), and it discusses the different designated uses of wetlands which are the functions of wetlands, being wildlife habitat, biological diversity, recreation, aesthetic enjoyment, erosion control, groundwater recharge, low flow augmentation, and storm water retention. And --
**Q Go ahead.**
A And with the fact that the wetland had been filled, these designated uses no longer existed.
**Q Now, designated uses, are they part of the agency's classification scheme --**
A Yes.
**Q -- of waters? And could you explain that?**
A The agency designates water uses in 7050. Basically wetlands are designated as a 2(d), 3(d) 4(c), 5 and 6 and these contain classifications that address wildlife habitat, water quality, industrial use, recreational use, fisheries and those type of things, and these designated uses come from those designations.
**Q Okay. And the agency's determination with**



**regard to these designated uses and the road fill were, again, what?**
A That the designated uses had been lost to the fill and that in order to satisfy nondegradation mitigation would have to be put into place and at this point it wasn't going to be.
**Q So the loss of these designated uses is a violation of those standards, is that correct?**
A Yes.
**Q After revocation, did you receive any other information from the Corps regarding their particular view of the After-the-Fact Permit application?**
A After the revocation we did receive a Public Notice from the Corps of Engineers indicating they were going to determine it was not in the public interest to issue the permit.
(Exhibit No. 17 was marked.)
BY MR. COOL:
**Q Handing you what has been marked as Exhibit 17, do you recognize that document?**
A Yes. This is the June 12, 2001 Corps of Engineers 404 Public Notice on the Gary Bailey project indicating that the issuance of the permit to retain the dredge and fill material would be contrary to public interest.



**Q Now, again it's typical in the 401 process to get these types of communications from the Corps, is that correct?**
A Yes, very typical.
MR. COOL: Move the admission of 17.
MR. FISH: No objection, Your Honor.
THE JUDGE: It will be received.
MR. COOL: Your Honor, could we go off the record for a minute?
THE JUDGE: Yes.
(An off-the-record discussion was held.)
THE JUDGE: An off-the-record agreement has been reached between counsel that certain procedural correspondence can be received into the record. I guess the court reporter can mark those now.
(Exhibit Nos. 18 through 22 were marked.)
MR. COOL: Mr. Fish's January 10, 2003 letter to Jeff Lewis of the PCA is Exhibit 18. Mr. Fish's February 18, 2003 letter to the Pollution Control Agency is Exhibit 19. The MPCA's letter dated February 27, 2003 to Mr. Fish is Exhibit 20. Mr. Fish's March 3, 2003 letter to the MPCA and me is Exhibit 21. And my letter dated March 7, 2003 to Mr. Fish is Exhibit 22. And in accordance with Mr.

Fish's stipulation, I move these -- move these for admission.
THE JUDGE: All right, they are received.
MR. COOL: No further questions of this witness, Your Honor.
THE JUDGE: Off the record for a moment.
(A break was taken at this time.)
THE JUDGE: We were resuming after the lunch break. And Mr. Cool, I believe you were done and so, Mr. Fish, it's your opportunity.
CROSS-EXAMINATION
BY MR. FISH:
**Q Sir, on I believe it is an exhibit introduced by Mr. Cool you acknowledged receipt of correspondence from Lake of the Woods County taking over as applicant of the -- of this project, is that right?**
A Can I find that first?
**Q I believe it's Exhibit 11.**
A Yes, I have it here.
**Q All right. Now, Page 2 of that receipt it says it's from the County Highway Department indicating that the permit should be addressed to the county as the county has taken over the road, and you acknowledge receiving and having that information --**



A Yes.
**Q -- throughout your subsequent decision making processes?**
A Yes.
**Q Now, did you make -- indicate any objection or have any correspondence or communications with Mr. Bailey as to, I guess, the consensual understanding that the county now owned the road and was now the applicant on all the -- all further permits?**
A No.
**Q Did you treat the county as the applicant after that point?**
A No.
**Q And do you have any explanation as to why Mr. Bailey was not advised that the county was not being treated as an applicant after that point?**
A The information wasn't directed to us regarding our 401 Certification specifically. In discussion with the Corps of Engineers on who was the applicant for the road, it was still established that Mr. Bailey was the one who filled the road without a permit and he's the one that is still being directed with the 404 Permit application, so we retained our direction of our 401 Certification to the applicant, Mr. Bailey.



**Q You testified it was established that Mr. Bailey was still the applicant. This is despite representations by the local county that they were now the applicant?**
A The fact that the local county indicated they were the applicant was just the beginning of the discussion. We needed to see what the Corps was going to consider as the person responsible for the permit action.
**Q And as far as your permit action, you made the independent decision yourself that you would disregard the county's taking over this position as applicant?**
A We relied on the Corps of Engineers to establish who was the project applicant. The Clean Water Act 404 Program requires us to certify the application for the federal permit, and as long as the federal permit was addressing Gary Bailey as the applicant, we did so also.
**Q Now when you were questioned earlier and you were -- strike that. First of all, you were fully aware that the county had full ownership rights to this road at this time?**
A I did not understand that. I know there was a long debate and information at different times



about the county accepting the road, not quite ready to accept it, requiring additional information. It wasn't a specific issue that was pertinent to our decision making.
**Q If you'd refer to Page 3 of Exhibit 11, I believe there is a circled paragraph. Could you read that, please?**
A The paragraph indicates, Motion by Commissioner Swenson to approve the final plat of Sunny Beach. Second by Commissioner James and the same being put to a vote was unanimously carried.
**Q Now, is there any ambiguity that the county had approved the plat based on that representation to you?**
A I would assume so, yes.
**Q And that would be the final plat?**
A I'm not that familiar with the platting requirements on the county, so I'm not sure if there are other actions involved.
**Q Now, in questions by Mr. Cool you -- it was asked of you what attempts Mr. Bailey made to comply or follow through with your revocation, some certain requirements set on your revocation of the 401 Certification. Were these specific -- I guess is it your testimony or your representation that this was**

Mr. Bailey's duty to comply with these recommended -- I guess resubmissions of a plan and so forth?
A As we indicated in the letter, if the applicant would choose to reapply, these were pieces of information we wanted him to address in that reapplication.
Q And once again this revocation is not addressed to Mr. Bailey is it, refer to Exhibit No. 16?
A No.
Q So there's no indication that he should be the one to be considered as the applicant, is there?
A I think there is.
Q Even though it's directed to the Army Corps of Engineers?
A It's directed to the Army Corps of Engineers, the heading identifies it as the Gary Bailey project, in the text of the letter we discuss the applicant, and we carbon copied the letter to the applicant.
Q Likewise, you carbon copied a letter to several governmental agencies, including Lake of the Woods County, didn't you?
A Yes.
Q So there's absolutely nothing in this letter



that characterizes Mr. Bailey as the applicant, is there?
MR. COOL: Objection, argumentative.
THE JUDGE: I don't think it's argumentative, but, you know, the letter should speak for itself. I don't -- I don't know that I have the letter.
MR. FISH: Exhibit 16.
THE JUDGE: 16, just a moment.
MR. COOL: It's the . . .
THE JUDGE: Well, anyway, let's keep going. You know, the point is that either it does identify him as the applicant or doesn't, and you can -- if he said that he considered him the applicant, we're going to have to look at the letter and see where it talks about the applicant. I mean if it's worth it.
BY MR. FISH:
Q Now, let's talk about the actual application itself as it was completed in -- and forwarded to your office. It's your understanding, isn't it true, that absolutely none of the information on this application, as far as representations of whether there was a floodplain, representation of the soil depth of unsaturated soil, virtually all other



representations that were made in making your initial approval, none of those representations were made by Gary Bailey himself but Lake of the Woods County, isn't that true?
A I have to go over each piece of information to ascertain where the information came from as you went through them.
Q Let's first talk about the actual application itself. Isn't this something that is -- that was prepared by Lake of the Woods County and signed by Gary Bailey?
A That I'm not aware of.
Q Did you ever follow through with Lake of the Woods County to see where that information was obtained?
A In talking with Mr. Gary Lockner or?
Q Lake of the Woods County, whomever you followed through with. Did you ever follow through with Lake of the Woods County, whatever official, to see where this information was obtained?
A The only official I talked to from Lake of the Woods County was Mr. Gary Lockner.
Q All right. And in making some type of a determination that inaccurate or false information was provided to you which provided the basis for your



revocation, did you make any investigation prior to issuing your letter of revocation as to who made these representations?
A The information I assumed that was contained in the Public Notice of the Corps of Engineers came from the applicant.
Q Who was represented to be Lake of the Woods County?
A Not to my knowledge. The applicant was Mr. Bailey.
Q Well, are you -- I'm talking as a factual matter, not as a matter of who -- who may have excavated some soil, but who actually filled out forms and who has represented to be the applicant.
A If it was other than Mr. Bailey representing themselves as the applicant, I'm not aware of that.
Q So are you now saying you did not receive Exhibit 11 where Lake of the woods County clearly refers to themselves as being the applicant and the owner of this road? Page 2, sir.
THE JUDGE: Just so I understand, are you -- are you referring to the -- what I would call the memo, date transmitted November 5, '99, being the first handwritten notation? Is that the page you're referring to?

MR. FISH: The letter of November 5, 1999 on official county letterhead.

THE JUDGE: Letter of November 5th. Is it handwritten, November 5th?

MR. FISH: Yes.

THE JUDGE: That's the one you're referring to?

MR. FISH: Yes.

MR. ZDON: I did receive that. Is that the question?

BY MR. FISH:

**Q Yet you've totally disregarded any assertion by Lake of the Woods County as being the applicant in this matter?**

MR. COOL: Objection, argumentative.

THE JUDGE: We've covered that. He's answered it. I think it's been decided.

BY MR. FISH:

**Q My question to you, sir, is given the disagreement between Lake of the Woods County and the Army Corps of Engineers, what postured you to unconditionally side with the Army Corps of Engineers as to who was the applicant on this project?**

A The requirement for the certification is to address the compliance of the -- the permit that's



going to be issued. From every indication from the Corps that permit was still being issued to Gary Bailey.

**Q Did the Army Corps of Engineers at any time advise you that they altered the application, eliminating Lake of the Woods County as the applicant and inserting without --**

MR. COOL: Objection, facts not in evidence.

MR. FISH: Let me finish the question, please.

THE JUDGE: Okay, you can finish the question, yeah.

BY MR. FISH:

**Q Did the Army Corps of Engineers ever advise you that they had altered this application from Lake of the Woods County as being the applicant inserting themselves without notice or consultation with any parties Gary Bailey as the applicant?**

THE JUDGE: Now do you have an objection?

MR. COOL: I think it's -- yes, Your Honor, I do have an objection, facts not in evidence.

MR. FISH: It's a question, Your Honor.

THE JUDGE: Are we going to see this



application at some point?

MR. FISH: Tell you what, I have an exhibit I can go through that might speak for itself.

THE JUDGE: All right.

(Exhibit No. 23 was marked.)

BY MR. FISH:

**Q Showing you what's been marked --**

MR. COOL: Excuse me, Your Honor, could I see this?

MR. FISH: I'm not introducing it, I'm asking for identification.

BY MR. FISH:

**Q I'm showing you what's marked as Exhibit No. 23, have you ever seen this exhibit before?**

A I don't recognize it.

**Q All right. Are you aware of the substance of what's gone on in this transaction regardless of whether you've seen this document before?**

A Am I aware it occurred? No, I'm not.

**Q Now I'll ask the question again. Given this document, were you aware that the Army Corps of Engineers altered the application inserting Gary Bailey's name on it instead of Lake of the Woods County?**



A I am not aware that any final decision differs than --

**Q My question, sir, is yes or no. Are you aware that the Army Corps of Engineers altered the application inserting Gary Bailey's name on it instead of Lake of the Woods County's?**

MR. COOL: Objection, argumentative and facts not in evidence.

THE JUDGE: I think it's facts not in evidence. If you've got some application you want to introduce -- he's already said he doesn't know, but if you've got some application you want to introduce, let's introduce it and ask him whether he's aware of that.

MR. FISH: I'll introduce Exhibit 23, Your Honor. I don't think he's said he's seen this, but I can get facts into evidence relating to it.

MR. COOL: I'm going to object to it.

MR. FISH: What's the basis?

MR. COOL: This witness is not familiar with it. If you've got a witness you want to put that exhibit in, find a witness. This witness apparently hasn't seen it.

MR. FISH: I guess the objection is not unless I lay foundation, Your Honor, which I

understand is -- the Court has given some discretion, but whether there are facts in evidence relating to the Army Corps's alteration of documents. Now the Court's given discretion to Mr. Cool to introduce numerous documents drafted by the Army Corps of Engineers. This is a document drafted by the Army Corps of Engineers acknowledging and admitting they altered the documents.

THE JUDGE: Is the author of that document going to be testifying.

MR. FISH: The recipient is, Mr. Jeff Koschak.

THE JUDGE: Okay, Mr. Koschak's going to be testifying.

THE JUDGE: I think it's legitimate to -- if you were just going to ask him whether -- he's already said he's not seen the document, he's not aware of the transaction. So I --

MR. FISH: I didn't -- I guess -- I got an objection when I got to that question, Your Honor.

THE JUDGE: No, you got the answer. The answer was no, he's not aware of it. All right, if Mr. Koschak's going to be testifying, let me just look at this and make sure I understand what it is.

MR. COOL: Your Honor, with regard -- may



I address the Court?

THE JUDGE: Yes.

MR. COOL: With regard to Mr. Koschak's testimony, I am going to be calling him for the limited purposes of the decision about his activities on the wetland delineation days and the lateral effect calculations. I am not going to be exploring this issue which is being litigated with the Federal Corps of Engineers regarding who is the applicant. There's no evidence in this proceeding, as I think Mr. Zdon has testified, that the agency received any official notice from the Corps indicating that their June 1999 Public Notice was not accurate. And this is one of the issues that, as I understand the federal litigation, is addressing who should have been given the appropriate notice and due process for the Corps's denial of the permit. It's not relevant to this proceeding. And if he's going to now try to leverage and get his foot in the door and initiate discovery on these Corps witnesses on issues that are outside the 401 Certification process, then the agency objects and recommends that -- if this is the direction that Mr. Fish is going, that we would appropriately notify the Corps of Engineers' counsel so that they can make a decision about the nature of



Mr. Fish's cross-examination.

MR. FISH: Your Honor, this is -- now Mr. Cool has changed the scope of the testimony that apparently was allowed by Mr. Koschak. Before it was no questions about hypothetical scenarios involving wetlands. In other words, if he did this would this be allowed. Mr. Cool represented to the Court that we'll be able to question him on any facts and any conclusions, just not hypotheticals, Your Honor. This is not a hypothetical I'd be questioning him on.

MR. COOL: Your Honor, I don't think my representations were that broad. I mean the extent to which I request that Mr. Koschak testify, the cross-examination should be limited to those areas upon which I discuss with Mr. Koschak. It's obvious that Mr. Fish is now going to use Mr. Koschak for all sorts of other issues that are related to the federal litigation. This is exactly the reason why Mr. Fish should have proceeded in making accommodations with the Corps and its counsel regarding the extent to which Mr. Fish was going to try to use these witnesses to do discovery on things not relevant to the PCA.

MR. FISH: Your Honor, Mr. Koschak is



obviously here under my subpoena. He was not subpoenaed by anybody else. I have no preconditions with Steve Eggers. I have no preconditions with Jeff Koschak. I have no preconditions with the counsel from the United States Army. As far as I'm concerned he's here under my subpoena. If he has a specific objection, he can certainly make that on his own behalf or the government's behalf. However, Mr. Cool is not representing the United States Government, he's representing the State of Minnesota. This is relevant to this proceeding.

I think the opportunity to be heard as the applicant or who is the applicant is absolutely essential in this matter. This is not a core issue being litigated in the federal matter, Your Honor. Mr. Cool is not a part of that action, so I'm not certain where he's getting this information.

THE JUDGE: All right, here's the thing. I don't care what's going on in the federal action. And I certainly don't want to -- as I think we explained in our telephone conference call the very first day that the three of us spoke, I don't want to try to turn this into a global litigation of everything. I think the question is was it appropriate for the PCA to revoke their 401

Certification and the question of who is the applicant I don't think matters. To the extent that Mr. Cool or Mr. Zdon attempted to suggest that Mr. Bailey was somehow negligent or wrong because he was the applicant I will disregard. I don't -- I don't want -- I don't see why I have to get into this question of who is the applicant to determine whether the PCA had a basis for revoking it's 401 Certification. So I don't think that this Exhibit 23 is relevant to my proceeding and therefore it's not admitted. We know what the PCA did, they treated Bailey as the applicant. Whether that was correct or not, I don't think particularly matters unless we're claiming that Mr. Bailey didn't get notice or something like that or something important was sent to the wrong person, but I don't think that's what we're claiming or what your claim is in this matter.

MR. FISH: Well, it does go beyond that, Your Honor. And I guess as a matter of the record, the administrative record here today, maybe if the Court will not be accepting that as an exhibit, maybe accept it as a limited Court's exhibit for the -- so we know exactly what's on the record if it's not going to be accepted, Your Honor.

THE JUDGE: Okay. What our rules provide



because -- I won't go into the reason, but basically they provide that the record will include exhibits which are offered but not received. I won't consider it in my recommendation but it will be there, so if you want to argue to the PCA Board something based on this exhibit and you can convince the PCA Board that is relevant, then they can consider it. In other words, it will go with -- it's in -- it's like an offer of proof is what it is. You get it in the record for purposes of arguing to some higher decision maker that the trial court was wrong and that's okay and that's perfectly legitimate. So 23 will not be received but will remain part of the record.

BY MR. FISH:

**Q Okay. Sir, was there ever any follow-up with the county regarding your interpretation of the Army's wetland delineation prior to issuing your revocation order?**

A No.

**Q Why not?**

A I felt that previously there was no delineation completed on the project. We were relying on a site evaluation that was performed by the TEP members. The delineation is the procedure



that is recognized by the State and Federal Government as the requirements to actually delineate the line, and specifically, the Corps of Engineers dictates what is waters of the United States that will be considered under the permit and it's their determination that's final for us to make our certification based on.

**Q Isn't it true -- isn't it true that this entire parcel that you previously approved, you had full knowledge that it was all Type 7 wetlands?**
Yes or no, sir.

A At the time of our determination we were utilizing the county's position that there was a band of upland there.

**Q My question was: You were fully aware it was 100 percent Type 7 wetland. That was represented to you very clearly, wasn't it?**

MR. COOL: Objection, asked and answered.

MR. FISH: I don't believe it has been answered.

THE JUDGE: I don't think it's been answered either. If you didn't pay attention to it or something you can just tell us.

THE WITNESS: I was aware that the NWI map indicated it was all wetland. The NWI map has a



percentage of failure with it. It must be ground truth when you're looking at a specific site. I was aware that the first application indicated that it was all wetland, but in the deliberations and the evaluation of whether it was wetland or not, we also heard from the county that it wasn't wetland based on site evaluation.

BY MR. FISH:

**Q So your answer is yes?**

A My answer is at the time of certification I did not know this was all wetland.

**Q My question was: Wasn't it represented to you it was 100 percent wetland?**

A Yes, at points it was.

**Q Thank you. And isn't it also true, sir, there's never been a representation whatsoever that on-site mound systems will be placed in these lots?**

A There was.

**Q By whom?**

A Mr. Lockner indicated that mound systems would be appropriately placed in the area.

**Q Was there ever a request by any landowner or the county to place a mound system on these parcels?**

A To our agency, no.

**Q Yet this was one of the bases of your**

revocation?
A Yes.
**Q And there was no exploration by your office as to alternative septic systems or whether there would even be septic systems placed on these lots, was there?**
A There was. We inquired to the applicant in our comment letter that if septic systems were going to be used there, demonstrate how they could be placed in compliance with our Minnesota Rules. And in our revocation letter we indicated again that if septic systems were planned to be used there, it has to be indicated how they would be in compliance with the rules.
**Q And the county never responded to that, did they?**
A No.
**Q As far as the road is concerned, when you initially granted certification, the condition of that road has not changed whatsoever, has it?**
A I'm not fully aware what might have happened to the road between that time and now.
**Q So you're aware of no conditions, changes in condition of the road?**
A No, I'm not.



**Q And as far as the location of the road as it relates to either up a small area of uplands within 100 feet of the lake and the wetlands itself, there's been no representation that the status of the road as being in wetlands has changed, has there, between the time you approved the certification and revoked it?**
A I'm sorry, I didn't understand the question.
**Q My question is: The road was always in a swamp when you approved it and it was in a swamp when you revoked the permit, wasn't it?**
A Yes.
**Q So that wasn't a factor, was it?**
A It was a factor, yes.
**Q In the approval or in the denial of the revocation, I mean.**
A The fact that the road was constructed in the wetlands is a factor in our certification; and yes, it was a factor in our revocation.
**Q Isn't it true, sir that you -- your revocation letter itself cites the sole reason as a difference in the estimated quantity of impacted wetlands from about 2.98 acres to slightly over 7 acres, isn't that true that that was the sole basis for this revocation?**
A No.



**Q Isn't it true that's what your revocation letter indicates?**
A The revocation letter states that. There were other issues associated with why we revocated it.
**Q But they didn't go in that letter, did they?**
A Yes, they did. The entire contents of the letter reflects our position.
**Q And this was based solely on the Army Corps's delineation, isn't that true?**
A No. It was based on the Army Corps' delineation, information that we had received regarding the lateral effects of the ditch drainage, an understanding that there would be lot development that had increased wetland impacts beyond what we anticipated in our original evaluation.
**Q And all of this came from the Corps?**
A Yes.
**Q So it was solely based on the wetland delineation by the Corps?**
A Well, it was a wetland delineation done by the Corps, a routine Minnesota -- Minnesota routine evaluation on the wetland, measurements of the activity which are not specifically the wetland delineation, there were some other actions involved.



**Q Now, you were aware, were you not, that Lake of the Woods has -- had already certified and accepted this plat pursuant to Minnesota statutes confirming it was suitable for building and residential development?**
A I'm not entirely familiar with the requirements to be platted. I was aware that they had voted at their county meeting, as an exhibit indicated.
**Q Are you aware of any conflict of laws that would prohibit you from issuing a revocation after the plat has been accepted?**
A No, I'm not.
**Q Now I'm referring -- looking at your -- your phone notes with Jeff Koschak dated 8/20/99, which is Exhibit No. 9, in this document -- do you have it in front of you, sir?**
A Say it again, please?
**Q Do you have the document in front of you, sir? I may refer to it.**
A Yes.
**Q About a third of the way down it states, The county is giving permits for septic system constructions in wetlands. What did you mean by that statement?**

A What I meant was our discussion at this time with Koschak was that the entire area was wetland, and that it was our understanding that the county would be issuing septic system permits for construction on those lots.

**Q And the next sentence, Zoning officer will issue a septic system in conformance with 7080, which is the septic system statute. What did you mean by that statute?**

A That that's the information we were getting, that the septic system would be in conformance with 7080 even though we saw a conflict in that determination.

**Q And what was the conflict?**

A That at this point it was our understanding that the entire area was wetland and had saturated soil, and that there was not at least one foot of unsaturated soil there.

**Q Did you follow through with any confusion you had with the county relating to off site systems, on site electric systems, holding tanks, other alternative systems than the mound system you'd been focusing on?**

A I talked to the county about what their intentions were in terms of the septic systems and



that was relayed that they were talking about mound systems.

**Q And did you have any discussion that that would not pass with them and they should look at alternative sites or alternative systems?**

A I don't recall if I suggested to them to look at alternative systems.

**Q And do you believe there are alternative systems that if you would have suggested they may have looked into?**

A There may be.

**Q Next line down you state, Bailey CWA violation. What did you mean by that?**

A There was a discussion of another Clean Water Act violation going on with Mr. Bailey on a separate issue, a separate farm site of some form that didn't have anything to do with this issue.

**Q Then why was it being discussed in context of whether this revocation notice would be sent out?**

A At this point we weren't talking revocation, but we were just talking about the entire project -- or the entire situation.

**Q I apologize if I'm taking too much time, these are the exhibits I've not had an opportunity to spend a lot of time reviewing.**



THE JUDGE: No problem.

BY MR. FISH:

**Q Mr. Zdon, isn't it true that there's no specific minimum or maximum impact that would, I guess, prompt a revocation in this matter, whether it be 7 acres or 3 acres? There's simply no -- there's nothing other than a subjective number that might be in somebody's mind as to whether this is now an unacceptable amount or whether it would be an acceptable amount?**

A The revocation wasn't based on a threshold of increased impact, no.

**Q So that had nothing to do with your consideration?**

A The increase in impact was a consideration, yes.

**Q All right. And what did you gauge it against, this 3 acre or 7 acre as against the entire 100 plus acre parcel or 60 plus acre parcel or the entire county or the entire nation? What was your gauge as far as that this was, I guess, a more negative factor, this 4 acres of wetlands that would be affected in Lake of the Woods County?**

A The issue with the increase was that it hadn't been identified as part of the permit



proposal. The certification was based on 1.5 acres of road fill only, and now with the new information of the increased impact due to lateral drainage from the ditches, due to lot development and septic systems, that cumulatively added up to violations of Water Quality Standards and specifically because it had not been addressed under our -- the impact hadn't been addressed under .0186 which requires the applicant to submit an evaluation of avoidance, minimization and mitigation. The information wasn't there on that level of impact that was occurring.

**Q And is this something you would have logically been able to glean from the record at the time of the first certification, that there would be some type of a road -- driveway between the proposed road and the 100-foot setback where there was uplands?**

A Yes. We knew there was going to be additional impact to the lots. The building sites and septic systems were proposed to be located on upland, so that would not create additional impact. Access driveways would have been required, and typically, historically, both the Federal Government and our agency have agreed that when it takes an access road to get from a road or a driveway to an

upland building site, that that's granted and it could be granted under one of the general permits or nationwide permits that the Corps of Engineers offers that we've already certified.

**Q And, sir, what's the percentage of Lake of the Woods County that consists of wetlands?**

A I couldn't give you an exact figure. I know it's very high. In the 90 percent perhaps.

**Q Do you know how many acres Lake of the Woods County consists of?**

A I don't have that figure.

**Q In the hundreds of thousands would you imagine?**

A Could be.

**Q As a percentage of overall wetlands in the County of Lake of the Woods, this increase, does it even amount to a 100th of a percent?**

A Perhaps not. It's not an issue though.

**Q All right. Now on Exhibit 3 you're referring to the National Wetlands Inventory, I think you characterized it. This is based on -- on photographs back in the early '80s, isn't it?**

A Somewhere in that time period, yes.

**Q And are you aware if these maps have been updated?**



A They're constantly being updated. I do not know if this particular quad has been updated since then.

**Q Why would they be updated?**

A With new photography.

**Q My question was why, not how. I'm sorry.**

A With new photography available showing changes in the landscape. I imagine U.S. Fish and Wildlife Service has a mission to keep these maps as accurate as possible.

**Q So the information that was provided I think October of 1982 from the ariel photography, this very likely has changed in the last 21 years?**

A Likely.

**Q Especially with the amount of development on this lakeshore, ditching?**

A Yes.

**Q Despite that, you're using this as a credible source of information for the existence of wetlands?**

A It's was one of the tools we used to look at it, yes.

**Q Sir, did you personally visit this site?**

A No, I did not.

**Q Did the county approach and have discussions**



**with you regarding using its own credits for mitigating some of the increased wetland -- wetlands discovered in this matter?**

A No.

**Q It was never discussed with your office?**

A I saw correspondence at some point that indicated the county or there was a discussion of using county credits if the county took over, but it wasn't proposed to us.

**Q And did -- was that ever followed through with the county prior to the revocation of your certification?**

A It was not made available to me before the revocation.

**Q Now, one of the -- one of the matters you testified a great deal about was you were concerned about these mound systems that may or may not be placed on the property and that may or may not be selected as the means of sewage disposal blowing out. Is that one of your, I guess, prime considerations in your revocation, if I understood you correctly?**

A It was one of the prime considerations, yes.

**Q All right. And this is despite the fact that -- that there had been I guess at that time a couple of years of development on the property and no**



**-- no construction of sewer systems whatsoever.**

A I'm sorry, I didn't understand the question.

**Q My question was: You had this apparently strong concern despite the fact that there were over 12 landowners with various ownership interests in these lots and none of them had attempted to construct any type of sewer system there over the period of development?**

A Yes.

**Q Now, you have available to you national floodplain maps, I would assume?**

A Are you referring to the Federal Emergency Management Agency?

**Q Yes.**

A If we don't have them in the office, I know we've gotten them before.

**Q And apparently your attorney or yourself made -- had a concern that the -- the plat map that was drafted by the surveyor didn't put the 100 -- 100-year floodplain level on that. Is that an accurate statement?**

A Yes.

**Q And yet you have this readily available to you?**

A It was -- it was available, yes.

**Q All right. Did you make a note that this was a deficiency that should be corrected prior to issuing your approval or did you bother to take a look at the national maps?**

A I did not know there was a floodplain issue associated with this lake. We relied on the county indicating the ordinary high water, and I did not know that there was floodplain concerns in this area.

**Q But you're aware that the ordinary high water mark was only three feet below this entire plat, weren't you aware of that?**

A Yes.

**Q That despite that and -- you were also fully aware that the ordinary high water mark certainly does not represent the 100-year floodplain level?**

A I was also aware that this was a controlled reservoir, so at that time I did not expect there was floodplain issues because of the control on the outlet.

**Q So the oversight and the concern of the** 100-year floodplain, that was -- the failure of anyone looking into it was because you were not concerned of it is that a fair way to put that?

A No.

**Q And you had these maps readily available, I**



**think you testified?**

A The maps are available.

**Q All right. Is that something you would normally look at when issuing these certifications?**

A If there was an issue of potential floodplain within a location, we would look at them. We normally rely on the applicant to supply that.

**Q Now, you made various demands in your revocation letter that new applications be submitted and so forth. You're also fully aware of the Army Corps of Engineers' order to restore this road and basically rip it out and restore it to its original condition, are you aware of that?**

A I'm aware of that now.

**Q You're aware that that's -- that order was based in part on your revocation of the water quality certification?**

A I'm not aware of that.

**Q So you're not -- you don't have any prior relationship with the Federal Government that they -- that your certification or your blessing is required prior to them signing off on --**

A It's required. I know the Army Corps in their decision document indicated the bases for denying the permit, and I guess I don't recall they



specifically said because the 401 had not been issued.

**Q But you're aware that's required?**

A It's required, yes.

**Q So it would be a basis?**

A The Army Corps didn't list that in their decision document, so I -- I wouldn't speculate if they would have or would not have denied that permit without our -- with our revocation coming in.

**Q And based on the Army Corps' position that this would be unconditionally taken out, without resubmission of any type of a plan or a sewer system or mitigation or secondary impacts, wouldn't you agree, sir, that the request for additional applications from the applicant, whomever that may be, in your revocation notice is absolutely meaningless and futile?**

A I don't have any control over the Army Corps' decision process or subsequent enforcement. I was working with the applicant basically on the certification. And from our state perspective if it would have been resubmitted with information addressing all these issues, we would have re-evaluated for compliance with Water Quality Standards.



**Q My question: Given your knowledge and working with these governments, government entities, it would be futile, wouldn't it? Yes or no?**

A No.

MR. COOL: Objection, argumentative.

THE JUDGE: Okay. I agree, I don't think yes or no is appropriate in this kind of a situation. So he's got to be allowed to answer the question.

BY MR. FISH:

**Q All right, I'll ask it this way: Did you make any attempts whatsoever in your coordination with the Army Corps of Engineers to make your demands and your requirements to send some type of application back in consistent with one another so it would not automatically be rejected by one agency and possibly reconsidered by another?**

A The Army Corps of Engineers makes their decision independent. There are times when we deny a certification and the Corps will issue a denial without prejudice, which means we're not denying this project based on the merits of the case but we're denying it solely because the PCA has refused to give you a certification.

Then there's situations where they deny it with

prejudice with reasons that are contained in their decision document.

**Q So your answer is no, you make no attempts to reconcile or coordinate requirements of the applicant on this project with the Army Corps of Engineers?**

A The letter of revocation that had that opportunity was sent to the Corps so that they knew of our position.

**Q Your answer is no?**

A My answer is yes, that's our coordination.

**Q Send a letter my way or the highway, or what was -- did you have any type of communication in this joint decision making other than sending them a letter of what your requirements were?**

MR. COOL: Objection, facts not in evidence.

THE JUDGE: The question is did he have any communication other than sending them a letter. Well, I think we've seen there's been lots of -- tons of communication.

BY MR. FISH:

**Q I'm talking about the time frame that the decision was made. From the receipt of the Army Corps of Engineers wetland delineation to figuring**



**out what they're going to put in their revocation notice, as far as you submit me this application with this information, the local government unit does this, applicant must indicate all wetlands that exist on the road and lots and indicate total wetland impact, basically all these requirements, my question was: Was there any coordination or communication jointly to -- to submit some type of unified or joint requirements prior to this order?**

THE JUDGE: I think the question was was there any attempt to come up with joint requirements?

MR. ZDON: With the Corps of Engineers are you asking?

BY MR. FISH:

**Q Yes.**

A No, they're independent decisions.

**Q All right. So there was no joint -- the answer is no?**

A Other than the letter we sent to make them aware of our position and our request for additional information and our availability to re-review a new application.

MR. FISH: Thank you, sir. That's all the questions I have.

THE JUDGE: Okay. Mr. Cool, do you have



anything more?

MR. COOL: Yes, just one clarification.

REDIRECT EXAMINATION

BY MR. COOL:

**Q Mr. Zdon, would you please look at Exhibit No. 6, the agency's request for information.**

A Yes.

**Q Do you recall some discussions with Mr. Fish about communications with the county about alternative septic system?**

A Repeat, please?

**Q Do you recall some discussion with Mr. Fish requesting communications with the county regarding alternative septic system?**

A Yes.

**Q This letter was directed to the Corps and Mr. Bailey, is that correct?**

A Correct.

**Q And Mr. Bailey didn't respond to this informational request, is that correct?**

A Correct.

**Q And the information that the agency had at the time of certification was that provided by Mr. Lockner's letter of October '99 where he indicated mound systems where the --**



MR. FISH: Objection, this is leading, Your Honor. This isn't a question, this is testimony by counsel.

THE JUDGE: I think it's legitimate to ask was there anything else, other than the letter from Mr. Lockner, which made you think mound systems were going to be used.

THE WITNESS: No.

THE JUDGE: Okay.

MR. COOL: I have no further questions.

MR. FISH: Nothing, Your Honor.

THE JUDGE: Thank you very much. Leave those exhibits here, please. All right. Move on to the next witness.

MR. COOL: I'd like to call Dale Krystosek, please.

THE JUDGE: Raise your right hand, please.

DALE KRYSTOSEK,

after having been duly sworn, testified as follows:

DIRECT EXAMINATION

THE JUDGE: Be seated.

BY MR. COOL:

**Q Mr. Krystosek, would you please state your full name and spell your last name for the record?**

A My name is Dale Edward, last name is

K-R-Y-S-T-O-S-E-K.
**Q What is your current employment?**
A I work as a wetland specialist with the Minnesota Board of Water and Soil Resources.
**Q How long have you been with the Board of Water and Soil Resources, which as an acronym is BW --**
A SR.
**Q SR? And also referred to as BWSR (BoWSeR), is that correct?**
A That's correct.
**Q How long have you been with BWSR?**
A I worked with BWSR for eleven years.
**Q And in what types of capacities?**
A Last three years as a wetland specialist. Prior to that as a board conservationist.
**Q And what's your formal education post high school?**
A I have a bachelor of science in wildlife management from the University of Minnesota. I've completed some graduate work at Bemidji State University, and in addition to that have completed about 500 hours of training in wetland delineation, wetland functions and values and other aspects of wetland science.



**Q And what was your study at Bemidji State?**
A Biology, chemistry and botany.
**Q And in your current capacity what are your responsibilities and duties?**
A As a wetland specialist I'm responsible for providing assistance, technical assistance, to local units of government. That would be counties and cities in their implementation of the Wetland Conservation Act, so I participate in Technical Evaluation Panels whereby we make recommendations and technical findings on things like wetland boundaries, wetland functions and values, wetland replacement plans, exemptions, sequencing issues. So I routinely assist counties in making those types of findings and recommendations to the decision makers.
**Q And you've received training in wetland delineation?**
A Yes, I have. I've taken four separate wetland delineation courses. Each one of these courses is about four to five days long. So I've completed those sections. And, in addition, the last three years I've assisted as a field instructor in training new staff in wetland delineation methods.
**Q Have you done wetland delineations?**
A Yes, I have.



**Q How did you become involved in the Bailey project matter?**
A Back in the --
(Reporter interruption.)
BY MR. COOL:
**Q Mr. Krystosek, I was asking you when did you become involved in the Bailey project matter?**
A Back in summer of 1999. In my duties at that time as a board conservationist I was taking over responsibility for several new counties, including Lake of the Woods County, so on July 30, 1999 I went out with Brian Dwight of the Board of Water and Soil Resources and Dan Eckland, who was a wetland specialist with our agency, and Les Lemm and we -- and the purpose of that basically field day was to look at issues related to wetlands in the county. And so on that day we went out and looked at the Sunny Beach -- excuse me -- is it Sunny Beach or Sandy Shores? The development, the -- Sunny Beach, I believe. And took a look at the site. We -- Brian Dwight had informed me and Mr. Eckland that there was an outstanding violation at this site. There was a road in place, appeared to be in a hardwood swamp, Type 7 wetland, so we talked about the fact that there was a violation at that site and that although



a wetland replacement plan had been approved, it had not yet been completed. The mitigation or wetland replacement had not yet occurred, so that in itself was a violation. When an impact takes place, mitigation needs to take place either prior to or concurrently with the impact and that had not occurred at that time.
**Q Subsequent to that you'd been out to the Sunny Beach site several times?**
A Yes. I went out again I believe it's September 29, 1999, and on I believe it was September 7th of 2001 and several other times, probably about four or five times.
**Q And what are the nature of these visits to the site subsequent to the Corps' denial of the permit?**
A There were several wetland violations, outstanding wetland violations on the lot that we investigated to determine -- as part of the Technical Evaluation Panel whether or not they were violations. And also I think on one or two of those visits we knew that there were some Wetland Conservation Act issues, there was an outstanding violation and a couple of occasions I believe the Soil and Water Conservation District for the county wanted to

discuss the situation, how we should handle it under the state law.
Q Have you had reason to review any of the Corps's material -- material regarding their wetland delineation of this site?
A Yes, I have. I've had an opportunity to review the delineation work that was completed by Steve Eggers of the U.S. Army Corps of Engineers and Rod Heschke, H-E-S-C-H-K-E. He's a soil scientist with the U.S. Department of Agriculture, Natural Resource Conservation Service. So the delineation report that I reviewed had technical work completed by both Mr. Heschke and Steve Eggers.
Q And based on your subsequent visits to this wetland site and your review of the Corps documents, have you observed anything inconsistent with the Corps' conclusions?
A No, I have not. I'm confident that the delineation report that was completed by those two individuals is accurate. I've not seen anything to dispute that. You know, from my first visit back on July 30, 1999, you know, my first impression was that there was extensive wetlands on the site, that it was a wooded swamp, it was a Type 7 wetland. I believe the delineation report shows one upland island and



also the lateral effect of a ditch on the south end of that development. So I'm in complete agreement that that delineation was accurate.
In fact, Steve Eggers is one of the instructors at the wetland delineation course and Rod Heschke would be considered one of the top soil scientists from this part of the state. He's -- he's an area soil scientist and he is regularly referred -- we refer to him regularly --
MR. FISH: Your Honor, I'm going to object to these. These guys are going to testify about their own credentials. I think that they could do that themselves if they're going to be here, otherwise I don't think this is relevant or proper foundation has been layed.
THE JUDGE: Is Mr. Heschke going to be here?
MR. COOL: No, Your Honor.
MR. FISH: Then I would definitely reassert the objection.
THE JUDGE: Just a moment. I don't think it's proper to have this witness testify about Mr. Heschke's reputation.
BY MR. COOL:
Q You've had reason to be on the site in



September of 1999?
A That's correct.
Q And could you explain what you were doing on the site at that time?
A On that day I was out with Mr. Gary Lockner from the county and Les Lemm. We visited a number of sites throughout the county looking at wetland issues, in some cases wetland violations and I believe some proposed projects also. Late that day, I believe it was September 29, 1999, we -- I believe Gary asked us to stop and take a look at -- at the site and we did that. It was late in the afternoon. We were kind of tight on schedule, so we -- we went out to a site in the development and Gary selected the site and we spent, I think, 10 or 15 minutes. We completed a soil boring, looked at the soils, we talked a bit, I believe, about the lake levels and again didn't spend much time out on site.
Q How many soil borings were taken?
A One.
Q And did Mr. Lockner identify the reason for going to the site?
A Not directly. You know, I knew that there were some issues; obviously there was some wetland issues. There were Wetland Conservation Act -- like



I stated earlier, there was a violation at the site, so I knew there was some interest in looking at it. Gary may have referred to, you know, some septic issues, but understand -- as far as I was concerned we were just doing a very quick evaluation and my expertise is in wetlands so that's what I was there looking at.
Q Had you worked with Mr. Lockner frequently prior to this particular site visit?
A No. I knew of Gary and, you know, I had met him, but this is probably like maybe the second or third opportunity that I actually went out in the field and discussed technical issues with him. So I did not know him very well.
Q Referring to I believe it's Exhibit No. 6.
THE JUDGE: You know, Mr. Cool, when you took that notebook back, I think you took the early exhibits back with it. So if I could have -- and actually there was no objection to No. 2 through 10, so as much as you've got of 2 through 10 I'd take.
MR. COOL: Excuse me, about the delay, Your Honor. I'm sorry, Your Honor, I can not locate the particular letter.
THE JUDGE: All right, we'll just go ahead, that's all right. If it becomes critical I'll

find a copy somewhere. I think all the earlier -- let's go off the record for this.

(An off-the-record discussion was held.)

BY MR. COOL:

**Q Do you recognize this document?**

A Yes, I do.

**Q Is that --**

THE JUDGE: Just for the record, this is Exhibit 10. Okay, you may proceed.

BY MR. COOL:

**Q And that's your signature on the letter also, is that correct?**

A Yes, yes, it is.

**Q And were you asked to review this letter and sign it, is that correct?**

A What I recall about the review of the letter was that Mr. Lockner asked me to -- we're -- again this with one of the dates when we're out in the field and I had spent a fair amount of time and I believe towards the end of that field trip Mr. Lockner seemed a little bit anxious about this issue and asked me to review it, and so I took a minute or two, again it was towards the end of the day and reviewed it at that point.

**Q And what did you review this letter for?**



A My review was in relation to the -- whether or not the letter made any claims about wetlands on the site. I had -- my only involvement in this particular development was as it related to the Wetland Conservation Act, so I reviewed the letter quickly, admittedly, to see whether or not it made any statements about either presence or absence of wetlands and I noted that Mr. Lockner stated that wetland delineation had not been done, and when I saw that, you know, I was more comfortable in -- in some of the content at least.

**Q Now, you've been to the site subsequent to the September 29th visit, is that correct?**

A That is correct.

**Q And did you revisit the particular area that you believed this particular soil boring had taken place?**

A Yes. As part of some of the subsequent visits we walked over portions of the -- of the area.

**Q Could you point out to the Court and describe where you believe the September 29th soil boring was made?**

A I believe it was in the area between Lots 3 and 4. Again, this is four years ago, so I can't say exactly precisely where it was. In addition to that



recollection I -- I've taken the opportunity to review Mr. Lockner's description. In his letter he refers to certain types of trees, aspen and birch and also white spruce and balsam, and I compared that to the wetland delineation report and the data sheets that correspond to Gary's description match pretty closely. So I'm pretty confident that we were in what was determined to be upland by the Corps of Engineers delineation report.

**Q You're talking about the island of upland --**

A That's correct.

**Q -- that was identified?**

A That's correct.

**Q Do you believe it's a reasonable interpretation of this letter that it's conveying there's a 50- to 100-foot corridor or a corridor between 50 feet inland and 100 foot -- 100 feet inland throughout the entire plat?**

A Not at all. The -- as I stated earlier, I was comfortable that this letter did not make any statements about absence or presence of wetlands. I knew there were wetlands out there. I was confident that there was extensive wetlands on the site. I think this letter -- you know, upon review, I -- I only recently received a copy of this letter and no



letter -- had not received a copy from Mr. Lockner. And so upon reviewing it further, I see he's making some statements -- or appears to be making some statements that would imply that this site was suitable for development and I'm absolutely not in support of that conclusion. And I do not believe that it adequately represents either our investigation, again a ten-minute site visit, one soil boring to make an interpretation that this site is suitable just does not -- does not support the limited investigation we did. It's --

**Q I apologize for maybe confusion that I've created, but is it an accurate interpretation that it's implying there's this 100-foot upland throughout the entire plat, is that correct?**

A It implies that. I do not agree with that conclusion.

**Q With regard to the last paragraph, it's indicating that septic systems would not likely be permitted further inland than 100 feet from the shore. Do you have any response to that particular paragraph?**

A I would agree with that in that the majority of this plat is wetland.

MR. COOL: I don't have any further

questions, Your Honor.
THE JUDGE: All right. Mr. Fish?
CROSS-EXAMINATION
BY MR. FISH:
**Q Sir, did you meet with Mr. Cool prior to testifying today?**
A No.
**Q Have you discussed with him at all your testimony here today or the contents of this letter?**
A We've had several conversations, yes.
**Q Several conversations?**
A Phone conversations, yes.
**Q Okay. And this letter, it states you were out there on the 29th of September and the letter is dated October 14th, so you had a couple of weeks to think about what you were doing before you signed this letter?**
A I saw the letter for approximately one to two minutes before it was presented to me for signing. And at that time I had no reason to doubt Mr. Lockner's expertise, you know, in this -- in what he was stating. My review was whether or not it made accurate statements related to wetland delineation.
**Q So you're basically -- am I understanding you're refuting every word that you represented in**



**this letter?**
A No, not at all.
**Q Except for the last paragraph?**
A No, I did not say that. Actually, if -- if you were to insert a couple of -- just several words, it would change and probably make it more accurate. For example, if we were to say that -- that the first sentence there, the end of the first sentence, to determine high water table situation at the building sites and the plat, if you insert instead of the building sites at one site in the plat that would be accurate. So my review I did not catch that, you know, subtle reference.
**Q Let me hold you on. I don't have a question about that in front of you. Now you're aware that this letter was addressed to the Minnesota Pollution Control Agency?**
A That is correct.
**Q And this was for the purposes of approval of a plat?**
A No, I had no idea. What I thought the purpose of this letter was, based on very limited conversation with Mr. Lockner, was he was going to describe these 10 or 15 minutes we spent at this one site possibly to explore some discussions with the



Pollution Control Agency. I really had -- that was my perception of what it was about. Typically --
**Q Discussions about approval of a plat?**
A No, not about approval of a plat. Talking about specific -- a site, one site in this plat.
**Q And under the Regarding it says, Gary Bailey plat. It doesn't say one site or spot in between two lots that we picked out that was the highest spot in the quarter mile section, it doesn't say that, does it?**
A No, I don't see that. It should have.
**Q And this upland area that you claim that you're sitting on, this isn't really a visible upland area, is it? It's basically the same elevation as the entire rest of the plat, isn't that true?**
A No, there's light elevation change. We saw some birch and --
**Q I'm not talking about a vegetation change, I'm talking about elevation change. There's no real elevation change there, is there?**
A Very minor, but --
THE JUDGE: Let him finish, please. Just don't interrupt him. The question was is there an elevation change that separates this area from the rest?



MR. KRYSTOSEK: Very slight. I mean everything is relative. If you're out in the Red River Valley, two inches is significant in some cases. There was some elevation change, slight elevation change.
BY MR. FISH:
**Q Slight elevation change?**
A Sure.
**Q So it's hardly noticeable. So when -- when you were there, wouldn't it be more fair --**
MR. COOL: Objection, testifying.
THE JUDGE: You've got to ask the question and then stop.
BY MR. FISH:
**Q Wouldn't it be more fair to characterize this upland area as being consistent with the entire plat?**
A No, not at all.
**Q As far as elevation?**
A I would say we -- we make judgments related to what's surrounding, and if -- if eight-inch, ten-inch, you know, fifteen-inch difference in elevation is significant for that site, that is significant.
**Q I think you testified this was a slight**

**elevation change?**
A That is correct, but it's --
**Q All right. And you signed this in your official capacity as a government employee addressed to another government employee?**
A That's correct.
**Q And did you feel these were untruthful statements at the time they were made?**
A My review of the letter was for its accuracy for presence or absence of wetlands. I have no authority under, you know, septic issues. So I was under the understanding that I was reviewing this -- as a part of a Technical Evaluation Panel we respond only to Wetland Conservation act issues, not the septic issues, so I was -- I believe this is a misrepresentation of the work we did that day for ten minutes in the field.
**Q And did you bring that up to Mr. Lockner at the time you signed this document?**
A I had no idea this letter was being used to make decisions on suitability of this plat for septic systems. Had I known that, had I had a copy of the letter, I would have notified the Pollution Control Agency that it was a misuse of the information. It's a misrepresentation of the work we did.



**Q You had no idea it had anything to do with sewer systems yet it states between the 50-foot setback line for sewers and the 87-foot setback line for structures we found six of top soil, eight inches of silty loam, sixteen inches of very gravelly loam,. and it goes on to describe vegetation and other issues. Despite that clear -- that's the largest paragraph of this four paragraph letter. Despite that you had no idea that this had to do with septic systems?**
A I did not say that. I believe I told Mr. Lockner at the time that we were -- we were making technical decisions based on Wetland Conservation Act and that I had no expertise in septic systems. So my review of the letter was whether or not it was accurate for Wetland Conservation Act purposes. That was my own purpose. Again, I have no authority under septic systems.
**Q And even under the Wetland Conservation Act, are you stating that your representations in here are without either training or you are now changing what your representations were made in here?**
A No, I am trained and capable of making decisions related to Wetland Conservation Act.
**Q Did Mr. Lemm somehow pressure you into**



**signing this document?**
A Not at all.
MR. FISH: I have no further questions for you.
THE JUDGE: Do you have anything further?
MR. COOL: I have nothing further, Your Honor.
THE JUDGE: Okay, thank you. Good. It's now -- why don't we go off the record.
(A break was taken at this time.)
THE JUDGE: We're now resuming after a break. You may proceed, Mr. Cool.
MR. COOL: I'd like to call Mr. Les Lemm, please.
THE JUDGE: Raise your right hand, please.

LESLIE LEMM,

after having been duly sworn, testified as follows:

DIRECT EXAMINATION

THE JUDGE: Be seated.
BY MR. COOL:
**Q Mr. Lemm, would you please state your full name and spell your last name for the record?**
A Leslie Paul Lemm, L-E-M-M.
**Q And what is your current employment position?**



A I'm the district manager for the Lake of the Woods Soil and Water Conservation District.
**Q And how long have you been in that position?**
A Approximately four and a half years.
**Q And could you give me a summary review of your post high school education and training?**
A I have a bachelor's degree in natural resources management from the University of Minnesota Crookston, and I just recently completed the requirements for my master's degree in natural resources management from North Dakota State University.
**Q And what specific training do you have related to wetland issues?**
A I have completed the wetland delineation course that was sponsored by the Board of Water and Soil Resources, and I have attended several training sessions concerning the Wetland Conservation Act.
**Q And are -- have you been trained in doing wetland delineations?**
A Yes.
**Q And do you do wetland delineations?**
A I have, yes.
**Q Could you explain the role of a Soil and Water Conservation District in regard to the Wetland**

**Conservation Act processes?**
A First of all, a technical representative of the Soil and Water Conservation District serves on the Technical Evaluation Panel, which has been discussed earlier. In addition to that, we provide technical assistance to landowners and applicants in dealing with the wetland rules.
**Q And you've served on the TEP, is that correct?**
A Yes.
**Q When did your office first become involved in the Bailey matter?**
A I believe my office was involved before my time of employment. Exactly when, I can't answer that.
**Q Okay. When did you become involved with the Bailey matter?**
A I started working for the SWCD in January of '99, and it was probably late winter, early spring when I -- when I became involved in it.
**Q And what was your first involvement?**
A My first involvement was just assisting in filling out the replacement -- the revised replacement plan application. There had been an original replacement plan application prior to my



employment, and that application had to be revised, so I helped fill out the new application.
**Q And do you recall why the new one -- or the -- excuse me, the old one had to be revised?**
A Yes. There's -- based on some comments received by the Department of Natural Resources, they raised some questions concerning the time lines and basically timing of the -- when the application was sent out and approved. Things -- procedural things like that, but it seems to me that the main complaint was that the application proposed to mitigate all impacts with what's called public value credits, and the requirement is that at least the first one to one ratio needs to be replaced with new wetland credits. Anything required over and above that amount for mitigation then can be used -- public value credits can be used for that mitigation. So the first application only proposed to use public value credits.
**Q And you assisted on the second plan?**
A The second, yes.
**Q And in preparation for working on that second plan did you review the first plan at all?**
A Yes.
(Exhibit No. 24 was marked.)



BY MR. COOL:
**Q Handing you what has been marked as Exhibit 24, before I ask you what that document is, the SWCD office has produced its files related to Bailey to the Pollution Control Agency, is that correct?**
A Yes.
**Q Do you recognize this particular document?**
A Yes.
**Q And could you explain what it is?**
A This is the original replacement plan application for the -- the road impacts in the area of the Sunny Beach plat application by Gary Bailey.
**Q And is this the plan you reviewed in preparation for assisting on the second plan?**
A Yes.
MR. COOL: I'd move its admission.
THE JUDGE: Any objection to what's been marked as Exhibit 24?
MR FISH: No objection.
THE JUDGE: It will be received.
(Exhibit No. 25 was marked.)
BY MR. COOL:
**Q Handing you what has been marked as Exhibit No. 25, do you recognize that document?**
A Yes.



**Q And what is that?**
A This is the revised application that I assisted in filling out.
**Q Now, in regard to the mitigation plan itself, could you direct us to where, if anyplace, in this document it identifies the deadline for completing the application or the implementation of the plan itself?**
MR. FISH: I'm going to object to the question. Are we referring to he being the applicant Lake of the Woods County or the applicant Gary Bailey? It's vague.
MR. COOL: Maybe I could ask Mr. Lemm.
BY MR. COOL:
**Q Who's identified as the applicant in this particular notice and application?**
A Gary Bailey.
**Q In regard to this particular plan then, can you -- and I guess I'm specifically looking at Page 2 of 5, is that the deadline then for implementation of the plan?**
A Yes.
**Q And how is that deadline usually derived? Is that done in consultation with the applicant or --**
A Generally I guess it's based on allowing a

reasonable amount of time for the work to be completed. Normally -- under normal circumstances that deadline would coincide either on or before the completion of a project. In this case the project was already completed before the mitigation.

**Q And is it typical for these types of documents to include copies of attached soil maps?**

A Yes, it's I guess common practice to include additional information with the applications in order for those reviewing the applications to have some of that information available to them.

**Q And for both the impact site and the mitigation site would it be the practice of the SWCD to review these soil maps?**

A Yes.

**Q And are these the soil maps that are prepared by the Natural Resource Conservation Service?**

A Yes.

**Q Do you folks at the SWCD also rely on the National Wetland Inventory maps?**

A Yes.

**Q In regard to this particular plan, was -- it was approved, is that correct?**

A Yes.



**Q And was there ever an extension granted for implementation of the plan?**

A Yes.

**Q Could you explain the circumstances surrounding that extension?**

A It was initiated by a call to myself from Mr. Bailey. He had concerns about the -- the road itself and the Corps of Engineers possibly requiring that road to be removed. And I talked to Gary Lockner about it and also to my board about it and we felt that it was reasonable to extend that time line I guess just to give him more time while those issues were being resolved.

**Q Do you recall how long that extension occurred for?**

A From my recollection it was approximately one year.

MR. FISH: I didn't get the exhibit number on that last one, was that offered or -- we're getting ahead of ourselves.

THE JUDGE: Right, it wasn't offered yet. That was 25.

MR. COOL: I'm sorry, offer Exhibit 25, which is the second plan.

MR. FISH: No objection.



THE JUDGE: It will be received.

(Exhibit No. 26 was marked.)

BY MR. COOL:

**Q Mr. Lemm, I'm handing you Exhibit No. 26. Do you recognize that document?**

A Yes.

**Q And what is that?**

A This is a letter from myself and Gary Lockner granting an extension on the time line for Gary to complete his restoration --

**Q And what is the deadline --**

A -- or mitigation.

**Q What is the deadline that's identified in that document?**

A July 1st of 2000.

**Q Now, do you know if Mr. Bailey ever implemented the second replacement plan?**

MR. FISH: I'm going to object, Your Honor. The Court's stricken as irrelevant information regarding who is the applicant. I think Mr. Cool's trying to backdoor more information in here. The county acknowledged in Exhibit 11 that they were the applicant shortly after this extension was granted, Your Honor, and I don't know where this line of questioning is going. It seems like it's



already been stricken as irrelevant by the Court. Exhibit 11 shows the County of Lake of the Woods taking over as applicant as of November 5, 1999, less than two months after Exhibit 26 was the -- the extension was granted. So if I'm not allowed to question on who is the applicant and who's responsible for this, I don't know what the relevance of Mr. Cool doing the same is.

THE JUDGE: I think the question is was the work done or not. And I think that's a legitimate question.

MR. FISH: By Mr. Bailey as applicant I think is what the implication is.

THE JUDGE: You and I can read the application. I'm going to allow the question. Was the work done? I don't care who did it. Was it done?

THE WITNESS: No.

BY MR. COOL:

**Q And what is the status of the replacement plan at this time?**

A It is no longer valid.

**Q Now, do you recall in your work whether Mr. Bailey was ever asked to do a wetland delineation out at the Sunny Beach site?**

A Yes. In reviewing the information in -- contained in our file, there was, I believe, two separate instances where he was asked by the Corps of Engineers to hire a wetland private consultant to do a wetland delineation and there was also a letter from Gary Lockner requesting that he -- or suggesting that he hire a private consultant to do a wetland delineation.

**Q And in regards to Mr. Lockner's request, did he --**

MR. FISH: Your Honor, I'm going to object to anything that Mr. Lockner is going to testify to as not in evidence.

THE JUDGE: Well, Mr. Lockner's going to testify presumably.

MR. FISH: I don't know the letter being referred to here.

(Exhibit No. 27 was marked.)

BY MR. COOL:

**Q Handing you what has been marked as Exhibit 27.**

THE JUDGE: First of all let's take care of 26. Is there any objection to Exhibit 26? That's the one-year extension.

MR. FISH: No, Your Honor.



THE JUDGE: Okay, it will be received.

THE JUDGE: Mr. Cool? Proceed.

BY MR. COOL:

**Q Do you recognize that document?**

A Yes.

**Q And is that a document from the SWCD files?**

A It is in the SWCD files, yes.

**Q And did Mr. Lockner discuss this request for a wetland delineation with you?**

A Yes.

**Q And what was the nature of the discussion? Why was a wetland delineation requested of Mr. Bailey?**

A I guess to confirm the existence of wetlands on the site; that there was some questions by the Corps of Engineers concerning the accuracy of any information that had been submitted concerning wetlands at the site.

**Q Now, are you aware of whether Mr. Bailey ever did a wetland delineation?**

A Not to my knowledge.

**Q And are you aware of any wetland delineation done on the Sunny Beach plat prior to the Corps of Engineers's wetland delineation?**

A No.



**Q And you've reviewed the SWCD files, is that correct?**

A Yes.

**Q Would it have been typical had any wetland delineation been done, for the SWCD files to reflect that?**

A Yes.

**Q And why is that?**

A As a member of the Technical Evaluation Panel, the SWCD would generally review the delineation and the results of that delineation for accuracy.

**Q And so they would have -- those types of documents would have found their way into your file or should be in the file?**

A Yes.

**Q Okay. When was the first time that you visited the Sunny Beach plat?**

THE JUDGE: Did you intend to offer 27?

MR. COOL: I apologize, Your Honor. Yes, move the admission of 27.

MR. FISH: I'm going to object, Your Honor, this is similar to the previous documents excluded regarding the Army Corps of Engineers and in specific, Exhibit 23. He is not the drafter of this



document and I believe this is something that would appropriately come in with Gary Lockner.

THE JUDGE: Just a moment, I don't know what -- just a moment. I think it can come in. I think Mr. Lockner's going to be here, you can ask him any questions about it that you want, but if it came out of their files I think it's legitimate, so 27 is received.

BY MR. COOL:

**Q Do you recall the first time that you visited the site?**

A I don't recall specifically, but it would have been in the spring or summer of '99. I don't recall a specific date as the first time I'd been on the site.

**Q But you did visit the site with Mr. Lockner and Mr. Krystosek in September of 1999, is that correct?**

A Yes.

**Q And you subsequently visited the site several other times, --**

A Yes.

**Q -- is that correct?**

A And I do remember one -- prior to the September of '99 there was a July of '99 site visit

with Dale Krystosek and Dan Eckland and Brian Dwight that I was -- I was involved in. Whether that was the first one or not, I don't recall.

**Q Okay.**

A But I have been involved in -- I have made several site visits since.

**Q And site visits both prior to and after the Corps' wetland delineation?**

A Yes.

**Q And have you reviewed the Corps' wetland delineation documents?**

A Yes.

**Q And which documents did you review?**

A The soils and vegetation -- the data sheets from the 1987 Corps of Engineers Manual, I've reviewed those, and also briefly -- briefly scanned over the Minnesota Routine Assessment, the MnRAM evaluation that they complete.

**Q So you're familiar with the findings of the Corps, is that correct?**

A Yes.

**Q In your subsequent visits to the plat after the Corps' delineation, have you made any -- made any observations about the nature of the wetlands or the plat itself that are inconsistent with their**



**findings?**

A No, not at all.

**Q Did you -- did the SWCD assist or participate in any discussions about the issuance of Wetland Conservation Act restoration orders for this site?**

A Yes.

**Q And could you explain the nature of those discussions?**

A There was two separate lines of discussion. One was concerning the road itself. And concerning the road itself it was decided that for the sake of avoiding redundancy and making it easy for the -- I guess, for the landowner to understand it, as long as the Corps of Engineers had a restoration order in place, that at the time it wouldn't be necessary for a WCA, Wetland Conservation Act, restoration order to be issued in addition to it.

The other discussion was concerning the lots, the individual lots, which several of these lots had been filled to some extent and those lot owners had not received a restoration order from the Corps of Engineers so it was felt that it would be appropriate to issue a restoration order to those lot owners that had unauthorized fill in their lots.



**Q And the SWCD relied on the Corps' information as part of the information in their recommendation for the issuance of these orders?**

A Yes.

**Q Do you know how many restoration orders have been issued?**

A Eight. I believe there was eight.

**Q Eight, okay. And prior to the issuance of those orders, did the SWCD send out any letters to the lot owners regarding the concerns about WCA --**

**A Yes.**

**Q -- concerns?**

MR. FISH: I'm going to object to this line of questioning. I don't know what the relevance of it is.

THE JUDGE: Could you tell us, Mr. Cool?

MR. COOL: Well, Your Honor, the agency had a concern that the project was being segmented and that there were other impacts that were going to occur on the lots if a proper mitigation sequence was not implemented. And through these witnesses the agency is introducing evidence that, in fact, there was clearing and filling going on under the jurisdiction of the WCA thing, so there were, in fact, impacts occurring on these lots consistent with



the agency's concern.

THE JUDGE: Okay. Do we need the restoration orders to prove that?

MR. FISH: I would stipulate that there was fill placed by eight individual lot owners.

THE JUDGE: Is that enough? Is that satisfactory, Mr. Cool, that there was, in fact, fill and what else -- what else did you say they were doing?

MR. COOL: Well, there was clearing.

MR. FISH: I don't know that clearing is prohibited by anything but -- irrelevant, but . . .

BY MR. COOL:

**Q Are clearing issues addressed under the WCA?**

A Not under WCA, no. They are under the shoreline ordinance, unless -- sorry, Your Honor.

THE JUDGE: No, no, I was -- is the shoreline ordinance something you enforce --

MR. LEMM: No.

THE JUDGE: -- or is that something that the DNR does?

MR. LEMM: It's something that the county enforces.

THE JUDGE: The county, okay. Let's -- you know, for purposes of this project were you

concerned about the clearing or were you concerned about the filling?

MR. LEMM: Filling. What I was going to say about the clearing is unless it results in the filling of the wetland. So if there's mechanized land clearing that results in them -- also at the same time the movement of spoil or soil and that acts as filled, then that -- yes, that would be . . .

THE JUDGE: Maybe we can just stipulate that there has been filling and that they issued eight restoration orders and that would be the end of it.

BY MR. COOL:

Q **Just to follow up, have the restoration orders been complied with?**

A No.

Q **And is there any ongoing enforcement by any entity to enforce the restoration orders?**

A Not at this time.

Q **So the filling remains in place, is that correct?**

A Yes.

Q **You've been to the site several times. Have you ever observed the ditches themselves?**

A Yes.



Q **And what have you observed about the ditches?**

A Just, I guess, their existence and the fact that they were effectively conveying water, and their depth.

Q **And what about their depth?**

A It was approximately two feet, 2.1, 2.2, right in that range.

Q **And you've made measurements of that?**

A Yes.

Q **And you believe these measurements are representative of the ditches on both sides of the new road?**

A Yes.

Q **Have you had any reason to evaluate the original replacement plan which included estimates of lateral effect?**

A No.

Q **You were out on the site in September of '99, is that correct?**

A Yes.

Q **And do you recall why you were asked or how it came about that you came to the site?**

A Yes. I was with Gary Lockner and Dale Krystosek. We had been looking at other areas,



wetland issues, I guess, in the county, and Gary had asked us if we would stop at that -- at the Sunny Beach area with him and just to look at it. He had some concerns whether there was actually a foot of separation or not, he claimed that there was, from unsaturated soil.

Q **And what happened when you got to the site?**

A We walked -- he drove to a crossing or an approach and we walked towards the lake from the -- from the sun -- the road itself, walked towards the lake to the east and stopped, I guess, more than -- more than halfway towards the lake. We stopped, did one single soil boring and just visually looked at some of the vegetation growing there.

Q **And you subsequently received a letter from Mr. Lockner?**

A Yes.

Q **And what was the nature of the discussion regarding that letter?**

A Basically saying that there was one foot of separation. At least in the site that we looked at there was one foot of separation of unsaturated soil and -- like I said I'd have to look at it, but there's also some indication of septic systems and buildings.



Q **Referring you to Exhibit 10, that's the October 14th letter. Do you recognize that letter?**

A Yes.

Q **Is that your signature?**

A Yes.

Q **And do you recall who wrote this letter?**

A Gary Lockner.

Q **And what did you review it for?**

A I reviewed it for wetland purposes. I guess I have no -- there are references to septic systems and buildings, but I had no -- have no training or expertise in those areas and that was not any of my responsibility, so I looked at the -- what we had done as far as the wetlands.

Q **Do you think it's a fair interpretation of that letter that it's representing there's a 100-foot corridor of upland on the entire plat? Let me strike that if I'm causing confusion.**

A I can answer it. Yeah, yes.

Q **Do you agree based on the observations you've made at the site is there such a corridor of upland throughout the entire plat?**

A Based on the subsequent site investigations and additional information, no, I would not agree. Based on additional information I've received since

then no, I would not agree.
Q You've reviewed the Corps delineation, correct?
A Yes.
Q And you've subsequently visited the site?
A Yes.
Q What can you tell us about the site that you believe you were at on September 29th?
A That's one of the things that I noticed right away is the difference between the Corps' delineation and the one specific site investigation that we did that day. After looking at it and going on site, looking at the Corps' delineation there was one small upland island within -- within that plat and after going on site and looking at the site where we did our soil boring it was in that -- in fact, in that -- that upland island.
Q So with regard to the representations in the letter on the corridor, those are incorrect, is that --
A Yes.
Q -- your position?
A Yes.
Q Referring you to the fourth paragraph of that letter indicating that there was probably not



land inland of 100 feet that would -- be allowed for permitting of septic systems, is there anything you observed about the site that would indicate that's inaccurate?
A No, I can't -- I couldn't specifically speak to septic systems, but nothing that I observed would indicate that there was more than one foot of saturated -- one foot or more of unsaturated soil beyond 100 feet, no.
MR. COOK: I have no further questions of this witness.
THE JUDGE: All right. Mr. Fish, do you have any questions.
CROSS-EXAMINATION
BY MR. FISH:
Q Mr. Lemm, are you joining the co-author of that October 14th letter that you're now refuting what you signed as being inaccurate or misrepresentative in any manner?
A Certain parts of it are, I guess, not my expertise. I can say that it says a specific wetland delineation was not done.
Q Let me be more specific. We found about six inches of top soil, eight inches of silt loam and at least six -- sixteen inches of very gravelly loam



very likely extending down to the OHW, and I'm assuming that's ordinary high water, mark of Lake of the Woods. Are you disputing that or the context it was given in, that sentence?
A I would say in that specific site that is roughly accurate, yes.
Q What is that specific site?
A The specific site that we did the soil boring in. At that specific soil boring.
Q All right. You didn't say in this letter that you did one soil boring?
A No. I didn't write the letter.
Q You did sign off on it?
A Yes.
Q It says, In our opinion that because of the coarse, gravelly nature of the subsoil, that the water table could not establish itself within at least a foot of the surface within 100 feet of the lakeshore. Do you believe that sentence is inaccurate or in any way stated out of context?
A It is accurate at this specific site that we did the specific soil boring at.
Q So you're qualifying it now. You did not qualify it when you signed it and sent it off to the Minnesota Pollution Control Agency?



A No, I did not. And the reason I did not is there were no data sheets collected, there were no -- there was not wetland delineation. The only thing -- from my opinion and my understanding the only purpose of this letter was to raise the question that there -- there may be -- or there is at least at this one spot unsaturated soil for a foot or more and then it needs to be looked into more.
Q Wouldn't it have been appropriate if you had such a concern at that time that you -- that you stated it was just a few square feet out of these many hundreds of thousands of square feet in this plat that were upland, that this letter only referred to a few square feet?
A I wouldn't that say it referred to a few square feet. The soil boring was taken in one specific site. The extent of that upland area was not determined then. Should it have been explained better? Yes. I was not the author of the letter; however, I --
Q You no longer work with Gary Bailey -- I'm sorry, Gary Lockner, do you?
A No.
Q He's actually a former employee, he's retired?

A Yes.
Q Yet yourself and -- I'm sorry, if I mispronounce the name, Mr. Krystosek, Krystosek do continue to work together on projects?
A Yes.
Q And your credibility in dealing with, I assume, the Army Corps of Engineers, the MPCA, the BWSR, as well as your fellow employees is important, isn't it?
A Yes.
Q In fact, you're recently promoted?
A Yes.
Q Now, Mr. Cool questioned you about Exhibit 26, which was a letter from yourself to Mr. Bailey granting him a one-year extension of time?
A Yes.
Q Now, you -- were you aware of the fact that Lake of the Woods County took over, at least they represented they took over as applicant on this matter?
A No.
Q That was never made known to you?
A No.
Q Did you have any coordination with Lake of the Woods County about their role as the applicant,



taking over applicant shortly after that letter was issued?
A No.
Q Did you have any discussions with Gary Lockner about that?
A As Lake of the Woods County taking over as the applicant, no, not that I recall.
Q You don't remember him ever making any such representation to yourself, ever acknowledging it or having any knowledge of it whatsoever?
A The only thing that I can recall is at a meeting in Bemidji Mr. Lockner had made a comment that the county would supply the mitigation for the project. I didn't recall that as being that the county would become the applicant.
Q Now. Did you have -- first of all, have you reviewed Exhibit 10? I believe it was either 10 or 11 here that I was referring to.
THE JUDGE: You may be referring to Exhibit 11.
MR. FISH: Exhibit 11, I'm sorry.
BY MR. FISH:
Q Have you had an opportunity to review that exhibit?
A Just a second, let me see if I can find it.



Q States the U.S. Army Corps of Engineers on the outside of it.
A Yep.
Q Take a moment to review it, if you haven't reviewed it prior to today's hearing.
A Portions of it I recognize and portions of it I do not.
Q How about the letter of Lake of the Woods County dated November 5th of 1999 where it says permit should be addressed to the county?
A No, I do not recognize that.
Q Were you aware that the county -- the county road was -- or the platted road was taken over by the county?
A Yes.
Q And they continue to maintain it?
A I assume they maintain it. I haven't witnessed any maintenance activities.
Q Were you aware that they issued culvert permits and fill permits for culverts?
A Yes.
Q Now, you refer to a letter dated July 24th of 2000, Exhibit No. 27, where Mr. Lockner has been advised or somehow concludes that there was a conflict of interest in the county proceeding as the



plat developer. You were aware of that letter?
A Yes.
Q When you received that letter did that somehow give you some kind of a sense that the county had been proceeding as the plat developer prior to that time?
A No.
Q Do you know why Mr. Lockner would have sent such a letter then?
A I guess the contents of the letter speak for themselves. I didn't see any connection between that and the county being the applicant.
Q Now at this time isn't it true that the Army Corps of Engineers had completed or was within a matter of days of completing its wetland delineation, which was subsequently the basis of the MPCA's revocation of its certification?
A I don't remember the exact date offhand of the Corps of Engineers's wetland delineation. I assume it was after this letter.
Q Would September of 2000 ring a bell for the completion of that delineation?
A Sounds familiar, yes.
Q So after -- after this July or shortly thereafter wouldn't you agree that it would have been

**pointless for Mr. Gary Bailey to attempt to obtain some type of an expert to do a delineation on the property since the Corps of Engineers has already done it?**

A Well, I would say that it would have definitely -- or it would have been to his benefit and his responsibility as applicant to do a delineation before that time. After the Corps of Engineers completed their delineation, if there were any questions as to the accuracy of that delineation, then he still could have hired a private consultant to do a separate delineation to try and refute the accuracy of the Corps' delineation.

**Q Now at any time after yourself and Gary Bailey signed this letter of October 14th, it was sent to the Minnesota Pollution Control Agency characterizing the plat as having 100 feet of uplands. Did you ever refute that in writing prior to today's hearing?**

A Yes.

**Q Did you say I was wrong in my letter of October 14th, please disregard that letter, it was taken out of context?**

A I said based on additional information received after that time, after the -- well, let me



back up. I said that we did only look at one site, took one soil boring, did not complete any of the required delineation paperwork and did not intend it to be construed as a -- as a full delineation of the wetland boundary, and based on new information from the Corps of Engineers delineation, that the -- there was not that distance of upland area throughout the entire plat. And also that my only purpose for reviewing it was for the Wetland Conservation Act and not for septic systems or buildings.

**Q So this was done --**

THE JUDGE: Excuse me just a moment. In your last question you said after you and Gary Bailey signed the October 14th --

MR. FISH: I'm sorry, Gary Lockner.

THE JUDGE: Right, right, thank you. Now you can proceed.

BY MR. FISH:

**Q Mr. Lemm, that was -- your conclusion, your change of heart, if you will, was done after the Army Corps' delineation in the fall of 2000?**

A Yes.

**Q There was no mention that your work should be ignored in the letter of July 24, 2000 by Gary Lockner where he's suggesting that there's a conflict**



**of interest and Mr. Bailey should obtain his own wetland delineation?**

A No.

**Q So there was -- did you personally call Mr. Bailey and say hey, we were wrong, we made mistakes, we should never have supported this plat, you need to get your own delineation?**

A No. I never did support the plat. I did not take one side or the other on the plat.

**Q I'll rephrase the question. Did you ever call Mr. Bailey prior to a suggestion that he -- at any time prior to the Army Corps issuing their wetland delineation saying I was wrong or I do not believe my representations in my letter of October 14th are fairly characterized or you should not rely on anything I've said in your application process to the MPCA or the Army Corps, did you ever make any such representations?**

A No. I believe as far as the water table at that specific site that we looked at is accurate. There is more than one foot separation.

**Q As far as any actions by Gary Bailey involving this matter, he relied on yourself as an expert, Gary Lockner as an expert, as well as other officials in drafting these applications, sending**



**them out and was not asked at any time prior -- or during this application that he should --**

MR. COOL: Objection, seems to be a compound question.

MR. FISH: I'm not finished with it.

THE JUDGE: Let him finish.

BY MR. FISH:

**Q That he should somehow go and get a wetland delineation expert in this application process?**

MR. COOL: Objection, compound.

THE JUDGE: The question is whether or not anybody told him to go out and get an expert before the Corps of Engineers? Is that your question?

MR. FISH: Basically.

MR. LEMM: Yes.

BY MR. FISH:

**Q And can you refer to that correspondence?**

A I have one of them in front of me, the letter from Gary Lockner on July 24, 2000, and from recalling -- reviewing my file there was at least two separate instances that he was informed by the Corps of Engineers back in the early '90s that he should get a -- have a wetland delineation done.

**Q Right, and yet you assisted him -- or at least you assisted him in this plat application**

**process?**
A No, I did not.
**Q So your letter of October 14th, you're disputing that in any way should have been construed as supporting this plat or giving information in allowing MPCA to make a determination of whether to approve this plat?**
A It says right in the letter that a specific wetland delineation was not done. There were no delineation data sheets collected. The only thing, in my opinion, that this letter does, because it does not supply any -- any of the necessary information, the only thing that this letter does in my opinion is raise the question that maybe this should be looked at a little bit closer and there should be a wetland delineation done. As far as septic system and buildings, I couldn't speak to that. I only assumed that -- that Mr. Lockner was the expert on it and that he -- and he knew what he was writing on those issues.
**Q This wetland delineation, it's not required for approval by any plat by either the Army Corps or the MPCA, is it?**
A As far as I understand it, it would not be required by the Corps or the MPCA unless there is an



objection to or some question as to the actual existence of any extent of wetlands on the property. This letter may have -- may have raised some questions to that extent.
**Q And throughout this process would it be a fair characterization that Mr. Bailey relied on the expertise of the county and the people that he was working with in the county to complete these applications, make certain that he was following through correctly on the application process?**
A I can't speak to any process or applications as far as the plat itself. The only thing I can speak to is the actual replacement plan application, the second one which I assisted him with.
**Q So you assisted Mr. Bailey in completing that application?**
A Yes.
**Q Actually drafted that application for him?**
A Well, I took the information out of the first plan, included the -- that into the second plan and also additional information that was in the file and that I received from Mr. Bailey, and I don't know if there's anything I may have received from Gary Lockner or Brian Dwight, I don't recall, but I -- all I did was put that information into the plan.



**Q And you put together this plan, drafted it and had Mr. Bailey sign it with the hope, at least a hope in the expectation that it -- that it met muster? In other words, that it would be approved?**
A I had no such hope or expectation.
**Q You thought this was futile?**
A I wouldn't say that. That's not my job to determine that. My job at the time was to assist him in completing the application. The information that was in that application is not for me to -- to approve or disapprove.
**Q Well, my question was: Did you expect this -- did you at least hope that this plan would be approved that you drafted?**
A I didn't hope one way or the other. This was the information that was provided to me that I helped -- that I put into this for him. It's a service that we provide to the landowners and to the applicants. We can't tell -- we can give them technical advice. We can't tell them yes or no, this will or this will not be accepted because we are not the approving authority.
**Q That wasn't my question, whether it would be accepted or not, sir. It was whether you put this together knowing full well that there was say either**



**a blatant aspect of it missing or whether it was what you consider a normal plan that you submitted and it was lacking -- wasn't lacking anything, as far as deficiencies for approval? In providing your technical -- I'll rephrase that again. In providing your technical expertise, did you see any glaring deficiencies in this plan that Mr. Bailey had to correct prior to submitting it?**
A At the time, no.
**Q So would it be fair that Mr. Bailey and yourself thought you were complying with the prerequisites of the plan and it was a good plan?**
A I guess I wouldn't answer that with a yes or no question (sic). That's not how I would characterize how I -- my involvement with this plan or how I felt about it.
**Q How did you feel about it?**
A I didn't have any feelings about it one way or the other. It's not my job to have a feeling about it. My job is to help in assisting in completing the application. If I'm asked my advice or my input as part of the Technical Evaluation Panel, then I can give it. And at the time, just to also clarify things, I had not completed wetland delineation training yet or had any Wetland

Conservation Act training.
**Q Yet you were qualified to give advice?**
A I didn't give advice. That's what I'm saying.
**Q I thought you testified you were giving technical advice.**
A I could have if I was asked as a member of the Technical Evaluation Panel.
**Q Then what exactly, what assistance did you provide to Mr. Bailey on this if you didn't provide any advice?**
A I filled out the application based on -- with the information that was provided to me.
**Q Now, there was some concern about the filling that was done by some of the private landowners. Isn't it true that yourself, as well as the Army Corps of Engineers in private e-mails you sent back and forth concluded that this would naturally revert back to natural wetland without the need to excavate this fill?**
A Not that I recall, no.
**Q Have you had any such conversation or e-mail with Mr. Koschak --**
A Without -- without removing the fill, no.
MR. FISH: I have no other questions, Your



Honor.
THE JUDGE: Okay. Mr. Cool, do you have any others?
MR. COOL: No, I do not, Your Honor.
THE JUDGE: I have one question. Where are you located? Where is your office located?
MR. LEMM: It's in the Federal Building. We're located in the Post Office building. We're -- we're kind of a state/county agency, but we partner with the Natural Resources Conservation Service and housed in the Federal Building.
THE JUDGE: In what town?
MR. LEMM: Oh, Baudette.
THE JUDGE: Baudette?
MR. LEMM: Yes.
THE JUDGE: Okay. I didn't know where you were from, if you were from --
MR. LEMM: Sorry.
THE JUDGE: -- the Cities or where. Okay, thank you. Okay. What's next?
MR. COOL: Mr. Fish has approached me with regards to a witness that he was going to call, and I've agreed to try to accommodate that individual's timing problems, so I think Mr. Fish is going to call someone.



MR. FISH: Walt Leu, he's here from -- he is the former county engineer.
THE JUDGE: Why don' we go off the record.
(An off-the-record discussion was held.)
THE JUDGE: Mr. Fish, who did you want to call, please?
MR. FISH: Walter Leu.
WALTER LEU,
after having been duly sworn, testified as follows:
DIRECT EXAMINATION
THE JUDGE: Be seated.
BY MR. FISH:
**Q Could you state your name and address, please?**
A Walter Paul Leu, L-E-U. And my address now is 7907 Oinonen Road, O-I-N-O-N-E-N, Cloquet, Minnesota.
**Q And how are you employed, sir?**
A I'm currently an assistant district engineer for the Department of Transportation.
**Q You for a period of time worked in Lake of the Woods County in, I guess, various capacities?**
A I was the county engineer.
**Q Did you also work as a local government official on wetlands issues for a period of time?**



A Yes, I did.
**Q Can you describe, I guess, what your title was an -- first of all, what was your title, exactly?**
A I kind of think it was whatever the County Board wanted me to be at the time, but pretty much hired as the county engineer and supervised the activities of the County Highway Department. I also was the ditch inspector for the county ditch system. And then I also was the wetlands administrator and as the local government unit representative for Lake of the Woods County.
**Q All right. And did you have any training in wetlands administration?**
A I took the Board of Water and Soil Resources certification class and was certified as a wetlands delineator.
**Q And how long did you, I guess, have that role?**
A I'm kind of fuzzy on that in that I don't recall, but probably for at least a year or two as the county engineer.
**Q All right. Now I realize I haven't -- you haven't -- you indicated to me earlier that you hadn't had time -- or hadn't had an opportunity to review any of your -- the documents or any of your**

**work on the Sunny Beach project.**
A No, I haven't reviewed any of the documents.
**Q You haven't had any extensive or -- any extensive conversations with myself about that project either?**
A No, nothing.
**Q All right. Can you tell me -- first of all, can you tell me generally what you recall as far as your involvement on the Sunny Beach project?**
A As the county engineer any time there is a plat being developed that I would as a role of the county engineer look at the grading of the road to make sure that it was going to meet the county standards for what we would call an unorganized township road or a plat road as such. So I do remember going there after the preliminary plat was approved and after I knew there was some work going on on the road and generally looked at the -- at the clearing and grubbing and the -- in the building of the road itself.
I also recall going out there with Gary Lockner and I believe Jeff Koschak from the Corps of Engineers looking at the wetlands issue and whether or not there was encroachment on wetlands for the road itself. And then also looking at individual



lots to see if -- if there was any particular wetlands within the lots and if there was a buildable site on those lots and also if there could possibly be an on-site sewage system on any of those lots also.
**Q Do you remember any discussions with Mr. Koschak of the Army Corps of Engineers relating to that issue?**
A We went and we had -- I think Jeff had a probe or whatever and we were looking at, you know, some different soils and some different profiles. It was pretty difficult walking around there because nothing was cleared out on the lots and so I remember it was kind of hard to tell exactly which lot you were on or where you were in the plat. But we did some investigation on some of that and it appeared that there was some wetlands. And even the road, it had been cleared and I think some of the -- some of the grading work was being done. And it looked like part of the road itself might have encroached on some wetlands, but at the time it looked like not the entire road segment was an encroachment on the wetland. At least that was my interpretation of what we were looking at there.
**Q And did yourself -- do you remember any of**



**the conclusions or, I guess, general nature of the feasibility of that project, any conclusions that you may have discussed with Mr. Koschak or Mr. Lockner regarding the feasibility and how that relates to wetlands?**
A My recollection of being out there and looking at the site itself is it was marginal but it might have been doable. And the road itself was coming along and once they had stripped the vegetation there, I mean in -- when you talk about -- I know it was mentioned here it was a swamp, but that's not a swamp. I mean it's -- it's a woods like you would find pretty much in most areas of Lake of the Woods County. And, you know, in the woods and in the springtime and even in the early summer all the soil is going to be saturated, but once they had stripped the trees -- and I mean the trees that they had for clearing were -- I mean they were pretty good sized popple and birch. I mean they were like 20 and 30 feet tall. I mean that's a pretty good sized tree. You wouldn't necessarily associate that with, you know, a really wet wetland. And so it looked like the material that we were -- and we don't allow organic material to go in the grade, and so they had stripped off what I would say would have been about



six or seven inches of top soil and organic material, you know, just from the forest leaf beds and stuff like that and roots, and there was mineral soil underneath there suitable for building the road grade on. So that's what I observed. And even though we were looking at some different sites there, I do remember Gary thinking that there would probably be -- Gary Lockner, that there would be a zone where they could put an onsite system. And we reviewed several lots in there. We put in -- it was just a hand probe, but we hand probed several areas, what I recall, and some of them -- some of them were wet, but then we walked around and we'd find a spot that was -- looked like it would be suitable. So I mean that's what I recall of the situation. And I also recall that whatever violations for fill that would have been placed in the wetland along the road, that we would probably work with Gary Bailey to have a Corps' permit and to mitigate that. And at the time, you know, as the wetlands administrator I was working with the board -- or the Soil Water Conservation District to look at mitigation sites for the county that we could use for credits for these kinds of platted road projects; not for the individual lots themselves, but for the road. So we thought maybe we

would have credits available some time in the future for any of these kinds of encroachments. And that's what I remember.
**Q And you also worked on this project in the capacity as a county engineer, is that right?**
A Correct.
**Q I want to show you a couple of exhibits.**
(Exhibit Nos. 28 through 30 were marked.)
BY MR. FISH:
**Q I'm going to show you what's marked Exhibits 28, 29 and 30. They're not in chronological order. I realize I haven't had an opportunity to show you these before. Do you recognize all three of these exhibits?**
A Yes, I do.
**Q And what are these documents?**
A They're basically -- as the county engineer it's my responsibility that the developer constructs the road, the plat road, to our standards, the county adopted standards. And each of these -- each of these letters addresses some deficiencies in the construction of the road, engineering deficiencies in the construction of the road.
**Q And these are letters that are directed to Mr. Bailey, is that right?**



A That's correct.
**Q And in particular -- I guess in general they talk about additional gravel would be available from the county for fill and grade, geotextile fabric and normal things in the construction of a road?**
A That's correct.
THE JUDGE: Could we get these identified like with dates and things like that? 28, for example?
MR. FISH: Okay. Let me grab a copy of all three. I guess as far as Exhibit No. 30, this would be -- Exhibit No. 28, that would be the November 30th letter, is that right? Is that what I have them marked as?
MR. LEU: That's correct, November 30th.
MR. COOL: Which year?
THE JUDGE: It's a letter from who to who?
MR. FISH: 1998. This is a letter from Gary Bailey -- I'm sorry, from Walter Leu to Gary Bailey.
THE JUDGE: Okay.
BY MR. FISH:
**Q On that letter you copied Gary Lockner, the environmental engineer, is that right?**



A That's correct. He also was the zoning administrator or whatever and would need to have this -- the road would have to be approved before we could recommend final plat approval to the board.
**Q And then on Exhibit 30 -- I'm sorry, Exhibit 29, this is a letter dated September 16th of 1998, is that right?**
A That's correct.
**Q And this is merely a letter continuing recommendation and deficiencies on the road that needed to be corrected per county specs?**
A That is correct.
**Q And on Exhibit 30, that's a letter dated May 27th of 1999, which would have been eight or nine months later. This was, I guess, one of the -- I guess nearing the end of the project. Would that be a fair characterization?**
A My -- yeah, I terminated my employment with Lake of the Woods County in December of '98, and so this letter was signed by the Assistant County Engineer acting as the County Highway Engineer on May 27th of '99.
**Q And was Mr. Sindelir, who took over from your position, from what you can see this was his follow-up on your earlier --**



A That would be correct.
MR. FISH: Offer Exhibits 28, 29 and 30, Your Honor.
THE JUDGE: Is there any objection to 28, 29 or 30.
MR. COOL: Could I see copies, please? I'm sorry, 28 I've got down as a November 30th letter.
THE JUDGE: Yes, should be.
MR. LEU: That's Exhibit 30.
MR. COOL: I don't have that.
MR. FISH: Which day are you missing?
MR. COOL: November 30th. No objection to the November 30 letter.
THE JUDGE: Is that 28?
MR. COOL: Yes, that's 28.
THE JUDGE: Okay, 28 is received.
MR. LEU: Exhibit 28 is the May 27th letter of 1999.
MR. FISH: I got them backwards then. The witness has the correct numbering, so could you tell us -- go through those again for me, please, sir?
MR. LEU: Exhibit 28, May 27, 1999 letter from Bill Sindelir to Gary Bailey. Exhibit 29,

September 16, 1998 letter from Walter Leu, County Engineer, to Gary Bailey. And Exhibit 30 is November 30, 1998 from Walter Leu to Gary Bailey.

THE JUDGE: Thank you.

MR. COOL: I have no objection, Your Honor.

THE JUDGE: So 28, 29 and 30 are received.

BY MR. FISH:

**Q Now, Mr. Leu, you earlier characterized the -- this area as not being a swamp but wetlands. Can you describe what you meant by that? Or limited wetlands I guess was more your characterization.**

A Lake of the Woods -- I mean it's the old lake bottom from, you know, glacial Lake Agassiz, so it's pretty flat and it's low and it's poorly drained. And it was mentioned here previously, it's a technical description of the character of the Lake of the Woods is it might be 90 percent of all the land area in Lake of the Woods would be considered wetland, and so there's degrees -- it's almost like there's a degree of upland. Upland is more important than wetland, so it's not so much is it wetland but is it closer to an upland than it would be a wetland. So when you're looking at a road like that where I would -- I would consider Type 7 wetland to be a lot more stunted growth trees, brushy, you know, maybe



standing water on the surface, those types of things; not what I would consider to be, you know, a pretty strong growth of popple trees and birch trees and those things like that. You know, maybe -- maybe looking at every scientific description of all the characters maybe that would -- you know, and there you have many technical experts over there saying that that's a Type 7 -- that meets the criteria for a Type 7 wetland, but to somebody that's been in Lake of the Woods County and done a lot of road construction and stuff like that, you know, to look at those soils and those conditions I would say that wasn't really that wet. Typically you would remove the vegetation there and you wouldn't have a saturated soil, it would dry out relatively easily. It's not water coming up from the ground up, it's mostly just water that hasn't had an opportunity to evaporate because of the vegetative cover over the top of it. And once -- and you could tell that because once they had opened up the road and done the clearing, then that area dried out pretty good and he was able to make a pretty good subgrade out of it.

**Q That would bring up my next question. As far as your opinion on the history of this area, was this primarily a forested county?**



A Pardon?

**Q Was this primarily either total swamp or forest as far as the natural vegetation of the county prior to any clearing?**

A Yeah, I mean the thing that did the most clearing in Lake of the Woods County was the fires that burned off the vegetation and maybe even any overlying peat that was on the land. I mean most of the lands that are being farmed or -- up in Lake of the Woods were probably at one time -- you know, would have been a forested wetland according to the definition.

**Q Now, the map, I don't know if you were here earlier when the initial witness for the state showed a map that showed just this very small segment of Mr. Bailey's plat as being some type of a wetland and no wetland to the north and no wetland to the south where there's open fields. In your opinion, was there any difference as far as the soil types or geography, anything other than the fact that this was wooded and the soil was protected from the sun and the winds that would distinguish this from the lands to the north of that plat or to the south?**

A In my opinion, and I think it was probably a little -- it was probably a little heavier soil there



and that's probably why it hadn't been necessarily logged off and farmed previously, and so it might have been marginally wetter, but it was probably relatively typical of the other areas around there, or it just hadn't been adequately ditched in order to drain surface water.

**Q Now you're not purporting or making any representations that you're a wetlands expert at all?**

A Other than -- other than the training that I took through the Board of Water and Soil Resources and, you know, learned their techniques for identifying between a wetland and an upland area.

**Q And as far as the local government, the local government officials were concerned, would think be considered, I guess, land that you would be protecting as a wetland with no development or was this consistent with other developments for the local -- I guess the local --**

A We were --

**Q -- tolerances within the county?**

A As kind of the wetlands administrator for Lake of the Woods, what we were trying to do I thought was most important and I had -- and Doug Easthouse is here and he worked with the Soil and Water Conservation District and we had actually --

the county had hired him to do a wetlands inventory, to actually find areas that were -- I mean the really sensitive wetlands, the wetlands that were really important, the ones that -- I mean in Lake of the Woods a forested wetland, I mean we must have a hundred thousand acres of forested wetland, is that important, you know, or is there a different kind of wetland that's more important to our area than a forested wetland. And so -- and we were working in the undeveloped areas around the Lake of the Woods to find those areas of important wetlands and identify those and protect those and the areas that we could develop into -- into lots to help develop our county and economic development for our county and that they weren't -- they might have been a little on the wet side but maybe they were developable and maybe we could mitigate any impacts that those platted areas would have, you know, with an alternate wetlands source that was -- and actually create a wetland that was different than the same kind of wetland that we always had in Lake of the Woods; try to create a Type 3 or Type 4, which would be like a wetland with some substantial standing water in it. You know, and a little bit of variation in our wetlands instead of kind of a monoculture of wetlands.



**Q By monoculture you mean Type 7 wetlands?**
A A lot of Type 7 wetlands, yes.
**Q So as far as you're concerned on this particular project, this was not at all unusual for normal development in Lake of the Woods County?**
A You know, I mean -- in any county the easiest areas are going to be developed first and as your county tries to grow, the more I would say probably fringer areas are looking to be developed. So it was important for us to find, you know, on these areas can we make them work or can't we. I think honestly I thought that Gary Bailey's plat, that we could make that work.
MR. LEU: I have no other questions, Your Honor.
THE JUDGE: Okay. Mr. Cool, would you -- would you like to have a break before we -- before we begin with him.
MR. COOL: No, I'm fine, Your Honor.
THE JUDGE: Okay, fine.

CROSS-EXAMINATION

BY MR. COOL:
**Q Mr. Leu, did you have any training in the design or inspections of septic systems sites?**
A No, I did not.



**Q One of the letters, and again I'm referring to the September 16th letter, 1998, Exhibit 29, the first apparent deficiency referred to in that letter was the fact that the county had not inspected or approved the subgrade prior to the placement of gravel base. Did you observe the gravel base?**
A The placement of the gravel base? I guess I don't understand your question.
**Q Did you observe the placement of the gravel base?**
A When it was being laid down, yes.
**Q Yes. And did you inspect the subgrade at that time?**
A I didn't inspect -- I didn't approve the subgrade prior to placement of the gravel base. So the contractor did not receive a letter from me saying it was okay to put the gravel base on, but I had periodically inspected the subgrade, but not in an official capacity and the contractor did not receive a letter prior to placement of the gravel base. And if you look -- if you look at Item No. 2, that's -- what we would typically do is before we would place the gravel base on, the county would actually provide the contractor with a geotextile fabric to lay on the subgrade before you put your



gravel base on there, thereby preserving the gravel base from any contamination from the soil underneath it. And so that's -- that's why I like to approve the subgrade prior to it, so that we can get them the fabric first.
**Q Could you explain to me what the subgrade is?**
A The subgrade is -- basically the subgrade is the material to build the road above natural ground. And you can do that one of two ways: one, you can haul in material from someplace else and deposit that on the -- you know, after you've got your cleared area you would deposit that; or you could take material from each side of the road creating the ditches, putting that material from the ditches into the middle of the road and compacting that and that would be your subgrade.
**Q I'm confused. Did you observe the road bed prior to placement of the subgrade?**
A Yes, I did. That would be the clearing. That's when they went in and cleared the trees and stripped whatever top soil or organic material was on that.
**Q Do you recall what time of year that was?**
A That would have been -- it probably would

have been June or July.
**Q Do your technical standards for this type of road include requirements for the construction of ditches?**
A Yes, we do require ditches.
**Q And does it specify width and depth of ditches?**
A Yes, it does.
**Q And do you recall what you would have required for this road?**
A Not right off the top of my head, but when Mr. Lemm up here he had mentioned the two-foot separation or the two-foot ditch and I think that's what we -- that's what we would require. Typically is it would have to be at least a minimum of one and a half feet below natural ground to the bottom of the ditch. And so -- and then as the subgrade comes up, that would probably be at least two feet from the top of the road bed to the bottom of the ditch.
**Q I'm trying to picture this, so work with me here.**
A It pretty much looks like just about any road you drove up on only on a smaller scale.
**Q But I want to try to understand the technical standards for the required ditch depth.**



**You indicated it would have been at least a foot and a half minimum?**
A That's our minimum, yeah.
**Q But you think this would have required a two-foot depth?**
A No, no. Because -- I think Mr. Lemm was measuring from the road bed to the bottom of the ditch and our specifications would require a minimum from natural ground to the bottom of the ditch. Natural ground being the lot, the roadbed being the center of the road somewhere.
**Q So a foot and a half from the natural ground referred to as the lot?**
A Yes.
**Q Do your technical standards specify a minimum width for these types of ditches?**
A If -- I mean the county has a policy on these kinds of roads and those specifications and standards are written in that policy, and I cannot recall that right off the top of my head, but it would be about a three- or four-foot ditch bottom.
**Q Were you involved in your Wetland Conservation Act capacity in preparing the replacement plans for Mr. Bailey?**
A No. That -- that I left with the Soil and



Water Conservation District or with Gary Lockner to help with a replacement plan. I did not work on that, that I recall.
**Q Do you recall whether you actually worked on the construction or the design of the road itself?**
A All I did as far as the road is actually inspect it and then make recommendations via the letters to Gary Bailey to give to his contractor on what the deficiencies were in the -- in the design of the construction of it. In the design -- the design parameters are specifically spelled out in the county's policy for these kinds of roads.
MR. COOL: I have no further questions, Your Honor.
THE JUDGE: Okay. Do you have anything further for him, Mr. Fish?
MR. FISH: Your Honor, I just did want to -- like to offer one exhibit based on cross.
(Exhibit No. 31 was marked.)

REDIRECT EXAMINATION

BY MR. FISH:
**Q Mr. Leu, you didn't have the benefit of reviewing your file before coming here. Could you identify Exhibit 31 for me, please?**
A Exhibit 31 is a Sequencing Finding of Fact



with Gary Bailey's name on it and with my typed name as the authorized LGU official, and this was dated the 31st of July 1998.
**Q Is this when you were still acting as the LGU official?**
A Yes.
**Q Is this something you would have had, I guess, either involvement in or received as part of your official record?**
A Yes.
**Q And what was the purpose of this Sequencing Findings of Fact?**
A That the sequencing was adequately addressed.
**Q Is this something that's done at the initiation of, I guess, the procedure to go through the hoops of the Wetlands Act and the certification of the various agencies involved with that?**
A I would assume so. I myself did not prepare this.
MR. FISH: We'll offer Exhibit 31, Your Honor.
THE JUDGE: Is there any objection to what's been marked as Exhibit 31?
MR. COOL: May I ask a few questions?

THE JUDGE: Sure.

THE WITNESS: But it would have been prepared --

MR. COOL: Well -- if you didn't prepare this, who did?

MR. LEU: It would have been prepared under my direction, and I'm thinking it was the Soil and Water Conservation District that might have prepared this for me.

MR. COOL: Do you recognize the documents attached to this?

MR. LEU: Yes, I do.

MR. COOL: Are those documents typically attached to a Findings of Fact?

MR. LEU: I would think so.

MR. COOL: Well, do you recall whether these documents were attached to this Finding of Fact?

MR. LEU: You've got to remember this is 1998 and it's 2003 and so I'm -- to be honest with you, I -- somebody might have typed the front page, but I probably did attach some of the other materials with this, you know, and probably worked on part of this, but I can't remember actually typing this front sheet up myself, I'm sorry. But I do recall the



attachments as being the things that we would look at in terms of the -- in terms of the wetland -- the Natural Wetland Inventory map and the -- and the Soil Survey Data for the types of soil that were in the area there and the engineering properties of the soil, and also the Flood Insurance Rate Map showing if there was a floodplain in the area.

MR. COOL: I have no objections, Your Honor.

THE JUDGE: All right. Then Exhibit 31 will be received.

MR. FISH: I have no other questions, Your Honor.

THE JUDGE: Okay. Thank you very much. By the way, if you had a detailed recollection of 1998 we'd be suspicious. Let's go off the record.

(An off-the-record discussion was held. The hearing was adjourned for the day.)