STATE OF MINNESOTA
OFFICE OF ADMINISTRATIVE HEARINGS
1000 Washington Square, Suite 1700
100 Washington Avenue South
Minneapolis, MN 55401-2138

---

In the Matter of Gary Bailey -
MPCA Section 401 Certification

File No. 6-2200-15413-2

VOLUME II

---

DATES: July 23-25, 2003
LOCATION: Lake of the Woods County Courthouse
Baudette, Minnesota

ADMINISTRATIVE LAW JUDGE: Allan W. Klein

APPEARANCES:

Mr. Rick Cool
Assistant Attorney General
Suite 900 - NCL Tower
445 Minnesota Street
St. Paul, Minnesota 55101-2127
In behalf of the MPCA.

Mr. Alan B. Fish
Attorneys and Counselors at Law
109 Second Street Northeast
Roseau, Minnesota 56751
In behalf of Gary Bailey.

COURT REPORTER: Stefanie Lamppa Olson
Registered Professional Reporter



INDEX


| WITNESS: | EXAMINED BY: | PAGES: |
|---|---|---|
| Day 2 | | |
| Steve Eggers | Cool - Direct | 234 - 292 |
| | Fish - Cross | 293 - 331 |
| | Cool - Redirect | 331 - 333 |
| | Fish - Recross | 333 - 339 |
| | Cool - Redirect | 339 - 340 |
| | Fish - Recross | 341 - 342 |
| Jeffrey Koschak | Cool - Direct | 342 - 353 |
| | Fish - Cross | 354 - 361 |
| | Fish - Direct | 361 - 378 |
| | Cool - Cross | 379 - 381 |
| | Fish - Redirect | 381 - 382 |
| Mark Wespetal | Cool - Direct | 382 - 453 |
| | Fish - Cross | 454 - 466 |
| Jeffrey Koschak | Cool - Rebuttal | 467 - 470 |
| | Fish - Surrebuttal | 470 - 472 |


EXHIBITS


| EXHIBIT IDENTIFICATION: | PAGE RECEIVED: |
|---|---|
| Zdon No. 23 - May 2, 2001 E-mail from Denton to Koschak | 374 |
| Eggers No. 32 - Plat Map | 247 |
| Eggers No. 33 - August 29-30, 2000 Data Sheets for Wetland Delineation of Sandy Shores Drive and Sunny Beach Plat | 255 |
| Eggers No. 34 - Appendix B-4 Wetland Plant List | 262 |
| Eggers No. 35 - Attachment B, Minnesota Routine Assessment Method for Evaluating Wetland Functions | 277 |
| Eggers No. 36 - Letter from Kasprisin to Bailey and Department of Army Permit Evaluation and Decision Document | 286 |




INDEX (cont'd)


| EXHIBIT IDENTIFICATION: | PAGE RECEIVED: |
|---|---|
| Eggers No. 37 - July 25, 2001 Handwritten Letter From Bailey to the Local LGU and July 26, 2001 Letter from Gary Bailey | 290 |
| Eggers No. 38 - October 12, 2001 Letter From Whiting to Bailey | 290 |
| Eggers No. 39 - Letter from Ball to Bailey and Accompanying Documents | 292 |
| Koschak No. 40 - Handwritten Note from Rod Heschke to Koschak | 353 |
| Koschak No. 41 - June 17, 1999 Notice of Wetland Conservation Act Decision | 362 |
| Koschak No. 42 - May 2001 E-mails | 364 |
| Koschak No. 43 - May 2000 E-mails | 364 |
| Koschak No. 44 - September 2000 E-mails | 365 |
| Koschak No. 45 - Withdrawn | -- |
| Wespetal No. 46 - Soil Survey of Lake of the Woods County Area, Minnesota | 390 |
| Wespetal No. 47 - Mound Specs | 409 |
| Wespetal No. 48 - Jamie Gowdy Application For a Land Use Permit | 441 |
| Wespetal No. 49 - Sunny Beach Plat | 439 |
| Wespetal No. 50 - Assessment of Lot Sizes for Sunny Beach Development | 443 |
| Wespetal No. 51 - Sunny Beach Plat | 446 |
| Wespetal No. 52 - November 8, 1999 E-mail from Koschak to Zdon | 471 |




THE JUDGE: Why don't we go on the record and begin. You may call your next witness, Mr. Cool.

MR. COOL: I'd like to call Steve Eggers, please.

THE JUDGE: Mr. Eggers, do you want to come up here, please. Raise your right hand, please.

STEVE EGGERS,

after having been duly sworn, testified as follows:

DIRECT EXAMINATION

THE JUDGE: Be seated. You may proceed, Mr. Cool.

BY MR. COOL:

Q **Mr. Eggers, would you please state your full name and spell your last name for the record?**
A Steve Dale Eggers, E-G-G-E-R-S.
Q **And by whom are you employed?**
A The U.S. Army Corps of Engineers, St. Paul District.
Q **How long have you been with the Corps?**
A Twenty-five years.
Q **And in what positions?**
A I started off as a biologist and for the last 15 years I've been the senior ecologist in regulatory branch.
Q **As an ecologist do you do wetland**

**delineations?**
A Yes.
**Q How long have you been doing delineations for the Corps?**
A Twenty-five years.
**Q Could you please give me a summary of your educational background?**
A I'm a graduate of the University of Wisconsin at LaCross with a Bachelor of Science Degree in biology, minor in chemistry. I've also completed additional course work in plant taxonomy at the University of Minnesota.
**Q Have you been involved in any formal training courses?**
A Yes, through my career at the Corps I've completed about 700 Corps-sponsored training, including all of the Corps-sponsored wetland training courses.
**Q Do you hold any licenses?**
A Yes, I'm a certified professional wetland scientist.
**Q How long have you been certified?**
A Since 1995.
**Q What's required to become certified?**
A The resume and work experience are reviewed



by a panel that's part of the Society of Wetland Scientists Review Board, so you submit documentation of your education and experience.
**Q Are you a member of any professional associations?**
A Society of Wetland Scientists.
**Q And what is the purpose of that organization?**
A It's an international society that promotes wetland sciences, forums, educational forums and promotes wetland sciences in general.
**Q Are you a member of any other associations?**
A The Wetland Delineators Association.
**Q And what's that organization?**
A It's a group of private consultants and agency staff in academia that focus solely on wetland delineation, educational experiences also provide forums and exchange of scientific information.
**Q Have you been involved in any organizational efforts with that board?**
A Yes, I served on the board of directors for the Wetland Delineators Association for four years.
**Q Do you have any publications?**
A Yes, I'm a co-author of Wetland Plants and Plant Communities of Minnesota and Wisconsin, First



Edition was 1987, Second Edition was 1997.
**Q And any others?**
A No formal peer reviewed articles, but numerous Corps of Engineers reports specific to topics such as mitigation, regulation and delineation.
**Q And are those reports made available not only to the Corps employees but the public in general?**
A Yes, they are. Some are on our web site.
**Q Have you been involved in any teaching positions?**
A Yes, one of my job duties is to serve as an instructor, and I teach wetland delineation, compensatory mitigation and also plant taxonomy to state, local, fed and tribal staff.
**Q How long have you been doing that?**
A I've been teaching wetland delineation since 1992 for the State of Minnesota's annual training and since 1994 I served as lead instructor in delineation training for the Corps of Engineers, Red Four (phonetic) version of delineation training in Minnesota and Wisconsin.
**Q And over the course of your training, how many people do you believe you've trained?**



A I've trained over 1,000 students in wetland delineation.
**Q Have you developed any wetland evaluation techniques in your work at the Corps?**
A Yes, I've been part of the interagency work group that developed the Minnesota Routine Assessment method for assessing functional values of wetlands.
**Q Any other guidance or evaluation techniques?**
A Yes, I've authored a Public Notice on Guidelines to Wetland Delineators for submitting delineations to the Corps, the St. Paul District.
**Q In your current position what are your duties and responsibilities?**
A I'm a project manager that handles some of the most complex and controversial cases that the Corps St. Paul District handles. That includes permit actions, enforcement actions and delineations.
**Q And does this work include actually conducting delineations?**
A Yes.
**Q And does it include evaluating other evaluations that have been submitted to the Corps?**
A Yes, I review delineations submitted by consultants.
**Q And what do you review those for?**

A For compliance with the Corps' approach to delineation under our delineation manual and guidance to make sure that the delineations are thorough and accurate.
**Q So do you actually check their worksheets?**
A Yes.
**Q And their determinations?**
A Yes.
**Q And do you make final decisions or recommendations regarding these proposals?**
A Yes.
**Q Regarding the delineation process, what is briefly a delineation?**
A It's a precise identification of the boundary of a wetland.
**Q And could you give the history of the development of this delineation methodology?**
A Yes. Given the Corps of Engineers' regulatory program under Section 404 of the Clean Water Act the Corps first adopted a definition of wetlands; that was in 1977. Then the Corps developed a Delineation Manual to apply that definition in the field. And the Corps had drafts of this manual in the early 1980s, used Corps staff at training sessions as tests, and then finalized a delineation



manual in 1987 and it's called a Corps of Engineers Wetlands Delineation Manual or '87 Manual for short.
And going back to the wetland definition, wetlands are those areas inundated areas or saturated by surface or groundwater at a frequency and duration sufficient to support and under normal circumstances do support a prevalence of vegetation typically adapted for life in saturated soil conditions. So to boil that down, wetlands are composed of three parameters or criteria: vegetation, soils and hydrology, and we refer to that as the three parameter approach and that was incorporated into our 1987 manual.
So to summarize, wetlands have hydric soils or wetland soils, they're dominated by hydrophydic plants or wetland plants and they're inundated or saturated at this recurring frequency and for sufficient duration to meet our wetland hydrology criterion.
**Q Is it the '87 Manual then that contains the methods and standards against which you evaluate delineation?**
A Yes, along with guidance that we receive from our headquarters.
**Q And do you do training regarding the methods**



**and standards in the '87 Manual?**
A That's the heart of our delineation training.
**Q Now, do you do delineations alone?**
A Yes.
**Q And so what type of training do you have to address the three parameters?**
A The training that I went through prior to becoming an instructor is that you need to be proficient to identify the dominant plant species, to recognize certain hydric soil characteristics and then to record hydrology observations. So the training I had allowed me to accomplish all of those on my own as a competent delineator.
**Q So you don't necessarily have to be a soil scientist to do the soils evaluation of the three parameter approach?**
A That's correct.
**Q What work products are typically created when a delineation is done?**
A We record the field observations on data sheets and we have a standardized form that the Corps uses. We also need a map that shows the location of the sample points so when you leave the field you can have an approximation where each sample point, each



transect was located.
**Q Now, earlier you mentioned that you participated in an interagency task force regarding another methodology. Would you just discuss that methodology?**
A Sure. I mentioned the Minnesota Routine Method for Wetland Functional Assessment or MnRAM, and this was a product of an interagency work group and it's a standardized approach to allow a wetland professional to evaluate a wetland and determine what functions it provides and then rate those functions as high, medium or low.
**Q And what type of training is needed to implement a MnRAM assessment?**
A You need to be a wetland specialist. A lay person would not be able to accurately work with MnRAM, but a wetland professional who has experience in one or more of the three criteria for wetlands and general understanding of the others can do MnRAM.
**Q And do you actually do training for MnRAM?**
A We have done training for MnRAM, yes.
**Q How often are you a trainer?**
A I've been a trainer for MnRAM, for several MnRAM courses; maybe not every year but periodically.
**Q And how are the MnRAM determinations or**

findings used in the Corps' decision making process?
A MnRAM can help document the functions that a wetland provides, then we can overlay a proposed project and determine what impact the project may have on those functions. Also MnRAM can identify functions that need to be replaced, assuming a permit's issued and a fill activity or dredge activity occurs, MnRAM would help identify the functions lost and the Corps would use that to determine the compensatory mitigation requirements to offset those wetland losses.
Q Now, can MnRAM assessment be implemented without doing a wetland delineation?
A Yes.
Q And why is that?
A Two different things. MnRAM functional assessment you don't need to have a precise boundary to implement MnRAM for a wetland. And as I mentioned, the wetland delineation is that precise boundary determination.
Q You mentioned a second point, and maybe those were the two?
A Okay. I guess I don't --
Q Okay.
A -- don't follow.



Q My confusion, excuse me. When were you assigned to the Bailey matter?
A I recall about the 1st of August in 2000.
Q And what was your assignment in this particular case?
A To conduct a wetland delineation of the site.
Q And what type of preparation work did you do in preparation for doing the delineation?
A I reviewed the County Soil Survey, the National Wetlands Inventory Map, the U.S.G.S. Topographic Map, looked at aerial photography.
Q Now, would you discuss your use of the County Soil Survey? My first question is is this the County Soil Survey that is prepared by the Natural Resource Conservation Service?
A Correct, the standard County Soil Survey.
Q Why do you review those surveys?
A To get an idea of the soils present at a particular site, to read the soil profile descriptions and whether those soils are hydric or nonhydric.
Q Did you do that in this case?
A Yes.
Q And what did you view or review in the Soil



Survey Manual?
A That the Sunny Beach plat was composed of hydric soils.
Q And do you recall what type of soils those were?
A Wabanica and zippel.
Q Did you review their various soil profile characteristics?
A Yes.
Q You reviewed the National Wetland Inventory map, is that correct?
A Yes.
Q And why do you review those maps?
A It's a general starting point for what may be wetlands on a particular project site.
Q And are these routinely relied upon in the Corps's work on delineation?
A They are not formal jurisdictional maps; they're a starting point for a rough idea of what wetlands may be present.
Q Okay. What is the overall site assessment that you do in attempting to decide how to evaluate a particular plat or area?
A You need to determine how many transects and how many sample points would be adequate to



characterize the site. So we'd look at variances and topography and soils, different plant communities. Again you can do this in the office with aerial photography and the County Soil Survey map, the topographic map. The point is that you must sample all representative soils, vegetation, hydrology and topography on a site.
Q Did you also look in this particular case at the plat map of the Sunny Beach development?
A Yes.
Q Hand you what has been marked as Exhibit 32. Before I ask you details about that particular document, just some background. The Corps eventually made a decision regarding the after-the-fact application, is that correct?
A Yes.
Q And what was that decision?
A Denial of the permit.
Q And was -- is that currently being challenged in Federal Court?
A Yes.
Q And what did the Corps have to prepare in terms of a record for that proceeding?
A We prepare a combined decision document that includes an environment assessment pursuant to the

National Environmental Policy Act. It also includes the EPA 404(B)(1) analysis and a finding of contrary or not contrary to the public interest.
**Q And in a broader overview, you also have to prepare an administrative record, is that correct?**
A Yes.
**Q And the document before you, could you describe that document?**
A Okay. The Sunny Beach plat.
**Q Yes.**
A This is a document that I had in my possession for the delineation.
**Q And you reviewed this prior to the delineation, is that correct?**
A That's correct.
MR. COOL: Move its admission, Your Honor.
THE JUDGE: Is there any objection to what's been marked as Exhibit 32?
MR. FISH: No, no objection.
THE JUDGE: It will be received.
BY MR. COOL:
**Q When you decide again to evaluate the site and now for the particular Bailey site, what is it that you lay out in terms of transects and sample points? How do you begin that process?**



A A standard approach in '87 Manual for delineation is establish a baseline and then do transects more or less perpendicular to that baseline, and sample points along each transect at intervals that include sampling all variances and soil, vegetation, hydrology or topography. So each time you encounter something new or different do a new sample point as a general rule.
**Q Did you establish a baseline in the Bailey matter?**
A Yes, I used the Sandy Shores Drive road fill as the baseline.
**Q And how did you run your transects?**
A From that baseline I ran transects more or less east of the lake.
**Q In an east/west --**
A Roughly. It was not a direct east, but yes, roughly in an eastern direction to the lake.
**Q And how many transects did you initially determine were necessary for this site?**
A In the office looking at the size of the site I drew up eight transect lines.
**Q And eventually how many did you do?**
A Five.
**Q And why -- why the reduced number?**



A Once you completed the third transect we were encountering no new soils, vegetation, hydrology or topography. We did two additional transect lines just to make sure and again saw nothing new to record. It was a -- pretty much a uniform hardwood swamp, same soil, same hydrology. No additional transects were deemed necessary.
**Q Now, did you do any transects to the west side of the road?**
A I did not.
**Q And why not?**
A It was outside the project site.
**Q Did you review the area to the west of the road?**
A Yes, I did a reconnaissance survey to the west of Sandy Shores Drive just to confirm that it was the same plant community, same hydrology and I did that.
**Q And what were your determinations?**
A It was the same plant communities, same soil, same hydrology as we found on the eastern side of Sandy Shores Drive.
**Q Now, you've indicated that you do wetland delineations alone, correct?**
A That's correct.



**Q But in this particular case you had another member assist you, is that correct?**
A Correct.
**Q And could you explain why and who this person was?**
A Mr. Rod Heschke is a soil scientist with USDA Natural Resources Conservation Service. I worked with him as an instructor at our delineation training. For this case I determined it would be beneficial to have a soil scientist, have his expertise and also splits up the workload. The delineations can be done more quickly, more efficiently.
**Q Now, besides Mr. Heschke's involvement with you as a trainer, did he have any particular -- do you know of any particular prior involvement he's had in Lake of the Woods County?**
A He's one of the authors of the County Soil Survey.
**Q And what does that mean? Did he do fieldwork, do you know?**
A I don't know of his precise involvement, but soil scientists typically do the fieldwork for the County Soil Survey and then write up the soil descriptions.

Q In this particular delineation what role did Mr. Heschke play?
A He filled out the data sheet with the detailed soil profile descriptions. He also made observations of hydrology.
Q And what was your particular role then?
A I jointly also did observations of hydrology, and I did the vegetation component of the delineation. And at the start of the delineation I also reviewed the soils with Mr. Heschke and reached concurrence on what we thought we saw in the way of hydric soils and how to characterize those soils.
Q Now, did you observe Mr. Heschke's soil sampling techniques?
A Yes.
Q And what were your conclusions regarding his techniques?
A They're the standard techniques we use for wetland delineation.
Q So they were consistent with the '87 Manual?
A That's correct.
Q Did you also observe the soil borings?
A I did.
Q And do you recall how many?
A We -- I could provide a number. I don't



have that off the top of my head, but all of the sample points are mapped and also there's some supplemental sample points recorded in the data sheets.
Q What -- in your observations what did you observe about the soils?
A They fit the Wabanica soil series predominantly. They are hydric soils.
Q Ultimately a decision is made at each sample point about whether that particular location is a wetland or not, is that correct?
A That's correct.
Q And who makes that determination or who made that determination in this case?
A I did. The Corps and also EPA make the final call on Clean Water Act jurisdiction.
Q And generally what do you do prior to making that determination?
A I thoroughly review the data sheets and the documentation of soils, vegetation and hydrology. And the last part of our data sheet is a wetland determination for that sample point, yes or no, and also in that section.
Q So did you review Mr. Heschke's work in this case?



A Yes.
Q You reviewed his data sheets?
A That's correct.
Q And is this fairly typical of what you do when you review delineations that are submitted for the Corps?
A Yes.
Q And what's the process that you go through in evaluating these data sheets that are provided by other individuals such as Mr. Heschke?
A I'll review the data sheets along with all the other information, the aerial photography, the County Soil Survey, the topographic map, any hydrology data for monitoring wells and put all of that together and reach a conclusion yes or no, this site is wetland or this particular transect was in wetlands.
Q But regard -- and specifically regarding soil borings, against what type of method or standard do you compare those data sheets against?
A The Corps has hydric soil indicators, and I would check the data sheets to see if the recorded soils information matched the Corps' hydric soil criteria. There's also another document that we use as an option and that's called the Field Indicators



of Hydric Soils and I can also check that.
Q And did you check those in this particular matter?
A I did.
Q As a result of your review of all this data, what was the Corps' determination with regard to this site?
A It had hydric soils, wet hydrology and was dominated by hydrophytes, so it met the '87 Manual wetland criteria.
THE JUDGE: I'm sorry, and it was dominated by what?
MR. EGGERS: Hydrophytes, water plants. I'm sorry, I could say wetland plants.
THE JUDGE: Okay, thank you.
BY MR. COOL:
Q Now you indicated that data sheets were prepared, is that correct?
A That's correct.
(Exhibit No. 33 was marked.)
BY MR. COOL:
Q Handing you what has been marked as Exhibit 33, could you tell me what that document is?
A This is a package of materials that I prepared. It has the data sheets that Mr. Heschke

and I recorded. And has two end products, one is -- I should say one end product and that is the drawing that shows upland and upland inclusion and then an effectively drain corridor at the very southern end of Sunny Beach plat, and the rest of the plat is wetland.

**Q And this is a document that is in the Corps' administrative record, is that correct?**

A That's correct.

MR. COOL: I move the admission of Exhibit 33.

THE JUDGE: Is there any objection to 33?

MR. FISH: No, Your Honor.

THE JUDGE: It will be received.

BY MR. COOL:

**Q Mr. Eggers, I'd like to review just in a broad sense the overview so that the Court can have a sense of how on a site-by-site basis an evaluation is done. But before I do that, I just want to direct your attention to what is the Corps number in this document Page 298. Do you see that? Do you see that map?**

A I do.

**Q And on the placard, just so that everyone sees so you can point in detail, I'm holding up what**



**is a copy of Page 298. Do you recognize that?**

A Yes.

**Q And could you explain to the Court again your determination of the baseline and the transects, and generally again how you decided to go from eight to five transects?**

A All right. I mentioned that the road fill for Sunny Shores Drive is used as a baseline. It's indicated here in the drawing. From that baseline more or less or not due east but eastward towards the lake I laid in originally eight transects. You can see they were placed something like this. So about every 150 to 200 feet was a new transect. And the idea, as I mentioned, is to make sure that your wetland delineation reviews all representative portions of the site, does not miss a particular soil inclusion or different plant community or other factors. By the time we finished Transact 3, we had found no new variations in soils, vegetation, hydrology and topography. We though did two more transects to the north just to make sure there were no other variables, and then once we did that there's no need to do the transect in between those points as we'd just be recording the same data.

**Q Did you make observations between the**



**Transects 3 and 4, 4 and 5, and 5 and the northern boundary?**

A Yes, reconnaissance survey, walked through that area, looked for anything that was different in the way of soils, vegetation, hydrology, topography.

**Q Did you observe anything different in those areas?**

A I did not.

**Q No, in your data sheets there's a second map, is that correct?**

A That's correct.

**Q And on what page is that?**

A The Corps Exhibit 299.

**Q And again showing you a placard with a blown up Page 299. Could you describe the areas that are shaded in this document?**

A The shaded areas are non-wetlands under pre-project conditions. And the lower southern -- southernmost part where Transact 1 went through was effectively drained by a preexisting agricultural drainage ditch that came from the west along this alignment to the lake. So that meant this area no longer had wetland hydrology, therefore the Corps' methodology is that it is no longer considered



wetlands.

**Q And you mentioned preexisting drainage ditch or tile, I forget what you indicated, but that was not part of the road construction project?**

A That's correct. It predated the road construction project.

**Q Was there any other area that you identified that was -- did not meet the three parameter criteria?**

A Yes, a small upland inclusion is found at sample point Transect 2-2.

**Q Directing you to Page 309 of the data sheets, and again for the Court's background, this is sample point Transect Point 2-a, is that correct?**

A That's correct.

**Q And generally what's the location of 2-a with regard to the road?**

A I tape measured the sample point locations both north/south and east/west directions and there's a small drawing on Page 310 of the Corps exhibits that show this sample point was approximately 292 feet north of that old farm road and about 52 feet east of the new road fill.

**Q Now directing your attention to the top box, lower left-hand corner, there's a series of three**

**questions. What's the purpose of those questions?**
A Those are to set the stage for the wetland delineation. These are important points you need to recognize up front.
**Q And could you describe what it is you're looking for in each of these questions?**
A Certainly. Normal circumstances is the first question and under the Corps methodology for delineation normal circumstances refers to the soils and hydrology normally present without regard to vegetation. In this case the answer is no, normal circumstances do not exist because both the soils and hydrology had been altered by the unauthorized activities, ditching and filling.
The second part, Is the site significantly disturbed? And that answer is yes. Ditching, filling, land clearing were all conducted so the site has been disturbed.
The last one, Is the area a problem area? Problem area are -- is a reference to wetlands or one or more of the three parameters may be obscured just due to natural seasonal variations. In this case we have a soil type that can be difficult to distinguish between the hydric wetland soil and the non-hydric upland soil. Those are -- the Wabanica soils are



included in that, so they are a problem soil. Also I indicated seasonal wetlands, and that refers to wetlands that may be saturated or inundated early on in the growing season but the water table generally drops late summer to fall because of higher temperatures, less precipitation, maximum plant growth. So they're seasonally wet early in the growing season, they tend to dry out towards the end of the growing season.
**Q In regard to the next dark box labeled Vegetation, can you explain what observations and recordings are made there?**
A Certainly. In small print there it says, Dominant Plant Species, so our methodology is to consider the plant community present and identify the dominant plants. And we do this by layers. So the Stratum column that's next over has a T that stands for trees, SAP is a sapling, H stands for herbaceous.
**Q So you basically start from top and work your way down?**
A Yes. So the Dominant Plant Species, these are all the scientific names, that first one there is black ash, tree size, and the third column says, Indicator, has FACW with a plus. This is an indicator status that's been assigned to individual



plant species as to their occurrence in wetlands -- frequency of their occurrence in wetlands.
**Q Mr. Eggers, I'm going to hand you and have marked as an exhibit for merely purposes of helping us all understand the Indicator categories. And with the indulgence of counsel and the Court, this document comes out of a University of Minnesota Septic System Training Manual, and I'm merely offering this for the purposes of identifying the various categories that are used to identify wetland vegetation and to assist the Court and counsel in understanding these various abbreviations that Mr. Eggers is using in the data. So if I could have this marked, Your Honor.**
THE JUDGE: All right. I suppose the key question is whether these definitions agree with the definitions he had in mind when he was filling out his data sheets.
(Exhibit No. 34 was marked.)
BY MR. COOL:
**Q Mr. Eggers, handing you what has been marked as Exhibit 34, again that being an excerpt from the University of Minnesota Septic Training Manual identifying various indicator categories, are you familiar with those categories?**



A Yes.
**Q And would you review those and see if they are generally the ones you use in your work?**
A They're the same as what we use.
MR. COOL: Move the admission.
MR. FISH: No objection, Your Honor.
THE JUDGE: All right. It will be received. I don't know that we actually moved and received 33 yet. 33 is the large package of data sheets. Is there any objection to Exhibit 33?
MR. FISH: I have that as 32.
MR. COOL: I have that as 33, but I have that as admitted.
THE JUDGE: It was admitted, all right.
MR. COOL: If not, I'll move it again.
MR. FISH: Yeah, it was admitted, Your Honor.
THE JUDGE: Okay, fine. All right, 33 is received.
MR. COOL: And 34?
THE JUDGE: Yes.
BY MR. COOL:
**Q Okay. Mr. Eggers, using the explanatory material I've just handed out, could you take us briefly through this Transect 2-a Vegetation?**

A All right. Should we explain the indicator categories briefly?
**Q Yes, the overview would, I think, be helpful.**
A Okay. Exhibit 34 is an indicator status that's assigned to individual wetland plant species as to their frequency of occurrence in wetlands. So at the very wettest end we have obligates wetland plants, greater 99 percent occurrence in wetlands, such as cattails and soft stem bulrush. And Facultative wetland plants occurs in wetlands 67 to 99 percent of the time. That gives you an idea, I don't think we need to go through the entire list. At the bottom is obligate upland plants that occur in wetlands less than 1 percent of the time. So this was a method that was developed for actually wetland classification and also adopted for wetland delineation to categorize plants as to their occurrence in wetlands.
So applying that to our data sheet 2-a, if we look at the Indicator status again, number one under Vegetation for Fraximus Nigra is black ash, it's a tree size, and the Indicator status using the indicator on Exhibit 34 is facultative wetland. It has also a plus after it, and Exhibit 34 at the



bottom notes that a plus sign indicates this plant occurs at the wetter end of that indicator status. So that means that facultative wetland plus is almost up to the obligate wetland category.
Going to, for example, let's look at a herbaceous plant, number three, agrostis gigantea, is red top, a common grass, it's a herbaceous plant. It is facultative wetland. Do we need to continue with more examples?
**Q I think that's fine. Could you explain to us at the end of those observations there's a reference to a Percent of Dominant Species. What is the information that's being recorded there?**
A The statement Percent of Dominant Species that are obligate, FAC wet or facultative, excluding facultative with a minus, is the basic rule for dominance by wetland plants. So this is the '87 Manual conclusion for the wetland plant or hydrophytic vegetation criteria. So the percentage must be greater than 50 percent of dominance by plants that are of these wetter categories in order to meet the '87 Manual wetland plant criteria.
In this case as you can see is 100 percent of the plant species that are dominant are wetland plants.
**Q Directing your attention to the Hydrology**



**box, what observations are made and recorded for this criteria?**
A We have several field observations, Depth of Surface Water, Depth to Free Water in Pit, and Depth to Saturated Soils. And then to the right of that we have a list of hydrology indicators starting with Primary Indicators, which means one is sufficient to indicate wetland hydrology. Below that are a list of Secondary Indicators, which means two or more are required to indicate wetland hydrology. And there's also a Remark section.
**Q So within the Primary and Secondary Indicator box, if you have a primary indicator, you do not need any secondary indicators, is that correct?**
A That's correct.
**Q And if you have no primary indicator, then you need at least two secondary indicators, is that correct?**
A That's correct.
**Q For background, what are the two secondary indicators that you checked here?**
A The facultative neutral test uses vegetation to indicate hydrology. In other words, plants respond to hydrology. If the dominant plants on the



facultative wetland and obligate wetland site outnumber the dominant plants that are on the dry side of facultative, it meets this FAC-neutral test. In other words, dominance by wetland plants is a secondary indicator you have wetland hydrology.
**Q And what is intended by the reference to Local Soils Survey Data?**
A The County Soil Survey Data includes along with the soil description also a table that shows the seasonal high water table and flooding frequency for soils. So we can use that data if we've identified a soil down to the soil series level and say it has a seasonal high water table of so and so or it's flooded at certain frequency and that's sufficient to meet the hydrology criteria, at least as a secondary indicator.
**Q In regard to the Field Observation box at this particular Transect 2-a what were the observations you made?**
A I observed free water in the soil pit at six inches from the surface, and that soils were saturated to the surface.
**Q Now, there had been a two-inch rainfall event 24 hours prior to the start of your visit, is that correct?**

A That's correct.
**Q And how is a rainfall event taken into account and in particular this rainfall event?**
A Recorded on your data sheets, which I did, so we note that these observations of hydrology occurred after this rainfall event about 24 hours prior. In the final analysis though looking at all of the data, the soil series and characteristics we observed on site indicate long term wetland hydrology. Also the plant community as you see here indicates long term wetland hydrology. So the two-inch rainfall must be taken into context of conditions, the hydrology that you observed on the day of the site visit, but in the final analysis you look at the big picture and the soils of this type and the plant community dominance of these species only occur in wetland, where wetland hydrology exists.
**Q And did you do any other analysis regarding to this rainfall event?**
A I did. To look at the rainfall in a broader context, we have a weighted approach to antecedent precipitation that looks three months prior and I did that analysis. So instead of a --just a two-inch rainfall 24 hours prior, I looked at 90 days prior to



the site visit and put our site visit and field condition in context of antecedent precipitation over that three-month period.
**Q And what were your determinations when you used that review period?**
A That three-month period was within a normal range of precipitation.
**Q And was this rainfall unexpected as a result of that evaluation?**
A No, a two-inch rainfall in summer is fairly common.
**Q Turning to -- and I'm going to jump over 310 because on 310 it references the data sheets that are attached, so I'm jumping to Page 311. Are you generally familiar with this data sheet?**
A Yes.
**Q And could you describe what is being recorded on these types of data sheets?**
A The soil series as a map unit, Wabanica; listed as a hydric soil in the local soils -- hydric soils list and that was indicated as yes. And then the detailed description of horizon, depth and texture and matrix are all the profile description for the soil. Underneath that is the field indicators for hydric soils that I mentioned. It



indicates which of those it had met, and at the very bottom are observations of hydrology.
**Q Now, looking at the on-site evaluation profile description, could you summarize for the Court the key evaluation that is being done there and highlight which entries are key to your evaluation?**
A The field indicators for hydric soils, that's shown as F4 and yes. If one field indicator of hydric soils is met, that is a test positive for hydric soil. So that in and of itself is sufficient to identify this sample as hydric soil.
Going back to the detailed soils description and applying the '87 Manual hydric soil indicators, this soil description meets those indicators.
**Q Finally, going back to Page 310 and directing your attention to the shaded block that's called Wetland Determination, who fills in this part of the data sheet?**
A I did.
**Q And again what do you do before you fill in this chart?**
A This is the conclusion of all the fieldwork, all of the office work and brings all the information down to this conclusion, Wetland Determination. So it's the fieldwork, review of all the data sheets,



review of the aerial photography, the County Soil Survey, all of the data synthesized and you arrive at your Wetland Determination as indicated here.
**Q Now, this is the process that you went through on each of the transect sample points, is that correct?**
A That's correct.
**Q You identified a particular upland parcel within the entire plat, correct?**
A Yes, an upland inclusion.
**Q At what sample point, transect point was that located?**
A That would be Sample Point 2-2.
**Q And do you recall what drew your attention to this specific point?**
A I saw a change in vegetation and topography.
**Q And could you describe what changes in vegetation that you observed?**
A Saw white spruce. That's the only location on the site that I observed white spruce.
**Q And do you recall where you observed the white spruce from?**
A It was about Sample 2-a, the one we just went through.
**Q So it was near the road?**

A Yes.
**Q Could you see this white spruce from the road itself?**
A I believe so.
**Q What did you observe about the topography of this area?**
A It was an elevation.
**Q And do you recall the difference in elevation from the surrounding area?**
A I don't recall exactly other than perhaps one foot. I mean we were -- it's very subtle but noticeable.
**Q Okay. Could you just briefly describe the three criteria, the observations you made with regard to these three criteria at this particular point.**
A All right. So it's our Corps Exhibit 315. We'll look at our vegetation again and here in contrast to 2-a the percent of dominant species that are wetland plants are only 40 percent. So the vegetation failed to meet the wetland vegetation criteria where more than 50 percent of dominant plants are facultative or wetter. So the plant species indicate non-wetland.
We also looked at soils, of course, as we do at every sample point, and here we did not find any free



water in the pit, and saturated soils do not exist until 17 inches below the surface. It did meet the FAC-Neutral test, but, as I indicated, we need two secondary indicators for wetland hydrology. Here at this sample point we only had one. On the soils data sheet that's Corps Exhibit 317, notice that the soils were also non-hydric.
So putting that all together under the Wetland Determination on Exhibit 316 of the Corps administrative record, all three wetland criteria were not found at this sample point, so it was marked as not wetland. And we tape measured the dimensions of this high spot.
**Q Now I'm going to move you to a different transect. Transect No. 3, Plot No. 3 -- or sample Point No. 3. I believe this is found on your data sheets Page 329.**
A Okay.
**Q Could you identify the location of this sample point?**
A It was approximately 191 feet east of the eastern edge of the new road and 470 feet -- 478 feet north of the old road and 101 feet west of the cut bank of the lakeshore.
**Q What observations did you make about the**



**three criteria here?**
A As indicated at the conclusion of the vegetation analysis, 86 percent of the dominant plants were wetland plants or hydrophytes, so it meets the hydrophytic vegetation criterion of the 87 Manual. For hydrology we had saturated soils and free water right at the surface with three inches of inundation in microdepressions, so the site met wetland hydrology criterion.
For soils you have to look at Corps Exhibit 332, and the soil profile description meets hydric soil criteria. Also under soils remarks there was a supplemental soil boring about 12 foot from the lakeshore which also found hydric soils and found that wetland plants dominated at that location.
**Q Now, why did -- go ahead, excuse me.**
A I've just got to conclude Wetland Determination obviously was all three wetland criteria were met, the sampling point was wetland.
**Q Now, why did you do the supplemental soil boring?**
A We had heard a theory that 100 feet in from the lake was drained, effectively drained by the lake. We wanted to test that theory and take a soil boring and look at the wetland plants closer to the



lake, so we did that soil pit about 12 feet from the lakeshore.
**Q What were the results of that supplemental boring?**
A We found hydric soils and dominancy by wetland plants.
**Q Consistent with a wetland?**
A That is correct.
**Q In the observations and evaluations you made on site, what was your determination regarding this proposed theory of a 100-foot corridor of upland?**
A It was not supported by our field observations.
**Q Okay. Did you do another -- or another type of evaluation of the wetland at the Bailey plat?**
A I did a MnRAM evaluation.
**Q And could you describe exactly what you did and how you do a MnRAM evaluation?**
A I did the MnRAM evaluation after the delineation, so I had all of that data and familiarity with the site. The MnRAM also has you look at watershed and broader issues surrounding the wetland. So I accumulated all of the U.S.G.S. topographic map and again County Soil Survey maps, National Wetland Inventory maps, so in combination

with the mapping and my field experience in the site, I went through the MnRAM analysis and completed it.

**Q And do you create data sheets for MnRAM?**

A There's a series of questions. It's kind of a worksheet that you go through and it's -- you record your answers right on those forms.

**Q And you did that in this case, is that correct?**

A Yes, I did.

**Q And what were your findings based upon the MnRAM method?**

A That this particular wetland had high ratings for a number of functions. In fact, for quite a few functions. And moderate ratings for others and low ratings for others.

**Q Were there any functions that you felt were being impaired or impacted?**

A Yes. By the unauthorized work?

**Q Or by whatever you observed. What were your findings with regard to impaired functions?**

A My determinations were that the filling and ditching had impaired several wetland functions, including hydrologic modifications and how that impacted on wetland hydrology. Groundwater interaction was another.



**Q And specifically with regard to groundwater interaction, what's the concern that you observed there?**

A This wetland is predominantly supported by groundwater. The free water we observed in the soil pits is a reflection of the water table. And if you look to the west of this wetland complex we see wetlands on higher elevations that slope down to the project site. And these are all indicators we have groundwater movement from the higher elevations to the west, through this wetland to the lake. So it is closely tied with groundwater.

(Exhibit No. 35 was marked.)

BY MR. COOL:

**Q Handing you what has been marked as Exhibit 35, do you recognize that document?**

A. Yes.

**Q What is it?**

A This is the MnRAM analysis that I completed.

**Q And is this also part of the Corps' administrative record?**

A It is.

MR. COOL: I move the admission, Your Honor.

THE JUDGE: All right. Is there objection to what's been marked as Exhibits 35.



MR. FISH: I don't know if there's been any foundation laid yet, Your Honor, so I would object. Because it's part of the record does not it's proper -- mean the foundation's properly been laid.

THE JUDGE: As I recall, the witness said he performed the analysis and he knows how to do it. I don't know what the concern is. Maybe you could expand on that.

MR. FISH: Is this the document that he's referring to that he's prepared?

THE JUDGE: Yes, I assume so.

MR. FISH: I guess I didn't hear any foundation on that. If that's what his testimony was, then I have no objection.

THE JUDGE: Let me make sure I understand this. You prepared this analysis?

MR. EGGERS: I did.

THE JUDGE: All right. Exhibit 35 is received.

BY MR COOL:

**Q Again as background, Mr. Eggers, what is the standard against which you're evaluating this particular wetland at Sunny Beach?**

A You're going to use as a standard the



highest functioning example of this plant community within the general region. So we would look at a hardwood swamp that's undisturbed and functioning at full capacity, if you will.

**Q Directing your attention to Page 583 of this document, what is that?**

A It's a summary table of all the functions that were analyzed as part of MnRAM.

**Q And the actual worksheets for this summary are in this attachment, is that correct?**

A That's correct. You can go through the attachment, see circles or handwritten answers.

**Q And would you please describe why both boxes in the upper left-hand corner of the summary chart are checked?**

A Yes. I checked both actual conditions and projected conditions, the latter in parentheses. So I did the MnRAM in view of the unauthorized fill and the ditches in place, and then projected if restoration is accomplished by removal of the fill, filling in of the ditches, how would that affect wetland functions.

**Q Now, you've identified how many functions that are impacted when you compare actual to projected conditions?**

A There were three that under projected conditions would increase if restoration is accomplished.

**Q And could you identify for the Court again those three?**

A Maintenance of Hydrologic Regime, in essence the wetland hydrology; Flood and Stormwater Attenuation and Groundwater Interaction.

**Q With regard to the flood stormwater attenuation, what function is being evaluated there?**

A The ability of the wetland to store stormwater and flood water, to slow down the flow of stormwater and flood water and moderate flooding.

**Q Okay. Did you prepare any other documents as a result of your wetland delineation?**

A I incorporated my observations in the Corps' Environmental Assessment.

**Q And is that Environmental Assessment part of the decision making process in this particular** After-the-Fact Permit application?

A It is.

**Q And could you discuss how these various analyses are brought together for a final determination?**

A Okay. The Corps' decision document I



mentioned earlier includes an environmental assessment. The Corps is required under the National Environmental Policy Act to prepare an EIS or EA and that covers the permit review process in total. It looks at the project, the different alternatives to that project, and an analysis of all the impacts of that project. And also in this case the results if restoration is accomplished. It included the MnRAM, it included field observations from the wetland delineation. In essence, it's the complete package of the Corps' analysis of the project.

**Q And did you prepare in -- the preparation of this in writing of this particular final determination assessment?**

A I participated in writing the environmental assessment.

**Q And what did the assessment do in terms of the road and the lot development? How did the assessment treat those components of this plat development?**

A The Corps' analysis was that the road and lot development were directly related. The impetus for the road was to facilitate vehicular access to proposed lakeshore lots, and under the Corps' guidance and regulations, again going back to NEPA



and the CEQ guidelines implementing NEPA, the EPA's 404(B)(1) guidelines and the Corps' regs all point that the not only direct impacts but that secondary and cumulative impacts must be considered as part of the Corps' environmental assessment. So since they were directly related, the Corps assessed not only the road fill and ditches, but also potential lot development and impacts associated with that.

**Q Now, did this final assessment take into account the effects of the ditches?**

A Yes.

**Q And what were those determinations?**

A The lateral effect of the ditches, in other words the extent beyond the ditches that wetland hydrology is removed, was calculated and that acreage, as I recall, was 4.96 acres of wetland drained by the lateral affects of the new ditches. That was included in the environmental assessment as one of the impacts to wetlands.

**Q Did the assessment address the Corps' mitigation sequencing requirements?**

A Yes.

**Q And how did it do that? And maybe we can start with some background. What is mitigation sequencing?**



A The Corps has a three-step sequence to mitigation starting with avoidance. Are there alternatives, options that would avoid impacts entirely within wetlands. Number two, if there are impacts that can't be avoided, can they be minimized. For example, shifting the footprint of a project to avoid wetland or using steeper side slopes to minimize wetland fill. And then the third step is compensatory mitigation or a means to compensate for the wetland functions lost due to the authorized fill.

**Q And in the assessment what were the determinations regarding avoidance?**

A Because Mr. Bailey proceeded with unauthorized work, he preempted the Corps' ability to work with him on the avoidance, potential avoidance of wetland impacts.

**Q And with regard to the compensation component of the sequencing, what were the determinations?**

A Compensatory mitigation was proposed. The Corps' analysis of that mitigation was that it was inadequate and unacceptable. The basic purpose of compensatory mitigation is to replace those wetland functions lost due to an authorized project.

Therefore, in this case to replace the functions lost, the impacts are to a hardwood swamp that's a shoreland adjacent to the lake, directly tied to groundwater and to the hydrology of the lake and very diverse as we mentioned, high MnRAM ratings for a number of functions. In return for or compensation for impacting this high quality hardwood swamp, the mitigation proposed was some 15 miles inland, would consist of regrading a gravel pit and also include a ditch plug. And my analysis is that it would result in not only a different kind of a wetland with different functions, but it would be a low quality, low functioning wetland that was inadequate to replace the functions impacted at Sunny Beach.

**Q Was the location of the proposed mitigation site a significant factor in the determination of the inadequancy?**

A Yes.

**Q And why is that?**

A As I mentioned, impact site is shoreland wetlands. The proposed mitigation was some 15 miles removed from the lake, entirely different wetland functions, entirely different hydrologic system.

**Q But is there something about the shoreland, its location that is of concern to the Corps?**



A Yes. I mean shoreland wetlands have their own set of functions and values. Also this is an international water body, significant tourism, recreational lake as opposed to a gravel pit some miles inland.

**Q The particular mitigation plan that the assessment evaluated, what was that? Was that the one, do you recall, that was proposed in the original Public Notice?**

A It was, in the 1999 Public Notice.

(Exhibit No. 36 was marked.)

BY MR. COOL:

**Q Handing you what has been marked as Exhibit 36, there's actually three different documents there. If you would take a look at those and describe those?**

A This is the Corps' decision documentation. The letter right upfront dated June 12th is the cover letter with the denial of the permit notification. Attached to it is the Corps' form for an administrative appeal of that decision. Following that is the Corps' what we call the combined decision document that includes the environmental assessment and the 404(B)(1) guideline determinations.

**Q And is there an attachment to that document?**

A Yes, we have an Attachment A that is the Public Notice that the Corps published.



**Q Now, there was another attachment to this document, is that correct?**

A Yes.

**Q And that's the Attachment B, the MnRAM that we've just discussed and it was already entered as another exhibit?**

A That's correct.

**Q And the documents that you have in front of you, these are documents that you assisted in the preparation of?**

A Yes.

MR. COOL: I move the admission.

THE JUDGE: All right. Is there any objection to what's been marked as Exhibit 36?

MR. FISH: Your Honor, the only objection would be the basis that this matter is presently under review. The validity of this document is being reviewed by the federal court at this time. So therefore the usefulness in this proceedings is minimal, we believe.

THE JUDGE: Well, I understand that much of the Corps work is under review. I think it's legitimate to have it in as a historical document and as a statement of his -- of this witness' summary of the environmental effects, but it's under appeal and the appeal hasn't been decided yet, so I think it's legitimate to have it in the record. So 36 is received.



BY MR. COOL:

**Q In regard to the public interest factors that are evaluated, what were the particular concerns of the Corps regarding wetland impacts?**

A The functions associated with those impacts. The wetland provided important wetland functions, as I mentioned, directly adjacent to a lake that's an international waterbody. The Corps' documentation notes the important water quality functions, shoreland protection, high quality wildlife habitat, high quality floristic diversity/integrity. In short, this is a high quality wetland, and the work that was done bisected this high quality hardwood swamp and as we noted had substantial adverse impacts not only for fill, but also in the drainage effect of the new ditches.

**Q What assessment did the Corps make of the water quality impacts under the public interest factors?**

A The project has adverse water quality impacts. First of all, the clearing of vegetation,

the perennial vegetation, bulldozing of the trees, exposed soils to erosion. Trucking and fill brings in -- and the stabilization of that fill resulted in erosion. The ditches now convey sediments directly to the lake where prior there were no ditches in the interior of that hardwood swamp. Instead water percolated through the swamp to the lake, filtered through it, had almost no sediment. So the adverse impacts to water quality include sediment deposition conveyed by the lake -- I'm sorry, conveyed by the ditches to the lake. Also if we went ahead and looked at the potential lot development associated with the road, conversion of those lots with fill also subject to erosion, and then subsequent development of lawns where fertilizer and pesticides may be used, and again with the new ditches we have direct conveyance of those pesticides and fertilizers to the lake.

**Q In Mr. Fish's opening statement my recollection is that he asserted that the Corps' denial and this decisional document was based solely on the MPCA's revocation of the Section 401 Certification. Is that an accurate depiction of what's encompassed in this decisional document?**

A It is not. The project failed both the



404(B)(1) guidelines, which in and of itself results in Corps' denial of a permit. Also a district engineer found that the project was contrary to the public interest, also results in denial of the permit. So the Corps denied with prejudice.

**Q And again the 404 guidelines, did you mention that?**

A Yes. The EPA as part of their contribution to and part of their responsibility under the Clean Water Act was to prepare guidelines for use in evaluating discharges of dredge and fill material into the waters of the U.S. So EPA prepared the guidelines that the Corps of Engineers uses to evaluate proposed fills in wetlands.

**Q Now subsequent to this decision did Mr. Bailey propose any other mitigation plans?**

A He did.

**Q And did you evaluate those plans?**

A Yes.

**Q And what was your -- what was proposed and what was your evaluation?**

A Mr. Bailey has about 52 acres to the west of the hardwood swamp, same tract of land. It has been farmed in the past. It don't have the -- the forested wetland. When I saw it, it was colonized by



wetland plants, mostly recanary grass with willow shrubs, so it was reverting back to wetland with abandonment of agricultural use. And the proposal included set aside of those wetlands and an easement that would then prevent mowing, haying, plowing, other activities that might degrade those reestablishing wetlands.

**Q And what was the Corps' assessment of this proposal?**

A That was also inadequate compensatory mitigation.

**Q Did you prepare or assist in the preparation of a response to this particular mitigation proposal?**

A Yes.

**Q And what ultimately was the Corps' determination with regard to this proposal?**

A It is not suitable compensatory mitigation.

**Q So it was not accepted, is that correct?**

A That's correct.

(Exhibit Nos. 37 and 38 were marked.)

BY MR. COOL:

**Q Handing you what has been marked as Exhibit 37, do you recognize that document?**

A Yes.



**Q And what is it?**

A It's a letter from Mr. Bailey proposing a mitigation.

**Q Is this the proposal you reviewed?**

A Yes.

**Q Handing you what has been marked as Exhibit 38, do you recognize that document?**

A Yes.

**Q And what document is that?**

A This is the Corps' response to the new mitigation proposal by Mr. Bailey.

**Q And you assisted in the preparation of this document?**

A Yes.

MR. COOL: I'd move the admission of 37 and 38.

MR. FISH: No objection, Your Honor.

THE JUDGE: All right, they will be received.

BY MR. COOL:

**Q As a result of the June 2001 decision, what has the Corps done with regards to the current status of the site?**

A We issued a Restoration Order.

**Q And did you prepare or assist in the**

**decision making on that Restoration Order?**
A Yes.
**Q And what was your role?**
A I prepared the letter.
**Q Did you prepare anything regarding the proposed mitigation?**
A Or the Corps' rejection of the mitigation?
**Q I'm sorry, a Restoration Order was prepared, is that correct?**
A That's correct.
**Q And what does the Restoration Order require?**
A That the road fill be removed and the ditches filled in and then seeded with the appropriate seed mixture.
(Exhibit No. 39 was marked.)
BY MR. COOL:
**Q Handing you what has been marked as Exhibit 39, do you recognize that document?**
A I do.
**Q And what is it?**
A This is the Corps' Restoration Order to Mr. Bailey.
**Q And paging through this document to the map, could you explain the extent of the restoration or the area to be restored?**



A Okay. Figure 1 shows a cross-hatch area to be restored. That is the Corps' determination of unauthorized fill material placed in wetlands. It includes all of the Sandy Shores Drive down to the southern part which is excluded, the very southern end there about where Lots 1 and 2 meet because that area was previously drained by an agricultural ditch that predated the project, so the Corps considers that non-wetland.
MR. COOL: I move the admission of 39.
THE JUDGE: All right. Is there any objection to 39?
MR. FISH: No, Your Honor.
THE JUDGE: It will be received.
BY MR. COOL:
**Q What's the status of restoration under this order?**
A The restoration has not been accomplished.
MR. COOL: I have no further questions, Your Honor.
THE JUDGE: All right, just a moment. Mr. Fish, would you like to break now or would you like to do some cross and then take a break?
MR. FISH: I'll just continue on.
THE JUDGE: Okay, fine.



CROSS-EXAMINATION
BY MR. FISH:
**Q Mr. Eggers, this Restoration Order, it directs Mr. Bailey to perform activities on a county owned road, is that right?**
A I'm not sure of the legal status of road ownership.
**Q Prior to the Army Corps ordering Mr. Bailey to interfere with legal road, did the Army Corps make any attempt to verify ownership of the road?**
A The Corps' Restoration Order is based on who did the discharge or fill material that was unauthorized. In the Corps' determination that is Mr. Bailey.
**Q So it makes no -- no determination as to who the owner is. Is that what your testimony is?**
A My testimony is that I am not sure of the legal status of road ownership.
**Q Certainly that would have an impact on anybody's ability to perform construction activities, if the property's owned by another governmental entity?**
A Again the Corps' basis for the Restoration Order is who placed the fill and that party is responsible then to remove the fill if the Corps so



orders.
**Q So the Corps has no answer for how this could be done if there is an -- if there are other legal obstacles by other legal entities such as Lake of the Woods County?**
MR. COOL: Objection, argumentative.
THE JUDGE: I would overrule the objection. I don't think it's argumentative. I think you can answer the question, if you know.
MR. EGGERS: I cannot answer the question, but the Corps' legal counsel may be the appropriate place to seek an answer.
BY MR. FISH:
**Q And you didn't bring any with you today when you were testifying about his failure to comply about -- with this order?**
A I'm sorry, I didn't hear the first part.
**Q Legal counsel didn't show up today regarding your ability to answer these -- the sufficiency of Mr. Bailey's following through with this Restoration Order?**
A That's correct, there's no legal Corps counsel present.
**Q So we won't know the answer to that question?**

MR. COOL: Objection, argumentative.
THE JUDGE: I agree, that's unnecessary, Mr. Fish.
BY MR. FISH:
Q. **Now, Mr. Eggers, has Lake of the Woods County contacted you and stated or written to you or legal counsel that Mr. Bailey is going to be given permission to alter this county road?**
A Could you restate that last part? Given permission?
Q **Yes.**
A All right. I guess restate the question.
Q **I'm sorry. Has Lake of the Woods County provided any documentation that Mr. Bailey is -- has been given permission to alter this public road?**
MR. COOL: Objection, Your Honor, it seems to be just a different way of getting at the issue of who owns the road.
THE JUDGE: Well, I think --
MR. FISH: It's a permission question.
THE JUDGE: I think the question is whether he is aware of discussions between Mr. Bailey and the county with regard to whether Mr. Bailey can restore. I think he can answer that to the extent he's aware.



MR. EGGERS: I do not know.
BY MR. FISH:
Q **All right. Are you aware if all of the unauthorized -- alleged unauthorized activity was conducted by Mr. Bailey, individual lot owners or under the direction and control of Lake of the Woods County?**
A Can you restate that first part again?
Q **Are you aware of -- if any of the unauthorized excavation or fill as alleged in the Restoration Order was conducted by Mr. Bailey or individual lot owners or Lake of the Woods County or under the direction and control of Lake of the Woods County?**
A We know that Mr. Bailey did unauthorized work. We also know that individual lot owners did unauthorized work. It's not clear to what extent the County did work on the road.
Q **Is Mr. Bailey being requested to restore work that -- that the Corps is unsure of whether the county did or not?**
A The Corps' position is Mr. Bailey did the work and the order of restoration is directed to Mr. Bailey.
Q **Has there been any investigation that you're**



**aware of as to the county's involvement in excavation or fill on this area?**
MR. COOL: Objection, relevance.
MR. FISH: He opened it up, Your Honor.
THE JUDGE: Well, now just a moment. Excuse me. We have objection to the question of whether they investigated what the county's done, and I would sustain the objection. The basic thing that this man is here for, it seems to me, is to talk about the wetland delineation. He's also talked about the fact that they issued a Restoration Order. Whether they've investigated whether or not the county did it or not, I don't think is relevant to our case. It may be very relevant to the federal case that's going to be looking at the validity of this Restoration Order, but I'm not going to decide the validity of this Restoration Order, so I don't think it matters whether -- if they're wrong, some federal body is going to say they're wrong. I don't -- I don't particularly care whether they issued it or not, but to me for my purposes I'm just going to note that they issued a Restoration Order and then it's under appeal.
MR. FISH: For that purpose, Your Honor, I would ask that any testimony regarding Mr. Eggers,



whether Mr. Bailey or the County or anyone else has failed to follow this order, as well as the Restoration Order, Exhibit 39, be stricken from the record if I'm not allowed to inquire into this subsequent matter which Counsel Cool has been allowed to.
THE JUDGE: Whether he's complied with the Restoration Order? Mr. Cool, do you want to respond to that?
MR. COOL: Well, Your Honor, I think, if my memory serves me correct, I offered the fact that the Corps issued a Restoration Order and merely asked whether restoration had occurred. I did not ask whether Mr. Bailey had implemented restoration.
THE JUDGE: Well, I think that's a fine point. For my purposes here's the thing: I'm going to say the Restoration Order was issued and it's my understanding that it's under appeal. Now is that -- I don't know much about the federal case, so you tell me whether that's right, Mr. Fish, whether it's under appeal or not.
MR. FISH: Yes, there are aspects of it under appeal, Your Honor. I think the implication by the State of Minnesota here and the Federal Government are that Mr. Bailey is somehow responsible

for this and he's somehow the bad guy because he can't go on a county road and tear it apart. I guess I don't want to have the court get that impression.

THE JUDGE: I understand your position very well, and I'm not going to get that impression. And I just don't think it's relevant for my purposes whether or not Mr. Bailey has followed the order or has appealed it. He has a legal right to appeal it. And so I think that's enough just to say it's under appeal. And I will not draw any adverse inferences from the fact that the restoration has not yet been performed. Let's go off the record for just a moment.

(An off-the-record discussion was held.)

BY MR. FISH:

**Q Mr. Eggers, now you acknowledge that Mr. Bailey has made -- as well as the county has made multiple proposals in an attempt to mitigate, all of which have been rejected by the Army Corps of engineers?**

MR. COOL: Objection, facts not in evidence. I don't believe this witness has testified that the county has proposed mitigation.

MR. FISH: Let me ask that question first, Your Honor.



BY MR. FISH:

**Q Mr. Eggers, are you aware that the County proposed mitigation in this well -- in this matter as well as Mr. Bailey?**

A I am not.

**Q All right. As far as Mr. Bailey's proposals, all of Mr. Bailey's multiple proposals for mitigation have been rejected, have they not?**

A That's correct.

**Q In fact, Mr. Bailey spoke with you personally about onsite mitigation as in fact he owns in excess of 50 acres abutting this property to the west, which you unconditionally rejected, isn't that true?**

A That's correct.

**Q And the nature of the mitigation plan proposed by Mr. Bailey I think you testified was an important factor in the Restoration Order?**

A I'm sorry, could you repeat that?

**Q Isn't it true that you testified that the nature of the mitigation proposed by Mr. Bailey was an important factor in your decision making whether to restore the road or not?**

A That's correct.

**Q Now, is there some policy of the Corps of**



**Engineers that they -- they require continuous, I guess, bidding against themselves as people who are offering mitigation or does the Corps of Engineers provide some type of assistance as to what they would accept for mitigation?**

MR. COOL: Objection, you know, argumentative.

THE JUDGE: Okay, I agree it's argumentative, but I think it's a legitimate question. Does the Corps assist landowners in coming up with mitigation plans that would be acceptable to the Corps?

MR. EGGERS: We do, Your Honor. We'll work with a permit applicant, give suggestions on potential sites. If they have some rough sketches or conceptual ideas of a mitigation and what can be done on a particular site, we will respond to that.

BY MR. FISH:

**Q Was that done in this case?**

A Not prior to the permit decision.

**Q Was it done after the permit decision?**

A The permit decision includes an analysis of the mitigation proposed and why it was rejected.

**Q My question was: Did you work with Mr. Bailey after the permit decision to come up with some**



**type of mitigation?**

A I did have the discussion with Mr. Bailey on the onsite mitigation and the Corps responded to that.

**Q And that was complete restoration of the road?**

A I was talking about the 52-acre onsite mitigation proposal that Mr. Bailey and I talked about over the phone.

**Q The one that was rejected?**

A That's correct.

**Q Did the Corps come up with any -- did you work with Mr. Bailey on that point to propose whether there would be any possibility of mitigation?**

A I discussed it with Mr. Bailey and laid out reasons why the Corps would not accept that, and that's detailed in our October 12, 2001 response to Mr. Bailey.

**Q Why the Corps would not accept any type of mitigation other than as laid out in their Restoration Order?**

A The October 12, 2001 letter was specific to the onsite mitigation proposal.

**Q All right. So your testimony is there's no alternatives other than what was provided in the**

October letter?
MR. COOL: Objection, argumentative.
THE JUDGE: I agree. That's not his testimony. Sir, I would remind you, and I'll do this on the record, there is no jury here and I am going to base my decision on the facts of what happened, not what I -- not whether I think Mr. Bailey is a good guy or not whether I think this witness is a good guy. If you'd please just try to develop the facts of whether -- of whatever you want to develop, but try to leave out the characterizations, it would be good.
MR. FISH: Maybe I can explain my theory, Your Honor. I'm not trying to do some type of dramatic questioning here. My purpose is to show that the -- I believe part of the action we have involving the Army Corps of Engineers as well as the MPCA is their motivations in this matter, Your Honor. There's some offsite elk farm issues that are being developed here and it's clear that -- and I think the record will show some of the motivations by the Army Corps of Engineers and the MPCA to use that elk farm matter as -- use this matter as leverage on the elk farm matter and there's some in -- there's -- I received e-mails that I will



introduce into evidence, Your Honor, that show the Army Corps of Engineers trying to leverage this property into some type of nature conservancy or have it join the Zippel State Park. This isn't entirely a scientific case, Your Honor. I believe it's a highly political case. And I believe the level of discretion exercised by the Corps of Engineers was tainted from the beginning and that is really my purpose of these questions.
THE JUDGE: Well, I don't know much about this elk farm business. There was some reference to it in our first telephone prehearing conference and I think we -- I think my recollection is that we decided we weren't going to get into it. You're going to have to have -- I think -- well, I have to think about this a little bit because I didn't -- I'm not quite aware of this theory until just now. But my question, my concern, what I have to decide is whether the PCA had a valid basis for revoking their certification.
MR. COOL: Your Honor, may I address the Court?
THE JUDGE: Yes.
MR. COOL: While the agency staff have grave concerns about the insinuations being made by



counsel regarding leveraging, they're -- that is not the situation with regard to this particular proceeding. These two different projects are not connected in terms of the decision making that was done here on the 401 Certification and subsequent revocation.
The manner in which this was raised in our prehearing telephone conference was, I believe, in regard to a question raised by the Court about any possible settlement. And throughout this entire proceeding Mr. Fish and myself have been aware that separate from this proceeding there is government involvement in an elk farm situation, but as I have conveyed to Mr. Fish, the PCA is not a main player in that. Yes, the PCA is aware of what's going on at the elk farm, but they are not involved in the day-to-day decision making and the negotiations that apparently are going -- ongoing with U.S. EPA.
So the agency sees no connection between these two projects and strenuously objects to any insinuation that the agency is somehow involved in this process to enhance or leverage or in any way affect anything that's going on in a totally separate situation.
MR. FISH: Your Honor, I would



characterize that as a classical reply. The correspondence speaks otherwise, Your Honor. They are a major player in this elk farm and counsel has provided no evidence that they're not. Mr. Bailey will be able to testify as to their involvement. The PCA is certainly dealing with a very political situation out there. And for the record, Your Honor, this is a large quantity of land, several thousand acres, that has been fenced with a 96-inch woven wire fence sufficient to hold back virtually any animal that this state has in its natural habitat. And it's legal, it's been established as legal, and the MPCA doesn't like it, the DNR doesn't like it. They're claiming it's changing patterns of wildlife travel, potential disease problems. There are many other political problems. Local landowners issues. This is an issue that is simply not separate, Your Honor. Mr. Bailey has been singled out on this matter. Lake of the Woods County, the MPCA, the Army Corps of Engineers have routinely approached hundreds, if not thousands, of similar projects to this lakeshore project that Mr. Bailey has now been subject to over four years of court action by multiple agencies on, Your Honor, all as a result, we believe, of his decision to build an elk farm.

So a simple brush aside characterization by counsel we think is highly inappropriate and does not characterize this matter.

THE JUDGE: I would like to see what you have to substantiate your allegation the MPCA is involved in the elk farm business.

MR. FISH: I can certainly -- my office is a 130-mile round trip, Your Honor. I can certainly obtain that, but it wouldn't be today.

THE JUDGE: This witness is here today and it's my understanding as you may recall from our phone conversation that this witness has some time problems. Why don't we -- I'm going -- here's what I'm going to say. I'm going to say that the concept of the MPCA participating in some sort of a joint effort to force Mr. Bailey to do something in connection with another project at this point is going to be ruled irrelevant and not appropriate subject of discussion.

If you can convince me after you get your materials that, in fact, it is a legitimate topic to go into in order to make sure your client gets a fair hearing, then we'll go into it, but at this point I'm going to rule no.

Now does this particular witness have anything to



do with that project that you need to ask him about now, because he's not going to be here any longer?

MR. FISH: As far as the elk farm project?

THE JUDGE: Isn't that what you're concerned about? In other words, if I were to rule in your favor on this elk farm motivation theory, what would you ask this witness as opposed to if I ruled against you and said you couldn't ask it?

MR. FISH: Well, Your Honor, as far as the specifics in the elk farm, we have counsel in St. Cloud that are handling that matter. I don't know of any specific involvement on the elk farm, although he may have had it, I'm not aware of it. I'm more focusing on these highly subjective decisions and failures on the part of the Army to do what would be customary and normal in situations such as this that simply have not been done in this case.

THE JUDGE: I think it's legitimate for you to point out that they have not offered any other ideas other than what's in their letter of October 12th, and I think you've already made that point. As far as I can recall what the record is, you've already made that point. And if there are others you want to make, you can do so, but I don't know that he



is an appropriate person to talk about this elk farm business with.

MR. FISH: And I don't know that either, Your Honor, as I indicated.

THE JUDGE: If it's necessary, we can get him back by video or telephone or some other means. If we rule that we're going to get into some broader discussion of the agency's motivation, then we can revisit him at some later time. And I don't think he -- from what I can tell so far, I don't think he's the key man you want to talk to about that.

MR. FISH: With that should I proceed, Your Honor?

THE JUDGE: You should proceed with the understanding that at this time I'm not going to allow you to get into --

MR. FISH: Yeah.

BY MR. FISH:

Q **Mr. Eggers, now you claim that this quarter mile of forest along the lake has high functions as a wetland in the County of Lake of the Woods. Now, first of all, have you made -- in your decision to deny Mr. Bailey as well as the county to keep this road and prevent development on the 14 individual lots, have you can take -- have you taken into**



**consideration substantial erosion on these lots from Lake of the Woods?**

A By natural lakeshore erosion?

Q **Yes.**

A That's just the existing condition, pre-project condition of the -- of those lots.

Q **Exactly. Have you taken into consideration the rate of erosion on these lots by natural forces of Lake of the Woods?**

A No.

Q **Are you aware of the rate of natural erosion by Lake of the Woods on these lake lots?**

A No.

Q **Would it surprise you if you learned to know it was between 10 and 15 feet per year in certain years?**

MR. COOL: Objection, testifying.

MR. FISH: It will be read into the evidence, Your Honor. I'm not making this up.

THE JUDGE: All right, I'm going -- subject to your tying it in later on I'll let you ask now.

MR. EGGERS: And the question was: Am I aware of the number of feet of erosion per year?

BY MR. FISH:

Q Well, my question was if you -- if you in your investigation chose to look into that and found out that it was as high as 10, 15 feet per year in certain years, and doing the math yourself in a number of years these lots will not even exist, will that have an impact on your decision --
MR. COOL: Objection, testifying.
MR. FISH: -- on whether this project and development which may very likely stop erosion would be allowed?
THE JUDGE: Just a moment. I think the question is whether or not you took it into account and you said no, you didn't. Are you aware of the erosion, and I think you said no, you're not, is that correct, you're not aware of the erosion?
MR. EGGERS: I'm not aware of the rate of erosion. But I would point out that erosion is a natural process that's a natural interface between a lake and a wetland. And the Corps of Engineers analyzed artificial manmade importation of fill, digging of ditches, bulldozing. Those are very different, natural process versus man-made alteration.
THE JUDGE: I understand that. Okay, we're going to say he didn't take it into account, he



didn't investigate it, and I'm going to stop it at that point. And if you can show later on through your own testimony, that will obviously discredit his. So I'm going to sustain the objection at this point.
BY MR. FISH:
Q Another aspect that you claim was important in this matter is that it acts as a national filter for the hydrology. In other words, upland water coming toward the lake, if I understand you right?
A Surface water flowing towards the lake, correct.
Q Isn't it true, sir, that this small quarter mile development is abutted by a ditch on the north side as well as a ditch on the south side?
A That's correct.
Q Isn't it also true, sir, that this property owned by Gary Bailey is also abutted by a ditch on the west side?
A Adjacent to the road, the county road?
Q The west side of Mr. Bailey's property.
A That is quite some distance from this particular plat.
Q My question was: Isn't it true that it's abutted on the west side as well?



A There is a ditch on the west side of Mr. Bailey's 52-acre property, yes.
Q Now, if we take a look at this 52-acres being abutted by ditches on three sides and Lake of the Woods on the east, it's virtually surrounded by drainage. Wouldn't that be a fair characterization?
A It doesn't take into account though the filtering ability of the wetlands in between those ditches, which is substantial.
Q And of course the filtering ability of the 14 acres of this plat will be affected but not of the remaining 38 acres, isn't that true?
A I don't think so because we have water flow coming from the west picking up nutrients, sediments outside of just this particular plat.
Q Now -- so what you're saying is this 38 acres would be insufficient to maintain the same hydrology as the 52 acres, or have you done an analysis on that?
A This is one large interconnected wetlands system, so it's difficult to piecemeal and compartmentalize and say this has this function and doesn't have that function.
Q So what you're saying is you don't know what the development of this 14 acres would have as an



impact on the overall picture of the hydrology in the area?
A No, to the contrary, I think the Corps's environmental assessment addresses that.
Q And what exact impact is that, sir, as opposed to leaving -- using only the 38 acres of Mr. Bailey's remaining property to filter groundwater? What would be the difference?
A If you go to the Corps' environmental assessment, I'm looking at hydrology in general as a basis for water quality functions, and given that the unauthorized road fill and ditches are perpendicular to groundwater and surface water flows, those have a substantial adverse impact not only reducing wetland hydrology but also conveying sediments and any nutrients directly to the lake through that ditch system. The ten acres of wetlands on the east side of the unauthorized road fill, because they've been more or less cut off from hydrology moving west towards the lake through now what is a ditch and road is going to be intercepted. So that ten acres of wetlands on the east side of this unauthorized road and ditches is going to become drier, therefore adversely impacting those wetlands.
Q To what extent?

A Over time you'll see a succession to nonwetland plants, no longer serve wetland functions, or at most exist in a degraded state.

**Q You're talking about the ten acres. Your concern was the effect of hydrology to the west. What effect will it have on that hydrology? Have you ever quantified that?**

A Is your question if this 13-acre plat is developed what would be the impacts to the 38 acres west?

**Q Yes, or land beyond that. I'm not certain what hydrology you're referring to, whether it's just that 38 acres or whether you're going on west where the land raises up.**

A I could illustrate that with the National Wetland Inventory Map and the U.S.G.S. Topographic Map that show extensive wetlands to the west much beyond Mr. Bailey's property. And my point is this is one large interconnected wetland system that's tied together with both groundwater and surface water.

**Q My question, once again, to you, sir, is have you ever quantified the effect this would have or have you merely made conclusions that this will adversely affect this larger system?**

A It would affect it in an accumulative sense.



Piecemeal loss of components of this wetland is going to effect the system as a whole.

**Q And could you describe how?**

A It will cut off part of this wetland complex from the lake. It's going to have a conveyance system with the new ditch system to convey sediments and nutrients directly to the lake that don't exist today.

THE JUDGE: When you reach a logical stopping place, we have to vacate the room for a little bit.

MR. FISH: Now is as good of time as any.

(A break was taken at this time.)

THE JUDGE: We're now resuming after a break. And you may proceed, Mr. Fish.

MR. FISH: Thank you, Your Honor.

BY MR. FISH:

**Q Mr. Eggers, now you indicated that this matter was denied with prejudice. Am I right on that?**

A That's correct.

**Q Can you explain to me the legal significance of that or what you understand the significance of it to be?**

A The Corps of Engineers made a final permit



decision of denial of the permit as opposed to denial without prejudice such as when another governmental agency denies a permit, the Corps of Engineers will say we're going to deny without prejudice and -- unless that permit applicant can resolve the matter with the state or local permitting authority.

**Q So what you're testifying to in essence is regardless of what happens with the MPCA, your denial stands?**

A That's correct.

**Q So if Mr. Bailey were to follow through with some of the recommendations of the MPCA regarding sewer and other issues, that would have no impact on the Army Corps' decision to allow no development in that area?**

A There's potential Mr. Bailey could reapply. If he has substantially changed the project or reduced the impacts, the Corps could reevaluate a new permit application.

**Q You'll have to explain to me the difference then, sir, of what -- of the significance of this being denied with prejudice means then?**

A The project as proposed was denied with prejudice. Mr. Bailey as we mentioned owns property, substantial property, to the west. The Corps would



entertain a permit application for development on other properties. This 52 acres to the west the Corps would accept a permit application and evaluate that as to the merits and make a decision that's separate.

**Q Okay. So you're not saying Mr. Bailey can submit another application on this plat, he has to go somewhere else on a different parcel and submit an application, be an entirely different matter?**

A Could be the same parcel, the 52 acres, but a different plat, different layout.

**Q Away from the lakeshore?**

A That's correct. Although a new plan that focused on development to the west, perhaps there's opportunity to have a community access to the lake, we don't know since we didn't get the chance to evaluate any other alternatives for this site.

**Q But as far -- I just want to be clear. I don't want to have any muddling here. As far as the Army Corps is concerned, there will be no development on this plat?**

A No, that's not correct.

**Q Residential development?**

A That's not correct.

**Q I'm even more confused now. What**

**residential development would the Army Corps consider on this plat?**

A The Corps' environmental assessment details that Lot 14 and Lots 1 and 2 could have access other than -- vehicular access other than the unauthorized road so those lots are open to development potentially. Lot 1 is non-wetland so no permit's required from the Corps, that could be developed now. Lots 14 and 2 are in different stages with the Wetland Conservation Act, it's undecided the final resolution for development of those two lots.

**Q So it's the center eleven lots that as far as the Corps is concerned could never be developed for residential purposes?**

A The Corps' not made a permit decision on the lot fills. The Corps' only made a permit decision on Sandy Shores Drive and unauthorized fill associated with it.

**Q All right. Maybe I can -- so in a nutshell, there's been no decision on the residential lots themselves; however it's been ordered that the access to these lots be unconditionally removed?**

A Vehicular access through the Sandy Shores Drive unauthorized fill is to be removed.

**Q All right. So to characterize this**



**properly, if there were to be anything considered by the Corps it would be substantially different than what you would consider a normal extension of Sandy Shores Drive where there's a road 100 -- or 200, 300 feet and then houses every -- every lot every hundred feet? Any proposed development would be substantially different than that, the existing culture out there?**

MR. COOL: Objection, testifying.

THE JUDGE: Testifying. No, I don't think so. I -- you know, I guess -- well, I think you can answer the -- do you understand the question? If you do, I think you can answer it.

MR. EGGERS: Could you restate it?

BY MR. FISH:

**Q Sure. You're aware of the Sandy Shores development abutting this immediately to the north?**

A Correct.

**Q Wouldn't you fairly characterize that as houses on individual lots with a road very similar to what is being proposed by Mr. Bailey?**

A Yes.

**Q Basically identical for all practical purposes?**

A I don't know if those were built in



wetlands, though.

**Q You made no determination of that? You made no determination as to whether the abutting development is in wetlands?**

A You characterize the proposed Sunny Beach as being similar to Sandy Shores development to the north. Sunny Beach is entirely in wetlands. I can't say the same for Sandy Shores development to the north is my statement.

**Q So you don't know whether it's in wetlands?**

A I don't know.

**Q You did no testing up there?**

A Those could very well be authorized, either they're built in uplands or they predated our jurisdiction.

**Q But you don't know that either?**

A Not at this moment without doing review of our records.

**Q All right. Again my general question is there's simply no -- the Army Corps of Engineers simply will not allow this proposed development to be similar to what abuts it to the north?**

MR. COOL: Objection, asked and answered.

MR. FISH: I think that's --

THE JUDGE: No, I don't think so. I think



he can answer -- I don't think it has been asked and answered, no.

MR. EGGERS: I think it's inaccurate to make -- try to make a comparison between the proposed Sunny Beach plat and the already developed plat to the north. To the north could have been upland or predates the Corps of Engineers' jurisdiction and been authorized fill or just predates our jurisdiction. The Sunny Beach plat has tremendous shortcomings with development.

BY MR. FISH:

**Q My question was yes or no, sir. We're not -- I didn't ask you about other hypotheticals. You will not allow a similar plat, isn't that true?**

A My answer is those are two dissimilar plats. I can't answer that yes or no.

**Q How are they dissimilar?**

A Sunny Beach is entirely within wetlands. To the north may or may not have been in wetlands and may have predated the regulations that now apply to Sunny Beach.

**Q What you're stating is you don't know if they're dissimilar, not that they are dissimilar. Isn't that a more accurate statement, sir?**

A Well, certainly dissimilar in one is

developed and one isn't.
**Q Exactly. That was my question, sir. You would not allow the development of this continued characteristic, would you?**
A No, because the Corps has not made permit decisions on the lots themselves. The Corps has only made a permit decision on the access road.
**Q And speaking of this timing, now this project started in 1996, it's now 2003. Do you have any idea when the Corps may make its decision?**
A By project starting in 1996 you're referring to a permit application? What was the start?
**Q My question is: Do you have any idea when the Corps may make its final decision on this matter?**
A Regarding the lots, we have different stages. We have denied without prejudice because of a Wetland Conservation Act Restoration Order on several lots. Other lots have made no application to the Corps. Whether those lots could be filled and developed to some degree is unknown.
**Q You're testifying now that you based in part your decision to remove the road then because these lots would be developed and you felt that they were in Type 7 wetlands and developing them would affect the hydrology and other aspects of the purpose of**



**wetlands. Now at the same time are you telling me you don't know what these lots may be used for, therefore you can't make a decision? They may be fillable? I'm becoming confused once again, sir.**
A The Corps of Engineers has not received permit applications for most of the lots. Therefore, there's been no decision. The Corps cannot prejudge permit decisions. The Corps has analyzed the unauthorized road fill for Sandy Shores Drive and made a final decision on that.
**Q Now, on your on site report you note that there is a surface water of three inches in microdepressions?**
A Uh-huh.
**Q Now, --**
THE JUDGE: I'm sorry, could you -- could you tell us what you're talking about, what exhibit number, page number?
MR. FISH: Page 320, Your Honor, Exhibit 35. I'm sorry, wait a minute, that might be the wrong exhibit. That's page 320 on whichever one it is.
THE JUDGE: I think that's Exhibit 33. All right.
BY MR. FISH:



**Q You indicate on Exhibit 33 that there are three-inch microdepressions?**
A Yes. Well, no, there's ponding of water three inches in depth within microdepressions.
THE JUDGE: I'm sorry, this is on Page 320 or some other page?
MR. FISH: Actually I have it on a couple of different pages, Your Honor. I might -- there might be a difference.
THE JUDGE: I think it may be 321 and there's talk about microdepressions.
MR. FISH: I'm sorry, yeah.
THE JUDGE: Okay, 321.
BY MR. FISH:
**Q Page 321 you indicate that there's up to 3.5 inches actually in that page of water in microdepressions. Wouldn't you agree with me, sir, this was solely caused by the two inches of rain the night before?**
A No, it's also due to seasonal high water table.
**Q And did you make any -- did you do some type of a scientific determination of this and test the water and any mineral content or is this just a guess?**



A The microdepressions themselves are evidence of this type of ponding over a long period of time. The standing water on that day could have been due in part to the two-inch rainfall, but that topography in association with the soils and vegetation of that site indicate long-term wetland hydrology, that this is a common occurrence.
**Q Did you ever view this site other than two days after a two-inch rainfall?**
A I have visited the site in 2001. It was not after a major rainfall, to my knowledge.
**Q Did you do any similar testing?**
A No.
**Q So the only testing was done within the two days of a two-inch rain fall?**
A That I did, correct.
**Q I think you already testified you did no -- no testing on the developed lots abutting this project to the north?**
A I personally did not, but the Corps has records of past permit decisions and I cannot answer today if, in fact, the Corps reviewed other developments to the north where permit decisions were made.
**Q Now, have you done any other onsite**

delineations in Lake of the Woods County?
A I have not.
Q Have you done any other enforcement actions against landowners in Lake of the Woods County?
A Yes.
Q Have you done any enforcement actions against Lake of the Woods County?
A We're working with the County Highway Department on another part of Sandy Shores Drive to the north, on their violation.
Q All right. And this would be the -- the continuation of Mr. Bailey's road, is that correct?
A It's Sandy Shores Drive to the north.
Q In fact, that was under water recently due to some flooding, is that your understanding?
A I don't know.
Q One of your criteria, I think you had testified to, was the saturation with recurring frequency. Can you explain what you meant by that?
A Okay. For wetland hydrology saturation must meet a certain frequency and duration to meet wetland hydrology criteria, and that criteria is 5 percent of the growing season in most years saturation to the surface is a criterion for wetland hydrology.



Q And do you have evidence of the level of saturation on this project other than your single visit?
A I personally do not, but others have visited the site on other occasions.
Q Sufficient to -- are you testifying that there has been tests on other occasions to determine saturation levels?
A I don't know. I'm speaking of roadside visits, observation of water flow in ditches, in the ditches.
Q So there's some water in the ditches, but you don't know the soil saturation level in these lots, do you?
A I don't know if others looked at soil saturation.
Q So you don't have what you would classify under your own criteria as recurring saturation, would you?
A The methodology for wetland hydrology is the indicators that I went through, the field indicators, and those are means to determine whether saturation occurs at a frequency and duration sufficient to meet wetland hydrology. So meeting a field indicator is sufficient.



Q All right. So I understand you saw some indicators but you have no personal knowledge of the level of saturation as far as recurring?
A I observed the saturation documented on the data sheets.
Q All right. Is your answer yes or no to that, sir?
A Repeat the question.
Q You have no personal knowledge of recurring, visualized saturation of the soil, do you?
A I do in fact. I did observe saturation of these soils.
Q On how many occasions, sir?
A During the two-day site visit documented on the data sheets.
Q So for two days out of the 365 days you did observe saturation. Other than those two days, do you have any other personal observations of recurring saturation?
A I do not have direct observations.
Q I don't know if I asked you this. You did testify that another one of your main concerns for this -- removing these ditches was the fact that pesticides would enter the lake?
A Associated with residential development,



yes.
Q Okay. I don't know if I heard that before. You're saying pesticides associated with possible development of these lots?
A That's correct.
Q Now, as I understand it, there's nothing that would prevent these lot owners from clearing these lots, is there, as far as your jurisdiction?
A Section 404 jurisdiction does not pertain to simply cutting vegetation, that's correct.
Q So someone could go in there and turn these all into a mowed lawn and do pesticides regardless of whether there's ditches there, is that true?
A They could as long as they're strictly cutting the vegetation, not importing fill, not bulldozing, not moving fill.
Q So the concern over, I guess, pesticides that may come in these residential lots would very likely happen regardless of this ditch, wouldn't it?
A Apparently I don't know if there is any use of pesticides, it's just a -- in its natural state. The pesticide would be associated with the development of lots.
Q And have you made a determination of what effect it would have on your findings if all

**vegetation were removed from these lots?**
A It would degrade the wetland but would not eliminate all those important functions.
MR. FISH: Thank you, that's all the questions I have.
THE JUDGE: All right. Do you have anything more, Mr. Cool?
MR. COOL: Yes, I do, Your Honor.

REDIRECT EXAMINATION

BY MR. COOL:
**Q Mr. Eggers, in Mr. Fish's examination you were discussing wetland complexes, and you've previously indicated that you've looked at National Wetland Inventory Maps. Do you recall that testimony?**
A Yes.
**Q Handing you what has been marked as Exhibit 3, now this is an exhibit that has been entered by the MPCA. Do you know whether your review of NWI maps is of a map exactly like this or an updated version or what is, to the extent you can, your recollection of what versions of NWI maps you may have looked at?**
A If not the identical map it's very similar. I'm not sure about the Draft here.



**Q Okay. Would it help the Court in using this map to explain the complex that you were talking about?**
A Yes.
**Q If I were to hold this up so that you could point, what is the complex that you were talking about earlier? Maybe you should begin by pointing out the Bailey location.**
A Bailey site is here (indicating).
**Q And you're referring to Section 21, correct?**
A Correct. This also has elevations on it, the U.S.G.S. Topographic Map, and as you can see, we start at a higher elevation to the west and extensive wetlands radiating out from this higher elevation and wetlands including sloping wetlands. What that indicates, we have groundwater flow from higher elevation down the sloping wetlands out to this flat ancient lake plain through the project site and then to the lake.
**Q Could you just describe the directions you've just talked about?**
A From west to east generally.
**Q Okay.**
A So it's one interconnected hydrologic system, a flow-through system all interconnected by



groundwater and then hydrologically connected to the lake.
MR. COOL: I don't have any further questions, Your Honor.
THE JUDGE: Mr. Fish, did you have anything further?

RECROSS-EXAMINATION

BY MR. FISH:
**Q Mr. Eggers, now did you inspect the cross sectioning of the ditches and roads between this higher elevation substantially to the west and the 500-foot stretch of land along the lakeshore?**
MR. COOL: Objection, Your Honor, it seems to go beyond the rebuttal.
THE JUDGE: No, I think it's -- I think it's legitimate. He's talking about the flow and if you're going to talk about the flow it's legitimate to talk about the ditches and things. It's legitimate.
MR. EGGERS: I observed ditches from the north/south county road that's the west border of Mr. Bailey's property. I observed wetlands on both sides of the road.
BY MR. FISH:
**Q Wouldn't you agree that these are**



**substantial ditches that I guess separate this higher elevation that you're referring to from Mr. Bailey's property?**
A I don't know what substantial entails. I mean one-foot ditch, four-foot ditch?
**Q How deep were these ditches, sir?**
A I don't recall, I didn't measure them, but with such a vast hydrologic system scattered ditches are relatively ineffective other than a narrow zone along each ditch.
**Q Now you're saying scattered ditches. Isn't it true that this north/south ditch goes on continuously for several miles totally bisecting this area?**
A But to impact wetland hydrology in such a vast wetland network of wetland needs a pattern of ditches closely spaced to result in significant reduction in wetland hydrology. Widely spaced ditches no matter how long have less effect, usually a corridor along each ditch that's relatively narrow.
**Q So if you take that to its next logical conclusion, the shallow two-foot ditch of a minimum -- of only a quarter mile that Mr. Bailey is proposing would have only a minimal effect on the hydrology, isn't that true, according to your**

**analysis here?**
A The Corps' environmental assessment we're talking about the two ditches on Sunny Beach plat –
**Q Yes.**
A – along the unauthorized road? The Corps using our environmental assessment determined that was not going to be insignificant, it's actually a substantial effect in draining wetlands within the plat.
**Q You qualified that within that plat?**
A Within – well, the road ditches along the unauthorized portion of Sunny Beach Road had about a 5-acre draw-down, 4.96 to be exact is the calculation.
**Q I think you testified these ditches were in existence when you did your testing, isn't that right?**
A The new ditches along the unauthorized portion of the road were in place during the August 2000 fieldwork that I conducted, yes.
**Q And despite that you had standing water and 100 percent saturation in the developed lots, isn't that true?**
A Yes.
**Q No noticeable draw-down?**



A Again we can factor in the two-inch rain. And what we're interested in is long-term conditions, not the conditions after a heavy rain, not conditions that are unusual, but over the long term those ditches would effectively drain 4.96 acres of wetlands, approximately.
**Q So now you're testifying that this 4.96 acres was not drained at the time you did this testing, this was an estimate or a projection.**
A The 4.96 acres is an estimate. And what the ditches will do, they may not drain after two-inch rain sufficiently to eliminate that observation of saturation the next day, but what it's going to do is eliminate natural wetland hydrology, that long-term saturation necessary to support these wetlands.
**Q And as far as long term, I believr these ditches had been in place slightly over two years at the time of your involvement?**
A That's correct.
**Q And there was no noticeable draw-down at that time, was there?**
A Again we're placing too much emphasis on the two-inch rain and observations that may be from that. Over the two-year period the ditches had an effect. It's very likely they have effectively eliminated



wetland hydrology within that approximate 4.96 acres.
**Q Yet you can cite to no elimination, can you?**
A The wetland delineation methodology is going to look at long term and those ditches likely – I'll rephrase that. Those ditches do have an adverse impact and can eliminate wetland hydrology. If we had come back after the two-inch rain in four or five days those ditches very well could have drawn that site down and eliminated wetland hydrology.
**Q You don't know that though, do you?**
A I did not visit after the second day of our fieldwork.
**Q So that 4.96 acre number is entirely speculative?**
A It's a standard technique for calculating drainage effect.
**Q And that technique is speculative?**
A No, it's a systematic – it's a – it's a calculation that's accepted for wetland delineation purposes.
MR. FISH: I have no further questions.
THE JUDGE: I had a couple of things. I know that you testified early on that you didn't know the exact number of borings that you took. Do you have a rough idea of how many borings you took?



MR. EGGERS: Yes, Your Honor. 17 formal borings. By that I mean a full data sheet soil profile description, and then at least two shovel pits that we noted in remarks of the data sheet under the soil section, and that would be transect 2 and transact 3 had two shovel pits that were closer to the lake, again testing that theory of 100 feet of upland nearest the lake.
THE JUDGE: Are those shovel pits something you did yourselves?
MR. EGGERS: Mr. Heschke and I did that. It was probably he – he as a soil scientist was doing the soil, actual soil sampling with the shovel.
THE JUDGE: Okay, thank you. Then there was some talk about what I thought I heard as a soil pit. I don't know what a soil pit is. It may have been shovel pit. I may have misheard it?
MR. EGGERS: Could be one and the same, Your Honor, depending on what tool we use. Under the hydrology section for – on each data sheet the phrase used is depth of free water in pit, and that simply could be a soil boring with a shovel or with an auger or with different kinds of soil probes. It's not necessarily a shovel pit.
THE JUDGE: Thank you, that was all the

questions I had. Does that engender any questions from either of you?

MR. FISH: Yes, Your Honor.

THE JUDGE: Mr. Fish?

RECROSS-EXAMINATION

BY MR. FISH:

**Q Mr. Eggers, none of these soil borings were done on the road, were they?**

A No.

**Q None of the soil borings were done to the west of the road, were they?**

A That's correct.

**Q They were all done on entirely privately owned lots not owned by Mr. Bailey, except for the end lot, of course, the one that does not have wetlands, isn't that true?**

A That's correct.

MR. FISH: I have no further questions.

THE JUDGE: Anything further for the witness?

MR. COOL: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. COOL:

**Q I want to understand. Is there any reason you would do soil borings directly on the road**



**itself?**

A We wouldn't have the proper equipment. We would have needed a heavy duty auger. We, the Corps, not myself personally, but Mr. Jeffrey Koschak walked the road alignment during construction and confirmed hydric soils and observed the wetland vegetation of black ash trees and others that were bulldozed along that alignment, so we had evidence that the road construction, that road alignment itself was in wetlands. In fact, we advised Mr. Bailey to cease work because he had work in wetlands with mechanized land clearing without a permit.

**Q And you observed the wetland area to the west of the roads, is that correct?**

A That's correct.

**Q And that had -- what were your findings with regard to that reconnaissance?**

A It's the same hardwood plant community, the same hummocky water-filled depressions, same soils, same topography. It's one contiguous wetland complex that the road bisected.

MR. COOL: I have no further questions.

THE JUDGE: Okay. Is there anything further for the witness?

RECROSS-EXAMINATION



BY MR. FISH:

**Q This claimed cease and desist order or request to stop, was this something in writing?**

A No, it was verbal, to my understanding, from the Corps.

**Q And were you aware the county continued work on that road after that?**

A Again I'm not familiar with what the county may or may not have done as specifics.

**Q And was there ever any written order to cease and desist prior to your wetland delineation nearly two years later?**

A From the Corps?

**Q Yes.**

A I don't know.

**Q So as far as you know, the Corps allowed this matter to go on for two years, lots to be sold off and the county to take over the road without any --**

THE JUDGE: Okay, all right, sir. Sir, I have to intervene. There is no jury here. You just get the facts that you need without all the --

MR. FISH: These are facts.

THE JUDGE: You can put it in your brief. He said he's not aware. I think it's fair to say



that you're not aware of any written cease and desist orders being issued prior to the delineation, is that a fair statement?

MR. EGGERS: Correct. Instead the Corps accepted a permit application and process, an After-the-Fact Permit.

MR. FISH: That's all the questions I have, Your Honor.

THE JUDGE: All right. Thank you very much. I would note for the record it's now about 11:30. Why don't we go off the record and talk scheduling.

(An off-the-record discussion was held.)

THE JUDGE: We're going to go forward with the next witness.

MR. COOL: I would call Mr. Koschak, Jeff Koschak.

THE JUDGE: Raise your right hand, please.

JEFFREY KOSCHAK,

after having been duly sworn, testified as follows:

DIRECT EXAMINATION

THE JUDGE: Be seated.

BY MR. COOL:

**Q Mr. Koschak, would you give your full name**

**and spell your last name for the record?**

A My full name is Jeffrey, J-E-F-F-R-E-Y, Alan, A-L-A-N, Koschak, K-O-S-C-H-A-K.

**Q And by whom are you employed?**

A U.S. Army Corps of Engineers, St. Paul District.

**Q And in what capacity?**

A Biologist and act as the project manager for various projects and applications in an eight county area in Minnesota.

THE JUDGE: Mr. Koschak, you tend to speak quite fast.

MR. KOSCHAI I'll slow down, Your Honor.

THE JUDGE: Please intentionally slow down.

MR. KOSCHAK: Okay.

BY MR. COOL:

**Q And how long have you been with the Corps?**

A Nineteen years, 17 years with St. Paul District.

**Q And prior to the Corps, did you work with anyone else?**

A U.S. Fish and Wildlife Service and the USDA for a short time.

**Q In your capacity, current capacity, what are**



**your typical responsibilities and duties?**

A I evaluate applications that come in for various projects in an eight county area in northwest Minnesota, and I have signature authority for certain permits, and I decide if those permits could be issued or not.

THE JUDGE: Okay, slow down. You have what kind of authority?

MR. KOSCHAK: I have signature authority --

THE JUGE: Signature authority.

MR. KOSCHAK: -- for certain permits.

THE JUDGE: Okay, thank you.

BY MR. COOL:

**Q And do those evaluations include permit applications for Section 404 permits?**

A Section 404, Clean Water Act and Section 10 Rivers and Harbors Act.

**Q Could you briefly go through your post high school education?**

A I graduated with a bachelor of science degree in wildlife biology from the University of Wisconsin Steven's Point in 1982. And took one post graduate course in oceanography.

**Q Have you taken any wetland training courses?**



A Yes. I've taken all of the wetland -- formal wetland courses the Corps offers, several or at least four different delineation courses the Corps offers.

**Q And are you a wetland delineator by training?**

A I perform wetland delineations, yes.

**Q Do you have any licenses or certifications?**

A I'm a certified professional wetland scientist by the Society of Wetland Scientists and a professional wildlife biologist by the Wildlife Society.

THE JUDGE: Excuse me just a moment, let me ask the court reporter. Can you hear him okay? All right, fine. She's what matters.

BY MR. COOL:

**Q You've heard the testimony regarding the wetland delineation that was performed at the Sunny Beach plat, is that correct?**

A I've heard it.

**Q Were you on site during that period of time of the wetland delineation?**

A Yes, I was with Steve Eggers and Rod Heschke from the USDA.

**Q And what role were you playing on those**



**particular days?**

A Well, I was the initial project manager on this project and so I was sort of facilitator for the delineation. I set up the logistics, stuff like that. I did do a measuring of the lot fills that were out there and observed the ditch depths and those kinds of things.

**Q And so you actually walked the plat sites, is that correct?**

A Yeah.

**Q And you made various measurements?**

A Yeah.

**Q And could you describe how you made those measurements?**

A Well, the measurements I mainly took were of the lot fill areas and we have what's called a measuring wheel, so we just roll the measuring wheel and it gives us the distance in feet and I did that.

**Q And did you -- were you assisted by anyone in this effort?**

(Reporter interruption.)

A Les Lemm from SWCD assisted me on that.

**Q Mr. Koschak, I'm handing you what has been marked as Exhibit 15.**

A Okay.

Q Do you recognize that document?
A Yes. I recognize my writing on the cover sheet. My message to Larry Zdon of PCA. You want me to go page by page?
Q Yeah, if you could just briefly describe the document.
A Like I said, the first page is a cover sheet that I wrote to Larry Zdon and Lisa Kraemer at PCA, just a note what this was. The second page is a page of the plat with -- the plat itself has the lots and the lot fills where I show the rough dimensions of the -- of the lot fills that are out there. Some of this writing is mine, but not all of it. The notes on the left-hand side where it's Type 6/7 wetland and the question down below about the septic systems is my writing. The very bottom is my writing, too. The lot fills themselves I think were done by Les Lemm, as far as I can tell. That's that page.
The next page which is Lot Developments at Sunny Beach, I wrote the title. The top half for Lots 11 through 14, those were done by Les Lemm. And I wrote down below from Lots 2 through 10. I wrote the bottom note there, too, and I signed it.
MR. FISH: Your Honor, can I object? Which exhibit are we looking at?



THE JUDGE: We're on Exhibit 15, which looks like this. And we were on the third substantive page that begins with the title Lot Developments at Sunny Beach.
MR. KOSCHAK: The end of this is just our Corps Public Notice that was issued back on June 24, 1999. And I didn't draft the Public Notice but my boss, Julett Denton --
(Reporter interruption.)
MR. KOSCHAK: My boss, Julett Denton, is the one that signed the Public Notice, but I drafted it. And that's all there is to the -- the rest of it.
BY MR. COOL:
Q In addition to making these measurements and entries, did you perform any other tasks during the wetland delineation process?
A I was with Steve Eggers and Rod Heschke during the time and I observed some of the same things Mr. Eggers just testified to as far as the saturation, inundation, site inundation, micropockets and stuff like that, so I saw some of those things.
Q And you had been on the site previously, is that correct?
A Several times.



Q Are the observations that you made during the delineation consistent with what you had seen in the past regarding wetland criteria?
A I would say so. I've been at the site, it's hard for me to tell you an exact number, but probably four or five times I recall, I think it's in the record, and dating back over the last ten years before -- some of it was before the work was done out there, and I observed before -- before the work was done that there were saturated soils out there and there was some water and some microdepressions that Mr. Eggers described. That's all before the work was done. I know one time was in 1994 when Mr. Seally (phonetic), a developer in the Brainerd area, was with us at that time. That's in the record.
Q In regard to evaluations that are done on delineations and in particular the effect of ditches, do you folks at the Corps rely on other specialists or scientists or other entities for input?
A Yeah, quite alot -- yes, quite often.
Q Who do you typically rely on?
A When it comes to ditching and trying to determine what's called lateral effect, we typically do rely upon the USDA because they have the expertise. They, for example, have written what's



called The Minnesota Drainage Guide for the state and so they're recognized experts for hydrology and also for determinations, so we do turn to them for those kind of determinations.
Q You mentioned USDA. You mean by that United States Department of Agriculture?
A Yes.
Q And a particular unit or subunit of the department?
A Well, in the northwestern area it's typically Rod Heschke, who again I was on site with in 2000. He's with the NRCS, Natural Resources Conservation Service.
Q Had you worked with Mr. Heschke previous to this --
A Yeah.
Q -- project?
A Yes.
Q And you relied on his input, is that correct?
A Yes.
(Exhibit No. 40 was marked.)
BY MR. COOL:
Q Handing you what has been marked as Exhibit 40, do you recognize that document?