A Yes, I do.

**Q And what is it?**

A This is a fax from Rod Heschke to myself regarding the expected wetland effects down at the site based on --

(Reporter interruption.)

A Ditch depths that are out there.

**Q And what is the date that you have received or is on this particular fax?**

A Looks like September 15, 2000.

**Q Now, when you were provided with this information, how did you use this information?**

A We need to determine what -- what's called the lateral effect was for the ditches that were out there, the unauthorized ditches, so I relied upon this information to determine that.

**Q Which ditches did you folks make lateral effect determinations on?**

A Both the ditches that were next to the unauthorized road fill and also the south ditch, the one going south across the property.

**Q And you used this information to do that, is that correct?**

A Yes.

**Q Now in regard to the new ditches along the road itself, what calculations or determinations did you do with this information?**



A Well, as I recall, I think we used the one and a half foot depth for the road ditches along the unauthorized road because that's what I observed before and so we took one and a half foot. Unfortunately one and a half foot wasn't on this, we had a two foot depth, and for that the USDA or Rod Heschke told us to use the Skaggs value, which was 105. So as I recall what I did is I took 75 percent of 105 to get the 79 feet, whatever it was, that was in the record that we determined out there.

**Q Is that what you used to make your calculations?**

A Yeah, took 75 percent of the 105, as I recall.

**Q Now, in dealing with the ditch on the south end, what do you recall about your calculation there?**

A I think that was two and a half feet, as I recall, so we took the difference between 105 and 140 because the ditch depths were two feet and three feet given to us, so I split the difference. I think that's how we come up with the 123 feet for the south edge.

**Q Is this extrapolation process that you've used typical for what you do when --**



A That's the way we have to do it because I don't think the USDA in their -- the form that they use, they can't put in half foot depths, I don't think, so they typically give us in full for measurements so we have to extrapolate from there.

**Q And in regard to the ditch effects, you conveyed this information to the PCA, correct?**

A Yeah, we did.

**Q Is that routinely something you do in terms of sharing information with the PCA?**

A Well, when a project before us is a Section 401 water quality certification as this did, yes, we normally share all the information we can so each agency knows what's available out there and what's going on.

MR. COOL: I move the admission of Exhibit 40.

MR. FISH: No objections.

THE JUDGE: 40 will be received.

MR. COOL: I have no further questions, Your Honor.

THE JUDGE: All right. Do you have any questions?

CROSS-EXAMINATION



BY MR. FISH:

**Q When was your initial visit to the site once preparation began?**

A The first site visit I recall was back in 1998 with Mr. Bailey and some others.

**Q You were with Mr. Bailey?**

A Yeah, I recall Mr. Bailey was there and who else was there would be Walter Leu, who testified yesterday, Doug Easthouse with SWCD, I think he's here, and I believe the previous district conservationist for the USDA was there, too, but I can't remember her name.

**Q At that time did you advise Mr. Bailey or Walter Leu to do no more work on that road?**

A I informed Mr. Bailey that no further work should be done since in my view the work that was already done was a violation of Section 404 and no further work should be done until this matter is cleared up.

**Q That was in 1998?**

A That was in 1998, yeah.

**Q When did you finally do the wetland delineation?**

A Well, again, normally during our process what we do is a reconnaissance like Mr. Egger

explained. You know, we do wetland delineations but they're more involved in stuff like that. I've taken soil borings I think in 1994 just to confirm that there was wetlands out there. We typically don't do a full what's called comprehensive wetland delineation that we did in 2000, so that's -- that takes a lot of time and effort and stuff like that. So what we normally do is just general reconnaissance survey of the area and I did that back in 1994, whatever the record shows. I can't remember the exact dates of those previous site visits, but I determined before there was wetlands out there.

THE JUDGE: Okay, okay, okay. I think it's best if you just answer the narrow questions that are asked. He asked when did you do the wetland delineation? I think the answer is did you say was 2000?

MR. KOSCHAK: A full comprehensive delineation was 2000, but I did previous reconnaissance determinations, delineations, before that. They were just reconnaissance, they weren't formal delineations.

THE JUDGE: I think he was asking about the full one.

BY MR. FISH:



Q **Do you know why it took two years with known development going on there for the Army Corps to do the delineation in 2000?**

A Well, like I said, we normally would only do the general reconnaissance delineations. That's all we normally do to ascertain that we have jurisdiction out there. Those were done before. The reason we did the full comprehensive is because we were looking at considering the denial of the permit out there, so that's why we had to make sure and do a comprehensive.

Q **Why were you looking at denying the permit?**

A Well, for the reasons Mr. Eggers explained there. So it's -- I should add here, Your Honor, we're getting into issues and I don't know if I've been authorized to answer all these questions, but I have a letter I can share with you, if I could, from my counsel.

THE JUDGE: If it's about that, yes, I'd like to see it.

MR. KOSCHAK: Should I get down and get the letter from my counsel?

THE JUDGE: Yes, we should all see this.

MR. KOSCHAK: I have four copies.

THE JUDGE: For the record, let me



indicate I've been handed a letter dated July 22, 2003 directed to Mr. Fish from Steven P. Adamski, that's A-D-A-M-S-K-I, the acting district counsel for the Department of the Army Corps of Engineers. And a copy of this was given to Jeff Koschak, the witness. Now let me read the letter, please. I've read the letter.

MR. KOSCHAK: Can I add something, Your Honor? Despite the letter, I've talked to our counsel, Steve Adamski, he has authorized me to answer fact questions about the case that Mr. Fish may have, but I cannot go into hypotheticals. I'm not an expert witness either, but I can answer factual questions I know about the case.

THE JUDGE: I don't think we're in a problem area yet. I think that the question asked was do you know why it took two years and I think you were in the process of answering that.

MR. KOSCHAK: Yeah. Well, like I mentioned, we did -- we determined to do a final formal comprehensive delineation when it was determined that -- actually several reasons. First of all, my supervisor decided to change the case from a project manager, from myself to Mr. Eggers. Mr. Eggers had not seen the site, so we went up there to



get the site looked at thoroughly for that reason. And again, that's -- I think at that time, too, it was being looked at already that a favorable decision was not going to be found on the case out there, but we wanted to ascertain and make sure about the full scope of the site out there. But again I had done previous reconnaissance delineations to confirm that there was wetlands already out there, which that's what I based my Public Notice on.

BY MR. FISH:

Q **That leads me to my question. It was anticipated that you'd be denying this application, but you wanted to do a wetland delineation first.** Is that a fair characterization?

MR. COOL: Objection, calls for a conjecture.

MR. FISH: I think he testified he anticipated denying it.

THE JUDGE: No, I think it's a fair question. If you know. I don't know, maybe you don't know.

MR. KOSCHAK: I can't recall, I guess, I mean exactly when it was looked at to be an unfavorable decision out there. During that time though, like I said, when the case was being

transferred from myself over to Steve Eggers.
BY MR. FISH:
**Q Now, you indicated that you gave some type of verbal order to the parties present in 1998 to stop activity. Did you at any time after that prior to the wetland delineation and the ultimate Restoration Order send notice to the county to cease and desist activities of fill or excavation onsite?**
A Not so much the county, but Mr. Bailey. I recall once I got the application, the fact application, I sent a letter, which I had the signature authority for, asking for more detailed information on the project and I recall in that letter we informed Mr. Bailey to do no further work at the site.
**Q Were you aware of the county's ownership at these stages?**
MR. COOL: Objection, Your Honor. It seems to me this is going beyond the scope of direct. And in accordance with discussion that we had yesterday, it was my understanding the Court was at least seriously considering my objections for going beyond the direct because of the issues.
MR. FISH: I think we resolved those issues with Mr. Adamski's letter, Your Honor. No



hypotheticals. I think he's spoken for himself.
THE JUDGE: Well, it seems to me that had I not been aware of Mr. Adamski's telephone conversation with the witness, I would have done the procedure that we talked about yesterday. I think it still may be cleaner -- just in case there's some problem down the road, I think it may be cleaner if we restrict at this point his cross-examination to matters covered on direct so we still have Mr. Cool's objection at this point. Then immediately when we're done with that I will allow you to call him as your witness pursuant to your subpoena and you can ask the questions you want to go beyond the cross.
MR. FISH: With that, I guess, difference that we're treating this witness for reasons I don't know now, I would like some type of representation or assurance that this witness will remain until I'm able to call him and that he doesn't disappear under some federal preemption.
THE JUDGE: It was my understanding from your representations about the telephone conversation that you were willing to answer questions from Mr. Fish.
MR. KOSCHAK: For factual, and I'd like to get all my testimony done today, if I could.



THE JUDGE: No, I understand. We'll take him out of order, we'll take him now, immediately, was my plan.
MR. FISH: Based on that, Your Honor, I will wait for my additional questions until Mr. Cool is done with redirect.
THE JUDGE: That's correct. Did you have any redirect, Mr. Cool?
MR. COOL: I have none, Your Honor, thank you.
THE JUDGE: All right. You just stay there for a moment. And we're now done with the portion of your testimony relating to Mr. Cool's questions. We're now going to have you answer questions from Mr. Fish as his witness pursuant to the subpoena. And the letter from Mr. Adamski and your representations about the telephone conversation are understood. Okay, Mr. Fish, you may proceed.
MR. FISH: Thank you, Your Honor.
(Exhibit Nos. 41 through 44 were marked.)
DIRECT EXAMINATION
BY MR. FISH:
**Q Mr. Koschak, I'm showing you what's been marked as Exhibit 41. It's titled Notice of Wetland Conservation Act Decision. Is this a document you**



**recognize?**
A Yes, I seem to recall it.
**Q In fact, your name is being listed on there as --**
A Yep, I'm copied.
**Q -- a copy. Did you receive a copy of that near the time it was dated, 6/17 of 1999?**
A Best I recall. Long time ago, but . . .
MR. FISH: I move for the admission of Exhibit 41, Your Honor.
THE JUDGE: Is there any objection to what's been marked as 41?
MR. COOL: No objection.
THE JUDGE: It will be received.
BY MR. FISH:
**Q Showing you what's been marked as Exhibit 42, do you recognize this document?**
A This is an e-mail from myself to my boss, Julett Denton, and Steve Eggers and someone else in our office, actually an e-mail train. Yeah, I suppose -- yeah, it looks familiar. I wrote some of these.
**Q These were documents you either e-mailed or received, is that right?**
A It looks like they're all e-mailed

documents, but yeah, I either sent them or received them.

**Q And they relate to the Bailey project, the Sunny Shores (sic) project?**

A Appears to be, yes.

MR. FISH: I move for the admission of Exhibit No. 42, Your Honor.

THE JUDGE: Is there any objection to 42?

MR. COOL: Could I inquire of counsel? I've got a five-page document --

MR. FISH: It repeats itself. It's the same way I received it.

MR. COOL: With regard to Pages 3, 4 and 5, these seem to be different e-mails. Is there an assertion that these are all part of the same e-mail train?

MR. FISH: I'm not making any assertion. I recopied them as I received them from the Corps of Engineers. So if they have different dates and are a different train, I can't make any determinations.

MR. COOL: Is there any specific e-mail you want in --

MR. FISH: All of them.

MR. COOL: -- versus this entire -- I have no objection.



THE JUDGE: All right, 42 will be received.

BY MR. FISH:

**Q Showing you what's marked as Exhibit 43, I'd likewise ask if you can identify that document?**

A I believe it looks like another e-mail train between myself or -- to other Corps staff or else being received.

MR. FISH: I move for the admission of Exhibit No. 43.

MR. COOL: Is this beginning with the May 26, 2000?

MR. FISH: I think I handed them to you in the order that they were marked as exhibits, so it should be.

MR. KOSCHAK: Yeah.

THE JUDGE: All right. Is there any objection to what's been marked as Exhibit 43?

MR. COOL: No objection.

THE JUDGE: It will be received.

BY MR. FISH:

**Q And lastly, Exhibit No. 44, this starts out with an e-mail dated September 18th of 2000. Do you recognize that?**

A Yes, another e-mail train between myself,



going to Les Lemm at SWCD and back from Les to -- so between me and Les Lemm.

MR. COOL: I have no objection, Your Honor.

MR. FISH: I would move for its admission.

THE JUDGE: All right, Exhibit 44 is received.

BY MR. FISH:

**Q Now, I'll refer you, first of all, to Exhibit 41. This is a Notice of Wetland Conservation Act Decision. You would acknowledge the local government unit had accepted the replacement plan application at that time?**

A The best I recall, but I would have to check our file to make sure that's the date or close to the date we received it. Without our file and our date stamp I don't know for sure.

**Q You don't have anything, I guess, disputing the validity of this document?**

A I just note that there have been times and it may be even on this case where we didn't receive some of this --

(Reporter interruption.)

A Sorry. I would just note that, as I recall, there were certain documents we didn't receive in



this case until much later than what the date was on the documents. I recall that, but which ones they were and when they were received, I'd have to look at our actual Corps file which I have down in St. Paul.

**Q And as far as your e-mail Exhibit No. 42 dated May 18th of 2001, were -- basically is everything that you would have written in there, first of all, your words are true and correct?**

A I presume so. I haven't read all this, but it looks familiar.

**Q All right. Now, you state in your e-mail that this might be the best chance of our recommended alternative, the Nature Conservancy to buy the site and add it to Zippel Bay State Park. Can you tell the Court what -- what you meant by that?**

A Are you in the first paragraph?

**Q Yes, last sentence of the first paragraph.**

A As I recall, during my role or as initial project manager on the case I wrote up or assisted writing up our environmental assessment and part of the assessment what we needed to do is address alternatives, and one of the alternatives, feasible alternative we thought was -- again feasible and practical was perhaps to have Mr. Bailey sell the property so it goes to a state park. That way Mr.

Bailey gets money for the property out there and he can do something with the land. At least it's money for the land. And my note about that was only that that may be again an option would be -- if it were denied, that the Nature Conservancy might be able to buy the property out there. They have bought other property in the area or from the area that Corps violations out there, so it wouldn't be the first time.

**Q This was written in the context of supporting the EPA to send out Restoration Orders and Violation Orders, isn't that true?**

A Not EPA, probably -- probably LGU.

**Q So -- so you're using the enforcement actions in an attempt to persuade Mr. Bailey to sell the property to the Zippel Bay State Park or Nature Conservancy?**

MR. COOL: Objection, argumentative.

THE JUDGE: I think you can ask him whether one of his motivations was -- well, just a moment, let me think for a moment. No, you can't. He's a government official and there's a problem with motivation of government officials. I think you better let the document speak for itself. Better let the document speak for itself.



BY MR. FISH:

**Q Finally on Paragraph 3 of that same e-mail, the last sentence you state that, I believe that it's finally the best answer since you should all remember that EPA is already dealing with Bailey on his miles of road/ditching he's doing at his homestead in the county. Now what EPA project were you referring to there?**

A I think that would be the -- what you referred to as the elk farm before.

**Q So you were working in conjunction with the EPA on the elk farm issue, is that what was going on?**

A I wasn't. My partner back in the Brainerd office, Leo Grabowski, is handling the elk farm violations Mr. Bailey has out there.

**Q So you're fully aware of them, though.**

A I'm aware of it.

**Q You had conversations with the Army Corps officials working on that matter?**

A I talked with Bob Whiting handling that every day, I see him every day.

**Q And you, in fact, coordinated your efforts on those two projects?**

A I wouldn't go that far. We're separate project managers and we do our separate actions as



far as that goes, but if we know something about one particular project, we'll share that information.

**Q Finally on the second paragraph, you were -- you were receiving an e-mail from a Julett Denton. Now who is he?**

A She is my direct supervisor. She's our section chief for outstate Minnesota.

**Q And in that e-mail she states, I believe that Steve E., I assume that's Steve Eggers, agreed that if the road is removed and no additional fill is placed the wetland would eventually reclaim itself. Is that a fair characterization of the Corps' opinion at that time, as far as you're aware?**

A As far as I recall, yeah, as far as I see it here.

**Q Now in fact, you were coordinating with the EPA, as well as the DNR to determine who would be issuing what types of violations or restoration orders on this project, isn't that true?**

A As we normally do, yes. We always do that.

**Q So as a -- as I guess a matter of routine practice to, I guess, obtain whatever goals it is you're after, you would coordinate who would do what type of enforcement actions?**

A That is actually the point and purpose of



what's called the --

(Reporter interruption.)

A TEP, Technical Evaluation Panel, that was discussed yesterday in testimony. That's its primary purpose is to determine what agencies can do what on what project, that's the primary purpose. That's why I serve in those TEPs, too, as a Corps representative.

**Q So if there was a representation that -- earlier in this hearing that, you know, each of these agencies is acting somehow independently, that wouldn't be entirely correct, would it?**

MR. COOL: Objection, argumentative.

THE JUDGE: I agree, you can make that argument in your brief. I think that's -- you can -- that's a legitimate argument. Just get the facts out now that you need and make the argument later.

BY MR. FISH:

**Q Now, on Exhibit No. 43, fourth page in in the center you are -- an e-mail date of May 25th of 2000, you are writing a letter to a Donna Kell, -- I'm sorry, that's wrong, Joseph Yanta. Donna Kell is listed right below that name. Who is Joseph Yanta?**

A He is one of the project managers in St.

Paul, but I think at that time he was serving as acting section chief, so my personal supervisor, acting.

**Q Now starting in the fifth line of the text of that e-mail halfway through it, the sentence, isn't it true you stated, However, the LOW CHD, and you state, I trust you know the acronym behind that, Told me that they are actually responsible for the road since Lake of the Woods County Board of Commissioners approved the Sunny Beach plat and designated it as a public road. Is that a true statement on your behalf?**

A It is at that time, and I can add that I've been subsequently informed by the county engineer that they no longer view themselves as the owner out there. This statement was made on the presumption that the road had all the permits and I talked to the County engineer, Bruce Hasbergen, he's told me since that --

MR. FISH: I'll object to any hearsay --

THE JUDGE: Okay, slow down. The best way to deal with that kind of situation is to say yes, that was my understanding at that time.

BY MR. FISH:

**Q And as far as you're aware there's been no**



**documents recorded at the recorder's office or any other legal work that would change this classification or your understanding?**

A Not aware of any, no.

**Q Referring you to Exhibit No. 44, your e-mail dated Monday, September 18, 2000, the first e-mail on that page, and isn't it true that you state, As far as the Sunny Beach Road, I'm really surprised to hear that you think it will be more of a mess for WCA if we approve than if we deny it or did you mean the reverse? Nevertheless, I redrafted our permit decision for issuance provided new ditches are filled back in due to the Board's approval of the plat, a lack of alternatives, and the abundance of wetlands in the county. I also drafted a permit to mitigate for the road by withdrawing credits from the county's new bank, as Lockner advised, and I certified the bank for the Corps under the permit. Is that a true statement by yourself on September 18th of 2000 to Les Lemm?**

A I wrote that it appears, yes.

**Q Showing you what's marked as Exhibit No. 45, do you recognize that e-mail?**

A Yes.

**Q Is this the e-mail you received from your**



**direct supervisor, Ms. Denton?**

A Appears so, yes.

MR. FISH: All right. I don't know that I have an extra copy available. I move for the admission of Exhibit No. 45, Your Honor. Actually this has previously been marked as Exhibit No. 23, I may want to do it that way. The Court may want me to do it that way.

THE JUDGE: It's probably cleaner if we use Exhibit 23, just so we don't have to deal with 23 separately. It's the same e-mail, is that what you're telling me, Mr. Fish?

MR. FISH: Yes. You know I don't know if I have the original --

THE JUDGE: The court reporter has the original.

MR. FISH: Let me switch those around.

THE COURT: Just for the record, what we're doing now is giving the witness Exhibit 23 and we're withdrawing what had been marked as 45.

MR. FISH: Off the record.

(An off-the-record discussion was held.)

THE JUDGE: I should indicate for the record that I had put a post-it sticker on there to remind myself that 23 had not been received.



MR. FISH: Again I would move for the admission of Exhibit No. 23 at this time, Your Honor.

MR. COOL: I have no objection, Your Honor.

THE JUDGE: All right, then 23 is received. You can take that sticker off and dispose of it.

MR. FISH: Let the record reflect I removed the sticker, Your Honor.

THE JUDGE: So 23 is received.

BY MR. FISH:

**Q Mr. Koschak, on this e-mail it reads, Please go to the Comdec and change the applicant from Hasbergen to Bailey. Make sure this is done on all the pages. Now, first of all, what were they talking about there?**

A I believe that's the decision document that Julett Denton was referring to. What had happened when we had gotten the word from the county engineer before, as we referenced before, I don't know when it was, that the county should be the applicant, we had -- we had noted that in our computer system. We have a computer data base, and so we did change the applicant to the county or at least the county being co-applicant. And the way that worked then, some of

the forms had the applicant or the county or Mr. Hasbergen as being the applicant and my boss didn't want that, she wanted -- we viewed Mr. Bailey to be the applicant all along so we wanted to make sure all the documents had Mr. Bailey. But there was one -- I think we were aware there was one document that still had county on there and that's where the confusion occurred.

**Q All right. So this decision was made by your superior, as far as you're aware?**

A Yeah, Julett Denton or in consultation with our Branch Chief, Bob Whiting.

**Q So despite the representations by the county and Mr. Bailey this was done without the -- let me strike that. This was done without the consent or knowledge of Mr. Bailey, is that right?**

A It's the Corps' determination of who the applicant is, I suppose, so it's -- like I said, we did view Mr. Bailey to be the applicant all along.

**Q So your answer was yes, it was done without the advice or consent of Mr. Bailey?**

A Yes, as normally is done, yeah.

**Q All right. Now, this -- this -- this same site had previously been permitted for substantial excavation, isn't that right?**



A I recall we -- the Corps had issued a permit called a GP-1 for a harbor in that wetland area out there, but I talked to the project manager, that was Michael Keefe, who did that permit, and he wasn't aware at the time that it was wetland -- there was wetlands out there.

THE JUDGE: Please, sir, please, please, please. Just answer the question and don't give the explanation. You'll get plenty of chance to give the explanation later.

BY MR. FISH:

**Q Your answer is yes?**

A Yeah, I'm aware of that.

**Q And you had -- you had visited this site at the time of the harbor permit process, isn't that right?**

A Not at that time. That was 1990, as I recall.

**Q You had -- let me rephrase that. Isn't it true that you visited this site in 1994?**

A That is one of the dates I recall, yeah, I think so.

**Q And that was in conjunction with the time period that the harbor permit was still in effect, isn't that true?**



A Yes, I think so. Yeah, it would have been valid, I think, for five years from when it issued was in 1990, and we sent a letter to follow-up on that.

**Q And isn't it true this harbor permit would have resulted in excavation of several, I guess, tens of thousands of yards of this same projected -- or proposed site that is now Sunny Shores plat?**

A I can't recall what the specifics of the harbor dimensions were, I didn't work on that permit.

**Q Based on your experience, would you expect on any inland harbor to be tens of thousands of yards?**

A We go by area, not by volume. I wouldn't know how much volume or cubic yards it would be out there. Depends what depth you dug to.

**Q And for a harbor to go into a site that's three feet above lake level you would expect it would be a substantial depth, I would imagine?**

A I can't guess that. I wouldn't know what Mr. Bailey had in mind.

**Q Certainly you wouldn't approve a harbor with a depth of one foot in -- one foot, would you?**

MR. COOL: Objection, calls for speculation and conjecture.



THE JUDGE: I agree.

MR. FISH: I think that's a lay question, Your Honor, not expert.

THE JUDGE: Okay. Let me just ask: There was some reference in the materials which I read last night to a marina. Is that what you recall, a marina?

THE WITNESS: Yes, Your Honor, we issued a permit, a GP-1, for a harbor.

THE JUDGE: Okay, all right.

MR. FISH: That was what I was referring to. I don't know if there's a difference between a harbor and a marina.

THE JUDGE: We're now talking about a -- well, never mind. Let's just keep going.

BY MR. FISH:

**Q Do you know if the Corps has made any -- any determination as to whether there would be more or less impact from this harbor or marina which was approved than this plat with two-foot ditches that was not approved?**

A Not that I'm aware.

**Q I'm sorry?**

A Not that I'm aware of.

MR. FISH: I have no other questions.

THE JUDGE: Okay. Let's go off the record for a minute.

(An off-the-record discussion was held.)

THE JUDGE: Why don't we proceed then with the cross-examination by Mr. Cool.

CROSS-EXAMINATION

BY MR. COOL:

**Q Mr. Koschak, during the direct by Mr. Fish you were talking about a discussion that you had had with an individual Harsbarger (sic), is that correct?**

A Bruce Hasbergen.

**Q And who is he?**

A He is the current county engineer.

**Q And what did he convey to you in terms of information about the county's position on the road?**

MR. FISH: I'll object, Your Honor, calls for hearsay. Mr. Hasbergen is 100 yards away if counsel wants him to testify.

THE JUDGE: Well, I think it's legitimate. he can tell us what he -- what he was told. If it's dramatic we can get Mr. Harshberger or whatever his name is. Go ahead.

MR. KOSCHAK: Mr. Hasbergen. What he told me was -- I recall, is that the county would accept the road as their own if it was approved with all



proper permits, but since the Corps, as we know, denied the permit and there was a question about the 401 certification the county does not view themselves as being the owner out there, and he also told me that they would not do the restoration because Mr. Bailey put the road in. That's what he told me.

**Q You've been shown a variety of e-mails that were exchanged between various individuals and the Corps, correct?**

A Yes.

**Q And at your level within the organization and in regard to this specific permit decision, you don't have the authority to make the final decision on this permit, is that correct?**

A Correct. I only act as the project manager where I make a recommendation. It's up to my supervisors, Julett Denton as section chief, and Bob Whiting, who is the branch chief, and actually on denials it goes to our district engineer to make the final decision on those projects. I only recommend, I don't decide.

**Q In regard to the direct by Mr. Fish about the marina permit, you were indicating that you had talked to, I believe, a Mr. Michael Keefe or Mike Keefe?**



A Right.

**Q Who is that individual?**

A Michael Keefe is one of the project managers who was down in St. Paul but now he's at Stevens Point field offices. As I recall, he wrote the GP-1 for the harbor, but in talking to Mike previously he had told me he did not have the NWI map that's been referenced around here at that time so he did not know it was all wetlands out there so he issued the permit figuring it may be upland out there.

MR. COOL: I have no further questions, Your Honor.

THE JUDGE: Do you have anything further, Mr. Fish.

MR. FISH: Yes.

REDIRECT EXAMINATION

BY MR. FISH:

**Q Mr. Koschak, it was Bruce Hasbergen, the county engineer, that called you, not the county board members?**

A Bruce Hasbergen, the county engineer. I deal with him often. In fact, I'll see him tomorrow. And during one of our many discussions we had discussed the case and that's what he mentioned to me.



**Q You don't know if he has any authority whatsoever to overrule the County Board's decision to take over this road?**

A I'm not aware of that.

MR. FISH: I have nothing else.

THE JUDGE: All right, thank you, very much. Off the record.

(An off-the-record discussion was held. A break was taken at this time.)

THE JUDGE: All right. We're now resuming after the lunch break. Would you call your next witness?

MR. COOL: I'd like to call Mr. Mark Wespetal.

THE JUDGE: Raise your right hand, please.

MARK WESPETAL,

after having been duly sworn, testified as follows:

DIRECT EXAMINATION

THE JUDGE: Be seated.

BY MR. COOL:

**Q Mr. Wespetal, would you please state your full name and spell your last name for the record?**

A Mark, with a K, Steven Wespetal, W-E-S-P-E-T-A-L.

383

**Q And by whom are you employed?**
A The Minnesota Pollution Control Agency.
**Q And in what capacity?**
A I'm with the Septic Tank Drain Field Program.
**Q And what did you do prior to coming to the MPCA?**
A I worked for eight years with the Natural Resource Conservation Service as a soil scientist doing soil mapping in Green and Greengold Counties in Iowa.
**Q And is that information used to create what has been called in this hearing as the County Soil Survey maps?**
A Yes.
**Q And what is your educational background?**
A I have a Bachelor's of Science Degree in agronomy from the University of Wisconsin, River Falls, and I have about 12 graduate credits from the University of Minnesota.
**Q And what kind of additional training have you taken in your professional life?**
A I just counted that up the other day and I think I have over 40 different training seminars, national symposiums, things of that nature dealing

384

with soil science, sewage, sewage treatment, septic systems, things along that – that line.
**Q And are you licensed or certified in any capacity?**
A I am a licensed professional soil scientist for the State of Minnesota. I'm a licensed professional soil scientist for the State of Wisconsin. I'm a registered designer for septic systems in Minnesota. And I'm a certified soil tester for the State of Wisconsin, certified to do septic system work in Wisconsin.
**Q And have you authored any publications?**
A I've authored some publications nationally. I've authored one for the American Society of Testing and Materials dealing with site evaluations for disturbed and compacted soils and design standards for – for disturbed and compacted soils. I've done one on an alternative mound design for the American Society of Agricultural Engineers. I've done another paper for the American Society of Agricultural Engineers dealing with performance systems. Those are systems that do not have exact design specifications but they paint outcomes for individuals to do designs to meet certain environmental and public health goals. I've also

385

authored a site evaluation book with the University of Minnesota. I co-authored that, I should say. And I've also authored parts of the University of Minnesota training manual dealing with septic systems.
**Q And the training manual is used in a variety of training programs, is that correct?**
A Yes, it is.
**Q And could you just explain the University of Minnesota's training program and your participation in that program?**
A Yes. The University of Minnesota's training program is training courses that are offered in all areas of the septic world, if you will: design, installation, pumping, inspections, and so those courses are provided to licensed individuals to give them the training necessary so they can achieve their licensure to do work in Minnesota. I've been involved with those programs for about 14 years doing instructions on all of those courses except for the inspector workshop, I've never taught that one, but I've taught all the other ones. And again besides the licensing requirements, we also have continuing education requirements and I do the continuing education workshops with the University to keep

386

people's continuing education hours up to date.
**Q And those are people who are involved in the MPCA's licensed septic system programs?**
A Yes.
**Q Are you a member of any professional associations?**
A I'm a member of the Wisconsin Society of Professional Soil Scientists, member of the Minnesota Society of Professional Soil Scientists and the American Society of Agronomy.
**Q And what are your current work duties and responsibilities in the MPCA's septic system program?**
A Currently I'm the lead technical worker for the MPCA Septic System Program. That involves mainly revisions to and interpretations of the state code, Minnesota Rule Chapter 7-0-8-0, 7080. I also do, again, the training as part of my function. I also do a lot of technical assistance to industry professionals and local units of government and also do some enforcement actions against the licensed professionals who are maybe not operating as they should.
**Q And in addition to this and providing technical assistance, do you actually review or do site evaluations for septic systems?**

387

A Yes, I do both, yes.
**Q For background information, could you explain the main components of an individual sewage treatment system or what we're referring to as an ISTS?**
A Yes. The main components of an ISTS, first it starts with flow or sewage from the building, goes into a building sewer and is discharged into a septic tank. What the septic tank does, it basically just is kind of a gravity operated tank so the materials that are heavier than water, more dense than water will sink to the bottom of the tank. The materials that are lighter than water, like silts and greases, things of that nature, will float to the top of the tank leaving somewhat of a clarified effluent in the middle of the tank. That clarified effluent then goes into a soil treatment system. That can have many types of configurations of how that sewage gets distributed in the soil, in the soil treatment area. There's a number of different ways of doing that. And then the main component of the main treatment and disposal function of the system is the soil that is found below the soil treatment dispersal area.
**Q And what is meant by a standard system?**
A A standard system is an ISTS system that has

388

had adequate research done on it for contaminant removal capabilities, has adequate research for hydrolic performance, that it can perform hydrologically. It has been field tested, field trialed in a number of different locations, different soil types, different climatic conditions. And basically we have that recipe on how to do that type of system nailed down pretty tight that we can say pretty much in confidence that that system will -- can be designed, constructed and operated with certainty that it will meet environmental and public health outcomes.
**Q In regard to an ISTS site evaluation, what is required in terms of soil evaluations?**
A Can you say that again? I didn't quite follow.
**Q In regard to site evaluations overall, what is required for soil evaluations of the site?**
A For soil evaluations of the site the Minnesota Rules Chapter 7080 requires that some sort of review be done with the soil survey mapping that is available and then to go out and conduct a field evaluation of that.
**Q Have you routinely used Soil Survey Maps for doing this type of preliminary evaluation?**

389

A Yes. Again, that's required by the rule to use a soil survey.
(Exhibit No. 46 was marked.)
BY MR. COOL:
**Q I'm handing you what has been marked as Exhibit 46. Could you describe -- describe that document?**
A Yeah, this is copies of pages from the Lake County -- or Lake of the Woods County Soil Survey Manual.
**Q And these are the types of soil survey manuals that you did fieldwork for in your past position with the NRCS?**
A Yes.
**Q And it's these types of soil survey materials that you would review in your professional capacity in terms of the preliminary soils evaluation?**
A Yes.
**Q And did you, in fact, use this particular excerpt in preparing for your testimony today?**
A Yes.
MR. COOL: I move the admission of Exhibit 46.
THE JUDGE: Is there any objection to

390

what's been marked as Exhibit 46?
MR. FISH: No.
THE JUDGE: It will be received.
BY MR. COOL:
**Q Now, in regard to the document itself, could you just briefly describe what information is contained in these types of county soil survey materials?**
A The type of information that's contained in soil surveys is basically it's an inventory of all the soils in the county, and basically they're portrayed on maps, so you have an aerial, extent and location of each part of the county as far as the soil types are concerned.
Besides having the map and location of the soil, they also describe the soils as far as the different characteristics such as soil textures, top soil depth, drainage or saturation levels, bedrock conditions, landscape position. Anything you really want to know about the physical properties of the soil are described in the soil survey report.
Along with the raw description of the -- of the properties of the soil, the soil survey also provides interpretations as far as different types of land use. So is this soil suitable for a roadbed, is this

soil suitable for a building site, is this soil suitable for any number of land usage you can possibly think of it gives recommendations as far as the suitability of those soils.

**Q I apologize, Mr. Wespetal, but my copy of the map is quite dark. Looking at the map that's in the exhibit, can you identify the numbers regarding the soil types for the Bailey plat map?**

A Yes, the northern part of the Bailey plat map is soil type numbered No. 568, and that soil type is zippel, and then the bottom soil type on the southern probably half of the site is Soil Type 569, which is wabanica.

**Q And in regard to the soil profile descriptions, turning to Page 113 of your excerpt, could you just briefly describe what information is being conveyed in the paragraph under Typical Pedon?**

A That's pedon.

**Q Pedon.**

A What's portrayed there, as I stated a little earlier, is the soil survey provides the basic physical characteristics of the soil as far as soil texture, and texture is how much sand versus how much silt versus how much clay is there. It gives you the soil coloration, and its coloration gives you an idea



of the -- the saturated level of the soil by soil coloration. It gives you what soil structure, which is how the sand, silt and clay are kind of glued together. Is it a hard pan type of situation or not. It gives you the idea of the ph, whether it's neutral ph or aesthetic ph or high ph. And it gives you the boundary condition, whether it's a sharp, clear distinct boundary or kind of a disfuse, gradual boundary between the different layers or different zones in the soil.

**Q Looking at the Wabanica Series, could you describe just briefly what the Ap and Bg notations mean in that first set of paragraphs?**

A Sure. Soil scientists have their own little nomenclature when they do write a profile description, and I can kind of translate that into layman's terms, if you'd like. The Ap horizon is basically telling you it's a top soil horizon. The A horizon is meant to be that it's on the surface and it's commonly known as a top soil. The P behind that means it's a plow layer, which basically means it's been farmed and disturbed and turned over, so that P means plowed or disturbed type of a situation.

The letter below that or the horizon below that,



it's called a Bg. The big B, capital B, there stands for subsoil. That's the shorthand soil scientists use for subsoil. And the g indicates -- the little letter g indicates that it is a glade or gray horizon indicating that the color of that zone is fairly gray.

**Q Now, what are the implications looking at the Bg profile there of the grayness color and also of those various numbers that are in the parentheses?**

A Sure. If you look at the Bg horizon, which is the first subsoil horizon that we can identify on the -- on the description, it's indicated as being a dark gray color, and behind the dark gray there's a nomenclature saying 10YR 4/1. That is a color reading from the standard color chip from the standard color book that soil scientists use to identify the soil coloration. And so the YR is a mixture of yellow and red at some mixture of ten, which I'm not sure actually how they arrive at those, but it's a mixture of yellow and red. The upper number 4 means that it's halfway between black and white on the scale, so it's a darkness and lightness scale. And then the one -- the slash one below that is called the chroma, C-R-O-M-A (sic), and that indicates the deviation from gray with one being the



most gray that that color can get.

**Q Now, for us lay people, you say you've got some colored chips. Tell me exactly what you're doing out in the field when you're trying to look at these various factors that you've just discussed?**

A Okay. You get a sample from the horizon or the zone that you're looking for to identify and then you grab a sample. It's got to be kind of a natural or unsmeared sample because you don't want to mix the colors together, so it's a natural broken chunk of soil in your hand. You have a standard color book with standard color chips inside of that. You get the sunlight at your back and you read -- you try to match up the color of the soil to the standard color chip and then identify that and then you record that into your site description.

**Q Now, are these factors, the chroma, the color, part of an ISTS site evaluation and part of the agency's rules?**

A Yes.

MR. COOL: And, Your Honor, the -- the other -- at the beginning of the process I proposed to admit a rule. For purposes of discussion I think it would be helpful here for Mr. Wespetal to testify regarding this process that's identified in the

rule. Could I propose to offer this as an exhibit for background purposes?

THE JUDGE: I think you can just have him use it. I think it's all right to have him use it. I don't think it has to be an exhibit.

BY MR. COOL:

**Q Mr. Wespetal, I'm handing you an excerpt** from Minnesota Rule Chapter 7080.0110, and specifically Subpart 4 dealing with field evaluations. Could you direct us to the part of this rule that deals with the information that you've just discussed about color, chroma, those types of things?

A Yes, that's found in, again, 7080.0110 Subpart 4, Item D(5).

**Q And that's at the very bottom of the page, is that correct?**

A That's at the very bottom of the page, yes.

**Q And could you briefly describe the content of the rule and what is required?**

A Yes, part -- what this rule is dealing with is how to determine which soil colorations indicate a seasonally saturated layer for a fairly prolonged period of time that would affect the treatment and the hydrolic performance of an individual sewage treatment system. The basis for the standards that



are found in this rule are based on soil science means and methods found in the Soil Taxonomy, the Soil Survey Manual, the Field Guide for Interpreting Soils and those are all USDA publications. And so we basically pull those out of those publications, modified them slightly for septic systems, not a lot but just slightly, and put them in the rule to -- again, the purpose was to identify a zone that had a seasonal saturation long enough to cause hydrolic and treatment problems with septic systems.

**Q Now, those types of chroma and hue issues are then contained later on in this rule, is that correct?**

A Yes, it's found in the section that I previously described, yes.

**Q And these are factors that you use to evaluate a particular site for saturated soil conditions, is that correct?**

A Yes.

**Q Why is the issue of saturated soils of such importance to the performance of ISTS's?**

A ISTS's have two -- two functions. Number one, that all the contaminants that are found in sewage are dealt with, they are attenuated or degraded in some way, shape or form, and that the



sewage remain below ground. So when you're talking about a septic system, that's what it does, it treats sewage to acceptable levels and when it's treating it all the sewage stays beneath the ground so it can't come in contact with humans or pets or flies or mosquitoes, things of that nature. And so if you have a saturated condition, that really adversely affects how the contaminants can be absorbed and treated on the soil and how much water the soil can actually transmit to go away.

If you look at the loading rate on a septic system for the soils on the Bailey property, we would be loading those soils at the rate of 12, maybe up to 24 feet of water per year on those soils. Lake of the Woods County gets about 1.8 feet of rainfall a year. So we're asking those soils to take, again, between 12 and 24 feet. So that's a lot of extra water we're asking the soils to take. So to know that saturated zone is extremely important because we're going to add a lot of water to that site so we can't exasperate a problem. If the soils can't handle 1.8 feet of water per year because they're saturated, if we add, you know, 12 to 24 feet you're asking for some major hydrolic problems.

**Q Now, in the design and siting of septic**



**systems, what is done to avoid saturated soil systems?**

A What's done is, again, you do a soil investigation and from that investigation you determine where that seasonally saturated layer is based on the requirements we've just discussed in the rule, and your system has -- the bottom of your dispersal area in your soils, basically your rock trench or rockbed, whatever you might have, has to be three feet above that layer, that seasonally saturated layer in the soil.

**Q Why is a three-feet separation distance important?**

A Again, the three-foot separation distance, it provides the two basic functions of an ISTS, which is sewage treatment and hydrolic performance so that the sewage can get away. That has been based on many, many research reports done over the years indicating that three foot is the magic number for both removing the contaminants in the sewage and providing enough zone or space that the water can get away and move away from the system.

**Q Now, the three-foot separation is intended to create a zone of unsaturated soil, is that correct?**

A Yes.
**Q In layperson's terms, what's happening to the sewage, pollutants as they go through an unsaturated zone?**
A As they go through an unsaturated soil, the first thing is they're moving very slowly because as -- as -- as moisture content in the soil decreases, the rate of that water moving slows down substantially, and some of the contaminants are in the sewage especially pathogens, viruses have a certain life, so if you can slow down their travel and hold them in the soil long enough, by natural processes they will just die, die off. So that's a very critical thing is that you have very slow movement of water.
The second thing is the films of water in the soil are very, very thin, so therefore the soil can actually attract the contaminant to itself because it's in close contact with the soil because it's moving in a very thin film of water in close contact with the soil. So it has negative charges associated with it, a lot of the pollutants have positive charges and so if they come in close contact with one another the soil can just kind magnetically attach itself to the contaminant and hold the contaminant



while the water passes and purifies.
So those are the two main reasons why we want -- oh, and oxygen is a big thing, too, a lot of oxygen, because there's a lot of contaminants that are broken down in the presence of oxygen and if you have unsaturated soils, you know, the areas that don't contain water contain oxygen and that oxygen is then used by native soil bacteria to break down a lot of the biological type of contaminants.
**Q Now, what happens in areas where there is not that type of separation distance in the actual ground itself?**
A When you don't have that natively in the soil, we do have design methods to overcome that. The most common way that most people are familiar with is with a mound system. And to try to describe that is let's say you have -- from the ground surface down let's say you have water seeping saturated soil at about a one-foot depth. I just said previously you need a three-foot treatment zone and so if you only have one foot in the soil natively, you can import some engineered fill, which we call clean sand, and you can add two feet of sand to the one foot of good soil thereby having your three feet of separation distance. Then you put your dispersal



medium on top of that, then you introduce your sewage through the dispersal medium, trickles through two feet of engineered fill, one foot of natural soil, which, again, is all unsaturated. Then at that time it can hit a saturated zone, it's treated by that point and can mix with the groundwater and travel laterally away from the system.
**Q Now, does the agency's Chapter 7080 actually have design criteria regarding soil for mound systems?**
A Yes.
**Q Mr. Wespetal, I'm handing you an excerpt from Minnesota Rules 7080.0170 and in particular Subpart 5. Do you recognize that rule provision?**
A Yes, I do.
**Q And could you briefly describe in that document the soils criteria that are used for mound systems?**
A Sure. That's right in the beginning, it's Subpart 5 (A) says, Location of mounds. It says the mounds must be constructed on original soils, which I can define that in just a minute, and provide at least 36 inches of vertical separation from the bottom of the drainfield to the saturated soil or to the bedrock.



**Q Now this rule has been amended recently, right, and is that amendment included in this attachment?**
A No, it is not. So I was mistaken, it was on Page 3, the third page. Yeah, the rule has been amended so it has to have -- again the -- provide 36 inches of vertical separation distance and the mound must be placed on original soil and the upper 12 inches of that original soil must be unsaturated and not have any bedrock either.
**Q Now, what is the absorption area?**
A The absorption area is the actual area that actually sees sewage. You look at a mound system, you can see it has an upslope dike, a downslope dike and dikes on the sides just for landscaping purposes and for ease of mowing and things of that nature, but not that -- that whole footprint that you're seeing out in the field is not actually absorption area, but just the area that is actually receiving sewage and infiltrating sewage into the ground that is considered the absorption area.
**Q And original soils, again what are those?**
A Original soils are naturally occurring, inorganic soils that haven't been manipulated by mankind in some sort of the construction activity by

smearing or compacting or cutting or filling. That is the – basically the definition of original soils. That's found in Minnesota Rules Chapter 7080.0020 – I can't remember the subpart offhand, but the definition is located there.

**Q What is the importance of having an upper 12 inches of an absorption area that's unsaturated?**

A Again, the key thing for that, which I mentioned just a little earlier, is you're putting quite a bit of water into the soil dispersal area, and if your soil natively contains -- is saturated to the ground surface and you're trying to introduce some more water at that ground surface level, at that absorption area, the water basically doesn't have much place to go, especially if you have a really low gradient, which again the gradient on this site is fairly flat so the water is really not moving laterally very quickly. So, again, if you're trying to load a lot of sewage from the top, there's a lot of water already at the surface, they meet, you have no gradient, then the water is going to go sideways and come out of the toe of the mound or the bottom of the mound footprint.

**Q Now has the agency had some actual experience with systems that have been installed in**



**areas of saturated soils?**

A Yes. Original rule, 7080 rule, which was issued in 1978, did not have this provision in it. I suppose they didn't think about it at the time, the rule writers didn't think about it during the original writing of the rule. And the consequence of that, there were systems that were put into the ground with less than one foot of good natural soil. A good example of that was a federal 201 project around Lake George in the northeast metro area where systems, mound systems were placed on soils that did not meet the one-foot requirement. There was many, many failures of those mounds. When I'm talking about failures I mean seepage at the toe because they were just placed in a very wet condition and the water from -- the sewage that was infiltrating down had no place to go when it hit the saturated soil, again traveled sideways and peaked out the toe of the mound.

Other instances were found in St. Louis County where they actually put mounds on extremely wet sites that actually were peat soils and actually these mounds actually sunk into the ground because the weight of the sand on the peat, the peat could not support that weight and they actually shrunk into the



ground.

So due to those types of situations we were running into, the 1996 rule the addition was made to put only mounds on soils with one foot of good natural material.

**Q Now, since it was first placed into the rule in the mid '90s, has it always been in the rule?**

A No. It was inadvertently deleted by accident during the 1999 revisions. It was going to be placed -- it was currently found I think in the definition section, it was going to be moved to the Subpart 5(A) we were talking about and during that transition during the writing process it inadvertently got deleted.

When we found out about that we were just not very happy about that because that's a main provision for mounds is to put them on a very decent spot and not into a very wet situation, so we have a newsletter and we got word out to the public as soon as we possibly could telling them please, you know, don't put mounds on sites with less than one foot of good soil because of the previous problems that we knew it would have and we tried to get to the rule making process to fix that mistake as soon as possible. It took us a few years to do it, but



actually we did it as fast as we possibly could because that was a major component for properly setting mounds and that wasn't in there. We were anticipating many, many problems so we actually tried to get the rule -- fix it as soon as possible. Took us to 2003, but I guess for rule writing that was fairly quickly. But that was a major -- in fact, that was really the only reason that we went into rule writing was to try to fix that provision.

**Q Again absent this 12-foot (sic) separation, would mounds installed on saturated soils potentially violate other PCA rules?**

A Yeah, when anticipating that those mounds would be weeping out or seeping out at the toe with untreated sewage, they would be in violation of such rules as Minnesota Rule 7050.0210, Minnesota rule 7060.0660, Chapter 7080.0065, and also it would be classified as an imminent health threat in Minnesota Rules Chapter 7080. So there was a number of potential violations that could occur if mounds were put in those very wet situations.

**Q And the 7080 rule -- or 7050 rule that you referred to in .0210, is that the nuisance conditions?**

A Yes, that would be the nuisance conditions.

**Q What -- what physically is happening in regard to a violation of 7080.0065, the provision that you referred to?**
A That provision is fairly clear that sewage from individual sewage treatment systems cannot be out on the ground surface. That's also noted in other places in the rule. So again we would likely anticipate systems built on these wet sites would seep or weep out on the ground surface, which would be in direct violation of 7080.0065.
(Exhibit No. 47 was marked.)
BY MR. COOL:
**Q Handing you what has been marked as Exhibit 47, do you recognize that excerpt?**
A Yes.
**Q And what is it?**
A This is D-30, D as in dog 30, from the University of Minnesota Onsite Sewage Treatment Training Manual.
**Q And you've authored parts of this manual, is that correct?**
A Yes.
**Q And would this assist in your description of a mound system?**
A Yes.



MR. COOL: I'd offer this exhibit.
THE JUDGE: Any objection to what's been marked as Exhibit 47?
MR. FISH: Your Honor, actually this is -- I would object, this is apparently some type of an article or document out of a training manual created by the witness himself, and the witness can testify as to his own opinion. Unless there's going to be some type of legal cite to this, I believe this isn't appropriately taken as evidence, Your Honor, and it shouldn't be merely read into the record such as other treatises are.
MR. COOL: Well, Your Honor, we're not offering -- we're offering it for the purposes of providing a schematic of what a mound system is so that Mr. Wespetal can bring to some closure the various things that he's been talking about before. So we're focusing merely on this excerpt and we can certainly offer the entire manual, if that's a concern.
THE JUDGE: Is it the diagram that you're interested in?
MR. COOL: That is correct, Your Honor.
THE JUDGE: Do you have any problem with the diagram alone without the explanatory text?



MR. FISH: Not so long as it's treated as an illustrative exhibit, Your Honor.
THE JUDGE: Why don't we do that, we will take the diagram only and use it for purposes of illustrating his discussion. That's fine.
BY MR. COOL:
**Q Mr. Wespetal, could you just briefly then describe the various parts of this schematic mound system?**
A Yes. We'll start with the soil beneath that. That's probably the easiest place to start. If you look at the -- where the soil is described on this diagram it mentions that there's a limiting layer down there. Again, that's been identified by site evaluation procedure indicating that there is either bedrock at that location or saturated soil level at that location. And so that has been identified in the site evaluation report and therefore the design is kind of based on that report. So in this situation here we're going to maybe assume that that's at one foot below the ground surface. Let's just do that for the sake of discussion. So then therefore -- again, you need to have that three-foot vertical separation distance from that limiting layer and so then you added what's



called -- in this diagram it's called clean sand. That's -- that term is a term found in Minnesota Rule 7080, so that's an engineered fill with very exact specifications on what that sand can be. That sand is there to provide treatment. Again that three foot unsaturated zone, that sand is there unsaturated, in an unsaturated condition to provide the slow water movement, the attenuation, the breakdown and things of that nature. Below that there is your dispersal mechanism, which in this case here is identified as clean rock with perforated pipe in that. That pipe is pressurized by a pump and so the sewage is received from a tank with a pump in it, it's distributed in those pipes under pressure so you have even distribution over the rock bed and then it again trickles down into the sand layer itself, getting some treatment, partial treatment, passing through the native soil completing the treatment, hitting the limiting layer and at that point there it's being treated; and again, if you have at least 12 inches of good soil, research has shown that the water can be transmitted away from that mound system without it peaking out on the toe of that mound.
**Q Now, are artificial or manmade drainage systems allowed for purposes of conveying the water**

away from the absorption area?
A You can use those. They're not counted as being part of your one foot of natural original soil. If you have a lot -- an existing lot with difficulties, you can try to enhance the drainage with some sort of drainage mechanism, but that would not be considered a standard mound system, it would be considered an other system or kind of more of an experimental system that, again, the definition of original soil which mounds need to be placed on has to be naturally occurring. So the way that is viewed is that it has to drain itself down to a foot level, you know, without having standing water on its own without any aid from ditching or drain tile or anything of that nature.
**Q Now, in regards to the Bailey plat, have you conducted an evaluation of available soils data --**
A Yes.
**Q -- regarding that site?**
A Yes.
**Q And what type of informational sources did you review in preparing to do that type of evaluation?**
A I looked at the NWI map that was -- that was offered earlier as an exhibit. I looked at the Soil



Survey Report, which is offered as Exhibit 46. I looked at the Corps of Engineers data sheets. And I looked at one site evaluation that was conducted on Lot No. 10 for a Jamie Gowdy.
**Q In regard to Corps data sheets, you're referring to Exhibit 33, is that correct?**
A Yes.
**Q And what information in those data sheets did you consider in your evaluation?**
A I looked at the -- I had hydrologic assessment done by Mr. Eggers as far as looking at the depth of water in the holes that day and the saturation level above those holes. I also looked at the soil reports done by Mr. Heschke.
**Q Now, in your duties and responsibilities at the PCA you've indicated that you review other people's work, is that correct?**
A Yes.
**Q And so reviewing this data would be consistent with what you do in your normal duties in terms of evaluating material submitted by others for site evaluations?**
A Yes.
**Q If you would just briefly, looking at the information on -- for Pages 300 and 302, do you see those for Transect Point 1-1, what was your evaluation of the soils in terms of ISTS placement at this location?**



A Okay. First you went to Page 300, which has the hydrology -- hydrology part of the assessment. They did not see standing water in that hole there and that was possibly -- probably -- likely due to the drainage tile that was located to the south of the site, so -- and they didn't see water, but again if you're assessing this for Minnesota Rule Chapter 7080 for a standard system, you really can't count that drain tile as being a legitimate way of achieving your one foot of original soil which, again, needs to be naturally occurring and with drain tile that would not be considered to be natural occurring unsaturated zone but that unsaturated zone was created by the ditching. So that's what I concluded from Page 300.
From Page 302 I looked at the soil reports there, the soil data sheets there done by Mr. Heschke, and what I focused on first to be -- keep it short and keep it simple as far as the evaluation and the testimony, I went down to, again, the first level of subsoil found in that -- in that report, and that's listed as the Bg horizon, which is the third horizon



down. And then I looked at the -- what's called the Matrix Color (Moist), which is the fourth column over, and that sort of coloration there is determined to be a 5Y 5/2. That has significance for us as far as what the rule says. So if you went to Minnesota Rules Chapter 7080.0110 Subpart -- Subpart 4(D), that has the classification mechanism or the taxonomic method of determining whether that 5Y 5/2 color is indeed indicating a saturated soil level of a long enough duration that would effect the ISTS performance. And so what I did, I looked at that color, which is a 5Y 5/2 and I ran it through the taxonomic classification in 7080 to determine saturated soil of a significance for design and found that that color indeed indicated a saturated level, according to the rules as issued in 7080, and so that would be what's termed your limiting layer for design for an ISTS system.
So at that level there we would say that that limiting layer, that saturated soil level, would be at an 11 -- 11 inch depth. Again Minnesota Rules Chapter 7080 indicates that you need at least 12 inches of unsaturated soil for standard mound systems. This wet condition came in at 11 and so this would not meet the requirements for Chapter

7080.
In addition, on Column 5 it says Fe or Fe/Mn Masses, that's iron or magnesium masses. Those masses also have taxonomic value as far as determining saturated level in 7080 and the presence of those masses in that zone also indicates that you have a seasonally saturated level at that point there. So either you have the grayish color which indicated in the third column or if you have the iron masses indicated in the fourth column, if you had either one of those that's indicating saturated level of significance for septic system design. Again those come in at 11 inches, which is one inch higher than our 12-inch minimum.

**Q In layperson's terms, this location doesn't have acceptable soils, is that correct?**
A Yes, that is correct.
**Q And you've done a similar evaluation for the remaining transect points on Transect No. 1?**
A Yes.
**Q And what was your conclusion?**
A Again as stated by Mr. Eggers earlier, he said that the soils are very similar throughout the transects and I found that to be true in reviewing the information. So the remaining -- the remaining



soil borings on Transects No. 1 are very similar without really much change at all between them and so they would all indicate to me that they do not meet the 12-inch requirement because on Soil Boring 2 on Transect 1 the grayish subsoil is coming in at seven inches, which is above 12. For Boring No. 3 the grayish colors come in at, let's see, nine inches. And so, again, along that transect here we had no soil borings that had a 12-inch separation distance from the ground surface to the seasonally high -- seasonally saturated soil layer.
**Q And you did this same type of evaluation for all of the transects, 1 through 5, of the site?**
A Yes.
**Q And I just want to draw your particular attention to Transect 2-2 on Page 315. Do you recall the significance of this site?**
A Let's see. Yes, this was the area of upland that was identified earlier in earlier testimony.
**Q And directing your attention to the soil analysis on Page 317, would you please analyze those soils from an ISTS perspective?**
A Yes. We'll skip over the A horizon which right now does not really factor into our decision making at the moment. We'll go down to the B horizon



and that, again, distance starts at five inches from the ground surface down to eight. It's listed as being a sandy loam texture and the soil color there is indicated as being a 2.5Y 4/3. If you ran that through the taxonomic number classification in 7080 you would find out that that zone there, according to the rules of 7080, does not contain a saturated condition for long enough to be a cause for septic system design. So that five to eight-inch layer would be considered okay as far as any treatment and transmittal zone for a septic system.
If you go down deeper than that you'll see the horizon destination there is a C, the depth is from 8 to 40 inches, it turns to a silt loam and the matrix color now is a 2.5Y 5/3. So if you ran that color, matrix color, through the taxonomic classification in 7080 you would find out that that color is also considered a well-drained -- well, not well-drained, but it doesn't have saturation there long enough to cause a problem with septic system design.
However, if you look on the next column over, which is the fourth column over, you see that it has 10 percent very bright rusty iron, iron masses or iron concretions at that point there. 7080 again states that if you either have gray colors, which it



indicated on the third column on Page 317, or if you have these iron or manganese masses, which is indicated in the fourth column, either one of those, that would indicate there that the duration of the water table is long enough there to affect septic system performance.
So if you looked at that C horizon from 8 to 40 inches and you ran those colors through the taxonomic classification in 7080, we would say that that soil is wet enough to affect septic system performance and you could not count that as part of your unsaturated zone or your good soil for your 36 inches of separation distance or for your 12 inches required for a mound system.
If you note the depth there, that -- those colorations I just described come in at eight inches, that's still above the 12 inches required for a mound system. And so even this island -- upland island that has been identified in earlier testimony, may be considered upland for wetland purposes but it's not well drained enough for a mound system. So it even falls short of that because the wetland rules in their determination of hydric soils in 7080 determinations for mounds is just slightly different, I mean it's not exactly parallel. We added some, you

know, conditions because we're adding quite a bit of water from sewage so we had to be conservative with our soils call to try to accommodate all the water we're putting into the soil.

So this zone here even though it may be considered non hydric or upland soils for wetland purposes would not support the operation of a mound system.

**Q You've done a similar analysis for all the remaining transects and sample points, correct?**

A Yes.

**Q Did you find at any of those sample points soils acceptable for mound systems?**

A No. Every one that I reviewed, which was all of them, I reviewed all the data sheet pages, none of the soils met the requirement for a mound system, for a standard mound system.

**Q Now, earlier you indicated that you had also reviewed a specific permit application for the Bailey site, is that correct?**

A Yes.

**Q And could you give me some background information on what you looked at?**

A Yes, we had both soils evaluation and design sheets for a proposed mound system on Lot No. 10. I



reviewed that information and made some comments to the accuracy and the conclusions drawn from that report.

(Exhibit No. 48 was marked.)

BY MR. COOL:

**Q Handing you what has been marked as Exhibit 48, do you recognize that document?**

A Yes.

**Q What is it?**

A This is the application for and approved for a septic system on Lot 10 of Sunny Beach development. Along with the application was the design sheets and the soils report and a sketch plan for that – for that proposal.

**Q And which entity provided this document to the PCA?**

A Lake of the Woods County.

**Q And you've reviewed this material, correct?**

A Yes.

**Q Could you briefly summarize your evaluation and point to any relevant parts of this application as you discuss it?**

A I could make a number of comments, but what would be relevant would be the soils information concerning this – this proposal, which is found on



the second to the last page in the – in the document. And when reviewing this I got real mixed messages of how to make some conclusions regarding this soil boring. For example, the first point that I noted there about a third of the way down on the sheet it says, Vegetation. Again this soil boring log comes from the University of Minnesota manual. I did not write this form, a co-worker did, and so his designations and my designations are a little different. But anyhow, he has it listed there as Vegetation and what they were trying to portray here is what type of vegetation do you have, water loving, wetland-type of vegetation or do you have upland types of vegetation. And so the site evaluator here indicated that the vegetation here was wet. Wet doesn't mean physically wet like just after a rainfall, it means it was water-loving vegetation, wetland-types of vegetation on the site. So that was circled as being wet.

The -- under Drainage, which is a couple of lines down, the choices the site evaluator had to circle was good, problems and solutions. He circled that there was some problems with drainage on the site indicating that, again, the drainage would be – the water was not draining away from the soil and there



was problems with that. There was no solutions offered for the drainage problems that were identified.

And then what is confusing about it, because those seem to be consistent with the other soils data that we looked at, that the vegetation was wet, that there was drainage problems, so that all seemed to fall into place with all the other documentations that I did review, so that wasn't really a problem, but where the problem kind of came in is during -- after the soil boring that was listed on the right-hand side of the page there, that when you look at that soil report, the first thing you notice is you do not have those Munsell color notations that we relied on in earlier designations. The Soil Survey Report had the Munsell notations, the Corps of Engineers report had the color notations, the Munsell notation, the color notation. This report lacked that. The Minnesota Rules Chapter 7080 requires the use of the Munsell color book in order to make that determination, and I don't see any notations here to tell me that the book was used or whether the color readings were correct or not. So that was the confusing part.

And the most confusing part, I guess, would be

that at the 8 to 30-inch level the site evaluator basically said it was a light brown. Now, in laymen's terms when you see the word light brown you'd indicate that that would be a nice, well-drained condition, brownish colors versus grayish colors. Brownish colors indicate a well-drained condition where the water table is not there for any significant period of time. So that would not be an impediment for a septic system design to have light brown colors. And again, what's noted here is those light brown colors ran down to a depth of 30 inches, which is very inconsistent with all the other reporting that we did have. So again when you see a light brown color depth to 30 inches, all the other borings done didn't even come close to that type of an assessment and there's no Munsell color notations given, it's confusing to me exactly the procedure they were using and whether these observations were accurate or not accurate.

Q **Now, had this been submitted to the PCA for site evaluation, what would you have done with this report?**

A Again, we probably would have sent it back asking for more information, especially the Munsell color notations because you really can't progress



with the rest of the design of the system until you know what the soils can produce on their own and how much water they infiltrate and things of that nature. So the soil boring log is kind of the key and unless that's nailed down tight, we know exactly what the soils can do and can't do, then we can't progress into the design phase of the septic system.

Q **How did you factor this into your overall evaluation on the Bailey Sunny Beach plat?**

A Again, by having the Munsell color notations and having light brown colors down to 30 inches, I guess at this point I'd have to not consider that as part of my -- as part of my data set that I would use to assess this site because of a nondocumentation that he actually did use a color book.

Q **In this particular application did the preparer of this document identify a potential location for the septic system?**

A Yes, I think he did.

Q **And can you describe your evaluation of that distance from the lakeshore?**

A Yes. It's found on the third page from the front, and it seems like the system is going -- the structure was going to be 75 feet back from the lake,



which I think is the legal setback for a dwelling or structure from the lake, Lake of the Woods. And then the septic system was just to the -- to the north and a little bit to the west of that building structure.

Q **So this -- this was further inland than 100 feet, at least from this diagram?**

A It would appear to be. There's no dimensional lines provided, but there's a number 75 with a foot symbol after it between the lake and it looks like the proposed dwelling. There are no other types of dimensional lines given, but I assume that they were trying to say that the dwelling would be 75 feet from the lake.

Q **This type of evaluation has to be conducted by a licensed ISTS professional, is that correct?**

A Yes.

Q **And was this one prepared by such an individual?**

A Yes.

Q **And is that person identified in this document?**

A Yeah, it was a Mr. Tim Fish and his license number is listed here somewhere. I can't find it right offhand, but his license number was listed on the report. Oh, here it is, License No. 2097.



Q **Did you conduct any other evaluations -- well, let me -- strike that. In terms of your review of data of the Bailey plat, did you see any information -- taking into consideration the Gowdy application and all the other material that you've reviewed, did you observe any data that would lead you to believe that mound septic systems could be built in this area in compliance with 7080?**

A I found no data that would support the use of mound systems on the site as a standard mound system.

Q **Did you conduct any other evaluations of the Bailey plat?**

A Yeah, I conducted an evaluation just on a pure aerial extent or size extent to see just how much physical room there would be to place mound systems on these sites.

Q **And what did you consider in doing that evaluation?**

A I considered a number of factors. The first factor that I considered was the 50-foot lake setback required by DNR shoreline regulations. I also factored in the 100-year floodplain elevation and extent over those lots. And then I took Mr. Lockner's assessment of the soils that from the lake

level to 100 feet back from the lake level, that those actually were suitable soil conditions, and I also factored in some property line setbacks, too, which are also significant. So those are the factors I used to make this assessment.

**Q And what assumptions did you make in terms of making these assessments in terms of the size of the system?**

A Okay, when I -- when I first did the assessment I assumed a very -- very small dwelling, I assumed a very low water using dwelling. In fact, I assumed that this would be the lowest water using dwelling that would be allowed under 7080 with a flush toilet. I knew you could make it even smaller if it was with a nonflush toilet, like an incinerator toilet or an outhouse or privy or something like that, but I assumed that people wanted at least a flush toilet, so I made the system as small as I possibly could and be legal under 7080 rules and yet have a flush toilet.

**Q What assumptions did you make about the requirements for standard systems?**

A I assumed they had to be a standard system which would require one foot of, again, unsaturated soil to place the mound on top of and that the mound



would not be in the 100-year floodplain.

**Q What legal considerations did you take into consideration regarding standard systems?**

A I'm not sure what you're asking. Try it again.

**Q Do the rules require more than two standard systems?**

A Oh, yes. The other consideration was, again, in Minnesota Rule Chapter 7080.0305 requires that lots developed after 1996 -- I should say after January 16th of 1996, I believe it is, that they require enough area for two -- two suitable standard individual sewage treatment systems.

**Q And did you take into consideration as you evaluated two standard systems any other rules? Are you aware that the Shoreland Management Rules require two standard systems?**

A Yeah, sorry. Minnesota Rule 7080 requires two standard septic system sites per lot and so does the Minnesota Rule Chapter 6120.3500 also require that, too.

**Q What's the reason for the requirement for two standard systems?**

A The reason for the requirement is because septic systems even though they're properly designed,



properly constructed, properly maintained, they do have a finite life. The septic tank does not provide, again, a lot of treatment for the contaminant. Those contaminants and the solid materials, the fine solid materials that are soluble and suspended in water, they find their way out to the drainfield and in time the drainfield will start to plug up. That's just a natural occurrence that happens in septic systems. So we calculate -- the septic system drainfield has a finite life and that life runs from anywhere between 25 and 50 years before the system actually will plug up. Once it does start to plug up we like to have a replacement area so we can kind of match the -- match the life of the dwelling with the life of the lot to provide adequate sewage treatment.

**Q What did you assume in terms of the corridor that might be available for these two standard system?**

A Okay. Again, how I figured the corridor for these two standard systems is I first -- again, I assumed that -- I used the -- the -- Mr. Lockner's assessment from his October 14, 1999 letter, which stated that it was his belief that there was a suitable soil area from the lakeshore to 100 feet



back from the lake. Now again the agency doesn't necessarily, you know, subscribe to that position but just for the sake of doing the assessment we just assumed that that would be true just to run the assessment. Again we don't necessarily believe that there's suitable soils there, but we just -- we just -- for the sake of this we just kind of went with it. So again I drew a 100-foot line back from the lakeshore level and assumed that 100-foot corridor from the lake level to 100 feet back was suitable soil area. So then I had a 100-foot swath at that point that, you know, possibly could be suitable because it was -- had adequate drainage. From that then I looked at the 100-year floodplain elevation, a map which was drawn on the plat map by Widseth, Smith & Nolting and they had that designation of 100-foot (sic) floodplain marked on there. And then I found that the 100-foot (sic) floodplain mark, you know, varied among the -- varied along the plat map and in some areas it was very deep into the lot and some areas there was virtually no floodplain on the lot, so I put that lot -- I put that into my assessment and looked at how those two lines overlapped.

**Q Mr. Wespetal, why is the -- what's the significance of having a floodplain in terms of**

standard systems?
A The significance of that is because the Minnesota Rule Chapter 7080 does not call a mound system in a floodplain area a standard system. It's called an alternative system, which is found in Minnesota Rules 7080.0172 and those are labeled as alternative systems and not standard systems.
**Q So you can't locate a standard system in a floodplain, is that correct?**
A That's right, yes.
**Q What did you take into consideration or what did you assume about potential other constraints that might affect the locations of a septic system?**
A When I did my assessment I just looked at the parameters I just mentioned before, suitable soils based on Mr. Lockner, floodplain elevation, and other things you could probably add further constraints on that would be the -- there's a 50-foot lake setback, so that corridor which was once 100 feet wide based on the suitable soils definition is now cut from 50 feet -- from a 100-foot wide swath to a 150-foot wide swath because of that setback. So that's one other constraint you could add to the -- to the mixture.
Plus there's other constraints --



THE JUDGE: Excuse me just a moment. I think you just said 150 foot. If you start out with 100 foot from the soil information and then you exclude the 50 feet from the floodplain, what are you left with?
MR. WESPETAL: Excuse me, it would be a 50-foot swath. I think I talked too fast.
THE JUDGE: Okay, all right.
MR. WESPETAL: So it's 100-foot wide minus the setback, which is 50 feet, so 100 minus 50 is that band or that corridor now is a 50-foot wide corridor and not 100 foot wide. Then there's other constraints besides just what I mentioned before. Minnesota Rules Chapter 7080 has other siting requirements for mound systems. For example, they can't be placed in a swale, they have to be placed on a contour, they can't be placed on disturbed or compacted soils, they have to meet the property line setback, they have to meet the well setback, they have to meet a building setback. I did not even factor those in my assessment at this point.
BY MR. COOL:
**Q So for purposes of your assessment, did you assume almost perfect or perfect conditions?**
A I assumed perfect conditions.



**Q And what were the findings of your analysis?**
A The findings of my analysis were basically on lots -- let me look at the map here, go from a little bit of memory here. That Lots 1, 2, 3, 4 and 5 basically, the 100-foot -- I mean the 100-year floodplain line was farther than the suitable soil line at 100 feet. So if my swath of suitable soil layer -- soil was 100 feet based on Mr. Lockner and my floodplain was deeper than that, that basically then took out all my good, suitable soil area because of the floodplain restriction. And that was on Sites 1 through 5 basically had no suitable area for a standard system based -- based on the encroachment of the floodplain. That also occurred on Lot No. 14 where the floodplain elevation was deeper than the 100 foot of suitable soil area. So again 1 through 5 and 14 based on this assessment would not have any area for a suitable -- suitable situation.
On the remaining lots there was some area of suitable soil on those lots. With Lots 6, 7, 8 and 9, those lots appeared to have, you know, a reasonable amount of suitable soil area or suitable area that you possibly could place a mound system in, again, under perfect conditions of no well setbacks or property line setbacks or things of that nature.



That those lots seemed to be a -- you know, reasonably assured of having some area for a mound system.
Then Lots 10, 11, 12 and 13, the area there was pretty small. Those would have to take some detailed investigative work to try to find out if there's enough area on those lots to see if you could get two standard mound sites within those -- with those lots there.
**Q Now, this analysis was done under the assumption that there were appropriate soils for a standard mound system, correct?**
A Yes.
**Q And the agency has not seen information indicating that such soils exist, is that correct?**
A That is correct.
(Exhibit No. 49 was marked.)
BY MR. COOL:
**Q Handing you what has been marked as Exhibit 49, do you recognize that document?**
A Yes.
**Q And what is it?**
A That is a drawing of the assessment that I made that I just explained.
**Q And the shaded areas are the assumed**

suitable soil locations sites, is that correct?
A Yes.
MR. COOL: I move the admission of Exhibit 49.
THE JUDGE: Any objection to Exhibit 49.
MR. FISH: I've got a question briefly.
THE JUDGE: Yes.
MR. FISH: When was this document made?
MR. WESPETAL: It was probably maybe a week.
MR. FISH: A week ago?
MR. WESPETAL: Yeah. Probably a week ago, maybe a little less.
MR. FISH: I guess this one is clearly something that wasn't disclosed with the administrative record, Your Honor. I would -- on those grounds I would move that it not be admitted. I've not seen this before ten seconds ago.
MR. COOL: Well, there is --
THE JUDGE: Did you want to respond?
MR. COOL: Yes, I do, Your Honor. There is no outstanding data practices request that the agency has received covering documents recently prepared. There was no discovery done by Mr. Fish with regard to witnesses or what witnesses were



preparing in terms of their evaluations. This was not prepared for the Corps' administrative record, this was prepared for purposes of this hearing.
MR. FISH: Your Honor, it was represented I would have every document I need from the administrative record as I requested, therefore no formal discovery was done. It's not normal to do formal discovery in these matters and informal discovery is actually supported by the court system, as I understand, and counsel is really giving me no explanation as to why it wasn't given to me, Your Honor, if he intends to -- except for the purpose of surprise, I would imagine.
MR. COOL: Your Honor, this was prepared in preparation of this contested case hearing as a witness evaluation and witness exhibits.
MR. FISH: Exactly my point.
THE JUDGE: The problem is that there wasn't a -- a request made. Had there been a request for all exhibits or had that been ordered by me as some sort of a prehearing order, that would have clearly taken care of the problem.
MR. FISH: Your Honor, so you do not want us to refer to counsel representations when doing discovery in these matters in the future?



THE JUDGE: I'm not done yet. I don't recall -- I did not tape record the prehearing conference telephone conversation, I did not issue any sort of a letter that talks about what agreement there was with regard to disclosure of documents, so I can't say what that was. My gut reaction is this is not -- based on what we've had in terms of oral testimony, this is not terribly important, it just illustrates graphically what's already been testified to orally.
Mr. Cool, use your best recollection, if you can, and tell me what you think happened during our prehearing conference telephone call with regard to discovery, if you can remember.
MR. COOL: Well, you asked about discovery and, I believe, my recollection is we discussed that there had been no formal discovery in terms of things like interrogatories, that type of thing, but I don't recall representing that he had every document. And even if I had, this is the type of document that was just recently prepared post our discussion.
THE JUDGE: That's true. Mr. Fish, you tell me your recollection, please.
MR. FISH: Your Honor, my recollection of my telephone conference with Mr. Cool --



THE JUDGE: Is this the one I was in on?
MR. FISH: That I don't know, but I had a specific conference with Mr. Cool regarding the timing of this matter and whether we'd even be having this matter due to the nature of the ongoing lawsuits, and in that it was represented to me by him that since I had done the public data request I had everything he had. He indicated something to the effect, Your Honor, this isn't verbatim, that if I wanted to do another discovery request I would just get what I already have and that due to the numerous court actions that have been floating around we probably both have many duplicative copies of all of the documents that were used in this matter.
MR. COOL: Your Honor, if that was a conversation that Mr. Fish and I had and if it was during the time of scheduling of this hearing, that had to be substantially before the Public Notice that was for this contested case hearing, and we were in the process of preparing for hearing, but in this -- terms of this evaluation, this evaluation was probably initiated, and Mr. Wespetal can refresh my recollection, probably within the last two weeks.
MR. WESPETAL: Definitely within the last three weeks, yes.

MR. COOL: So these documents didn't even exist prior to the Public Notice of this hearing.

THE JUDGE: All right, here's what I'm going to rule: I'm going to rule that the document can come in and that there was no binding obligation on either one of you apparently to provide copies of exhibits to the other. There may have been – I don't know what happened in conversations between the two of you, but I think that's the kind of thing that has to be nailed down unfortunately in writing somehow. And so that's the ruling, it can come in, it's not barred by the fact that Mr. Fish did not have it. I wish it had been otherwise because this is – this particular document I don't think matters that much, this just illustrates what he's been talking about orally, but there may be documents where this is going to be a problem and it's too bad that it was left the way it was. All right. So it can come in.

By the way, did we offer 48, the Gowdy permit application?

MR. COOL: I will offer it, Your Honor.

THE JUDGE: Is there any objection to 48, the Gowdy permit application?

MR. FISH: Your Honor, was this after the



MPCA revocation? To the extent it was, I would object.

THE JUDGE: No, it's October 9th of '01. I shouldn't say no. It was October 9th of '01. I don't know the date of the PCA –

MR. COOL: The PCA's revocation was October of 2000.

THE JUDGE: So it's after – it's after the revocation. So why are you offering it, Mr. Cool?

MR. COOL: The Gowdy application?

THE JUDGE: Right.

MR. COOL: For purposes of Mr. Wespetal's evaluation of the site soils, to indicate that he took into consideration what information was available regarding specific soil borings on the site.

THE JUDGE: Just he considered everything he had available, including the Gowdy thing?

MR. COOL: Right.

THE JUDGE: Do you want to stipulate to that and then it won't be in the record, Mr. Fish?

MR. FISH: I guess I'm not certain what he meant by – what he's meaning by this.

THE JUDGE: I think what he's trying to say is that in reaching his determination of whether



the soils were suitable he considered everything he had available to him.

MR. FISH: Suitable at the time of the revocation or suitable today?

THE JUDGE: Today, I think.

MR. FISH: Well, I think that would be irrelevant. I think what's relevant is what information they had in front of them at the time they made their decision. To the extent they're now relying on new additional information, I don't think that is relevant at all to the – to the revocation, Your Honor, and should be stricken.

THE JUDGE: This supports – I mean this is more apt to support you than him.

MR. FISH: I suppose it depends on how it's viewed.

THE JUDGE: Well, anyway. I will – let me think about this. I'm going to admit it for purposes of his statement that he considered everything he had available to him. So it's admitted. At some point we should probably take a break, whenever there's a logical places. If you can finish up with him soon, fine. If not, . . .

MR. COOL: Yes, I can.

(Exhibit No. 50 was marked.)



BY MR. WESPETAL:

**Q Mr. Wespetal, handing you what has been marked as Exhibit 50, do you recognize that document?**

A Yes.

**Q What is it?**

A This is more of a narrative description of what I testified to and what's portrayed on Exhibit 49.

**Q And is this a summary of the assumptions and factors that you took into consideration?**

A Yes.

MR. COOL: I move the admission of exhibit 50.

MR. FISH: This I would most certainly object to, Your Honor. It looks like it was prepared on 7/21/03 and, as he states, it's a narrative of his testimony. It would be considered argumentative and hearsay, Your Honor, and simply not any evidence that I believe is admissible under any court rule.

THE JUDGE: It's a summary of what he testified to, is that correct?

MR. COOL: It's more – it's the details, is that correct, Mr. Wespetal?

MR. WESPETAL: Yeah, details is probably a good way to describe it, yes.

THE JUDGE: I'm going to admit it, it shows his calculations. It will help all of us, I think, know how he reached his conclusion.

BY MR. COOL:

**Q Mr. Wespetal, in doing your evaluation you basically assumed that there were no other constraints other than the 50-foot corridor, is that correct?**

A Yes.

**Q And for purposes of illustration of potential constraints on lot development and sizing, did you do a further evaluation based upon the Gowdy application?**

A Yes, I did. I did a little more follow-up after the Gowdy review.

(Exhibit No. 51 was marked.)

BY MR. COOL:

Q Handing you what has been marked as Exhibit 51, do you recognize that document?

A Yes.

**Q And what is that?**

A That is the same as Exhibit 49 only with the addition of an -- the addition of another constraint, which would be the well setback constraint that was proposed on Lot No. 10.



**Q And basically describe the well -- are we talking water supply wells?**

A Yes, we're talking water supply wells.

**Q And where are those constraints or setbacks required in the rule?**

A Those setbacks are required in Minnesota Health Department Water Well Rules, which is Minnesota Rule 4725. I got that one mixed up with the plumbing code, but I think it's 4725.

MR. COOL: Move the admission of this document.

MR. FISH: I would object on the same grounds as the previous documents, Your Honor.

THE JUDGE: What this shows is graphically the area that would be left if you took into account the well setback requirements, is that what you're saying?

MR. WESPETAL: Yes.

THE JUDGE: Where did you get the well setback locations from -- the wells themselves, rather.

MR. WESPETAL: I just did it for Lot No. 10, and what I did there is I had the proposed site plan for Lot No. 10 that was conducted by Mr. Tim Fish, and again they had the structure located, they



had the septic system located and they had the well located on that sketch plan. So just for the sake of illustrative purposes I thought well, again there's lots of constraints on siting a septic system, well constraints being one of them. I thought just as an example that well was proposed as listed on Exhibit 51, so I measured out from the site plan done by Mr. Tim Fish, I measured those measurements on the plat map as close as possible that I could and then I just drew two circles, one would be the well setback from the deep well, which would be the smaller circle on the map, and one would be a -- the larger circle would be if Mr. -- Mr. Gowdy would have installed a shallow well versus a deep well. So two different setbacks based on the well depth. So I just was trying to get an illustrative purpose in my mind to look at, you know, again there's other constraints besides just the suitable soil and the 100-year floodplain and the 50-foot setback from the lake. There's many other constraints and well setback is one of them, so I did this for my own just kind of illustrative purposes to see what it would look like.

BY MR. COOL:

**Q The purpose you're trying to illustrate is there are constraints that certain lot owners**



**unbeknownst to them can constrain other lot development by the placement of other things such as water wells, correct?**

A Yes.

THE JUDGE: All right. I'm going to admit the document for purposes of showing the impact of the well setback rules.

MR. COOL: Mr. Wespetal -- I apologize, Your Honor, this is going on a little longer. Do you want to take your break now?

THE JUDGE: We're willing to keep going.

BY MR. COOL:

**Q Mr. Wespetal, if this project were to proceed and include the installation of mound systems in the areas you've indicated are not suitable, the soils are not suitable, would there be any danger to human health or the environment as a result of the installation of these systems?**

A I would have to say yes to that. Again sewage can contain, you know, very high levels of pathogenic organisms, such things as viruses, bacteria, parasites, all sorts of things that can get people sick. And if again, if the soils are saturated to the ground surface, soils introduced from a mound system above the soil surface, it passes

through let's say a, you know, a couple feet of sand which is not total treatment, it needs to pass through three feet, it may pass through maybe two feet of sand, hits the saturated soil level, travels sideways and partially treated sewage can then seep out in the yard where, again, it's exposed to the public. Things such as children playing can come in contact with it, pets can come in contact with it, other animals, vectors such as mosquitoes and flies can come in contact with it. So it is considered an imminent public health threat in Minnesota Statute 115.55 that is partially treated sewage without underground surfaces, it's labeled as an imminent threat to public health and safety.

**Q Would it create any public health concerns regarding groundwater?**

A Yeah, the same concerns that would basically apply -- for example, let's say the sewage passes through the two feet of mound sand, gets into the one foot of saturation soil and let's say the gradient is high enough that the water is moving pretty fast, the groundwater rather is moving pretty fast and it can get away from the system underground because of a fairly high gradient. In this case here I don't see much of a gradient, but anyhow, if there was a



gradient it could pass out underneath the ground surface. But at that point there the groundwater would be -- would be impacted because it can only pass through two feet of soil and not three foot, so now you have the same pathogenic problems now entering the groundwater and that groundwater would be discharged to the lake via the groundwater and come out in the lake as plume and, again, then the same public health problems would result to swimmers, boaters, fishermen, things of that nature that would come in contact with the sewage/groundwater mixture which would have untreated pathogens.

**Q Would there be any danger to the environment resulting from the operations of these mound systems on saturated soils?**

A Yeah, the same would occur with phosphorus that I just described for pathogens, that sewage contains, you know, phosphorous in it and the phosphorous is well documented that it causes eutrophication of lakes, which is increases of aquatic growth and algae and things of this nature. So again if the sewage would peak out on the ground surface it could directly run out into the lake adding phosphorous to the lake or during rainstorm events, you know, that puddle of sewage with



phosphorous could wash off into the lake.

And then the same mechanisms would also follow with groundwater, the partially treated sewage would not be treated for phosphorus. This partially treated sewage/groundwater mixture would travel laterally underneath the ground, come out as a plume into the lake and contaminate the lake with phosphorous from an underground source also.

**Q Now, if these types of situations actually occurred, there would be rule violations, is that correct?**

A Yes.

**Q And what particular rules would be violated if those scenarios occurred?**

A The one violation would be Minnesota Rule 7050.0210, which basically is discharges -- discharge of untreated sewage into waters of the state.

MR. FISH: Your Honor, I'm going to object to this line of testimony. There's been no allegation that anybody's violated a rule here regarding sewer discharge. I don't know how that's at all relevant to these proceedings. I suppose we could hypothesize a million types of violations that a landowner could do in the future regarding -- disregarding permits, disregarding setback laws, but



I don't know how any of that is relevant here today, Your Honor.

THE JUDGE: Mr. Cool, do you want to respond?

MR. COOL: The relevancy, Your Honor, is if this project as proposed with development and with the indications from the October 1999 letter from the county that mound systems could be installed on these systems -- or on these sites, the agency is identifying conditions on the sites which in the agency's view would result to septic systems that would not be installed in compliance with the 7080 and which would, based on the agency experience with the installation of mound systems on saturated soils, result in the discharges of undertreated sewage resulting in endangerment to not only public health but the environment. And I think it's important for full development that the agency be allowed to identify those rules that potentially could be violated under those conditions.

THE JUDGE: All right, I'm going to allow him to continue. Let me just say something, and I've been thinking this for the last half hour. Mr. Fish, if there is some sewer plan other than the standard mound systems and we're just wasting our time talking

about standard mound systems, –

MR. FISH: Your Honor, I'm holding an e-mail where the MPCA themselves were in negotiations with the County on an off-site central location and I guess that's why I'm wondering what this whole line of testimony is about, Your Honor. According to the MPCA and their suggestions there was no need for any mound systems on this, yet that seems to be the entire focus of this last hour and a half of testimony.

THE JUDGE: What is the plan for sewage?

MR. FISH: The initial plan was a mound system. During the discussions about off-site systems these Restoration Orders came down and Revocation Orders came down before this off-site system suggested by the MPCA, by Lawrence Zdon, became viable, Your Honor. And it appears that the MPCA now wants to ignore these discussions and go back to the -- to the time frame when the mound systems were being discussed.

THE JUDGE: Are you willing to commit there won't be mound systems?

MR. FISH: Most certainly if that's a precondition, Your Honor, yes, absolutely.

THE JUDGE: If they agree there won't be



mound systems, do we need any further testimony about mound systems? I mean mound systems were apparently in your mind or in the agency's mind.

MR. COOL: Yes, Your Honor, they clearly were because there's been an absence of information from Mr. Bailey regarding these sites and the information that was evaluated was that that is most recent. So the applicant hasn't come forward with any proposals. Now I don't know at this point in time in this hearing how the applicant, apparently he's exerting more control than the PCA currently knows about these sites, you know, to make a representation that mounds won't be now placed on the sites. I don't know how legally enforceable such a commitment in this proceeding can be made. Certainly the agency could explore that if Mr. Bailey, as indicated in the revocation, wanted to reapply for a certificate and provide the kind of information that the agency requested on exactly what was he going to propose. So the agency had to evaluate what they believed were the current proposals, you know, as articulated to them by the various people who had been in communication with Mr. Bailey during the platting system or the platting process. That's why the emphasis on the mound system and the evaluations



of the mound systems.

THE JUDGE: How much more have you got on mound systems that you need facts from him? Legal conclusions about whether it would violate a rule or not you can make in a brief. The question about facts from him on mound systems, have you gotten everything you need?

MR. COOL: Well, Your Honor, certainly in the capacity of PCA staff people they make compliance determinations all the time.

THE JUDGE: I understand that. My question is: Do you need more facts from him?

MR. COOL: No, Your Honor.

THE JUDGE: I think we should wind up the mound system stuff then. And now let's take a break, let's take a 15-minute break at this point and then we'll come back.

(A break was taken at this time.)

THE JUDGE: We're now resuming after a break. You may proceed, Mr. Cool.

MR. COOL: I have no further questions, Your Honor.

THE JUDGE: Okay. Mr. Fish?

CROSS-EXAMINATION

BY MR. FISH:



**Q Mr. Wespetal, you spent just about two hours testifying about one specific type of mound system here. I think you called it -- was it a standard mound system or what was the name of that?**

A Standard mound system, yes.

**Q How many different types of septic treatment systems are there, whether individual, communal or otherwise?**

A It all depends -- you want standard systems, alternative, experimental?

**Q Standard, experimental, alternative, all of them.**

A Standard there is -- there's five standard; alternative, there is four or five alternative; and then there's two other classifications in the rule called Other and Performance and that basically has unlimited potential for design options.

**Q Did you explore any of those other types of systems and how they could be applied to this project?**

A No.

**Q Do you know if the MPCA in their workup of this matter explored other types of systems and their application of this project?**

A I was not aware of any myself, no.

(Exhibit No. 52 was marked.)
BY MR. FISH:
**Q Showing you what's marked as Exhibit 52, have you ever seen that document?**
A I don't believe so, no.
**Q All right. Now, Lawrence Zdon, what is his, I guess, status with you or relationship to you?**
A He's a water quality engineer for the MPCA and I am a -- I guess a technical expert dealing with individual sewage treatment system programs. He deals with the larger wastewater issues, I deal with more individual wastewater issues.
**Q Were you aware that you were both working on this project?**
A When I started working on the case, that's the first knowledge I've had of the Bailey situation, while working on this case. It was presented to me probably about, I don't know, six weeks ago, maybe. That's the first I've heard of this case and if Larry was working on it earlier than that, I have no idea. We didn't have any big conversation about that probably previous to that.
**Q So you had no conversation with him about a suggestion that perhaps a central drainfield collection system placed in the back or to the west**



**would be better than an individual sewer system treatment plan on this project?**
A Larry and I did not discuss any treatment -- other treatment options for this site, no.
**Q In your preparation for this trial?**
A Yeah, in preparation for trial we've talked about other things concerning design options or whatever, but previous to that time, no.
**Q Now I don't purport to be any type of expert in your field of work, but have you made any type of a historical, I guess -- have you done any type of historical research on Lake of the Woods and how the shoreline may or may not have changed over the last 50 years and the effect that would have on the soil types near the shoreline?**
A No, I have not.
**Q Now one of the aspects of what you testified to was a lack of drain-down within so many feet, 100 feet or so of the shore. That was one of the, I guess, main concerns here or disputes between yourself and the local county officials. Would that be a fair characterization?**
A Yes.
**Q Do you believe the local county officials may have more knowledge about the historical nature**



**of the soil in this area?**
A I really couldn't speculate on that, I guess.
**Q Do you have any opinion as to what would be considered relict mottling, I believe the term is?**
A Yes, I am aware and understand relict mottling, yes.
**Q Maybe you could describe to the Court what relict mottling is?**
A What relict mottling is, it's basically -- it is a -- what I just described earlier, it's indications that the -- had high water saturated conditions at a certain level in the soil, but that was based on basically past wetness. For example, if you had a wetter climatic period when the glaciers were melting or whatever, you had a lot more water involved in the area, at that time soils were forming during that high water mark and therefore these features that we just discussed, gray colors and these iron masses, were forming in this higher water environment, and then when the water's climatic change or the glacier went away or whatever, then the water level -- the water regime was reduced that these features still remained in the soil. So if we look at those features as of today, they would be



actually reflective of the past wetness period.
**Q And as far as any potential relict mottling in this 100-foot area within the lakeshore around the Sunny Shores project, do you have any idea of the extent and age of that relict mottling that might be present?**
A Are you asking me do I think that is relict mottling with that first 100 feet?
**Q My question is: Do you have any knowledge of the extent of relict mottling that may be present?**
A I have no knowledge of any relict mottling in this -- along this lakeshore.
**Q Do you have any knowledge of how many year ago it may have been that the actual lakeshore extended out 50 feet or even more from its present location?**
A No, I do not.
**Q Do you do any investigation with the local government officials, mapping or other agencies to make a determination of this when deciding whether relict mottling was present or not?**
A No.
MR. COOL: Objection, ambiguous. What is "this" referring to?
MR. FISH: The previous question.

THE JUDGE: The previous lakeshore locations?
MR. FISH: Yes.
THE JUDGE: The question was did you do -- why don't you repeat it, I don't want to get it wrong.
BY MR. FISH:
Q **My question and I'll try to repeat it was: Did you do any investigation with either local government officials, historical maps or otherwise to determine the precise location of the lakeshore 50 years ago prior to making your conclusion as to whether this was a relict mottling or not?**
A No.
Q **So had the lakeshore been out 50 feet or 100 feet further, certainly the drain-back area would be changing as erosion changes, would that be a fair statement?**
A I'm not totally understanding your proposition, but --
Q **Well, do you believe there's some natural drain-down from the shore of Lake of the Woods into this -- into typical soil -- soil banks abutting the Lake of the Woods area?**
A There is likely some drain-down, yeah.



Q **And as -- as the shoreline erodes, this drain-down will crawl backwards with the shoreline. Wouldn't that be a reasonable statement?**
A Yes.
Q **And isn't it true that it's been determined 100 feet is the typical draw-down of a shoreline?**
A That's real soil dependent. In a heavier textured soil I'd say it would be less, in a finer -- or in a heavier textured soils, clay-type soils would be less and sandy type soils would be more, so it's tough to make a general statement about that.
Q **Have you made any type of an independent determination of the vegetation type and how that may affect whether this is -- historic vegetation has not yet been reclaimed by more upland type vegetation due to the erosion on the shore and change?**
A No, I've not made any determination like that, no.
Q **Now, you made some reference that it may be illegal to place a sewer system in a floodplain?**
A Yes.
Q **Do you have a cite for that?**
A The cite would be in 6120, and the provisions there, I don't remember the exact reference, if the -- there's two parts of the



floodplain, there's the floodway and there's the flood fringe. The shoreland floodplain regulations basically prohibit any system from going into the floodway, but they do -- Minnesota Rules Chapter 80 (sic) does allow systems to be put into the flood fringe with certain design -- extra design considerations.
Q **Are you stating that the State of Minnesota unconditionally does not allow septic systems in a floodway?**
A Yes, in a floodway, yes.
Q **Under any circumstances?**
A I'm not sure of the variance procedure in that rule. I don't know if -- who is empowered to issue a variance from that. Most rules have some sort of variance provisions, but I'm not sure if that variance provision is attributed to that citation or who does that, I really don't know.
Q **So whether a variance is available is beyond the scope of your expertise?**
A Yes.
Q **Now, did the standard Minnesota rules account for varying moisture accumulation during the winter months from, say, southern Minnesota to northern Minnesota?**



A I think I understand your question. I think the answer is no.
Q **Ground soil moisture accumulation.**
A I'm not following what exactly you're referring to.
Q **Saturation, is there any differentiation --**
A Between southern Minnesota and northern Minnesota, do we factor that into the rules?
Q **Yes.**
A No.
Q **Have you factored that into any of your -- I guess, your analysis on the Bailey project?**
A No.
Q **Would you agree that there is substantial difference in saturation levels between northern Minnesota and southern Minnesota depending on the season?**
A I guess no, not really.
Q **Have you -- do you have any data on this? Have you ever, I guess, researched that issue?**
A Well, it's a little more than just precipitation. It's precipitation and landscape position. So if you have a place that it's -- it's receiving quite a bit of run-off from upslope, you can have a very wet site in southern Minnesota and

you can have a very dry site in northern Minnesota based on just landscape position alone, so it's just not climate it's a number of factors of, again, hydrolic head to a discharge point, soil texture, landscape position. I mean there's a number of factors to determine whether the soil is wet or it's dry, it's just not a regional -- a regional north/south boundary.

**Q How about temperature?**

A How about temperature? It would probably play a minor part, if you really stopped to think about it and tried to think through it probably temperature has some effect, but boy, it's probably not going to be much.

**Q You don't know though, do you?**

A No. To be on the safe side I'll say no.

**Q So midwinter thawing or late freezing, early thaws in the south would have no substantial impact or no impact whatsoever, according to your opinion?**

MR. COOL: Objection, facts not in evidence. I don't think he testified to that.

MR. FISH: These are temperature oriented questions, Your Honor. I think he's testified that temperature has no play on this.

THE JUDGE: I think -- I think that's his



testimony. I think the important matter is whether it's in the rule or not. You know, if the rule doesn't take it into account, it doesn't matter what he thinks.

BY MR. FISH:

**Q So Mr. Wespetal, --**

MR. FISH: I'm sorry, Your Honor.

THE JUDGE: I don't think there's anything in the rule that I know of about it. It's either saturated or it's not. I think you better establish that because it's the rule that counts, and if the rule is defective, then the rule is defective.

BY MR. FISH:

**Q Mr. Westfall (sic), do you have a specific reference of the soil type found in Lake of the Woods County as it can be found in your rules?**

A Are you asking can we classify the soils in Lake of the Woods County per the rules in 7080?

**Q Yes.**

A Yes, we can.

**Q And is this conclusively established or is there any ambiguity in the soil types?**

A In the soil types or in the rule provisions? I'm not sure which you're asking.

**Q As -- in the soil types as found in Lake of**



**the Woods County.**

A Is there any ambiguity in the soil coloration as far as determining saturation, is that what you're asking?

**Q As determining soil types.**

A I need that clarified again.

**Q I'll try to rephrase it.**

A Thank you.

**Q As you apply the rules as established in Minnesota to the soil types found in Lake of the Woods County, have you found any ambiguity in clearly classifying the soil types in Lake of the Woods County to these rules?**

A We have found none, no.

**Q Now, if -- in your analysis did you take into account potential uses of these lots that would not include septic systems and wells on each and every lot?**

A No.

**Q Did you in your hypothetical of what may happen in the future consider common wells or less frequent -- less frequent wells than one per lot?**

A No.

**Q Did you consider off-site septic systems?**

A No.



**Q Did you consider lots that may go undeveloped indefinitely in the future and be more recreational than residential?**

A No.

**Q Did you consider future erosion on these lots and the implications that may have on the feasibility of these wells or mound systems you were talking about?**

A No.

**Q So to summarize your testimony, basically your testimony is limited to very narrow circumstances that all lots would have mound systems and all lots would have wells? That was the limited, I guess, scope of your analysis?**

A Yes.

MR. FISH: I have no other questions.

THE JUDGE: All right. Mr. Cool, do you have anything more?

MR. COOL: No, Your Honor.

THE JUDGE: All right, thank you very much.

MR. COOL: Could we go off the record?

(An off-the-record discussion was held.)

THE JUDGE: Back on the record.

MR. COOL: I'd like to call Mr. Jeff

Koschak, please.

THE JUDGE: Mr. Koschak, you're still under oath.

THE WITNESS: Okay.

JEFFREY KOSCHAK,

having been previously sworn, testified as follows:

REBUTTAL EXAMINATION

BY MR. COOL:

**Q Mr. Koschak, do you recall in your earlier direct examination by Mr. Fish a discussion about a marina project?**

A Yes, I do.

**Q And do you recall some discussion about a general permit that apparently affected this marina project?**

A Yeah, I recall the harbor permit we discussed.

**Q And could you briefly -- well, could you explain to the extent you know what this marina project was about and how it was covered by this particular general permit?**

A As I discussed before, as I recall, Michael Keefe, who was a current Corps project manager at Stevens Point, Wisconsin, handled that project. He received the application from Mr. Bailey. I don't



recall exact specifics of the harbor it mentions. That's in our administrative file in St. Paul. But Michael Keefe then issued a general permit, what's called GP-1 for the harbor. I think that was about in March of 1990.

(Deposition Exhibit No. 53 was marked.)

BY MR. COOL:

**Q Handing you what has been marked as Exhibit 53, do you recognize that document?**

A Yes, that's the Corps Public Notice that advertised the General Permit 1, GP-1, that was in effect in this time period. It says on the third page it was issued January 1, 1990 and expired June 30, 1990, but there had been subsequent GP-1 issuances of this. And it stayed the same, as I recall, to about the year 2000, then the conditions got changed slightly, but at least when the permit was issued to Mr. Bailey this was the one which had been used.

MR. COOL: Move for the admission of Exhibit 53.

THE JUDGE: Any objection to what's been marked as Exhibit 53?

MR. FISH: I guess I do have an objection. I don't know what the relevance of this general



permit is.

THE JUDGE: Mr. Cool?

MR. COOL: Well, there seemed to be some discussion about the implications of this general permit coverage for the site itself, and the permit has certain limitations that may be implicated by the discussion of a marina in the prior permitting. So for clarity, the PCA is offering the general permit with Mr. Koschak to explain some of the limitations that exist in this permit.

MR. FISH: I guess I'd renew my objection, Your Honor. This isn't -- I mean Mr. Bailey's permit was specific to his shore. It may have incorporated provisions of this document, but, again, I don't know what the relevance is, and it certainly isn't -- isn't the same permit he received, Your Honor. This is a general state-wide permit issued.

THE JUDGE: Do you intend to argue anything about this harbor or marina?

MR. FISH: No, I don't have any other evidence on it, Your Honor.

THE JUDGE: I'll tell you what, I don't think it had any relevance when it was first being discussed myself and so I'm going to say that 53 is not relevant and any discussion of the marina or



harbor is not relevant.

MR. COOL: I have no further questions, Your Honor.

MR. FISH: Your Honor, I do have -- would like to ask Mr. Koschak a rebuttal-type question, I guess you would characterize it as.

THE JUDGE: All right. I guess I'm not going to consider the marina or harbor.

MR. FISH: That has nothing to do with the marina. Not cross, but rebuttal.

MR. COOL: Well, Your Honor, I --

THE JUDGE: If you're entitled to call him back on rebuttal, why isn't Mr. Fish? It's the same thing. Okay.

SURREBUTTAL EXAMINATION

BY MR. FISH:

**Q Mr. Koschak, I'm showing you what's marked as Exhibit 52. Do you recognize that document?**

A This is an e-mail from myself to Larry Zdon, yes.

**Q And this -- this is the e-mail dated November 8th of 1999 wherein you suggest that a central drainfield collection system be placed, is that true?**

A Where at?

Q (Indicating.)
A Yes, that looks correct.
MR. FISH: I'll offer Exhibit No. 52, Your Honor.
THE JUDGE: Any objection to 52?
MR. COOL: No objection, Your Honor.
THE JUDGE: It will be received.
BY MR. FISH:
**Q This was actually in reference to the fact that -- and I think -- if I may quote somewhat verbatim off of your e-mail you refer to the fact that Bruce Hasbergen or Lake of the Woods County now has become the permittee on this project, is that right?**
A At that time it appears that I was under that understanding.
**Q And you were suggesting that he, in other words, Mr. Hasbergen, and Gary Lockner sort of team up in the next sentence and work on this project together?**
A With Mr. Bailey. I mention Mr. Bailey, too.
**Q Certainly. And likewise, that Lake of the Woods County as permittee, may want to pursue an offsite central collection system, you even suggest a location, isn't that true?**



A I mention the county engineer confirmed they became the new permittee and I suggested that Mr. Hasbergen work with Mr. Lockner and Mr. Bailey to see if a central collection system could be done.
**Q That was actually your suggestion, wasn't it?**
A Suggestion or recommendation. Again I don't have any decision authority, but a suggestion to see if things could be resolved out there.
**Q That's something you suggested might be quite feasible and with your expertise and training you believed that could be quite feasible in that project?**
A I don't have any expertise in septic systems. I understand general concepts, but I leave the expertise up to the PCA, they're the experts, not myself.
MR. FISH: No other questions.
THE JUDGE: Mr. Cool, do you have anything?
MR. COOL: No, I don't.
THE JUDGE: Thank you very much. Mr. Cool, do you have anyone else?
MR. COOL: I have no further witnesses, Your Honor.



THE JUDGE: Off the record for a minute.
(An off-the-record discussion was held.)
THE JUDGE: Why don't we break now and resume at 8:30.
(The hearing was adjourned for the day.)