STATE OF MINNESOTA
OFFICE OF ADMINISTRATIVE HEARINGS
100 Washington Square, Suite 1700
100 Washington Avenue South
Minneapolis, MN 55401-2138

---

In the Matter of Gary Bailey -
MPCA Section 401 Certification

File No. 6-2200-15413-2

Volume III

---

DATES: July 23-25, 2003
LOCATION: Lake of the Woods County Courthouse
Baudette, Minnesota

ADMINISTRATIVE LAW JUDGE: Allan W. Klein

APPEARANCES:

Mr. Rick Cool
Assistant Attorney General
Suite 900 - NCL Tower
445 Minnesota Street
St. Paul, Minnesota 55101-2127
In behalf of the MPCA.

Mr. Alan B. Fish
Attorneys and Counselors at Law
109 Second Street Northeast
Roseau, Minnesota 56751
In behalf of Gary Bailey.

COURT REPORTER: Stefanie Lamppa Olson
Registered Professional Reporter



INDEX


| WITNESS: | EXAMINED BY: | PAGES: |
| --- | --- | --- |
| Day 3 | | |
| Gary Lockner | Fish - Direct | 476 - 526 |
| | Cool - Cross | 526 - 529 |
| Leslie Lemm | Cool - Rebuttal | 530 - 532 |
| Steve Eggers | Cool - Rebuttal | 533 - 535 |
| | Fish - Surrebuttal | 535 - 537 |
| Mark Wespetal | Cool - Rebuttal | 538 - 545 |
| | Fish - Surrebuttal | 545 - 546 |

EXHIBITS

| EXHIBIT IDENTIFICATION: | PAGE RECEIVED: |
| --- | --- |
| Kroschak No. 53 - January 5, 1990 Public Notice | -- |
| Lockner No. 54 - Soils Map | 490 |
| Lockner No. 55 - Soils Map | 490 |
| Lockner No. 56 - Recommendation to the County Board | 498 |
| Lockner No. 57 - June 17, 1999 Notice of Wetland Conservation Act Decision | 522 |




THE JUDGE: You can call your first witness.
MR. FISH: I would call Gary Lockner.
THE JUDGE: Before you're seated, can I ask you to raise your right hand, please.

GARY LOCKNER,
after having been duly sworn, testified as follows:

DIRECT EXAMINATION

THE JUDGE: Be seated.
BY MR. FISH:
**Q Mr. Lockner, could you state your name and occupation, sir?**
A Gary Joel Lockner, L-O-C-K-N-E-R, and I'm retired.
**Q All right. And what -- how were you employed prior to retirement?**
A I was Lake of the Woods County Environmental Services Director for 30 years.
**Q All right. And could you briefly outline your duties? I realize they may have changed, but say over the last five years at the Lake of the Woods County.**
A As Environmental Service Director I'm -- I was zoning administrator that enforced zoning and subdivision regulations; solid waste official, we set



up a rather extensive solid waste program; I was county planner, which does grants and any planning; environmental services director; civil defense director, different title; agricultural inspector; county sanitarian; wetlands administrator, and a bunch of other things, including county artist. That's my sketch and I've got the plaque in the lobby on the floor. So I'm a jack-of-all-trades.
**Q Now, as the wetlands administrator did you have any -- any training associated with that?**
A As what?
**Q Your role facilitating wetlands compliance with the government.**
A Well, I was a wetlands administrator off and on. Walt Leu had it for a while.
**Q What period of time did you act as wetlands administrator?**
A I don't know when they started the wetlands rules for sure. It was '95 or something like that. And I wrote half the wetlands water planning grant application and plan, and then the County Board gave it to the district board that wanted to do it, and then six months later they couldn't do it and they gave it back, so then I finished it. And I was wetlands administrator until sometime, I think, in

'95 or something like that.
And then once it was established the County Board gave it to the highway engineer on the premise that 50 building permits a year and quarter of an acre of wetlands in each one didn't amount to as much as a major -- not even a major, an alteration to a county road somewhere to wetlands and that would have been more wetlands than all our permits together, so they gave it to the engineer because they figured that would be primarily where the work -- where the work had -- where it would affect everybody. But then he retired and -- or left, and I got it back in -- I don't remember the date, but '9 -- I can't even find it on here, but '90 something.
**Q '98, fall of '98 ring a bell?**
A The what?
**Q Fall of 1998, approximate range in there?**
A I think it was -- yeah. I can find it on here.
**Q That's fine. Can you detail your education, I guess starting with any college and subsequent training that you've had during your employment?**
A I'm -- I'm -- I took the state wetlands training and the advanced wetlands training. I'm certified in both of those. I've gone to probably



seven sewage workshops put on by Westerfall and Gunderson (phonetic) and different agencies. I have a lot of training in a lot of other aspects due to zoning and -- such as soils and groundwater and everything else.
**Q What are some of your -- maybe you could detail some of your --**
A The what?
**Q Maybe you could detail some of your training in soils and groundwater?**
A Well, basically the wetlands and -- and the sewage. And, you know, in 30 years you go to a lot of that stuff and every different -- I have so many different titles and every different title would have a different -- might have a workshop at a conference, but I don't remember all the workshops. But in college I had a degree in social studies and geography, almost a degree in geology, and I specialized in geology in college and did quite a bit of research in that, which is Lake Agassiz and glaciers and one thing or another.
Then in the 33 years I lived in Lake of the Woods County I had to make myself an expert on this environment; not an expert on the Minnesota River valley, but I'm an expert on Lake of the Woods



County. And we've had to do extensive research up here way beyond doing the regular administrative parts of the job because it's so different. And even when I came into the county there were no maps of the county. There wasn't any -- hadn't been any research on anything. Nobody -- it had been ignored. And we did a lot of research in 30 years just trying to find out why things were the way they were. A lot of things up here are different than other places. It's a very unusual county.
**Q Maybe you can give a little history of the formation of this county to the best of your knowledge and why the land structure may be different?**
A I think Beltrami County threw it away in 1922, didn't know what to do with it.
**Q I guess my focus would be more on soil, soil types and structures.**
A This is -- this is upper Lake Agassiz, I called it. There's other terms for the different parts of it. But it's a very high percentage of bog. And in this county when the people came in they developed the lowest parts of the county, not the highest, because the lowest are the driest and the highest are the wettest. You can leave Lake of the



Woods and walk out of a swamp on the edge of Lake of the Woods or a shoreline situation and go a mile uphill and you'll be standing in a peat bog. The highest parts of the county for all practical purposes are dominated by peat bogs, which are higher in the middle than they are on the edge. So you just keep getting wetter the more uphill you go, basically. And the population settled along the water and along the estuaries, basically.
And all water moves downhill, so it's a real trick figuring out where the water from the peat bogs going on the way to the lake or on the way to rivers, are you in the way of that water or aren't you; you know, where is it going, is it going under the ground, on the ground, just under the ground, not moving at all. And that's a real trick.
And we found some amazing situations in doing some of that research. It's really interesting. And I brought some of that. But it's basically a flat county, average maybe ten feet at best incline toward the lake. Les could correct me on that, maybe it might be something different, but it basically inclines to the northeast and it's relatively flat and poorly drained.
Most of the property, more than a quarter -- more

than 100 yards from water bodies was peat and it was burned off in the '30s and '40s, '50s and '60s, and I think sometime in the '80s they made a law you can't burn peat, can't burn anything unless it creates an open flame and that put an end to peat burning. But in the '70s, early '70s and '60s there were days when you couldn't see that house over there for the peat smoke, many, many, many days off and on through the years. Everybody was burning peat.

THE JUDGE: Just for the record, that's roughly 300 feet.

MR. LOCKNER: Yeah. I couldn't see the trees in my yard and that was 50 feet away at times. It was a major problem for traffic on highways. But when they quit burning peat that put an end to developing new farmland for all practical purposes because it's kind of not economical to do it mechanically, you know.

BY MR. FISH:

**Q How about Lake of the Woods itself, as far as its natural expansion?**

A Lake of the Woods is a reservoir. It's a -- it's not a clean water reservoir, if you want to use layman's terms. It's synonymous with the Severn River system in Canada. You can fly into Canada and



go over thousands of beautiful lakes and you get up to Sandy Lake and -- about 700 miles north and you can see into the water two inches maybe in the whole lake. I've been up there fishing. And it's because the Severn River is silt loam soil in that area and it erodes easily, and so is Lake of the Woods. It's not as bad, but there's a lot of silt. The shoreline is highly erodable. It's not a bedrock shoreline and it's not a clay shoreline and it's not a sandy or gravelly shoreline; it's a silty loam shoreline, clay loam shoreline and it erodes very easily, especially according to -- I can't remember the guy's name, but he's from Thunder Bay, he's a very well known researcher for the University of Canada and he did erosion studies on Lake of the Woods, including the south shore, which is American. And I've met him and DNR knows who he is. But I can't remember his name. And he did research right up in the area of Gary's plat and north of that.

And there are subdivision lots not far north of Gary that were platted in the '70s probably and they are gone completely.

**Q By gone you mean underwater?**

A They washed away. They've eroded away. The biggest event was 1950 where we had a major flood in



1950 and the water got up to 1064, beyond the International Joint Commission's regulatory level that they're supposed to regulate the lake in, the band, and caused a lot of erosion, and damages were made by the Canadian government because they regulate the dam.

And the closest we ever had to that since was we had, as far as I understand it, three 1,000-year floods, not 500-year floods, which floodplain regulations are based on, but 1,000-year floods in the last two years or within two years, in the last three years maybe and that caused quite a bit of erosion. I know they have told me on -- within Gary's plat in some cases they've lost 15 feet of shoreline there. So the lake has eroded back.

And in respect to Gary's plat, the lake was 50 feet out further in 1949, from what the natives tells us, and we have maps to support that, aerial photos and maps and things of that nature.

**Q Now, you had some involvement with the Sunny Beach plat, is that right?**

A Yes, as zoning administrator it was my job to process the plat.

**Q Can you tell me what your -- I guess your initial involvement was, to the best of your**



**recollection?**

A It started in '94 or maybe before that because Gary wanted to do a harbor at some point before that, but it never happened, but I don't have the records on the harbor with me. But -- and in '94, if I remember right, he came back in and was considering -- considering possible harbor digging again and a plat. And I wrote him a letter which talks about the harbor, talks about wetlands and talks about something we ran into in -- in a private, I guess, investigation in the office trying to figure out why bumble bees fly and technically they're not allowed to, but why certain things work in Lake of the Woods County or happen in Lake of the Woods County and they're not supposed to. Mainly septic systems, they're not supposed to work, but they do and we couldn't quite figure out why and we've been doing a lot of research. But we took the -- the county soils map and we colored it. If I remember right, I had SWC do it, which was Doug Easthouse. We had the WCA grant, we administered it and then we would pay the district to do things in relation to WCA and water planning wetlands because they needed the money and we needed -- we didn't want to add staff. So we had them color all the county soils

maps, copies of them, hydric, non-hydric, and kind of hydric, kind of in between, gray area, which is kind of how the soil sheets are.

And we ran into a situation -- and because of that I held Gary's plat up for -- from '94 to '98 and he wasn't real happy about that and I killed a sale in the process with Taylor Investment. But according to the subdivision ordinance Gary would have had to supply information to us to show the plat was feasible to do and Gary's not a guy to just sit around staring at the walls and he had a lot of irons in the fire and it just never got done, and because of what we found on here, we were rather concerned about the plat.

THE JUDGE: Okay, now let's -- words like here are meaningless in a transcript.

MR. LOCKNER: Okay, I'm going to clarify that. Here means on the soil sheet, soil maps. And I'll explain it the best I can. Lake of the Woods is a remnant of Lake Agassiz, which is a big pond of water behind the glacier, the glacier disintegrated toward the north and Minnesota acted as a dam and the water would build up in between the melting ice and the dam. The outlet for Lake Agassiz was the Minnesota River and as it got further north it would



find outlets first into Lake Superior as the ice disintegrated and then other outlets, so it would drop to different levels. As it disintegrated eventually then ended up Lake of the Woods, Lake Winnipeg and -- and, you know, any lakes that are remaining in the valley.

As it dropped in the stages, as it found outlets it would create a beach. The water would level off for a period of time, up to a few hundred years maybe, and erosion would create a beach. Near the last -- near the end of it there were like three beaches created in the area of Gary Bailey's plat. And Long Point, which is a part of the county that protrudes into Lake of the Woods is dominated by a horseshoe-shaped piece of bedrock right in the middle about three miles from the lake in every direction coming in from the north, east and west, and that bedrock as the glaciers came through and the lake was established and sorted, all the materials as the lake dropped created sandbars and sand -- it sorted out the material.

So all around that horseshoe-shaped bedrock there's deposits of sand, which is common in the rest of the county, too. There's two kinds of sand. There's a sandbar under the water, which is angular



sand, and contractors look for sand deposits that are basically sandbar under the water because they're angular and they make good gravel for roads and things, round sand doesn't. And then there's round sand, which is beach sand because it was rolled by waves and rounded off and ground down. Most of the sand around the horseshoe-shaped bedrock at Long Point is angular sand, but there are strips of beach sand and they show -- here's an example on my map. There's an elongated feature --

MR. FISH: Maybe I should have that marked as an exhibit.

(Exhibit Nos. 54 and 55 were marked.)

BY MR. FISH:

**Q All right. We have exhibits 54 and 55. Maybe, first of all, you could identify what 54 is?**

A 54 had is a photocopy of the soil, county soil atlas.

**Q And the coloring on it is something that was placed by you?**

A Yes.

**Q And that indicates -- what does the coloring indicate?**

A It's orange, and it indicates a series of soil types that form a pattern.



**Q All right. And 55, Exhibit 55?**

A Basically the same thing, but it's in yellow and it's a little different. I don't know why I had two of them laying around, but I didn't want to miss something. You know, I haven't had a lot of time to prepare for this.

But there's basically -- the lake dropped three times. All Long Point was under water, created sandbars; then the lake dropped to the top level, which is shown by a long probably two-mile long beach deposit and it actually goes all the way around the point.

MR. COOL: Excuse me, Your Honor, could we see the exhibits?

THE JUDGE: Yeah, --

MR. FISH: I will, first of all, offer them as evidence and if there's any objections then we can testify to them.

THE JUDGE: Why don't we offer them and let Mr. Cool see them?

MR. LOCKNER: They're both -- yeah, okay. Could I say something?

THE JUDGE: Why don't we wait for just a moment.

MR. COOL: In regards to Exhibit No. 55,

there seems to be material missing from the map.
THE JUDGE: What do you mean?
MR. COOL: Well, there's text missing. I don't know if it was dissolved by some -- there's a strip of white. You see the strip of white doesn't exist there.
MR. FISH: Are you saying there's coloring missing or there's text missing?
MR. COOL: Well, lines of coloring and numbers that appear to be missing.
MR. FISH: Oh, I think -- the purpose of this is illustrative of the yellow area. They're basically identical maps.
MR. COOL: No objection to the exhibits.
THE JUDGE: All right. 54 and 55 are received. Is there -- are they both copied off the same map?
MR. LOCKNER: Yes. And I would suggest that anyone interested pick up a free copy of the county soil's atlas in the zoning office and look at it in that.
THE JUDGE: We've got, I think, pages in the record already.
MR. LOCKNER: Then it dropped to a second beach, but we noticed something in this pattern of



the way the sand was created. If you look at any map you can tell which way a river flows because what they call the rule of the Vs, all rivers go into another river facing downstream. In this case the soil pattern -- the sand deposits were facing out, going the opposite direction. They're little fingers of sand -- sandy soil type going out from the beach and protruding outwards and I looked at that and I said what the heck is that. It's a delta, it's an underwater delta. And there are -- the water that landed on this hill, in the sandy areas on the hill, had to find its way to the lake. In the north end of Birch Beach (sic) plat it went on top of the clay three feet deep and right under the top soil to the lake. In this area -- and it shows in the soils map, it has a different soil type. In this area it went -- it found a path of least resistance and headed for the lake along this --
THE JUDGE: Turn it so Mr. Cool can see what you're saying.
MR. LOCKNER: Yeah, along a pattern that points right to Gary's plat. In other words, it -- all water from the hill to a lower area does not go as a sheet, it finds paths of least resistance. Not always the lowest areas, it could be the sandier



areas, even though they're higher it will move through the sand. And this pattern below the top beach is basically a delta that was formed underwater.
Then the lake dropped to the next level and there's a beach remnant which will show in the other -- in the soils atlas you can see the patterns.
THE JUDGE: That's the eastern more red area that you've outlined?
MR. LOCKNER: Well, this wasn't meant for Court, it was meant for my own notes --
THE JUDGE: I know --
MR. LOCKNER: -- a long time ago, but we do have better maps that show it.
THE JUDGE: -- but somebody's going to look at that map and say what's he talking about. Are you talking about the eastern more of the two red areas.
MR. LOCKNER: Yes.
THE JUDGE: Okay.
MR. LOCKNER: And they're about -- not maybe a mile apart, but there are successive beaches, and below each one there's a finger of sand, a soil type that's basically a finger of sand with little things pointing outward showing it's a delta.



And for most -- in most cases you drive along the road west of Gary's plat and you cannot see any elevation difference, you can't see any difference in just looking at it that there's a different soil type, but there's -- right under the surface it's a lot sandier than it is on the adjacent soils. And we found that in the county in a lot of areas, the water will perk through a sandier soil. How did the soil get sandy? From what we can tell, moving from a bog to a lake or a river, it simply soaked through the clay and from the downside up it A, eroded, formed a gully in many cases, in Bailey's it didn't; and B, sucked all the fines out of the soil leaving the coarser material, which allowed the water to move through even faster and it was under the surface.
But this pattern tends to die off right before the plat. Now when Taylor Investment came up and wanted to buy the property to develop, as I understand it, Gary wanted to sell it wholesale, they wanted to go out and look at it, and I took these maps out and I showed them and I said there's a very unusual water pattern pointing right at the plat from up on the ridge which is a couple hundred feet higher, I think, and there seems to be an awful lot of water going that direction underground.

And in the middle of the plat, maybe about a fourth of the plat or less, there was a -- what I described as an ash swale. There was a portion of the plat that was totally dominated by ash trees. And ash trees are a wetland tree. And you find ash woods --

MR. FISH: Actually there's a larger map, so maybe you can refer to one of the court exhibits if you appear to be looking at the plat.

THE JUDGE: Okay. What we're looking at is the --

MR. FISH: I don't know if that's been marked.

THE JUDGE: -- blowup of the transect of the Corps, the one that shows Transects 1 through 5 in it, but that's -- for purposes -- it shows the lot numbers and I think that's what you want probably. So you tell us where this ash swale was in relation to the lot numbers.

MR. LOCKNER: If I remember right, it was about in 9, 10 and 11. It's just off the -- just on the north side, north edge of the -- I believe the southern soil type which is wabanica. And that's totally dominated by ash trees, and not only that but the ash trees' roots ran out on the ground for a foot



or two or three trying to stay out of the water. When I took Taylor Investment up there in a year that wasn't particularly wet I told them you better have boots, and they were kind of dressed up, you know and no, no, we don't need boots. I said well, you're going to get wet and we decided maybe they could hop from tree trunk to tree trunk on the bottom, tree base to tree base and stay out. They got wet. There was nine or ten inches of water in that ash swale that wasn't anywhere else.

I had reached a conclusion that that may have been a spring. Now in all the USGS maps of Lake of the Woods County, which I had on the wall of my office for 25 years, there's only two times where the words spring appears on the map and one is on the road straight west of Gary Bailey's plat a half a mile and the other one is in the woods south and west of that. Basically they are the water that landed on the ridge, went underground through that sandy soil and popped up at a lower elevation. I believe that ash swale is a spring, and I told Taylor Investment that that, I thought, was an issue as far as the developability of the plat. I think at least from the ankles down they agreed with me and they didn't buy the property. I don't think Gary was too happy



about that, but he was civil about it.

And we continued to keep this material in the file until '9 -- until right before -- until when Gary came in to plat himself, have a surveyor subdivide it, and we brought it up again. In fact, I think it was probably a year before. And in the subdivision ordinance it says that the applicant has to supply enough information for the county to determine whether the plat is feasible. And I think Gary was pretty busy and never really got around to doing that to our satisfaction.

I think maybe a year or two passed, but eventually largely due to the fact that we're a pretty user friendly county, even though we're understaffed, we are public servants, I got around to finding information ourselves for the applicant to try to fill in the blanks in the application process for a plat. One of the things I did was I got ahold of a guy, finally, named Erik Morhing.

THE JUDGE: Could you spell his last name, do you know?

MR. LOCKNER: If I can find my paper. E-R-I-K M-O-R-H-I-N-G. And he, I believe, was a groundwater specialist working for BWSR, could be DNR, but I believe it was BWSR, Board of Soil and



Water Conservation -- or Soil and Water Resources. He was a calcareous fen specialist, which is -- peat bogs have calcareous fens, and the reasons they have calcarious fens is because there's water up welling in the bog. Lake of the woods County and northern Minnesota is dominated by glacial material brought down by the Wadena and Des Moines lobes that came through Winnipeg and picked up lot of limestone and we have a very light, highly soluable type soil structure, and if you run water through it for a period of time, it takes material out of that soil and at the top of the water table it will -- it will deposit it as -- as a calcareous deposit. And in the soils atlas, which I need a copy of for this and I forgot it, it's in the office, I can show you in the soil sheets where that's the case. It will say calcareous whatever right in it, right in the soils description. And I brought him up because that would have been the case with a spring. He came up, and I don't remember the exact date, but it was sometime in -- previous to the plat application, but not more than a year or two previous, probably a couple of months previous, and we went out there, and we did one analysis in the ash swale because we didn't think the rest was wetland. It had birch and popple on it

and had the lake next to it, had a ditch on the south side and it didn't look like wetland.

**Q Let me interrupt you a moment, get an exhibit that might refresh your memory of that.**

(Exhibit No. 56 was marked.)

BY MR. FISH:

**Q I'll have you identify that, Exhibit 56.**

A Exhibit 56 is my recommendation to the County Board on Gary's Bailey's plat at the time of the application for an initial plat.

**Q Attached to that, I believe, was a -- I don't know if it was attached to your document, but attached is a copy of some County Board minutes approving a final plat of Sunny Beach?**

A Okay.

MR. FISH: I would offer Exhibit 56, Your Honor.

MR. LOCKNER: If Gary --

THE JUDGE: Just a moment, please. Is there any objection to 56?

MR. COOL: No objection, Your Honor.

THE JUDGE: Okay, it will be received.

MR. LOCKNER: If Gary couldn't find the time to submit data for the plat, we weren't going to



give it a high priority, but we finally got around to it if for no other reason than this unusual hydrogeologic feature interested me a lot and the man has a right to have his -- have his -- his development scenario processed by the government and not have us just sit on our rear for ten years.

So I was able to do a considerable amount of research and I brought Erik Morhing up and we went out there and we did a boring or two, and he told me that -- what we found was some top soil and then kind of a gravelly sand down a foot and a half in the middle of that -- I believe it was in the middle of that ash swale, and it was his opinion that the soil structure, believe it or not, would support a structure. That it may have been a spring, but ironically that ash swale has not filled with water since, to my knowledge, and we've been out there because of all this platting and everything else for the last almost ten years and I have never seen water in that thing again.

And groundwater takes a year or two to migrate, so I mean if you have a wet period like we did last July, maybe next year it will happen, but it hasn't happened since '94, somewhere in there.

THE JUDGE: Maybe what you should do is



ask specific questions to sort of -- you know, to move it along. We've got now the recommendation of the County Board, but keep us going on the chronology, if you could.

MR. FISH: All right. Actually Mr. Lockner's doing quite a good chronology, but I can -- so we don't have too much of a narrative I'll give him a quick leading -- or direct a question, if you'd like, Your Honor.

BY MR. FISH:

**Q At that point -- well, basically what was the conclusion that yourself and Mr. Morhing were able to draw with respect to the ability of this** area --

A His analysis of ash swale alone was that -- and the soil sheets don't show that ash swale, the soil sheets don't show the high spots that aren't wetland according to the Corps. The soil sheets are very -- they're very general or very generic and there's a lot of inclusions. His opinion was that he hadn't done enough research to prove it was a spring, although it looked like it to him, but that it had a very strong soil structure. Basically his description would be that you can throw a bunch of tinker toys in a box and it's a very tight packed



situation and you could put something on it, it will support it, but you can put those tinker toys together and it's a very airy scenario but that will hold a structure. They've got strength. And in this soil it had strength. The fines were taken out but it had a lot of strength that would support structures.

It wasn't at the setback for the buildings, however, it was beyond it; nor was it where they would have to put sewers.

THE JUDGE: Beyond meaning which direction?

MR. LOCKNER: Beyond west -- it was beyond the set back from the lake for structures, it was like 120 feet back and more, 100 feet back or more.

BY MR. FISH:

**Q So was it within an area that you could build?**

A It would be their backyard, not the front yard towards the lake, and it really wouldn't effect structures and sewers. I took Dale Krystosec, I took Les Lemm, I took Dan Thul from the DNR, I took everybody and his brother up there to look at this plat, and we eventually determined -- in fact, while I was out there with -- it was either Easthouse or

Dan Thul, I believe, we had a cell phone, my office cell phone, and we called Kelly Voigt, which was Les Lemm's equivalent -- no, that's not right. NRCS technician in her office and said look at the soil type and look at your chart, and those charts are used by everybody all over the state and they're still used and tell us what the drainage effect of a four-foot drop to the lake would be in this soil. And she looked it up and it was 120 feet or whatever it was going back way beyond the -- it indicated at least a foot of dry material at the building site setback.

MR. COOL: Objection, Your Honor, hearsay. There's been no foundation laid that the individual, Kelly Voigt, had any experience rendering any type of opinion that has just been testified to. Other than a title, we have no idea what her training was, what she looked at. There is no trustworthiness or reliability regarding exactly her background, qualifications for the statements that have just been rendered by Mr. Lockner.

THE JUDGE: Do you -- was this Kelly Voigt somebody you dealt with on a regular basis?

MR. LOCKNER: Sure. Everybody here did. She was the NRCS -- she ran the NRCS office. It's a



federal office --

THE JUDGE: Okay. And she -- she was -- who's the current holder of her position, as far as you know?

MR. LOCKNER: I can't remember his name. He's over in the Federal Building.

THE JUDGE: Did he testify in this proceeding?

MR. LOCKNER: No.

THE JUDGE: I'm going to allow the testimony to stand. This is what he relied on. I'm obviously not going to give it as much weight as I would give somebody who testified themselves live, but you can testify on what you relied on.

MR. LOCKNER: We didn't rely on Kelly's opinion, we relied on her reading the chart on that soil. And if you go to the soils atlas on both these soils it says groundwater one to three feet. And that was another source we used to make a determination. Sure, it might have been -- there might have been inclusions of water table that were higher, but as a pattern and the soil atlas of Lake of the Woods County done by the state, one- to three-foot water table.

And when I took classes on wetlands from Dale



Westerfall and all his people, one of the things we did was go out to an area where there was a ditch, the whole class, he said here's a ditch, here's the soil, here's a chart, it was on the test, how far back does this ditch drain the water table down in this soil. So it was an exercise that I had recently, within the last two or three years previous to that, had been trained to do. So we felt, my office felt and I talked about it with the County Board and everything, all these other parties, many of them have testified, that there was enough draw-down from the lake in most of the plat where it was buildable.

And I was not aware of any law and I can't find it in our floodplain ordinance that said you cannot build in a floodplain and that you can't have a mound system, which is a standard system in a floodplain. I have no idea where that came from.

BY MR. FISH:

**Q On that point, Mr. Lockner, can you distinguish the different types of categories of floodplains?**

A There's floodplains and flood fringe -- floodways and flood fringe areas. A floodway is adjacent to a river where anything in the way will



wash away, and a flood fringe is just an area that will slowly inundate and then -- and then water -- as the water drops it dries out again. And Gary Bailey's plat is not a floodway, it's a flood fringe area.

**Q What's the significance of that?**

A Pardon me?

**Q What's the significance of that?**

A Well, nothing washes away, it just can -- you have to walk through water to get out of your house. Now the floodplain regulations require two things in building in a -- two or three things, but two that are relevant here. One is that you have to build a house a foot higher -- the floor of the house a foot higher than the flood level, which is 1064 there. So all houses in floodplains in Lake of the Woods County or all structures have to be at 1065 elevation and we have to agree with that before we grant or approve the building permit. In fact, they have to -- somebody has to shoot it afterwards, shoot the elevation.

And any sewer system has to be water tight. In other words, when the water inundates, it cannot flush the septic tank out into the water. And if these procedures are followed -- and that you not use

the sewer during a flood event. We -- as far as we were concerned and nobody ever argued with me about it, any state agency or the county attorney or anybody, we did it for years and as far as I know they did it everywhere else. It hasn't been a problem. We probably have one of the biggest flood fringe areas in the state. There aren't too many big lakes that flood, inundation. Much of Minnesota is -- and we're more like Devil's Lake, you know, than the Mississippi River or some river in Minnesota, but -- and our development's down near the water because you get uphill and you're in a peat bog. So this is something we've dealt with more than many counties. But I've never heard anybody say boo about granting permits in floodplains and putting in mound systems.

**Q In fact the development at the north, does that have a similar elevation?**

A Elevation -- it gradually rises to the north to some degree and then kind of drops down a little and goes up and it's -- Gary Bailey's plat is -- it's starting toward Zippel Bay Park and it's starting to go downhill and you can see that in the floodplain rate map where the floodplain is starting to work its way inland, although the floodplain map is not exactly the way the 1064 elevation in the plat is.



The floodplain map looked -- the plat looks to be more accurate than the floodplain map. As far as we knew, there was no law against building a -- building in floodplains if you met specific rules and regulations, which we enforced, and Dan Thul of the DNR watched us to make sure that we did.

**Q You -- you actually -- I don't know if it was that occasion or another visit to the site with Les Lemm and Dale Krystosec of the BWSR Board, is that right?**

A Yes.

**Q And you actually at one time signed a joint letter that was -- that has already been introduced into evidence. Do you recall that?**

A Yes.

**Q Now -- first of all, do you have a copy of that with you?**

A (Witness nods head.)

**Q All right. Can you tell me -- can you tell me about that visit to the site?**

A In my own words?

**Q Yes.**

A It must have been -- it must have been -- it's a blizzard in July when I talk Dale Krystosec into anything, I'll tell you that. I've never been



able to get him to cooperate on anything without a huge argument.

The letter kind of speaks for itself. You go out there and look at it and we did and we poked around. I don't remember exactly everything we did. But it looked like every other piece of shoreline. It had birch trees, popple trees, there wasn't any water. I think we dug a hole or something we didn't find any water and -- near the surface and we discussed and all agreed that I would write a letter like this, and then I wrote it and they each looked at it and I don't believe they signed it -- you know, I didn't write it on site obviously, but they all read it and signed it. And it was meant to tell the MPCA what we saw and our opinion. We had no way to force them to do anything. We give them our opinion and they -- they have their own people and they do their own investigations and they've got other sources of information and it wasn't an ultimatum, it was a letter stating our opinion on the property.

**Q So you didn't have any, I guess, what you consider persuasive powers over Mr. Krystosec or -- I think there was a suggestion earlier that he only had an opportunity to skim this and didn't know what the purpose of the letter was. Would that be a fair**



**characterization?**

A I can't speak for how he read the letter. I mean that's -- he testified to that.

**Q Now, when you were at the site viewing this, was it -- I mean the purpose of this visit fairly self-evident, that it was for the purpose of evaluating a proposed plat as opposed to a single boring site?**

MR. COOL: Objection, Your Honor, it seems to me it's been asked --

MR. LOCKNER: I don't quite understand the question.

MR. COOL: -- and answered. He said the letter speaks for itself and it seems in the first paragraph there's a statement indicating that.

THE JUDGE: There is a statement in the letter, but to the extent he has an individual recollection of why they went out there, I think he can testify to that, what he -- for example, did you arrange the trip? Were you the one who called up and said --

MR. LOCKNER: I have no idea why we were out there, I can't remember. But Dale --

THE JUDGE: That's fair, if you can't remember.

MR. LOCKNER: Dale in supervising our wetlands administration would come up almost monthly, and his job was to promote the state policies and make sure these things were enforced reasonably, reasonably.

And Les, SWCD technician, got to be very astute at doing wetlands work of all types. He's -- puts a lot of effort into it and he was a -- very much an expert, in my opinion, and we relied on him a good deal to do the leg work for us because we didn't have the staff to go out there and do it and SWCD was more orientated toward that type of work than zoning officers are generally, so we put a high reliance on Les to do our --

BY MR. FISH:

**Q I don't think you answered the question --**

A We were just out there -- we looked at other sites in the county, too, so it was just on a tour.

**Q Was he aware this was for the purpose of a proposed plat development, I guess?**

A No, this was after the plat was applied for and approved, I believe. It was in regard to questions regarding -- I think it was in response to questions on -- from MPCA on the availability to have sewers.



**Q Was there already a road there at that time, to the best of your memory?**

A I don't remember when the road was built in relation to that visit.

**Q Now, there's been some testimony about the soil type there, indicated this is saturated -- I guess the three aspects, vegetation, soil type and water, I guess, if I could summarize in layman's terms, this area is simply not suitable for building or sewer systems and I believe you were here during that testimony. What's your, I guess, opinion in response to that?**

A Part of his testimony was that -- and we used it too, the National Wetlands Inventory map, which is one of the more erroneous documents I've ever seen. It was done by aerial photography. Walt Leu and I went down south of town to look at a bridge they wanted to rebuild and they had to widen the bridges south of the airbase and the road next to the airbase south of town. And we had that map with us, and it showed wetland on the southwest corner of the bridge side -- southeast. And it's a creek down here and a field up there 40 feet and a bunch of woods on the incline. Now why would a bunch of large oak trees on an incline be a wetland? Because the guy



doing an aerial photo looked at the elevation of the field, in our opinion, and the elevation of the creek and saw the woods next to the creek lower than the field and figured it was the floodplain of the creek and called it wetland, and it's dryer than the field which is high and flat and poorly drained and higher than the creek, but it's in a drained area on an incline.

And in a lot of cases on that map in this county where there was woods and farmland he called it a wetland. Could have been a -- very well drained, but he called it a wetland because all they had to do -- all they had was aerial photos to go with, they didn't have on-site on that like the soils atlas did or like a visit to the site does. So we don't necessarily agree with it. It's -- it's a loose guide, but you cannot rely on that map unless there's something real obvious going on that you can see as you drive out there. It's -- it's -- there's a lot of errors built into it because of the way it was done. They had no choice but to do it that way, but it's not meant to be a definitive tool, it's meant to be a guide, a general analysis. What was your question again?

**Q I'm sorry. Your analysis of the -- I guess**



**the wetland indicators is where I was going.**

A When Eggers went out there, and I went out there when Eggers was there, and did the delineation, which our county attorney and our people in the county here decided not to do the delineation. A, it was the responsibility of the developer; and B, we were the permitting agency; and C, we didn't have enough staff or time. So even Les and I agreed that neither office would go out, if I remember right, and do the delineation, even though we're certified as wetlands delineators, because we were the permitting agency and it wasn't our responsibility and they'd maybe just argue with our conclusion anyway if they didn't like it. So that was up to the developer.

The corps finally sent somebody up named Steve Eggers and he went out there and did it and we went out there and talked to him, and he was using a rock hound's magnifying glass, these little magnifying glasses that you open up, and I've got one at home, and he's finding mottling -- the only way he found mottling in some areas was smaller than the naked eye can see. And frankly, I don't remember that from class. I didn't -- they may have done it, but general consensus was you can see most mottling, but he was finding mottling with a magnifying glass.

And I asked him, How can you -- how do you know what that is? He said well, what you I mean? I said it could be relict or historic mottling. Forty years before or more the shoreline was 50 feet further out and the draw-down drainage effect of the lake based on the SWCD charts and that soil would have been out there, not back here. It would have been -- if the lake is 50 feet further out, the draw-down would not go as far into the lot as it does now with the erosion further back. And that's historic -- I said that could be historic from not that many years ago. And his answer was well, the red will wash out, the red mottling, the iron will wash out if you have a draw-drawn of the water table and it's not inundated anymore. Rain water -- it will become soluble and move to a different level, but the gray will stay for a long time. I said, How long? Well, he didn't know. And I assumed well, it doesn't have wetland vegetation, you've got popple trees and birch trees, although popple can go either way. You have the ferns, if I remember right, where we were standing and he was probably on Lot 2 or 3 then, were upland ferns, not lowland ferns. And we didn't see any dominance of wetland vegetation, he said, but the vegetation right on the ground, the mosses and some



of the grasses and right on the ground, not even sedges, but right on the ground were wetlands vegetation. Now, I don't know how long a wetland vegetation under a fern overstory, under a brush overstory, under a tree overstory, on a flat plain will stay that way after the water table drops a foot, but he didn't know either. With no fires or no -- man had never been in there, to my knowledge, and the shore eroded 50 feet further back and how long can you still have some minor vegetation stay FAC wet or wetland instead of upland, I have no idea. I've never seen any data on that. And I'm not sure there's very good data on how long mottling will stay before it washes out or changes.

**Q Was Mr. Eggers aware of any -- did he acknowledge any drain-down due to the shoreline?**

A No. They claim there wasn't any. And that's the first time I've ever heard of that in 30 years. It contradicts the class and it contradicts the charts and contradicts everything I've ever heard. You dig a ditch, it drains the soil down. Not just the surface water, it affects the soil.

So based on all the data we had from Morhing and from the charts and from our classes and from the vegetation we were looking at and everything else, we



figured that you could have structures and mounds on most of the plat.

**Q Based on that, did you make any recommendations to the County Board?**

A I wrote them a page recommendation at the time of the initial plat, I believe, and it starts out, Gary Bailey has been requesting to plat part of his property in Prosper Township for the last four years. There's a typo there. That's how long I held him up trying to get data because this wasn't, you know, a hill, it wasn't a perfect place to subdivide, but it was very analogous to what we have to live with in Lake of the Woods County.

And I mentioned the spring. And you can read it, it's made of record. And I mentioned Morhing and I mentioned that we -- we'd issue sewer permits, but they have to be within the code.

And that brings up another issue --

THE JUDGE: Is this what you want?

MR. COOL: Objection --

THE JUDGE: Yeah. No, the way this works is he asks you questions.

MR. LOCKNER: All right, all right, all right.

THE JUDGE: Yeah, go ahead.



BY MR. FISH:

**Q Mr. Lockner, did you discuss various septic system types or sewage treatment types with either the MPCA or other governmental agencies regulating this matter?**

A Oh, sure.

**Q Who did you discuss this with and what was the contacts and suggestions?**

A Discussed it with Westerfall as a matter of -- not necessarily on this plat, but as a matter of sewage designs because he was the guy that taught the classes and we could not -- we couldn't apply what he taught or the rules in all cases because things didn't work the same. It didn't seem to work the same here, the bumble bee flew, and the sewers worked and we couldn't figure out why, it was against everything in -- not everything, but certain parts in the classes, the data, design standards. And my job was to find out why they worked and that's the best way to find out, with the permit.

And PCA, I talked to MPCA about this plat, about the letter that I sent him that Dale signed and Les signed. We discussed it, and they tend to rely on the local counties to reach decisions or whatever agency supplies them data. You know, they really

don't work very hard to go against them and apparently they trusted us, so . . .

**Q Did you discuss -- was there ever -- was there ever any discussion or follow-through relating to offsite treatment plants on this project?**

A No. Well, yeah, it came up. Gary brought it up first, I think, but that was quite late in the game, but it was always an option and I'm sure it was mentioned. We always talk to people about it, but can you have a communal system offsite? Sure, if there's a place to put it.

Going back to some testimony I heard the other day, you can't create a lot in the State of Minnesota unless it has room for two standard sewers. Hogwash, as far as I can tell. We -- they platted Brush Highland up on the lake, up on the Angle, and at the time of the plat we pulled the whole -- all the lots off the plat on the north end of the island because it was all bedrock, even though they could have gone communal systems just inside, just to the south of the shoreline, we took all those lots off because DNR told us it's a violation of that regulation, which was about a year and a half old at that time. Since then I've talked to Dan Thul, and other situations have happened in the state, and he said well, they



could go communal. And now since I retired I see they were re-platted. So some agency decided that even though they can't have sewers, they could go communal and they platted it and it was recorded and nobody argued about it. So it must be legal. And we assumed if you go communal system it's analogous to having a city sewer, and if you have a city sewer on the property the lots don't even have to meet the size requirements or the setback requirements, they all go lesser -- less restrictive. But it was an option and Gary knew it was an option. We didn't discuss the actual designs, but we discussed the concept, but let's see if they can go individual sewers first, let's see what the people are going to do with the lots first. They might not build on them.

**Q That brings me to the next question. During the period of time that you were aware -- after the plat had been approved and development began, had anybody actually constructed a sewer on the property?**

A Oh, no. We -- the concerns about the whole plat showed up very quickly, began to show up very quickly after the plat because he had -- Gary had to meet the wetland regulations. Each lot owner would have to do replacement, the road was built and



replacement was an issue and everything started, in a sense, falling apart for Gary on the plat. The lots had been sold, but it became very difficult -- a lot of agencies got involved and had a lot of questions.

It's rather odd that we held a public hearing on the plat after discussing the whole concept with agencies and Gary applying to many agencies for at least four years that when we held a public hearing of the plat, not one agency responded negatively.

**Q Now that brings me to my next area of question. Prior to the County Board accepting this plat and under Minnesota statutes designating it suitable for residential development and sewer systems, did you provide notice to the MPCA, DNR and Army Corps of Engineers?**

A We supplied legal notice to everybody. The law says we supply legal notice to, and I know for a fact the Corps got one and they -- I mean the DNR got one and they notified the Corps. I don't know how the MPCA gets notified. We're not obligated to notify every state agency, to my knowledge.

**Q Did the DNR or the Corps or the MPCA make any type of objection to -- by letter, phone call or otherwise at the time of the approval of the plat?**

A I -- you'd have to check the County Board



minutes, but I don't believe anybody showed up at the hearing and I don't remember any written responses that I can remember. But it's been a number of years and I haven't been in the office for a long time. But the County Board probably would have -- that's the initial plat stage, the hearing is, so there's some time before the plat's approved and there would have been -- we would have responded to whatever comments, but I don't think we got any.

**Q Regardless, the plat was approved by the county?**

A Yeah, eventually, later after the hearing, you know, months.

(Exhibit No. 57 was marked.)

BY MR. FISH:

**Q Showing you what's marked as Exhibit 57, could you just identify that exhibit, please?**

A Notice of Wetland Conservation Act Decision.

**Q This is a document that you prepared?**

A Les Lemm prepared it for the county in cooperation with the county.

**Q I note that on the bottom --**

A Or Walt Leu, I don't remember which, but if I remember right Walt said --

**Q I note on the bottom it indicates that you**

**mailed this document, on the bottom of the first page.**
A I guess I did. That's not -- I didn't type this, but I must have.
**Q All right. And I note it also indicates it was mailed to the Army Corps of Engineers as well as the wetlands coordinator Doug Norris, --**
A Right.
**Q -- at the Ecological Services in St. Paul, --**
A Right.
**Q -- as well as other entities?**
A Yes.
MR. FISH: I'd ask for the admission of Exhibit 57.
MR. COOL: No objection, Your Honor.
THE JUDGE: 57 will be received. Do I -- do you have copies -- I'd like to see these as they're coming in.
MR. FISH: You know, I've been providing a copy to counsel. I don't have a fourth copy. And actually I don't have any questions with him on that particular document.
THE JUDGE: All right.
BY MR. FISH:



**Q Mr. Lockner, when the County accepted the plat, was there discussions by either yourself or another, I guess, office within the county about taking over the application process -- application process as applicant and offering county credits and mitigation of the wetlands?**
A The county created a wetland bank or was in the process of creating a wetland bank about the time the plat was beginning to be controversial, and there was a gravel pit north of town and it was five acres. and I was instructed by the Board to offer the Corps of Engineers, and I went down to the Corps of Engineers twice specifically just for that, drove all the way down and met with them, that we would -- the county, being we took over the road, would replace the wetlands credits for the road. I don't know if there was a lot of discussion on the lots at that time because they hadn't applied for anything yet, the individual property owners, but we would replace the wetland credits on the road. We didn't have our wetland approved yet. So it was negotiated -- it was a matter of negotiations that when the Corps of Engineers and BWSR approved our wetlands, that's one of the things we would do with it. It took a long time to get that wetland approved, and -- but Gary's



plat wasn't going anywhere either because of the controversy, so eventually we got the wetland approved and the Corps struggled with this mitigation or negotiation with Bailey for so long that we ended up using most of the credits on the wetland for other uses before they even got to the point where they could make a decision on it. So --
**Q What was the period of time that the Army Corps of Engineers, I guess, had this project in various proposal stages without making a decision?**
MR. COOL: Objection, speculation.
THE JUDGE: Yeah, unless you know. The record clearly says, doesn't it, when he applied and when they decided? Where we've already got in the record specific dates, general recollection from him isn't going to help.
BY MR. FISH:
**Q Did you -- I guess what -- first of all, were you still employed by the county at the time of the Corps' wetland delineation?**
A Yes.
**Q And upon receiving that, did you have any further -- further involvement in this project?**
A Well, Walt got to be wetlands delineator for most of the time that -- or a good deal of the time



that the plat was starting to get controversial, so I wasn't terribly involved in it in that regard. I was waiting to be zoning administrator and do building permits and sewer permits. I really didn't have a tremendous amount of input into the whole process when I wasn't wetlands administrator, no, and after the plat was approved.
**Q Did you have -- now do you recall any other substantial involvement in this matter at all?**
A Well, people like Gowdy and some of the others, I believe Gowdy maybe may have made application for a building permit, which we -- the county attorney told me we couldn't grant, and it was obvious we couldn't grant because this thing was in negotiation, I don't know. I'd like to use the word litigation, but I don't know if anybody had actually filed anything or whatever, but it was in a state of flux, and it was decided that that we could not issue building permits based -- until it was settled and based on Eggers wetlands delineation, which would have to be either re-evaluated with a different conclusion or negotiated with those other agencies. The county is -- does most of the work out in the field applying all these regulations, but when we get into situations like this, the Corps and the DNR tend

to be the dominant agency and MPCA, so we take a hind -- backseat, so to speak.

MR. FISH: I have no other questions, Your Honor.

THE JUDGE: Could I ask one question? When did you quit working for the County?

MR. LOCKNER: March 26th or 28th of 2002.

THE JUDGE: 2002, okay. All right, thank you. Mr. Cool, do you have any questions?

MR. COOL: Yes, I do, Your Honor.

THE JUDGE: Okay.

CROSS-EXAMINATION

BY MR. COOL:

**Q Mr. Lockner, you indicated that you were out at the site during the Corps' wetland delineation, is that correct?**

A Yes.

**Q And you talked to Mr. Eggers and as he -- in your words, as he was using some kind of magnifying glass. Do you recall that?**

A It's what we used to -- all geologists have them. They're little stainless steel magnifying glasses that you open it up out of a little casing, and they're only maybe a half-inch in diameter and they're very powerful.



**Q You know Mr. Eggers, is that correct?**

A I know of him and I've seen him, but if I saw him on the street I probably wouldn't recognize him.

**Q Do you know if he's in this room?**

A Not for sure, no. I suspect he is, but I'm not entirely sure, and it's been a number of years.

**Q Okay. You indicated that the location where this conversation with Mr. Eggers took place was on Lot 2 or 3, is that correct?**

A I thought it was up toward the higher end. In fact, I believe he was talking about this as a little higher than the rest and this was Gary's lot or very close to it.

**Q Do you think that could have been in the upland area, based on your observations of the vegetation?**

A I believe there were two areas that were considered upland later and it might have been in one of those, although what he found in the soil with a glass at that location may not have been what he was talking about, we may have been talking about what he found in other areas.

**Q But you indicated --**

A I don't question his result as far as what



he found, my only question was how can he justify -- how can he prove it is not relict mottling or relict vegetation that there's a water table a foot down.

**Q And that was --**

A And he never answered. I'd like to hear an answer to that.

**Q In that location, it was your observations that there was no wetland vegetation, is that correct?**

A I didn't say that.

**Q Then what -- I apologize if I'm --**

A When you delineate, it's a dominance of wetland vegetation, not if there's any.

**Q So --**

A Almost any vegetation can exist in an obstinate environment if it decides to for some reason.

**Q So is it correct that at this location where you were talking to Mr. Eggers, it was your observation that there was not a dominance of wetland vegetation?**

A That wasn't the discussion with him. It didn't matter where we were standing. The discussion was whether or not the fact that he found these mottling within 100 feet of the shore, does that mean



the water table's to the surface.

**Q Do you recall what observations you made about wetlands vegetation at the location that you and Mr. Eggers had this conversation?**

A I really didn't pay much attention to it. I think we looked at some, but I think our conversation was more general to the plat, not specific to the location.

MR. COOL: I have no further questions, Your Honor.

THE JUDGE: Okay. Do you have anything further?

MR. FISH: No.

THE JUDGE: Okay, thank you very much. All right. Mr. Fish, what's next?

MR. FISH: We'll rest at this time, Your Honor.

THE JUDGE: All right. What else is there to do on the record, that we need to do on the record?

MR. COOL: Your Honor, could we have a short break so I could discuss possible rebuttal?

THE JUDGE: Sure. Why don't we take a ten-minute break at this point and then we'll be back.

(A break was taken at this time.)

THE JUDGE: We're now resuming after a break. Is there anything further?

MR. COOL: Yes, Your Honor, I'd like to recall Les Lemm.

THE JUDGE: This is rebuttal?

MR. COOL: Yes, Your Honor.

THE JUDGE: Mr. Lemm, you're still under oath. You may proceed.

LES LEMM,

having been previously sworn, testified as follows:

REBUTTAL EXAMINATION

BY MR. COOL:

**Q Thank you. Mr. Lemm, in your direct testimony you indicated that you had recently measured the depth of the ditches, and I'm referring to the new ditches along the road fill in the Bailey plat. Do you recall that testimony?**

A Yes.

**Q And Mr. Walter Leu testified and raised an issue about where you made measurements from in regard to their accuracy. Could you describe where you made the measurements?**

A Yes, they were approximately -- splitting the plat approximately in thirds. We actually did



two different sites. One approximately a third of the way down.

**Q And you're pointing to approximately which lot?**

A Oh, roughly -- roughly Lot 11. And then the other site was approximately two-thirds of the way down, roughly probably Lot 6 or 7.

**Q And how did you make the measurements?**

A It was myself and Kate Stefenson (phonetic), who is resource specialist in our office. We set up a laser level on the top of the road and we took measurements with the staff gauge at the bottom of the ditch on each side of the road and at the -- on the natural ground level off to the side of the ditch.

**Q So -- and the difference then --**

A Yes, the difference was the depth of the ditch.

**Q So it was between, just so I understand, it's the natural ground beginning at the outer lip of the ditch and the bottom of the ditch?**

A Yes.

**Q And what were the ditch depths that you obtained in those four measurements?**

A The four measurements, one was 1.9 feet, one



was 2.0 feet and two of them were 2.1 feet.

**Q Now just for clarity, when you set up on the roadbed, you're not measuring the distance from the top of the road to the bottom of the ditch?**

A Absolutely not.

MR. COOL: Okay. No further questions, Your Honor.

THE JUDGE: All right. Do you have anything, Mr. Fish?

MR. FISH: Just a second, Your Honor.

THE JUDGE: Sure.

MR. FISH: I don't know that this is even an issue as to road depth. I thought there might have been a reference in the Army's report. But I have no questions.

THE JUDGE: Okay, thank you very much.

MR. COOL: I'd like to call Mr. Steve Eggers as a rebuttal witness.

THE JUDGE: All right. Mr. Eggers, you're still under oath.

MR. EGGERS: Yes, Your Honor.

STEVEN EGGERS,

having been previously sworn, testified as follows:

REBUTTAL EXAMINATION

BY MR. COOL:



**Q Mr. Eggers, you were present for the testimony of Mr. Gary Lockner, is that correct?**

A Yes.

**Q And do you remember Mr. Lockner's testimony indicating that he was a certified delineator?**

A Yes.

**Q Now, you've testified that you do training in Minnesota, is that correct?**

A Wetland delineation training, yes.

**Q Are you aware of any certification process in Minnesota that certifies wetland delineators?**

A I am not.

**Q Regarding observations made about wetland determinations or wetland delineations, what does the training for wetland delineators promote in terms of documentation?**

A It's essential to document observations of soils, vegetation and hydrology, any kind of disturbance, any factor that could affect wetlands on data sheets as Mr. Heschke and I did for the Sunny Beach delineation.

**Q Okay. And if wetland delineation observations of either hydrology, vegetation or soils are submitted to the Corps for consideration in an evaluation and these are not supported by**

**documentation, what does the Corps do?**
A The Corps would reject that delineation, send it back to the person who did the work and ask them to submit the appropriate documentation on data forms.
**Q Do you recall Mr. Lockner's testimony about relict mottling?**
A I do.
**Q Do you understand the concept of relict mottling?**
A Yes.
**Q You used a soil scientist in this wetland delineation?**
A That's correct, Mr. Heschke.
**Q Did Mr. Heschke identify any relict mottling on any of his soil boring data sheets?**
A There's no mention of relict mottling on his data sheets.
**Q Would it have been your expectation that if that had been observed, it would have been reported?**
A Yes.
**Q And why is that?**
A It would have been an important feature in the wetland delineation if, in fact, conditions had changed, hydrology had changed and what was observed



as a relict feature as opposed to a current feature.
**Q And that would have been factored into the wetland delineation determination, is that correct?**
A That's correct.
MR. COOL: I have no further questions, Your Honor.
THE JUDGE: Okay. Do you have anything, Mr. Fish?
MR. FISH: Yes.

SURREBUTTAL EXAMINATION

BY MR. FISH:
**Q Was there any inquiry whatsoever about the rapid erosion on the shore?**
A No.
**Q Was there any knowledge about the rapid erosion on the shore?**
A I personally do not have that knowledge.
**Q So the failure to mention relict mottling could wholly be a result of a lack of knowledge. Wouldn't that be a fair statement?**
A Could you restate that, please?
**Q The failure to consider relict mottling could wholly be as a result of a lack of knowledge of the rapid rate of erosion on the shore?**
MR. COOL: I'm going to object, Your



Honor, it calls for speculation.
THE JUDGE: Well, I think it's a legitimate question. No, you can answer the question.
MR. EGGERS: Relict mottling was considered and was not observed and not indicated on the data sheets.
BY MR FISH:
**Q Isn't relict mottling typically considered something of a historic -- a historic condition such as 50 years, 100 years, even 1,000 years ago?**
A A hundred to more years ago, yes, not a recent . . .
**Q Wouldn't you agree that 15 foot of erosion in a year to these lots would be something you'd probably not even seen before?**
A In any case, in a similar case?
**Q Well, I'll rephrase that.**
A All right.
**Q Was there any consideration that the draw-down could be moving back at a rate of 15 foot a year due to substantial erosion on the river bank (sic)?**
A Not due to erosion, but the data sheets and our approach did look at the theory that within 100



feet of the lake there was a supposed draw-down effect, and that theory was rebutted by the documentation of the data sheets.
**Q That would be the standing water and the hydric soil?**
A And depth to the water table that was observed.
**Q And again this was considering the recent two-inch rainfall?**
A That's correct.
MR. FISH: I have no other questions.
THE JUDGE: Do you have anything further?
MR. COOL: I have nothing further of this witness.
THE JUDGE: Thank you very much. All right, is there anything else?
MR. COOL: Yes, sir, I'd like to call Mr. Wespetal, Mark Wespetal.
THE JUDGE: Sir, you're still under oath.
MR. WESPETAL: Yes, Your Honor.

MARK WESPETAL,

having been previously sworn, testified as follows:

REBUTTAL EXAMINATION

BY MR. COOL:
**Q Mr. Wespetal, I've given you the Corps' data**

**sheets. Could you identify the exhibit number on that document?**

A Yes, what's before me is Exhibit No. 33.

**Q And directing you to pages regarding Transect No. 1, you evaluated these soils and this particular transect for purposes of soils for ISTS systems, is that correct?**

A Yes.

**Q And what determination did you make about the effect of the ditch along this transect?**

A Again as stated in earlier testimony, the soil conditions based on the soil colorations indicated that the soil is indicating a seasonally high water table. However, on this first transect here, which was close to the southern ditch, it was very noticeable that under the hydrology section on -- starting on Page 300, for Transect No. 1, indicated no visible water in any of the borings that they did conduct on Transect 1-1, 1-2, and Transect No. 1-3, there was no visible signs of water, even though the soil colors indicated that there was a seasonally high water table based on the soil coloration as -- as described in my earlier testimony, that if gray and redoximorphic features are present in the soil, that the water table --



means a present day water table.

**Q So your determination was with regard to the effect of the ditch?**

A What my conclusion was is that the ditch was close enough to affect the draw-down of the water along this transect, indicating to me that the soil permeability was such that the -- that drainage was effective on this site and water could be moved by effective ditching in this area.

**Q Okay. Directing your attention to Page 318 of your data sheets, this is Transect 2, sample point No. 3. Could you identify where this sample point is in regard to the bank of the lakeshore?**

A According to the data sheet, it is written on -- on the sheet that this is -- point Transect 2 No. 3 was located 64 feet west of the cut bank of the lakeshore.

**Q And looking at this particular set of data sheets for Sample 3, what's your determination regarding draw-down effect?**

A Looking at the hydrology as listed on Page 318, that they found depth to free water in the pit at six-inch depth, and depth to saturated soil at a zero-inch depth, and again my conclusion was this -- this transect received the same two-inch rainfall as



Transect 1 did.

**Q And what is the significance of that?**

A That we saw draw-down on Transect No. 1 by the ditch and we don't see any evidence of draw-down here from the lake at this location.

**Q Directing you to Transect 3 Sample Point 3 on Page 329, what are your observations there with regards to draw-down?**

A Okay. This --

**Q Excuse me, let me ask you first, what is the location of this Sample Point No. 3 with respect to the bank of the lakeshore?**

A According to the data sheet it indicates that the location of the data point was 101 feet west of the cut bank of the lakeshore.

**Q And what is your evaluation of the soils at this location?**

A That depth to free water in the pit and depth to saturated soil was right at the ground surface.

**Q And in regard to draw-down effect did you have any determination?**

A Again, there seemed to be no draw-down effect to -- from the lake at 101 feet from the lakeshore.



**Q Directing your attention to page I think it's 330, do you find that document? Again we're talking about Sample Point No. 3, Transect No. 3, it's the second page.**

A Yes.

**Q Do you see the material regarding the supplemental boring?**

A Yes, uh-huh.

**Q And what location was that supplemental boring?**

A According to the data sheet the supplemental boring was 12 feet from the cut bank of the lakeshore.

**Q And in regard to the other information that's conveyed there, do you have enough information there to make any determination?**

A They found hydric soils at the site and they had hydrophytes -- hydrophylic vegetation at that location.

**Q Is there enough information there for you to make a determination of draw-down effect?**

A We don't have any direct observations of water at this 12-foot location, so we can't make a conclusive evidence, but from the presence of the hydrophytes, again they need water to survive and

therefore if they were still dominant in that area we would suspect and conclude that the water was still fairly high at that level.

**Q Directing your attention to Transect No. 4, Sample Point 3 on Page 339, what's the location of that point from the bank of the lakeshore?**

A In -- according to the data sheet it's 89 feet west of the cut bank of the lakeshore.

**Q Looking at the data, what's your determination with regard to draw-down at this site?**

A Again the observation made there at the depth of free water in the pit was at six inches and the depth to saturated soil was zero at the ground surface.

**Q And your determination with regard to draw-down?**

A Again 89 feet west of the lake there appeared to be no draw-down at that -- at that point.

**Q Now, on Page 342 Transact 4, Sample Point No. 4, could you tell us where the location of that point is?**

A The location of this point was 15 feet west of the cut bank at the lakeshore.

MR. FISH: This isn't rebuttal, this is a repeat of testimony. I'm not hearing anything new



here. I'd object to this line of questioning.

THE JUDGE: I believe that there's something new with regard to the presence or absence of draw-down effect. That's what I'm hearing to be new. So I think it's legitimate rebuttal to the draw-down theory. So you can continue.

MR. WESPETAL: I guess the data point was 15 feet from the cut bank of the lakeshore. The draw-down here seemed to be -- have some draw-down because the depth of saturation that was noted was at 17 inches.

BY MR. COOL:

**Q And at this point you're still at least 35 feet from the ISTS or sewer setback, is that correct?**

A Yes.

**Q Directing you to Transect No. 5, Sample Point No. 3 on Page 353, what's the location of that point from the bank?**

A The location was 87 feet from the cut bank of the lakeshore.

**Q And looking at the data, what's your determination with regard to draw-down?**

A The depth to free water in the pit and the depth to saturated soil as indicated on the data sheet were -- were zero or at the ground surface.



So indicating to me at 87 feet from the cut bank of the lakeshore there was no effective draw-down.

**Q Directing your attention to Page 356, Transect 5, Sample Point No. 4, what's the location of that point?**

A The location of this point was 15 feet from the cut bank of the lakeshore.

**Q And what's your determination based on the data presented with regard to draw-down?**

A That the depth of saturated soil was 12 inches and the depth to free water in the pit was at 20 inches indicating some draw-down 15 feet from the lake.

**Q Some, but substantial?**

A No.

MR. FISH: Objection, it calls for -- substantial is not a -- I guess a scientific term, Your Honor. I think the numbers speak for themselves.

THE JUDGE: I sort of agree. I agree. I don't think it's necessary for him to talk about substantial or not.

BY MR. COOL:

**Q With regard to the areas that we've just discussed along the lakeshore, you haven't observed**



**any draw-down effect that would be similar to the draw-down effect of the south ditch?**

A That would be correct, yes.

MR. COOL: I have no further questions, Your Honor.

THE JUDGE: Do you have any, Mr. Fish?

SURREBUTTAL EXAMINATION

BY MR. FISH:

**Q Sir, how long has the ditch on the south end been drying the soil and creating draw-down, how many years?**

A I'm not sure of the number of years.

**Q Could it be 50 years?**

MR. COOL: Asked and answered, objection.

THE JUDGE: Well, he -- I think it's -- I think it's a legitimate question. You can answer the question. Do you know whether -- the question is whether it's been one year, 50 years, do you know?

MR. WESPETAL: I have no idea, no, no.

THE JUDGE: Okay.

BY MR. FISH:

**Q Do you know how long the lakeshore as it sits there and has been doing this draw-drawn for 100 feet back or however many feet back it is has been at its static position?**

A No.

MR. FISH: I have no further questions.

THE JUDGE: Okay. Anything further?

MR. COOL: No, Your Honor.

THE JUDGE: Thank you very much. Okay. Anything else?

MR. COOL: We have no further rebuttal witnesses, Your Honor.

THE JUDGE: Do you have anything more, Mr. Fish?

MR. FISH: I don't believe so.

THE JUDGE: Then let's go off the record.

(An off-the-record discussion was held.)

THE JUDGE: Then we're adjourned.

(The hearing was concluded at this time.)



CERTIFICATE

I, Stefanie Lamppa Olson, a Notary Public in and for the County of St. Louis, State of Minnesota, do hereby certify that the foregoing hearing was taken in the above-entitled action on July 23-25, 2003.

That the witnesses were first duly sworn before the commencement of their testimony; that the testimony so given by said witnesses was reduced by me in stenotype and transcribed under my supervision; that the transcript is a true record of the testimony given by the witnesses.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties or attorneys or financially interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this ______ day of __________, 2003.

Stefanie Lamppa Olson
Notary Public - Minnesota
Commission Expires 1/31/05