**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**GARY BAILEY,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Civil No. 02-1078L**
**Honorable John P. Wiese**

---

**PLAINTIFF"S MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENTS SECOND MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

The Defendant, United States of America has, for a second time, moved for summary judgment requesting this court dismiss Plaintiff's case, claiming Plaintiff has no 'cognizible property interest'. The Defendant again, uses the common tactic of pointing fingers at another regulatory agency, when called to the task of facing a consequence for regulating property to such an extent there remains no economical use or alternatively diminished the value of the property to such an extent just compensation is warranted.

The Defendant attempts to claim because the MPCA revoked it's 401 Certification, the Plaintiff had no cognizable rights in real property for any sort of development or use, and therefore requests dismissal. It's argument is flawed for the obvious reason the Defendant regulated the property by preventing the addition of fill into the land, effectively preventing the erection of structures on the land, effectively preventing the building of roads on the land and preventing any

sort of economically productive use of the land under it's own decision making process. The Defendant could well have denied the permit application upon the MPCA's 401 certification revocation without prejudice, and without an order for restoration, however it failed to do so. Instead, making a decision to deny the permit with prejudice under it's own public interest analysis. The decision is in no way 'duplicative' of limitations inherent in the property ownership under the laws of the State of Minnesota. The State of Minnesota approved of the placement of fill in this land, approved the drainage of this wetland to facilitate residential development, and approved of the development of residences on this land. (See Plaintiff's App. Dated 3/15/05, p. 33) The County even permitted culverts to both Plaintiff and others within Sunny Beach (See Exhibit 7) which have been ordered removed. This is undisputed fact.

In the instant case, the Defendant has claimed jurisdiction over land, alleging it is a wetland that is adjacent to Lake of the Woods asserting a hydrological connection allows the Defendant to assert jurisdiction under Riverside Bayview, 474 U.S. 121, (1985)and SWAANC, 531 U.S. 159(2001) baldly stating it can regulate activities on this land, entirely within the State of Minnesota, in direct contradiction to the State's land use decisions on this property. Even after the scathing opinion issued by the Supreme Court in Rapanos v. U.S.,1265 S.Ct. 2208 (2006) , chastising the government for upsurping the powers of local government in land use decisions, in direct contradiction of Congressional direction, the Plaintiff is marching on with it's 'Land is Waters' approach to federal jurisdiction, claiming this land, duly platted and zoned by the local government unit as residential property, is water. Not just any water, but a highly valuable public resource, which in it's opinion, should not be disturbed in any way due to vague ecological purposes, this in a County comprised of 90% wetlands. (See Exhibit 2)

## ANALYSIS

The Supreme Court has made clear that, in cases such as the present one, "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." Lucas v. South Carolina Costal Council, 505 U.S. 1003, 1019 (1992).

Total deprivations of use are , for Fifth Amendment purposes, treated as 'categorical' takings just like physical occupations because 'total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation.' Id. At 1017. As the Federal Circuit has stated, compensation is required, 'whether the taking is by physical occupation for the public to use as a park, or by regulatory imposition to preserve the property as a wetland so that it may be used by the public for groundwater recharge and other ecological purposes." Florida Rock Industries, Inc. v. United States, 18 F.3d 1560, 1569 (Fed. Cir. 1994); See also Palm Beach Isles Assocs. v. United States, 231 F.3d 1354, 1357 (Fed. Cir. 2000)

"A categorical taking is distinct from a taking 'that is the consequence of a regulatory imposition that prohibits or restricts only some of the use that would otherwise be available to the property owner but leaves the property owner with substantial economic use." Maritrans, Inc. v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003)(citation omitted).

As previously briefed, Plaintiff has alternatively alleged a taking under the ad hoc facual analysis found in Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978). The factors examined are the character of the governmental action at issue, the economic impact of the action on the claimant, and the extent to which the action has interfered with claimant's investment-backed expectations. Id. This is to ensure that plaintiffs are not forced "alone to bear public burdens

which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960).

In this case all use of the 26 acres of real property comprising the Sunny Beach Plat is explicitly restricted by the administrative permit denial, administrative restoration order and judicial restoration order.

Under the decree obtained by the United States, Mr. Bailey is required to remove the access road, backfilling the ditches to the original, pre-construction contours of the wetland using the elevation of the adjacent, undisturbed alleged wetlands as a reference. The Plaintiff must then seed the restoration area with specific wetland mix. In the years 2009, 2010, and 2011 the Plaintiff has been ordered to control certain weed species through hand removal and spot application of an herbicide. (See Exhibit 6)

The Defendant's decision prevents any sort of driving on the property, prevents any erection of structures or buildings on the property and prevents the disturbing of any of the soils on the entire 26 acres. There is no remaining economical beneficial use, given the goal of the Defendant is to restore the land to its previous natural condition, effectively creating for all purposes, an environmental easement.

In short, the 26 acres must remain economically idle under the terms of the Defendant's regulatory decisions.

Although this is a simple case wherein the government's regulations transformed private property into public property without just compensation, Defendant requests dismissal, again claiming Plaintiff has no 'cognizable property interest'. This Court has already determined Plaintiff has a cognizable property interest in 'Sunny Beach' and standing to assert a claim. The Defendant's

regulations are forbidding the owners from making a use of the property which is not harmful to the public. The Defendant's motion must be dismissed as the Plaintiff has shown he possessed property rights in the real property at issue and the development that the Defendant destroyed utilizing its regulatory powers.

**1. The Plaintiff had a cognizable property interest in filling the wetland under Minnesota's Wetland Conservation Act as the State approved his request to fill the area for the access road and replace the lost wetlands elsewhere.**

First, the Defendant has pointed to no case that is remotely analogous to the facts of this case which encompasses real property citing to case that involve ships and mining leases, not real property. As Cienega Gardens, 331 F.3d 1319(2003) and United Nuclear Corp., v. U.S., 912 F.2d 1432, 1437(Fed. Cir. 1990) hold, every stick in the bundle of property rights inherent in the ownership of property must be considered in a takings analysis.

Second, the Defendant argues that background principles of State Law define plaintiff's property interest while ignoring that Minnesota has a long history of recognizing a property owners right to access as previously briefed, and further ignores other rights inherent in property ownership, such as the right to build habitable structures, the right to drive on the property, the right to garden and a whole host of other rights encompassed in a persons right to reasonably use and enjoyment of their property, which must be considered in the taking analysis.

A plaintiff is disqualified from claiming a Fifth Amendment taking only if he or she has no 'valid property interest," Wyatt v. United States, 270 F.3d 1090, 1096 (Fed. Cir. 2001). "All real estate property interests are cognizable under the Fifth Amendment. Cienega Gardens, 331 F.3d at 1329 (stating the "'[e]very sort of [real property] interest the citizen may possess' counts as a

property interest under the Fifth Amendment")(quoting United States v. Gen. Motors Corp., 323 U.S. 373, 378 (1945)); cf. Forest Props., Inc. v. United States, 39 Fed. Cl. 56, 68-70 (1997)(finding property interest in right to exercise contract.).

Plaintiff has alleged the Defendant has taken private property in the form of real estate, which this Court has already determined Plaintiff retains a cognizible property interest. (See Bailey I, 78 Fed. Cl. 239 (2007)

Defendant claims Plaintiff has not identified a protected property right. Plaintiff would submit that he had the right under State Law to fill the area for the access road as the State of Minnesota accepted Plaintiff's replacement for any loss of wetlands resulting from the access road, which would allow for driving on the property. (See Exhibit 6) Plaintiff further submits he held a right and ability to develop the property with residences given Lake of the Woods County acceptance of Plaintiff's request to zone the property for 'residential' use. (See Plaintiff's Appendix dated 03/11/05 p. 34-35) This creates the right to develop the property. Further, there has been no prohibition for development for commercial uses by the State of Minnesota.

There is a cognizible property right by statute to use one's real property under Minnesota law. Minnesota counties are empowered to engage in land-use planning and zoning. Minn. Stat. §394.21, subd 1 (2006) Generally, counties' official land-use controls, are to be established by ordinance. Minn. Stat. §394.24, subd. 1, .301, subd. 1 (2006) It is undisputed that Lake of the Woods County amended the zoning ordinance and designated the Sunny Beach plat as 'residential property.' (Id.)

In Minnesota, even the act of platting has significance in creating rights as found in Semler Construction v. City of Hanover, 667 N.W.2d 457(2003) wherein the court stated:

> The significance of receiving preliminary plat approval in the real

> estate development cannot be overstated. The term "preliminary" approval is misleading because preliminary plat approval establishes the nature, design and scope of a development project and triggers significant activity by both developers and cities. Upon receiving preliminary plat approval, development agreements are signed, grading and infrastructure installation begins, and property marking may begin. Those activities are undertaken with the expectation that the entire area encompassed by the preliminary plat will be final platted and developed over time and in accordance with guidelines established in the preliminary plat.
>
> . . . . .
>
> Under the municipal-planning statutes, municipalities may adopt a comprehensive municipal plan, Minn. Stat. §á462.3535, subd. 1 (2002); zoning ordinances, Minn. Stat. §á462.357, subd. 1 (2002); and subdivision regulations, Minn. Stat. §á462.358, subd. 1a (2002). Specifically, a municipality may adopt regulations governing the development of subdivisions. Minn. Stat. §á462.358 (2002). These regulations may be comprehensive, addressing "without limitation" such areas as size, location, roads, water supply, and conservation. Minn. Stat. §á462.358, subd. 2a. The municipality may condition approval of the subdivision on such matters as "construction and installation of sewers, streets, electric, gas, drainage, and water facilities." Id.
>
> Semler Construction, Inc. v. City of Hanover, 667 N.w.2d 547(Minn.Ct.App.2003)

Plaintiff had a vested right to develop this property upon the acceptance by LOW of his application to plat.

"A zoning statute or ordinance is one which, by definition, regulates the building development and uses of property." In re Denial of Eller Meida Company's Applications, 664 N.W.2d 1,8 (Minn. 2003) "The Minnesota legislature has delegated to municipalities the power to determine and plan the use of land within their boundaries." VanLandschoot v. City of Mendota Heights, 336 N.W.2d 503, 507 (Minn. 1993); See Minn. Stat. 462.351 (2006)(stating that the purpose of the Municipal Planning Act is to provide municipalities 'with the necessary powers' to

conduct and implement municipal planning)

The Defendant's position would give no legal significance to the legal authority of the local government unit to decide land use issues. The record is clear the Defendant substituted it's judgment of the LGU in a land use issue. The Court should also be mindful, Defendant cites no statutory authority granted by the legislature to the MPCA with power to enforce wetland regulations. Only the DNR has the power to enforce Minnesota's Wetland Conservation Act, which certainly does not prevent the development of this land, as the DNR already had notice of the LGU's legislative decision to accept the plat and zone the property for residential use.

Minn. Stat.462.358 subd 3c states:

Subd. 3c. **Effect of subdivision approval.** For one year following preliminary approval and for two years following final approval, unless the subdivider and the municipality agree otherwise, no amendment to a comprehensive plan or official control shall apply to or affect the use, development density, lot size, lot layout, or dedication or platting required or permitted by the approved application. Thereafter, pursuant to its regulations, the municipality may extend the period by agreement with the subdivider and subject to all applicable performance conditions and requirements, or it may require submission of a new application unless substantial physical activity and investment has occurred in reasonable reliance on the approved application and the subdivider will suffer substantial financial damage as a consequence of a requirement to submit a new application. In connection with a subdivision involving planned and staged development, a municipality may by resolution or agreement grant the rights referred to herein for such periods of time longer than two years which it determines to be reasonable and appropriate.

Lake of the Woods county unconditionally approved the subdivision plat application and amended the zoning ordinance in declaring the Sunny Beach plat 'residential property' and unconditionally accepted the final plat, with the exception of requiring Mr. Bailey to post a $10,000.00 bond to ensure the access road was brought up to county standards.

The statute recognizes a subdividers rights and investment in the platting and development process.

> 462.352 subdivision 1 defines official controls as follows:
> "Official controls" or "controls" means ordinances and regulations which control the physical development of a city, county or town or any part thereof or any detail thereof and implement the general objectives of the comprehensive plan. Official controls may include ordinances establishing zoning, subdivision controls, site plan regulations, sanitary codes, building codes and official maps.

The State of Minnesota had notice of the preliminary plat application for this parcel and notice of LOW's intent to all residential development on this property.

The zoning of the property as residential creates rights to build habitable residences as it is well established there is a reciprocity of advantage in zoning laws. See Euclid v. Ambler Co., 272 U.S. 365, 71 L. Ed. 303, 47 S. Ct. 114 (1926) Should the Army Corp of Engineers have the ability to decide land use issues by prohibiting uses analogous to a zoning law, then a taking claim would have little force as the claimant has in a sense been compensated by the public program "adjusting the benefits and burdens of economic life to promote the common good." Penn. Central, 438 U.S. 104, 124, 57 L.Ed. 2d 631, 98 S.Ct. 2646. Thus shared economic impacts resulting from certain types of land use controls have been held to be non-compensable. In this case, there is no such shared economic impact from the Defendant's application of regulations to this property as the Plaintiff was in no way benefitted from the Defendant's regulatory decisions.

To the contrary the Defendant's investment backed expectations were completely destroyed by the defendant's public interest decisions. All development activity came to a screeching halt. Even culverts that were previously permitted by the county were ordered removed. (See Exhibit 8 and P's App. 03/15/05 p.261 - 270)

There are no direct compensating benefits accruing to the property given the Defendant's decision to restore this wetland to its natural condition in the public interest and therefore Bailey, as

a result of Defendant's regulatory decisions made regarding this property, has a claim for a taking under the 5th Amendment. (See Exhibit 1) Put another way, Plaintiff's reciprocity of advantage of the amendment of the zoning ordinance on December 22, 1998 has been destroyed by the Defendant.

The value of the property with the Defendant's regulations preventing fill, driveways and structures, has been completely destroyed as there is no economically viable use. (See Exhibit 1) The value of the property as 'residential' is a cognizable property interest. See Florida Rock Industries v. U.S. 18 F.3d 1560 (Fed Cir 1994)("The Dissent is concerned that what is being taken is 'value,' not property. In fact, in a regulatory context such as this it is both.") Further, Minnesota Statute Section 117.025, Subd. 2 clearly provides an interest in 'value' describing a 'taking' as "every interference, under the power of eminent domain, with the possession, enjoyment, or value of private property." (See Minn. Stat. 117.025 subd. 2) Minnesota has therefore a private property interest in 'value' within the bundle of sticks.

By regulating this property by preventing the disturbing of wetlands, and with it, the ability to use the property for access, structures or even camping, the Government has gone too far and taken property interests of reasonable use and enjoyment, requiring just compensation.

**A. Defendant has a right to develop habitable structures on the property located within 'Sunny Beach'.**

The Defendant argues Plaintiff never had any stick in this bundle of rights to develop residences on the property, arguing rules promulgated and administered by the MPCA somehow prevent the erection of a habitable residence. Plaintiff would assert he has in his bundle of sticks the right to a reasonable economic use to the property, the right to drive on the property, the right to build structures on the property, and the right to build a habitable residence on the property. One

cannot equate a standard for sewer designs with the prohibition of building a habitable residence. There are alternatives one may utilize for waste disposal other than sewers.

The Defendant attempts to pidgeonhole the argument that if there can be no sewers, there can be no residential buildings, no roads, no fill, no earthmoving, no commercial development. That is not the opinion of the MPCA, nor holding from the MPCA contested case hearing.

The MPCA specifically stated individual sewers may be placed in this alleged wetland through three separate avenues, (See Defendant's Exhibit I & Exhibit J ) as follows:

Drainfield systems must not be in wetland or be placed in fill (such as a mound system) over a wetland in order for the system to be in conformance with Minn. R. 7080 for On-site Sewage Treatment Systems unless one of the following actions are satisfied:

1. The local government assigns this project experimental status and the action complies with Minn. R. 7080.0910, subp. 3a.
2. The local government submits to the MPCA for approval and adopts alternative standards that would allow drainfields and mounds in wetlands in accordance with Minn. R. 7080.0305, subp.6.
3. The project satisfies the variance procedure at the local government under 7080.305, subd. 3

This is clear the MPCA did not find, nor did it even provide the opinion, that sewers outright prevented on this property under their rules. Indeed a variance has never been sought so it is speculative what the MPCA would do.

The only regulation preventing residential development of this property is the application of the CWA by the Corp where they determined this property was such a highly valuable wetland, it was in the public interest it should not be disturbed.

The Defendant postures and mischaracterizes the States determinations, claiming 'neither the plaintiff, nor any other owner, could possess a stick in their bundle of property rights that would allow them to locate residential development on the lake front lots at issue in the case." (See

Defendant's Memorandum p. 1) As explained for more fully below, that is a mischaracterization of fact and law of the State of Minnesota.

The Defendant could well have issued a provisional permit conditioned on what if felt was adequate mitigation for any loss of wetlands that may have occurred as a result of development or conditioned a permit on Plaintiff or Lake of the Woods County obtaining approval from the MPCA to place sewers or alternative waste disposal systems on the property pursuant to Minn. R. 7000.000 and 7050.0190, subd.1(2005). Simply because the MPCA was concerned about the siting of ISTS's does not determine the property was 'undevelopable' pursuant to Minnesota law. Neighbors could share sewer systems if neither had a sufficient area for two systems

The Defendant's argument is essentially that Plaintiff did not have a reasonable investment backed expectation of building homes on the individual lots due to the existence of MPCA rules limiting the ability of owners to construct in ground sewers. In Ciovanella v. Conservation Com'n of Ashland, the Appellate Court reversed a trial court's determination that the property owner did not have a reasonable investment-backed expectation of building a home on a 17,490 square foot lot due to the existence of a zoning law limiting new home construction to 30,000 square foot lots, where a person in the owner's situation could reasonably rely on his ability to build on the undersized lot based on its similarity to the surrounding lots on which homes had already been build, or based on the availability of special permits for preexisting nonconforming lots. That is exactly the situation we have here today. Plaintiff indisputably had a reasonable investment backed expectation to develop as all local and state agencies had notice of the platting process and notice of the LGU's intention to re-zone the property from natural resource to residential property. No agency complained nor objected. Further, miles of shoreland comprised of the exact type of alleged

wetland was developed immediately to the north of Defendant's property which the Defendant allowed, and certainly the MPCA allowed

This case is analogous, as the local government unit stated it would allow sewers on the property, giving Plaintiff a reasonable expectation of placing sewers within the individual lots, and even if sewers are not allowed in wetlands, with appropriate fill to achieve the 12 inches of unsaturated soils as alleged by the MPCA, there are experimental systems available to the Plaintiff as described by the MPCA, offsite systems and variances

This is to say nothing of the fact that one can build a habitable residence structure, campsite or put it to other use without a sewer, given the technology available today with composting and electrical incinerating toilets. (See Exhibit 4)

**2. Placing fill into a marginal wetland does not constitute a nuisance.**

The Defendant pled as an affirmative defense to Plaintiff's taking claim, 'Plaintiff's proposed activities are barred by the background principles governing property and nuisance articulated in Minnesota law,' (See Defendant's Answer dated February 9, 2004) claiming this affirmative defense protects the Defendant from liability.

Precedent establishes that dredging or filling a wetland does not constitute a nuisance. 58 AmJur Proof of Facts 3d 81, §24, Denial of Wetland Permit as Basis for Landowner's Regulatory Taking Claim (2008) citing Florida Rock Industries, Inc. v. U.S., 21 Cl. Ct. 161, 1990 WL 103774 (1990), judgment entered, 23 Cl. Ct. 653, 1991 WL 149855 (1991) and judgment vacated, 18 F3d 1560 (Fed Cir. 1994) reh'g denied, en banc suggestion declined, (June 21, 1994); Loveladies Harbor, Inc., v. U.S., 21 Cl. Ct. 153, 1990 WL 103691 (1990), judgment aff'd, 28 F.3d 1171 (Fed. Cir. 1994), reh'g and suggestion for reh'g en banc denied, (Sept. 29, 1994); Ciampetti v. U.S., 18 Cl. Ct.

548, 1989 WL 129389 (1989). Further, a nuisance by its definition is defined in terms of the resulting harm rather than in terms of conduct which causes the harm. Highview N. Apartments v. County of Ramsey, 323 N.W.2d 65, 70 (Minn. 1982)

The Defendant has not shown, nor can they show any sort of harmful water pollution resulting from Plaintiff's road building activities.

At common law there are two types of nuisances, public and private. A private nuisance is anything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance. Minn. Stat. 561.01. The interference must come from an invasion of the land. The invasion can be of particles, gases, noise, vibration, etc. It stems from the common law principle what one must use his land so as not to injure his neighbors.

There are three elements to a private nuisance: (i) there must be a substantial interference with the plaintiff's use and enjoyment of his land caused by the defendant; (ii) the defendant must act intentionally (meaning intending to cause the action which produces the offense), or unintentionally and negligently (including wantonly, recklessly, etc); and (iii) the plaintiff must be entitled to the use and enjoyment of the land; i.e. he must be in possession, but need not be the owner.

A public nuisance is a nuisance which adversely affects the public as a whole and is defined by criminal statute. Minn. Stat. 609.74. However, the building of the access road cannot be a public nuisance as it is established if a use is authorized by the legislative body it cannot be a public nuisance. Romer v. St. Paul City Ry. 75 Minn. 211, 77 N.W. 825 (1899); Richards v. Washington Terminal Co., 233 U.S. 546 (1914).

A public nuisance is defined as "whoever by an act or failure to perform a legal duty intentionally does any of the following:

1. Maintains or permits a condition which unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of any considerable number of members of the public; or
2. Interferes with, obstructs, or renders dangerous for passage, any public highway or right-of-way, or waters used by the public; or
3. Is guilty of any other act or omission declared by law to be a public nuisance and for which no sentence is specifically provided."

Minn Stat. 609.74

The government made no attempt to allege or analyze any act of Plaintiff that would fall under this statute. The Defendant certainly cannot allege there is a public nuisance from Plaintiff's roadbuilding activities.

The fact that the State of Minnesota issued a WCA permit to fill the alleged wetland for the access road through its Wetland Conservation Act, is conclusive evidence that filling the alleged wetland is not a nuisance under state law. Id., citing Florida Rock Industries, Inc., v. U.S., 18 F.3d 1560 (Fed. Cir. 1994), reh'g denied, en banc suggestion declined, (June 21, 1994).

The MPCA did not take the position the placement of fill in wetlands is a nuisance. The MPCA repeatedly apprised Bailey that it would consider variance applications for the placement of sewers on the property. (See Exhibit 5, P. 35,) asserting MPCA's rules have variance standards and procedures. (Id.) The Defendant cannot claim a nuisance when no sewers have yet been attempted to be placed on the property. No nuisance condition exists. It is well established wetlands can be drained and filled with a replacement plan in Minnesota. The fact that the State of Minnesota issued a permit to fill the alleged wetland through its Wetland Conservation Act is conclusive evidence that the filling the alleged wetland is not a nuisance under state law. Id., citing Florida Rock Industries, Inc., v. U.S., 18 F.3d 1560 (Fed. Cir. 1994), reh'g denied, en banc suggestion

declined, (June 21, 1994).

There is nothing preventing the State of Minnesota from accepting a replacement plan from individual lot owners to replace lost wetlands in exchange for filling their lots with a sufficient amount of fill to ensure a sewer system that is safe and a habitable residence can be built. The only thing preventing approval of a State WCA application is the Defendant's coersion to State agencies to act to restore the land under a teamwork theory. (See P's App 03/15/05 p. 67) In fact, LOW has told April Stavig, the owner of Lot 14, they would approve a WCA permit for fill if the Defendant approved of the fill. The Defendant informed Stavig they would consider approval if LOW approved a permit under the WCA. (See Exhibit 13, p. 87)

Further, the entire decision of the MPCA was based on assumptions. First, the MPCA's decision to revoke the certification was based on the assumption Plaintiff had not completed the mitigation pursuant to his WCA replacement plan for the access road. That assumption was false, as Plaintiff did complete mitigation. (See Affidavit of Gary Bailey) Next, the decision assumed Plaintiff was the applicant for the permit, again that assumption was false, as it is indisputable the county took over as applicant for the road. ((See P's App. 03/15/05 p. 50)

Plaintiff further submits the following proposed facts of Defendant's are materially disputed preventing summary judgment:

**Materially disputed fact**: The Defendant was not required to deny the permit application as a result of the 401 revocation. (Defendant's Memorandum p. 6)

Defendant posture's in its memorandum, claiming the Act <u>requires</u> denial of a permit if a State denies the 401 certification. In fact, if a state denies approvals under the Act, the Corps does not necessarily consider the State's action sufficient cause to deny issuance of the federal permit.

See Claudia Copeland, Nationwide Permits for Wetlands Projects: Permit 26 and Other Issues and Controversies, CRS Report 97-223 ENR, at 13 (1999). There is no 'we-had-no-choice defense' to a taking action against the Corp for its purported public interest determination.

The Defendant was free to deny the permit, without prejudice, based on the 401 revocation, yet it failed to do so. Instead, seeking a full denial for the purpose of achieving restoration of the access road and providing a chance for the Nature Conservancy to buy the site and add to Zipple Bay State Park, and coercing local agencies to enforce restoration on the individual lot owners. (See Plaintiff's 03/15/05 Appendix p.67) It loudly declared in doing so this land must not be touched. See also Ciampettiv v. United States, 18 Cl. Ct. 548, 555-556 (1989).

**Materially disputed fact**:

No determination has been made whether a septic system will be allowed on any of the individual lots.

The entire crux of the Defendant's argument is that 'because no sewer systems will be allowed on the property, the landowner cannot develop, therefore no taking has occurred.' This is a fallacy.

Mr. Westepal was clear in his testimony. A person cannot locate a standand ISTS in a floodplain, however there are alternative systems that can be utilized. See Minn. Rule 7080.0172.

Mr. Westepal found on lots 1,2,3,4 and 5 and 14 there was no suitable soil area for an ISTS because of the floodplain restriction (CCH 433)

He found that on lots 6,7,8 and 9 there was some area of suitable soil on those lots. (Id.) Those lots appeared to have a reasonable amount of suitable soil area or suitable area that you possibly could place a mound system in. Lots 10, 11, 12 and 13, Mr. Westepal did not have

sufficient information to determine whether there was enough area on those lots to see if you could get two standard mound sites within the lots.(Id.) This does not establish that sewers would not be allowed and the property is therefore 'undevelopable', it just means that he did not have sufficient information to make a determination.

**Materially disputed fact:**

Minnesota Rules requiring 12 inches of unsaturated natural soils cited by Defendant were not in existence at the time of the permit denial nor the restoration order, nor even today.

The Defendant cites Minnesota Rule 7080.0170 as authority for it's proposition no mound systems would be allowed within Sunny Beach. What the Defendant fails to point out is the testimony at trial by Mark Westepal, representative of the MPCA was this rule was deleted in 1999 and not re-enacted until 2003. (CCH, p. 404-405) Further, the 2007 rule cited by the Defendant rule has been repealed. (See Generally, Minnesota Officer of the Revisor Statutes at www.revisor.leg.state.mn.us)

Gary Lockner, Environmental Services Director and one time wetlands administrator for Lake of the Woods County testified "I was not aware of any law and I can't find it in our floodplain ordinance that said you cannot build in a floodplain and that you can't have a mound system, which is a standard system in a floodplain." (CCH p. 504) He went on to testify that there were only two relevant requirements in building in a floodplain in Lake of the Woods County. "One is that you have to build a house a foot higher - the floor of the house a foot higher than the flood level, which is 1064 there. So all houses in floodplains in Lake of the Woods County or all structures have to be at 1065. . . . And any sewer system has to be water tight. In other words, when the water inundated, it cannot flush the septic tank out into the water. . . . But I've never heard anybody say boo about

granting permits in floodplains and putting in mound systems. (CCH 505-506)

Lake of the Woods County clearly permitted mound systems in floodplains , there was no rule preventing such action, and Plaintiff clearly had an investment backed expectation that sewers would be permitted.

**Materially disputed fact:**

Defendant postures claiming no sewer systems are allowed in a floodplain under any circumstances. That proposition is not true. Mark Wespetal testified that Minn. Rule Chapter 80 does allow systems to be put into the flood fringe with certain design considerations. (CCH 460-461)

He further testified that his entire testimony in Case 1:02-cv-01078-VJW was based on assumptions, including the following:

He did not take into account potential uses of the lots that would not include septic systems and wells on the each lot. (CCH p. 465)
He did not consider the possibility of common wells. (Id.)
He did not consider off-site septic systems. (Id.)
His testimony was limited to the very narrow assumption that all lots would have mound systems and all lots would have wells. (Id. At 466)
He did into explore any other types of systems such as experimental or alternative systems which according to the MPCA's 'basically has unlimited potential for design options. (See CCH p. 454)

The crux of the Defendant's argument is that one cannot build in a floodplain area. That is not the case. Many homes in Lake of the Woods County are build in the floodplain. 14) The rules only require the building be built at or higher than floodplain level, 1064 feet elevation. (CHH p. 504-506)

The Defendant's attempt at dismissal is analogous to the attempt in Lucas v. South Carolina Coastal Council, 112 S.Ct. 2886 (1992). Here, Lucas purchased two beachfront lots in 1986 on which he planned to build single family homes. In 1988 the legislature enacted the Beachfront

Management Act (Act), which barred construction of occupiable improvements in an area that included Plaintiff's lots. Plaintiff did not contest the validity of the Act as a lawful exercise of police power, but filed suit, contending the Act's complete extinguishment of his property's value entitled him to compensation. The trial court found for the Plaintiff. Among is factual determinations were that at the time the plaintiff purchased the lots, they were zoned for single-family residential construction and there were no state or county restrictions imposed on such use of the property. The state supreme court reversed because Plaintiff had not contested the validity of the statute, feeling it was bound to accept the legislatures' finding that new construction threatened this public resource, and the statute was designed to prevent serious public harm. Plaintiff appealed the state's supreme court decision.

The United Stated Supreme court reversed the appellate court, finding the state supreme court erred in applying the 'harmful or noxious uses' principle to decide the case. The Court reasoned the 'harmful or noxious use' principle was merely the Courts' early formulation of the police power justification necessary to sustain (without compensation ) <u>any</u> regulatory diminution in value.

This writer could not find one case where a Plaitniff was dismissed from asserting a taking on the allegation that the placement of fill in a wetland is a nuisance, nor did Defendant cite any such case.

The MPCA's revocation of water quality certification was not, as the State would have the Court believe, an exercise of police power of a sewer under nuisance principles. Rather, its actions were in direct relation to question of mitigation of wetlands resulting from an access road servicing already platted residentially zoned building lots. The PCA's choice to speculate there would be some potential nuisance from sewers in the future is just that, speculation. The fact of the matter

is, it is yet to be seen whether the residential lots will ever be developed with mounds and if so whether they would indeed in fact comply with ISTS regulations by use of contained systems, offsite treatment systems, mound systems with sufficient drainage and fill or other alternative permitted sewage treatment systems, such as experimental systems.

The Defendant has not proven the existence of a public nuisance. It is no more likely that individual lot owners, or Plaintiff for that matter, will pollute these lots with sewage than they will fill them up with junk cars with oil dripping out of them. The Defendant's speculation is simply too remote. Indeed, if in fact MPCA's regulations prevent ISTS's in wetlands per se, the MPCA will also be subject to a selective prosecution claim as a result of it, too, ignoring the miles of residential development to the immediate North of the Sunny Beach property and the innumerable ISTS's that have been placed in those wetlands, all which would be 'nuisances' under the Defendant's argument, in which it has done nothing, with the exception of certifying LOW's CWA after-the-fact replacement application.(See Exhibit 14) Clearly, the Defendant was not concerned of nuisance conditions resulting from an access road in the miles of residences that are located in the floodplain immediately to the north of Sunny Beach.

Defendant's argument further fails as Minnesota law recognizes the right of a property owner to develop. See McShane v. City of Faribault, 292 N.W.2d 253 (Minn. 1980)(airport safety zoning ordinance that limited development and caused a substantial and measurable decline in market value was a taking).

In Minnesota, a taking can arise out of interference with the ownership, possession, or enjoyment of real property. Northern States Power Co. v. Minnesota Metropolitan Council, 667 N.W.2d 501 (Minn. Ct. App. 2003).

The Plaintiff has indisputably suffered economic loss as a result of CWA restrictions placed on the property.[1] Not only in expending thousands of dollars on a road, which has now been removed as ordered by the federal government, (See Exhibit 6[2]) The value of the land diminished dramatically. (See Exhibit 1)

Without the filling of wetland, there is no viable use of this 26 acres of land. Plaintiff has also previously shown the value of the property diminished dramatically from residential lakeshore property, to land that cannot be disturbed in the slightest. No fill is allowed for roads to access the land, no fill is allowed to facilitate the building of any structures, nor, under the Corp's interpretation of its Congressional grant of authority and rules it promulgated, may the property be driven on with tracked machinery as the Defendant has interpreted its rules that may result in soils falling back onto land, which the Defendant deems a 'discharge' as well, as it admits it regulated 'mechanized land clearing' as well. (See Deposition of Jeff Koschak p. 29) See also Regulatory Guidance Letter No. 90-5, Land clearing Activities Subject to Section 404 Jurisdiction (July 18, 1990).

Individual lot owners have now been constructively evicted from their own residentially approved real property as removal of the road has successfully prevented access.[3]

---

[1]For the Court's clarification, the 'property' will mean the legal description encompassing Sunny Beach subdivision as described in the Complaint.

[2]Plaintiff has argued the Defendant does not even have jurisdiction to regulate the property at issue, which was found valid by the District Court and is now on appeal to the 8th Circuit.

[3]A landowner in Minnesota has a compensable property right of access to an abutting public road. C and R Stacy, LLC, et al, v. Chisago County, A06-2302 (Dec. 11, 2007, citing Cf. Finke v. State, 521 N.W.2d 371, 375 (Minn. App. 1994)(citing Hendrickson v. State, 267 Minn. 436, 442, 127 N.W.2d 165, 170-71

**3. Defendant's regulations are not duplicative of the limitations inherent in property ownership as defined by background principles of state law.**

Nor is Defendant's argument that it's decision 'duplicates the limitations inherent in property ownership, as defined by background principles of state law" of any merit. (See Def's memorandum p. 17) It should be self evident in our eco-friendly market that it is not necessary for residential property to have a traditional Individual Sewage Treatment System (ISTS). There are numerous technological alternatives for waste disposal, including Composting Toilets[4], and Incinerating Toilets[5] to name a few. (See Exhibit 4)

Further, although there may be rules restricting the placement of sewers on some of the lots, the MPCA has never made a statement or declaration that sewers would be outright prohibited.

In this case the government conceded that the only remaining use of the parcel was to sell it to the Nature Conservancy or Zipple Bay State Park. (See Plaintiff's Appendix previously submitted, p. 37). The Defendant cannot build a road on the property, cannot build structures on the property and cannot disturb any soils on the property. (See Affidavit of Gary Bailey)

In its denial of the permit application, the Defendants reasoning for the denial was not based upon the speculation of whether or not sewers would be allowed on the property, nor did the Defendant attempt to apply those rules to the property. In fact, in issuing the denial to place fill on

---

[4]Indeed, Sun Mar Composting Toilets advertise their product specifically for circumstances that do not allow for septic systems or water connection. "Some have been installed in cabins and homes that have rocky soil that does not permit a septic system drain field or homes in close proximity to lakes, rivers and streams. (See Exhibit 4)

[5]Incinolet purports greater comforts, cleanliness and ease of maintenance over a composting toilet. (See Exhibit 4)

the property, the Corps' senior decision-maker stated, as reasoning for the permit denial:

> I have determined that issuance of this permit would be contrary to the public interest. Therefore, I must deny the request.
>
> Retention of the dredged and fill material would contribute to unacceptable degradation of a valuable wetland resource and the adjacent Lake of the Woods, an international waterbody with substantial recreational, ecological and economic values. The hardwood swamp impacted by the project has high functional values for water quality protection, shoreline protection, wildlife habitat, and floristic diversity/integrity.

The Defendant cannot now assert the reasoning for the denial was the a result of it's speculation that sewers would not be allowed pursuant to regulations. The Defendant well had the ability to issue a permit conditioned on the grant of certification from the MPCA to ensure the State's water quality standards were addressed, or alternatively deny the permit "without prejudice". Instead it decided under its own public interest analysis and regulations, the placement of the access road would be contrary to the public interest, opining this particular wetland had such high functional values, floristic diversity and wildlife habitat, it should not be disturbed. It's denial made no mention the placement of an access road or development of residences constituted a nuisance.

The law commands Plaintiff should not bear alone the burden of the government's decision this wetland resource has high functional values that benefit the public. As a result of the permit denial, and for no other reason, this residential subdivision previously approved by the local government has been defeated by the Corps regulation. The opinions and regulatory authority of the MPCA is an entirely different matter and state court issue.

In fact, Mr. Bailey brought action against the MPCA given Defendant's pointing fingers at the MPCA. In that litigation, the MPCA refused to affirmatively state sewers were prohibited on the property, and expressly stated that Bailey could reapply for another certification and/or avail

himself to the MPCA variance procedures, which are is still available to Mr. Bailey stating "Bailey's Takings Claim is Not Ripe Because There Has Been No Final Application Of The MPCA Water Quality Standards And Related Rules." (See Exhibit 5, May 16, 2007 Memorandum to 9th Judicial District Court) where it repeatedly pointed out that MPCA's rules have variance standards and procedures. See Minn. R. 7000.000 and 7050.0190, subp.1(2005).

Defendant's entire defense is a red herring. There are other alternatives for waste disposal if an ISTS is not able to be designed which would comply with MPCA regulations such as contained compost toilets, incinerating toilets and centralized offsite treatment facilities.

This is to say nothing of the Defendant's right to fill the alleged wetland granted to the Plaintiff by the State of Minnesota under the Wetland Conservation Act. (See Plaintiff's Appendix previously submitted p. 28 and 46) Certainly the granting of permission to fill wetlands and replace elsewhere is a cognizable property right.

The MPCA later revokes the certification for the access road under the false assumption Plaintiff did not complete mitigation and under the false assumption Minnesota laws require a developer to mitigate for all potential loss of wetlands stemming from a development. Minnesota has no such requirement. Individual landowners, once they determined what they wanted to do with their land, were free to request a replacement plan under the WCA for any wetlands that may be disturbed as a result of their individual projects.

The court should also be mindful the Army Corp of Engineers is not required to obtain state authorization or meet state water quality standards with respect to its CWA permits. See Minnesota v. Hoffman 543 F.2d 1198 (8th Cir. 1976).

The MPCA in deciding that wetland impact were not mitigated, and questioning the

'suitability' of developing the land is, in all reality, questioning the decision by the county board to plat and rezone the property. Rezoning property is a legislative act. Parties wishing to challenge legislative decisions by local government bodies "must first litigate the question of their validity in district court." Dead Lake Ass'n, Inc., v. Otter Tail County, 695 N.w.2d 129, 134(Minn. 2005) . It cannot backdoor its rules through the federal permitting process. The MPCA did not challenge LOW zoning decision in administering its responsibility of deciding land use issues under our federalist system. Further, the Department of Natural Resources is charged with enforcing Minnesota's Wetland Conservation Act. The DNR had notice of the application to plat Sunny Beach for residential development and notice to rezone the property from 'natural resource' to 'residential' and did not object at the time and place of the hearing. (CCH p. 520)

Municipalities adopt zoning ordinances to execute the policies and goals of their land use plan. SuperAmerica Group v. City of Little Canada, 539 N.w.2d 264 (Minn. Ct. App. 1995) See Minn. Stat. 462.357 subd. 1. The zoning statute or ordinance regulates by district, the building development and uses of property. Orme v. Atlas Gas & Oil Co., 217 Minn. 27, 13 N.W.2d 757 (1944)

The Defendant completely avoids in its analysis the application or effect of its regulations upon this wetland, as doing so would show it has affected a taking of private property in contravention of the Federal Constitution. See McShane v. Faribault, 292 N.W.2d 253 (Minn. 1980) The Defendant has cited no authority one cannot build a structure on land for use as a residence without an in-ground sewer system as there is no such law.

Further, the Defendant ignores it's permit denial was the catalyst of numerous State issued restoration orders which demanded Mr. Baily and other landowners to remove fill placed on the

individual lots which Lake of the Woods County permitted with the issuance of culvert permits. Many landowners built driveways leading to their property from the access road and placed culverts in the ditch on either side of the road. The County required landowners to obtain a permit to place a culvert in its ditch and even sold landowners the culvert and gravel to place on their lands for driveways. Those culvert were also ordered removed by the Defendant.

**4. Plaintiff should be allowed his day in Court for a full evidentiary hearing on his claim.**

This is not a case where the economic impact was a mere diminution in value. See, e.g. Rockefeller Center Properties v. United States, 32 Fed. Cl. 586, 594 (1995)(holding 4.3% loss did not support a taking), Maritrans, 342 F.3d 1344, 1358 (Fed. Cir. 2003) (holding 13.1% diminution did not support a taking), Bass Enterprises Production Co. v. United States, 54 Fed. Cl. 40, 401 (2002)(holding 5% decrease did not support a taking). Rather, the United States' actions has deprived Mr. Bailey of all economically viable use of the entire 26 acre tract as described in the plat. Accordingly under the standard set forth in Lucas, this was a categorical taking of the entire 26 acres by the Defendant, mandating just compensation for the property taken.

Alternatively, even if this Court does not find a categorical taking, Mr. Bailey is entitled to recover just compensation under the ad hoc Penn Central test, given the drastic diminution in value resulting from the Defendant's regulation of this property. (See Exhibit 1) Mr. Bailey is entitled to compensation under this test because the three factors generally looked to in the Penn Central test weigh in favor of a cognizable taking.

Specifically, the character of the government's actions in this case was more invasive than required. First, the Court should be mindful that 90% of land in Lake of the Woods County would qualify as a wetland. (Exhibit 2) There is a very high percentage of bog in Lake of the Woods

County, and the population settled around the lakes because the shoreland areas were drier than the inland peat bogs. (Id.) Type 7 wetlands are so common in the county that they are not highly valued by local government officials. (Id.) Local wetland officials believed that Type 3 or 4 wetlands were the really important ones, the ones worth identifying and protecting and when possible, creating. (Id.) Type 7 wetlands were less important and if they could be drained or otherwise made suitable for lots or other economic development, that was a good use for them. (Id.)

The character of the Defendant's actions is making a decision that it is in the public interest that this particular wetland should not be disturbed at all, ignoring the local government's decision to drain the watertable and fill for residential development. (See P's App. 03/05/05 p. 33) Assuming arguendo that the action did not deprive Mr. Bailey of all economic value, it certainly came close. Any reasonable economic use has been eviscerated by the Corps actions. Plaintiff's expectations were clearly reasonable given the local government unit approved of the plan to develop residences and had approved the draining of wetlands, evidenced by the WCA approval for the access road, under Minnesota's Wetland Conservation Act. (See Id. p. 28 & 33)

The Federal Circuit has defined the proper approach to a non-categorical regulatory taking claim: 'When a taking is determined to be non-categorical, the court must embark on a fact-based inquiry in which it applies the standard promulgated by the Supreme Court in Penn Central to evaluate whether the governmental action at issue constituted a cognizable taking of the property interest at issue." Maritrans, Inc. v. United States, 342 F. 3d 1344, 1351 (Fed Cir. 2003). The Penn Central analysis involves 'several factors that have particular significance." Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978) Those factors are the character of the governmental action at issue, the economic impact of the action on the claimant, and the extent to which the action

has interfered with the claimant's distinct, investment-backed expectations. Id.

This is not to say that the Court may consider only those factors, or that all three must weigh in either a plaintiff's or defendant's favor to prevail. See Id. ([T]his Court, quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensation by the government, rather than remain disproportionately concentrated on a few person."); see also Palazzolo v. Rhode Island, 533 U.S. 606, 636 (2001)(O'Connor, J., concurring)("The Takings Clause requires careful examination and weighing of all the relevant circumstances in this context. The court below therefore must consider on remand the array of relevant factors under Penn Central before deciding whether compensation is due.")

Ultimately, the purpose of the ad hoc inquiry, as in other inverse condemnation cases, is to ensure that plaintiffs are not forced 'alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960)

Mr. Bailey's expectations when he purchased the property in June of 1989 were to develop the property into some sort of residential property. (See Exhibit 3,p. 61, ln 6-12) His expectation was clearly reasonable given the fact six residential subdivisions were developed directly adjacent and to the north of Mr. Bailey's property. (Id. p.64, ln 9-p.66, ln 25 and Exhibit 14)

The adjacent subdivisions were comprised of the same type of land that comprises Mr. Bailey's property. (Id. p. 64, ln 21-25 and Exhibit 14) The fact that the property was re-zoned from natural resource to 'residential' by Lake of the Woods County Board is evidence Mr. Bailey's expectations were reasonable. The fact the LGU granted a permit under the State's Wetland Conservation Act to fill the alleged wetland for the access road is also evidence of the reasonableness

of Mr. Bailey's expectations.

"The manner in which the concepts should be understood is that investment-backed expectations always depend on the underlying restrictions at the time of purchase. For example, in buying land zoned single family-residential, a property owner has no legitimate investment-backed expectation that he can dig a coal mine. However, the owner does have an investment-backed expectation that he can build a single family home." Ambase v. United States, 58 Fed. Cl. 32, 51 (2003). Clearly, the fact that the local government unit charged with land use decisions, knowing the property was in a floodplain (Exhibit 1, p. 3) and contained some wetlands, yet approved the proposal to change the zoning to residential, shows Mr. Bailey's expectations were reasonable.

The purpose of the Takings Clause is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. U.S.C.A. Const. Amend. 5. Palazzolo v. Rhode Island, 533 U.S. 606, 121 S. Ct. 2448, 150 L.Ed. 2d 592 (2001).

> The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation ... When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States... The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking ... we are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.

Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922)

As the Federal Circuit has stated:

> Marketplace decisions should be made under the working assumption that the Government will neither prejudice private citizens, unfairly shifting the burden of a pubic good onto a few people, nor act arbitrarily or capriciously, that is, will not act to disappoint reasonable investment-backed expectations. The Government, in a word, must act fairly and reasonably, so that private parties can pursue their interests.

Florida Rock Industries, Inc. v. United States, 18 F.3d 1560, 1571 (Fed. Cir. 1994).

The character of Defendant's action in this case supports a regulatory taking. As stated in

Florida Rock Ind. v. United States, 45 Fed. Cl. 21 (Fed. Cl. 1999)

The final prong of the Penn Central test, the character of the government action, does not here argue against a taking, but rather for one; to benefit the public. Florida Rock's bundle of property rights was severely diminished: 'the government, under the guise of regulation, cannot take from a property owner the core economic value of the property, leaving the owner with a mere shell of shambled expectations." Although it is true that not every strand in the bundle was cut, the thin handful which remains little resembles the full sheaf once held by Florida Rock. It strains the court's sense of logic to suggest this well-pruned parcel is still whole. Florida Rock's property, post-regulation, is different in kind, not merely degree, from its pre-regulation property, and this argues for a compensable taking. The government might as well have physically occupied the property, leaving Florida Rock the option of visiting its land for recreation, or selling it. Id. At 41-42 (citations omitted)

## CONCLUSION

The Supreme Court sent a strong message to this particular agency in Rapanos v. U.S.,1265 S.Ct. 2208 (2006) against this exact type of interference with States rights to decide issues of land use.

Justice Scalia, in Rapanos, emphasized the overzealous nature of this regulatory agency stating the 'burden of federal regulation on those who would deposit fill material in locations denominated 'waters of the United States' is not trivial. In deciding whether to grant or deny a

permit, the U.S. Army Corps of Engineers (Corps) exercises the discretion of an enlightened despot . . ."

This agency did just that, exercised the discretion of an enlightened despot, denying a permit application to fill 2 acres of wetland in a county comprised of $90% wetlands, claiming this 26 acre parcel had significant function value hardwood swamp impacted by the project has high functional values for water quality protection, shoreline protection, wildlife habitat, and floristic diversity/integrity. Prompting and coercing all other agencies that had approved the development through due process notice to turn around and deny all applications for any sort of use and issue restoration orders for the fill previously permitted.

This Court has not been asked to question the legitimacy or the effect of the 401 Certification revocation by the MPCA, but has been requested to determine the effect of the Corps Permit denial to place fill on the property for a road accessing 14 individual lots zoned as residential by the local government unit charged with the power of land use planning. Plaintiff respectfully requests this court deny Defendant's motion in its entirety.

Respectfully Submitted,

ALAN B. FISH P.A.

S/Alan B. Fish

Alan B. Fish, #0238120
102 2nd Street N.W.
Roseau, MN 56751
(218)-463-2088 (phone)
(218)-463-2099 (fax)
Counsel of Record

\Gayle2008\c\clients\BAILEY V. USA TAKINGS.02\SUMMARYJUDGMENT.06\MEMORANDUM.08S.wpd