# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**GARY BAILEY,**

**Plaintiff,**

**AFFIDAVIT OF ALAN FISH**

**v.**

**THE UNITED STATES,**

**Civil No. 02-1078L**
**Honorable John P. Wiese**

**Defendant.**

Alan Fish being first duly sworn on oath deposes and states that he is the attorney representing the Plaintiff in the above entitled matter, and is a member of good standing of the bar of the State of Minnesota and of this Court. That attached hereto are true and accurate copies of the documents listed as follows:

| | | |
|---|---|---|
| Exhibit 1 | Scott Pahlen Appraiser Report dated June 27, 2008 | p. 1 - 72 |
| Exhibit 2 | Findings of Fact, Conclusions and Recommendations of Judge Allan W. Klien dated October 3, 2003 | p. 73 - 87 |
| Exhibit 3 | Transcript of deposition of Gary Bailey dated Dec. 1 2004 | p. 88 - 132 |
| Exhibit 4 | Internet advertisements of Sun Mar Composting Toilets and Incinolet, electric incinerating toilet from July 24, 2008 | p. 133 - 136 |
| Exhibit 5 | Memorandum submitted by the MPCA in the case Gary Bailey v. Lake of the Woods County, Department of Natural Resources & Minnesota Pollution Control Agency, in Case No. C5-04-209 venued in the 9th Judicial District, State of Minnesota. | p. 137 - 184 |
| Exhibit 6 | Order for Judgment dated March 31, 2008 in case 05-CV-2245. | p. 185 - 200 |
| Exhibit 7 | Minnesota Wetland conservation Act Wetland Replacement Plan Application document and Decision approving Plaintiff's request to replace wetlands impacted by the placement of the access road. | p. 201 - 207 |

| | | |
|---|---|---|
| Exhibit 8 | Approach Culvert Permits issued by Lake of the Woods County to Plaintiff and others with interests in land located in the 'Sunny Beach' plat. These culverts were ordered removed by the Defendant herein. | p. 208 - 218 |
| Exhibit 9 | Summons and Complaint against Plaintiff herein commenced by the Defendant to obtain judicial enforcement of the administrative restoration order, case number 05-CV2245. | p. 219 - 237 |
| Exhibit 10 | Memorandum Opinion and Order issued September 25, 2007 in case number 05-CV-2245 | p. 238 - 277 |
| Exhibit 11 | Order Dismissing Criminal Complaint against Gary Bailey filed May 1, 2006 in case number 39-T8-05-697 | p. 278 - 280 |
| Exhibit 12 | Defendant's Memorandum of Law requesting the Dismissal of the criminal complaint. | p. 281 - 306 |
| Exhibit 13 | Transcript of Deposition of April Stavig taken Feb. 21, 2008 Without exhibits. | p. 307 - 331 |
| Exhibit 14 | Selected correspondence regarding Lake of the Woods County's CWA After the Fact Permit Application for 1.5 miles of access road directly abutting the access road at issue in Plaintiff's Permit denial. | p. 332 - 372 |
| Exhibit 15 | Transcript of Deposition of Dennis Thompson taken Feb. 21, 2008 Without exhibits | p.373 - 387 |
| Exhibit 16 | Transcript of Deposition of Raynard Lundgren Without exhibits | p.388 - 399 |
| Exhibit 17 | Transcript of Deposition of Thomas Woitalla taken March 6, 2008 Without exhibits | p. 400 - 415 |
| Exhibit 18 | Transcript of Deposition of David Wolf taken March 6, 2008 Without exhibits | p. 416 - 428 |

FURTHER YOUR AFFIANT SAYETH NOT.

Alan B. Fish

Subscribed and sworn to before
me this 7th day of August, 2008.

Notary Public

GAYLE L. PETROWSKI
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2010

C:\clients\BAILEY V. USA TAKINGS.02\SUMMARYJUDGMENT.068\APPENDIXINDEX.088.wpd

# APPRAISAL REPORT

# SUNNY BEACH PROPERTY

# WILLIAMS, MINNESOTA

DATE OF INSPECTION: 6-25-08

DATE OF REPORT: 6-27-08

PREPARED BY:

SCOTT PAHLEN, APPRAISER
SCOTT PAHLEN REALTY, INC.
59516 STATE HWY 11, WARROAD, MN 56763

# SCOTT PAHLEN REALTY, INC.

Your Friends in Real Estate

59516 State Hwy. 11
WARROAD, MN 56763

www.pahlenrealty.com
E-mail: realty@wiktel.com

OFFICE (218) 386-1800
FAX# (218) 386-1817

June 27, 2008

Ms. Rita Fish-Whitlock
Alan B. Fish, P. A.
Attorneys and Counselors At Law
102 2nd Ave NW
Roseau, MN 56751

RE: Appraisal of Sunny Beach Property

Dear Ms. Fish-Whitlock:

Pursuant to your request, I have inspected the real estate described herein. The estimate of value involves land and improvements and is predicted on the following;

a. Physical inspection of the real estate.
b. Comparable sales.
c. Cost analysis, less reasonable charges for depreciation, plus a fair value to land.
d. Income analysis.
e. Appraiser's experience and perception of trends and market fluctuations.
f. Analysis of all pertinent data.

After correlation of the data compiled and pertinent, it is the opinion that as of the dates below, value of the subject property was:

| | Regulated | Unregulated |
|---|---|---|
| June 12, 2001 | $30,852.50 | $537,600 |
| October 22, 2001 | $30,852.50 | $537,600 |
| September 27, 2005 | $52,890 | $1,083,600 |
| September 25, 2007 | $88,150 | $1,498,000 |
| March 31, 2008 | $88,150 | $1,498,000 |

If you should have any questions after reading this report, feel free to call me.

Sincerely,

Scott Pahlen, Appraiser

TABLE OF CONTENTS

| | |
|---|---|
| LETTER OF TRANSMITTAL | 1 |
| TABLE OF CONTENTS | 2 |
| FIRREA TABLE OF CONTENTS | 3-4 |
| CERTIFICATION OF VALUE | 5 |
| ASSUMPTIONS AND LIMITING CONDITIONS | 6-7 |
| PURPOSE OF APPRASAL/APPRAISAL PROBLEM | 8 |
| PROPERTY RIGHTS APPRAISED | 9 |
| DEFINITION OF MARKET VALUE | 10 |
| PROPERTY PHOTOGRAPHS | 11-15 |
| AREA DESCRIPTION | 16-17 |
| TITLE AND RECORD DATA & LEGAL DESCRIPTION | 18-20 |
| HIGHEST AND BEST USE | 20 |
| SITE FEATURES & ENVIRONMENTAL CONCERNS | 21 |
| DESCRIPTION OF THE SUBJECT PROPERTY | 22 |
| DESCRIPTION OF MARKET COMPARISON APPROACH | 23 |
| MARKET COMPARISON APPROACH | 24-28 |
| COMPARABLE SALE DATA | 29-62 |
| DOCUMENTS REVIEWED | 63 |
| PLAT MAP | 64 |
| TOWNSHIP MAP | 65 |
| QUALIFICATIONS OF APPRAISERS | 66-69 |
| APPRAISERS' LICENSES | 70-71 |

APPRAISAL STANDARDS COMPLIANCE TABLE OF CONTENTS
FIRREA CHECKLIST

1. Conform to USPAP, except that the Departure Provision, which allows below minimum work, will not apply.

2. Include a disclosure of any steps taken in order to comply with the Competency Provision of USPAP.

3. Be based on the market value or other values as defined in the attached definitions.

4. i. Be written and presented in a narrative report.

ii. Be sufficiently descriptive to enable the reader to ascertain the market value and the rationale for the estimate.

iii. Provide detail and depth reflective of the complexity of the property appraised.

5. Analyze and report in reasonable detail any prior sales of the property within the last three years.

6. Analyze and report current revenues, expenses, and vacancies on income producing properties rather than upon estimated or projected figures not supported by current market conditions.

7. Use a reasonable marketing period for the property.

8. Analyze current market conditions and trends that will affect the income, absorption, or value of the property.

9. Report the "as is" (using appropriate deductions and discounts for holding and marketing costs and entrepreneurial profit) and the stabilized market values for development property; report both the value in use and value as vacant for owner/occupied property.

10. Include in the USPAP-required certification and additional statement that: "the appraisal assignment was not based on a requested minimum valuation, a specific valuation or the approval of a loan."

APPRAISAL STANDARDS COMPLIANCE TABLE OF CONTENTS, CONTINUED
FIRREA CHECKLIST

11. Contain sufficient supporting documentation to allow the reader to ascertain the appraiser's report logic, reasoning, judgment, and analysis.

12. Include a legal description of the subject property (in addition to the description required by USPAP).

13. Identify and value separately any non-real estate items.

14. Use and reconcile the income, direct sales, and cost approaches to value, and explain the omission of any approach not used.

15. Disclose any items not provided to the appraiser.

CERTIFICATION OF VALUE

I, the undersigned, do hereby certify that I have personally inspected the property located at:

Sunny Beach
Williams, MN 56686

To the best of my knowledge and belief, the statements of fact contained in this report and upon which the opinions herein are based, are true and correct, subject to the assumptions and limiting conditions explained in the report.

Employment in and compensation for making this appraisal are in no way contingent upon the value reported, and I certify that I have no interest, either present or contemplated, in the subject property. I have no personal interest or bias with respect to the subject matter of the appraisal report or the parties involved.

This appraisal report identifies all of the limiting conditions (imposed by the terms of my assignment or by the undersigned) affecting the analysis, opinions, and conclusions contained in this report.

No one other than the undersigned prepared the analysis, opinions, or conclusions concerning real estate that are set forth in this appraisal report.

This appraisal report has been made in conformity with and is subject to the requirements of the Code of Professional Ethics and Standards of Professional Conduct of the American Institute of Real Estate Appraisers of the National Association of Realtors.

Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser or the firm with which he is connected) shall be disseminated to the public through advertising media, public relations media, sales media or any other public means of communication without the prior written consent and approval of the undersigned.

______________________ 6-27-08
(signature) Scott Pahlen

______________________ 6-27-08
(signature) Nels Grafstrom

ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal report has been made with the following general assumptions:

1. No responsibility is assumed for the legal description or for matters including legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

2. The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3. Responsible ownership and competent property management are assumed.

4. The information furnished by others is believed to be reliable. However, no warranty is given for its accuracy.

5. All engineering is assumed to be correct. The plot plans and illustrative material in this report are included only to assist the reader in visualizing the property.

6. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

7. It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal report.

8. It is assumed that all applicable zoning and used regulations and restrictions have been complied with, unless nonconformity has been stated, defined, and considered in the appraisal report.

9. It is assumed that all required licenses, certificates of occupancy, consents, or other administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

10. It is assumed that the utilization of the land and improvements are within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

ASSUMPTIONS AND LIMITING CONDITIONS, CONTINUED

This appraisal report has been made with the following general limiting conditions:

1. The distribution, if any, of the total valuation in this report between land and improvements applies only under the stated program of utilization. The separate allocations for land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

2. Possession of this report, or a copy thereof, does not carry with the right of publication. It may not be used for any purpose by any person other than party to whom it is addressed without the written consent of the appraiser, and in any event only with proper written qualification and only in its entirety.

3. The appraiser herein by reason of this appraisal is not required to give further consultation, testimony, or be in attendance in court with reference to the property in question unless arrangements have been previously made.

4. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news , sales, or other media, without the prior written consent and approval of the appraiser.

5. Disclosure of the contents of the appraisal report is governed by the By-laws and Regulations of the professional appraisal organizations with which the appraiser is affiliated.

6. Unless otherwise stated in this report, the existence of hazardous material, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances.

7. The presence of substances such as asbestos, urea-formaldehyde foam insulation or other potentially hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

## PURPOSE OF THE APPRAISAL

The purpose of this appraisal is to establish value of the property at Sunny Beach, both regulated and unregulated, at different dates in the past 7 years.

## THE APPRAISAL PROBLEM

Ms. Rita Fish-Whitlock requested an appraisal for this property. We have been asked to establish market value as defined in this report. The income and cost approaches have been disregarded since the subject property is un-improved and is not income producing. The market comparison approach is the main determining factor for value. Some other items of concern that will need to be addressed in the report are local rates, trends, and the local economy.

USPAP-FIRREA acknowledgement:

I agree to accept the appraisal assignment as outlined above and will, to the best of my ability, perform to FIRREA and USPAP standards.

________________________ 6-27-08
Scott Pahlen, Appraiser

________________________ 6-27-08
Nels Grafstrom, Appraiser

## PROPERTY RIGHTS APPRAISED

The subject real estate will be appraised by estimating the market value of the fee simple interest of the real estate. For use in this appraisal, the definition of the fee simple interest shall conform to the following definition obtained from page 87 of the real estate appraisal terminology by Byrl N. Boyce PH.D., published in 1975.

> "FEE SIMPLE INTEREST"
>
> An absolute fee; a fee without limitation to any particular class of heirs or restrictions, but subject to the limitations of eminent domain, escheat, police powers and taxation. An inheritable estate.

## MARKET VALUE

Market value is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeable, and assuming the price is not affected by undue stimulus. Implicit in this definition are the consummation of a sale as of a specified date and the passing of good title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated.

2. Both parties are well informed and well advised, and acting in what they consider their own best interests. When it is unlikely that the sale can be completed within 12 months—the property appraiser must discount all cash flows generated by the property to obtain the estimate of market value.

3. A reasonable period of time is allowed for exposure in the open market.

4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto.

5. The price represents normal consideration for the property sold unaffected by special or creative financing or sales concessions granted to anyone associated with the sale, or other special or creative terms, services, fees, costs or credits involved in the transaction.

11

































15







LAKE OF THE WOODS COUNTY AREA DESCRIPTION

Lake of the Woods County lies in north-central Minnesota along the Canadian Border. Minneapolis is 360 miles S, Winnipeg, Manitoba is 145 miles NW, and Grand Forks, North Dakota is 170 miles SW. The population of Lake of the Woods County is about 5,000 with Baudette having a population of about 1,250. Other small municipalities include Williams, and Graceton, and many people inhabit the areas along the Rainy River and Lake of the Woods shoreline, including the Northwest Angle.

The area is well known for a large lake called Lake of the Woods which encompasses over 950,000 acres and has over 14,000 islands. This lake lies in Minnesota and two Canadian provinces (Manitoba and Ontario). The lake supports a large tourist industry as well as strong property values near it's shores. This lake brought early explorers to the area in the late 1700s and was the main reason this area was settled prior to much of Minnesota.

The topography of the area is mainly level to the eye and much of the inhabited area of Lake of the Woods County is surrounded by rich black farmland. Main crops are wheat, sunflowers, oats, barley, hay, flax, canola, timothy, and bluegrass. There are also numerous dairy and beef cattle farms.

The largest industry in Lake of the Woods County is Solvay Pharmaceuticals, located in Baudette. The major employer for the area is Marvin Windows in Warroad which currently employs around 3,000. A snowmobile and recreational vehicle manufacturer in Roseau (Polaris Industries) employs around 2,000. Other manufacturers in the area include wood stove manufacturers and a hockey stick factory. The tourism industry is one of the mainstays for employment. Many resorts lie along the Rainy River and south shore of the lake. Lake of the Woods County continually has one of the lower unemployment rates in the state.

Across the southern part of the county lies a large state forest (Beltrami Island). This huge expanse of land (650,000 acres) is mostly high sandy soils because it was an island at the time of Lake Agassiz during ice age melt-off. This area is open for public use and much of the timber industry buys stumpage from public agencies within the forest.

The area's transportation needs are serviced by the Canadian National RR and MN highways #11 & #72. Airports are located in Baudette and Warroad.

County banks include Border State Bank, Wells Fargo, and First Federal Bank, all located in Baudette.

LAKE OF THE WOODS COUNTY AREA DESCRIPTION, CONTINUED

The government of Lake of the Woods County is typical of many counties with a board of commissioners, township officers and mayor-council in the municipalities.

The school systems have been upgraded with a new facility in Baudette. Students on the west side of Lake of the Woods County attend school in Warroad. The closest college is in International Falls (68 miles E). Many area students also attend college in Bemidji, MN.

Police and fire protection is available in all parts of Lake of the Woods County. The towns each have a volunteer fire department. Police protection is provided as a blanket by the Lake of the Woods County Sheriff's Department with Baudette offering a city police department.

Baudette's hospital has recently completed an extensive expansion and remodeling effort.

# TITLE AND RECORD DATA

## LEGAL DESCRIPTION

Lots 1-14, Sunny Beach Plat and Government Lot 3, NW1/4 SW1/4, that part of SE1/4 SW1/4 & Government Lot 4 lying north of ditch and less that part of Government Lots 3 & 4 platted to Sunny Beach 21-163-33

## LAND AREA

88.15 acres

## SERVICES

Public water & sewer are not available. The property has wells and septic systems. Telephone service is by CenturyTel and electrical service is from Northstar Electric of Baudette. Although public transportation is nearly nonexistent, this is normal for the area.

## HIGHEST AND BEST USE

Lakeshore development

## AREA ECONOMY

Area is dependant on tourism, manufacturing, forest products, and agriculture. Unemployment rate in Lake of the Woods County is continually one of the lowest in out-state Minnesota. The area relies on a window manufacturer (Marvin Windows in Warroad), a recreational vehicles manufacturer (Polaris Industries in Roseau), and a pharmaceutical company. Other local industries are wood stove manufacturers and a number of other small industries, including gaming. The economy is expected to remain stable in the area with slow to steady growth.

## POPULATION

Lake of the Woods County has a population of about 5,000. Population has remained steady the past ten years and is expected to continue.

TITLE AND RECORD DATA, CONTINUED

TRANSPORTATION

| | |
|---|---|
| Rail Lines: | Canadian National runs along the Border and around the southern part of Lake of the Woods |
| Highways: | State Hwy #11, #72, & #172 |
| Airport: | Baudette & Warroad both have airports |

BANKS

Baudette has Wells Fargo, First Federal & Border State Bank

MACRO LOCATION

Lake of the Woods County is located in the north central part of Minnesota. The north border of the county is the US-Canadian border. Closest major cities are: Duluth—240 miles SE; Minneapolis-St.Paul—360 miles S; Winnipeg, Manitoba—145 miles NW; Grand Forks, ND—170 miles SW.

GOVERNMENT

Lake of the Woods County has a Board of Commissioners and a Mayor/Council government.

EDUCATION

Baudette has a public K-12 school system.

FIRE DEPARTMENT

Local volunteer

POLICE DEPARTMENT

Lake of the Woods County Sheriff's Department

MEDICAL FACILITIES

Baudette has a newer hospital. There is also a nursing home located there. Warroad has Altru clinic and a nursing home.

INSPECTION

The subject property was inspected on June 25, 2008.

## HIGHEST AND BEST USE

That reasonable and probable use that will support the highest present value, as defined, as of the effective date of the appraisal.

Alternatively, that use, from and among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and which results in the highest land use.

The definition immediately above applies specifically to the highest and best use of land. It is to be recognized that in cases where a site has existing improvements on it, the highest and best use may very well be determined to be different from the existing use. The existing use will continue, however, unless and until land value in its highest and best use exceeds the total value of the property in its present use.

Implied within these definitions is recognition of the contribution of that specific use to community environment or to community development goals in addition to wealth maximization of individual property owners.

Also implied is that the determination of highest and best use results from the appraiser's judgment and analytical skill, i.e., that the use determined from analysis represents an opinion and not a fact to be found. In appraisal practice the concept of highest and best use represents the premise upon which value is based.

HIGHEST AND BEST USE OF THE LAND

| | |
|---|---|
| Regulated | Recreation/Hunting |
| Unregulated | Lakeshore Development |

## SITE FEATURES

1. Road access is on County Road 53 and Sandy Shores Drive.

2. Topography is mainly level with a good view of Lake of the Woods.

3. Subject has average visibility from County Road 53 and Sandy Shores Drive.

4. Land is of normal shape and proximity does not affect value.

## ENVIRONMENTAL CONCERNS

Contamination, hazardous wastes, pollution, asbestos, etc. are becoming a great concern in the valuation of real estate. This appraisal has several disclaimers about these issues. An appraiser is not normally qualified to detect these substances and accepts no liability for doing so. It is the responsibility of the appraiser to disclose any "red flags" that might indicate problems. I have no knowledge nor did I see any evidence of any substances that would affect the value of the subject land.

## Sunny Beach Property

The subject property is located along Lake of the Woods just south of the development known as Sandy Shores in Lake of the Woods County. Vehicle access is from County Road 53 on the west side of the property and Sandy Shores Drive on the north edge. Land size is 74.95 acres on the west side of the road. The plat of Sunny Beach encompasses a total of 13.2 acres, split into 14 lots with similar sizes and water frontage amounts.

There are currently no building improvements on the property and the only improvements include the disputed road and driveways into the lots.

Property west of the road is mainly woods/brush and land that would be considered recreational. A small portion of the property was formerly used for agricultural purposes, but this is no longer the case. The property next to the lake is mainly wooded with a mixture of trees.

The subject property has been valued using five different dates:

| | |
|---|---|
| June 12, 2001 | Date of permit denial |
| October 22, 2001 | Date of restoration order |
| September 27, 2005 | Date U.S. commenced suit to judicially enforce restoration order |
| September 25, 2007 | Date U.S. was granted summary judgment for its request to judicially enforce restoration order |
| March 31, 2008 | Date judgment was entered |

Values are determined using sales data from the Lake of the Woods County Assessor's office. The market area was defined as the subject township, Prosper, and the two adjacent townships, Lakewood & Zippel. Each date will have values as a developed property and as undeveloped property with a mixed use of recreational/hunting and a small amount of agricultural land.

## DESCRIPTION OF THE MARKET COMPARISON APPROACH

The sales comparison approach is a method of estimating market value in which a subject property is compared with similar properties that have sold recently. Preferably, all properties are in the same geographic area. One premise of the sales comparison approach is that the market will establish a price for the subject property in the same manner that the prices of comparable, competitive properties are established.

The sale prices of the properties deemed most comparable to the subject property tend to set the range in which the value of the subject property will fall. Further consideration of the comparative data indicates to the appraiser a figure representing the value of the appraised property, in keeping with the definition of value sought, as of the date of the appraisal. Essentially, the sales comparison approach is a systematic procedure for comparison. In applying the sales comparison approach, an appraiser:

1. Researches the market to obtain information about transactions, listings, and other offering of properties similar to the subject property.
2. Verifies the information through a knowledgeable source, preferably one of the participants in the transaction, by considering whether the (1) data obtained are factually accurate, (2) transactions reflect arms-length market considerations.
3. Determines relevant units of comparison. For example, acre, square foot, multiplier, and develops a comparative analysis for each unit.
4. Compares the subject property and comparable sales and adjusts the sale price of each comparable as appropriate or eliminates the property as a comparable.
5. Reconciles the several value indications that result from the comparables into a single value indication.

Estimating the degree of comparability between two properties involves judgment about their similarity. This judgment is based on consideration of elements of comparison—the characteristics of properties and transactions that cause prices to vary.

The elements of comparison are (1) financing terms, (2) conditions of sale, (3) market conditions (time), (4) location, (5) physical characteristics, and (6) income characteristics. Adjustments for them are made to the price of each comparable property as appropriate. *

* Taken from Understanding the Appraisal, 1986, American Institute of Real Estate Appraisers of the National Association of Realtors; 430 N. Michigan Ave., Chicago, IL 60611-4088

## June 12, 2001

**Value of land as regulated prohibiting the placement of fill structures and roads**

Farm, timber and recreational property sales during the years of 2000 and 2001 in the townships of Lakewood, Prosper, and Zippel, sold in the range of value from $250/acre - $1,047/acre. There were 3 state sales that were at the high end of these amounts. All sold in May of 2001 and sold above the going rate in the market at the time and are not considered good value indicators. According to the most similar sales, the value of the subject property with a recreational use is $350/acre. Applying this to the subject, the total value is

88.15 acres X $350 = $30,852.50

**Value of land without effect of regulations**

Value for the western 56 acres of the subject property is the same as the undeveloped property. However, the back lots on the west side of the road that were going to be sold to the owners on the lake side of the road have a higher value. The lots across the road from the developments at Sandy Shores and Birch Beach sold for $3,000 - $9,900 in 2000 & 2001 depending on the size of the lot. Since there were 14 lots in Sunny Beach, there would have been 14 back lots. These sites were expected to be around 1.3 acres which would be larger than most back lots at Sandy Shores and Birch Beach, so an $8,000 value is given. The most similar sales for lake front properties occurred in the development of Sandy Shores. These two sales were for $28,200 in May 2000 and $30,000 in May 2000. Both had 100' of frontage on the lake. These sales indicate a value of $29,000 per lot at this time.

| | |
|---|---|
| 56 acres x $350 = | $ 19,600 |
| 14 back lots x $8,000 = | $112,000 |
| 14 lots x $29,000 = | $406,000 |
| | $537,600 |

**Value Difference = $506,747.50**

# October 22, 2001

**Value of land as regulated prohibiting the placement of fill structures and roads**

Value differences between June 12, 2001 and October 22, 2001 are non-existent. There were a few sales of similar mixed recreational and agricultural property, but all were within the previous range and none of the transactions warranted an increase or decrease in market value.

88.15 acres X $350 = $30,852.50

**Value of land without effect of regulations**

Developed properties with water frontage and back lots did not experience a reduction or rise in values in the 4 months between June and October of 2001. The values remain the same.

| | |
|---|---|
| 56 acres x $350 = | $ 19,600 |
| 14 back lots x $8,000 = | $112,000 |
| 14 lots x $29,000 = | $406,000 |
| | $537,600 |

**Value Difference = $506,747.50**

## September 27, 2005

**Value of land as regulated prohibiting the placement of fill structures and roads**

Farm, timber and recreational property sales during the years of 2004 and 2005 in the market area sold in the value range from $296/acre - $1,250/acre. One sale of great interest was 145.1 acres for $175,000 on 3/25/2004. This sale included 500 feet of usable frontage along the lake. The value per acre for this property was $1,206, but is considered superior to the subject property since it has usable land along the lake while the subject does not. According to the most similar sales, the value of the subject property with a recreational use is $600/acre. Applying this to the subject, the total value is

88.15 acres X $600 = $52,890

**Value of land without effect of regulations**

Value for the western 56 acres of the subject property is the same as the undeveloped property. Back lot values sold up to $18,000, but this amount was higher than most and the value per back lot is $10,000. Two sales of lake front properties took place in the development of Sandy Shores. One sold for $60,000 in January 2004 and the other for $37,500 for a ½ lot in July 2004. These sales indicate a value of $65,000 per lot at this time.

| | |
|---|---|
| 56 acres x $600 = | $ 33,600 |
| 14 back lots x $10,000 = | $140,000 |
| 14 lots x $65,000 = | $910,000 |
| | $1,083,600 |

**Value Difference = $1,030,710**

## September 25, 2007

**Value of land as regulated prohibiting the placement of fill structures and roads**

Farm, timber and recreational property sales during the years of 2006 and 2007 in the market area sold in the value range from $500/acre - $1,450/acre. According to the most similar sales, the value of the subject property with a recreational use is $1,000/acre. Applying this to the subject, the total value is

88.15 acres X $1,000 = $88,150

**Value of land without effect of regulations**

Value for the western 56 acres of the subject property is the same as the undeveloped property. Back lot values sold up to $21,600, but this amount was higher than most and the value per back lot is $10,000. Two similar sales of unimproved lake front property took place. Both were in the Sandy Shores development north of the subject property. One occurred in January 2007 and sold for $96,000. The sale price of the other was $135,000 and included a lot and a half and a back lot. The date of this sale was 8/7/06. These sales indicate a value of $93,000 per lot at this time.

| | |
|---|---|
| 56 acres x $1,000 = | $ 56,000 |
| 14 back lots x $10,000 = | $140,000 |
| 14 lots x $93,000 = | $1,302,000 |
| | $1,498,000 |

**Value Difference = $1,409,850**

## March 31, 2008

**Value of land as regulated prohibiting the placement of fill structures and roads**

Value differences between September 25, 2007 and March 31, 2008 are non-existent. There were a few sales of similar mixed recreational and ag property, but all were within the previous range and none of the transactions warranted an increase or decrease in market value.

101.95 acres X $1,000 = $88,150

**Value of land without effect of regulations**

Developed properties with water frontage and back lots did not experience a reduction or rise in values in the 6 months between September 2007 and March 2008. The values remain the same.

| | |
|---|---|
| 56 acres x $1,000 = | $ 56,000 |
| 14 back lots x $10,000 = | $140,000 |
| 14 lots x $93,000 = | $1,302,000 |
| | $1,498,000 |

**Value Difference = $1,409,850**

# PROSPER - RESIDENTIAL & SEASONAL

## 2001

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 16.31.33.120 | 5/4/01 | P. Kruse to Robert Selstad | WD | 75,000 | .56 ac 100 FF | | old | 23,000 | 31% |
| 2 | 16.32.34.010 | 5/7/01 | G. Merck to Walsh Properties, L.L.C. | WD | 42,500 | 7.00 ac | | blt 1980 1124 sq ft | 50,800 | 120% |
| 3 | 16.55.01.210 | 5/9/01 | J. Hedlund to Raynard Lundgren | WD | 78,400 | 100 ff | | 1032 sq ft | 78,400 | 100% |
| 4 | 16.08.23.000 16.53.01.410 | 5/25/01 | R. Lundgren to Myron Norberg | WD | 55,000 | 50 ff | | 468 sq ft | 50,000 | 91% |
| 5 | 16.58.50.011 | 6/8/01 | J. Nyhus to John Poland | WD | 6,000 | | | lot only | 4,500 | 75% |
| 6 | 16.08.23.020 | 7/16/01 | S. Pahlen to Deborah Sontowski | CD | 7,502 | 6.97 ac | | lot only | 3,400 | 45% |
| 7 | 16.08.23.000 | 9/10/01 | S. Pahlen to Deborah Sontowski | CD | 6,600 | 8.95 | | lot only | 4,400 | 67% |
| 8 | 16.52.00.120 16.08.43.040 | 8/30/01 | J. Field to Patrick Reicherts etal | WD | 64,000 | 80 ff | | 864 sq ft | 57,800 | 90% |
| 9 | 16.55.01.400 | 10/18/01 | B. Olson to David House | WD | 90,000 | 100 ff | | 1036 sq ft | 89,800 | 100% ✓ |
| 10 | 16.57.01.050 | 10/26/01 | B. Trottier to Ray Spilde | WD | 28,500 | 100 ff | | lot only | 15,000 | 53% |
| 11 | | | | | | | | | | #DIV/0! |
| 12 | | | | | | | | | | #DIV/0! |
| 13 | | | | | | | | | | #DIV/0! |
| 14 | | | | | | | | | | #DIV/0! |
| 15 | | | | | | | | | | #DIV/0! |
| 16 | | | | | | | | | | #DIV/0! |
| 17 | | | | | | | | | | #DIV/0! |
| 18 | | | | | | | | | | #DIV/0! |
| 19 | | | | | | | | | | #DIV/0! |
| 20 | | | | | | | | | | #DIV/0! |
| 21 | | | | | | | | | | #DIV/0! |
| 22 | | | | | | | | | | #DIV/0! |
| 23 | | | | | | | | | | #DIV/0! |
| 24 | | | | | | | | | | #DIV/0! |
| 25 | | | | | | | | | | #DIV/0! |
| 26 | | | | | | | | | | #DIV/0! |
| 27 | | | | | | | | | | #DIV/0! |
| 28 | | | | | | | | | | #DIV/0! |
| 29 | | | | | | | | | | |

# PROSPER - RESIDENTIAL & SEASONAL

| Initials | Date |
|---|---|
| Prepared By | |
| Approved By | |

16

2000

WILSON JONES COMPANY G7804 ColumnWrite ® MADE IN U.S.A.

| | PARCEL | DATE | SELLER - BUYER | DEED | SALE PRICE | LOT SIZE | PRICE PER F.F. OR AC. | BLDG. & PROP. CLASS LOC. ETC. | EMV | RATIO |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 53.01 .330 | 1/00 | D. SNUSTAD TO JACK LUNDBOHM | W/D | 65000 | 50 F.F. | | SCHMIDT WAAG 952 ⌀ | 58300 | 90% |
| 2 | 55.01 .310 | 4/00 | N. SHETTERLY TO CLINTON GILBERTSON | W/D | 75185 | 100 F.F. | | S. SHORES 1056 ⌀ | 73100 | 97% |
| 3 | 56.01 .100 | 5/00 | R. HITES TO JOEL MEADE | W/D | 28200 | 100 F.F. | | LOT ONLY | 22500 | 80% |
| 4 | 50.01 .010 | 4/00 | RAMSAY TRST. TO TOM BERGGREN | TR/D | 25000 | 250 F.F. | 100 | LOT ONLY | 32000 | 128% |
| 5 | 54.02 .130 | 4/00 | R. DYBEDAHL TO MIRIAM BALDWIN | W/D | 750 | 50 FF | | LOT ONLY | 500 | 67% |
| 6 | 55.01 .220 | 4/00 | L. JOHNSON TO PAHLEN-FICHTER | W/D | 95000 | 100 F.F. | | 1072 ⌀ | 87100 | 92% |
| 7 | 59.01 .080 | 4/00 | W. HOLMGREN TO MIKE SIMMONDS | W/D | 105600 | 1 R.R. | | 784 ⌀ | 94300 | 89% |
| 8 | 60.01 .020 | 5/00 | S. SHORES TO THOMAS PRICE | W/D | 3300 | 100x400 | | LOT ONLY | 2900 | 88% |
| 9 | 60.01 .300 | 5/00 | D. MEADE TRST TO ELTON ERDAHL | W/D | 9900 | 500x400 | | LOTS ONLY | 8700 | 88% |
| 10 | 55.01 .060 | 5/00 | D. HAUG TO ROY CASEY | C/D | 75000 | 100 FF | | 784 ⌀ | 59200 | 79% |
| 11 | 56.01 .120 | 5/00 | R. HITES TO ACEY OLSON | W/D | 30000 | 100x343 | 300 | LOT ONLY | 22500 | 75% |
| 12 | 52.003 .160 | 3/00 | R. SWATEK TO ROY SANDSTROM | W/D | 81000 | 100 FF | | 640 ⌀ | 46400 | 57% |
| 13 | 54.02 .010 | 9/00 | G. OLSON TO DENNIS KOSTER | | 5500 | | | LOT ONLY | | |
| 14 | 60.01 .200 | 8/00 | J. MEADE TO KELLY WICKLUND | C/D | 3800 | 100x400 | | LOT ONLY | 2900 | 76% |
| 15 | 18.43 .030 | 9/00 | FULLER TRUST TO GORDON SORENSON | C/D | 7500 | 10 AC | | LOT ONLY | SPLIT | |
| 16 | 55.01 .420 | 11/00 | D. HOUSE TO FRANCES THOMPSON | W/D | 170000 | 100 F.F. | | 1844 ⌀ W/GAR | 108100 | 64% |
| 17 | 08.34 .030 | 6/00 | J. LUNDBOHM TO PAUL KING | W/D | 41000 | | | | 39900 | |
| 18 | 50.02 .151 | 12/00 | AM FED BANK TO TERRY SOINE | W/D | 55600 | 75 F.F. | | LAKE SIDE 1296 ⌀ | 49200 | 88% |
| 19 | 51.01 .190 | 12/00 | D. AANDAL TO RAY SPILDE | W/D | 85000 | 50 F.F. | | BIRCH BEACH 896 ⌀ | 76400 | 89% |
| 20 | 51.02 .270 | 11/00 | K. WICKLUND TO CAROL EDSTROM | W/D | 45000 | BACK LOT | | | 57700 | 128% |

# PROSPER - FARM & TIMBER

## 2001

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 16.18.43.010 | 5/21/01 | Fuller Family Tr. to Gordon Sorenson | CD | 7,500 | 10.00 ac | | | 5,500 | 73% |
| 2 | 16.08.23.000 | 6/14/01 | G. Larson to Scott Pahlen | WD | 5,000 | 15.92 ac | | lot only | 7,700 | 154% |
| 3 | [illegible] | 9/10/01 | S. Pahlen to Deborah [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| 4 | | | | | | | | | | #DIV/0! |
| 5 | | | | | | | | | | #DIV/0! |
| 6 | | | | | | | | | | #DIV/0! |
| 7 | | | | | | | | | | #DIV/0! |
| 8 | | | | | | | | | | #DIV/0! |
| 9 | | | | | | | | | | #DIV/0! |
| 10 | | | | | | | | | | #DIV/0! |
| 11 | | | | | | | | | | #DIV/0! |
| 12 | | | | | | | | | | #DIV/0! |
| 13 | | | | | | | | | | #DIV/0! |
| 14 | | | | | | | | | | #DIV/0! |
| 15 | | | | | | | | | | #DIV/0! |
| 16 | | | | | | | | | | #DIV/0! |
| 17 | | | | | | | | | | #DIV/0! |
| 18 | | | | | | | | | | #DIV/0! |
| 19 | | | | | | | | | | #DIV/0! |
| 20 | | | | | | | | | | #DIV/0! |
| 21 | | | | | | | | | | #DIV/0! |
| 22 | | | | | | | | | | #DIV/0! |
| 23 | | | | | | | | | | #DIV/0! |
| 24 | | | | | | | | | | #DIV/0! |
| 25 | | | | | | | | | | #DIV/0! |
| 26 | | | | | | | | | | #DIV/0! |
| 27 | | | | | | | | | | #DIV/0! |
| 28 | | | | | | | | | | #DIV/0! |
| 29 | | | | | | | | | | |

32

# PROSPER - FARM & TIMBER

16

© WILSON JONES COMPANY G7504 ColumnWrite ® MADE IN U.S.A.

| | Initials | Date |
|---|---|---|
| Prepared By | | |
| Approved By | | |

## 1995-00

| PARCEL | DATE SOLD | SELLER - BUYER | DEED | SALE PRICE | TOTAL ACRES | TILL ACRES | PER AC. LAND ONLY | PER AC. W/BLDG. | FMV | RATIO |
|---|---|---|---|---|---|---|---|---|---|---|
| 17,34,.000 | 2/96 | G. BAILEY TO BRUCE LAUGTUG | C/D | 30000 | 120 | - | 250 | - | 19300 | 64% |
| 08,23,.000 | 6/96 | L. KLAMM TO GEORGE LARSON | | 10500 | 20 | | 525 | | SPLIT | |
| 08,23,.010 | 6/96 | L. KLAMM TO HARVEY SCHMIDT | | 10500 | 20 | | 525 | | SPLIT | |
| 07,22,.000 | 8/97 | J. RAHENKAMP TO JAMES SORENSON | W/D | 10000 | 36 | - | 250 | | 5900 | 59% |
| 29,31,.000 | 9/97 | G. ANDRES TO BRUCE NELSON | W/D | 7500 | 40 | - | 188 | | 7000 | 93% |
| 07,21,.000 | 5/98 | L. KOERTH TO JAMES SORENSON | W/D | 10000 | 40 | | 250 | | SPLIT 7800 | |
| 20,42,.000 | 8/98 | G. BAILEY TO JEFF DAHL | C/D | 10000 | 40 | | 250 | | 8000 | 80% |
| 20,12,.000 | 12/98 | B. LAUGTUG TO JACQUELINE ASP | W/D | 18000 | 40 | | 450 | | 7800 | 43% |
| 20,12,.010 | 12/98 | J. ASP TO DUANE BESSLER | W/D | 13000 | 29 | | 450 | | SPLIT | |
| 33,33,.040 | 5/00 | ST. OF MN TO SCOTT PAHLEN | | 3270 | 10 | | | | EXEMPT | |
| 33,33,.030 | 7/00 | S. PAHLEN TO THAD EHLENFIELD | | 5300 | 10 | | LOT ONLY | | 1500 | 28% |

# LAKEWOOD - RESIDENTIAL & SEASONAL

## 2001

| | Parcel Number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 14.51.01.030 | 4/16/01 | J. Stennes to Arnesen's Rocky Point | WD | 13,000 | | | M/H | change in use | |
| 2 | 14.53.01.040 | 8/14/01 | M. Stenberg to David Johnson | WD | 74,250 | 84 ff | | 720 sq ft 1 car | 51,500 | 69% |
| 3 | 14.14.43.010 | 8/22/01 | R. Hanson to Jay Mueller | CD | 8,600 | 5 ac | 1720 | | 4,400 | 51% |
| 4 | 14.50.04.040 | 10/5/01 | R. Wicklander to Michael Lindholm | WD | 21,500 | 100 x 140 | | M/H | 13,400 | 62% |
| 5 | | | | | | | | | | #DIV/0! |
| 6 | | | | | | | | | | #DIV/0! |
| 7 | | | | | | | | | | #DIV/0! |
| 8 | | | | | | | | | | #DIV/0! |
| 9 | | | | | | | | | | #DIV/0! |
| 10 | | | | | | | | | | #DIV/0! |
| 11 | | | | | | | | | | #DIV/0! |
| 12 | | | | | | | | | | #DIV/0! |
| 13 | | | | | | | | | | #DIV/0! |
| 14 | | | | | | | | | | #DIV/0! |
| 15 | | | | | | | | | | #DIV/0! |
| 16 | | | | | | | | | | #DIV/0! |
| 17 | | | | | | | | | | #DIV/0! |
| 18 | | | | | | | | | | #DIV/0! |
| 19 | | | | | | | | | | #DIV/0! |
| 20 | | | | | | | | | | #DIV/0! |
| 21 | | | | | | | | | | #DIV/0! |
| 22 | | | | | | | | | | #DIV/0! |
| 23 | | | | | | | | | | #DIV/0! |
| 24 | | | | | | | | | | #DIV/0! |
| 25 | | | | | | | | | | #DIV/0! |
| 26 | | | | | | | | | | #DIV/0! |
| 27 | | | | | | | | | | #DIV/0! |
| 28 | | | | | | | | | | #DIV/0! |
| 29 | | | | | | | | | | |

# LAKEWOOD - RESIDENTIAL & SEASONAL

| | Initials | Date |
|---|---|---|
| Prepared By | | |
| Approved By | | |

14

1999 - 00

© WILSON JONES COMPANY G7504 ColumnWrite ® MADE IN U.S.A.

| PARCEL | DATE SOLD | SELLER - BUYER | DEED | SALE PRICE | LOT SIZE | PRICE PER F.F. OR AC. | BLDG. P.PROP CLASS. LOC. ETC. | EMV | RATIO |
|---|---|---|---|---|---|---|---|---|---|
| 15.41.021 | 2/99 | S. Phalen to Jeffrey Auker | C/D | 4900 | 10A | | Lot only | 3300 | 67% |
| 15.44.010 | 3/99 | J. Bartleson to David Forsberg | W/D | 3000 | 5A | | Lot only | 2500 | 83% |
| 51.02.050 | 4/99 | F. Hanson to David Sjostrand | FD/D | 13000 | | | 651 ø M/H | 10000 | 77% |
| 50.04.120 | 9/99 | S. Matzye to Joe Adsero | W/D | 10000 | | | M/H | 7200 | 72% |
| 51.02.070 | 8/99 | V. Waage to Constance Nordine | W/D | 6500 | | | 480 ø | 10900 | 168% |
| 05.31.070 | 2/00 | L. Demarais to Arenson's | C/D | 90000 | 175 F.F. 3.36A. | | M/H Change of use | 37500 | |
| 50.01.010 | 4/00 | V. Radi to Alice Bretag | W/D | 58000 | 50 F.F. | | 722 ø | 41600 | 72% |
| 50.04.140 | 8/00 | D. Odegaard to Wes Skibicki | W/D | 5500 | | | Lot only | 4000 | 73% |
| 51.02.080 | 6/00 | D. Harper to Thomas Schutz | W/D | 4750 | | | | 7300 | 154% |
| 50.02.060 | 10/00 | G. Schmitt to Byron Egg | W/D | 71000 | 50 F.F. | | (Crock? [illegible]) 1218 ø | 50400 | 71% |
| 50.06.014 | 9/00 | J. Haugen to John Stauffenecker | W/D | 20000 | | | (Crock? [illegible]) 520 | 17800 | 89% |
| 14.43.011 | 10/00 | R. Hanson to Charles Stewart | C/D | 5550 | 5A | | Lot only | Split | |
| 14.42.012 | 11/00 | R. Hanson to Scott Albrecht | C/D | 6262 | 10A | | Lot only | Split | |
| 50.05.101 | 10/00 | G. Schmitt to Donald Cash | C/D | 23000 | | | Garage | 13300 | |
| 53.03.020 | 1/00 | C. Severson to John Arnesen | W/D | 12500 | | | M/H | 12300 | |

# LAKEWOOD - FARM & TIMBER

## 2001

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 14.11.14.000 | 5/11/01 | State of MN to Bruce E. Erickson | AC | 16,700 RE<br>9,763 TIM | 40 ac | $661 | | state sale | |
| 2 | 14.12.24.000 | 5/11/01 | State of MN to Gary Olson | AC | 22,800 RE<br>19,067 TIM | 40 ac | $1,047 | | state sale | |
| 3 | 14.12.12.000 | 5/22/01 | State of MN to Long Point Huntg Club | AC | 21,600 RE<br>11140 TIM | 40 ac | $819 | | state sale | |
| 4 | | | | | | | | | | #DIV/0! |
| 5 | | | | | | | | | | #DIV/0! |
| 6 | | | | | | | | | | #DIV/0! |
| 7 | | | | | | | | | | #DIV/0! |
| 8 | | | | | | | | | | #DIV/0! |
| 9 | | | | | | | | | | #DIV/0! |
| 10 | | | | | | | | | | #DIV/0! |
| 11 | | | | | | | | | | #DIV/0! |
| 12 | | | | | | | | | | #DIV/0! |
| 13 | | | | | | | | | | #DIV/0! |
| 14 | | | | | | | | | | #DIV/0! |
| 15 | | | | | | | | | | #DIV/0! |
| 16 | | | | | | | | | | #DIV/0! |
| 17 | | | | | | | | | | #DIV/0! |
| 18 | | | | | | | | | | #DIV/0! |
| 19 | | | | | | | | | | #DIV/0! |
| 20 | | | | | | | | | | #DIV/0! |
| 21 | | | | | | | | | | #DIV/0! |
| 22 | | | | | | | | | | #DIV/0! |
| 23 | | | | | | | | | | #DIV/0! |
| 24 | | | | | | | | | | #DIV/0! |
| 25 | | | | | | | | | | #DIV/0! |
| 26 | | | | | | | | | | #DIV/0! |
| 27 | | | | | | | | | | #DIV/0! |
| 28 | | | | | | | | | | #DIV/0! |
| 29 | | | | | | | | | | #DIV/0! |

| | Initials | Date |
|---|---|---|
| Prepared By | | |
| Approved By | | |

MADE IN U.S.A.

# LAKEWOOD - FARM & TIMBER

14

1995-2000

© WILSON JONES COMPANY G7504 ColumnWrite ®

| PARCEL | DATE SOLD | SELLER - BUYER | DEED | SALE PRICE | TOTAL ACRES | TILL ACRES | PER AC LAND ONLY | PER AC. W/BLDG | EMV | RATIO |
|---|---|---|---|---|---|---|---|---|---|---|
| 29.23.000 | 4/95 | G. STENNES TO JOHN ARNESEN | C/D | 60000 | 160 | 156 | 375 | — | 33600 | 56% |
| 01.21.000 | 1/96 | M&J FARMS TO GREG McGRAW | C/D | 12453 | 40 | | 311 | | SPLIT | |
| 01.22.000 | 1/96 | M&J FARMS TO LESLIE PETERSON | W/D | 12600 | 40 | | 315 | | SPLIT | |
| 01.41.000 | 1/96 | M&J FARMS TO GREG McGRAW | W/D | 48000 | 161 | | 300 | | SPLIT | |
| 01.41.000 | 12/96 | M&J FARMS TO GREG McGRAW | C/D | 12000 | 40 | | 300 | | SPLIT | |
| 15.33.000 | 12/96 | R. SONDGEROTH TO KEVIN LASSER | W/D | 16000 | 20 | | 200 | | 12700 | 79% |
| 28.24.000 | 4/97 | ST. OF MN TO GROVE FARMS | C/D | 7220 | 40 | | 180 | | EXEMPT | |
| 01.25.000 | 10/97 | M. HOLLIDAY TO RICHARD WARNER | W/D | 61000 | 315 | | 193 | | 63800 | 105% |
| 01.23.000 | 12/97 | R. WARNER TO GREG McGRAW | C/D | 68000 | 315 | McGRAW | 216 | | 63800 | 94% |
| 15.42.000 | 11/97 | P. HALLING TO KEVIN LASSER | C/D | 20000 | 90 | — | 222 | | 18600 | 93% |
| 22.12.000 | 5/99 | E. WILSON TO KEVIN LASSER | W/D | 12000 | 40 | | 300 | | 7800 | 65% |
| 22.13.000 | 10/99 | H. DOEBLER TO JOE KRAEMER | C/D | 80000 | 200 | 167 | | 400 | 78200 | 98% |
| 31.14.000 | 2/00 | N. HAWKS TO STEVEN HELMSTETTER | | 85000 | 360 | 344 | 236 | | 102800 | 121% |
| | 4/00 | K. GILLIE TO SCOTT PIEPER | C/D | 317500 | 1225 | | 259 | ALSO ROSEAU CO. | | |
| 29.12.000 | 7/00 | P. SATTLER TO MARK HANGSLEBEN | W/D | 10000 | 40 | — | 250 | — | 9800 | 98% |
| 36.11.000 | 10/00 | C. OLSON TO MIKE GALLAGHER | W/D | 16000 | 40 | — | 400 | | SPLIT | |
| 36.11.000 | 10/00 | C. OLSON TO JERRY NEYENS | C/D | 39000 | 80 | — | 488 | | SPLIT | |
| 36.[illegible].000 | 11/00 | C. OLSON TO MIKE O'NEIL | W/D | 36000 | 120 | — | 300 | | SPLIT | |

# ZIPPEL - RESIDENTIAL & SEASONAL

## 2001

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 18.50.01.380 | 4/2/01 | Northland Turkey Farms to Leland Omdahl | QC | 45,000 | 138 FF | | 864 sq. ft. | 56,100 | 125% |
| 2 | 18.50.01.390 | 6/11/01 | D. Drummond to Michael Dwyer | QC | 29,000 | 100 FF | | 2 old M/H's | 19,400 | 67% |
| 3 | 18.51.03.010 | 6/12/01 | R. Greenwaldt to Brian Kelly | WD | 35,000 | 170 FF | | old M/H | 17,700 | 51% |
| 4 | 18.51.02.100 | 7/2/01 | T. Goetsch to LeRoy Smith | WD | 7,000 | | | | 3,800 | split 54% |
| 5 | 18.15.21.030 | 5/11/01 | L. Maudal to Nick Palnovich | QC | 6,500 | | | | 6,600 | 102% |
| 6 | 18.50.01.130 | 7/30/01 | K.Erickson to Bruce Lawrence | WD | 22,000 | | | old M/H | 19,900 | 90% |
| 7 | 18.51.02.110 | 7/2/01 | T. Goetsch to Keith Smith | WD | 40,000 | | | M/H 2 car | 58,200 | 146% |
| 8 | 18.50.01.110 | 9/28/01 | N. Keller to Donald Sufka | WD | 70,000 | | | 856 sq ft | 60,800 | 87% |
| 9 | | | | | | | | | | #DIV/0! |
| 10 | | | | | | | | | | #DIV/0! |
| 11 | | | | | | | | | | #DIV/0! |
| 12 | | | | | | | | | | #DIV/0! |
| 13 | | | | | | | | | | #DIV/0! |
| 14 | | | | | | | | | | #DIV/0! |
| 15 | | | | | | | | | | #DIV/0! |
| 16 | | | | | | | | | | #DIV/0! |
| 17 | | | | | | | | | | #DIV/0! |
| 18 | | | | | | | | | | #DIV/0! |
| 19 | | | | | | | | | | #DIV/0! |
| 20 | | | | | | | | | | #DIV/0! |
| 21 | | | | | | | | | | #DIV/0! |
| 22 | | | | | | | | | | #DIV/0! |
| 23 | | | | | | | | | | #DIV/0! |
| 24 | | | | | | | | | | #DIV/0! |
| 25 | | | | | | | | | | #DIV/0! |
| 26 | | | | | | | | | | #DIV/0! |
| 27 | | | | | | | | | | #DIV/0! |
| 28 | | | | | | | | | | #DIV/0! |
| 29 | | | | | | | | | | #DIV/0! |

| | Initials | Date |
|---|---|---|
| Prepared By | | |
| Approved By | | |

MADE IN U.S.A.

# ZIPPEL - RESIDENTIAL & SEASONAL

18 — 1997-2000

© WILSON JONES COMPANY G7503 ColumnWrite ®

| PARCEL | DATE SOLD | SELLER - BUYER | DEED | SALE PRICE | LOT SIZE | PRICE PER E.F. | BLDG., P.PROP. CLASS, LOC., ETC. | EMV | RATIO |
|---|---|---|---|---|---|---|---|---|---|
| 51.02. .060 | 3/97 | F. Herzog to Richard Swanson | C/D | 4500 | 100x200 | | Lot | 3000 | 67% |
| 51.03. .050 | 9/97 | R. Dybedahl to John Burian | C/D | 19000 | 150 F.F. | | Lot | 7900 | 42% |
| 54.01. .020 | 9/97 | Winter-Sett to Keith Mills | C/D | 6000 | | | Lot | 4500 | 75% |
| 54.01. .050 | 9/97 | Winter-Sett to Robert Miller | C/D | 2800 | | | Lot | Commons 400 | |
| 51.01 .050 | 2/98 | W. Sett to Tim A. Hofius | C/D | 13200 | | | M/H | 15400 | 117% |
| 50.01 .160 | 5/98 | D. Persson to Allen Kukowski | W/D | 80000 | 100 F.F. | | (Wildwood) 1152 ⌀ | 71900 | 90% |
| 50.01 .010 | 5/98 | M. Hardwick to Andrzej Rymsza | W/D | 29000 | | | (Wildwood) 490 ⌀ | 25000 | 86% |
| 51.02. .010 | 4/98 | Winter-Sett to Dan Middendorf | C/D | 5000 | | | Lot only | 3000 | 60% |
| 08.43. .010 | 6/98 | D. Bridges to David House | C/D | 25000 | | | Lot only | 7100 | 28% |
| 10.34. .100 | 7/98 | J. Jirmasek to Loran Ballard | C/D | 19000 | | | old cabin | 22800 | 120% |
| 50.01 .040 | 6/98 | E. Aker to Bruce Erickson | C/D | 13000 | | | old cabin | 13500 | 104% |
| 51.03 .030 | 7/98 | D. Nesset to Bob Dybedahl | W/D | 21300 | | | Lot only | 13100 | 62% |
| 51.50 .010 | 7/98 | D. Zentner to Merle Vagle | C/D | 16000 | | | M/H | 14800 | 93% |
| 51.02 .020 | 9/98 | Winter-Sett to Keith Anderson | W/D | 9000 | | | Lot only | 6000 | 67% |
| 25.11. .010 | 10/98 | V. Schofield to Stephen Cooper | W/D | 92307 | | | 2/0 1200 # | Split | |
| 51.02. .050 | 9/98 | Winter-Sett to Richard Swanson | C/D | 4600 | | | Lot only | 5300 | 115% |
| 50.01 .160 | 1/99 | A. Kukowski to David Sullivan | W/D | 90525 | | | 1152 ⌀ 552 ⌀ 576 ⌀ | 75200 | 83% |
| 50.01 .310 | 5/99 | Q. Clark to Robert Ludwig | W/D | 90000 | | | | 81900 | 91% |
| 15.24 .020 | 7/99 | M. Thompson to Daniel Crompton | S/C | 4000 | | | Lot only | 8700 | 218% |
| 51.02 .040 | 3/99 | Winter-Sett to Nancy LaRue | C/D | 4600 | | | Lot only | 5000 | 109% |
| 10.43. .061 | 8/99 | J. Johnson to Berkley Hall | W/D | 92500 | 5.6 A. | | | 49800 | |
| 10.34. .080 | 9/99 | K. Hagstrom to Leonard Olson | C/D | 8000 | .36 A. 115' | | Lot only | 9400 | 118% |
| 51.03. .056 | 1/00 | J. Burian to Douglas Cardinal | | 22000 | 150 FF | | M/H (take over payments) | 13300 | 60% |
| 51.03 .090 | 5/00 | T. Trulson to Eugene Fichter | W/D | 7000 | 120 FF | 58 | Lot only | 5800 | 83% |
| 51.03 .090 | 10/00 | E. Fichter to Danial Goble | W/D | 12500 | 120 FF | 104 | Lot only | 5800 | 46% |
| 57.02 .050 | 12/00 | M. Neumiller to Richard Swanson | W/D | 7500 | | | Lot only | 5000 | 67% |
| 53.01 .041 | 6/00 | R. Brown to Darrell Peterson | C/D | 40000 | 184 F.F. | | M/H | 29500 | 73% |
| 55.01 .040 | 8/00 | D. Peterson to Gene Miller | C/D | 25000 | | | M/H | 13400 | 54% |

# ZIPPEL - FARM & TIMBER

## 2001

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ft or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 18.15.33.000 and others | 3/1/01 | J. Krohn to Allan Kaspar | CD | 161,736 | 539.12 ac | $300 | land only | 108,800 | 67% |
| 2 | 18.24.43.010 | 5/10/01 | W. Block to Michael Schulz | TD | 87,500 | 18.18 ac | | 1368 sq ft | split | |
| 3 | 18.30.11.000 | 4/26/01 | R. Erickson to Gervais Hillaert | WD | 21,000 | 80 ac | $263 | land only | 19,700 | 94% |
| 4 | 18.23.31.010 | 7/2/01 | J. Krohn to Jerome Johnson | WD | 5,864 | 13.03 | 450. | | 3,300 | 56% |
| 5 | | | | | | | | | | #DIV/0! |
| 6 | | | | | | | | | | #DIV/0! |
| 7 | | | | | | | | | | #DIV/0! |
| 8 | | | | | | | | | | #DIV/0! |
| 9 | | | | | | | | | | #DIV/0! |
| 10 | | | | | | | | | | #DIV/0! |
| 11 | | | | | | | | | | #DIV/0! |
| 12 | | | | | | | | | | #DIV/0! |
| 13 | | | | | | | | | | #DIV/0! |
| 14 | | | | | | | | | | #DIV/0! |
| 15 | | | | | | | | | | #DIV/0! |
| 16 | | | | | | | | | | #DIV/0! |
| 17 | | | | | | | | | | #DIV/0! |
| 18 | | | | | | | | | | #DIV/0! |
| 19 | | | | | | | | | | #DIV/0! |
| 20 | | | | | | | | | | #DIV/0! |
| 21 | | | | | | | | | | #DIV/0! |
| 22 | | | | | | | | | | #DIV/0! |
| 23 | | | | | | | | | | #DIV/0! |
| 24 | | | | | | | | | | #DIV/0! |
| 25 | | | | | | | | | | #DIV/0! |
| 26 | | | | | | | | | | #DIV/0! |
| 27 | | | | | | | | | | #DIV/0! |
| 28 | | | | | | | | | | #DIV/0! |
| 29 | | | | | | | | | | |

4C

| | Initials | Date |
|---|---|---|
| Prepared By | | |
| Approved By | | |

# ZIPPEL - FARM & TIMBER

18

© WILSON JONES COMPANY G7504 ColumnWrite ® MADE IN U.S.A.

## 1995 - 2000

| PARCEL | DATE SOLD | SELLER - BUYER | DEED | SALE PRICE | TOTAL ACRES | TILL. ACRES | PER AC. LAND ONLY | PER AC. W/BLDG | EMV | RATIO |
|---|---|---|---|---|---|---|---|---|---|---|
| 29.12.000 | 1/96 | R. JANSSEN TO STEVEN REINERT | W/D | 18000 | 120 | — | 150 | — | 18000 | SPLIT ? |
| 29.41.000 | 1/96 | R. JANSSEN TO WILLIS BITTER | W/D | 7000 | 40 | 39 | 175 | — | SPLIT | |
| 31.32.000 | 1/97 | D. HEPPNER TO GERVAIS HILLAERT | C/D | 102000 | 78 | — | 200 | 1308 | 92400 | 90% |
| 33.11.000 | 5/97 | R. HAGEBECK TO WILLIS BITTER | C/D | 32000 | 160 | 157 | 200 | — | 36300 | 113% |
| 27.33.000 | 7/97 | R. PAULSETH TO WILLIS BITTER | W/D | 51600 | 240 | 199 | | | 51700 | 100% |
| 32.14.010 | 6/97 | R. PAULSETH TO DENNIS UBEL | W/D | 96000 | 80 | 75 | | 1200 | 114300 | 119% |
| 30.31.000 | 9/98 | E. KAFKA TO GREGORY KRZOSKA | TR/D | 24000 | 157 | | 153 | — | 33200 | 138% |
| 31.21.000 | 3/99 | E. KAFKA TO ALBERT ALBRECHT | TR/D | 20000 | 79 | 75 | 253 | — | 16900 | 85% |
| 15.41.000 | 5/99 | J. KROHN TO KENNETH SENZEK | C/D | 16000 | 51 | 50 | 316 | — | SPLIT | |
| 31.11.000 | 10/99 | M. BERGEN TO ALBERT ALBRECHT | PR/D | 18000 | 80 | 77 | 225 | — | 17800 | 100% |
| 16.41.000 | 3/00 | W. MARCH TO DONALD PETERSON | W/D | 12000 | 40 | — | 300 | | 8700 | 73% |
| 26.33.000 | 2/00 | D. HOOPS TO RICHARD LINDNER | W/D | 22500 | 120 | — | 188 | | 17300 | 77% |
| 05.41.000 | 5/00 | P. PEDERSON TO DAVID HERZOG | W/D | 10000 | 40 | — | 250 | | 6400 | 64% |
| 31.13.000 | 5/00 | D. HEPPNER TO PAUL PETERSON | W/D | 37500 | 152 | 152 | 247 | | SPLIT | |
| 31.31.000 | 6/00 | D. HEPPNER TO GERVAIS HILLAERT | | 20000 | 80 | | 250 | | | |
| 15.11.000 | 7/00 | R. BLOCK TO KENNETH TIDGWELL | W/D | 17000 | 40 | 33 | 425 | | 7900 | 47% |
| 28.13.000 | 7/00 | W. BITTER TO ALLAN KASPAR | C/D | 620000 | 1520 | | 408 | | SPLIT | |
| 21.32.000 | 11/00 | P. LaVALLA TO VINCENT SMITH | W/D | 11000 | 40 | — | 275 (BRUSH) | | 7000 | 64% |
| 21.23.000 | 11/00 | P. LaVALLA TO JEROME KROHN | W/D | 11000 | 40 | — | 275 " " | | 7000 | 64% |
| 6.14.000 | 11/00 | G. GIFFORD TO GARY STROHL | C/D | 11000 | 40 | — | 275 | | 8400 | 76% |
| 34.11.000 | 13/00 | V. PETERSON TO ALLAN KASPAR | W/D | 132000 | 440 | | 300 | | 95800 | 73% |
| 34.23.000 | 12/00 | G. PETERSON TO ALLAN KASPAR | W/D | 33000 | 160 | | 206 | | 36700 | 111% |

# 2005 Prosper

## Residential and SRR

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 16.06.31.050 | 1/5/05 | A. Oveson to Willie Walker | WD | 55,000 | 8 ac | | M/H w/addn d/gar | 59,600 | 108% | |
| 2 | 16.58.50.011 | 3/22/05 | J. Poland to Tim Flanigan | QD | 7,000 | 3.86 ac | $1,813 | bare land | 7,100 | 101% | |
| 3 | 16.59.01.070 | 6/1/05 | J. McMenamy to Carter Hontvet | WD | 275000 RE<br>10000 PP | 100 ff | | 1120 sq ft d/gar | 176,500 | 64% | |
| 4 | 16.57.01.100<br>16.60.01.160 | 6/10/05 | R. Josack to Joseph Anderson | WD | 260,000 | 100 ff & back lot | | 1280 sq ft house, cabin/workshop, d/gar | 234,000 | 90% | |
| 5 | 16.32.31.000 | 8/9/05 | T. Olson to Prosper Properties, LLC | WD | 24,650 | 73 ac | $337 | bare land | 21,800 | 88% | |
| 6 | 16.51.01.130<br>16.51.02.140<br>16.51.02.150 | 9/15/05 | W. DeSautel to John P. A. Johnson | WD | 274500 RE<br>54560 PP | 100 ff & back lots | | 1978 sq ft main cabin + other cabins, garages and buildings | 259,800 | 95% | |
| 7 | 16.55.01.170 | 10/10/05 | E. Grunz to John Thomas | WD | 155,000 | 100 ff | | 672 sq ft d/gar | 115,700 | 75% | |
| 8 | | | | | | | | | | #DIV/0! | |
| 9 | | | | | | | | | | #DIV/0! | |
| 10 | | | | | | | | | | #DIV/0! | |
| 11 | | | | | | | | | | #DIV/0! | |
| 12 | | | | | | | | | | #DIV/0! | |
| 13 | | | | | | | | | | #DIV/0! | |
| 14 | | | | | | | | | | #DIV/0! | |
| 15 | | | | | | | | | | #DIV/0! | |
| 16 | | | | | | | | | | #DIV/0! | |
| 17 | | | | | | | | | | #DIV/0! | |
| 18 | | | | | | | | | | #DIV/0! | |
| 19 | | | | | | | | | | #DIV/0! | |
| 20 | | | | | | | | | | #DIV/0! | |
| 21 | | | | | | | | | | #DIV/0! | |
| 22 | | | | | | | | | | #DIV/0! | |
| 23 | | | | | | | | | | #DIV/0! | |
| 24 | | | | | | | | | | #DIV/0! | |
| 25 | | | | | | | | | | #DIV/0! | |
| 26 | | | | | | | | | | #DIV/0! | |
| 27 | | | | | | | | | | #DIV/0! | |
| 28 | | | | | | | | | | #DIV/0! | |
| 29 | | | | | | | | | | #DIV/0! | |

42

# Prosper, 2005

## Ag and Timber

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 16.06.34.010 | 10/17/05 | J. Fevold to Craig Neumiller | WD | 10,000 | 10 ac | $1,000 | | use change | | |
| 2 | | | | | | | | | | #DIV/0! | |
| 3 | | | | | | | | | | #DIV/0! | |
| 4 | | | | | | | | | | #DIV/0! | |
| 5 | | | | | | | | | | #DIV/0! | |
| 6 | | | | | | | | | | #DIV/0! | |
| 7 | | | | | | | | | | #DIV/0! | |
| 8 | | | | | | | | | | #DIV/0! | |
| 9 | | | | | | | | | | #DIV/0! | |
| 10 | | | | | | | | | | #DIV/0! | |
| 11 | | | | | | | | | | #DIV/0! | |
| 12 | | | | | | | | | | #DIV/0! | |
| 13 | | | | | | | | | | #DIV/0! | |
| 14 | | | | | | | | | | #DIV/0! | |
| 15 | | | | | | | | | | #DIV/0! | |
| 16 | | | | | | | | | | #DIV/0! | |
| 17 | | | | | | | | | | #DIV/0! | |
| 18 | | | | | | | | | | #DIV/0! | |
| 19 | | | | | | | | | | #DIV/0! | |
| 20 | | | | | | | | | | #DIV/0! | |
| 21 | | | | | | | | | | #DIV/0! | |
| 22 | | | | | | | | | | #DIV/0! | |
| 23 | | | | | | | | | | #DIV/0! | |
| 24 | | | | | | | | | | #DIV/0! | |
| 25 | | | | | | | | | | #DIV/0! | |
| 26 | | | | | | | | | | #DIV/0! | |
| 27 | | | | | | | | | | #DIV/0! | |
| 28 | | | | | | | | | | #DIV/0! | |
| 29 | | | | | | | | | | #DIV/0! | |
| 30 | | | | | | | | | | #DIV/0! | |

# Prosper, 2004

## Seasonal and Residential

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 16.55.01.100 | 1/2/04 | H. Schmidt to M. Janzen | CD | 60,000 | 100 ff | $600 | bare lot | 33,000 | 55% | x |
| 2 | 16.06.22.030 | 7/29/04 | G. Bondy to Carl Hanson | WD | 115,000 | 50 ff | | MH | 64,500 | 56% | x |
| 3 | 16.52.00.040 | 8/25/04 | L. Sorensen to David Maki | WD | 73,000 | 40 ff | | 792 sq ft | 68,900 | 94% | x |
| 4 | 16.53.01.310<br>16.53.04.130 | 8/9/04 | E. Falk to Bertram McDonaugh | WD | 80,000 | 50 ff | | 468 sq ft | 59,900 | 75% | x |
| 5 | 16.55.01.280 | 8/25/04 | L. Walsh to Larry Pioske | WD | 130,000 | 100 ff | | 520 sq ft d/gar | 84,100 | 65% | x |
| 6 | 16.55.01.310 | 9/3/04 | R. Spilde to Robert Johnson | WD | 142,000 | 100 ff | | 1056 sq ft d/gar | 106,500 | 75% | x |
| 7 | 16.61.01.071 | 7/19/04 | P. Weimer to Della Snustead | WD | 37,500 | 50 ff | $682 | bare lot | 15,000 | 40% | |
| 8 | 16.08.34.010 | 9/20/04 | D. Ebertowski to Bill Baker | WD | 18,000 | 0.34ac | | bare lot | 5,000 | 28% | x |
| 9 | 16.08.43.020 | 10/5/04 | R. Anderson to George Sontowski | WD | 11,000 | 0.38ac | | bare lot | 5,000 | 45% | |
| 10 | 16.55.01.060 | 9/14/04 | R. Casey to Emery Lee | WD | 161,000 RE<br>5,000 PP | 100 ff | | 784 sq ft d/gar | 112,000 | 70% | x |
| 11 | 16.51.01.160<br>16.51.02.180 | 11/17/04 | D. Halvorson to Greg Schuette | WD | 149,000 | 50 ff & backlot | | 1944 sq ft | 132,800 | 89% | |
| 12 | | | | | | | | | | | |
| 13 | | | | | | | | | | | |
| 14 | | | | | | | | | | | |
| 15 | | | | | | | | | | | |
| 16 | | | | | | | | | | | |
| 17 | | | | | | | | | | | |
| 18 | | | | | | | | | | | |
| 19 | | | | | | | | | | | |
| 20 | | | | | | | | | | | |
| 21 | | | | | | | | | | | |
| 22 | | | | | | | | | | | |
| 23 | | | | | | | | | | | |
| 24 | | | | | | | | | | | |
| 25 | | | | | | | | | | | |
| 26 | | | | | | | | | | | |
| 27 | | | | | | | | | | | |
| 28 | | | | | | | | | | | |
| 29 | | | | | | | | | | | |
| 30 | | | | | | | | | | | |

44

# Prosper

## 2004 Farm and Timber

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 16.06.34.030 | 12/14/04 | J. Fevold to Marlan Pearson | WD | 10,000 | 10 ac | $1,000 | bare land | change in use | | |
| 2 | | | | | | | | | | | |
| 3 | | | | | | | | | | | |
| 4 | | | | | | | | | | | |
| 5 | | | | | | | | | | | |
| 6 | | | | | | | | | | | |
| 7 | | | | | | | | | | | |
| 8 | | | | | | | | | | | |
| 9 | | | | | | | | | | | |
| 10 | | | | | | | | | | | |
| 11 | | | | | | | | | | | |
| 12 | | | | | | | | | | | |
| 13 | | | | | | | | | | | |
| 14 | | | | | | | | | | | |
| 15 | | | | | | | | | | | |
| 16 | | | | | | | | | | | |
| 17 | | | | | | | | | | | |
| 18 | | | | | | | | | | | |
| 19 | | | | | | | | | | | |
| 20 | | | | | | | | | | | |
| 21 | | | | | | | | | | | |
| 22 | | | | | | | | | | | |
| 23 | | | | | | | | | | | |
| 24 | | | | | | | | | | | |
| 25 | | | | | | | | | | | |
| 26 | | | | | | | | | | | |
| 27 | | | | | | | | | | | |
| 28 | | | | | | | | | | | |
| 29 | | | | | | | | | | | |
| 30 | | | | | | | | | | | |

45

# 2005 Lakewood

## Residential and SRR

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 14.51.02.050 | 6/10/05 | D. Sjostrand to Kevin Malwitz | WD | 18,000 | 4037.5 sq ft | | 651 sq ft cabin & m/h | 16,700 | 93% | |
| 2 | 14.53.03.010 | 7/27/05 | D. Newton to Benedict Shutrop | WD | 18,000 | .13 ac | | M/H | 14,800 | 82% | |
| 3 | 14.15.41.020 | 8/2/05 | M. Aarthun to David Moberg | WD | 13,000 | 10 ac | $1,300 | bare land | 7,000 | 54% | |
| 4 | 14.15.33.000 | 8/16/05 | K. Lasser to Steven Jacobson | WD | 50,000 | 40 ac | $1,250 | bare land | 19,000 | 38% | |
| 5 | 14.50.01.070 | 9/15/05 | R. Harris to Milo Ravndalen | WD | 247,000 | 50 ff | | 1460 sq ft d/gar | 151,400 | 61% | |
| 6 | 14.01.11.012 | 10/19/05 | J. Quanrud to Robert Baird | WD | 1,500 | 1.00 ac | $1,500 | bare land | split | | |
| 7 | 14.36.11.000 | ~~10/4/05~~ | J. Neyens to Kenneth Jones | WD | 30,000 | 30 ac | $1,000 | bare land | 13,500 | 45% | |
| 8 | 14.16.43.000<br>14.21.12.000 | 10/28/05 | J. Fish to Glen Gonsorowski | CD | 60,000 | 80 ac | $750 | bare land | 40,000 | 67% | |
| 9 | 14.17.12.00 | 12/14/05 | R. Hine to George Eager | WD | 14,900 | 10 ac | $1,490 | bare land | 9,900 | 66% | |
| 10 | | | | | | | | | | #DIV/0! | |
| 11 | | | | | | | | | | #DIV/0! | |
| 12 | | | | | | | | | | #DIV/0! | |
| 13 | | | | | | | | | | #DIV/0! | |
| 14 | | | | | | | | | | #DIV/0! | |
| 15 | | | | | | | | | | #DIV/0! | |
| 16 | | | | | | | | | | #DIV/0! | |
| 17 | | | | | | | | | | #DIV/0! | |
| 18 | | | | | | | | | | #DIV/0! | |
| 19 | | | | | | | | | | #DIV/0! | |
| 20 | | | | | | | | | | #DIV/0! | |
| 21 | | | | | | | | | | #DIV/0! | |
| 22 | | | | | | | | | | #DIV/0! | |
| 23 | | | | | | | | | | #DIV/0! | |
| 24 | | | | | | | | | | #DIV/0! | |
| 25 | | | | | | | | | | #DIV/0! | |
| 26 | | | | | | | | | | #DIV/0! | |
| 27 | | | | | | | | | | #DIV/0! | |
| 28 | | | | | | | | | | #DIV/0! | |
| 29 | | | | | | | | | | #DIV/0! | |
| 30 | | | | | | | | | | #DIV/0! | |

# 2005 Lakewood

## Farm & Timber

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 14.22.22.000 | 4/22/05 | B. Gillie to Allan Thompson | CD | 14,000 | 40 ac | $350 | bare land | 19,000 | 136% | |
| 2 | | | | | | | | | | #DIV/0! | |
| 3 | | | | | | | | | | #DIV/0! | |
| 4 | | | | | | | | | | #DIV/0! | |
| 5 | | | | | | | | | | #DIV/0! | |
| 6 | | | | | | | | | | #DIV/0! | |
| 7 | | | | | | | | | | #DIV/0! | |
| 8 | | | | | | | | | | #DIV/0! | |
| 9 | | | | | | | | | | #DIV/0! | |
| 10 | | | | | | | | | | #DIV/0! | |
| 11 | | | | | | | | | | #DIV/0! | |
| 12 | | | | | | | | | | #DIV/0! | |
| 13 | | | | | | | | | | #DIV/0! | |
| 14 | | | | | | | | | | #DIV/0! | |
| 15 | | | | | | | | | | #DIV/0! | |
| 16 | | | | | | | | | | #DIV/0! | |
| 17 | | | | | | | | | | #DIV/0! | |
| 18 | | | | | | | | | | #DIV/0! | |
| 19 | | | | | | | | | | #DIV/0! | |
| 20 | | | | | | | | | | #DIV/0! | |
| 21 | | | | | | | | | | #DIV/0! | |
| 22 | | | | | | | | | | #DIV/0! | |
| 23 | | | | | | | | | | #DIV/0! | |
| 24 | | | | | | | | | | #DIV/0! | |
| 25 | | | | | | | | | | #DIV/0! | |
| 26 | | | | | | | | | | #DIV/0! | |
| 27 | | | | | | | | | | #DIV/0! | |
| 28 | | | | | | | | | | #DIV/0! | |
| 29 | | | | | | | | | | #DIV/0! | |
| 30 | | | | | | | | | | #DIV/0! | |

# Lakewood, 2004

## Residential and Seasonal

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 13.35.14.000 | 3/25/04 | J. Petkevich to Michael Anderson | WD | 175,000 | 145.10 ac 500 ff useable | | bare land | 197,400 | 113% | x |
| 2 | 14.15.41.021 | 1/21/04 | T. Gallagher to Richard Olson | WD | 7,300 | 10 ac | $730 | bare land | 7,000 | 96% | x |
| 3 | 14.25.11.000 | 4/15/04 | M. Gallagher to Todd Cardinal | WD | 36,000 | 20 ac | | garage & pole shed | 19,800 | 55% | x |
| 4 | 14.36.43.000 | 4/7/04 | C. Olson to Dean Opatz | WD | 75,000 | 40 ac | | 1203 sq ft d/gar | 90,400 | 121% | x |
| 5 | 14.50.01.050 14.50.04.151 | 7/8/04 | D. Odegaard to Harris Hanson | WD | 90,000 | 50 ff and lot | | 672 sq ft cabin | 63,700 | 71% | x |
| 6 | | | | | | | | | | | |
| 7 | | | | | | | | | | | |
| 8 | | | | | | | | | | | |
| 9 | | | | | | | | | | | |
| 10 | | | | | | | | | | | |
| 11 | | | | | | | | | | | |
| 12 | | | | | | | | | | | |
| 13 | | | | | | | | | | | |
| 14 | | | | | | | | | | | |
| 15 | | | | | | | | | | | |
| 16 | | | | | | | | | | | |
| 17 | | | | | | | | | | | |
| 18 | | | | | | | | | | | |
| 19 | | | | | | | | | | | |
| 20 | | | | | | | | | | | |
| 21 | | | | | | | | | | | |
| 22 | | | | | | | | | | | |
| 23 | | | | | | | | | | | |
| 24 | | | | | | | | | | | |
| 25 | | | | | | | | | | | |
| 26 | | | | | | | | | | | |
| 27 | | | | | | | | | | | |
| 28 | | | | | | | | | | | |
| 29 | | | | | | | | | | | |
| 30 | | | | | | | | | | | |

# Lakewood, 2004

## Farm and Timber

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 14.22.11.000 | 6/28/04 | B. Gillie to Kevin Lasser | WD | 14,000 | 40 ac | $350 | | change in use | | |
| 2 | 14.34.43.000 | 7/26/04 | J. Bodahl to D K L & K LLC | WD | 68,000 | 80 ac | $850 | | change in use | | |
| 3 | | | | | | | | | | #DIV/0! | |
| 4 | | | | | | | | | | #DIV/0! | |
| 5 | | | | | | | | | | #DIV/0! | |
| 6 | | | | | | | | | | #DIV/0! | |
| 7 | | | | | | | | | | #DIV/0! | |
| 8 | | | | | | | | | | #DIV/0! | |
| 9 | | | | | | | | | | #DIV/0! | |
| 10 | | | | | | | | | | #DIV/0! | |
| 11 | | | | | | | | | | #DIV/0! | |
| 12 | | | | | | | | | | #DIV/0! | |
| 13 | | | | | | | | | | #DIV/0! | |
| 14 | | | | | | | | | | #DIV/0! | |
| 15 | | | | | | | | | | #DIV/0! | |
| 16 | | | | | | | | | | #DIV/0! | |
| 17 | | | | | | | | | | #DIV/0! | |
| 18 | | | | | | | | | | #DIV/0! | |
| 19 | | | | | | | | | | #DIV/0! | |
| 20 | | | | | | | | | | #DIV/0! | |
| 21 | | | | | | | | | | #DIV/0! | |
| 22 | | | | | | | | | | #DIV/0! | |
| 23 | | | | | | | | | | #DIV/0! | |
| 24 | | | | | | | | | | #DIV/0! | |
| 25 | | | | | | | | | | #DIV/0! | |
| 26 | | | | | | | | | | #DIV/0! | |
| 27 | | | | | | | | | | #DIV/0! | |
| 28 | | | | | | | | | | #DIV/0! | |
| 29 | | | | | | | | | | #DIV/0! | |
| 30 | | | | | | | | | | #DIV/0! | |

4[c]

# 2005 Zippel

## Res & SRR

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 18.08.44.010 18.09.33.020 | 2/14/74 | L. Stanton to American Cashflow | WD | 27,500 | 400 ff 5 ac | $68.75 | bare land | 12,600 | 46% | |
| 2 | 18.50.01.370 | 7/15/05 | R. Omdahl to ESI #74, LLC | WD | 210,000 | 106 FF | | 1024 sq ft d/gar | 111,000 | 53% | |
| 3 | 18.51.03.050 | 9/16/05 | D. Cardinal to Gerald Ahlers | WD | 92,000 | 150 ff | | 952 sq ft | 72,900 | 79% | |
| 4 | | | | | | | | | | #DIV/0! | |
| 5 | | | | | | | | | | #DIV/0! | |
| 6 | | | | | | | | | | #DIV/0! | |
| 7 | | | | | | | | | | #DIV/0! | |
| 8 | | | | | | | | | | #DIV/0! | |
| 9 | | | | | | | | | | #DIV/0! | |
| 10 | | | | | | | | | | #DIV/0! | |
| 11 | | | | | | | | | | #DIV/0! | |
| 12 | | | | | | | | | | #DIV/0! | |
| 13 | | | | | | | | | | #DIV/0! | |
| 14 | | | | | | | | | | #DIV/0! | |
| 15 | | | | | | | | | | #DIV/0! | |
| 16 | | | | | | | | | | #DIV/0! | |
| 17 | | | | | | | | | | #DIV/0! | |
| 18 | | | | | | | | | | #DIV/0! | |
| 19 | | | | | | | | | | #DIV/0! | |
| 20 | | | | | | | | | | #DIV/0! | |
| 21 | | | | | | | | | | #DIV/0! | |
| 22 | | | | | | | | | | #DIV/0! | |
| 23 | | | | | | | | | | #DIV/0! | |
| 24 | | | | | | | | | | #DIV/0! | |
| 25 | | | | | | | | | | #DIV/0! | |
| 26 | | | | | | | | | | #DIV/0! | |
| 27 | | | | | | | | | | #DIV/0! | |
| 28 | | | | | | | | | | #DIV/0! | |
| 29 | | | | | | | | | | #DIV/0! | |
| 30 | | | | | | | | | | #DIV/0! | |

# 2005 Zippel

## Farm and Timber

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 18.28.13.000 (primary) | 3/1/05 | A. Kaspar to Robert Gjerdingen | WD | $2,284,298 | 4153.27 ac | $550 | | 1,667,600 | 73% | |
| 2 | 18.22.31.020 | 3/8/05 | A. Kaspar to James Rinde | WD | $6,000 | 10 ac | $600 | | 3,700 | 62% | |
| 3 | 18.25.43.000 | 9/1/05 | W. McDaniel to Robert Ericksen | WD | $34,000 | 80 ac | $296 | | 23,700 | 70% | |
| 4 | | | | | | | | | | #DIV/0! | |
| 5 | | | | | | | | | | #DIV/0! | |
| 6 | | | | | | | | | | #DIV/0! | |
| 7 | | | | | | | | | | #DIV/0! | |
| 8 | | | | | | | | | | #DIV/0! | |
| 9 | | | | | | | | | | #DIV/0! | |
| 10 | | | | | | | | | | #DIV/0! | |
| 11 | | | | | | | | | | #DIV/0! | |
| 12 | | | | | | | | | | #DIV/0! | |
| 13 | | | | | | | | | | #DIV/0! | |
| 14 | | | | | | | | | | #DIV/0! | |
| 15 | | | | | | | | | | #DIV/0! | |
| 16 | | | | | | | | | | #DIV/0! | |
| 17 | | | | | | | | | | #DIV/0! | |
| 18 | | | | | | | | | | #DIV/0! | |
| 19 | | | | | | | | | | #DIV/0! | |
| 20 | | | | | | | | | | #DIV/0! | |
| 21 | | | | | | | | | | #DIV/0! | |
| 22 | | | | | | | | | | #DIV/0! | |
| 23 | | | | | | | | | | #DIV/0! | |
| 24 | | | | | | | | | | #DIV/0! | |
| 25 | | | | | | | | | | #DIV/0! | |
| 26 | | | | | | | | | | #DIV/0! | |
| 27 | | | | | | | | | | #DIV/0! | |
| 28 | | | | | | | | | | #DIV/0! | |
| 29 | | | | | | | | | | #DIV/0! | |
| 30 | | | | | | | | | | #DIV/0! | |

# Zippel, 2004

## Residential and Seasonal

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 18.15.21.010 | 1/27/04 | Est. of C. Hull to William Spieker | Sp Adm Deed | 85000 RE 5000 PP | 313 ff 1.75 ac | | 968 sq ft d/gar | 81,300 | 96% | |
| 2 | 18.50.01.360 | 6/14/04 | T. Ekre to Kenneth Pogorelec | WD | 40,000 | 106 ff | $377 | MH | 29,200 | 73% | x |
| 3 | 18.51.02.120 | 9/24/04 | T. Goetsch to Keith Smith | WD | 30,000 | | | pole garage | 21,600 | 72% | x |
| 4 | 18.51.03.090 | 5/28/04 | J. Coble to Thomas Hovda | WD | 14,900 | 120 ff | $124 | bare lot | 17,300 | 116% | x |
| 5 | 18.50.01.060 | 7/21/04 | G. Solberg to Larry Pittman | WD | 51,500 | 100 ff | | bare lot | 20,000 | 39% | |
| 6 | 18.50.01.230 | 12/21/04 | M. Hanson to Rebecca Holm | WD | 177,000 | 102 ff | | 1540 sq ft d/gar | 91,900 | 52% | |
| 7 | | | | | | | | | | | |
| 8 | | | | | | | | | | | |
| 9 | | | | | | | | | | | |
| 10 | | | | | | | | | | | |
| 11 | | | | | | | | | | | |
| 12 | | | | | | | | | | | |
| 13 | | | | | | | | | | | |
| 14 | | | | | | | | | | | |
| 15 | | | | | | | | | | | |
| 16 | | | | | | | | | | | |
| 17 | | | | | | | | | | | |
| 18 | | | | | | | | | | | |
| 19 | | | | | | | | | | | |
| 20 | | | | | | | | | | | |
| 21 | | | | | | | | | | | |
| 22 | | | | | | | | | | | |
| 23 | | | | | | | | | | | |
| 24 | | | | | | | | | | | |
| 25 | | | | | | | | | | | |
| 26 | | | | | | | | | | | |
| 27 | | | | | | | | | | | |
| 28 | | | | | | | | | | | |
| 29 | | | | | | | | | | | |
| 30 | | | | | | | | | | | |

# Prosper, 2007

## Res & SRR

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study | currrent class | proposed class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 16.06.43.010 | 2/9/07 | M. Simmonds to Charles Smith | WD | 62,500 | 15 ac | | metal shed | 28,600 | 46% | | SRR | SRR |
| 2 | 16.53.01.290<br>16.53.04.120 | 4/11/07 | P. Knochenmus to Paul Scheirer | WD | 157,000 | 50 ff & back lot | | 732 sq ft d/gar | 107,000 | 68% | | SRR | SRR |
| 3 | 16.55.01.410 | 1/27/07 | D. House to Chris Bouley | WD | 96,000 | 100 ff | $960 | bare lot | 63,800 | 66% | | SRR | SRR |
| 4 | 16.30.32.020 | 5/2/07 | J. Wheeler to Lawrence Sorenson | WD | 25,000 | 8 ac | | 984 sq ft c/gar | 60,000 | 240% | | RES | RES |
| 5 | 16.55.01.230 | 9/17/07 | R. Spilde to Charles Thompson | WD | 349,500 | 100 ff | | 1464 sq ft 3/gar w/living area | 245,000 | 70% | | RES | SRR |
| 6 | 16.33.33.030 | 9/28/07 | M. Smith to Rusty Madoll | WD | 14,650 | 20 ac | | bare lot | 14,200 | 97% | | SRR | SRR |
| 7 | 16.33.33.010 | 10/19/07 | R. Levy to Kevin Evenson | WD | 10,000 | 10 ac | | bare lot | 8,400 | 84% | | SRR | SRR |
| 8 | 16.55.01.050 | 10/15/07 | D. Haug to Clayton Moen | WD | 162,000 | 100 ff | | 2301 sq ft d/gar | 210,600 | 130% | | SRR | SRR |
| 9 | | | | | | | | | | #DIV/0! | | | |
| 10 | | | | | | | | | | #DIV/0! | | | |
| 11 | | | | | | | | | | #DIV/0! | | | |
| 12 | | | | | | | | | | #DIV/0! | | | |
| 13 | | | | | | | | | | #DIV/0! | | | |
| 14 | | | | | | | | | | #DIV/0! | | | |
| 15 | | | | | | | | | | #DIV/0! | | | |
| 16 | | | | | | | | | | #DIV/0! | | | |
| 17 | | | | | | | | | | #DIV/0! | | | |
| 18 | | | | | | | | | | #DIV/0! | | | |
| 19 | | | | | | | | | | #DIV/0! | | | |
| 20 | | | | | | | | | | #DIV/0! | | | |
| 21 | | | | | | | | | | #DIV/0! | | | |
| 22 | | | | | | | | | | #DIV/0! | | | |
| 23 | | | | | | | | | | #DIV/0! | | | |
| 24 | | | | | | | | | | #DIV/0! | | | |
| 25 | | | | | | | | | | #DIV/0! | | | |
| 26 | | | | | | | | | | #DIV/0! | | | |
| 27 | | | | | | | | | | #DIV/0! | | | |
| 28 | | | | | | | | | | #DIV/0! | | | |
| 29 | | | | | | | | | | #DIV/0! | | | |
| 30 | | | | | | | | | | #DIV/0! | | | |

# 2006 Prosper

## Residential and SRR

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 16.08.34.020 | 6/16/06 | L. Olson to Paul King | WD | $7,000 | .25 ac | | bare land | 5,000 | 71% | |
| 2 | 16.53.02.020 | 6/19/06 | P. Kruse to Verdell Anderson | WD | $105,000 | 125 ff | | 480 sq ft cabin | split | | |
| 3 | 16.61.01.070<br>16.60.01.080 | 8/7/06 | P. Weimer to Steve Plovie | WD | $135,000 | 150 ff and back lot | $900 | bare land | 104,300 | 77% | |
| 4 | 16.55.01.060 | 8/21/06 | E. Lee to Todd Lewis | WD | 188,000 RE<br>$2,000 PP | 100 ff | | 784 sq ft 3/gar | 148,300 | 79% | |
| 5 | 16.08.43.080 | 7/7/06 | B. McDonough to M. Hangsleben | TD | 4,000 | .46 ac | | bare land | 5,000 | 125% | |
| 6 | 16.52.00.030 | 8/23/06 | L. Olson to Terrence Wagner | WD | 110,000 | 85 ff | | 1008 sq. ft. d/gar | 107,900 | 98% | |
| 7 | 16.55.01.230 | 9/1/06 | T. Taylor to Ray Spilde | WD | 295,000 | 100 ff | | 1464 sq ft d/gar w/living area | 230,000 | 78% | |
| 8 | | | | | | | | | | #DIV/0! | |
| 9 | | | | | | | | | | #DIV/0! | |
| 10 | | | | | | | | | | #DIV/0! | |
| 11 | | | | | | | | | | #DIV/0! | |
| 12 | | | | | | | | | | #DIV/0! | |
| 13 | | | | | | | | | | #DIV/0! | |
| 14 | | | | | | | | | | #DIV/0! | |
| 15 | | | | | | | | | | #DIV/0! | |
| 16 | | | | | | | | | | #DIV/0! | |
| 17 | | | | | | | | | | #DIV/0! | |
| 18 | | | | | | | | | | #DIV/0! | |
| 19 | | | | | | | | | | #DIV/0! | |
| 20 | | | | | | | | | | #DIV/0! | |
| 21 | | | | | | | | | | #DIV/0! | |
| 22 | | | | | | | | | | #DIV/0! | |
| 23 | | | | | | | | | | #DIV/0! | |
| 24 | | | | | | | | | | #DIV/0! | |
| 25 | | | | | | | | | | #DIV/0! | |
| 26 | | | | | | | | | | #DIV/0! | |
| 27 | | | | | | | | | | #DIV/0! | |
| 28 | | | | | | | | | | #DIV/0! | |
| 29 | | | | | | | | | | #DIV/0! | |
| 30 | | | | | | | | | | #DIV/0! | |

# Lakewood, 2007

## Res & SRR

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study | current class | proposed class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 14.36.11.010 | 1/29/07 | J. Neyens to Jeffrey Bluhm | WD | 70,000 | 90 acres | $778 | | 63,700 | 91% | | SRR | SRR |
| 2 | 14.50.05.103 | 3/28/07 | E. Berg to Reginald Schow | WD | 40,000 | irregular shaped lot | | bare lot | 34,300 | 86% | | SRR | SRR |
| 3 | 14.17.12.020 | 8/21/07 | A. Davis to Michael Reed | WD | 37,500 | 20 ac | $890 | bare land | 17,800 | 47% | | SRR | SRR |
| 4 | 14.17.12.023 | 11/16/07 | M. Reed to Richard Peterson | WD | 25,000 | 2.09 ac | $11,961 | bare land | split | | | SRR | SRR |
| 5 | | | | | | | | | | #DIV/0! | | | |
| 6 | | | | | | | | | | #DIV/0! | | | |
| 7 | | | | | | | | | | #DIV/0! | | | |
| 8 | | | | | | | | | | #DIV/0! | | | |
| 9 | | | | | | | | | | #DIV/0! | | | |
| 10 | | | | | | | | | | #DIV/0! | | | |
| 11 | | | | | | | | | | #DIV/0! | | | |
| 12 | | | | | | | | | | #DIV/0! | | | |
| 13 | | | | | | | | | | #DIV/0! | | | |
| 14 | | | | | | | | | | #DIV/0! | | | |
| 15 | | | | | | | | | | #DIV/0! | | | |
| 16 | | | | | | | | | | #DIV/0! | | | |
| 17 | | | | | | | | | | #DIV/0! | | | |
| 18 | | | | | | | | | | #DIV/0! | | | |
| 19 | | | | | | | | | | #DIV/0! | | | |
| 20 | | | | | | | | | | #DIV/0! | | | |
| 21 | | | | | | | | | | #DIV/0! | | | |
| 22 | | | | | | | | | | #DIV/0! | | | |
| 23 | | | | | | | | | | #DIV/0! | | | |
| 24 | | | | | | | | | | #DIV/0! | | | |
| 25 | | | | | | | | | | #DIV/0! | | | |
| 26 | | | | | | | | | | #DIV/0! | | | |
| 27 | | | | | | | | | | #DIV/0! | | | |
| 28 | | | | | | | | | | #DIV/0! | | | |
| 29 | | | | | | | | | | #DIV/0! | | | |
| 30 | | | | | | | | | | #DIV/0! | | | |

# Lakewood , 2007

## Ag & Timber

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study | current class | proposed class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 14.35.14.000 | 6/26/07 | S. Pieper to John White | WD | 40,000 | 40 ac | $1,000 | bare land | 30,000 | 75% | | Ag | SRR |
| 2 | 14.12.13.000 | 12/26/07 | G. Olson to Brook Adolfson | WD | 304,000 | 320 ac | $950 | bare land | 234,000 | 77% | | T | SRR |
| 3 | | | | | | | | | | #DIV/0! | | | |
| 4 | | | | | | | | | | #DIV/0! | | | |
| 5 | | | | | | | | | | #DIV/0! | | | |
| 6 | | | | | | | | | | #DIV/0! | | | |
| 7 | | | | | | | | | | #DIV/0! | | | |
| 8 | | | | | | | | | | #DIV/0! | | | |
| 9 | | | | | | | | | | #DIV/0! | | | |
| 10 | | | | | | | | | | #DIV/0! | | | |
| 11 | | | | | | | | | | #DIV/0! | | | |
| 12 | | | | | | | | | | #DIV/0! | | | |
| 13 | | | | | | | | | | #DIV/0! | | | |
| 14 | | | | | | | | | | #DIV/0! | | | |
| 15 | | | | | | | | | | #DIV/0! | | | |
| 16 | | | | | | | | | | #DIV/0! | | | |
| 17 | | | | | | | | | | #DIV/0! | | | |
| 18 | | | | | | | | | | #DIV/0! | | | |
| 19 | | | | | | | | | | #DIV/0! | | | |
| 20 | | | | | | | | | | #DIV/0! | | | |
| 21 | | | | | | | | | | #DIV/0! | | | |
| 22 | | | | | | | | | | #DIV/0! | | | |
| 23 | | | | | | | | | | #DIV/0! | | | |
| 24 | | | | | | | | | | #DIV/0! | | | |
| 25 | | | | | | | | | | #DIV/0! | | | |
| 26 | | | | | | | | | | #DIV/0! | | | |
| 27 | | | | | | | | | | #DIV/0! | | | |
| 28 | | | | | | | | | | #DIV/0! | | | |
| 29 | | | | | | | | | | #DIV/0! | | | |
| 30 | | | | | | | | | | #DIV/0! | | | |

# 2006 Lakewood

## Residential and SRR

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 14.14.41.050 | 5/9/06 | D. Peterson to David Myhrer | WD | 10,000 | 5 ac | $2,000 | old MH | 10,400 | 104% | |
| 2 | 14.50.06.010 | 6/1/06 | G. Schmitt to Reggie Schow | CD | 67000 RE 5000 PP | | | 1120 sq ft & shed | 60,700 | 91% | |
| 3 | 14.14.41.040 | 6/2/06 | M. Mykleby to Steven Holmstrom | WD | 8,000 | 5 ac | | old mh | 10,100 | 126% | |
| 4 | 14.50.03.060 | 8/10/06 | F. Jaenicke to Peter Helgeson | CD | 125,000 | 50 ff | | 996 sq ft | 87,300 | 70% | |
| 5 | 14.50.06.020 | 10/25/06 | R. Hodgson to Timothy Anderson | WD | 63,000 | 90'x95' | | 572 sq ft | 30,100 | 48% | |
| 6 | 14.50.04.070 | 9/19/06 | C. Brown to Timothy Bjerk | PR | 21,600 | 50'x165' 20'x165' | | bare lots | 18,000 | 83% | |
| 7 | | | | | | | | | | #DIV/0! | |
| 8 | | | | | | | | | | #DIV/0! | |
| 9 | | | | | | | | | | #DIV/0! | |
| 10 | | | | | | | | | | #DIV/0! | |
| 11 | | | | | | | | | | #DIV/0! | |
| 12 | | | | | | | | | | #DIV/0! | |
| 13 | | | | | | | | | | #DIV/0! | |
| 14 | | | | | | | | | | #DIV/0! | |
| 15 | | | | | | | | | | #DIV/0! | |
| 16 | | | | | | | | | | #DIV/0! | |
| 17 | | | | | | | | | | #DIV/0! | |
| 18 | | | | | | | | | | #DIV/0! | |
| 19 | | | | | | | | | | #DIV/0! | |
| 20 | | | | | | | | | | #DIV/0! | |
| 21 | | | | | | | | | | #DIV/0! | |
| 22 | | | | | | | | | | #DIV/0! | |
| 23 | | | | | | | | | | #DIV/0! | |
| 24 | | | | | | | | | | #DIV/0! | |
| 25 | | | | | | | | | | #DIV/0! | |
| 26 | | | | | | | | | | #DIV/0! | |
| 27 | | | | | | | | | | #DIV/0! | |
| 28 | | | | | | | | | | #DIV/0! | |
| 29 | | | | | | | | | | #DIV/0! | |
| 30 | | | | | | | | | | #DIV/0! | |

5

# 2006 Lakewood

## Farm & Timber

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 14.15.34.000<br>14.15.42.000<br>14.22.11.000 | 6/30/06 | K. Lasser to Richard Gooderum | WD | 304,500 | 210 ac | $1,450 | old MH | 130,100 | 43% | |
| 2 | | | | | | | | | | #DIV/0! | |
| 3 | | | | | | | | | | #DIV/0! | |
| 4 | | | | | | | | | | #DIV/0! | |
| 5 | | | | | | | | | | #DIV/0! | |
| 6 | | | | | | | | | | #DIV/0! | |
| 7 | | | | | | | | | | #DIV/0! | |
| 8 | | | | | | | | | | #DIV/0! | |
| 9 | | | | | | | | | | #DIV/0! | |
| 10 | | | | | | | | | | #DIV/0! | |
| 11 | | | | | | | | | | #DIV/0! | |
| 12 | | | | | | | | | | #DIV/0! | |
| 13 | | | | | | | | | | #DIV/0! | |
| 14 | | | | | | | | | | #DIV/0! | |
| 15 | | | | | | | | | | #DIV/0! | |
| 16 | | | | | | | | | | #DIV/0! | |
| 17 | | | | | | | | | | #DIV/0! | |
| 18 | | | | | | | | | | #DIV/0! | |
| 19 | | | | | | | | | | #DIV/0! | |
| 20 | | | | | | | | | | #DIV/0! | |
| 21 | | | | | | | | | | #DIV/0! | |
| 22 | | | | | | | | | | #DIV/0! | |
| 23 | | | | | | | | | | #DIV/0! | |
| 24 | | | | | | | | | | #DIV/0! | |
| 25 | | | | | | | | | | #DIV/0! | |
| 26 | | | | | | | | | | #DIV/0! | |
| 27 | | | | | | | | | | #DIV/0! | |
| 28 | | | | | | | | | | #DIV/0! | |
| 29 | | | | | | | | | | #DIV/0! | |
| 30 | | | | | | | | | | #DIV/0! | |

# Zippel, 2007

## Res & SRR

| | [illegible]er | Date Sold | [illegible] - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study | currrent class | proposed class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible].01.360 | 8/8/07 | K. [illegible] to Phillip Fowler | WD | 60000 RE<br>10000 PP | 106 ff | | MH | 63,600 | 106% | | SRR | SRR |
| [illegible] | [illegible]8.21.32.000 | 10/15/07 | M. [illegible] to Thomas Nelson | WD | 36,000 | 40 ac | | bare land | 29,300 | 81% | | SRR | SRR |
| 3 | | | | | | | | | | #DIV/0! | | | |
| 4 | | | | | | | | | | #DIV/0! | | | |
| 5 | | | | | | | | | | #DIV/0! | | | |
| 6 | | | | | | | | | | #DIV/0! | | | |
| 7 | | | | | | | | | | #DIV/0! | | | |
| 8 | | | | | | | | | | #DIV/0! | | | |
| 9 | | | | | | | | | | #DIV/0! | | | |
| 10 | | | | | | | | | | #DIV/0! | | | |
| 11 | | | | | | | | | | #DIV/0! | | | |
| 12 | | | | | | | | | | #DIV/0! | | | |
| 13 | | | | | | | | | | #DIV/0! | | | |
| 14 | | | | | | | | | | #DIV/0! | | | |
| 15 | | | | | | | | | | #DIV/0! | | | |
| 16 | | | | | | | | | | #DIV/0! | | | |
| 17 | | | | | | | | | | #DIV/0! | | | |
| 18 | | | | | | | | | | #DIV/0! | | | |
| 19 | | | | | | | | | | #DIV/0! | | | |
| 20 | | | | | | | | | | #DIV/0! | | | |
| 21 | | | | | | | | | | #DIV/0! | | | |
| 22 | | | | | | | | | | #DIV/0! | | | |
| 23 | | | | | | | | | | #DIV/0! | | | |
| 24 | | | | | | | | | | #DIV/0! | | | |
| 25 | | | | | | | | | | #DIV/0! | | | |
| 26 | | | | | | | | | | #DIV/0! | | | |
| 27 | | | | | | | | | | #DIV/0! | | | |
| 28 | | | | | | | | | | #DIV/0! | | | |
| 29 | | | | | | | | | | #DIV/0! | | | |
| 30 | | | | | | | | | | #DIV/0! | | | |

# 2007 Zippel

## Ag & Timber

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study | current class | proposed class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 18.21.13.000 18.22.41.000 18.23.23.000 18.29.11.000 17.24.11.000 22.07.12.000 | 4/23/07 | R. Gjerdingen to R.R.V., LLC | WD | 693,076 | 975.71 ac | $710 | | 532,400 | 77% | | AG | AG |
| 2 | 18.15.33.000 18.16.23.000 18.21.11.000 18.22.22.000 | 4/23/07 | R. Gjerdingen to Norvel Parsley | WD | 334,061 | 471.58 ac | $708 | | 261,000 | 78% | | AG | AG |
| 3 | 18.28.13.000 18.18.12.000 18.18.21.000 18.18.31.000 18.27.11.000 18.33.11.000 18.33.13.000 18.34.11.000 18.34.22.000 | 4/23/07 | R. Gjerdingen to Richard Petefish | WD | 1,892,413 | 2312.27 ac | $818 | 2068 sq ft & ag bldgs | 1,518,300 | 80% | | AG | AG |
| 4 | 18.07.14.000 18.17.22.000 18.32.12.000 | 4/23/07 | R. Gjerdingen to Scott Pieper | WD | 280,450 | 395 ac | $710 | | 217,300 | 77% | | AG | AG |
| 5 | 18.19.12.000 | 4/17/07 | R. Daily to Ivan Potter | WD | 20,000 | 40 ac | $500 | | 25,500 | 128% | | AG | SRR |
| 6 | 18.29.31.000 | 12/21/07 | J. LaValla to Mark Berndt | WD | 72,000 | 80 ac | $900 | | 60,000 | 83% | | TIM | TIM |
| 7 | 18.36.11.001 | 12/19/07 | C. McDaniel to Bradley Hinrichsen | WD | 8,750 | 20 ac | $438 | | 7,900 | 90% | | TIM | AG |
| 8 | 18.36.11.002 | 12/19/07 | C. McDaniel to Edward Hannaman | WD | 8,750 | 20 ac | $438 | | 7,900 | 90% | | TIM | AG |
| 9 | | | | | | | | | | #DIV/0! | | | |
| 10 | | | | | | | | | | #DIV/0! | | | |
| 11 | | | | | | | | | | #DIV/0! | | | |
| 12 | | | | | | | | | | #DIV/0! | | | |
| 13 | | | | | | | | | | #DIV/0! | | | |
| 14 | | | | | | | | | | #DIV/0! | | | |
| 15 | | | | | | | | | | #DIV/0! | | | |
| 16 | | | | | | | | | | #DIV/0! | | | |
| 17 | | | | | | | | | | #DIV/0! | | | |
| 18 | | | | | | | | | | #DIV/0! | | | |
| 19 | | | | | | | | | | #DIV/0! | | | |
| 20 | | | | | | | | | | #DIV/0! | | | |
| 21 | | | | | | | | | | #DIV/0! | | | |
| 22 | | | | | | | | | | #DIV/0! | | | |
| 23 | | | | | | | | | | #DIV/0! | | | |
| 24 | | | | | | | | | | #DIV/0! | | | |
| 25 | | | | | | | | | | #DIV/0! | | | |

68

# 2006 Zippel

## Farm and Timber

| | P[illegible] n[illegible] | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | [illegible] | 6/19/06 | K. Senzek to Albert Albrecht | WD | $42,000 | 79.50 ac | $528 | bare land | 40,500 | 96% | |
| [illegible] | [illegible]10 | 7/12/06 | K. Senzek to Jerome Krohn | WD | $6,050 | 11.07 | $546 | bare land | 5,800 | 96% | |
| [illegible] | [illegible]1.000 | 11/2/06 | Kissner Properties to Scott Pieper | WD | $36,000 | 40 ac | $900 | bare land | 22,700 | 63% | |
| [illegible] | | | | | | | | | | #DIV/0! | |
| [illegible] | | | | | | | | | | #DIV/0! | |
| [illegible] | | | | | | | | | | #DIV/0! | |
| 7 | | | | | | | | | | #DIV/0! | |
| 8 | | | | | | | | | | #DIV/0! | |
| 9 | | | | | | | | | | #DIV/0! | |
| 10 | | | | | | | | | | #DIV/0! | |
| 11 | | | | | | | | | | #DIV/0! | |
| 12 | | | | | | | | | | #DIV/0! | |
| 13 | | | | | | | | | | #DIV/0! | |
| 14 | | | | | | | | | | #DIV/0! | |
| 15 | | | | | | | | | | #DIV/0! | |
| 16 | | | | | | | | | | #DIV/0! | |
| 17 | | | | | | | | | | #DIV/0! | |
| 18 | | | | | | | | | | #DIV/0! | |
| 19 | | | | | | | | | | #DIV/0! | |
| 20 | | | | | | | | | | #DIV/0! | |
| 21 | | | | | | | | | | #DIV/0! | |
| 22 | | | | | | | | | | #DIV/0! | |
| 23 | | | | | | | | | | #DIV/0! | |
| 24 | | | | | | | | | | #DIV/0! | |
| 25 | | | | | | | | | | #DIV/0! | |
| 26 | | | | | | | | | | #DIV/0! | |
| 27 | | | | | | | | | | #DIV/0! | |
| 28 | | | | | | | | | | #DIV/0! | |
| 29 | | | | | | | | | | #DIV/0! | |
| 30 | | | | | | | | | | #DIV/0! | |

# 2006 Zippel

## Res & SRR

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 18.50.01.100 | 3/7/06 | J. Klabunde to Paul Haugo etal | WD | 65,000 | 120 ff | | M/H w/screen porch, d/gar | 66,300 | 102% | |
| 2 | 18.08.44.020 | 3/15/06 | R. Ramsey to David House | WD | 205,000 | 300 ff | | 792 sq ft d/gar | 59,200 | 29% | |
| 3 | 18.36.13.010 | 2/28/06 | F. Jones to Steven Jorgenson | WD | 14,000 | | | bare land | 13,800 | 99% | |
| 4 | 18.51.03.060 | 3/27/06 | R. Lofgren to Douglas Olson | WD | 260000 RE 5000 PP | 300 ff | | 1280 sq ft d/gar | 238,700 | 92% | |
| 5 | 18.50.01.090 | 6/14/06 | E. Eisterhold to Curtis Olstad | WD | 77,500 | 122 ff | | M/H d/gar | 77,100 | 99% | |
| 6 | 18.50.01.390 | 8/28/06 | M. Dwyer to Joseph Tabory | WD | $222,738.37 RE $12,261.63 PP | 100 ff | | 1120 sq ft large gar | 141,000 | 63% | |
| 7 | 18.08.43.000 | 10/2/06 | P. O'Connell to Jerome Erdahl | WD | 74,900 | 900 ff | | 600 sq ft s/gar | 53,900 | 72% | |
| 8 | 18.51.03.090 | 10/19/06 | T. Hovda to Mitchell Magnusson | WD | 27,000 | 120 ff | | bare lot | 17,300 | 64% | |
| 9 | 18.54.01.010 | 8/29/06 | K. Mills to Christopher Atwater | WD | 35,500 RE 12,500 PP | | | M/H | 26,700 | 75% | |
| 10 | 18.15.43.010 | 11/17/06 | Border State Bank to Lynn Hammer | WD | 96,000 | 4.69 ac | | 2052 sq ft D/W Gar/Shop | 101,400 | 106% | |
| 11 | | | | | | | | | | #DIV/0! | |
| 12 | | | | | | | | | | #DIV/0! | |
| 13 | | | | | | | | | | #DIV/0! | |
| 14 | | | | | | | | | | #DIV/0! | |
| 15 | | | | | | | | | | #DIV/0! | |
| 16 | | | | | | | | | | #DIV/0! | |
| 17 | | | | | | | | | | #DIV/0! | |
| 18 | | | | | | | | | | #DIV/0! | |
| 19 | | | | | | | | | | #DIV/0! | |
| 20 | | | | | | | | | | #DIV/0! | |
| 21 | | | | | | | | | | #DIV/0! | |
| 22 | | | | | | | | | | #DIV/0! | |
| 23 | | | | | | | | | | #DIV/0! | |
| 24 | | | | | | | | | | #DIV/0! | |
| 25 | | | | | | | | | | #DIV/0! | |
| 26 | | | | | | | | | | #DIV/0! | |
| 27 | | | | | | | | | | #DIV/0! | |
| 28 | | | | | | | | | | #DIV/0! | |
| 29 | | | | | | | | | | #DIV/0! | |
| 30 | | | | | | | | | | #DIV/0! | |

# PROSPER, 2008

## Ag & Timber

| | Parcel number | Date Sold | Seller - Buyer | Deed | Sale Price | Lot Size | Price per ff or acre | Bldg., P.Prop, Class, Loc. | EMV | Ratio | Study | currrent class | proposed class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 16.08.32.010 | 3/7/08 | R. Slocum to Philip Johnson | WD | 29,000 | 19.24 ac | | | 14,400 | 50% | | T | SRR |
| 2 | | | | | | | | | | #DIV/0! | | | |
| 3 | | | | | | | | | | #DIV/0! | | | |
| 4 | | | | | | | | | | #DIV/0! | | | |
| 5 | | | | | | | | | | #DIV/0! | | | |
| 6 | | | | | | | | | | #DIV/0! | | | |
| 7 | | | | | | | | | | #DIV/0! | | | |
| 8 | | | | | | | | | | #DIV/0! | | | |
| 9 | | | | | | | | | | #DIV/0! | | | |
| 10 | | | | | | | | | | #DIV/0! | | | |
| 11 | | | | | | | | | | #DIV/0! | | | |
| 12 | | | | | | | | | | #DIV/0! | | | |
| 13 | | | | | | | | | | #DIV/0! | | | |
| 14 | | | | | | | | | | #DIV/0! | | | |
| 15 | | | | | | | | | | #DIV/0! | | | |
| 16 | | | | | | | | | | #DIV/0! | | | |
| 17 | | | | | | | | | | #DIV/0! | | | |
| 18 | | | | | | | | | | #DIV/0! | | | |
| 19 | | | | | | | | | | #DIV/0! | | | |
| 20 | | | | | | | | | | #DIV/0! | | | |
| 21 | | | | | | | | | | #DIV/0! | | | |
| 22 | | | | | | | | | | #DIV/0! | | | |
| 23 | | | | | | | | | | #DIV/0! | | | |
| 24 | | | | | | | | | | #DIV/0! | | | |
| 25 | | | | | | | | | | #DIV/0! | | | |
| 26 | | | | | | | | | | #DIV/0! | | | |
| 27 | | | | | | | | | | #DIV/0! | | | |
| 28 | | | | | | | | | | #DIV/0! | | | |
| 29 | | | | | | | | | | #DIV/0! | | | |
| 30 | | | | | | | | | | #DIV/0! | | | |

Documents Reviewed

June 2001 Permit Denial for access road
October 2001 Restoration order
US Memorandum in Case No. 02-639 Dated April 25, 2003
Lake of the Woods County Assessors' sales records
Judge Wolkski's Memorandum Opinion Order denying USA motion for summary judgment
Deposition of Gary Bailey Dated December 1, 2004 & March 31, 2008
William Clements appraisal report
Copy of Mr. Bailey's complaint for just compensation
Memorandum opinion and order dated September 25, 2007
Order for judgment dated March 31, 2008

PROSPER

PLAT M-1

# SUNNY BEACH




| Lot | Block | |
|---|---|---|
| 1 | 1 | Gary Bailey |
| 2 & 3 | 1 | Dennis Thomson |
| 4, 5 & 6 | 1 | Gary Bailey |
| 7 | 1 | Suzanne Anderson |
| 8 | 1 | David Russell |
| 9 | 1 | Gary Bailey |
| 10 | 1 | Gary Bailey |
| 11 | 1 | Karl Persson |
| 12 | 1 | Gary Bailey |
| 13 | 1 | Gary Bailey |
| 14 | 1 | April Stavig |

65

# PROSPER

MAP 12

TOWNSHIP 163 N RANGE 33 W




| | | | | | |
|---|---|---|---|---|---|
| 5- | 1 | Cary Olson | 30- | 1 | Gary Sherlock |
| | | | | 2 | Lorraine Sherlock |
| 6- | 1 | Michael Neumiller | | 3 | Carl Sherlock |
| | 2 | Craig Neumiller | | 4 | Janice Smidt |
| | 3 | Jeffrey Holmes | | 5 | Scott Sherlock |
| | 4 | Rodney Thompson | | 6 | Paul Olson |
| | 5 | Willie Walker | | 7 | Joyce Hornbaker |
| | 6 | Marlan Pearson | | | |
| | 7 | Scott Woidtke | 32- | 1 | Prosper Properties, LLC |
| | 8 | Craig Neumiller | | | |
| | 9 | Jeffrey Fevold | 33- | 1 | Richard Levy |
| | 10 | Michael Simmonds | | 2 | Robert Bondaruk |
| | 11 | Jeffrey Fevold | | 3 | Michael Smith |

66

# SCOTT PAHLEN REALTY, INC.

Your Friends in Real Estate

59516 State Hwy. 11
WARROAD, MN 56763

www.pahlenrealty.com
E-mail: realty@wiktel.com

OFFICE (218) 386-1800
FAX# (218) 386-1817

## Qualifications of Scott Pahlen
## Certified General Real Estate Appraiser

I. Professional Experience

A. Minnesota Real Estate Broker - 25 years (#0445018)
B. Real Estate Appraiser - 20 years
C. Building Contractor -10 years
D. HUD Fee Appraiser - ND (#2012) MN (#2226)
E. VA Fee Appraiser - MN (#570)
F. MN Appraiser License - Certified General (#4000351)
G. Passed MN Appraiser Examination (Level II Certified)
First offered 3/16/91, taken & passed 3/16/91
H. National Association of Realtors Appraisal Section Founding Member

II. Professional Affiliations

A. National Association of Real Estate Appraisers
B. Minnesota Association of Realtors
C. National Association of Realtors

III. Education (partial list)

A. Thief River Falls Area Vocational Technical Institute
- Degree of Occupational Proficiency in Sales & Marketing
- Farm Appraisal Update
- Financial Investment Analysis with the HP-12C

B. Farm and Land Institute
- Establishing Value of Rural Farm Land

C. MAPA
- Bank Examiners and Regulators Perspective
- Capitalization Rates
- Discounted Cash Flow Analysis
- Market Abstraction
- Retail and Shopping Center Trends
- USPAP and You, Departure Guidelines

D. University of Minnesota
- Appraisers Guide to URAR
- Appraising Troubled Properties
- Property Valuation

E. Eastern Iowa Community College & American Institute of Appraisers
- Standards of Professional Practice

F. Minnesota Assessors
- Property Valuation Short Course

G. Intro to Appraisal Principles 101

H. Intro to Appraisal Principles 102

I. Intro to Appraisal Principles 103

J. Appraiser Standards and Ethics 105

K. Appraisal Standards and Ethics 105

IV. Clients Served (Partial List)

1st Federal Bank, Baudette
1st National Bank, Bemidji
1st National Bank, Cold Spring
1st National Bank, Int'l Falls
1st Natl. Bank, Grand Forks
American Federal Savings Bank
Appraisal Management Co., Inc.
Argyle State Bank
AVCO Financial
Badger State Bank
Bank of America
Better Homes & Gardens
Border State Banks
Boise Employees Credit Union, International Falls
Centrust
Citizens State Bank, Roseau
City of Warroad
Crookston National Bank
Evergreen Land Services
Farmers Home Administration
FBS Mortgage
FGB Realty Advisors
First American Banks
First Banks
Fullerton Financial Corp.
Goldome Realty Credit Corp.
Heigl Mtg. & Financial Corp.
Inland Mortgage Corp.
Investor's Savings Bank, Mpls.
Karlstad State Bank
Knutson Mortgage Corp.
Lenders Service, Inc.
Lumberman's Investment Corp.

Metropolitan Federal Bank
MN Dept. of Transportation
National Wildlife Federation
Northwestern Bell Telephone
Norwest Banks
NW State Bank, Hallock
PHH Homeequity
PHH US Mortgage
Preferred Mortgage Corp.
Quintana Petroleum Corp.
Security Pacific
Security State Bank, Warroad
Small Business Administration
Society National Bank
Staples State Bank
Summit Mortgage Corp.
TRW Real Estate Services
Twin City Federal
University of Minnesota
University of North Dakota
Wabanica Products, Inc.
Wells Fargo Banks
Numerous Others...

**Qualifications of Nels Grafstrom**

Licensed Real Property Appraiser

License # AP-20291486

Expires 8/31/2009

Appraisal Courses

Appraisal 101: Introduction to Appraisal Principles I

Appraisal 102: Introduction to Appraisal Principles II

Appraisal 103: Introduction to Appraisal Practices I

Appraisal 104: Introduction to Appraisal Practices II

Appraisal 105: Introduction to Appraisal Standards and Ethics

Appraisal 106: Appraiser's Guide to Residential Construction

Appraisal 107: How to Perform FHA Appraisals

Understanding Septic Systems

Houses: They don't Build 'em like they used to

National USPAP Update 2003, 2005, 2007

...numerous others

Passed State Exam - May 5, 2001

Passed FHA Appraiser Exam - June 23, 2005

Passed Certified Residential Appraiser Exam - December 21, 2007

Other Education

Bachelor of Science, 2000, United States Air Force Academy
Major: Management

Experience

Working as appraiser since August 20, 2001.

# STATE OF MINNESOTA

PAHLEN, SCOTT H
59516 STATE HWY 11
WARROAD, MN 56763

## Department of Commerce

**The Undersigned COMMISSIONER OF COMMERCE for the State of Minnesota hereby certifies that**

**SCOTT H PAHLEN**

59516 STATE HWY 11
WARROAD, MN 56763

has complied with the laws of the State of Minnesota and is hereby licensed to transact the business of

**Resident Appraiser : Certified General**

**License Number: 4000351**

unless this authority is suspended, revoked, or otherwise legally terminated. This license shall be in effect until August 31, 2009.

**IN TESTIMONY WHEREOF, I have hereunto set my hand this August 28, 2007.**

Glenn Wilson

**COMMISSIONER OF COMMERCE**

Minnesota Department of Commerce
Licensing Division
85 7th Place East, Suite 500
St. Paul, MN 55101-3165
Telephone: (651) 296-6319
Email: licensing.commerce@state.mn.us
Website: commerce.state.mn.us

**Continuing Education:**

| CE Requirement Type | CE Required Hours |
| --- | --- |
| Total - Appraiser | 30 |
| USPAP | 7 |

**Notes:**

- **Continuing Education:** 15 hours is required in the first renewal period, which includes a 7 hour USPAP course. 30 hours is required for each subsequent renewal period, which includes a 7 hour USPAP course.
- **Appraisers:** You must hold a licensed Residential, Certified Residential, or Certified General qualification in order to perform appraisals for federally-related transactions. **Trainees do not qualify.** For further details, please visit our website at commerce.state.mn.us.

# STATE OF MINNESOTA

## Department of Commerce

GRAFSTROM, NELS HENRY
33432 COUNTY RD 13
SALOL, MN 56756

**The Undersigned COMMISSIONER OF COMMERCE for the State of Minnesota hereby certifies that**

**NELS HENRY GRAFSTROM**

33432 COUNTY RD 13
SALOL, MN 56756

has complied with the laws of the State of Minnesota and is hereby licensed to transact the business of

**Resident Appraiser : Licensed Residential**

**License Number: 20291486**

unless this authority is suspended, revoked, or otherwise legally terminated. This license shall be in effect until August 31, 2009.

**IN TESTIMONY WHEREOF, I have hereunto set my hand this August 28, 2007.**

Glenn Wilson

**COMMISSIONER OF COMMERCE**

Minnesota Department of Commerce
Licensing Division
85 7th Place East, Suite 500
St. Paul, MN 55101-3165
Telephone: (651) 296-6319
Email: licensing.commerce@state.mn.us
Website: commerce.state.mn.us

**Continuing Education:**

| CE Requirement Type | CE Required Hours |
|---|---|
| Total - Appraiser | 30 |
| USPAP | 7 |

**Notes:**

- **Continuing Education:** 15 hours is required in the first renewal period, which includes a 7 hour USPAP course. 30 hours is required for each subsequent renewal period, which includes a 7 hour USPAP course.
- **Appraisers:** You must hold a licensed Residential, Certified Residential, or Certified General qualification in order to perform appraisals for federally-related transactions. **Trainees do not qualify.** For further details, please visit our website at commerce.state.mn.us.

6-2200-15413-2

STATE OF MINNESOTA
OFFICE OF ADMINISTRATIVE HEARINGS
FOR THE MINNESOTA POLLUTION CONTROL AGENCY

In the Matter of Gary Bailey – MPCA Section 401 Certification

**FINDINGS OF FACT, CONCLUSIONS AND RECOMMENDATION**

A public hearing in this matter was held on July 23, 24 and 25 in the Lake of the Woods County Courthouse in Baudette, Minnesota.

Appearing on behalf of the Minnesota Pollution Control Agency (hereinafter "MPCA") staff was Assistant Attorney General Richard P. Cool, 445 Minnesota Street, Suite 900, St. Paul, MN 55101-2127.

Appearing on behalf of Gary Bailey ("Bailey" or "Respondent") was Alan B. Fish, Alan B. Fish, P.A., Attorney at Law, 109 Second Street NE, Roseau, MN 56751.

The record in this matter closed on September 4, 2003, when the Administrative Law Judge was informed that Respondent would not be filing a brief.

**NOTICE**

This report is a recommendation, not a final decision. The Minnesota Pollution Control Agency Board will make the final decision after a review of the record. The Board may adopt, reject or modify the Findings of Fact, Conclusions, and Recommendations. Under Minn. Stat. § 14.61, the final decision of the Board shall not be made until this Report has been made available to the parties to the proceeding for at least ten days. An opportunity must be afforded to each party adversely affected by this Report to file exceptions and present argument to the Board. Parties should contact Darlene Sigstad, Board Secretary, at 651-296-7306 to learn the procedure for filing exceptions or presenting argument.

If the Board fails to issue a final decision within 90 days of the close of the record, this report will constitute the final agency decision under Minn. Stat. § 14.62, subd. 2a. The record closes upon the filing of exceptions to the report and the presentation of argument to the Board, or upon the expiration of the deadline for doing so. The Board must notify the parties and the Administrative Law Judge of the date on which the record closes.

Under Minn. Stat. § 14.62, subd. 1, the agency is required to serve its final decision upon each party and the Administrative Law Judge by first class mail or as otherwise provided by law.

## STATEMENT OF ISSUE

Was it appropriate, and consistent with Minn. Rule pt. 7001.0140, for the MPCA to have revoked the Section 401 Certification previously issued to Gary Bailey in connection with construction of a road and the development of a residential subdivision along the southern shore of Lake of the Woods?

Based upon all of the proceedings herein, the Administrative Law Judge makes the following:

## FINDINGS OF FACT

1. Lake of the Woods County was originally part of Beltrami County, but was split off in 1922 when, as a long-term county resident put it, "I think Beltrami County threw it away..., didn't know what to do with it."[1] The reality behind this quip is that the County is physically large (1,297 square miles), but only sparsely populated (4,522 persons in 2000).[2] Tax forfeited land is not uncommon in the areas of the County inland from the lakeshore of Lake of the Woods.[3]

2. Walter Leu, who served as the County Highway Engineer and as the Wetlands Administrator for a time, stated that 90% of the land in the County would qualify as a wetland.[4] Gary Lochner, who both preceded and succeeded Walter Leu as wetlands administrator, said the County had a "very high percentage" of bog, and that the population settled around the lakes because the shoreland areas were drier than the inland peat bogs.[5]

3. Type 7 wetlands are so common in the county that they are not highly valued by local government officials. Walter Leu believed that Type 3 or Type 4 wetlands were the "really important" ones, the ones worth identifying and protecting and, when possible, creating. Type 7 wetlands, on the other hand, were less important and if they could be drained or otherwise made suitable for lots or other economic development, he thought that was a good use for them.[6]

4. In the late 1980s, Gary Bailey (hereinafter "Bailey") purchased a 65-acre parcel of land adjacent to Lake of the Woods.[7] Bailey placed most of the parcel into

---

[1] Test. of Gary Lockner, Tr. 480.
[2] Statistics are as of the 2000 census, taken from the County's Official website, as viewed on September 22, 2003. See www.co.lake-of-the-woods.mn.us/statistics.htm.
[3] Hr'g Ex. 57, p. 11 and 13.
[4] Test. of Walter Leu, Tr. 217.
[5] Test. of Gary Lockner, Tr. 480-481 and 506.
[6] Test. of Walter Leu, Tr. 220-222.
[7] *Bailey v. United States Army Corps of Engineers, et al.*, No. CIV 02-639, 2002 WL 31728947 at *3 (D. Minn. Nov. 21, 2002). A comprehensive factual background regarding the COE's permit application history, including some background relevant to this proceeding, is set forth in this November 2002 order. Many of the facts set forth in this Report are taken from that Order, and are adopted by the ALJ as his own.

agricultural use but kept an approximate 13-acre portion of the parcel along the shoreline in a natural state.[8] Almost all of this approximate 13-acre parcel is a Type 7 wetland.[9] Bailey constructed an access road for a residential/recreational development to be known as "Sunny Beach" in this parcel. He did not seek a permit from the Corps of Engineers prior to building the road. Only later was this construction the subject of a COE Section 404 after-the-fact permit application. The project site is located in the NE1/4 of the SW1/4, Section 21, T. 163N., R. 33W, Prosper Township, Lake of the Woods County, Minnesota.[10] As approved by the County Board in late 1998, the plat had 14 lots, averaging 33,700 square feet each, with roughly 100' of shorefront each being roughly 300 feet deep.[11] The road was built along the westerly edge of the plat, and the lots ran from the road to the lake.[12]

5. Bailey constructed the new access road in the approximate 13-acre Type 7 wetland in 1998.[13] Bailey constructed the road by clearing a 66-foot wide zone through a 1493-foot long portion of the Type 7 forested wetland area.[14] Bailey excavated two drainage ditches, one on each side of the new road, and used the excavated material to construct the road.[15]

6. On December 22, 1998, the County Board rezoned the land in the "Sunny Beach" plat and approved the final plat.[16] Those actions were based upon a memorandum[17] from Gary Lockner, who was the County Zoning officer. The memorandum described the presence of standing water on parts of the plat, but opined that the ground could support structures if a drainage system could lower the water table 2 to 2.5 feet and fill was placed on the land as part of the construction process. The memo also noted that:

> The entire frontage of the proposed plat is floodplain. Mound systems are required by County, State and Federal regulations in floodplains. The LOW Zoning office will grant septic system

[8] *Id.*

[9] *See* Findings 23 through 26.

[10] COE Public Notice, Hr'g Ex. 2, p. 1. This Report will refer to the exhibits introduced at the MPCA contested case hearing as "Hr'g Ex.__."

[11] Hr'g. Ex. 39, p. 4.

[12] Hr'g Ex. 33, p. 2.

[13] COE Public Notice, Hr'g Ex. 2, p. 1. In June, 1998, the COE staff visited Bailey's wetland site and found Bailey had done mechanized landclearing in the wetlands as a first step in constructing the access road. *Bailey*, 2002 WL 31728947 at *3. The roadway bisected the forested wetland, running parallel to the shoreline between 260-400 feet from the lake. *Id.* At the time of the COE visit, Bailey had not yet brought in fill material or excavated the drainage ditches on either side of the proposed road. *Id.* Both orally and in writing, COE told Bailey to cease work on the road, but he did not. *Id.*, Eggers Test. Tr. 340-341, and Koschak Test. Tr. 359.

[14] *Id.* and Sunny Beach Plat Map (page 2 of 5).

[15] *Id.* at 1-2 and Road Plan View and Cross-Section (page 3 of 5). Although Bailey proceeded with completing the road in 1998, Bailey did not receive final plat approval for the Sunny Beach development until late December, 1998. *Bailey*, 2002 WL 31728947 at *4.

[16] Hr'g. Ex. 56, p. 2

[17] *Id*, p. 1.

> permits for mound systems in the proposed Baily plat. Approval of the septic system permits is subject however to improved drainage at each site that lowers the water table to levels acceptable to ISTS (Individual Sewage Treatment System) design standards.[18]

There is no evidence to suggest that a drainage system as suggested by Lochner was ever built or even engineered. But several of the lots that were sold were cleared and in eight lots, fill was placed on them. They are now subject to Restoration Orders issued by the county SWCD.[19]

7. In May, 1999, Bailey resubmitted his Minnesota Wetland Conservation Act ("WCA") wetland replacement plan application to Lake of the Woods County ("LOW" or "County").[20] Bailey had to redo the original plan because it did not provide for the appropriate types of compensatory mitigation.[21] Bailey's resubmitted replacement plan proposed the creation of 2.9 acres of Type 3 wetland at another location in the County and the plan required that construction of the replacement wetland was to be completed no later than October 31, 1999.[22] Gary Lockner, the LOW Office of Environmental Services director, approved Bailey's replacement plan in June, 1999.[23]

8. On June 24, 1999, the COE issued a public notice regarding Bailey's application for an after-the-fact Section 404 permit to retain fill and dredged material discharged into the Sunny Beach wetlands for purposes of constructing the access road.[24] The COE notice also indicated that the LOW Soil and Water Conservation District ("SWCD") had determined that the road project would impact 2.91 acres of wetland and that this impact determination took into account the drainage effect created by the two new ditches that flowed south into an older, deeper ditch that discharged to the lake.[25] The 2.91-acre impact estimate was based on roadbed fill that affected approximately 1.58 acres and on the lateral drainage effect of 19.5 feet (lateral distance) of each ditch. Based on the estimated 1493-foot road length and the estimated 19.5-foot drainage effect, the estimate indicated that the two 1.5-foot deep ditches would have a lateral drainage effect of approximately 1.34 acres.[26] The COE

[18] *Id.*

[19] Test. of Les Lemm, Tr. 185. LOW Co. SWCD.

[20] Notice of WCA Application, Hr'g Ex. 25.

[21] Testimony of Les Lemm, Tr. 170.

[22] Hr'g Ex. 25, pp. 2-3 of 5.

[23] *Id.*, p. 5 of 5.

[24] Hr'g Ex. 2.

[25] *Id.*, p. 2.

[26] *Id.*, Road Plan View and Cross-Section (p. 3 of 5). During the August 2000 wetland delineation, COE staff observed that the drainage ditches along the road exceeded the planned 1.5-foot depth, and were in the 1.5-2.0 foot depth range. Koschak e-mail, Hr'g Ex. 14. In assessing the lateral drainage effects of the ditches, the COE used the lower range of a 1.5 foot-depth to make its determination that the ditches would drain 4.97 acres of wetland. *Id.* In fact, the LOW SWCD measured these road ditches and found that the ditches were approximately 2.0 feet in depth. Testimony of Les Lemm ("Lemm Test."), Tr. 185-86, 530-32. The deeper the ditch, the greater the lateral drainage effect within the wetland. Heschke facsimile, Hr'g Ex. 40. But the ditches were not deep enough to draw down 2.0 to 2.5 feet of water in the areas that Lochner had identified as suitable for mound septic systems. See Finding 6 above.

notice indicated that the replacement plan described the compensatory mitigation work "the applicant has agreed to perform."[27] The COE public notice is considered Bailey's application to MPCA for the Section 401 certification.[28]

9. MPCA's review of the COE public notice identified several concerns with the Bailey project. First, the notice raised an issue about the extent of the wetland in the project site and whether compliant individual sewage treatment systems ("ISTSs") could be installed on these lots.[29] Second, the notice indicated the access road's purpose was for residential development which could then have additional secondary impacts on the wetlands and wetland functions.[30] The notice only addressed the road impacts and not the residential development impacts. The residential development impacts caused MPCA concern that the mitigation sequence requirements in the water quality nondegradation standards, Minn. R. 7050.0186, were not being addressed.[31]

10. In light of these concerns, MPCA issued a request for information ("RFI") on July 23, 1999 to Bailey seeking additional information regarding the impacts of the proposed project.[32] The RFI requested Bailey to submit information on three substantive issues. First, the RFI noted MPCA's concern that the secondary and cumulative impacts on the wetlands from the lot development associated with the direct impacts of the road should not be ignored.[33] The RFI requested Bailey to submit a layout of the entire project area showing all existing wetlands on the access road site and the lot sites and to evaluate the predictable potential impacts to these wetlands from lot development in order to get a determination of the total wetland impact of the project.[34] MPCA noted that if there was no upland or minimal upland (i.e., non-wetland area) on the lots, the need and justification for the access road should be reconsidered.[35]

11. Second, MPCA's RFI noted that the siting of ISTSs for the lots had not been specified. The RFI requested that Bailey submit information demonstrating how compliance with the ISTS rules, Minn. Rules ch. 7080, would be accomplished.[36] Third, the RFI noted that the COE public notice did not indicate how compliance with the wetland avoidance and minimization requirements of the Section 404(b)(1) guidelines and MPCA's avoidance nondegradation requirements, Minn. R. 7050.0186, subp. 4,

---

[27] *Id.* p. 2.
[28] Testimony of Larry Zdon ("Zdon Test."), Tr. 32.
[29] Zdon Test, Tr. 32. Compliant ISTSs require three-feet of unsaturated soils in order to fulfill the two basic functions of an ISTS, sewage treatment and hydraulic performance. Testimony of Mark Wespetal ("Wespetal Test."), Tr. 396-400. A mound system can be used to obtain the 3-foot treatment area but even a standard mound system is required to have at least 12 inches of unsaturated original soil in the absorption area. Zdon Test., Tr. 63-64; Wespetal Test., Tr. 401-06; Minn. R. 7001.0170, subp. 5.A.(2) (Supp. 2002).
[30] *Id.*
[31] *Id.*, Tr. 43.
[32] Zdon Test., Tr. 42; Hr'g Ex. 6.
[33] Hr'g Ex. 6, p. 2.
[34] *Id.*
[35] *Id.*
[36] Hr'g Ex. 6, p. 2.

were going to be achieved.[37] The RFI indicated that impact avoidance had to be addressed to show compliance with the water quality standards and then requested that Bailey submit information related to this issue for MPCA's review.[38]

12. Bailey did not respond to MPCA's RFI regarding these three substantive issues.[39]

13. On August 20, 1999, COE staff reported to Zdon that they thought the Bailey lots were all Type 7 wetland with saturated soils as shallow as six inches below the surface and that the lots would require additional filling for access and structures.[40] Despite those conditions, the COE staff person indicated that Gary Lockner, the County Zoning officer, was going to issue permits to allow ISTS construction in wetlands.[41] The COE staff person also indicated that he wanted the road ditches plugged to eliminate further drainage of the wetlands.[42]

14. Zdon then talked to Gary Lockner, the County Zoning officer, about the Bailey site.[43] Lockner indicated that the County WCA Technical Evaluation Panel ("TEP") would be doing a wetland delineation.[44] Lockner told Zdon that there were no wetlands in the project site within the nearest 100 feet of the lake.[45] Lockner also stated that there was at least one foot of unsaturated soils toward the lakeshore that would provide suitable sites for installation of mound system ISTSs.[46]

15. On September 17, 1999, the County granted Bailey an extension on the implementation and completion of his WCA wetland replacement plan.[47] The extension required Bailey to complete all construction in the replacement plan by July 1, 2000.[48] Subsequently, Bailey informed the COE that he was not going to implement the compensatory mitigation in his WCA replacement plan because Bailey considered

[37] *Id.*, p. 3.
[38] *Id.*
[39] Zdon Test., Tr. 50.
[40] Zdon Test., Tr. 52-54; Hr'g Ex. 9.
[41] Hr'g Ex. 9.
[42] Zdon Test., Tr. 53: Hr'g Ex. 9, p. 2.
[43] Zdon Test. Tr. 62-65.
[44] *Id.*, Tr. 63.
[45] *Id.*, Tr. 64-65.
[46] *Id.*, Tr. 62-63. The existence of at least one-foot of unsaturated soils is important for the purposes of installing standard ISTS mound systems. Mr. Lockner, director of the LOW County Office of Environmental Services ("OES"), asserted that ISTS mound systems could be installed at the Bailey site. OES Letter, Hr'g Ex. 10. Under MPCA ISTS rules, the upper 12 inches of the mound absorption area must be unsaturated soils (i.e., above saturated soils). Minn. R. 7080.0170, subp. 5.A.(2) (Supp. 2002). The one-foot of unsaturated soils for mound systems is needed for proper treatment of the pathogens, bacteria, viruses and other pollutants of the partially treated sewage entering the ground and for hydraulic performance of the mound system, so that water can flow away from the system. Wespetal Test., Tr. 396-97, 401-02.
[47] Lemm Test., Tr.174; Hr'g Ex. 26.
[48] *Id.*, Hr'g Ex. 26.

himself as just another lot owner.[49] Bailey never implemented the WCA replacement plan and that plan is no longer valid.[50]

16. In October, 1999, MPCA staff again talked to Lockner about the Bailey site. They discussed whether there were adequate upland (non-wetland) areas for the installation of ISTSs.[51] Lockner told MPCA staff that the TEP had been to the site and determined that there were adequate soils, with at least one foot of unsaturated soils along a 100-foot band paralleling the lakeshore, for ISTSs. Lockner indicated that a letter reflecting these findings was being forwarded to MPCA.[52]

17. By letter dated October 14, 1999, Lockner notified MPCA that the TEP had conducted a site visit on September 29 to determine the high ground water table at the building sites in the Bailey plat.[53] The OES letter stated that gravelly subsoils were located between the 50-foot setback for septic systems and the 75-foot setback line for structures.[54] The OES letter also asserted that because of these coarse, gravelly subsoils, saturated soil conditions could not be established in the upper one foot of the soil "within 100 feet of the lakeshore."[55] While acknowledging that a formal wetland delineation had not been conducted, the OES letter asserted that the soil conditions in this 100-foot corridor nearest the lake would allow for mound systems.[56] Finally, the OES letter stated that ISTSs would not be permitted further from the lakeshore than 100 feet because of the existence of saturated soil conditions in these inland areas.[57] The letter was drafted by Lockner, but signed by Lockner, Les Lemm, and Dale Krystosek. Lemm was a Resource Specialist with LOW Soil and Water Conservation District. Krystosek was a Board Conservationist with the State Board of Water and Soil Resources.

18. The October 14, 1999 OES letter was an important factor in MPCA's decision to eventually issue a Section 401 certification for the Bailey project.[58] Only later did MPCA find out that the OES letter's statements and determinations were based on only one soil sample located in the exact location where the COE's wetland delineation would later identify a small island of upland.[59] Krystosek and Lemm later testified that the one soil sample and the assertions derived from that sample did not accurately represent the soil conditions of the entire 100-foot corridor nearest the lakeshore in the plat.[60] Krystosek and Lemm did agree that the letter was accurate regarding the fact that saturated soil conditions further inland from the lakeshore (i.e.,

---

[49] COE Decision Document, Hr'g Ex. 36, p. COE 541.
[50] Lemm Test., Tr. 175-76.
[51] Zdon Test., Tr. 65.
[52] *Id.*
[53] OES Letter, Hr'g Ex. 10.
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] Zdon Test., Tr. 75-76.
[59] Testimony of Dale Krystosek (Kyrstosek Test.). Tr. 155, 158-60; Lemm Test.; Tr. 186-90.
[60] Krystosek Test., Tr.160; Lemm Test., Tr. 188-89.

areas greater than 100' from the lake) would prevent the installation of septic systems in those locations.[61]

19. In early November, 1999, MPCA staff were contacted by Jeff Koschak, the COE project manager, about the COE's permit review status.[62] Koschak told MPCA that it was his intention to draft a provisional Section 404 permit authorizing the retention of the 1.58 acres of fill related to the road bed construction but also requiring that the road ditches be filled back in.[63] In light of the COE's intentions to proceed with the provisional permit, MPCA staff completed its deliberations and evaluations on the Section 401 application based on the information that had been provided.[64]

20. By MPCA letter dated December 17, 1999, MPCA issued its Section 401 certification for the Bailey road project identified in the COE's June 1999 public notice.[65] The Section 401 certification was limited to the project's 1.58 acres of wetland fill for the road based on the COE notice. It assumed, but did not state, that the COE would require the plugging of the road ditches.[66] The certification was expressly conditioned on Bailey's implementing the compensatory mitigation to replace the lost wetland functions and designated uses for unavoidable wetland impacts to satisfy a portion of MPCA's wetland nondegradation requirements, Minn. R. 7050.0186, subp. 6.[67]

21. Issuance of MPCA's Section 401 certificate was principally based on four factors. First, the certificate only addressed the road impacts because the COE indicated that its intended provisional permit would only address the road impacts, despite MPCA's earlier efforts to get Bailey and the COE to consider both the primary impacts of the road and the secondary and cumulative impacts of lot development related to the road construction.[68] Second, MPCA believed that the original estimated 2.91 acres of wetland impact identified in the COE June notice would be reduced to only the 1.58 acres of impact from the road fill. The additional 1.33 acres of wetland impact associated with the lateral drainage effect would be eliminated due to COE's expressed intention of issuing a permit that required the road ditches to be plugged.[69] Third, MPCA expected that Bailey would implement the compensatory mitigation in the WCA replacement plan identified in the COE June notice.[70] Fourth, MPCA relied on the October 14, 1999 OES letter as accurately representing the conditions of the Bailey site in regard to the availability of unsaturated soils on which ISTS mound systems could be installed and operated in compliance with the ISTS rules, Minn. R. chapter 7080.[71]

[61] Krystosek Test., Tr. 160; Lemm Test., Tr. 190.
[62] Zdon Test., Tr. 74-75.
[63] *Id.*
[64] *Id.*, Tr. 75-77.
[65] Zdon Test., Tr. 77; Hr'g Ex. 12.
[66] *Id.*, Tr. 77; Hr'g Ex. 12.
[67] Hr'g Ex. 12.
[68] *See* Hr'g Ex. 6.
[69] Zdon Test., Tr. 76.
[70] *Id.*, Tr. 76-77.
[71] *Id.*, Tr. 75-76.

22. Despite the COE's representations in early November, 1999 about the intentions to draft a provisional permit, no such permit was ever issued or sent to MPCA.[72] The COE was questioning the accuracy of information that had been submitted concerning wetlands at the site.[73] The COE was still concerned with the extent of the wetlands on the Bailey site and those COE concerns now included the proposed residential lots and the impact of lot development on any existing wetlands in the plat.[74] These concerns were communicated to Lockner, and by OES letter dated July 24, 2000, Lockner notified Bailey of the COE's concerns and Lockner requested that Bailey conduct a wetland delineation on the entire plat to determine the type, extent and location of all wetlands on the plat.[75] Bailey did not conduct a wetland delineation and did not submit the requested information.[76]

23. In late August, 2000, COE staff and staff from the U.S. Department of Agriculture's Natural Resources Conservation Service ("NRCS") conducted a formal on-site wetland delineation of the Bailey Sunny Beach plat.[77] A wetland delineation is designed to determine the extent of wetlands on a site by assessing three key factors: (1) the presence of hydric soils; (2) the presence of inundated or saturated soils to support hydorphytic wetland vegetation; and (3) the prevalence of wetland vegetation.[78] COE and NRCS staff had originally planned to do a total of eight (8) transects of the Bailey plat, but after three transects they determined that the results were so consistent that they reduced the number of transects to five (5). The fourth and fifth transects were done to confirm the consistency of the predominance of the wetland's presence throughout the entire plat.[79]

24. In addition to the delineation, COE staff and Les Lemm surveyed the lots to determine the nature and extent of clearing and filling that had occurred on the lots.[80] Based on the late August delineation, the COE determined that the Bailey plat consisted almost entirely of Type 7 forested wetland except for upland in two locations: a small, isolated island of upland between Lots 3 and 4, and upland on Lot 1 created by the lateral drainage effect of the old ditch running along the south border of Lot 1.[81] The COE's Steve Eggers concluded that, overall, "99 percent of the project site was composed of wetlands prior to the unauthorized fill."[82] Eggers determined that the Bailey plat was a "high quality wetland" that provided numerous important wetland functions such as shoreland protection, high quality wildlife habitat, biodiversity and integrity and water quality protection.[83] COE and NRCS experts determined that

---

[72] Zdon Test., Tr. 79.
[73] Lemm Test., Tr. 178.
[74] *See* Hr'g Ex. 27.
[75] Hr'g Ex. 27.
[76] Lemm Test., Tr. 176-79.
[77] Testimony of Steve Eggers ("Eggers Test."), Tr. 244-286; COE Data Sheets, Hr'g Ex. 33; COE Decision Document, Hr'g Ex. 36.
[78] *Id.*, Tr. 240.
[79] *Id.*, Tr. 248-49, 256-57.
[80] Testimony of Jeff Koschak ("Koschak Test."), Tr. 346-47.
[81] *See* Eggers Test., Tr. 256-258; COE Data Sheets, Hr'g Ex. 33, p. COE 299.
[82] Hr'g Ex. 14, p. 2 (Eggers-to-Koschak e-mail, Sept. 13, 2000, 5:16 p.m.).
[83] Eggers Test., Tr. 286-87.

Lockner's 100-foot-corridor-of-upland theory was not supported by their field observations.[84]

25. During the late August, 2000 delineation, COE staff also observed that the new ditches along both sides of the access road were 1.5-2.0 feet deep.[85] Rod Heschke, the NRCS soil scientist that assisted in the delineation, determined, that based on the Wabanica soils series on this site, the lateral drainage effect of a 2.0-foot deep ditch would be 105 feet.[86] Using the lower 1.5-foot depth of the 1.5-2.0 foot range of observation, the COE determined that the new road ditches would have at least a lateral drainage effect distance of 79 feet.[87] Excluding the lateral effect of the old ditch on the south end of the plat, the COE determined that the new road ditches would drain 4.97 acres of wetland, an amount substantially above the approximate 1.33 acres of ditch drainage that was identified in the COE's June 1999 notice.[88] This 4.97 acres of ditch drainage impact was in addition to the 1.58 acres of wetland impact due to road fill.[89]

26. In late September, 2000, COE staff conveyed information, results and determinations of their wetland delineation to MPCA.[90] That information included the COE's determination that the entire Bailey plat was wetlands except for the small upland island between lots 3 and 4 and the upland resulting from the drainage from the old, existing ditch along the plat's south border.[91] The COE indicated that the site was virtually all (i.e., 99%) wetlands consisting of a high quality wooded wetland.[92] The COE also conveyed information regarding its determination that the lateral drainage effect of the new road ditches was 4.97 acres.[93] The COE also submitted a plat map and tabulations to MPCA showing the extent of vegetation clearing and fill occurring on individual lots for driveways and ditch crossings.[94] The Administrative Law Judge adopts the findings and determination of the COE as his own.

27. After reviewing this new COE information, MPCA staff called both Koschak and Eggers and confirmed the delineation findings that there was no upland corridor existing in that 100-foot corridor near the shoreline as had been asserted by the County OES in Lockner's October 14, 1999 letter.[95]

28. The MPCA staff team evaluated this additional information in light of what information had been conveyed to MPCA through the COE public notice, COE staff

---

[84] *Id.*, Tr. 274.
[85] Hr'g Ex. 14.
[86] Hr'g Ex. 40.
[87] Koschak Test., Tr. 350-53; Hr'g Ex. 14 (Koschak-to-MPCA e-mail), p. 1.
[88] Hr'g Ex. 14, p.1; *see* Eggers Test., Tr. 281; COE Decision Document, Hr'g Ex. 36, pp. COE 535, 538.
[89] Hr'g Ex. 14, p. 1.
[90] Zdon Test., Tr. 80-81, 89-92; Hr'g Exs. 13, 14 and 15.
[91] Zdon Test., Tr. 89, 92; Hr'g Ex. 14, p. 2 (Eggers-to-Koschak e-mail, Sept. 13, 2000, 5:16 p.m.).
[92] Zdon Test., Tr. 89.
[93] *Id.;* Hr'g Ex. 14, p. 1.
[94] Zdon Test., Tr. 92; Hr'g Ex. 15.
[95] Zdon Test., Tr. 95-96.

communications and information submitted by Lockner.[96] MPCA had still not received any information from Bailey in response to MPCA's July, 1999 RFI.[97] By the early fall of 2000, MPCA's deliberations and evaluations centered on four main areas: (1) MPCA's continuing concern that the road assessment not be segmented from the impacts of the lot development; (2) the COE wetland delineation refuting the October, 1999 OES letter about the presence of any upland within the 100-foot corridor of the shoreline; (3) the compensatory mitigation in the WCA replacement plan identified in the COE's public notice addressing the original wetland-impact estimate of 2.91 acres being inadequate to compensate for the additional wetland impacts determined by the COE delineation; and (4) because virtually the entire plat was wetland, the lack of assurance that ISTSs could be installed that would comply with the MPCA rules.[98] Given the lack of information and uncertainty on these issues, MPCA determined it could not modify the existing Section 401 certificate to address these unknowns and uncertainties, and decided that the certificate should be revoked.[99]

29. On October 4, 2000, the MPCA revoked Bailey's Section 401 certificate.[100] The MPCA revocation indicated that the secondary and cumulative wetland impacts must not be segmented and that those additional impacts had to be considered as part of this permitting process.[101] The MPCA revocation also noted that the COE delineation had demonstrated the lack of any upland, or minimal upland, for ISTS locations and that this situation required further evaluation of the developability of the lots as justification for the access road.[102] Finally, the MPCA revocation stated that the COE's delineation indicated that the true impact of the road project was 6.55 acres consisting of 4.97 acres due to ditch drainage impact and 1.58 acres of road fill.[103] The MPCA revocation expressly notified Bailey that if he chose to reapply for a certificate, Bailey needed to submit additional information regarding: (1) the entire extent of wetlands on the road and lot sites and the total wetland impact from the road and lot development; (2) demonstration on how Bailey was going to comply with the MPCA's ISTS rules, Minn. R. chapter 7080, for any proposed septic system installations; and (3) a demonstration on how Bailey was going to comply with the MPCA's nondegradation wetland mitigation sequence in Minn. R. 7050.0186, subp. 4, to avoid and minimize wetland impacts.[104]

30. In addition to the wetland delineation, the COE staff prepared a Minnesota Routine Method for Wetland Functional Assessment ("MnRAM") of the Bailey plat.[105] MnRAM documents the functions that a wetland provides and determines what functions are lost due to project impacts.[106] The Bailey MnRAM analysis demonstrated

[96] Zdon Test., Tr. 94-95.
[97] *Id.*, Tr. 96.
[98] Zdon Test., Tr. 94-100.
[99] *Id.*, Tr. 100.
[100] MPCA Revocation Letter, Hr'g Ex. 16.
[101] *Id.*
[102] *Id.*
[103] *Id.*, p. 2.
[104] *Id.*, p. 2.
[105] Eggers Test., Tr. 274.
[106] *Id.*, Tr. 243.

that this wetland complex had high functional ratings for many of the wetland functions.[107] Using MnRAM, Eggers determined that Bailey's dredging and filling had significantly impaired several wetland functions including ground water interaction, wetland hydrology and stormwater attenuation.[108]

31. The COE's final decisional analysis included an environmental assessment that incorporates the findings of the delineation and MnRAM analyses.[109] That decisional analysis also takes into account the 404(b)(1) guideline determinations.[110] After completing these analyses on June 12, 2001, the COE denied Bailey's application for an after-the-fact Section 404 permit.[111] In making this final decision, the COE determined that the road and lot development were directly related so the COE's environmental analysis assessed not only the road and ditch impacts but also the potential lot development and its associated impacts.[112] In concluding these aspects were directly related, the COE determined that the sole purpose of the dead-end road was to provide access to the lots in the plat.[113]

32. The COE also revised its estimated wetland impacts from the unauthorized road project to approximately 7.04 acres (1.45 acres of fill, 0.63 acres of ditch excavation and 4.96 acres of lateral drainage effect) instead of the 2.91 acres stated in the COE's June 1999 public notice.[114] Approximately 2.08 acres of wetland had already been destroyed by the road fill and ditch excavation and approximately 1.30 acres of hardwood wetland had already been destroyed or altered due to lot development.[115] The COE determined that ultimate lot development would result in an additional 2.98 to 7.46 acres of wetland fill (minimum lot development and maximum lot development, respectively).[116] The COE also determined that Bailey's proposed compensatory mitigation was inadequate and unacceptable because it did not replace the lost wetland functions of the hardwood swamp, the proposed mitigation site was 15 miles inland and away from the lake, and that the replacement wetland would be a low quality, low functioning wetland.[117]

33. In October, 2001, the COE issued a restoration order directing Bailey to remove the access road, fill in the ditches and return the area to its natural wetland state.[118] The restoration order required the restoration work to be completed between

---

[107] *Id.*, Tr. 275; MnRAM Evaluation, Hr'g Ex. 35, p. COE 583.
[108] Eggers Test., Tr. 275, 279; Hr'g Ex. 35, p. COE 583.
[109] Eggers Test., Tr. 279-80.
[110] *Id.*, Tr. 284, 287-88.
[111] COE Decision Document, Hr'g Ex. 36.
[112] Eggers Test., Tr. 280-81; *see* Hr'g Ex. 36, p. COE 535.
[113] *Id.*, p. COE 540.
[114] Hr'g Ex. 36, p. COE 535.
[115] *Id.*
[116] *Id.*, p. COE 541.
[117] Eggers Test., Tr. 282-83; Hr'g Ex. 36, pp. COE 541-43. Subsequent to the COE denial, Bailey submitted a second mitigation proposal to the County and to the COE. Eggers Test., Tr. 288-290; Bailey's July 25, 2001 Letter, Hr'g Ex. 37. The COE subsequently determined that this proposal was not suitable compensatory mitigation. Eggers Test., Tr. 289; COE Response, Hr'g Ex. 38.
[118] Eggers Test., Tr. 290-91; COE Restoration Order, Hr'g Ex. 39.

July 1 and August 15, 2002.[119] As of the conclusion of the contested case hearing in July of 2003, the required restoration had not been implemented by Bailey.[120] As of August 7, 2003, the COE had not begun a civil action to enforce its restoration order.[121]

34. In March 2002, Bailey sued the COE, MPCA, the Minnesota Department of Natural Resources and Lake of the Woods County in federal district court seeking judicial review of the defendants' various regulatory actions and asserting takings claims against the defendants. In November, 2002, the Court dismissed all of Bailey's claims against the state agencies and Lake of the Woods County.[122] On August 7, 2003, the Court issued its final order and judgment upholding the COE's denial of Bailey's application for an after-the-fact Section 404 permit and dismissing Bailey's complaint with prejudice.[123]

35. Subsequent to MPCA's October 2000 revocation, MPCA staff learned of two other pieces of information that were not available to MPCA at the time of its deliberations on the Section 401 revocation determination in the fall, 2000.[124] First, MPCA was apprised that Bailey's WCA replacement plan had not been implemented and that the plan was no longer valid.[125] The implementation of the compensatory mitigation in that WCA replacement plan, as it was noticed in the COE's June 1999 public notice, was expected to satisfy MPCA's wetland nondegradation requirements, Minn. R. 7050.0186.[126]

36. Second, MPCA subsequently learned that a significant portion of the Bailey plat was floodplain.[127] This project site restriction would have been integral to MPCA's deliberations because the presence of floodplain further complicates the installation of standard ISTSs and compliance with state rules requiring minimum lot sizes to accommodate ISTS installations.[128]

37. Standard ISTSs are prohibited from being located or installed in floodplains.[129] MPCA's ISTS rules require that all lots created after January 23, 1996 by local government zoning must have enough suitable land surface area for two standard ISTS soil treatment areas.[130] In addition, Minnesota's shoreland regulations also require minimum lot sizes sufficient for the construction of two standard soil treatment

---

[119] Hr'g Ex. 39, p. 2.
[120] Eggers Test., Tr. 292.
[121] *Bailey v. United States Army Corps of Engineers, et al.*, No. CIV. 02-639, 2003 WL 21877903 at *3 (D. Minn., Aug. 7, 2003).
[122] *Bailey*, 2002 WL 3178947 at *14.
[123] *Bailey v. United States Army Corps of Engineers*, No. CIV. 02-639, 2003 WL 21877903 at *5-6 (D. Minn. Aug. 7, 2003).
[124] Zdon Test., Tr. 102-05.
[125] *Id.*, Tr. 102; Lemm Test., Tr. 175-76.
[126] Zdon Test., Tr. 77, 102-03.
[127] *Id.*, Tr. 103; *see* COE Delineation Data Sheets, Hr'g Ex. 33; pp. COE 298-99.
[128] Zdon Test., Tr. 103, 428.
[129] Wespetal Test., Tr. 430-31; *see* Minn. R. 7080.0170, subp. 1.C. (2001).
[130] Minn. R. 7080.0305, subp. 4.F. (2001).

systems.[131] Based on these ISTS siting requirements and assuming perfect siting conditions and suitable soils, MPCA determined that six lots in the Bailey plat do not have sufficient area to meet the MPCA rule and shoreland regulation requirements.[132] Another four sites are very small and require additional, detailed site-specific investigation work to determine whether those lots have sufficient areas for two standard systems.[133]

Based upon the foregoing Findings of Fact, the Administrative Law Judge makes the following:

## CONCLUSIONS

1. The agency and Administrative Law Judge have jurisdiction in this matter pursuant to Minn. Stat. § § 14.50, 115.03, and Minn. Rules pts. 7000.1800 and 1900, and pts. 7001.1400-1470.

2. Timely notice of the hearing was given, and all other substantive and procedural requirements of law and rule have been satisfied.

3. The agency may revoke a Section 401 certification if it finds that any of the following conditions have been met:

> A. That with respect to the facility or activity to be certified, the proposed certificate holder will not comply with all applicable state and federal pollution control statutes and rules administered by the agency, or conditions of the certification;
>
> * * *
>
> C. That the certificate holder has failed to disclose fully all facts relevant to the facility or activity to be certified, or that the certificate holder has submitted false or misleading information to the agency; or,
>
> D. That the certified facility or activity endangers human health or the environment and that the danger cannot be removed by a modification of the conditions of the certification.

---

131 Minn. R. 6120.3500, subp. 3 (2001).

132 Wespetal Test., Tr. 432-33; Wespetal Site Analysis, Hr'g Ex. 50. Wespetal conducted an evaluation of how much land area was available to place standard mound systems on the Bailey plat lots. Wespetal Test., Tr. 426-35; Hr'g Exs. 49-50. For the purposes of this evaluation, Wespetal assumed perfect conditions; that is, no other existing siting constraints on any lot and that there were suitable soils on every lot based on Lockner's 100-foot corridor-of-suitable-soils theory. Wespetal Test., Tr. 432-34; Hr'g Ex. 50. MPCA has not seen any data or information that there are suitable soils on these lots for ISTSs or that Lockner's theory was accurate. Wespetal Test., Tr. 434.

133 *Id.*, Tr. 434; Hr'g Ex. 50.

4. The agency has demonstrated, by a preponderance of the evidence, that Bailey will not comply with applicable rules or certificate conditions in that the WCA Replacement Plan was to be implemented by July 1, 2000, and Bailey failed to meet this deadline, and he now says that he will not do it. The rule requires compensatory mitigation before or concurrently with the actual physical alteration of the wetland.[134] Bailey did not comply with this.

5. The agency has demonstrated, by a preponderance of the evidence that Bailey has failed to disclose fully all facts relevant to the activity. He failed to disclose the extent of wetland and the extent of the impact. Information on these items was requested by the July, 1999 request for information, but it was not supplied. In addition, the request for information asked Bailey for an explanation of how he was going to comply with the ISTS rule, which he failed to do. He failed to fully disclose the actual depths and draw down data concerning his ditches, which affects the amount of wetland compensation needed. He also failed to indicate that a significant portion of the plat is floodplain.

6. The agency has proven, by a preponderance of the evidence, that the proposed plan endangers human health and the environment and that the danger cannot be eliminated by modifying the permit. In particular, sewage is likely to be discharged without adequate treatment. In addition, the completion of the road and ditches, without adequate compensation, has harmed the environment, and has induced the clearing and filling of lots without appropriate permits or mitigation.

Based upon the foregoing Conclusions, the Administrative Law Judge makes the following:

**RECOMMENDATION**

IT IS HEREBY RECOMMENDED: that the agency's revocation of the Section 401 Certification be AFFIRMED.

Dated this 3rd day of October 2003.

Allan W. Klein

ALLAN W. KLEIN
Administrative Law Judge

[134] Minn. R. pt. 7050.0186, subd. 6 D.

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GARY BAILEY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Civil No. 02-1078L
Honorable Victor J. Wolski

DEPOSITION OF GARY BAILEY

December 1, 2004

A p p e a r a n c e s:

For the Plaintiff:

ALAN B. FISH, P. A.
109 Second Street Northeast
Roseau, Minnesota 56751
By: ALAN B. FISH, ATTORNEY AT LAW

For the Defendant:

U. S. DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
P. O. Box 663
Washington, D. C. 20044-0663
By: ELSIE B. KAPPLER, ATTORNEY AT LAW

Also Present: Robert Whiting
Jeffrey Koschak

Taken By: Joy Filipski, Court Reporter

2

I N D E X


DEPONENT: PAGE NO.

GARY BAILEY

Examination by . . . Ms. Kappler 7


| EXHIBITS | MARKED | OFFERED |
|---|---|---|
| No. 1 -- Notice | 8 | |
| No. 2 -- Complaint | 9 | |
| No. 3 -- Interrogatories | 10 | |
| No. 4 -- Permit Application | 19 | |
| No. 5 -- Letter 8-18-93 | 19 | |
| No. 6 -- Letter 2-25-94 | 19 | |
| No. 7 -- Letter 5-13-94 | 19 | |
| No. 8 -- Letter from James T. Scott | 19 | |
| No. 9 -- Project Notification Form | 19 | |
| No. 10 -- Wetland Replacement Plan Application | 19 | |
| No. 11 -- Public Notice | 19 | |
| No. 12 -- Letter 7-5-99 | 19 | |
| No. 13 -- Letter 7-9-99 | 19 | |
| No. 14 -- Letter 8-3-99 | 19 | |
| No. 15 -- Letter 8-9-99 | 19 | |
| No. 16 -- Letter 12-17-99 | 19 | |
| No. 17 -- Letter 7-24-00 | 19 | |

3

I N D E X (Cont'd)

| EXHIBITS | MARKED | OFFERED |
|---|---|---|
| No. 18 -- Letter 10-4-00 | 19 | |
| No. 19 -- Initial Plat Sunny Beach | 19 | |
| No. 20 -- Prosper Township Map | 19 | |
| No. 21 -- Township 160 N Range 33 W Map | 19 | |
| No. 22 -- Map of Lots | 19 | |
| No. 23 -- 54754 Contract for Deed | 19 | |
| No. 24 -- 55320 Quitclaim Deed | 19 | |
| No. 25 -- Protected Waters Permit | 19 | |
| No. 26 -- 57093 Warranty Deed | 19 | |
| No. 27 -- Mortgage | 19 | |
| No. 28 -- 59163 Contract for Deed | 19 | |
| No. 29 -- 67286 Quitclaim Deed | 19 | |
| No. 30 -- 67287 Quitclaim Deed | 19 | |
| No. 31 -- 67539 Contract for Deed | 19 | |
| No. 32 -- 67449 Warranty Deed | 19 | |
| No. 33 -- 67439 Contract for Deed | 19 | |
| No. 34 -- 67463 Contract for Deed | 19 | |
| No. 35 -- 67641 Warranty Deed | 19 | |
| No. 36 -- 67644 Contract for Deed | 19 | |
| No. 37 -- 67654 Warranty Deed | 19 | |
| No. 38 -- 67811 Contract for Deed | 19 | |

4

I N D E X (Cont'd)

| EXHIBITS | MARKED | OFFERED |
|---|---|---|
| No. 39 -- 68005 Warranty Deed | 19 | |
| No. 40 -- 68010 Mortgage | 19 | |
| No. 41 -- 68007 Contract for Deed | 19 | |
| No. 42 -- 68164 Contract for Deed | 19 | |
| No. 43 -- 68239 Warranty Deed | 19 | |
| No. 44 -- 70216 Warranty Deed | 19 | |
| No. 45 -- 72224 Warranty Deed | 19 | |
| No. 46 -- 72148 Quitclaim Deed | 19 | |
| No. 47 -- 74013 Quitclaim Deed | 19 | |

. . . The following is the Deposition of GARY BAILEY, taken at the request of the Defendant in the above-entitled cause, pending in the United States Court of Federal Claims, pursuant to Notice and the Federal Rules of the Court of Federal Claims, before Joy Filipski, Court Reporter, a Notary Public within and for the State of Minnesota, at the ROSEAU COUNTY COURTHOUSE, 606 Fifth Street Southwest, Jury One, Roseau, Minnesota, on Wednesday, December 1, 2004, at 10:03 o'clock a.m., at which time counsel appeared as hereinbefore set forth . . .



(Whereupon, Mr. Jeffrey Koschak is not present.)

MS. KAPPLER: Okay, let's go on the record.
Okay.

G A R Y B A I L E Y,

the Plaintiff, of Williams, Minnesota, called as a witness by the Defendant, being first duly sworn by Joy Filipski, Court Reporter, a Notary Public within and for the State of Minnesota, was examined and deposed on his oath as follows:

MS. KAPPLER: For the record, this deposition is being taken pursuant to Rule 30 of the Rules of the Court of Federal Claims.
It's being taken in Jury Room One at the Roseau County Courthouse in Roseau, Minnesota, and duly recorded.
Stipulations are as provided in the Rule.



EXAMINATION
BY MS. KAPPLER:
Q. Good morning, Mr. Bailey.
A. Good morning.
Q. Let me just run through, if I may, some of the basic instructions for a deposition.
It's important that you let the reporter take down all of your answers so that -- accordingly, I need to get my entire question out before you begin answering. And I'll do my best to let you get your entire answer out before I ask you the next question.
If you need to take a break at any point, I'm perfectly comfortable with that, please just let me know.
You need to know that you will have the opportunity to read and sign this deposition transcript and to prepare an errata sheet, noting any changes, but that you may be subjected to cross-examination at a later point regarding the changes that you've made.
Under the applicable Rule, Mr. Fish is constrained in, in, in terms of what he can tell you not to answer. And, and those, those



instructions need to be limited to situations that are privileged matters.
Ready to begin?
A. (No verbal response.)
Q. Mr. Fish, I'm showing you what is described as a Notice -- or, Mr. Bailey, excuse me, a Notice of Deposition. Have you seen this document?
A. Yes.
Q. Okay. Is it your understanding that you are appearing today pursuant to this Notice?
A. Yes.
Q. Thank you.
MS. KAPPLER: I'd like to have this marked as the first Exhibit.
(Whereupon, Deposition Exhibit No. 1, Bailey, was marked for identification.)
Q. (By Ms. Kappler) Okay. Mr. Bailey, I'm next showing you a, a copy of the Complaint in this matter. Are you familiar with this document?
A. Yes.
MS. KAPPLER: Okay, I'd like to have that marked as the second Exhibit, please.

(Whereupon, Deposition Exhibit No. 2, Bailey, was marked for identification.)
Q. (By Ms. Kappler) Let me next show you, Mr. Bailey, a document entitled: Plaintiff's Answers to Defendant's First Set of Interrogatories. Have you ever seen this document?
MR. FISH: Go ahead and read through the whole thing.
A. I believe so.
Q. (By Ms. Kappler) Okay. And leaving aside the Answer to Interrogatory No. 4, regarding the amount paid for the property, meaning the property that is the subject of this takings' action, and this -- the reference to the, the purchase date of 1976, are the, are the Answers provided in these Interrogatories true to the best of your knowledge?
A. Yes.
MS. KAPPLER: I'd like to have that marked as the second Exhibit -- third Exhibit, excuse me.
MR. FISH: Can we go off the record for a moment?
MS. KAPPLER: Sure.



(Whereupon, there was discussion off the record.)
(Whereupon, Deposition Exhibit No. 3, Bailey, was marked for identification.)
MS. KAPPLER: Okay, if we could go back on the record.
Q. (By Ms. Kappler) Mr. Bailey, what is your address?
A. My address is 1946 Range Line Road Southwest; Williams, Minnesota.
Q. And where is Williams, Minnesota, in relation to Roseau?
A. 40 miles to the east.
Q. Are you married?
A. Yes.
Q. And what is your wife's name?
A. Lynn.
Q. How long have you been married?
A. Since June 29.
Q. Of this year?
A. That's correct.
Q. Okay. Were you previously married to someone else?
A. Yes.
Q. And what is her name?



A. Kathryn.
Q. When did you marry Kathryn?
A. October 28 of '71.
(Whereupon, Mr. Jeffrey Koschak entered the room.)
Q. (By Ms. Kappler) Okay. And you've since divorced Kathryn?
A. Yes.
Q. What date were you divorced?
A. July 4, 2003.
Q. Okay.
Could you briefly describe your educational background, please.
A. I have a BS degree from the University of Minnesota in marketing.
Q. What year did you obtain that degree?
A. '73.
Q. And beginning with 1973, forward, would you describe your employment history?
A. Well, my first job I had was with Blue Cross/Blue Shield, which got me back up in the north country, where I'm from.
From 1978, to the present, I've been self-employed.



Q. And could you describe what you've done in your capacity as a self-employed individual?
A. I owned a lumberyard in Grand Rapids, I built homes, manufactured and built log homes.
And I sold that business in about '86.
Q. And what have you done since 1986?
A. Well, I had my accident, which put me in a wheelchair in 1979. And we moved up to Lake of the Woods in '85. I've been logging and brokering wood since then.
Q. Have you ever been deposed before?
A. Yes.
Q. Could you tell me in what legal action or actions you were deposed?
A. Just on a boundary dispute, I guess.
Q. Who were the parties to that boundary dispute?
A. Who was it?
THE DEPONENT: Was that -- would that be --

MR. FISH: Yeah, you can --
THE DEPONENT: Mauser, would that be --
MR. FISH: Oh.
THE DEPONENT: And then Feldmans --
MR. FISH: Well, whoever you remember.
I think they -- the other party had brought in a lot of government agencies.
A. It, it used to be the Mausers, and then he died, and the, the land reverted to his daughter, which -- their, their name are Feldmans.
Q. (By Ms. Kappler) How do you spell Mauser?
A. M-a-u-s-e-r, I believe.
Q. Apart from this dispute with the Mauser-Feldman family, have you ever been deposed in any other legal action?
A. I believe I have, I --
Q. You, you do believe you have or you do not believe you have?
A. No, I have, I believe. I mean, I've -- just business and everything else, it seems like over the years I, I would have.



Q. Have you ever been a party to any legal action?
A. Yes, I've been party to a lot of legal actions, I guess.
Q. Okay. Could you identify the legal actions, leaving aside this specific legal action that, that you're being deposed in today, could you describe -- could you identify the other legal actions in which you have been involved as a party?
A. One was, I was, a car accident.
Q. Were you the plaintiff?
A. (No verbal response.)
Q. Or the defendant?
A. I was the defendant.
That happened to be one, that still had insurance on my vehicle, even though I wasn't part of the crash, you know.
Q. Your vehicle was involved in the crash?
A. Vehicle was, yes.
Q. Okay. Who sued you?
A. The party that -- the car went out of their lane and hit that car, and I was behind that car, so I hit them in the back when



I -- when, when the crash occurred.
Q. Do you recall their name?
A. No, I don't.
Q. When, when was that legal action?
A. Oh. Probably in the late '70s. Seven -- or '74, '75, somewhere around in there.
Q. Okay. What other legal actions have you been a party in?
A. Uhm. I, I, I can't remember right now.
Q. Okay. Can you remember if you ever sued anyone?
A. If I ever sued anybody? Yes, I would remember that.
Q. Okay. Could you identify any legal action in which you've actually sued someone else?
A. I have never sued anybody else.
Q. Well, Mr. Bailey, are you not currently a plaintiff in a legal action against Lake of the Woods County and various agencies of the State of Minnesota?
A. Well, I, I assumed that that's part



of this whole thing, I'm -- you're talking something prior, I've never.
Q. Okay. Leave -- leaving aside this takings action against The United States, what other legal actions can you identify in which you have been a plaintiff?
A. (No verbal response.)
Q. Including this legal action against the State --
A. I --
Q. -- of Minnesota.
A. I can't recall any.
Q. So the legal action against Minnesota and Lake of the Woods County is the only other one you can identify as you're sitting here today?
A. That's what I remember as of today here.
Q. Okay. Have you ever been involved in any criminal proceedings?
A. Like -- what do you mean?
Q. Have you ever been the subject of a criminal action?
A. Yes, I have.
Q. Okay. What did that involve?

A. Oh. It was a, a trapping violation.
Q. What were you accused of specifically?
A. Having animals not properly tagged.
And the reason being, they're -- my mother's enrolled at Red Lake, which is a Reservation to the south here. They were out of tags. I had the animals and I showed them to undercover guys and I, I wouldn't sell them. But they, they, they brought action against me and didn't let me use Red Lake as a defense.
Q. What year was that?
A. '86 I believe.
Q. Were you convicted?
A. Yes.
Q. Was this a felony?
A. No. Gross misdemeanor.
Q. What was your sentence?
A. I think I had $1500 fine and 90 days in jail.
Q. Where did you serve your time?
A. In Lake of the Woods.



I, I could have pled guilty at any time and paid a hundred-dollar fine, but I, I fought it.
Q. Have you ever been the subject of any other criminal proceedings?
A. I don't believe so.
Q. Mr. Bailey, where did you grow up?
A. On the Red Lake Indian Reservation.
Q. Okay. Did you reside there until you attended the University of Minnesota?
A. No. I, I resided there until I was eight. And then I had a stepfather who was in the Air Force, from there we traveled all over the world, I guess, following him around. I graduated --
Q. Okay.
A. -- high school in the Philippines Islands.
MS. KAPPLER: Why don't we go off the record, I'll try to premark some of these Exhibits.
(Whereupon, there was discussion off the record from 10:18 o'clock a.m. to 10:31 o'clock a.m.)



(Whereupon, Deposition Exhibit Nos. 4 through 47, Bailey, were marked for identification.)
MS. KAPPLER: Ready to go back on.
Q. (By Ms. Kappler) Mr. Bailey, I asked you a short while ago about any lawsuits that you may have been involved in. Do you have any knowledge about a suit against a neighbor regarding a beaver dam?
A. Oh, yeah, yeah.
Q. Could you explain the circumstances of that suit?
A. Adjacent to my property, people had a beaver dam -- in fact, two, two neighbors do -- well, actually three neighbors do, I guess.
Two of them would take the, take the dam apart and allow the water to go out the way it should go.
But this particular one I had to take, take to court because he wouldn't break the dam, the water backed up over -- across my property and, and destroyed some of my trees.
Q. Who -- who's the, the individual that you sued there?



A. I think that was Stanley Pream.
Q. Could you spell his last name, please?
A. P-r-e-a-m.
I think his wife works for the Corps of Engineers.
Q. When was that suit filed?
A. Within the last couple years.
Q. Is it still pending?
A. No.
Q. Okay.
A. We, we had a flood in 2002 and it took the beaver dam out, so it alleviated the problem. And my -- I had killed the beavers around my property, so there's no, no beavers in there right now.
Q. So what happened to the lawsuit: was it dismissed?
A. It -- the judge actually came out and, and viewed the property, and since the flood, flood came in while the suit was on, it -- the -- even though I let it go through, the, the dam wasn't there anymore, the flood washed it out.
Q. Do you know what happened to the

legal action itself? Do you know if it was dismissed?
A. I, I think he just said to bring it back up if it became a problem again.
Q. Okay. Where was that action filed?
A. In Lake of the Woods County.
Q. That action involving the car accident, which county was that in?
A. Uhm. Probably Hennepin.
Q. I'm sorry, what was the name of the county?
A. Hennepin.
Q. Could you spell that for me, please?
A. I think it's: H-e-n-n-i-p-i-n (sic).
Q. Have you had any legal actions in Roseau?
A. None that I remember, no.
Q. Okay. Are there any other counties besides Lake of the Woods County and Hennepin County -- are there any legal actions that have been filed by you or against you in any county other than Hennepin or Lake of the Woods County?
A. I, I can't recall right now.



Q. Okay. Have you ever been the subject of a legal action outside of the state of Minnesota?
A. No.
Q. I'd like to begin, if I could, by showing you some maps. These are maps that have been premarked as Exhibits 19 through 22.
Let me show you, first, a document entitled: Initial Plat; Sunny Beach. This is Exhibit No. 19.
Is all of the property depicted in Exhibit 19 property currently owned by you?
A. Yes.
Q. Is all of the property depicted in Exhibit 19, property which you owned on -- in June of 2001?
A. I believe so.
Q. Showing you a tax plat. This is Exhibit 20. I'd like you, if you would, to identify, through outlining, property that you currently own or have ever owned.
A. Currently own or --
Q. Or have ever owned.
A. (Deponent complied.)
Q. Showing you what was premarked as



Exhibit 21. Could you identify property that you currently own or have ever owned by outlining that area?
A. Uhm.
(Deponent complied.)
You, you want to know even the 40s that I own?
Q. Any property that you currently own or have ever owned.
A. On these two 40s, I'm not sure of -- I, I -- my daughter owns this 40 right here. I bought these two 40s. I don't know if they're in my name. I know they're in her name now, you know. I don't know --
Q. What --
A. -- originally if they were in my name or not.
Q. What is your daughter's name?
A. Erica Bailey Johnson.
Q. And how old is she?
A. Twenty -- going to be 29.
Q. Okay.
A. Should I put those down or not?
Q. Any property that -- you're saying she acquired it on her own or --



A. No, no, I -- the neighbor had them for sale and I bought them. And I don't know if they, they came in my name first. But they are in her name. I, I bought them for her.
Q. Okay. Yes, please mark that property.
A. I believe that's everything.
Q. Okay. Does some or all of the property we've identified in Exhibit 21, include property that is known generally as Elk Ranch?
A. Some of that includes that property, yes.
Q. Could you point that out and describe the property in Exhibit 21?
A. Do you have another color or something or --
Q. Maybe you can just draw an arrow from the property with a -- and identify it as Elk Ranch.
A. I guess other people call it Elk Ranch, I don't. It's still my farm, you know.
MR. FISH: I'm going to interpose an objection on relevance and not likely to lead to the discovery of admissible evidence at

25

this time, unless Counsel comes with something on the record.

Along these -- line of questioning on the Elk Ranch property.

MS. KAPPLER: The goal here's simply to identify in general the property owned by Mr. Bailey in and around the subject area.

A. What I'll do is I'll put that as a fenced in area, because that's, that's what it is. Everything else is still my ranch, or whatever you want to call it, I guess.

Q. (By Ms. Kappler) Is the area on Exhibit 21 that you have outlined and, and described as fenced, all of the property known generally by others, as you understand it, as Elk Ranch?

A. Well, since I own more land than that, I, I -- it's hard to explain what somebody else calls my place, but my place is just the, the Bailey Farm, or whatever, you know, I mean.

Q. Let, let me, let me ask another question.

Do you have an understanding of

26

what has been described as Elk Ranch by others?

A. That would be the area where I have elk inside the fence, yes.

Q. Okay. Is that the entire area of what is known as Elk Ranch?

A. That I'm not sure, you know, I -- it's the only area I have elk, because it's fenced.

Q. I see.

Is there any property adjacent to that property that is not depicted in Exhibit 21 that you own?

A. Yes.

Q. How much property do you own that is adjacent to the area that you've noted as fenced on Exhibit 21?

A. It's all, it's all been outlined on that sheet.

Q. What I'm trying to determine, is, is there an area outside of the area depicted on this map for Exhibit 21, that you own that is adjacent to any of the property that you've outlined here?

A. The closest land is 2 and a half miles south that I own another 120 acres.

27

Q. Okay.

Mr. Bailey, I'd like to return to the topic of some of the legal actions you've been involved in.

It's true, is it not, that you've been involved in some legal actions with the United States Environmental Protective Agency involving the property you've described as Elk Ranch? Isn't that correct?

MR. FISH: I'll object to the characterization of legal action, Counsel. The mere act of paying your taxes, land taxes, could be construed as a legal action. Maybe to clarify your question more.

Q. (By Ms. Kappler) There are enforcement proceedings involving the Elk Ranch property, are there not?

A. There's been ongoing negotiations, but there's no lawsuit or anything.

Q. There have been proceedings involving violations of the Clean Water Act, have there not?

A. Claimed violations, which I -- I'm in dispute and trying to work out, yes.

Q. Have you also been involved in some

28

legal action involving trespassing on a neighbor's property in or around the area we've identified as the fenced area on Exhibit 21?

A. Since my land was -- the, the most recent that it was surveyed was in 1909. And with the, the assumption that GPS is, is a means of locating lost points, I guess what has been a boundary over almost a hundred years has been changed to where it should have been a hundred years ago. And it -- that's what began a dispute.

Q. Was it --

A. Boundaries have been moved from where they were previous to where they should be.

Q. Have you moved those boundaries?

A. I haven't moved any boundaries, no.

Q. Who moved the boundaries?

A. The -- by means of GPS, they located them where they should have probably been located when they originally surveyed them. But using chains all the way across, whatever, I mean, the -- it -- the normal place where neighbors assumed the boundaries to be over the years, weren't accurate, I guess is,

29

is what the surveyors are saying.
Q. Who, who do you -- you indicated: they. Did a survey, they. Who, who was responsible for --
A. Adjacent --
Q. -- this survey?
A. -- property owners had a surveyor come out and, and survey it using GPS. Not, not pulling a tape or anything.
Q. Was there a lawsuit filed in connection with issues relating to this neighbor's property?
A. Yes.
Q. Who filed that lawsuit?
A. Just like I, I said before, Feldmans.
Q. Aah, this is the, the suit by the Feldmans?
A. Mauser-Feldmans, yes.
Q. Did they allege that you were trespassing on their property?
A. Yes.
Q. How was that lawsuit resolved?
A. It -- since, since the lines meander back and forth, the --

30

MS. KAPPLER: Excuse me for just a moment.
Sorry to cut your answer off.
(Whereupon, there was discussion off the record.)
MS. KAPPLER: I apologize.
Could you read back Mr. Bailey's last answer.
(Whereupon, the question and answer were read back by the reporter.)
A. Here again, the judge made a visit to the property. The, the ultimate goal of the property owners adjacent to me was to stop me from building my elk fence. What, what ensued after that, is the fence became the property line.
Q. (By Ms. Kappler) Oh.
A. So that was the end of the lawsuit.
Q. When was that lawsuit filed?
A. That I don't know.
Q. Was it in the '90s?
A. Yep.
Q. You say the fence became the line, --
A. Yes.

31

Q. -- the fence, as placed by you?
A. Fence as placed by me. And should have been placed by an adjacent property owner -- yes, I, I built the entire fence.
Q. Do you have an understanding as to how the legal matter was resolved? Was the matter dismissed, for instance?
A. There was judgments on both parts. I guess I don't recall the, the exact -- what it was, but it was -- it, it came to an end, I guess is what I'm trying to say.
Q. Was that case filed in Lake of the Woods County?
A. I believe so.
Q. What I'd like to do now is review a series of deeds with you.
Most, if not all, of these are copies of -- certified copies of deeds provided by the recorder in Lake of the Woods County.
MS. KAPPLER: Mr. Fish, would you be willing to stipulate to their authenticity, in, in light of the fact that they are copies of certified copies?
MR. FISH: Yeah, there's no foundational objections.

32

Q. (By Ms. Kappler) Let me show you, Mr. Bailey, first of all, what has been premarked as Deposition Exhibit No. 23, a deed, a contract for deed from John Lewis and Beryl Lewis, to Gary Bailey and Kathryn Bailey, dated June 28, 1989.
Would you verify that your signature appears in that document?
A. That's my signature.
Q. Now turning our attention back to Exhibit 20, would you identify, through some sort of outlining, and through reference to Exhibit 23, the area acquired by way of that deed.
A. (Deponent complied.)
Q. If you would identify to the side that that property is encompassed by Exhibit 23.
A. (Deponent complied.)
Q. So for clarification, the entire area that you've outlined and, and connected to Exhibit 23, is all of the property acquired through the contract for deed that is marked as Exhibit 23?
A. Yes.

Q. Does that property include the area later platted as Sunny Beach?
A. Yes, it does.
Q. Do you know the acreage of the area that you have outlined here?
A. Well, the, the 40s on the east side of the road, I -- or the west side of the road, are -- they could be 40 acres or less than that. I know the, the, the complete land on the east side of the road is 86 acres.
Q. On the east side of the road it's 86 acres and on the other side of the road you indicated --
A. Well, should be 40-acre squares, but if they're light or heavy, it would differentiate that on the, on the deed.
Q. The, the road you've identified and that you're referring to is the road marked as, as Route 53?
A. Yes.
Q. Now Exhibit 23 indicates a purchase price of $135,000. Is that, indeed, how much you paid for the property that you've identified and outlined in Exhibit 20?
A. No.



Q. How much did you actually pay for the property outlined in --
A. It was --
Q. -- Exhibit 20?
A. It was a three-year contract at 10 percent interest, so I -- I probably paid close to $160,000 for it.
Q. Turning our attention to what's been premarked as Exhibit 24. Could you identify for the record the property acquired through this document, which is entitled quitclaim deed, identify it in Exhibit 20?
A. (Deponent complied.)
Is that right?
Q. If you could just note beside that Exhibit 20, so we know what, what deed it refers to.
MR. FISH: 24, you mean, Counsel?
Q. (By Ms. Kappler) Exhibit 24.
MS. KAPPLER: Thank you.
A. (Deponent complied.)
Q. (By Ms. Kappler) Okay.
Turning your attention to what is premarked as Exhibit 26. A warranty deed from John Lewis and Beryl Lewis to Gary and Kathryn



Bailey, dated June 29, 1989.
Does that deed indicate satisfaction of the obligation for the property you identified in Exhibit 20 and tied to Exhibit 23?
MS. KAPPLER: Excuse me.
MR. FISH: You can look at the Exhibits if you want to.
Q. (By Ms. Kappler) Sure. I'm sorry.
MR. FISH: Trace the --
20 and 23 she's referring to in her question.
A. It should be the same.
Q. (By Ms. Kappler) Okay. So --
In July 11 -- on July 11 of 1991, approximately, you had satisfied your obligation in connection with the contract for deed which is marked as Exhibit 23?
A. Yes. It's hard for me to remember when it take -- when it took place, --
Q. Okay.
A. -- but -- (no further response.)
Q. Turning your attention to what was premarked as Exhibit 27. A record of a mortgage recorded with the Lake of the Woods



County on July 12, 1991.
Would you, by reference to Exhibit 20 -- or, excuse me, in Exhibit 20, indicate the area covered by that mortgage?
A. (No verbal response.)
Q. You can do that in dark pencil, if it's just a portion of the property that you're going to outline.
A. (Deponent complied.)
Q. Okay. If you could then indicate that that is the property identified in Exhibit 27, just by writing Exhibit 27?
A. (Deponent complied.)
Q. So, for the record, the property depicted in Exhibit 27, and that you've outlined in Exhibit 20, is a portion of the property acquired by you and your ex-wife in 1989. Is that correct?
A. Yes.
Q. Let me show you Exhibit 28, a contract for deed dated March 1, 1993, from you and your ex-wife to a Mr. Dahl.
A. Uh-huh.
Q. Would you outline, on Exhibit 20, and identify on that document, the area covered

by that deed?
MR. FISH: Do you want another color?
A. Do you want to --
Q. (By Ms. Kappler) I'm not sure I have anything else. Maybe we can just use a different kind of marking, cross-hatches or something like that, or Xs, around the area.
A. (Deponent complied.)
MR. FISH: I really can't tell what you marked.
Q. (By Ms. Kappler) Let me see if I can identify it more clearly for the record by reference to the names in there.
Would you identify, for the record, the names that are included in the plat map for the, the parcels that you've marked as being linked to Exhibit 28?
A. Can you read them for me?
Q. Let me see if I can.
The one to the left has your name, the one to the right has Mr. Dahl's name.
A. Okay.
Q. Is it, nevertheless, your understanding that that entire parcel was



conveyed to Mr. Dahl in 1993?
A. It was under contract for deed.
Q. Okay. Turning your attention to what's been premarked as Exhibit 29. And also your attention to what has been premarked as Exhibit 30.
Would you take a look at those documents and tell me whether or not these documents collectively represent a land exchange with a Robert Pieper and a Kathryn Pieper?
A. Uh-huh. Okay.
Do you want me to explain what it is?
Q. Yes, please.
A. When, when this -- like in my whole county -- like I was saying, the last time they surveyed anything in the county is in 1909.
The, the ditch between myself and Mr. Pieper, which Mr. Pieper did the ditch, was on and off the property line as put in by the surveyor that did the platting.
So instead of having the, the -- since it was on both sides of the ditch, as far as the, the boundary meander on both sides,



what we did on this exchange was we made the ditch the property line. And that's, that's what -- that ensued.
It's on the south end of the property.
Q. So what was the property line as you understood it prior to the execution of these deeds --
A. Well, --
Q. -- marked Exhibit 30, 29 and 30?
A. -- we all assumed that the ditch was the property line. However, when the surveyor surveyed it, the, the property line was both on the outside and the inside of the ditch, so this -- we made the ditch the property line, I guess is what we did.
Q. Was this ditch used for irrigation purposes?
A. Just for drainage.
Q. Okay. Could you, by reference to Exhibit 20 -- or rather, on Exhibit 20, indicate where the ditch ran --
A. Sure.
Q. -- that was the subject of this land exchange or, or subject of these deeds



marked Exhibit 29 and 30.
A. (Deponent complied.)
Q. And indicate specifically, however it ran. Thank you.
If you could put an end point and a beginning point with a line, something, to, to indicate --
A. (Deponent complied.)
Q. If you could just make that a little darker, so we can really see what the beginning point and end point is.
A. Runs from the county road to the lake.
Q. Okay.
A. I don't know if you can read my writing.
Q. Yes.
Okay. Turning your attention to what's been premarked as Exhibit 31. A contract for deed dated December 27, 1998, from yourself and your ex-wife to a Raynard Lundgren and a Marilyn Lundgren.
And let me, on this connection, give you a copy of Exhibit 22.
First of all, is Exhibit 22 a, a

depiction of what's been described as Sunny Beach?
A. I believe the initial one, they had it reversed with the first line up here. The, the -- this, this is the, this is the way it ended up, though, the one that you have here.
Q. Could you indicate by reference to Exhibit 31, the property that was the subject --
A. Well, it'd be Lot --
Q. -- of Exhibit -- in Exhibit 22?
A. Do you want me to just --
Q. Yes. If you could just outline it or write the Lundgrens' name next to it?
A. (Deponent complied.)
MR. FISH: 31.
Q. (By Ms. Kappler) Okay, this one.
Okay. Showing you Exhibit 33, a contract for deed from you and your ex-wife to a Dennis Thomson and Michele Thomson. Would you identify the property that was the subject of that contract for deed on Exhibit 22, please.
A. (Deponent complied.)
Q. Showing you what's been premarked as Exhibit 34. Contract for deed dated



December 29, 1998, from you and your ex-wife to a Michael Washburn. Would you identify in Exhibit 22 the property that was the subject of that contract for deed?
A. (Deponent complied.)
Q. Okay. Showing you what's been premarked as Exhibit 35, a warranty deed from you and your ex-wife to David Russell and Deanna Hoebbel. Could you identify in Exhibit 20 the property that was the subject of that warranty deed?
A. (Deponent complied.)
Q. Okay. Showing you next what's been premarked as Exhibit 36, a contract for deed from yourself and your ex-wife to David Wolf and Charmaine Wolf. Would you identify the property that was the subject of that contract for deed, please.
A. (Deponent complied.)
Q. Okay. Showing you what's been premarked as Exhibit 37. A record of a conveyance from yourself and your ex-wife to Suzanne Anderson as trustee. Would you identify the property that's the subject of that deed?



A. (Deponent complied.)
Q. Showing you what's been premarked as Exhibit 38, a contract for deed from you and your ex-wife to a Jamie Gowdy. Would you please identify in Exhibit 22 the property that was the subject of that contract for deed, please.
A. (Deponent complied.)
MR. FISH: Lot 10?
THE DEPONENT: Yeah.
Any difference if I own it?
MR. FISH: Uhm?
THE DEPONENT: Does it make a difference if I own them now?
MR. FISH: You can ask me later.
MS. KAPPLER: I'll ask you all those questions later.
THE DEPONENT: Okay.
Q. (By Ms. Kappler) Showing you what's been premarked as Exhibits 39 and 40. First, warranty deed from you and your ex-wife to a Thomas Woitalla and Vivian Woitalla. Exhibit 40, a mortgage with a Mr. Woitalla -- excuse me -- and Vivian Woitalla as, as mortgagors, and Kathryn and Gary Bailey as



mortgagees.
Could you identify the property that was subject of the warranty deed and mortgage just identified as Exhibits 39 and 40?
A. (Deponent complied.)
Q. Okay. Okay, showing you what has been premarked as Exhibit 41. A contract for deed between Gary Bailey and Kathryn Bailey and April Stavig, as trustee for the Fish Trust. Would you identify the property that's the subject of that document?
A. (Deponent complied.)
Q. Is your attorney, Mr. Fish, a trustee of that, that trust?
MR. FISH: If you know.
A. I -- I'm not sure.
Q. (By Ms. Kappler) Is it your understanding that Mr. Fish has an interest in that property?
A. The whole Fish family does, yes.
Q. Okay.
Turning your attention to Exhibit 42. Would you identify the property that is the subject for the contract of deed from a Mr. Bailey and Kathryn Bailey to, to a Karl and

Linda Persson?
A. (Deponent complied.)
Q. Okay.
Mr. Bailey, I'd like to ask you about the transactions that were the subject of the, the deeds that we just went through.
Let me --
Beginning with the contract for deed dated 12-30-98, from you and your ex-wife to the Thomsons.
This was for Lots 2 and 3.
Did you ever deal with the Thomsons specifically?
A. No.
Q. Were you represented by a real estate agent who dealt with the Thomsons?
A. It was an open listing.
Q. Do you know if the sale was facilitated by any particular agent?
A. Three different agencies sold the property up here, so I have -- (no further response.)
Q. Do you know who was responsible for the sale to these individuals?
A. I don't right -- I, I made a list.



I, --
Q. Okay.
A. -- I have --
Q. So which, which agents were involved in the sale of any of the parcels that we identified in the Sunny Beach area?
A. North Border Realty.
Q. Where are they located?
A. In Baudette.
Q. What other Realtor?
A. Pahlen Real -- Realty.
Q. Would you spell Pahlen, please?
A. P-h -- h-a-l-e-n.
Q. H-a --
A. L-a-n.
Q. L-a-n.
And where is Pahlen Realty located?
A. Warroad.
MR. FISH: P-a-h. Pahlen.
THE DEPONENT: P-a-h?
MR. FISH: Yeah, P-a-h.
A. I spelled that wrong then, P-a --
Q. (By Ms. Kappler) P-a-h-l-e-n?
A. L-e-n.
Q. L-e-n?



A. Yeah.
Q. Okay. In Warroad.
And who was the third Realtor?
A. Lake Count -- Lake Country.
Q. And where is that located?
A. Warroad.
Q. Who were your contacts at each of these Realtors, beginning with North Border Realty?
A. Patrick La Valla.
Q. How do you spell Mr. La Valla's last name?
A. L-a V-a-l-l-a.
Q. And at Pahlen --
MS. KAPPLER: Pahlen?
MR. FISH: Pahlen.
Q. (By Ms. Kappler) Pahlen --
A. Pahlen, there we go.
Q. -- Realty?
A. Scott Pahlen.
Q. And at Lake Country Realty?
A. Francine Fish.
Q. And is that Mr. Fish's mother?
A. Yes.
Q. Okay. Speaking generally,



regarding the sales of the properties that, that are identified in Exhibit 22 as parcels 2 through 14, did you personally have any dealings with the individuals who purchased those parcels?
A. No.
Q. When, when you say that you didn't have any dealings personally with these purchasers, do you mean prior to the purchase?
A. I mean at any time.
Q. At no time, either before or after the purchases by these individuals, have you dealt personally with any of them?
A. I, I might have talked to them on the phone, that was nothing --
Q. Okay.
A. -- personally.
Q. Okay.
A. I mean, --
Q. When I say: personally, I mean telephone conversations --
A. I, I --
Q. -- as well.
A. I had telephone conversations with some of them.

Q. So now referring back to the period prior to the purchase by any of these individuals, did you have any telephone contact with any such persons?
A. I might have. People've been trying to buy that property for years, I just -- (no further response.)
Q. Do you have any specific recollection of dealing with any of the individuals who purchased Lots 2 through 14?
A. I don't.
Q. Telephonically, in person or otherwise, prior to their purchase?
A. I, I don't -- I know once they knew I was going to develop it, they, they -- people started calling, you know.
And I, I couldn't sell until the, the land was platted.
Plotted, platted.
And that's what I told them.
Q. Okay. Were some of the individuals who contacted you prior to the platting of the property, some of the individuals who eventually purchased --
A. I believe so.



Q. -- parcels.
Who else contacted you?
A. Just the Realtors I believe.
Q. Did you ever have it listed formally?
A. No.
Q. Did, did Realtor -- you're saying Realtors also contacted you in connection with this property?
A. Once, once, once they heard that I was going to develop it up there, yes.
Q. When did these inquiries from Realtors or any other persons begin?
A. Probably started in 1990, when I had a marina permit to build a marina up there.
Q. Did anyone ever suggest to you a purchase price for this property?
MR. FISH: Counsel, by: this property, what are you referring to?
MS. KAPPLER: Thank you. That's a good question.
Q. (By Ms. Kappler) Referring back to the conversations you had, did anyone indicate the property area they were interested in acquiring?



A. Yes, there was one outfit that that's all they did, was develop lakeshore properties and they wanted to purchase the whole front.
Q. What are you referring to as the front?
A. Well, the lakeshore part of the property.
Q. What is -- what are you referring to as the lakeshore part of the property?
A. The four -- 14 lots that you have as the platted part.
Q. Now, looking at Exhibit 22, Exhibit 22 includes a road described as Sandy Shores Drive, that's correct?
A. That would include the, the road, yes.
Q. Okay. That road did not exist in the early '90s, did it?
A. No, it didn't.
Q. There, there was no obvious dividing line between, between what's been platted as, as Exhibit -- or, excuse me, as, as parcels 1 through 14, and the property west of those parcels in the early '90s?



A. No.
Q. In fact, that road didn't even exist until 1998. Isn't that correct?
A. That's correct.
Q. So with that in mind, do you have an understanding of what property specifically these individuals were inquiring about when they indicated they wanted to buy lakeshore property?
A. That, that property's unique probably to all of Lake of the Woods, because it's the only wooded parcel of the lakeshore that's left that hasn't been developed.
And, and it, it encompasses about 20 acres between the land that's divided by the road that's on the lakeside and the land that butts up to the field that's on the west side.
Q. Okay. So referring back to Exhibit 20, when you say the, the land that butts up against the road, you're referring to the road that is described as Route 53 on Exhibit 20?
A. No, no, no, no.
Q. What --
A. Okay. If --
Q. -- are you referring to?

53

A. If you looked at an aerial photo of the property, or topographical map, you could see that there's 56 acres of field and the rest is a wooded lakeshore. And that's what I'm talking about as the wooded lakeshore part.
Q. Referring back to Exhibit 20, can you draw in -- gosh, I wish we had another color. Let me use your pen.
I'll try to use another pen that will identify it more clearly. Can you identify the area that you considered to be the wooded lakeshore?
A. It's easier, easier to describe because everything else is a field.
Q. Maybe you could just draw into the area lightly with pencil --
A. Okay.
Q. -- with cross-hatching or some other marking.
A. 86 acres less 56 acres of field is -- (no further response.)
Q. Okay. So what I need for you to do is outline the boundaries of the area that you consider to be wooded lakeshore property.
A. Okay. But I, I don't know where 56

54

acres falls in here. It's probably in this area here. The lake.
Q. Okay. And the 56 acres -- excuse me, the 86 acres that you're referring to is to the west --
A. 56 --
Q. -- of the --
A. The 56-acre field is to the west of that.
Q. Excuse me. You indicate 56 acres of field is wooded lakeshore. Is that correct?
A. No, no, no, no, no.
56 acres, less the 56 acres.
Q. Sorry, sorry, this says 86 acres.
A. Or -- yeah, yeah, 86 acres less 56 acres of field is --
Q. Is wooded lakeshore?
A. Is --
So --
Q. So --
A. It takes 56 from 86 and you come up with approximately 20 acres of wooded lakeshore.
Q. I believe it's 30 acres -- sorry, 30 acres -- yes, 56?

55

MR. FISH: Yep.
A. Yeah.
Q. (By Ms. Kappler) 30 acres of --
MR. FISH: Sounds --
Q. (By Ms. Kappler) -- wooded lake- --
MR. FISH: -- about right.
Q. (By Ms. Kappler) -- shore is the area to the east of a line that you've identified in Exhibit 20?
A. You're right.
Q. And to the west is field. Is that correct?
A. Yes.
Q. It's an agricultural area?
A. It's a prior converted.
Q. Prior converted wetlands area?
A. Well, that's what they call, call it, it, it -- it's farmable land, yes.
Q. Yes.
Do you farm that land?
A. I turned to black again last year. It's in -- it's just in grass right now.
Q. Have you in the past farmed that land?

56

A. Yes.
Q. What have you farmed on that land?
A. Just, just grass.
Q. Just grass?
A. Just, just the forage, I guess.
Q. For grazing or --
A. No.
Q. -- hay?
A. No, it's for hay.
Q. Now, the area that you've depicted on Exhibit 23 as wooded lakeshore, is it your understanding that that was the area that was the subject of inquiries by Realtors and others beginning sometime in the early '90s?
A. Yes.
Q. Did anyone in connection with that property area suggest to you a price that they would be willing to pay for that property?
A. Yes.
Q. First of all, who suggested a price to you?
A. I got -- I have all that stuff at home.
MR. FISH: If you remember now.
A. I, I don't remember it right now.

Q. (By Ms. Kappler) Well, what prices were suggested to you?
A. That I don't remember either, I mean.
Q. Do you remember a range of prices?
A. It was the $300,000 plus, I believe.
But I --
That's just for undeveloped land.
Q. Now, in your Interrogatory Answers, that we marked as Exhibit 3?
A. Uh-huh.
Q. And we've discussed this on the record a little earlier, in response to Interrogatory No. 4, about the amount paid for the property. And in that case, we defined the property as the area depicted in Exhibit 22.
You indicated you had paid $65,000 in 1976. Now we've clarified that actually you acquired the property in 1989. Is that correct?
A. Uh-huh.
Q. And we've clarified that your acquisition of that property was, in part, contained within --



MS. KAPPLER: Or strike that.
Q. (By Ms. Kappler) We've clarified that that property was included within the property conveyed to you on June 28, 1989, in, in the deed we've marked as Exhibit 23.
A. My answer was what?
Q. Is, is the property that you acquired contained within the property that was the subject of what we've marked as Exhibit 23?
A. Well, more concerned about the price that you have down there.
Q. You indicated in your Interrogatory Answers, which we've marked as Exhibit 3, that the price of the property was $65,000?
A. Well, that's wrong. I mean, whatever's on the --
Q. Okay. So to clarify, what --
A. What it should have been is the total of 135 plus the interest.
Q. Which was, as you testified earlier, approximately $160,000 total?
A. Yep, maybe, maybe you got the one off of there or something.
Q. Okay. Now so you paid approximately $160,000 for property that



included the property that you've noted was -- is wooded lakeshore property?
A. Yes.
Q. Okay. That property also included agricultural property to the west and to the south, did it not?
A. Mainly to the west there was one 40-acre field that was adjacent by one 40.
Q. Okay. I want to be very clear about what property was acquired by way of Exhibit 23. We've marked this up so many times, I don't want there to be any doubt about it.
What I'd like for you to do is, on Exhibit 20, outline the boundaries up here, draw them literally up here, so we know what the shape of the property was that was acquired by way of Exhibit 23.
A. (Deponent complied.)
Q. Okay. And if you would just write -- mark next to that Exhibit 23, so we know what we're talking about.
A. (Deponent complied.)
Q. Okay. And that property, then, that you've outlined the, the boundaries of at



the top of Exhibit 20, included the 56 acres which you indicate was wooded lakeshore?
A. No, 56 acres was a field.
Q. Oh, I beg your pardon, it was 30 acres of wooded lakeshore?
A. Yes.
Q. It also included the additional 56 acres to the west of that, that was field that ran up against the road that we've marked as Route 53. Is that correct?
A. That's correct.
Q. And it also included the two parcels to the left of that which bear your name and Mr. Dahl's name. Is that correct?
A. Yes.
Q. And then the property to the south of the parcel that has Mr. Dahl's name. Is that correct?
A. That's correct.
Q. So for all of that property, you paid $160,000, approximately, after you were done making your payments?
A. That's correct.
Q. Now I asked you about inquiries for the wooded lakeshore property, approximately 30

61

acres, that you began to receive sometime in the early '90s.
You believe you received some inquiry and a suggestion that someone would be willing to pay $300,000 for that property?
A. Well, people are -- always wanted to develop it and I, I probably entertained a lot of people wanting to do that, you know. And I, I held onto it, thinking that I -- was going to be something that I could use in retirement, as far as developing the lots up there.
Q. Was one such individual an individual by the name of Scott Seeley with a company called Taylor Investments?
A. That sounds correct, yes.
Q. Okay. Do you recall any of your discussions with Mr. Seeley?
A. Only that he was interested in purchasing the, the land for developing it.
Q. Okay. Now that was prior to it being platted as a subdivision, --
A. That's correct.
Q. -- wasn't it?
A. Yeah.

62

Q. What kinds of inquiries did Mr. Seeley make about the property?
A. He was interested in that marina permit that I had and what, what my intentions were, I guess.
Q. Did he ask you about the presence of wetlands in the property area?
A. I had a -- I had him -- he wanted to go out and look at the property, which I believe somebody from either NRCS or the county planning and SWCD, went out with him, I didn't.
Q. Did -- you had conversations with --
A. I had --
Q. -- Mr. Seeley?
A. -- conversations with him, yes.
Q. Did Mr. Seeley ever inquire about wetlands in the area that he was interested in purchasing?
A. Not to my knowledge, I, I, I don't remember, I guess.
Might have.
Q. In the multiple inquiries you received regarding this wooded lakeshore area, the 30 acres --

63

A. Uh-huh.
Q. -- you've described here, did anyone inquire about wetlands on the property?
A. Only to the extent that if the -- whatever the County came up with is what they'd have to abide by, I guess as far as the rulings.
Q. Did anybody ask you about the presence of wetlands on the property?
A. I don't specifically remember that, no.
Q. You don't remember anyone even mentioning the word wetlands to you?
A. I can't recall.
Q. Did anyone inquire to you about legal constraints on the developability of that property you've described as the wooded lakeshore area?
MR. FISH: Now, again, Counsel, you're referring to prospective purchasers?
MS. KAPPLER: Yes.
A. Only to the extent what -- I refer them to -- the county planning person would initiate permits.
Q. (By Ms. Kappler) I'm not, I'm not

64

asking about what you said to them, I'm asking as to whether anyone inquired to you about the developability of the property?
A. You're, you're talking people that purchase lots?
Q. Prospective purchasers, people who called you inquiring about the property.
A. I, I can't recall that, no.
Q. You can't recall whether anyone expressed any interest or concern about legal constraints associated with the development of the property?
A. I said -- the only thing I said is that my land was as high or higher than the adjacent land that's been developed and it shouldn't be a problem, anything that would happen would have to be permitted through the County.
Q. You say you indicated that was as high or higher than the adjacent property?
A. It's, it's -- yes, it's the same type of property that's been developed. And there's six subdivisions there that -- like I said, people been after me to develop that because that's what they've been doing along

the whole lake.
Q. What did you mean, high or as high, higher or as high?
A. Well, in -- this county's relatively flat, you know, and it -- the, the differentiae between low and high is, is, is a, I don't know, a term we use in the county just by using common sense, I guess, the differentiation between high and low.
Q. Okay.
A. This, this, to anybody in the county, would be considered high ground.
Q. Okay. What I'm trying to understand is what do you mean -- and what did you mean, rather, when you said high ground?
A. That it could be built in -- could be built on.
Q. That it could be built on?
A. Yes.
Q. Did you mean it wasn't wetlands?
A. Yes.
Q. Now, you said you had these inquiries beginning in the early '90s?
A. Yes.
Q. And these continued through what



period?
A. Up to the time I decided I was going to sell, sell lots up there.
Q. So through 1999? Or -- let me see --
The last of these sales, I guess, was June 29, 19 -- excuse me.
June 1, 1999, the conveyances to the Perssons. Is that correct?
A. Mo -- I, I believe so, I, I can't remember.
Q. Okay. So throughout that period, people were inquiring about the prospective purchase of the property?
A. Yes.
Q. And throughout that period, you were indicating that the property was on high ground?
MR. FISH: I'll object, that misstates his testimony. He says it was high or higher than the neighboring, and they would have to inquire with the Lake of the Woods County as to whether it was permitable. I think he's asked and answered this several times.



MS. KAPPLER: Okay. I, I want to go off the record for a moment.
(Whereupon, there was discussion off the record.)
MS. KAPPLER: Let's, let's put this on the record.
Off the record, I've had a discussion with Mr. Fish about my concern that his last objection was in violation of Rule 30 and was tantamount to coaching the witness.
And I've expressed my concern that any future such instructions may be the subject of a discussion before his Honor.
MR. FISH: And I'll, I'll merely indicate, my response is that the, the objection's duly noted.
And to the extent that Counsel considers this objection a waiver, it's noted as well.
Q. (By Ms. Kappler) Now, I want to be clear about what your representations were to prospective buyers.
You indicated that in connection with discussions with prospective buyers, and let me know whether this is a correct



characterization of your testimony, that the property was as high or higher than property that had been developed in adjacent areas. Is that correct?
A. I'm saying, it's the same type of ground that has been developed in the past. The, the -- contacting the, the County, or the Realtor, they're, they're the ones selling land, knowing what's being built on -- if there's a -- problems with anything, they would know more than I would.
Q. Okay. You indicated that by high, you meant it wasn't wetlands; --
A. I didn't --
Q. -- is that correct?
MR. FISH: Objection.
A. I didn't indicate --
MR. FISH: Let -- you can answer, Gary, but I'm going to put my objection on the record. I'll -- objection. Counsel's misstating the testimony. At no time did Mr. Bailey characterize the land as high, he characterized the land as high or higher as other similarly developed land.
You can answer.

69

Q. (By Ms. Kappler) Okay. Let me, let me ask the question again, because I don't mean to misstate your testimony, what I'm trying to do is clarify what your testimony is.
When you said the land was higher or as high, did you mean that it was not wetlands?
A. I didn't say it was high or higher, I said it was the same as the surrounding ground that was being built upon.
And, and the ultimate authorities to say whether you could build on it, is the permitting process through the County. I, I didn't say that a person could build on anything.
Q. Okay. My question was: when you said higher or as high, did you mean that it wasn't wetlands?
A. Yes, I did.
Q. Okay. And those communications with prospective buyers, where you indicated that the property was higher or as high as adjacent properties that had been developed, went from the early '90s, through the time when the last of these properties was sold to, it

70

looks like Mr. Persson, in 1999. Is that correct?
MR. FISH: Do you understand the, the question?
THE DEPONENT: No, I don't.
Q. (By Ms. Kappler) Were you, throughout the entire period we've described, from the early '90s, through approximately 1999, conveying to prospective purchasers that you believed the property was as high or higher than the land that had been developed in adjacent areas?
A. I never tried to sell my land, I never did.
Q. Okay. I'm not asking what your attempts were, I'm talking about communications with prospective purchasers.
You indicated that you had conveyed to individuals that the property was as high or higher than land that had been developed in adjacent areas.
I'm trying to determine the time period through which you were making these statements to prospective purchasers.
Were you making these statements

71

from the early '90s, through the late '90s?
A. Well, I was told by the, the Corps when I had the permit for the marina, that it was wooded uplands and that, to me, I mean, I -- whether I inferred that to somebody that asked me about it, I, I just inferred they were building in the same type of area that, that my land was all the way along the lake.
Q. Okay. I'm not, I'm not asking --
A. I never --
Q. -- what you inferred --
A. I never inferred it wasn't wetlands or it was higher than something else, I didn't infer it.
Q. Now I'm not trying to infer anything, I'm trying to figure out what -- you indicated that you had spoken with prospective purchasers and that you had indicated that the property was as high or higher than land that had been developed in adjacent areas. I'm just trying to figure out, simple question, Mr. Bailey, --
A. Simple question --
Q. -- what was the time period?
A. I didn't tell any prospective

72

buyers, referred them off to a Realtor, I didn't talk about my lots to anybody.
Q. Okay.
A. I didn't sell any of my lots.
Q. Mr. Bailey, you had indicated earlier that you had communicated with prospective purchasers that the property was as high or higher --
A. I was referring --
Q. -- to the land that was developed?
A. -- to Taylor Investments, and that's probably -- I talked to -- they were the only ones I talked to about this.
Q. Is it your testimony now that the only individual that you represented that the property was as high or higher than the property that had been developed on adjacent parcels, Scott Seeley at Taylor Investments?
A. That's one person that I recall that, --
Q. Okay.
A. -- that they wanted to develop the property.
Q. And that inquiry was in approximately 1997, was it not?

73

A. I can't recall, but --
Q. Okay.
Back in 1990, you applied for a permit to put in a harbor, had you not?
A. Yes.
Q. Okay. Let me just show you what we premarked as Exhibit 4.
Is that your application for that permit?
A. I guess.
Q. And, in fact, you received that permit, did you not?
A. Yes, I did.
From nine different agencies.
Q. Okay. And showing you what was premarked as Exhibit 25.
Is Exhibit 25 a record of the permitting allowed by the State, the Department of Natural Resources?
A. Yes.
Q. Okay. Now, sometime thereafter, you had communications with the Corps of Engineers, did you not?
MS. KAPPLER: Well, strike that.
Q. (By Ms. Kappler) You had had

74

communications with the Corps of Engineers in connection with your harbor -- or permit, hadn't you?
A. Yes.
Q. You had had them before you even filed this permit application, hadn't you?
A. Yes.
Q. Had you spoken with Mr. Koschak, who's standing (sic) over here?
A. Yes, I have.
Q. Okay. Had you spoken with him in connection with this harbor permit?
A. Yes, I had.
Q. And do you recall your discussions with Mr. Koschak regarding the harbor or permit?
A. He said it'd probably fall in the reg -- as long as it wasn't over an acre, it'd fall under the normal blank, the permitting process, because it, on his map, he said it was wooded uplands.
Q. Mr. Koschak represented to you that it was wooded uplands?
A. Yes, he did.
Q. Okay. And when did he make that

75

statement to you?
A. During the permitting process.
Q. So sometime on or around the time you submitted this application in January of 1990, that was received by the Corps, it looks like in February of 1990, Mr. Koschak represented to you that the area affected by the harbor was wooded uplands?
A. Yes.
Q. Okay. Now, sometime in 1993, the Corps sent you a letter, and it's the letter that was premarked as Exhibit 5. Was it not?
A. I, I remember this.
Q. You received that letter?
A. Yes.
Q. And that letter refers to a copy of the National Wetlands Inventory map -- or actually encloses a National Wetlands Inventory map, does it not?
A. What, what I was told is that they came out with a new map and, and looking at new topographical map, all of the woods along the lake were now wooded wetlands. That's what -- referring --
Q. So --

76

A. -- to that letter.
Q. Okay. So -- and you were provided with a copy of that National Wetlands Inventory map, were you not?
A. No.
Q. So the statement in here, enclosing -- purporting to enclose a copy of the National Wetlands Inventory map, is incorrect?
A. I might have a, a par -- a portion that includes on -- my land in there, yes.
Q. Okay. So you received some -- you received some map?
A. Yes.
Q. And you understood that map to indicate that your property was, was a wetlands area?
MR. FISH: I'll object. Counsel, are you referring to type one wetlands, type six wetlands, --
MS. KAPPLER: Wetlands.
MR. FISH: -- developable wetlands?
MS. KAPPLER: Wetlands.
A. Everything in the county is a wetland, I mean, the, the --
Q. (By Ms. Kappler) Well, that's not

exactly right, is it?
A. Well, it's pretty, pretty close to being right. I mean, what they did is they changed everything from the old map that showed it as, as wooded upland, now it, just by somebody doing a new map, it was all wooded wetland. I mean, nobody come out on my property and said it was wetland.
Q. Well, --
A. They made a new map.
And just the color code changed it to wooded wetland.
Went from brown to green.
Q. You had seen a map provided by the Corps of Engineers prior, previously, that indicated that the, the area was not wetlands?
A. All the topographical maps are, are coded as colorwise. Whether they're, they're wetland or upland or, or anything in between that, what -- prior to that weren't in the same color code as the new ones.
Q. Did -- was it your understanding because it was wooded, it wasn't wetlands?
A. Because it was wooded it wasn't wetlands?



Q. Was that your understanding?
A. My understanding was, prior to that new map being coming out, Mr. Koschak understood it was wooded wetlands, too. That's how come he gave me the blanket permit.
Q. I'm asking you about what your understanding was.
Was it your understanding, before receiving a copy of the National Wetlands Inventory map, or the, the relevant portion, that forested wetlands were not -- or, excuse me, forested property was not wetlands by definition?
MR. FISH: I'll object, that's argumentative.
Q. (By Ms. Kappler) I'm just trying to clarify what your understanding was. Did you believe, before you received a copy of this map, that if it was forested, it could not be wetlands?
A. No.
Q. Okay.
A. I mean, I, I log blue spruce, I log on pine and it's totally different kind of ground.



Q. Now, let me show you what was premarked as Exhibit 7. A letter from Mr. Wopat, to you. Did you receive that letter?
A. I believe I have.
Q. Okay. And do you recall having any discussions with Mr. Koschak around the issues described in this letter?
A. Most of my questions were referred to local, local people.
Q. My question is: do you recall having any discussions with Mr. Koschak regarding the issues outlined in this letter?
A. I don't.
Q. Okay. So you don't recall having any discussions with Mr. Koschak regarding the possibility of hiring a consultant to delineate the property?
A. I don't recall, no.
Q. Okay. Is -- in any event, you, you got this letter?
A. I assume I did.
Q. Okay. And that letter indicated that you may wish to hire a qualified private consultant to help you delineate this highly diverse site, did it not?



MR. FISH: She's asking you to read the letter.
A. That's what the letter says, yes.
Q. (By Ms. Kappler) Did you ever consult any -- contact any individuals to, to delineate the property or regarding delineation of the property?
A. The local, local people up here.
Q. You say: the local people, who are you referring to?
A. NRCS, SWCD.
Q. Did you --
A. County --
Q. -- contact private consultants?
A. County water planning.
Q. Did you contact any private consultants regarding the preparation of a delineation?
A. No, I didn't.
Q. So you never priced it -- you never explored it with private consultants?
A. Not, not when I had the experts right in the County that would -- could do the same thing.
Q. Well, did they do it for you?

A. They ultimately did.
Q. Delineated the property?
A. (No verbal response.)
Q. The County?
A. (No verbal response.)
Q. Okay. What are you referring to?
A. The -- all who -- crew of eight experts were out there delineating. I assume they come up with a -- at a point they, they decided what, what was what. I mean, I -- (no further response.)
Q. So is it your testimony that state and local authorities prepared a delineation?
A. During that period, from 1990 to 2000, there was ten different people in those jobs, I mean, I, I -- (no further response.)
Q. Did you contact your local representatives and senator regarding some of the issues you were having with the Corps --
A. Yes.
Q. -- of Engineers?
A. Yes, I did.
Q. And what did you communicate to them?
A. Well, some of the problems I was



having, as far as it looked to be, that I didn't have any of those problems until I put up my elk fence.
Q. So it was your belief that the issues you were having related to the wetlands near Lake of the Woods was tied in some way to the property that we identified in Exhibit 21 as the fenced property?
A. It sure looked like it, I didn't have any problems prior to that.
(Whereupon, there was discussion off the record.)
Q. (By Ms. Kappler) How many times did you contact your representatives or senators regarding issues with the Corps?
MR. FISH: I'm going to object to relevance, nor is it likely to lead to discovery of admissible evidence, and it's boarding on harassing.
If Counsel would like to show how this could be in any way discoverable or used in this lawsuit, I, I would like to know. If not, I may advise Mr. Bailey to halt on this line of questioning.
MS. KAPPLER: Well, I -- for the



record, I don't think that you have a basis for instructing him not to answer. The, the information need not be relevant if it can lead to the discovery of admissible evidence.
And what I'm trying to determine is what representations Mr. Bailey made to other individuals regarding these issues. And I would say that, that that is mainly likely to lead to the discovery of admissible evidence. I don't think it comes close to harassment.
Q. (By Ms. Kappler) Mr. Bailey, did you make multiple inquiries to your congressional representatives regarding these issues?
A. Well, I, I talked to my representatives.
Q. Okay.
A. They came out and looked on the site.
Q. Okay. Who was your local representative?
A. Well, at that particular time it was LeRoy Stumpf.
Q. Uh-huh.
A. That was state.



Q. And Mr. Stumpf actually came out to the property?
A. Yes.
Q. And what did you indicate to Mr. Stumpf about the issues?
A. I didn't go out with him to the site.
Q. When did Mr. Stumpf come and visit the property?
A. I don't know, I think they went out on a road, road -- the county board's normal road -- what do they call that, when they look at it, look at county roads in the spring and see what -- which ones are bad, which ones are -- needs to be fixed and whatnot. The road tour, I guess is what they call it.
Q. What we premarked as Exhibit 8 is a letter to Senator Wellstone, the late Senator Wellstone, from the Corps of Engineers. It's a 1994 letter.
Were your inquiries to Mr. Stumpf in and around the time of that letter?
A. Now, Mr. Wellstone has never been up in this area, I --
Q. I'm, I'm not actually asking about

your contact with Mr. Wellstone, I'm trying to establish a time period during which you were communicating with Mr. Stumpf.
A. Mr., Mr. Wellstone was at a meeting in Grand Rapids, which, which Senator Graham was there on forest roads. And I, I got along really good with Mr. -- with, with Mr. Graham. And he introduced me to Mr. Wellstone and he, he was concerned.
Q. You mean Senator Graham?
A. Senator Graham, Senator Wellstone.
Q. Bob Graham or Phil Graham?
A. Phil, the one that Coleman just beat, I guess.
Q. So when -- communications with Mr. Stumpf is what I'm trying to determine. Were they with this issue, is what I'm trying to determine?
A. Mr. Stumpf is a personal friend of mine, so I -- he -- I don't know when I, when I told him about it. Could have been when I first started out with the marina application.
Q. Okay. So you, you cannot --
A. It's --
Q. -- tell me when your communications



with Mr. Stumpf were?
A. No. He was concerned about developing and what -- no. I mean, just like any senator, he'd like to see the things expanding and going on in the county, you know, any, any help he could do, he was there, you know.
Q. Okay.
A. I mean, just any, any person he'd do that for.
Q. Okay. What did you indicate to Mr. Stumpf about the issues that you were having?
A. At, at what particular time?
Q. Let's talk about your earliest contact with Mr. Stumpf around the issues relating to this property.
A. It was probably when I, when I first went in to do the road and was told that I had to wait and, and get proper permits if I needed them.
Q. So you're talking about communications sometime around 1998?
A. It would be -- yeah, yes.
MR. FISH: Counsel, I'd go on record, on Exhibit 20 -- or Exhibit 8, has this



been disclosed in discovery?
MS. KAPPLER: It's part of the administrative record.
MR. FISH: That's not my question. You're saying this is in the administrative record?
MS. KAPPLER: Yeah, it's got the Bates stamp from the administrative record.
MR. FISH: All right.
MS. KAPPLER: Okay.
Q. (By Ms. Kappler) So you believe you first communicated with Mr. Stumpf about issues relating to this property in approximately 1998, when you were having issues about the road?
A. I think the County brought it up to him and -- whether or not I contacted him, he contacted me, I --
Q. Okay. So what did you communicate to Mr. Stumpf about these issues?
A. Well, it, it -- I guess, to me, it -- there was never a problem with anybody else doing subdivisions along that whole section of the lake. And if there was a problem, I, I, I couldn't see one, you know, I mean, -- (no



further response.)
Q. Okay. Now you indicated you had also had a conversation with Senator Graham and Senator Wellstone at some point?
A. Yes.
Q. And was your communication with Mr. Wellstone in person sometime around the time around 1994, after you had provided -- been provided with a copy of the National Wetlands Inventory map?
A. That I can't recall. I know it was a meeting in Grand Rapids, that he just wanted to talk to me.
Q. So tell me what you can recall about your discussion with Mr. -- or Senator Wellstone.
A. I didn't talk to him in length about anything other than that -- being a former resident of Grand Rapids. I knew the mayor and the mayor said that if I wanted to talk to him any time, he'd, he'd, he'd get me in to see him. I -- they were -- it was a big meeting, I didn't -- I just said hi and that was about it then.
Q. What, what did the meeting concern?

A. It was forest issues.
Wellstone, Hober (phonetic), Starr, Graham, they're all there on forestry-related issues.
Q. Okay. So did you have any substantive discussion with any of these individuals regarding your property along Lake of the Woods?
A. Oh, it was Mr. Graham, since he was getting involved in forest roads and whatnot, and forestry issues. And he was one of our, our people that knew things.
I was telling him about the new map you came out with prior to that, was something that you call wooded uplands, and because of a -- of the way you now called it, it now became a wooded wetlands, you know.
Q. So --
A. I --
Q. -- if I understand it correctly, you discussed the NWI map, the National Wetlands Inventory map, with --
A. I was --
Q. -- Senator Graham?
A. -- concerned -- this happened all



the way along the part of the map I had. It, it changed everything from what it had been to something new. I was concerned and so was Mr. Graham, with, with how, how people were changing things from what you construed -- since you have more power in wetlands issues than you do in wooded upland issues, that what -- this could be a problem as me being a logger. And, and he construed that -- he was going to look into it.
Q. Okay. Mr. Bailey, you outlined earlier on Exhibit 20, the property that you acquired in 1989.
What investigation, if any, did you conduct into the nature of the property that you were acquiring before acquiring it?
A. I, I bought it -- I -- like I said, for an investment. Mr. Pieper, who farms out to the lake adjacent to me, kept his lakeshore as an investment. And prior to that -- I mean, nothing along that whole lake has ever experienced any problems as far as being buildable.
Q. Okay. What, what I'm asking about is what investigation, if any, you conducted



prior to acquiring the property? And I mean that entire property that you've identified here on Exhibit 20 as the property that you acquired in 1989.
MR. FISH: I'll object, I think he just answered the question.
Q. (By Ms. Kappler) I'm asking you about your investigation.
MR. FISH: And I -- I'll object --
MS. KAPPLER: Okay.
MR. FISH: -- to the question, he just answered the question.
MS. KAPPLER: Let's read back Mr. Bailey's last answer, if you would.
(Whereupon, the answer was read back by the reporter.)
Q. (By Ms. Kappler) Okay. So in light of your last answer, it sounds like what you've described to me is what your view of things was at the time you acquired it.
What I'm trying to understand is what investigation you undertook, if any, prior to acquiring that property.
Let me be specific. Did you speak with any local or state officials regarding the



property that you were considering purchasing?
A. FSA, NRCS.
Q. FSA stands for --
A. Farm Service.
Q. Okay. And this is prior to your acquisition of this property?
A. Yes.
Q. Okay. Any other state, local or federal authorities that you spoke with in connection with the acquisition of this entire property?
A. When I was in the farm program at that time, it was -- they, they were the ones to ask.
Q. Okay.
A. Or refer you to somebody else.
Q. Okay. So those were the only officials that you spoke with related to your acquisition of this property?
A. I believe so.
Q. Okay. Did you deal with any consultants regarding this property before acquiring it?
A. No.
Q. Did you con -- communicate with any

93

real estate agents about this property before acquiring it?
A. No.
Q. Did you, did you deal only with the Lewises in connection with the acquisition of this property or were you working at all through any agents?
A. No, I just dealt with the Lewises.
Q. Okay. What, if anything, did the Lewises communicate to you about the property that you were acquiring?
A. That they, themselves, haven't developed it, because they -- it -- that's the reason it hadn't been developed, is because they didn't want it to be developed.
And, and they didn't want any neighbors down there, I guess is the big problem.
Q. Do you know how long the Lewises had owned the property they sold to you before --
A. No.
Q. -- selling it?
A. No, I don't.
Q. Do you know if the Lewises continue

94

to own any property around that area?
A. No.
Q. Okay. How old were they, approximately, when you acquired the property from them?
A. Probably in their 60s, I suppose.
Q. Okay. Did you communicate with any neighbors before acquiring this property?
A. Well, I knew a lot of people that bought land along Sandy Shores.
Q. Had you communicated with them in connection with the acquisition of this property?
A. Well, they, they, they knew that it was highly developable and really valuable land, you know, I mean.
Q. Okay. What, what I'm trying to determine is: did you, in connection with the acquisition of this property, communicate with neighbors about this property?
A. A lot of people had been trying to buy land -- buy that land from Lewises, and I just happened to be one that connected with them, --
Q. Okay.

95

A. -- they just liked me, I guess.
Q. Mr. Bailey, did you speak with any neighbors before acquiring this property? About the property you were going to acquire?
A. Yeah, I --
Q. Did you speak with Mr. Pieper?
A. No.
Q. Did you speak with any of the folks who own property further up Sandy Shores?
A. I, I -- yeah, I knew four or five people that lived there.
Q. Did you communicate with them about the property that you were acquiring?
A. I probably did.
Q. Okay.
A. I can't recall it.
Q. Okay. Do you recall anyone, other than the individuals -- the Lewises and the individuals at FSA and NRCS, that you communicated with prior to acquiring this property, in connection with your acquisition of this property?
A. I can't recall.
Q. Okay. Now let's go back to your communications with FSA and NRCS. What did you

96

discuss with them about this property?
A. Well, since some of my land was in the farm program, I mean, whether or not it qualified for CRP or just, just how it, it fell in line with that.
Q. Okay. That was an important issue for you, --
A. Yes, it was.
Q. -- to determine that the agricultural land was land that qualified for the farm program?
A. Well, if you could still farm it, yes.
Q. Okay. Did you make any inquiries regarding the forested areas?
A. Normally on their maps they, they have a habit of whether it's wetland or upland or -- this wasn't classified.
Q. I'm, I'm asking if you made any inquiries to anyone regarding the area that wasn't farmland but forested?
A. No.
Q. Did you examine any maps or drawings or other documents before acquiring this property?

A. I had the old topographical maps.
Q. Who prepared those old topos?
A. The old ones? They -- you, you buy them just through a -- what I'm trying to say, like a hunting store. I mean, they've got all the topographical maps.
Q. And what was the purpose of looking at these topographic maps?
A. What is the purpose of it?
Q. Why did you look at those topographic maps in connection with your purchase?
A. Well, I more so, on the east -- the stuff on the west side of the road, because I, I like to hunt, just to see what was back there I guess. Me, being in a wheelchair, more look at a map, I do, than being able to be on ground. Being in a wheelchair and being able to get around.
Q. So you were trying to determine if it was good hunting ground?
A. The stuff on the west side.
Q. The west side of Route 53?
A. Uh-huh.
Q. Okay.



A. And, and --
Q. What other purpose did you look at for, for -- what other purpose did you look at the topographic maps, if any?
A. Just, just how -- just to see how the land laid with the, with the adjacent ground.
Q. So you were the -- when you say -- let me, let me clarify.
Were you trying to determine what the contours of the land were, literally? What was higher?
A. Well, in our county, it doesn't make any difference there, because it -- it's relatively flat. You're, you're -- we don't have any hills or anything like that.
Q. So for what other purpose, besides hunting, were you looking at the topographic map?
A. It's usually -- for me, being a -- logging, what kind of trees are on this, mainly, I guess, is what I'm looking for.
Q. And the types of trees are detailed on the topographic map that you have?
A. If, if it looked like it was treed,



yeah, I'd go to forestry and see what kinds of trees were on it.
Q. Did you go to forestry to see what kind of trees there were?
A. I did, yeah.
Q. Okay.
So you actually went to, went to the forestry offices --
A. Uh-huh.
Q. -- and determined what trees were on the property that you were acquiring?
A. That -- that's true.
Q. What area were you thinking about logging?
A. On the west side of the road.
Q. The west side of the road that is now there?
A. Yeah -- no, no, the west side of the main road there.
Q. Of Route 53?
A. There you go.
Q. Okay.
To what extent was that area forested, as opposed to open agricultural land at the point you acquired this?



A. Relatively forested except for the home site.
Q. Okay.
A. Probably 10 acres.
Q. So you went to forestry to find --
A. Uh-huh.
Q. -- out about the trees?
A. Yeah. Up, up at the lake was predominantly aspen, and I could log that at any time, too.
Q. Okay.
MR. FISH: Counsel, I think it's probably a good time for a break, we've been going for two and a half hours here or so.
MS. KAPPLER: That's fine. If, if you don't mind, I'd like to take a couple minutes to firm up this area about who you spoke with and what you did.
And I think I'll be able to do that in five or ten minutes.
MR. FISH: You want to repeat the questions or do you have new questions?
MS. KAPPLER: I'm, I'm trying to -- I thought we had determined everyone he had talked to and everything he had done and now I

hear about forestry, so --
Q. (By Ms. Kappler) Did you go anywhere else, did you look at anything else in connection with the acquisition of this property?
You've described conversations with FSA and NRCS. You say you spoke with the Lewises about it. And you indicate that you looked at topographic maps. And then you went to forestry and investigated the specific trees that were on the property.
Did you do anything else before acquiring this property in connection with your acquisition of this property?
A. A lot of that stuff I did after I --
(Whereupon, Mr. Robert Whiting left the room.)
A. -- acquired the land.
Q. (By Ms. Kappler) Okay. I'm talking about before acquiring the land.
A. Before acquiring, I, I --
Q. So did you go to forestry before or after?
A. No, after.



Q. Okay. Did you look at the topos before or after?
A. After.
Q. Did you speak with FSA before or after?
A. Before.
Q. Okay. And what about NRCS?
A. Before.
Q. And these communications with the Lewises were before, presumably?
A. Yes.
Q. Okay.
Did you do anything else before you purchased this property, besides communicating with the Lewises, FSA and NRCS?
A. I might have looked at it from the lake, you know, this is --
From a snowmobile or from a boat, I guess, but -- (no further response.)
Q. You had dealt with wetlands issues in connection with Elk Ranch, hadn't you?
MR. FISH: Are you moving on to a different topic?
MS. KAPPLER: I am, actually. Let's take a break.



MR. FISH: Yeah.
(Whereupon, a lunch recess was taken at 12:18 o'clock p.m. to 1:32 o'clock p.m.)
MS. KAPPLER: I'm ready to go back on the record.
Q. (By Ms. Kappler) Now, Mr. Bailey, when we were last speaking, we were discussing some of the efforts that you took in connection with the acquisition of this property.
And I, I want to clarify a couple of things, and that is, the specific substance of your discussion with FSA and NRCS.
You indicated that you wanted to verify that the land was in the farm program. Is that correct?
A. Well, I knew it was in the farm program, --
Q. Okay.
A. -- but --
Q. Was there other specific information you were trying to acquire from FSA or NRCS?
A. That -- that's just what -- I wanted to reverify it, I guess, because the,



the owner I bought it from, rented it out to, to the neighbor, Bob Pieper.
Q. So when you say: in the farm program, were you trying to determine whether it qualified for certain subsidies?
A. Well, I knew it did that, but I, I just, I just wanted to see the base, all that kind of stuff on it.
Q. See the --
A. To, to see what's been planted on it and that kind of stuff, you know, you always look and see what the history is on farmland.
Q. So did you actually visit FSA and NRCS and, and review --
A. I --
Q. -- documentation?
A. I was in the farm program, they just copy a map and send it out to you, yeah.
Q. Okay. So you had some conversation to verify that it was indeed in the farm program. And then you reviewed documents that were provided --
A. They sent --
Q. -- by FSA or NRCS, which one was it, by the way?

105

A. It's probably NRCS.
Q. Okay. And then you reviewed those documents to, --
A. Uh-huh.
Q. -- to -- simply to find out what the history of the agricultural area was?
A. And I, I might have done that after I bought it, too, I --
Q. Okay.
A. Whether I bought it or did it before it was -- I, I bought it for lakeshore is what I did, you know, I -- (no further response.)
Q. Okay. Now let's talk about the Elk Ranch property.
You -- just so we're clear, that -- when we talk about Elk Ranch, and when I talk about Elk Ranch, I'm referring to the area that you identified on Exhibit 21 as the fenced area.
Had you had occasion to deal with any issues involving wetlands on Elk, Elk Ranch?
A. Since when?
Q. At any point.

106

A. Yes.
Q. First of all, when did you acquire that property?
A. It'd been piecemeal all the way along, but I -- 1978 is when --
Q. Okay.
A. -- I first bought it.
Q. Okay. And then looking at 1978 forward, --
A. Uh-huh.
Q. -- did you have occasion to deal with any wetlands issues at all during that period?
A. I think in '86, somewheres around in that area.
Q. Okay. What happened in 1986?
A. I cleaned out the stock pond on my property.
Q. Cleaned out stock mount?
A. Stock pond.
Q. Pound.
What is that?
A. It's a pond built by FSA.
Q. Oh, I'm sorry, stock pond?
A. Stock pond.

107

Q. I see, okay.
A. So, so the, the fellow that I bought it from, used to raise cows on there and, --
Q. Uh-huh.
A. -- and it was all, all silted in.
So I cleaned it out.
And took some beaver dams out.
Q. Okay. So when you say you had occasion to deal with wetlands issues, what, what do you mean?
A. Well, that's the only thing I did, I -- prior to that, the neighbor was -- which is now my land, was draining his land under a farm program where they paid him 75 percent to do that.
Q. Uh-huh.
A. I, I did everything on my property on my own.
Q. Okay. When did you first have any contact with state, local or federal authorities around wetlands issues?
A. Like I said, it was eighty -- '85, '86, somewhere around in there.
Q. So what, what happened -- what,

108

what was the, what was the nature of your contact with these authorities during that time period?
MR. FISH: Counsel, I think he just answered that question.
MS. KAPPLER: I'm trying to determine -- he said he had contact, and what I'm trying to determine, what was the contact.
MR. FISH: We just went through the pond.
MS. KAPPLER: Okay. He described the pond.
Q. (By Ms. Kappler) What I'm trying to figure out: what was your contact with the authorities?
A. That's when I first met Mr. Koschak.
Q. Okay.
So you met Mr. Koschak?
A. Uh-huh.
Q. And what was the subject matter of your meeting with Mr. Koschak?
A. Well, I, I wanted to know why he was the expert. And even though he carried the big book and the wheel, you know, he, he said

he was from Alaska and was counting muskox before he come on my property.

But that's the first thing I, I heard about that I was in violation of something.

Q. So you were informed of a violation?

A. Uh-huh.

Possible violation.

Q. Okay. By Mr. Koschak?

A. Well, by, by the Corps, you know, --

Q. Okay.

A. -- wrote me and told me Mr. Koschak was going to come visit.

Q. Okay. And what was your understanding of the nature of the alleged violation?

A. Well, like I said, I was cleaning out my stock pond, making it larger, and in doing so, I put peat on top of peat and they said --

Q. Uh-huh.

A. -- that was a violation of whatever.



So I, I, I gave the peat to the County, who was using it to, to fill their landfill for a cover. And they, they took the peat that I had piled on the wetland. I took care of that.

Q. Okay. Did you --

A. Other, other than that, I wasn't draining anything, I was just making it so I could get around and, and cleaning what was originally done there.

Q. Okay. Did you deal with any state or local officials around issues dealing with these wetlands?

A. I had -- back then, instead of -- when you were in the farm program, you -- your contact was U.S. Fish & Wildlife, --

Q. Uh-huh.

A. -- instead of the Corps, like it is now.

I contacted the, the people from Agassiz Refuge. They were the local U.S. Fish & Wildlife people.

Q. Could you spell Agassiz?

A. A-g-i-a --

MR. FISH: I think it's:



A-g-a-s-s-i-z. I think.

A. It goes --

MS. KAPPLER: I'm sorry, what is that?

MR. FISH: I think it's: A-g-a-s-s-i-z.

MS. KAPPLER: Okay.

Q. (By Ms. Kappler) You contacted them for what purpose?

A. Well, you're supposed to contact them if you had anything to do with water, which, which I was doing with, with the pond.

And they came out. And what I wanted to do is -- was, was dike it up and, and, and make more water on my property, is what I was trying to do.

They came out and surveyed it and they said it was too flat. They said I -- by doing that, I'd, I'd kill a lot of my trees that couldn't take water. You know, I didn't, I didn't want to do that. And that wasn't my intent. I was -- so they, they left me two culverts and that was the last I seen them.

Q. Okay. Now when, when was that, dealing with the -- with Fish & Wildlife?



A. I was --

Q. That was before you dealt with the Corps?

A. That was '80s, somewheres right around, right around the same time.

They, they might have more recollection of when that was, but digging through my piles of stuff, I probably could find exactly when it was, but -- (no further response.)

Q. Okay. After this '85, '86 period, when you were dealing with the Corps and you dealt with Mr. Koschak, when was --

A. Uh-huh.

Q. -- the next time you had occasion to deal with any kind of state, local or federal officials around wetlands issues?

A. Uhm. Are you talking on -- you're talking about the elk farm now?

Q. We can -- Elk Ranch or, or any other property.

A. It'll get pretty confusing, because the two are totally separate, but you --

The Elk Ranch, when I started doing the fence, that's, --

Q. Okay.
A. -- that's my --
Q. Okay. When was that?
A. Uhm. I would say somewheres '96, '97, I think.
Q. Okay. That's on the --
A. I'm --
Q. -- Elk Ranch?
A. I'm guessing now on that. I, I could look back and see when I -- because I've got records of when I bought the elk fence and all that, but --
Q. Okay. And what was the issue related to that?
A. Well, issue is, none of the neighbors wanted me to put up the elk fence, so they, in turn, tried everything they could, which finally went to the wetlands people, to see if I, if I could put a fence across the wetlands.
Q. And the Corps was involved --
A. In the, in the --
Q. -- or the EPA? Who was it?
A. Well, the -- it first was the DNR --



Q. Uh-huh.
A. -- and the County.
They didn't have any jurisdiction over fences. So they referred them off to the, the Corps, which, there again, they didn't have anything to do with fences, but they had to do, if I was draining something.
Q. Yeah.
A. Well, everything -- wasn't draining anything, but it ultimately come down to if, when I augered my posts into the ground, the material that came out of the auger, the EPA said was a pollutant.
Q. What is an auger?
A. It's, it's the drill to make a hole in the ground so you can put your post. It --
Q. Uh-huh.
A. So I pulled all my posts out, leveled it all off again and pushed them down with a backhoe.
Well, they, they didn't like that at all, you know, they didn't leave any pollutants in the ground, but I put up my fence.
Q. What was the pollutant that was



unearthed?
A. Just as I said, the auger material that came out of the auger, the sand.
Q. Oh, I see, okay.
A. They got so fussy, they didn't want me to drive my Cat on it because it would pick up sand and the sand would fall off the tracks into, into the wetlands, what they call a pollutant.
Q. Okay. So that was your next dealing around wetlands issues on the Elk Ranch?
A. Uh-huh.
Q. What was your next dealing, going back to your first dealings with Mr. Koschak and the Corps back in the mid-'80s, what was your next dealing with the Corps around wetlands issues as to any property?
A. It was just under the road issue.
Q. Okay.
A. Road up at the lake.
Q. What about the harbor permit?
A. Well, I, I kept extending the, the thing through the, the Minnesota DNR.
Q. Uh-huh.



A. And they did a, a jetty for the Zippel Bay area and, and they found out by doing that jetty, that they had the problem with longshore drift, which meant that the sand built up behind it.
So when I finally decided I was going to do my, my permit, they said: well, you'd have a problem with longshore drift, so we're going to deny your permit.
And that -- that's what they did at that, that point then.
Q. Okay.
A. Then the, the Corps come out with this new thing saying that my land was now wooded wetland instead of wooded uplands and it's been in havoc ever since.
Q. Okay. So between 1985 and the time when you were seeking to obtain a permit from, from the Corps for, for the construction of this, this harbor, --
(Whereupon, Mr. Robert Whiting re-entered the room.)
Q. (By Ms. Kappler) -- did you have any dealings with the Corps or any state or local authorities around wetlands issues?

A. The, the own -- well, now, are we talking elk fence? Talking --
Q. Either, either property, any property. I'm just trying to figure out what your experience dealing with wetlands issues was in dealing with authorities.
A. Okay. Let's, let's -- on the elk farm, I'm, I'm a logger who has to go under the Minnesota logger education program, have to be qualified or certified to log.
We got to go to classes on forest roads, how to build forest roads. This is where I got involved with Mr. Graham. Because he was helping define forest roads, because they're supposed to be exempt in our particular area.
The way you build the road, is take the spoil from adjacent to the road, because there's no gravel in our area, build your base out of that.
And, and what you have is a lateral ditch between where you start the road and where you end the road. And that's what I did on my property.
Q. When you say: your property, what



property --
A. I'll say the --
Q. -- are you referring to?
A. -- elk fence, or Elk Ranch, go from one to the next, I guess. And that's still in dispute.
Q. Okay.
A. Ultimately, they said my road was okay and I had to put ditch plugs here and there, which didn't, didn't make any, any difference to, to the flow of the water or anything.
Q. Okay. What was the time period when you were involved dealing with -- first, dealing with the forest road issue?
A. Well, --
'97, I would think somewheres right in there.
Q. Okay. So what I'm trying to find out is if between 1985, when you were first dealing with the Corps around --
A. Uh-huh.
Q. -- wetlands issues on Elk Ranch, and 1990, I believe, when you apply for a permit for the harbor, --



A. Uh-huh.
Q. -- on what became the, the Sunny Beach area, did you have any dealings with the state, local or federal authorities around wetlands issues?
A. (No verbal response.)
Q. Just for that time period.
A. I, I, I don't recall any.
Q. Okay.
Now we talked a little bit earlier about your discussions with Scott Seeley at Taylor Investments.
Those were before the property was formally subdivided, weren't they?
A. Yes.
Q. Was it your understanding that Mr. Seeley was investigating the possibility of subdividing the property himself?
A. That -- that's what he, he came to me --
Q. Okay.
A. -- for.
Q. Did you have any discussions with anyone else about the purchase of the property before it had actually been platted as a



subdivision?
A. No.
Q. When did you decide to develop the property with home sites?
A. I guess I thought I was going to develop it from the, the day I asked for the marina permit, you know, as far as getting a marina, it was always under the understanding that the marina was on the far south end of the property, which, which is only accessible if you built a road in there, which -- and the County knew I was going to build houses in there. And they always were after how I was going to lay it out.
And this, this Seeley group was looking at putting PDUs, I guess, planned development unit, which is like town houses in there.
And I, I was thinking of building a house for myself up there at one time, so I, I didn't, really didn't want a whole bunch of people up there.
So ultimately we decided I, I was going to plat it at one time, which meant I didn't have to plot it. And the acreage from

the main road, all the way out to the lake, was 6 acres on each one of those lots.

And the, the County talked me into platting versus plotting it, and that's what I ended up doing.

Q. Let me find what I'm looking for.

I meant to inventory these documents, sorry.

Okay.

Let me show you what we marked as Exhibit 22. And direct your attention, in particular, to the area that's marked as Sandy Shores Drive.

You constructed that road, did you not?

A. I had a contractor construct it.

Q. Who's the contractor?

A. Well, Mark La Valla, but I don't remember what his, his -- name of his firm is. I think it's just La Valla Sand & Gravel, I think.

Q. La Valla?

A. La Valla.

Q. Could you spell that again?

A. L-a V-a-l-l-a.



Q. Okay. And I'm sorry, the name of his firm is La Valla Sand & Gravel?

A. I believe so.

Q. Okay. How much did it cost you to construct that road?

A. If I added it all up, just over $25,000.

Q. Did you pay for all the materials?

A. Yes.

Q. And labor?

A. Yes.

Q. Did you pay for that from savings or did you borrow against any property in order to pay for that construction?

A. Well, depended on what I did. I, I mean, I -- where I got it from -- I mean, I paid him in full.

Q. I'm, I'm asking where -- was it money you had in savings or was it money that you borrowed against -- you, you borrowed from something?

A. I, I can't remember. I, I know that's one of the reasons I sold the property, the, the Jeff Dahl, so I'd have money to do the road.



So I --

Q. Okay.

A. -- whether or not that was to pay off another loan, I, I don't know at the present --

Q. Okay.

A. -- at that time.

Q. When did you commence that construction?

A. I think it was in '98, I believe.

Q. Do you recall approximately when?

A. No, I don't. I -- we were going to start in the spring and I, I went to the County, went to, went to SWCD, and asked them what I had, had to get. And they didn't know. And nobody else had anything along that whole road, so he said start. So I started.

And then we, we grubbed the road out and they told us we had to get Corps permits, which I didn't have to do before.

Q. Okay. So --

A. We roughed in a road, is what we did.

Q. Okay. So you started it in 1998.

Sometime after you started that



property -- started that construction, but before you concluded it, did you have occasion to meet with members of the Corps -- representatives of the Corps?

A. Oh, yeah, everybody was out there.

Q. Okay. And that was before the project was concluded, wasn't it?

A. Yes.

Q. And what, what did they say to you?

A. That I -- that I'd have to get -- apply for an after-the-fact permit.

Q. What else did they tell you?

A. They didn't really tell me a whole lot. That it could be wetlands, that it had to be delineated, and that's what the whole panel of experts got together to, to do.

Q. Okay. Well, you knew there was wetlands out there?

A. (No verbal response.)

Q. Right?

A. Not, not the whole thing is a wetland, no.

Q. Well, you knew that in the NWI map that you had been given in 1993, a certain area of that lakeshore property had been --

A. I --
Q. -- identified as wetlands, right?
A. I disputed that from the time I got the thing.
Q. But you knew that the Corps believed that it was wetlands?
A. I didn't know that, I mean, they, they gave me that with, with U.S. Fish & Wildlife, stating it was now, versus it wasn't before.
Q. Okay. You were told to stop work on that, that road, weren't you?
A. Yes, I did.
Q. But you finished it?
A. I -- they told me I could go back and finish it, yes.
Q. Who told you you could go back and finish it?
A. People down at SWCD.
Q. Who?
A. He works up at the Pro -- Zippel Bay Park.
THE DEPONENT: Remember, I was telling you his name?
MR. FISH: Yeah.



THE DEPONENT: Got a funny --
MR. FISH: You've said it many times.
I can't recall.
A. I -- it might pop --
Q. (By Ms. Kappler) Okay.
A. -- into my head, but I don't have it right now.
Q. Did anybody from the Corps ever suggest to you that it was okay for you to finish that road?
A. Well, what, what they got back is my after-the-fact permit application and through phone calls, I was calling them all the time, see when I could go in and finish it.
And they had the Public Notice, which was the last thing before it was okayed and --
Q. Okay. Well, hold on, I'm, I'm not there yet.
We're, we're back in 1998.
A. Yeah.
Q. You started the construction?
A. I --
Q. Sometime, sometime before you



finished the construction, you were visited by Corps representatives?
A. Yeah.
Q. You were told to stop work?
A. Yep.
Q. And sometime after that, you finished the work?
A. No, I, I only finished the work in '99.
Q. Before -- well, --
Let me, let me show you what we've marked as Exhibit 9.
Could you identify that document?
A. Yep.
Q. What is this document?
A. It's, it's the road for the -- up at the Sandy Shores.
Q. Okay. And the date of that application is 6-17-98?
A. Yep.
Q. Okay. And you signed that --
MS. KAPPLER: Withdraw that question.
Q. (By Ms. Kappler) To whom did you submit this permit application?



A. As I said, all the things that I do are through the Farm Service, so I -- it was either through NRCS or -- most of that stuff were not through SWCD.
Q. This, this didn't go to the Farm Service, did it?
A. No, but they -- that's, that's where they have all the forms they help you fill out. And that's what they did on that one, --
Q. Okay.
A. -- helped me fill it out.
Q. But it's your belief that you submitted this to a state authority?
A. They're a local government unit that dispenses those things off to the, the other members of their -- whatever team they are for waters.
Q. And the government unit, I think you submitted this one to, was the SWCD?
A. It's, it's the people that helped me fill it out, yes.
Q. Okay. The Soil & Water Conservation --
A. Yes.

Q. -- District.
Okay. Now, had you, at this point, obtained any estimates from Mr. La Valla about the costs?
A. Yes.
Q. Okay. And what had he indicated to you?
A. That it'd be somewheres around $25,000.
Q. Okay. And you had actually commenced construction at the point that you put this application in, hadn't you?
A. I'm not certain.
Q. Okay. Let's, let's take a look at this.
You indicate that the project purpose is: construct road for access, hyphen, logging?
A. Uh-huh.
Q. Was this a logging road?
A. We, we took trees out.
Q. Okay.
A. It could have been a logging road, that's the way they told me to fill it out.
Q. What's, what's your understanding



of what a logging road is?
A. Logging is a road that accesses something for logging timber.
Q. Okay. So what were you accessing for the purpose of logging timber?
A. Well, I can still log my property if I want to.
Q. I'm, I'm -- I, --
A. I --
Q. -- I understand that. What, what I'm trying to determine is what, what were you attempting to access for the purpose of logging?
A. Aspen.
Q. The -- were you talking about the property to either side of the road?
A. Both sides of the road. They're getting too big and they're falling down.
Q. Okay.
A. And that's what we did, we cleaned a lot of that stuff out of there.
Q. Okay. So you said: construct road for access. So --
A. Yeah.
Q. -- is -- did this mean it was an



access road for access --
A. Both --
Q. -- for logging?
A. Both purposes.
Q. Access to what?
A. Access to the property. Had no -- the only other road was on, on the south end and the north end.
Q. So looking at what we marked as Exhibit 22. There's a road that runs along parcel 14, is there not?
A. It's the road that shows on your map.
Q. And there's also a road down next to parcel number 1?
A. Yes, it is.
Q. These are the, the properties that are owned by you and the Fish Family Trust respectively, right?
A. Yes.
Q. Okay. Now, on this form that you filled out on June 17, 1998, you indicated that the property -- the project cost was 8 to $10,000.
What was the basis for that?



MR. FISH: Maybe you could show him the Exhibit so he could --
MS. KAPPLER: It's right here.
MR. FISH: Show him the cost on the Exhibit.
A. I guess it was just an estimate, I --
It says: rough in of road; not complete road. I suppose that's the reason. It's -- down here I have a: rough in of road. Which is just --
MR. FISH: Let the record indicate he's referencing language on the permit application.
A. Right, right here, it says: rough in of road.
Q. (By Ms. Kappler) So are you saying that the, the 8 to $10,000 was purely for roughing in?
A. That's what I'm guessing it was, yes.
Q. And not for paving or anything else?
A. Well, no.
Q. Gravel or --

A. No, no.
Q. What, what did you mean by roughing in?
A. Just a, a -- you, you take the trees out, the -- you grub the, grub the stumps out so you have a, a basis for a road.
Q. Okay.
Mr. Bailey, that road is part of the property that you claim was taken by The United States, is it not?
A. Yes.
Q. What action of The United States do you claim results in the taking of your property?
MR. FISH: I'll object, that calls for a legal conclusion.
If you understand the case law determining what constitutes the moment of a taking and you feel comfortable answering, answering a legal conclusion, go ahead. If you don't understand --
A. I don't. I don't understand it.
Q. (By Ms. Kappler) Do you believe that the, that the decision of the Corps of Engineers denying your permit application



resulted in a taking of your property?
A. In, in -- the extent where -- yes, I do.
Q. And that decision was in June of 2001, was it not?
A. I'm not sure a date.
Q. Mr. Bailey, were you the owner of that road in June of 2001?
MR. FISH: I'll object to the form of the question. Define owner. As it applies to real estate law. Clarify, please, Counsel.
Q. (By Ms. Kappler) Did you own a fee interest in that road?
A. It's, it's under dispute, I guess I, I --
Q. It's a yes or no question.
MR. FISH: Answer if you can.
A. Well, I, I -- I am not sure if I -- there's an easement there or if the County owns the road, the only -- (no further response.)
Q. (By Ms. Kappler) On -- in June of 2001, did that road belong to you?
MR. FISH: Asked and --
A. I'll say --
MR. FISH: -- answered, Counsel.



A. I'll have to say no.
Q. (By Ms. Kappler) No.
Now, looking at the various parcels here, starting with parcel number 2. Exhibit 33. Which, which is the subject of, of a deed in Exhibit 33. Did you own parcels 2 and 3 --
MR. FISH: Again, Counsel, --
Q. (By Ms. Kappler) -- in June of 2001?
MR. FISH: -- I'm going to object to the form of the question. Define your interpretation of own.
Q. (By Ms. Kappler) Were you an owner of that property?
MR. FISH: Whether a vendor/vendee, a reverter, contingency contract? What ownership interests are you referring to, Counsel?
MS. KAPPLER: First of all, vendor/vendee does not define -- let's put it this way.
Q. (By Ms. Kappler) Had, had you sold the property to the Thomsons prior to that date?
A. It's really hard for me, unless I'm



looking at those -- you're talking 14 different individuals. And what if it's a contract for deed or if they, they purchased it, there's -- makes a difference whether or not they owned it or I owned it.
Q. Well, they still owed you money?
A. Well, if they still owed me money, then I owned it. In most cases, they quit making payments, so if I wanted to, I could take the lots back, I imagine.
Q. Well, let's, let's talk about that.
Why did they stop making payments?
First of all, who stopped making payments? Which, which owners?
THE DEPONENT: Can I have that list that I have --
MR. FISH: Yeah, if you want to.
Refresh your memory.
No, I don't have it, I sent it back to the office to get copied.
Q. (By Ms. Kappler) Well, let me run through the list.
You sold Lots 4, 5 and 6 to the Wolfs, did you not?
A. Yes, I did.

Q. Did they stop making payments?
A. No, I bought those lots back.
Q. So they didn't stop making payments?
A. They purchased those lots, couldn't get a building permit and I bought them back from them.
Q. How much did you pay for them?
A. Even though they, they wanted me to write up something where they'd get more than what they paid for it, I, I offered what they paid me for them.
Q. What, what did they pay for them?
A. I think it was $75,000.
Q. Did you pay interest?
A. I'd need to look at their contract, but I think they, they paid in a period of time where, where it wasn't a year. Between the purchase agreement and when they paid for, for the lots.
Q. Okay. So they'd paid in their entirety --
A. Uh-huh.
Q. -- for the lots.
And, in fact, you transferred a



warranty deed to them --
A. Uh-huh.
Q. -- in June of '99.
And then in 2001, you repurchased the property --
A. Yes.
Q. -- for what they paid?
A. Yes.
Q. You were in a lawsuit with the Wolfs, were you not?
A. Well, I don't know if it was a lawsuit.
Q. They sued you, didn't they?
A. They were going to.
Q. Is it your testimony that you were not involved in a lawsuit --
A. They were --
Q. -- with them?
A. They were also going to sue the County.
Q. Did they sue you?
A. I don't know quite if they sued me or not.
THE DEPONENT: Did they? Did they, Al, or --



MR. FISH: Yeah, he doesn't understand the, the word sue. There was --
Q. (By Ms. Kappler) Well, you know that in this case, for instance, we have a document that has the name of the court -- I'm looking at Exhibit 3, name of party and a legal action number?
A. Yeah.
Q. Did the Wolfs bring a legal action against you? Did your name appear on a document with the name of a court --
A. We never went to court or anything.
Q. -- and parties.
You never went to court?
A. No.
Q. Going to court is what I mean by a lawsuit.
So it's your testimony that you were not involved in any way in a lawsuit with the Wolfs?
MR. FISH: Counsel, wait a minute. You define lawsuit as going to court, is that --
MS. KAPPLER: He, he just said: we never went to court.



MR. FISH: You said: going to court. You said the words: going to court.
MS. KAPPLER: I'm, I'm using Mr. Bailey's words.
MR. FISH: Okay. Please clarify if you're paraphrasing him or giving a definition.
Q. (By Ms. Kappler) Let, let me be clear.
I underst -- understood, when I showed you the pleading that we've got marked as Exhibit 3, that you, you equated that with going to court. Quotes around going to court. Is that correct?
A. I don't believe -- I never went to court.
Q. You mean, physically didn't walk into a courtroom?
A. I don't -- I can't recall that, no.
Q. Okay. Leaving aside whether you physically entered a courtroom, --
A. Uh-huh.
Q. -- what I'm trying to find out: were legal documents filed? Was a lawsuit filed by the Wolfs against you?
MR. FISH: You know, Counsel, I'm

141

going to object. First of all, Minnesota does not require the filing of any lawsuits to commence a lawsuit. So you might be asking legal questions that are beyond his knowledge. I'm doing that more for your benefit, Mr. -- in the substance of the answer.

MS. KAPPLER: Maybe we can go off the record.

(Whereupon, there was discussion off the record.)

MS. KAPPLER: Let me go back on the record and let me clarify that.

Q. (By Ms. Kappler) Were you served by a Complaint -- with a Complaint by the Wolfs?

A. I, I -- I'm -- I can't recall, I guess. I, I, I know we negotiated at some point and we -- purchasing the lots back, because they couldn't build on it and they wanted to build a house.

Q. Okay. Who, who told them they couldn't build?

A. The county planner.

Same guy that helped -- I mean, that did the platting.

142

Q. Did the Wolfs accuse you of anything?

A. Probably could have accused me of anything. I never met the Wolfs, I never talked to them.

Q. You do not know the Wolfs?

A. Huh-uh.

The lots were sold by North Border.

Q. By the way, did any of the realty companies that you identified before as being involved in listing the property or, or selling the property, obtain a commission in the sale?

A. They all did.

Q. And what was the commission?

A. Either 6 or 7 percent.

Q. Do you know if they ever included photographs of the property or a description of the property in any kind of published brochure?

A. That, that I don't know, I --

Q. Do you know if a photograph or description of the property appeared in any flyer that was posted?

A. I've, I've never seen one.

Q. Do you know what the vehicle was for providing the public with information about

143

the, the sale of the property?

A. That was -- that area there is one of the last places on the lake that has any, any lots that could be developed, so anybody coming up here looking for a -- lake lots, they'd, they'd probably have a big list of people. That's, that's how come they sold so fast.

Q. Was there a sign posted on the property?

A. No.

Q. I'm missing part of my Exhibits.

So --

Turning our attention to the property parcel 11, that was acquired by the Perssons, that property was reconveyed to -- was --

MS. KAPPLER: Strike that.

Q. (By Ms. Kappler) Sorry about that.

Okay. Let me ask you about the property that was conveyed to a Mr. Gowdy, Lot 10. At some point thereafter, did Mr. Gowdy reconvey this property to you?

A. Yes, he did.

Q. And that reconveyance is the

144

subject of what we premarked as Exhibit 46, is it not?

A. Yeah, correct.

Q. Okay. Could you tell me whether you are aware of any discussions that Mr. Gowdy had with anyone regarding the circumstances leading to this reconveyance?

A. He went up to Gary Lockner, the county planner, to see if he could get a building permit.

Q. And what is your understanding of what transpired in this discussion with --

A. They --

Q. -- Mr. Lockner?

A. They wouldn't give him a building permit.

Q. Did you ever have any discussions with Mr. Gowdy about, about this property?

A. He just wanted to know if I'd buy it back.

Q. Did he threaten you with any kind of legal action?

A. Huh-uh, no.

Q. How much did you pay for it?

A. How much did he pay for it?

Q. How much did you pay for it.
A. I just paid him back what he, he paid me.
It's on a contract for deed.
Q. Apart from the Wolfs and Mr. Gowdy, have you had to repurchase property from anyone?
A. No.
Q. Let me turn your attention to what we've premarked as Exhibit 47. This is a conveyance from your ex-wife to you. Listing interests in numerous properties.
You indicated, I believe, that your divorce from your wife was effective in 2003. Is that correct?
A. I believe so.
Q. Okay. And this, this conveyance actually occurred in 2002.
A. Oh, then, then it should go to two -- well, --
Q. Am I correct, that this conveyance was in 2002?
A. Then, then I'm, I'm in error, then.
Q. You, you say you're in error. Do you mean that you were --



A. It should probably --
Q. -- incorrect about the date of your divorce?
A. It should be 2002.
Q. Okay. Was this conveyance from your wife to you tied to any agreement in connection with your divorce?
A. Yes.
Q. And could you tell me about the terms of that agreement, please?
MR. FISH: With respect to real estate, Counsel?
MS. KAPPLER: With respect to, with respect to any matters.
Q. (By Ms. Kappler) Let's, let's deal with the disposition of any property, real and personal.
A. What does that have to do with the, the lake lots?
Q. The question is simply to determine what the terms of the divorce were. So we can understand what the backdrop was for the conveyance of this property.
MR. FISH: Well, Counsel, this is a divorce, just so we don't have any objections,



maybe you could be more specific on questions. Recite the general nature of all agreements in the divorce, some that may or may not be relevant? Maybe you could focus in on what you're so interested in.
MS. KAPPLER: I think the problem we have here is that the consideration for this conveyance is undoubtedly swept within the entire terms of the divorce agreement.
Q. (By Ms. Kappler) So what I'm trying to determine, essentially, is -- and I'll be very pointed about it: what did she get? You got, virtually, her interest in every property in this area, did you not?
A. Uh-huh.
Q. What did she get?
MR. FISH: Well, hold on, Counsel, are you trying to ask Mr. Bailey if he bought her interest in some property or whether some property was given -- was titled in her name as the -- of the -- as a result of some agreement, some property was --
MS. KAPPLER: Let me, let me back up.
Q. (By Ms. Kappler) Attachment one



lists numerous parcels.
Did your wife retain an interest in any property in this area in northern Minnesota?
A. No.
Q. Did she convey her interests as a joint owner of these properties --
A. Yes.
Q. -- to you?
A. You have --
Q. Entirely?
A. Yeah, you have it there in front of you.
Q. So what I'm trying to determine is: did she retain an interest in any property?
A. No.
Q. Okay. What -- she didn't do this for nothing. Am I right?
MR. FISH: Do what, Counsel? Please clarify.
Q. (By Ms. Kappler) What did she get in connection with the divorce decree that made her willing to give you her, her interests as a joint owner in many, many different parcels?
MR. FISH: Counsel, I'm going to

149

object to the form of that question, you're assuming that she -- Mr. Bailey traded something for that property. Your, your -- the, the question you're asking is argumentative now.

MS. KAPPLER: Well, that's --

MR. FISH: If, if you want to know what she received as a result of the divorce, maybe you should --

MS. KAPPLER: That was my first question. That's why I was trying to ask it broadly.

MR. FISH: You understand my objection. You're, you're implying that Mr. Bailey paid Mrs. Bailey for her interest in property.

MS. KAPPLER: What I'm trying to understand is what the nature and the terms of the divorce were that would lead someone to convey their interests as a joint owner in countless property interests.

Q. (By Ms. Kappler) So what I'm -- what -- my question is: what were the terms of the divorce? Back to my original question.

MR. FISH: So you're simply asking:

150

what did she receive?

Q. (By Ms. Kappler) Well, what did she receive? We can put it that way.

A. Well, yeah, I don't know why you need to know that, but I, I mean, dollars -- in dollars --

Q. Yes.

A. -- ten years from now? I mean, --

Q. Yes, what did she receive?

A. (No verbal response.)

Q. It goes to the value of this property. That's the point of these questions.

MR. FISH: Oh, I'll object to that then, Counsel. If you want a copy of a divorce decree, that's a public record. There is no tie-in between the real estate and the division of any cash assets the parties held.

MS. KAPPLER: Okay.

A. That's between me and her and how the whole divorce developed and got resolved, I guess.

Q. (By Ms. Kappler) But --

A. I mean, --

Q. -- this is, this is a perfectly legitimate line of inquiry.

151

What I'm trying to determine is what the value of these assets were. And that information is, is something that can be gleaned or discerned from the totality of the divorce --

MR. FISH: Well, Counsel, --

Q. (By Ms. Kappler) -- agreement.

MR. FISH: -- how about this, Counsel, how about we stipulate, we'll, we'll go to the district courthouse, we'll obtain a copy of the divorce decree, which outlines what Mr. Bailey received and what Ms. Bailey received, so he doesn't have to guess --

MS. KAPPLER: Okay.

MR. FISH: -- at the exact nature of any, you know, cash that he received, cash that she received and land that he received. And I think --

MS. KAPPLER: Okay.

MR. FISH: -- that's about --

MS. KAPPLER: That is fine, I will accept that.

Q. (By Ms. Kappler) But let me ask this question: do you have any other agreements with your wife regarding any future

152

proceeds that you might receive in connection with any of the properties --

A. No.

Q. -- listed here?

A. No.

Q. So, for instance, if you were to recover --

A. Any --

Q. -- any funds in this -- let me finish the question so that we don't confuse --

A. Okay.

Q. -- the reporter.

If you were to recover any interests in this legal action from The United States, do you have any agreement with your ex-wife that she would be able to receive a portion of any proceeds?

A. No, I don't.

Q. Okay. Has she given up her right to receive any proceeds in connection with any of these properties?

A. Both, both the right for that and the right for paying the, the bills for getting up to that point.

Q. Okay.

153

Did you -- was the property that was the subject of the deeds that cover parcels 2 through 14, the subject of --
MS. KAPPLER: Well, strike that.
Q. (By Ms. Kappler) Were, were the parcels listed in any particular listing price?
A. I think they were, I think they were pretty much all the same.
Q. Do you know what the listing price was?
A. I mean, it, it pretty much was the price that they all paid for their lots. There was no movement up or down on them for --
Q. Everybody paid $25,000 a lot, didn't they?
A. Yes.
Q. That, that was consistent across all of the lots?
A. Yeah. I mean, I'd have to look at all of them, but I'm sure that's what it was.
Q. And you believe that is the price that they were offered for sale at?
A. Uh-huh.
Q. You're aware that some of these individuals put some fill on their property,

154

are you not?
A. I'm, I'm aware that they bought the culvert from the County and made access to their property, yes.
Q. You're aware that they attempted to obtain permits from the Corps for certain activities on these properties?
A. I've been to county board meetings where they approached the board to get a variance and been -- they don't know what to tell them, I guess that's, that's where I've been.
I don't know if they approached the Corps, as far as getting any permits.
Q. Are you aware of any steps that any of these individuals have taken to restore their property?
A. No.
Q. What logging, if any, did you do on the property as we've defined it, the property that is -- includes what you've described as Sandy Shores Drive in the platted areas?
A. Took out about ten loads of wood out of there. And it's -- kind of left some of the ash trees and cut down the big poplar trees

155

before they blew down. And there's still, there's still some blown down in there.
Q. It's your understanding that you're permitted to do logging on wetlands, is it not?
A. Yeah, I mean, --
Q. Your answer is: yes?
A. Yes.
Q. Mr. Bailey, you have brought a legal action against the state and local authorities related to this property, have you not?
A. Yes.
Q. And it's your position that they took your property, is it not?
A. Well, the panel of experts was eight different agencies, I guess you could blame each one of them, they're all going to be together.
Q. You're seeking to be compensated for the value of this property by the state and local authorities, are you not?
A. I believe we have a lawsuit in that, in that regard, yes.
Q. You said you'd taken about ten truckloads of, of logs off of the property.

156

First of all, was the logging done on the access road?
A. Log -- well, all the trees were taken off the access road.
Q. Okay. And what was the value of the logs that you cleared there?
A. '98 prices, probably between 5 and $600 a truckload.
Q. You've been involved in logging for many, many years, have you not?
A. Yes, I have.
Q. Okay. You have a lot of experience with pricing --
A. Yes, --
Q. -- of, --
A. -- I do.
Q. -- of logs.
Could you give me a sense of how the pricing has changed from the mid-'80s, to the current day?
MR. FISH: What type of log, Counsel?
MS. KAPPLER: Let me clarify that.
Q. (By Ms. Kappler) Is there a, a big difference in --

A. Species.
Q. -- the price of logs based on the species?
A. Yes.
Q. What kinds of logs are the most valuable?
A. Probably anything you can make a saw bolt out of, or saw --
Q. What species would that include?
A. That, that can be any kind of species on, on saw bolts.
Q. Saw bolt?
A. Anything you can saw lumber out of.
Q. Uh-huh.
That would be the most valuable?
A. Yes.
Q. Okay.
A. And --
Q. And --
A. -- pine, pine probably be the most, aspen being the last.
Q. Aspen being the least valuable, --
A. Least.
Q. -- pine being the most?
A. Uh-huh.



Q. Is there value in timber that you can't make a saw bolt out of?
A. Well, that's -- I predominantly cut wood for pulp, and that, that goes to paper mills or to chipboard mills --
Q. Okay.
A. -- to make chipboard.
Q. And the trees in the area that you've identified as, as the, the property for purposes of this action, what kind of trees are there?
A. There's a little ash, most -- mostly aspen and balm of Gilead.
Q. And in terms of value, you put pine at the top and aspen at the bottom. Where, where does ash fit in there?
A. If you can find a market for it, it's, it's upwards around pine, but --
Q. Uh-huh.
A. -- you, you need a market for it.
Q. And what have the other one -- you mentioned ba -- balm --
A. Uh-huh.
Q. Balm --
A. Balm of Gilead.



Q. And, and in terms of its value, how does it fit into the continuum between pine and aspen?
A. It goes in as a -- an aspen species, but if you log it by itself, it's, it's worth less than what the aspen is. It's the lowest one on the totem pole there.
Q. What kinds of trees were among the trees that you cleared?
A. That's what I said was most -- mostly aspen.
Balm of Gilead, a little ash, birch.
Q. What about birch, where does that fit in?
A. Birch, --
(Whereupon, Ms. Rita E. Fish-Whitlock entered the room.)
A. -- since the mills aren't using it, now it falls in about where balm is.
Q. (By Ms. Kappler) You're saying the mills -- that's used for pulp?
A. Yes, that's for pulp.
Q. Okay.
(Whereupon, Ms. Rita E.



Fish-Whitlock left the room.)
Q. (By Ms. Kappler) So have you done any logging on any other area of the property that we -- that you acquired in that transaction back in 1989?
A. No.
Q. You've done logging in the area that we described as the Elk Ranch property, --
A. Yes.
Q. -- haven't you.
What kinds of trees are there?
A. Predominantly aspen, again.
A lot of pine.
Q. Okay. The -- you indicated that in '98 the value of those ten truckloads was somewhere between 500 and 600 --
A. Yes.
Q. -- a truckload; is that correct.
What'd values for these kind of species look like ten years before?
A. Ten years before --
Q. '98.
A. -- '98?
Q. Yes.
A. In '88.

The -- well, when we first came up here, poplar, just, just to give you stumpage prices, probably anywheres from 50 cents to $2.
Q. In terms of truckloads; let's --
A. Truckloads.
Q. -- work with the same volume.
A. Well, --
Probably --
MR. FISH: I'm going --
A. It's really hard --
MR. FISH: -- to --
Clarify your question, Counsel. Are you asking the value that is paid at market or are you, are you asking the value that's paid a landowner for the stump -- stumpage? Or are you asking for --
MS. KAPPLER: I -- I am -- I'm trying to work in the same way that Mr. Bailey described this, being 500 and $600 a truckload. I, I don't know --
A. That is --
MS. KAPPLER: -- if it's a market price.
A. No, that's delivered to the mill.
Q. (By Ms. Kappler) Okay.



A. That includes hauling and logging and everything there.
Q. So using that as our gauge here, --
A. Uh-huh.
Q. -- what, what did values look like by the truckload back in '88?
A. (No verbal response.)
Q. The same kind of mix of trees.
A. Probably, I don't know, I would say around 400 or something, somewheres in that -- stumpage is what's gone up so much.
Q. What do you mean by: stumpage?
A. What you pay for a tree on a stump before it's physically cut.
Just, just to give you the same light, those same trees now are, are -- where they were worth $600, the, the stumpage is probably worth that in today's price.
Q. I want to make sure I understand what you mean by stumpage. You're talking about the area below the cut?
A. No, no, no, I'm talking about the standing tree.
Q. So just buying the land with the trees -- or buying the timber rights?



A. Yep. Just buying the timber rights has gone from -- back in early '80s -- or '86, around there, there, the DNR was actually logging trees up here and letting them fall down and regrow. They're at 50 cents a cord. Now, they're up to 40, $50 a cord for that same tree that was worth 50 cents on a stump, that's how much timber stumpage has gone up.
Q. Here you own the whole property, not just the timber rights?
A. Right.
Q. So you have the benefit of the stumpage, the, the logs themselves, everything?
A. That's what I do. I'm -- my property, I planted half a million trees, you know, to let them grow.
Q. So the stumpage right -- I'm assuming that when you give me the, the value for -- let me, let me rephrase that question.
We're going to set aside the issue of the stumpage and the, the, the timber rights. Just in terms of the marketability of the logs, how have values changed from the mid to late '80s to the current time?
A. (No verbal response.)



Q. Has it been a straight line up?
A. Almost vertical.
Q. Really?
A. I mean, --
Q. Much more valuable now?
A. Yes, yes.
Q. Is that something you foresaw back in the mid-'80s?
A. Nobody did. People, people up here were clearing land and, and bulldozing it up and burning it, actually. Now, the, the wood on it is worth more than what their land is worth today.
Q. Do you have an understanding of why there's been this dramatic shift in the market?
A. Just, just the world market and Minnesota has the highest timber prices in the whole world.
It's, it's really a unique deal. I talk -- that's what I do, is broker wood.
But I, I talk to all these guys and they, they can't keep up. Some of these mills are going to fold because they can't keep up with the high stumpage price.
Q. Because they can't afford to, to

lease men -- or timber rights or to acquire them?

A. Well, just, just other parts of the world are cheaper for, for doing the same thing we're doing here. So that, that mix is going to go somewheres else if, if we keep spending what we're doing for stumpage. I mean, it --

We're in a place now where there's -- you can sell all the board you make, but as soon as that changes, then, then the mills would start going back into the red, I guess.

COURT REPORTER: Can we go off the record for a second?

MS. KAPPLER: Sure.

COURT REPORTER: I just need to change paper.

MS. KAPPLER: Okay, that's fine. I'm, I'm going to be done shortly, I think.

COURT REPORTER: Thank you.

Q. (By Ms. Kappler) Mr. Bailey, in connection with your application for an after-the-fact permit, Exhibit 9, you prepared a wetland replacement plan application, did you not?

A. With the help of SWCD again.



Q. And that was one -- such wetland plan replacement application is the one that we've premarked as Exhibit 10. Isn't that correct?

A. I filled that out with the help of Les Lemm.

Q. And who is Mr. Lemm?

A. He was the, the new guy in the SWCD.

Q. This wetland replacement plan application was submitted on 5-19-99.

A. Uh-huh.

Q. And that's almost a year after your application was submitted. Is that correct?

A. That could be.

Q. What, what dealings, if any, did you have with state, federal and local officials relating to your application during that year?

A. Like I said, when we first went in to do the road, they kicked us out. Then had after-the-fact permits, which they said I could go back in. And it was all to the point of being signed off and I had to do 2.91 acres of mitigating on my property. Which I started.



And during that whole process, the County told me what else I had to do to make the road come into County standards so they could accept it as a county road. They, they outlined what I had to do, what it would cost.

And they said if I didn't do it, that they would do it. But if I did it, I had to bond for that amount, which I did, at the bank.

Q. Yet, you acquired a surety bond or had a letter of credit?

A. No, I had to actually go to the bank and put $10,000 aside, the bond, for -- in case they had to make the road up to the county specs.

I, I did everything they told me to do. The County accepted the road as theirs, they released my bond.

Mr. Lockner stated that since they now own the road, that they'd take care of the 2.91 acres under their wetland bank credits that they had.

I, I quit doing anything up at my property for that 2.91 acres.

Everybody got in a big rue, saying



that the Lake of the Woods couldn't do that. And essentially it's been in litigation ever since.

Q. During that period, did the Corps ask you to provide any documentation in support of your application?

A. I, I don't believe so.

Q. Were you dealing directly with the Corps or were you dealing with them through the County?

A. Dealing through, through the County.

Q. Did you have an understanding of certain documentations -- documentation that you needed to submit in advance of the issuance of a Public Notice?

A. I believe we did all that, because the Public Notice was in the paper and -- (no further response.)

Q. What I'm asking is: did you have some understanding of what documentation you needed to submit in support of your application before a Public Notice could issue?

A. Not, not prior to talking to SWCD, or -- it, it wasn't -- Les Lemm was way after

the fact. The person prior to him is the one that we did the after-the-fact permit with.
Q. Okay. And who was that?
A. That's the person I was trying to --
Q. Walter Leu?
A. No, no, no. Walter Leu is the county engineer.
Q. Okay.
A. SWCD person before Les Lemm.
Q. My, my question, though, was -- is really separate from that.
A. Okay.
Q. I'm trying to determine if you had an understanding, before the Public -- that -- before the Public Notice could issue, you needed to provide certain documentation?
A. I guess I got that information from, from SWCD.
Q. Okay. You got what information?
A. What we had, what we had to submit for after-the-fact.
Q. Okay. What did you believe or understand you needed to submit in support of your application?



A. Just a detailed -- what we were going to do with the property, I guess I -- (no further response.)
Q. While the -- your application was pending, did you have dealings with the Minnesota Pollution Control Agency?
A. Like I said, there was like eight or nine different agencies that we had to go through to, to get the okay from, and, and it -- started that out with the marina.
Q. You knew you had to obtain a 401 certification from the Minnesota Pollution Control Agency, did you not?
A. I -- there again, I -- whatever the County said I had to do is what, what I did.
Q. You're familiar with what a 401 certification is?
A. Can I look at that one?
Q. Let me show you what's been premarked as Exhibit 16, it's a letter from the MPCA to Char Hauger at the CO-R, at the Corps, December of 1999.
A. They, they did give me a permit.
Q. Okay. You, you understood that you



needed a 401 certification in order to develop this property?
A. I'm saying I did whatever the County told me to do and I --
Q. Okay. I'm not asking what the County said, I'm asking whether you understood a 401 certification was required in order to develop this property?
A. I'm not sure if I did or not.
Q. In August, 2000, wetland delineation was done of your property. Is that correct?
A. I'm not sure of the timeline, but it was at one point.
Q. Were you around when that happened?
A. I -- well, --
I -- the, the crew of whatever it was -- I mean, I was out there more than once.
Q. And following that delineation, was provided to the MPCA, wasn't it?
A. I, I believe so.
Q. Okay. Showing you what was premarked as Exhibit 18. Do you have an understanding of what this letter is?
A. Well, I, I know at the County, at



one time, I was thinking there was -- it was defined, 150-foot setback. And their argument over what was -- who was right, who was wrong, I just stayed out of it.
Q. You understand that the MPCA revoked the 401 certification it had previously issued, do you not?
A. Yep.
Q. And you understand that the Corps is not in a position to issue a 404 permit without a -- either a 401 certification or some sort of waiver by the MPCA?
A. (No verbal response.)
Q. Do you understand that?
A. No, I don't.
Q. In connection with the development of the property you claim was taken by The United States, do you assign a value to the road separate from the parcels?
A. I, I think it'd have to be in conjunction with the parcels.
Q. Well, each of these parcels was sold for a certain amount, wasn't it?
A. That's true. You have --
Q. Okay.

A. -- to have access to it.
Q. Each one was sold for $25,000, wasn't it?
A. With access.
Q. Okay. Well, --
A. Take the road out, there wouldn't be an access to it.
Q. Okay.
A. You --
Q. What I'm trying to determine is: is there a separate value for that road?
A. There has --
MR. FISH: Object -- I'm going to object, Counsel. You -- at your demand, we've bifurcated the issues in this case. And I think you've, you've characterized the discovery to date as threshold issues.
And I've asked numerous Interrogatories and questions relating to road valuations experts and the like, all which have gone unresponded to as being threshold issues, premature.
So I think if we're going to be discussing threshold issues, you know, we should discuss when that's going to be done by



the Army Corps of Engineers, as well as Mr. Bailey.
MS. KAPPLER: Okay. Well, the issue bears on the economic impact and also bears on the, the, the parcel as it's described. And, and that, that Mr. Bailey claims was taken.
Q. (By Ms. Kappler) So it's my understanding, Mr. Bailey, that you claim this entire piece of property was taken from you by The United States. Is that correct?
MR. FISH: And, again, Counsel, you're looking at Exhibit No. 22?
MS. KAPPLER: I am.
Q. (By Ms. Kappler) I'm looking at Exhibit 22.
MR. FISH: And you're referring to all, in your -- by say -- the word: this, you're referring to all ends of Exhibit 22?
MS. KAPPLER: I'm referring to what, what we understand the -- to be the entire platted subdivision.
Q. (By Ms. Kappler) Is that correct?
A. Well, along with the adjacent land, too, I mean, there, there --



Q. Let me show you Exhibit 20.
Is it your testimony that you're claiming The United States took all of the land that we've -- that you've outlined at the top and tied to Exhibit 23?
A. No.
Q. Could you identify the specific land that you claim The United States took when it denied you the after-the-fact permit?
A. Same -- the, the land less -- it is 56 acres of field, just what I put down on there.
Q. Okay. So you're talking about the -- some of the land that's on the other side of Sandy Shores Drive?
MR. FISH: By: other, Counsel, you're meaning west?
MS. KAPPLER: Yes, west.
A. Yes.
Q. (By Ms. Kappler) That property wasn't acquired by any of these individuals who purchased the parcels, was it?
A. No, but I could sell it.
If, if --
Q. The individuals didn't purchase



Sandy Shores Drive?
A. They purchased with the knowledge access would be to that lot.
Q. Now, Mr. Bailey, have you contacted the Realtors that you identified for me for documents related to this action and as requested by the defendant?
A. What documents are those?
Q. Have you sought to obtain documents relating to the sale of the property? Listing agreements, any of the sort?
A. I have all their purchase agreements.
Q. I'm not talking about -- when you say: purchase agreements, you mean the documents that we've marked as Exhibits today, or do you mean something different?
MR. FISH: Counsel, this is more of a legal question.
I advised you prior to the hearing that we had not only the recorded documents that we would -- we call contract for deeds, but also what's -- what are called purchase agreements, which we've been able to assemble, we will provide you.

177

Q. (By Ms. Kappler) Have you obtained any documents in the nature of notes or records of communications with these real estate agents?
A. No.
Q. Have you sought to obtain such documents?
A. No.
MS. KAPPLER: Give me two minutes, I'd just like to chat with my clients and --
MR. FISH: Uh-huh.
MS. KAPPLER: -- I'll, I'll be ready to wrap up.
(Whereupon, a one-minute recess was taken.)
(Whereupon, Mr. Jeffrey Koschak is no longer present.)
MS. KAPPLER: Okay.
Well, with that, I'm ready to conclude.
Subject to Mr. Fish's cross-examination.
MR. FISH: I'm not going to put anything on the record today with Mr. Bailey.
MS. KAPPLER: Okay.

178

COURT REPORTER: Read and sign?
MR. FISH: Sure.
COURT REPORTER: Thank you.
(Whereupon, the deposition was concluded at 2:59 o'clock p.m.)

179

I, GARY BAILEY, do hereby certify that the foregoing 178 pages contain a full, true and correct transcript of the testimony as given by me at the aforesaid time and place with corrections, if any, as noted on the attached sheet or sheets.

Gary Bailey

Dated this day of , 2004.

180

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA )
) ss
COUNTY OF POLK )

I, JOY FILIPSKI, a Notary Public within and for the County of Polk and State of Minnesota, do hereby certify:

That prior to being examined the afore-named witness was by me sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition, consisting of 178 pages of typewritten materials, was taken down by me in Stenotype at the time and place therein named, and was thereafter reduced to typewriting under my direction.

I further certify that I am neither related to any of the parties or counsel nor interested in this matter directly or indirectly.

WITNESS my hand and seal this day of

Joy Filipski
Notary Public
Polk County, Minnesota

My Commission expires January 31, 2005.

# Sun Mar Composting Toilets

Easy to Install, No water, No Sewer, No Septic Needed
Easy to Use and Maintain
Environmentally Friendly- No Possible Groundwater Contamination
Ideal Solution for Home, Cabin, Yurt, Artist Studio, Pool Cabana, Barns, R.V's, Boats & Much More

Sun Mar Toilets can be an excellent alternative to conventional commodes where circumstances do not allow for septic systems or water connections. Some have been installed in cabins and homes that have rocky soil that does not permit a septic system drain field or homes in close proximity to lakes, rivers and streams.

Some have chosen them over a conventional flush toilet to avoid septic tank construction that requires the elimination of trees and could contaminate ground or well water used for drinking. Others have wanted to make their home more eco friendly or green.



Others have added them where water and sewer connections are not available such as pool cabanas and barns. The Space Saver Model works well in a small closet or basement for those needing an extra commode in the house but do not want to dig up the foundation for the sewer line required by a conventional toilet.

Whatever your reason for considering a Sun Mar toilet you will find that they are easy to install, use and maintain. You will also be rewarded with rich compost that you may use on your trees and flowers while knowing that you are doing something good for the environment.

Thanks,

Fred W. Tanner
Independent Sun-Mar Dealer
c/o Cedar House Inn & Yurts
6463 Highway 19 North
Dahlonega, GA 30533
(706) 867-9446
info@composttoilets.net

- **Why not purchase a toilet from someone that actually owns one and has used them for over five years. We often provide coaching to our customers after the sale on issues that may arise with usage and maintenance.**

A-133

***We receive calls from individuals who did not purchase from us. If you bought from another dealer please call that dealer for assistance after the sale.***

Why We Use Them

Frequently Asked Questions

Why Sun Mar?

Models to Fit Your Needs
How to Order & Pricing

We use Sun Mar toilets at our bed and breakfast inn



Cedar House Inn & Yurts
Bed and Breakfast
Eco friendly b&b, vegetarian breakfast always available, vegan with advance notice.

KIVA loans that change lives

Site Map Links

Independent Sun-Mar Dealer: 6463 Highway 19 North, Dahlonega, GA 30533 (706) 867-9446

A-134

INCINOLET®
ELECTRIC INCINERATING TOILET

## THE INCINOLET ADVANTAGE

HOW IT WORKS
ABOUT US
EASY INSTALLATION
SPECS & PRICING
MAINTENANCE
CONTACT US

**Click image to enlarge:**



INCINOLET uses electric heat to reduce human waste (urine, solids, paper) to a small amount of clean ash, which is dumped periodically into the garbage. INCINOLET remains clean because waste never touches the bowl surface. A bowl liner, dropped into the bowl prior to use, captures the waste, then both liner and its content drop into the incinerator chamber when the foot pedal is pushed. You can use INCINOLET at any time-even while it is in cycle.

Home | Contact Us

**A Typical Cycle:**

Incineration cycle is started with the push button. Both heater and blower come on when button is pushed. Heater alternates off and on for a preset period of time, blower continues on until unit has cooled.

Several people may use the toilet in rapid succession. Push the start button after each use to reset the timer.

### INCINOLET vs. Composting Toilets

| | INCINOLET | Composting Toilets |
|---|---|---|
| Cleanliness | Paper Bowl Liner contains waste - keeps bowl sparkling clean. | Bowl is not protected - waste can stain and smear bowl surfaces. Waste is visible in some models |
| Odor | Waste is incinerated after each use - keeps bathroom free of odor and flies. | Waste accumulates and decomposes over a 3-6 month period of time - user can see |

| | | |
|---|---|---|
| | Catalyst within the toilet keeps exhaust odor-free. | accumulated waste and some insects may be attracted. |
| Water | Uses no water. | Some models use water and must be plumbed. |
| Additives | Nothing to add. | Peat moss must be added after every 3-4 uses. Other "food" for microbes must be added from time to time. |
| Residue | Ash produced is germ-free - no restrictions on its disposal. | Compost produced must be put out onto the ground, but cannot be used as fertilizer for food producing plants. Some models drain excess urine out into a pit or an old septic system. |
| Climate | Can be used in any climate and can be left in an unheated environment for long periods of time. | Microbes must be kept warm and must be "fed" from time to time or they die, stopping the composting process and leaving raw sewage in the toilet or composting vault. Waste must be "stirred" periodically. |
| Electrical Requirements | Uses 120 volts (some 240 volt models), at 15 amps. Uses about 1½ kilowatt hour of electricity per cycle. Electric drawn only when toilet is in use. | Electric models use 120 volts. Electricity may be needed all the time, even during off seasons, to operate evaporation fan and heater. |

Click here to download a condensed PDF manual.

Email: sales@incinolet.com • Phone: (214) 358-4238
Toll-Free: 1-800-527-5551 • Fax: (214) 350-7919
Research Products/Blankenship, USA • 2639 Andjon, Dallas, Texas 75220

Copyright © 2006 Research Products/Blankenship, Inc. All rights reserved.

STATE OF MINNESOTA

DISTRICT COURT

COUNTY OF LAKE OF THE WOODS

NINTH JUDICIAL DISTRICT

CASE TYPE: Inverse Condemnation
Negligent Misrepresentation
Breach of Contract

Gary Bailey,

Plaintiff,

vs.

Minnesota Pollution Control Agency, an agency of the State of Minnesota, Lake of the Woods County, a political subdivision of the State of Minnesota, and Department of Natural Resources, an agency of the State of Minnesota,

Defendants.

Court File No.: C5-04-209
The Honorable Charles H. LeDuc, II

**DEFENDANT MINNESOTA POLLUTION CONTROL AGENCY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Defendant Minnesota Pollution Control Agency (MPCA) submits this memorandum of law in support of its motion to dismiss, or alternatively, motion for summary judgment. The MPCA moves this Court to dismiss Plaintiff Gary Bailey's claims for estoppel and inverse condemnation based on MPCA's revocation of a section 401 certification.

Bailey's estoppel claims should be dismissed because the Complaint fails to state a claim on which relief can be granted. Bailey bases his estoppel claim on an unfounded legal theory that county platting preempts all other state agency regulatory decisions; the claim is not based on any MPCA affirmative misconduct. This Court also lacks subject matter jurisdiction to estopp MPCA's revocation decision because only the Court of Appeals can review MPCA's final

decision. Bailey's estoppel claim is also barred by res judicata because it is a claim previously litigated in Bailey's 2003 contested case hearing.

Bailey's taking claim should be dismissed on several bases. First, the taking claim should be dismissed because Bailey did not bring the inverse condemnation claim through a petition for mandamus. Second, this Court does not have subject matter jurisdiction because only the Court of Appeals can determine if a takings occurred as a result of MPCA's quasi-judicial revocation decision. Third, this Court lacks subject matter jurisdiction because the claim is not ripe. It is well settled law in Minnesota that a regulatory takings claim is not ripe for adjudication unless the property owner has sought a variance or submitted alternative proposals for the use of the property to the decision maker. In this case, Bailey has failed to seek any variances and he submitted only one application to the MPCA; consequently, there has been no final MPCA determination regarding the application of MPCA regulations to the reasonable uses of the Bailey property. Fourth, MPCA's decision was based on a public-harm prevention regulatory program and Bailey's project was causing MPCA rule violations and nuisances. Accordingly, no taking occurred because MPCA was using its police powers to stop and prevent nuisances.

Finally, Bailey's claims should be dismissed under the doctrine of unclean hands. Bailey has repeatedly failed to disclose relevant information regarding his project and failed to comply with certification conditions. Accordingly, the MPCA should not be forced to compensate Bailey for the consequences of his wrongful actions and his failures to act.

**DOCUMENTS APPRISING THE RECORD**

The following documents comprise the record on which MPCA's motion is made:

1. The affidavits and exhibits of Lawrence Zdon and Richard P. Cool submitted with this Memorandum of Law; and

2. All of the pleadings, submittals and orders that are a part of the Court's files in this matter.

## STANDARD OF REVIEW

MPCA moves this Court for an order dismissing Bailey's claims against MPCA on various legal and equitable bases, including Bailey's failure to state a claim upon which relief can be granted. On a motion to dismiss, the only question before the Court is whether the complaint states a legally sufficient claim for relief. *Elzie v. Commissioner of Public Safety*, 298 N.W.2d 29, 32 (Minn. 1980). It is immaterial to the Court's deliberations whether or not the plaintiff can prove the facts alleged. *Id.*

MPCA's motion for dismissal of Bailey's estoppel claim, in part, and of Bailey's taking claim is supported through MPCA affidavits that present facts outside Bailey's Complaint. Accordingly, the MPCA's motion should be treated as a motion for summary judgment. Minn. R. Civ. P. 12.02 (2007). Summary judgment is appropriate under Rule 56.03 of the Minnesota Rules of Civil Procedure when it is "show[n] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995). Summary judgment is mandatory when the record reflects a complete lack of proof of an essential element of the plaintiff's claim. *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997).

## FACTUAL AND PROCEDURAL BACKGROUND

### I. BAILEY'S PROPERTY AND SUNNY BEACH.

The property that Bailey claims has been taken by the MPCA is an approximate 13.2 acre parcel located in Lake of the Woods County, identified as Sunny Beach ("Sunny Beach" or "the Property"). Complaint, ¶¶ 1 and 5; Gary Bailey Deposition, Dec. 13, 2005 at 114-15, Ex. 19

("Bailey 12/05") (deposition and Ex. 19 attached as Exs. 1 and 2 respectively to Cool Aff.). The Property has been subdivided into 14 lots and includes a road ("the Road"). Complaint, ¶¶ 4-5 and 7-8; Bailey 12/05, Ex. 19. Bailey had the Road constructed in 1998. Gary Bailey Deposition, Dec. 1, 2004 at 51-52, 121, 123 ("Bailey 12/04") (deposition attached as Ex. 6 to Cool Aff.).

The lots on the Property have different land owners. *See* Complaint, ¶ 11. For example, Lots 7, 8 and 11 are owned in fee simple by landowners other than Bailey, ownership having been transferred by Bailey by warranty deed to these other landowners. Complaint, ¶ 11; Bailey 12/05 at 107-08. Lots 2 and 3 are owned by the Thomsons under a contract for deed. Complaint, ¶ 11; Bailey 12/05 at 104. Lot 14 is owned by the Fish Family Lake Lot Trust (April Stavig, trustee) under a contract for deed. Complaint, ¶ 11; Bailey 12/05 at 110. Bailey had the lots sold at a price of $25,000 per lot. Bailey 12/05 at 102.

Sunny Beach is only a small portion of a much larger area originally purchased by Bailey in June, 1989. In June, 1989, Bailey purchased 206 contiguous acres from the Lewises that included Sunny Beach. Bailey 12/05 at 22-23. Bailey's purchase included three 40-acre parcels (i.e. 120 acres) on the west side of County Highway 53 and an 86 acre parcel on the east side of County Highway 53, contiguous to the 120 acres.[1] *Id.* at 22-23, Exs. 20 and 21 (Exs. 20-21 attached as Exs. 3-4 to Cool Aff.). Bailey eventually sold the three 40-acres parcels (i.e. 120 acres) on the west side of County Highway 53 to Dahl. *Id.* at 25-26, Ex. 21.

The 86 acre parcel east of County Highway 53 consists of a 56-acre farm field and a 30-acre wooded parcel, with the Road nearly bisecting the 30-acre wooded area. Bailey 12/04

[1] Bailey indicated the purchase price was approximately $130,000 - $140,000. Bailey 12/05 at 117.

at 53-56; Bailey 12/05 at 23, 26, 115, Exs. 10 and 20 (Exs. 10 and 20 attached as Exs. 5 and 3 respectively to Cool Aff.). Bailey established the Road in the 30-acre wooded area for access and logging. Bailey 12/04 at 129-31; Bailey 12/05 at 45. Bailey has already removed approximately ten (10) truckloads of logs from the wooded parcel at an estimated price of $500-$600 a truckload.[2] *Id.* at 154-56. The 56-acre farm field was historically used to raise small grains (e.g. oats, barley, wheat). Bailey 12/05 at 89-90. Bailey has the field enrolled in a Farm Service Agency set-aside program. *Id.* at 93-94. However, the field is still farmable land. Bailey 12/04 at 55. Bailey has also raised hay (e.g. beef cattle forage) on the field and sold the hay to persons who did the harvesting. Bailey 12/05 at 94-95; Bailey 12/04 at 55-56. Bailey keeps the field worked so that he can plant something on it if he wanted to. Gary Bailey Deposition, Nov. 17, 2006 at 78-79 ("Bailey 11/06") (attached as Ex. 7 to Cool Aff.).

The 86 acre parcel has recreational uses, in addition to small lot development, logging and farming uses. In the winter, the parcel is used for snowmobiling and for lake access for ice fishing, and in the summer, for lake and beach access. Bailey 11/06 at 78-79 and 133-34. The parcel also provides wild game habitat for sharp-tail grouse and the parcel is located in a very productive big buck area for deer hunters. Bailey 12/05 at 27 and 131.

Bailey has also conceived development plans for low density residential uses for the 86 acre parcel that entail approximate 5-acre plots running in an east-west direction from County Highway 53 to the lake. Bailey 12/05 at 74, 96-97. According to Bailey, more people are interested in bigger plots of land with lake access rather than small parcels. *Id.* at 97. Under this

[2] Bailey indicated that aspen was the primary tree in the wooded area, trees that could be logged at any time. Bailey 12/04 at 100.

low density development option, Bailey anticipates upwards of seven (7) plots could be developed. *Id.* at 97.

Finally, Bailey could easily sell the non-Sunny Beach portion of the 86 acre parcel (i.e. approx. 73 acres) if he wanted to sell. Bailey 12/05 at 130-31. Bailey said this remaining 71-73 acre parcel would be in demand, in part because it is close to the lake, its adjacent to the road (County Highway 53) and it has access to electricity. *Id.* at 131-32. Bailey says this land could sell for $800-$1000 per acre. *Id.* at 131; Bailey 11/06 at 15.

## II. LEGAL AND REGULATORY BACKGROUND.

Minnesota's State Water Pollution Control Act is a comprehensive statute designed to prevent pollution and to abate existing pollution of waters of the state, including discharges that create nuisance conditions or render the waters actually or potentially harmful or detrimental to designated uses. *See, e.g.*, Minn. Stat. §§ 115.01, subd. 13; 115.03, subd. 1(a) - 1(c) and 115.42 (2006). MPCA's pollution prevention authorities address potential polluting conditions resulting from human activity that could alter the chemical, physical and biological integrity of waters, including wetlands. Minn. Stat. § 115.01, subds. 13 and 22 (2006). To accomplish these duties, MPCA has permit and certification programs designed to impose appropriate, site-specific conditions on regulated projects to ensure compliance with all applicable state and federal environmental laws, including surface and ground water quality standards. *See, e.g.*, Minn. Stat. § 115.07 (2006); Minn. R. 7001.0150, 7001.1030, subp. 1 and 7001.1470 (2005).

The MPCA has adopted comprehensive surface and ground water quality standards to protect surface waters and ground water from pollution. These standards include a prohibition on the discharge of untreated sewage into any surface waters and a prohibition on nuisance conditions caused by any sewage discharges. Minn. R. 7050.0210, subps. 1-2 (2005). Regarding

individual sewage treatment systems (ISTSs), MPCA's standards require that an ISTS not discharge or seep sewage or sewage tank effluent to the ground surface or to surface waters. Minn. R. 7080.0065, subp. 4 (2005). Sewage discharges are also prohibited to the unsaturated zone (i.e. the zone between the land surface and the water table). Minn. R. 7060.0600, subp. 2 (2005). Sewage is also prohibited from being deposited in such place, manner or quantity as to actually or potentially preclude or limit the use of the underground water as a potable water supply. Minn. R. 7060.0600, subp. 2 (2005).

MPCA's water quality standards for wetlands include a nondegradation rule to protect wetlands from the impacts caused by physical alterations. Minn. R. 7050.0185, subp. 9 and 7050.0186 (2005). This rule incorporates a wetland mitigative sequence to avoid and minimize wetland impacts from regulated projects and if needed, requires compensatory mitigation for unavoidable impacts. Minn. R. 7050.0186, subps. 2-6 (2005).

The MPCA's Section 401 certificate program at issue here has its regulatory basis in the federal Clean Water Act ("CWA"). The CWA is also a comprehensive water quality statute designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve these goals, the CWA establishes distinct roles for federal and state governments. For example, the CWA prohibits the discharge of any pollutant into U.S. waters unless authorized by a federal permit or specific exception under the CWA. *See* 33 U.S.C. §§ 1311(a), 1362(12). The states, however, have the primary responsibility for enforcing the applicable water quality standards on intrastate waters. 33 U.S.C. § 1319(a).

The CWA's Section 401 requires states to provide a water quality certification before a federal permit or license can be issued for activities that may result in a pollutant discharge to surface waters. 33 U.S.C. § 1341(a). Section 401 allows the state to impose limitations,

monitoring requirements and other terms and conditions in the certificate to assure that the applicant will comply with the state's water quality standards and with any other appropriate requirement of state law. 33 U.S.C. § 1341(d). The certification's limitations, requirements, terms and conditions then become conditions on the applicable federal permit or license. *Id.*

MPCA has procedural rules to implement its Section 401 certification program. Minn. R. 7001.1400-.1470 (2005). Under these rules, MPCA can issue a Section 401 certification only if "there is a reasonable assurance that the activity will be conducted in a manner that will not violate applicable water quality standards." Minn. R. 7001.1470, subp. 1.C. (2005). MPCA is also authorized to revoke a Section 401 certificate if such revocation is supported by any of the findings in Minn. R. 7001.0140, subp. 2. Minn. R. 7001.1450, subp. 1.B. (2005).

The federal regulatory program that provides the backdrop for MPCA's Section 401 decision in this case is the U.S. Army Corps of Engineers ("COE") CWA Section 404 permit program. Section 404 authorizes the COE to issue permits for the discharges of dredged and fill material into U.S. waters, including wetlands. 33 U.S.C. § 1344(a). COE and U.S. Environmental Protection Agency ("EPA") regulations govern the processing and issuance procedures of Section 404 permits. *See* 33 C.F.R. pts. 320-25; 40 C.F.R. pt. 230. In the COE's evaluation of a Section 404 permit application, the COE conducts a "public interest" review that considers the full public interest by balancing the favorable impacts against the detrimental impacts of the project. 33 C.F.R. § 320.1(a).

The COE can also consider an application for an *after-the-fact* Section 404 permit where the dredge or fill discharge has already occurred. 33 C.F.R. § 326.3(e). The COE follows a similar public interest review and decision procedure for after-the-fact permit applications as it does for pre-discharge permit applications, including the solicitation of public comments on the

project proposal, a public interest review that includes an analysis of whether the discharge complies with the wetland guidelines, and a determination of whether the fill material will be allowed to remain in place. *See* 33 C.F.R. § 326.3(e)(1)-(2). After completing the after-the-fact application review and analysis, COE may issue or deny the permit. *Id.* The COE's permit decision is subject to judicial review under the federal Administrative Procedure Act.

## III. BAILEY'S ROAD CONSTRUCTION AND SECTION 401 CERTIFICATION PROCESS.

Approximately five years before Bailey constructed the Road, the COE notified Bailey that the Property contained wetlands. In August, 1993, the COE sent a letter to Bailey notifying him that his lakeshore property included wetlands, and that the COE had become aware of Bailey's intentions to place fill or dredged material from the marina project into this wetland area to develop residential lots. Bailey 12/04 at 75-76, Depo. Ex. 5 (Depo. Ex. 5 attached as Ex. 8 to Cool Aff.). Bailey received the COE letter. *Id.* at 75. In this letter, the COE explained that if Bailey intended to place fill or dredged material into the wetland area for residential lot development, he needed another COE Section 404 permit for this activity. Bailey 12/04, Ex. 5.

Bailey, by his contractor, initiated Road construction in the spring of 1998. Bailey 12/04 at 121-23. During the Road's construction, COE staff inspected the Property and notified Bailey he should stop work on the Road until the COE's Section 404 permit violations were cleared up. *Id.* at 124-25; Koschak Test., MPCA Contested Case Hearing ("CCH") Tr. 354 (CCH Transcript is Ex. 6 to the Zdon Aff.). Bailey was also apprised that he would have to apply for a COE Section 404 after-the-fact permit. Bailey 12/04 at 124.

Bailey completed the Section 404 permit application in June, 1998. Bailey 12/04 at 126-27; Depo. Ex. 9 (Local-State-Federal Project Notification Form) (Depo. Ex. 9 attached as Ex. 9 to Cool Aff.). Bailey's application described the project as "construct road for access -

logging." Cool Aff., Ex. 9. Bailey completed the Road construction in 1999. Bailey 12/04 at 127.

In late October 1998, Bailey submitted the Sunny Beach plat application to Lake of the Woods County. Bailey 12/05 at 55-57. In December, 1998, the Lake of the Woods County Board ("the County") approved Bailey's plat application for Sunny Beach. Complaint, ¶ 5. Bailey began selling lots in December, 1998. *See, e.g.* Bailey 12/04 at 40, 45. By June, 1999, Bailey had sold the 13 lots.[3] Bailey 12/04 at 66.

The MPCA first became aware of Bailey's Sunny Beach project when MPCA received the COE's June 24, 1999 public notice regarding Bailey's after-the-fact Section 404 permit application. Zdon Test., CCH Tr. 31-32. The COE's public notice was treated by MPCA as the section 401 certificate application. *Id.* at 32.

The COE's public notice included a Sunny Beach plat map indicating the presence of a Type 7 wetland in the platted area. Zdon Test., CCH Tr. 34, Hrg. Ex. 2 (attached as Ex. 7 to Zdon Aff.). There was no indication of any floodplain on the plat map included in the public notice. Zdon Test., CCH Tr. 34. The MPCA's initial concerns about the Bailey project centered on whether acceptable, compliant septic systems (i.e. individual sewage treatment systems or ISTS) could be installed on the Property in compliance with MPCA's ISTS rules, Minn. R. chapter 7080 and the extent of wetland impact from lot development. *Id.*, CCH Tr. 36-37.

After an initial review of the Bailey project and public notice, the MPCA issued a request for information ("RFI") on July 23, 1999 to Bailey requesting additional information regarding septic system compliance and wetland impacts. Zdon Test., CCH Tr. 42-44. MPCA's RFI

[3] Bailey retained ownership of Lot 1. *See* Complaint, ¶ 7.

indicated that drainfield septic systems must not occur in wetlands or be placed in fill (such as a mound system) over a wetland in order for the system to be in conformance with Minn. R. chapter 7080, the ISTS rules. *Id.*, Hrg. Ex. 6 (attached as Ex. 8 to Zdon Aff.). The RFI expressly requested that Bailey should respond by indicating how compliance with Minn. R. chapter 7080 for septic systems for the individual lots will be demonstrated. *Id.*, Hrg. Ex. 6, p. 2. Bailey did not respond to the MPCA's RFI on the ISTS issue. Zdon Test., CCH Tr. 50, 94-95, 147.[4]

The MPCA's RFI also requested that Bailey submit a layout of the entire project showing existing wetlands on the Road site and existing wetlands on the lot sites and submit an evaluation of the potential wetland impacts from lot development as a means to determine the project's total wetland impact. *Id.*, Hrg. Ex. 6, p. 2. Bailey did not respond to the MPCA's RFI on these two wetland issues. Zdon Test., CCH Tr. 50, 94-95, 147.

MPCA staff continued its section 401 analysis of the Bailey project with informational exchanges with COE and County staff, including MPCA's receipt of a letter from the County regarding a September 29, 1999 Property inspection. *See, e.g.* Zdon Test., CCH Tr. 51-54, 61-68, 71-74 and Hrg. Ex. 10 (attached as Ex. 10 to Zdon Aff.). The COE staff indicated that the project area appeared to be all Type 7 wetland but that COE-proposed ditch filling would eliminate some wetland impacts. *Id.*, CCH Tr. 53, 74-75.

Subsequent MPCA evaluations focused on the issues related to whether there existed unsaturated soils within a 100-foot band of the Property's lakeshore and the adequacy of space for proper ISTS siting, and on wetland impacts including reducing the impacts to just 1.58 acres

---

[4] Bailey responded to MPCA's RFI by sending a letter to the COE about MPCA's reference to trout waters. Zdon Test., CCH Tr. 50, Hrg. Ex. 8 (attached as Ex. 9 to Zdon Aff.). This was the only Bailey response MPCA received to its RFI. *Id.*, CCH Tr. 50.

of impact by filling in the road ditches. Zdon Test., CCH Tr. 76-77. Based on these evaluations, the MPCA issued its Section 401 Certification on December 17, 1999. *Id.*, CCH Tr. 77, Hrg. Ex. 12 (attached as Ex. 11 to Zdon Aff.). The MPCA certification was conditioned, in part, on the implementation of the wetland mitigation plan that had been previously approved by the County's Soil and Water Conservation District ("SWCD"). *Id.*, CCH Tr. 76-77, Hr. Ex. 12.

In July, 2000, the County requested Bailey to conduct a wetland delineation of the Property, including a determination of the type, extent and location of wetlands. Hrg. Ex. 27 (attached as Ex. 23 to Zdon Aff.). Bailey did not conduct the requested wetland delineation. Lemm Test., CCH Tr. 176-79.

Approximately 8 months after MPCA issued the certification, MPCA was notified that the COE was going to perform a wetland delineation of the Property in late August 2000. Zdon Test., CCH Tr. 79-80. MPCA was later informed the delineation had occurred, was apprised of some of the delineation results, and received e-mails and a fax from the COE regarding the COE's delineation results. *Id.*, CCH Tr. 80-81, 89-93, Hrg. Exs. 13, 14, 15 (attached as Exs. 12, 13 and 14 to Zdon Aff.). Steve Eggers, the COE's wetland expert, determined that upwards of 99% of the project site was wetlands prior to the unauthorized fills. Hrg. Ex. 14, p. 2 (Sept. 13, 2000 e-mail). Eggers also determined the existence of an upland island (i.e. non-wetland) on Lots 3 and 4. *Id.* Eggers determined that the only non-wetland (excluding recent fill areas) was on the Property's south end caused by the lateral draining effect of the ditch. *Id.* MPCA staff confirmed that the COE's delineation demonstrated there was not a 100-foot band of upland near the shoreline. Zdon Test., CCH Tr. 95.

After further evaluation and deliberation regarding the new information resulting from the COE delineation, the MPCA determined there had been a lack of full disclosure regarding the

Sunny Beach project and that the COE's new information showed that the wetlands and wetland impacts were more extensive than previously identified. Zdon Test., CCH Tr. 96. In addition, MPCA determined that if the project proceeded, it created potential endangerment to public health, including nuisance conditions, because septic systems installed in saturated wetland soils would fail and discharge untreated sewage to the ground surface, the lake, and groundwater. *Id.*, CCH Tr. 97. MPCA determined that failing septic systems could result in untreated sewage contaminating groundwater and nearby wells, creating health problems for drinking water in that area. *Id.*, CCH Tr. 97. MPCA determined that due to the uncertainty of any potential Bailey response to the COE's delineation information, a modification of the certification was not possible but that if Bailey reapplied for another certificate, the Bailey's responses to the COE's delineation information could be evaluated at that time. *Id.*, CCH Tr. 98-99.

Subsequent to these evaluations, MPCA revoked the Section 401 certification on October 4, 2000. Zdon Test., CCH Tr. 94-100, Hrg. Ex. 16 (attached as Ex. 15 to Zdon Aff.). The MPCA revocation noted that the lots had no upland (i.e. non-wetland) available on which to locate ISTSs based on the COE delineation. Hrg. Ex. 16, p. 2. The MPCA revocation also noted the Road project had 6.55 acres of wetland impacts. *Id.* This 6.55 acre impact is in comparison to the 2.91 acres of wetland impact initially identified in the COE's July 1999 public notice. Zdon Aff., Hrg. Ex. 2. The MPCA revocation expressly notified Bailey that if he chose to reapply for another certificate based on the updated COE wetland delineation, he should provide a total wetland impacts evaluation and information on how compliance with the ISTS rules, Minn. R. chapter 7080, for the individual lots was going to be achieved. *Id.*

Bailey never responded to MPCA's October 2000 letter and never provided information on the ISTS and wetland issues raised in the letter. Zdon Test., CCH Tr. 101-02.

Subsequent to the October 2000 revocation, the MPCA received new, relevant information about the Property that had not been previously divulged to MPCA by Bailey. First, the MPCA found out that Bailey's SWCD-approved mitigation plan had expired and that the required mitigation was not completed. Zdon Test., CCH Tr. 102. Failure to implement the mitigation plan results in violations of MPCA water quality standards. *Id.*, CCH Tr. 104-07. Second, the MPCA obtained information that portions of the Property were in a floodplain which raised further MPCA concerns because siting ISTSs in a floodplain increased the opportunity for ISTS failure, with resulting endangerment to the public health. *Id.*, CCH Tr. 103-04.

## IV. BAILEY'S FIRST FEDERAL TAKINGS LAWSUIT.

In March 2002, Bailey sued the COE, MPCA, the County and the Minnesota Department of Natural Resources (MDNR) in federal court. *See Bailey v. United States Army Corps of Engineers, et al.*, Civ. No. 02-639 (RHK/RLE); Cool Aff., Ex. 13 (Complaint). In that case, Bailey claimed that MPCA's revocation decision was a takings and that pursuit of MPCA administrative remedies was futile. Complaint, ¶¶ 47, 50.

In MPCA's motion to dismiss, the MPCA argued the takings claim was not ripe because Bailey had failed to meet the two ripeness requirements in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City,* 473 U.S. 172 (1985), the *final decision* requirement and the *state's-takings exhaustion* requirement. With regard to the *Williamson* final decision requirement, the MPCA pointed out that MPCA's October 2000 revocation expressly stated that Bailey could reapply for another certification and that the MPCA revocation identified the types of information Bailey needed to supply with any future application. Cool Aff., Ex. 15 at 10. MPCA also pointed out that Bailey had not availed himself of the MPCA variance

procedures, an option that was still available to Bailey in order to address the *Williamson* final decision requirement. Cool Aff., Ex. 14 at 15-16; Ex. 15 at 10.

The federal court dismissed Bailey's taking claim against the MPCA. Cool Aff., Ex. 16 at 25, 31. Bailey then initiated this action against the MPCA in August 2004. *See* Complaint. Bailey has also initiated a takings lawsuit in August 2002 against the United States in the federal court of claims. *See Gary Bailey v. United States*, Civ. No. 02-1078L (Fed. Ct. Cl.).

## V. BAILEY'S CONTESTED CASE HEARING.

Bailey requested a contested case hearing on the MPCA decision to revoke Bailey's section 401 certification. Hrg. Exs. 18 and 19 (attached as Exs. 16 and 17 to Zdon Aff.). MPCA responded to Bailey's hearing request with a request for further information and at the same time, notified Bailey again of his opportunity to submit another certificate application and of the ISTS/wetland informational needs that were identified in MPCA's October 2000 revocation decision. Hrg. Ex. 20, p. 2 (attached as Ex. 18 to Zdon Aff.). The MPCA letter also notified Bailey about MPCA's variance option and the variance procedures. *Id.* In responding to MPCA's request for hearing-related information, Bailey stated:

> We believe the main issue to be addressed in the hearing is that MPCA did not have the power to revoke the 401 certification given the local government units [sic] decision to plat the property as residential and decision to allow septic systems pursuant to experiment variances. *In essence according to law, the State of Minnesota is bound by the previous decision of the local government unit.*

Hrg. Ex. 21 (attached as Ex. 19 to Zdon Aff.)(emphasis added).

Mr. Fish identified this same estoppel argument in his opening statement at the MPCA's contested case hearing (CCH) to the Administrative Law Judge:

> As far as the issues as I see them here today, Your Honor, first of all is whether the revocation by the MPCA, whether they even have the authority and power to revoke this based on the local government unit's approval of the plat, the ownership of this property by multiple entities, their previous approval of the plat

- of the - project, Your Honor, the availability of sewer systems onsite as determined by a plan by the local government officials.

Fish Test., CCH Tr. 15.

Bailey was notified a CCH was scheduled. Hrg. Ex. 22 (attached as Ex. 20 to Zdon Aff).

At the hearing, the SWCD district manager testified that the SWCD-approved wetland mitigation plan had not been implemented and that the plan was no longer valid. Lemm Test., CCH Tr. 170-76, Hrg. Exs. 25-26 (attached as Exs. 21-22 to Zdon Aff.). Steve Eggers, the COE's senior ecologist, testified extensively about the COE's wetland delineation, including testimony regarding issues addressed in the COE's decisional documents that Eggers assisted in preparation.[5] *See, e.g.* CCH Tr. 234-342, Hrg. Exs. 35-36 (attached as Exs. 24-25 to Zdon Aff.). The COE's decisional document stated, with regard to Bailey's SWCD-approved mitigation plan, that:

Also, Mr. Bailey recently informed the Corps that he is not going to perform the above compensation since he considers himself as just another lot owner.

Hrg. Ex. 36 at 10 (COE 0541).

Mark Wespetal, MPCA's ISTS expert and licensed professional soil scientist, testified extensively about the Property's wetland soils and how those soils were not adequate for an ISTS mound system that had been proposed by Bailey. Wespetal Test., CCH Tr. 382-466. Wespetal analyzed the soils at all COE transect locations and none of the soils analyses showed soils adequate for standard mound systems. *Id.*, CCH Tr. 419, 426. Wespetal testified that, given these inadequate soils, these mound systems would weep and seep untreated or partially treated sewage to the ground surface and nearby waters. *Id.*, CCH Tr. 406-07, 446-49. Such conditions

[5] Eggers is a certified professional wetland scientist. Eggers Test., CCH Tr. 235.

would be considered an imminent public health threat. *Id.*, CCH Tr. 447. Such conditions could result in untreated pathogens entering the groundwater and nearby lake creating similar public health problems. *Id.*, CCH Tr. 447-48. Under such conditions, Wespetal testified that several MPCA rules would be violated, including rules prohibiting sewage discharges to ground surface and nuisance conditions. *Id.*, CCH Tr. 406-07, 449.

Wespetal also analyzed the Property to determine whether there was sufficient land area on each lot for two standard ISTS systems. Wespetal Test., CCH Tr. 426-42, Hrg. Ex. 50 (attached as Ex. 26 to Zdon Aff.). MPCA ISTS rules and the Minnesota Department of Natural Resource's shoreland management rules require land area sufficient for two standard systems. *Id.*, CCH Tr. 428. This two-system area requirement is needed because even well designed, properly maintained ISTSs have a finite life (e.g. 25-50 years before plugging occurs) so a replacement land area is needed. *Id.*, CCH Tr. 428-29. Wespetal's evaluation showed that six lots did not have sufficient area for two standard systems. *Id.*, CCH Tr. 433-34, Hrg. Ex. 50. Wespetal's evaluation also showed that another four lots were very small and required additional site-specific investigation work to determine whether those 4 lots could comply with the two-standard system requirement. *Id.*; ALJ's Report at 13-14, ¶ 37.

## VI. ALJ'S REPORT AND MPCA FINAL DECISION.

The administrative law judge (ALJ) issued Findings of Fact, Conclusions and Recommendation ("ALJ's Report"). Zdon Aff., Ex. 3. The ALJ recommended that MPCA's certification revocation be affirmed. ALJ's Report, Ex. 3 at 15. The ALJ found that MPCA's revocation "expressly notified Bailey that if he chose to reapply for a certificate, Bailey needed to submit additional information" regarding the extent of wetlands on the Property and a demonstration on how Bailey was going to comply with the MPCA's ISTS rules and MPCA's

wetland nondegradation mitigation rule. *Id.*, ¶ 29. The ALJ also found that Bailey had failed to respond to the MPCA's June 1999 RFI regarding "these three substantive issues." *Id.*, ¶¶ 10-12.

The ALJ's Report made numerous findings regarding the COE's wetland delineation, including the COE's determination that the Sunny Beach site was virtually all (i.e. 99%) wetlands consisting of a high quality wooded wetland. ALJ's Report, ¶ 26. The ALJ also found that the experts from the COE and the U.S. Department of Agriculture's Natural Resources Conservation Service (NRCS) had determined that the 100-foot-corridor-of-upland theory was not supported by the experts' field observations. *Id.*, ¶ 24. The ALJ adopted the COE's August 2000 wetland delineation findings and determinations as the ALJ's own. ALJ's Report, ¶ 26.

The ALJ determined that the Bailey project "endangers human health and the environment" because "sewage is likely to be discharged without adequate treatment." ALJ's Report at 15, ¶ 6. The ALJ also found that MPCA had demonstrated that six lots did not have sufficient land area to meet the two-standard system requirements of MPCA rules and MDNR's shoreland management rules, and that another four lots were very small and required additional site-specific investigation work to determine whether those 4 lots could comply with the two-standard system requirement. *Id.*, at 13-14, ¶ 37.

The ALJ determined that Bailey did not comply with applicable MPCA rules and conditions of Bailey's Section 401 certification conditions by failing to meet the SWCD-approved mitigation plan implementation deadline and by Bailey's position that he will not implement that mitigation plan. ALJ's Report, at 15, ¶ 4; *see also* ALJ's Report Findings of Fact, at 6-7, ¶ 15. The ALJ also determined the following:

> The agency has demonstrated by a preponderance of the evidence that Bailey has failed to disclose fully all facts relevant to the activity. He failed to disclose the extent of the wetland and the extent of the impact. Information on these items was requested by the July, 1999 request for information, but it was not supplied.

> In addition, the request for information asked Bailey for an explanation of how he was going to comply with the ISTS rule, which he failed to do. He failed to fully disclose the actual depths and draw down data concerning his ditches, which affects the amount of wetland compensation needed. He also failed to indicate that a significant portion of the plat is floodplain.
>
> *Id.* at 15, ¶ 5.

The MPCA Commissioner issued the MPCA's final decision, adopting the ALJ's Report. Zdon Aff., Ex. 4 (MPCA Findings of Fact, Conclusions and Order). With regard to Bailey's issue that a county platting decision preempts MPCA section 401 decisions, the MPCA determined as follows:

> The MPCA has the legal authority to make Section 401 certification decisions, including a revocation decision, in this matter notwithstanding the county's plat decision. MPCA's Section 401 authority, including its authority to make a certificate revocation determination, is not pre-empted, supplanted or limited by the county plat decision.
>
> Zdon Aff., Ex. 4 at 4, ¶ 9.

The MPCA's final decision also identified several current ongoing MPCA wetland rule violations resulting from the failure of implementation of the SWCD-approved wetland mitigation plan. Zdon Aff., Ex. 4 at 4-5, ¶ 11. Finally, the MPCA's final decision stated:

> *The agency has proven, by a preponderance of the evidence, that the proposed Sunny Beach project endangers human health and the environment and that the danger cannot be eliminated by modifying the Section 401 certification. In particular, sewage is likely to be discharged without adequate treatment. This situation exists because there is no evidence of the existence of soil conditions at the Sunny Beach project site that comply with MPCA's individual sewage treatment system (ISTS) rules. The discharge of sewage without adequate treatment will create nuisance conditions and an imminent public health threat and violate other MPCA rules (e.g., Minn. R. 7050.0210, subps. 1-2, Minn. R. 7060.0600, subp. 2, Minn. R. 7080.0065, subp. 4).* Even if compliant ISTS soils existed (they do not), several lots in the Sunny Beach plat do not have adequate area to comply with the two-standard ISTS system requirements of MPCA ISTS rules and MDNR shoreland regulations and these conditions endanger human health and the environment. In addition, the completion of the road and ditches, without adequate compensation, has harmed the environment,

> and has induced the clearing and filling of lots without appropriate permits or mitigation.

Zdon Aff., Ex. 4 at 5, ¶ 15 (emphasis added).

The MPCA issued an Order affirming MPCA's revocation of the certification. Zdon Aff., Ex. 4 at 6. The MPCA's Order also expressly stated: "This Order may be appealed to the Minnesota Court of Appeals in the manner provided in Minn. Stat. § 14.63 to Minn. Stat. § 14.69 (2002) if filed and served not more than 30 days after receipt of this Order." *Id.,* Ex. 4 at 6. Bailey did not appeal MPCA's decision to the Court of Appeals. Zdon Aff., ¶ 4.

## VII. Post-MPCA Decision Developments.

In March 2004, Bailey's attorney sent a draft complaint for a takings action against the MPCA, MDNR and the County. Zdon Aff., ¶ 7, Ex. 1. The Bailey letter stated in part:

> It is my understanding all administrative remedies have been exhausted with the DNR, Lake of the Woods County as well as the MPCA and I would merely confirm this with you at this time. If I do not hear from you, I will assume you agree with this.

*Id.,* Ex. 1.

The MPCA responded to the Bailey attorney's letter by letter dated March 18, 2004. Zdon Aff., ¶ 8, Ex. 2. In response to Mr. Fish's assertion that all MPCA administrative remedies had been exhausted, the MPCA expressly disagreed and stated there was no factual basis for his conclusions. *Id.,* Ex. 2. The MPCA letter summarized at least three specific instances where MPCA had apprised Bailey of the availability of being able to reapply for another section 401 certification with the various types of information needed for the Sunny Beach project and of the ability to avail himself of the MPCA variance procedures. *Id.,* Ex. 2. As of the March 2004 MPCA letter, Bailey had not sought any section 401 reapplication nor had he availed himself of MPCA's variance procedures. *Id.,* Ex. 2.

Bailey has never sought or applied for any variances from MPCA water quality standards with regard to Sunny Beach. Bailey 12/05 at 133. Bailey has not applied for any variances from any MPCA rules, including ISTS rules. *Id.*, at 133-34. No person, including Bailey, has filed any variance application with the MPCA regarding Sunny Beach. Zdon Aff., ¶ 5. Bailey has not submitted a second section 401 certificate application with the MPCA regarding his preferred Sunny Beach project with the additional information MPCA requested or another use or development option for the Property, other than Bailey's original Road plan that was incorporated into the COE's June 1999 after-the-fact Section 404 permit public notice. *Id.*, ¶ 6.

## ARGUMENT

### I. THIS COURT SHOULD DISMISS BAILEY'S ESTOPPEL CLAIM BECAUSE: (A) THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED; (B) THIS COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW BAILEY'S ESTOPPEL CLAIM; AND (C) BAILEY IS BARRED FROM RELITIGATING THE ESTOPPEL CLAIM BY THE RES JUDICATA DOCTRINE.

MPCA moves this Court to dismiss Bailey's estoppel claim on three bases. First, Bailey's estoppel claim should be dismissed under Minn. R. Civ. P. 12.02(e) because the Complaint fails to state a claim upon which relief can be granted. Second, MPCA moves to dismiss Bailey's estoppel claim because the Court lacks subject matter jurisdiction to review MPCA's decision. MPCA's certification decisions can only be reviewed by the Court of Appeals. Finally, Bailey is barred by the res judicata doctrine from relitigating this estoppel claim because it is the same claim that was raised and determined in Bailey's contested case hearing on the certification revocation.

**A. Bailey's Complaint Fails To State A Claim On Which Relief Can Be Granted Because There Has Been No Affirmative MPCA Misconduct.**

Under Minn. R. Civ. P. 12.02(e), dismissal is proper if there are no facts consistent with the pleading that support the relief demanded. *See Brakke v. Hilgers*, 374 N.W.2d 553, 555 (Minn. App. 1985).

Bailey asserts that MPCA is estopped from revoking the certification "due to LOW's official act of platting the parcel and determining the lots suitable for residential buildings." Complaint, ¶ 14. Bailey's estoppel claim has nothing to do with MPCA conduct. Bailey's claim is based solely on an unfounded legal theory that County platting decisions preempt and supplant all other state agency regulatory requirements. Under Bailey's theory, once a county approves a plat, all state agencies would be legally bound to rubberstamp their respective regulatory decisions in accord with the county decision or face an automatic court finding that these state agency decisions are an error of law and subject to automatic estoppel.

Counties are distinct legal entities that are organized as subordinate agencies of the state. *Kasch v. Clearwater County*, 289 N.W.2d 148, 151 (Minn. 1980). A fundamental rule of statutory construction is that the state is not bound by the passage of a law unless named therein, or unless the words of the act are so plain, clear, and unmistakable as to leave no doubt as to the intention of the legislature. Minn. Stat. § 645.27 (2006). The rationale for this rule lies in the doctrine of sovereign immunity. *Lienhard v. State*, 431 N.W.2d 861, 864 (Minn. 1988). Bailey has not cited any statute or definitive case law that County platting decisions create such a legally binding and preemptory effect on other state agency regulatory programs.

Bailey's claim is based solely on the County's platting decision, not any affirmative MPCA wrongful conduct. In fact, the Complaint fails to allege any MPCA misconduct.

To establish a claim of equitable estoppel against the government, a party must prove: (1) the agency made a misrepresentation of material fact; (2) the agency knew the representation was false; (3) the agency intended that its representation be acted upon; (4) the other party did not know the facts; and (5) the other party relied on the agency's misrepresentation to their detriment. *REM-Canby, Inc. v. Minn. Dep't of Human Servs.*, 494 N.W.2d 71, 74 (Minn. App. 1992). Affirmative misconduct, rather than simple inadvertence, mistake or imperfect conduct is required. *Id.* Equitable estoppel should be applied sparingly and only if the wrongful conduct threatens to work a serious injustice. *Ridgewood Dev. Co. v. State,* 294 N.W.2d 288, 292 (Minn. 1980). A party has a heavy burden of proof to establish estoppel. *Id.* Wrongful conduct is the most important element of an estoppel case. *Id.*, at 293.

There has been no wrongful MPCA conduct and no MPCA official knowingly made any false misrepresentations. The only relevant facts underlying Bailey's estoppel claim is the County's platting decision. Therefore, Bailey's estoppel claim should be dismissed because he has not stated a claim upon which relief can be granted.

**B. Only The Minnesota Court Of Appeals Has Jurisdiction To Review MPCA's Certification Decisions.**

MPCA moves to dismiss Bailey's estoppel because it is merely a subterfuge to get this Court to review and *rescind* or *nullify* MPCA's revocation. The Court lacks subject matter jurisdiction because MPCA's decisions can only be reviewed by the Court of Appeals.

Judicial review of MPCA's certification decisions are governed by the Minnesota Administrative Procedure Act (APA), Minn. Stat. §§ 14.63-.69. Minn. Stat. § 115.05, subd. 11 (2006); *see In re Winona County Municipal Solid Waste Incinerator*, 442 N.W.2d 344, 347 (Minn. App. 1989) (judicial review of MPCA decision is obtained under APA). MPCA's judicial review statute provides in relevant part:

> Judicial review. Any person aggrieved by any final decision of the agency or of the commissioner may obtain *judicial review thereof pursuant to sections 14.63 to 14.69* if the final decision is made pursuant to the agency's or the commissioner's authority under section 115A.914, this chapter, chapter 116, or the rules adopted thereunder, and if the decision is a final decision pertaining to:
>
> (1) *issuance, amendment, or denial of a permit, license, or certification*; . . . .

Minn. Stat. § 115.05, subd. 11(2006) (emphasis added).

Under the APA, a person aggrieved by a final agency decision must file a writ of certiorari with the Court of Appeals. Minn. Stat. § 14.63 (2006). The writ must be filed and served not more than thirty days after the person receives the final agency decision. *Id.* Appeals under the APA are to be heard by the Court of Appeals, not the district court. *Counties of Blue Earth, et al. v. Minnesota Department of Labor and Industry*, 489 N.W.2d 265, 268 (Minn. App. 1992). The APA, section 14.63, also provides for certiorari review by the Court of Appeals of a final decision in a contested case hearing made by an agency with statewide jurisdiction. *Heideman v. Metropolitan Airports Commission,* 555 N.W.2d 322, 323 (Minn. App. 1996).

The Court of Appeals has exclusive jurisdiction over certiorari review absent express statutory language in the governing statute vesting judicial review in the district court. *Township of Honner v. Redwood County*, 518 N.W.2d 639, 641 (Minn. App. 1994), *rev. denied* (Minn. Sept. 16, 1994). There are no provisions in MPCA's statutes, Minn. Stat. chapters 115 and 116, that authorize review of MPCA certifications in the district court. Consequently, only the Court of Appeals has jurisdiction, under section 115.05, subd. 11, to review MPCA's decision.

Bailey's contested case hearing was held in July 2003 and the ALJ's report was issued in October, 2003. Zdon Aff., Exs. 3-6. MPCA's final decision was issued on January 16, 2004. *Id.*, Ex. 4. MPCA's final decision expressly stated that judicial review could be obtained through Minn. Stat. §§ 14.63-.69 in the Court of Appeals. *Id.*, Ex. 4 at 6 (Order). Bailey did not appeal

that decision to the Court of Appeals. Zdon Aff., ¶ 4. Bailey cannot collaterally attack that MPCA decision by seeking *rescission* or *nullification* of MPCA's decision using an estoppel claim in this Court. In sum, Bailey's claim should be dismissed because this Court does not have jurisdiction to review and rescind or nullify MPCA's decision.

**C. Bailey's Estoppel Claim Is Barred By The Doctrine Of Res Judicata.**

Bailey's estoppel claim was raised and resolved in Bailey's contested case hearing. The Court lacks jurisdiction to address the estoppel claim because that administrative proceeding is res judicata as to the estoppel claim in this suit.

A claim is barred under the res judicata doctrine when: (1) the prior litigation resulted in a final adjudication on the merits; (2) both proceedings involve the same cause of action[6]; and (3) both proceedings involve the same parties. *Demers v. City of Minneapolis,* 486 N.W.2d 828, 830 (Minn. App. 1992). The application of res judicata constitutes an absolute bar to a second suit for the same cause of action and is conclusive between the parties "not only as to every matter which was actually litigated, but also as to every matter which might have been litigated." *Id.*; *see Nelson v. Am. Family Ins. Group,* 651 N.W.2d 499, 511 (Minn. 2002) (absolute bar as to every matter that might have been litigated in prior proceeding). Therefore, successive litigation is barred involving claims that arise from the "same operative nucleus of facts," regardless of the labels. *Anderson v. Werner Continental, Inc.*, 363 N.W.2d 332, 335 (Minn. App. 1985).

Res judicata will apply to administrative decisions when an agency acts in a quasi-judicial capacity. *Graham v. Special Sch. Dist. No. 1,* 472 N.W.2d 114, 115-16 (Minn. 1991). A

[6] A cause of action is a situation or state of facts which would entitle a party to sustain action and give him a right to seek judicial review. *Surf and Sand, Inc. v. Gardebring*, 457 N.W.2d 782, 787 (Minn. App. 1990). The common test is to inquire whether the same evidence will sustain both actions. *Id.*

contested case hearing conducted according to the Minnesota Administrative Procedure Act is a quasi-judicial proceeding. *Bahr v. City of Litchfield*, 420 N.W.2d 604, 607 (Minn. 1988). In addition, the doctrine is applicable if agency resolves disputed issues properly before it which the parties have had the opportunity to litigate. *Surf and Sand, Inc. v. Gardebring*, 457 N.W.2d 782, 787 (Minn. App. 1990), *review denied* (Minn. Sept. 20, 1990). To apply res judicata in an administrative context, the judicial remedy must include either administrative determinations or access to a state appellate court. *Id.* In the *Surf* case, the appellate court ruled that that both remedies existed based on the prior contested case hearing (CCH) by an administrative law judge (ALJ) and appellate review of the subsequent agency decision. *Id.* at 784 (citing prior appellate decision challenging agency decision based on the CCH) and 787.

Like the *Surf* case, both remedies were available to Bailey. Bailey requested and participated in the CCH before the ALJ. Bailey raised the estoppel issue in the CCH. *See supra* pp. 15-16 (Part V.). MPCA's final decision expressly addressed Bailey's estoppel issue by finding that MPCA's section 401 authority was not pre-empted, supplanted or limited by the County plat decision. Zdon Aff., Ex. 4 at 4, ¶ 9. Bailey had the right to have appellate court review of MPCA's decision on that issue. *See* Minn. Stat. § 14.63 (judicial review by writ).

Bailey's estoppel claim is the same legal claim he made in the CCH. Both estoppel claims involve the same cause of action as both claims arise out of the same operative nucleus of facts, MPCA's section 401 decision. Therefore, Bailey's estoppel claim should be dismissed because the Court is barred by the doctrine of res judicata from asserting jurisdiction.

## II. THIS COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW BAILEY'S INVERSE CONDEMNATION CLAIM BECAUSE THE CLAIM WAS NOT BROUGHT THROUGH A PETITION FOR MANDAMUS.

MPCA moves this Court, under Minn. R. Civ. P. 12.02(a), to dismiss Bailey's claim for inverse condemnation because the claim was not brought through a petition for mandamus.

Actions for inverse condemnation must be brought to the court through an action in mandamus. *Thomsen v. State,* 284 Minn. 468, 474, 170 N.W.2d 575, 580 (1969); *see Dale Properties, LLC v. State*, 638 N.W.2d 763, 765 (Minn. 2002) (taking, in the constitutional sense, must be brought by petition for a writ of mandamus); *Gibson v. Comm'r of Highways*, 287 Minn. 495, 499, 178 N.W.2d 727, 730 (1970) (whether taking occurred must be decided in a mandamus proceeding by mandamus court). Mandamus is an extraordinary legal remedy awarded, not as a matter of right, but in the exercise of sound judicial discretion and upon equitable principles. *See County of Swift v. Boyle,* 481 N.W.2d 74, 77 (Minn. App. 1992).

Bailey failed to initiate the proper action for his takings claim by failing to file a petition for a writ of mandamus. Consequently, this Court lacks subject matter jurisdiction to consider the takings claim and it should be dismissed.

## III. THIS COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW BAILEY'S INVERSE CONDEMNATION CLAIM; ONLY THE COURT OF APPEALS CAN REVIEW MPCA'S QUASI-JUDICIAL DECISION TO DETERMINE WHETHER A TAKING OCCURRED.

MPCA moves this Court to dismiss Bailey's inverse condemnation claim for lack of subject matter jurisdiction. Bailey claims MPCA's revocation is a takings. Bailey can only challenge MPCA's decision to determine whether a taking occurred through a writ of certiorari to the Court of Appeals because MPCA's action was a quasi-judicial decision. Accordingly, this Court lacks jurisdiction to determine whether MPCA's decision resulted in a takings.

A contested case hearing conducted according to the Minnesota Administrative Procedure Act (APA), Minn. Stat. ch. 14, is a quasi-judicial proceeding. *Bahr v. City of Litchfield*, 420 N.W.2d 604, 607 (Minn. 1988).[7] The APA provides for certiorari review by the Court of Appeals of a final decision in a contested case hearing. Minn. Stat. § 14.63. It is a general rule that absent an explicit statutory or appellate rule authorizing review in the district court, judicial review of all administrative quasi-judicial decisions must be invoked only by writ of certiorari in the Court of Appeals. *Tischer v. Housing & Redev. Auth. of Cambridge*, 675 N.W.2d 361, 363 (Minn. App. 2004), *aff'd*, 693 N.W.2d 426, 429 (Minn. 2005).

Jurisdiction to review whether an agency's quasi-judicial decision constitutes a taking is in the Court of Appeals by a writ of certiorari. *City of Minneapolis v. Meldahl*, 607 N.W.2d 168, 172 (Minn. App. 2000); *see Farrell v. City of Minneapolis*, 2004 WL 885692 at *2 (Minn. App. April 27, 2004) (where appellant seeks to bring damage claims that require inquiry into the facts surrounding an agency's quasi-judicial decision, jurisdiction is only by writ of certiorari) (case is attached as Ex. 11 to Cool Aff.).

In *City of Minneapolis*, the appellant sought inverse condemnation for the city's quasi-judicial decision determining his building was a nuisance warranting demolition. *City of Minneapolis*, 607 N.W.2d at 172. The Court of Appeals found that appellant's assertion that he was entitled to a trial on damages was premature because there had been no determination of a taking, and that the determination of whether the city's quasi-judicial decision constituted a

---

[7] *See In re Chisago Lakes School District,* 690 N.W.2d 407, 409-10 (Minn. App. 2005)(decision based on a contested case hearing is a quasi-judicial decision); *In re Excess Surplus Status of Blue Cross and Blue Shield of Minnesota,* 606 N.W.2d 697, 707 (Minn. App. 2000), *reversed by* 624 N.W.2d 264 (Minn. 2001)(when a contested case hearing is used to gather and evaluate evidence, an agency is acting in a quasi-judicial role).

taking could only be established by the Court of Appeals through a petition for writ of certiorari. *Id.* The Court reasoned that the takings claim is not separate and distinct from the city's quasi-judicial decision because an inquiry into the facts surrounding the takings claim would involve an inquiry into the city's quasi-judicial decision to demolish the structure. *Id.* Accordingly, the Court held that such judicial inquiries, including any takings determination, must be in the Court of Appeals by writ of certiorari alone. *Id.*

In *Farrell*, the appellant sought damages for the city's decision to revoke his rental dwelling license. *Farrell,* 2004 WL 885692 at *1. The Court found that determining whether appellant was entitled to damages necessarily required an inquiry into whether the city's quasi-judicial decision was correct; in essence, the damage claim is not separate and distinct from the quasi-judicial decision to revoke his license because the inquiry into the facts surrounding the damages claim would involve an inquiry into the city's decision to revoke the license. *Id.*, at *2. The Court held that the appellant may challenge the city's quasi-judicial decision and all claims arising from that decision, including damages claim, only through a writ of certiorari. *Id.*, at *3.

As the case law demonstrates, some takings claims are not reviewable in the district court. The jurisdiction for judicial review of takings claims depends upon the underlying action being challenged. The determining factor is not the claim itself, but the activity complained about. The manner in which the claim is characterized in the complaint doe not change the jurisdictional analysis. *Dietz v. Dodge County*, 487 N.W.2d 237, 239-40 (Minn. 1992).

In this case, Bailey's taking claim arises out of a common nucleus of operative facts with the revocation decision. MPCA's decision was a quasi-judicial decision, the result of a contested case hearing before an ALJ. Zdon Aff., Ex. 5 (Notice and Order for Hearing). Bailey's taking claim is not separate and distinct from MPCA's quasi-judicial decision. It does not matter

whether or not Bailey properly pled a claim for inverse condemnation. His takings claim depends upon a challenge to MPCA's quasi-judicial decision; he can make no claim of taking without challenging MPCA's Findings, Conclusions and Order. Accordingly, Bailey's taking claim should be dismissed because jurisdiction to determine whether MPCA's revocation decision created a takings is by writ of certiorari only in the Court of Appeals.

## IV. BAILEY'S TAKINGS CLAIM IS NOT RIPE BECAUSE BAILEY HAS NOT APPLIED FOR ANY VARIANCES FROM MPCA RULES AND HE HAS FAILED TO SUBMIT A SECOND APPLICATION AND HE CANNOT PROVE THESE OPTIONS ARE FUTILE.

Even if this Court has jurisdiction, Bailey's taking claim is not ripe because he has not sought any final MPCA decision through a second application or through variance procedures, and Bailey cannot prove these procedures are futile.

### A. Bailey's Takings Claim Is Not Ripe Because There Has Been No Final Application Of The MPCA Water Quality Standards And Related Rules.

In Minnesota, landowners seeking to compel inverse condemnation have the burden of proving that the governmental action denies *all reasonable uses of his land. Czech v. City of Blaine,* 312 Minn. 535, 539, 253 N.W.2d 272, 274 (1977). Consequently, a takings claim challenging governmental regulation is not ripe for judicial review until the governmental entity charged with implementing the regulations has reached a *final decision* regarding the application of the regulations to the land. *Palazzolo v. Rhode Island,* 533 U.S. 606, 618 (2001) (quoting *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186 (1985).[8] A taking claim is ripe "once . . . the permissible uses of the property are known [by

[8] This action is also not ripe because no taking has resulted from MPCA's revocation. The Road was fully constructed at the time of MPCA's revocation. The Road continues to exist, providing access to Bailey's Property and all lots. The Road's continued presence makes any calculation of damages impractical, conjectural and speculative. What would this Court be compensating Bailey for given the Road's existence and use? Therefore, Bailey's takings claim is not ripe.

the court] to a reasonable degree of certainty." *Id.* at 620. Whether a regulation has gone "too far" cannot be measured "until the administrative agency has arrived at a final, dispositive position regarding how it will apply the regulation to the particular land in question." *Hunkins v. City of Minneapolis*, 508 N.W.2d 542, 544 (Minn. App. 1994) (quoting *Williamson*).[9]

The lack of ripeness deprives this Court of subject matter jurisdiction over Bailey's takings claim. *See Samaad v. City of Dallas*, 940 F.2d 925, 934 (5th Cir. 1991) (the ripeness analysis of *Williamson* is a jurisdictional requirement that cannot be waived).

In *Williamson*, the Supreme Court found that the landowner had not met the finality requirement because he failed to seek a variance from the ordinance. *Williamson*, 473 U.S. at 187-190. The Court held that resort to the variance procedures would result in a conclusive determination by the planning commission whether it would allow development in any manner proposed by the landowner, and that absent a commission decision on a variance request, there was not a final, reviewable decision. *Id.* at 194.

Minnesota courts adhere to the *Williamson* finality requirement, requiring variance applications or at least a second plan where the first plan is rejected. *See, e.g. Wheeler v. City of Wayzata*, 533 N.W.2d 405, 407 (Minn. 1995) (takings claim is not ripe where landowner neither perfected their rezoning application nor applied for a variance); *see also County of Pine v. Minn. Dep't of Natural Res.*, 280 N.W.2d 625, 630 (Minn. 1979) (judicial review of takings claim

9 The U.S. Supreme Court has clearly established this finality requirement noting that its cases "uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations purporting to limit it." *Hunkins*, 508 N.W.2d at 544 (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)).

denied where owner failed to exhaust remedies by applying for a variance from the ordinance).[10]

In *Hay v. City of* Andover, 436 N.W.2d 800, 804 (Minn. App. 1989), the Court, citing *Williamson*, held that for a takings claim to be ripe, the owner "must apply for a variance from the regulations which might have allowed development of the property." In affirming the trial court's decision that the takings claim was not ripe because no variance had been sought, the Court held it was not futile for the owner to at least ask the city to allow property development "in some other manner" than originally proposed as a mobile home park. *Id.*, at 805.

In addition, a takings claim is not ripe where only one plan is rejected and no other plan is proposed. *See Thompson v. City of Red Wing,* 455 N.W.2d 512, 516 (Minn. App. 1990), *rev. denied* (Minn. June 26, 1990) (*citing Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 136-37 ((1978)). In *Thompson*, the Court held that the takings claim was not ripe because the owner had only submitted a plan for a gravel extraction and failed to submit plans for developing alternative uses of the land consistent with the statute. *Id.*, at 516. Where only the gravel mining use had been denied, the Court held "it is purely speculative to conclude that all reasonable use is denied." *Id.*; *see also Larson v. County of Washington,* 387 N.W.2d 902, 907-08 (Minn. App. 1986), *rev. denied* (Minn. Aug. 20, 1986) (to establish a taking, the owner bears the burden of showing not only that all primary uses are unavailable, but also that no reasonable secondary uses (e.g. ones permitted by special use permit *or variance*) are available).

Like the land owners in the previous cases, Bailey has never sought or applied for any variances from MPCA water quality standards or MPCA rules. Bailey 12/05 at 133-34. No one

---

[10] *See State v. Regitschnig*, 1991 WL 276185 (Minn. App. 1991) (taking claim not ripe because owner failed to seek a variance to allow some other use other than his initial proposed mobile home park expansion), *attached* to Cool Aff., Exh. 12.

has filed any variance application regarding Sunny Beach. Zdon Aff., ¶ 5. Bailey has not submitted a second section 401 certificate application regarding the Sunny Beach project with the additional information MPCA requested or another application for the Property, other than Bailey's original Road plan that was incorporated into the COE's June 1999 after-the-fact permit public notice. *Id.*, ¶ 6.

The undisputed evidence shows that numerous uses are already being made of Bailey's 86-acre parcel. *See, supra* pp. 3-6. For example, Bailey's property development plan succeeded in part because 6 of the 13 lots were sold, at $25,000 a lot, and are currently owned by other individuals. *See* Complaint, ¶ 11. Bailey has used and can continue to use the 56 acre farm field for agriculture crops (e.g. small grains and hay). Bailey 12/04 at 55. Bailey is also getting inquiries from potential buyers on the other 71 acres, acreage which he indicates he could sell for upwards of $800-$1000/acre. Bailey 12/05 at 130-31; Bailey 11/06 at 15. Bailey has logged and can still log inside the forested area, an area that provides recreational uses like hunting and lake access. Bailey has also conceived low density residential plans for developing the property with larger 5-acre plots with access to the west on County Highway 53. Bailey 12/05 at 74, 96-97. The uncontroverted evidence demonstrates that Bailey's primary development uses exist, other reasonable uses exist, and there are other potential reasonable uses that could be addressed in a section 401 reapplication or variance process.

The *Williamson* final-decision requirement has not been met because Bailey has submitted only one certificate application and he has failed to apply for any variances or reapply for another certification. The permissible uses of Bailey's 86-acre parcel have not been determined by a final MPCA decision with any reasonable degree of certainty. The evidence demonstrates that reasonable uses of the 86-acre parcel exist and that "it is purely speculative to

conclude that all reasonable use is denied." *See Thompson*, 455 N.W.2d at 516. Accordingly, the Court should dismiss Bailey's taking claim because it is not ripe.

**B. Bailey Cannot Prove That A Reapplication For A Section 401 Certificate Or A Variance Application To The MPCA Would Be Futile.**

Bailey asserts that available administrative remedies are futile. Complaint, ¶ 10. However, the burden is on Bailey to prove that pursuing variances or a section 401 reapplication with MPCA would be futile. *See Pine County*, 280 N.W.2d at 630 (reversing trial court's ruling that enforcement of ordinance was a regulatory taking where owners failed to request variance or show that it would be futile to do so). If a landowner bypasses available administrative remedies, the landowner must demonstrate that seeking redress through the administrative process would have been futile or impossible. *NSPEA v. Minn. Dep't of Admin.*, 2003 WL 139717, at *3 (Minn. App. 2003), *attached* Cool Aff., Ex. 10). As one federal court stated, in evaluating a futility argument in a takings analysis:

> . . . the mere possibility, or even the probability, that the responsible agency may deny the permit should not be enough to trigger the [futility] excuse. To come within the exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so).

*See Gilbert v. Cambridge*, 932 F.2d 51, 61 (1st Cir. 1991). The filing of one meaningful, additional application will ordinarily be necessary, although not alone sufficient, as a precondition to invoking the futility exception, the same approach used by the Seventh and Ninth Circuits. *Id.*[11]

---

[11] The Minnesota courts have adopted a similar high "refusal-must-be-certain" standard. *See Ellingson & Assocs., Inc. v. Keefe*, 410 N.W.2d 857, 860 (Minn. App. 1987) (no exhaustion required if administrative bodies have unequivocally committed themselves to a position); *see also Amcon Corp. v. City of Eagan*, 348 N.W.2d 66, 72 (Minn. 1984) (no exhaustion required when city's demonstrated attitude makes it clear that administrative relief will not be forthcoming). The uncertainty of success before an administrative agency does not prove futility. (footnote continues on next page)

Bailey cannot prove that a section 401 reapplication or a variance application would be futile because the MPCA has repeatedly apprised Bailey that it would consider these applications. *See supra* pp. 14-15, 20-21. The MPCA's October 2000 revocation stated Bailey could reapply for another certification with information regarding total site wetland impacts and how compliance with the MPCA ISTS rules and other MPCA wetland rules would be accomplished. Zdon Aff., Ex. 15. During Bailey's 2002 federal lawsuit, MPCA's pleadings reiterated that Bailey could reapply for another certification and use the MPCA's variance processes. Cool Aff. Exs. 14-15. MPCA's rules have variance standards and procedures. *See* Minn. R. 7000.7000 and 7050.0190, subp. 1 (2005).

In February 2003, the MPCA again notified Bailey of the certificate re-application option and identified the available MPCA variance rules and procedures. Zdon Aff., Ex. 18. In March 2004, in response to Mr. Fish's erroneous declaration that all administrative remedies had been exhausted, the MPCA notified Bailey again that he had not availed himself of the reapplication or variance options. Zdon Aff., Exs. 1 and 2.

The evidence shows that MPCA has repeatedly told Bailey that a variance application and a certificate reapplication would be considered. Consequently, Bailey cannot prove that availing himself of these MPCA variance or certificate reapplication options would be futile.

## V. THERE IS NO TAKING BECAUSE BAILEY'S PROJECT VIOLATES WATER QUALITY STANDARDS AND RELATED RULES, AND CREATES NUISANCE CONDITIONS.

Under Part III of this memorandum, the MPCA asserts that this Court does not have subject matter jurisdiction to determine whether MPCA's decision is a takings. If this Court has

---

*Schuyler v. Metro. Transit Comm'n,* 374 N.W.2d 453, 456 (Minn. App. 1985) (failure to appeal discharge through administrative process is not justified on the basis that the agency would not help him and that he thought he would not be successful).

jurisdiction, the MPCA argues here, in the alternative, that the MPCA's revocation did not create a takings because Bailey's project violates MPCA rules and creates nuisance conditions. The MPCA properly exercised its police powers to prevent nuisance conditions. Accordingly, as a matter of law, there has been no taking and Bailey's taking claims should be dismissed.[12]

### A. Bailey Is Barred From Re-litigating Any Facts, Issues and Claims Regarding MPCA's Revocation Under The Doctrines Of Res Judicata And Collateral Estoppel.

Bailey cannot collaterally attack MPCA's final decision in this inverse condemnation action. The facts, issues and claims resolved in Bailey's CCH and the MPCA's final decision can be conclusively applied in this summary judgment motion because Bailey is precluded from relitigating those facts, issues and claims under the doctrines of res judicata and collateral estoppel.[13] This situation is precisely the type in which the doctrines of res judicata and collateral estoppel are most necessary to prevent collateral attacks in order to protect the separation of powers doctrine, to protect the MPCA from unnecessary, duplicative proceedings, and to prevent a drain of resources of the parties and the judiciary. Matters determined in an administrative agency's permitting process, from which no appeal was taken, cannot be

---

[12] Bailey claims a regulatory taking. Regulatory takings claims fall into two categories. One, recognized in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003 (1992), turns on whether the property has effectively no remaining economic value. In that event, a *per se* or categorical taking arises. A second takings type arises when the property retains some economic value. In that event, the circumstances may be assessed using the factors in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). Here, the evidence shows that Bailey's 86 acre parcel has reasonable uses and substantial economic value. *See, supra* pp. 3-6.

[13] The applicability of res judicata to Bailey's CCH proceeding was addressed previously and will not be repeated here. *See supra* pp. 25-27. The application of res judicata is equally applicable to all of the claims related to Bailey's compliance with MPCA rules and other legal requirements applicable to the project. *See Nelson*, 651 N.W.2d at 511 (res judicata bars claims actually litigated as well as every matter that might have been litigated).

collaterally attacked in an eminent domain action. *Minneapolis Gas Co. v. Dahle*, 171 N.W.2d 813, 815 (Minn. 1969); *see City of Rochester v. Peoples Cooperative Power Ass'n, Inc.*, 505 N.W.2d 621, 624 (Minn. App. 1993)(collateral attack on underlying annexation decision is impermissible in eminent domain proceeding).

The doctrine of collateral estoppel applies to administrative decisions when made in a quasi-judicial capacity. *Graham v. Special Sch. Dist. No. 1*, 472 N.W.2d 114, 115-16 (Minn. 1991); *Falgren v. State, Board of Teaching*, 545 N.W.2d 901, 905 (Minn. 1996). Collateral estoppel precludes litigants from raising issues of fact or law that are identical with the issues previously litigated and which were necessary and essential to the former decision. *See Aufderhar v. Data Dispatch, Inc.*, 452 N.W.2d 648, 650 (Minn. 1990). For collateral estoppel to apply, five factors must be met:

> 1. the issue to be precluded must be identical to the issue raised in the prior agency adjudication;
>
> 2. the issue must have been necessary to the agency adjudication and properly before the agency;
>
> 3. the agency determination must be a final adjudication and properly before the agency;
>
> 4. the estopped party was a party or in privity with a party to the agency determinations; and
>
> 5. the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Graham*, 472 N.W.2d at 116. The collateral estoppel requirements are satisfied here.

The issues to be precluded are identical to the factual and legal issues resolved in the CCH, which included those issues identified in the MPCA's Notice and Order for Hearing. Zdon Aff., Ex. 5 Those issues include Bailey's estoppel issue and whether there was any factual basis

for any of the findings in Minn. R. 7001.0140, subps. 2.A., 2.C. and 2.D. which provide in relevant part:

> The following findings of the agency constitute justification for the agency to . . . revoke a section 401 certification without reissuance:
>
> A. with respect to the facility or activity to be certified, the proposed certificate holder will not comply with all applicable state and federal pollution control statutes and rules administered by the agency, or conditions of the section 401 certification; . . .
>
> C. that the certificate holder has failed to disclose fully all facts relevant to the facility or activity to be certified, or that the certificate holder has submitted false or misleading information to the agency or the commissioner;
>
> D. that the certified facility or activity endangers human health or the environment and that the danger cannot be removed by a modification of the conditions of the section 401 certification. . . .

Minn. R. 7001.0140, subp. 2.[14] These issues, the related facts and application of facts to MPCA rules demonstrated that water quality standards are being violated, that ISTS rules would be violated and that nuisances exist.[15] The resolved issues also include Bailey's failure to respond to MPCA's 1999 request for information (RFI) and Bailey's failure to fully disclose all relevant facts, issues that relate to the MPCA rule criteria underlying MPCA's revocation. Accordingly, the first *Graham* factor is met based on this common nucleus of issues.

---

[14] In applying parts 7001.0010 to 7001.0210 to the processing of section 401 certifications, the word "permit" shall be construed to mean "section 401 certification" and the term "permittee" shall be construed to mean "certificate holder." Minn. R. 7001.1400. The text above has been modified to account for these constructions.

[15] The MPCA Notice and Order for Hearing identified relevant laws and rules on these issues, including Minn. R. ch. 7001 (MPCA certification processing rules), Minn. R. 7001.1400-.1470 (the 401 rules), Minn. R. chs. 7050 and 7060 (ground and surface WQ standards) and Minn. R. ch. 7080 (ISTS rules). *See* Zdon Aff., Ex. 5.

The second *Graham* factor is met because, as identified in part 7001.0140 above, the issues were necessary to MPCA's adjudication of the revocation and properly before the MPCA. The remaining *Graham* factors are met because Bailey was a party, represented by counsel, in the contested case hearing which was heard by an ALJ in accordance with APA hearing requirements and MPCA's final decision was subject to judicial review in the Court of Appeals.[16]

Accordingly, under the doctrines of res judicata and collateral estoppel, the facts, claims and issues determined in Bailey's CCH and MPCA's final decision are controlling here.

### B. Minnesota's Common Law And Statutory Law Prohibit Nuisances Caused By Water Pollution.

A government regulatory action is not deemed to be a taking if it prohibits what would or legally could be a nuisance because the state is merely acting to protect the public under its inherent police powers. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1029 (1992) (state law principles of nuisance already inhere in every property owner's title). Here, the courts must inquire into the degree of harm posed by the landowner's proposed activities. *Id.*

It is a settled principle of takings law that under the *Penn Central* analytic framework, the government may defend against liability by claiming the regulated activity constituted a state law nuisance without further regard to the other two *Penn Central* factors. *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 351 (2002); *Mugler v. Kansas*, 123 U.S. 623, 662-69 (1887); *Brace v. United States*, 48 Fed.Cl. 272, 278 (2000) (a government regulation is not deemed to be a taking if it prohibits what would or legally could be

---

[16] Contested case hearings are quasi-judicial proceedings subject to judicial review which by definition meet the third and fifth *Graham* factors. *See Graham*, 472 N.W.2d at 116; *see also Bahr,* 420 N.W.2d at 607 (CCH is a quasi-judicial proceeding); Minn. Stat. § 14.63 (judicial review of CCH in court of appeals by writ of certiorari).

a nuisance). If the regulatory action prevents what would or legally could have been a nuisance under state nuisance law, then no taking has occurred because the state is merely acting to protect the public under its inherent police powers. *Crepple v. United States*, 41 F.3d 627, 631 (Fed. Cir. 1994). Accordingly, if state nuisance law justifies the restraint, the court does not proceed to the remaining two *Penn Central* factors. *Id.*

Minnesota appellate courts adhere to the same principles that where the regulation is genuinely designed to prevent harm to the public and it likely to achieve that goal, the courts will not find a taking. *Zeman v. City of Minneapolis*, 552 N.W.2d 548, 555 (Minn. 1996); *see City of Minneapolis v. Meldahl*, 607 N.W.2d 168, 172 (Minn. App. 2000) (when state properly uses its police powers to abate nuisance, no taking occurs and the landowner is not entitled to compensation).[17] In applying the *Penn Central* factor regarding the character of the government action, the Minnesota Supreme Court stated:

> Under this factor, we must examine the regulation at issue, with emphasis on its purpose and the possibility of achieving that purpose with this regulation. *While this is always an important consideration in a takings analysis, in cases involving a regulation aimed at the protection of the public health and safety, it becomes paramount.* If the state regulation appears genuinely designed to prevent harm to the public and is likely to achieve that goal and the harm suffered by the property owner does not appear to be one that should be borne by the entire community, we will not find a taking.

*Id.*, at 554 (emphasis added).

---

[17] The rights of private property are subservient to the public right to be free from nuisances which may be abated without compensation. *State v. Guliford*, 174 Minn. 457, 465, 219 N.W. 770, 773 (1928). The state's police powers include the right to abate a public nuisance and property so affected is not taken for public use, and therefore, there is no obligation to make compensation. *Id.*; *see State Fire Marshall v. Sherman*, 201 Minn. 594, 277 N.W. 249 (1938) (nuisance abatement is not a taking of private property; the public takes nothing, it simply causes on who maintains land that endangers life and property to remove it).

In *Zeman*, the Court was reviewing a takings claim based on the revocation of Zeman's rental dwelling license. *Id.*, at 551. The city argued the underlying ordinance was a valid exercise of municipal power to ameliorate a nuisance. *Id.*, at 553. The Court's analysis drew comparisons to other nuisance-prevention cases (e.g. destruction of infected trees, strict regulation of coal mining) and stated that a harm-prevention regulation designed to protect "the public from noxious harm or illegal activity, is a powerful rationale militating against find a taking." *Id.*, at 554 (emphasis added). The Court found no taking because the ordinance restricted uses that were properly treated as part of the common burden of citizenship and it served the public harm prevention purpose. *Id.*, at 555.

The MPCA's 401 regulatory program serves a public-harm prevention purpose because it is designed to prevent water pollution and related nuisance conditions. Water pollution, especially sewage discharges, has always been an actionable nuisance under Minnesota common and statutory law. The state's police powers extend to control pollution and the disposal of sewage. *Minnesota Energy & Econ. Dev. Auth. v. Printy*, 351 N.W.2d 319, 341-42 (Minn. 1984); *County of Pine v. State, Dep't of Natural Resources*, 280 N.W.2d 625, 629 (Minn. 1979)(limiting pollution is a valid exercise of police powers).

"Anything is nuisance at the common law which renders the enjoyment of life and property uncomfortable." *City of St. Paul v.* Gilfilin, 36 Minn. 298, 299, 31 N.W. 49, 50 (1886). The right to be free from nuisance created by water pollution has long been recognized by Minnesota law.[18] A classic instance of harm from nuisance is where sewage is deposited on

---

[18] Minnesota's statutory law of nuisance is declaratory of the common law of nuisance. *Hall v. Stokely-Van Camp, Inc.*, 259 Minn. 101, 103, 106 N.W.2d 8, 10 (1960) (Minn. Stat. § 561.01); *Lead v. Inch*, 116 Minn. 467, 471, 134 N.W. 218, 219 (1912) (Rev. Laws 1905, § 4446); *see also* (footnote continues on next page)

neighboring property, sewage being unhealthy and offensive to the senses. *Highview North Apartments v. County of Ramsey*, 323 N.W.2d 65, 71 (Minn. 1982) (sewage deposits on a neighboring property is a classic instance of a harm from nuisance); *see Huber v. City of Blue Earth*, 213 Minn. 319, 6 N.W.2d 471 (1942) (city's raw sanitary sewage and canning factory effluent discharge to stream causing pollution, creating actionable nuisance); *Hughes v. Village of Nashwauk*, 177 Minn. 547, 225 N.W. 898 (1929) (city's sewage discharges to premises is enjoinable nuisance); *Nienow v. Village of Mapleton*, 144 Minn. 60, 174 N.W. 517 (1919) (village's sewage discharge into ditch extending onto plaintiff's land is enjoinable nuisance); *Joce v. Village of Janesville*, 132 Minn. 121, 155 N.W. 1067 (1916) (polluted discharges of surface water, city filth and sewage onto plaintiff's land is nuisance). Human-induced groundwater contamination is also a nuisance. *See, e.g., Nelson v. Swedish, etc., Cemetery Ass'n*, 111 Minn. 149, 126 N.W. 723 (1910) (enjoinable nuisance may result if cemetery is so situated that burial will contaminate water of wells or springs).[19]

Moreover, the State Water Pollution Control Act, Minn. Stat. chapter 115, MPCA's water quality standards rules and MPCA's ISTS rules merely codify the nuisance harm prevention principles reflected in Minnesota's nuisance common law. For example, section 115.03 requires

---

M.S.A. ch. 561, V.35-37 (2000), pp. 377-78 (showing historical derivations of current section 561.01). For example, Mason's Minn. St.1927, § 9580 (M.S.A. § 561.01) gave district courts jurisdiction to abate private nuisances arising from water pollution. *Satren v. Hader Cooperative Cheese Factory*, 202 Minn. 553, 279 N.W. 361 (1938).

[19] Actionable nuisance is also created by sewage mixed with industrial water pollution. *See, e.g., Herrmann v. Larson*, 214 Minn. 46, 7 N.W.2d 330 (1943) (nuisance created by septic tank effluent and creamery's waste water discharging to neighboring property); *Johnson v. City of Fairmont*, 188 Minn. 451, 247 N.W. 572 (1933) (city septic tank discharge and factory waste discharges to creek and slough then to plaintiff's farm causing actionable nuisance).

the MPCA to adopt and enforce standards to prevent and abate water pollution. *See, e.g.*, Minn. Stat. § 115.03, subd. 1(e) (2006). Water pollution is defined as:

> "Pollution of water," "water pollution," or "pollute the water" means: (a) the discharge of any pollutant into any waters of the state or the contamination of any waters of the state so as to create *a nuisance or render such waters unclean, or noxious, or impure so as to be actually or potentially harmful or detrimental or injurious to public health, safety or welfare,* to domestic, agricultural, commercial, industrial, recreational or other legitimate uses, or to livestock, animals, birds, fish or other aquatic life; or (b) the alteration made or induced by human activity of the chemical, physical, biological, or radiological integrity of waters of the state.

Minn. Stat. § 115.01, subd. 13. Waters of the state include both surface and ground waters. *See, Id.*, subd. 22. MPCA is also required to adopt surface water standards for quality and purity which indicate polluted conditions which are actually or potentially deleterious, detrimental, harmful or injurious to the public health, safety or welfare. Minn. Stat. § 115.44, subd. 3-4; *see* Minn. R. 7050.0210, subp. 2 (nuisance conditions prohibited); Minn. R. 7080.0010 (improper location of ISTS adversely affects the public health, general welfare and safety by discharge of inadequately treated sewage to ground surface, surface and ground waters). Finally, any violation of a MPCA rule or standard constitutes a public nuisance that may be enjoined by legal actions. Minn. Stat. § 115.071, subd. 4 (2006).

Water pollution is an abatable nuisance under Minnesota common and statutory law. By administering the section 401 program as MPCA did in the Bailey project, MPCA exercised its police powers to protect public health and the environment from nuisances. Bailey does not have a right to maintain nuisance conditions on the Property under either common or statutory law.

A Maryland appellate court found that a regulatory agency's denial of an ISTS permit was in accordance with a regulatory program designed to prevent nuisances and accordingly, the permit denial was not a takings. *Erb. v. Maryland Dept. of Environment*, 110 Md.App. 246, 676

A.2d 1017, 1026-28 (Md. App. 1996) (attached as Ex. 17 to Cool Aff.). Private nuisance law can abate sewage disposal systems that are detrimental to the public health; consequently, public regulation designed to prevent these same nuisances is not a taking. *Id.*, 676 A.2d at 1027.

**C. MPCA's Decision Conclusively Shows That Bailey's Project Violates Water Quality Standards And Related Rules, And Creates Nuisances.**

In the CCH, the MPCA's licensed soil scientist testified about the site's wetland soils and how the wetland soils were not adequate for standard ISTS mound systems that had been proposed by Bailey. Wespetal Test., CCH Tr. 382-466. None of the soils analyses showed soils adequate for a standard mound system. *Id.*, CCH Tr. 419, 426. The MPCA scientist testified that, given the inadequate soils, these mound systems would likely result in the weeping out or seeping out of untreated sewage from the mounds to the ground resulting in nuisance conditions and violations of MPCA rules. *Id.*, CCH Tr. 406-07, 446-49.

The ALJ found that the Bailey project endangered human health and the environment because "sewage is likely to be discharged without adequate treatment." Zdon Aff., Ex. 3, ALJ's Report, at 15, ¶ 6. The MPCA determined this endangerment was caused in part due to site limitations because there was no evidence of soil conditions at Sunny Beach that would comply with MPCA ISTS rules. Zdon Aff., Ex.4, at 5, ¶ 15. The MPCA found that the discharge of sewage without adequate treatment will create nuisance conditions and an imminent public health threat. *Id.*, Ex. 4, at 5, ¶ 15. These sewage discharges would also result in violations of several MPCA rules including Minn. R. 7050.0210, subps. 1-2 (prohibition on discharge of untreated sewage and on nuisance conditions), 7060.0600, subp. 2 (prohibition on sewage discharges into unsaturated zone polluting ground water) and 7080.0065, subp. 4 (prohibitions on seepage to ground surface and on discharges of sewage or sewage tank effluent to ground surface or surface waters). *Id.*

The MPCA scientist also evaluated the complications of siting ISTSs where a significant portion of the Property is floodplain. The MPCA scientist conducted an evaluation to determine whether sufficient land area existed for mound systems (assuming no soils constraints which MPCA did not find). Wespetal Test., CCH Tr. 426-446. MPCA only learned that a significant portion of the Property was in the floodplain after the revocation. ALJ's Report, ¶¶ 35-36. Bailey had failed to apprise MPCA that the plat included significant areas of floodplain. *Id.*, Concl. ¶ 5. With the floodplain constraints and applicable MPCA and MDNR shoreland management requirements (i.e. lot sizes need to accommodate two standard systems), the MPCA scientist determined that six lots did not have sufficient land area to meet MPCA and MDNR rules and another four sites were very small and required additional site-specific investigation work to determine whether the sites were large enough for two standard systems. *Id.*, at 13-14, ¶ 37. The MPCA determined that these limiting lot conditions (i.e. inadequate area for two systems) endangered human health and the environment. Zdon Aff., Ex. 4, at 5, ¶ 15.

In addition, the County SWCD district manager testified that the SWCD-approved wetland mitigation plan had never been implemented. Lemm Test., CCH Tr. pp. 175-76. This testimony corroborated the COE's decisional document which indicated that Bailey had informed the COE that he was not going to implement the SWCD-approved mitigation plan because he considered himself as just another land owner. ALJ's Report, ¶ 15. The MPCA's section 401 certification was expressly conditioned on Bailey's implementation of the mitigation plan. Zdon Aff., Ex. 11 (Dec. 1999 Certificate); ALJ's Report, ¶ 20. Bailey's failure to implement the mitigation violated Minn. R. 7050.0186, subp. 6.D. and the section 401 certification condition

itself.[20] Zdon Aff., Ex. 4, MPCA Findings, at 4-5, ¶ 11. The lack of wetland mitigation means there are ongoing violations of MPCA's wetland nondegradation standards and related wetland rules at the Property. *Id.*

Bailey's CCH proceeding conclusively demonstrated that there was no reasonable assurance that Bailey's project would meet applicable water quality standards. The CCH evidence conclusively demonstrated there were ongoing violations of MPCA water quality standards and likely violations of ISTS rules creating nuisance conditions and the likelihood of imminent public health and safety problems if septic systems were installed into the Property's wetland soils. The MPCA properly exercised its police powers to abate and prevent these nuisances by its certification revocation. Consequently, as a matter of law, there has been no taking and Bailey's taking claims should be dismissed.

## VI. BAILEY'S CLAIMS ARE BARRED BY THE EQUITABLE DOCTRINE OF UNCLEAN HANDS.

Even if Bailey were to seek mandamus, Bailey has unclean hands and his claims should be barred. Mandamus is granted on equitable principles and an applicant for such a writ, who has unclean hands, is guilty of illegal conduct, or who has violated the equitable principles, may be rejected. *State v. Magie,* 235 N.W. 526, 527 (Minn. 1931) (mandamus is granted on equitable principles; its purpose is to remedy a wrong, not to promote one). A party that engages in a course of continued nondisclosure has unclean hands and cannot avail themselves of equitable relief. *Sanborn v. Sanborn,* 503 N.W.2d 499, 504 (Minn. App. 1993).

---

[20] Bailey's acceptance of the certificate in 1999 constitutes waiver of the right to belatedly contest the validity of those conditions. *See McNamara v. Office of Strategic and Long Range Planning,* 628 N.W.2d 620, 625 (Minn. App. 2001), *rev. denied* (Minn. Aug. 22, 2001) (challenge to the validity of dedication fees is waived where the challenger failed to challenge the fees prior to final action on the application).

In this case, Bailey initiated Road construction resulting in wetland filling without the required Section 404 permit in the face of the COE's 1994 letter notifying Bailey of the permit requirements. *See supra* p. 9. Bailey engaged in continued nondisclosure by failing to respond to the MPCA's 1999 RFI which sought relevant data about the extent of Property wetlands, total wetland impacts, and information about ISTS rule compliance. Zdon Aff., Ex. 6; CCH Tr. 42-45, 49-50, 95-96; ALJ's Report, ¶¶ 10-12 and Concl. ¶ 5. Bailey also failed to disclose the actual depths and draw down data concerning the road ditches, which affected the amount of wetland compensation needed. ALJ's Report, ¶ Concl. ¶ 5. Bailey failed to indicate that a significant portion of the plat was located in floodplain. *Id.*; Zdon Ex. 4 (MPCA Findings) ¶ 12. In July 2000, the County requested that Bailey conduct a wetland delineation on the entire plat to determine the type, extent and locations of all wetlands in an effort to respond to COE concerns about the accuracy of site information; but Bailey did not conduct the delineation and did not submit the requested information. Lemm Test., CCH Tr. 176-79; ALJ's Report, ¶ 22. Bailey failed to disclose to the MPCA that he was not going to implement the wetland compensatory mitigation, an enforceable condition within Bailey's section 401 certificate, and in fact, Bailey did not comply with that certificate condition. ALJ's Report, ¶ 35, Concl. ¶ 5.

Bailey engaged in a pattern of illegal conduct and continued nondisclosure of key facts integral to MPCA's certification decision. Bailey violated the equitable principles he now seeks to enforce against the MPCA. Because Bailey has unclean hands, Bailey should be precluded from availing himself of the equitable remedy of mandamus.

## CONCLUSION

For the foregoing reasons, MPCA respectfully requests that the Court grant MPCA's motion to dismiss, or in the alternative, MPCA's motion for summary judgment dismissing Bailey's claims against the MPCA.

Dated: 5/16/07

Respectfully submitted,

LORI SWANSON
Attorney General
State of Minnesota

Richard P. Cool
RICHARD P. COOL
Assistant Attorney General
Atty. Reg. No. 17497X

445 Minnesota Street, Suite 900
St. Paul, Minnesota 55101-2127
(651) 296-7347 (Voice)
(651) 296-1410 (TTY)

ATTORNEYS FOR PLAINTIFF MINNESOTA POLLUTION CONTROL AGENCY

AG: #1791670-v1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,

v.

GARY BAILEY,

Defendant.

GARY BAILEY,

Third-Party Plaintiff,

v.

LAKE OF THE WOODS COUNTY,

Third-Party Defendant.

Case No. 05-CV-2245 (PJS/RLE)

ORDER FOR JUDGMENT

Friedrich A.P. Siekert, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Alan B. Fish, ALAN B. FISH, P.A., for defendant.

Scott T. Anderson, RATWIK ROSZAK & MALONEY, P.A., for third-party defendant.

In the summer of 1998, defendant Gary Bailey constructed a road on a parcel of wetland located in Lake of the Woods County, Minnesota ("the Site"), without obtaining a permit under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344. In October 2001, the United States Army Corps of Engineers ("the Corps") issued a restoration order requiring Bailey to restore the wetland to its pre-violation condition. After Bailey refused to do so, the United States brought this action under Section 309(b) of the CWA, 33 U.S.C. § 1319(b), to require Bailey, "at his own expense and at the direction of the Corps, to restore the wetlands to their pre-

Received 3-31-08
Docketed ✓
Scanned
Client E-mailed ✓
Client U.S. Mail

violation condition in accordance with the Restoration Order dated October 22, 2001, issued by the Corps." Compl. ¶ 2.

On September 25, 2007, the Court granted in part the motion of the United States for summary judgment. The Court found that the Corps properly asserted jurisdiction over the Site under the CWA. The Court further held that, because "the Corps's restoration order [met] all of the requirements of [*United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293 (5th Cir. 1976)]," the Court would "enter an injunction requiring Bailey to comply with that order." Docket No. 148 at 35. The Court then ordered Bailey to submit a proposed restoration plan. After an unsuccessful attempt to appeal the Court's order, Bailey finally submitted a proposed plan. The United States objected to Bailey's proposal and submitted its own proposed restoration plan. Bailey then moved for a stay of the judgment to be entered in this case.

On March 12, 2008, the Court held a hearing on the parties' dispute over the content of the restoration plan, as well as on Bailey's motion for a stay. For the reasons stated in its September 25, 2007 order, and for the reasons that follow, the Court denies Bailey's motion for a stay and issues a final injunction requiring Bailey to restore the wetland that he unlawfully polluted nearly a decade ago.

*A. The Restoration Plan*

Before addressing the content of the final injunction to be entered in this case, the Court observes that the United States appears to have misunderstood the Court's September 25, 2007 order. In that order, the Court stated that it "will enter an injunction requiring Bailey to restore the Site, at his own expense, to its pre-violation condition *in accordance with the Restoration Order dated October 22, 2001* . . . ." Docket No. 148 at 39 (emphasis added). This Court's

order was consistent with the parties' positions during the summary-judgment proceedings. During those proceedings, the United States asked the Court to "order Bailey to restore the property *in accordance with the [October 22, 2001] Restoration Order*," Docket No. 78 at 44 (emphasis added), and all of the parties' arguments were directed to the propriety of enforcing that restoration order.

The October 22, 2001 restoration order is a one-page order with four numbered paragraphs listing the restoration work Bailey must perform at the Site. *See* Docket No. 161, Attach. A at COE0701. The United States now proposes a sixteen-page final injunction that goes well beyond the original restoration order. *See* Docket No. 162. The United States's new proposals include detailed requirements specifying how Bailey must perform the actual restoration work (such as the use of erosion-control barriers and the type and storage of the equipment Bailey must use) and also expands the scope of the work that Bailey must perform (by, for example, requiring Bailey to plant trees, perform soil ripping, and hand-cast and rake in the native grass seed). The United States also seeks to extend the time in which Bailey must undertake these activities: Whereas the Corps's original order requires Bailey to control weeds for three years following restoration, the United States's proposed order would require Bailey to control weeds for five years following restoration and would further require Bailey to submit monitoring reports for each of those five years.

In sum, after litigating the propriety of the original restoration order, and with no prior notice to Bailey or the Court, the United States is now asking the Court to dramatically expand the scope of the work that Bailey must undertake. The Court rejects, as both unwise and unfair, the United States's attempt to improve the original restoration order. The original order was the

product of notice-and-comment proceedings by the Corps — the agency with the expertise to determine what steps are necessary to restore the wetland. Bailey received proper notice of those proceedings and had a fair opportunity to develop a record and to have his views heard and considered. In this case, though, the United States gave Bailey (and the Court) no notice of the new requirements that it seeks to graft onto the original restoration order until long after discovery had closed and the Court had ruled on the parties' dispositive motions. The Court lacks the expertise to determine the propriety of these additional proposals in the first instance, and the United States has submitted no record evidence to aid the Court in responsibly exercising its judgment. Even if the United States had submitted such evidence, Bailey has had no opportunity to respond to it or submit his own evidence. In the main, therefore, the Court will limit the final injunction to requiring Bailey to comply with the original restoration order issued by the Corps.

That said, the Court will include in the final injunction a couple of the United States's new proposals, because those proposals, while not expanding the substance of the restoration order, will assist the Court in ensuring that its final injunction is obeyed. Specifically, the Court will order Bailey to conduct surveys of the Site both before he begins the restoration process and after he has completed earth-moving activities. The Court will also require Bailey to permit the United States reasonable access to the Site. Finally, the Court will clarify that, to comply with the restoration order, Bailey will have to remove the culverts and fill placed on the Site by others. The reasons for ordering Bailey to undertake these tasks are as follows:

*1. Surveys.* The restoration order requires Bailey to remove the unauthorized road, fill in the ditches, and reestablish the original contours of the wetland using the elevation of the

adjacent, undisturbed wetland as a reference. Given the history of this and related litigation, the Court fears that, at some point, the parties will dispute whether Bailey has complied with this aspect of the order. Land surveys will help to prevent such disputes and substantially assist the Court in resolving any such disputes that arise. Thus, under its inherent authority to ensure compliance with its injunctions, the Court will order Bailey, at his own expense, to conduct the surveys requested by the United States.

*2. Access.* Having issued a valid and enforceable restoration order, the United States has the right to ensure that Bailey complies with it. More importantly, this Court has the authority to ensure that its orders are obeyed. In the absence of any right of access to the Site, the United States will not be able to bring possible violations of the final injunction to the Court's attention. Thus, although the original restoration order does not explicitly require that the United States be given the right to visit the Site for the purpose of monitoring Bailey's compliance, the Court will grant a limited right of access to the United States, as specified in its order below.

*3. Culverts and Fill Placed by Others.* Bailey objects to the requirement in the United States's proposed order that he remove culverts and fill placed on the Site by others. Bailey contends that the original restoration order does not require him to remove those items and argues that the United States should be sanctioned for contending that he should remove them. If anyone should be sanctioned, it is Bailey. During the summary-judgment proceedings, Bailey stood before this Court and argued forcefully that the restoration order was inequitable precisely because it required him to remove culverts and fill placed on the Site by others. *See, e.g.*, Docket No. 99 at 27; Hr'g Tr. 101-04, May 2, 2007. The Court rejected Bailey's argument, finding that the culverts and fill in question were placed by innocent parties to whom Bailey sold

the lots without disclosing his lack of a proper permit for the road, that the culverts and fill would never have been placed on the Site in the absence of Bailey's knowing violation of the law, and that removing the culverts and fill was a de minimis burden on Bailey in light of his obligation to remove a quarter-mile road.

Bailey now excuses his about-face by claiming that he was so overcome by the eloquence of the United States's arguments during the summary-judgment proceedings that he neglected to carefully read the contents of the one-page restoration order — the order over which he has been litigating for about six years. Bailey's claim is not plausible. Because the parties have already fully litigated the issue of the culverts and fill placed on the Site by others, and because Bailey insisted before this Court that the restoration order *did* require him to remove those culverts and that fill, the Court stands by its earlier ruling that it is equitable, under *Sexton Cove*, to require Bailey to remove the culverts and fill in question.

*B. Bailey's Motion for a Stay of the Judgment*

Bailey asks the Court to stay its judgment until he has had an opportunity to complete the appellate process. A party seeking a stay pending appeal must show the following:

> (1) that it is likely to succeed on the merits; (2) that it will suffer irreparable injury unless the stay is granted; (3) that no substantial harm will come to other interested parties; and (4) that the stay will do no harm to the public interest.

*James River Flood Control Ass'n v. Watt*, 680 F.2d 543, 544 (8th Cir. 1982) (per curiam).

1. Likelihood of Success on the Merits

This case presented two main questions: (1) Which test, of those articulated in the various opinions in *Rapanos v. United States*, 547 U.S. 715 (2006), should the Court apply to determine whether the Corps has jurisdiction over the Site under the CWA? and (2) Has the Corps met the applicable test(s)?

Both Bailey and the United States moved for summary judgment on these issues. In its September 25, 2007 order, the Court concluded that the Corps could establish CWA jurisdiction under *Rapanos* using *either* the test articulated in the plurality opinion *or* the test articulated in Justice Kennedy's opinion concurring in the judgment. The Court then found that the Corps had met Justice Kennedy's test and thus properly asserted jurisdiction over the Site.

To date, every federal court applying *Rapanos* — including the First, Seventh, Ninth, and Eleventh Circuits — has concluded that the Corps may assert CWA jurisdiction over a given site if the site meets Justice Kennedy's test. *See N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999-1000 (9th Cir. 2007); *United States v. Robison*, 505 F.3d 1208, 1222 (11th Cir. 2007); *United States v. Johnson*, 467 F.3d 56, 66 (1st Cir. 2006); *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 725 (7th Cir. 2006) (per curiam). Not a single court has accepted Bailey's argument that, if Justice Kennedy's test (but not the plurality's test) is met, no CWA jurisdiction

exists.[1] Given the unanimity of opinion in favor of applying Justice Kennedy's test, it is highly unlikely that Bailey will succeed in overturning this aspect of the Court's holding.

Under Justice Kennedy's test, CWA jurisdiction exists whenever there is a "significant nexus" between the wetland in question and navigable-in-fact waters — and, when the wetland is "adjacent" to the navigable-in-fact waters, a significant nexus exists as a matter of law. *Rapanos*, 547 U.S. at 779-80. In applying Justice Kennedy's test to the facts of this case, the Court held, essentially, that the Corps had presented competent and extensive expert evidence that the Site is situated in a wetland adjacent to navigable-in-fact waters (Lake of the Woods), whereas Bailey, who relied mainly on his own affidavit and presented no expert evidence of any kind, had failed to present any competent evidence to the contrary. No doubt Bailey took the calculated risk of submitting no real evidence regarding Justice Kennedy's test in the hope that the Court would agree with his argument that CWA jurisdiction exists only when the plurality's test is met. That was not a wise gamble, given that no federal court has yet agreed with Bailey's argument. In any event, though, given the Corp's substantial evidence that the wetland in

[1]As the Court noted in its September 25, 2007 order, the only possible exception to this substantial body of opinion in favor of applying Justice Kennedy's test is *United States v. Chevron Pipe Line Co.*, 437 F. Supp. 2d 605, 613 (N.D. Tex. 2006), in which the court appeared to assume that Justice Kennedy's test is controlling, but found that test so ambiguous that it resorted to pre-*Rapanos* circuit precedent for guidance. Since the Court issued its earlier opinion, the Court's research has uncovered only one case that appears to assume that the plurality's test is controlling. *See Natural Res. Def. Council v. Kempthorne*, 525 F. Supp. 2d 115, 124 n.11 (D.D.C. 2007). In denying the plaintiffs' motion for a preliminary injunction under various federal environmental statutes, *Kempthorne* cited the plurality's test when it observed, in a footnote, that the plaintiffs did not appear likely to prevail in establishing CWA jurisdiction. *Id.* But *Kempthorne* relied mainly on the fact that the plaintiffs had waived their CWA claims, and there is no indication that the issue of the proper test was before the court.

question is indeed adjacent to Lake of the Woods, and given the dearth of evidence to the contrary, Bailey is unlikely to prevail on appeal.

Finally, Bailey contends that, even if the Court's holding in favor of CWA jurisdiction is upheld, he is likely to succeed in reversing the Court's holding that the Corps's restoration order is equitable under the factors set forth in *Sexton Cove*. In particular, Bailey points to the lack of evidence regarding his financial resources. The reason for this lack of evidence, however, is that Bailey never contested that he has the financial wherewithal to remove the road, and he conceded that removing the road would probably not cost much more than it cost to construct the road. *See* Docket No. 148 at 29; Hr'g Tr. 66, May 2, 2007. Nor did Bailey offer evidence that the cost of removing the road would render removal impractical. Instead, as the Court noted in its September 25 order, the focus of Bailey's *Sexton Cove* analysis was his argument that it would be inequitable to require him, rather than Lake of the Woods County, to restore the wetland. But, as the Court has already found, Bailey knowingly violated the law and caused the environmental damage at issue. Bailey cannot now rely on his own failure to submit evidence of his financial condition to avoid responsibility for his conduct. Bailey is not likely to succeed in overturning this aspect of the Court's order.

2. Irreparable Injury

Bailey argues that he will suffer irreparable injury if he is forced to remove the road before a final adjudication on the merits of his appeal. At oral argument, the United States said that it is unaware of any right Bailey may have to recover against the United States in the event that Bailey prevails on appeal after having removed the road. Thus, Bailey appears to be correct that any financial injury he may suffer as a result of a legally erroneous order to remove the road

would be irreparable. But, as noted, Bailey conceded at oral argument that removal of the road will probably not cost much more than the original construction, for which the original bid was $10,000 (and which, at the most, cost about $20,000). Hr'g Tr. 65-66, May 2, 2007. In other words, although the harm suffered by Bailey would be irreparable, it would also be relatively modest. This factor therefore does not weigh heavily in Bailey's favor.

3. Harm to Others and the Public Interest

Bailey constructed the road ten years ago, in defiance of the explicit instructions of the Corps. Bailey has yet to take any action to mitigate the damage that he has caused. The public — especially the small community surrounding Lake of the Woods — may well question the value and purpose of federal environmental laws when knowing and blatant violations can go unremedied year after year after year. Moreover, it will take many years for the wetlands to repair themselves, and necessary restoration work has already been delayed for a decade. The sooner restoration is begun, the better for the public. These factors weigh against granting a stay.

4. Conclusion

Having considered the relevant factors, the Court is persuaded that a stay of the judgment is not warranted. It is true that, if Bailey ultimately prevails on appeal, he will suffer irreparable harm. But he has very little chance of prevailing on appeal, and the harm that he will suffer is relatively modest. At the same time, the public interest is clearly served by requiring Bailey to restore the wetlands this summer, before yet another growing season is lost.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The area to be restored ("the Restoration Area") is located in Section 21, Township 163 North, Range 33 West, Lake of the Woods County, Minnesota. Beginning at the north end of the subdivision, the Restoration Area measures approximately 1,370 feet in length by 66 feet in width. *See* App. 1. The Restoration Area also includes the areas on which culverts and fill material were placed to facilitate the construction of driveways. The Restoration Area excludes the southernmost 123-foot length of the road adjacent to lot 1 and the portion of lot 2 that was constructed in non-wetlands.

2. Defendant Gary Bailey is ORDERED to restore the Restoration Area, at his own expense, to its pre-violation condition in compliance with the October 22, 2001 Restoration Order issued by the Army Corps of Engineers ("the Corps") as follows:

   a. Defendant shall remove the unauthorized dredged and fill material placed for the extension of Sandy Shores Drive to an upland disposal site approved in advance by the Corps, except for that necessary to fill in the ditches as described in paragraph 2(c) below. The unauthorized dredged and fill material to be removed includes all driveway culverts and related fill material.

   b. Removal of the fill shall expose the native, loamy soils and reestablish the original, pre-construction contours of the wetland. Defendant shall use the

elevation of the adjacent, undisturbed wetlands as a reference for this purpose.

c. Defendant shall backfill the ditches associated with the unauthorized road in the Restoration Area with the native, loamy soils used to construct the road. Defendant shall reestablish the original, pre-construction contours of the wetland using the elevation of the adjacent, undisturbed wetlands as a reference. Defendant shall haul all excess fill material to an upland site approved in advance by the Corps.

d. Defendant shall begin the work described in paragraphs 2(a), 2(b), and 2(c) no later than June 15, 2008 and shall complete that work no later than August 15, 2008.

e. Defendant shall seed the Restoration Area between September 15, 2008 and October 15, 2008 with thirty pounds of seed mix per acre. The seed mix shall conform to the specifications in the following table, except that defendant may, with advance approval from the Corps, make substitutions in the mix:

| SEED MIXTURE FOR RESTORATION AREA | | |
|---|---|---|
| Common Name | Scientific Name | % of Mix |
| Virginia wild rye | *Elymus virginicus* | 30.0 |
| Annual rye grass | *Lolium italicum* | 20.0 |
| Fowl bluegrass | *Poa palustris* | 20.0 |
| Fringed brome grass | *Bromus ciliata* | 20.0 |
| Prairie cord-grass | *Spartina pectinata* | 6.0 |

| | | |
|---|---|---|
| Softstem bulrush | *Scirpus validus* | 2.0 |
| Green bulrush | *Scirpus atrovirens* | 0.5 |
| Canada bluejoint grass | *Calamagrostis canadensis* | 0.1 |
| Blue flag iris | *Iris virginica-shrevii* | 0.3 |
| Canada anemone | *Anemone canadensis* | 0.1 |
| Marsh milkweed | *Asclepias incarnata* | 0.2 |
| Great blue lobelia | *Lobelia siphilitica* | 0.1 |
| Goldenglow | *Rudbeckia laciniata* | 0.2 |
| Blue vervain | *Verbena hastata* | 0.2 |
| Joe-pye weed | *Eupatorium maculatum* | 0.3 |

f. During the years 2009, 2010, and 2011, defendant shall accomplish control of the following weed species through hand removal or spot application of an herbicide approved for wetland/aquatic use:

i. Reed canary grass (*Phalaris arundinacea*);

ii. Purple loosestrife (*Lythrum salicaria*);

iii. Common buckthorn (*Rhamnus cathartica*);

iv. Glossy buckthorn (*Rhamnus frangula*); and

v. Canada thistle (*Cirsium arvense*).

g. No later than May 15, 2008, defendant shall submit to plaintiff and the Court a surveyed site plan, developed by professional registered land surveyors, showing property boundaries, waterbodies, wetlands, and areas of unauthorized dredged or fill material. Elevation contours of six inches or one foot shall be mapped. The plan view scale shall be no less than 1 inch = 75 feet. The surveyed site plan shall include spot elevations in

undisturbed soil conditions on either side of the road corridor. The spot elevations shall total at least thirty (fifteen on each side of the road corridor, spaced approximately one hundred feet apart).

h. Within fifteen days of completing earth-moving activities, defendant shall submit to plaintiff and the Court an as-built survey, developed by professional registered land surveyors, that depicts the spot elevation grades of fifteen points within the Restoration Area at approximately one hundred foot intervals that match with the thirty spot elevation controls described in paragraph 2(g).

i. For the purpose of monitoring defendant's compliance with this order, defendant shall permit plaintiff to conduct three visits to the Restoration Area during 2008 and two visits per year in 2009, 2010, and 2011. During the visits, plaintiff may take reasonable measures and conduct reasonable tests to determine and document defendant's compliance, or lack thereof, with this order. Plaintiff must seek permission from the Court for any visits in excess of those expressly permitted by this order. Plaintiff shall provide defendant at least forty-eight hours' notice before any visit conducted pursuant to this order. Defendant or his representative may be present during any visit by plaintiff — if defendant or his representative is available when plaintiff chooses to visit — but must not interfere in any way with plaintiff's activities.

3. Defendant's motion to stay enforcement of judgment [Docket No. 167] is DENIED.

4. The Court shall retain jurisdiction over this action for the purpose of enforcing this order.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: March 31, 2008

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge


T.163 N., R.33 W.
S COUNTY, MN.
FIGURE 1
AREA TO BE RESTORED
SANDY SHORES DRIVE
SHORES
CENTERLINE DRAINAGE DITCH
CULVERTS
14
42700 SQ.FT.
13
40600 SQ.FT.
12
11
37500 SQ.FT.
10
9
33300 SQ.FT.
8
30200 SQ.FT.
7
30000 SQ.FT.
6
29400 SQ.FT.
5
29400 SQ.FT.
4
30000 SQ.FT.
3
30500 SQ.FT.
2
28500 SQ.FT.
1
33500 SQ.FT.
LAKE OF THE WOODS
GOV'T LOT 3
GOV'T LOT 4
WATERS EDGE ON 10/7/98
100 YEAR FLOOD LINE ELEV. = 1064.0
ORDINARY HIGH WATER LINE ELEVATION = 1061.25
SCALE IN FEET
ALL DIMENSIONS ARE ±
ELEVATIONS ARE BASED ON THE NATIONAL GEODETIC VERTICAL DATUM OF 1929 (NGVD29) AND FROM THE 1997 LAKE OF THE WOODS VERTICAL CONTROL SURVEY
EXISTING TRAIL
CENTERLINE DRAINAGE DITCH (AGREED BOUNDARY LINE)
CENTERLINE DRAINAGE DITCH
CULVERTS
COE0703
WIDSETH

Minnesota Wetland Conservation Act

# WETLAND REPLACEMENT PLAN APPLICATION

## APPLICANT INFORMATION

Gary Bailey
Name(s) of Applicant

Route 1, Box 103
Street Address

Williams, MN 56686
City, State, Zip Code

(218)783-6071 -same-
Telephone (Daytime) (Evening)

Name(s) Authorized Agent

Street Address

City, State, Zip Code

( )
Telephone (Daytime) (Evening)

## PROPOSED IMPACTED WETLAND INFORMATION

Location: T 163N R 33W S 21 1/4 SW 1/4 NE
UTM Coordinates: X: ________ Y: ________

County Name/Number: Lake of the Woods/39

Major Watershed Name/Number: Lake of the Woods/80

Wetland type: Circular 39 7 ; NWI PFO1B

Size of entire wetland: 20 acres

Topographic setting (check one):
Shoreland X Riverine ____
Floodplain ____ Flowthrough ____
Tributary ____ Isolated ____

Check one: ☐ <50% ☐ 50%-80% or ✓ > 80%
Check one: ☐ Agricultural land; ✓ Non-ag. land
Minimum replacement ratio(check one): ✓ 1:1 ☐ 2:1

Size of total wetland impact: 2.9 acres

Minimum replacement needed: 5.8 acres

Estimated size of surface water drainage into wetland: 25 acres
If the wetland is within a shoreland wetland protection zone or the floodplain of a watercourse, list the distance and direction to the waterbody or watercourse: 300+ feet in a NE direction.

List the dominant vegetation and land use in the impacted wetland area (ex. willows, cattails, grass, sedges, open water/pasture, row crop, etc.): Black Ash, Poplar

**Attach the following information:**

(1) A recent **aerial photograph or accurate map** of the impacted wetland area showing:
   a. the location, extent, and purpose of the proposed wetland fill or drainage;
   b. the location of any surface inlets or outlets draining into or out of the wetland;
   c. the land use within the immediate watershed within one mile of the impacted wetland. Or, include a written description that notes the presence and location, if any, of wetland preservation regions and areas, wetland development avoidance regions and areas, and wetland deficient regions and areas as identified in the comprehensive water plan;
(2) A **soils map** of the site;
(3) **Evidence of ownership** or rights to the affected area (or otherwise demonstrate to the LGU);
(4) A description of the **avoidance and minimization** alternatives considered; and
(5) Any **other information** required by the LGU, e.g. delineation report.

## PROPOSED PROJECT DESCRIPTION

Describe the nature and purpose of the proposed project: 1/4 mile long road into property for access purposes. The road has already been completed.

Timetable: project will begin on ___/___/___ (mo/day/yr) and will be completed by ___/___/___

## PROPOSED MITIGATION INFORMATION

Mitigation will be accomplished as follows (check one):

✓ **Project-specific replacement only.** Complete all information below.

☐ **Purchase of Wetland Banking Credits only.** Attach Application for Withdrawal of Wetland Credits (Exhibit J); **do not** complete project-specific information below, and skip to "Special Considerations" on Page 4.

☐ **A combination** of the project-specific replacement and purchase of banking credits. Complete information below for project-specific mitigation, and attach Application for Withdrawal of Wetland Credits (Exhibit J) for credit information.

☐ *Check here if excess credits are anticipated from project-specific replacement above the required minimum mitigation ratio, and those credits are to be deposited into the Minnesota Wetland Bank, following Minnesota Wetland Bank procedures.*

**Attach the following information:**

(1) **A recent aerial photograph or accurate map** of the mitigation site showing:
- a. The location of the mitigation site;
- b. The location of any surface inlets or outlets draining into or out of the wetland;
- c. The land use of the immediate watershed within one mile of the mitigation wetland;

Or include a written description that also notes the presence and location, if any, of wetland preservation regions and areas, wetland development avoidance regions and areas, and wetland deficient regions and areas as identified in the comprehensive water plan;

(2) **Scale drawings** of the replacement wetland showing plan and profile views and fixed photo-reference points for monitoring purposes;

(3) **Evidence of ownership** or rights to the land affected by the proposed mitigation wetland, which includes, but is not limited to, the following; title to the land, fee owner, marital status, mortgages, and other interests in the land;

(4) **A soils map** of the mitigation site;

(5) **A monitoring plan**; and

(6) Any other information required by the LGU.

**Provide the following information:**

(7) Describe how the replacement wetland shall be constructed, for example, excavation or restoration by blocking an existing tile; the type, size, and specifications of outlet structures; elevations, relative to Mean Sea Level or established bench mark, of key features, for example, sill, emergency overflow, and structure height; and best management practices that will be implemented to prevent erosion or site degradation:

The created wetland will be excavated to an average maximum depth of 3 feet, with an undulating bottom. The shoreline will be irregular with a maximum slope of 7:1. The edges and side slopes of the basin will be top dressed with stockpiled organic material. The middle of the ponded area will be left free of organic material to ensure some open water area. The drainage ditch on the south side of the project site will be pushed in with fill. A spillway will be constructed that would divert water back into the ditch in the event of flooding. The water source for the wetland will be surface run-off as well as sub-surface sources. Construction shall effectively create a minimum of 2.9 acres of wetland area and will be completed no later than 10/31/99.

(8) For created wetlands only, list additional soils information sufficient to determine the capability of the site to produce and maintain wetland characteristics: See attatched soils information.

(9) List all other local, state, and federal permits and approvals required for the activity.

USACOE 404 Permit

Lake of the Woods County Shoreland Ordinance

## PROPOSED PROJECT-SPECIFIC MITIGATION INFORMATION

***Replacement Site 1:***

Location: T 160N R 33W S 27 1/4 NE 1/4 SE

UTM Coordinates: X: ________ Y: ________

County Name/Number: Lake of the Woods/39 Major Watershed Name/Number: Rainy River/79

Check one: ☐ <50% ☐ 50%-80% or ✓> 80%

Pre-existing Wetland (if any): ______ Acres of Type ________ (Circular 39)
(Complete table below for credits resulting from successful construction.)

Topographic setting (check one):

| | | | |
|---|---|---|---|
| Shoreland | ______ | Riverine | ______ |
| Floodplain | ______ | Flowthrough | ______ |
| Tributary | ______ | Isolated | X |

Replacement ratio:

| | |
|---|---|
| Minimum: | 1:1 |
| +Out-of-kind: | 1:1 |
| +Topo. Setting: | 1:1 |
| +Local Public Value: | |
| =**Required Ratio:** | 2:1 |

Estimated size of surface water drainage into proposed mitigation wetland: 80 acres

If the mitigation wetland is within a shoreland wetland protection zone or the floodplain of a watercourse, list the distance and direction to the waterbody or watercourse: ______ feet in a ______ direction.

List the dominant vegetation and land use in the proposed mitigation wetland area (ex. willows, cattails, grass, sedges, open water/pasture, row crop, etc.): Abandoned gravel pit.

***Replacement Site 2:***

Location: T 160N R 33W S 26 1/4 NE 1/4 NE

UTM Coordinates: X: ________ Y: ________

County Name/Number: Lake of the Woods/39 Major Watershed Name/Number: Rainy River/79

Check one: ☐ <50% ☐ 50%-80% or ✓> 80%

Pre-existing Wetland (if any): ______ Acres of Type ________ (Circular 39)
(Complete table below for credits resulting from successful construction.)

Topographic setting (check one):

| | | | | | |
|---|---|---|---|---|---|
| Shoreland | ______ | Riverine | ______ | Floodplain | ______ |
| Flowthrough | ______ | Tributary | ______ | Isolated | X |

Estimated size of surface water drainage into proposed mitigation wetland: 200 acres

If the mitigation wetland is within a shoreland wetland protection zone or the floodplain of a watercourse, list the distance and direction to the waterbody or watercourse: ______ feet in a ______ direction.

List the dominant vegetation and land use in the proposed mitigation wetland area (ex. willows, cattails, grass, sedges, open water/pasture, row crop, etc.): Previously resotored gravel pit creating a type 3 wetland consisting of grasses, cattails, sedges, and open water areas, that was approved in 1994 for partial mitigation in this project.

## CREDITS THAT WILL RESULT FROM SUCCESSFUL COMPLETION OF REPLACEMENT PLAN

| Credit Sub-Group[1] | NWC Acres or Sq. Ft. | PVC Acres or Sq. Ft. | Wetland Type[2] | Topo. Setting[3] | Restoration or Creation |
|---|---|---|---|---|---|
| A. New | 2.9 | | 3 | Isolated | Creation |
| B. PVC | | 2.9 | 3 | Isolated | Previously Created |
| C. | | | | | |
| D. | | | | | |
| Totals: | 2.9 | 2.9 | 3 | Isolated | Creation |

☐ Check here if additional credit sub-groups are part of this replacement plan and are listed on an attachment to this document.

[1] A separate credit sub-group shall be established for each wetland or wetland area that has different wetland characteristics.

[2] Circular 39 types: 1, 1L, 2, 3, 4, 5, 6, 7, 8, B, U.

[3] Topographic setting types: shoreland, riverine, floodplain, flow-through, tributary, isolated.

**Special Considerations**

To the best of the applicant's knowledge, are any of the following factors applicable at the impact or replacement site? Note whether present or not by indicating as follows: Impact Site (I), Replacement Site (R), Both (B), Neither (N).

1. Federal or state-listed endangered species N
2. Rare natural communities N
3. Special fish and wildlife resources including:
   a. Fish passage and spawning areas N
   b. Colonial waterbird nesting colonies N
   c. Migratory waterfowl concentration areas N
   d. Deer wintering areas N
   e. Wildlife travel corridors N
4. Archaeological or historic sites N
5. Ground water sensitive areas N
6. Sensitive surface waters (e.g., DNR designated trout waters) N
7. Educational or research sites N
8. Waste disposal sites N
9. Is the project consistent with local plans (e.g., watershed management plans, land use plans, zoning and master plans)? B
10. Is the project part of a pollutant trading agreement with the MPCA? ___ Yes X No

**Replacement Assurance and Sworn Statements**

Gary Bailey (Applicant) states by signature below that:

1. The wetland will be replaced before or concurrent with the actual draining or filling of a wetland, OR; an irrevocable bank letter of credit or other security acceptable to the local government unit has been provided to guarantee the successful completion of the wetland value replacement; AND,
2. The replacement wetland was not previously restored or created under a prior approved replacement plan; AND,
3. The replacement wetland was not drained or filled under an exemption during the previous ten years; AND,
4. The replacement wetland was not restored with financial assistance from public conservation programs, unless the replacement wetland qualifies under Minn. Rules Chapter 8420.0540, Subp.2.D.(3) [☐ check here if applicable]; AND,
5. The replacement wetland was not restored using private funds other than those of the landowner unless the funds are paid back with interest to the individual or organization that funded the restoration and the individual or organization notifies the local government unit in writing that the restored wetland may be considered for replacement [☐ check here if applicable]; AND,
6. The Declaration of Restrictions and Covenants for the replacement wetland will be recorded, or Application for Withdrawal of Wetland Credits will be completed, prior to any work to impact any wetlands. I hereby affirm that the information above is correct and truthful to the best of my knowledge.

Gary P. Bailey (signature) — 5-19-99

(Applicant Signature) (Date)

*Note: Any approval is not effective until all conditions above are satisfied and signatures below are complete. No work may begin until the 15-day appeal window has lapsed, or, in the event of an appeal, until the appeal has been finalized.*

**FOR LGU USE ONLY**

A.) Replacement Plan is (check one): ☐ Approved ☐ Approved with Conditions (Attach conditions) ☐ Denied

(LGU Official Signature) (Date)

B.) LGU has received evidence of title and proof of recording of Declaration of Restrictions and Covenants:

(County where recorded) (Date recorded) (Document # assigned by recorder)

(LGU Official Signature) (Date)

Lake of the Woods County Environmental Services

# NOTICE OF WETLAND CONSERVATION ACT APPLICATION FOR IMPACTS >10,000 SQUARE FEET

MAY 21 1999

***Name of Applicant:*** Gary Bailey

***Application Number:*** 98-02R

***Type of Application (check one):***

☐ Exemption ✓ Replacement Plan

☐ No Loss ☐ Banking Plan

***Date of Application:*** May 19, 1999

***Location of Project:***

| NE | SE | 21 | 163N | 33W |
|---|---|---|---|---|
| 1/4 | 1/4 | Sec. | Twp. | Range |

***Summary of Project:***

This is a re-submittal, with modifications, of a previous application which was in response to a WCA violation. Respondent's concerns have been addressed and built into the replacement plan. Mr. Bailey has constructed a new road on his property impacting 2.9 acres of type 7 wetland. Since the impacts occurred in a shoreland area, the required replacement ratio is 2:1. He proposes to mitigate for these impacts by creating 2.9 acres of type 3 wetland and applying 2.9 additional acres of Public Value Credits from a prior approved gravel pit restoration creating a type 3 wetland. Ownership of project and mitigation sites has been properly demonstrated by the landowner. A monitoring plan is being developed with the landowner in compliance with WCA statutes. Fixed photo-reference points will be selected upon completion.

***List of Addressees:***

Gary Bailey, landowner
TEP members:
  Brian Dwight, BWSR Board Conservationist
  Gary Lockner, Lake of the Woods County Environmental Services Director
  Les Lemm, Lake of the Woods SWCD
Paul Swenson, DNR Regional Administrator
Doug Norris, DNR Wetlands Coordinator, Ecological Services. St. Paul Office
Jeff Koschak, U.S. Army Corps of Engineers

You are hereby notified that the above-referenced application was made on the date stated above. A copy of the Application is attached. Comments will be accepted on this application until June 10, 1999.

***Date of mailing of this Notice:***
May 20, 1999 *By:* Les Lemm

*Title:* Resource Specialist, Lake of the Woods SWCD

Lake of the Woods Environmental Services
P.O. Box 808, Baudette, MN 56623

# NOTICE OF WETLAND CONSERVATION ACT DECISION

***Name of Applicant:*** Gary Bailey

***Application Number:*** 98-02R

***Type of Application (check one):***

- Exemption Decision
- No Loss Decision
- ✓ Replacement Plan Decision
- Banking Plan Decision

***Date of Decision:*** 6/17/1999

***List of Addressees:***
Gary Bailey, landowner
TEP members:
Brian Dwight, BWSR Board Conservationist
Gary Lockner, Lake of the Woods County Environmental Services Director
Les Lemm, Lake of the Woods SWCD
Paul Swenson, DNR Regional Administrator
Doug Norris, DNR Wetlands Coordinator, Ecological Services St. Paul Office
Jeff Koschak, U.S. Army Corps of Engineers

You are hereby notified that the decision of the Local Government Unit to accept the replacement plan of the above-referenced application was made on the date stated above. The Local Government Unit's findings were included with the Replacement Plan Application. Pursuant to Minn. R. 8420.0250 any appeal of the decision must be commenced by mailing a petition for appeal to the Minnesota Board of Water and Soil Resources within fifteen (15) days of the date of the mailing of this Notice.

***Date of mailing of this Notice:*** 6/17/1999
*By:* Gary Lockner
*Title:* LOW County Environmental Services Director

Jeff:
For WCA purposes, the decision on Bailey's replacement plan had to be made by June 20th I have the name of the final lot owner and will find out the lot #'s and send the info to you within the next few days.
Thanks
Les Lemm

JUN 21 1999



COE0124

# APPROACH PERMIT APPLICATION

DATE: 8-27-96




**APPROACH CROSS-SECTION DATA:**

DIMENSION "A": TOP WIDTH OF APPROACH 40' FT.

DIMENSION "B": MAXIMUM HEIGHT OF FILL ______ FT.

DIMENSION "C": DIAMETER OF CULVERT 24" IN.

DIMENSION "D": LENGTH OF CULVERT ______ FT.

DIMENSION D = B * 6 + A

FOR SNOWPLOWING, DIMENSION "A" SHALL BE A MINIMUM OF 20 FT.

DIMENSION "C", CULVERT DIAMETER, IS DETERMINED BY THE COUNTY.

**APPLICANT DATA:**

PROPERTY DESCRIPTION: South of Sandy Shores

ROAD NUMBER: ______

NAME: GARY BAILEY

ADDRESS: ______

PHONE: 783-6071

PROPERTY OWNER'S SIGNATURE Gary L. Bailey

**COUNTY DATA:**

APPROVED: VD. INSTALLED: INSPECTED:

DATE PAID: PICKUP DATE/PERSON:

Picked up 8-31-98 by Mark LaValla

Pd 8-27-98
Could we be going to deliver to Sandy Shores?

**EXHIBIT 21**

A-208

230

# APPROACH PERMIT APPLICATION

AUG 2 1999

DATE: 7/26/1999




## APPROACH CROSS-SECTION DATA:

DIMENSION "A": TOP WIDTH OF APPROACH ______ FT.

DIMENSION "B": MAXIMUM HEIGHT OF FILL ______ FT.

DIMENSION "C": DIAMETER OF CULVERT 18 IN.

DIMENSION "D": LENGTH OF CULVERT 30 FT.

DIMENSION D = B * 6 + A

plastic pipe

FOR SNOWPLOWING, DIMENSION "A" SHALL BE A MINIMUM OF 20 FT.

DIMENSION "C", CULVERT DIAMETER, IS DETERMINED BY THE COUNTY.

## APPLICANT DATA:

PROPERTY DESCRIPTION: Sandy Shores (Sunday Beach Lot 7)

ROAD NUMBER: ______

NAME: Matt Anderson

ADDRESS: 70 River Oaks Drive Roseau, MN 56751

PHONE: 218-463-2175

PROPERTY OWNER'S SIGNATURE ______

COMMENTS: ______

## COUNTY DATA:

APPROVED: ______ INSTALLED: ______ INSPECTED: ______

DATE PAID: ______ PICKUP DATE/PERSON: ______

# APPROACH PERMIT APPLICATION

DATE: 8/11/99




## APPROACH CROSS-SECTION DATA:

DIMENSION "A": TOP WIDTH OF APPROACH ______ FT.

DIMENSION "B": MAXIMUM HEIGHT OF FILL ______ FT.

DIMENSION "C": DIAMETER OF CULVERT 18 IN.

DIMENSION "D": LENGTH OF CULVERT 30 FT.

DIMENSION D = B * 6 + A

FOR SNOWPLOWING, DIMENSION "A" SHALL BE A MINIMUM OF 20 FT.

DIMENSION "C", CULVERT DIAMETER, IS DETERMINED BY THE COUNTY.

## APPLICANT DATA:

PROPERTY DESCRIPTION: Sunny Beach Plat

ROAD NUMBER: Sandy Shores Drive South

NAME: Jamie Gowdy

ADDRESS: P.O. Box 1130, Brainerd, MN 56401

PHONE:

PROPERTY OWNER'S SIGNATURE [signature]

COMMENTS:

| | |
|---|---|
| $ 54.50 | 1-10'x18" |
| 109.00 | 1-20'x18" |
| ~~8.18~~ | ~~1-18" Band~~ |
| 8.58 | Holing Fee |
| 11.72 | Tax |
| $191.98 | |

## COUNTY DATA:

APPROVED: WS INSTALLED: INSPECTED:

DATE PAID: PICKUP DATE/PERSON:

Pd 8-27-99

# APPROACH PERMIT APPLICATION

DATE: 6/3/99




## APPROACH CROSS-SECTION DATA:

DIMENSION "A": TOP WIDTH OF APPROACH ______ FT.

DIMENSION "B": MAXIMUM HEIGHT OF FILL ______ FT.

DIMENSION "C": DIAMETER OF CULVERT 18 IN.

DIMENSION "D": LENGTH OF CULVERT 30 FT.

DIMENSION D = B * 6 + A

FOR SNOWPLOWING, DIMENSION "A" SHALL BE A MINIMUM OF 20 FT.

DIMENSION "C", CULVERT DIAMETER, IS DETERMINED BY THE COUNTY.

## APPLICANT DATA:

PROPERTY DESCRIPTION: Lot #9, Sunny Beach Plat (163-33-21)

ROAD NUMBER: Sandy Shores Drive South

NAME: ~~Raymond~~ Raynard Lundgren

ADDRESS: Route 1, Box 78, Roseau, MN 56751

PHONE: 218-463-1683

PROPERTY OWNER'S SIGNATURE Raynard Lundgren

COMMENTS: ______

## COUNTY DATA:

APPROVED: 6/8/99 INSTALLED: INSPECTED:

DATE PAID: 6-8-99 PICKUP DATE/PERSON: 6-10-99 / Rex Black

Pd 182.83 6-8-99 To be picked up by Dept 3.

# APPROACH PERMIT APPLICATION

MAY 27 1999

DATE: 5/21/99




APPROACH CROSS-SECTION DATA:

DIMENSION "A": TOP WIDTH OF APPROACH ____ FT.

DIMENSION "B": MAXIMUM HEIGHT OF FILL ____ FT.

DIMENSION "C": DIAMETER OF CULVERT 18 IN.

DIMENSION "D": LENGTH OF CULVERT 30 FT.

DIMENSION D = B * 6 + A

FOR SNOWPLOWING, DIMENSION "A" SHALL BE A MINIMUM OF 20 FT.

DIMENSION "C", CULVERT DIAMETER, IS DETERMINED BY THE COUNTY.

APPLICANT DATA:

PROPERTY DESCRIPTION: Lot #11, Sunny Beach Plat

ROAD NUMBER: Sandy Shores Drive South

NAME: Karl Persson

ADDRESS: 9005 Iffert Avenue NE - Monticello, MN 55362

PHONE:

PROPERTY OWNER'S SIGNATURE *Karl J. Persson*

To Pick up on Friday, June 18

30'x18" #163.50
Hdlng Fee 8.18
Tax 11.16
#182.84

Appt 6-8-99

COUNTY DATA:

APPROVED: WS INSTALLED: INSPECTED:

DATE PAID: PICKUP DATE/PERSON:

Pd 6-18-99

APPROACH PERMIT APPLICATION

DATE: 9/3/99




APPROACH CROSS-SECTION DATA:

DIMENSION "A": TOP WIDTH OF APPROACH ______ FT.

DIMENSION "B": MAXIMUM HEIGHT OF FILL ______ FT

DIMENSION "C": DIAMETER OF CULVERT 18 IN.

DIMENSION "D": LENGTH OF CULVERT 30 FT.

DIMENSION D = B * 6 + A

FOR SNOWPLOWING, DIMENSION "A" SHALL BE A MINIMUM OF 20 FT.

DIMENSION "C", CULVERT DIAMETER, IS DETERMINED BY THE COUNTY

APPLICANT DATA:

PROPERTY DESCRIPTION: Lot #8, Sunny Beach Plat

ROAD NUMBER: Sandy Shores Drive South

NAME: David Russell

ADDRESS: 4808 C. Lakeshore dr. Wooder Lake IL 6009

PHONE: 815 728.0196

PROPERTY OWNER'S SIGNATURE David W. Russell

COMMENTS: ______

COUNTY DATA:

APPROVED: BH INSTALLED: ______ INSPECTED: ______

DATE PAID: ______ PICKUP DATE/PERSON: ______

# APPROACH PERMIT APPLICATION

DATE: 7/28/1999

AUG 16 1999




## APPROACH CROSS-SECTION DATA:

DIMENSION "A": TOP WIDTH OF APPROACH 26 FT.

DIMENSION "B": MAXIMUM HEIGHT OF FILL 4 FT.

DIMENSION "C": DIAMETER OF CULVERT 18 IN.

DIMENSION "D": LENGTH OF CULVERT 30 FT.

DIMENSION D = B * 6 + A

18"x30' $163.50
Handling Fee 8.18
Tax 11.16
$182.84

FOR SNOWPLOWING, DIMENSION "A" SHALL BE A MINIMUM OF 20 FT.

DIMENSION "C", CULVERT DIAMETER, IS DETERMINED BY THE COUNTY.

## APPLICANT DATA:

PROPERTY DESCRIPTION: LOTS #2 & #3 SUNNY BEACH Rd

ROAD NUMBER: #2 Sunny Beach Rd, WILLIAMS, MN

NAME: Dennis Thomson

ADDRESS: P O Box 597; Warroad, MN 56763

PHONE: Home (218)386-3113 work (218)386-2453

PROPERTY OWNER'S SIGNATURE Dennis J Thomson

COMMENTS: This is in the south end of the Lake of the Woods by Sandy Shores.

## COUNTY DATA:

APPROVED: WB INSTALLED: INSPECTED:

DATE PAID: PICKUP DATE/PERSON:

* CAREFUL INSTALLATION IS REQUIRED WITH POLY CORRUGATED PIPE AS IT IS FLEXIBLE AND ENDS HAVE TENDENCY TO POP UP DURING BACKFILLING WHICH RESTRICTS FLOW!

# APPROACH PERMIT APPLICATION

DATE: May 14, 1999




## APPROACH CROSS-SECTION DATA:

DIMENSION "A": TOP WIDTH OF APPROACH ______ FT.

DIMENSION "B": MAXIMUM HEIGHT OF FILL ______ FT.

DIMENSION "C": DIAMETER OF CULVERT 18" IN.

DIMENSION "D": LENGTH OF CULVERT ~~30~~ FT.
26' WB

DIMENSION D = B * 6 + A

FOR SNOWPLOWING, DIMENSION "A" SHALL BE A MINIMUM OF 20 FT.

DIMENSION "C", CULVERT DIAMETER, IS DETERMINED BY THE COUNTY.

## APPLICANT DATA:

PROPERTY DESCRIPTION: Sunny Beach Plat Section 21, T-163-N, R-33-W Lot # 12

ROAD NUMBER: Sandy Shores Drive South

NAME: Michael Washburn

ADDRESS: 2815 South 17th Street - Apt #201 701/746-7824

PHONE: Grand Forks, ND 58201

PROPERTY OWNER'S SIGNATURE Michael R. Washb
Michael R. Washburn

## COUNTY DATA:

APPROVED: INSTALLED: INSPECTED: DC

DATE PAID: PICKUP DATE/PERSON:

Pd and Picked up by Ret Blocker 5-26-99

APPROACH PERMIT APPLICATION

DATE: 6/3/99




APPROACH CROSS-SECTION DATA:

DIMENSION "A": TOP WIDTH OF APPROACH ____ FT.

DIMENSION "B": MAXIMUM HEIGHT OF FILL ____ FT.

DIMENSION "C": DIAMETER OF CULVERT 15" IN. or 18"

DIMENSION "D": LENGTH OF CULVERT 26 FT.

DIMENSION D = B * 6 + A

FOR SNOWPLOWING, DIMENSION "A" SHALL BE A MINIMUM OF 20 FT.

DIMENSION "C", CULVERT DIAMETER, IS DETERMINED BY THE COUNTY.

APPLICANT DATA:

PROPERTY DESCRIPTION: Lot #20, Block 1 - Sandy Shores (163-33-21)

ROAD NUMBER: Sandy Shores Drive

NAME: Bob Welin

ADDRESS: HCR Box 9, Roseau, MN 56751

PHONE: Bob Welin 463-4274

PROPERTY OWNER'S SIGNATURE Bob Welin

COMMENTS:

COUNTY DATA:

APPROVED: [signature] INSTALLED: INSPECTED:

DATE PAID: 6-10-99 PICKUP DATE/PERSON: 6-10-99 / Rex Block

$119.60
5.98
8.14
133.74

APPROACH PERMIT APPLICATION

MAY 24 1999

DATE: May 17, 1999




APPROACH CROSS-SECTION DATA:

DIMENSION "A": TOP WIDTH OF APPROACH ~~20~~ FT.

DIMENSION "B": MAXIMUM HEIGHT OF FILL ~~2~~ FT.

DIMENSION "C": DIAMETER OF CULVERT 18 ~~12~~ IN.

DIMENSION "D": LENGTH OF CULVERT 26 (30) ~~28~~ FT.

DIMENSION D = B * 6 + A

FOR SNOWPLOWING, DIMENSION "A" SHALL BE A MINIMUM OF 20 FT.

DIMENSION "C", CULVERT DIAMETER, IS DETERMINED BY THE COUNTY.

APPLICANT DATA:

PROPERTY DESCRIPTION: Lot 13 Block 1 Sunnybeach

ROAD NUMBER: Sandy Shores Drive, Lot 13

NAME: Tom Woitalla

ADDRESS: 16723 59th Street N.E.
Elk River, MN 55330

PHONE: 612 428 4709

PROPERTY OWNER'S SIGNATURE Thomas Woitalla

18"x30'
Pipe $163.50
Hdlng 8.18
Tax 11.16
$182.84

COUNTY DATA:

APPROVED: [signature] INSTALLED: INSPECTED:

DATE PAID: PICKUP DATE/PERSON:

Copy sent to Tom W. 6-1-99
Pd 6-18-99

TO CHECK ON MONDAY 5-17-99

APPROACH PERMIT APPLICATION

DATE: 5-14-99




APPROACH CROSS-SECTION DATA:

DIMENSION "A": TOP WIDTH OF APPROACH ______ FT.

DIMENSION "B": MAXIMUM HEIGHT OF FILL 1.3 Ditch ~~2.0~~ 2.3 road FT.

DIMENSION "C": DIAMETER OF CULVERT 18" IN.

DIMENSION "D": LENGTH OF CULVERT 30 FT.

DIMENSION D = B * 6 + A

FOR SNOWPLOWING, DIMENSION "A" SHALL BE A MINIMUM OF 20 FT.

DIMENSION "C", CULVERT DIAMETER, IS DETERMINED BY THE COUNTY.

APPLICANT DATA:

PROPERTY DESCRIPTION: SANDY SHORES 5th addition (SUNNY BEACH)

ROAD NUMBER: LOT ~~3~~ 4, 5, 6

NAME: DAVID J. WOLF

ADDRESS: P.O. 128, JORDAN MN 55352

PHONE: 612-492-2271

PROPERTY OWNER'S SIGNATURE [signature]

Per Rex: Wolf provided his own pipe (18"x30') new.

COUNTY DATA:

APPROVED: DC INSTALLED: INSPECTED: [initials]

DATE PAID: PICKUP DATE/PERSON:

Judge Michael J. Davis
Mag. Judge Raymond L. Erickson

AO 440 (Rev. 10/93) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of Minnesota

UNITED STATES OF AMERICA,
Plaintiff,

V.

GARY BAILEY,
Defendant

## SUMMONS IN A CIVIL CASE

CASE NUMBER: 05-2245 MJD|RLE

TO: (Name and address of Defendant)

Gary Bailey
1946 Range Line Rd SW
Williams, MN 56686
c/o Alan B. Fish, Esq.
109 2d St. NE, Roseau, MN 56751

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Friedrich A. P. Siekert, AUSA
U.S. Attorney's Office
600 U. S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Richard D. Sletten
CLERK

September 27, 2005
DATE

G. Schneider
(By) DEPUTY CLERK

G.Schneider

AO 440 (Rev. 10/93) Summons in a Civil Action

## RETURN OF SERVICE

| Service of the Summons and complaint was made by me[1] | DATE |
|---|---|
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: ____________________

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: ____________________

☐ Returned unexecuted: ____________________

☐ Other (specify): ____________________

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on ____________________ ____________________

Date *Signature of Server*

____________________

*Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**CIVIL ACTION NO.______**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GARY BAILEY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **COMPLAINT FOR PERMANENT INJUNCTION** |

The United States of America (the "United States"), through its undersigned attorneys, by the authority of the Attorney General, alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil action commenced under section 309(b) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(b), to obtain permanent injunctive relief against Defendant Gary Bailey ("Bailey") for the discharge of pollutants into waters of the United States in or about Lake of the Woods County, Minnesota, without authorization by the United States Army Corps of Engineers (the "Corps"), in violation of CWA section 301(a), 33 U.S.C. § 1311(a).

2. By way of this complaint, the United States seeks (1) to enjoin the discharge of pollutants into waters of the United States without a permit in violation of CWA section 301(a), 33 U.S.C. § 1311(a), and (2) to require Defendant Bailey, pursuant to CWA section 309(b), 33 U.S.C. § 1319(b), at his own expense and at the direction of the Corps, to restore

the wetlands to their pre-violation condition in accordance with the Restoration Order dated October 22, 2001, issued by the Corps.

## AUTHORITY AND NOTICE

3. Authority to bring this action is vested in the United States Department of Justice under 28 U.S.C. §§ 516 and 519, and in accordance with CWA section 309(b), 33 U.S.C. § 1319(b).

4. Notice of this action has been given to the State of Minnesota pursuant to CWA section 309(b) , 33 U.S.C. § 1319(b).

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to CWA section 309(b), 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1331 and 1345.

6. Venue is proper in the District of Minnesota pursuant to CWA section 309(b), 33 U.S.C. § 1319(b), and 28 U.S.C. § 1391(b) , because Defendant Bailey resides in this District, the subject property is located in this District, and the violations alleged in this complaint occurred in this District.

## THE PARTIES

7. The Plaintiff in this action is the United States of America.

8. Defendant Bailey is a private individual residing in or near Williams, Minnesota.

## STATUTORY AND REGULATORY PROVISIONS

9. CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants, including dredged or fill material, into navigable waters except in compliance with, inter alia, a permit issued by the Corps pursuant to CWA section 404, 33 U.S.C. § 1344 ("Section 404 permit").

10. CWA section 404(a), 33 U.S.C. § 1344(a), authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue Section 404 permits for the discharge of dredged or fill material into navigable waters at specified disposal sites, after notice and opportunity for public comment.

11. For discharges that originate or will originate in Minnesota, the Corps cannot issue á Section 404 permit unless the State of Minnesota either issues a water quality certification, or waives such certification, under CWA section 401, 33 U.S.C. § 1341(a).

12. CWA section 309(b), 33 U.S.C. § 1319(b), authorizes the commencement of a civil action in the district court of the United States for the district in which the defendant is located or resides or is doing business for appropriate relief, including a permanent injunction, against any person who violates CWA section 301(a), 33 U.S.C. § 1311(a).

13. The term "person" is defined in CWA section 502(5), 33 U.S.C. § 1362(5), as "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body."

14. The term "pollutant" is defined in CWA section 502(6), 33 U.S.C. § 1362(6), as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."

15. The term "discharge of a pollutant" and the term "discharge of pollutants" both are defined in CWA section 502(12), 33 U.S.C. § 1362(12), to include inter alia "any addition of any pollutant to navigable waters from any point source[.]"

16. The term "dredged material" is defined in 33 C.F.R. § 323.2(c)(1997) as "material that is excavated or dredged from waters of the United States."

17. The term "discharge of dredged material" is defined in 33 C.F.R. § 323.2(d)(1)(1997), in pertinent part, as "any addition of dredged material into, including any redeposit of dredged material within, the waters of the United States." The term includes, but is not limited to, "the addition of dredged material to a specific discharge site located in waters of the United States" and "[a]ny addition, including any redeposit, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized land clearing, ditching, channelization, or other excavation."

18. The term "fill material" is defined in 33 C.F.R. § 323.2(e)(1997), in pertinent part, as "material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of an [sic] waterbody."

19. The term "discharge of fill material" is defined in 33 C.F.R. § 323.2(f)(1997) as "the addition of fill material into waters of the United States." The term generally includes, without limitation, "[p]lacement of fill that is necessary for the construction of any structure in a water of the United States; the building of any structure or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, and other uses; [and] causeways or road fills[.]"

20. The term "point source" is defined in CWA section 502(14), 33 U.S.C. § 1362(14), as "any discernible, confined and discrete conveyance...from which pollutants are or may be discharged."

21. The term "navigable waters" is defined in CWA section 502(7), 33 U.S.C. § 1362 (7), as "the waters of the United States, including the territorial seas."

22. The term "waters of the United States," as defined in 33 C.F.R. § 328.3(a)(1997), includes, inter alia: "(1) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; ... [and] (7) Wetlands adjacent to such

waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1)-(6) of this section."

23. The term "wetlands " is defined in 33 C.F.R. § 328.3(b)(1997) as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions."

24. The term "adjacent" is defined in 33 C.F.R. § 328.3(c)(1997) as "bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'"

## GENERAL ALLEGATIONS

25. Defendant Bailey is a "person" within the meaning of CWA section 502(5), 33 U.S.C. § 1362(5).

26. The real property which is the subject of this complaint (the "Site") is located in or about Government Lot 3of Section Twenty-one (21), Township One Hundred Sixty-three (163) North, Range Thirty-three (33) West, Lake of the Woods County, Minnesota.

27. At the time of the unlawful discharges alleged in this complaint, Defendant Bailey owned the Site and/or controlled the activities that occurred on the Site.

28. The Site is approximately twenty-six (26) acres in size, is primarily a hardwood swamp, and is adjacent to Lake of the Woods in northern Minnesota.

29. Lake of the Woods is a "water of the United States" within the meaning of 33 C. F. R. § 328.3(a)(1)(1997).

30. The Site consists almost entirely of wetlands. The wetlands on the Site provided, among other benefits, a high functional level of wildlife habitat, shoreline protection, and water quality protection.

31. The wetlands on the Site are adjacent to Lake of the Woods and therefore are waters of the United States under 33 C.F.R. § 328.3(a)(7).

## FACTUAL ALLEGATIONS

32. By application dated January 18, 1990, Defendant Bailey applied for a Minnesota Department of Natural Resources ("MnDNR") permit to excavate an inland harbor and access channel to Lake of the Woods on the Site. The Corps was contacted relative to the proposed inland harbor project.

33. By letter dated March 13, 1990, the Corps advised Bailey the proposed inland harbor project was authorized under General Permit 001-MN, provided a separate permit was obtained from MnDNR and the conditions within the General Permit 001-MN were followed.

34. Among the conditions of the General Permit 001-MN were: (a) all dredged material was to be placed in an upland location and (b) the channel connection was not to result in the drainage or filling of any wetland area. The General Permit 001-MN also specifically excluded from its coverage fills to develop land for housing, industrial, or

commercial development. Accordingly, the General Permit 001-MN did not authorize fill in the wetlands on the Site.

35. The MnDNR subsequently issued a permit for the inland harbor project. The MnDNR did not extend the permit in 1997. No work was performed under the MnDNR permit.

36. By letter dated August 18, 1993, the Corps advised Bailey, among other things, that the Corps had became aware that Bailey's proposed harbor project, which had not been started as of that date, was located in a wetland area, that he was proposing to place fill and/or dredged material into the wetlands on the Site for the purpose of developing residential lots, and that the additional proposed work would require a Section 404 permit from the Corps in addition to the General Permit 001-MN and the MnDNR permit.

37. On or about May 11, 1994, the Corps met with Bailey on the Site. In a letter dated May 13, 1994, the Corps advised Bailey that he may want to hire a qualified private consultant to help him delineate the highly diverse site and to help him complete the required Section 404 permit application.

38. On or about June 15, 1998, the Corps conducted a Site visit with Bailey in attendance. The Corps found that Bailey, or other persons under his control, had conducted mechanized land clearing in the wetlands on the Site which resulted in a discharge of pollutants into wetlands, without a Section 404 permit in violation of CWA section 301, 33 U.S.C. § 1311. Upon information and belief, mechanized land clearing equipment was used

to accomplish the clearing in the wetlands. The mechanized land clearing created through the wetlands on the Site a corridor in the approximate width of 66 feet and the approximate length of 1,493 feet. The cleared corridor created a large opening in the hardwood canopy. The cleared corridor bisected the forested wetland on the Site and ran generally parallel to the shoreline between 260 and 400 feet from the lake. The land clearing was the first step in the construction of a new road to access the "Sunny Beach" development. During the site visit, the Corps verbally advised Bailey to cease all work on the road.

39. On or about June 17, 1998, Defendant Bailey filed a Local-State-Federal Project Notification Form with Lake of the Woods County proposing a project to construct an access road through the forested wetlands on the Site along the corridor already cleared without a Section 404 permit. In the notification form, Bailey stated he would be using a "backhoe/cat" to construct the road and acknowledged that 1.5 acres of wetland would be filled and/or drained by the project. Bailey acknowledged in his proposed state Wetland Replacement Plan dated August 12, 1998 that the wetland impact would be 2.9 acres.

40. On August 17, 1998, the Corps received a copy of the Local-State-Federal Project Notification Form from Lake of the Woods County. The Corps treated the form as an "after the fact" Section 404 permit application.

41. The Corps sent Bailey a Notice of Violation ("NOV") dated September 17, 1998, advising Bailey that a Section 404 permit had not been issued by the Corps for the road

project, that conducting such work without a permit was a violation of the Clean Water Act, and that no additional work could be performed prior to obtaining a Section 404 permit. The letter further stated the Corps had received Bailey's after the fact permit application on August 17, 1998, but it needed additional information from Bailey before the application could be processed.

42. On or about October 23, 1998, Defendant Bailey applied to the Lake of the Woods County to plat the eastern portion of the Site (approximately 13 acres) into lots for a residential development which would come to be known as "Sunny Beach."

43. On or about November 3, 1998, the Corps conducted a visit to the Site. On that visit, the Corps observed Bailey and/or other persons under his control had placed fill in the area previously cleared and that a gravel road with roadside ditches had been constructed. Upon information and belief, the equipment used to place the fill included a backhoe, a front-end loader, and/or a truck. The placement of fill and gravel and the excavation of ditches was done without a Section 404 permit from the Corps and in violation of CWA Section 301(a), 33 U.S.C. § 1311(a), and after the Corps had advised Bailey to cease work on the road until he had obtained a Section 404 permit from the Corps.

44. On or about December 22, 1998, the Lake of the Woods County Board approved the final plat of Sunny Beach.

45. Between December 1998 and June 1999, Defendant Bailey and his then-wife Kathryn Bailey signed warranty deeds or contracts for deed conveying 13 of the 14 lots in the Sunny Beach subdivision to third persons.

46. On June 8, 1999, the Corps determined that Bailey's after the fact Section 404 permit application was complete.

47. On June 24, 1999, the Corps issued a public notice to solicit comments regarding Bailey's after the fact Section 404 permit application to retain the dredged or fill material previously discharged into wetlands on the Site.

48. On or about November 15, 1999, the Corps conducted a Site visit. At that visit, Corps officials observed, among other things that gravel had been placed on the road surface and many of the 14 lots had driveway approaches extending from the road into the lots.

49. By letter dated December 17, 1999, addressed to the Corps, the Minnesota Pollution Control Agency ("MPCA") issued a water quality certification with certain conditions under CWA section 401, 33 U.S.C. § 1341(a) relating to the project described in Bailey's after the fact Section 404 permit application.

50. On August 29 and 30, 2000, the Corps and the United States Department of Agriculture's Natural Resources Conservation Service conducted an on-site wetland delineation of the Sunny Beach plat on the Site. The Corps's delineation found that most of the lots in the Sunny Beach plat consisted almost entirely of wetlands. The Corps's

delineation found the impact of the road project on wetlands on the Site included approximately 1.45 acres that had been filled, approximately 0.63 acres that had been excavated, and approximately 4.96 acres that had been or were being drained by associated ditches, for a total wetlands impact of approximately 7.04 acres. In addition, the Corps's delineation found that approximately 1.30 acres of wetlands were affected by filling and/or mechanized land clearing activities within 10 of the 14 lots.

51. After receiving the Corps's wetland delineation, by letter dated October 4, 2000, the MPCA revoked its CWA Section 401 water quality certification for the road project because the Corps's wetland delineation had shown the secondary and cumulative impacts would be greater than described in Bailey's application to the MPCA.

52. On June 12, 2001, the Corps denied Bailey's request for an after the fact Section 404 permit for the road, finding that issuance of the permit would be contrary to public interest.

53. Also on June 12, 2001, the Corps issued a public notice soliciting comments on the proposed remedy for the unauthorized road fill. The Corps received comments and considered them.

54. On October 22, 2001, the Corps issued a Restoration Order to Bailey directing Bailey to remove the access road, fill in the associated ditches, seed, and otherwise return the wetlands to their pre-violation condition. The Restoration Order set two deadlines: the

deadline for removing the unauthorized dredged or fill material and backfilling the ditches was August 15, 2002, and the deadline for seeding the area was October 15, 2002.

55. In December 2001, Bailey filed an administrative appeal from the decision by the Corps to deny his after the fact Section 404 permit application. The Corps denied the administrative appeal because the appeal was not submitted timely.

56. In March 2002, Bailey filed a civil action in the United States District Court for the District of Minnesota seeking, among other things, judicial review of the Corps's action denying his after the fact Section 404 permit and compensation from the United States on the grounds that the actions taken by the United States constituted a taking of his property in violation of the Fifth Amendment.

57. On November 21, 2002, the District Court dismissed two of the three claims asserted by Bailey, leaving only the claim challenging the Corps's denial of Bailey's application for the after the fact Section 404 permit. On August 7, 2003, the District Court upheld the Corps's denial of Bailey's application for an after the fact Section 404 permit.

58. To date, Bailey has failed to comply with the Corps of Engineers Restoration Order.

**CLAIM FOR RELIEF**

**DISCHARGE OF POLLUTANTS WITHOUT A PERMIT**

59. The United States incorporates herein by reference the allegations contained in paragraphs 1 - 58.

60. During the course the mechanized land clearing, ditching, and the filling activities described above, Defendant Bailey and/or persons acting on his behalf discharged dredged or fill material into waters of the United States at the Site without a Section 404 permit issued by the Corps.

61. Defendant Bailey had prior knowledge of the permit requirements of the CWA and that the Site contained wetlands based on the Corps's letter dated August 18, 1993 and otherwise.

62. The dredged or fill material that Defendant Bailey and/or persons acting on his behalf caused to be discharged as described above constituted "pollutants " as defined in CWA Section 502(6), 33 U.S.C. § 1362(6).

63. Defendant Bailey and/or persons acting on his behalf used mechanized land-clearing and/or earth-moving equipment to accomplish the discharges as described above. These pieces of equipment are "point sources " as defined in CWA Section 502(14), 33 U.S.C. § 1362(14).

64. The wetlands on the Site into which Defendant Bailey, and/or persons acting on his behalf, discharged dredged and/or fill material as described above are adjacent to Lake of the Woods, an international navigable water, and therefore are "waters of the United States" as defined in 33 C.F.R. § 328.3(a) and thus "navigable waters" as defined at CWA section 502(7), 33 U.S.C. § 1362(7).

65. Each instance of the placement of dredged or fill material into the wetlands on the Site as described above constitutes a "discharge of a pollutant" or "discharge of pollutants" within the meaning of CWA section 502(12), 33 U.S.C. § 1362(12), and within the scope of CWA section 404, 33 U.S.C. § 1344.

66. Defendant Bailey did not obtain a Section 404 permit from the Corps for the above-described discharges of dredged or fill material into waters of the United States at the Site as required by CWA sections 301(a) and 404, 33 U.S.C. §§ 1311(a) and 1344.

67. At the time of the unlawful discharges described above, Defendant Bailey owned the site and/or controlled the activities at the Site.

68. Defendant Bailey conducted, contracted for, supervised, and/or otherwise controlled the unauthorized activities at issue and described above.

69. Defendant Bailey is a "person" within the meaning of CWA section 502(5), 33 U.S.C. § 1362(5).

70. Defendant Bailey has violated and continues to violate CWA Section 301(a), 33 U.S.C. § 1311(a), because of the unauthorized discharges of dredged or fill material into waters of the United States, including wetlands, at the Site and by his allowing said discharged dredged and fill material to remain in the wetlands on the Site, all as described above.

71. Each day that such unpermitted discharges of dredged or fill material remain in place in the wetlands on the Site constitutes a separate violation of CWA Section 301(a), 33 U.S.C. § 1311(a).

72. To date, Defendant Bailey has failed to comply with the Restoration Order issued by the Corps on October 22, 2001. The dredged or fill material remains in the wetlands on the Site.

73. Defendant Bailey is subject to injunctive relief pursuant to CWA sections 309(b), 33 U.S.C. §§ 1319(b).

74. Unless enjoined by order of this Court, the Defendant is likely to continue to allow the dredged or fill material to remain in the wetlands on the Site in continuing violation of CWA Section 301(a), 33 U.S.C. § 1311(a).

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays this Court order the following relief:

1. That Defendant Bailey be enjoined permanently from allowing the discharged dredged or fill material or other pollutants to remain in the wetlands on the Site;

2. That Defendant Bailey be enjoined permanently from discharging or causing the discharge of dredged or fill material or other pollutants into any waters of the United States except in compliance with the CWA;

3. That Defendant Bailey be enjoined to undertake measures, at Defendant's own expense and at the direction of the Corps, to effect complete restoration of the Site in

accordance with the restoration order issued by the Corps on October 22, 2001 or as otherwise ordered by the Court;

4. That the United States be awarded its costs and disbursements incurred in this action; and

5. That the United States be granted such other relief as the Court may deem just and proper.

Date: 9-27-05

THOMAS B. HEFFELFINGER
United States Attorney
District of Minnesota

Friedrich A.P. Siekert

FRIEDRICH A.P. SIEKERT
Assistant U.S. Attorney
Attorney ID No. 142013
600 United States Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5600

OF COUNSEL:

MOLLY A. MCKEGNEY, ESQ.
Assistant District Counsel
U.S. Army Engineer District, St. Paul
190 East 5th Street
St. Paul, MN 55101

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,

v.

GARY BAILEY,

Defendant.

GARY BAILEY,

Third-Party Plaintiff,

v.

LAKE OF THE WOODS COUNTY,

Third-Party Defendant.

Case No. 05-CV-2245 (PJS/RLE)

MEMORANDUM OPINION AND ORDER

Friedrich A.P. Siekert, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE; and Daniel R. Dertke, UNITED STATES DEPARTMENT OF JUSTICE, for plaintiff.

Alan B. Fish and Rita Fish-Whitlock, ALAN B. FISH, PA, for defendant.

Scott T. Anderson and Sonya J. Guggemos, RATWIK ROSZAK & MALONEY, PA, for third-party defendant.

M. Reed Hopper, PACIFIC LEGAL FOUNDATION; and Rita Fish-Whitlock, ALAN B. FISH, PA, for amicus curiae Pacific Legal Foundation.

Defendant Gary Bailey constructed a road on a parcel of wetland located in Lake of the Woods County, Minnesota, without obtaining a permit under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344. In October 2001, the United States Army Corps of Engineers ("the Corps") ordered Bailey to restore the land to its pre-violation condition. After Bailey refused to

do so, the United States brought this action under Section 309(b) of the CWA, 33 U.S.C. § 1319(b), to enforce the restoration order and to enjoin Bailey from discharging further pollutants into the wetland.

The United States, Bailey, and third-party defendant Lake of the Woods County ("the County") have all moved for summary judgment. For the reasons set forth below, the Court denies Bailey's motion, grants in part the motion of the United States, and grants the County's motion. The Court orders Bailey to restore the wetland that he unlawfully polluted almost a decade ago.

## I. BACKGROUND

Bailey owns a parcel of land located along the western shore of Lake of the Woods ("the Lake") in northern Minnesota. This 13-acre site ("the Site") consists mostly of wetland, as defined by the Corps.[1] Eggers Decl. Ex. X ¶ 4.G, Jan. 30, 2007 ("Eggers Decl."). Bailey planned to plat the Site for residential development and sell lakeside lots. To that end, Bailey hired Mark LaValla in 1998 to construct an access road through the Site. In May and June of 1998, LaValla cleared a roadway sixty-six feet wide and approximately a quarter of a mile long. LaValla Dep. 22, 57, Oct. 16, 2006 ("LaValla Dep."). The roadway runs from north to south, parallel to the Lake of the Woods shoreline. The north end of the roadway connects to a preexisting road known as Sandy Shores Drive. Bailey's planned development was known as

---

[1]Bailey admits that the Site includes some wetland, but he denies that the Site consists primarily of wetland or that the roadway itself was constructed in wetland. Def.'s Resp. to Pl.'s First Set of Req. for Admis. Nos. 11, 15, 18, 26. As discussed below, the problem for Bailey is that he has not supported his position with anything like competent evidence. The United States, by contrast, has offered expert evidence that the Site — including the land on which Bailey constructed the roadway — consists almost entirely of wetland.

Sunny Beach, and the access road Bailey constructed is informally called Sunny Beach Road ("the Road"), although it is labeled "Sandy Shores Drive" on the plat Bailey later filed with the County. The Road was built along the western edge of the parcel (the edge furthest from the Lake). As platted, the Site has fourteen lots running from the Road to the Lake, and each lot has approximately 100 feet of lakefront. Bailey has sold some lots and continues to own the others.

LaValla dug a ditch on each side of the roadway and used the excavated material to construct the Road itself. LaValla Dep. 33-36, 41-42, 47. LaValla also installed two culverts beneath the north and south ends of the Road.[2] LaValla Dep. 103-04, 127 & Exs. 2, 20, 24. Finally, LaValla topped the Road with approximately 2000 square yards of gravel (about 130 truckloads) from his gravel pit. LaValla Dep. 82-84, 99.

Bailey was informed several times, by various government officials, that the Road was not legally authorized and that he should stop construction until he obtained a proper permit. On June 11, 1998, after LaValla had cleared the roadway but before work on the Road was complete, employees of the local Soil and Water Conservation District visited the Site and told LaValla that the Road was not properly permitted and that he should stop construction, which he did. LaValla Dep. 88-90 & Ex. 6. A few days later, a Corps official visited the Site with Bailey and several County employees. Administrative Record ("AR") at COE0438. The Corps official, Jeff Koschak, told Bailey to do no more work on the Road. *Id.* About a week later, a

---

[2]The record is somewhat unclear regarding the placement of culverts on the Site. As best as the Court can tell, LaValla placed two culverts on the Site — on the north and south ends of the Road — and individual landowners to whom Bailey sold plots installed culverts under the spots where their driveways connect to the Road. There is apparently also a preexisting culvert on the northern edge of the Site. Def.'s Mem. Resp. Pl.'s and Third Party's Mots. Summ. J. 11 n.4; Hasbargen Dep. 23-26, Aug. 26, 2005.

representative from the Environmental Protection Agency ("EPA") told Bailey that the EPA would not pursue enforcement action against him as long as no further work was done at the Site pending the issuance of a permit. *Id.* Even before June 1998, Bailey was aware that he would need a permit to construct a roadway on the Site, as Bailey had tried to develop the Site in 1993, and the Corps had informed him then that he would need a permit before placing any dredged or fill material on the Site. AR at COE0049 (August 18, 1993 letter advising Bailey that he needed a permit before placing dredged or fill material on his land for the purpose of developing residential lots).

On June 17, 1998, Bailey filed a Local-State-Federal Project Notification Form with the County proposing to construct an access road for logging in the Site. AR at COE0069-70. The Corps received a copy of this form on August 17, 1998 and treated it as an after-the-fact application for a permit under Section 404 of the CWA. Bailey Dep. Ex. 6, Nov. 17, 2006 ("Bailey Dep."). Without waiting for a decision on his application, Bailey instructed LaValla to complete the Road, which LaValla did later that summer. LaValla Dep. 105-06; Bailey Dep. 44-46. Bailey alleges that Doug Easthouse of the Soil and Water Conservation District told him that the Corps would approve the application and that he should go ahead and finish the Road. Bailey Dep. 46. The timing of these events is somewhat unclear, but the record indicates that the Road was complete by September 17, 1998 — the date on which the Corps notified Bailey in writing that the Road violated the CWA, that his application for an after-the-fact permit was incomplete, that no additional work should be done on the Road before obtaining a permit, and that, if his permit application was ultimately denied, Bailey might be required to restore the land to its previous condition. Bailey Dep. Ex. 6.

Bailey intended that, once the Road was completed, he would dedicate it to the County, so that the Road would become public and the County would be responsible for maintaining it. For that reason, Bailey solicited the County's guidance on complying with County road specifications. (Obviously, the question whether a road meets County road specifications is entirely separate from the question whether a road meets federal environmental standards.) At Bailey's request, the County inspected the Road and, by letter dated September 16, 1998, informed Bailey of certain improvements that were necessary to bring the Road into compliance with County road standards. Bailey Dep. 52 & Ex. 5; LaValla Dep. Ex. 20. The County sent Bailey another letter, in November 1998, containing more specific recommendations and requiring Bailey to post a $10,000 bond to ensure that the Road met County standards. Bailey Dep. Ex. 4; AR at COE0633. In the spring of 1999, Bailey hired LaValla to make the improvements to the Road, which included adding about 530 square yards of gravel and replacing the culverts with new pipe. (The previous culverts were made of used pipe.) LaValla Dep. 120-21 & Ex. 20. LaValla purchased the gravel from a County gravel pit. LaValla Dep. 122-23 & Ex. 23.

At the same time that Bailey was working on the Road, he was preparing to gain approval for platting the Site. In October 1998, Bailey filed an application with the County to plat fourteen residential lots on the Site. Bailey Dep. 64; Lockner Dep. 16, Aug. 25-26, 2005. By the time Bailey applied for the plat, he had already received the Corps's notice of violation. Bailey Dep. 64. The County environmental-services director, Gary Lockner, recommended approval of the Sunny Beach plat, and the County's Board of Commissioners approved the plat on December 22, 1998. AR at COE0104; Bailey Aff. Ex. 2 ¶ 6, Aug. 3, 2006. The plat states

that Bailey and his wife "do hereby donate and dedicate to the public for public use forever SANDY SHORES DRIVE, the road shown on this plat." Stromlund Aff. Ex. N, Feb. 1, 2007. At oral argument, the County conceded that the Road became a public road upon the Board's approval of the plat, although the County disputes the nature of its property rights over the Road.

On June 12, 2001, the Corps denied Bailey's Section 404 permit application.[3] Bailey Dep. Ex. 7. On October 22, 2001, after a period of public notice and comment, the Corps ordered Bailey to restore the property at his own expense. Specifically, the Corps ordered Bailey to: (1) remove the dredged and fill material used to construct the Road; (2) fill in the ditches; (3) seed the restored area with a specified seed mixture; and (4) control certain weed species for three years following restoration. *Id.* The Corps ordered Bailey to complete the restoration and seeding by October 15, 2002. *Id.*

After Bailey refused to comply with the restoration order, the United States brought this action to enforce it. Bailey counterclaimed, arguing that the Corps does not have jurisdiction over the Site and that the Corps's restoration order is arbitrary and capricious. Bailey also brought a third-party complaint against the County, alleging that the County should have to pay to restore the Site. Both Bailey and the United States move for summary judgment on the United States's claim and Bailey's counterclaim, while the County moves for summary judgment on Bailey's third-party claim.

---

[3]Bailey challenged the denial of the permit and lost. *See Bailey v. U.S. Army Corps of Eng'rs*, No. 02-639, 2003 WL 21877903 (D. Minn. Aug. 7, 2003).

## II. ANALYSIS

### *A. Standard of Review*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is genuine only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In considering a motion for summary judgment, a court must assume that the nonmoving party's evidence is true and must draw all justifiable inferences arising from the evidence in that party's favor. *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003).

### *B. The Corps's Jurisdiction Over the Site*

The CWA prohibits the discharge of any "pollutant" from any "point source" into "navigable waters" without a permit. *See* 33 U.S.C. § 1311(a) (prohibiting the "discharge of any pollutant by any person" absent compliance with other sections of the CWA); 33 U.S.C. § 1362(12) (defining "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source"). Bailey concedes that the fill and gravel that he placed on the Site during the construction of the Road were pollutants that were discharged from a point source. Bailey also concedes that he discharged those pollutants without getting a permit from

the Corps. But Bailey strongly denies that the land onto which he discharged those pollutants is "navigable waters" for purposes of the CWA.

The CWA defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Under the Corps's regulations, "navigable waters" is not restricted to waters that are navigable. Indeed, it is not even restricted to waters. Rather, "navigable waters" is defined to include "navigable-in-fact" or "traditionally navigable" waters *and* the wetlands that are adjacent to such waters. 33 C.F.R. § 328.3(a)(7). The scope of the Corps's wetlands jurisdiction has been fiercely litigated in the federal courts, and the issue was addressed by the United States Supreme Court last year in *Rapanos v. United States*, 126 S. Ct. 2208 (2006).

1. The *Rapanos* Decision

In *Rapanos*, the Court clearly rejected the Corps's argument that it could regulate all wetlands that were anywhere near navigable-in-fact waters. *See id.* at 2257 (Stevens, J., dissenting) (describing the Corps's interpretation of its jurisdiction as covering non-isolated wetlands). Beyond that, however, *Rapanos* left the scope of the Corps's wetlands jurisdiction unclear, in large part because the Court was unable to produce a majority opinion. Instead, Justice Scalia authored a plurality opinion that was joined by three other justices; Justice Stevens authored a dissenting opinion that was joined by three other justices; and Justice Kennedy authored a concurring opinion that was joined by no one.

Writing for the plurality, Justice Scalia held that the Corps could exercise CWA jurisdiction over wetlands when, "[f]irst, . . . the adjacent channel contains a 'wate[r] of the United States,' (*i.e.*, a relatively permanent body of water connected to traditional interstate

navigable waters); and second, . . . the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." *Id.* at 2227. In the plurality's view, then, the Corps cannot exercise jurisdiction over Bailey's property unless the Site has a "continuous surface connection" with Lake of the Woods such that it is "difficult to determine" where Lake of the Woods ends and Bailey's land begins. Although the government argues to the contrary, it appears relatively easy to distinguish Bailey's land from Lake of the Woods, and thus it appears that the *Rapanos* plurality would find that the Corps does not have jurisdiction over the Site.

Unfortunately for Bailey, though, the *Rapanos* plurality was a plurality; a majority of the Court rejected Justice Scalia's analysis. In his concurrence, Justice Kennedy stated that he would find CWA jurisdiction whenever there is a "significant nexus" between the wetlands in question and navigable-in-fact waters. *Rapanos*, 126 S. Ct. at 2248. The test for whether wetlands possess a "significant nexus" to navigable-in-fact waters is whether "the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* In Justice Kennedy's view, then, the Corps can exercise jurisdiction over Bailey's land as long as the Site has a "significant[] [e]ffect" on the "chemical, physical, and biological integrity" of Lake of the Woods.

The *Rapanos* dissenters — unlike the plurality and unlike Justice Kennedy — would have found that CWA jurisdiction existed over the wetlands at issue in the *Rapanos* case itself. In other words, the *Rapanos* dissenters interpreted the CWA to provide wetlands jurisdiction that was broader than the jurisdiction recognized by the plurality and broader than the jurisdiction

recognized by Justice Kennedy. Writing for the dissenters, Justice Stevens also made explicit what was implicit in his analysis: The dissenters would find jurisdiction when either the plurality's or Justice Kennedy's test is met. *Id.* at 2265. In other words, if the plurality would find CWA jurisdiction over a particular wetland, so would the four dissenters, meaning that at least eight justices would deem jurisdiction to exist. And if Justice Kennedy would find CWA jurisdiction over a particular wetland, so, too, would the four dissenters, meaning that at least five justices would deem jurisdiction to exist. Thus, it appears that if *either* the plurality *or* Justice Kennedy would find that the Corps has jurisdiction over Bailey's property, this Court must do likewise. Bailey, however, disagrees.

2. The Plurality vs. Justice Kennedy

Bailey argues that, under the approach sanctioned in *Marks v. United States*, 430 U.S. 188 (1977), the *Rapanos* plurality opinion alone controls this case. In *Marks*, the Supreme Court said that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds[.]'" *Marks*, 430 U.S. at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). According to Bailey, the *Rapanos* plurality's test is the "narrowest ground" because the scope of wetlands jurisdiction that it recognized was narrower than the scope of wetlands jurisdiction recognized by Justice Kennedy.

Every court to address the question, however, has either (1) held that Justice Kennedy's opinion is controlling under *Marks* or (2) found that the *Marks* approach is unworkable as applied to *Rapanos* and held instead that the Corps has jurisdiction if either the plurality's test or

Justice Kennedy's test is met. *See, e.g.*, *United States v. Johnson*, 467 F.3d 56, 66 (1st Cir. 2006); *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724 (7th Cir. 2006) (per curiam), *petition for cert. filed*, No. 06-1331, 75 U.S.L.W. 3556 (Apr. 2, 2007); *N. Cal. River Watch v. City of Healdsburg*, No. 04-15442, 2007 WL 2230186, at *6 (9th Cir. Aug. 6, 2007); *United States v. Cundiff*, 480 F. Supp. 2d 940, 944 (W.D. Ky. 2007); *Simsbury-Avon Preservation Soc., LLC v. Metacon Gun Club, Inc.*, 472 F. Supp. 2d 219, 226-27 (D. Conn. 2007); *United States v. Chevron Pipe Line Co.*, 437 F. Supp. 2d 605, 613 (N.D. Tex. 2006).[4]

The most cogent defense of the latter approach is the First Circuit's opinion in *Johnson*, which describes the shortcomings of using *Marks* to determine the controlling opinion in a case like *Rapanos*:

> "*Marks* is workable — one opinion can be meaningfully regarded as 'narrower' than another — only when one opinion is a logical subset of other, broader opinions." . . .
>
> This understanding of "narrowest grounds" as used in *Marks* does not translate easily to [*Rapanos*]. The cases in which Justice Kennedy would limit federal jurisdiction are not a subset of the cases in which the plurality would limit jurisdiction.

*Johnson*, 467 F.3d at 63-64 (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)). Noting that the Supreme Court has moved away from the *Marks* formula, the First Circuit held that, rather than following a literal reading of *Marks*, the better approach is to examine *Rapanos* for a legal standard that, when applied, will produce results with which a majority of the Court would agree. *Id.* at 64-66.

---

[4]Bailey contends that *Chevron Pipe* applied the plurality's test. A close reading of *Chevron Pipe*, however, indicates that the court assumed that Justice Kennedy's test is controlling, but found that test so ambiguous that it resorted to pre-*Rapanos* circuit precedent for guidance. *Chevron Pipe*, 437 F. Supp. 2d at 613.

As described above, and as Justice Stevens explained in his dissent, it is clear that at least eight Justices would find wetlands jurisdiction under the CWA when the plurality's test is met, and that at least five justices would find wetlands jurisdiction under the CWA when Justice Kennedy's test is met. *See Rapanos*, 126 S. Ct. at 2265 (Stevens, J., dissenting) (stating that "[g]iven that all four Justices who have joined this opinion would uphold the Corps' jurisdiction in both of these cases — and in all other cases in which either the plurality's or Justice Kennedy's test is satisfied — on remand each of the judgments should be reinstated if *either* of those tests is met."). This Court will therefore follow the lead of *Johnson* and adopt the approach suggested by Justice Stevens: The United States may establish jurisdiction under either Justice Kennedy's test or the plurality's test.

3. Applying Justice Kennedy's Test

Again, Justice Kennedy would find CWA jurisdiction whenever there is a "significant nexus" between the wetlands in question and navigable-in-fact waters, and he would find such a nexus whenever the wetlands "significantly affect the chemical, physical, and biological integrity" of the navigable-in-fact waters. *Rapanos*, 126 S. Ct. at 2248. Significantly for this case, Justice Kennedy made clear that, when the wetland is "adjacent" to the navigable-in-fact waters, he would find that a significant nexus exists as a matter of law. *Id.* at 2248 ("As applied to wetlands adjacent to navigable-in-fact waters, the Corps' conclusive standard for jurisdiction rests upon a reasonable inference of ecologic interconnection, and the assertion of jurisdiction for those wetlands is sustainable under the Act by showing adjacency alone.").[5]

---

[5]Bailey argues that this is a misinterpretation of Justice Kennedy's opinion. Citing *Northern California River Watch v. City of Healdsburg*, 457 F.3d 1023 (9th Cir. 2006), Bailey argues that adjacency alone is not sufficient to meet the "significant nexus" test. Def.'s Mem.

The Corps defines "adjacent" to mean "bordering, contiguous, or neighboring" and provides that "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'" 33 C.F.R. § 328.3(c). Justice Kennedy found the Corps's definition of "adjacent" to be reasonable when applied to wetlands adjacent to navigable-in-fact waters. *Rapanos*, 126 S. Ct. at 2245-46. In finding this definition reasonable, Justice Kennedy specifically noted that it may be the *absence* of a hydrological connection between the wetland and the nearby navigable-in-fact waters that creates a significant nexus, because the wetland may prevent polluted waters from reaching the navigable-in-fact waters. *Id.*

All parties agree that Lake of the Woods is a navigable-in-fact water. The question, then, is whether the Road was built on wetlands "adjacent" to Lake of the Woods for purposes of 33 C.F.R. § 328.3(c) — and thus for purposes of Justice Kennedy's test. If it is, then five members of the United States Supreme Court (Justice Kennedy and the four *Rapanos* dissenters) would find that the Corps can exercise jurisdiction over Bailey's property under the CWA.

The Court finds that the Road was built on wetlands "adjacent" to Lake of the Woods for two reasons. First, the Corps has presented evidence that the wetland on the Site extends to the

Resp. Pl.'s and Third Party's Mots. Summ. J. 4. Bailey is correct that *Northern California River Watch* supports his position, but *Northern California River Watch* simply got it wrong. A careful reading of Justice Kennedy's opinion leaves no doubt that he distinguishes between wetlands adjacent to navigable-in-fact waters (in which case adjacency alone *is* sufficient to establish jurisdiction) and wetlands adjacent to nonnavigable *tributaries* of navigable-in-fact waters (in which case the Corps must introduce evidence establishing a significant nexus). *Rapanos*, 126 S. Ct. at 2248-49; *see also United States v. Fabian*, No. 02-495, 2007 WL 1035078, at *13 (N.D. Ind. Mar. 29, 2007) (noting the Ninth Circuit's erroneous reading of *Rapanos*). Indeed, the Ninth Circuit recently withdrew its original opinion in *Northern California River Watch* and issued a new opinion clarifying that adjacency to a navigable-in-fact water is sufficient. *N. Cal. River Watch*, No. 04-15442, 2007 WL 2230186 at *6.

edge of the Lake and thus is "bordering" on or "contiguous" to the Lake. Second, even if there were a factual issue concerning whether the wetland actually extends to the edge of the Lake, the Corps has presented sufficient evidence that the wetland is nevertheless "adjacent" within the meaning of the Corps's definition, because any strip of dry upland separating the wetland and the Lake is akin to the "man-made dikes or barriers, natural river berms, beach dunes and the like" that do not destroy adjacency under 33 C.F.R. § 328.3(c).

*a. The Wetland Extends to the Lake*

Regardless of the presence of adjacent wetlands, the Corps's jurisdiction over waters of the United States extends to the ordinary high-water mark ("OHWM") of non-tidal waters. 33 C.F.R. § 328.4(c)(1). The OHWM is defined as

> that line on the shore established by the fluctuations of water and indicated by physical characteristics such as clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

33 C.F.R. § 328.3(e). The OHWM of Lake of the Woods is typically at the midpoint or higher on the cut bank of the shoreline, Eggers Decl. ¶ 30, and the Corps's jurisdiction thus extends to that point, even without the existence of an adjacent wetland.

The Corps defines wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b). To conduct "wetlands delineations" — that is, formal identifications of the presence and extent of wetlands for the purpose of determining jurisdiction over them — the Corps uses the criteria set forth in the 1987 Corps of Engineers Wetlands

Delineation Manual ("1987 Manual") and Corps memoranda interpreting the 1987 Manual.[6] Eggers Decl. Ex. X ¶ 2.A.

In general, the 1987 Manual defines land as wetland when, under normal conditions:

> 1. The land consists of hydric soils (soils formed under conditions of saturation, flooding, or ponding long enough during the growing season to develop anaerobic conditions in the upper part of the soil);
>
> 2. The land has wetland hydrology (inundation or saturation of soils for at least 5% of the growing season in most years); and
>
> 3. The land is dominated by hydrophytic vegetation (plants that have the ability to grow, effectively compete, reproduce, and/or persist in anaerobic soil conditions caused by inundated or saturated soil conditions).

Eggers Decl. ¶¶ 9-12 & Ex. X ¶¶ 2.A- 2.D. In other words, to determine whether a particular piece of property is wetland, the Corps looks at soil, water, and plants. To establish wetland hydrology (the second factor), the Corps requires either a primary indicator (such as direct observation of saturation within twelve inches of the surface) or two secondary indicators (such as the FAC-neutral test and local soil survey data (explained below)). Eggers Decl. Ex. X ¶ 2.D.

In this case, the Corps presents expert evidence from three people: Steve Eggers, a senior ecologist with the Corps; Rod Heschke, a soil scientist with the United States Department of Agriculture; and Kelly Urbanek, a senior project manager and biologist with the Corps. *See* Eggers Decl. Exs. X, Y. Eggers and Heschke conducted wetlands delineations at the Site in August 2000 and May 2006. Eggers Decl. Ex. X ¶ 3.A. Urbanek accompanied Eggers and

---

[6] An updated, on-line edition of the 1987 Manual may be found at http://el.erdc.usace.army.mil/wetlands/pdfs/wlman87.pdf.

Heschke during the May 2006 delineation, and Urbanek and several other representatives of the Corps conducted a third site inspection on October 19, 2006. Eggers Decl. Ex. X ¶ 3.A; *id.* Ex. Y ¶ 2.0.

In conducting wetlands delineations, the Corps's general rule is to establish at least one sample point where a change in soils, hydrology, vegetation, or topography occurs. Eggers Decl. Ex. X ¶ 3.B. In total, Eggers and Heschke established forty-six sample points at the Site along a number of transects extending west from the Lake. Eggers Decl. Ex. X ¶ 3.B & Figs. 3, 4. At each sample point, Eggers and Heschke dug depressions in the ground to check soil types and saturation levels. Eggers Decl. Ex. X ¶¶ 4.B(2), 4.E. To check for hydrophytic vegetation, Eggers and Heschke sampled plant species around each sample point in a five-foot radius (in the case of herbaceous species) and a thirty-foot radius (in the case of saplings and shrubs). Eggers Decl. Ex. X ¶ 4.F. They also counted trees. *Id.* Eggers selected representative sample points and located additional points where he observed changes in vegetation. Eggers Decl. ¶ 38.

Thirteen of the sample points were within 15 to 101 feet of the cut bank of the shoreline. Eggers Decl. Ex. X ¶ 4.H. All thirteen of these sample points contained hydric soils and were dominated by hydrophytic vegetation. *Id.* Eleven of the thirteen points had a primary indicator of wetland hydrology (saturation within twelve inches of the surface). *Id.* A twelfth had two secondary indicators of wetland hydrology (the FAC-neutral test and local soil survey data).[7]

---

[7]An area meets the FAC-neutral test if plants that "almost always" (greater than 99% probability) and "usually" (67% to 99% probability) grow in wetlands outnumber plants that almost always or usually grow in non-wetlands. Eggers Decl. ¶ 14(1) & Ex. X at Table 1. The local soil survey data indicates that the soil types at the Site are Wabanica silt loam and Zippel very fine sandy loam, which are both categorized as hydric soils. Heschke Decl. ¶ 7(A), Jan. 29, 2007. Heschke found hydric soils at every sample point, with the exception of one sample point located within the upland "island" straddling lots 3 and 4. Heschke Decl. ¶ 7(B), Jan. 29, 2007.

Eggers Decl. Ex. X ¶¶ 4.B(2), 4.H. The thirteenth sample point, which lacked sufficient indicators of wetland hydrology, is located in a corridor on the southern boundary of the plat that extends westward from the shore of the Lake and encompasses most of lot 1. Eggers Decl. Ex. X ¶¶ 4.G, 4.H & Fig. 8. Eggers and Heschke determined that this corridor, which is drained by a preexisting ditch, is not wetland. *Id.*

Based on their observations and on photographs of the Site, Eggers and Heschke opine that the entire Sunny Beach plat is wetland, with the exception of a small "island" straddling lots 3 and 4 and the corridor that encompasses most of lot 1. Eggers Decl. Ex. X ¶ 4.G & Fig. 8. The wetland at the Site includes nearly all of the land on which Bailey built the Road, *id.*, and extends to the cut bank of the Lake, Eggers Decl. ¶ 38. The vegetation of the wetland extends to, and sometimes below, the OHWM. Eggers Decl. ¶ 30.

Bailey makes a lackluster attempt to dispute whether the wetlands criteria in the 1987 Manual are met. For example, Bailey contends that there is no soil saturation within one foot of the surface for 5% of the growing season, that there is a lack of soil saturation within 100 feet of the Lake (thus creating a barrier between the wetland and the Lake), and that the first 100 feet from the Lake is upland. Def.'s Mem. Supp. Mot. Summ. J. 4, 6. Bailey cites no record support for these particular assertions, however, and the primary evidence he offers in support of his assertions about the non-wetland characteristics of the Site is his own affidavit. Bailey has a bachelor's degree in marketing and finance and disavows any expertise in identifying wetlands. Bailey Dep. 73-74. He obviously lacks the expertise necessary to identify what portions of the Site are wetlands. Although Bailey, like any other non-expert, is competent to testify about his

direct observations of the Site, he has failed to show that any of his observations are relevant to determining to what extent the Site is a wetland as defined in the 1987 Manual.

At various points in his briefing, Bailey also cites to documents and testimony that reflect the opinions of Gary Lockner (the County environmental services director) and other County and state officials, who at one time concluded that there was no wetland within 100 feet of the Lake. *See, e.g.*, Def.'s Answer Ex. 1 at 498-516 (transcripts of Lockner's testimony from a state administrative proceeding); Koschak Dep. Ex. 60, Dec. 2, 2004 (October 14, 1999 letter from Lockner to the Minnesota Pollution Control Agency opining that the water table was lower than 12 inches below the surface within 100 feet of the Lake). Putting aside the fact that much of this evidence is inadmissible,[8] none of these individuals has been identified as an expert in this case, nor did any of them conduct a formal delineation of the Site. Instead, they came to their conclusions on the basis of a single soil sample that happened to come from the upland "island" on the Site. These officials (apparently with the exception of Lockner) later concluded that the soil sample did not accurately represent the soil conditions of the entire 100-foot corridor of land nearest the Lake. Bailey Aff. Ex. 2 at 7 ¶¶ 17-18, Aug. 3, 2006. Insofar as this evidence is offered to prove that the 100-foot corridor of land nearest the Lake is not wetland, it is patently unreliable and thus inadmissible under Fed. R. Evid. 702.

---

[8]Much of this evidence (for example, Lockner's testimony at a state administrative proceeding and Lockner's August 25-26, 2005 deposition in a state case) is clearly hearsay and does not come within the hearsay exception for former testimony. *See* Fed. R. Evid. 804(b)(1) (permitting the admission of former testimony if the declarant is unavailable as a witness and the party against whom the testimony is offered had an opportunity and similar motive to develop the testimony). The United States has not objected to Bailey's introduction of this testimony, however, and in general the parties have relied without objection on depositions and other testimony taken in the course of the many other proceedings that have been spawned by Bailey's actions and litigiousness.

Rather than offering competing expert evidence of the hydrologic characteristics of the Site, Bailey focuses his efforts on disputing whether the United States has offered sufficient evidence that the wetland extends to the Lake. Specifically, Bailey argues that Eggers failed to establish any sample points within fifteen feet of the Lake and that therefore the United States has failed to prove that the wetland is adjacent to the Lake.

Eggers established sample points where he observed changes in vegetation. He did not establish any sample points within fifteen feet of the Lake because he observed no changes in vegetation between the Lake and the sample points closest to the Lake. Eggers Decl. ¶ 38; Eggers Dep. 59-60, Nov. 16, 2006 ("Eggers Dep."). Moreover, Eggers relies not only on primary indicators of wetland hydrology (direct observation of saturated soil), but also on secondary indicators of wetland hydrology (the FAC-neutral test and local soil survey data). Eggers found that the FAC-neutral test was met close to the Lake through his own observation. Eggers Decl. ¶ 38; Eggers Dep. 59-60. True, Eggers did not formally sample herbaceous vegetation beyond the five-foot radius surrounding each sample point, but he did sample saplings and shrubs in a thirty-foot radius around each sample point, and he observed no changes in vegetation closer to the Lake that would have necessitated additional sample points. As for the other secondary indicator (local soil survey data), Heschke concluded, based on his observations of the Site, the local soil survey data, and the prevalence of hydric soils in the surrounding area, that the soils within fifteen feet of the Lake are hydric. Heschke Decl. ¶ 8, Jan. 29, 2007. Thus, the Corps has offered sufficient evidence for a factfinder to conclude that the wetland is adjacent to the Lake — which, under Justice Kennedy's test, means that the Corps can exercise

jurisdiction over it. As Bailey offers no competent evidence to the contrary, the United States is entitled to summary judgment on this issue.

*b. Separation by a Fifteen-Foot Strip of Land Does Not Destroy Adjacency*

Alternatively, even if the Corps's evidence is insufficient to establish that the fifteen feet of land just west of the cut bank is wetland, the Corps's definition of "adjacency" — which Justice Kennedy found reasonable, *Rapanos*, 126 S. Ct. at 2245-46 — is broad enough to include the wetland west of that fifteen-foot corridor. The Corps's definition of "adjacency" makes clear that some separation of wetlands and navigable-in-fact waters does not destroy adjacency. 33 C.F.R. § 328.3(c).

Bailey argues that the examples of barriers in the regulation — "man-made dikes or barriers, natural river berms, beach dunes and the like" — are all either artificial (thus interrupting what would have been a natural hydrological connection) or indicate the movement of water (thus implying a hydrological connection). As Justice Kennedy explained, however, the Corps's jurisdiction over adjacent wetlands does not require a hydrological connection. *Rapanos*, 126 S. Ct. at 2245-46. Because wetlands sometimes protect adjacent waters by absorbing flood water and impurities, the *absence* of a hydrological connection in those cases is the reason why the wetland has a significant nexus with the navigable water. *Id.*

Bailey's theory is that the Lake draws down the water table of the adjoining land, thus creating a barrier of non-wetland around the shore. Assuming (contrary to the evidence) that this is true, that barrier is exactly the type of separation that does not destroy adjacency under § 328.3(c). Bailey points out that the Corps refused to indicate what the outer limit of "adjacency" might be. Although another case might require a precise answer to that question, a

wetland abutting a fifteen-foot corridor of land drained by the navigable water is well within any conceivable outer limit. Thus, even if the Corps has failed to prove that the wetland is actually "bordering" on or "contiguous" to the Lake, the wetland is still adjacent to the Lake within the meaning of § 328.3(c), and the Corps has properly exercised jurisdiction over it.

4. Request to Exclude

Bailey asks the Court to disregard Eggers's November 9, 2006 supplemental expert report because it was served after the October 1, 2006 expert-disclosure deadline. *See* Docket No. 35 at 3. The facts relevant to this request are as follows:

On September 1, 2006, the United States asked Bailey for permission to conduct a third site inspection, but Bailey did not cooperate and the United States ultimately brought a motion to compel entry on land. Chief Magistrate Judge Raymond L. Erickson granted the motion on October 13, *see* Docket No. 56, and Bailey did not appeal that order. The United States conducted the third inspection on October 19, and Eggers's November 9, 2006 supplemental report sets forth the findings and conclusions from that inspection.

Bailey argues that the November 9 report is untimely and that the United States did not disclose Rod Heschke, the soils scientist, as an expert before serving the report. As the foregoing makes clear, however, the supplemental report was untimely only because Bailey himself refused to give the government access to the Site. Bailey also fails to cite any prejudice caused by the untimeliness of the report. He had access to the report before deposing Eggers and long before the hearing on the pending motions. In addition, whether or not the United States fully complied with the expert-disclosure requirements of Fed. R. Civ. P. 26(a)(2) with respect to Heschke before November 9, Heschke was clearly identified as a soils scientist and author of the

original report, and his identity and role were thus no surprise to Bailey. The Court therefore rejects Bailey's attempt to exclude the supplemental report.

5. Rule 702 Challenge

As an alternative to his argument that the November 9 report is untimely, Bailey argues that Eggers's opinion that the wetland extends to the Lake is inadmissible under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Bailey argues that Eggers's opinion that the wetland extends to the Lake is unreliable under Rule 702 for two reasons: (1) the Corps uses facultative plants as an indicator of the presence of hydrophytic vegetation, and (2) Eggers failed to consider the drainage effect of the Lake on the land nearest the Lake. The Court considers each argument in turn.

*a. The Use of Facultative Plants*

To identify the presence of hydrophytic vegetation, the Corps uses a list of plant species published by the United States Fish and Wildlife Service ("the USFWS"). Eggers Decl. Ex. X ¶ 2.C. The USFWS categorizes plant species according to the probability that they will grow in wetlands as compared to the probability that they will grow in non-wetlands. Eggers Decl. Ex. X ¶ 2.C. According to the 1987 Manual, hydrophytic vegetation is present if more than 50% of the dominant plant species are "obligate wetland plants" (which grow in wetlands more than

99% of the time), "facultative wetland plants" (which grow in wetlands 67–99% of the time), or "facultative plants" (which grow in wetlands 33–67% of the time). Eggers Decl. Ex. X ¶ 2.C & Table 1. The Corps further distinguishes between plants in the facultative categories by assigning a positive (+) or a negative (–) to indicate the wetter and drier ends of the categories. Eggers Decl. Ex. X Table 1. In determining whether hydrophytic vegetation is present, the Corps excludes plants in the negative (–) facultative category. Eggers Decl. Ex. X ¶ 2.C.

Bailey argues that using facultative plants as an indicator of wetlands renders the Corps's conclusions unreliable because such plants are equally likely to grow in non-wetlands. As explained above, however, the presence of hydrophytic vegetation is just one of three criteria used to define wetlands (the other two being hydric soils and wetland hydrology). Thus, while the mere presence of facultative plants may mean that the area has only a 50% likelihood of being wetlands, the Corps's use of additional criteria ensures that its method of distinguishing wetlands from non-wetlands is reliable. Moreover, even if it is theoretically possible for the Corps to conclude that hydrophytic vegetation is present solely on the basis of facultative plants, the Corps did not do so in this case. The Corps found obligate wetland plants and facultative wetland plants, both of which are much more likely to grow in wetlands than in non-wetlands. Eggers Decl. Ex. X Tables 1, 2. Finally, the Corps does not use *all* facultative plants as indicators of hydrophytic vegetation; instead, the Corps considers only those facultative plants that are on the wetter end of the facultative spectrum.

More importantly, in challenging the Corps's use of facultative plants to identify wetlands, Bailey is really challenging the Corps's definition of wetlands. The purpose of the 1987 Manual, which permits the use of facultative plants to identify wetlands, is to delineate

wetlands for jurisdictional purposes. Bailey's challenge is therefore not really a *Daubert* challenge; it is more akin to an argument that the Corps's definition of wetlands in the 1987 Manual is unreasonable. Congress has provided, however, that the Corps shall continue to use the 1987 Manual until a final wetlands-delineation manual is adopted after notice and public comment. Energy and Water Development Appropriations Act, 1993, Pub. L. No. 102-377, 106 Stat. 1315 (1992). Even aside from this Congressional mandate, the 1987 Manual is entitled to deference, whether it is viewed as an interpretation by the Corps of its own regulations, or as a long-standing technical interpretation that is within the Corps's particular expertise. *See United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 219 (2001) (an agency's reasonable interpretation of its own regulations is entitled to deference); *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (noting that courts accord deference to agency interpretations in keeping with the degree of the agency's care, the consistency, formality, and persuasiveness of its position, and the extent to which the subject is a technical one within the agency's area of expertise). *Cf. United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131 (1985) (noting that the Corps is entitled to deference in its construction of the CWA). The Court therefore rejects Bailey's challenge to the Corps's use of facultative plants as an indicator of the presence of hydrophytic vegetation.

*b. Failure to Consider Drainage Effect of the Lake*

Bailey next argues that Eggers's opinion that the wetland extends to the Lake is unreliable because Eggers refused to consider the drainage effect of the Lake on the surrounding land. In the original report, Eggers used something called the "van Schilfgaarde equation" to estimate the impact of man-made ditches on the Site. According to this equation, a two-foot-

deep ditch in Wabanica soils (one of the soil types found on the Site) would have a lateral drainage effect of 105 feet. Eggers Decl. Ex. X ¶ 4.D. During Eggers's deposition, he was asked whether the drop in elevation at the cut bank of the Lake would similarly drain the surrounding lakeshore. Eggers Dep. 71-74. Eggers testified that he had never heard of using the van Schilfgaarde equation to determine the drainage effect of a *lake* and that he thought it would be inappropriate to do so. Eggers Dep. 72-73.

Bailey points to testimony by County environmental services director Gary Lockner, in which Lockner described using a chart — apparently a chart that was based on the van Schilfgaarde equation — to estimate the drainage effect of Lake of the Woods on surrounding land. Def.'s Answer Ex. 1 at 498-516. But, as noted above, Lockner has not been qualified as an expert in this case; Lockner did not conduct a wetlands delineation of the Site; and there is no evidence that he knows what he is doing in using the van Schilfgaarde equation in estimating the drainage effect of a huge natural lake, as opposed to relatively small man-made ditches.

Eggers conducted the delineation according to the standards set out in the 1987 Manual. In keeping with those standards, Eggers relied on his own observation of both primary and secondary indicators of wetland hydrology. Bailey has not pointed to anything in the 1987 Manual requiring the Corps to determine wetland hydrology on the basis of the possible drainage effect of a neighboring lake, much less anything requiring the Corps to use the van Schilfgaarde equation to estimate the drainage effect of a lake. Nor has Bailey offered any competent evidence that it is appropriate to use the van Schilfgaarde equation to estimate the drainage effect of lakes. In short, nothing in the record indicates that Eggers's failure to apply the van Schilfgaarde equation to Lake of the Woods renders his opinions unreliable. Finally, the Court

notes that, even if it excluded Eggers's opinion that the wetland includes the fifteen feet nearest the edge of the Lake, the Corps has still offered sufficient evidence that the wetland is "adjacent" to the Lake within the meaning of its regulations and thus within CWA jurisdiction under Justice Kennedy's test.

*C. Other Challenges to the Corp's Assertion of Jurisdiction*

Bailey raises several other arguments challenging the Corps's assertion of jurisdiction over the Site, all of which are plainly meritless.

First, Bailey argues that the Corps has unconstitutionally invaded an area of authority reserved to the states. Essentially, Bailey argues that the County's approval of the plat precludes the Corps from enforcing the CWA. This claim is frivolous. Under the Supremacy Clause, a board of county commissioners obviously cannot block the enforcement of federal environmental laws by platting a parcel of wetland. U.S. Const. Art. VI, cl. 2.

Second, Bailey argues that, in directing the restoration order to him rather than to the County, the Corps has acted arbitrarily and capriciously within the meaning of the Administrative Procedure Act. *See* 5 U.S.C. §§ 702, 706(2) (persons harmed by arbitrary and capricious agency action are entitled to judicial review of that action). Agency action is "arbitrary and capricious" only when it lacks any rational basis. *Falk v. United States* ex rel. *Dep't of Interior*, 452 F.3d 951, 953 (8th Cir. 2006). As discussed below, the Corps had ample reason to direct the restoration order solely at Bailey, and thus its action was not arbitrary or capricious.

Finally, Bailey argues that the Corps has violated the Equal Protection Clause by administering its regulations in a disparate manner. Bailey points out that the preexisting County

road to the north of the Site (to which the Road connects) was built without a Section 404 permit. Bailey complains that, when the County applied for an after-the-fact permit for that preexisting road, the Corps apparently permitted the County to mitigate, rather than requiring restoration.[9] Yet when Bailey applied for an after-the-fact permit for his road, the Corps required restoration. Thus, Bailey claims, the Corps violated the Equal Protection Clause by treating him less favorably than the County.

Bailey is incorrect. To make out a violation of the Equal Protection Clause, Bailey would have to show that he was similarly situated to the County and that the Corps's disparate treatment of the two lacked a rational basis. *Geach v. Chertoff*, 444 F.3d 940, 945 (8th Cir. 2006). Bailey has not made such a showing. The County applied for an after-the-fact permit for a road that had been in existence for many years and that served many long-time residents — a road that apparently was not built in knowing defiance of the law. Bailey applied for an after-the-fact permit for a brand-new road that served almost no one — a road that Bailey persisted in building despite being warned that he was breaking the law. Under these circumstances, it is obviously not irrational for the Corps to treat Bailey differently from the County.

*D. The Restoration Order*

The Court has found, for the reasons described at length above, that the Corps does indeed have jurisdiction over the Site under the CWA. Other than disputing the jurisdiction of the Corps, Bailey does not deny that construction of the Road violated the CWA — and thus Bailey does not deny that the United States is entitled to relief of *some* type. But Bailey raises a

---

[9]The portion of the record to which Bailey cites does not indicate what became of the County's after-the-fact permit application. *See* Hasbargen Dep. 55-64, Aug. 26, 2005.

host of challenges to the particular restoration order entered against him on October 22, 2001 — the restoration order that the United States now asks this Court to enforce.

The CWA authorizes injunctive relief for violations of § 1311(a). 33 U.S.C. § 1319(b). Both the United States and Bailey have addressed the propriety of injunctive relief under the standards set forth in *United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293 (5th Cir. 1976). Under the *Sexton Cove* line of cases, a restoration plan must: (1) be designed to confer maximum environmental benefits tempered with a touch of equity; (2) be practical and feasible from an environmental and engineering standpoint; (3) take into consideration the financial resources of the defendant; and (4) include consideration of the defendant's objections. *Id.* at 1301; *see also United States v. S. Inv. Co.*, 876 F.2d 606, 615 (8th Cir. 1989).

On June 12, 2001, the same day that the Corps denied Bailey's after-the-fact permit application, the Corps issued a public notice soliciting input on the "potential environmental remedy/solution for the unauthorized road fill." AR at COE0623-0624. The Corps received a number of responses to this public notice. AR at COE0638-0660. While the Corps was considering possible remedies, Bailey proposed a mitigation plan, AR at COE0663-0665, which the Corps considered and rejected (along with Bailey's original mitigation plan proposed as part of his Section 404 permit application). AR at COE0675-0676. The Corps explained that Bailey's proposed mitigation plans were inadequate because they would result in a net loss of wetland function. *Id.*

After considering the responses to its public notice and the *Sexton Cove* factors, the Corps ordered restoration of the wetland. AR at COE0700-01. Specifically, the Corps ordered Bailey to: (1) remove the dredged and fill material used in construction of the Road; (2) fill in

the ditches; (3) seed the restored area with a specified seed mixture; and (4) for three years following restoration, control certain weed species via hand removal or spot use of an herbicide approved for wetland use. *Id.* The Corps found, and Bailey does not dispute, that removal of the Road can be accomplished using the same equipment that was used to clear the roadbed. *Id.* The Corps also found that restoration would confer maximum environmental benefits because it would reestablish a high-quality wetland near an important international waterbody. *Id.*; *see also* Eggers Decl. Ex. X ¶ 5.A (giving a rating of "high" to 5 out of 11 wetland functions of the subject wetland, including vegetative diversity, downstream water quality, and wetland water quality).

Bailey does not seriously dispute that restoration, as outlined in the restoration order, would provide the maximum possible environmental benefit, nor does he dispute that restoration is practical and feasible from an environmental and engineering standpoint. Bailey also does not argue that restoration is beyond his financial means; in fact, Bailey conceded at oral argument that removing the Road will probably not cost much more than building the Road did. Although Bailey argues that it is not practical to restore the wetland because it would take twenty-five years for newly planted trees to mature, from an environmental standpoint twenty-five years is but the blink of an eye. Moreover, long before the trees have matured, the wetland will serve to enhance water quality by trapping and filtering runoff. Eggers Decl. Ex. X ¶¶ 5.A, 6.A.

The focus of Bailey's *Sexton Cove* argument is that the restoration order is inequitable. To hear Bailey tell it, the County directed Bailey to build the Road, yet now is unfairly trying to duck responsibility for it. Bailey emphasizes the County's actions in approving the Sunny Beach plat, informing Bailey how to build the Road to County standards, requiring Bailey to post a

bond, and issuing permits for culverts to individuals who purchased lots from Bailey. Bailey argues that the County took over the Road and the responsibility for obtaining the required permit. Bailey notes that the County has performed some maintenance work on the Road, and has even widened and seeded the ditches, and Bailey points out that LaValla obtained some of the gravel for the Road from a County gravel pit. Because the County was so heavily involved with the Road, Bailey contends, the Corps acted inequitably in failing to require the County to restore the wetland.

An examination of the record demonstrates that Bailey's contentions are meritless. The undisputed fact is that, at all relevant times, Bailey and Bailey alone was the driving force behind the creation of the Road. It was Bailey's decision to clear the sixty-six-foot wide roadway through the wetland and build the Road. It was Bailey who hired LaValla to perform the work. It was Bailey who told LaValla to resume the work after LaValla had been told to stop. And it was Bailey who stood to profit from the construction of the Road.

Bailey did have extensive interactions with the County, but the focus of those interactions was *not* on the Road's compliance or lack of compliance with federal environmental standards — something that the County had no authority to address. Rather, the focus of Bailey's interaction with the County was on getting the land platted and getting the County to take over responsibility for maintaining the Road. None of this makes the County responsible for Bailey's violations of the CWA. At every step of the way, Bailey was well aware, as he had been since at least 1993, that he needed a Section 404 permit to place fill on the Site. AR at COE0049. He chose to defy the law by starting construction on the Road without a permit, and then he chose to defy the law again by resuming work after the Corps told him to stop.

Bailey implies that the County led him to believe that it would obtain the Section 404 permit on his behalf and that he finished the Road in reliance on the County's promise. The timing of events, however, belies this claim. The work on the Road was performed in three stages: During the initial stage, in June 1998, LaValla cleared the roadway and began building the Road. This stage was interrupted when LaValla and Bailey were told to stop work on the Road. At some point later that summer, Bailey instructed LaValla to finish building the Road. Although the record is not entirely clear as to when LaValla completed this second stage of the work — Bailey must know, but fails to mention this fact in his briefing — the record reflects that the Road was completed sometime before September 17, 1998, when the Corps notified Bailey in writing that the completed Road violated the CWA. Bailey Dep. Ex. 6. The third stage of work took place in 1999, when LaValla upgraded the Road by replacing the culverts and adding gravel.

There is no evidence that Bailey sought input from the County before he cleared the roadway and began building the Road in June 1998, so it is difficult to know how the County could be blamed for that. Bailey does try to blame the County for his decision to resume construction of the Road during the late summer of 1998. Specifically, Bailey claims that, after he stopped work on the Road, the County instructed him to complete it. In support of his claim, Bailey points to a September 16, 1998 letter from the County to Bailey. *See* Def.'s Mem. Resp. to Pl.'s and Third Party's Mot. Summ. J. 24; Bailey Dep. Ex. 5 (Sept. 16, 1998 letter from the County to Bailey stating "[p]er your telephone request, I inspected your road construction . . . for compliance with [county standards]. . . . Before recommendation to the County Board for

acceptance as an unorganized Township Road, all of these deficiencies would have to be addressed.").

There are two problems with Bailey's argument. First, as described above, the Road was essentially completed by the time that Bailey received the County's September 16 letter. Obviously, then, Bailey did not rely on the letter in ordering LaValla to resume construction. Second, the September 16 letter does not, in fact, instruct Bailey to complete the Road. Rather, the letter reflects that Bailey solicited the County's input on how to build the Road to County standards because *Bailey* wanted the County to take over the Road. The fact that a government informs a citizen of the legal requirements for taking a certain action does not mean that the government is thereby *directing* the citizen to take that action, much less assuming legal responsibility for the citizen's violation of federal law. If, for example, Bailey had asked what kind of building permit he needed before constructing a restaurant on the Site, and the County responded, that would be a far cry from the County "instructing" Bailey to build a restaurant.

Bailey also claims that Doug Easthouse of the Soil and Water Conservation District told him that the Corps would approve the application and that he was free to finish the Road. Bailey Dep. 46. Putting aside the fact that Easthouse did not work for the federal government and thus did not have authority to make decisions on behalf of the Corps, Easthouse also did not work for the County, and thus his actions cannot be blamed on the County. *See* Minn. Stat. § 103C.331, subd. 1 (soil and water conservation districts are governmental and political subdivisions of the state). More importantly, Bailey was told in June 1998 by the federal government — both the Corps and the EPA — to cease work on the Road until he obtained the proper permit from the Corps. AR at COE0438. It defies belief that Bailey, after being told by the *Corps* to stop work

on the Road until he got a permit from the *Corps*, would resume work on the road without checking first with the *Corps*. Thus, even under the most charitable reading of the record, Bailey cannot claim ignorance of the fact that any additional work would be at his own risk.[10] *Cf. Sexton Cove*, 526 F.2d at 1300 (developers who did not contact the Corps before beginning construction, and were later notified that a permit was required, were not misled into believing that they were exempt from permit requirements).

Bailey next argues that the restoration order is inequitable because it requires him to remove items placed on the land by others. Specifically, Bailey identifies culverts and fill placed by owners of the lots on the Site, a culvert and fill that the County allegedly placed on the Site, the seeding of the ditches by the County, and road grading by the County. Bailey also argues that the County widened the ditches and used the excavated material for more road base.[11]

Even assuming that Bailey's factual allegations are true, it is not inequitable for Bailey to be required to remove these items in conjunction with his removal of the Road. The United

[10]Bailey also cites a May 1, 2006 order of state district-court judge Charles H. LeDuc as evidence that the County induced Bailey to build the Road. Fish Decl. Ex. 10, March 5, 2007. Judge LeDuc dismissed *criminal* charges brought against Bailey by the *state* on the basis of equitable estoppel, apparently concluding that the County bore some responsibility for development at the Site. (It is not entirely clear what Bailey was charged with, but it appears that he was charged with violating state environmental law.) Judge LeDuc did not cite any evidence that the County induced Bailey to build the Road, but simply relied on Bailey's memorandum in support of dismissing the charges. *Id.* at 3. Nowhere in that memorandum did Bailey point to any evidence that the County induced Bailey to build the Road. Moreover, the United States was not a party to that action, and it does not appear that Judge LeDuc had the benefit of the evidence of Bailey's culpability that the United States has presented in this case.

[11]Bailey also identifies other items, such as spoil that the County cast onto his land when it recently cleaned the ditch on the southern border of the Site. The spoil was not cast onto the Road, however, and Bailey is not being asked to remove it. *See* Crompton Dep. 13, Nov. 28, 2006 ("Q. [The spoil] was placed into the farmer's field? A. Yes.").

States is seeking the removal of a quarter-mile long road that runs through a sixty-six-foot wide roadway, for which Bailey is entirely responsible. In comparison, the burden of removing a few additional items is minimal. Moreover, Bailey bears some share of the responsibility for these items. Obviously, if he had not built the Road, *none* of these items would now be on the Site.

Bailey is directly responsible for some items, such as the gravel placed on the Road by LaValla in 1999. Other items, such as most of the culverts, were placed near the Road by those to whom Bailey sold lots. Bailey apparently did not tell these purchasers that he did not have the necessary permit for the Road and that, in fact, he might be required to remove the Road. He can hardly be heard to complain now about having to remove a few culverts that these innocent lot owners placed near the Road; the fact that the County issued permits to the lot owners to place these culverts does not make Bailey any less culpable. *Cf. United States v. Cumberland Farms of Conn., Inc.*, 826 F.2d 1151, 1165 (1st Cir. 1987) (finding that the restoration order was equitable because, while it placed a "heavy burden" on the defendant, the defendant had no one but itself to blame for its predicament).

Bailey cites to County timesheets as evidence that the County placed fill on the Road, but these timesheets do not distinguish between Sandy Shores Drive and the Road, and thus there is no proof that the County placed fill on the Road. Hasbargen Dep. 11-12, Aug. 26, 2005. Although there is some evidence that the County widened the ditches, *see* Fish-Whitlock Aff. Ex. 9, Jan. 25, 2006, that widening (along with the seeding of the ditches) will have little impact on the cost to Bailey of restoring the Site. Finally, with respect to the preexisting culvert to the north of the Road, the restoration order does not include that culvert, and the fact that the County

placed it there is therefore irrelevant. AR at COE0703 (map attached to restoration order showing the area to be restored).

Bailey also argues — and the County concedes — that the County has owned the Road since December 1998, when the County Board approved the Sunny Beach plat.[12] Bailey and the County make detailed arguments about state property law with respect to public roads. But nowhere does Bailey explain why the current ownership of the Road is relevant under the CWA. There is no doubt that it was *Bailey* who violated the CWA, and nothing in the statute or the case law interpreting it suggests that Bailey can escape liability by passing the Road on to the County. Certainly, a violator's lack of continuing control over polluted property may be relevant to whether restoration is practical. But the practicality of restoration is not a problem in this case, as the County represented at oral argument that it will take all steps necessary to allow Bailey to comply with the restoration order.

The Court therefore concludes that the Corps's restoration order meets all of the requirements of *Sexton Cove*, and the Court will enter an injunction requiring Bailey to comply with that order. The Court will not, however, enjoin Bailey from discharging further pollutants into the Site, as the government requests. Before the Court could enter such an order, the United

---

[12]Bailey argues that the United States has taken inconsistent positions with respect to Bailey's ownership of the Road. *See* Def.'s Mem. Resp. Pl.'s and Third Party's Mots. Summ. J. 23. Specifically, Bailey claims that the United States has argued, in a pending takings case in the Federal Court of Claims, that Bailey has no interest in the Road. *Id.* The United States has moved to supplement the record with a copy of Bailey's memorandum in the takings case, which the Court grants. Pointing to that memorandum, the United States argues that it is *Bailey* who has taken inconsistent positions with respect to his ownership interest in the Road. Each side apparently seeks to estop the other from taking an inconsistent position in this case. The Court need not involve itself in this skirmish, however, because the nature of Bailey's property rights over the Road is irrelevant.

States would have to show the likelihood of a *future* CWA violation by Bailey. *See, e.g., United States v. Sea Bay Dev. Corp.*, No. 06-624, 2007 WL 1378544, at *3 (E.D. Va. May 8, 2007); *United States v. Fabian*, No. 02-495, 2007 WL1035078, at *17 (N.D. Ind. Mar. 2, 2007). The United States has made no such showing. True, Bailey has demonstrated a willingness to defy the instructions of the Corps, but he did so while his permit application was pending, and there is no suggestion that Bailey intends to place more fill on the Site or otherwise violate the CWA. An injunction prohibiting him from doing so is therefore unwarranted.[13] *Cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 193 (2000) (federal courts should narrowly frame relief to fit the precise facts of the case); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982) (courts retain discretion to grant or deny injunctions restraining violations of the CWA).

*E. Bailey's Claim Against the County*

The United States filed this action against Bailey in September 2005. In January 2006, Bailey moved to join the County as a third-party defendant under Fed. R. Civ. P. 19. Docket No. 14. Judge Erickson found that joinder of the County was not proper under Rule 19, but granted Bailey permission to implead the County under Fed. R. Civ. P. 14. Docket No. 25. Contrary to Bailey's representation at oral argument, Judge Erickson did not *order* Bailey to implead the County under Rule 14. Indeed, Judge Erickson expressly noted that the Court might ultimately find Bailey's Rule 14 allegations unsustainable. *Id.* at 18. Bailey did not object to the

---

[13]The United States cites only one district-court case for the proposition that it is entitled to an injunction restraining Bailey from future violations. *See Leslie Salt Co. v. United States*, 820 F. Supp. 478, 484 (N.D. Cal. 1992). The court in *Leslie Salt* did not cite any authority or provide any analysis supporting its conclusion, and thus its opinion is not persuasive.

denial of his Rule 19 motion, but instead brought a third-party complaint against the County under Rule 14.

In his third-party complaint, Bailey alleges that the County is responsible for the CWA violation, and asks that the Court order the County — *instead* of Bailey — to restore the wetland at its own expense in the event that the United States prevails on its claim. Docket No. 26. This, however, is not a proper basis for a Rule 14 claim. A defendant may not use Rule 14 to implead a third-party defendant who may have liability to the plaintiff *instead* of the defendant or in *addition* to the defendant. Rather, a defendant may use Rule 14 to implead a third-party defendant only if that third party will be liable to the *defendant* if the defendant is found liable to the plaintiff. Moreover, the liability of the third-party defendant to the defendant must be *contingent* on the defendant being held liable to the plaintiff:

> "Rule 14(a) allows a defendant to assert a claim against any person not a party to the main action only if that third person's liability on that claim is in some way dependent upon the outcome of the main claim. Rule 14(a) does not allow the defendant to assert a separate and independent claim even though the claim arises out of the same general set of facts as the main claim."

*Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 (8th Cir. 2003) (quoting *United States v. Olavarrieta*, 812 F.2d 640, 643 (11th Cir. 1987)). Thus, Bailey's claim against the County cannot be an independent claim (such as, say, misrepresentation or negligence), because such claims cannot be brought under Rule 14. Instead, his claim must be in the nature of a claim for indemnity or contribution, such as the type of claim that an insured might bring against his insurer after being sued for damages in connection with a car accident.

The problem with Bailey's claim against the County is that Bailey has identified no cognizable legal theory under which he has a right of indemnity or contribution against the

County. Bailey can, of course, *defend* against the United States's lawsuit by arguing that it was the County, and not he (or not just he), who violated the CWA. But to implead the County under Rule 14, Bailey must be able to claim — based on an insurance contract or statutory indemnification provision or something else — that, if he is held liable to the United States, then the County should be held liable to *him*. Bailey has identified nothing in the CWA or any law or contract that gives him such a right against the County, and thus his Rule 14 claim fails.[14]

At oral argument, Bailey seemed surprised when the Court's line of questioning revealed that he had not asserted a proper Rule 14 claim, and Bailey asked that the Court give him a chance to come up with a theory for why the County might have the type of obligation that could be enforced under Rule 14. The Court declines the invitation. Bailey impleaded the County over a year ago, and he has had ample time to determine whether he has a proper legal basis for his claim. Moreover, Bailey cannot reasonably argue that Judge Erickson's decision to permit him to implead the County was a kind of judicial imprimatur of his claim. Rule 14 is simply a procedural device; it does not create a substantive right to relief. 6 Charles Alan Wright et al., *Federal Practice and Procedure* § 1446 (2d ed. 1990). If Bailey did not wish to be limited by

---

[14]The County argues that Bailey's claims are precluded by the doctrines of claim and issue preclusion. It is unnecessary to address this argument, given the dismissal of the Rule 14 claim on other grounds. The Court notes, though, that if Bailey had asserted an *independent* claim against the County in this case — that is, if he had simply sued the County and argued "you are liable to me whether or not I am held liable to the government" — then Bailey's claim would most likely be precluded, as Bailey has already sued the County more than once on claims arising out of the same set of facts alleged in this case. *See Bailey v. U.S. Army Corps of Eng'rs*, No. 02-CV-639, 2002 WL 31728947, at *11-13 (D. Minn. Nov. 21, 2002) (dismissing Bailey's detrimental-reliance claim against the County). But, as described in the text, Bailey's Rule 14 claim is necessarily a *contingent* claim — a claim that "if and only if I am held liable to the United States, then you should be held liable to me." Bailey has yet to incur any liability, and thus any claim for contribution or indemnity against the County has yet to be adjudicated.

the strictures of Rule 14, he could have objected to Judge Erickson's denial of his Rule 19 motion. But he did not. Bailey's third-party complaint against the County is therefore dismissed.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Bailey's motion for summary judgment [Docket No. 58] is DENIED.

2. Lake of the Woods County's motion for summary judgment [Docket No. 82] is GRANTED, and Bailey's third-party complaint against the County [Docket No. 26] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

3. The United States's motion to supplement the record [Docket No. 143] is GRANTED.

4. The United States's motion for summary judgment [Docket No. 76] is GRANTED IN PART AND DENIED IN PART as follows:

   a. Bailey's counterclaim [Docket No. 2] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

   b. The Court will enter an injunction requiring Bailey to restore the Site, at his own expense, to its pre-violation condition in accordance with the Restoration Order dated October 22, 2001 ("Restoration Order"), a copy of which is in the record at AR at COE0700-0705.

   c. Bailey shall file and serve a restoration plan no later than ninety days from the date of this order. The restoration plan shall contain a schedule of the

activities to be conducted to comply with the restoration order and a timeline for implementing each activity.

d. The United States shall file and serve any comments on the restoration plan no later than forty-five days after Bailey has filed and served the plan. The Court will then review the submissions of the parties and issue a final injunction.

5. The United States's motion is DENIED in all other respects.

Dated: September 25, 2007

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge

STATE OF MINNESOTA | IN DISTRICT COURT

COUNTY OF LAKE OF THE WOODS | NINTH JUDICIAL DISTRICT

State of Minnesota,

Plaintiff,

V

District Court File No. 39-T8-05-000697

Gary Lee Bailey,

Defendant.

**ORDER**

This matter came before the Undersigned District Court Judge on September 6, 2005. The parties were allowed additional time for submissions and the record was closed on October 12, 2005.

After the Court was advised the parties "agreed to continue the case."

This Court was of the impression that the continuance was applicable to this criminal case as well as the underlying or companion civil matter.

In further review, the Court now determines that that was not the case and that the parties are, in fact, awaiting an order relative to the present matter.

Plaintiff was represented by Philip Miller, Lake of the Woods County Attorney. The Defendant was represented by Alan Fish, Attorney at Law, Roseau, Minnesota.

A number of other cases were, in fact, continued contingent upon the outcome of this case. Each of those files is captioned State of Minnesota versus Gary L. Bailey. The Court understands those files to be as follows: T2-05-808, T4-05-809, T0-05-807, T2-05-811 and T2-05-812.

FILED
MAY 1 2006
COURT ADMINISTRATOR
LAKE OF THE WOODS COUNTY

The Court notes that there are several memoranda which have been filed in support of dismissal offered by the Defendant in this case. The Court finds no written memorandum in the file in support of the State's position.

Now, based upon the entire file and record of the proceedings herein, together with the evidence received at the hearing and the numerous exhibits, the Court **ORDERS** that this criminal case is herewith **DISMISSED.**

The appended memorandum of law is made a part of this Order.

IT IS SO ORDERED.

DATED: April 28, 2005.

Charles H. LeDuc
Judge of District Court

MEMORANDUM

This case arises out of a land development project that was started in the late 1990s. Through a series of events, some government agencies appeared to approve it, whereas others have alleged that any development on the property has been in violation of law.

The improvements were apparently made by the Defendant in some part or other, but it also appears to this Court that improvements were made by other individuals as well under contingent sale agreements.

In November of 2001 the Department of Natural Resources issued a restoration order to the Defendant. The restoration order directed the Defendant to restore the land subject to this case within seven months or by June 10, 2002. Nothing was done, however, the parties did engage in extensive settlement negotiations which continue the

context of companion civil cases both before this Court and the federal court. Over two years after the completion deadline of June 10th, another directive was issued by the Department of Natural Resources with an extension time granted to September 30, 2004. Again nothing was done and over eight months later the Defendant was again finally charged criminally.

It is this Court's opinion that the dispute between the parties herein is quintessentially a civil matter for the civil courts, which is pending presently, and this Court therefore dismisses the case.

In arriving at this decision, this Court is persuaded by the Defendant's argument that the prosecuting authorities should be estopped from bringing criminal prosecution charges against the Defendant under the circumstances of this case. The Court therefore largely relies upon the argument offered by the Defendant in his memorandum dated October 11, 2005, beginning on page 15 and continuing through page 23.

This Court does not reach nor make any ruling or opinion relative to the defense argument concerning equal protection or the defense argument that the restoration order is arbitrary and unreasonable, such decision on such issues being unnecessary under the circumstances of this case.

Finally, with respect to the remaining cases, which are considered companion or related criminal cases, those matters arising out of virtually identical sets of facts covering different properties, those matters are dismissed for the same reasons. CHL

STATE OF MINNESOTA

COUNTY OF LAKE OF THE WOODS

DISTRICT COURT

NINTH JUDICIAL DISTRICT

State of Minnesota,

Plaintiff,

vs.

Gary Lee Bailey,

Defendant.

**DEFENDANT'S MEMORANDUM OF LAW**

Court File No. T8-05-000697

## PROCEDURAL HISTORY

Since the mid 80's Defendant has owned a government lot of real property in Lake of the Woods County along the shores of Lake of the Woods, consisting of approximately 65 acres. The majority of this land was agricultural in nature with the exception of approximately 24 acres located along the shoreline that was not plowed under in previous years, but kept in a natural state, and originally zoned as natural resource.

The Defendant approached Lake of the Woods County requesting to develop the lakeshore property. The initial proposal was to build a marina to serve the western shore of Zipple Bay within Lake of the Woods. Lake of the Woods County supported this project. The Corp of Engineers informed the Defendant the marina fell under a nationwide permit and all that was required was approval from the Department of Natural Resources. Defendant obtained approval.(See Exhibit 1 attached hereto.)

This plan was abandoned due to financial considerations of the project. What is relevant however, is that this marina would have necessitated an identical and no less intrusive access road as constructed and applied for in the federal CWA application for the 'Sunny Beach' access road, the federal denial of which was the catalyst for state action here today.

In October 1998, Defendant submitted application to Lake of the Woods County to plat the lakeshore portion of a 52 acre government lot. (See Exhibit 2 attached hereto) The plat, consisting of approximately 13 acres, was met with approval. (See Exhibit 3 attached hereto)

The Lake of the Woods County Board approved the Plaintiff's initial application to plat the parcel as a residential subdivision in November, 1998, and approved the final plat in December of 1998. (See Exhibit 15 previously submitted) A motion to amend the county zoning ordinance to change the land use of the 'Sunny Beach' plat from agricultural/natural environment to residential was also approved by Lake of the Woods County on December 18, 1998. (See Exhibit 15 previously submitted).

In the summer of 1998 after speaking with local government officials, Defendant began building an access road for the subdivision according to the specifications required by Lake of the Woods County Highway Department. Lake of the Woods County told Defendant how to construct the road and he complied. Defendant relied on local government officials to guide him through the various requirements of completing this project.

Lake of the Woods County highway engineer, Walter Leu, in a statement dated August 13, 1998, clearly mislead the Army Corp of Engineers in this process. The record is clear that Mr. Leu, while simultaneously instructing Defendant on deficiencies in the access road that needed to be rectified, was advising the Army Corps of Engineers that they had advised Bailey to stop

construction on the road until the Army Corps permitted it. (See Exhibits 3 previously submitted and Exhibit 4 attached hereto) Specifically, on September 16, 1998, the County was directing Defendant to fix deficiency's with regard to the road while one month earlier, asserting to the Corp, the County had directed Defendant to cease building activities. This is not the only misbehavior by governmental officials regarding this failed development.

It is clear that Lake of the Woods County felt this land was developable and represented to the Defendant and other governmental entities the land was developable. In its recommendation to the County Board to accept the plat, Gary Lockner, the Environmental Services director, asserted as follows:

> ......
> The County Subdivision Ordinance which (sic) requires the developer to supply soils and ground water information for proposed plats in order for the County to determine if and how proposed lots can be built on. Gary Bailey has not been able to supply that information, so following the initiation of wetlands replacement negotiations with wetlands administrator and the local SWCD I requested expert advise from Erik Morhing, a ground water specialist that works for BSWR. He and Brian Dwight and myself visited the site with Gary [B]ailey's permission on August 21st . Even through the County has been subject to a noticeable dry period for the month previous Morhing was able to ascertain the likelihood of the ground water conditions from available data and site observations.
>
> It was determined that even though the area is almost certainly subject to a high ground water table due to water moving from the Prosper ridge area to the west, a reasonable percentage of the water in the south central portion of the property may be from surface water. Copies of soil sheets are attached. The most noticeable soils feature encountered was a very highly developed soil structure. This strong soil structure allows water to pass through the soil quite rapidly, but also gives the soil a high degree of weight bearing capacity.
>
> With a drainage system lowering the water table 2 to 2.5 feet, which is the OHWM of the lake, and with some fill that would be normally

> associated with building, it can reasonable be expected that the ground in the area of the wettest part of the proposed development would support structures even in the wettest periods. The entire frontage of the proposed plat is floodplain. Mound systems are required by county, state and federal regulation in floodplains. The Lake of the Woods Zoning office will grant septic system permits for mound systems in the proposed Bailey plat. Approval of the septic system permits is subject however to improved drainage at each site that lowers the water table to levels acceptable to ISTS (Individual Sewage treatment System) design standards.
> Lot size minimums are 100 feet wide at the shoreline and building line and 200 feet deep. Minimum lot area is 20,000 square feet. Building setback in 75'. Septic system setback is 50 feet and downhill from the well.
>
> The Lake of the Woods Zoning recommends acceptance of a plat application for the Bailey property.
> (See Exhibit 3 attached hereto.)

Further, In a letter to the MPCA dated October 14, 1999 written by Gary Lockner, Director of Environmental Services, and signed by Les Lemm, SWCD Resource Specialist and Dale Krystosek, all provided the opinion from a site investigation of the property, conducted September 29, 1999, that the "water table could not establish itself to within at least a foot of the surface within 100 feet of the lakeshore." (See Exhibit 5 attached hereto)

This is an opinion that the first 100 feet from the shore is upland. The letter also stated "it appeared that the soil conditions in the area of the septic systems and buildings would allow for mound systems and occupied structures." (Id.)

Dale Krystosek later testified at an MPCA administrative hearing this statement "was a misrepresentation of the work we did that day".(See Exhibit 10 MPCA transcript p.165) Les Lemm, employee of SWCD, also testified at the hearing and implied that Gary Lockner led Krystosek and Lemm to the exact small area of upland which the Corp of Engineers later found in a delineation,

and implied Lockner intentionally led them to the only area of upland on the site. (See Id. p.188-192)

It is clear the Minnesota Pollution Control Agency was told by Lake of the Woods County that there was at least 100 feet of upland between the lake and the wetland within this plat, and the property would be suitable for septic systems and building residential homes.( See Exhibit 5 attached hereto)

Defendant was informed mitigation would be required for any wetlands that would necessarily be filled for the access road. Defendant's state based Wetland Conservation Act replacement plan for the access road was approved by Walter Leu, then acting WCA administrator for Lake of the Woods County. (See Exhibit 3 previously submitted). Defendant clearly has complied with all local and state laws.

On November 5, 1999, Lake of the Woods County sent a fax to the Army Corp of Engineers that stated as follows:

> Permit should be addressed to the County. The County has taken the road over. - See attached sheet. Any questions or problems give me a call.
> (See Exhibit 5 previously submitted.)

It was decided Lake of the Woods County should be applicant for the federal permit, given it was now a publically owned road.

Lake of the Woods County even offered banked wetland credits as mitigation for the road as Lake of the Woods County acknowledging they had taken over as permit applicant for the Federal Clean Water Act permit. (See Exhibit 7 previously submitted) It appears from the federal administrative record, the Army Corp drafted a permit for acceptance of the road and utilized the County's offer to mitigate, in September of 2000. (See Id.)

This is not the only action Lake of the Woods County has taken with regard to the access road. Lake of the Woods County Highway Department has actually placed some of the fill the Army Corp of Engineers has now ordered Defendant alone to remove. The Corp is simply turning its head to Lake of the Woods actions, completely ignoring Lake of the Woods Counties acts.

It is clear LOW had no issue with developing this property or filling this wetland and in fact, issued approach and culvert permits between August 1998 and September 1999. (See Exhibit 2 previously submitted)

Plaintiff's characterization of Defendant as a wetland violator is false.

Defendant, at the request of Lake of the Woods County, applied for a permit under the State's Wetlands Conservation Act on June 17, 1998 for the access road. (See Exhibit 3 previously submitted) The parties had no problems reaching an agreement on the acts necessary to adequately replace any lost wetlands. A Wetland Conservation Act permit application was approved by Lake of the Woods County and the Soil and Water Conservation District, as a participant of the technical evaluation panel, agreed with the replacement of the wetlands as proposed by Defendant. (Id.)

Another Wetland Conservation Act Application was submitted at the request of the SWCD. This was also approved on June 17, 1999. (See Exhibit 6 attached hereto.)

Lake of the Woods County had taken over as applicant on the federal after-the-fact permit application when they took over ownership and maintenance of the road upon acceptance of the plat. (See Exhibit 6 previously submitted) In November, 1999, Lake of the Woods County did not dispute ownership of the access road occurred upon Lake of the Woods County Boards acceptance of the plat. However now the County clearly states it never owned the road. (See Exhibit 7 attached hereto)

Lake of the Woods county was the sole communicator with the Army Corp of Engineers following the plat approval given the fact that Lake of the Woods County had taken over as applicant to the Corps and owned the road.

As required by the federal rules, an application was also made to the Minnesota Pollution Control Agency for a 401 Water Quality Certification. The MPCA certified the Section 401 requirement on December, 17, 1999. (See Exhibit 8 attached hereto)

This certification was later revoked by the MPCA without the benefit of an independent investigation, as it appears the MPCA relied solely on the findings of the Army Corp in its decision to revoke the certification. (See Exhibit 9 attached hereto)

Plaintiff requested an administrative hearing regarding the MPCA's decision to revoke the 401 certification for the access road. At that hearing various government officials testified under oath. (See Exhibit 10 attached hereto) The administrative law judge approved the MPCA's decision to revoke the permit. (See Exhibit 11 attached hereto) Testimony at that hearing has direct bearing on issues in this case.

The Army Corp of Engineers denied Lake of the Woods Counties permit application for the access road although ordered Defendant alone to fully restore the access road. Lake of the Woods County, as applicant, did not appeal the decision or attempt to negotiate or resubmit a plan even though it represented to the Defendant it would appeal the decision. (See Exhibit 12 attached hereto) In fact, Lake of the Woods County did just the opposite. Lake of the Woods County then ordered lot owners to remove fill from their property. (See Exhibit 13 attached hereto)

It is clear Lake of the Woods County changed its mind concerning this project, when it came to having to question the federal governments admittedly controversial opinion regarding the extent

of wetlands in the area. First Lake of the Woods County supported the project, it is now assisting in destroying the project.

In an attempt to resolve the matter, Defendant offered a full 52 acres of prior converted cropland (PC) to be put into a conservation easement as on-site compensatory mitigation to offset the impacts of the access road. This parcel is located adjacent to the Sunny Beach subdivision and is therefore also adjacent to Lake of the Woods. The Army Corp rejected this proposal. Plaintiff is unaware of any negotiations initiated by Lake of the Woods County to keep the access road it now owned.

To further complicate matters, Defendant received the federal permit denial letter from the Army Corp with an attached document called a 'Request for Appeal'. (See Exhibit 8 previously submitted) The document indicated the appropriate appealing agency of the Permit Denial to be "Lake of the Woods County" due to the fact that the County had taken over the after-the-fact permit application and owned the road. (See Id. pg. 3) As the Request for Appeal was addressed to Lake of the Woods County, Defendant did not appeal the decision as the County had stated they would be appealing the decision. (See Exhibit 12 attached hereto) Lake of the Woods County did not appeal the decision. Defendant's later request to submit an appeal was denied by the Corp as untimely. A restoration order was issued by the Army Corp of Engineers to Defendant alone to remove a publically owned access road. Removal of this road would entirely prohibit access to the individual lots, many of which are owned by others.

In March of 2002, Defendant filed a civil action in the United States District Court for the District of Minnesota, seeking judicial review of the permit denial and the restoration order issued by the Army Corp of Engineers. That case was dismissed and Defendant was thrown into what is

known as The Tucker Act Shuffle. Private property owners whose rights have been trampled must choose between suing for injunctive relief in the federal district courts or monetary relief in the U.S. Court of Federal Claims, as the government argues that one court cannot decide on the relief sought until the other court has made a determination of the relief within that court's jurisdiction. As a result, citizens are 'shuffled' back and forth. Due largely to arguments utilized by the government in the Tucker Act Schuffle, the Defendants suit was dismissed.

Defendant has filed a claim against the United States in the Federal Court of Claims alleging the Corps decision results in an uncompensated taking of property. As a defense, the U.S. has claimed the MPCA is responsible for any alleged uncompensated taking as a result of it's revocation of the 401 certification. A convenient defense to a regulatory taking claim is pointing fingers at other regulatory agencies for the taking. Throughout this entire process, the governmental agencies have pointed fingers at one another when called to task for the legal consequences of their actions.

Meanwhile, Defendant has been subjected to legal action brought against him by one lot owner, and other lot owners have quit paying installments on the contract for deeds held by Defendant, subjecting him to financial losses. The entire development project previously approved by Lake of the Woods County is now being destroyed with the assistance of Lake of the Woods County. The County has abandoned maintenance the public road. Defendant alone has commenced litigation against the Federal government for this clear interference of property rights.

It is clear the restrictions placed on the subject property are such an extent that as of today, there is no economical viable use of "Sunny Beach" or in the alternative, the value of this has been substantially diminished. The Army Corps of Engineers desires the land to be sold to a state park or to a nature conservancy. (See Exhibit 14 attached hereto)

Individual lot owners who purchased the previously approved residential lakeshore property have lost access to their property due to the Corp's Order to remove the road. This is complicated by the fact that Defendant has no standing to have this federal Restoration Order judicially reviewed until the U.S. attempts enforcement.

It does not appear the federal government will enforce its restoration order issued to Defendant given the actions of Lake of the Woods and a high standard it must meet to achieve judicial approval of such a drastic action, due to Lake of the Woods County being comprised almost entirely of wetlands. Again, Defendant has no standing to question the decision of the Federal Government's decision to issue the restoration order until such time as an enforcement action is brought. This has not happened as of today.

Plaintiff's argument in the Federal Court of Claims alleging a taking is based upon the permit denial, a rare 'final agency decision' for the Corp. The Defendant is awaiting a decision on a motion for summary judgment to dismiss his complaint, filed by the United States, based upon the actions of the MPCA. The fact that Defendant sold these lots following the plat approval is now being used as a legal issue by the state on a standing issue as well.

The Army Corps of Engineers has further alleged it is the MPCA's responsibility that the road permit was denied, claiming the Corps was prohibited from permitting the project without State 401 Certification. The MPCA initially certified the road based upon representations made by Les Lemm and Gary Lockner in October 1999. That certification was revoked following the Corp's delineation of the property. Hence, all of the involved state agencies are pointing fingers at one another for this failed legislatively approved plat with no road access.

Since the final agency decision of the Army Corp was made, Lake of the Woods County has

denied all building permit applications, utilizing the decision of the Army Corp of Engineers for its denial.(See exhibit 15 and13 attached hereto)

The Defendant has provided this history as it is an important backdrop to the criminal charges before this Court.

As the situation exists to day, Lake of the Woods County permitted culverts in 'Sunny Beach', sold the culverts to individuals and then subsequently requires landowners to remove all fill. Lake of the Woods County directed the landowners how to place the culverts and fill, given the placement was within government property, i.e. the ditch. Lake of the Woods County directed and aided landowners to violate the WCA under its own argument it attempts to make concerning any alleged violation of the WCA.

Lake of the Woods County officials went so far as to not even accept an application for a holding tank from one lot owner given the controversial nature of this subdivision and government officials refused to even speak with the Defendant regarding anything to do with the development project. To say this project is a bungled administrative nightmare is an understatement.

Further, Lake of the Woods County abandoned the legally platted access road which has and continues to degrade. Without the access road, Defendant will not have reasonable and suitable access to Lot One which he retained as record owner.

After Defendant's receipt of the state restoration order for Lot 5 and, at the request of Lake of the Woods County at a board meeting, the Defendant submitted an application for no-loss exemption pursuant to the WCA on April 3, 2003. (See Exhibit 18 previously submitted) Lake of the Woods County has taken no administrative action on this application, completely ignoring its receipt, although Steve Sindelir, assistant environmental director, admitted receipt of the application

in his deposition on August 26, 2005. In fact, Lake of the Woods County made no response whatsoever to Defendant's application.

The Defendant received a tab charge executed by Tracy Hanson and Jeff Birchum, noted as assisting officer. Jeff Birchem is an conservation officer with the Department of Natural Resources. The tab charge alleges Defendant violated Rule 8420.0290, alleging the date of offense as October 1, 2004, charging Defendant with a violation of a restoration order for Lot 5 of Sunny Beach. Defendant did not place the fill which he has been ordered to remove. Upon information and belief, David Wolfe, the previous lot owner, placed the culvert and fill at the direction, and with the assistance, of Lake of the Woods County.

Further, Lake of the Woods County has directly placed fill in the real property known as 'Sunny Beach' without a permit and, utilizing the State's argument, this as well violated the "Wetland Conservation Act". No administrative or criminal charges have been commenced against Lake of the Woods County.

Lake of the Woods County placed fill in the access road of Sunny Beach and also cleaned ditches within this subdivision. Lake of the Woods County also placed a culvert along the northern boundary of the platted parcel, replacing a ditch which required a substantial amount of fill. The State of Minnesota did not issue a restoration order for this 'illegal' activity to Lake of the Woods County.

Defendant requests the criminal complaint be dismissed upon the following grounds and arguments.

**ANALYSIS**

ISSUE: The criminal charge in the above matter violates the equal protection clause of U.S.

Const. Amend. XIV and therefore the charges must be dismissed.

A Defendant can raise the defense of discriminatory enforcement by law enforcement officials on all levels of state criminal laws. City of Minneapolis v. Buschette , 307 Minn. 60, 66, 240 N.W.2d 500, 503 (1976).

It is settled law that under the equal protection clause of U.S. Const. Amend. XIV, persons accused of violating a regulatory law imposing penal sanctions are protected from an intentional discrimination in the enforcement of the law. See State v. Vadnais, 202 N.W.2d 657, 295 Minn. 17 (1972)(Reversing conviction and dismissing charge of parking a mobile home trailer upon land in violation of township ordinance due to undisputed failure of township to enforce law on others.) citing Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L. ed. 220 (1886).

"A conscious exercise of some selectivity in enforcement, based on a rational exercise of police or prosecutorial discretion or a mere laxity in enforcement, does not itself establish a constitutional violation. However, an intentional or deliberate decision by public officials, acting as agents of the state, not to enforce penal regulations against a class of violators expressly included within the terms of such penal regulation does . . . constitute a denial of the constitutional guarantee of equal protection of the laws." Id.

The discriminatory enforcement defense should be raised prior to trial by motion pursuant to the Minnesota Rules of Criminal Procedure. Because the issue does not go the guilt or innocence of the particular defendant, the matter should be heard and decided by the court prior to trial. See City of Minneapolis v. Buschette, 307 Minn. 60, 240 N.W.2d 500 (Minn.1976). The discrimination must be shown by a preponderance of the evidence. State v. Russell, 343 N.W.2d 36 (Minn.1984).

It is clear that under the State's own factual basis for this complaint against the Defendant,

Lake of the Woods County is a violator of the Wetland Conservation Act in the exact same 'wetland' it has been alleged Defendant and other landowners violated.

The technical evaluation panel has clearly refused to recommend the issuance of a restoration order to Lake of the Woods County as the panel is made of, in part, of the very people that issued the wetland fill applications, however, this does not abrogate the Defendant's equal protection rights. Further, this delay may very well have prevented it. In fact, the DNR may now be prohibited from pursuing enforcement against the County given the Statute of Limitations in effect.

The WCA has been enforced in a discriminatory manner which violates the equal protection clause of the Fourteenth Amendment because Lake of the Woods County has been treated differently under the WCA than other 'wetland violators' in Sunny Beach.

As a result of this discriminatory enforcement of a regulatory law, the State of Minnesota is precluded from prosecuting the Defendant until such time as it enforces the laws in a nondiscriminatory manner in accordance with the equal protection clause of the Fourteenth Amendment. Id. citing People v. Utica Daw's Drug Co. Inc., 16 App. Div. 2d 12, 225 N.Y.S. 2d 128, 4 A.L.R. 3d 393 (1962).

The State cannot dispute Lake of the Woods County has placed fill along the northern border of Lot 14 in its placement of a culvert extending from the access road to the lakeshore. The State has provided no argument whatsoever to redeem Lake of the Woods actions. No permit applications have been disclosed to the defense for the County's work, nor has the State disclosed restoration orders to Lake of the Woods county for any of it's activity.

LOW further placed fill in the form of gravel in the access road and conducted ditching activities parallel to the access road that would by all definition, violate the WCA. Lake of the

Woods County has not made application pursuant to the WCA for the placement of fill within 'Sunny Beach', or anywhere near Sunny Beach during its tenure of owning and maintaining the access road, nor before. In fact, Lake of the Woods County was found to have illegally filled adjoining portions of Sandy Shores Drive, which it admits, and has apparently applied for an after-the-fact permit with the Corps.(See Exhibit 13 previously submitted)

The DNR has not issued a restoration order to Lake of the Woods County. The State is clearly discriminating in its application of the law and this is a violation of equal protection as guaranteed by the Constitution. These facts, under the doctrine of equal protection necessitates dismissal of all charges.

ISSUE: The State is equitably estopped from enforcing the restoration order given the local government units bad behavior in the administration of this development project which led directly to the alleged wetland violation for which the State is now attempting to enforce. In the alternative the doctrine of entrapment bars this charge.

In Minnesota, equitable estoppel will be applied against the government in a criminal prosecution context. See State v. Liepke, 403 N.W.2d 252, 256 (Minn. App. 1987)(barring criminal prosecution for violations of zoning laws).

The general rule for establishing equitable estoppel is that a person must demonstrate inducement to rely, in good faith, on language or conduct resulting in injury, detriment, or prejudice. Ridgewood Dev. Co. v. State, 294 N.W.2d 288, 292 (Minn.1980). The simple fact of this case is that Lake of the Woods County created the situation as it exists today, and as a result of the representations of those officials, the State is estopped from enforcing its police powers.

Applying the law to the specific circumstances of this case, the State will be estopped from exercising its police powers when a property owner, (1) relying in good faith (2) upon some act or

omission of the government, (3) has made such a substantial change in position or incurred such extensive obligations and expenses that it would be highly inequitable and unjust to destroy the rights which he ostensibly had acquired. Id.

Ridgewood Dev.Co. is the Minnesota landmark decision examining the doctrine of equitable estoppel and vested rights. The vested right doctrine in Minnesota developed specifically to deal with State control over private development through the use of zoning provisions and building permits. (See Hawkinson v. County of Itasca 304 Minn 367, 231 N.W.2d 279 (1975).

The vested right doctrine and equitable estoppel are used by the Courts in Minnesota and else where as alternative ways of resolving developer/government relations in the land use context. See Generally Cunningham and Cremmer, vested rights, estoppel, and the land development process, 29 Hastings L.J. 623 (1978).

The major difference between the doctrines concerns the Courts focus. While a Court applying a theory of equitable estoppel investigates the loss of the developer if he is not permitted to finish the project, in vested rights analysis the Courts asks whether a developer has progressed sufficiently with his construction to acquire a vested right to complete it.

It is undisputed Lake of the Woods County platted this parcel of property as a residential subdivision and Defendant sold most of the lots. Nothing remained for the developer of this project following the approval by the County. Clearly, Defendant had a vested right to sell the parcels as platted, residentially zoned real estate with access.

It is undisputed the County owned the access road upon approval of the plat as they have admitted as much. (See Exhibit 5 previously submitted) The County was the applicant for the Army Corp of Engineers permit for the access road because of the approval of the Plat.(See Exhibit 14

previously submitted) It is undisputed the County has abandoned the road after the Corp of Engineers denied its permit application.(see exhibit 7 attached hereto) It is undisputed the County sold lot owners gravel and culverts and permitted the placement of these culverts and fill in the exact same wetland they are now alleging wetland 'violations' yet they permitted fill and actually placed fill within Sunny Beach in violation of State law. (See Exhibit 1 previously submitted)

Because the local government unit previously established this parcel of property as a platted residential subdivision, and Lake of the Woods County permitted these culverts, landowners have a vested right to be permitted to have access and reasonable use of their property.

The State has completely ignored landowners rights and Lake of the Woods County's actions regarding this piece of property and LOW's inducement, aiding and instructing of landowners to violate the WCA. Lake of the Woods County even sold Defendant the gravel for the access road.(See Exhibit 10 previously submitted) Clearly this is a case where the doctrine of equitable estoppel should apply.

The next analysis under vested rights further shows the fill should remain and not be removed. Ridgewood Development Co. v. State., 294 N.W.2d 288, 294 (Minn. 1980). In this context the court determines whether a developer has made sufficient progress with its project or created such binding commitments as to acquire a vested right to complete the project. Id.

As a general rule, a right becomes vested when it has 'arisen upon a contract, or transaction in the nature of a contract, authorized by statute and liabilities under that right have been so far determined that nothing remains to be done by the party asserting it.' Id. (quoting Yeager v. Delano Granite Works, 250 Minn. 303, 307, 94 N.W.2d 363, 366 (1957)) A mere expectation, desire, or intention to develop a property in a particular way is not sufficient to create a vested right.

Wermager v. Cormorant Township, 716 F.2d 1211, 1215 (8th Cir. 1983). To acquire a vested right, a developer must have progressed significantly with physical aspects of the project or made a binding commitment to develop the property. Id. Central to this case is the ability and right to access.

The Defendant undisputedly spent thousands of dollars on this development project. The County required the Defendant to post a bond in the amount of $10,000.00 to ensure the completion of the access road was up to County specifications. (See Exhibits 9 and 10 previously submitted) The Defendant spent $25,000.00 building the access road and thousands of dollars on surveyors to complete the plat. Defendant agreed to provide mitigation for lost wetlands. Clearly, these are not acts that rise to a criminal level.

The plat was legislatively approved and the access road transferred to Lake of the Woods County, through its acceptance of the final plat. LOW made a legislative determination to allow sewer systems on the property. Indeed, in a letter addressed to the County Board in support of Defendant's application to subdivide and plat the parcel know known as Sunny Beach, Environmental Services Director, Gary Lockner, specifically determined that sewers would be allowed.(See Exhibit 3 attached hereto) Further, in October, by way of a separate letter to the MPCA, Gary Lockner, and members of the technical evaluation panel provided the opinion there was at least 100 feet of upland along the shoreline which would support buildings and sewer systems. (See Exhibit 5 attached hereto)

It is clear, Lake of the Woods County administrators made a land use suitability analysis concerning 'Sunny Beach' plat wherein Lake of the Woods determined the lots were buildable lots prior to accepting the plat pursuant to Minnesota Rule 6120.35 which states:

6120.3500 SUBDIVISION PROVISIONS.

> Subpart 1. Land suitability. Each lot created through subdivision must be suitable in its natural state for the proposed use with minimal alteration. Suitability analysis by the local unit of government shall consider susceptibility to flooding, **existence of wetlands**, soil and rock formations with severe limitations for development, severe erosion potential, steep topography, inadequate water supply or sewage treatment capabilities, near-shore aquatic conditions unsuitable for water-based recreation, important fish and wildlife habitat, presence of significant historic sites, or any other feature of the natural land likely to be harmful to the health, safety, or welfare of future residents of the proposed subdivision or of the community.
>
> Minn. Rule 6210.3500 emphasis added.

Lake of the Woods County determined sewer systems would be allowed within the Sunny Beach plat prior to the final plat being accepted by the county board and made a legislative determination the land was suitable for building. The State then makes 'an about face' after lots were sold and determines no building will take place and all previous fill placed within Sunny Beach must be removed, in direct contravention to its original position and legislative determination.

Further, all building permit applications submitted have been denied. For example, after the final plat approval, Jamie Gowdy purchased Lot 10 on a contract for deed from Defendant. Mr. Gowdy then applied to Lake of the Woods County for a building permit. The application included an Individual Sewage Treatment System Worksheet drafted by a certified sewer designer that determined a mound system was feasible.(See Exhibit 17 attached hereto) The building permit was denied. (Id.)

The reasoning for the denial was that no sewers would be allowed on the property due to wetlands. The denial, dated October 11, 2001, reads:

> First of all, the US Army Corps of Engineers delineated Sunny Beach Plat and has determined that most of the plat, and all of Lot 10, is wetlands. County and MPCA regulations do not allow the permitting of septic systems in wetlands.
>
> Secondly, the US Army Corps of Engineers has reviewed the wetlands requirements for the road that was constructed to serve Sunny Beach Plat. It is the developer's responsibility to satisfy County, state and federal wetlands regulations. The Corps of Engineers has not approved the wetlands replacement plan that Gary Bailey, the plat developer, has submitted for the road. They consider the road to be in violation of their regulation, and may require that the road be removed and the wetlands be restored. Without the road the lots have no access.

First, Lake of the Woods County made a suitability analysis pursuant to 6120.3500 which requires a determination of whether sewers would be allowed then subsequently determined sewers would not be allowed. These contrary representations cannot be argued.

A governmental entity will be estopped only if it committed affirmative misconduct. Id. see also In re REM-Canby, Inc., v. Minn. Dept. of Human Servs., 494 N.W.2d 71, 74 (Minn. App. 1993). The government's act or omission must be tantamount to an affirmative misrepresentation. See Brown v. Minn. Dept of Publ. Welfare, 368 N.W.2d 906, 910 (Minn. 1985). The party must also demonstrate expenditures unique to the proposed project that would not be otherwise usable. Ridgewood Dev.Co. v. State, 294 N. 2d 288, 292 (Minn.1980)

There is no dispute that Lake of the Woods approved the plat for this subdivision, finding the proposed development buildable. All governmental agencies, including the DNR, received notice of the public hearing on that application to plat, no agencies raised a concern. The local government unit determined the land to be suitable for building pursuant to established rules. There was nothing left to be done by the Defendant.

The lots were sold and individual lot owners, relying on affirmative representations by Lake of the Woods County officials placed fill in their property. Lake of the Woods County sold the lot owners the culverts and gravel and specifically directed their actions with culvert permits. Criminal charges should be estopped as a result of the County's actions.

Moreover, an agent for the Board of Soil and Water Resources, Dale Krystosek, has testified under oath concerning the letter submitted to the MPCA by Gary Lockner which he had signed, that the representations in the letter were a 'misrepresentation' of his evaluation of 'Sunny Beach' and a misuse of information. (See MPCA Transcript p.165) Dale Krystosek and Les Lemm insinuated that Gary Lockner mislead them in the evaluation of this property and led them to an area of upland to conduct a soil boring. (See MPCA transcript p. 158 and 187-192) Criminal charges are clearly improper when a state employee has alleged misrepresentation of another government employee.

The Defendant has commenced suit against the State requesting a mandamus requiring the State to initiate inverse condemnation proceedings for an unconstitutional taking of private property. The regulations that have been placed on this property are such an extent that there remains no economical viable use to the property.

Clearly related to the instant action is a citizens freedom to use and enjoy their property. The State of Minnesota, through its various administrative, technical and enforcing agencies has made clear that this property may not be put to any sort of use due to a determination that highly valuable wetlands exist on the property that serve a valuable public purpose of protecting water quality and providing habitat to wildlife. Although this determination was made by a federal agency, the State has embraced this agency's decision. Most notably, the instant the property was determined to be such highly valuable wetland by the federal government, Lake of the Woods County began issuing

state based restoration orders for fill and culverts that Lake of the Woods County previously permitted. Should the State be allowed to proceed with this enforcement proceeding, lot owners will be left with residentially platted lakeshore property with no access to that property.

The State, through its enforcement proceeding is taking this property without just compensation in violation of the State and Federal Constitution.

As so stated in State v. Vadnais, "justice demands that a court must not lend itself to a prosecution which would abridge a fundamental constitutional right. To do otherwise would be to grant the right but in reality to withhold its privilege and enjoyment." citing Mapp v. Ohio, 367 U.S. 643, 656, 81 S.Ct. 1684, 1692, 6 L.ed. 1081, 1090 (1961). The regulations the local government unit has placed on this property as directed by the State, are such an extent there remains no economical viable use that the Defendant's development has been completely destroyed. Individual lot owners are further being constructively evicted from their own residentially approved real property as the removal of the gravel and culverts will effectively prevent access. As the Court is aware, access to ones property is a constitutional right as well.

Article I, Section 13, of the Minnesota constitution provides that "private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured." Minnesota Statutes § 117.025, subd. 2 (2000), defines "[t]aking and all words and phrases of like import" to include "every interference, under the right of eminent domain, with the possession, enjoyment, or value of private property." Property owners who believe the state has taken their property in the constitutional sense may petition the court for a writ of mandamus to compel the state to initiate condemnation proceedings. Gibson v. Commissioner of Highways, 287 Minn. 495, 498, 178 N.W2d 727, 729-30(1970) Defendant has pled this cause as no payment has

been made by any governmental agency to Defendant or anyone else. Still the State pushes for criminal enforcement, completely ignoring rights guaranteed by the Constitution.

The State should be equitably estopped for its failure to compensate as well.

The doctrine of equitable estoppel and vested rights is closely related to the defense of entrapment which the Defendant also alleges.

A Defendant established a prima facie case of entrapment where the defendant shows that the government agent initiated the offense that the defendant lacked the predisposition to commit the offense. State v. Lenorud, 412 N.W.2d 816 (Minn.Ct.App.1987) Defendant would argue that Lake of the Woods County providing a permit to David Wolf induced Wolf to place fill in Lot 5 in violation of the WCA. Defendant requests this Court dismiss this complaint due to the County's inducment.

The Defendant has no power to charge the government with criminal acts. Clearly, this gives the State inequitable power over the Defendant. The Defendant respectfully requests the Court dismiss these charges given the legislative and administrative actions and representations made by governmental personnel which Plaintiff and others have relied on.

ISSUE

The Restoration Order is an arbitrary and unreasonable decision given the fact the Defendant did not place any of the fill the DNR has ordered removed.

The restoration order in the instant action is arbitrary and unreasonable given that Defendant did not place the fill and culvert in Lot 5 the State has ordered him to remove. In fact, the Defendant did not own Lot 5 when the fill was placed. Further, some of this fill was placed in land owned by Lake of the Woods County i.e. the ditch and the placement of the culvert and fill was done at the

direction of Lake of the Woods County given the placement was on LOW's property.

The allegation for this criminal prosecution by the State of Minnesota stems from a restoration order issued to Defendant to restore Lot 5 of 'Sunny Beach' dated November 2, 2001 and executed by James DeVault, directing Defendant to:

> Remove all gravel and other fill material placed in the lot, as well as the approach and culvert, and deposit it in an upland location. After removal of the fill, the area will be leveled off even with the natural ground level. Vegetation will be allowed to re-establish naturally.

The Defendant did not own Lot 5 when the 'gravel and other fill material' and 'approach and culvert' was placed in Lot 5. Defendant had sold 13 of the 14 lots following final approval of the plat. David Wolf owned the property at the time the fill was placed on Lot 5.

The State is in all reality attempting to charge the Defendant with a 'crime' of another. The basis of the allegation must lie on an administrative conclusion the Defendant violated the Wetland Conservation Act. This conclusion is completely false. The Defendant did not place the fill in Lot 5, the State has absolutely no evidence the Defendant placed fill in Lot 5 of Sunny Beach and it is not expected the State will attempt to make such an allegation.

The State is attempting to create liability on the Defendant for a 'crime' of another. Liability for crimes of another is governed under 609.05 which states:

> Subdivision 1. A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime.

There is absolutely no evidence the Defendant aided, advised, hired, counseled or conspired with another to violate the WCA. Lake of the Woods County, however, did aid in the violation of laws by its filling activities and permitting illegal fill. There is no doubt the Wolfs actions were

directed by Lake of the Woods County. (See Exhibit 1 previously submitted) The State's basis for the restoration order is flawed and Defendant respectfully requests this Court dismiss the formal complaint.

CONCLUSION

This criminal case is yet another chapter in an ever evolving struggle governmental agencies attempting to cooperate with one another with an end result to be the enforcing agencies are turning a blind eye to the wrongful acts of other fellow agencies.

This is to say nothing of the bungled administration of this residential subdivision within onerous wetland regulations even the administrators themselves have claimed are impossible.(See Exhibit 19 attached hereto) This an a lone person attempting to protect property rights against numerous local, state and federal agencies focused on 'cooperation'.

It is indisputable property rights have been one of the trinity of fundamental values that has defined our Nation's commitment to the integrity of the person since its founding. The other two pillars are, of course, liberty and life. As the Supreme Court has stated, 'if . . . the uses of private property were subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed]." Lucas 505 U.S. at 1014 (quoting Mahon., 260 U.S. at 415).

The County and administrative officials are themselves to blame for any alleged wetland violation. Defendant cannot be held criminally liable for actions done by another person at the direction of local government officials. It is clear that Lake of the Woods County was once behind this development, supporting Mr. Bailey's endeavor of developing this property and representing this

property was developable. The local legislative history of this plat and zoning change was well developed.

The Defendant has been provided assurances by administrators only to have those same administrators turn around and allege he is a 'wetland violator'. Defendant respectfully requests this Court dismiss this case under the above analysis.

Respectfully submitted,

ALAN B. FISH, P.A.

Dated: October 11, 2005

Alan B. Fish, #238120
Rita Fish-Whitlock, #0310785
109 Second Street Northeast
Roseau, Minnesota 56751
(218) 463-2088
Attorneys for Defendant

\\Rita\c\Clients\BAILEY.X05\MEMORANDUM.075.wpd

APPEARANCES

On Behalf of the Plaintiff:
ALAN FISH, P.A.
102 2nd Avenue Northwest
Roseau, Minnesota 56751
By: RITA FISH-WHITLOCK, ATTORNEY AT LAW

On Behalf of the Defendant:
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
P. O. Box 663
Washington, DC 20004
By: JAMES D. GETTE, TRIAL ATTORNEY

Taken By: Ruth Ann Johnson, RPR



CONTENTS


| DEPONENT: | PAGE |
|---|---|
| APRIL STAVIG | |
| Examination by . . . Mr. Gette | 4 |
| Examination by . . . Ms. Fish-Whitlock | 68 |
| Examination by . . . Mr. Gette | 92 |
| Examination by . . . Ms. Fish-Whitlock | 96 |

EXHIBITS*

| EXHIBITS | MARKED |
|---|---|
| No. 1 -- Copy of letter to April Stavig from James D. Gette, 2-6-08, with attached subpoena | 5 |
| No. 2 -- Copy of Right-of-Way Easement | 13 |
| No. 3 -- Copy of payments made | 24 |
| No. 4 -- Copy of Basic Application with attachments | 38 |
| No. 5 -- Copy of letter to April Stavig from Les Lemm, 10-26-99 | 52 |
| No. 6 -- Copy of Restoration Order | 55 |
| No. 7 -- Copy of Petition for Appeal | 62 |
| No. 8 -- Copy of 1999 Fish Family Lake Lot Trust Position Statement | 67 |
| No. 9 -- Copy of Memo to Lake of the Woods County Board of Commissioners, 12-27-02 | 83 |


(*Exhibits attached to ttranscript.)



PROCEEDINGS

APRIL STAVIG,

of Roseau, Minnesota, called as a witness by the Defendant, being first duly sworn by Ruth Ann Johnson, RPR, a Notary Public within and for the State of Minnesota, was examined and deposed on her oath as follows:

EXAMINATION

BY MR. GETTE:

Q. Good morning, Miss Stavig. We met just earlier, my name is Jim Gette, I'm a lawyer with the Department of Justice. I represent the United States in a lawsuit that has been filed by Gary Bailey against the United States. As you're probably aware, you were subpoenaed to be here today for your deposition.

Let me first ask you, have you ever had a deposition taken before?

A. I don't recall.

Q. Okay. Given that, let me give you some ground rules, just so that the day goes as easy as possible.

As you can see, our court reporter



is taking down everything we say, which means that we need not to talk over top of each other. So I'll work very hard at not cutting off your answers and if you'll do the same in terms of letting me finish my questions before you answer. Is that okay?

A. Yes.

Q. Okay. The other thing is, is that it's really important that you understand my questions. If at any time you don't understand what I'm asking or any question isn't clear to you, just let me know that. Okay?

A. Okay.

Q. The only final instruction is that I tend to take a lot of breaks during depositions, but sometimes lawyers get kind of tunnel vision and we kind of just keep charging along. If at any time you feel like you'd like a break, just let me know and we'll take a break. Okay?

A. Okay.

MR. GETTE: Let's start by having this marked as Deposition Exhibit 1.

(Whereupon, Deposition Exhibit No. 1, Stavig, was marked for identification.)


©2008

Page 6

Q. (By Mr. Gette) I'm handing you what's been marked as Deposition Exhibit 1 for your deposition. Do you recognize this document?
A. Yes, I do.
Q. Okay. And is this a letter and a subpoena that was sent to you requesting that you appear for your deposition today?
A. Yes, it was.
Q. Okay. If you'll turn to the last page of that document. You see there's an Attachment A dash April Stavig, that is a list of documents that you were requested to bring to your deposition today. Did you review that list before coming to your deposition today?
A. Yes, I did.
Q. Okay. And did you endeavor to collect documents that were responsive to that list?
A. Endeav -- oh, yes I did.
Q. Okay. Let me ask it a little more, did you collect documents that you thought were responsive to this list?
A. Yes, I did.
Q. Okay. And did you bring all of the

Page 7

documents that you thought were responsive to this list to your deposition today?
A. Yes, I did. All documents that I had in my possession.
Q. Were there any documents that you thought might be responsive to this request that were not in your possession?
A. There could be. I'm not sure if I have the abstract. I don't believe I do.
Q. Anything else?
A. I don't believe I still have a copy of the original contract for deed that was recorded with the Lake of the Woods County Courthouse.
Q. Did you have a copy of that deed at one point in time?
A. At one point I did, yes. Sorry.
Q. And what did you do with that deed?
A. I do not recall.
Q. Are there any other documents that you believe might be responsive to this list that you did not bring with you today?
A. I've got approximately six months worth of bank statements, the most recent ones, that are still in my possession, that are in my

Page 8

to do pile, that I have not had a chance to sort through, but those can be made available to you as well.
Q. Okay. And anything else?
A. Nothing that I can recall.
Q. That's good, you can set that aside.
A. Okay.
Q. Now I'd like to ask you some questions regarding the Fish Family Lake Lot Trust. When was that trust established?
A. It was established shortly before we signed the contract for deed agreement purchasing the property.
Q. And is the property you're referring to Lot 14 in the Sunny Beach Plat on Lake of the Woods?
A. Yes, it is.
Q. Who created the trust?
A. Who created the trust, specifically?
Q. Well, let me ask this first. Who are the beneficiaries of the trust?
A. The beneficiaries of the trust are myself, April Stavig, and three of my relatives, their names are Edward Fish, Kevin Fish and Alan Fish.

Page 9

Q. And what is your relationship to each of the other three beneficiaries?
A. Edward Fish is my first cousin.
MS. FISH-WHITLOCK: I'm going to be objecting as to relevancy at this point.
Q. (By Mr. Gette) Okay.
A. Kevin Fish is my first cousin.
MS. FISH-WHITLOCK: Same objection.
A. Alan Fish is my brother.
Q. (By Mr. Gette) Now was the -- well, let me ask it more broadly. What was the purpose of establishing the trust?
A. I guess I don't understand.
Q. Okay. Was the trust created solely to purchase this property?
A. It is my understanding that, yes, it was.
Q. Okay. Does the trust own any other assets?
A. With the exception of a small amount of money held in a checking account, no.
Q. And do each of the four beneficiaries hold an equal interest in the trust?
A. I'm not sure. I, I'm not sure if I

Page 10

can answer that question.
Q. Do you have any documents that evidence the creation of the trust?
A. Yes, I believe that we do have the trust document.
Q. When you say we, who do you mean?
A. It's held between, some of the documents are, were in my possession, some of them were in the possession of my brother Alan Fish.
MS. FISH-WHITLOCK: That's within our office. And you should be aware that at this point we are, I am here in a representative capacity of Gary Bailey, I'm also here in a representative capacity of the Fish Family Lake Lot Trust.
MR. GETTE: Okay. So you are representing the witness at this deposition today?
MS. FISH-WHITLOCK: Yes, I am.
Q. (By Mr. Gette) Okay. Now, Miss Stavig, am I correct that you are a trustee of the trust?
A. That is correct.
Q. Are there any co-trustees?

Page 11

A. Yes, there is.
Q. Okay. And who are the co-trustees?
MS. FISH-WHITLOCK: I'd object to relevancy.
Q. (By Mr. Gette) You can still answer it.
A. Alan Fish is a co-trustee.
Q. Any others?
A. No.
Q. Okay. Do, do all of the beneficiaries use the property from time to time?
A. Yes, they do.
Q. And I'd like to ask you a little bit about the current use of the property. Let's start with you. How, currently, are you using the property?
A. Specifically, in the recent past or in the past year, 12 months, do you mean?
Q. Well, let's start with the past 12 months.
A. Myself, I've used it to take my family out camping and we use it for family gatherings.
Q. In the last 12 months, how many

Page 12

times would you say you've taken your family to the property?
A. I would say at least a dozen.
Q. And when you say camping, do you use a camper, tents or both?
A. We have used both.
Q. And do you personally have a camper?
A. Yes, I do.
Q. Okay. What kind of camper is that?
A. It's a travel trailer, pull-behind.
Q. And do you take that to the property when you go camping?
A. Yes, I do. Most of the time.
Q. And do you -- I assume that most of the camping is during the summer months?
A. Yes.
Q. And do you leave the camper up there during the summer?
A. Occasionally, for short periods of time.
Q. Okay. Other than camping, is there any, and other than family gatherings, is there any other uses of the property in the last 12 months?
A. I think my husband went bird hunting

Page 13

up there last fall.
Q. Do you know what he hunts for?
A. Grouse.
Q. Do the other beneficiaries of the trust also go camping on the property?
A. Yes, they do. I've seen them all camping there when I've been there.
Q. And does each of them have a camper?
A. Yes, they do.
Q. Okay. So there are times in fact that you'll have four campers on the property at a given time?
A. Yes.
Q. Okay. Is there electrical service to the property?
A. Yes, there is.
MR. GETTE: I'd have this marked as Deposition Exhibit 2.
(Whereupon, Deposition Exhibit No. 2, Stavig, was marked for identification.)
MR. GETTE: Rita, this is a document I got yesterday, so you're welcome to take a look, but it's the only copy that I have.
MS. FISH-WHITLOCK: This was for North Star.

Page 14

Q. (By Mr. Gette) Miss Stavig, I'm handing you what's been marked as Exhibit 2 to your deposition. Take a moment and look at that and let me know if you recognize that document?
A. Yes, I do.
Q. Okay. What is that document?
A. It's a right-of-way easement for, to allow North Star Electric to install electric service to our property.
Q. Okay. And it looks like that deed was executed in March of 2000. Is that correct?
A. That's correct.
Q. Okay. And were you involved in arranging the easement so that North Star could provide electricity to the property?
A. My involvement consisted of contacting North Star Electric and requesting electric service to the property.
Q. Okay. Did the folks at North Star tell you that they would be filing an easement to accomplish that?
A. Yes, they did.
Q. And did you give them your approval

Page 15

to have that easement filed?
A. Yes, I did.
Q. Now when was the electrical service established?
A. I do not recall exactly when it was installed. I would imagine, or I would guess that it was shortly after this easement document was signed.
Q. And is the electrical service simply on a pole so that you can hook your campers up to the electrical outlet, is that how that works?
A. There is a main service that comes onto the property, that the meter is attached to, and then we have a pigtail, underground line running north and south within the property where we have, oh, let's see, three RV posts with RV hookups and the electrical services attached.
Q. Now we talked about how often you visited the property in the past 12 months. What about the other beneficiaries, how often would you say that they have visited and spent time on the property?
A. I could not say, because I wasn't on

Page 16

the property at the same time that they were, necessarily. I would, I would, I would say probably almost or as much as I did.
Q. Now we talked about the past 12 months. Prior to the past 12 months, has your use of the property, in terms of number of visits, changed in any appreciable respect?
A. Well, there's been a few years where we've had some weather in the summer months where either you couldn't be out there because of the bugs or it was just simply too cold or the lake levels were too high to make it not conducive to swimming. But that was very few, I mean, I don't think it was more than a couple of years over the span of the last nine that we've owned it.
Q. So is it fair to say that any changes in the frequency of use of the property by you and your family has been dictated by weather conditions predominantly?
A. For the most part, weather would be the only thing that would change our use of the property, yes.
Q. And other than as a result of weather, has there been any change in use of

Page 17

the property by the other beneficiaries over the years?
A. Not that I'm aware of, no.
Q. I just want to ask you a few questions about yourself, actually.
A. Um-hum.
Q. What is your profession?
A. I actually have two professions. I'm a real estate broker and I'm an accountant. I do income tax preparation and bookkeeping for local businesses.
Q. Must be getting into the busy time of year for you?
A. I'm very busy right now.
Q. Okay. How long have you been a -- are you a, you may have said this, are you a licensed real estate broker?
A. Yes, I am.
Q. And is that licensed by the state of Minnesota?
A. Yes, it is.
Q. Okay. And how long have you been a licensed real estate agent in the state of Minnesota?
A. Agent meaning broker or salesperson?

Page 18

Q. Are there two different sorts of licenses?
A. Yes, there is.
Q. Okay. Educate me a little here again. What are the two different kinds of licenses?
A. There's real estate broker and there's real estate salesperson.
Q. And have you held both different types of licenses at different times?
A. Yes.
Q. Which license did you obtain first?
A. My real estate salesperson's license.
Q. When did you obtain that license?
A. I think it was 1997 or 1998.
Q. And then at some point after that -- well, let me ask you this.
Is it, are there greater responsibilities that come with a broker's license as opposed to a salesperson's license?
A. Yes, there is.
Q. Okay. And at some point in time did you step up to a broker's license?
A. Yes, I did.

Page 19

Q. Okay. And when did that occur?
A. In 2006.
Q. How long have you lived in -- well, let me ask you this. Where, your year-round residence, where is that located?
A. Within the city limits of Williams, Minnesota.
Q. And can you give me the actual address?
A. My home address is 410 Pine Street.
Q. Okay. And how long have you -- is that in -- what county is that in?
A. Lake of the Woods County.
Q. And how long have you lived in Lake of the Woods County?
A. Off and on or consistently?
Q. When did you first move to Lake of the Woods County?
A. I first moved to Lake of the Woods County when I was six years old.
Q. And would it be fair to say it's been your predominant residence over the years since then?
A. Yes.
Q. How did you come to be aware of the

Page 20

property on Lake of the Woods that we've been discussing?
A. The real estate company that I worked for, as a salesperson at the time, had an open listing on this property, meaning that our real estate company as well as most other real estate companies in Lake of the Woods and Roseau County were able to market and sell these lots on behalf of the owner.
Q. And what real estate agency was that?
A. That was Lake Country Realty.
Q. And are you still affiliated with Lake Country Realty?
A. Yes, I am.
Q. And what's your relationship?
A. I'm the broker-owner of Lake Country Realty.
Q. You said as an open listing you could market and sell on behalf of the owner. Is it fair to say, then, that in any transactions that you brokered, you represented the seller as opposed to the buyer?
A. In this particular transaction, I was a salesperson for Lake Country Realty. I

Page 21

also was the listing agent, so I was representing the seller in this transaction when we purchased the last available lot in this plat.
Q. And your lot was numbered Lot 14, correct?
A. That's correct.
Q. And was I right to understand this was the last lot to sell?
A. Yes, it was.
Q. Okay.
A. That was available for sale.
Q. Do you know whether the owner had retained any lots?
A. I believe he did retain a couple of lots.
Q. How many of the lots did Lake Country Realty broker?
A. I don't recall.
MS. FISH-WHITLOCK: If you don't know, at that time she wasn't the owner of the business at that time, if you don't know, you don't know.
A. No, I don't recall.
Q. (By Mr. Gette) That's fine. And

Page 22

anytime I don't know or I don't recall is a fine answer. Okay?
A. Um-hum.
Q. Great.
What was the purchase price of Lot 14?
A. The purchase price was $25,000.
Q. And was the purchase financed in any way?
A. Yes, it was.
Q. How was that?
A. It was financed by the seller, Gary Bailey, with a contract for deed.
Q. I'm going to show you what's been previously marked as Bailey Deposition Exhibit 41.
MS. FISH-WHITLOCK: Are you going to be entering this as a deposition exhibit here?
MR. GETTE: I think we'll just refer to it as a prior designated exhibit.
Q. (By Mr. Gette) Showing you that exhibit that's been marked as Bailey Deposition Exhibit 41. Do you recognize that document?
A. Yes, I do.
Q. What is that?

Page 23

A. I believe that is the contract for deed that Gary Bailey and myself signed to purchase Lot 14.
Q. And that indicates a, a sales price of $25,000, correct?
A. Yes, it does.
Q. Okay. And does it also indicate a down payment of $2,500 had been made?
A. Yes, it does.
Q. Okay. And is it your recollection that that $2,500 had indeed been paid at the time that you entered the contract for deed?
A. Yes, it was.
Q. Okay. How did the trust collect the, the money that it used to, to enter into the purchase agreement?
A. As far as I know, the four recipients of the trust all came up with the funds necessary between the four of them to produce the down payment and the closing costs.
Q. And since that point in time, since the point in time when the contract for deed was entered, has the trust continued to make payments under the contract for deed?
A. Yes, it has.

Page 24

Q. Okay.
MR. GETTE: Let me have this marked as Deposition Exhibit 3.
(Whereupon, Deposition Exhibit No. 3, Stavig, was marked for identification.)
MR. GETTE: Do you need to see that?
MS. FISH-WHITLOCK: No, that's fine.
Q. (By Mr. Gette) Okay. I'm handing you what's been marked as Deposition Exhibit 3. Do you recognize that document?
A. Yes, I do.
Q. What is that document?
A. That is a document that I produced from my QuickBooks program yesterday showing the records that I have of the payments that were made to Gary Bailey for the contract for deed for the purchase of the property.
Q. And is it fair to say that the payments indicated there began in July of 1999?
A. I believe that was when the first installment payment became due.
Q. And how often are payments made?
A. They are scheduled to be made every three months.
Q. And has the trust been paying them

Page 25

on time every three months?
A. No, they have not.
Q. Okay. And how often have the payments been untimely?
A. Oh, I guess it depends on what time of the year it is. When it gets close to the spring, everybody seems to hurry up and catch up on their payments.
Q. Was there ever a point in time when payments ceased or were they simply late at certain times?
A. They were simply late. I've got one or two people in my trust that just don't pay on time, so we, we're not able to gather the funds together to make the payments to Mr. Bailey.
Q. Okay. We won't call those folks out at this point.
And it appears that the quarterly payments that are made are in the amount of $894.88. Is that correct?
A. Yes. That's the payments that we've been making for the last several years.
Q. Okay. How many remaining payments are there before the contract for deed will be

Page 26

paid in full?
A. Oh, 40 payments, and there's, it appears that there is 34 payments made, so -- (no further response.)
MS. FISH-WHITLOCK: Do you know the payoff of the contract for deed at this time?
MR. GETTE: Objection.
THE DEPONENT: No, I don't.
MR. GETTE: Objection. I have a question pending. Don't instruct the witness while a question is pending. If you have an objection, that's fine.
Q. (By Mr. Gette) From the document that's been marked as Deposition Exhibit 3, does it appear that 34 payments have been made to date?
A. Yes, it does.
Q. Okay. And under the contract for deed are there 40 payments due?
A. Yes, there is.
Q. Okay. Now Deposition Exhibit 3, in the final column on the page indicates what appears to be a running balance of the funds owed. Is that correct?
A. That running balance is not correct.

Page 27

Q. Okay. And that's why I asked. At the bottom it appears that there's actually a negative balance owed. I assume that that is not correct?
A. That's, you're correct, that is not correct.
Q. Okay. See if we can get one more doc -- one more correct in there.
When the trust purchased the lot, what was the intention of the trustees, on behalf of the trust, in terms of development, if any, of the property?
MS. FISH-WHITLOCK: Objection, vague.
A. I guess we didn't really have any, anything absolute. We were hoping to be able to develop it, being that we did purchase this property with the understanding that it was a platted residential lot, and, unfortunately, it didn't turn out that way. After we purchased it, we started being told by local units of government that we could not use the property for its intended purpose.
Q. (By Mr. Gette) And when you say develop the property, what do you mean by that?

Page 28

A. Whatever development we, the four of us would agree upon.
Q. At the time of purchase you didn't have a specific development plan then. Is that fair to say?
A. Nothing on paper, no.
Q. As a beneficiary and trustee of the trust, did you have anything in your mind regarding what you hoped in terms of development for the property?
A. I was hoping that we could build on the property and improve the value.
Q. And what specifically did you consider building?
A. For its intended purpose, when the county platted and approved the plat, residential development.
Q. You said that you were apprised at some point by local units of government that it could not be developed for its intended purposes?
A. Yes.
Q. Specifically, who told you that?
A. Mr. Gary Lockner verbally informed me of that the first time I went in to try to

Page 29

get a building permit.
Q. When did you first attempt to obtain a building permit?
A. I do not recall, but it was early on in the ownership of the property.
Q. Did you submit an application for a building permit?
A. Eventually, yes, we did submit an application, an after-the-fact permit.
Q. Let me go back to the point in time when you met with Mr. Lockner. Did you actually submit an application for a building permit at that time?
A. No, I did not.
Q. And why did you not submit a building permit application at that time?
A. Because he verbally informed me that he would not accept one.
Q. Had you prepared a building permit application to submit at that time?
A. No. I had asked for an application and he told me at the time that he was not going to accept it, so I didn't have the application to submit.
Q. Okay. Did he tell you why he would

Page 30

not accept an application for a building permit?
A. He did, but I do not recall exactly what his reasons were.
Q. Do you recall generally?
A. No, I don't.
Q. And, again, you said that this conversation took place sometime in the early period of ownership of the property?
A. Yes, it did.
Q. Were there any other individual or government units that said that you could not develop the property?
A. Yes, there were. In so many words there were. We've received notices from the DNR, Department of Natural Resources, and the United States Army Corps of Engineers and Lake of the Woods County.
Q. Other than that conversation that we've already talked about between you and Gary Lockner, have you had any other conversations with him regarding development of the property?
A. I believe I've had one or two conversations with Mr. Lockner that was early on in the ownership of the property. Mr.

Page 31

Lockner retired shortly after we took title to the property and they had a new environmental services officer in place at the time.
Q. Do you know his name?
A. I believe Steve Sindelir took over for Mr. Lockner for a period of time and then Mr. Josh Stromland took over for Mr. Sindelir.
Q. And did you have conversations with either of those gentlemen regarding development of the property?
A. Yes, I have.
Q. Okay. Let's start with Mr. Sindelir. When did you first discuss development of the property with him?
A. Shortly after Mr. Lockner retired.
Q. And what was your purpose for talking to Mr. Sindelir?
A. I do not recall, but all of my conversations with Lake of the Woods County Environmental Services have dealt with attempts to obtain approval to improve the property.
Q. And, again, here, when you say develop the property, what specifically do you mean?
A. Whatever we could do. We've

Page 32

attempted to request information to install a septic system, we've attempted to request information on what permits we needed, if any, to install a driveway and a parking lot.
I have requested information on our electric service installation.
I have also requested information about the possibility of installing a boat access for the property.
And I have requested information for obtaining a building permit for construction of a residential building.
Q. Were you ever provided applications or application instructions for any of the various development plans that you just listed for me?
A. Sometimes I was provided applications and sometimes I was told I was not going to be provided applications.
Q. Other than Mr. Lockner, who has told -- what individuals have told you that they would not provide you applications?
A. Mr. Lockner, Mr. Stromland and Mr. Sindelir.
Q. Talk a little bit about the

Page 33

different development items that, that you listed. You first talked about the possibility of installing a septic system. When did you first approach local government officials about a septic system?
A. That was when Mr. Lockner was still employed with Lake of the Woods County.
Q. And what did Mr. Lockner tell you with respect to septic system installation?
A. He said he would not allow any septic systems to be installed on that property.
Q. Did he tell you why?
A. I don't recall his reasons why.
Q. Did you ever retain any professionals to design or provide you consultation on design of a septic system?
A. I was actually told by the Lake of the Woods County Board of Commissioners to, that I could work with Mr. Steven Sindelir and the wetland people in Bemidji, I can't remember their names. BWSR, Board of Soil and Water Resources.
The two were instructed to work with me to develop a plan that could meet the

Page 34

approval of the DNR and the Army Corps of Engineers and Lake of the Woods County.
After several attempts to meet with the Board of Soil and Water and Mr. Sindelir, and several canceled meetings that were canceled by Mr. Sindelir, I stopped making attempts to meet with them.
Q. So is it fair to say that no meetings of the type you just described ever took place?
A. That is correct.
Q. Okay. When you say Lake of the Woods county commissioners told you, did they tell you at a meeting of the commission itself or were these individual members telling you that this group would work with you?
A. This was, this was told at our hearing that we had for our permit application that was denied by the county board of commissioners.
Q. Okay. Initially I'd asked you a question regarding whether you had retained anyone to assist you in the design or consult with you on the design, and I want to go back to that question, because you gave me very

Page 35

important information, but I don't think you quite answered that question.
Did you actually hire someone on your own to provide you any consultation or designs for a septic system on Lot 14?
A. I hired no private companies, no.
Q. Aside from government officials, have you ever asked anyone to investigate the possibility of constructing a septic system on Lot 14?
A. Yes, I have.
Q. And who is that?
A. I have spoken to one individual who is, was at the time a licensed septic installer and designer, and he indicated to me that he believed that we could put a holding tank on the property.
Q. And who is that individual?
A. His name is Tim Fish.
Q. Any relation?
A. He's one of my cousins.
Q. Did he -- let me ask that differently.
Had he ever been on the property?
A. I, I'm not sure.

Page 36

Q. And when he referenced holding tank, did you understand that to be the kind of tank that has to be emptied periodically and taken off site?
A. A holding tank, from what I understand, is generally a tank that is buried in the ground and is pumped periodically.
Q. And do you know whether there are any state restrictions that would prevent you from using a holding tank on Lot 14?
MS. FISH-WHITLOCK: Objection, it calls for a legal conclusion.
Go ahead.
A. I don't know. I was told there wasn't, but, again, I, I don't know for absolute certain if there is or not.
Q. (By Mr. Gette) And when you say you were told there wasn't, who told you that?
A. I don't recall that, but it was somebody that, at the time, would have had knowledge of, of the rules. I've talked to, well, many people and I'm fairly certain it was someone who was licensed as a designer or an installer. I've spoken to a few of them informally.

Page 37

Q. What individuals, who are licensed installers, have you spoken to informally?
A. Besides Tim Fish, I'm not absolutely sure which ones, which other ones I've spoken to. It's been many years since I've worked with this.
Q. Go back to the payments that the trust has made to Mr. Bailey. It appears that there may be another year and a half worth of payments to go. Does the trust current -- strike that.
Is it currently the trust's intention to complete its payment obligations under the contract for deed with Mr. Bailey?
A. Yes, it is.
Q. Are you aware that there is a road that was constructed by Mr. Bailey that runs adjacent to Lot 14?
A. There are two roads that run adjacent to Lot 14. You would have to be more specific about which road you're speaking of.
Q. Okay. I mean the road that runs north-south.
A. It is my understanding that Mr. Bailey constructed it. I was not present and I

Page 38

didn't have knowledge of it at the time. I believe that was, that was put in before these lots were put on the market.
Q. Okay. Now to access your lot, do you need to use the road that runs north-south that you understand Mr. Bailey may have installed?
A. No, we don't.
Q. Okay. It's fair to say you access it from an east-west road that comes off of Sandy Shores Drive?
A. That's correct.
MR. GETTE: Have this marked as Deposition Exhibit 4.
(Whereupon, Deposition Exhibit No. 4, Stavig, was marked for identification.)
Q. (By Mr. Gette) Miss Stavig, I'm handing you what's been marked as Deposition Exhibit No. 4. Do you recognize this document?
A. Yes, I do.
Q. Okay. What is that?
A. That is the application that was given to me by Lake of the Woods County Environmental Services for an after-the-fact permit I was told I had to have.

Page 39

Q. Who told you you had to have that permit?
A. Lake of the Woods County Environmental Services told me this.
Q. And do you recall which individual there?
A. No, I do not. It may have been Steve Sindelir, I don't recall which one of them was in charge at the time.
Q. Okay. You'll notice that in the lower right-hand corner there's some numbers stamped LWC followed by a number.
A. Um-hum.
Q. I think those are numbers that were added for purposes of a separate lawsuit.
A. Um-hum.
Q. But just for ease of reference, if you turn back to the one that ends in 364.
A. Okay.
Q. Okay. What is that page?
A. It appears to be a partial plat map of Sunny Beach.
Q. And does that show your lot?
A. Yes, it does.
Q. And it appears that there are some

Page 40

lines that have been drawn onto Lot 14. Did you prepare that drawing?
A. I do not recall.
Q. Do you recall seeing this drawing when you submitted your application for a permit?
A. I'm absolutely sure that I probably did see it at the time, being that I was the one that submitted this application.
Q. Okay. Is -- could you tell me what the drawing on Lot 14 represents?
A. I believe it represents the gravel that we installed on the property, the area that we installed the gravel on so that we could park our campers and vehicles on the property.
Q. Okay. And it looks like there may also be a, a small driveway to access that parking area. Is that correct?
A. Yes.
Q. Okay. Did the trust have gravel installed for purposes of creating the parking area and the driveway?
A. Yes, we did.
Q. When did the trust do that?

Page 41

A. I would have to look at my check register to know that exact time. It was very early in the ownership of the property, though.
Q. Is your check register something that you brought with you today?
A. Yes, it is.
Q. Okay. Let me hand you the documents you brought with you and ask you to see if you can locate that?
MR. GETTE: And, actually, this is as good as any time for a quick break, so why don't we go off the record.
(Whereupon, a brief recess was taken.)
MR. GETTE: Let's go back on the record.
Q. (By Mr. Gette) Okay. Miss Stavig, while we took a break, you were nice enough to look through the documents that you brought with you and it appears that the check register that you referenced is not among those documents. Is that correct?
A. That's correct.
Q. Okay. I'll just ask you, if you could, we made arrangements before we went on

Page 42

the record to have you copy some of the documents after we leave here today and provide those. If you could please just provide a copy of that register at that time.
A. I can do that, that's not a problem.
Q. Okay. Great.
We were talking about some gravel installation on the property. Did you contact anyone, any of the local government officials, to request permission to install that gravel or to seek a permit before the installation of the gravel was completed?
A. No. I wasn't aware that we needed a permit at the time. It was my understanding that we just needed a permit to build, not to bring gravel on the property.
Q. And prior to the installation of the gravel, was there any clearing done on the property to create the parking area?
A. Yes. The first year we owned it we did clear some brush and a few trees, not very many.
Q. And when you say we, who actually did that work?
A. The four of us that are the

Page 43

recipients of the trust and our spouses and family members.
Q. And had you obtained any permits to conduct clearing on the property?
A. No. We weren't aware we needed any.
Q. Now I'd like to go back to what's been marked as Exhibit No. 4, which has the drawing on it.
A. Um-hum.
Q. And you see next to Lot 14 there's a corridor that's marked Public Access. Do you see that?
A. Yes.
Q. And is that the road from which you gain access onto Lot 14?
A. Yes, it is.
Q. And does that road go all the way down to Lake of the Woods?
A. It goes all the way to the high water mark of the lake, yes.
Q. And is there a boat access at the end of that road?
A. Well, it depends on who you're talking to. No, really, no, there isn't.
Q. So there's no boat ramp for example?

Page 44

A. No. No, no developed ramp.
Q. Have you seen individuals put in there?
A. A few brave ones, yes.
Q. From your property, how far would you need to go if you wanted to put a boat into the water?
A. Well, we could put a boat into the water on our property, depending on the slope of the sand and that, the time of year, the water level. Otherwise we would have to drive approximately three miles north to Long Point Resort or we could go to Winterset, which is approximately two miles south, there's a private boat ramp there that we could probably access. We've never used it, though.
Q. Okay. Do you have a boat?
A. Yes.
Q. Where do you usually put in?
A. Anywhere where the fish are. Zippel Bay, the Rainy River, Wheeler's Point boat access, Long Point. We have several different areas of the lake we've used our boat, the public access.
Q. Okay. And at Long Point Resort, you

Page 45

indicated, is there a boat ramp there?
A. Yes. It's a private boat ramp.
Q. Is there a fee for the use?
A. Yes, there is.
Q. Okay. What is the fee?
A. The last time I was there I think it was $5.
Q. And you said there's also a private boat ramp about two miles south of your property. Is that correct?
A. Yes.
Q. And is there a fee to use that?
A. I don't know. I've never used that one.
Q. Okay. What about at Zippel Bay, is there a fee there?
A. Yes, there is.
Q. What's the fee at Zippel Bay?
A. Whatever the daily park fee is. I think it goes up every year.
Q. So as long as you pay the park fee you can also use the boat ramp?
A. Yes.
Q. And what about at Wheeler's Point, is there a fee there?

Page 46

A. No, there's no fee.
Q. Do you know who maintains -- is there a boat ramp at Wheeler's Point?
A. Yes. That's a DNR boat ramp.
Q. Okay. And how far is that from your property?
A. I suppose 15 miles, I'm guessing.
Q. Do you own or rent a boat slip anywhere for your boat?
A. No.
Q. Have you ever?
A. No.
Q. If you wanted to, what's the closest marina facility you could use for that?
A. I don't know. I know there's some on the Rainy River. I don't know if any of the resorts closer to our lake lot offer that service or not.
Q. Prior to the trust's purchase of the lot, did you have any conversations personally with Mr. Bailey?
A. Prior to purchase?
Q. Correct.
A. I believe I did in the capacity of inquiring about the purchase of the property.

Page 47

Q. And did you ask Mr. Bailey if the lots could be developed?
A. I don't recall asking that question.
Q. Okay. Without having asked the question, did that subject come up, to your recollection, in your conversation with Mr. Bailey?
A. Not that I can recall, no.
Q. Did you discuss the road access to the lots with Mr. Bailey?
A. Not that I can recall.
Q. Tell me what you do recall about that conversation with Mr. Bailey.
A. I think mostly it was just about negotiating the, the terms of the contract and whether or not he'd be willing to take us on as buyers, because it was my understanding that these were platted residential lots, so I didn't feel it necessary to go into anymore detail and questions about buildability, because I assumed they were buildable.
Q. How did you become aware that these were platted residential lots?
A. There was a story in the newspaper. I was also an abstractor at the time and so I

Page 48

had access to Lake of the Woods county recorder's office and I reviewed the plat, the preliminary plat at the time there, and I was familiar with the progress of it, because I was interested in, in buying one of them.
Q. So is it fair to say that your interest developed even before Mr. Bailey had listed them for sale?
A. Yes. As a, as a buyer I was interested, I knew that they were going to be platted and that the county was just in the process of approving the plat and so that -- and then I'd been told through the grapevine what Mr. Bailey was planning on asking for the lots, so I decided at this time that I was probably going to be interested in purchasing one of them.
Q. Turning back to Exhibit No. 4, which you have in front of you, which was an after-the-fact permit application. Is that correct?
A. That's correct.
Q. And other than that permit application that's been marked as Exhibit No. 4, are there any other permit applications

Page 49

that the trust has actually filed for Lot 14?
A. Not that I'm aware of, no.
Q. Have you -- let me ask it separately.
Has the trust ever had any design drawings prepared for residential development on the property?
A. No, we've never done that.
Q. Okay. Have you had any design drawings done for any other type of development on the property?
A. No.
Q. Previously we talked about a conversation with Mr. Lockner in which he indicated that he would not accept a permit application for the property and then you also indicated that Mr. Sindelir and Mr. Stromland had, at different times, similarly made such indications. Is that correct?
A. No, that's not correct.
Q. Okay. It is correct that Mr. Lockner at some point in time told you he would not accept an application for a permit. Is that correct?
A. That is correct.

Page 50

Q. Okay. Did Mr. Sindelir make any similar representations to you?
A. He discouraged me. He was not helpful and he seemed unwilling to provide any information on the development or -- of this property.
Q. Did you ever ask him why he was being unhelpful?
A. Yes, I did. And I think, I don't recall his exact words, but I believe that he knew that the county was probably going to have legal issues over this controversy with the plat being approved and then the owners not being able to develop it, and he was kind of, I believe he kind of probably felt that he was getting put in the middle of this, so he was very hesitant to offer any information.
Q. Did he ever make any references to the Corps of Engineers and their involvement in permitting of the property?
A. He may have. I don't recall.
Q. Okay. Let's move on to Mr. Stromland. Did he ever indicate to you that he would not accept a permit application on the property?

Page 51

A. No, he did not. He was just very unhelpful.
Q. And did you ever have occasion to ask him why he was being unhelpful?
A. I didn't feel that it was a necessary question to ask.
Q. Did he ever make any references to the Corps of Engineers?
A. He may have. I don't recall. It's been several years since we've had any conversations with him about this.
Q. When the fill was placed on the property for the driveway and the parking area, do you know how much fill was placed?
A. No, I don't recall that.
Q. Did you contract with someone to install that fill?
A. I believe we used our own equipment to haul the fill and then we hired, I think all we paid for was the, the actual gravel itself out of the pit. We might have paid for loading, I guess I don't remember. It was several year ago.
Q. Did, did you and the other beneficiaries of the trust and their families

Page 52

actually spread the fill?
A. I wasn't present when the fill was brought on, so I guess I don't know who specifically did the work.
Q. Okay. Do you know whether you, whether the trust paid anyone to spread the fill?
A. I don't believe we did, no.
MR. GETTE: Have this marked as Deposition Exhibit 5.
(Whereupon, Deposition Exhibit No. 5, Stavig, was marked for identification.)
Q. (By Mr. Gette) Miss Stavig, I'm handing you what's been marked as Exhibit 5 to your deposition. If you could take a moment and look at that and then let me know if you recognize that document?
A. Oh, I forgot about Mr. Lemm.
Yes, I do. I remember seeing that.
Q. Okay. And this is a letter that is addressed to you. Did you receive this letter?
A. Yes, I did.
Q. Okay. And it's dated October 26 of 1999. Do you believe you would have received it at about that time?

Page 53

A. Most likely would have received it about that time, yes.
Q. Okay. At the point in time that you received this letter, had you placed the fill on your property for the parking area and the driveway?
A. I guess I don't remember if it was -- I would have to look at my check register before I would know the answer to that. It was, it was in, around that period of time.
Q. You see in the middle of paragraph two it says, A replacement plan must be approved before any wetland impacts take place.
Did you understand what that sentence meant when you received this letter?
A. No, I did not understand it.
Q. Did you contact Mr. Lemm, after having received this letter, to discuss it?
A. I may have. I don't believe I got very far with him, though.
Q. Do you recall any specifics regarding the content of any conversation you had with Mr. Lemm at about this time?
A. No. I do remember that it was not a very productive conversation, though.

Page 54

Q. When you say not very productive, what do you mean by that?
A. Well, what it means was Mr. Lemm was not very helpful in giving me information on what we needed to do and I guess I can't remember any other, any other specifics about it.
Q. Okay. When I use the term fill, do you know what that term means?
A. That's kind of a loose term. It could mean anything, any kind of a, of a material.
Q. As a real estate agent, when someone says they're going to place fill on their property, what do you understand that to mean?
A. Well, in general terms, I guess it means if you're going to fill a property, it means you're going to fill low spots so you can create a level surface. That's my general understanding of fill, yeah.
Q. At this point in time, back in 1999, as, in your capacity as a real estate agent, had you ever had, been involved in the sale or purchase of a property that included the need to obtain permitting for wetland fills?

Page 55

A. No, I had not.
MR. GETTE: Have you mark this Exhibit No. 6.
(Whereupon, Deposition Exhibit No. 6, Stavig, was marked for identification.)
Q. (By Mr. Gette) Handing you what's been marked as Exhibit 6 to your deposition, do you recognize that document?
A. Yes, I do.
Q. Okay. What is that document?
A. That is a document that I was sent, I believe by the DNR, ordering me to restore the property to its original condition.
Q. And when did you receive this notice?
A. Probably shortly after it was dated.
Q. Okay. And it looks like it was dated in November of 2001?
A. That's correct.
Q. Okay. If you look on the second page, it says Attachment A. Do you recall reviewing Attachment A at the time you received this notice?
A. Yes, I do.
Q. Okay. And just in the last

Page 56

paragraph, the first sentence, it says, Since construction of the access road, approximately 5,734 square feet of unauthorized fill was placed in Lot 14.
Do you see that sentence?
A. Yes, I do.
Q. And did you understand what they meant by that sentence?
A. It was my understanding that they made an assumption and they were trying to create a -- to, to consider it fact.
Q. Can you explain to me what you mean by that?
A. What I mean is I'm -- I contested that in my hearing.
Q. And what aspect of that did you contest?
A. I don't recall, but I guess I was going to contest the amount, because they -- it was my assumptions, based on statements they made in the hearing, that they, they had no basis in fact of their, their guesstimate of the square footage of fill that was put on the property.
Q. Have you ever measured the area on

Page 57

which you placed fill on Lot 14?
A. I personally have never measured the area, no.
Q. Do you know whether any of the other beneficiaries of the trust have?
A. I don't know.
Q. Do you know of anyone in particular who has conducted a measurement of the fill placed on Lot 14?
A. I'm sure someone did, but it was not anybody that I can recall specifically.
Q. You've never hired anyone to take such a measurement?
A. No.
Q. Let me ask you to turn back to Exhibit No. 4, where the drawing is contained on the page that has the Bates number LWC 364.
It appears that next to the drawings of the driveway and the parking area there are some measurements indicated. Do you see those?
A. Yes, I do.
Q. Okay. Do you have any reason to believe that those measurements are incorrect?
A. It is my understanding, when we were preparing this document, that we were taking

Page 58

measurements based on what we believed to be our parking area.
Q. Okay. So these were estimates that you had made at that time?
A. I believe so.
Q. And did you personally make those estimates?
A. I don't recall. I may have had some help.
Q. Okay. But those measurements were a part of the application that you submitted, correct?
A. Yes, they were.
Q. Okay.
A. Actually, now that I remember, I think Mr. Lemm did help me with this application.
Q. This application being Exhibit No. 4?
A. Yes.
Q. Okay. And in what way did he help you with that application?
A. It's been so many years it's hard to remember, but I think he did remember, he did help me with some of the specific technical

Page 59

language involved in the application.
Q. Can you point me to any areas, at this point, that you know he assisted you with?
A. It's been a long time. Maybe this wasn't the one that he helped me with.
Oh, the watershed number.
Q. What page is that on?
A. 357.
Q. So the, the chart on page 357, he assisted you with that?
A. He may have. Unless there was another application that we worked on that we -- that never was submitted. Again, this has been so many years.
Q. As I look through the document, it appears that the handwriting is fairly consistent throughout.
A. Most of it --
Q. Is that your handwriting?
A. Most of it is my handwriting, yes.
Q. Let me refer you to a specific page, page 355, --
A. Okay.
Q. -- and this is an answer to question 14, and it's a separate attachment to your

Page 60

application. Do you recall preparing this attachment?
A. Oh, question 14, where is that?
Q. It's on the previous page, actually, 354. It's the immediately preceding page.
A. What alternatives to this proposed -- okay.
Yes, I did prepare this, this attachment.
Q. Okay. And you see under item number two, it says, Sold property. You indicate, This was also not feasible, as we discovered that there are no willing buyers for a property that the state and federal government agencies involved have conducted a land taking of.
When you say this was not feasible, what are you referring to?
A. Question 14.
Okay. List at least two alternatives, one of which may be no build or do nothing.
Alternative one is parking cars on the road, alternative two is selling the property.
Q. Okay. So when you say this was not

Page 61

feasible, you were talking, you're referring to a sale of the property?
A. Yes. I think my intention there was selling the property for what we had purchased it for, which was $25,000, and that was not feasible. My, I believe my intent there was that I didn't believe we would be able to sell the property for what we paid for it, after we discovered the restrictions that the government was putting on the property that we were not aware of when we purchased it.
Q. Did the trust ever list the property for sale?
A. No. We didn't want to get into a laundry list of legal issues for starters. There would have been no end to it.
Q. Did you ever discuss potential sale of the property to anyone?
A. I believe we did discuss putting it on the market and we decided that it was an exercise in futility.
Q. Did you do any research at this time regarding what lakeside lots that were not platted had sold for?
A. That's kind of ambiguous, because

Page 62

Lake of the Woods has a mix of platted and unplatted residential property and there's a lot of different variations in the values of these properties simply because of the type of lakeshore they've got.

And so platted versus unplatted, as we found out after we bought this property, means nothing.

Q. Okay. My question was at the time did you conduct any research regarding the sales prices of nonplatted properties?

A. No, we didn't feel that it was necessary. We were confident, based on sales in the immediate area, what waterfront had been selling for, that we were getting a good buy.

Q. Now the sales in the immediate area that you're referring to, those would have been of platted properties, correct?

A. As far as I know, yes.

MR. GETTE: Have this marked as Exhibit No. 7.

(Whereupon, Deposition Exhibit No. 7, Stavig, was marked for identification.)

Q. (By Mr. Gette) Miss Stavig, I'm handing you what has been marked Exhibit 7.

Page 63

A. Um-hum.

Q. Do you recognize that document? And take a moment.

I think I actually gave you a bit too much there.

A. Yeah.

Q. Let me, the last two pages I'm going to remove here, my paralegal copied those together, and on the flight out here I removed them from my copy, not your copy.

MS. FISH-WHITLOCK: Is that LWC 00381 and 00382?

MR. GETTE: Correct.

Q. (By Mr. Gette) Now having cleaned up the, what's been marked as Deposition Exhibit 7, do you recognize that document?

A. This looks like a Petition for Appeal.

Q. And was that submitted on your behalf regarding Lot 14?

A. I believe so.

Q. And was it Miss Fish-Whitlock that prepared that for you?

A. Yes.

Q. By the way, let me finish the circle

Page 64

out here.

What is your relationship, if any, to Miss Fish-Whitlock?

A. Oh, as far as being related?

Q. Yeah.

A. She's my sister.

Q. Okay. I was pretty darn sure, you two look --

A. We don't, we look nothing alike.

Q. Okay. I always say that about my siblings too.

Did you review this petition for appeal at or around the time it was submitted to Lake of the Woods County?

A. I may have. I don't recall.

Q. Okay. Let me ask you to look at paragraph six on page one.

It says, Lake of the Woods County previously platted this parcel as residential, which required a determination that the land was suitable for building residential structures.

And it continues, The act of platting the parcel as residential and changing the zoning classification from natural resource

Page 65

was in violation of the laws of Minnesota and constituted a procedural error in violation of Minnesota Rule 6120.35.

Did you understand that the act of Lake of the Woods, of platting the parcel, was in violation of Minnesota law?

MS. FISH-WHITLOCK: Objection, you're asking her legal questions that I don't believe she's going to have the capacity to answer.

A. No, I don't believe I can answer that question.

Q. (By Mr. Gette) Okay. Did you question, when you received this document, did you question the accuracy of anything that was contained in it?

A. To my knowledge, I didn't believe there was anything inaccurate.

Q. That's fine.

Let me ask you one other question about this document. In paragraph ten you indicate that the prior decision regarding permitting of the property did not take into account the number of people who own and use the lot.

Page 66

Related to that, do you know whether there are any limitations under county regulations regarding how many individuals can use platted parcels or live on platted parcels?

A. You know, I believe that this issue came up during our appeal hearing before Lake of the Woods County Board, and neither representatives of the county, their employees or their attorney could come up with a, a limit.

Q. So as far as you know, there are no limits under current county law. Is that correct?

A. At the time no one that represented Lake of the Woods County, which is who we were appealing to, could come up with any limits, no.

Q. Okay. When the trust purchased the property, had you had any discussions with anyone who suggested that the Lot 14 may have wetlands on it?

A. No, I don't, not that I can recall.

Q. Had you had any discussions with Mr. Bailey in which he indicated there was any concern about wetlands on any of the platted

Page 67

properties?

A. Not that I can recall, no.

MR. GETTE: Have this marked as Stavig Exhibit 8.

(Whereupon, Deposition Exhibit No. 8, Stavig, was marked for identification.)

Q. (By Mr. Gette) Miss Stavig, I'm handing you what has been marked as Exhibit 8 to your deposition, and take a moment to look at that document and let me know if it's a document you recognize.

A. Okay.

Q. Okay. Having reviewed Stavig Exhibit No. 8, do you recognize that document?

A. No, I have never seen this.

Q. Okay.

MR. GETTE: I have no further questions for you this morning.

Counsel.

MS. FISH-WHITLOCK: Okay. I'd like to take just a five-minute break and organize my, my thoughts on where I need to go.

MR. GETTE: Okay.

(Whereupon, a brief recess was taken.)

Page 68

EXAMINATION

BY MS. FISH-WHITLOCK:

Q. First I'd like to talk about the use that this property has been put to since the 1999 Fish Family Lake Lot Trust has purchased it.

And you previously testified that you estimate that your family utilizes the property approximately 12 outings per year?

A. On average, yes.

Q. Okay. And Mr. Gette asked you concerning your personal knowledge of the three other beneficiary families as far as how often they used the property in any given year since ownership. Do you have, do you have personal knowledge as to the specific number of visits that each beneficiary utilizes the property?

A. No, I do not.

Q. Obviously it's fair to say that some beneficiaries use the property probably more than, than some of the others?

A. Oh, yes.

MR. GETTE: Objection as to form, leading.

Page 69

Q. (By Ms. Fish-Whitlock) All right. Now with regard to Deposition Exhibit No. 4, this is -- what is your understanding what this document was to be?

A. It was my understanding that this was an application that we needed to submit to Lake of the Woods County in order to be approved for an after-the-fact permit. We were led to believe by submitting this application that we could use wetland credits to mitigate the gravel that we installed on the lot.

Q. All right. Now this application was in response to a document that you received by the Department of Natural Resources?

MR. GETTE: Objection, leading.

A. It's my -- I don't recall the exact order this was, this happened, but I did receive a document in the form of a ticket from the Department of Natural Resources and somewhere along the line, after that ticket was received, I was told by another individual, whether they were from the county or Board of Soil and Water, I don't remember, that we could mitigate this or apply for an after-the-fact permit to resolve the situation.

Page 70

Q. (By Ms. Fish-Whitlock) Okay. Now this Deposition Exhibit No. 4, a basic application for the Minnesota -- what was, what was your understanding, when you applied for this, made this application as marked in Exhibit 4, what, what were you applying for?
A. We were basically following the direction of employees of the county, the local government. We were told that we needed to apply for this after-the-fact permit in order to validate the installation of the gravel that we put on the property and basically it would, it was our understanding that this would put us in compliance and that the ticket that I received would be dropped.
Q. All right. Now you previously testified that you believed that Les Lemm assisted you in, in completing this application?
A. I believe he did. I'm pretty sure that he was the one that said he would help me with this thing. I'm not absolutely sure, though, --
Q. Okay.
A. -- because it's been several years

Page 71

since we did this.
Q. And you requested that you purchase wetland banking credits in lieu of actual, actually conducting the replacement of wetlands elsewhere. Is that right?
A. Yes.
Q. Now there's several attachments on this application. Did you gather these attachments personally for the application?
A. I don't recall. I do know that I had some assistance from either Les Lemm or the Environmental Services office in putting this application together.
Q. Okay. Now I'd direct your attention to the page number that indicates LWC 00361.
A. Okay.
Q. Is that something that you would have had in your possession to attach to this basic application?
MR. GETTE: Objection, calls for speculation.
A. I don't recall.
Q. (By Ms. Fish-Whitlock) All right. Do you believe that you personally gathered this, this, looks to me like a plat map or a

Page 72

plat drawing, noted as LWC 00361?
A. I know that is not my handwriting, so it came from someone else.
Q. All right. And turning to the next page, LWC 00362, in what appears to be a, a map of some sort of Prosper Township, do you recall whether you attached this document to the basic application?
A. No, I don't recall.
Q. All right. Do you have any idea why this is attached to your basic application?
A. I'm assuming it's to determine overall where the location of this property is.
Q. Okay. And can you state with personal knowledge whether you attached this document, as noted as LWC 00362, or whether that was done by someone else?
A. I can't say for sure that, if I attached it or if someone else did.
Q. All right. And turning to the next page, LWC 00363, it appears to be a plat map of Sunny Beach that had certain markings on it.
Do you recall personally attaching this to your application?
A. I don't recall whether I did or did

Page 73

not.
Q. Okay. Does that document at all look familiar to you as far as there's, it appears as though there's certain markings along the plat map through Lot 12, through Lot 9, and it looks like in between Lot 5 and 6 and somewhat within Lot 3, do you have any personal knowledge as to what those markings mean?
A. It appears to me that this was a plat map that was marked up by someone who is familiar with elevations.
Q. You don't know who did that, though?
A. I don't know who did it, but --
MR. GETTE: Objection, --
A. -- it wasn't me.
Q. (By Ms. Fish-Whitlock) All right.
MR. GETTE: Objection, not allowing the witness to finish her answer.
Q. (By Ms. Fish-Whitlock) So do you have any idea where this document, LWC 00363, came from?
A. I don't remember, no.
Q. Okay. Do you believe, or did you, in preparing for this application, did you obtain information from anywhere else other

Page 74

than the assistance of Les Lemm?
A. I don't recall. I may have, I may not have. I guess I don't remember.
Q. All right. Would you have obtained any sort of assistance from the Environmental Services director or any employee of Lake of the Woods County in completing this application?
MR. GETTE: Objection, asked and answered.
A. It's possible that I did.
Q. (By Ms. Fish-Whitlock) Okay. Turning to page, on Exhibit, Deposition Exhibit No. 4, indicated with LWC 00364, do you recall this particular page being attached to your application when you submitted it?
A. I don't recall, but I don't remember ever -- I don't remember the specifics of the application process. It's been too many years.
Q. Okay. So as far as any suggestions that were made that you drew this little map on Lot 14, that would -- you're not testifying that you drew this map. Is that correct?
MR. GETTE: Objection, leading and mischaracterizing.

Page 75

A. I don't recall whether I did or did not draw this map.
Q. (By Ms. Fish-Whitlock) Okay. In looking at the handwriting on the drawn map on Lot 14, indicated on LWC 00364 in Deposition Exhibit No. 4, is that your handwriting?
A. It may be, it may not be.
Q. Okay. Turning to page 00365 of Deposition Exhibit No. 4. Do you know what this document is?
A. No, I don't.
Q. Okay. Do you recall attaching this document to your application?
A. No, I don't.
Q. Okay. Do you have any idea who attached this document to your application?
A. No, I don't. If they did, it was, it could have been -- it wasn't me that generated it, I know that.
Q. Okay. Do you have any personal knowledge as to whom attached this to your application?
A. No.
Q. All right. Turning to LWC 00366. Do you know that document is?

Page 76

A. No, I don't.
Q. All right. Do you recall attaching this to the Fish Family Lake Lot basic application?
A. No, I do not.
Q. Okay. Do you believe you attached it to your basic application?
A. If I did, then it was information I most likely got from the county and they told me that this was information that I would probably need would be my guess.
Q. Okay. So it wasn't necessarily your choice?
MR. GETTE: Objection, --
A. I don't recall.
MR. GETTE: -- vague.
Q. (By Ms. Fish-Whitlock) Now you also indicated that you believed that as far as the previous use of the property, that you believed your husband may have went bird hunting last fall?
A. I believe he did, yes.
Q. Okay. Do you have personal knowledge as to, you know, specifically where he went bird hunting as far as, you know,

Page 77

whether he was in a field or whether he was in a wooded area or whether he was -- I guess I'd like you to clarify your answer. It's my understanding that the Fish Family Lake Lot Trust owns a one-acre lot?
A. Um-hum.
Q. Okay. Do you know whether he was hunting on that specific lot or he just went out to the general Sandy Shores area and attempted to bird hunt?
A. No, I don't. I guess I don't recall.
Q. All right. You don't know whether, basically what my question is, is you don't know, you don't have personal knowledge as to whether he went hunting on Lot 14?
A. No. I wasn't there, --
Q. Okay.
A. -- so I don't know if he was standing in the lot or if he was standing on the road that doesn't exist, so -- (no further response.)
Q. Now moving on to Deposition Exhibit No. 6. You testified that this was the, a Restoration Order that you received from the

 ©2008

Page 78

Department of Natural Resources. Is that right?
A. Yes.
Q. All right. I'd like you to turn to the second page of Exhibit Number 6.
Now the basis for the Restoration Order was that the Army Corps of Engineers was going to be removing the access road. Is that your understanding of the findings on why you were issued a Restoration Order?
A. It was my understanding, I was sent a copy of my Restoration Order and the Restoration Order that was given to Gary Bailey, and Gary Bailey's Restoration Order was that he was to completely remove the road that he installed.
Q. The access road?
A. The access road.
Q. Now it's very clear that Lot 14 is not dependent upon, you know, the access road, though. Is that right?
A. That is correct.
Q. All right.
A. So -- yeah.
Q. All right. But you were issued a

Page 79

Restoration Order despite that?
MR. GETTE: Objection, vague.
A. This Restoration Order, I believe, doesn't, isn't entirely accurate, because it indicates that removal of the road will leave no access to the Sunny Beach lots. That is not true, because we do not need this road to access our lot.
Q. (By Ms. Fish-Whitlock) All right. Now the, Attorney Gette also questioned you on what your, as to your knowledge of the remaining payments that are, are owed to Gary Bailey at this time.
Do you know the exact payoff of what is owed to Mr. Bailey pursuant to that contract for deed?
A. No, I don't.
Q. Okay. Are you aware of whether interest has accrued as a result of late payments made by the trust?
A. I would imagine that Mr. Bailey would expect us to pay additional interest for the late payments, yes.
Q. Now you previously testified that, I want to make, I want to make this very clear,

Page 80

you were never able to submit a building permit to Lake of the Woods County?
A. I was, I was discouraged --
Q. Okay.
A. -- from submitting a building permit.
Q. All right. And there was at one point where you were refused, they would not -- or they refused to accept a building permit from you?
A. Early on, very early on, I requested a permit for a septic system and Mr. Lockner refused to give me the application because he told me he was not going to approve it anyway.
Q. Now after the issuance of the Restoration Order to remove the fill, there were state criminal charges brought as a result, where the state was alleging that you were violating a criminal law by not removing the fill. Is that right?
A. That is my understanding from the traffic ticket I received in the mail from the Department of Natural Resources.
Q. And that has, that has, that was in fact dismissed by -- that was dismissed?

Page 81

A. Yes, it was.
Q. All right. Now after the after-the-fact permit application to keep the fill on the property, there were still communications with local government officials in trying to resolve the issues as far as trying to assist you in finding what, how you can use this property. Is that right?
MR. GETTE: Objection, vague and leading.
A. Between the period of time when I submitted the application and the hearing was conducted, there was no communication. We were simply waiting for the results of the, of the application.
After that point, after the hearing, then I made several attempts to follow the request of the County Board of Commissioners to meet with BWSR and the local soil and water people and all of those attempts were rebuffed, or my, all of my, three, at least three of my scheduled meetings were canceled by the other party.
Q. (By Ms. Fish-Whitlock) Do you recall the dates of those communications?

Page 82

A. I have saved e-mails from Mr. Sindelir regarding those communications, but I don't recall the exact dates.
Q. All right. One of the issues in the denial of the wetland replacement plat application was that the, technically, the evaluation panel felt that the amount of gravel was excessive. Do you recall that issue?
A. I recall that coming up in the hearing, yes.
Q. All right. And do you recall what the response of the Environmental Services director was to our notification of the number of families that utilize this lot for camping purposes, for parking campers and rigs?
A. I believe his response was that he wasn't aware that there was four families using the property.
MR. GETTE: Object to the question as calling for hearsay.
Q. (By Ms. Fish-Whitlock) I'm showing you a letter dated December 27, 2002, I'd like you to review that, please.
MR. GETTE: Are you going to mark that as an exhibit?

Page 83

MS. FISH-WHITLOCK: No, I'm not going to mark it. It's not necessary.
MR. GETTE: It is necessary. If you're going to show the witness an exhibit, it needs to be marked as an exhibit.
I may have copies that you can use, in fact.
MS. FISH-WHITLOCK: Fine.
MR. GETTE: What's the date of the letter?
MS. FISH-WHITLOCK: December 27, 2002.
MR. GETTE: If you'd like to use this, you're welcome to.
MS. FISH-WHITLOCK: Thank you.
MR. GETTE: You can keep your original and then we can mark one of those.
(Whereupon, Deposition Exhibit No. 9, Stavig, was marked for identification.)
Q. (By Ms. Fish-Whitlock) Showing you what's been marked as Exhibit 9, I'd like you to review that. In particular, I'd like to, to direct your attention to paragraph five on page two.
A. Paragraph five, page two. Okay.

Page 84

Okay.
Q. Now after you've reviewed that document, do you recall why, the response of Lake of the Woods County to your indication, or your, your information that was provided of the number of campers and vehicles that utilize this lot, in requesting the decision makers take that into consideration in your application?
MR. GETTE: Objection, vague.
A. I guess what I do recall Mr. Sindelir stating in the hearing process is his determination that the city of Baudette zoning ordinance was the guideline that he used to determine the excessive amount of fill that we placed in the lot.
Basically he took the city of Baudette's minimum amount of parking space allowed, which is 300 square feet, and he determined that anything over and above the city of Baudette's minimum was considered excessive.
Q. (By Ms. Fish-Whitlock) Okay.
A. Which we objected to at the time.
Q. And the reason why that was objected

Page 85

to is because Lake of the Woods County is not in the city of Baudette. Is that right?
MR. GETTE: Objection, leading.
A. The reason we objected to it is the fact that he used the city of Baudette's minimum amount, not maximum, but minimum, and the city of Baudette has absolutely nothing to do with Lake of the Woods County as far as zoning and planning.
Q. (By Ms. Fish-Whitlock) Has any person from the Department of Natural Resources, the Board of Water and Soil Resources, the Army Corps of Engineers, or any other governmental agency, ever requested permission to enter your property to conduct a delineation or site investigation?
A. No.
Q. Do you know whether you can put a dock on Lot 14?
A. I was told by Gary Lockner early on that I would have to check with the DNR. I did check with the DNR and I was told that we could pour all the concrete we wanted in Lake of the Woods as long as it was below the high water mark and they had no problem with us putting a

 ©2008

Page 86

dock on the property as long as we made application to them. We never did, however.
Q. All right. Is there any docks located along the shoreline, I'm going to characterize it as Sandy Shores, the mile south and the mile north of where Lot 14 is located, are you aware of any docks that are located in that area?
A. There are no permanent docks.
Q. Now there's been some, I'm going to characterize it as conflicting information between various governmental agencies when it comes to Lot 14. Would that be a fair statement?
A. (No response.)
Q. I'll rephrase.
Has any agency given you an indication that they would accept any, an application for the placement of fill that is now in existence should you obtain approval, approval from another government agency?
A. Yes. In fact, I was led to believe, when I applied for this after-the-fact permit, that I would not have a problem getting approval of it, that it was just a, simply a

Page 87

matter of filing the application and paying the $2,200 that it would cost us to purchase the wetland credits.
And so we didn't, we didn't think there was going to be a problem at that point.
Q. Okay.
A. And somewhere along the line, during this process and shortly thereafter, was where we started running into problems with Lake of the Woods County telling us they would approve our after-the-fact permit if the Army Corps of Engineers approved.
And then the Army Corps of Engineers decided that, telling us that they would approve it if the local government approved us, which basically put us at a stalemate, and we just decided to, to drop it and -- because there was no, there was no place to go at that point.
Q. You were simply going in circles at that point?
A. We were, we were traveling in circles, yeah.
Q. Now how long have you lived in Lake of the Woods County?

Page 88

A. I've lived in Lake of the Woods County off and on since the first grade.
Q. Okay. Do you, do you have, do you feel that you have knowledge or do you feel as though you can distinguish between a wetland and a nonwetland?
A. As much as the, a common person could, yes.
Q. Okay. When you purchased Lot 14, the first 100 feet, did it appear to you to be wetland?
A. The waterside or the, or the roadside?
Q. The waterside.
MR. GETTE: Objection, calls for an expert opinion.
A. I guess I really couldn't say. It didn't, it didn't look swampy. I mean, --
Q. (By Ms. Fish-Whitlock) What sort of trees were on it?
A. There was birch, there was ash, there was a couple pine trees and some, a mix of other trees I guess I'm not familiar with.
Q. All right. Did you have any conversations with Gary Lockner on his opinion

Page 89

on whether wetlands existed on that property?
A. Early on, when Gary told me that he was not going to issue any permits for septic systems out there, he said the reason he wasn't going to do it is because he believed that it was a wetland. As far as I can recall, he said he wasn't, he -- and I can't remember his exact wording, but he said it was too much of a hot potato and he wasn't going to, he wasn't going to start butting heads with --
Q. Okay. Did you have --
A. -- larger units of government.
Q. Did you have any conversations with any local government officials who indicated to you that they believed that the first 100 foot of shore land was not wetlands?
A. I may have. I don't recall --
Q. Okay.
A. -- those conversations, though.
Q. Now you're a real estate agent and now a broker?
A. Yes.
Q. As far as the value of Lot 14, since the date you purchased the property to the present, has that diminished?

Page 90

A. When we purchased Lot 14, we were five or six years into passage of the Wetland Conservation Act and basically the state wetlands law, which was passed in 1992, up and to the point that we purchased that property, that wetlands law had not been enforced.

There was, it was so complicated and so all-encompassing that local units of government, to my knowledge, were still trying to get their hands around this act to determine just what it encompassed and, and where, where it started and where it stopped. So there was very little or no enforcement that had gone on up to that point.

Q. As far as you're aware?

A. As far as I was aware as a real estate professional and as a, a resident of the county.

It appeared to me that our particular situation was being used as, or it seemed to me, based on the reactions I was getting, that we were being used as a test case, or a Guinea pig, for the state wetlands law. That was the, that was the impression I was getting from the local units of government,

Page 91

because the local people were still fighting it to a point, because it was bad for the local government, it was bad for growth, it was bad for, it was costing them an enormous amount of time and resources and money trying to enforce something that they didn't totally understand.

And, but they were being told by people in higher positions than they were that they had to do this, they didn't have a choice. So, unfortunately, they were being stuck between a rock and a hard place. They, they had to do this, but they didn't know how far they had to, to push it.

And to make a long story short, this, it created a perfect storm, a mess of sorts, that nobody wanted to be involved in. But I believe, it's my opinion that the Army Corps of Engineers is the one that's been pulling the levers here, they're the ones that have been pushing this, instructing the state of Minnesota, the DNR and the local units of government, either through coercion or just plain this is the way it's going to be, to put our, put us in a situation where we can do absolutely nothing with our property besides

Page 92

stand on the road and look at it.

MR. GETTE: Objection, nonresponsive.

MS. FISH-WHITLOCK: I have no further questions.

EXAMINATION

BY MR. GETTE:

Q. Okay. I have a few follow-up questions.

Miss Stavig, do you have any formal training in identifying wetlands?

A. No, I don't.

Q. Do you have any education in how you identify wetlands?

A. None.

Q. This is just to make sure I heard you right. Did you say that it would be $2,200 to purchase wetland credits?

A. That's what I was told by one of the county employees at the time, when I was completing the after-the-fact permit application, that the cost of the credit, based on what we were applying for, would be approximately $2,200.

Page 93

Q. Okay. And from whom did you understand you were buying the credits?

A. It was my understanding that Lake of the Woods County had some wetlands banked and that we could purchase them directly from the county.

Q. You indicated in response to a question that there were no permanent docks along Sandy Shores in the area of Lot 14. Is that correct?

A. That's correct.

Q. Okay. Do people place temporary docks in the summertime?

A. Yes, they do.

Q. Have you ever placed a temporary dock off of Lot 14?

A. No, we have not.

Q. Based upon your conversation with the DNR regarding docks, do you understand that you could place a temporary dock along Lot 14, in the summer, if you wish to?

A. That was my understanding, yes.

Q. You indicated that you had saved some e-mails from a Mr. Sindelir regarding meetings that were canceled. Do you recall

Page 94

that?
A. Yes.
Q. Do you still have those e-mails?
A. I believe I do, yes.
Q. Okay. Would you be willing to produce those?
A. I could do that.
Q. Okay. You said that early on in the application process you were led to believe that you could purchase these wetland credits. Who told you that?
A. I believe it was either Mr. Lemm or Mr. Sindelir that told me that.
Q. And when would they have told you that?
A. I would say most likely during the process of building the application or putting together the information that we needed to apply for the after-the-fact permit.
Q. Miss Stavig, do you know who has responsibility for enforcement of the Wetland Conservation Act?
A. I was told that the enforcement lies with the Minnesota Department of Natural Resources.

Page 95

Q. You said it's your opinion that the Army Corps of Engineers is, you used the phrase pulling the levers?
A. Yes.
Q. What's the basis for that understanding?
A. Because every inquiry I've made to Lake of the Woods County and the DNR has pointed me towards the Army Corps of Engineers making statements and issuing orders that they don't want to object to.
Specifically, the, the ticket that was mailed to me, was sent to me, it was my understanding, on orders of a representative from the Army Corps of Engineers to the Department of Natural Resources.
Q. Did someone at DNR tell you that?
A. No, they didn't. I was, I was told that by someone else and I don't recall who it was. It could have been the, the lady that wrote the ticket that, that told me that.
Q. Do you know what organization she worked for?
A. She was from the DNR, she was out of Detroit Lakes, I believe.

Page 96

Q. Do you remember her name?
A. No. But her name's on the ticket, which is, I think, I believe in, in the file.
Q. Earlier I asked you whether at a specific time you had put your property on the market for sale. Have you ever placed Lot 14 on the market for sale?
A. No, we have not.
MR. GETTE: I don't have any further questions.

EXAMINATION
BY MS. FISH-WHITLOCK:
Q. Do you have any personal knowledge as to what the estimated tax value of Lot 14 is right now?
A. I might be a thousand or two off, but I believe the last property tax statement I received had it valued at $4,400.
Q. And that was for the year 2008 or 2007?
A. I think it was '07. 44 or 5400, I believe. It's been hanging right there for several years.
It went from a high of 28,000, the

Page 97

year after we purchased it, down to the four or 5,000 it's valued at now.
MS. FISH-WHITLOCK: I don't have any other questions.
MR. GETTE: I'd just like to put on the record, earlier we had discussed, you brought some documents with you today, Miss Stavig, you've agreed to copy certain documents out of that file as well as to produce some e-mails with Mr. Sindelir --
THE DEPONENT: Um-hum.
MR. GETTE: -- and a check register as well. Is that correct?
THE DEPONENT: That's correct.
MR. GETTE: Okay.
MS. FISH-WHITLOCK: I'd like to be specific on, on what -- e-mails from Mr. Sindelir, check register?
MR. GETTE: Correct.
MS. FISH-WHITLOCK: And --
MR. GETTE: And the documents identified in the folder that she brought with her here today.
MS. FISH-WHITLOCK: That's, that's my question, which documents?

Page 98

MR. GETTE: The documents that have been turned sideways in the folder.

MS. FISH-WHITLOCK: Okay. Okay. Understood.

MR. GETTE: Let's go off the record.

MS. FISH-WHITLOCK: We're going to read and sign, by the way.

(Whereupon, the deposition was concluded at 12:30 o'clock p.m.)

Page 99

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA )
) ss
COUNTY OF POLK )

I, RUTH ANN JOHNSON, a Notary Public within and for the County of Polk and State of Minnesota do hereby certify:

That prior to being examined the afore-named witness was by me sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition, consisting of 98 pages of typewritten materials, was taken down by me in Stenotype at the time and place therein named, and was thereafter reduced to typewriting under my direction.

I further certify that I am neither related to any of the parties or counsel nor interested in this matter directly or indirectly.

WITNESS my hand and seal this day of

Ruth Ann Johnson
Notary Public
Polk County, Minnesota

My Commission expires January 31, 2012.

Page 100

A C K N O W L E D G E M E N T O F D E P O N E N T

I, APRIL STAVIG, do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes or corrections, if any, appear in the attached errata sheet signed by me.

Date APRIL STAVIG

Page 101

Alan Fish
102 Second Avenue, Northwest
Roseau, Minnesota 56751

IN RE: Gary Bailey vs. The United States

Dear Mr. Fish:

Enclosed please find your copy of the deposition of APRIL STAVIG, along with the original signature page. As agreed, you will be responsible for contacting the witness regarding signature.

Within 30 days of receipt, please forward errata sheet and original signed signature page to James D. Gette.

If you have any questions, please do not hesitate to call. Thank you.

Yours,

Ruth Ann Johnson
Reporter/Notary

cc: James D.Gette

DEPARTMENT OF THE ARMY
ST. PAUL DISTRICT, CORPS OF ENGINEERS
190 FIFTH STREET EAST
ST. PAUL, MN 55101-1638

REPLY TO
ATTENTION OF

June 7, 2005

Operations
Regulatory (MVP-2001-5667-JKA)

Mr. Bruce Hasbargen
Public Works Director
Lake of the Woods County
P.O. Box 808
Baudette, MN 56623

Dear Mr. Hasbargen:

This letter is in response to your letter of May 25, 2005, regarding the after the fact initial proffered permit for Sandy Shores Drive adjacent to Lake of the Woods. I forwarded the initial proffered permit to you for your consideration on March 28, 2005. In your letter, you stated objections over the ratio at which the wetland impacts are to be mitigated and the scope of the impacts that are addressed by the required mitigation.

I have considered your objections and offer the following explanation for the District's determination as well as a potential resolution of this matter. Many of the wetland fills that have occurred to date on the lots adjacent to Sandy Shores Drive were reasonably foreseeable and would not have occurred but for the County's construction of the road. Therefore, these impacts would have been considered in a permit evaluation for the road had one been conducted prior to construction. In light of this, we have considered these impacts in our after-the-fact permit process and our mitigation requirement of 25.38 acres includes adequate offsets for the direct, indirect, induced, and cumulative impacts of the road to date.

As compensation for the direct, indirect, cumulative, and induced wetland impacts caused to date by construction of Sandy Shores Drive, I will accept the proposed 25.38 acres of wetland mitigation to be conducted on the Graceton Wildlife Management Area. Any future fills, including the County's proposed improvements to Sandy Shores Drive or further residential development on lots adjacent to the road, will be addressed through separate permit applications. The cumulative impacts analysis of any future permit applications will consider the aquatic impacts already caused by the construction of Sandy Shores Drive and its associated development. The initial proffered permit under consideration is no assurance that future permits will be issued or, if so, an indication of the type or amount of compensatory mitigation that would be required.

EXHIBIT 27

I believe this proposal adequately addresses your concerns over the initial proffered permit. I respectfully request that you consider the information contained in this letter and provide a written response within 30 days of the date of this letter. If you have any questions, contact Mr. Jon Ahlness in our St. Paul office at (651) 290-5381. In any correspondence or inquiries, please refer to the Regulatory number shown above.

Sincerely,

Robert J. Whiting
Chief, Regulatory Branch

Copy Furnished:

Josh Stromlund, LOW County

*Lake of the Woods County*
*Public Works Department*

*Phone: 218/634-1767*
*Fax: 218/634-1768*
*An Equal Opportunity Employer*
*306 8th Avenue S.E.*
*P.O. Box 808*
*Baudette, MN 56623*

May 25, 2005

MSP 27 May 2005

RECEIVED
MAY 27 2005
CORPS OF ENGINEERS
ST. PAUL DISTRICT
REGULATORY BRANCH

U.S. Army Corps of Engineers
Colonel Michael Pfenning
District Engineer and Commander
190th 5th St. E
St. Paul MN 55101-1638

Dear Colonel Pfenning,

This letter is a formal objection to the permit dated March 28, 2005; regarding the mitigation site for Township Road #381 (Sandy Shores Drive). The reasons for this objection are the ratio at which the road is to be replaced and the exclusion of the private landowners as originally agreed upon by the county and Mr. Jon Ahlness.

The county has been trying to upgrade Sandy Shores Drive since the original application dated July 5, 2001. This road was constructed between 1978 and 1988 when this area was developed into residential lots. Mr. Jeff Koschak, who was the Corps representative at the time the application was submitted, said nothing regarding Corps involvement pertaining to this maintenance application. We believe that the developer of the Sunny Beach subdivision also played a role in this situation by asking why the Corps is involved with his illegally constructed road and not Sandy Shores Drive.

We also object to the idea that we are not going by the regulations that were in place 17-27 years ago when the original road was constructed. We believe that this issue is well beyond the statute of limitations regarding this project. Instead of ignoring this problem, the county and the Corps met and discussed several options to resolve this matter. We have taken the recommendations from Mr. Koschak and have decided to plug a ditch, Judicial Ditch #16, for the mitigation. A 1.5 mile segment of the ditch will be plugged and abandoned to serve as mitigation for Sandy Shores Drive.

During the summer of 2004, the county and the Corps had several discussions pertaining to the landowner projects that have taken place within the subdivisions and also Sandy Shores Drive. We identified that some of the landowners did not receive Corps approval on their various projects. After some discussion it was agreed that projects conducted by a landowner prior to June 1998, a Nationwide Permit 29 would have been issued and therefore no mitigation is required. It was

also agreed that projects conducted from June 1998, to April 1, 2004, the landowners would be responsible to obtain a Corps permit and from April 1, 2004, the county and the Corps would work together in addressing individual projects in the future. During these discussions the county said that we would be willing to accept responsibility for the landowners that did not have Corps approval between the dates of June 1998, to April 1, 2004, and include their impacts in the mitigation site. The amount of impact was to be determined at a later date by Mr. Ahlness. Since there was excess mitigation after the road deduction, the private landowners were then added to the mitigation site. Mr. Ahlness thought that this was a great idea to resolve past issues.

An after the fact application was submitted to the Corps dated September 13, 2004, for the original road construction of 17.98 acres of wetland impact. The mitigation site would restore 25.65 acres of wetland and the remaining 7.67 acres would serve as mitigation to satisfy the landowner impacts. This idea was brought to the attention of Mr. Bob Whiting and he did not have a problem with it as long as the county did not receive any monetary gain from the mitigation site. The county will not use any portion of this mitigation site as a wetland bank. If there would be any acreage left over after the road and landowner portions are deducted, it would be used as excess mitigation as a good faith effort in starting from a clean slate. The application was for a 1:1 mitigation ratio for the road since; it has been 17-27 years since the original road construction. Also, the landowner portion was at the same ratio because of the length of time that has passed.

During the comment period the MNDNR noted that private landowners should not be allowed to use this mitigation site for their benefit since the mitigation site is located on the Graceton Wildlife Management Area. The County talked with Mr. Ahlness and Ms. Kelly Urbanek regarding this issue and they both assure the County that we still could make the original application work by addressing the landowner's projects under the mitigation site in the future. They said that it would take creativity in addressing this issue but, it could be done.

Mr. Ahlness and the County had discussions regarding the provisional permit requirements. The county had no problem with the requirements set forth by Mr. Ahlness so he pushed the permit up the chain of command. After review by Mr. Whiting and Ms. Marita Valencia, the provisional permit was sent back to Mr. Ahlness with a comment stating that a 1:1 mitigation ratio was not adequate to address the impacts associated with Sandy Shores Drive. The reason for this was because of temporal loss and partial out-of-kind replacement. The impacts associated with the road are to Types 6 & 7 wetlands and the mitigation site would be a Type 6. This was a shock to us because at no time did anyone say anything about an increased mitigation ratio, temporal loss, out-of-kind replacement, or Section 401 approval by the Minnesota Pollution Control Agency (MPCA). We were lead to believe that we would resolve all past issues by accomplishing this mitigation project.

After talking with Mr. Ahlness about the changes to the permit, we asked the question of, "What set of regulations are we going by, current or when the original road construction took place?" The answer that we got from Mr. Ahlness was that he was going by the original date of construction but, he was told otherwise. We believe that this is not legal. You can not use current regulations to address an issue that happened 17-27 years ago. The county feels that we have worked in good faith with the Corps in addressing this issue and have taken a proactive approach in dealing with the past and future projects.

This past summer, with the cooperation of a local landowner the county accomplished an eighty (80) acre wetland restoration site. This site has been identified in the Lake of the Woods Comprehensive Local Water Management Plan (CLWMP) as a high priority area within the county. This site was a converted agricultural field at the headwaters of Bostic Creek, which leads to Lake of the Woods. The goal of this project was two fold: stop sedimentation to Lake of the Woods and restore wetlands within the county. Also, this restoration site can be used to offset the temporal loss issue that the Corps deals with. We are in the process of having the Corps acknowledge this restoration site.

The above is a summary of what Lake of the Woods County has gone through in the past four (4) years in trying to resolve this issue. Considerable amounts of time and money have been invested in this project. We would appreciate if you would look into this matter and approve the original application that was submitted on September 13, 2004. This would be a great benefit to the county and the landowners if the original application is approved.

Sincerely,

Bruce Hasbargen
Public Works Director

Lake of the Woods County
Office of Land and Water Planning

Josh Stromlund
Land & Water Planning Director
PO Box 808
Baudette, MN 56623
Phone (218) 634-1945
Fax (218) 634-2509

April 27, 2005

U.S. Army Corps of Engineers
Colonel Michael Pfenning
District Engineer and Commander
190th 5th St. E
St. Paul MN 55101-1638

Dear Colonel Pfenning,

This letter is in reference to the Sandy Shores road mitigation site located on the borders of s. 35&36, T. 162N, R. 33W (Zippel Township), and s. 1&2, T. 161N, R. 33W (McDougald Township), in Lake of the Woods County. We are frustrated with the U.S Army Corps of Engineers (Corps) and feel that we have been mislead throughout this whole process. A provisional permit has been issued but, is not the original plan that the county or the representative from the Corps had been working towards. The end to this long and complicated project is within site but, individuals within the Corps feel the need to keep putting up additional hurdles in order to extend the process. We have tried to work with the Corps to the best of our ability to resolve all past issues and now we will not be able to accomplish the original plan which would provide our residents with the proper mitigation. If you are not familiar with this situation, here is an explanation of what has taken place:

An application dated July 5, 2001, was submitted to the Corps by the Lake of the Woods County Highway Engineer for the maintenance of Township Road #381 (Sandy Shores Drive). According to aerial photos the original road was constructed in phases between 1978 and 1988 when this area of the county was developed. The Corps representative at the time when this application was submitted knew about the history of the road and said nothing regarding Corps involvement. Also, the developer of Sunny Beach, a subdivision located to the south, constructed a road without authorization and starting asking questions of why the Corps is involved with his road and not the Sandy Shores Road. We believe that this is the reason why the Corps feels the need to come after the county twenty-seven (27) years later. Doesn't statue of limitation come into play?

A letter that is dated August 12, 2002, states that we must seek DA authorization for the original road construction concurrent with authorization of any additional regulated work on this road, signed by Mr. Robert Whiting, Regulatory Branch Chief. Instead of ignoring this problem and completing the maintenance of the road, the county met with the Corps and discussed several options to resolve this matter, since this road is nearly impossible to travel on every spring. Lake of the Woods County has numerous drainage ditches and it was recommended by the Corps, that a ditch plug would be the best option to satisfy the mitigation requirements. The County identified a ditch that is located in the Graceton Wildlife Management Area (WMA), Judicial Ditch #16, as a viable site to plug. A 1.5 mile segment of the ditch would be plugged and abandoned to serve as mitigation for Sandy Shores Drive. The county had a difficult time in getting permission from the Minnesota Department of Natural Resources (MNDNR); to plug this segment of ditch since it is located within the boundaries of a WMA. The MNDNR finally agreed to allow this project to take place with certain restrictions.

During the summer of 2004, the county and the Corps had several discussions pertaining to the landowner projects that have taken place within the subdivisions and also the road. We identified that the some of the landowners did not receive Corps approval on their various projects. After some discussion it was agreed that projects conducted by a landowner prior to June 1998, a Nationwide Permit 29, would have been issued and therefore no mitigation is required. It was also agreed that projects conducted from June 1998, to April 1, 2004, the landowners would be responsible to obtain a Corps permit and from April 2004, the county and the Corps would work together in addressing individual projects in the future. Also, during these discussions, the county said that we would be willing to accept responsibility for the landowners that did not have Corps approval between the dates of June 1998, to April 1, 2004, and include their impacts in the mitigation site. The amount of impact for these landowners was to be determined at a later date. Since there was going to be excess mitigation after the road deduction, the private landowners were then added to the mitigation site. The representatives from the Corps thought that was a great idea to resolve past issues.

An after the fact application was submitted to the Corps dated September 13, 2004, for the original road construction of 17.98 acres of impact. The mitigation site would restore 25.65 acres of wetlands and the remaining 7.67 acres would serve as mitigation to satisfy the landowner impacts. This idea was brought to the attention of Mr. Whiting and he did not have a problem with it as long as the county did not receive any monetary gain from it. The county will not use any portion of this mitigation site as a wetland bank. If there would be any acreage left over after the road and landowner portions are deducted, it would be used as excess mitigation as a good faith effort in starting from a clean slate. The application was for a 1:1 mitigation ratio for the road since; it has been twenty-seven years since the original road construction. Also, the landowner portion was at the same ratio because of the length of time that has passed.

During the comment period the MNDNR noted that private landowners should not be allowed to use this mitigation site for their benefit since the mitigation site is on public land administered by the MNDNR. The Corps representative and I talked regarding this issue and assured me that we still could make the original application work by addressing the landowner's projects under the mitigation site in the future.

The Corps representative and I recently had a discussion regarding the provisional permit requirements. The county had no problem with these requirements so the representative pushed this permit up the chain of command. After review by Mr. Whiting and Ms. Marita Valencia, the provisional permit was sent back down to the Corps representative and their comments stated that a 1:1 mitigation ratio is not adequate to address the impacts associated with Sandy Shores Road. The reason for this is because of temporal loss and partial out of kind replacement. The impacts associated with the road are to Types 6 & 7 wetlands and the mitigation site would be a Type 6. This was a shock to us because at no time did anyone say anything about an increased mitigation ratio, temporal loss, out-of-kind replacement, or Section 401 approval, from the Minnesota Pollution Control Agency. We were lead to believe that we would resolve all past issues by accomplishing this mitigation project.

The question that was asked to the Corps representative was, "What set of regulations are we going by, current or when the original road construction took place?" The answer that we got from the Corps representative was going by the original date of construction but, **he was told otherwise**. This is not legal. You can't use current regulations to address an issue that happened twenty-seven years ago. Are we dealing with a personal opinion by a couple representatives from the Corps or a professional opinion? The county feels that we have worked with the Corps in addressing this issue and has taken a proactive approach in dealing with future projects.

This leaves the county in a dilemma of what to do next. Do we ignore the Corps, move forward with the project and take our chances? Do we agree to allow all the mitigation to be used for the road and leave the landowners on their own to deal with the regulations of the Corps? Do we appeal this decision? Does the county have to do another mitigation site to resolve the issues for the landowners? It may take another four (4) years, or longer, to resolve this issue again. How are the landowners going to resolve their issues? The county doesn't have an adequate amount of wetland acres within our wetland bank. Also, if the landowners were to go out of the county to purchase wetland credits, the county would require an increase ratio for wetland credits. We believe that it is not appropriate or fair to the landowners that received an exemption under the Wetland Conservation Act (WCA). Furthermore, the county along with a private landowner accomplished an eighty (80) acre wetland restoration site this past summer. This site was a converted agricultural field at the headwaters of a tributary that leads into Bostic Bay of Lake of the Woods, an area identified as high priority by our Local Water Management Plan. The goal of this project was two fold: stop sediment from entering the lake and to restore wetlands within the county. This restoration site has not been acknowledged by the Corps.

The above is a summary of what Lake of the Woods County has gone through in the past four years to accomplish this project. Considerable amounts of time and money have been invested trying to accomplish this project. We would like to meet with you and discuss this issue further at your earliest convenience. In the eyes of the county and some individuals within the Corps, agree that this is a great opportunity for the county and the Corps to resolve the past issues with one project.

Sincerely,

Josh Stromlund

Cc:

Lake of the Woods County Commissioners
Lake of the Woods County Soil and Water Conservation District Board of Supervisors
Lake of the Woods County Soil and Water Conservation District staff
Lake of the Woods County Highway Engineer
Honorable Collin Peterson, U.S Representative
Honorable Mark Dayton, U.S Senator
Robert Whiting, U.S. Army Corps of Engineers
Marita Valencia, U.S Army Corps of Engineers
Jon Ahlness, U.S. Army Corps of Engineers
Kelly Urbanek, U.S Army Corps of Engineers
Ron Harnack, Executive Director, Board of Water and Soil Resources
Ron Shelito, Regional Director, Board of Water and Soil Resources
Dale Krystosek, Wetland Specialist, Board of Water and Soil Resources
Bill Best, Board Conservationist, Board of Water and Soil Resources

Lake of the Woods County
Office of Environmental Services

Steven Sindelir
Assistant Zoning Administrator
PO Box 808
Baudette, MN 56623
Phone (218) 634-1945
Fax (218) 634-2509

RECEIVED
MAR 15 2004
CORPS OF ENGINEERS
ST. PAUL DISTRICT
REGULATORY BRANCH

March 12, 2004

Jon Ahlness✓
USACOE – 190 5th Street East
St. Paul MN 55101-1638

Dear Mr. Ahlness:

As requested in our telephone conversation yesterday, I am sending you copies of the 2003 aerial photos of the Birch Beach (2 ea.) and Sandy Shores Plats (5 ea.). I talked to Brent, our GIS person, and he said that he e-mailed the names and addresses that you had also requested. I was unable to obtain any information regarding the issue of any fill activity prior to lots being sold. Below please find the month and year that each of these plats were approved:

| | |
|---|---|
| Birch Beach Resort | - June, 1926 |
| Birch Beach Resort #2 | - October, 1963 |
| Sandy Shores | - October, 1975 |
| Sandy Shores 1st Addition | - November, 1978 |
| Sandy Shores 2nd Addition | - October, 1985 |
| Sandy Shores 3rd Addition | - April, 1990 |
| Sandy Shores 4th Addition | - April, 1990 |

If I can be of any further assistance, please call me at the above phone number.

Sincerely,

Steven Sindelir

Steven Sindelir
Lake of the Woods County

Enc: 2003 Aerial Photos – Birch Beach and Sandy Shores




hese data are provided on an
AS IS" basis, without warranty
f any type, expressed or implied,
cluding but not limited to any
arranty as to their performance,
erchantability, or fitness for any
articular purpose.

# Sandy Shores

## 2003 Aerial Photo

1"=800 Feet

A-342

03-11-2004






| | | |
|---|---|---|
| iese data are provided on an IS IS" basis, without warranty 'any type, expressed or implied, cluding but not limited to any irranty as to their performance, erchantability, or fitness for any irticular purpose. | **Sandy Shores 1st-S of 3rd**<br>**2003 Aerial Photo** | |
| | 1"=350 Feet | 03-11-2004 |






hese data are provided on an
AS IS" basis, without warranty
f any type, expressed or implied,
ncluding but not limited to any
varranty as to their performance,
nerchantability, or fitness for any
articular purpose.

# Sandy Shores 2nd-Mid-3rd

2003 Aerial Photo

1"=300 Feet | A-344 | 03-11-2004



N

hese data are provided on an AS IS" basis, without warranty f any type, expressed or implied, ncluding but not limited to any arranty as to their performance, erchantability, or fitness for any articular purpose.

# Sandy Shores 4th-N of 3rd

2003 Aerial Photo

| | |
|---|---|
| 1"=300 Feet | 03-11-2004 |






| | | | |
|---|---|---|---|
| hese data are provided on an AS IS" basis, without warranty f any type, expressed or implied, icluding but not limited to any arranty as to their performance, erchantability, or fitness for any articular purpose. | **Birch Beach Resort #2**<br>**2003 Aerial Photo** | | |
| | 1"=300 Feet | A-346 | 03-11-2004 |






These data are provided on an "AS IS" basis, without warranty of any type, expressed or implied, including but not limited to any warranty as to their performance, merchantability, or fitness for any particular purpose.

# Birch Beach Resort

2003 Aerial Photo

1"=300 Feet A-347 03-11-2004

**Lake of the Woods County**
**Office of Environmental Services**

Gary Lockner, Director
PO Box 808
Baudette, MN 56623
Phone (218) 634-1945
Fax (218) 634-2509

January, 8 1998

Jeffrey Koschak
US Army Corps of Engineers
8896 E Gull Lake Dr NW
Brainerd, MN 56401

Jeff:

Attached you will find a list of current property owners on the north end of Sandy Shores in Prosper Township. I have also included a list of Building Permits that have been issued in the area. I hope this information will help you for the public notice you plan on mailing. If you have any questions, I can be reached at 634-4536.

Sincerely,

Brent Birkeland
Asst. Zoning Administrator

C:\MYDOCU~1\Permits Database.xls

| | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Last_Name | First_Name | Fee | Permit | Action | Twp_Name | Sec | Twp | Range | Date | Lot_Block | Notes |
| 66 | Atkinson | Eugene | | 8127 | BP | Prosper | 17 | 163 | 33 | | | |
| 406 | Cripe | Jerry & Sharon | | 9047 | BP | Prosper | 17 | 163 | 33 | | | |
| 520 | Erdahl | Elton | | 9036 | BP | Prosper | 17 | 163 | 33 | | | |
| 622 | Gazda | Kenneth | | 8701 | BP | Prosper | 17 | 163 | 33 | 2/23/87 | Govt. Lot 2, Lot 5, Block 1, Sandy Shores S | Ben Trottier now owns, 93-99 |
| 752 | Hedlund | Jan M. | | 8305 | BP | Prosper | 17 | 163 | 33 | | | |
| 822 | House | David | | 8227 | BP | Prosper | 17 | 163 | 33 | | | |
| 880 | Johnson | Roger G. | | 9106 | BP | Prosper | 17 | 163 | 33 | | | |
| 1029 | Larson | Charles | 75 | 9517 | BP | Prosper | 17 | 163 | 33 | 6/8/95 | Lot 3,Blk 1 Sandy Shores Fourth | |
| 1036 | Lauglug | Bruce L. | | 8116 | BP | Prosper | 17 | 163 | 33 | | | |
| 1199 | Meade | Joel | | 8215 | BP | Prosper | 17 | 163 | 33 | | | |
| 1201 | Meade | Joel | | 9731 | BP | Prosper | 17 | 163 | 33 | 7/9/97 | | |
| 1337 | North Sandy Shores Corp | | | | IP | Prosper | 17 | 163 | 33 | 3/11/85 | Govt lots 1 & 2 | Sandy Shores 2nd & 3rd Additions |
| 1338 | North Sandy Shores Corp | | | | IP | Prosper | 17 | 163 | 33 | 12/12/88 | Govt Lts 1,2,& 3 | Hearing for North Sandy Shores 4th Add |
| 1621 | Senty | Mike | Unk. | 8204 | BP | Prosper | 17 | 163 | 33 | 4/2/82 | Sandy Shores, Block 1, Lot 6 | Ronald Ditsch now owns |
| 1675 | Snustead | Erwin | 75 | 9677 | BP | Prosper | 17 | 163 | 33 | 9/24/96 | Lot 5 Sandy Shores 4th | |
| 1721 | Starren | Jon M. | | 93104 | BP | Prosper | 17 | 163 | 33 | 9/27/93 | Lot 13, Sandy Shores 2nd Addn. | |
| 1722 | Starren | Jon | 75 | 9642 | BP | Prosper | 17 | 163 | 33 | 6/10/96 | Lot 14 Sandy Shores 4th | |
| 1835 | Trottier | Ben | None | 9399 | BP | Prosper | 17 | 163 | 33 | 9/20/93 | Lot 5, Blk 1, Sandy Shore 2nd Addn. | Update of 8701 |
| 1865 | Vieira | Theodora A. | 50 | 9308 | BP | Prosper | 17 | 163 | 33 | 4/7/93 | Lot 15, Block 1, Sandy Shores 3rd Addn. | |
| 1919 | Welin | Roger | 75 | 9638 | BP | Prosper | 17 | 163 | 33 | 10/20/96 | Lot 9 Sandy Shores 4th | |
| 1995 | Zimney | Ronald S. | | 8629 | BP | Prosper | 17 | 163 | 33 | | Lot 6, Block Sandy Shores Second Addition | |
| 1997 | Zimney | Ronald | | 9627 | BP | Prosper | 17 | 163 | 33 | 8/13/96 | Lot 6 Sandy Shores 2nd | |

DAVID MEADE CHILDREN'S TRUST
PO BOX 351
BLACKDUCK MN 56630

JON M. STARREN ETUX
2723 KNIGHT DR
GRAND FORKS ND 58201

CAROL J. TOMBERLIN
3620 S 37 AVE
MINNEAPOLIS MN 55406

JOEL MEADE ETUX
53 SANDY SHORES DR
WILLIAMS MN 56686

ROBERT L. WAAG ETUX
RR1 BOX 108E
GENESEE ID 83832

DAVID MEADE CHILDREN'S TRUST
PO BOX 351
BLACKDUCK MN 56630

PAUL T. WEIMER ETUX
817 W ORANGE AVE
ST PAUL MN 55117

DELLA SNUSTEAD ETUX
507 NE 6 AVE
ROSEAU MN 56751

DAVID A. HAGEN TR UA 9/4/92
956 PINE VIEW CT
EASTERN HEIGHTS MN 55119

THEODORE A. VIEIRA ETUX
PO BOX 128
WILLIAMS MN 56686

DOROTHY R. CUOZZO
71 SANDY SHORES DR
WILLIAMS MN 56686

CRAIG W. VALENTIK ETUX
1844 W MCANDREWS RD
BURNSVILLE MN 55337

HARVEY W. SCHMIDT ETUX
54 BIRCH BEACH DR
WILLIAMS MN 56686

NORTH SANDY SHORES CORP.
53 SANDY SHORES DR
WILLIAMS MN 56686

BEN TROTTIER ETUX
64 SANDY SHORES DR
WILLIAMS MN 56686

JERRY D. LARSON
PO BOX 2189
FARGO ND 58108

HARVEY W. SCHMIDT ETUX
54 BIRCH BEACH DR
WILLIAMS MN 56686

GARY D. MILLER ETUX
7234 S LAMAR AVE
COTTAGE GROVE MN 55016

BRUCE LAUGTUG
46 SANDY SHORES DR
WILLIAMS MN 56686

GEORGE O. P. LEE ETUX
5225 THURMAN DR
SIOUX FALLS SD 57106

ELTON I. ERDAHL ETUX
14115 WOODHAVEN RD
MINNETONKA MN 55345

CHARLES A. LARSON ETUX
3425 GOLFVIEW DR #312
EAGAN MN 55123

ROGER WELIN ETUX
RR2 BOX 175A
ROSEAU MN 56751

GERALD L. TOMBERLIN ETUX
3620 S 37 AVE
MINNEAPOLIS MN 55406

NORTH SANDY SHORES CORP.
53 SANDY SHORES DR
WILLIAMS MN 56686

JAMIE MCENELLY ETUX
49 SANDY SHORES DR
WILLIAMS MN 56686

ROGER HITES
51 SANDY SHORES DR
WILLIAMS MN 56686

Minnesota Pollution Control Agency

April 28, 2005

RECEIVED
MAY 02 2005

K.V(X)
R.W(Z)

Mr. Robert J. Whiting
Regulatory Branch, St. Paul District
U.S. Army Corps of Engineers
190 Fifth Street East
St. Paul, MN 55101-1638

Mr. Josh Stromlund
Office of Land and Water Planning
Lake of the Woods County
P.O. Box 808
Baudette, MN 56623

RE: CENCS-CO-R-01-5667-JKA
Lake of the Woods County – Sandy Shores Drive
Lake of the Woods County
Section 401 Waiver

Dear Messrs. Whiting and Stromland:

This letter is submitted by the Minnesota Pollution Control Agency (MPCA) under authority of Section 401 of the Clean Water Act (33 USC 1251 et seq.), Minn. Stat. chs. 115 and 116, and Minn. R. 7001.1400-.1470. The referenced project involves a proposal to retain 17.98 acres of fill in wetlands adjacent to Lake of the Woods as part of the original project to construct Sandy Shores Drive (Township Road 381) which was progressively constructed during the period of 1978 – 1988. The project is located in the SW ¼ of Section 16, and the E ½ of Section 17, T 163 N, R 33 W, Lake of the Woods County, Minnesota. This application is for an After the Fact Clean Water Act Section 404 Permit for the original road construction measuring 5,900 feet in length and about 35 to 40 feet wide that took place during that 1978-1988 time period.

The MPCA staff have reviewed the application, related documents and obtained other information about the project through other sources. The MPCA staff believe the application accurately depicts the road project based on the information gathered and reviewed.

The wetland compensatory mitigation for the road construction will consist of constructing two ditch plugs in an existing Judicial Ditch # 16 located in Section 35 and 36, T 162 N, R 33 W, and Section 1 and 2, T161 N, R 33 W. The mitigation will restore hydrology to a 1.5 mile length of the ditched wetland providing a calcutlated 25.38 acres of restored wetland. It is MPCA's understanding that the applicant is committed to fully implementing this compensatory mitigation and that the mitigation will be an enforceable part of any Section 404 Permit. Given the current status of this road project, the proposed mitigation will satisfy the requirements of Minn. R. 7050.0186, including subp. 2 and 6. If the proposed mitigation proposal is changed substantially, the proposal must be submitted to the MPCA for further review.



520 Lafayette Rd. N.; Saint Paul, MN 55155-4194; (651) 296-6300 (Voice); (651) 282-5332 (TTY); www.pca.state.mn.us
St. Paul • Brainerd • Detroit Lakes • Duluth • Mankato • Marshall • Rochester • Willmar
Equal Opportunity Employer • Printed on recycled paper containing at least 20 percent fibers from paper recycled by consumers.

St. Paul District
U. S. Army Corps of Engineers

**DEPARTMENT OF THE ARMY PERMIT**
**EVALUATION AND DECISION DOCUMENT**

APPLICATION NUMBER: MVP-2001-5667-JKA

APPLICANT: Lake of the Woods County

PROJECT: Retain fill material placed for the purpose of providing access to the Sandy Shores residential developments

## PART I - INTRODUCTION

This document includes an environmental assessment, as required by the National Environmental Policy Act; the District Engineer's statement of findings, including a determination regarding compliance with the Section 404(b)(1) guidelines (if appropriate) and the need for an environmental impact statement; and the District Engineer's determination as to whether or not the project is contrary to the public interest. (NOTE: The Corps of Engineers permit regulations are at Title 33 of the Code of Federal Regulations (CFR), Parts 320 through 330.)

A public notice describing the project and its location is attached (Attachment A).

## PART II - ENVIRONMENTAL ASSESSMENT

PROJECT PURPOSE.

The purpose of the project is to provide access to the Sandy Shores residential developments.

PARTICIPANTS IN THE PUBLIC INTEREST REVIEW.

The public notice was sent to all known interested parties, including the appropriate Federal, State, and local agencies. A public notice mailing list is included in the permit file. A summary of comments follows:

U.S. Environmental Protection Agency (EPA). No comments were received during the comment period.

U.S. Fish and Wildlife Service (FWS). No comments were received during the comment period.

State Department of Natural Resources (DNR). The DNR provided the following comments:

Because the road has facilitated significant lakefront development, removal of the fill is not a viable option. We therefore recommend that the impact be mitigated through new wetland creation or wetland restoration. The Minnesota Department of Natural Resources has consented to allow restoration to occur on the Graceton State Wildlife Management Area, provided that the following conditions are incorporated in the Department of the Army permit:

A. All wetland restoration plans shall be reviewed and approved by DNR Area Wildlife Manager Jeff Dittrich prior to start of construction.
B. Lake of the Woods County shall agree to be responsible for all future maintenance of the ditch plugs.
C. A maintenance agreement with the DNR shall be developed prior to construction that identifies County responsibilities for future maintenance, describes future use and management of the restored wetlands, and requires that the County be responsible for all corrective measures that may be ordered by the U.S. Army Corps of Engineers.
D. The two-mile portion of Judicial Ditch 16 located between County Road 105 and County Road 4 shall be abandoned prior to construction.

In a follow-up letter dated January 24, 2005, the DNR stated that it is opposed to use of the Wildlife Management Area for mitigation beyond that required for the 17.98-acre violation.

Minnesota Pollution Control Agency (MPCA). No comments were received during the comment period. However, MPCA provided a letter to the Corps dated April 28, 2005 stating, "The MPCA waives its authority to certify the referenced project application."

State Historic Preservation Officer (SHPO). SHPO provided the following comment:

Based upon available information, we conclude that no properties eligible for or listed on the National Register of Historic Places are within the project's area of effect.

ALTERNATIVES KEY.

Throughout the remainder of Part II of this document, the proposed project and its alternatives will be identified according to the following key:

P = Project as described in the public notice (or as subsequently modified).

D = Denial of the permit.

MITIGATION AND THE SECTION 404(B)(1) RESTRICTIONS ON DISCHARGE.

Guidelines issued by the U.S. Environmental Protection Agency (EPA) pursuant to Section 404(b)(1) of the Clean Water Act restrict discharges of dredged or fill material under certain circumstances (see 40 CFR 230.10). These circumstances include specified types of environmental harm that would be caused by the discharge under review.

The guidelines also restrict discharges when there are feasible, less environmentally-damaging alternatives available. In general, this portion of the guidelines corresponds to the definition of mitigation found in the guidelines issued by the Council on Environmental Quality to implement the National Environmental Policy Act (see 40 CFR 1508.20). The policies and procedures for implementing the 404(b)(1) guidelines were set forth in a Mitigation Memorandum of Agreement (MOA) issued by the EPA and the Corps on February 7, 1990. According to the MOA, "The Corps will strive to avoid adverse impacts and offset unavoidable adverse impacts to existing aquatic resources, and for wetlands, will strive to achieve a goal of no overall net loss of values and functions." To carry out this policy, the Corps will, in general, evaluate Section 404 applications by gathering and reviewing all information on a project, including potential mitigation, at the same time. Then the Corps makes the following sequence of determinations:

1) Avoidance - The Corps first makes a determination that potential impacts have been avoided to the maximum extent practicable. To determine the availability of alternatives that would avoid impacts, one of the following two criteria must be applied:

a) If the project is in a special aquatic site (such as a wetland), and if the project does not need to be in or near the special aquatic site to fulfill its basic purpose (i.e., the project is not "water dependent"), then the Corps is required to

assume that there are practicable alternatives that do not involve special aquatic sites. To overcome this presumption, the applicant must clearly demonstrate to the Corps that practicable alternatives are not available. If the presumption is not overcome, the Corps must deny the permit application.

b) If the project is not in a special aquatic site and/or is water dependent, the Corps is not required to assume that there are practicable upland alternatives. However, if the Corps identifies such alternatives, the applicant must clearly demonstrate that they are not feasible. If such a demonstration cannot be made, the Corps must deny the permit application.

2) Minimization - The Corps will next mitigate unavoidable impacts, to the extent appropriate and practicable, by requiring steps to minimize those impacts.

3) Compensation - Finally, the Corps will mitigate unavoidable impacts, to the extent appropriate and practicable, by requiring steps to compensate for aquatic resource values.

In determining "appropriate and practicable" measures to offset unavoidable impacts, such measures should be appropriate to the scope and degree of those impacts and practicable in terms of cost, existing technology, and logistics in light of overall project purposes. The Corps will give full consideration to the views of the resource agencies when making this determination.

(NOTE: It may be appropriate to deviate from the above sequence when the discharge is necessary to avoid environmental harm or when the proposed discharge can reasonably be expected to result in environmental gain or insignificant environmental losses.)

The following is a summary of the mitigation sequence as it pertains to the proposal (Alternative P) and, if applicable, its alternatives (A1, A2, etc.). If denial of the permit (Alternative D) is not specifically addressed, the reader may assume that no discharge subject to Section 404(b)(1) sequencing would result from such action.

Avoidance. The purpose of this project is to provide access to the Sandy Shores residential developments. This is not a water-dependent activity because a road does not need to be located within a special aquatic site to fulfill its basic purpose. Furthermore, the project site contained wetlands, which are special aquatic sites. Therefore, the Corps must assume that there were practicable alternatives available that would have avoided wetland impacts. However, given the residential

development that has occurred along the road since its construction was completed in 1988, removal of the fill for the road is not a viable option at this time.

Minimization. Discharge of fill into 17.98 acres of wetland occurred during the construction of Sandy Shores Drive. The fill impact for the road is about 5,900 feet long and 35 to 40 feet wide. The wetland fill that was discharged to construct the road is the minimum needed to provide adequate access to the Sandy Shores residential developments.

Compensation. A total of 17.98 acres of wetland were filled to construct the road. However, the presence of the road induced additional wetland impacts by adjacent lot owners who filled wetlands for driveway and home construction. As wetland replacement, the applicant has proposed to conduct compensatory wetland mitigation at a site on the Graceton Wildlife Management Area in Sections 35 and 36, T. 162N., R. 33W., and Sections 1 and 2, T. 161N., R. 33W., in Lake of the Woods County approximately 10 miles south southeast of the project site. The mitigation would consist of constructing two ditch plugs in an existing judicial ditch to restore hydrology to a 1.5-mile length of shrub-carr (Type 6) wetland that has been hydrologically altered by the ditch. Lateral effect calculations for the site were conducted by Jon D. Hodgson, a Professional Engineer for the North Central Minnesota Joint Powers Board, in order to determine the area where wetland hydrology would be restored (mitigation area). The mitigation area was calculated to be 25.38 acres. In addition, the applicant has investigated the potential for abandonment and plugging of an additional 0.5-mile of the ditch just east of the proposed 1.5-mile segment. A private landowner owns the land on the south side of that portion of the ditch. The landowner has indicated that he may want to plug the ditch to create a wetland mitigation bank on his property. If that were approved, an additional 0.5-mile length of ditch would be plugged and wetland hydrology would be restored on both sides of the ditch. The DNR has requested that the entire 2-mile length of ditch be abandoned.

For a summary of all elements of Sec. 404(b)(1) compliance (including the alternatives criteria discussed above), see the matrix that follows the list of Technical Evaluation Factors.

GENERAL PUBLIC INTEREST FACTORS.

IMPACT KEY:
B = Beneficial effect.
A = Adverse effect.
0 = No effect.

NOTE: The absence of narrative under any heading with a "B" or "A" in the parenthesis indicates that, although there would be an impact, it would be a very minor one. If assessing more than one alternative, the impacts for each alternative will be shown in separate parentheses. However, if none of the alternatives would have an impact (either beneficial or adverse) on a given factor, a single (0) will be used after that factor.

Noise levels. D(0) P(A) Noise levels have likely increased on and near the site, temporarily during construction and permanently as a result of vehicular traffic on the road and residential use of the adjacent lots that were developed as a result of the project.

Aesthetic values. D(0) P(A) Many people consider converting a wetland from its natural condition to a developed use as an adverse impact to aesthetic values. In this case, a road was constructed through an undeveloped hardwood swamp and shrub-carr wetland. The road enabled the development of lakeshore lots, many in wetlands, along a stretch of previously undeveloped Lake of the Woods shoreline. However, it is likely that the lot owners are appreciative of the aesthetic values provided by their lots.

Recreation. D(0) P(B) The road and adjacent lots have provided numerous recreational opportunities for many residents. Those opportunities include boating, fishing, birding, relaxation, etc. Without the road for access, the site would provide recreational opportunities for a very limited number of people.

Transportation. D(0) P(A) The existence of Sandy Shores Drive and the adjacent lots has likely generated increased automobile and truck traffic on the local road system.

Public health. (0)

Safety. (0)

Community growth. D(0) P(B) The road provided access to the Sandy Shores residential developments, which resulted in the construction of homes and an increase in the population of the area.

Business/home relocations. (0)

Existing/potential land use. D(0) P(A) The site was undeveloped hardwood swamp and shrub-carr wetland. The area to the north and

south were residential developments along the shore of Lake of the Woods. The area south of the site, but away from the lakeshore was agricultural land. The area north of the site, but away from the lakeshore and the area west of the site were undeveloped hardwood swamp and shrub-carr wetlands. The new roadway construction impacted 17.98 acres of undeveloped wetland, and it enabled the development of numerous residential lots, many of which were also in wetlands.

Property values. D(0) P(B) The road provided access to numerous lakeshore lots, which greatly increased the value of the property.

Tax revenues. D(0) P(B) The road resulted in increased property values and increased tax revenues.

Public facilities and services. D(0) P(B) A public roadway was constructed, and it provides a public service.

Employment. D(0) P(B) The construction work provided temporary employment.

Business activity. (0)

Farmland/food supply. (0)

Flooding. (0)

Energy. (0)

Mineral needs. (0)

Air quality. D(0) P(A) There was likely a minor temporary effect on air quality during construction.

Terrestrial habitat. (0) Very little terrestrial habitat was impacted because most of the road was constructed in wetlands.

Aquatic habitat. D(0) P(A) Lot and shoreline modifications by lot owners along the road have likely resulted in an increase in chemical runoff into Lake of the Woods and a decrease in water quality. This could result in the loss of some habitat for portions of the lake's fishery.

Habitat diversity and interspersion. D(0) P(A) The project site provided primarily wetland habitat. The wetland fill for road construction resulted in a loss of wetland habitat in the subwatershed and potentially provided an opening where exotic and invasive species could become established; however, the proposed

wetland mitigation would replace 25.38 acres of wetland habitat at an offsite location.

Water quality. D(0) P(A) The placement of fill in the wetlands has caused permanent loss of the functions and values that the wetlands provided. The lost functions include assimilation of nutrients by wetland vegetation and the removal of suspended sediments from water moving through the wetlands. In addition, fertilizers, herbicides and pesticides from the landscaped portions of the adjacent residential lots are likely discharging into Lake of the Woods.

Water supply. (0)

Groundwater. (0)

Soils. (0)

Shoreline processes. (0)

Wetlands. D(0) P(A) The project has resulted in the filling of 9.93 acres of hardwood swamp (Type 7 wetland) and 8.05 acres of shrub-carr wetland(Type 6 wetland). The total wetland fill direct impact was 17.98 acres. In addition, the project resulted in induced wetland impacts on adjacent lots for the construction of driveways and residential buildings. Approximately 7.36 acres of induced wetland impacts occurred before June of 1998, and would have been covered under Nationwide Permit 29 without required mitigation. Approximately 6.72 acres of wetland impacts occurred between June of 1998 and April 1, 2004. Permits and mitigation would have been required for those impacts.

The dominant vegetation in the hardwood swamp was ash, aspen, and sedge. The dominant vegetation in the shrub-carr wetland was willow and sedge. The applicant has proposed to conduct compensatory wetland mitigation at a site on the Graceton Wildlife Management Area in Sections 35 and 36, T. 162N., R. 33W., and Sections 1 and 2, T. 161N., R. 33W., in Lake of the Woods County. The mitigation would consist of constructing two ditch plugs in an existing judicial ditch to restore hydrology to a 1.5-mile length of wetland that has been hydrologically altered by the ditch. Lateral effect calculations for the site were conducted by Jon D. Hodgson, a Professional Engineer for the North Central Minnesota Joint Powers Board, in order to determine the area where wetland hydrology would be restored (mitigation area). The mitigation area was calculated to be 25.38 acres. The proposed mitigation would restore hydrology to a shrub-carr wetland (Type 6 wetland). The predominant vegetation expected in the mitigation area would be willow and sedge.

Secondary and cumulative effects. D(0) P(A) Secondary effects of this project have previously been discussed under "Aquatic habitat" and "Water quality." In addition, the road has provided opportunities for private development of lots adjacent to the road. Much of the lot development has adversely impacted wetlands. Cumulative effects would include the direct loss of 17.98 acres of wetland within the project subwatershed. In addition, approximately 6.72 acres of induced wetland impacts occurred between June of 1998 and April 1 of 2004. However, the applicant has proposed 25.38 acres of wetland mitigation in Lake of the Woods County within the Lake of the Woods watershed. Therefore, there would be no net loss of wetland acreage.

PUBLIC INTEREST FACTORS MERITING SPECIAL CONSIDERATION.

Navigation. (0)

Endangered species. (0) The U.S. Fish & Wildlife Service did not comment on potential impacts to endangered species.

Historical/archaeological. (0) SHPO stated that no properties eligible for or listed on the National Register of Historic Places are within the project's area of effect.

Wild and scenic rivers. (NA) None are present in the area.

Tribal Trust resources. (NA)

State listed impaired (Section 303(d)) waters. (NA) None are present in the area.

Section 176(c) of the Clean Air Act General Conformity Rule Review.

The proposal has been analyzed for conformity applicability pursuant to regulations implementing Section 176(c) of the Clean Air Act. It has been determined that the activities proposed under this permit will not exceed de minimis levels of direct emissions of a criteria pollutant or its precursors and are exempted by 40 CFR Part 93.153. Any later indirect emissions are generally not within the Corps continuing program responsibility and generally cannot be practicably controlled by the Corps. For these reasons, a conformity determination is not required for this permit.

THE ENVIRONMENTAL PROTECTION AGENCY'S 404(B)(1) GUIDELINES.

As explained above, the discharge of dredged or fill material will be evaluated in accordance with guidelines developed by the EPA. The guidelines are found at Title 40, Code of Federal Regulations, Part 230.

Testing.

The Section 404(b)(1) guidelines require testing of the extraction site for contaminants except under certain circumstances. These include the existence of prior test results, scientific research and/or experience that indicates that contaminants are not present in the material to be discharged. Testing may also be omitted if the discharge site is adjacent to the extraction site and subject to the same sources of contaminants, and materials at the two sites are substantially similar. Testing may also be omitted if constraints are available to reduce contamination to acceptable levels, and if the potential discharger is willing and able to implement such constraints. In this case, testing is not required because the fill was obtained from a nearby State-owned site.

Technical Evaluation Factors.

In making our findings on compliance with the Section 404(b)(1) guidelines, we have considered the potential impacts of the project (and alternatives, if any) on the physical and chemical characteristics of the aquatic ecosystem. These characteristics are listed in Subparts C - F of the guidelines, 40 CFR Part 230.20 - 230.54, as found on pp. 85350 - 85354 of the Federal Register, Vol. 45, No. 249. The characteristics include substrate, suspended particulates/turbidity, water, current patterns and water circulation, normal water fluctuations, salinity gradients, threatened and endangered species, fish, crustaceans, mollusks, and other aquatic organisms in the food web, other wildlife, sanctuaries and refuges, wetlands, mud flats, vegetated shallows, riffle and pool complexes, municipal and private water supplies, recreational and commercial fisheries, water-related recreation, aesthetics, parks, national and historical monuments, national seashores, wilderness areas, research sites, and similar preserves.

CEMVP-OP-R (2001-5667-JKA)
APPLICANT: Lake of the Woods County

Section 404(b)(1) compliance summary matrix.

P = Proposal. D = No action (denial). A1, A2 = Additional alternatives, if any. Where only a P is shown, it indicates that all alternatives meet compliance criteria for that item. An unknown is a noncompliance; this will be designated with a U in the DOES NOT COMPLY column.

| | | MEETS CRITERIA | DOES NOT COMPLY |
|---|---|---|---|
| 1. | The applicant must overcome the presumption that a practicable, less environmentally damaging alternative site, outside special aquatic sites, exists. If the project is water dependent, OR is not in a special aquatic site, enter only N/A (not applicable). | D,P | |
| 2. | There must be no alternative that is practicable, is less damaging to the aquatic ecosystem, and has no other significant, adverse environmental effects. | D,P | |
| 3. | The discharge must not violate state water quality standards or Clean Water Act Section 307 toxic effluent standards or bans. | D,P | |
| 4. | The project must not jeopardize the continued existence of an endangered species. | D,P | |
| 5. | The project must not cause significant adverse effects on municipal water supplies, plankton, fish, shellfish, wildlife, special aquatic sites, or other aspects of human health or welfare. | D,P | |
| 6. | The project must not cause significant adverse effects on life stages of aquatic life and other wildlife dependent on aquatic ecosystems. | D,P | |
| 7. | The project must not cause significant adverse effects on ecosystem diversity, productivity, or stability. | D,P | |
| 8. | The project must not cause significant adverse effects on recreational, aesthetic or economic values. | D,P | |

| | | |
|---|---|---|
| 9. All appropriate and practicable steps, to minimize potential adverse effects of the discharge on the aquatic ecosystem, must be taken. | D,P | : |

OTHER AUTHORIZATIONS.

Water-quality certification: MPCA waived its authority for Section 401 water quality certification in a letter dated April 28, 2005.

## PART III - SUMMARY AND STAFF RECOMMENDATION

**GENERAL EVALUATION.**

The relative extent of the public and private need for the proposed work.

There was no public need for the road. Rather, the road construction project has helped satisfy private desire for access to additional lakeshore lots on Lake of the Woods. The applicant has received a benefit from the additional taxes paid on the increased value of the private properties adjacent to the road.

The practicability of using reasonable alternative locations and methods to accomplish the objective of the structure or work.

The road was constructed from 1978 to 1988 without Clean Water Act Section 404 authorization. The road has facilitated significant lakefront development. Because of that development, a search for alternative locations and removal of the fill for the road are no longer practicable alternatives.

The extent and permanence of the beneficial and detrimental effects that the proposed structure or work is likely to have on the public and private uses to which the area is suited.

The discharge of fill into 17.98 acres of wetland for construction of Sandy Shores Drive has resulted in a permanent loss of wetland functions and values at the site. However, the applicant would conduct wetland mitigation at a site on the Graceton Wildlife Management Area to restore hydrology to 25.38 acres of wetland. The wetland mitigation work should provide long-term benefits. In addition, numerous lot owners have

received long-term benefits because the road has provided them an opportunity to develop and utilize lakeshore lots on Lake of the Woods.

STAFF RECOMMENDATION. Based on an evaluation of all data submitted or gathered during the public interest review, it is the recommendation of the Regulatory Branch that a permit be granted for the proposed project.

July 7, 2005
Date

Jon K. Ahlness
Jon K. Ahlness
Project Manager

July 7, 2005
Date

For Ralph H. Augustin
Robert J. Whiting
Chief, Regulatory Branch

**PART IV - FINDINGS AND DECISION OF THE DISTRICT ENGINEER**

I have considered the foregoing facts, analysis, and recommendation. The following are my views on this permit application:

FINDING OF NO SIGNIFICANT IMPACT.

Having reviewed the information provided by the applicant, the comments submitted by interested parties, and the environmental assessment contained in this document, I find that this permit action will not have a significant impact on the quality of the human environment. Therefore, an environmental impact statement will not be required.

SECTION 404(B)(1) COMPLIANCE/NON-COMPLIANCE DETERMINATION.

The discharge complies with the guidelines, with the inclusion of appropriate and practicable conditions to minimize pollution or other harmful impacts to the affected ecosystem.

PUBLIC HEARING REQUEST.

No public hearing request was received.

CEMVP-OP-R (2001-5667-JKA)
APPLICANT: Lake of the Woods County

DECISION.

I have reviewed and evaluated, in light of the overall public interest, the documents and factors concerning this permit application as well as the stated views of other interested agencies and the concerned public. In doing so, I have considered the possible consequences of this project in accordance with regulations published in 33 CFR Part 320 to 330 and 40 CFR Part 230. I find that issuance of a Department of the Army permit (with special conditions):

___X___ would not be contrary to the public interest.

_______ would be contrary to the public interest.

I have determined that this permit will be issued if the State issues a Section 401 Water Quality Certification or waiver.

July 7, 2005
Date

for Michael F. Pfenning
Colonel, Corps of Engineers
District Engineer

DEPARTMENT OF THE ARMY
ST. PAUL DISTRICT, CORPS OF ENGINEERS
190 FIFTH STREET EAST
ST. PAUL, MN 55101-1638

REPLY TO ATTENTION OF
Operations
Regulatory (MVP-2001-5667-JKA)

MAR 28 2005

Mr. Bruce Hasbargen
Lake of the Woods County
P.O. Box 808
Baudette, MN 56623

Dear Mr. Hasbargen:

We have completed our review of your project to retain fill material in 17.98 acres of wetland adjacent to Lake of the Woods. The project site is in the SW ¼ of Sec. 16 and the E ½ of Sec. 17, T. 163N., R. 33W., Lake of the Woods County, Minnesota.

By Federal law, no Department of the Army (DA) permit can be issued until a State Section 401 Water Quality Certification has been issued or the requirement for the certification has been waived. As of this date the Minnesota Pollution Control Agency (MPCA) has not issued a Section 401 Water Quality Certification for your proposed work. If the MPCA does not issue or waive certification by October 5, 2005, the Section 401 Certification requirement will be automatically waived.

Enclosed is a **"PROVISIONAL PERMIT."** The provisional permit is **NOT VALID** and does **not** authorize you to do your work. The provisional permit describes the work that will be authorized, and the General and Special Conditions which will be placed on your final Department of the Army (DA) permit, if the Section 401 Water Quality Certification requirements are satisfied as described below. **No** work is to be performed in the waterway until you have received a validated copy of the DA permit.

Conditions of the State 401 Water Quality Certification will become conditions to the final DA permit. Should the State's action on the required certification preclude validation of the provisional permit in its current form, a modification to the provisional permit will be evaluated and you will be notified as appropriate. Substantial changes may require a new permit evaluation process, including issuing a new public notice.

Once the State has issued the required Section 401 Water Quality Certification or the date above has passed without the State issuing or waiving certification, and you agree to the terms and conditions of the provisional permit, you should sign and date both copies and return them to us. Your DA permit will not be valid until we have returned a copy to you bearing both your signature and the signature of the appropriate Corps official.

If the State denies the required Section 401 Water Quality Certification, then the DA permit is denied without prejudice. If you should subsequently obtain a Section 401 Water

Quality Certification, you should contact this office to determine how to proceed with your permit application.

If you have any questions concerning your State Section 401 Water Quality Certification, please contact Mr. Larry Zdon of the MPCA at (651) 297-8219.

If your project will require off-site fill material that is **not** obtained from a licensed commercial facility, you must notify us at least five working days before start of work. A cultural resources survey may be required if a licensed commercial facility is not used.

If you disagree with the enclosed jurisdictional determination, you may provide new information. Please follow the directions in Section D of the enclosed Notification of Administrative Appeal Options and Process and Request for Appeal.

If this provisional permit is not acceptable and you would like to appeal the permit decision, please follow the directions in Section A of the enclosed Notification of Administrative Appeal Options and Process and Request for Appeal.

The decision regarding this action is based on information found in the administrative record, which documents the District's decision-making process, the basis for the decision, and the final decision.

If you have any other questions concerning your application for a DA permit, please contact Jon K. Ahlness in our St. Paul office at (651) 290-5381. In any correspondence or inquiries, please refer to the Regulatory number shown above.

Sincerely,

Robert J. Whiting
Chief, Regulatory Branch

Copy furnished:

Josh Stromlund, LOW County

Construction Operations
Regulatory (MVP-2001-5667-JKA)

**PROVISIONAL PERMIT**

**NOT VALID**

**DO NOT BEGIN WORK**

This **PROVISIONAL PERMIT** is **NOT VALID** until:

1. You obtain:__X__a Section 401 Water Quality Certification from the Minnesota Pollution Control Agency.

2. You sign and return the enclosed provisional permit with the State Section 401 Water Quality Certification and the appropriate permit fee as indicated below.

__X__ No Fee Required

3. The Corps signs the permit and returns it to you.

Your permit is denied without prejudice if the State denies your Section 401 Water Quality Certification and/or does not concur with your Coastal Zone Consistency determination.

**DO NOT BEGIN WORK**

| NOTIFICATION OF ADMINISTRATIVE APPEAL OPTIONS AND PROCESS AND REQUEST FOR APPEAL | | | |
|---|---|---|---|
| Applicant: Lake of the Woods County | | File Number: 2001-5667-JKA | Date: MAR 2 8 2005 |
| Attached is: | | | See Section below |
| X | INITIAL PROFFERED PERMIT (Standard Permit or Letter of Permission) | | A |
| | PROFFERED PERMIT (Standard Permit or Letter of Permission) | | B |
| | PERMIT DENIAL | | C |
| X | APPROVED JURISDICTIONAL DETERMINATION | | D |
| | PRELIMINARY JURISDICTIONAL DETERMINATION | | E |

**SECTION I** - The following identifies your rights and options regarding an administrative appeal of the above Decision. Additional information may be found at http://usace.army.mil/inet/functions/cw/cecwo/reg or Corps regulations at 33 CFR Part 331.

**A. INITIAL PROFERRED PERMIT:** You may accept or object to the permit.

- **ACCEPT:** If you received a Standard Permit, you may sign the permit document and return it to the district engineer for final authorization. If you received a Letter of Permission (LOP), you may accept the LOP and your work is authorized. Your signature on the Standard Permit or acceptance of the LOP means that you accept the permit in its entirety, and waive all rights to appeal the permit, including its terms and conditions, and approve jurisdictional determinations associated with the permit.

- **OBJECT:** If you object to the permit (Standard or LOP) because of certain terms and conditions therein, you may request that the permit be modified accordingly. You must complete Section II of this form and return the form to the district engineer. Your objections must be received by the district engineer within 60 days of the date of this notice, or you will forfeit your right to appeal the permit in the future. Upon receipt of your letter, the district engineer will evaluate your objections and may: (a) modify the permit to address all of your concerns, (b) modify the permit to address some of your objections, or (c) not modify the permit having determined that the permit should be issued as previously written. After evaluating your objections, the district engineer will send you a proffered permit for your reconsideration, as indicated in Section B below.

**B. PROFFERED PERMIT:** You may accept or appeal the permit.

- **ACCEPT:** If you received a Standard Permit, you may sign the permit document and return it to the district engineer for final authorization. If you received a Letter of Permission (LOP), you may accept the LOP and your work is authorized. Your signature on the Standard Permit or acceptance of the LOP means that you accept the permit in its entirety, and waive all rights to appeal the permit, including its terms and conditions, and approved jurisdictional determinations associated with the permit.

- **APPEAL:** If you choose to decline the proffered permit (Standard or LOP) because of certain terms and conditions therein, you may appeal the declined permit under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer. This form must be received by the division engineer within 60 days of the date of this notice.

**C. PERMIT DENIAL:** You may appeal the denial of a permit under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer. This form must be received by the division engineer within 60 days of the date of this notice.

**D. APPROVED JURISDICTIONAL DETERMINATION:** You may accept or appeal the approved JD or provide new information.

- **ACCEPT:** You do not need to notify the Corps to accept an approved JD. Failure to notify the Corps within 60 days of the date of this notice, means that you accept the approved JD in its entirety, and waive all rights to appeal the approved JD.

A-369

- **APPEAL:** If you disagree with the approved JD, you may appeal the approved JD under the Corps of Engineers Administrative appeal Process by completing Section II of this form and sending the form to the division engineer. This form must be received by the division engineer within 60 days of the date of this notice.

**E. PRELIMINARY JURISDICTIONAL DETERMINATION:** You do not need to respond to the Corps regarding the preliminary JD. The Preliminary JD is not appealable. If you wish, you may request an approved JD (which may be appealed), by contacting the Corps district for further instruction. Also you may provide new information for further consideration by the Corps to reevaluate the JD.

SECTION II - REQUEST FOR APPEAL or OBJECTIONS TO AN INITIAL PROFFERED PERMIT

REASONS FOR APPEAL OR OBJECTIONS: (Describe your reasons for appealing the decision or your objections to an initial proffered permit in clear concise statements. You may attach additional information to this form to clarify where your reasons or objections are addressed in the administrative record.)

ADDITIONAL INFORMATION: The appeal is limited to a review of the administrative record, the Corps memorandum for the record of the appeal conference or meeting, and any supplemental information that the review officer has determined is needed to clarify the administrative record. Neither the appellant nor the Corps may add new information or analyses to the record. However, you may provide additional information to clarify the location of information that is already in the administrative record.

POINT OF CONTACT FOR QUESTION OR INFORMATION:

| If you have question regarding this decision and/or the appeal process, you may contact: | If you only have questions regarding the appeal process you may also contact: |
|---|---|
| Jon K. Ahlness<br>U.S. Army corps of Engineers, Regulatory Branch<br>190 Fifth Street East<br>St. Paul, MN 55101-1638<br>Telephone: (651) 290-5381 | Division Engineer<br>C/o Martha s. Chieply, Appeal Review Office<br>CEMVD<br>P.O. Box 80<br>Vicksburg, Mississippi 39181-0080<br>Telephone: (601) 634-5820 |

RIGHT OF ENTRY: Your signature below grants the right of entry to Corps of Engineers personnel, and any government consultants, to conduct investigations of the project site during the course of the appeal process. You will be provided a 15 day notice of any site investigation, and will have the opportunity to participate in all site investigations.

| Signature of appellant or agent. | Date: | Telephone number: |
|---|---|---|
| | | |

JURISDICTIONAL DETERMINATION
U.S. Army Corps of Engineers

Revised 8/13/04

DISTRICT OFFICE: St. Paul District
FILE NUMBER: MVP-2001-5667-JKA
PROJECT LOCATION INFORMATION:

State: Minnesota
County: Lake of the Woods
Center coordinates of site (latitude/longitude): Lat: 48.9382043202 Lon: -94.9196242217
Approximate size of area (parcel) reviewed, including uplands: 18 acres.
Name of nearest waterway: Lake of the Woods
Name of watershed: Lake of the Woods

JURISDICTIONAL DETERMINATION

**Completed:** Desktop determination ☐ Date:
Site visit(s) ☒ Date(s): July 7, 2004

**Jurisdictional Determination (JD):**

☐ Preliminary JD - Based on available information, ☐ *there appear to be* (or) ☐ *there appear to be no* "waters of the United States" and/or "navigable waters of the United States" on the project site. A preliminary JD is not appealable (Reference 33 CFR part 331).

☒ Approved JD – An approved JD is an appealable action (Reference 33 CFR part 331).
Check all that apply:

☐ *There are* "navigable waters of the United States" (as defined by 33 CFR part 329 and associated guidance) within the reviewed area. Approximate size of jurisdictional area:

☒ *There are* "waters of the United States" (as defined by 33 CFR part 328 and associated guidance) within the reviewed area. Approximate size of jurisdictional area: 18 acres

☐ *There are "isolated, non-navigable, intra-state* waters or wetlands" within the reviewed area.
☐ Decision supported by SWANCC/Migratory Bird Rule Information Sheet for Determination of No Jurisdiction.

BASIS OF JURISDICTIONAL DETERMINATION:

**A. Waters defined under 33 CFR part 329 as "navigable waters of the United States":**

☐ The presence of waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.

**B. Waters defined under 33 CFR part 328.3(a) as "waters of the United States":**

☐ (1) The presence of waters, which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide.
☐ (2) The presence of interstate waters including interstate wetlands[1].
☐ (3) The presence of other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate commerce including any such waters (check all that apply):
  ☐ (i) which are or could be used by interstate or foreign travelers for recreational or other purposes.
  ☐ (ii) from which fish or shellfish are or could be taken and sold in interstate or foreign commerce.
  ☐ (iii) which are or could be used for industrial purposes by industries in interstate commerce.
☐ (4) Impoundments of waters otherwise defined as waters of the US.
☐ (5) The presence of a tributary to a water identified in (1) – (4) above.
☐ (6) The presence of territorial seas.
☒ (7) The presence of wetlands adjacent[2] to other waters of the US, except for those wetlands adjacent to other wetlands.

**Rationale for the Basis of Jurisdictional Determination (applies to any boxes checked above).** *If the jurisdictional water or wetland is not itself a navigable water of the United States, describe connection(s) to the downstream navigable waters. If B(1) or B(3) is used as the Basis of Jurisdiction, document navigability and/or interstate commerce connection (i.e., discuss site conditions, including why the waterbody is navigable and/or how the destruction of the waterbody could affect interstate or foreign commerce). If B(2, 4, 5 or 6) is used as the Basis of Jurisdiction, document the rationale used to make the determination. If B(7) is used as the Basis of Jurisdiction, document the rationale used to make adjacency determination:* Fill was discharged into an unnamed wetland adjacent to Lake of the Woods, which is a navigable water of the United States.

**Lateral Extent of Jurisdiction:** (Reference: 33 CFR parts 328 and 329)

☐ Ordinary High Water Mark indicated by:
- ☐ clear, natural line impressed on the bank
- ☐ the presence of litter and debris
- ☐ changes in the character of soil
- ☐ destruction of terrestrial vegetation
- ☐ shelving
- ☐ other:

☐ High Tide Line indicated by:
- ☐ oil or scum line along shore objects
- ☐ fine shell or debris deposits (foreshore)
- ☐ physical markings/characteristics
- ☐ tidal gages
- ☐ other:

☐ Mean High Water Mark indicated by:
☐survey to available datum; ☐physical markings; ☐ vegetation lines/changes in vegetation types.

☐Wetland boundaries, as shown on the attached wetland delineation map and/or in a delineation report prepared by:

**Basis For Not Asserting Jurisdiction:**

☐The reviewed area consists entirely of uplands.
☐Unable to confirm the presence of waters in 33 CFR part 328(a)(1, 2, or 4-7).
☐Headquarters declined to approve jurisdiction on the basis of 33 CFR part 328.3(a)(3).
☐ The Corps has made a case-specific determination that the following waters present on the site are not Waters of the United States:
- ☐ Waste treatment systems, including treatment ponds or lagoons, pursuant to 33 CFR part 328.3.
- ☐ Atificially irrigated areas, which would revert to upland if the irrigation ceased. Artificial lakes and ponds created by excavating and/or diking dry land to collect and retain water and which are used exclusively for such purposes as stock watering, irrigation, settling basins, or rice growing.
- ☐ Artificial reflecting or swimming pools or other small ornamental bodies of water created by excavating and/or diking dry land to retain water for primarily aesthetic reasons.
- ☐ Water-filled depressions created in dry land incidental to construction activity and pits excavated in dry land for the purpose of obtaining fill, sand, or gravel unless and until the construction or excavation operation is abandoned and the resulting body of water meets the definition of waters of the United States found at 33 CFR 328.3(a).
- ☐ Isolated, intrastate wetland with no nexus to interstate commerce.
- ☐ Prior converted cropland, as determined by the Natural Resources Conservation Service. Explain rationale:
- ☐ Non-tidal drainage or irrigation ditches excavated on dry land. Explain rationale:
- ☐ Other (explain):

**DATA REVIEWED FOR JURSIDICTIONAL DETERMINATION (mark all that apply):**

☒ Maps, plans, plots or plat submitted by or on behalf of the applicant.
☒ Data sheets prepared/submitted by or on behalf of the applicant.
- ☒ This office concurs with the delineation report, dated **10-25-02**, prepared by (company): **Lake of the Woods Soil & Water Conservation District**
- ☐ This office does not concur with the delineation report, dated prepared by (company):

☐ Data sheets prepared by the Corps.
☐ Corps' navigable waters' studies:
☐ U.S. Geological Survey Hydrologic Atlas:
☒ U.S. Geological Survey 7.5 Minute Topographic maps:
☐ U.S. Geological Survey 7.5 Minute Historic quadrangles:
☐ U.S. Geological Survey 15 Minute Historic quadrangles:
☒ USDA Natural Resources Conservation Service Soil Survey:
☒ National wetlands inventory maps:
☐ State/Local wetland inventory maps:
☐ FEMA/FIRM maps (Map Name & Date):
☐ 100-year Floodplain Elevation is: (NGVD)
☒ Aerial Photographs (Name & Date): **FSA 2003**
☐ Other photographs (Date):
☐ Advanced Identification Wetland maps:
☒ Site visit/determination conducted on: **July 7, 2004**
☐ Applicable/supporting case law:
☐ Other information (please specify):

[1]Wetlands are identified and delineated using the methods and criteria established in the Corps Wetland Delineation Manual (87 Manual) (i.e., occurrence of hydrophytic vegetation, hydric soils and wetland hydrology).

[2]The term "adjacent" means bordering, contiguous, or neighboring. Wetlands separated from other waters of the U.S. by man-made dikes or barriers, natural river berms, beach dunes, and the like are also adjacent.

JA 3-7-05

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| GARY BAILEY, Plaintiff, | |
| v. | |
| THE UNITED STATES, Defendant. | Civil No. 02-1078L Honorable Victor J. Wolski |

COPY

DEPOSITION OF DENNIS THOMSON

February 21, 2008

. . . The following is the Deposition of DENNIS THOMSON, taken at the request of the Defendant in the above-entitled cause, pending in the United States Court of Federal Claims, pursuant to Notice and the Federal Rules of Civil Procedure, before Ruth Ann Johnson, RPR, a Notary Public within and for the State of Minnesota, at the AmericInn, Highway 11 West, Roseau, Minnesota, on Thursday, February 21, 2008, at 1:25 o'clock p.m., at which time counsel appeared as hereinbefore set forth . . . .

Page 2

APPEARANCES

On Behalf of the Plaintiff:
ALAN FISH, P.A.
102 2nd Avenue Northwest
Roseau, Minnesota 56751
By: RITA FISH-WHITLOCK, ATTORNEY AT LAW

On Behalf of the Defendant:
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
P. O. Box 663
Washington, DC 20004
By: JAMES D. GETTE, TRIAL ATTORNEY

Taken By: Ruth Ann Johnson, RPR

Page 3

CONTENTS


| DEPONENT: | PAGE NO. |
|---|---|
| DENNIS THOMSON | |
| Examination by . . . Mr. Gette | 4 |
| Examination by . . . Ms. Fish-Whitlock | 21 |
| Examination by . . . Mr. Gette | 45 |

| EXHIBITS | MARKED |
|---|---|
| No. 1 -- Copy of plat | 12 |
| No. 2 -- Copy of letter to Mr. and Mrs. Thomson from Rita Fish-Whitlock, 5-31-05, with attachments | 17 |
| No. 3 -- Invoice for culvert | 20 |


(*Exhibit 3 retained by counsel.)
(*Exhibits attached to transcript.)

Page 4

PROCEEDINGS

DENNIS THOMSON,

of Warroad, Minnesota, called as a witness by the Defendant, being first duly sworn by Ruth Ann Johnson, RPR, a Notary Public within and for the State of Minnesota, was examined and deposed on his oath as follows:

EXAMINATION

BY MR. GETTE:
Q. Mr. Thomson, my name is Jim Gette, we've spoken on the phone and met just prior to your deposition today. I represent the United States in a lawsuit that has been brought by Gary Bailey regarding some property down in, along Lake of the Woods, and I've subpoenaed you to, to give your deposition here today.
Let me start by asking you, have you ever had your deposition taken before?
A. No, I haven't.
Q. Okay. A few quick instructions just to help things move along as smoothly as possible.
As you notice, the court reporter is here and she's taking down everything that both

Page 5

I and you say and that, therefore, it's important that we not talk over top of each other. So I'll work very hard not to interrupt your answers, if you could try to do the same with respect to my questions. Okay?
A. All right.
Q. The second thing is that it's important that you understand any questions that I ask you today. Sometimes my questions may not be as clear or as understandable as necessary and if you find that to be the case, just let me know that you don't understand the question and I'll be happy to rephrase it for you. Okay?
A. Okay.
Q. The final thing is any time, if you want a break, you just let me know that and we'll do that. All right?
A. All right. Sounds good.
Q. First off, give me your name and your address?
A. Name is Dennis James Thomson, address is 304 Virginia Avenue Northeast, Warroad, Minnesota, 56763.
Q. Now at some point in time did you

Page 6

purchase some property along Lake of the Woods?
A. Yes, I did.
Q. Okay. And about when was that?
A. I believe it was around 1998.
Q. And was this property in what is called the Sunny Beach Plat?
A. Yes, it is.
Q. Okay. And are you aware that there are 14 platted lots in that development?
A. Yes, I am.
Q. Okay. And how many of those did you buy?
A. Two.
Q. Okay. And what are the numbers of your platted lots?
A. I believe mine are two and three. There's one on the end.
Q. Did you work through any real estate agent in purchasing the property?
A. I did. I'm not -- I can't remember the real estate agent's name, but it is on the, one of the forms, the deeds, he brought it into the store.
Q. Okay. Does Patrick LaValla --
A. Yes, that's it.

Page 7

Q. Okay. And did you understand, during the process of buying the property, whether Mr. LaValla was acting as your agent or Mr. Bailey's agent?
A. Yeah. Mr. LaValla said that he was selling the land for Gary Bailey.
Q. Now prior to your -- let me lay the foundation for that. From whom did you purchase the property?
A. It was all written up and I paid the deposit to Mr. LaValla.
Q. Do you know who the owner of the property was, from whom you were buying the property?
A. It did come up at some time that I would be making payments to Gary Bailey.
Q. Now prior to your purchase of the property, had you ever met Mr. Bailey?
A. No. And I haven't met him yet.
Q. Okay. Have you ever spoken with Mr. Bailey?
A. Yes, we've talked on the phone.
Q. Sometimes I get so automated when I'm doing these depositions that I ask for your address and then forget to listen. What town

Page 8

do you live in?
A. Warroad, Minnesota.
Q. And how far is that from the property up on the Lake of the Woods?
A. Must be about 20 miles. It's 20 minutes or so to get out there.
Q. Okay. When did you first have occasion to talk to Mr. Bailey on the phone?
A. I just, I remember calling him to, when I started getting some of the notices that there were problems with whether it was wetlands or not, and we discussed it and he said he was working on taking care of that.
Q. Prior to your purchase of the property, did anyone inform you that there were any questions regarding wetlands on the property?
A. No. In fact, it was brought to my attention that it was more or less a continuation of the road from Sandy Shores and it was listed as farmland on the county records, so it did not indicate anywhere along the line that it was wetlands.
Q. How much did you pay for your two lots?

Page 9

A. $50,000.
Q. And were you required to make a down payment?
A. It was $500 at the close of the deal, a check for $500.
Q. And then did you finance the remainder of the purchase?
A. The rest of it went on contract for deed with monthly payments.
Q. Do you know offhand how much your monthly payments are?
A. $594 and some change.
Q. And are you current with your payments under the contract for deed?
A. Actually, I'm a little bit behind, but we've discussed that and he's not worried about it, so I've been doubling up a little bit in the last few months to catch back up.
Q. Are you able to estimate approximately how many months you're behind?
A. That would be about eight to ten months, because I, there for one year I wasn't paying much.
Q. During the period that you testified you weren't paying much, what was the reason

Page 10

for that?
A. We, things got a little tight at the store, we didn't have a lot of extra cash, and I opened a Radio Shack and that took some of the money, and then I bought the building, and with 11 apartments, that just kind of made cash flow a little bit slow.
Q. Throughout that period was it always your intention to become current with your payments?
A. Yes. Yes.
Q. And under the initial duration of the contract for deed, would your payments be -- how much longer would your payments run?
A. It ran for ten years, from the, October of 2008 -- I mean of 1998 to, now it should be in October of this year, but it, it might be yet. I'm working on that.
Q. And at this point Mr. Bailey has indicated that he's comfortable with your attempts to come current with your payments?
A. Yes. He says he's not worried a bit.
MR. GETTE: This is off the record.
(Whereupon, there was discussion off

Page 11

the record.)
Q. (By Mr. Gette) When you purchased the property, what were your intentions with respect to how you would use the property?
A. Michele and I were planning on putting a summer cabin out there.
Q. And was it your intention that the summer cabin would include a septic system?
A. Yes. That type of area, because of the depth and stuff of the sand, it would have had to have been a mound system, but they have built them on other parts of the lake, so we didn't think there would be any problem with that.
Q. Have you ever had any drawings built with respect to construction on the property?
A. No, we haven't drawn anything up.
Q. Have you ever hired anyone to investigate whether a septic system could be installed on the property?
A. No, we haven't done that.
Q. Has anyone ever told you that a septic system could or could not be placed on the property?
A. The way I understand it with the

Page 12

wetlands and everything, now it's not acceptable. They, one of the neighbors brought in a port-a-pot type of thing is what they had to eliminate their waste with.
Q. Do you know what neighbor that was?
A. That was just the next one to the, the, it would have been the -- west of me. I just happened to see him do it when he was out there fishing and stuff, so -- (no further response.)
Q. Okay. Let's --
A. I don't know if that one may, that person may have sold it or not, I'm not sure.
Q. Okay.
MR. GETTE: Let's mark this as Thomson Exhibit 1.
(Whereupon, Deposition Exhibit No. 1, Thomson, was marked for identification.)
Q. (By Mr. Gette) Mr. Thomson, I'm handing you a copy of what will be Exhibit 1 to your deposition, that is a copy of the plat of the properties we've been talking about. Have you seen a copy of this plat before?
A. Yes, I have. I have seen it.
MS. FISH-WHITLOCK: I'm going to

Page 13

object to characterization as a copy of a plat.
MR. GETTE: Okay.
Q. (By Mr. Gette) And you see where Lots 2 and 3 are located toward the bottom of the plat?
A. Right. I'm, I'm thinking now maybe I'm three and four, because there's the road here (indicating) and then a partial of two. I --
Q. The, the only -- with respect to the, with respect to the port-a-potty that was placed, in which direction on this would it have been?
A. It would have been -- it's -- would have been to the, is this marked as north and stuff (indicating), how is this?
Q. Let's just take toward the top of the page versus toward the bottom.
A. Toward the top from my property, be the next one towards the top.
Q. Okay. So it would be have been the property toward the top of the page as you head away from your property?
A. Right.
Q. Okay. That's all I wanted on that,

Page 14

I just wanted to make sure we had the right property.
Now you indicated that it was your understanding that with the wetlands septic systems would not be allowed. How did you come to that understanding?
MS. FISH-WHITLOCK: Objection, mischaracterization of his testimony.
Go ahead.
A. I, I didn't think any -- well, what I understood was there could be no development of the land or nothing built on it and I just assumed that would include any kind of a septic system or, or a house, so -- (no further response.)
Q. (By Mr. Gette) How did you understand there would be no development allowed?
A. Because it was wetlands and they wouldn't allow any construction.
Q. Did you have any conversations with the local government officials regarding the development of the property?
A. No, I haven't.
Q. Have you had any conversations with

Page 15

representatives of the United States Corps of Engineers?
A. No.
Q. Is it currently your intention to complete the payments that are called for under the contract for deed?
A. Yes, I plan on completing those payments.
Q. Have you ever made any attempts to sell this property?
A. No. I have been approached by people, but I have not tried to sell it.
Q. Who has approached you about the property?
A. Just I had people call me on the phone, I had no idea who they were, and they just stated that they knew I owned some land out on the lake and they wanted to know if I was interested in selling and I just said no.
Q. Approximately when did those calls come to you?
A. I think the last one was about a year and a half ago.
Q. And approximately how many of these calls do you think you've received?

Page 16

A. Altogether it was just three.
Q. Do you recall when the first two calls occurred?
A. That was about midway through, so it would have been about five years after I'd been paying on the land. And about that time I was about halfway through and I think about -- then I received the first call.
Q. So the first call, would it be fair to say it was somewhere in the vicinity of 2003?
A. Yes.
Q. When was the last time you were out to the property?
A. It's been about three years now.
Q. What are your current plans in terms of development of the property or use of the property?
A. I'm actually waiting to find out what happens. I know some efforts have been made to set aside different wetlands and to get that taken off the wetland list and right now I'm just waiting to find out what's going to happen before I do anything.
Q. In the three telephone calls that

Page 17

you received, did any of those purchasers indicate they were aware that the property was wetlands?
A. No, they never brought that up.
Q. Did you bring that up in your conversations with them?
A. No. The conversation wasn't very long, because as soon as they said what they wanted, I just said I'm not interested.
Q. Have you ever applied for any building or land use permits for the property?
A. No.
MR. GETTE: Let's mark this as Exhibit 2.
(Whereupon, Deposition Exhibit No. 2, Thomson, was marked for identification.)
Q. (By Mr. Gette) Mr. Thomson, I'm handing you what's been marked as Exhibit 2 to your deposition. Do you recognize --
MS. FISH-WHITLOCK: Before -- I'm going to be objecting to relevancy.
MR. GETTE: Okay.
Q. (By Mr. Gette) Do you recognize that document? And you can take some time to look at it.

Page 18

A. No. I -- let's see here.
Is this -- just the top one?
Q. Yeah. Let's start with the top page.
A. Okay.
Q. Do you recognize that letter?
A. I don't remember seeing it.
Q. Okay. I'd ask you to flip back two pages and take a look at that document.
A. Oh, okay. That was when there was some other people -- okay. I remember this now.
This is, I thought this was -- let me see, let's see, there -- I remember seeing something that -- but it wasn't, it wasn't addressed to Michele or I, there were some other parties that he was taking to court, that they never -- they didn't pay anything at all from the, from the beginning.
Q. Okay. Let me, the document aside, let me ask you this. Did, did you ever become aware at any point -- strike that. I don't like that characterization.
Did you ever believe that Mr. Bailey had instituted any legal action against you for

Page 19

failure to make payments?
A. No.
Q. Okay. Have you placed any gravel or done any improvements on the lot?
A. The only thing I did was put in the culvert system with a road going down off the road that he built.
Q. When you say the road he built, the road Mr. Bailey built?
A. Mr. Bailey built, yes.
Q. And did you hire someone to do that work?
A. Yeah. I bought the culvert and then somebody from out in that area, that has a sand pit or something, brought out the, the fill to put over the top of the culvert.
Q. And then did you also say that you put a driveway in?
A. Yeah. That was, that was over the culvert, that's right.
Q. Okay. How deep into the property from the roadway did the driveway go?
A. Well, it just, actually it was just what they did to cover the culvert to get onto the land.

Page 20

Q. Mr. Thomson, I'm going to show you a, one of the documents that you brought with you today. Does that receipt relate in any way to the placement of the culvert that we were just discussing?
A. Yeah. That's, that's where they put the crossing in, so they -- that was the charge and stuff to, to get it taken care of.
Q. Okay. I'm going to have the court reporter mark this with an exhibit sticker, and I'll let you take this with you and you can copy and send it back to us, but that way we'll, --
A. Okay.
Q. -- we'll know what was being referred to.
A. I need to get a copy of this, too, because I don't know why I'm making payments if this took place (indicating), because I --
Q. And by this you're referring to Deposition Exhibit 2?
A. Yes.
Q. Okay.
MR. GETTE: Let's go off the record a second.

Page 21

(Whereupon, Deposition Exhibit No. 3, Thomson, was marked for identification.)
MR. GETTE: Okay. Back on the record.
Q. (By Mr. Gette) So, Mr. Thomson, then, what's been marked as Deposition Exhibit 3, just so I'm clear, that is a copy of the invoice that you were billed for the installation of the culvert on your property?
A. Right.
Q. Is that correct?
A. Yes, it is.
Q. Okay.
MR. GETTE: I don't have any other questions for you right this minute, but Mr. Bailey's counsel may.

EXAMINATION
BY MS. FISH-WHITLOCK:
Q. Mr. Thomson, my name is Rita Fish-Whitlock, I'm an attorney representing Mr. Bailey in these proceedings. I don't think that we've ever had the pleasure of meeting, kind of unusual --
A. No.

Page 22

Q. -- in our small area.
I guess, first, some of the questions that I have to ask you -- had to ask you had to do with your answers to some of Mr. Gette's questions to you.
So, again, if you don't understand any of the questions that I'm asking you, please state so. You know, there's no need to speculate. If you're not sure of an answer to a question, that's fine, too, you know.
A. Um-hum.
Q. I know a lot of these activities took place several years ago and it's perfectly understandable, sometimes we can refresh our memories through reviewing documents, and I'll try to do that with you as well. So, again, if you don't understand one of my questions, please tell me and I'll rephrase.
Now you indicated that when you first purchased the property you didn't know who was selling it. Is that correct?
A. No. I was approached by Mr. LaValla that some land was for sale out there. And at that time I was interested in the land, but before I purchased it, I did find out who.

Page 23

Q. Okay.
A. He told me who, who owned it and who I'd be making payments to, so -- (no further response.)
Q. Okay. So Mr. LaValla must have known that you were in the market to purchase lakeshore property?
A. I --
MR. GETTE: Objection.
Q. (By Ms. Fish-Whitlock) Go ahead.
A. I was looking for, I had talked to some people about getting some land out by Sandy Shores or so, and it might have gotten back to them, because I was approached by him.
Q. Okay. All right. Now as far as the price that you paid for these lots in 1998, did you feel as though that was, that you were getting good value for two lakeshore lots at that time?
A. Yes.
MR. GETTE: Objection, calls for expert speculation.
Go ahead.
Q. (By Ms. Fish-Whitlock) Go ahead.
A. I thought I was getting a fairly

Page 24

good deal based on what I knew people were selling lots for further up the side of the lake there.
Q. As far as, are you speaking about empty lots or vacant lots?
A. Yeah. Empty lots that hadn't been developed yet.
Q. Okay. Do you recall any specific examples of sales of vacant lots up in that area during that time?
A. I believe somebody that had a lot about, a little less than full size of mine, got about $30,000 for it, and they had, at the time they bought it, they bought it for like $8,000 or something, so I figured that it was a very good chance that the property along the lake would increase in value.
Q. All right. So just to clarify, what you're testifying to is when you were, you were searching for lakeshore property, you had personal knowledge at that time of a vacant lot near Sandy Shores selling for $30,000?
MR. GETTE: Objection, leading. Answer.
Q. (By Ms. Fish-Whitlock) Go ahead and

Page 25

answer.
A. Yes. Okay. I had heard somebody talking about how they'd sold it for -- and made a good profit.
Q. Okay. In, as far as your in -- I'd like to get into what your investment expectations were when you decided to purchase these two lakeshore lots.
Was it at all your expectation that these lots would appreciate in value?
A. I --
MR. GETTE: Objection as to relevancy.
Q. (By Ms. Fish-Whitlock) Go ahead.
A. But I, when, when I purchased that, I was hoping that the land would become valuable and if Michele and I weren't able to build there or decide to build someplace else, I would be able to sell it and make a profit on it, yes.
Q. Okay. Now much of, obviously, the agreement between you and Mr. Bailey is of record between the recorded contract for deed and you don't dispute anything that can -- everything is of record and recorded in the

Page 26

county recorder's office, as far as your aware. Is that correct?
A. Yes. As far as I know, everything was recorded and taken care of.
Q. Now you mentioned earlier that you, it was your intent to build a, a summer cabin on this property when you purchased it in 1998?
A. Yes. Um-hum.
Q. At the time that you purchased it, did you have any sort of expectations or a guideline or a goal as to when you wanted that summer cabin to be built?
A. Actually, Michele and I were, after we got the road in there, we were going in there, we were starting to clear some of the brush away to make it drivable to the lake area and probably use it for a while to, with tents and camping out and things like that. We had not set any date to build anything.
Q. Okay. So initially you were going to use the property for camping?
A. Right.
Q. But at some time in the future it was your intent to build a summer cabin?
A. Yes.

Page 27

Q. Okay. But as far as specifically, you hadn't devised a, a goal at that point?
A. No, we hadn't.
Q. All right. Now Mr. Gette asked you if you had any drawings made up to place a septic system on the land that you own out in, on Sunny Beach. Why is that?
MR. GETTE: Objection, calls for speculation as to why I would ask a question.
MS. FISH-WHITLOCK: Not -- let me rephrase then.
Q. (By Ms. Fish-Whitlock) Mr. Gette previously asked you if you had any drawings made up for placing a septic system on the property. Do you recall that question?
A. Yes, I do.
Q. Okay. Why is it that you have not had any drawings made up?
A. We were in the process yet of still kind of clearing brush away and getting ready to take down a tree that was partially fallen when we started getting notices and stuff that it was wetlands and at that point I decided not to do anything further with it.
Q. Okay. When you said that you

Page 28

decided not to do anything further with it, did you believe that it would have been futile?
A. I just, I was under the impression from some of the people, some of the things people said about wetlands, that I could not take -- I could cut a tree down, but I could not remove roots and things like that on wetland, so for me to just get rid of a tree that was partially fallen, if I had to leave the stump and the roots there, it just didn't make sense to me.
Q. Okay. And do you recall who these people were that were giving you those types of ideas?
A. I'm, I'm not sure. I did talk to some of the people that, there was a fellow from Ace Hardware that also bought some land out there not too far from mine, and we discussed a little bit about it and he said that you can't do any -- you can take out, you know, trees level, but you can't remove roots and do all kinds of stuff.
I believe that's -- I never checked into it to find out if that was true or not, but I took his word for it.

Page 29

Q. So you were mostly kind of relying on just another person from the area and not really looking into local government officials' determinations with regard to that?
A. I had no contact with any of the government people at all involved, so -- (no further response.)
Q. Now Mr. Gette previously asked you whether or not you had any drawings made up for building your summer cabin. Do you recall that question?
A. Yes, I do.
Q. Okay. Why is it that you haven't had any drawings made up to build your summer cabin?
A. When we decided not to do it at that time, we looked at a lot of pictures and stuff of things we liked, but we never went to get any kind of drawings, which costs money to do, so we instead got a house, I have some acreage down in Motley, we got house plans to build down there.
Q. Now do you have any, I'd like to know what your personal knowledge is as far as status of the extension of Sandy Shores Drive,

Page 30

as it sits today?
A. I'm -- after talking to Gary Bailey about everything, he said that all along Sandy Shores there it was black humus soil and stuff, so they had to bring in a lot of fill.
He went to the county there --
Q. I guess that's not really what my question is.
MR. GETTE: Objection.
Q. (By Ms. Fish-Whitlock) Are you, my question is, are you, are you aware that this, that the extension of Sandy Shores Drive has been ordered to be removed?
A. I, they have told me that, in fact, he has informed me, Gary, that he is supposed to be taking, taking that road out, yes.
Q. Okay. And should this road be removed, you won't have access to your lots. Is that right?
A. That's right. I would not be able to get to my lot.
Q. All right. Now as it sits today, is there any use that you can put that lot to?
A. Yeah. I can, I could put a roll-out dock and stuff there and I could also build

Page 31

something that was not structured so that it would be taking out any, anything.
I think I could, I was looking into that, I might be able to put something that would be flat on the land and not -- and I don't know whether or not I could put any septic system in, but it would not have to be necessary, I don't imagine, if we just went out there and camped overnight or something.
Q. Okay. So at this point, even if the road is removed pursuant to the Army Corps of Engineers' order, you would simply utilize the lake to access your property?
A. That would be the only way I could get there and there are -- well, I don't have a dock, but that would be the only way I could get to the lake -- or get to that land is by the lake.
Q. Now you, previously Mr. Gette asked you a question with regard to, it had to do with your intentions of, of developing the property, and you stated that it was your understanding that no development would be allowed in wetlands. Who told you that?
A. That was just all, all the people

Page 32

that were, that owned the land out there and stuff. And the, and the man, I can't remember his name, Michele would know it, from Ace Hardware, said that you could not develop the land if it was considered wetlands.
Q. Okay. So you're not --
A. I have no contact with anybody that, one way or the other, whether they know -- nobody that really knows, I guess.
Q. Okay.
A. No.
Q. So you haven't, as far as -- do you know at this point -- or what is your understanding of what agency is preventing development of your property, upon your understanding?
A. I think it's the DNR.
Q. Okay. You believe it's the DNR that's preventing development of your property?
A. Yes. I really don't -- I've never talked to anybody that has identified themselves as preventing the development of the land.
Q. Okay. So your understanding that no development is going to be allowed on this

Page 33

property is simply that knowledge you've gained from just speaking with another lot owner?
A. Yes.
MR. GETTE: Objection, asked and answered.
Q. (By Ms. Fish-Whitlock) Now if you're not, I mean, not being able to put the summer cabin on this property is in direct contradiction to your, what you intended when you purchased it. Is that a fair statement?
MR. GETTE: Objection, leading.
A. Yeah. My intention was to put a summer cabin there when I purchased the land and then when the developments took place, that it looked like they weren't going to allow any development of the land, I just kind of disregarded those thoughts and quit, quit planning for it.
Q. (By Ms. Fish-Whitlock) Okay. You also mentioned you've had a couple of, of phone calls by people inquiring into whether you would be willing to sell your lakeshore lots.
Did you, did it appear at all that the people who called you on the phone knew about the regulations that were being placed on

Page 34

that property at that time?
A. I think conversation never went that deep. They mostly consisted of do you own some lake frontage property out by Sandy Shores and I said I did. And they said would you be interested in selling it and I said no, I wouldn't.
And that was pretty much the conversation, nothing about prices or anything like that came up, because I just didn't want to even discuss it with them, so -- (no further response.)
Q. Okay. Did you not want to discuss it with them because of the regulations that were being placed on the property or because you did not feel as though anyone would purchase the property given the regulations?
MR. GETTE: Objection, suggests that one of those two is the correct answer and it's leading.
A. One of my thoughts were that these people may know that the land was being, being set aside as wetlands and were trying to get a bargain, to pay much less than I originally paid for it, and I, that's the indication I

Page 35

got, that I just didn't even want to deal with it.
Q. (By Ms. Fish-Whitlock) Okay. You said you haven't been to the property for the last three years?
A. It's been about that long since I've been out there. We kind of stopped going out there when we couldn't do anymore developing to get ourselves to be able to drive into the land.
Q. Okay. Did you receive a Restoration Order to remove the culvert that you had placed for your driveway?
A. I never -- I, I don't remember getting anything where it said -- there was talk from someone that they had, somebody had contacted them about removing a culvert, but I didn't get, I don't remember getting any notice myself.
Q. Okay. So you still have your culvert in place?
A. It was the last time I was out there.
Q. Okay. Since it's been three years, you don't even know, do you?

Page 36

A. I don't know.
Q. That's all right.
Okay. Do you have any knowledge as to where the culvert was purchased from?
A. I had to, I contracted -- or I con -- from, Ace Hardware had a source and I went through him. He got his at the same place, so I -- and he had them delivered out there, so that's, that's as much as I know about it. I just paid the money.
Q. Okay.
A. Seemed easier that way.
Q. So I want to be clear. As far as the development activity that did occur on the property, basically you put in a culvert in the ditch and then fill, placed sand over that to create a driveway into your lots?
A. Yeah.
Q. And the driveway didn't extend very far?
A. No. It, when we would pull in, we'd just parked at the end of the part that we built over the ditch. Otherwise we wouldn't be, wouldn't be able to get across without going through the ditch, which usually had a

Page 37

little water in it.
Q. Okay. Do you recall at all having to apply for a culvert permit with Lake of the Woods County?
A. I don't really remember doing it.
Q. Okay. I'd like to get into your opinions of how the, the effect of the regulations that have been, that have been placed on your property has had an effect on the value. Do you believe that it's affected the value?
MR. GETTE: Objection, calls for expert testimony and speculation. He's not qualified to offer opinions.
You can go ahead and answer.
A. Okay. What I have, the land has been valued at in tax purposes, went from $400, when it was considered farmland, up to $45,000, and now it's back down to 10,500 for tax purposes. So I show, in my, in my thoughts, it sounds like it's being depreciated back down again, because of not being able to be developed is what I think.
Q. (By Ms. Fish-Whitlock) Okay. And do you have any understanding as to why or what

Page 38

regulation is preventing development of your property?
A. Just the fact that it was termed wetlands, which all I have to go by is what happens to people when, that you see in California, when they're trying to build, say a high-rise someplace and it comes across some snail or something, that they find that's a -- some -- something that's getting ready to be extinct and all of a sudden they consider it, to stop all the work on the development of that area because it's considered a, getting rid of a, some kind of an animal or something that is becoming extinct.
And that's just, that's kind of the same way I feel about it when they say wetlands, it means you have to leave it like it is, and that's where I come from.
I don't know from any personal experience or talking to anybody what all the regulations are concerning wetlands, but I have seen them stop a lot of other construction and stuff by -- we've tried to get something through the marsh in Warroad and there's some kind of snail in this crick bed, so we can't

Page 39

dredge it out to make an entry point to the lake.
And that's, they just won't let us even take out any of the grass and stuff there, so that's the kind of stuff I see as when they condemn it.
Q. Is when they condemn it?
A. It's like being condemned there, so you can't do anything with it.
Q. Do you consider that your property, as far as Lots 2 and 3, are being condemned?
A. From further development, they're pretty much condemning it to stay the, you know, status quo, it's not going to go anywhere else.
Q. All right. Do you have an economical viable use for Lots 2 and 3 at this time?
A. Right now I don't have.
MR. GETTE: Objection, calls for expert testimony.
You can go ahead.
A. I don't have any, I'm not making any plans to use it in any way right now.
Q. (By Ms. Fish-Whitlock) You're not

Page 40

making any plans to use it in any way right now. Do you have, at this point, any way to make money off of Lots 2 and 3?
A. No. If I was to sell it at the present time I would lose a considerable amount of money.
Q. Okay. And is it big enough for agricultural purposes?
A. It, it has trees and stuff on it that would have to be, that would all have to be cleared for, to make it agricultural, but -- (no further response.)
Q. All right. As far as how much you paid for the property, if you had to estimate the acreage of Lots 2 and 3, how much would that be?
A. It's a couple hundred feet on the, on the lakefront and whatever that depth and stuff like that, it can't be more than a couple acres in there.
Q. Maybe two acres you'd estimate?
A. Probably.
Q. Okay. And you paid $50,000 for that two acres. Is that right?
A. Right.

Page 41

Q. Do you believe that you could put a crop in there to make a reasonable return on that investment of $50,000, utilizing it as agricultural land?
MR. GETTE: Objection, lacks foundation, calls for an expert opinion.
A. Not unless it was something illegal.
Q. (By Ms. Fish-Whitlock) Okay. All right. Are you aware of whether there is anything, are you aware of any other use that you can put the property to?
A. No. Actually, that, that land right there would be mostly a vacation spot for somebody or a summer area where they could stay there and enjoy the lake and things like that. It's not, not really a place where you, you would be making any money off of anything, like growing any crop or, or anything like that.
It would have to be --
Q. I guess my question to you is as it sits right now with the, the road is being, is being ordered removed, is there any use to that property that you can think of?
MR. GETTE: Objection, asked and answered.

Page 42

A. Nothing that I, that I know of that, that could be done with it. If the road is removed, you can't bring anything in there to have a trailer, anything, you'd have to come by boat to, to a dock that you would have, to find some way to get out in there.

And then once you had your dock and had your boat there, there would be no place to stay overnight or do anything, so it would be not worthwhile doing.

Q. (By Ms. Fish-Whitlock) Okay. Not conducive for even camping purposes?

MR. GETTE: Objection.

A. To try to get, try to get, without a road in there, to try to get camping tents and stuff in there, you'd have to hike in quite a ways.

Q. (By Ms. Fish-Whitlock) Have you received any correspondence from the Army Corps of Engineers, other than what you brought here today?

A. As far as I know, everything that I have from them concerning wetlands is, is here. I haven't -- I don't think, I can't remember anything else that was sent to me.

Page 43

Q. Do you recall whether the Army Corps of Engineers has ever instructed you not to conduct any activity until such time as a permit has been obtained from them?

MR. GETTE: Objection, vague --

A. No.

MR. GETTE: -- as to what you mean by activity.

A. Yeah. I haven't --

Q. (By Ms. Fish-Whitlock) You understood what I mean by activity on the property?

A. Right. I, I haven't received anything that stops me from doing anything out there. And the only thing that stopped me from trying to do anything like remove brush and trees and stuff was that, my understanding that I couldn't do that from -- and it wasn't from anybody in real knowledge of the deal, I'd never talked to anybody in the -- any professional, you know.

Q. So there has been no governmental agency that has provided you any sort of letter or correspondence stating that you are not to develop that property?

Page 44

MR. GETTE: Objection, he's answered the question three times now.

A. Yeah, not that I know of. I haven't seen anything.

Q. (By Ms. Fish-Whitlock) Do you have, I guess, what are your plans, should -- you know, obviously the, the, the Army Corps of Engineers has ordered that the extension of Sandy Shores Drive be removed, you indicated earlier that you're just kind of waiting to find out what happens.

MR. GETTE: Objection.

Q. (By Ms. Fish-Whitlock) At what point are you going to, do you have any idea, do you have any plan at this point?

A. No. Actually, what I want to do is instead of losing all the money I've invested so far is just finish off paying what I owe and then hold onto the land and see what develops.

Hopefully something will change, but the taxes at this rate are very minimal and so I'll just hope that something down the line changes.

I have, I did talk to some people, nobody in the know, again, that if it's

Page 45

possible sometimes to set aside land someplace else, if it's available, as wetlands, and then convert your land to nonwetlands, I didn't find out what any of the prices would be, but that was another option I had.

Q. Okay. And you haven't yet?

A. I haven't explored that any further.

Q. Have you spoken with any of the other lot owners on their attempts to do just that?

A. My wife Michele had talked to the gentleman from Ace Hardware and he was working on some things, but all of a sudden we just quit communicating and I have no further knowledge of what, what may have developed. We got busy with everything else we're doing and it just kind of faded away.

Q. Sure. Okay.

MS. FISH-WHITLOCK: I don't have any further questions for you.

EXAMINATION

BY MR. GETTE:

Q. Okay. Just a couple of follow-up things.

Page 46

Earlier you testified that a friend in the general vicinity of your lot had sold a lot that was slightly smaller than yours for $30,000. Is that correct?
A. It was not in the vicinity of the area where I am. It was further down in the developed, by the developed areas down from Sandy Shores, where it goes along the lake there, it was a lot he had owned in the, in the Sandy Shores area. It was a wooded lot that he sold, so it was in that area, not very far, maybe a, less than a half a mile from where I am.
Q. Is that, do you know whether that was further north up the lake or further south?
A. It would be further, towards the top of the page, going down the road along Sandy Shore, so --
Q. Okay.
A. -- whatever those distance -- or directions are (indicating).
Q. Okay. Further toward the top of what has been marked Exhibit No. 1?
A. Yes. And I, I believe this, to the right of those lots faces north, so it would be

Page 47

more to the, to the west, southwest. --
Q. Okay.
A. -- up in that area.
Q. All right. But it's definitely in the direction toward the top of the page of Exhibit 1?
A. Yes, it is.
Q. Okay. And when did that sale take place?
A. That was actually -- when I started looking for some land to buy on a lake is when I had heard that he had sold this land for that amount and then, so that would have been in '9 -- probably early '98 or so, in that range.
Q. And that was a lakefront lot?
A. Yes, it was.
Q. And did that have road access?
A. Yes. The, the Sandy Shores road went right by it.
Q. Was the property developed in any way?
A. No. It was all wooded.
Q. You talked at one point about tents and camping. Have you ever camped out on that property on Lake of the Woods?

Page 48

A. No. We just went out there during the daytimes, we took a picnic table out there and had that there for awhile and just did picnics, but we didn't stay overnight.
Q. Okay. Talk a little bit further about the three phone calls you received on the property.
Was price ever discussed in any of those telephone conversations?
A. No. They asked me whether or not I had land on the lake and I said I had. And I may have been wrong, but I, I just got the feeling they were looking to buy the land at a cheap price and I just kind of, maybe just shut off on them right there and I just said, no, I don't want to sell.
Q. Okay. But they never mentioned a price?
A. No money was never brought up about it.
Q. And they never mentioned the fact there were regulations prohibiting development on the property?
A. No. The conversation never got that far.

Page 49

Q. So your sense that they were trying to get a bargain was just an assumption on your part. Is that correct?
A. It was just an assumption on my part, yes, it was.
Q. Do you have any experience as a real estate professional?
A. No, I don't.
Q. Okay. Do you have any expertise as appraiser?
A. No, I don't.
Q. Have you had the property that you own on Lake of the Woods appraised at any time?
A. No, I haven't.
MR. GETTE: Okay. That's all I have.
MS. FISH-WHITLOCK: Mr. Thomson, you have the right to review your deposition to ensure that the court reporter is accurate. You can review the deposition and make sure everything is accurate, otherwise you can waive the deposition, the reading of the deposition. That's entirely up to you.
THE DEPONENT: I, I'll waive it. I don't believe I have --

Page 50

MS. FISH-WHITLOCK: That's fine.
THE DEPONENT: -- anything to --
MR. GETTE: Okay. One last thing before we go off the record.
You did bring some documents with you today --
THE DEPONENT: Yes, I did.
MR. GETTE: -- and you've agreed to make some copies for us, after you leave here today, and we'll indicate which documents that I need copied, and then you have my card and you can send them to us. Okay?
THE DEPONENT: Okay. Send them to the 601 D Street?
MR. GETTE: That's it.
THE DEPONENT: Okay.
(Whereupon, the deposition was concluded at 2:31 o'clock p.m.)
(Whereupon, the original Deposition Exhibit No. 3, Thomson, was retained by Mr. Thomson.)

Page 51

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA )
) ss
COUNTY OF POLK )

I, RUTH ANN JOHNSON, a Notary Public within and for the County of Polk and State of Minnesota do hereby certify:

That prior to being examined the afore-named witness was by me sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition, consisting of 50 pages of typewritten materials, was taken down by me in Stenotype at the time and place therein named, and was thereafter reduced to typewriting under my direction.

I further certify that I am neither related to any of the parties or counsel nor interested in this matter directly or indirectly.

WITNESS my hand and seal this day of

Ruth Ann Johnson
Notary Public
Polk County, Minnesota
My Commission expires January 31, 2012.

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA )
) ss
COUNTY OF POLK )

I, RUTH ANN JOHNSON, a Notary Public within and for the County of Polk and State of Minnesota do hereby certify:

That prior to being examined the afore-named witness was by me sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition, consisting of 50 pages of typewritten materials, was taken down by me in Stenotype at the time and place therein named, and was thereafter reduced to typewriting under my direction.

I further certify that I am neither related to any of the parties or counsel nor interested in this matter directly or indirectly.

WITNESS my hand and seal this 5th day of March

Ruth Ann Johnson
Notary Public
Polk County, Minnesota

My Commission expires January 31, 2012.

Page 2

APPEARANCES

On Behalf of the Plaintiff:
ALAN FISH, P.A.
102 2nd Avenue Northwest
Roseau, Minnesota 56751
By: RITA FISH-WHITLOCK, ATTORNEY AT LAW

On Behalf of the Defendant:
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
P. O. Box 663
Washington, DC 20004
By: JAMES D. GETTE, TRIAL ATTORNEY

Also Present: Marilyn Lundgren

Taken By: Ruth Ann Johnson, RPR

Page 3

CONTENTS


| DEPONENT: | PAGE |
|---|---|
| RAYNARD LUNDGREN | |
| Examination by . . . Mr. Gette | 4 |
| Examination by . . . Ms. Fish-Whitlock | 17 |
| Examination by . . . Mr. Gette | 39 |
| Examination by . . . Ms. Fish-Whitlock | 40 |
| Examination by . . . Ms. Gette | 44 |
| Examination by . . . Ms. Fish-Whitlock | 44 |

EXHIBITS*

| EXHIBITS | MARKED |
|---|---|
| No. 1 -- Copy of subpoena | 8 |
| No. 2 -- Payment list | 9 |
| No. 3 -- Copy of letter to Gary Bailey from Raynard Lundgren, 5-5-01 | 11 |
| No. 4 -- Copy of Notice of Cancellation of Contract for Deed | 13 |
| No. 5 -- Copy of letter to Raynard Lundgren from the Department of the Army, Corps of Engineers, 2-6-02 | 22 |
| No. 6 -- Copy of letter to Mr. and Mrs. Raynard Lundgren from Gary and Kathy Bailey, 5-10-01 | 38 |
| No. 7 -- Letter to Raynard Lundgren from the Department of the Army, Corps of Engineers, 6-12-01 | 44 |


(*Exhibits attached to transcript.)

Page 4

PROCEEDINGS

RAYNARD LUNDGREN,

of Roseau, Minnesota, called as a witness by the Defendant, being first duly sworn by Ruth Ann Johnson, RPR, a Notary Public within and for the State of Minnesota, was examined and deposed on his oath as follows:

EXAMINATION

BY MR. GETTE:

Q. Afternoon, Mr. Lundgren.
A. Yeah.
Q. We've talked on the phone before and just a little earlier today, my name is Jim Gette, I'm a lawyer for the Department of Justice, I represent the United States in a lawsuit that Gary Bailey has filed against the United States and specifically the, the United States Army Corps of Engineers.
I'm going to ask you a series of questions here today in your deposition and let me begin by first asking you whether you've ever had your deposition taken before?
A. Yes, I have.
Q. Okay. And what, under what

Page 5

circumstances did you have your deposition taken?
A. My employer.
Q. So it was an employment related issue?
A. Yes.
Q. Okay. And was it a lawsuit in which you were a party?
A. No.
Q. Okay. So your employer was being sued by someone else?
A. Yes.
Q. Okay. And how long ago was that, that you gave a deposition?
A. I'm guessing 15, 20 years.
Q. Okay. All right.
Okay. Let me remind you, then, of a few of the ground rules, since it's been quite awhile.
The reporter is taking down everything that we say, so it's important that we not talk at the same time. So if you'll wait until I finish my questions, I'll do my best to wait until you finish your answers. Okay?

Page 6

A. (No verbal response.)
Q. Rule number two is that to get everything down, it has to be a verbal response, so when I do ask questions, make sure you give a verbal response yes, no, whatever the answer may be. Okay?
A. Okay.
Q. And it's also important that you understand whatever questions I ask you. I think the questions today will be pretty straightforward, but if I ask anything that you don't understand, will you agree to tell me so that I can fix the question and then ask a question that you understand?
A. Yes, I will.
Q. Okay. And the final thing is that I'm happy to take a break at any time, if you would like. So if at any point you would feel you would like a break, hopefully this won't be too long, but if you feel you need a break at any time, just let me know and we'll take one.
A. I will do that.
Q. Okay. Mr. Lundgren, in December of 1998 did you purchase a property up on Lake of the Woods?

Page 7

A. Yes.
Q. Okay. And was that property a plat in the, what's called the Sunny Beach Development?
A. Yes.
Q. Okay. Do you know what your lot number was?
A. 14.
Q. 14.
Is it possible it was nine?
A. Oh, yes. It was nine.
Q. And what did you pay for that property?
A. It was on a contract for deed for $25,000.
Q. Okay. Do you remember whether you had to put any money down?
A. Yes.
Q. Okay. Do you remember how much?
A. No, I don't recall the exact amount right now, but -- (no further response.)
MS. FISH-WHITLOCK: Can I provide a document to refresh his memory?
MR. GETTE: I'm going to do that.
Q. (By Mr. Gette) Okay. I'm going to

Page 8

show you a copy of the contract for deed, which has been previously marked as Bailey Deposition Exhibit 31, and ask you to turn to the second page of that, toward the top, and take a quick look.
First of all, do you recognize that document?
A. Yes.
Q. And is that the contract for deed that you executed to buy the property from Mr. Bailey?
A. Yes.
Q. Okay. And I believe it indicates toward the top that you put 2,500 down and then the rest was financed on the contract for deed. Does that sound right?
A. That is correct.
Q. Okay. Now I'm going to have a document that you brought --
MR. GETTE: First of all, let me have this marked as Deposition Exhibit 1.
(Whereupon, Deposition Exhibit No. 1, Lundgren, was marked for identification.)
Q. (By Mr. Gette) Mr. Lundgren, let me ask you, do you recognize the document that's

Page 9

been marked as Lundgren Exhibit 1?
A. Yes, I do.
Q. Okay. And what is that document?
A. It's asking me to appear for a deposition on February 21 at 3:00 o'clock.
Q. Okay. And the last page of that document there is a list of documents that were, you were requested to bring with you. Is that correct?
A. Yes.
Q. Okay. And did you bring certain documents with you in response to that request?
A. Yes, I did.
Q. Okay.
MR. GETTE: I'm going to have this document marked as Exhibit No. 2.
(Whereupon, Deposition Exhibit No. 2, Lundgren, was marked for identification.)
Q. (By Mr. Gette) Mr. Lundgren, I'm handing you what's been marked as Exhibit No. 2 to your deposition. Is that one of the documents that you brought with you today?
A. Yes, it is.
Q. Okay. And can you identify that document for me?

Page 10

A. It's the payment list of, of the amounts and when we've made payments of each month for the property.
Q. Okay. So is this a document that you obtained at the time that you entered into the contract for deed?
A. Yes.
Q. Okay. And subsequent to that, did you, or someone on your behalf, make certain notations on that document?
A. Yes.
Q. Okay.
A. My wife has made notations on here.
Q. Okay. And do those handwritten notations indicate the, the date on which you made payments to Mr. Bailey?
A. Yes, that is correct.
Q. Okay. And do the notations also indicate the date on -- that's what I just asked.
Do those notations also indicate a check number for each payment that you made to Mr. Bailey?
A. Yes, it does.
MR. GETTE: Have that marked as

Page 11

Exhibit 3.
(Whereupon, Deposition Exhibit No. 3, Lundgren, was marked for identification.)
Q. (By Mr. Gette) I'm showing you what's been marked as Exhibit 3 to your document. Do you recognize this document, Mr. Lundgren?
A. Yes, I do.
Q. Okay. Is this a copy of a letter that you sent to Mr. Bailey?
A. Yes, it is.
Q. Now it's dated May 8 of 2001. Would that have been when you sent the letter to Mr. Bailey?
A. Yeah, within a day or two.
Q. Fair enough.
It indicates in the letter that you're requesting a refund from Mr. Bailey. Is that correct?
A. Yes.
Q. Okay. Why were you requesting the refund?
A. We had found out that we weren't able to build on this property and it was, I don't remember for sure all the issues with it

Page 12

at that time, but there was different statements or -- that were made as to, from the, I believe the Army Corps of Engineers, that that was -- we weren't going to be able to build on this land because it was considered wetland.
Q. Now at about the time that you sent the letter that's been marked as Deposition Exhibit 3 to Mr. Bailey, did you also stop making payments on your contract for deed at that time?
A. That is correct.
Q. Okay. And showing you what's been marked, again, as Deposition Exhibit 2, from that document can you tell me when the last payment you made to Mr. Bailey was?
A. March 18, 2001.
Q. Now from the time that you entered the contract for deed until March 18, 2001, had you made all the payments that were due to Mr. Bailey up to that point?
A. Yes, we had.
Q. And in your letter you indicate, which is Exhibit No. 3, you indicate that you're seeking a refund of $10,528.16. How did

Page 13

you come up to that figure?
A. I believe it was adding up all the payments that we had made and I don't remember for sure if it included property tax or not. And I don't remember for sure if it included the cost of a culvert and gravel.
Q. Have you ever received a refund from Mr. Bailey in any amount?
A. No, we have not.
Q. And do you still own that Lot 9 on Lake of the Woods?
A. I do not believe I do, because the taxes were not paid.
Q. Do you know whether --
MR. GETTE: Well, actually, let's mark this as Lundgren Exhibit 4.
(Whereupon, Deposition Exhibit No. 4, Lundgren, was marked for identification.)
Q. (By Mr. Gette) Okay. Mr. Lundgren, I'm showing you a document that's now been marked as Exhibit 4 to your deposition. Is this a document that you recognize?
A. Yes, I do.
Q. Okay. And at some point in time did you understand that Mr. Bailey was seeking to

Page 14

take the, the property back under the contract for deed?
A. Yes.
Q. Okay. And does this document relate to that effort by Mr. Bailey?
A. Yes.
Q. Let me step back for a second to this document that we marked as Exhibit 3, which is your letter to Mr. Bailey.
After you sent this letter to Mr. Bailey, did you have any communication with him?
A. I don't believe I did.
Q. Okay. Have you ever talked to Mr. Bailey?
A. One time on the telephone.
Q. Do you recall what you discussed with him?
A. It was something to the effect that I had heard that this property was, that we weren't going to be able to build on this property.
And Mr. Bailey told me that we would be able to build and that if I had any, any issues with anybody that they should contact

Page 15

Mr. Bailey.
Q. Now when Mr. Bailey instituted action to take the property back, did you seek legal counsel at that point?
A. Yes.
Q. Okay. And did you ultimately reach any agreement with Mr. Bailey regarding how the property was going to be handled?
A. Back up a moment, --
Q. Okay.
A. -- if you can.
Q. Sure.
A. The, on your statement, or your question earlier about seeking legal counsel, --
Q. Um-hum.
A. -- can you explain that a little bit more for me, please?
Q. Sure.
What we marked as Exhibit 4, did you receive that in the mail at some point, a notice of, of nonpayment?
A. Yes.
Q. Okay. And did you, at that point, contact any lawyers to help you out with the

Page 16

situation?
A. I cannot remember for sure when it was, but we did contact another lawyer firm to see if it would be beneficial for us to pursue this to try and get our money back or to -- mainly to get our money back, I guess.
Q. Okay. Now we had moved on to a new area. When, once you received the notice that Mr. Bailey was attempting to take the property back, did you reach any agreement with Mr. Bailey regarding how that was going to occur?
A. No. No.
Q. Okay. And did you have any conversations with Mr. Bailey or lawyers for Mr. Bailey?
A. No.
Q. All right. If we turn back to what's been marked as Exhibit No. 3.
In the first paragraph there you ask Mr. Bailey to, Please provide me with a copy of the permits you informed me you had when I contacted you on this matter or the information you had allowing this land to be developed.
Had you had some, the conversation you referenced earlier, had that conversation

Page 17

taken place before you sent this letter to Mr. Bailey?
A. Yes.
Q. Okay. And at that time had he said something to you regarding a permit?
A. Yes. In part of our conversation he had indicated, Mr. Bailey, that he had obtained all the correct permits required to be able to build and develop this property.
Q. And did you later learn that that representation was incorrect?
A. Yes.
MS. FISH-WHITLOCK: I'm going to object to the form of the question.
MR. GETTE: Okay. I don't have any further questions right now, Mr. Lundgren. Counsel for Mr. Bailey might have some questions.

EXAMINATION
BY MS. FISH-WHITLOCK:
Q. Mr. Lundgren, my name is Rita Fish-Whitlock, and I am an attorney representing Gary Bailey in proceedings against the United States government with regard to

Page 18

regulations that have been placed on the subdivision known as Sunny Beach.

We've never met and first what I would like to do in questioning you is mostly just address some of the questions that Attorney Gette has asked you and just to clarify some of your answers, so I have a good understanding of, of what those answers meant.

As I always explain to anybody who I'm about to ask questions for, if you don't understand any of my questions, please tell me that you don't understand, I'll rephrase as best that I can. Okay?

I tend to, I tend to make, I understand I, sometimes I tend to make my questions long and a little bit compound, and I'm working on that, that's just something, it's one of my tendencies, and I just ask the persons that are being deposed to, to watch for that. If you don't understand a question, please feel free.

Are you from the area, Mr. Lundgren?

A. Yes, I am.

Q. And where do you live?

A. Six miles west of Roseau.

Page 19

Q. Okay. So you're a Roseau resident?

A. Yes.

Q. How long have you been in Roseau?

A. 63 years. 62 years.

Q. Okay. All right. Now you purchased the property, it appears, in about October 28 of 1998. Does that sound about right?

A. That sounds right.

Q. Okay. Now the purchase agreement indicates that there was a purchase price of $25,000 and you made a $2,500 down payment. Does that, does that sound right?

A. That is right.

Q. All right. And the remainder of the balance was financed through a contract for deed that you entered into with Mr. Bailey. Is that correct?

A. That is correct.

Q. Okay. Now it looks to me like there may have been some confusion as to the monthly amount of payments that were due at first, but do you recall what specifically your payments on the contract for deed were, monthly payments?

A. No, I do not.

Page 20

Q. It's your understanding that your payment amount was to be $297.34 per month?

A. Yes.

Q. Okay.

MR. GETTE: Let the record reflect they're referring to Deposition Exhibit No. 2.

MS. FISH-WHITLOCK: Correct.

Q. (By Ms. Fish-Whitlock) Now you've documented, each of these notations that are in handwriting in lieu of typewritten font indicate a record of when you paid Mr. Bailey payments on those contract for deeds. Is that what the handwritten notations represent?

A. Yes, that is handwritten notes.

Q. Okay. So this indicates that the last payment that you made on that contract for dead was made on March 18 of 2001?

A. I believe that is correct.

MR. GETTE: Continuing objection to the replowing old ground, but go ahead.

Q. (By Ms. Fish-Whitlock) Now at this point you decided to quit making payments on the contract for deed?

A. That is correct.

Q. Okay. And what was the reasoning on

Page 21

why, that you decided to quit making those payments?

A. Because we had found out that we were not going to be able to build on this property.

Q. Okay. And how did you find out that you were not going to be able to build on this property?

A. I, I can't remember for sure if it was the Army Corps of Engineers or if it was Lake of the Woods County for sure who we obtained that information from.

Q. Okay. You've received correspondence from the Army Corps of Engineers with regard to your property on Sunny Beach?

A. Please restate that?

Q. You've received some correspondence from the Army Corps of Engineers with regard to your property on Sunny Beach?

A. Yes, I believe I have.

MS. FISH-WHITLOCK: Okay. You wouldn't have, happen to have an extra copy of this, would you (indicating)?

MR. GETTE: What's the date on it?

MS. FISH-WHITLOCK: February 6,

Page 22

2002.

(Whereupon, Deposition Exhibit No. 5, Lundgren, was marked for identification.)

Q. (By Ms. Fish-Whitlock) I show you what's been marked as Deposition Exhibit 5, I'd like you to review that document.

Do you recall receiving that document from the Army Corps of Engineers?

A. Yes, I do.

Q. Okay. Would, do, do you recall the time that you received the document?

A. No.

Q. Okay. Now your own records indicate that you ceased payments on the contract for deed in March of 2001. Is that right?

A. Um-hum.

Q. And then you received notice from the Army Corps of Engineers that this property was undevelopable pursuant to their regulations. So was it the Army Corps of Engineers that informed you that you wouldn't be able to do anything with this property?

MR. GETTE: Objection to the characterization, objection because it's leading.

Page 23

A. I don't recall.

Q. (By Ms. Fish-Whitlock) Okay. Okay.

MS. FISH-WHITLOCK: You already have the Notice of Cancellation of Contract for Deed in the record, correct?

MR. GETTE: Correct. It is Exhibit No. 4.

MS. FISH-WHITLOCK: Okay.

Q. (By Ms. Fish-Whitlock) Now do you recall being personally served this document on June 1 of 2005?

A. Yes.

Q. The sheriff's deputy came up and handed you a document?

A. That is correct.

Q. And that is this document (indicating)?

A. Yes.

Q. Okay. Now did you dispute any of the allegations that were made in this Notice of Cancellation of Contract for Deed that you had not paid payments due and payable on May 1, 2001, all the way through May 5 of 2005?

A. No.

Q. I mean, did you have any, any sort

Page 24

of dispute as far as these allegations?

A. No.

Q. Okay. Now you also had not paid property taxes on this parcel for a considerable number of years as of 2005 as well. Is that correct?

A. That's correct.

Q. And there is a risk that the property was going to go back to the, the state through tax forfeiture proceedings. Do you have any idea as to the status, whether that was going to happen?

A. Yes. I knew if, if I didn't pay taxes that, that I would, there was a possibility I would lose the property.

Q. Okay. Did you have any intentions on paying taxes and investing anymore money into this property at the time that you received this, this cancellation?

A. Can you restate that again? I'm kind of --

Q. Sure.

After you received this cancellation of contract for deed, did you have any intentions of making anymore investments into

Page 25

Lot 9?

A. No.

Q. All right. So you had no intentions of paying property taxes on that lot, on Lot 9?

MR. GETTE: Objection, asked and answered.

Q. (By Ms. Fish-Whitlock) Go ahead, you can answer the question.

MR. GETTE: You can answer, if you can.

A. It was based on if this land could be developed or not.

Q. (By Ms. Fish-Whitlock) Okay. And at this point you did not believe that the land, with the regulations that were being imposed on it, could be developed?

A. That is correct.

MR. GETTE: Objection, leading.

Q. (By Ms. Fish-Whitlock) Go ahead and answer the question.

A. That's correct.

Q. Okay. I do note one discrepancy between your documentation of the payments that you made to Mr. Bailey under the contract for deed and our allegations on the cancellation

Page 26

for contract for deed.
We believe that your payments ceased in May, but that's not correct, according to your own documentations, your last payment was in March, so there's actually an April payment that was missing as well, you, you did not make the April 1, 2001, payment?
A. I don't recall if these payments that look like a payment that was made on 3-21 of '01 was for March --
Q. Or April?
A. -- or if that had been for April.
Q. Okay. All right. That clarifies things for me.
Okay. When you were initially seeking lakeshore property in the Sandy Shores area and you -- well, tell me, how did you go about finding this lot? Were you actively seeking a lakeshore property or was there a real estate agent that approached you and, and informed you of this, was this a word of mouth thing?
A. It was --
MR. GETTE: Objection, compound.
You can answer if you can.

Page 27

A. I believe it was a word of mouth.
Q. (By Ms. Fish-Whitlock) You heard that there was some lakeshore property for sale?
A. Yes.
Q. Okay. And when you purchased the property, did you feel as though that was a good price for a platted lakeshore lot?
A. Yes.
Q. Did you feel as though you were getting good value for the amount that you paid?
A. Yes.
Q. Okay. Were you, I guess I'm getting, I'm getting into whether you were a smart shopper or not, but did you do any research or did you have any personal knowledge as to the amounts that similar vacant lakeshore property in that general vicinity of the Sandy Shores area was selling for at the time --
MR. GETTE: Objection, --
Q. (By Ms. Fish-Whitlock) -- when you purchased this property?
MR. GETTE: Objection, compound.
A. No.

Page 28

Q. (By Ms. Fish-Whitlock) Okay. When you purchased this lakeshore property, what were your expectations for it, what did you want to do?
A. I was going to build a lake home.
Q. Okay. And was this going to be a year-round lake home or were you planning on using it as a little more of a seasonal lake home or --
A. It would have been a year-round lake home that I would have retired to.
Q. Okay. Okay. Now did you place any -- did you begin developing your real estate on Sandy Shores?
A. Yes. I put in a culvert.
Q. Okay. And where did you buy the culvert from, do you recall?
A. I don't recall for sure who I bought it from.
Q. Okay. Is that, you, were you one of the people that hired Rex Block to install the culvert for you, did you hire anybody to do it?
A. Yes, I believe it was Rex Block.
Q. Do you recall whether you had to apply for a culvert permit in order to install

Page 29

that culvert?
A. No, I do not.
Q. Okay. Did you ever submit a building application to the Environmental Services director at Lake of the Woods County for the property?
A. No, I do not believe I filled out an application. I believe it was a telephone call to Lake of the Woods County.
Q. Okay. So you made a telephone call. Who did you speak with?
A. I believe it was Lockhart.
Q. Gary Lockner?
A. Gary Lockner.
Q. And do you recall what that conversation was about?
A. No -- well, yes, I do. It, it pertained to if it was beneficial to proceed with an, an application.
Q. For?
A. For building on this property.
Q. And what was Mr. Lockner's response?
A. If I remember correctly, he indicated that at this time it wouldn't be valuable or accepted, I guess.

Page 30

Q. He stated that your application to build wouldn't be accepted?
A. Accepted is probably not the correct word. As things were going, it didn't seem like it would, the application would get approved.
Q. So is it best to, would you characterize this as Gary Lockner informed you that a building permit would be futile?
A. No.
Q. Okay. Did he invite you to apply for a building permit?
A. I can't remember for sure what, what the full conversation or the full details of the discussion were.
Q. Okay. Did it appear in that conversation that he was discouraging it?
A. Not necessarily discouraging it, just that there was activity going on, on this property at the time that, I don't know how to say it, unsettled differences.
Q. Okay. Okay. When you made your last payment, what sort of use of the property were you able to make of it?
MR. GETTE: Objection, vague.

Page 31

A. What do you mean by use?
Q. (By Ms. Fish-Whitlock) Okay. I'm going to ask you this. Did you receive a Restoration Order to remove a culvert placed for a driveway onto your lot?
A. I don't believe I did.
Q. Okay.
A. I don't recall at least.
Q. Did you remove -- you did place a culvert, you do recall placing a culvert in the driveway, though, right?
A. A culvert was placed in the driveway, yes.
Q. Okay. And my question was, is -- okay. Is that culvert still there today as far as you're aware?
A. Yes.
Q. All right. When was the last time you were out to the property?
A. Two years ago.
Q. Okay. And two years ago that was still out there, the culvert --
A. Yes.
Q. -- that you placed in there.
All right. Now as far as your

Page 32

investment, your expectations when you purchased this property were, was to build a summer home, what do you feel, I mean, did you feel as though you can continue with those initial expectations?
MR. GETTE: Objection, mischaracterizes his prior testimony.
Q. (By Ms. Fish-Whitlock) You can answer the question.
A. Would you rein -- restate that?
Q. Sure.
You testified earlier that the, your expectations, when you purchased the property, was to build a residential home. Is that right?
A. Yes.
Q. Okay. As of March 20, 2001, did you believe that you would be able to fulfill those expectations of building a residential home?
A. That is correct.
Q. You, you did believe that you would be able to build a residential home at that time?
A. When we made our last payment, yes.
Q. Okay. You, you felt that it was

Page 33

still a possibility?
A. Slim, but a possibility.
Q. Okay. At what point did you decide that there, it was not a possibility for you to build a residential home on that property?
MR. GETTE: Objection, includes an unfounded assumption.
You can go ahead and answer.
A. About that same time frame.
Q. (By Ms. Fish-Whitlock) About that same time frame?
A. Um-hum. Shortly after that time frame, that's why we didn't make anymore payments.
Q. The reason why you didn't make anymore payments, then, was because you were unable to fulfill your expectation of building a summer home on that property?
MR. GETTE: Objection, leading.
You can answer the question.
Q. (By Ms. Fish-Whitlock) And I'm trying to understand, you know, your thought processes in purchasing a property, making payments and then ceasing payments, and the reasons for that.


©2008

Page 34

And it has to also do, also do with what you were, what your expectations were on this property when you first purchased it and that's really what I'm focusing on.

And we have it pretty well established that your expectations, when you purchased this property, was to build a residential home?

MR. GETTE: Counsel, I think we've been over this. I mean, he's indicated what his expectations are. He's also indicated why he stopped making payments, because he couldn't build a home on the property. I don't know why we have to put the witness through going through this the third or fourth time.

MS. FISH-WHITLOCK: And that might be, I may be very, you know, not understanding what he's saying, so, you know, that's why we're very careful about what we do.

Q. (By Ms. Fish-Whitlock) So at this point it was when you felt that the expectations of building a summer home were, were gone?

MR. GETTE: Objection, leading, putting words in the witness's mouth. Why

Page 35

don't you just ask him why he, why he stopped making payments.

Q. (By Ms. Fish-Whitlock) Okay. Why did you stop making payments?

A. Because there was a, in my opinion, a slim chance that we would be able to build a home and develop this property and I didn't want to invest anymore money into something that I was going to get absolutely no value out of.

Q. Okay. Thank you.

Now as far as you're aware, do you have knowledge as to what regulations were being placed on this property that prevented you from achieving your expectations?

MR. GETTE: Objection, it's been asked and answered.

Q. (By Ms. Fish-Whitlock) You can answer the question.

A. The --

Q. Do you recall what information that you received that gave you that idea?

MR. GETTE: Objection, again, asked and answered.

Q. (By Ms. Fish-Whitlock) I'll -- let

Page 36

me, let me put it this way.

Was Gary Bailey telling you that you could not develop this property?

A. No.

Q. Okay. So it was some other governmental agency or some other agency that was telling you that you could not develop this property?

A. Yes.

Q. Okay. Do you recall which agency that was?

A. No, I do not.

Q. Okay. Do you have any personal knowledge as to the Army Corps of Engineers' decision to remove the extension of Sunny -- of Sandy Shores Drive, that runs through the Sunny Beach Plat, that provides your property with access?

MR. GETTE: Objection, vague.

A. Very little if any.

Q. (By Ms. Fish-Whitlock) Okay. I understand that you received some public notices from the Army Corps of Engineers that they were considering an after-the-fact permit application?

Page 37

MR. GETTE: Objection.

A. Yes.

Q. (By Ms. Fish-Whitlock) Do you recall whether or not, was there a concern that you were going to lose access to this property as a result of that public notice?

A. Say that again, please?

Q. Did you recall whether it was a concern of yours that you were going to lose access to your property?

A. Yes.

Q. Okay. I'd like to go back to the conversation that you had with Gary Lockner.

You indicated that you spoke with Gary Lockner inquiring into applying for a building permit application. Did Gary Lockner in any way state that he would not accept a permit application from you?

MR. GETTE: Objection, asked and answered.

Q. (By Ms. Fish-Whitlock) And there is a distinction between willing to accept and --

MR. GETTE: Objection, --

Q. (By Ms. Fish-Whitlock) -- providing information of what he believes is going to

happen if you submit one.
MR. GETTE: Objection, it's not even a question.
A. The telephone conversation was a long time ago and I don't remember for sure.
Q. (By Ms. Fish-Whitlock) Okay. That's okay.
(Whereupon, Deposition Exhibit No. 6, Lundgren, was marked for identification.)
Q. (By Ms. Fish-Whitlock) Showing you what's been marked as Exhibit 6. Do you recognize that document?
A. Yes, I do.
Q. Okay. This is a document that you received from Mr. Gary Bailey. Is that correct?
A. Yes.
Q. And that was in response to your letter to Mr. Bailey dated May 8, 2001?
A. May 10, 2001.
Q. So this, you know, the document, Exhibit 6, is dated May 10, so is, my question is, is Gary's letter to you a response to your letter to him?
A. Yes, I believe it is.



Q. All right. I just want to be sure you've never received a Restoration Order by either the Army Corps of Engineers or the Department of Natural Resources?
A. Stating?
Q. That you have to remove any fill or culverts that were placed on your property.
A. I do not recall --
Q. Okay.
A. -- receiving a letter.
Q. Okay.
MS. FISH-WHITLOCK: I have no further questions.

EXAMINATION
BY MR. GETTE:
Q. Okay. Mr. Lundgren, I just have a couple of questions.
Looking, again, back at Exhibit No. 2, does that indicate that your last payment on the property was on March 18 of 2001?
A. Our, our handwritten date is March 20, 2001.
Q. March 20, 2001.
A. Yeah.



Q. Okay. Thank you.
And showing you Exhibit No. 5, showing you what's been marked Exhibit No. 5, this is a letter that you indicated you received from the Army Corps of Engineers, correct?
A. Yes.
Q. Okay. And what is the date of that letter?
A. February 6, 2002.
Q. Okay. Do you have any reason to believe that date is inaccurate?
A. No, I do not.
MR. GETTE: All right. I have no further questions.

EXAMINATION
BY MS. FISH-WHITLOCK:
Q. Just a couple of follow-up questions.
You were, Mr. Lundgren, were receiving notices by the Army Corps of Engineers on a permit application for the extension of Sandy Shores Drive through the Sunny Beach Subdivision. Is that right?



Do you recall receiving any notices mailed to you by the Army Corps of Engineers?
A. None other than the one I had here, I believe.
Q. Okay. I was going to ask you about this, and I'm not going to mark it quite yet, but this is a public notice for fill in the Middle River-Snake area on, on land that really doesn't appear at all to be in any way relevant to the Sunny Beach. Why did you provide this document here today?
A. It was some information that I had received in the last period of time since '98 and --
Q. Okay.
A. -- it was in the file and --
Q. Had to do with the Army Corps of Engineers, so I --
A. -- I didn't know if it was, pertained to this or not, so -- (no further response.)
Q. Okay. I'm going to be showing you a document that you brought here today pursuant to Mr. Gette's subpoena and the letter dated February 6, 2002, the one you brought, actually

Page 42

has a copy of the Restoration Order of the Department of the Army's October 22, 2001, order to remove the Sandy Shore Drive.
Had you ever seen the October 21, 2001, Department of the Army order to Mr. Bailey to remove the access road or the extension of Sandy Shores Drive prior to February 6, 2002?
A. I looked through that, I must have.
Q. Okay. I want to be clear on your answer to this. Had you ever, had you ever seen this Department of the Army letter dated October 22, 2001, dated to Gary Bailey, ordering him to remove the Sandy Shores Drive through Sunny Beach?
A. Say that one more time.
Q. Okay. Prior to February 6, 2002, had you ever seen this document?
A. I do not recall for sure.
Q. Okay. I know that there's more documentation within here that you brought, so . . .
I'm showing you a June 12, 2001, letter dated to you from the Army, Department of the Army, Corps of Engineers, indicating

Page 43

that discharge and fill material has been placed in wetlands on your lot and in the Sunny Beach development.
Do you recall, do you recall receiving this letter?
A. Yes, I do.
Q. Okay. Do you recall what your thoughts were after you received that letter?
A. No, I do not.
Q. Okay. What do you understand that letter to be?
MR. GETTE: Objection, the letter speaks for itself.
MS. FISH-WHITLOCK: Okay.
A. I understand that the reason is to cease all activity on the property.
Q. (By Ms. Fish-Whitlock) On your property?
A. Yeah.
Q. Is this the document that prompted you to cease payments on the contract for deed?
MR. GETTE: Objection.
A. I do not know.
Q. (By Ms. Fish-Whitlock) Okay.
MS. FISH-WHITLOCK: I have no

Page 44

further questions.
MR. GETTE: I'd like to have that marked.
(Whereupon, Deposition Exhibit No. 7, Lundgren, was marked for identification.)

EXAMINATION
BY MR. GETTE:
Q. Mr. Lundgren, I've had marked as Exhibit 7 the letter you were just referring to in your testimony in response to questioning by Ms. Fish-Whitlock.
What is the date of that letter?
A. June 12, 2001.
Q. Do you have any reason to believe that you received that letter at any time other than on or about June 12, 2001?
A. No, I do not.
MR. GETTE: Okay. I have no further questions.

EXAMINATION
BY MS. FISH-WHITLOCK:
Q. Mr. Lundgren, were you typically up to date on making your payments for the

Page 45

contract for deed in a timely manner or was it, were you ever behind at any time, prior to your ceasing payments completely?
MR. GETTE: Objection, asked and answered.
A. I don't know for sure.
MS. FISH-WHITLOCK: Okay.
MR. GETTE: You finished?
MS. FISH-WHITLOCK: Yeah.
MR. GETTE: Okay. While we're still on -- actually, let's take care of this off the record.
(Whereupon, there was discussion off the record.)
MR. GETTE: Mr. Lundgren, once the court reporter puts together what we said here today, you'll have an opportunity, if you would like, to look at it and make corrections to anything or you can waive that right and trust that she'll get it right.
So I'd leave that decision up to you, whether you'd like to review it and make corrections or whether you would waive the right to do that.
MS. FISH-WHITLOCK: For the most

Page 46

part, the court reporters are very accurate.

THE DEPONENT: Um-hum.

MR. GETTE: It's really your call.

MS. FISH-WHITLOCK: It's really your call.

THE DEPONENT: I'll, I'll waive. Thank you.

(Whereupon, the deposition was concluded at 4:39 o'clock p.m.)

(Whereupon, the original Deposition Exhibit Nos. 2 and 7, Lundgren, were retained by Mr. Lundgren.)

Page 47

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA )<br>
) ss<br>
COUNTY OF POLK )

I, RUTH ANN JOHNSON, a Notary Public within and for the County of Polk and State of Minnesota do hereby certify:

That prior to being examined the afore-named witness was by me sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition, consisting of 46 pages of typewritten materials, was taken down by me in Stenotype at the time and place therein named, and was thereafter reduced to typewriting under my direction.

I further certify that I am neither related to any of the parties or counsel nor interested in this matter directly or indirectly.

WITNESS my hand and seal this day of

Ruth Ann Johnson<br>
Notary Public<br>
Polk County, Minnesota

My Commission expires January 31, 2012.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

GARY BAILEY,

Plaintiff,

v. Court File No. 02-1078L

Honorable Victor Wolski

THE UNITED STATES,

Defendant.

---

DEPOSITION of THOMAS WOITALLA, taken before Shirley A. Hosch, a Notary Public in and for the County of Washington, State of Minnesota, on Thursday, the 6th day of March, 2008, commencing at approximately 11:08 a.m., at the Army Corps of Engineers, 190 East 5th Street, in the city of St. Paul, Minnesota.

* * *

Page 2

APPEARANCES

JAMES D. GETTE, ESQ.
U.S. Department of Justice Environment & Natural Resources Division,
601 D Street, NW
P.O. Box 663,
Washington, DC 20044-0663
Representing the Defendant.

STEVEN P. ADAMSKI, ESQ., of the
U.S. Army Corps of Engineers,
190 Fifth Street East,
St. Paul, Minnesota 55101-1638,
Representing the Defendant.

ALAN B. FISH, ESQ.
Alan B. Fish, P.A., Attorneys and Counselors at Law
102 2nd Avenue Northwest,
Roseau, Minnesota 56751,
Appeared via the telephone
Representing the Plaintiff.

* * *

Page 3

CONTENTS

| EXAMINATION BY MR. GETTE: | PAGE |
|---|---|
| Woitalla Ex. 1, Subpoena | 6 |
| Woitalla Ex. 2, Building layout | 8-11, 19 |
| Woitalla Ex. 3, Basic Application | 12-14, 16-17, 31 |
| Woitalla Ex. 4, 7/22/99 Invoice for gravel | 14-15 |
| Woitalla Ex. 5, 8/3/00 Invoice for gravel | 15-16 |
| Woitalla Ex. 6, 4/5/01, New electrical service | 17-19 |
| Woitalla Ex. 7, Warranty Deed | 21 |
| Woitalla Ex. 8, Residential Mortgage | 21-22 |
| Woitalla Ex. 9, Amortization Schedule | 22-26, 28 |
| Woitalla Ex. 10, 8/3/04 Restoration order | 26-27 |
| Woitalla Ex. 11, 10/19/04 invoice to remove driveway | 27-28, 35 |
| Woitalla Ex. 12, 5/25/05 default letter | 29-30 |
| Woitalla Ex. 13, Replacement Plan Decision denied | 31-32 |
| Woitalla Ex. 14, Letter from the Woitalla's | 32-33 |
| Woitalla Ex. 15, Approach permit application | 34 |
| Woitalla Ex. 16, 10/27/04 complete restoration | 35 |
| Woitalla Ex. 17, 6/30/05 Letter of Christensen | 36-37 |
| Woitalla Ex. 18, Photocopy of check 6191 | 38 |
| EXAMINATION BY MR. FISH: | 39 |
| OBJECTIONS BY MR. GETTE: | 39, 41, 42, 46, 47 |

Page 4

* * *
(The following proceedings were duly had:)
* * *

THOMAS WOITALLA,
after having been first duly sworn, deposes and says as follows:

EXAMINATION

BY MR. GETTE:
Q. Good morning, Mr. Woitalla.
A. Good morning.
Q. First of all, am I pronouncing that right?
A. Close enough.
Q. My name is Jim Gette. We met earlier this morning before we began the deposition, as well as I have talked to you before on the phone. Let me start by asking you if you've ever had a deposition taken before?
A. No, I haven't.
Q. Let me give you a few of the ground rules. As you see, the court reporter is here today and she is taking down everything that both of us say,

Page 5

because of that it's important that we not talk at the same time. So I would ask you to make sure that you wait until you are sure I've finished my question before you answer and I will try to wait until you complete your answers before I pose the next question; is that okay?
A. Okay.
Q. The second thing is, because we're putting this down on paper, nods of the head or different movements, don't count. So you need to give me a verbal answer or an oral answer to each question, okay?
A. Yes.
Q. And I will point out to you that it's important for her that you keep your voice up too, so that she can hear everything you say?
A. Okay.
Q. And two additional instructions. The first is that it's real important that you understand my questions. If at any time I ask a question that isn't clear to you, would you please ask me to repeat the question or rephrase the question, so it's understandable?
A. Yes.
Q. And the final thing is if you want to take a break

Page 6

at any point, just let me know and we will do that?
A. All right.
Q. Let's start off by having you state your full name?
A. Thomas L. Woitalla.
Q. And what is your address, Mr. Woitalla?
A. 16723 59th Street Northeast, Elk River, Minnesota.
Q. Now, I'm going to have the court reporter mark Exhibit 1 to your deposition.
(Woitalla Deposition Exhibit 1 marked for identification.)
Q. I will hand that to you, Mr. Woitalla and ask you to take a quick look at that?
A. (Witness reviews document.)
Q. Is that a copy of a Subpoena that was served on you, to appear at this deposition today?
A. Yes, it is.
Q. And if you turn to the last page of that there is a list of documents that you were requested to identify and bring with you if you had them available; is that correct?
A. Yes.
Q. Did you bring with you some documents today?
A. Yes, I did.

Page 7

Q. As we indicated before we were on the record, we will make copies of all of those and provide them to Plaintiff's Counsel, as well. Some of those documents we've already copied and faxed to Plaintiff's Counsel and he will have some questions for you a little bit later this morning, okay?
A. (Witness nods.)
Q. In 1999 did you buy a property on Lake of the Woods?
A. Yes, I did.
Q. At the time you purchased that property, had you been looking for property in the area?
A. No. A friend of mine told me about it.
Q. And did you go up to take a look at the property before you purchased it?
A. Yes, I did.
Q. How many times did you do that?
A. We went up there once.
Q. Who was the friend that told you about the property being available?
A. Carl Pierson.
Q. Had he purchased property in the Sunny Beach development?
A. Yes, he did.

Page 8

Q. And did you work with some real estate agent with respect to your purchase of that property?
A. Yes, I did.
Q. Who was that?
A. I believe her name was Francine Fish.
Q. Before buying the property, who did you talk to about the property?
A. In regards to . . ?
Q. Fair enough, Let me ask this: You had talked to Mr. Pierson about the property, obviously; is that correct?
A. Yes.
Q. And did you talk to Ms. Fish about the property?
A. Yes, I did.
Q. Were there any other individuals, Mr. Bailey, who is the owner of the property or other individuals you talked to about the property?
A. No.
Q. Do you recall what you discussed with Ms. Fish before you purchased the property?
A. Yes. She went over the property, showed us some papers on the property and showed us that one document with the proposed housing layout.
MR. GETTE: Let me have this marked as Woitalla Exhibit 2.

Page 9

(Woitalla Deposition Exhibit 2 marked for identification.)
Q. (By Mr. Gette, continuing) Mr. Woitalla, I'm handing you what's been marked as Exhibit 2 to your deposition. Is this one of the documents that you brought with you this morning?
A. Yes, it is.
Q. Can you tell me what that documents is?
A. It's basically the building or a building layout for the septic system, the driveway and the house and garage.
Q. How did you come to receive what's been marked as Exhibit 2?
A. We got this when we went and talked to the realtor, Francine Fish.
Q. So did you actually receive this from Francine Fish?
A. Yes.
Q. And if you see there is a box marked 40 feet by 40 feet on the exhibit?
A. Yes.
Q. Can you tell me what that box represents?
A. The house.
Q. And there is another box that's marked with 26 feet by 30 feet. Can you tell me what that box

Page 10

represents?
A. The garage.
Q. There are certain setbacks noted on the document. Were those explained to you at all?
A. Uh-huh, that's 75 feet from the water's edge or whatever.
Q. And there is also what appears to be 20 feet along the edges of the property; is that correct?
A. Yes.
Q. Was that also explained to you as a setback that was required?
A. Yes.
Q. Do you know the source of those requirements; federal law, state law, local zoning ordinances?
A. That I do not know.
Q. Okay. There is also a box with a smaller dotted line box inside of it on Exhibit 2. Do you know what that represents?
A. That was supposed to be for the septic system.
Q. And I notice that the exhibit says "Proposed house, garage, well and septic mound system." Was there a well on the property?
A. This right there, that thing right there (indicating).
Q. Okay. You are pointing on Exhibit 2 to a circle?

Page 11

A. A crosshatch.
Q. With a crosshatch in it, okay. Now, was that well actually already installed on the property?
A. No, there is nothing on there.
Q. And during the time you owned the property, did you ever install a well?
A. No.
Q. Now, when this document says septic mound system, do you understand what a mound system is?
A. Yes.
Q. What is that?
A. It's a system where the water is pumped up into a mound of dirt that they have built up on the property.
Q. Did anyone explain to you why a mound system was being considered?
A. No.
Q. During the time you owned the property, did you investigate the possibility of installing a septic system?
A. No, I did not.
Q. Did you talk to any of the other lot owners who had investigated a septic system?
A. No.
(Cell phone rings.)

Page 12

MR. GETTE: Let's go off the record.
(Off the record.)
Q. (By Mr. Gette, continuing) Mr. Woitalla, I'm going to have another document marked as Exhibit 3 to your deposition.
(Woitalla Deposition Exhibit 3 marked for identification.)
Q. It's a multi-page document, if you would take a second and look through that and let me know when you have done that?
A. (Witness reviews document.) Okay.
Q. Okay. Do you recognize that document?
A. Yes. I filled that out.
Q. Is that your handwriting on that document?
A. Yes.
Q. And this was an application that you made for wetlands, a replacement plan?
A. Yes.
Q. And how did it come about that you submitted this application?
A. I don't remember which guy gave -- one of the guys up there, I don't remember if it was Lockner or whoever was the head of soil and water up there in Lake of the Woods County, gave us these papers to fill out to try to get an approval for this --

Page 13

I'm at a loss for words.
Q. That's okay, let me try to help you through this. First of all, this was somebody at the Soil and Water Conservation District?
A. Yes. I forget what his name was, there was a couple of them. There was one there first and then another guy took over after he quit and I don't remember their names.
Q. Was one of them Les Lemm?
A. Yes, there you go.
Q. And do you recall whether it was Les or the other gentleman who suggested this application?
A. Boy, I don't remember.
Q. That's a number of years. "I don't remember" is a fine answer, whatever you can recall. Was this an application for replacement of wetlands that had already been impacted on your property?
A. Yes.
Q. And if you turn back to in the lower right-hand corner a document that's stamped page 954; do you have that in front of you?
A. Yes, I do.
Q. It appears to be a drawing of work on your lot; is that correct?
A. Yes, that's correct.

Page 14

Q. And it indicates Lot 13, was that your lot?
A. Yes.
Q. And on that it says, "Work already completed"; is that your handwriting?
A. Yes.
Q. Did you make this drawing?
A. Yes, I did.
Q. And what is the drawing intended to represent?
A. It's my driveway that I wanted put in up to a deck that I had on the front of the property.
Q. And when did you install -- when did you have the driveway installed?
A. I would have to look at my documents, I'm not sure. It's one of those invoices.
MR. GETTE: Let me have this marked as Woitalla Exhibit 4.
(Woitalla Deposition Exhibit 4 marked for identification.)
Q. (By Mr. Gette, continuing) I'm handing you what's been marked as Woitalla Exhibit 4, do you recognize that document?
A. Okay. This one here is for the driveway approach.
Q. Okay. This is an invoice from Lake Area Construction, Rex Block; is that correct?
A. Yes.

Page 15

Q. And did you hire Mr. Block to do some work for you on the property?
A. Yes, I did.
Q. And this indicates this was done in June of 1999; is that correct?
A. Yes.
Q. And what was this specific work again?
A. This is the approach going into the lot from off the road.
Q. So did this include installing a culvert?
A. Yes.
Q. It appears that you paid Mr. Block $385 for that work?
A. Yes.
MR. GETTE: Now, I will have this marked as Exhibit 5 to your deposition.
(Woitalla Deposition Exhibit 5 marked for identification.)
Q. (By Mr. Gette, continuing) I will hand that to you and take a look at that invoice. Now, again, this is another invoice from Lake Area Construction, Rex Block, correct?
A. Yes.
Q. And it's dated August 3 of 2000?
A. Yes.

Page 16

Q. What was this invoice for?
A. This is the gravel that I used to put in the driveway.
Q. And did Mr. Block actually install the driveway for you?
A. Yes.
Q. What did that entail?
A. All he had to do was dump the gravel and push it in with the Cat.
Q. So with some sort of a dozer?
A. Yes, a bulldozer.
Q. And does that date seem right to you, August of 2000, when that would have been installed?
A. Yes, that sounds right. I'm sorry.
Q. Now, going back to what we had marked as Exhibit 3 and the drawing that you prepared, does that drawing represent the driveway that you had Mr. Block install for you?
A. Yes, it does.
Q. Now, it also indicates at the very end or toward the lakeside of the lot, the word "deck" is written in?
A. Uh-huh, that's where I had a deck.
Q. What kind of deck was it?
A. It was just a wood deck that I put in there.

Page 17

Q. Did you put that in or did you have somebody install that for you?
A. I put it in.
Q. Now, during this time period, 1999 to 2000, were you using the property?
A. Yes.
Q. About how often?
A. Probably a couple times a month.
Q. So mostly on weekends?
A. Yes.
Q. Summertime or year-round?
A. Mainly summer, but I was up there twice during the winter.
Q. And would you stay on the property when you went up there?
A. Yes.
Q. Camping?
A. Yes.
Q. Camper or --
A. I had a motor home.
Q. Now, did you have electricity on the property?
A. Yes, I did.
MR. GETTE: I'm going to have this marked as Exhibit 6.
(Woitalla Deposition Exhibit 6

Page 18

marked for identification.)
Q. Mr. Woitalla, I'm handing you what's been marked as Exhibit 6 to your deposition, take a quick look at that?
A. Okay.
Q. Do you recognize this document?
A. Yes, I do.
Q. Was this one of the documents you brought with you today?
A. Yes.
Q. What is that document?
A. It's my paper from the North Star Electric Cooperative that they gave me for the prices for installing the meter and the . . .
Q. And that was in April of 2001?
A. Yes.
Q. And is that when you had electric service installed on the property?
A. Yes.
Q. And did North Star Electric Cooperative actually do the installation?
A. Yes. They put the meter loop in and then from there I wired it from there to a box.
Q. And how did they actually run the lines to your property?

Page 19

A. The meter was actually on Lot 14 and then I just put a post in on the property line and I ran an extension cord to my vehicle.
Q. So North Star brought it from Lot 14 up to your property line?
A. Yes.
Q. Do you know whether North Star ever extended that beyond Lot 13 into the other lots?
A. No, they didn't.
Q. Now, I'd like to go back a little bit in time to when you were considering purchasing the property again and if you would look at Exhibit 2, that was the drawing that had been provided to you by the real estate agent, correct?
A. Yes.
Q. Did you indicate to the real estate agent what you intended to do with the property once you purchased it?
A. Not really, no.
Q. Did the real estate agent indicate to you that it was available for residential development?
A. Yes, she did.
Q. Now, aside from camping up there, are you a fisherman?
A. Yes, I was or am.

Page 20

Q. Did you go out on the lake to fish up there?
A. Yes.
Q. Did you have a boat?
A. Yes.
Q. Where would you put in?
A. Right off our lot mainly. I had a track system that I put up for the boat.
Q. What kind of boat is it?
A. A 16-foot Lund.
Q. And did you put in there at your lot over the course of a couple of years?
A. Well, actually, I didn't put the boat in on the lot. I went up to the resort north of us and I kept the boat on my lot, to clarify that.
Q. So you would go in and put in up at the resort?
A. Yeah, just north of our lot. It was -- I forget the name of it.
Q. Morrison?
A. No. Long Point Resort, I believe.
Q. Okay. And when you say you kept the boat on the property, how would you get it --
A. I had a little track system that we made that could pull the boat up onto the lot or out of the water.
Q. So you would pull it up onto the property and it

Page 21

would actually sit on the property?
A. Yes.
Q. Did you ever have any problems with that system using that system on your property?
A. Now and then logs would come rolling up and knock the feet out from underneath it and stuff, but for the most part it worked pretty good. And there was one year the water was too low, so I couldn't use it.
MR. GETTE: Mark this as Exhibit 7.
(Woitalla Deposition Exhibit 7 marked for identification.)
Q. (By Mr. Gette, continuing) Mr. Woitalla, I'm handing you what's been marked as Exhibit 7 to your deposition. Do you recognize that document?
A. Yes, I do.
Q. What is that document?
A. That was the paper that we signed for the deed.
Q. Is this a copy of the deed for the purchase of the property?
A. Yes.
MR. GETTE: I will have this marked as Exhibit 8.
(Woitalla Deposition Exhibit 8 marked for identification.)

Page 22

Q. (By Mr. Gette, continuing) Handing you what's been marked as Exhibit 8, Mr. Woitalla, is that a copy of a mortgage that you executed at the time you purchased the property?
A. (Witness reviews document.) Yes, it is.
Q. And if you would look on page one -- first of all, let me ask you, what was the total purchase price of the property?
A. $25,000.
Q. And did you put some amount down?
A. Yes, I did.
Q. Do you remember how much?
A. I think I gave you a receipt. It was $2,133, I believe. I might not have given that one to you.
Q. Okay. We will see if we can find it at a break. Now, it indicates that if you look on the bottom of the mortgage there, which is Exhibit 8, that the mortgage was for $22,500; is that correct?
A. Yes.
Q. And your monthly payments were to be $297.42; is that correct?
A. Yes.
MR. GETTE: Now, let me have this marked as Exhibit 9.
(Woitalla Deposition Exhibit 9

Page 23

marked for identification.)
Q. (By Mr. Gette, continuing) Handing you what's been marked as Exhibit 9, do you recognize that document?
A. Yes, I do.
Q. And is that a copy of the amortization schedule for your mortgage?
A. Yes, it is.
Q. And again it indicates the payments were going to be $297.42?
A. Yes.
Q. Now, there is some handwriting on this document; do you recognize that handwriting?
A. Yes, it's mine.
Q. And down the left-hand side of that document, there are certain numbers that have been calculated and are written in your handwriting; do you know what those are?
A. I'm guessing that's the interest amount, without calculating it.
Q. Now, most importantly on this document, on the second page, there is some handwriting that looks like it says "last payment"?
A. Yes.
Q. Is that what that says?

Page 24

A. Yes, it does.
Q. And that again is in your handwriting?
A. Yes.
Q. Does that indicate to you what the last payment you made on the property was?
A. Yes, it does.
Q. And when was that?
A. July 7th of '02.
Q. So were you timely with your payments, from the time of purchase, up to July 7th of 2002?
A. I know we missed -- we were late on one or two, I know, I remember.
Q. The payments that you were late on, did you ultimately make those payments?
A. Yes, we did.
Q. Other than those couple of late payments, were you otherwise timely with your payments from the time you purchased up to July 7th, 2002?
A. Yes.
Q. Did you ever miss any payments completely during that time period?
A. None that I'm aware of.
Q. Do you recall when you marked this paper to indicate when your last payment was?
A. No, I don't. I do have the last check, though,

Page 25

that I wrote (indicating).
Q. So you've just handed me a check that indicates that your last payment was July 7th of 2002. We will get that copied and include that as an exhibit to your deposition at the next break.
A. Okay.
Q. Now, am I correct that the mortgage was held by Mr. Bailey?
A. Yes, it was.
Q. And so you would make payments directly to him?
A. Yes.
Q. Have you ever had any conversations with Mr. Bailey?
A. Yeah, I've talked to him a few times.
Q. What led you to contact him?
A. Well, when the property wasn't looking like it was going to be buildable or anything, I called him and asked him if we could escrow my payments into an escrow account in case this thing did go back and I could just get my money back for it.
Q. And what was his response?
A. He said "no."
Q. Do you know about when that conversation would have occurred?
A. No, I don't remember. I didn't document that

down.
Q. Was that before you actually ceased making payments on the mortgage?
A. Yes, it was.
Q. What ultimately led you to decide to stop making payments on the property?
A. Well, it didn't look like things were going very well and I just decided rather than putting more good money into bad, I just quit paying for it.
Q. And when you say "it didn't look like things were going very well," what do you mean by that?
A. Well, we were being forced to pull all of our gravel off and none of our -- when we filed for these applications to put fill in, nothing was approved and it just didn't look like things were going very well.
MR. GETTE: Mr. Woitalla, I'm going to have this marked as Exhibit 10.
(Woitalla Deposition Exhibit 10 marked for identification.)
Q. (By Mr. Gette, continuing) Handing you, Mr. Woitalla, what's been marked as Exhibit 10 to your deposition, when you referenced just a minute ago having to remove the gravel, is this a notice of the requirement of that restoration work?



A. Yes, it is.
Q. And did you receive this letter?
A. Yes, I did.
Q. What actions did you take in response to this order to restore the property and remove the gravel?
A. At that point, I called up Rex Block and I had him remove the gravel.
Q. Now, this letter that's been marked as Exhibit 10 is dated August 3, 2004, does that seem about right, as to when you would have received it?
A. Yes.
Q. Any reason to believe that's not the right date?
A. No.
MR. GETTE: And let's have this marked as Exhibit 11.
(Woitalla Deposition Exhibit 11 marked for identification.)
Q. (By Mr. Gette, continuing) I'll hand you what's been marked as Exhibit 11, Mr. Woitalla; do you recognize that document?
A. Yes, I do.
Q. And is that one of the documents you brought with you today?
A. Yes.



Q. What is that document?
A. This is the invoice for the gravel removal by Rex Block.
Q. So you actually retained Mr. Block to remove the driveway?
A. Yes, I did.
Q. And the invoice indicates it's dated October 19th of 2004. Do you have any reason to believe that that isn't when he actually conducted the work?
A. To my knowledge, that's the day he did it.
Q. And it indicates that you paid Mr. Block $300 for that work; is that correct?
A. Yes, I did.
Q. Mr. Woitalla, I'm showing you again what was marked as Exhibit 9 to your deposition. This is the amortization schedule?
A. Sure.
Q. Now, if you would look at the third column on that sheet, it says "payment amount"; do you see that?
A. Yes.
Q. And it indicates again for each month the payment amount was going to be $297.42, correct?
A. Yes.
Q. Is that in fact what you paid Mr. Bailey each month while you were making payments?



A. Yes.
Q. If we add up the amounts in that column from the first payment on June 7th, 1999 through July 7th of 2002, would that total the amount that you paid to Mr. Bailey on the mortgage?
A. Yes.
Q. Okay. And then in addition to that amount, you would have also paid him the amount of your down-posit, correct?
A. Yes.
Q. Do you currently own that property?
A. No, I don't.
Q. And can you tell me what transpired? Did you sell the property?
A. No, I gave it back to -- well, first, Mr. Bailey gave us a -- I don't know what the word for it is -- but that we were delinquent on our payments. Oh, a foreclosure notice on our property.
MR. GETTE: Let's have this marked as Exhibit 12.
(Woitalla Deposition Exhibit 12 marked for identification.)
Q. (By Mr. Gette, continuing) Mr. Woitalla, showing you what's been marked as Exhibit 12 to your deposition, if you would take a moment and just



 (C) 2008

look over that document?
A. Yes, I recognize this document.
Q. It appears to be a letter that was sent to you; did you receive this letter?
A. Yes, I did.
Q. And what was this letter?
A. It was about my default on my loan or mortgage on my property.
Q. And what did you do in response to receiving this letter?
A. I hired a lawyer.
Q. And can you describe for me how the -- what occurred after you received this notice?
A. Well, I hired a lawyer and he gave me some documents telling me what could happen if I defaulted on this loan and not paid off the total balance and from there we just tried to negotiate with Mr. Bailey and as an end result, we gave back the property to Bailey.
Q. Now, was some agreement reached that would protect your credit?
A. Yes. They agreed not to wreck my credit and they just took it back.
Q. So as you understand it, did they employ some method by which they would recoup the property



without actually doing a type of foreclosure that would impact your credit?
A. To be honest with you, my lawyer handled that end of it and I don't know exactly how that went.
Q. Now, in the process by which you gave the property back, did you receive any refunds or monies from Mr. Bailey?
A. No.
Q. Did you receive any reimbursements for development that you had done on the property?
A. No.
Q. Mr. Woitalla, I would ask you to look back again at Exhibit 3?
A. Okay.
Q. That's the permit application that you filed for wetland replacement, correct?
A. Yes.
Q. And what was the result of that permit application?
A. I was denied.
MR. GETTE: Can I have this marked as Exhibit 13
(Woitalla Deposition Exhibit 13 marked for identification.)
Q. (By Mr. Gette, continuing) I'll have you take a



look at Exhibit 13, Mr. Woitalla, is that a copy of the notice of denial of your permit application?
A. Yes, it is.
Q. Other than the wetland replacement application that you submitted, did you submit any other applications for permits for that property?
A. Not that I recall.
Q. Did you ever submit an application for a permit to install a septic system?
A. No.
Q. Any actual application for construction of a home?
A. No.
Q. Now, when you purchased the property, what was your intention, with respect to use of the property?
A. At the beginning, we were just going to use it for a camping lot and then maybe later on put a cabin up there.
MR. GETTE: I'll have this document marked as Exhibit 14.
(Woitalla Deposition Exhibit 14 marked for identification).
Q. (By Mr. Gette, continuing) Mr. Woitalla, I'm showing you what has been marked as Exhibit 14,



take a moment and look at that document?
A. (Witness reviews documents.) Yes, I remember this document.
Q. What is this document?
A. Well, we were writing to try to plead with these guys to let this thing go through, let the permits go through for Mr. Bailey.
Q. Do you know to whom you wrote that letter?
A. I think it was the County, Lake of the Woods County.
Q. And did you write this letter?
A. Yes, I did.
Q. In the last paragraph, it begins, "When we bought Lot 13, it was not disclosed this area was a wetland"; is that an accurate statement?
A. Yes, it is.
Q. When did you first become aware that there were wetlands on the property?
A. I believe it was when we started -- when we first filed for a permit to put our approach in and then problems started.
Q. So is it fair to state it was on or shortly after your filing for the permit for the approach?
A. Yes. I think we were denied at first and then somehow later on they got it approved to put it

Page 34

in.
MR. GETTE: Let's have this marked as Exhibit 15.
(Woitalla Deposition Exhibit 15 marked for identification.)
Q. (By Mr. Gette, continuing) I'd ask you to take a look at Exhibit 15, Mr. Woitalla?
A. Yes.
Q. Is that your permit for the approach -- your application for the approach permit?
A. Yes, it is.
Q. And did you sign that document?
A. Yes, I did.
Q. And it indicates it's dated May 17th of 1999?
A. Yes.
Q. So would it have been on or around that time that you first became aware that there were wetland issues with the property?
A. I believe it was right after we filed for this. No, actually, it was before this was approved.
Q. Let me ask you this: How did you first become aware? Who told you of the wetland issues?
A. I don't remember who told us.
Q. That's fine.
A. Oh, can I, on this document 14, we sent that paper

Page 35

to the Army Corps in St. Paul.
Q. Okay.
MR. GETTE: I will have this marked as Exhibit 16.
(Woitalla Deposition Exhibit 16 marked for identification.)
Q. (By Mr. Gette, continuing) Mr. Bailey, I will show you what's been marked as Exhibit 16 to your deposition, take a minute and look that over and I will ask you some questions?
A. (Witness reviews document.) Yes, I remember this document.
Q. What is that document, Exhibit 16?
A. This is the approval for my gravel removal.
Q. So after you had Mr. Block remove the gravel, did you receive this from someone?
A. Yes, I did.
Q. Do you know who sent this to you?
A. I can't read his writing.
Q. Yeah, that's why I asked. The signature is hard to make out, isn't it?
A. Yes, it is.
Q. Do you know whether this was from the county or from the which organization sent this to you?
A. It must have been from Lake of the Woods County.

Page 36

Q. And referring back to Woitalla Exhibit 11, how much did it cost you to comply with the restoration order?
A. It was $300.
Q. Were there any other expenses other than what you paid to Mr. Block to remove the driveway?
A. No.
MR. GETTE: Have this marked as Exhibit 17.
(Woitalla Deposition Exhibit 17 marked for identification.)
Q. (By Mr. Gette, continuing) Mr. Woitalla, I'm showing you what's been marked as Exhibit 17 and ask you to actually take a quick look through that document. It's a three-page letter, so it may take you a few minutes, but take your time?
A. (Witness reviews document.)
Q. Okay. Did you have a chance to take a look at that document?
A. Yes, I did.
Q. This appears to be a letter from your lawyer to Ms. Rita Fish-Whitlock; is that correct?
A. Yes.
Q. Did you receive a copy of this letter at the time your lawyer wrote it?

Page 37

A. Yes, I did.
Q. Now, if you look on the second page of that document, there is a large paragraph in the second half of the document that starts, "The first offer is"; do you see that?
A. Yes, I do.
Q. And it says, "The first offer is that Mr. Woitalla will agree to pay Mr. Bailey the sum of $4,000 to fully and finally complete the purchase of Mr. Woitalla's lot in Sunny Beach." Was this an offer to Mr. Bailey that you had approved your lawyer making?
A. Yes, it was.
Q. And am I correct in understanding that you would pay Mr. Bailey $4,000, in addition to what you had already paid him to date, at that point?
A. Yes.
Q. And in turn, at that point you would own the property outright, if he accepted the offer?
A. Yes.
Q. And you were making that offer at this point in time, which this letter is dated June 30, 2005, knowing that there were issues related to wetlands on the property, correct?
A. Correct.



 (C) 2008

Q. And also knowing at this time that the Corps of Engineers had denied Mr. Bailey's permit for the road application, correct?
A. Yes.
Q. And did Mr. Bailey accept your offer?
A. No.
MR. GETTE: Alan, I think I'm finished with my questions, but I'm going to ask to take just a brief break to look through my notes to make sure I've covered everything I want to.
MR. FISH: That's fine.
MR. GETTE: So let's take five minutes.
(Recess.)
MR. GETTE: Let me have this marked as Exhibit 18.
(Woitalla Deposition Exhibit 18 marked for identification.)
Q. (By Mr. Gette, continuing) Mr. Woitalla, I'm handing you what's been marked as Exhibit 18 to your deposition, a two-page document. Are these copies of the front and back of the final check that you sent to Mr. Bailey?
A. Yes, it is.



Q. And that's dated July 7th of 2002?
A. Yes, it is.
MR. GETTE: That's all I have, Alan.

EXAMINATION

BY MR. FISH:
Q. Mr. Woitalla, I have just have a couple of questions. First, you received communication from the Army Corps of Engineers essentially restricting your use of this property; is that right?
A. Yes.
Q. And was that one of the or I guess the primary reason you stopped making payments on the property?
A. Yes. I'd have to say so.
Q. And is it your understanding that that is why the County of Lake of the Woods and the DNR stopped, I guess, being cooperative with permitting people to use this for residential or camping purposes?
MR. GETTE: Objection; calls for the witness to speculate.
Q. Go ahead.
A. Do you want to rephrase or ask that question



again?
Q. I will ask it to you again. Until the Army Corps asserted their jurisdiction, calling this wetland, did you have any problems with Lake of the Woods like getting your culvert permit or anything like that?
A. We had a little problem at first getting the permit.
Q. Okay.
A. They didn't give it to us right away, because they had said that there was some problems with it.
Q. All right, and was the problem the Army Corps of Engineers?
A. At that point, I can't answer that. I don't remember what it was.
Q. All right. Regardless, has the Army Corps of Engineers permitted you to do any activity on that property?
A. No.
Q. And have you applied to the Army Corps of Engineers to conduct any activity or appealed any of their requests?
A. Yes, I did.
Q. And what was their response?
A. They denied all of our applications.



Q. Okay. And based on that, was that a basis to stop making payments to Mr. Bailey?
A. Yes, it was.
Q. And would you say that that affected your property, is that why you stopped making payments?
A. Say that again?
Q. Would you say that the Army Corps' regulation of this property affected the value of your property?
MR. GETTE: Objection; calls for an expert opinion.
Q. Go ahead.
A. Do you want to repeat that one more time?
Q. When the Army Corps rejected your application, do you believe that made your property worth less money?
A. I would have to say --
MR. GETTE: Same objection; go ahead.
A. I would have to say "yes."
Q. And did it limit your uses of the property?
A. At that point really, no, it didn't.
Q. And that's based on what the county had already -- or the DNR had already said you could or could not do; is that right.
MR. GETTE: Objection; vague.
Q. Well, let me rephrase the question. I won't make

Page 42

you answer that one, Mr. Woitalla. First of all, were you aware that the MPCA and Lake of the Woods County were claiming that they could not permit uses of this property, because of the Army Corps -- the Army Corps' wetland determination?
A. Not at first I wasn't.
Q. Are you aware of that -- I mean, did you become aware of that at some time?
A. Later on.
Q. Did you understand it was the Army Corps' work on that property that resulted in Lake of the Woods County and the State of Minnesota being resistant to further development?
MR. GETTE: Objection; calls for speculation.
Q. Go ahead.
A. I'm not going to answer.
Q. You have to answer the question.
MR. GETTE: If you know the answer --
A. Run that by me again?
MR. FISH: First of all, I would admonish Counsel not to be suggestive to the witness, by saying, "If you can answer." You are in direct violation of deposition rules, Counsel and I will

Page 43

ask you not to do that again.
MR. GETTE: I'm not in violation of anything, Alan. You can ask the witness whatever questions you want.
MR. FISH: And you heard my admonishment, Counsel?
MR. GETTE: I'm on the phone, Alan. I can hear what you are saying.
MR. FISH: Actually, I'm going to have the court reporter read the question back.
(The previous question was read by the court reporter.)
A. The Army Corps' work?
Q. Yeah. Do you understand the question, Mr. Woitalla?
A. No, I don't.
Q. All right. Were you aware that the Army Corps had done what's called a wetland delineation on that property, after you purchased it?
A. Yes, I did.
Q. And were you aware that after that decision or that was submitted to the State of Minnesota and the County of Lake of the Woods, that they then refused further permitting of development on the property?

Page 44

A. Yes.
Q. And so prior to that wetland delineation, the County permitted you to put fill on the property in the form of your culverts; is that right?
A. Yes.
Q And after that point in time, they did not permit you to do any other activity?
A. Yes.
Q. And as far as your use of the property, you were just using if for camping. Is it your understanding that you simply couldn't use it for camping after the Army Corps asserting their jurisdiction on the property?
A. I guess I wasn't really aware of that, because we were just parked there and nobody told me I had to take off my motor home. Even after I had the gravel pulled out of there, I still had my motor home there.
Q. Okay. So you weren't told that if you drive a motor vehicle on the property and you disturb the soil in any manner that you will be violating Army Corps of Engineers regulations?
A. I would have to say nobody, that I recall, told me that, no.
Q. Now, I have to ask you this question: After you

Page 45

removed your gravel pad, when you drove your motor vehicle to try to camp on the property, would it in fact depress the soil or disturb the soil in any manner whatsoever?
A. Yes, it would.
Q. And as far as uses of the property, do you believe building a permanent dock out there would be feasible, given the ice and wind conditions?
A. No.
Q. And did any of your neighbors up and down within say a mile or a quarter mile, have any permanent docks that lasted year-round out there?
A. No.
Q. And why is that?
A. Because the ice would tear it out, as it would in any lake.
Q. And how about the boat launching, you said one year you couldn't get your boat to the shore or maybe you could expand on that?
A. I could get my boat to shore, but I had that track system that I had to put my boat on. At that point, the water was too low to use that.
Q. All right. And the size of boat you used on the water, how large was that?
A. It was a 16-foot Lund.

Page 46

Q. Okay, so like an aluminum boat?
A. Yes.
Q. Now, when you purchased the lot, you understood i had been platted, that Lake of the Woods County had accepted the plat for it?
A. That's what I was assuming, yes.
Q. When that was done, were you aware that Lake of the Woods County had to confirm that it was suitable for building and residential purposes?
MR. GETTE: Objection; calls for speculation.
Q. Go ahead and answer.
A. I just assumed that everything was clear to go.
Q. And were you further aware that the Army Corps of Engineers had verbally represented that mitigation would be allowed on the property to Lake of the Woods County?
A. Yeah, I do recall something, but I don't remember at which point I was told that.
Q. Okay. Who do you think would have told you that, would that have been Mr. Lockner?
A. It was either Lockner or Les Lemm, I believe, one of the two.
Q. All right. So you were aware that Lockner or Les Lemm were dealing with the Army Corps of

Page 47

Engineers?
A. Yes.
Q. And it was your understanding through -- and Lockner and Les Lemm, I think Les Lemm works for the Soil and Water Conservation District and Mr. Lockner for the County; is that right?
A. Yes.
Q. And it's your understanding that the Army Corps of Engineers had represented to the county that they would allow mitigation?
A. At a given point, I remember somebody saying that, yeah.
Q. And that was -- you are saying that was either Les Lemm or Gary Lockner?
A. Yes. It was too long ago to remember which one it was.
Q. All right. You believe it was one of those two anyway?
A. Yes.
Q. Well, tell me this: What do you believe is the best use of that property if it were not regulated?
MR. GETTE: Objection; calls for speculation and an expert opinion, but go ahead.

Page 48

A. I would say a cabin or basically a recreational lot.
Q. So either recreational lots or residential lots or both, you are saying?
A. Yeah.
Q. And do you believe the regulations that were imposed on you, have prevented the ability to use it as a recreational or residential lot, to the extent you understand the regulations?
A. Yes.
MR. FISH: I have no other questions.
MR. GETTE: I have no further questions for Mr. Woitalla, so we will go off the record and we're all finished. Mr. Woitalla, you have the opportunity to receive a copy of your deposition, to read it and to mark any corrections and then sign it or you can waive that right, it's up to you, whichever you prefer?
THE WITNESS: Well, what would be to my best interest?
MR. GETTE: I'm not your lawyer in this, but if you feel more comfortable making sure that we got it all right.

Page 49

THE WITNESS: I will take a copy.
MR. GETTE: Okay. The reporter will send that to you with some instructions and you will just read through it. There will be a sheet where you mark your corrections and then you can send that back to the court reporter, okay?
THE WITNESS: Okay.
(At 12:40 p.m., the foregoing deposition was terminated.)



 (C) 2008

Page 50

STATE OF MINNESOTA )
) SS.
COUNTY OF WASHINGTON )

I hereby certify that I reported the deposition of THOMAS WOITALLA, on the 6th day of March, 2008, in St. Paul, Minnesota and that the witness was by me first duly sworn to tell the whole truth;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the reading and signing of the deposition by the witness were performed (unless indicated to the contrary on the following page).

WITNESS MY HAND AND SEAL this 21st day of March, 2008.

------------------

(Seal) Shirley A. Hosch
Court Reporter

Page 51

Capital Reporting Company
1821 Jefferson Place, Northwest
Third Floor
Washington, DC 20036

ERRATA SHEET

TITLE: Gary Bailey v The United States
VENUE: US Court of Federal Claims FILE NO: 02-1078L
WITNESS: Thomas Woitalla - 3/6/08 REPORTER: S. HOSCH
*********************************************************
Pg/Line | Change Reason
*********************************************************

_______________________ _______________
Signature of Witness Date

Page 52

Mr. Thomas Woitalla
16723 59th Street, N.E.
Elk River, MN 55330

IN RE: Bailey v The United States
Dear Mr. Woitalla:

This letter is to advise you that the original transcript of your deposition taken in the above matter will be available in our office, Capital Reporting Company, located at 1821 Jefferson Place, Northwest, Washington, D.C., for signature.

Pursuant to the rules, the transcript will be available for 30 days beginning with your receipt of this letter. Please contact the Capital Reporting Company office, at (202) 857-3376, in order to arrange for your review of the transcript.

If you have any questions, please do not hesitate to call. Thank you.

Yours,

Shirley A. Hosch
Reporter/Notary

cc: James Gette, Esq.
Alan Fish, Esq.

STATE OF MINNESOTA )
) SS.
COUNTY OF WASHINGTON )

I hereby certify that I reported the deposition of THOMAS WOITALLA, on the 6th day of March, 2008, in St. Paul, Minnesota and that the witness was by me first duly sworn to tell the whole truth;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the reading and signing of the deposition by the witness were performed (unless indicated to the contrary on the following page).

WITNESS MY HAND AND SEAL this 21st day of March, 2008.

SHIRLEY A. HOSCH
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2010

(Seal)

Shirley A. Hosch

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

GARY BAILEY,

Plaintiff,

v. Court File No. 02-1078L
Honorable Victor Wolski

THE UNITED STATES,

Defendant.

---

DEPOSITION of DAVID WOLF, via the telephone, taken before Shirley A. Hosch, a Notary Public in and for the County of Washington, State of Minnesota, on Thursday, the 6th day of March, 2008, commencing at approximately 9:00 a.m., at the Army Corp. of Engineers, 190 East 5th Street, in the city of St. Paul, Minnesota.

* * *

A P P E A R A N C E S:

JAMES D. GETTE, ESQ.,
U.S. Department of Justice
Environment & Natural Resources Division,
601 D Street, NW
P.O. Box 663
Washington, DC 20044-0663,
appeared representing the DEFENDENT.

STEVEN P. ADAMSKI, ESQ.,
U.S. Army Corps of Engineers
190 Fifth Street East,
St. Paul,Minnesota 55101-1638
appeared representing the DEFENDENT.

ALAN B. FISH, ESQ.,
Alan B. Fish, P.A., Attorneys and Counselors at Law
102 2nd Avenue, Northwest
Roseau, Minnesota 56751,
appeared via the telephone representing the
PLAINTIFF.

* * *



EXAMINATION OF DAVID WOLF

EXAMINATION BY MR. GETTE: PAGE
Wolf Ex. 1, Subpoena 6-7
Wolf Ex. 2, Purchase Agreement 21-22
Wolf Ex. 3, Contract for Deed 22-23
Wolf Ex. 4, 5/12/99 letter 23-24
Wolf Ex. 5, 10/26/99 letter from Mr. Lemm 15-20
Wolf Ex. 6, Wetland Conservation Act
Restoration Order (Exhibit not used)

Wolf Ex. 7, 6/20/01 letter to
Col. Kasprisin 25-27
EXAMINATION BY MR. FISH: 27
EXAMINATION BY MR. GETTE: 37
OBJECTIONS BY MR. GETTE: 28, 29, 30, 31, 32, 34,
36, 37

* * *



(The following proceedings were duly had:)

* * *

(Exhibits 1-7 pre-marked by Mr. Gette)

DAVID WOLF,
after having been first duly
sworn, deposes and says as
follows:

EXAMINATION

BY MR. GETTE:
Q. Mr. Wolf, my name is Jim Gette. We've talked over the phone several times previously. Let me begin simply by asking you, is this the first time that you've had your deposition taken?
A. No.
Q. How many times previously have you had the opportunity to be deposed?
A. I think only once.
Q. And did that relate in any way to your property up in Lake of the Woods or was that something else?
A. That was something else.
Q. Since you've only been through this once and



particularly since we're doing this by telephone, let me go through a couple of ground rules for the deposition with you. First, it's going to be very important today, even more than normal, that we be very careful to wait until the other person finishes talking before we begin to respond, so that the court reporter can get down everything we're saying. Can you join me in trying to work very hard at doing that today?
A. Yes, I can.
Q. Great. The other thing is that you will need obviously -- since you are on the phone, this one will be easy today -- to give us verbal responses. Also, it's very important that you understand any questions that I'm asking you?
A. Okay.
Q. So I would ask you, if there is any point that you feel like the question is not clear to you or that you don't understand it, that you ask me to rephrase it; would you do that?
A. Yes.
Q. Great. And finally at any point that you want to take a break -- I think this is going to be a very short deposition -- but if at any point you would like to take a break, simply let me no know and we

Page 6

will do that, okay?
A. Okay.
Q. Now, did you receive a Subpoena to appear for this deposition today?
A. Yes.
Q. Okay. And prior to this deposition did you receive a set of documents that I sent to you to be used at the deposition today?
A. Yes.
Q. And if you will take the document that was marked as Deposition Exhibit 1?
A. Okay.
Q. Do you have that in front of you?
A. Yes, I do.
Q. And is that a copy of the Subpoena that you were served directing you to appear for this deposition today?
A. Yes.
Q. If you turn to the last page of that document there is a list of documents that you were requested to produce, as well. Have you endeavored to locate documents responsive to that list?
A. Yes, we have. And everything that we could locate has been -- I believe it's been mailed to you or

Page 7

sent to you probably, excuse me, like today or yesterday or something like that.
Q. Okay. And as I understand from my paralegal, you were sending that here in St. Paul to the Corps of Engineers office; is that correct?
A. Yeah, whatever address you put down. My wife has taken care of that. She's very efficient at that kind of stuff, so I would guess wherever it says is where it's going.
Q. Okay, great.
MR. GETTE: And, Alan, obviously once we receive that we will make a copy available for you.
MR. FISH: Yes.
Q. (By Mr. Gette, continuing) Now, Mr. Wolf, I would like to ask you some questions about the property that you purchased back in 1999 up in Lake of the Woods County. How did you become aware of the availability of that property?
A. Actually, we were driving by, noticed the realty signs on those pieces of property. We were kind of looking for something at the time to build on and we seen those. We contacted North Border Realty, Pat LaValla, and that kind of started the proceeding, I guess.

Page 8

Q. Now, you said at the time you were looking for property; is that correct?
A. That's correct.
Q. How long have you had been looking for property in -- first of all in what region and area were you looking for the property?
A. Around Lake of the Woods.
Q. And were you specifically looking for lakefront property?
A. Yes.
Q. And how long -- at the point that you saw the for sale sign on this property, for how long before that had you been looking?
A. Probably on-and-off for a couple of years probably.
Q. Had you actually looked at other lakefront properties that were available during that two-year period?
A. Yes, we did.
Q. And why did you not -- well, let me ask you this: Did you put offers on any of those other properties?
A. No. There were not a lot of other open lots for sale.
Q. So is it fair to say that several of the other

Page 9

properties that you had looked at already had residences constructed on them?
A. That's correct.
Q. Were any of the other properties that you looked at vacant lots?
A. I can't recall.
Q. Okay. Now, let me jump ahead. At some point in time, did you reach an agreement with -- well, first of all, you ultimately did purchase the property at issue here from Mr. Bailey, correct?
A. That's correct.
Q. And how many lots did you buy from Mr. Bailey?
A. Three.
Q. Do you recall the lot numbers?
A. No, I don't. I know five was one of them. I think it might have been four, five and six. Yeah, I think it was four, five and six.
Q. Now, ultimately, did you reach some agreement with Mr. Bailey whereby he repurchased those properties from you?
A. Where they purchased them back, you mean?
Q. Correct.
A. Yes.
Q. And since the time that he repurchased those, have you purchased any other property in Lake of the

Page 10

Woods?
A. Yes, we did.
Q. Where is that property?
A. That property is on Grayson Beach Road. It's lakeshore property and it had a cabin on it, not what we wanted, but -- and probably a little bit to the south and to the east of where the other property was.
Q. How long have you owned that property?
A. I believe seven years, I think, something like that, six or seven years, I think.
Q. So that would put the purchase of that property somewhere around 2001/2002?
A. I believe so. I'm not positive. We were just talking the other day, I thought we had been there six or seven years.
Q. Now, how much property, approximately, did you purchase there on your current location?
A. I believe the lakeshore width is up around 130 feet, I believe.
Q. And do you know what the total acreage of the lot is?
A. No, I'm not sure.
Q. And you said it does have a cabin on it?
A. Yes, it does.

Page 11

Q. Have you had made any changes or improvements to the cabin?
A. Not at this time.
Q. And can I ask you, how much did you pay to purchase this property, including the cabin?
A. I believe it was around $130,000.
Q. And can you give me some sense of the size of the cabin, the number of bedrooms?
A. It's relatively small. It's a 30 by 40 with a loft and with a front porch on it, so it's 1200 plus the porch, plus the loft, I guess.
Q. Now, do you spend a substantial amount of time at the property on Lake of the Woods?
A. I try to, yes, I do.
Q. And about how much time a year would you estimate you spend up there?
A. In regards to weekends, I would say we probably spend, you know, upwards of 15 to 20 weekends a year here.
Q. Do you own a boat?
A. Yes, we do.
Q. And where do you keep -- did you keep that boat on the lake?
A. We keep the boat on the property here and then we launch it. It's hard to keep boats on the lake

Page 12

here, because of the wind and things like that, so they almost have to be harbored.
Q. And you don't have a harbor spot for it?
A. No.
Q. So do you launch from your property actually or go to a public boat ramp?
A. Most of the time we go to a resort and launch there.
Q. Which resort is that?
A. Morris Point Lodge.
Q. And is there a put-in fee when you use that facility?
A. Yes, there is.
Q. And do you know what that is?
A. I would say it's in that $6 range.
Q. Now, I want to go back again to the point where you were first looking for properties up in Lake of the Woods. How would you say the price of the property that you purchased from Mr. Bailey compared to the other properties you were looking at on the lake?
A. I would say they were priced about the same. Meaning, that you know that the price of the lot in proportion to what the whole property would be, if you found a place with a cabin on it, I presume

Page 13

the cabin is worth so much and the lot is worth so much, but I would say they were priced about on-the-market at the time there.
Q. Now, before you purchased the property from Mr. Bailey, did you speak to anyone regarding your intentions for the use of the property?
A. The realtor, Pat LaValla?
Q. And was Mr. LaValla acting as your agent or Mr. Bailey's agent in that transaction?
A. Mr. Bailey's agent.
Q. And what did you tell Mr. LaValla regarding your anticipated use of the property?
A. That we wanted to build a cabin on it and we talked at length about setbacks and how far from the water that they would let you build and all such things. And I don't know if they had electricity in at that time or not, I know that somewhere along this whole process, the power was already in, the underground power was in in front of the lot, things like that and that's about all I remember about that, but there is no question about it that he knew very well we were going to build on that property.
Q. Now, before the actual purchase of the property and when you went to closing, did you have any

Page 14

opportunity to speak to Mr. Bailey up to that
point in time?
A. To the best of your recollection, I don't believe
I've ever talked to Mr. Bailey.
Q. Now, when you were speaking to Mr. LaValla, did he
make any indications regarding wetland issues
related to the property?
A. Not prior to sale.
Q. Did you -- since you became aware of the property
based on a for sale sign, I'm assuming that you
had seen the property before you had closed on it?
A. Yes. We walked the property and looked things
over and we had a choice of lots, so I think about
half of them were for sale at that point. And we
wanted a block where we could put like three of
them together, that way we would have a buffer on
each side, because of the fact that up here you
could get someone with old -- park an old trailer
house next to you and I don't think there was a
lot of covenances and things like that, connected
with it.
Q. And when you actually walked the property, was
there an access road to the property already
constructed?
A. No. There was a trail, but there was a tree

Page 15

across it. There probably was vehicles in there,
but it was a trail.
Q. Now, by the time that you closed on the property
-- or let me ask you this: when was the road that
provided access to the lot finished?
A. After we purchased it.
Q. Now, at some point in time, did you become aware
that there were issues related to wetland problems
with the property?
A. Yes, we did.
Q. Do you know about when you became aware of that?
A. Well, I think this is part of one of your exhibits
here. I think there is a letter here from Les
Lemm of the Soil and Water. I don't know if
that's in here or not, but I thought I saw a copy
of it someplace.
Q. Yeah, if you pull out Exhibit 5.
A. Okay, I have that.
Q. Take a moment and just scan that over and let me
know if that's the letter you were referring to?
A. Yes, it is.
Q. And was your receipt of this letter the first time
you became aware of the wetland concerns related
to the property?
A. To the best of my knowledge, it was.

Page 16

Q. Now, what if anything did you do in response to
this letter?
A. Talked to Mr. LaValla. I think this probably
would have been my first phone call and then I
talked to Mr. Lemm. And you know there again it's
nine years ago, so it's a little bit foggy, but
that would have been -- I believe that was my
process on it.
Q. Do you recall what Mr. Lemm told you about the
wetland issues and what you could do with the
property?
A. Well, I learned what a type 7 woodland wetland was
I never heard of that before and that it was
basically -- I was told don't do anything further
to the property before things get resolved. But
that the option was that the county had wetland
credits to be able to purchase and that is also I
believe what Mr. Lavalla, when I first became
aware of what that was and I can't remember what
the cost was, 10 cents a foot or something, that
the county would go ahead and -- because they had
a wetland credits that you could buy and things
like that. And so then -- but we were going to
wait and not do anything further to the property
in the way of making anymore of a road into it or

Page 17

anything like that and we didn't.
Q. At that point in time, had you made any -- or let
me ask that differently. At that point in time,
had you done anything to the property?
A. We did. We did some clearing, brush clearing and
things like that and we had a driveway put in. I
had contacted Mr. Lavalla about that. He referred
me to the county. I think a Mr. Lockner was the
planning guy. He referred me to another office.
I think it might have been -- I'm not exactly sure
if it was like the road or Highway Department or
whatever. I went in and applied and obtained a
permit to put the access road and the driveway in
and I contacted Mr. Rex Block who had already -- I
think there were a couple of access roads and
driveways in and I believe he had already put in
some of the other ones. And you had to get a
permit as to the size of the culvert. The county
was very specific on the size of the culvert that
they wanted in there and things like that. And so
we did all that and it was approved and over time
-- I can't remember if Mr. Block got at it right
away, but over time, he constructed -- put the
culvert in, constructed the access road and the
driveway and after that we just used it as a -- we

Page 18

kind of cleared it and we parked a camper on there and things like that.
Q. So for some period of time, you were using the property for camping?
A. Yes.
Q. Do you know about how long that lasted?
A. Oh, I don't know, it strikes me as maybe being the time between Les Lemm's letter and the time that we went through all the grief of trying to figure out whether it ever would be able to be built upon and then probably from up until a year before -- probably the last year, before it was repurchased by Mr. Bailey, that we probably -- we probably didn't use it the last year. We were kind of sick of the whole deal by then so.
Q. Now, in terms of developing the property and putting in a cabin, did you ever have any designs prepared for that?
A. Not professionally. We did a lot of stuff on our own. We were shopping for the type of construction that it would be and where it would be placed. We had some stakes in there and things like that, because we had hopes, even as we found out about the wetland issues, but they told us credits would be available, so I was in there

Page 19

measuring how many dollars worth of credits I would have to buy in order to put the cabin on it and things like that. I had that all pretty well figured out.
Q. And that was measurements and staking that you did personally?
A. That's correct.
Q. Did you ever talk to any professionals about installing a septic system on the property?
A. We talked to -- there was a lot of discussion on septic symptoms with Mr. Lockner from the County here and then I also talked to someone from the MPCA. You might see that in the notes here someplace and -- because as it was, he seemed -- according to my memory here, as it was evolving, it seemed like that was going to be the second issue was that after, yeah, you could buy the credits to put the cabin on it, but then they may not allow you to put any sewer in. Well, that also was not the intent, so it sort of evolved, well, maybe you would have to put your own in-ground tank in and have it pumped from time to time. And then of course you know they were talking about the mound systems at that time and Gary Lockner said that he kind of thought that

Page 20

maybe they were going to try to make all the residents there operate -- or connect to one mound system that would be located -- centrally located on the property. But it was very messy, at that point and you really don't want to spend a lot of money building a cabin if you don't have a sewer system, but that's what I remember about that.
Q. So you had, is it fair to say, at least a couple of conversations with Mr. Lockner about those issues?
A. No, many. I would say a half-a-dozen probably.
Q. And at any point, did he say that he would provide you a permit to install a septic system?
A. Well, I think the option of just installing a tank and then having it pumped -- to the best of my recollection, I do think that was an option, but I don't think that would be anyone's first choice, but I really can't recollect that well as to what our options were at the time.
Q. Now, did you explore at all the different costs of the different systems that Mr. Lockner had discussed with you regarding septic systems?
A. Well, I may have talked to Rex Block to find out what the costs was, but I can't say that I did for sure, but I know that mound systems at that time

Page 21

were somewhere in that $6,000 or $7,000 range. I think you could put a tank in the ground for somewhat less than that, but then you would always be pumping it all the time, but that's about all I recollect on that.
Q. Now, is it fair to say you never had any septic system designs prepared for the property?
A. Yes.
Q. Now, aside from the driveway and the culvert access that you talked about previously, was there any other development that you actually did on the property?
A. No.
Q. Okay. Mr. Wolf, I would like to go back in time a bit now to when you actually did purchase the property. If you will take a look at what was marked as Exhibit 2. Do you have that in front of you?
A. Yes, I do.
Q. Do you recognize that document?
A. Yes, I do.
Q. What is that?
A. That look looks like and is the purchase agreement.
Q. And that indicates that the purchase price for

Page 22

these three lots was $75,000; is that correct?
A. That's correct.
Q. And it also indicates that you put a down-posit of $7,500; is that correct?
A. I believe that's correct.
Q. Now, how did you finance the purchase of the property?
A. They were sold as an option to a cash option. They were sold on a Contract for Deed, which according to my recollection was 10 percent down and 10 percent interest on a Contract for Deed. I don't remember exactly what the term was and things like that.
Q. Okay. If you will take a look at Exhibit 3 and is that a copy of the Contract for Deed that you executed for the purchase of the property?
A. Yes, it is.
Q. And if you turn to page three of that document, I think it confirms the details that you just indicated that there was a 10 percent interest rate and you had put the $7,500, 10 percent down payment, correct?
A. That's correct.
Q. And it indicates that then your monthly payments moving forward were going to be $892.02; is that

Page 23

correct?
A. That's correct.
Q. Now, once you executed this Contract for Deed, did you begin making those monthly payments?
A. I believe we made some. I am just trying to look here, according to your Exhibit 4, I think we made a few payments and then we later decided to -- because the interest rate was pretty excessive at the time -- that we decided to seek other ways to finance it.
Q. If you look at Exhibit 4?
A. Yes.
Q. Is this a handwritten letter that you prepared?
A. This is my wife's writing and I signed it and she signed it also.
Q. Okay. And it's dated May 12, 1999, correct?
A. That's correct.
Q. And it indicates that you are making a complete and full payment on the Contract for Deed, correct?
A. That's correct.
Q. So at that point in time, did you simply use your own cash to do that or did you find an alternative financial source that you used?
A. I don't recollect, but I believe we used our own

Page 24

cash, but we may have done some other financing to get that cash. I can't recall.
Q. Now, up to that point in time in May of 1999, the previous payments and in fact this final payment, included some components of interest, correct?
A. That's correct.
Q. Now, at some point later then you decided that you wanted to get out of this property; is that fair to say?
A. That's correct.
Q And when did that occur?
A. I don't -- I can't really remember, but it looks like it was May 12 of '99 and the purchase price was February 5th, so you are asking -- rephrase your question once?
Q. Sure. When did you decide that you wanted to have Mr. Bailey take this property back from you?
A. Oh, okay. I thought you were looking for when did we want to get rid of the Contract for Deed. We decided later on that, after we were pretty sure that it was unbuildable and even if it would have been ultimately buildable some day, it wouldn't have been buildable the way we wanted to, that we decided to seek to try to get our money back.
Q. How did you go about that?

Page 25

A. We hired an attorney from the Brink, Sobolik Law Firm from Hallock, Minnesota and I believe his name was Jeff Hane and he went ahead and filed suit and got some of our money back.
Q. Now, if you look at Exhibit 7, is that a letter that your lawyer prepared on your behalf?
A. That's correct.
Q. And it appears that that was in response to a notice that you had received regarding whether the access road would be able to be retained; is that correct?
A. That's correct.
Q. I would like you to look at the final sentence on the first page of the Exhibit 7, it says "Gary Bailey understood that the sole purchase of the lots was to build lake cabins."
A. Yes, I see that.
Q. Is that a fair statement, in your estimation?
A. Mr. LaValla, represented Mr. Bailey. Mr. LaValla knew what our intentions were. Like I said before, I don't believe I've ever spoke to Gary Bailey.
Q. Now, there is one other sentence that I would like to ask you about too and that is on page two. It's the next to the last paragraph, the final

 © 2008



5790936c-fefd-4516-b509-8faf42892b64

Page 26

sentence in that paragraph. It says, "Mr. Lockner also told Dave Wolf that he had previously warned Gary Bailey that he had to get the lots properly examined and officially classified." Is that an accurate statement by your lawyer?
A. Yes.
Q. When did Mr. Lockner tell you that?
A. I don't remember. I had so many conversations with Mr. Lockner that I maybe have something in some notes someplace, but that is what he had told me. I remember that, otherwise I wouldn't have told my lawyer that that's what he told me.
Q. Now, whatever notes you have related to this property, are those among the documents that you have forwarded onto me?
A. Yes, they are.
Q. Now, ultimately, how did you resolve your conflict with Mr. Bailey?
A. Mr. Hane, from the law firm, filed some proceedings and got the $75,000 back, I believe. I don't remember exactly what the numbers were, but I think that's what was settled on. You know, we were short all the money we put in in improvements. We were short a lot of stuff, but we were pretty nervous at the time. We kind of

Page 27

felt that probably everyone would be trying to get their money back and that we would rather be first in line instead of last in line, so.
Q. So ultimately your recollection is that you received $75,000 back?
A. Yes, I think so. I don't have that right in front of me, the exact amount, but that's somewhere in these documents, I'm sure.
MR. GETTE: Mr. Wolf, right now that's all the questions I have for you. Alan, did you have anything?
MR. FISH: Yes.

EXAMINATION

BY MR. FISH:
Q. Mr. Wolf, I represent Gary Bailey and I have for many years on this matter. I don't have very much, as far as questions, but I would like to ask you a few things first. When this property that you bought was initially sold to you on the Contract for Deed, was it platted, at that time?
A. Yes, it was.
Q. Okay. And as far as you were aware, this plat was approved by Lake of the Woods County; is that

Page 28

right?
A. I believed it was, yes.
Q. And you are aware that it had been rezoned by Lake of the Woods County as suitable for residential use?
A. I don't know about that action, but it -- you know, I believed that it was available for residential use, yes.
Q. Were you aware that by accepting and platting this property, Lake of the Woods County had to first confirm that the property was suitable for residential use?
MR. GETTE: I'm going object; calls for a legal conclusion.
Q. Go ahead and answer.
A. Why don't you repeat the question.
Q. Were you aware that by accepting the plat Lake of the Woods County was under an obligation to confirm that the property was suitable for residential use?
MR. GETTE: And I will repeat my objection.
A. I guess that's -- as a purchaser, I don't think that I could be aware of something like that.
Q. And where you aware likewise, of Gary Lockner's

Page 29

work on the property, prior to it being platted, where he represented it was suitable for residential uses?
A. I guess I could not have any knowledge of that either.
Q. Well, in your discussions with Mr. Lockner, did he ever explain to you how it ended up getting platted, if it had all these wetland problems, as alleged by the Army Corps?
A. I had no knowledge that it had any wetland problems.
Q. No, no, I understand you didn't have knowledge of that.
A. Prior to -- you are talking about -- why don't you repeat the question.
Q. During the time frame you were speaking with Mr. Locker, so this would have been after your purchase of the property?
A. Okay.
Q. Did he ever explain to you how it could have got this far into it and accepted by the Lake of the Woods County, have been platted, have been sold off and a County road built, without there being any advanced knowledge or discussion of these wetland problems?

Page 30

MR. GETTE: I'm going to object; vague and compound, but you can answer, Mr. Wolf.
A. I guess I can't -- I don't understand the question, I guess.
Q. Well, did he ever talk -- did Mr. Lockner ever talk to you about how these wetland problems arose so far into the --
A. I don't recall that, him going into a lot of detail on that, no.
Q. And in your opinion, would you agree that this property, the best use of this property would be for lakeshore residential purposes?
A. Yes, I would.
Q. And from your experience at looking at cabins and so forth along Lake of the Woods, is the lakeshore the most valuable property in the area?
MR. GETTE: I'm going to object to calling for an expert opinion, but you can go ahead and answer, Mr. Wolf.
A. Yes, I do.
Q. And as far as wetlands or wetter areas, obviously you have some knowledge of that now, but in what you looked at of the remainder of Mr. Bailey's property, did it appear consistent throughout or

Page 31

were there high ridges or consistent vegetation throughout the property?
MR. GETTE: Objection; compound.
Q. Go ahead.
A. I believe it looked similar.
Q. So the same Ash trees and ferns and things like that were pretty consistent throughout his property?
A. I believe so. I don't really remember a lot of differences.
Q. And as I guess one of the types of purchasers in Lake of the Woods, if you are purchasing a small lot, is it more preferable to be on the lake or say a half a mile or three quarters of a mile off of the lake?
A. More preferable to be on the lake.
Q. And this may be self evident, but is the value of the lots on the lake, from what you've observed in your experience in Lake of the Woods, substantially different, once you leave the waterfront?
MR. GETTE: Objection; vague, with respect to "substantially."
Q. Go ahead.
A. Yes.

Page 32

Q. Substantially lower away from the lake?
A. It's lower away from the lake.
MR. GETTE: Same objection.
Q. Go ahead.
A. Yes. It's substantially cheaper away from the lake.
Q. And the property that you purchased, you travel to an access and pay I think you said about $6 to launch your boat?
A. That's correct.
Q. Now, the harbor you launch at, this is a natural harbor; is that right?
A. Yes.
Q. And it's I guess a few miles to the south of Mr. Bailey's property?
A. Yes, yes. From Mr. Bailey's property to where I launch now?
Q. Yes.
A. Yeah, quite a ways. I would guess 10, 12 miles, something like that.
Q. Now, the property that you have, this abuts Lake of the Woods; is that accurate?
A. That's correct, yes.
Q. And the property you are currently using, you say it's not suitable for launching or docking boats?

Page 33

A. Well, I do have a DNR approved regulated size small launch down the front there, not a cement pad or anything, where you could launch a small boat if you had to. But most, you know, as with a lot of the lakeshore, the water is fairly shallow and most places you prefer a deep water launch.
Q. And is it pretty comparable, the water in front of your lot, to what it's like in front of Mr. Bailey's?
A. Yes.
Q. And this DNR approved device, is this like a couple of rails you could pull your boat up on?
A. It's a what they call a landing mat. You see it in the DNR a lot, use them all over. It's a steel matting that's connected together. They used in Vietnam and --
Q. Oh, to drive your boat off the edge?
A. Yes, that's all it is.
Q. And it's not feasible for larger boats you are saying?
A. No.
Q. And is it affected by water levels at all, the launching of the boats?
A. Oh, definitely.
Q. Are there times when you simply can't launch boats

Page 34

off of this part of Lake of the Woods?
A. Yes.
Q. And from a commercial standpoint, would it be feasible for a person to put a commercial boat launch in an area where you were or obviously where Mr. Bailey was, which is similar?
MR. GETTE: Objection; calls for expert opinion and speculation.
Q. Go ahead.
A. There weren't very many launches that were near that property.
Q. And in fact this entire -- we'll call it this northeast facing shore of Lake of the Woods and we will say from Morris Point on to Long Point; do you know that area?
A. A little bit.
Q. You fish out in that area?
A. Once in a while.
Q. You launch from Morris point; is that right? Where do you normally fish?
A. It depends on where the fish are, but it could be either direction.
Q. Okay. So you would go up north towards Mr. Bailey sometimes?
A. Sometimes we would fish in that direction, yes.

Page 35

Q. And the normal topography out there is it's quite shallow out for several hundred yards from the shoreline going up many, many miles north; would that be accurate?
A. That's correct.
Q. Maybe starting out at a couple of feet and staying that way and gradually dropping off to several more feet as you get several hundred yards out?
A. That's how most of it is.
Q. And along that strip are there any areas that you would say a person -- well, first of all, was there any commercial boat launching facilities that are not natural harbors in that strip?
A. Not commercial, no.
Q. And are there any permanent boat launching facilities, you know, such as a dock?
A. A few people have docks, many people along that stretch have put their own little pads in, cement pads in, to launch their boats off the front of their property.
Q. Have you ever seen a permanent dock along that strip, that sandy face of Lake of the Woods?
A. Very few.
Q. And are you aware of ice problems and heaves and so forth along there?

Page 36

A. Yes.
Q. Do you have that in the winter, too?
A. Oh, yes.
Q. Does it come up to your shore and build up ice heaves several feet high?
A. Sometimes.
Q. Do you feel that you could put a permanent dock out there?
A. It would have to be made out of some pretty tough stuff.
Q. And the area that Mr. Bailey is in, do you know if the Federal Government would even permit a vehicle to drive on that property, so you could launch a boat?
A. I don't know that.
MR. GETTE: Objection; calls for a legal conclusion.
Q. What's your understanding, from what the government told you?
A. Oh, that you couldn't drive on it or what?
Q. What's your understanding of what the Federal Government was going to allow you to do on your lot, once you received correspondence from the Corps of Engineers?
A. Well, the only thing, it seemed like it would be

Page 37

impossible to get a building permit, but I'm not very well versed in what else you can do involving a type 7 wetland. I guess, I don't know that.
Q. Okay. Well, from your experience of launching boats and operating motor vehicles, if the track of your vehicle disturbed the soil, do you think it would be possible to launch a boat from the Bailey plat, if the Federal Government prohibited that?
MR. GETTE: Objection; calls for him to speculate.
Q. Go ahead.
A. No.
Q. Okay, it would not be possible.
MR. FISH: Well, that's all the questions I have for you, unless the government has some more.
MR. GETTE: Just a couple of questions, Mr. Wolf.

EXAMINATION

BY MR. GETTE:
Q. Are you a real estate agent?
A. No.


© 2008

Page 38

Q. Do you have any expertise in real estate appraisal?
A. No.
MR. GETTE: That's all I have, Mr. Wolf.
MR. FISH: That's all I have, too. Thank you, sir.
MR. GETTE: We will go off the record now. David, you have the right to receive a copy of this deposition and to read it and to note any corrections or you can waive that right.
THE WITNESS: No, I would like that.
MR. GETTE: Okay. So the witness will read and sign. So you will receive it from the court reporter with a letter giving you instructions on how to accomplish that.
THE WITNESS: Okay.
MR. GETTE: For that purpose, can you give her your address?
THE WITNESS: David J. Wolf, P.O. Box 128, 600 Second Street West, Jordan, Minnesota 55352.
MR. GETTE: Okay, great, that's all

Page 39

we need.
THE WITNESS: Okay.
MR. GETTE: Thank you, Mr. Wolf.
(At 9:50 a.m., the foregoing deposition was terminated.)

Page 40

STATE OF MINNESOTA )
) SS.
COUNTY OF WASHINGTON )

I hereby certify that I reported the deposition of DAVID WOLF, on the 6th day of March, 2008, in St. Paul, Minnesota and that the witness was by me first duly sworn to tell the whole truth;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the reading and signing of the deposition by the witness were performed (unless indicated to the contrary on the following page).

WITNESS MY HAND AND SEAL this 21st day of MARCH, 2008.

\------------------
(Seal) Shirley A. Hosch
Court Reporter

Page 41

Capital Reporting Company
1821 Jefferson Place, NW
Third Floor
Washington, D.C. 20036
(202)857-3376

ERRATA SHEET

TITLE: Gary Bailey vs. The United States
VENUE: U.S. Court of Federal COURT FILE NO: 02-1078L
WITNESS: David Wolf - 3/6/08 REPORTER: S. HOSCH
*****************************************************
Pg/Line | Change Reason
*****************************************************

____________________ ______________
Signature of Witness Date

Page 42

ACKNOWLEDGEMENT OF DEPONENT

I, DAVID WOLF, do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct, and complete transcription of the testimony given by me, and any changes or corrections, if any, appear in the attached errata sheet signed by me.

________ ____________________

Date David Wolf

Page 43

Mr. David J. Wolf
P.O. Box 128
600 Second St. W.
Jordan, MN 55352

IN RE: Gary Bailey v. The United States

Dear Mr. Wolf:

This letter is to advise you that the original transcript of your deposition taken in the above matter will be available in ouroffice, Capital Reporting Company, located at 1821 Jefferson Place, Northwest, Washington, D.C., for signature per the request of Ms. Nana Babington

Pursuant to the rules, the transcript will be available for 30 days. Please call us at (202)857-3376 to obtain a copy for review.

If you have any questions, please do not hesitate to call. Thank you.

Sincerely,

Sara Freeman
Assistant Director of Operations

cc:JAMES D. GETTE, ESQ.
ALAN FISH, ESQ.

STATE OF MINNESOTA )
) SS.
COUNTY OF WASHINGTON )

I hereby certify that I reported the deposition of DAVID WOLF, on the 6th day of March, 2008, in St. Paul, Minnesota and that the witness was by me first duly sworn to tell the whole truth;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the reading and signing of the deposition by the witness were performed (unless indicated to the contrary on the following page).

WITNESS MY HAND AND SEAL this 21st day of MARCH, 2008.

SHIRLEY A. HOSCH
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2010

(Seal)

Shirley A. Hosch

Shirley A. Hosch
Court Reporter