6-2200-15413-2

STATE OF MINNESOTA
OFFICE OF ADMINISTRATIVE HEARINGS
FOR THE MINNESOTA POLLUTION CONTROL AGENCY

In the Matter of Gary Bailey – MPCA
Section 401 Certification

**FINDINGS OF FACT, CONCLUSIONS AND RECOMMENDATION**

A public hearing in this matter was held on July 23, 24 and 25 in the Lake of the Woods County Courthouse in Baudette, Minnesota.

Appearing on behalf of the Minnesota Pollution Control Agency (hereinafter "MPCA") staff was Assistant Attorney General Richard P. Cool, 445 Minnesota Street, Suite 900, St. Paul, MN 55101-2127.

Appearing on behalf of Gary Bailey ("Bailey" or "Respondent") was Alan B. Fish, Alan B. Fish, P.A., Attorney at Law, 109 Second Street NE, Roseau, MN 56751.

The record in this matter closed on September 4, 2003, when the Administrative Law Judge was informed that Respondent would not be filing a brief.

**NOTICE**

This report is a recommendation, not a final decision. The Minnesota Pollution Control Agency Board will make the final decision after a review of the record. The Board may adopt, reject or modify the Findings of Fact, Conclusions, and Recommendations. Under Minn. Stat. § 14.61, the final decision of the Board shall not be made until this Report has been made available to the parties to the proceeding for at least ten days. An opportunity must be afforded to each party adversely affected by this Report to file exceptions and present argument to the Board. Parties should contact Darlene Sigstad, Board Secretary, at 651-296-7306 to learn the procedure for filing exceptions or presenting argument.

If the Board fails to issue a final decision within 90 days of the close of the record, this report will constitute the final agency decision under Minn. Stat. § 14.62, subd. 2a. The record closes upon the filing of exceptions to the report and the presentation of argument to the Board, or upon the expiration of the deadline for doing so. The Board must notify the parties and the Administrative Law Judge of the date on which the record closes.

Under Minn. Stat. § 14.62, subd. 1, the agency is required to serve its final decision upon each party and the Administrative Law Judge by first class mail or as otherwise provided by law.

## STATEMENT OF ISSUE

Was it appropriate, and consistent with Minn. Rule pt. 7001.0140, for the MPCA to have revoked the Section 401 Certification previously issued to Gary Bailey in connection with construction of a road and the development of a residential subdivision along the southern shore of Lake of the Woods?

Based upon all of the proceedings herein, the Administrative Law Judge makes the following:

## FINDINGS OF FACT

1. Lake of the Woods County was originally part of Beltrami County, but was split off in 1922 when, as a long-term county resident put it, "I think Beltrami County threw it away..., didn't know what to do with it."[1] The reality behind this quip is that the County is physically large (1,297 square miles), but only sparsely populated (4,522 persons in 2000).[2] Tax forfeited land is not uncommon in the areas of the County inland from the lakeshore of Lake of the Woods.[3]

2. Walter Leu, who served as the County Highway Engineer and as the Wetlands Administrator for a time, stated that 90% of the land in the County would qualify as a wetland.[4] Gary Lochner, who both preceded and succeeded Walter Leu as wetlands administrator, said the County had a "very high percentage" of bog, and that the population settled around the lakes because the shoreland areas were drier than the inland peat bogs.[5]

3. Type 7 wetlands are so common in the county that they are not highly valued by local government officials. Walter Leu believed that Type 3 or Type 4 wetlands were the "really important" ones, the ones worth identifying and protecting and, when possible, creating. Type 7 wetlands, on the other hand, were less important and if they could be drained or otherwise made suitable for lots or other economic development, he thought that was a good use for them.[6]

4. In the late 1980s, Gary Bailey (hereinafter "Bailey") purchased a 65-acre parcel of land adjacent to Lake of the Woods.[7] Bailey placed most of the parcel into

---

[1] Test. of Gary Lockner, Tr. 480.
[2] Statistics are as of the 2000 census, taken from the County's Official website, as viewed on September 22, 2003. See www.co.lake-of-the-woods.mn.us/statistics.htm.
[3] Hr'g Ex. 57, p. 11 and 13.
[4] Test. of Walter Leu, Tr. 217.
[5] Test. of Gary Lockner, Tr. 480-481 and 506.
[6] Test. of Walter Leu, Tr. 220-222.
[7] *Bailey v. United States Army Corps of Engineers, et al.*, No. CIV 02-639, 2002 WL 31728947 at *3 (D. Minn. Nov. 21, 2002). A comprehensive factual background regarding the COE's permit application history, including some background relevant to this proceeding, is set forth in this November 2002 order. Many of the facts set forth in this Report are taken from that Order, and are adopted by the ALJ as his own.

agricultural use but kept an approximate 13-acre portion of the parcel along the shoreline in a natural state.[8] Almost all of this approximate 13-acre parcel is a Type 7 wetland.[9] Bailey constructed an access road for a residential/recreational development to be known as "Sunny Beach" in this parcel. He did not seek a permit from the Corps of Engineers prior to building the road. Only later was this construction the subject of a COE Section 404 after-the-fact permit application. The project site is located in the NE1/4 of the SW1/4, Section 21, T. 163N., R. 33W, Prosper Township, Lake of the Woods County, Minnesota.[10] As approved by the County Board in late 1998, the plat had 14 lots, averaging 33,700 square feet each, with roughly 100' of shorefront each being roughly 300 feet deep.[11] The road was built along the westerly edge of the plat, and the lots ran from the road to the lake.[12]

5. Bailey constructed the new access road in the approximate 13-acre Type 7 wetland in 1998.[13] Bailey constructed the road by clearing a 66-foot wide zone through a 1493-foot long portion of the Type 7 forested wetland area.[14] Bailey excavated two drainage ditches, one on each side of the new road, and used the excavated material to construct the road.[15]

6. On December 22, 1998, the County Board rezoned the land in the "Sunny Beach" plat and approved the final plat.[16] Those actions were based upon a memorandum[17] from Gary Lockner, who was the County Zoning officer. The memorandum described the presence of standing water on parts of the plat, but opined that the ground could support structures if a drainage system could lower the water table 2 to 2.5 feet and fill was placed on the land as part of the construction process. The memo also noted that:

> The entire frontage of the proposed plat is floodplain. Mound systems are required by County, State and Federal regulations in floodplains. The LOW Zoning office will grant septic system

[8] *Id.*

[9] *See* Findings 23 through 26.

[10] COE Public Notice, Hr'g Ex. 2, p. 1. This Report will refer to the exhibits introduced at the MPCA contested case hearing as "Hr'g Ex.__."

[11] Hr'g. Ex. 39, p. 4.

[12] Hr'g Ex. 33, p. 2.

[13] COE Public Notice, Hr'g Ex. 2, p. 1. In June, 1998, the COE staff visited Bailey's wetland site and found Bailey had done mechanized landclearing in the wetlands as a first step in constructing the access road. *Bailey*, 2002 WL 31728947 at *3. The roadway bisected the forested wetland, running parallel to the shoreline between 260-400 feet from the lake. *Id.* At the time of the COE visit, Bailey had not yet brought in fill material or excavated the drainage ditches on either side of the proposed road. *Id.* Both orally and in writing, COE told Bailey to cease work on the road, but he did not. *Id.*, Eggers Test. Tr. 340-341, and Koschak Test. Tr. 359.

[14] *Id.* and Sunny Beach Plat Map (page 2 of 5).

[15] *Id.* at 1-2 and Road Plan View and Cross-Section (page 3 of 5). Although Bailey proceeded with completing the road in 1998, Bailey did not receive final plat approval for the Sunny Beach development until late December, 1998. *Bailey*, 2002 WL 31728947 at *4.

[16] Hr'g. Ex. 56, p. 2

[17] *Id*, p. 1.

> permits for mound systems in the proposed Baily plat. Approval of the septic system permits is subject however to improved drainage at each site that lowers the water table to levels acceptable to ISTS (Individual Sewage Treatment System) design standards.[18]

There is no evidence to suggest that a drainage system as suggested by Lochner was ever built or even engineered. But several of the lots that were sold were cleared and in eight lots, fill was placed on them. They are now subject to Restoration Orders issued by the county SWCD.[19]

7. In May, 1999, Bailey resubmitted his Minnesota Wetland Conservation Act ("WCA") wetland replacement plan application to Lake of the Woods County ("LOW" or "County").[20] Bailey had to redo the original plan because it did not provide for the appropriate types of compensatory mitigation.[21] Bailey's resubmitted replacement plan proposed the creation of 2.9 acres of Type 3 wetland at another location in the County and the plan required that construction of the replacement wetland was to be completed no later than October 31, 1999.[22] Gary Lockner, the LOW Office of Environmental Services director, approved Bailey's replacement plan in June, 1999.[23]

8. On June 24, 1999, the COE issued a public notice regarding Bailey's application for an after-the-fact Section 404 permit to retain fill and dredged material discharged into the Sunny Beach wetlands for purposes of constructing the access road.[24] The COE notice also indicated that the LOW Soil and Water Conservation District ("SWCD") had determined that the road project would impact 2.91 acres of wetland and that this impact determination took into account the drainage effect created by the two new ditches that flowed south into an older, deeper ditch that discharged to the lake.[25] The 2.91-acre impact estimate was based on roadbed fill that affected approximately 1.58 acres and on the lateral drainage effect of 19.5 feet (lateral distance) of each ditch. Based on the estimated 1493-foot road length and the estimated 19.5-foot drainage effect, the estimate indicated that the two 1.5-foot deep ditches would have a lateral drainage effect of approximately 1.34 acres.[26] The COE

---

[18] *Id.*

[19] Test. of Les Lemm, Tr. 185. LOW Co. SWCD.

[20] Notice of WCA Application, Hr'g Ex. 25.

[21] Testimony of Les Lemm, Tr. 170.

[22] Hr'g Ex. 25, pp. 2-3 of 5.

[23] *Id.*, p. 5 of 5.

[24] Hr'g Ex. 2.

[25] *Id.*, p. 2.

[26] *Id.*, Road Plan View and Cross-Section (p. 3 of 5). During the August 2000 wetland delineation, COE staff observed that the drainage ditches along the road exceeded the planned 1.5-foot depth, and were in the 1.5-2.0 foot depth range. Koschak e-mail, Hr'g Ex. 14. In assessing the lateral drainage effects of the ditches, the COE used the lower range of a 1.5 foot-depth to make its determination that the ditches would drain 4.97 acres of wetland. *Id.* In fact, the LOW SWCD measured these road ditches and found that the ditches were approximately 2.0 feet in depth. Testimony of Les Lemm ("Lemm Test."), Tr. 185-86, 530-32. The deeper the ditch, the greater the lateral drainage effect within the wetland. Heschke facsimile, Hr'g Ex. 40. But the ditches were not deep enough to draw down 2.0 to 2.5 feet of water in the areas that Lochner had identified as suitable for mound septic systems. See Finding 6 above.

notice indicated that the replacement plan described the compensatory mitigation work "the applicant has agreed to perform."[27] The COE public notice is considered Bailey's application to MPCA for the Section 401 certification.[28]

9. MPCA's review of the COE public notice identified several concerns with the Bailey project. First, the notice raised an issue about the extent of the wetland in the project site and whether compliant individual sewage treatment systems ("ISTSs") could be installed on these lots.[29] Second, the notice indicated the access road's purpose was for residential development which could then have additional secondary impacts on the wetlands and wetland functions.[30] The notice only addressed the road impacts and not the residential development impacts. The residential development impacts caused MPCA concern that the mitigation sequence requirements in the water quality nondegradation standards, Minn. R. 7050.0186, were not being addressed.[31]

10. In light of these concerns, MPCA issued a request for information ("RFI") on July 23, 1999 to Bailey seeking additional information regarding the impacts of the proposed project.[32] The RFI requested Bailey to submit information on three substantive issues. First, the RFI noted MPCA's concern that the secondary and cumulative impacts on the wetlands from the lot development associated with the direct impacts of the road should not be ignored.[33] The RFI requested Bailey to submit a layout of the entire project area showing all existing wetlands on the access road site and the lot sites and to evaluate the predictable potential impacts to these wetlands from lot development in order to get a determination of the total wetland impact of the project.[34] MPCA noted that if there was no upland or minimal upland (i.e., non-wetland area) on the lots, the need and justification for the access road should be reconsidered.[35]

11. Second, MPCA's RFI noted that the siting of ISTSs for the lots had not been specified. The RFI requested that Bailey submit information demonstrating how compliance with the ISTS rules, Minn. Rules ch. 7080, would be accomplished.[36] Third, the RFI noted that the COE public notice did not indicate how compliance with the wetland avoidance and minimization requirements of the Section 404(b)(1) guidelines and MPCA's avoidance nondegradation requirements, Minn. R. 7050.0186, subp. 4,

---

[27] *Id.* p. 2.

[28] Testimony of Larry Zdon ("Zdon Test."), Tr. 32.

[29] Zdon Test, Tr. 32. Compliant ISTSs require three-feet of unsaturated soils in order to fulfill the two basic functions of an ISTS, sewage treatment and hydraulic performance. Testimony of Mark Wespetal ("Wespetal Test."), Tr. 396-400. A mound system can be used to obtain the 3-foot treatment area but even a standard mound system is required to have at least 12 inches of unsaturated original soil in the absorption area. Zdon Test., Tr. 63-64; Wespetal Test., Tr. 401-06; Minn. R. 7001.0170, subp. 5.A.(2) (Supp. 2002).

[30] *Id.*

[31] *Id.*, Tr. 43.

[32] Zdon Test., Tr. 42; Hr'g Ex. 6.

[33] Hr'g Ex. 6, p. 2.

[34] *Id.*

[35] *Id.*

[36] Hr'g Ex. 6, p. 2.

were going to be achieved.[37] The RFI indicated that impact avoidance had to be addressed to show compliance with the water quality standards and then requested that Bailey submit information related to this issue for MPCA's review.[38]

12. Bailey did not respond to MPCA's RFI regarding these three substantive issues.[39]

13. On August 20, 1999, COE staff reported to Zdon that they thought the Bailey lots were all Type 7 wetland with saturated soils as shallow as six inches below the surface and that the lots would require additional filling for access and structures.[40] Despite those conditions, the COE staff person indicated that Gary Lockner, the County Zoning officer, was going to issue permits to allow ISTS construction in wetlands.[41] The COE staff person also indicated that he wanted the road ditches plugged to eliminate further drainage of the wetlands.[42]

14. Zdon then talked to Gary Lockner, the County Zoning officer, about the Bailey site.[43] Lockner indicated that the County WCA Technical Evaluation Panel ("TEP") would be doing a wetland delineation.[44] Lockner told Zdon that there were no wetlands in the project site within the nearest 100 feet of the lake.[45] Lockner also stated that there was at least one foot of unsaturated soils toward the lakeshore that would provide suitable sites for installation of mound system ISTSs.[46]

15. On September 17, 1999, the County granted Bailey an extension on the implementation and completion of his WCA wetland replacement plan.[47] The extension required Bailey to complete all construction in the replacement plan by July 1, 2000.[48] Subsequently, Bailey informed the COE that he was not going to implement the compensatory mitigation in his WCA replacement plan because Bailey considered

---

[37] *Id.*, p. 3.
[38] *Id.*
[39] Zdon Test., Tr. 50.
[40] Zdon Test., Tr. 52-54; Hr'g Ex. 9.
[41] Hr'g Ex. 9.
[42] Zdon Test., Tr. 53: Hr'g Ex. 9, p. 2.
[43] Zdon Test. Tr. 62-65.
[44] *Id.*, Tr. 63.
[45] *Id.*, Tr. 64-65.
[46] *Id.*, Tr. 62-63. The existence of at least one-foot of unsaturated soils is important for the purposes of installing standard ISTS mound systems. Mr. Lockner, director of the LOW County Office of Environmental Services ("OES"), asserted that ISTS mound systems could be installed at the Bailey site. OES Letter, Hr'g Ex. 10. Under MPCA ISTS rules, the upper 12 inches of the mound absorption area must be unsaturated soils (i.e., above saturated soils). Minn. R. 7080.0170, subp. 5.A.(2) (Supp. 2002). The one-foot of unsaturated soils for mound systems is needed for proper treatment of the pathogens, bacteria, viruses and other pollutants of the partially treated sewage entering the ground and for hydraulic performance of the mound system, so that water can flow away from the system. Wespetal Test., Tr. 396-97, 401-02.
[47] Lemm Test., Tr.174; Hr'g Ex. 26.
[48] *Id.*, Hr'g Ex. 26.

himself as just another lot owner.[49] Bailey never implemented the WCA replacement plan and that plan is no longer valid.[50]

16. In October, 1999, MPCA staff again talked to Lockner about the Bailey site. They discussed whether there were adequate upland (non-wetland) areas for the installation of ISTSs.[51] Lockner told MPCA staff that the TEP had been to the site and determined that there were adequate soils, with at least one foot of unsaturated soils along a 100-foot band paralleling the lakeshore, for ISTSs. Lockner indicated that a letter reflecting these findings was being forwarded to MPCA.[52]

17. By letter dated October 14, 1999, Lockner notified MPCA that the TEP had conducted a site visit on September 29 to determine the high ground water table at the building sites in the Bailey plat.[53] The OES letter stated that gravelly subsoils were located between the 50-foot setback for septic systems and the 75-foot setback line for structures.[54] The OES letter also asserted that because of these coarse, gravelly subsoils, saturated soil conditions could not be established in the upper one foot of the soil "within 100 feet of the lakeshore."[55] While acknowledging that a formal wetland delineation had not been conducted, the OES letter asserted that the soil conditions in this 100-foot corridor nearest the lake would allow for mound systems.[56] Finally, the OES letter stated that ISTSs would not be permitted further from the lakeshore than 100 feet because of the existence of saturated soil conditions in these inland areas.[57] The letter was drafted by Lockner, but signed by Lockner, Les Lemm, and Dale Krystosek. Lemm was a Resource Specialist with LOW Soil and Water Conservation District. Krystosek was a Board Conservationist with the State Board of Water and Soil Resources.

18. The October 14, 1999 OES letter was an important factor in MPCA's decision to eventually issue a Section 401 certification for the Bailey project.[58] Only later did MPCA find out that the OES letter's statements and determinations were based on only one soil sample located in the exact location where the COE's wetland delineation would later identify a small island of upland.[59] Krystosek and Lemm later testified that the one soil sample and the assertions derived from that sample did not accurately represent the soil conditions of the entire 100-foot corridor nearest the lakeshore in the plat.[60] Krystosek and Lemm did agree that the letter was accurate regarding the fact that saturated soil conditions further inland from the lakeshore (i.e.,

---

[49] COE Decision Document, Hr'g Ex. 36, p. COE 541.
[50] Lemm Test., Tr. 175-76.
[51] Zdon Test., Tr. 65.
[52] *Id.*
[53] OES Letter, Hr'g Ex. 10.
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] Zdon Test., Tr. 75-76.
[59] Testimony of Dale Krystosek (Kyrstosek Test.). Tr. 155, 158-60; Lemm Test.; Tr. 186-90.
[60] Krystosek Test., Tr.160; Lemm Test., Tr. 188-89.

areas greater than 100' from the lake) would prevent the installation of septic systems in those locations.[61]

19. In early November, 1999, MPCA staff were contacted by Jeff Koschak, the COE project manager, about the COE's permit review status.[62] Koschak told MPCA that it was his intention to draft a provisional Section 404 permit authorizing the retention of the 1.58 acres of fill related to the road bed construction but also requiring that the road ditches be filled back in.[63] In light of the COE's intentions to proceed with the provisional permit, MPCA staff completed its deliberations and evaluations on the Section 401 application based on the information that had been provided.[64]

20. By MPCA letter dated December 17, 1999, MPCA issued its Section 401 certification for the Bailey road project identified in the COE's June 1999 public notice.[65] The Section 401 certification was limited to the project's 1.58 acres of wetland fill for the road based on the COE notice. It assumed, but did not state, that the COE would require the plugging of the road ditches.[66] The certification was expressly conditioned on Bailey's implementing the compensatory mitigation to replace the lost wetland functions and designated uses for unavoidable wetland impacts to satisfy a portion of MPCA's wetland nondegradation requirements, Minn. R. 7050.0186, subp. 6.[67]

21. Issuance of MPCA's Section 401 certificate was principally based on four factors. First, the certificate only addressed the road impacts because the COE indicated that its intended provisional permit would only address the road impacts, despite MPCA's earlier efforts to get Bailey and the COE to consider both the primary impacts of the road and the secondary and cumulative impacts of lot development related to the road construction.[68] Second, MPCA believed that the original estimated 2.91 acres of wetland impact identified in the COE June notice would be reduced to only the 1.58 acres of impact from the road fill. The additional 1.33 acres of wetland impact associated with the lateral drainage effect would be eliminated due to COE's expressed intention of issuing a permit that required the road ditches to be plugged.[69] Third, MPCA expected that Bailey would implement the compensatory mitigation in the WCA replacement plan identified in the COE June notice.[70] Fourth, MPCA relied on the October 14, 1999 OES letter as accurately representing the conditions of the Bailey site in regard to the availability of unsaturated soils on which ISTS mound systems could be installed and operated in compliance with the ISTS rules, Minn. R. chapter 7080.[71]

---

[61] Krystosek Test., Tr. 160; Lemm Test., Tr. 190.
[62] Zdon Test., Tr. 74-75.
[63] *Id.*
[64] *Id.*, Tr. 75-77.
[65] Zdon Test., Tr. 77; Hr'g Ex. 12.
[66] *Id.*, Tr. 77; Hr'g Ex. 12.
[67] Hr'g Ex. 12.
[68] *See* Hr'g Ex. 6.
[69] Zdon Test., Tr. 76.
[70] *Id.*, Tr. 76-77.
[71] *Id.*, Tr. 75-76.

22. Despite the COE's representations in early November, 1999 about the intentions to draft a provisional permit, no such permit was ever issued or sent to MPCA.[72] The COE was questioning the accuracy of information that had been submitted concerning wetlands at the site.[73] The COE was still concerned with the extent of the wetlands on the Bailey site and those COE concerns now included the proposed residential lots and the impact of lot development on any existing wetlands in the plat.[74] These concerns were communicated to Lockner, and by OES letter dated July 24, 2000, Lockner notified Bailey of the COE's concerns and Lockner requested that Bailey conduct a wetland delineation on the entire plat to determine the type, extent and location of all wetlands on the plat.[75] Bailey did not conduct a wetland delineation and did not submit the requested information.[76]

23. In late August, 2000, COE staff and staff from the U.S. Department of Agriculture's Natural Resources Conservation Service ("NRCS") conducted a formal on-site wetland delineation of the Bailey Sunny Beach plat.[77] A wetland delineation is designed to determine the extent of wetlands on a site by assessing three key factors: (1) the presence of hydric soils; (2) the presence of inundated or saturated soils to support hydorphytic wetland vegetation; and (3) the prevalence of wetland vegetation.[78] COE and NRCS staff had originally planned to do a total of eight (8) transects of the Bailey plat, but after three transects they determined that the results were so consistent that they reduced the number of transects to five (5). The fourth and fifth transects were done to confirm the consistency of the predominance of the wetland's presence throughout the entire plat.[79]

24. In addition to the delineation, COE staff and Les Lemm surveyed the lots to determine the nature and extent of clearing and filling that had occurred on the lots.[80] Based on the late August delineation, the COE determined that the Bailey plat consisted almost entirely of Type 7 forested wetland except for upland in two locations: a small, isolated island of upland between Lots 3 and 4, and upland on Lot 1 created by the lateral drainage effect of the old ditch running along the south border of Lot 1.[81] The COE's Steve Eggers concluded that, overall, "99 percent of the project site was composed of wetlands prior to the unauthorized fill."[82] Eggers determined that the Bailey plat was a "high quality wetland" that provided numerous important wetland functions such as shoreland protection, high quality wildlife habitat, biodiversity and integrity and water quality protection.[83] COE and NRCS experts determined that

[72] Zdon Test., Tr. 79.
[73] Lemm Test., Tr. 178.
[74] *See* Hr'g Ex. 27.
[75] Hr'g Ex. 27.
[76] Lemm Test., Tr. 176-79.
[77] Testimony of Steve Eggers ("Eggers Test."), Tr. 244-286; COE Data Sheets, Hr'g Ex. 33; COE Decision Document, Hr'g Ex. 36.
[78] *Id.*, Tr. 240.
[79] *Id.*, Tr. 248-49, 256-57.
[80] Testimony of Jeff Koschak ("Koschak Test."), Tr. 346-47.
[81] *See* Eggers Test., Tr. 256-258; COE Data Sheets, Hr'g Ex. 33, p. COE 299.
[82] Hr'g Ex. 14, p. 2 (Eggers-to-Koschak e-mail, Sept. 13, 2000, 5:16 p.m.).
[83] Eggers Test., Tr. 286-87.

Lockner's 100-foot-corridor-of-upland theory was not supported by their field observations.[84]

25. During the late August, 2000 delineation, COE staff also observed that the new ditches along both sides of the access road were 1.5-2.0 feet deep.[85] Rod Heschke, the NRCS soil scientist that assisted in the delineation, determined, that based on the Wabanica soils series on this site, the lateral drainage effect of a 2.0-foot deep ditch would be 105 feet.[86] Using the lower 1.5-foot depth of the 1.5-2.0 foot range of observation, the COE determined that the new road ditches would have at least a lateral drainage effect distance of 79 feet.[87] Excluding the lateral effect of the old ditch on the south end of the plat, the COE determined that the new road ditches would drain 4.97 acres of wetland, an amount substantially above the approximate 1.33 acres of ditch drainage that was identified in the COE's June 1999 notice.[88] This 4.97 acres of ditch drainage impact was in addition to the 1.58 acres of wetland impact due to road fill.[89]

26. In late September, 2000, COE staff conveyed information, results and determinations of their wetland delineation to MPCA.[90] That information included the COE's determination that the entire Bailey plat was wetlands except for the small upland island between lots 3 and 4 and the upland resulting from the drainage from the old, existing ditch along the plat's south border.[91] The COE indicated that the site was virtually all (i.e., 99%) wetlands consisting of a high quality wooded wetland.[92] The COE also conveyed information regarding its determination that the lateral drainage effect of the new road ditches was 4.97 acres.[93] The COE also submitted a plat map and tabulations to MPCA showing the extent of vegetation clearing and fill occurring on individual lots for driveways and ditch crossings.[94] The Administrative Law Judge adopts the findings and determination of the COE as his own.

27. After reviewing this new COE information, MPCA staff called both Koschak and Eggers and confirmed the delineation findings that there was no upland corridor existing in that 100-foot corridor near the shoreline as had been asserted by the County OES in Lockner's October 14, 1999 letter.[95]

28. The MPCA staff team evaluated this additional information in light of what information had been conveyed to MPCA through the COE public notice, COE staff

[84] *Id.*, Tr. 274.
[85] Hr'g Ex. 14.
[86] Hr'g Ex. 40.
[87] Koschak Test., Tr. 350-53; Hr'g Ex. 14 (Koschak-to-MPCA e-mail), p. 1.
[88] Hr'g Ex. 14, p.1; *see* Eggers Test., Tr. 281; COE Decision Document, Hr'g Ex. 36, pp. COE 535, 538.
[89] Hr'g Ex. 14, p. 1.
[90] Zdon Test., Tr. 80-81, 89-92; Hr'g Exs. 13, 14 and 15.
[91] Zdon Test., Tr. 89, 92; Hr'g Ex. 14, p. 2 (Eggers-to-Koschak e-mail, Sept. 13, 2000, 5:16 p.m.).
[92] Zdon Test., Tr. 89.
[93] *Id.;* Hr'g Ex. 14, p. 1.
[94] Zdon Test., Tr. 92; Hr'g Ex. 15.
[95] Zdon Test., Tr. 95-96.

communications and information submitted by Lockner.[96] MPCA had still not received any information from Bailey in response to MPCA's July, 1999 RFI.[97] By the early fall of 2000, MPCA's deliberations and evaluations centered on four main areas: (1) MPCA's continuing concern that the road assessment not be segmented from the impacts of the lot development; (2) the COE wetland delineation refuting the October, 1999 OES letter about the presence of any upland within the 100-foot corridor of the shoreline; (3) the compensatory mitigation in the WCA replacement plan identified in the COE's public notice addressing the original wetland-impact estimate of 2.91 acres being inadequate to compensate for the additional wetland impacts determined by the COE delineation; and (4) because virtually the entire plat was wetland, the lack of assurance that ISTSs could be installed that would comply with the MPCA rules.[98] Given the lack of information and uncertainty on these issues, MPCA determined it could not modify the existing Section 401 certificate to address these unknowns and uncertainties, and decided that the certificate should be revoked.[99]

29. On October 4, 2000, the MPCA revoked Bailey's Section 401 certificate.[100] The MPCA revocation indicated that the secondary and cumulative wetland impacts must not be segmented and that those additional impacts had to be considered as part of this permitting process.[101] The MPCA revocation also noted that the COE delineation had demonstrated the lack of any upland, or minimal upland, for ISTS locations and that this situation required further evaluation of the developability of the lots as justification for the access road.[102] Finally, the MPCA revocation stated that the COE's delineation indicated that the true impact of the road project was 6.55 acres consisting of 4.97 acres due to ditch drainage impact and 1.58 acres of road fill.[103] The MPCA revocation expressly notified Bailey that if he chose to reapply for a certificate, Bailey needed to submit additional information regarding: (1) the entire extent of wetlands on the road and lot sites and the total wetland impact from the road and lot development; (2) demonstration on how Bailey was going to comply with the MPCA's ISTS rules, Minn. R. chapter 7080, for any proposed septic system installations; and (3) a demonstration on how Bailey was going to comply with the MPCA's nondegradation wetland mitigation sequence in Minn. R. 7050.0186, subp. 4, to avoid and minimize wetland impacts.[104]

30. In addition to the wetland delineation, the COE staff prepared a Minnesota Routine Method for Wetland Functional Assessment ("MnRAM") of the Bailey plat.[105] MnRAM documents the functions that a wetland provides and determines what functions are lost due to project impacts.[106] The Bailey MnRAM analysis demonstrated

[96] Zdon Test., Tr. 94-95.
[97] *Id.*, Tr. 96.
[98] Zdon Test., Tr. 94-100.
[99] *Id.*, Tr. 100.
[100] MPCA Revocation Letter, Hr'g Ex. 16.
[101] *Id.*
[102] *Id.*
[103] *Id.*, p. 2.
[104] *Id.*, p. 2.
[105] Eggers Test., Tr. 274.
[106] *Id.*, Tr. 243.

that this wetland complex had high functional ratings for many of the wetland functions.[107] Using MnRAM, Eggers determined that Bailey's dredging and filling had significantly impaired several wetland functions including ground water interaction, wetland hydrology and stormwater attenuation.[108]

31. The COE's final decisional analysis included an environmental assessment that incorporates the findings of the delineation and MnRAM analyses.[109] That decisional analysis also takes into account the 404(b)(1) guideline determinations.[110] After completing these analyses on June 12, 2001, the COE denied Bailey's application for an after-the-fact Section 404 permit.[111] In making this final decision, the COE determined that the road and lot development were directly related so the COE's environmental analysis assessed not only the road and ditch impacts but also the potential lot development and its associated impacts.[112] In concluding these aspects were directly related, the COE determined that the sole purpose of the dead-end road was to provide access to the lots in the plat.[113]

32. The COE also revised its estimated wetland impacts from the unauthorized road project to approximately 7.04 acres (1.45 acres of fill, 0.63 acres of ditch excavation and 4.96 acres of lateral drainage effect) instead of the 2.91 acres stated in the COE's June 1999 public notice.[114] Approximately 2.08 acres of wetland had already been destroyed by the road fill and ditch excavation and approximately 1.30 acres of hardwood wetland had already been destroyed or altered due to lot development.[115] The COE determined that ultimate lot development would result in an additional 2.98 to 7.46 acres of wetland fill (minimum lot development and maximum lot development, respectively).[116] The COE also determined that Bailey's proposed compensatory mitigation was inadequate and unacceptable because it did not replace the lost wetland functions of the hardwood swamp, the proposed mitigation site was 15 miles inland and away from the lake, and that the replacement wetland would be a low quality, low functioning wetland.[117]

33. In October, 2001, the COE issued a restoration order directing Bailey to remove the access road, fill in the ditches and return the area to its natural wetland state.[118] The restoration order required the restoration work to be completed between

---

[107] *Id.*, Tr. 275; MnRAM Evaluation, Hr'g Ex. 35, p. COE 583.
[108] Eggers Test., Tr. 275, 279; Hr'g Ex. 35, p. COE 583.
[109] Eggers Test., Tr. 279-80.
[110] *Id.*, Tr. 284, 287-88.
[111] COE Decision Document, Hr'g Ex. 36.
[112] Eggers Test., Tr. 280-81; *see* Hr'g Ex. 36, p. COE 535.
[113] *Id.*, p. COE 540.
[114] Hr'g Ex. 36, p. COE 535.
[115] *Id.*
[116] *Id.*, p. COE 541.
[117] Eggers Test., Tr. 282-83; Hr'g Ex. 36, pp. COE 541-43. Subsequent to the COE denial, Bailey submitted a second mitigation proposal to the County and to the COE. Eggers Test., Tr. 288-290; Bailey's July 25, 2001 Letter, Hr'g Ex. 37. The COE subsequently determined that this proposal was not suitable compensatory mitigation. Eggers Test., Tr. 289; COE Response, Hr'g Ex. 38.
[118] Eggers Test., Tr. 290-91; COE Restoration Order, Hr'g Ex. 39.

July 1 and August 15, 2002.[119] As of the conclusion of the contested case hearing in July of 2003, the required restoration had not been implemented by Bailey.[120] As of August 7, 2003, the COE had not begun a civil action to enforce its restoration order.[121]

34. In March 2002, Bailey sued the COE, MPCA, the Minnesota Department of Natural Resources and Lake of the Woods County in federal district court seeking judicial review of the defendants' various regulatory actions and asserting takings claims against the defendants. In November, 2002, the Court dismissed all of Bailey's claims against the state agencies and Lake of the Woods County.[122] On August 7, 2003, the Court issued its final order and judgment upholding the COE's denial of Bailey's application for an after-the-fact Section 404 permit and dismissing Bailey's complaint with prejudice.[123]

35. Subsequent to MPCA's October 2000 revocation, MPCA staff learned of two other pieces of information that were not available to MPCA at the time of its deliberations on the Section 401 revocation determination in the fall, 2000.[124] First, MPCA was apprised that Bailey's WCA replacement plan had not been implemented and that the plan was no longer valid.[125] The implementation of the compensatory mitigation in that WCA replacement plan, as it was noticed in the COE's June 1999 public notice, was expected to satisfy MPCA's wetland nondegradation requirements, Minn. R. 7050.0186.[126]

36. Second, MPCA subsequently learned that a significant portion of the Bailey plat was floodplain.[127] This project site restriction would have been integral to MPCA's deliberations because the presence of floodplain further complicates the installation of standard ISTSs and compliance with state rules requiring minimum lot sizes to accommodate ISTS installations.[128]

37. Standard ISTSs are prohibited from being located or installed in floodplains.[129] MPCA's ISTS rules require that all lots created after January 23, 1996 by local government zoning must have enough suitable land surface area for two standard ISTS soil treatment areas.[130] In addition, Minnesota's shoreland regulations also require minimum lot sizes sufficient for the construction of two standard soil treatment

---

[119] Hr'g Ex. 39, p. 2.
[120] Eggers Test., Tr. 292.
[121] *Bailey v. United States Army Corps of Engineers, et al.*, No. CIV. 02-639, 2003 WL 21877903 at *3 (D. Minn., Aug. 7, 2003).
[122] *Bailey*, 2002 WL 3178947 at *14.
[123] *Bailey v. United States Army Corps of Engineers*, No. CIV. 02-639, 2003 WL 21877903 at *5-6 (D. Minn. Aug. 7, 2003).
[124] Zdon Test., Tr. 102-05.
[125] *Id.*, Tr. 102; Lemm Test., Tr. 175-76.
[126] Zdon Test., Tr. 77, 102-03.
[127] *Id.*, Tr. 103; *see* COE Delineation Data Sheets, Hr'g Ex. 33; pp. COE 298-99.
[128] Zdon Test., Tr. 103, 428.
[129] Wespetal Test., Tr. 430-31; *see* Minn. R. 7080.0170, subp. 1.C. (2001).
[130] Minn. R. 7080.0305, subp. 4.F. (2001).

systems.[131] Based on these ISTS siting requirements and assuming perfect siting conditions and suitable soils, MPCA determined that six lots in the Bailey plat do not have sufficient area to meet the MPCA rule and shoreland regulation requirements.[132] Another four sites are very small and require additional, detailed site-specific investigation work to determine whether those lots have sufficient areas for two standard systems.[133]

Based upon the foregoing Findings of Fact, the Administrative Law Judge makes the following:

## CONCLUSIONS

1. The agency and Administrative Law Judge have jurisdiction in this matter pursuant to Minn. Stat. § § 14.50, 115.03, and Minn. Rules pts. 7000.1800 and 1900, and pts. 7001.1400-1470.

2. Timely notice of the hearing was given, and all other substantive and procedural requirements of law and rule have been satisfied.

3. The agency may revoke a Section 401 certification if it finds that any of the following conditions have been met:

> A. That with respect to the facility or activity to be certified, the proposed certificate holder will not comply with all applicable state and federal pollution control statutes and rules administered by the agency, or conditions of the certification;
>
> * * *
>
> C. That the certificate holder has failed to disclose fully all facts relevant to the facility or activity to be certified, or that the certificate holder has submitted false or misleading information to the agency; or,
>
> D. That the certified facility or activity endangers human health or the environment and that the danger cannot be removed by a modification of the conditions of the certification.

---

[131] Minn. R. 6120.3500, subp. 3 (2001).

[132] Wespetal Test., Tr. 432-33; Wespetal Site Analysis, Hr'g Ex. 50. Wespetal conducted an evaluation of how much land area was available to place standard mound systems on the Bailey plat lots. Wespetal Test., Tr. 426-35; Hr'g Exs. 49-50. For the purposes of this evaluation, Wespetal assumed perfect conditions; that is, no other existing siting constraints on any lot and that there were suitable soils on every lot based on Lockner's 100-foot corridor-of-suitable-soils theory. Wespetal Test., Tr. 432-34; Hr'g Ex. 50. MPCA has not seen any data or information that there are suitable soils on these lots for ISTSs or that Lockner's theory was accurate. Wespetal Test., Tr. 434.

[133] *Id.*, Tr. 434; Hr'g Ex. 50.

4. The agency has demonstrated, by a preponderance of the evidence, that Bailey will not comply with applicable rules or certificate conditions in that the WCA Replacement Plan was to be implemented by July 1, 2000, and Bailey failed to meet this deadline, and he now says that he will not do it. The rule requires compensatory mitigation before or concurrently with the actual physical alteration of the wetland.[134] Bailey did not comply with this.

5. The agency has demonstrated, by a preponderance of the evidence that Bailey has failed to disclose fully all facts relevant to the activity. He failed to disclose the extent of wetland and the extent of the impact. Information on these items was requested by the July, 1999 request for information, but it was not supplied. In addition, the request for information asked Bailey for an explanation of how he was going to comply with the ISTS rule, which he failed to do. He failed to fully disclose the actual depths and draw down data concerning his ditches, which affects the amount of wetland compensation needed. He also failed to indicate that a significant portion of the plat is floodplain.

6. The agency has proven, by a preponderance of the evidence, that the proposed plan endangers human health and the environment and that the danger cannot be eliminated by modifying the permit. In particular, sewage is likely to be discharged without adequate treatment. In addition, the completion of the road and ditches, without adequate compensation, has harmed the environment, and has induced the clearing and filling of lots without appropriate permits or mitigation.

Based upon the foregoing Conclusions, the Administrative Law Judge makes the following:

**RECOMMENDATION**

IT IS HEREBY RECOMMENDED: that the agency's revocation of the Section 401 Certification be AFFIRMED.

Dated this 3rd day of October 2003.

Allan W. Klein

ALLAN W. KLEIN
Administrative Law Judge

[134] Minn. R. pt. 7050.0186, subd. 6 D.