1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GARY BAILEY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.    Civil No. 02-1078L
Honorable Victor J. Wolski

DEPOSITION OF GARY BAILEY

December 1, 2004

Appearances:

For the Plaintiff:

ALAN B. FISH, P. A.
109 Second Street Northeast
Roseau, Minnesota 56751
By: ALAN B. FISH, ATTORNEY AT LAW

For the Defendant:

U. S. DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
P. O. Box 663
Washington, D. C. 20044-0663
By: ELSIE B. KAPPLER, ATTORNEY AT LAW

Also Present: Robert Whiting
Jeffrey Koschak

Taken By: Joy Filipski, Court Reporter

2

INDEX


| DEPONENT: | PAGE NO. |
|---|---|
| GARY BAILEY | |
| Examination by . . . Ms. Kappler | 7 |

| EXHIBITS | MARKED | OFFERED |
|---|---|---|
| No. 1 -- Notice | 8 | |
| No. 2 -- Complaint | 9 | |
| No. 3 -- Interrogatories | 10 | |
| No. 4 -- Permit Application | 19 | |
| No. 5 -- Letter 8-18-93 | 19 | |
| No. 6 -- Letter 2-25-94 | 19 | |
| No. 7 -- Letter 5-13-94 | 19 | |
| No. 8 -- Letter from James T. Scott | 19 | |
| No. 9 -- Project Notification Form | 19 | |
| No. 10 -- Wetland Replacement Plan Application | 19 | |
| No. 11 -- Public Notice | 19 | |
| No. 12 -- Letter 7-5-99 | 19 | |
| No. 13 -- Letter 7-9-99 | 19 | |
| No. 14 -- Letter 8-3-99 | 19 | |
| No. 15 -- Letter 8-9-99 | 19 | |
| No. 16 -- Letter 12-17-99 | 19 | |
| No. 17 -- Letter 7-24-00 | 19 | |


3

INDEX (Cont'd)


| EXHIBITS | MARKED | OFFERED |
|---|---|---|
| No. 18 -- Letter 10-4-00 | 19 | |
| No. 19 -- Initial Plat Sunny Beach | 19 | |
| No. 20 -- Prosper Township Map | 19 | |
| No. 21 -- Township 160 N Range 33 W Map | 19 | |
| No. 22 -- Map of Lots | 19 | |
| No. 23 -- 54754 Contract for Deed | 19 | |
| No. 24 -- 55320 Quitclaim Deed | 19 | |
| No. 25 -- Protected Waters Permit | 19 | |
| No. 26 -- 57093 Warranty Deed | 19 | |
| No. 27 -- Mortgage | 19 | |
| No. 28 -- 59163 Contract for Deed | 19 | |
| No. 29 -- 67286 Quitclaim Deed | 19 | |
| No. 30 -- 67287 Quitclaim Deed | 19 | |
| No. 31 -- 67539 Contract for Deed | 19 | |
| No. 32 -- 67449 Warranty Deed | 19 | |
| No. 33 -- 67439 Contract for Deed | 19 | |
| No. 34 -- 67463 Contract for Deed | 19 | |
| No. 35 -- 67641 Warranty Deed | 19 | |
| No. 36 -- 67644 Contract for Deed | 19 | |
| No. 37 -- 67654 Warranty Deed | 19 | |
| No. 38 -- 67811 Contract for Deed | 19 | |


4

INDEX (Cont'd)


| EXHIBITS | MARKED | OFFERED |
|---|---|---|
| No. 39 -- 68005 Warranty Deed | 19 | |
| No. 40 -- 68010 Mortgage | 19 | |
| No. 41 -- 68007 Contract for Deed | 19 | |
| No. 42 -- 68164 Contract for Deed | 19 | |
| No. 43 -- 68239 Warranty Deed | 19 | |
| No. 44 -- 70216 Warranty Deed | 19 | |
| No. 45 -- 72224 Warranty Deed | 19 | |
| No. 46 -- 72148 Quitclaim Deed | 19 | |
| No. 47 -- 74013 Quitclaim Deed | 19 | |

. . . The following is the Deposition of GARY BAILEY, taken at the request of the Defendant in the above-entitled cause, pending in the United States Court of Federal Claims, pursuant to Notice and the Federal Rules of the Court of Federal Claims, before Joy Filipski, Court Reporter, a Notary Public within and for the State of Minnesota, at the ROSEAU COUNTY COURTHOUSE, 606 Fifth Street Southwest, Jury One, Roseau, Minnesota, on Wednesday, December 1, 2004, at 10:03 o'clock a.m., at which time counsel appeared as hereinbefore set forth . . .



(Whereupon, Mr. Jeffrey Koschak is not present.)

MS. KAPPLER: Okay, let's go on the record.
Okay.

GARY BAILEY,

the Plaintiff, of Williams, Minnesota, called as a witness by the Defendant, being first duly sworn by Joy Filipski, Court Reporter, a Notary Public within and for the State of Minnesota, was examined and deposed on his oath as follows:

MS. KAPPLER: For the record, this deposition is being taken pursuant to Rule 30 of the Rules of the Court of Federal Claims.
It's being taken in Jury Room One at the Roseau County Courthouse in Roseau, Minnesota, and duly recorded.
Stipulations are as provided in the Rule.



EXAMINATION

BY MS. KAPPLER:
Q. Good morning, Mr. Bailey.
A. Good morning.
Q. Let me just run through, if I may, some of the basic instructions for a deposition.
It's important that you let the reporter take down all of your answers so that -- accordingly, I need to get my entire question out before you begin answering. And I'll do my best to let you get your entire answer out before I ask you the next question.
If you need to take a break at any point, I'm perfectly comfortable with that, please just let me know.
You need to know that you will have the opportunity to read and sign this deposition transcript and to prepare an errata sheet, noting any changes, but that you may be subjected to cross-examination at a later point regarding the changes that you've made.
Under the applicable Rule, Mr. Fish is constrained in, in, in terms of what he can tell you not to answer. And, and those, those



instructions need to be limited to situations that are privileged matters.
Ready to begin?
A. (No verbal response.)
Q. Mr. Fish, I'm showing you what is described as a Notice -- or, Mr. Bailey, excuse me, a Notice of Deposition. Have you seen this document?
A. Yes.
Q. Okay. Is it your understanding that you are appearing today pursuant to this Notice?
A. Yes.
Q. Thank you.
MS. KAPPLER: I'd like to have this marked as the first Exhibit.
(Whereupon, Deposition Exhibit No. 1, Bailey, was marked for identification.)
Q. (By Ms. Kappler) Okay. Mr. Bailey, I'm next showing you a, a copy of the Complaint in this matter. Are you familiar with this document?
A. Yes.
MS. KAPPLER: Okay, I'd like to have that marked as the second Exhibit, please.

(Whereupon, Deposition Exhibit No. 2, Bailey, was marked for identification.)
Q. (By Ms. Kappler) Let me next show you, Mr. Bailey, a document entitled: Plaintiff's Answers to Defendant's First Set of Interrogatories. Have you ever seen this document?
MR. FISH: Go ahead and read through the whole thing.
A. I believe so.
Q. (By Ms. Kappler) Okay. And leaving aside the Answer to Interrogatory No. 4, regarding the amount paid for the property, meaning the property that is the subject of this takings' action, and this -- the reference to the, the purchase date of 1976, are the, are the Answers provided in these Interrogatories true to the best of your knowledge?
A. Yes.
MS. KAPPLER: I'd like to have that marked as the second Exhibit -- third Exhibit, excuse me.
MR. FISH: Can we go off the record for a moment?
MS. KAPPLER: Sure.



(Whereupon, there was discussion off the record.)
(Whereupon, Deposition Exhibit No. 3, Bailey, was marked for identification.)
MS. KAPPLER: Okay, if we could go back on the record.
Q. (By Ms. Kappler) Mr. Bailey, what is your address?
A. My address is 1946 Range Line Road Southwest; Williams, Minnesota.
Q. And where is Williams, Minnesota, in relation to Roseau?
A. 40 miles to the east.
Q. Are you married?
A. Yes.
Q. And what is your wife's name?
A. Lynn.
Q. How long have you been married?
A. Since June 29.
Q. Of this year?
A. That's correct.
Q. Okay. Were you previously married to someone else?
A. Yes.
Q. And what is her name?



A. Kathryn.
Q. When did you marry Kathryn?
A. October 28 of '71.
(Whereupon, Mr. Jeffrey Koschak entered the room.)
Q. (By Ms. Kappler) Okay. And you've since divorced Kathryn?
A. Yes.
Q. What date were you divorced?
A. July 4, 2003.
Q. Okay.
Could you briefly describe your educational background, please.
A. I have a BS degree from the University of Minnesota in marketing.
Q. What year did you obtain that degree?
A. '73.
Q. And beginning with 1973, forward, would you describe your employment history?
A. Well, my first job I had was with Blue Cross/Blue Shield, which got me back up in the north country, where I'm from.
From 1978, to the present, I've been self-employed.



Q. And could you describe what you've done in your capacity as a self-employed individual?
A. I owned a lumberyard in Grand Rapids, I built homes, manufactured and built log homes.
And I sold that business in about '86.
Q. And what have you done since 1986?
A. Well, I had my accident, which put me in a wheelchair in 1979. And we moved up to Lake of the Woods in '85. I've been logging and brokering wood since then.
Q. Have you ever been deposed before?
A. Yes.
Q. Could you tell me in what legal action or actions you were deposed?
A. Just on a boundary dispute, I guess.
Q. Who were the parties to that boundary dispute?
A. Who was it?
THE DEPONENT: Was that -- would that be --

13

MR. FISH: Yeah, you can --
THE DEPONENT: Mauser, would that be --
MR. FISH: Oh.
THE DEPONENT: And then Feldmans --
MR. FISH: Well, whoever you remember.
I think they -- the other party had brought in a lot of government agencies.
A. It, it used to be the Mausers, and then he died, and the, the land reverted to his daughter, which -- their, their name are Feldmans.
Q. (By Ms. Kappler) How do you spell Mauser?
A. M-a-u-s-e-r, I believe.
Q. Apart from this dispute with the Mauser-Feldman family, have you ever been deposed in any other legal action?
A. I believe I have, I --
Q. You, you do believe you have or you do not believe you have?
A. No, I have, I believe. I mean, I've -- just business and everything else, it seems like over the years I, I would have.

14

Q. Have you ever been a party to any legal action?
A. Yes, I've been party to a lot of legal actions, I guess.
Q. Okay. Could you identify the legal actions, leaving aside this specific legal action that, that you're being deposed in today, could you describe -- could you identify the other legal actions in which you have been involved as a party?
A. One was, I was, a car accident.
Q. Were you the plaintiff?
A. (No verbal response.)
Q. Or the defendant?
A. I was the defendant.
That happened to be one, that still had insurance on my vehicle, even though I wasn't part of the crash, you know.
Q. Your vehicle was involved in the crash?
A. Vehicle was, yes.
Q. Okay. Who sued you?
A. The party that -- the car went out of their lane and hit that car, and I was behind that car, so I hit them in the back when

15

I -- when, when the crash occurred.
Q. Do you recall their name?
A. No, I don't.
Q. When, when was that legal action?
A. Oh. Probably in the late '70s. Seven -- or '74, '75, somewhere around in there.
Q. Okay. What other legal actions have you been a party in?
A. Uhm. I, I, I can't remember right now.
Q. Okay. Can you remember if you ever sued anyone?
A. If I ever sued anybody? Yes, I would remember that.
Q. Okay. Could you identify any legal action in which you've actually sued someone else?
A. I have never sued anybody else.
Q. Well, Mr. Bailey, are you not currently a plaintiff in a legal action against Lake of the Woods County and various agencies of the State of Minnesota?
A. Well, I, I assumed that that's part

16

of this whole thing, I'm -- you're talking something prior, I've never.
Q. Okay. Leave -- leaving aside this takings action against The United States, what other legal actions can you identify in which you have been a plaintiff?
A. (No verbal response.)
Q. Including this legal action against the State --
A. I --
Q. -- of Minnesota.
A. I can't recall any.
Q. So the legal action against Minnesota and Lake of the Woods County is the only other one you can identify as you're sitting here today?
A. That's what I remember as of today here.
Q. Okay. Have you ever been involved in any criminal proceedings?
A. Like -- what do you mean?
Q. Have you ever been the subject of a criminal action?
A. Yes, I have.
Q. Okay. What did that involve?

A. Oh. It was a, a trapping violation.
Q. What were you accused of specifically?
A. Having animals not properly tagged.
And the reason being, they're -- my mother's enrolled at Red Lake, which is a Reservation to the south here. They were out of tags. I had the animals and I showed them to undercover guys and I, I wouldn't sell them. But they, they, they brought action against me and didn't let me use Red Lake as a defense.
Q. What year was that?
A. '86 I believe.
Q. Were you convicted?
A. Yes.
Q. Was this a felony?
A. No. Gross misdemeanor.
Q. What was your sentence?
A. I think I had $1500 fine and 90 days in jail.
Q. Where did you serve your time?
A. In Lake of the Woods.



I, I could have pled guilty at any time and paid a hundred-dollar fine, but I, I fought it.
Q. Have you ever been the subject of any other criminal proceedings?
A. I don't believe so.
Q. Mr. Bailey, where did you grow up?
A. On the Red Lake Indian Reservation.
Q. Okay. Did you reside there until you attended the University of Minnesota?
A. No. I, I resided there until I was eight. And then I had a stepfather who was in the Air Force, from there we traveled all over the world, I guess, following him around. I graduated --
Q. Okay.
A. -- high school in the Philippines Islands.
MS. KAPPLER: Why don't we go off the record, I'll try to premark some of these Exhibits.
(Whereupon, there was discussion off the record from 10:18 o'clock a.m. to 10:31 o'clock a.m.)



(Whereupon, Deposition Exhibit Nos. 4 through 47, Bailey, were marked for identification.)
MS. KAPPLER: Ready to go back on.
Q. (By Ms. Kappler) Mr. Bailey, I asked you a short while ago about any lawsuits that you may have been involved in. Do you have any knowledge about a suit against a neighbor regarding a beaver dam?
A. Oh, yeah, yeah.
Q. Could you explain the circumstances of that suit?
A. Adjacent to my property, people had a beaver dam -- in fact, two, two neighbors do -- well, actually three neighbors do, I guess.
Two of them would take the, take the dam apart and allow the water to go out the way it should go.
But this particular one I had to take, take to court because he wouldn't break the dam, the water backed up over -- across my property and, and destroyed some of my trees.
Q. Who -- who's the, the individual that you sued there?



A. I think that was Stanley Pream.
Q. Could you spell his last name, please?
A. P-r-e-a-m.
I think his wife works for the Corps of Engineers.
Q. When was that suit filed?
A. Within the last couple years.
Q. Is it still pending?
A. No.
Q. Okay.
A. We, we had a flood in 2002 and it took the beaver dam out, so it alleviated the problem. And my -- I had killed the beavers around my property, so there's no, no beavers in there right now.
Q. So what happened to the lawsuit: was it dismissed?
A. It -- the judge actually came out and, and viewed the property, and since the flood, flood came in while the suit was on, it -- the -- even though I let it go through, the, the dam wasn't there anymore, the flood washed it out.
Q. Do you know what happened to the

21

legal action itself? Do you know if it was dismissed?
A. I, I think he just said to bring it back up if it became a problem again.
Q. Okay. Where was that action filed?
A. In Lake of the Woods County.
Q. That action involving the car accident, which county was that in?
A. Uhm. Probably Hennepin.
Q. I'm sorry, what was the name of the county?
A. Hennepin.
Q. Could you spell that for me, please?
A. I think it's: H-e-n-n-i-p-i-n (sic).
Q. Have you had any legal actions in Roseau?
A. None that I remember, no.
Q. Okay. Are there any other counties besides Lake of the Woods County and Hennepin County -- are there any legal actions that have been filed by you or against you in any county other than Hennepin or Lake of the Woods County?
A. I, I can't recall right now.

22

Q. Okay. Have you ever been the subject of a legal action outside of the state of Minnesota?
A. No.
Q. I'd like to begin, if I could, by showing you some maps. These are maps that have been premarked as Exhibits 19 through 22.
Let me show you, first, a document entitled: Initial Plat; Sunny Beach. This is Exhibit No. 19.
Is all of the property depicted in Exhibit 19 property currently owned by you?
A. Yes.
Q. Is all of the property depicted in Exhibit 19, property which you owned on -- in June of 2001?
A. I believe so.
Q. Showing you a tax plat. This is Exhibit 20. I'd like you, if you would, to identify, through outlining, property that you currently own or have ever owned.
A. Currently own or --
Q. Or have ever owned.
A. (Deponent complied.)
Q. Showing you what was premarked as

23

Exhibit 21. Could you identify property that you currently own or have ever owned by outlining that area?
A. Uhm.
(Deponent complied.)
You, you want to know even the 40s that I own?
Q. Any property that you currently own or have ever owned.
A. On these two 40s, I'm not sure of -- I, I -- my daughter owns this 40 right here. I bought these two 40s. I don't know if they're in my name. I know they're in her name now, you know. I don't know --
Q. What --
A. -- originally if they were in my name or not.
Q. What is your daughter's name?
A. Erica Bailey Johnson.
Q. And how old is she?
A. Twenty -- going to be 29.
Q. Okay.
A. Should I put those down or not?
Q. Any property that -- you're saying she acquired it on her own or --

24

A. No, no, I -- the neighbor had them for sale and I bought them. And I don't know if they, they came in my name first. But they are in her name. I, I bought them for her.
Q. Okay. Yes, please mark that property.
A. I believe that's everything.
Q. Okay. Does some or all of the property we've identified in Exhibit 21, include property that is known generally as Elk Ranch?
A. Some of that includes that property, yes.
Q. Could you point that out and describe the property in Exhibit 21?
A. Do you have another color or something or --
Q. Maybe you can just draw an arrow from the property with a -- and identify it as Elk Ranch.
A. I guess other people call it Elk Ranch, I don't. It's still my farm, you know.
MR. FISH: I'm going to interpose an objection on relevance and not likely to lead to the discovery of admissible evidence at

this time, unless Counsel comes with something on the record.

Along these -- line of questioning on the Elk Ranch property.

MS. KAPPLER: The goal here's simply to identify in general the property owned by Mr. Bailey in and around the subject area.

A. What I'll do is I'll put that as a fenced in area, because that's, that's what it is. Everything else is still my ranch, or whatever you want to call it, I guess.

Q. (By Ms. Kappler) Is the area on Exhibit 21 that you have outlined and, and described as fenced, all of the property known generally by others, as you understand it, as Elk Ranch?

A. Well, since I own more land than that, I, I -- it's hard to explain what somebody else calls my place, but my place is just the, the Bailey Farm, or whatever, you know, I mean.

Q. Let, let me, let me ask another question.

Do you have an understanding of



what has been described as Elk Ranch by others?

A. That would be the area where I have elk inside the fence, yes.

Q. Okay. Is that the entire area of what is known as Elk Ranch?

A. That I'm not sure, you know, I -- it's the only area I have elk, because it's fenced.

Q. I see.

Is there any property adjacent to that property that is not depicted in Exhibit 21 that you own?

A. Yes.

Q. How much property do you own that is adjacent to the area that you've noted as fenced on Exhibit 21?

A. It's all, it's all been outlined on that sheet.

Q. What I'm trying to determine, is, is there an area outside of the area depicted on this map for Exhibit 21, that you own that is adjacent to any of the property that you've outlined here?

A. The closest land is 2 and a half miles south that I own another 120 acres.



Q. Okay.

Mr. Bailey, I'd like to return to the topic of some of the legal actions you've been involved in.

It's true, is it not, that you've been involved in some legal actions with the United States Environmental Protective Agency involving the property you've described as Elk Ranch? Isn't that correct?

MR. FISH: I'll object to the characterization of legal action, Counsel. The mere act of paying your taxes, land taxes, could be construed as a legal action. Maybe to clarify your question more.

Q. (By Ms. Kappler) There are enforcement proceedings involving the Elk Ranch property, are there not?

A. There's been ongoing negotiations, but there's no lawsuit or anything.

Q. There have been proceedings involving violations of the Clean Water Act, have there not?

A. Claimed violations, which I -- I'm in dispute and trying to work out, yes.

Q. Have you also been involved in some



legal action involving trespassing on a neighbor's property in or around the area we've identified as the fenced area on Exhibit 21?

A. Since my land was -- the, the most recent that it was surveyed was in 1909. And with the, the assumption that GPS is, is a means of locating lost points, I guess what has been a boundary over almost a hundred years has been changed to where it should have been a hundred years ago. And it -- that's what began a dispute.

Q. Was it --

A. Boundaries have been moved from where they were previous to where they should be.

Q. Have you moved those boundaries?

A. I haven't moved any boundaries, no.

Q. Who moved the boundaries?

A. The -- by means of GPS, they located them where they should have probably been located when they originally surveyed them. But using chains all the way across, whatever, I mean, the -- it -- the normal place where neighbors assumed the boundaries to be over the years, weren't accurate, I guess is,

is what the surveyors are saying.
Q. Who, who do you -- you indicated: they. Did a survey, they. Who, who was responsible for --
A. Adjacent --
Q. -- this survey?
A. -- property owners had a surveyor come out and, and survey it using GPS. Not, not pulling a tape or anything.
Q. Was there a lawsuit filed in connection with issues relating to this neighbor's property?
A. Yes.
Q. Who filed that lawsuit?
A. Just like I, I said before, Feldmans.
Q. Aah, this is the, the suit by the Feldmans?
A. Mauser-Feldmans, yes.
Q. Did they allege that you were trespassing on their property?
A. Yes.
Q. How was that lawsuit resolved?
A. It -- since, since the lines meander back and forth, the --



MS. KAPPLER: Excuse me for just a moment.
Sorry to cut your answer off.
(Whereupon, there was discussion off the record.)
MS. KAPPLER: I apologize.
Could you read back Mr. Bailey's last answer.
(Whereupon, the question and answer were read back by the reporter.)
A. Here again, the judge made a visit to the property. The, the ultimate goal of the property owners adjacent to me was to stop me from building my elk fence. What, what ensued after that, is the fence became the property line.
Q. (By Ms. Kappler) Oh.
A. So that was the end of the lawsuit.
Q. When was that lawsuit filed?
A. That I don't know.
Q. Was it in the '90s?
A. Yep.
Q. You say the fence became the line, --
A. Yes.



Q. -- the fence, as placed by you?
A. Fence as placed by me. And should have been placed by an adjacent property owner -- yes, I, I built the entire fence.
Q. Do you have an understanding as to how the legal matter was resolved? Was the matter dismissed, for instance?
A. There was judgments on both parts. I guess I don't recall the, the exact -- what it was, but it was -- it, it came to an end, I guess is what I'm trying to say.
Q. Was that case filed in Lake of the Woods County?
A. I believe so.
Q. What I'd like to do now is review a series of deeds with you.
Most, if not all, of these are copies of -- certified copies of deeds provided by the recorder in Lake of the Woods County.
MS. KAPPLER: Mr. Fish, would you be willing to stipulate to their authenticity, in, in light of the fact that they are copies of certified copies?
MR. FISH: Yeah, there's no foundational objections.



Q. (By Ms. Kappler) Let me show you, Mr. Bailey, first of all, what has been premarked as Deposition Exhibit No. 23, a deed, a contract for deed from John Lewis and Beryl Lewis, to Gary Bailey and Kathryn Bailey, dated June 28, 1989.
Would you verify that your signature appears in that document?
A. That's my signature.
Q. Now turning our attention back to Exhibit 20, would you identify, through some sort of outlining, and through reference to Exhibit 23, the area acquired by way of that deed.
A. (Deponent complied.)
Q. If you would identify to the side that that property is encompassed by Exhibit 23.
A. (Deponent complied.)
Q. So for clarification, the entire area that you've outlined and, and connected to Exhibit 23, is all of the property acquired through the contract for deed that is marked as Exhibit 23?
A. Yes.

Q. Does that property include the area later platted as Sunny Beach?
A. Yes, it does.
Q. Do you know the acreage of the area that you have outlined here?
A. Well, the, the 40s on the east side of the road, I -- or the west side of the road, are -- they could be 40 acres or less than that. I know the, the, the complete land on the east side of the road is 86 acres.
Q. On the east side of the road it's 86 acres and on the other side of the road you indicated --
A. Well, should be 40-acre squares, but if they're light or heavy, it would differentiate that on the, on the deed.
Q. The, the road you've identified and that you're referring to is the road marked as, as Route 53?
A. Yes.
Q. Now Exhibit 23 indicates a purchase price of $135,000. Is that, indeed, how much you paid for the property that you've identified and outlined in Exhibit 20?
A. No.



Q. How much did you actually pay for the property outlined in --
A. It was --
Q. -- Exhibit 20?
A. It was a three-year contract at 10 percent interest, so I -- I probably paid close to $160,000 for it.
Q. Turning our attention to what's been premarked as Exhibit 24. Could you identify for the record the property acquired through this document, which is entitled quitclaim deed, identify it in Exhibit 20?
A. (Deponent complied.)
Is that right?
Q. If you could just note beside that Exhibit 20, so we know what, what deed it refers to.
MR. FISH: 24, you mean, Counsel?
Q. (By Ms. Kappler) Exhibit 24.
MS. KAPPLER: Thank you.
A. (Deponent complied.)
Q. (By Ms. Kappler) Okay.
Turning your attention to what is premarked as Exhibit 26. A warranty deed from John Lewis and Beryl Lewis to Gary and Kathryn



Bailey, dated June 29, 1989.
Does that deed indicate satisfaction of the obligation for the property you identified in Exhibit 20 and tied to Exhibit 23?
MS. KAPPLER: Excuse me.
MR. FISH: You can look at the Exhibits if you want to.
Q. (By Ms. Kappler) Sure. I'm sorry.
MR. FISH: Trace the --
20 and 23 she's referring to in her question.
A. It should be the same.
Q. (By Ms. Kappler) Okay. So --
In July 11 -- on July 11 of 1991, approximately, you had satisfied your obligation in connection with the contract for deed which is marked as Exhibit 23?
A. Yes. It's hard for me to remember when it take -- when it took place, --
Q. Okay.
A. -- but -- (no further response.)
Q. Turning your attention to what was premarked as Exhibit 27. A record of a mortgage recorded with the Lake of the Woods



County on July 12, 1991.
Would you, by reference to Exhibit 20 -- or, excuse me, in Exhibit 20, indicate the area covered by that mortgage?
A. (No verbal response.)
Q. You can do that in dark pencil, if it's just a portion of the property that you're going to outline.
A. (Deponent complied.)
Q. Okay. If you could then indicate that that is the property identified in Exhibit 27, just by writing Exhibit 27?
A. (Deponent complied.)
Q. So, for the record, the property depicted in Exhibit 27, and that you've outlined in Exhibit 20, is a portion of the property acquired by you and your ex-wife in 1989. Is that correct?
A. Yes.
Q. Let me show you Exhibit 28, a contract for deed dated March 1, 1993, from you and your ex-wife to a Mr. Dahl.
A. Uh-huh.
Q. Would you outline, on Exhibit 20, and identify on that document, the area covered

37

by that deed?
MR. FISH: Do you want another color?
A. Do you want to --
Q. (By Ms. Kappler) I'm not sure I have anything else. Maybe we can just use a different kind of marking, cross-hatches or something like that, or Xs, around the area.
A. (Deponent complied.)
MR. FISH: I really can't tell what you marked.
Q. (By Ms. Kappler) Let me see if I can identify it more clearly for the record by reference to the names in there.
Would you identify, for the record, the names that are included in the plat map for the, the parcels that you've marked as being linked to Exhibit 28?
A. Can you read them for me?
Q. Let me see if I can.
The one to the left has your name, the one to the right has Mr. Dahl's name.
A. Okay.
Q. Is it, nevertheless, your understanding that that entire parcel was

38

conveyed to Mr. Dahl in 1993?
A. It was under contract for deed.
Q. Okay. Turning your attention to what's been premarked as Exhibit 29. And also your attention to what has been premarked as Exhibit 30.
Would you take a look at those documents and tell me whether or not these documents collectively represent a land exchange with a Robert Pieper and a Kathryn Pieper?
A. Uh-huh. Okay.
Do you want me to explain what it is?
Q. Yes, please.
A. When, when this -- like in my whole county -- like I was saying, the last time they surveyed anything in the county is in 1909.
The, the ditch between myself and Mr. Pieper, which Mr. Pieper did the ditch, was on and off the property line as put in by the surveyor that did the platting.
So instead of having the, the -- since it was on both sides of the ditch, as far as the, the boundary meander on both sides,

39

what we did on this exchange was we made the ditch the property line. And that's, that's what -- that ensued.
It's on the south end of the property.
Q. So what was the property line as you understood it prior to the execution of these deeds --
A. Well, --
Q. -- marked Exhibit 30, 29 and 30?
A. -- we all assumed that the ditch was the property line. However, when the surveyor surveyed it, the, the property line was both on the outside and the inside of the ditch, so this -- we made the ditch the property line, I guess is what we did.
Q. Was this ditch used for irrigation purposes?
A. Just for drainage.
Q. Okay. Could you, by reference to Exhibit 20 -- or rather, on Exhibit 20, indicate where the ditch ran --
A. Sure.
Q. -- that was the subject of this land exchange or, or subject of these deeds

40

marked Exhibit 29 and 30.
A. (Deponent complied.)
Q. And indicate specifically, however it ran. Thank you.
If you could put an end point and a beginning point with a line, something, to, to indicate --
A. (Deponent complied.)
Q. If you could just make that a little darker, so we can really see what the beginning point and end point is.
A. Runs from the county road to the lake.
Q. Okay.
A. I don't know if you can read my writing.
Q. Yes.
Okay. Turning your attention to what's been premarked as Exhibit 31. A contract for deed dated December 27, 1998, from yourself and your ex-wife to a Raynard Lundgren and a Marilyn Lundgren.
And let me, on this connection, give you a copy of Exhibit 22.
First of all, is Exhibit 22 a, a

depiction of what's been described as Sunny Beach?
A. I believe the initial one, they had it reversed with the first line up here. The, the -- this, this is the, this is the way it ended up, though, the one that you have here.
Q. Could you indicate by reference to Exhibit 31, the property that was the subject --
A. Well, it'd be Lot --
Q. -- of Exhibit -- in Exhibit 22?
A. Do you want me to just --
Q. Yes. If you could just outline it or write the Lundgrens' name next to it?
A. (Deponent complied.)
MR. FISH: 31.
Q. (By Ms. Kappler) Okay, this one.
Okay. Showing you Exhibit 33, a contract for deed from you and your ex-wife to a Dennis Thomson and Michele Thomson. Would you identify the property that was the subject of that contract for deed on Exhibit 22, please.
A. (Deponent complied.)
Q. Showing you what's been premarked as Exhibit 34. Contract for deed dated



December 29, 1998, from you and your ex-wife to a Michael Washburn. Would you identify in Exhibit 22 the property that was the subject of that contract for deed?
A. (Deponent complied.)
Q. Okay. Showing you what's been premarked as Exhibit 35, a warranty deed from you and your ex-wife to David Russell and Deanna Hoebbel. Could you identify in Exhibit 20 the property that was the subject of that warranty deed?
A. (Deponent complied.)
Q. Okay. Showing you next what's been premarked as Exhibit 36, a contract for deed from yourself and your ex-wife to David Wolf and Charmaine Wolf. Would you identify the property that was the subject of that contract for deed, please.
A. (Deponent complied.)
Q. Okay. Showing you what's been premarked as Exhibit 37. A record of a conveyance from yourself and your ex-wife to Suzanne Anderson as trustee. Would you identify the property that's the subject of that deed?



A. (Deponent complied.)
Q. Showing you what's been premarked as Exhibit 38, a contract for deed from you and your ex-wife to a Jamie Gowdy. Would you please identify in Exhibit 22 the property that was the subject of that contract for deed, please.
A. (Deponent complied.)
MR. FISH: Lot 10?
THE DEPONENT: Yeah.
Any difference if I own it?
MR. FISH: Uhm?
THE DEPONENT: Does it make a difference if I own them now?
MR. FISH: You can ask me later.
MS. KAPPLER: I'll ask you all those questions later.
THE DEPONENT: Okay.
Q. (By Ms. Kappler) Showing you what's been premarked as Exhibits 39 and 40. First, warranty deed from you and your ex-wife to a Thomas Woitalla and Vivian Woitalla. Exhibit 40, a mortgage with a Mr. Woitalla -- excuse me -- and Vivian Woitalla as, as mortgagors, and Kathryn and Gary Bailey as



mortgagees.
Could you identify the property that was subject of the warranty deed and mortgage just identified as Exhibits 39 and 40?
A. (Deponent complied.)
Q. Okay. Okay, showing you what has been premarked as Exhibit 41. A contract for deed between Gary Bailey and Kathryn Bailey and April Stavig, as trustee for the Fish Trust. Would you identify the property that's the subject of that document?
A. (Deponent complied.)
Q. Is your attorney, Mr. Fish, a trustee of that, that trust?
MR. FISH: If you know.
A. I -- I'm not sure.
Q. (By Ms. Kappler) Is it your understanding that Mr. Fish has an interest in that property?
A. The whole Fish family does, yes.
Q. Okay.
Turning your attention to Exhibit 42. Would you identify the property that is the subject for the contract of deed from a Mr. Bailey and Kathryn Bailey to, to a Karl and

45

Linda Persson?
A. (Deponent complied.)
Q. Okay.
Mr. Bailey, I'd like to ask you about the transactions that were the subject of the, the deeds that we just went through.
Let me --
Beginning with the contract for deed dated 12-30-98, from you and your ex-wife to the Thomsons.
This was for Lots 2 and 3.
Did you ever deal with the Thomsons specifically?
A. No.
Q. Were you represented by a real estate agent who dealt with the Thomsons?
A. It was an open listing.
Q. Do you know if the sale was facilitated by any particular agent?
A. Three different agencies sold the property up here, so I have -- (no further response.)
Q. Do you know who was responsible for the sale to these individuals?
A. I don't right -- I, I made a list.

46

I, --
Q. Okay.
A. -- I have --
Q. So which, which agents were involved in the sale of any of the parcels that we identified in the Sunny Beach area?
A. North Border Realty.
Q. Where are they located?
A. In Baudette.
Q. What other Realtor?
A. Pahlen Real -- Realty.
Q. Would you spell Pahlen, please?
A. P-h -- h-a-l-e-n.
Q. H-a --
A. L-a-n.
Q. L-a-n.
And where is Pahlen Realty located?
A. Warroad.
MR. FISH: P-a-h. Pahlen.
THE DEPONENT: P-a-h?
MR. FISH: Yeah, P-a-h.
A. I spelled that wrong then, P-a --
Q. (By Ms. Kappler) P-a-h-l-e-n?
A. L-e-n.
Q. L-e-n?

47

A. Yeah.
Q. Okay. In Warroad.
And who was the third Realtor?
A. Lake Count -- Lake Country.
Q. And where is that located?
A. Warroad.
Q. Who were your contacts at each of these Realtors, beginning with North Border Realty?
A. Patrick La Valla.
Q. How do you spell Mr. La Valla's last name?
A. L-a V-a-l-l-a.
Q. And at Pahlen --
MS. KAPPLER: Pahlen?
MR. FISH: Pahlen.
Q. (By Ms. Kappler) Pahlen --
A. Pahlen, there we go.
Q. -- Realty?
A. Scott Pahlen.
Q. And at Lake Country Realty?
A. Francine Fish.
Q. And is that Mr. Fish's mother?
A. Yes.
Q. Okay. Speaking generally,

48

regarding the sales of the properties that, that are identified in Exhibit 22 as parcels 2 through 14, did you personally have any dealings with the individuals who purchased those parcels?
A. No.
Q. When, when you say that you didn't have any dealings personally with these purchasers, do you mean prior to the purchase?
A. I mean at any time.
Q. At no time, either before or after the purchases by these individuals, have you dealt personally with any of them?
A. I, I might have talked to them on the phone, that was nothing --
Q. Okay.
A. -- personally.
Q. Okay.
A. I mean, --
Q. When I say: personally, I mean telephone conversations --
A. I, I --
Q. -- as well.
A. I had telephone conversations with some of them.

Q. So now referring back to the period prior to the purchase by any of these individuals, did you have any telephone contact with any such persons?
A. I might have. People've been trying to buy that property for years, I just -- (no further response.)
Q. Do you have any specific recollection of dealing with any of the individuals who purchased Lots 2 through 14?
A. I don't.
Q. Telephonically, in person or otherwise, prior to their purchase?
A. I, I don't -- I know once they knew I was going to develop it, they, they -- people started calling, you know.
And I, I couldn't sell until the, the land was platted.
Plotted, platted.
And that's what I told them.
Q. Okay. Were some of the individuals who contacted you prior to the platting of the property, some of the individuals who eventually purchased --
A. I believe so.



Q. -- parcels.
Who else contacted you?
A. Just the Realtors I believe.
Q. Did you ever have it listed formally?
A. No.
Q. Did, did Realtor -- you're saying Realtors also contacted you in connection with this property?
A. Once, once, once they heard that I was going to develop it up there, yes.
Q. When did these inquiries from Realtors or any other persons begin?
A. Probably started in 1990, when I had a marina permit to build a marina up there.
Q. Did anyone ever suggest to you a purchase price for this property?
MR. FISH: Counsel, by: this property, what are you referring to?
MS. KAPPLER: Thank you. That's a good question.
Q. (By Ms. Kappler) Referring back to the conversations you had, did anyone indicate the property area they were interested in acquiring?



A. Yes, there was one outfit that that's all they did, was develop lakeshore properties and they wanted to purchase the whole front.
Q. What are you referring to as the front?
A. Well, the lakeshore part of the property.
Q. What is -- what are you referring to as the lakeshore part of the property?
A. The four -- 14 lots that you have as the platted part.
Q. Now, looking at Exhibit 22, Exhibit 22 includes a road described as Sandy Shores Drive, that's correct?
A. That would include the, the road, yes.
Q. Okay. That road did not exist in the early '90s, did it?
A. No, it didn't.
Q. There, there was no obvious dividing line between, between what's been platted as, as Exhibit -- or, excuse me, as, as parcels 1 through 14, and the property west of those parcels in the early '90s?



A. No.
Q. In fact, that road didn't even exist until 1998. Isn't that correct?
A. That's correct.
Q. So with that in mind, do you have an understanding of what property specifically these individuals were inquiring about when they indicated they wanted to buy lakeshore property?
A. That, that property's unique probably to all of Lake of the Woods, because it's the only wooded parcel of the lakeshore that's left that hasn't been developed.
And, and it, it encompasses about 20 acres between the land that's divided by the road that's on the lakeside and the land that butts up to the field that's on the west side.
Q. Okay. So referring back to Exhibit 20, when you say the, the land that butts up against the road, you're referring to the road that is described as Route 53 on Exhibit 20?
A. No, no, no, no.
Q. What --
A. Okay. If --
Q. -- are you referring to?

53

A. If you looked at an aerial photo of the property, or topographical map, you could see that there's 56 acres of field and the rest is a wooded lakeshore. And that's what I'm talking about as the wooded lakeshore part.
Q. Referring back to Exhibit 20, can you draw in -- gosh, I wish we had another color. Let me use your pen.
I'll try to use another pen that will identify it more clearly. Can you identify the area that you considered to be the wooded lakeshore?
A. It's easier, easier to describe because everything else is a field.
Q. Maybe you could just draw into the area lightly with pencil --
A. Okay.
Q. -- with cross-hatching or some other marking.
A. 86 acres less 56 acres of field is -- (no further response.)
Q. Okay. So what I need for you to do is outline the boundaries of the area that you consider to be wooded lakeshore property.
A. Okay. But I, I don't know where 56

54

acres falls in here. It's probably in this area here. The lake.
Q. Okay. And the 56 acres -- excuse me, the 86 acres that you're referring to is to the west --
A. 56 --
Q. -- of the --
A. The 56-acre field is to the west of that.
Q. Excuse me. You indicate 56 acres of field is wooded lakeshore. Is that correct?
A. No, no, no, no, no.
56 acres, less the 56 acres.
Q. Sorry, sorry, this says 86 acres.
A. Or -- yeah, yeah, 86 acres less 56 acres of field is --
Q. Is wooded lakeshore?
A. Is --
So --
Q. So --
A. It takes 56 from 86 and you come up with approximately 20 acres of wooded lakeshore.
Q. I believe it's 30 acres -- sorry, 30 acres -- yes, 56?

55

MR. FISH: Yep.
A. Yeah.
Q. (By Ms. Kappler) 30 acres of --
MR. FISH: Sounds --
Q. (By Ms. Kappler) -- wooded lake- --
MR. FISH: -- about right.
Q. (By Ms. Kappler) -- shore is the area to the east of a line that you've identified in Exhibit 20?
A. You're right.
Q. And to the west is field. Is that correct?
A. Yes.
Q. It's an agricultural area?
A. It's a prior converted.
Q. Prior converted wetlands area?
A. Well, that's what they call, call it, it, it -- it's farmable land, yes.
Q. Yes.
Do you farm that land?
A. I turned to black again last year. It's in -- it's just in grass right now.
Q. Have you in the past farmed that land?

56

A. Yes.
Q. What have you farmed on that land?
A. Just, just grass.
Q. Just grass?
A. Just, just the forage, I guess.
Q. For grazing or --
A. No.
Q. -- hay?
A. No, it's for hay.
Q. Now, the area that you've depicted on Exhibit 23 as wooded lakeshore, is it your understanding that that was the area that was the subject of inquiries by Realtors and others beginning sometime in the early '90s?
A. Yes.
Q. Did anyone in connection with that property area suggest to you a price that they would be willing to pay for that property?
A. Yes.
Q. First of all, who suggested a price to you?
A. I got -- I have all that stuff at home.
MR. FISH: If you remember now.
A. I, I don't remember it right now.

Q. (By Ms. Kappler) Well, what prices were suggested to you?
A. That I don't remember either, I mean.
Q. Do you remember a range of prices?
A. It was the $300,000 plus, I believe.
But I --
That's just for undeveloped land.
Q. Now, in your Interrogatory Answers, that we marked as Exhibit 3?
A. Uh-huh.
Q. And we've discussed this on the record a little earlier, in response to Interrogatory No. 4, about the amount paid for the property. And in that case, we defined the property as the area depicted in Exhibit 22.
You indicated you had paid $65,000 in 1976. Now we've clarified that actually you acquired the property in 1989. Is that correct?
A. Uh-huh.
Q. And we've clarified that your acquisition of that property was, in part, contained within --



MS. KAPPLER: Or strike that.
Q. (By Ms. Kappler) We've clarified that that property was included within the property conveyed to you on June 28, 1989, in, in the deed we've marked as Exhibit 23.
A. My answer was what?
Q. Is, is the property that you acquired contained within the property that was the subject of what we've marked as Exhibit 23?
A. Well, more concerned about the price that you have down there.
Q. You indicated in your Interrogatory Answers, which we've marked as Exhibit 3, that the price of the property was $65,000?
A. Well, that's wrong. I mean, whatever's on the --
Q. Okay. So to clarify, what --
A. What it should have been is the total of 135 plus the interest.
Q. Which was, as you testified earlier, approximately $160,000 total?
A. Yep, maybe, maybe you got the one off of there or something.
Q. Okay. Now so you paid approximately $160,000 for property that



included the property that you've noted was -- is wooded lakeshore property?
A. Yes.
Q. Okay. That property also included agricultural property to the west and to the south, did it not?
A. Mainly to the west there was one 40-acre field that was adjacent by one 40.
Q. Okay. I want to be very clear about what property was acquired by way of Exhibit 23. We've marked this up so many times, I don't want there to be any doubt about it.
What I'd like for you to do is, on Exhibit 20, outline the boundaries up here, draw them literally up here, so we know what the shape of the property was that was acquired by way of Exhibit 23.
A. (Deponent complied.)
Q. Okay. And if you would just write -- mark next to that Exhibit 23, so we know what we're talking about.
A. (Deponent complied.)
Q. Okay. And that property, then, that you've outlined the, the boundaries of at



the top of Exhibit 20, included the 56 acres which you indicate was wooded lakeshore?
A. No, 56 acres was a field.
Q. Oh, I beg your pardon, it was 30 acres of wooded lakeshore?
A. Yes.
Q. It also included the additional 56 acres to the west of that, that was field that ran up against the road that we've marked as Route 53. Is that correct?
A. That's correct.
Q. And it also included the two parcels to the left of that which bear your name and Mr. Dahl's name. Is that correct?
A. Yes.
Q. And then the property to the south of the parcel that has Mr. Dahl's name. Is that correct?
A. That's correct.
Q. So for all of that property, you paid $160,000, approximately, after you were done making your payments?
A. That's correct.
Q. Now I asked you about inquiries for the wooded lakeshore property, approximately 30

acres, that you began to receive sometime in the early '90s.
You believe you received some inquiry and a suggestion that someone would be willing to pay $300,000 for that property?
A. Well, people are -- always wanted to develop it and I, I probably entertained a lot of people wanting to do that, you know. And I, I held onto it, thinking that I -- was going to be something that I could use in retirement, as far as developing the lots up there.
Q. Was one such individual an individual by the name of Scott Seeley with a company called Taylor Investments?
A. That sounds correct, yes.
Q. Okay. Do you recall any of your discussions with Mr. Seeley?
A. Only that he was interested in purchasing the, the land for developing it.
Q. Okay. Now that was prior to it being platted as a subdivision, --
A. That's correct.
Q. -- wasn't it?
A. Yeah.



Q. What kinds of inquiries did Mr. Seeley make about the property?
A. He was interested in that marina permit that I had and what, what my intentions were, I guess.
Q. Did he ask you about the presence of wetlands in the property area?
A. I had a -- I had him -- he wanted to go out and look at the property, which I believe somebody from either NRCS or the county planning and SWCD, went out with him, I didn't.
Q. Did -- you had conversations with --
A. I had --
Q. -- Mr. Seeley?
A. -- conversations with him, yes.
Q. Did Mr. Seeley ever inquire about wetlands in the area that he was interested in purchasing?
A. Not to my knowledge, I, I, I don't remember, I guess.
Might have.
Q. In the multiple inquiries you received regarding this wooded lakeshore area, the 30 acres --



A. Uh-huh.
Q. -- you've described here, did anyone inquire about wetlands on the property?
A. Only to the extent that if the -- whatever the County came up with is what they'd have to abide by, I guess as far as the rulings.
Q. Did anybody ask you about the presence of wetlands on the property?
A. I don't specifically remember that, no.
Q. You don't remember anyone even mentioning the word wetlands to you?
A. I can't recall.
Q. Did anyone inquire to you about legal constraints on the developability of that property you've described as the wooded lakeshore area?
MR. FISH: Now, again, Counsel, you're referring to prospective purchasers?
MS. KAPPLER: Yes.
A. Only to the extent what -- I refer them to -- the county planning person would initiate permits.
Q. (By Ms. Kappler) I'm not, I'm not



asking about what you said to them, I'm asking as to whether anyone inquired to you about the developability of the property?
A. You're, you're talking people that purchase lots?
Q. Prospective purchasers, people who called you inquiring about the property.
A. I, I can't recall that, no.
Q. You can't recall whether anyone expressed any interest or concern about legal constraints associated with the development of the property?
A. I said -- the only thing I said is that my land was as high or higher than the adjacent land that's been developed and it shouldn't be a problem, anything that would happen would have to be permitted through the County.
Q. You say you indicated that was as high or higher than the adjacent property?
A. It's, it's -- yes, it's the same type of property that's been developed. And there's six subdivisions there that -- like I said, people been after me to develop that because that's what they've been doing along

the whole lake.
Q. What did you mean, high or as high, higher or as high?
A. Well, in -- this county's relatively flat, you know, and it -- the, the differentiae between low and high is, is, is a, I don't know, a term we use in the county just by using common sense, I guess, the differentiation between high and low.
Q. Okay.
A. This, this, to anybody in the county, would be considered high ground.
Q. Okay. What I'm trying to understand is what do you mean -- and what did you mean, rather, when you said high ground?
A. That it could be built in -- could be built on.
Q. That it could be built on?
A. Yes.
Q. Did you mean it wasn't wetlands?
A. Yes.
Q. Now, you said you had these inquiries beginning in the early '90s?
A. Yes.
Q. And these continued through what



period?
A. Up to the time I decided I was going to sell, sell lots up there.
Q. So through 1999? Or -- let me see --
The last of these sales, I guess, was June 29, 19 -- excuse me.
June 1, 1999, the conveyances to the Perssons. Is that correct?
A. Mo -- I, I believe so, I, I can't remember.
Q. Okay. So throughout that period, people were inquiring about the prospective purchase of the property?
A. Yes.
Q. And throughout that period, you were indicating that the property was on high ground?
MR. FISH: I'll object, that misstates his testimony. He says it was high or higher than the neighboring, and they would have to inquire with the Lake of the Woods County as to whether it was permitable. I think he's asked and answered this several times.



MS. KAPPLER: Okay. I, I want to go off the record for a moment.
(Whereupon, there was discussion off the record.)
MS. KAPPLER: Let's, let's put this on the record.
Off the record, I've had a discussion with Mr. Fish about my concern that his last objection was in violation of Rule 30 and was tantamount to coaching the witness.
And I've expressed my concern that any future such instructions may be the subject of a discussion before his Honor.
MR. FISH: And I'll, I'll merely indicate, my response is that the, the objection's duly noted.
And to the extent that Counsel considers this objection a waiver, it's noted as well.
Q. (By Ms. Kappler) Now, I want to be clear about what your representations were to prospective buyers.
You indicated that in connection with discussions with prospective buyers, and let me know whether this is a correct



characterization of your testimony, that the property was as high or higher than property that had been developed in adjacent areas. Is that correct?
A. I'm saying, it's the same type of ground that has been developed in the past. The, the -- contacting the, the County, or the Realtor, they're, they're the ones selling land, knowing what's being built on -- if there's a -- problems with anything, they would know more than I would.
Q. Okay. You indicated that by high, you meant it wasn't wetlands; --
A. I didn't --
Q. -- is that correct?
MR. FISH: Objection.
A. I didn't indicate --
MR. FISH: Let -- you can answer, Gary, but I'm going to put my objection on the record. I'll -- objection. Counsel's misstating the testimony. At no time did Mr. Bailey characterize the land as high, he characterized the land as high or higher as other similarly developed land.
You can answer.

Q. (By Ms. Kappler) Okay. Let me, let me ask the question again, because I don't mean to misstate your testimony, what I'm trying to do is clarify what your testimony is.
When you said the land was higher or as high, did you mean that it was not wetlands?
A. I didn't say it was high or higher, I said it was the same as the surrounding ground that was being built upon.
And, and the ultimate authorities to say whether you could build on it, is the permitting process through the County. I, I didn't say that a person could build on anything.
Q. Okay. My question was: when you said higher or as high, did you mean that it wasn't wetlands?
A. Yes, I did.
Q. Okay. And those communications with prospective buyers, where you indicated that the property was higher or as high as adjacent properties that had been developed, went from the early '90s, through the time when the last of these properties was sold to, it



looks like Mr. Persson, in 1999. Is that correct?
MR. FISH: Do you understand the, the question?
THE DEPONENT: No, I don't.
Q. (By Ms. Kappler) Were you, throughout the entire period we've described, from the early '90s, through approximately 1999, conveying to prospective purchasers that you believed the property was as high or higher than the land that had been developed in adjacent areas?
A. I never tried to sell my land, I never did.
Q. Okay. I'm not asking what your attempts were, I'm talking about communications with prospective purchasers.
You indicated that you had conveyed to individuals that the property was as high or higher than land that had been developed in adjacent areas.
I'm trying to determine the time period through which you were making these statements to prospective purchasers.
Were you making these statements



from the early '90s, through the late '90s?
A. Well, I was told by the, the Corps when I had the permit for the marina, that it was wooded uplands and that, to me, I mean, I -- whether I inferred that to somebody that asked me about it, I, I just inferred they were building in the same type of area that, that my land was all the way along the lake.
Q. Okay. I'm not, I'm not asking --
A. I never --
Q. -- what you inferred --
A. I never inferred it wasn't wetlands or it was higher than something else, I didn't infer it.
Q. Now I'm not trying to infer anything, I'm trying to figure out what -- you indicated that you had spoken with prospective purchasers and that you had indicated that the property was as high or higher than land that had been developed in adjacent areas. I'm just trying to figure out, simple question, Mr. Bailey, --
A. Simple question --
Q. -- what was the time period?
A. I didn't tell any prospective



buyers, referred them off to a Realtor, I didn't talk about my lots to anybody.
Q. Okay.
A. I didn't sell any of my lots.
Q. Mr. Bailey, you had indicated earlier that you had communicated with prospective purchasers that the property was as high or higher --
A. I was referring --
Q. -- to the land that was developed?
A. -- to Taylor Investments, and that's probably -- I talked to -- they were the only ones I talked to about this.
Q. Is it your testimony now that the only individual that you represented that the property was as high or higher than the property that had been developed on adjacent parcels, Scott Seeley at Taylor Investments?
A. That's one person that I recall that, --
Q. Okay.
A. -- that they wanted to develop the property.
Q. And that inquiry was in approximately 1997, was it not?

73

A. I can't recall, but --
Q. Okay.
Back in 1990, you applied for a permit to put in a harbor, had you not?
A. Yes.
Q. Okay. Let me just show you what we premarked as Exhibit 4.
Is that your application for that permit?
A. I guess.
Q. And, in fact, you received that permit, did you not?
A. Yes, I did.
From nine different agencies.
Q. Okay. And showing you what was premarked as Exhibit 25.
Is Exhibit 25 a record of the permitting allowed by the State, the Department of Natural Resources?
A. Yes.
Q. Okay. Now, sometime thereafter, you had communications with the Corps of Engineers, did you not?
MS. KAPPLER: Well, strike that.
Q. (By Ms. Kappler) You had had

74

communications with the Corps of Engineers in connection with your harbor -- or permit, hadn't you?
A. Yes.
Q. You had had them before you even filed this permit application, hadn't you?
A. Yes.
Q. Had you spoken with Mr. Koschak, who's standing (sic) over here?
A. Yes, I have.
Q. Okay. Had you spoken with him in connection with this harbor permit?
A. Yes, I had.
Q. And do you recall your discussions with Mr. Koschak regarding the harbor or permit?
A. He said it'd probably fall in the reg -- as long as it wasn't over an acre, it'd fall under the normal blank, the permitting process, because it, on his map, he said it was wooded uplands.
Q. Mr. Koschak represented to you that it was wooded uplands?
A. Yes, he did.
Q. Okay. And when did he make that

75

statement to you?
A. During the permitting process.
Q. So sometime on or around the time you submitted this application in January of 1990, that was received by the Corps, it looks like in February of 1990, Mr. Koschak represented to you that the area affected by the harbor was wooded uplands?
A. Yes.
Q. Okay. Now, sometime in 1993, the Corps sent you a letter, and it's the letter that was premarked as Exhibit 5. Was it not?
A. I, I remember this.
Q. You received that letter?
A. Yes.
Q. And that letter refers to a copy of the National Wetlands Inventory map -- or actually encloses a National Wetlands Inventory map, does it not?
A. What, what I was told is that they came out with a new map and, and looking at new topographical map, all of the woods along the lake were now wooded wetlands. That's what -- referring --
Q. So --

76

A. -- to that letter.
Q. Okay. So -- and you were provided with a copy of that National Wetlands Inventory map, were you not?
A. No.
Q. So the statement in here, enclosing -- purporting to enclose a copy of the National Wetlands Inventory map, is incorrect?
A. I might have a, a par -- a portion that includes on -- my land in there, yes.
Q. Okay. So you received some -- you received some map?
A. Yes.
Q. And you understood that map to indicate that your property was, was a wetlands area?
MR. FISH: I'll object. Counsel, are you referring to type one wetlands, type six wetlands, --
MS. KAPPLER: Wetlands.
MR. FISH: -- developable wetlands?
MS. KAPPLER: Wetlands.
A. Everything in the county is a wetland, I mean, the, the --
Q. (By Ms. Kappler) Well, that's not

exactly right, is it?
A. Well, it's pretty, pretty close to being right. I mean, what they did is they changed everything from the old map that showed it as, as wooded upland, now it, just by somebody doing a new map, it was all wooded wetland. I mean, nobody come out on my property and said it was wetland.
Q. Well, --
A. They made a new map.
And just the color code changed it to wooded wetland.
Went from brown to green.
Q. You had seen a map provided by the Corps of Engineers prior, previously, that indicated that the, the area was not wetlands?
A. All the topographical maps are, are coded as colorwise. Whether they're, they're wetland or upland or, or anything in between that, what -- prior to that weren't in the same color code as the new ones.
Q. Did -- was it your understanding because it was wooded, it wasn't wetlands?
A. Because it was wooded it wasn't wetlands?



Q. Was that your understanding?
A. My understanding was, prior to that new map being coming out, Mr. Koschak understood it was wooded wetlands, too. That's how come he gave me the blanket permit.
Q. I'm asking you about what your understanding was.
Was it your understanding, before receiving a copy of the National Wetlands Inventory map, or the, the relevant portion, that forested wetlands were not -- or, excuse me, forested property was not wetlands by definition?
MR. FISH: I'll object, that's argumentative.
Q. (By Ms. Kappler) I'm just trying to clarify what your understanding was. Did you believe, before you received a copy of this map, that if it was forested, it could not be wetlands?
A. No.
Q. Okay.
A. I mean, I, I log blue spruce, I log on pine and it's totally different kind of ground.



Q. Now, let me show you what was premarked as Exhibit 7. A letter from Mr. Wopat, to you. Did you receive that letter?
A. I believe I have.
Q. Okay. And do you recall having any discussions with Mr. Koschak around the issues described in this letter?
A. Most of my questions were referred to local, local people.
Q. My question is: do you recall having any discussions with Mr. Koschak regarding the issues outlined in this letter?
A. I don't.
Q. Okay. So you don't recall having any discussions with Mr. Koschak regarding the possibility of hiring a consultant to delineate the property?
A. I don't recall, no.
Q. Okay. Is -- in any event, you, you got this letter?
A. I assume I did.
Q. Okay. And that letter indicated that you may wish to hire a qualified private consultant to help you delineate this highly diverse site, did it not?



MR. FISH: She's asking you to read the letter.
A. That's what the letter says, yes.
Q. (By Ms. Kappler) Did you ever consult any -- contact any individuals to, to delineate the property or regarding delineation of the property?
A. The local, local people up here.
Q. You say: the local people, who are you referring to?
A. NRCS, SWCD.
Q. Did you --
A. County --
Q. -- contact private consultants?
A. County water planning.
Q. Did you contact any private consultants regarding the preparation of a delineation?
A. No, I didn't.
Q. So you never priced it -- you never explored it with private consultants?
A. Not, not when I had the experts right in the County that would -- could do the same thing.
Q. Well, did they do it for you?

81

A. They ultimately did.
Q. Delineated the property?
A. (No verbal response.)
Q. The County?
A. (No verbal response.)
Q. Okay. What are you referring to?
A. The -- all who -- crew of eight experts were out there delineating. I assume they come up with a -- at a point they, they decided what, what was what. I mean, I -- (no further response.)
Q. So is it your testimony that state and local authorities prepared a delineation?
A. During that period, from 1990 to 2000, there was ten different people in those jobs, I mean, I, I -- (no further response.)
Q. Did you contact your local representatives and senator regarding some of the issues you were having with the Corps --
A. Yes.
Q. -- of Engineers?
A. Yes, I did.
Q. And what did you communicate to them?
A. Well, some of the problems I was

82

having, as far as it looked to be, that I didn't have any of those problems until I put up my elk fence.
Q. So it was your belief that the issues you were having related to the wetlands near Lake of the Woods was tied in some way to the property that we identified in Exhibit 21 as the fenced property?
A. It sure looked like it, I didn't have any problems prior to that.
(Whereupon, there was discussion off the record.)
Q. (By Ms. Kappler) How many times did you contact your representatives or senators regarding issues with the Corps?
MR. FISH: I'm going to object to relevance, nor is it likely to lead to discovery of admissible evidence, and it's boarding on harassing.
If Counsel would like to show how this could be in any way discoverable or used in this lawsuit, I, I would like to know. If not, I may advise Mr. Bailey to halt on this line of questioning.
MS. KAPPLER: Well, I -- for the

83

record, I don't think that you have a basis for instructing him not to answer. The, the information need not be relevant if it can lead to the discovery of admissible evidence.
And what I'm trying to determine is what representations Mr. Bailey made to other individuals regarding these issues. And I would say that, that that is mainly likely to lead to the discovery of admissible evidence. I don't think it comes close to harassment.
Q. (By Ms. Kappler) Mr. Bailey, did you make multiple inquiries to your congressional representatives regarding these issues?
A. Well, I, I talked to my representatives.
Q. Okay.
A. They came out and looked on the site.
Q. Okay. Who was your local representative?
A. Well, at that particular time it was LeRoy Stumpf.
Q. Uh-huh.
A. That was state.

84

Q. And Mr. Stumpf actually came out to the property?
A. Yes.
Q. And what did you indicate to Mr. Stumpf about the issues?
A. I didn't go out with him to the site.
Q. When did Mr. Stumpf come and visit the property?
A. I don't know, I think they went out on a road, road -- the county board's normal road -- what do they call that, when they look at it, look at county roads in the spring and see what -- which ones are bad, which ones are -- needs to be fixed and whatnot. The road tour, I guess is what they call it.
Q. What we premarked as Exhibit 8 is a letter to Senator Wellstone, the late Senator Wellstone, from the Corps of Engineers. It's a 1994 letter.
Were your inquiries to Mr. Stumpf in and around the time of that letter?
A. Now, Mr. Wellstone has never been up in this area, I --
Q. I'm, I'm not actually asking about

85

your contact with Mr. Wellstone, I'm trying to establish a time period during which you were communicating with Mr. Stumpf.
A. Mr., Mr. Wellstone was at a meeting in Grand Rapids, which, which Senator Graham was there on forest roads. And I, I got along really good with Mr. -- with, with Mr. Graham. And he introduced me to Mr. Wellstone and he, he was concerned.
Q. You mean Senator Graham?
A. Senator Graham, Senator Wellstone.
Q. Bob Graham or Phil Graham?
A. Phil, the one that Coleman just beat, I guess.
Q. So when -- communications with Mr. Stumpf is what I'm trying to determine. Were they with this issue, is what I'm trying to determine?
A. Mr. Stumpf is a personal friend of mine, so I -- he -- I don't know when I, when I told him about it. Could have been when I first started out with the marina application.
Q. Okay. So you, you cannot --
A. It's --
Q. -- tell me when your communications

86

with Mr. Stumpf were?
A. No. He was concerned about developing and what -- no. I mean, just like any senator, he'd like to see the things expanding and going on in the county, you know, any, any help he could do, he was there, you know.
Q. Okay.
A. I mean, just any, any person he'd do that for.
Q. Okay. What did you indicate to Mr. Stumpf about the issues that you were having?
A. At, at what particular time?
Q. Let's talk about your earliest contact with Mr. Stumpf around the issues relating to this property.
A. It was probably when I, when I first went in to do the road and was told that I had to wait and, and get proper permits if I needed them.
Q. So you're talking about communications sometime around 1998?
A. It would be -- yeah, yes.
MR. FISH: Counsel, I'd go on record, on Exhibit 20 -- or Exhibit 8, has this

87

been disclosed in discovery?
MS. KAPPLER: It's part of the administrative record.
MR. FISH: That's not my question. You're saying this is in the administrative record?
MS. KAPPLER: Yeah, it's got the Bates stamp from the administrative record.
MR. FISH: All right.
MS. KAPPLER: Okay.
Q. (By Ms. Kappler) So you believe you first communicated with Mr. Stumpf about issues relating to this property in approximately 1998, when you were having issues about the road?
A. I think the County brought it up to him and -- whether or not I contacted him, he contacted me, I --
Q. Okay. So what did you communicate to Mr. Stumpf about these issues?
A. Well, it, it -- I guess, to me, it -- there was never a problem with anybody else doing subdivisions along that whole section of the lake. And if there was a problem, I, I, I couldn't see one, you know, I mean, -- (no

88

further response.)
Q. Okay. Now you indicated you had also had a conversation with Senator Graham and Senator Wellstone at some point?
A. Yes.
Q. And was your communication with Mr. Wellstone in person sometime around the time around 1994, after you had provided -- been provided with a copy of the National Wetlands Inventory map?
A. That I can't recall. I know it was a meeting in Grand Rapids, that he just wanted to talk to me.
Q. So tell me what you can recall about your discussion with Mr. -- or Senator Wellstone.
A. I didn't talk to him in length about anything other than that -- being a former resident of Grand Rapids. I knew the mayor and the mayor said that if I wanted to talk to him any time, he'd, he'd, he'd get me in to see him. I -- they were -- it was a big meeting, I didn't -- I just said hi and that was about it then.
Q. What, what did the meeting concern?

A. It was forest issues.

Wellstone, Hober (phonetic), Starr, Graham, they're all there on forestry-related issues.

Q. Okay. So did you have any substantive discussion with any of these individuals regarding your property along Lake of the Woods?

A. Oh, it was Mr. Graham, since he was getting involved in forest roads and whatnot, and forestry issues. And he was one of our, our people that knew things.

I was telling him about the new map you came out with prior to that, was something that you call wooded uplands, and because of a -- of the way you now called it, it now became a wooded wetlands, you know.

Q. So --

A. I --

Q. -- if I understand it correctly, you discussed the NWI map, the National Wetlands Inventory map, with --

A. I was --

Q. -- Senator Graham?

A. -- concerned -- this happened all



the way along the part of the map I had. It, it changed everything from what it had been to something new. I was concerned and so was Mr. Graham, with, with how, how people were changing things from what you construed -- since you have more power in wetlands issues than you do in wooded upland issues, that what -- this could be a problem as me being a logger. And, and he construed that -- he was going to look into it.

Q. Okay. Mr. Bailey, you outlined earlier on Exhibit 20, the property that you acquired in 1989.

What investigation, if any, did you conduct into the nature of the property that you were acquiring before acquiring it?

A. I, I bought it -- I -- like I said, for an investment. Mr. Pieper, who farms out to the lake adjacent to me, kept his lakeshore as an investment. And prior to that -- I mean, nothing along that whole lake has ever experienced any problems as far as being buildable.

Q. Okay. What, what I'm asking about is what investigation, if any, you conducted



prior to acquiring the property? And I mean that entire property that you've identified here on Exhibit 20 as the property that you acquired in 1989.

MR. FISH: I'll object, I think he just answered the question.

Q. (By Ms. Kappler) I'm asking you about your investigation.

MR. FISH: And I -- I'll object --

MS. KAPPLER: Okay.

MR. FISH: -- to the question, he just answered the question.

MS. KAPPLER: Let's read back Mr. Bailey's last answer, if you would.

(Whereupon, the answer was read back by the reporter.)

Q. (By Ms. Kappler) Okay. So in light of your last answer, it sounds like what you've described to me is what your view of things was at the time you acquired it.

What I'm trying to understand is what investigation you undertook, if any, prior to acquiring that property.

Let me be specific. Did you speak with any local or state officials regarding the



property that you were considering purchasing?

A. FSA, NRCS.

Q. FSA stands for --

A. Farm Service.

Q. Okay. And this is prior to your acquisition of this property?

A. Yes.

Q. Okay. Any other state, local or federal authorities that you spoke with in connection with the acquisition of this entire property?

A. When I was in the farm program at that time, it was -- they, they were the ones to ask.

Q. Okay.

A. Or refer you to somebody else.

Q. Okay. So those were the only officials that you spoke with related to your acquisition of this property?

A. I believe so.

Q. Okay. Did you deal with any consultants regarding this property before acquiring it?

A. No.

Q. Did you con -- communicate with any

93

real estate agents about this property before acquiring it?
A. No.
Q. Did you, did you deal only with the Lewises in connection with the acquisition of this property or were you working at all through any agents?
A. No, I just dealt with the Lewises.
Q. Okay. What, if anything, did the Lewises communicate to you about the property that you were acquiring?
A. That they, themselves, haven't developed it, because they -- it -- that's the reason it hadn't been developed, is because they didn't want it to be developed.
And, and they didn't want any neighbors down there, I guess is the big problem.
Q. Do you know how long the Lewises had owned the property they sold to you before --
A. No.
Q. -- selling it?
A. No, I don't.
Q. Do you know if the Lewises continue

94

to own any property around that area?
A. No.
Q. Okay. How old were they, approximately, when you acquired the property from them?
A. Probably in their 60s, I suppose.
Q. Okay. Did you communicate with any neighbors before acquiring this property?
A. Well, I knew a lot of people that bought land along Sandy Shores.
Q. Had you communicated with them in connection with the acquisition of this property?
A. Well, they, they, they knew that it was highly developable and really valuable land, you know, I mean.
Q. Okay. What, what I'm trying to determine is: did you, in connection with the acquisition of this property, communicate with neighbors about this property?
A. A lot of people had been trying to buy land -- buy that land from Lewises, and I just happened to be one that connected with them, --
Q. Okay.

95

A. -- they just liked me, I guess.
Q. Mr. Bailey, did you speak with any neighbors before acquiring this property? About the property you were going to acquire?
A. Yeah, I --
Q. Did you speak with Mr. Pieper?
A. No.
Q. Did you speak with any of the folks who own property further up Sandy Shores?
A. I, I -- yeah, I knew four or five people that lived there.
Q. Did you communicate with them about the property that you were acquiring?
A. I probably did.
Q. Okay.
A. I can't recall it.
Q. Okay. Do you recall anyone, other than the individuals -- the Lewises and the individuals at FSA and NRCS, that you communicated with prior to acquiring this property, in connection with your acquisition of this property?
A. I can't recall.
Q. Okay. Now let's go back to your communications with FSA and NRCS. What did you

96

discuss with them about this property?
A. Well, since some of my land was in the farm program, I mean, whether or not it qualified for CRP or just, just how it, it fell in line with that.
Q. Okay. That was an important issue for you, --
A. Yes, it was.
Q. -- to determine that the agricultural land was land that qualified for the farm program?
A. Well, if you could still farm it, yes.
Q. Okay. Did you make any inquiries regarding the forested areas?
A. Normally on their maps they, they have a habit of whether it's wetland or upland or -- this wasn't classified.
Q. I'm, I'm asking if you made any inquiries to anyone regarding the area that wasn't farmland but forested?
A. No.
Q. Did you examine any maps or drawings or other documents before acquiring this property?

A. I had the old topographical maps.
Q. Who prepared those old topos?
A. The old ones? They -- you, you buy them just through a -- what I'm trying to say, like a hunting store. I mean, they've got all the topographical maps.
Q. And what was the purpose of looking at these topographic maps?
A. What is the purpose of it?
Q. Why did you look at those topographic maps in connection with your purchase?
A. Well, I more so, on the east -- the stuff on the west side of the road, because I, I like to hunt, just to see what was back there I guess. Me, being in a wheelchair, more look at a map, I do, than being able to be on ground. Being in a wheelchair and being able to get around.
Q. So you were trying to determine if it was good hunting ground?
A. The stuff on the west side.
Q. The west side of Route 53?
A. Uh-huh.
Q. Okay.



A. And, and --
Q. What other purpose did you look at for, for -- what other purpose did you look at the topographic maps, if any?
A. Just, just how -- just to see how the land laid with the, with the adjacent ground.
Q. So you were the -- when you say -- let me, let me clarify.
Were you trying to determine what the contours of the land were, literally? What was higher?
A. Well, in our county, it doesn't make any difference there, because it -- it's relatively flat. You're, you're -- we don't have any hills or anything like that.
Q. So for what other purpose, besides hunting, were you looking at the topographic map?
A. It's usually -- for me, being a -- logging, what kind of trees are on this, mainly, I guess, is what I'm looking for.
Q. And the types of trees are detailed on the topographic map that you have?
A. If, if it looked like it was treed,



yeah, I'd go to forestry and see what kinds of trees were on it.
Q. Did you go to forestry to see what kind of trees there were?
A. I did, yeah.
Q. Okay.
So you actually went to, went to the forestry offices --
A. Uh-huh.
Q. -- and determined what trees were on the property that you were acquiring?
A. That -- that's true.
Q. What area were you thinking about logging?
A. On the west side of the road.
Q. The west side of the road that is now there?
A. Yeah -- no, no, the west side of the main road there.
Q. Of Route 53?
A. There you go.
Q. Okay.
To what extent was that area forested, as opposed to open agricultural land at the point you acquired this?



A. Relatively forested except for the home site.
Q. Okay.
A. Probably 10 acres.
Q. So you went to forestry to find --
A. Uh-huh.
Q. -- out about the trees?
A. Yeah. Up, up at the lake was predominantly aspen, and I could log that at any time, too.
Q. Okay.
MR. FISH: Counsel, I think it's probably a good time for a break, we've been going for two and a half hours here or so.
MS. KAPPLER: That's fine. If, if you don't mind, I'd like to take a couple minutes to firm up this area about who you spoke with and what you did.
And I think I'll be able to do that in five or ten minutes.
MR. FISH: You want to repeat the questions or do you have new questions?
MS. KAPPLER: I'm, I'm trying to -- I thought we had determined everyone he had talked to and everything he had done and now I

hear about forestry, so --
Q. (By Ms. Kappler) Did you go anywhere else, did you look at anything else in connection with the acquisition of this property?
You've described conversations with FSA and NRCS. You say you spoke with the Lewises about it. And you indicate that you looked at topographic maps. And then you went to forestry and investigated the specific trees that were on the property.
Did you do anything else before acquiring this property in connection with your acquisition of this property?
A. A lot of that stuff I did after I --
(Whereupon, Mr. Robert Whiting left the room.)
A. -- acquired the land.
Q. (By Ms. Kappler) Okay. I'm talking about before acquiring the land.
A. Before acquiring, I, I --
Q. So did you go to forestry before or after?
A. No, after.



Q. Okay. Did you look at the topos before or after?
A. After.
Q. Did you speak with FSA before or after?
A. Before.
Q. Okay. And what about NRCS?
A. Before.
Q. And these communications with the Lewises were before, presumably?
A. Yes.
Q. Okay.
Did you do anything else before you purchased this property, besides communicating with the Lewises, FSA and NRCS?
A. I might have looked at it from the lake, you know, this is --
From a snowmobile or from a boat, I guess, but -- (no further response.)
Q. You had dealt with wetlands issues in connection with Elk Ranch, hadn't you?
MR. FISH: Are you moving on to a different topic?
MS. KAPPLER: I am, actually.
Let's take a break.



MR. FISH: Yeah.
(Whereupon, a lunch recess was taken at 12:18 o'clock p.m. to 1:32 o'clock p.m.)
MS. KAPPLER: I'm ready to go back on the record.
Q. (By Ms. Kappler) Now, Mr. Bailey, when we were last speaking, we were discussing some of the efforts that you took in connection with the acquisition of this property.
And I, I want to clarify a couple of things, and that is, the specific substance of your discussion with FSA and NRCS.
You indicated that you wanted to verify that the land was in the farm program. Is that correct?
A. Well, I knew it was in the farm program, --
Q. Okay.
A. -- but --
Q. Was there other specific information you were trying to acquire from FSA or NRCS?
A. That -- that's just what -- I wanted to reverify it, I guess, because the,



the owner I bought it from, rented it out to, to the neighbor, Bob Pieper.
Q. So when you say: in the farm program, were you trying to determine whether it qualified for certain subsidies?
A. Well, I knew it did that, but I, I just, I just wanted to see the base, all that kind of stuff on it.
Q. See the --
A. To, to see what's been planted on it and that kind of stuff, you know, you always look and see what the history is on farmland.
Q. So did you actually visit FSA and NRCS and, and review --
A. I --
Q. -- documentation?
A. I was in the farm program, they just copy a map and send it out to you, yeah.
Q. Okay. So you had some conversation to verify that it was indeed in the farm program. And then you reviewed documents that were provided --
A. They sent --
Q. -- by FSA or NRCS, which one was it, by the way?

A. It's probably NRCS.
Q. Okay. And then you reviewed those documents to, --
A. Uh-huh.
Q. -- to -- simply to find out what the history of the agricultural area was?
A. And I, I might have done that after I bought it, too, I --
Q. Okay.
A. Whether I bought it or did it before it was -- I, I bought it for lakeshore is what I did, you know, I -- (no further response.)
Q. Okay. Now let's talk about the Elk Ranch property.
You -- just so we're clear, that -- when we talk about Elk Ranch, and when I talk about Elk Ranch, I'm referring to the area that you identified on Exhibit 21 as the fenced area.
Had you had occasion to deal with any issues involving wetlands on Elk, Elk Ranch?
A. Since when?
Q. At any point.



A. Yes.
Q. First of all, when did you acquire that property?
A. It'd been piecemeal all the way along, but I -- 1978 is when --
Q. Okay.
A. -- I first bought it.
Q. Okay. And then looking at 1978 forward, --
A. Uh-huh.
Q. -- did you have occasion to deal with any wetlands issues at all during that period?
A. I think in '86, somewheres around in that area.
Q. Okay. What happened in 1986?
A. I cleaned out the stock pond on my property.
Q. Cleaned out stock mount?
A. Stock pond.
Q. Pound.
What is that?
A. It's a pond built by FSA.
Q. Oh, I'm sorry, stock pond?
A. Stock pond.



Q. I see, okay.
A. So, so the, the fellow that I bought it from, used to raise cows on there and, --
Q. Uh-huh.
A. -- and it was all, all silted in.
So I cleaned it out.
And took some beaver dams out.
Q. Okay. So when you say you had occasion to deal with wetlands issues, what, what do you mean?
A. Well, that's the only thing I did, I -- prior to that, the neighbor was -- which is now my land, was draining his land under a farm program where they paid him 75 percent to do that.
Q. Uh-huh.
A. I, I did everything on my property on my own.
Q. Okay. When did you first have any contact with state, local or federal authorities around wetlands issues?
A. Like I said, it was eighty -- '85, '86, somewhere around in there.
Q. So what, what happened -- what,



what was the, what was the nature of your contact with these authorities during that time period?
MR. FISH: Counsel, I think he just answered that question.
MS. KAPPLER: I'm trying to determine -- he said he had contact, and what I'm trying to determine, what was the contact.
MR. FISH: We just went through the pond.
MS. KAPPLER: Okay. He described the pond.
Q. (By Ms. Kappler) What I'm trying to figure out: what was your contact with the authorities?
A. That's when I first met Mr. Koschak.
Q. Okay.
So you met Mr. Koschak?
A. Uh-huh.
Q. And what was the subject matter of your meeting with Mr. Koschak?
A. Well, I, I wanted to know why he was the expert. And even though he carried the big book and the wheel, you know, he, he said

he was from Alaska and was counting muskox before he come on my property.
But that's the first thing I, I heard about that I was in violation of something.
Q. So you were informed of a violation?
A. Uh-huh.
Possible violation.
Q. Okay. By Mr. Koschak?
A. Well, by, by the Corps, you know, --
Q. Okay.
A. -- wrote me and told me Mr. Koschak was going to come visit.
Q. Okay. And what was your understanding of the nature of the alleged violation?
A. Well, like I said, I was cleaning out my stock pond, making it larger, and in doing so, I put peat on top of peat and they said --
Q. Uh-huh.
A. -- that was a violation of whatever.



So I, I, I gave the peat to the County, who was using it to, to fill their landfill for a cover. And they, they took the peat that I had piled on the wetland. I took care of that.
Q. Okay. Did you --
A. Other, other than that, I wasn't draining anything, I was just making it so I could get around and, and cleaning what was originally done there.
Q. Okay. Did you deal with any state or local officials around issues dealing with these wetlands?
A. I had -- back then, instead of -- when you were in the farm program, you -- your contact was U.S. Fish & Wildlife, --
Q. Uh-huh.
A. -- instead of the Corps, like it is now.
I contacted the, the people from Agassiz Refuge. They were the local U.S. Fish & Wildlife people.
Q. Could you spell Agassiz?
A. A-g-i-a --
MR. FISH: I think it's:



A-g-a-s-s-i-z. I think.
A. It goes --
MS. KAPPLER: I'm sorry, what is that?
MR. FISH: I think it's: A-g-a-s-s-i-z.
MS. KAPPLER: Okay.
Q. (By Ms. Kappler) You contacted them for what purpose?
A. Well, you're supposed to contact them if you had anything to do with water, which, which I was doing with, with the pond.
And they came out. And what I wanted to do is -- was, was dike it up and, and, and make more water on my property, is what I was trying to do.
They came out and surveyed it and they said it was too flat. They said I -- by doing that, I'd, I'd kill a lot of my trees that couldn't take water. You know, I didn't, I didn't want to do that. And that wasn't my intent. I was -- so they, they left me two culverts and that was the last I seen them.
Q. Okay. Now when, when was that, dealing with the -- with Fish & Wildlife?



A. I was --
Q. That was before you dealt with the Corps?
A. That was '80s, somewheres right around, right around the same time.
They, they might have more recollection of when that was, but digging through my piles of stuff, I probably could find exactly when it was, but -- (no further response.)
Q. Okay. After this '85, '86 period, when you were dealing with the Corps and you dealt with Mr. Koschak, when was --
A. Uh-huh.
Q. -- the next time you had occasion to deal with any kind of state, local or federal officials around wetlands issues?
A. Uhm. Are you talking on -- you're talking about the elk farm now?
Q. We can -- Elk Ranch or, or any other property.
A. It'll get pretty confusing, because the two are totally separate, but you --
The Elk Ranch, when I started doing the fence, that's, --

Q. Okay.
A. -- that's my --
Q. Okay. When was that?
A. Uhm. I would say somewheres '96, '97, I think.
Q. Okay. That's on the --
A. I'm --
Q. -- Elk Ranch?
A. I'm guessing now on that. I, I could look back and see when I -- because I've got records of when I bought the elk fence and all that, but --
Q. Okay. And what was the issue related to that?
A. Well, issue is, none of the neighbors wanted me to put up the elk fence, so they, in turn, tried everything they could, which finally went to the wetlands people, to see if I, if I could put a fence across the wetlands.
Q. And the Corps was involved --
A. In the, in the --
Q. -- or the EPA? Who was it?
A. Well, the -- it first was the DNR --



Q. Uh-huh.
A. -- and the County.
They didn't have any jurisdiction over fences. So they referred them off to the, the Corps, which, there again, they didn't have anything to do with fences, but they had to do, if I was draining something.
Q. Yeah.
A. Well, everything -- wasn't draining anything, but it ultimately come down to if, when I augered my posts into the ground, the material that came out of the auger, the EPA said was a pollutant.
Q. What is an auger?
A. It's, it's the drill to make a hole in the ground so you can put your post. It --
Q. Uh-huh.
A. So I pulled all my posts out, leveled it all off again and pushed them down with a backhoe.
Well, they, they didn't like that at all, you know, they didn't leave any pollutants in the ground, but I put up my fence.
Q. What was the pollutant that was



unearthed?
A. Just as I said, the auger material that came out of the auger, the sand.
Q. Oh, I see, okay.
A. They got so fussy, they didn't want me to drive my Cat on it because it would pick up sand and the sand would fall off the tracks into, into the wetlands, what they call a pollutant.
Q. Okay. So that was your next dealing around wetlands issues on the Elk Ranch?
A. Uh-huh.
Q. What was your next dealing, going back to your first dealings with Mr. Koschak and the Corps back in the mid-'80s, what was your next dealing with the Corps around wetlands issues as to any property?
A. It was just under the road issue.
Q. Okay.
A. Road up at the lake.
Q. What about the harbor permit?
A. Well, I, I kept extending the, the thing through the, the Minnesota DNR.
Q. Uh-huh.



A. And they did a, a jetty for the Zippel Bay area and, and they found out by doing that jetty, that they had the problem with longshore drift, which meant that the sand built up behind it.
So when I finally decided I was going to do my, my permit, they said: well, you'd have a problem with longshore drift, so we're going to deny your permit.
And that -- that's what they did at that, that point then.
Q. Okay.
A. Then the, the Corps come out with this new thing saying that my land was now wooded wetland instead of wooded uplands and it's been in havoc ever since.
Q. Okay. So between 1985 and the time when you were seeking to obtain a permit from, from the Corps for, for the construction of this, this harbor, --
(Whereupon, Mr. Robert Whiting re-entered the room.)
Q. (By Ms. Kappler) -- did you have any dealings with the Corps or any state or local authorities around wetlands issues?

117

A. The, the own -- well, now, are we talking elk fence? Talking --
Q. Either, either property, any property. I'm just trying to figure out what your experience dealing with wetlands issues was in dealing with authorities.
A. Okay. Let's, let's -- on the elk farm, I'm, I'm a logger who has to go under the Minnesota logger education program, have to be qualified or certified to log.
We got to go to classes on forest roads, how to build forest roads. This is where I got involved with Mr. Graham. Because he was helping define forest roads, because they're supposed to be exempt in our particular area.
The way you build the road, is take the spoil from adjacent to the road, because there's no gravel in our area, build your base out of that.
And, and what you have is a lateral ditch between where you start the road and where you end the road. And that's what I did on my property.
Q. When you say: your property, what

118

property --
A. I'll say the --
Q. -- are you referring to?
A. -- elk fence, or Elk Ranch, go from one to the next, I guess. And that's still in dispute.
Q. Okay.
A. Ultimately, they said my road was okay and I had to put ditch plugs here and there, which didn't, didn't make any, any difference to, to the flow of the water or anything.
Q. Okay. What was the time period when you were involved dealing with -- first, dealing with the forest road issue?
A. Well, --
'97, I would think somewheres right in there.
Q. Okay. So what I'm trying to find out is if between 1985, when you were first dealing with the Corps around --
A. Uh-huh.
Q. -- wetlands issues on Elk Ranch, and 1990, I believe, when you apply for a permit for the harbor, --

119

A. Uh-huh.
Q. -- on what became the, the Sunny Beach area, did you have any dealings with the state, local or federal authorities around wetlands issues?
A. (No verbal response.)
Q. Just for that time period.
A. I, I, I don't recall any.
Q. Okay.
Now we talked a little bit earlier about your discussions with Scott Seeley at Taylor Investments.
Those were before the property was formally subdivided, weren't they?
A. Yes.
Q. Was it your understanding that Mr. Seeley was investigating the possibility of subdividing the property himself?
A. That -- that's what he, he came to me --
Q. Okay.
A. -- for.
Q. Did you have any discussions with anyone else about the purchase of the property before it had actually been platted as a

120

subdivision?
A. No.
Q. When did you decide to develop the property with home sites?
A. I guess I thought I was going to develop it from the, the day I asked for the marina permit, you know, as far as getting a marina, it was always under the understanding that the marina was on the far south end of the property, which, which is only accessible if you built a road in there, which -- and the County knew I was going to build houses in there. And they always were after how I was going to lay it out.
And this, this Seeley group was looking at putting PDUs, I guess, planned development unit, which is like town houses in there.
And I, I was thinking of building a house for myself up there at one time, so I, I didn't, really didn't want a whole bunch of people up there.
So ultimately we decided I, I was going to plat it at one time, which meant I didn't have to plot it. And the acreage from

the main road, all the way out to the lake, was 6 acres on each one of those lots.

And the, the County talked me into platting versus plotting it, and that's what I ended up doing.

Q. Let me find what I'm looking for.

I meant to inventory these documents, sorry.

Okay.

Let me show you what we marked as Exhibit 22. And direct your attention, in particular, to the area that's marked as Sandy Shores Drive.

You constructed that road, did you not?

A. I had a contractor construct it.

Q. Who's the contractor?

A. Well, Mark La Valla, but I don't remember what his, his -- name of his firm is. I think it's just La Valla Sand & Gravel, I think.

Q. La Valla?

A. La Valla.

Q. Could you spell that again?

A. L-a V-a-l-l-a.



Q. Okay. And I'm sorry, the name of his firm is La Valla Sand & Gravel?

A. I believe so.

Q. Okay. How much did it cost you to construct that road?

A. If I added it all up, just over $25,000.

Q. Did you pay for all the materials?

A. Yes.

Q. And labor?

A. Yes.

Q. Did you pay for that from savings or did you borrow against any property in order to pay for that construction?

A. Well, depended on what I did. I, I mean, I -- where I got it from -- I mean, I paid him in full.

Q. I'm, I'm asking where -- was it money you had in savings or was it money that you borrowed against -- you, you borrowed from something?

A. I, I can't remember. I, I know that's one of the reasons I sold the property, the, the Jeff Dahl, so I'd have money to do the road.



So I --

Q. Okay.

A. -- whether or not that was to pay off another loan, I, I don't know at the present --

Q. Okay.

A. -- at that time.

Q. When did you commence that construction?

A. I think it was in '98, I believe.

Q. Do you recall approximately when?

A. No, I don't. I -- we were going to start in the spring and I, I went to the County, went to, went to SWCD, and asked them what I had, had to get. And they didn't know. And nobody else had anything along that whole road, so he said start. So I started.

And then we, we grubbed the road out and they told us we had to get Corps permits, which I didn't have to do before.

Q. Okay. So --

A. We roughed in a road, is what we did.

Q. Okay. So you started it in 1998.

Sometime after you started that



property -- started that construction, but before you concluded it, did you have occasion to meet with members of the Corps -- representatives of the Corps?

A. Oh, yeah, everybody was out there.

Q. Okay. And that was before the project was concluded, wasn't it?

A. Yes.

Q. And what, what did they say to you?

A. That I -- that I'd have to get -- apply for an after-the-fact permit.

Q. What else did they tell you?

A. They didn't really tell me a whole lot. That it could be wetlands, that it had to be delineated, and that's what the whole panel of experts got together to, to do.

Q. Okay. Well, you knew there was wetlands out there?

A. (No verbal response.)

Q. Right?

A. Not, not the whole thing is a wetland, no.

Q. Well, you knew that in the NWI map that you had been given in 1993, a certain area of that lakeshore property had been --

A. I --
Q. -- identified as wetlands, right?
A. I disputed that from the time I got the thing.
Q. But you knew that the Corps believed that it was wetlands?
A. I didn't know that, I mean, they, they gave me that with, with U.S. Fish & Wildlife, stating it was now, versus it wasn't before.
Q. Okay. You were told to stop work on that, that road, weren't you?
A. Yes, I did.
Q. But you finished it?
A. I -- they told me I could go back and finish it, yes.
Q. Who told you you could go back and finish it?
A. People down at SWCD.
Q. Who?
A. He works up at the Pro -- Zippel Bay Park.
THE DEPONENT: Remember, I was telling you his name?
MR. FISH: Yeah.



THE DEPONENT: Got a funny --
MR. FISH: You've said it many times.
I can't recall.
A. I -- it might pop --
Q. (By Ms. Kappler) Okay.
A. -- into my head, but I don't have it right now.
Q. Did anybody from the Corps ever suggest to you that it was okay for you to finish that road?
A. Well, what, what they got back is my after-the-fact permit application and through phone calls, I was calling them all the time, see when I could go in and finish it.
And they had the Public Notice, which was the last thing before it was okayed and --
Q. Okay. Well, hold on, I'm, I'm not there yet.
We're, we're back in 1998.
A. Yeah.
Q. You started the construction?
A. I --
Q. Sometime, sometime before you



finished the construction, you were visited by Corps representatives?
A. Yeah.
Q. You were told to stop work?
A. Yep.
Q. And sometime after that, you finished the work?
A. No, I, I only finished the work in '99.
Q. Before -- well, --
Let me, let me show you what we've marked as Exhibit 9.
Could you identify that document?
A. Yep.
Q. What is this document?
A. It's, it's the road for the -- up at the Sandy Shores.
Q. Okay. And the date of that application is 6-17-98?
A. Yep.
Q. Okay. And you signed that --
MS. KAPPLER: Withdraw that question.
Q. (By Ms. Kappler) To whom did you submit this permit application?



A. As I said, all the things that I do are through the Farm Service, so I -- it was either through NRCS or -- most of that stuff were not through SWCD.
Q. This, this didn't go to the Farm Service, did it?
A. No, but they -- that's, that's where they have all the forms they help you fill out. And that's what they did on that one, --
Q. Okay.
A. -- helped me fill it out.
Q. But it's your belief that you submitted this to a state authority?
A. They're a local government unit that dispenses those things off to the, the other members of their -- whatever team they are for waters.
Q. And the government unit, I think you submitted this one to, was the SWCD?
A. It's, it's the people that helped me fill it out, yes.
Q. Okay. The Soil & Water Conservation --
A. Yes.

Q. -- District.
Okay. Now, had you, at this point, obtained any estimates from Mr. La Valla about the costs?
A. Yes.
Q. Okay. And what had he indicated to you?
A. That it'd be somewheres around $25,000.
Q. Okay. And you had actually commenced construction at the point that you put this application in, hadn't you?
A. I'm not certain.
Q. Okay. Let's, let's take a look at this.
You indicate that the project purpose is: construct road for access, hyphen, logging?
A. Uh-huh.
Q. Was this a logging road?
A. We, we took trees out.
Q. Okay.
A. It could have been a logging road, that's the way they told me to fill it out.
Q. What's, what's your understanding



of what a logging road is?
A. Logging is a road that accesses something for logging timber.
Q. Okay. So what were you accessing for the purpose of logging timber?
A. Well, I can still log my property if I want to.
Q. I'm, I'm -- I, --
A. I --
Q. -- I understand that. What, what I'm trying to determine is what, what were you attempting to access for the purpose of logging?
A. Aspen.
Q. The -- were you talking about the property to either side of the road?
A. Both sides of the road. They're getting too big and they're falling down.
Q. Okay.
A. And that's what we did, we cleaned a lot of that stuff out of there.
Q. Okay. So you said: construct road for access. So --
A. Yeah.
Q. -- is -- did this mean it was an



access road for access --
A. Both --
Q. -- for logging?
A. Both purposes.
Q. Access to what?
A. Access to the property. Had no -- the only other road was on, on the south end and the north end.
Q. So looking at what we marked as Exhibit 22. There's a road that runs along parcel 14, is there not?
A. It's the road that shows on your map.
Q. And there's also a road down next to parcel number 1?
A. Yes, it is.
Q. These are the, the properties that are owned by you and the Fish Family Trust respectively, right?
A. Yes.
Q. Okay. Now, on this form that you filled out on June 17, 1998, you indicated that the property -- the project cost was 8 to $10,000.
What was the basis for that?



MR. FISH: Maybe you could show him the Exhibit so he could --
MS. KAPPLER: It's right here.
MR. FISH: Show him the cost on the Exhibit.
A. I guess it was just an estimate, I --
It says: rough in of road; not complete road. I suppose that's the reason. It's -- down here I have a: rough in of road. Which is just --
MR. FISH: Let the record indicate he's referencing language on the permit application.
A. Right, right here, it says: rough in of road.
Q. (By Ms. Kappler) So are you saying that the, the 8 to $10,000 was purely for roughing in?
A. That's what I'm guessing it was, yes.
Q. And not for paving or anything else?
A. Well, no.
Q. Gravel or --

133

A. No, no.
Q. What, what did you mean by roughing in?
A. Just a, a -- you, you take the trees out, the -- you grub the, grub the stumps out so you have a, a basis for a road.
Q. Okay.
Mr. Bailey, that road is part of the property that you claim was taken by The United States, is it not?
A. Yes.
Q. What action of The United States do you claim results in the taking of your property?
MR. FISH: I'll object, that calls for a legal conclusion.
If you understand the case law determining what constitutes the moment of a taking and you feel comfortable answering, answering a legal conclusion, go ahead. If you don't understand --
A. I don't. I don't understand it.
Q. (By Ms. Kappler) Do you believe that the, that the decision of the Corps of Engineers denying your permit application

134

resulted in a taking of your property?
A. In, in -- the extent where -- yes, I do.
Q. And that decision was in June of 2001, was it not?
A. I'm not sure a date.
Q. Mr. Bailey, were you the owner of that road in June of 2001?
MR. FISH: I'll object to the form of the question. Define owner. As it applies to real estate law. Clarify, please, Counsel.
Q. (By Ms. Kappler) Did you own a fee interest in that road?
A. It's, it's under dispute, I guess I, I --
Q. It's a yes or no question.
MR. FISH: Answer if you can.
A. Well, I, I -- I am not sure if I -- there's an easement there or if the County owns the road, the only -- (no further response.)
Q. (By Ms. Kappler) On -- in June of 2001, did that road belong to you?
MR. FISH: Asked and --
A. I'll say --
MR. FISH: -- answered, Counsel.

135

A. I'll have to say no.
Q. (By Ms. Kappler) No.
Now, looking at the various parcels here, starting with parcel number 2. Exhibit 33. Which, which is the subject of, of a deed in Exhibit 33. Did you own parcels 2 and 3 --
MR. FISH: Again, Counsel, --
Q. (By Ms. Kappler) -- in June of 2001?
MR. FISH: -- I'm going to object to the form of the question. Define your interpretation of own.
Q. (By Ms. Kappler) Were you an owner of that property?
MR. FISH: Whether a vendor/vendee, a reverter, contingency contract? What ownership interests are you referring to, Counsel?
MS. KAPPLER: First of all, vendor/vendee does not define -- let's put it this way.
Q. (By Ms. Kappler) Had, had you sold the property to the Thomsons prior to that date?
A. It's really hard for me, unless I'm

136

looking at those -- you're talking 14 different individuals. And what if it's a contract for deed or if they, they purchased it, there's -- makes a difference whether or not they owned it or I owned it.
Q. Well, they still owed you money?
A. Well, if they still owed me money, then I owned it. In most cases, they quit making payments, so if I wanted to, I could take the lots back, I imagine.
Q. Well, let's, let's talk about that.
Why did they stop making payments?
First of all, who stopped making payments? Which, which owners?
THE DEPONENT: Can I have that list that I have --
MR. FISH: Yeah, if you want to.
Refresh your memory.
No, I don't have it, I sent it back to the office to get copied.
Q. (By Ms. Kappler) Well, let me run through the list.
You sold Lots 4, 5 and 6 to the Wolfs, did you not?
A. Yes, I did.

Q. Did they stop making payments?
A. No, I bought those lots back.
Q. So they didn't stop making payments?
A. They purchased those lots, couldn't get a building permit and I bought them back from them.
Q. How much did you pay for them?
A. Even though they, they wanted me to write up something where they'd get more than what they paid for it, I, I offered what they paid me for them.
Q. What, what did they pay for them?
A. I think it was $75,000.
Q. Did you pay interest?
A. I'd need to look at their contract, but I think they, they paid in a period of time where, where it wasn't a year. Between the purchase agreement and when they paid for, for the lots.
Q. Okay. So they'd paid in their entirety --
A. Uh-huh.
Q. -- for the lots.
And, in fact, you transferred a



warranty deed to them --
A. Uh-huh.
Q. -- in June of '99.
And then in 2001, you repurchased the property --
A. Yes.
Q. -- for what they paid?
A. Yes.
Q. You were in a lawsuit with the Wolfs, were you not?
A. Well, I don't know if it was a lawsuit.
Q. They sued you, didn't they?
A. They were going to.
Q. Is it your testimony that you were not involved in a lawsuit --
A. They were --
Q. -- with them?
A. They were also going to sue the County.
Q. Did they sue you?
A. I don't know quite if they sued me or not.
THE DEPONENT: Did they? Did they, Al, or --



MR. FISH: Yeah, he doesn't understand the, the word sue. There was --
Q. (By Ms. Kappler) Well, you know that in this case, for instance, we have a document that has the name of the court -- I'm looking at Exhibit 3, name of party and a legal action number?
A. Yeah.
Q. Did the Wolfs bring a legal action against you? Did your name appear on a document with the name of a court --
A. We never went to court or anything.
Q. -- and parties.
You never went to court?
A. No.
Q. Going to court is what I mean by a lawsuit.
So it's your testimony that you were not involved in any way in a lawsuit with the Wolfs?
MR. FISH: Counsel, wait a minute. You define lawsuit as going to court, is that --
MS. KAPPLER: He, he just said: we never went to court.



MR. FISH: You said: going to court. You said the words: going to court.
MS. KAPPLER: I'm, I'm using Mr. Bailey's words.
MR. FISH: Okay. Please clarify if you're paraphrasing him or giving a definition.
Q. (By Ms. Kappler) Let, let me be clear.
I underst -- understood, when I showed you the pleading that we've got marked as Exhibit 3, that you, you equated that with going to court. Quotes around going to court. Is that correct?
A. I don't believe -- I never went to court.
Q. You mean, physically didn't walk into a courtroom?
A. I don't -- I can't recall that, no.
Q. Okay. Leaving aside whether you physically entered a courtroom, --
A. Uh-huh.
Q. -- what I'm trying to find out: were legal documents filed? Was a lawsuit filed by the Wolfs against you?
MR. FISH: You know, Counsel, I'm

141

going to object. First of all, Minnesota does not require the filing of any lawsuits to commence a lawsuit. So you might be asking legal questions that are beyond his knowledge. I'm doing that more for your benefit, Mr. -- in the substance of the answer.

MS. KAPPLER: Maybe we can go off the record.

(Whereupon, there was discussion off the record.)

MS. KAPPLER: Let me go back on the record and let me clarify that.

Q. (By Ms. Kappler) Were you served by a Complaint -- with a Complaint by the Wolfs?

A. I, I -- I'm -- I can't recall, I guess. I, I, I know we negotiated at some point and we -- purchasing the lots back, because they couldn't build on it and they wanted to build a house.

Q. Okay. Who, who told them they couldn't build?

A. The county planner.

Same guy that helped -- I mean, that did the platting.

142

Q. Did the Wolfs accuse you of anything?

A. Probably could have accused me of anything. I never met the Wolfs, I never talked to them.

Q. You do not know the Wolfs?

A. Huh-uh.

The lots were sold by North Border.

Q. By the way, did any of the realty companies that you identified before as being involved in listing the property or, or selling the property, obtain a commission in the sale?

A. They all did.

Q. And what was the commission?

A. Either 6 or 7 percent.

Q. Do you know if they ever included photographs of the property or a description of the property in any kind of published brochure?

A. That, that I don't know, I --

Q. Do you know if a photograph or description of the property appeared in any flyer that was posted?

A. I've, I've never seen one.

Q. Do you know what the vehicle was for providing the public with information about

143

the, the sale of the property?

A. That was -- that area there is one of the last places on the lake that has any, any lots that could be developed, so anybody coming up here looking for a -- lake lots, they'd, they'd probably have a big list of people. That's, that's how come they sold so fast.

Q. Was there a sign posted on the property?

A. No.

Q. I'm missing part of my Exhibits.

So --

Turning our attention to the property parcel 11, that was acquired by the Perssons, that property was reconveyed to -- was --

MS. KAPPLER: Strike that.

Q. (By Ms. Kappler) Sorry about that.

Okay. Let me ask you about the property that was conveyed to a Mr. Gowdy, Lot 10. At some point thereafter, did Mr. Gowdy reconvey this property to you?

A. Yes, he did.

Q. And that reconveyance is the

144

subject of what we premarked as Exhibit 46, is it not?

A. Yeah, correct.

Q. Okay. Could you tell me whether you are aware of any discussions that Mr. Gowdy had with anyone regarding the circumstances leading to this reconveyance?

A. He went up to Gary Lockner, the county planner, to see if he could get a building permit.

Q. And what is your understanding of what transpired in this discussion with --

A. They --

Q. -- Mr. Lockner?

A. They wouldn't give him a building permit.

Q. Did you ever have any discussions with Mr. Gowdy about, about this property?

A. He just wanted to know if I'd buy it back.

Q. Did he threaten you with any kind of legal action?

A. Huh-uh, no.

Q. How much did you pay for it?

A. How much did he pay for it?

Q. How much did you pay for it.
A. I just paid him back what he, he paid me.
It's on a contract for deed.
Q. Apart from the Wolfs and Mr. Gowdy, have you had to repurchase property from anyone?
A. No.
Q. Let me turn your attention to what we've premarked as Exhibit 47. This is a conveyance from your ex-wife to you. Listing interests in numerous properties.
You indicated, I believe, that your divorce from your wife was effective in 2003. Is that correct?
A. I believe so.
Q. Okay. And this, this conveyance actually occurred in 2002.
A. Oh, then, then it should go to two -- well, --
Q. Am I correct, that this conveyance was in 2002?
A. Then, then I'm, I'm in error, then.
Q. You, you say you're in error. Do you mean that you were --



A. It should probably --
Q. -- incorrect about the date of your divorce?
A. It should be 2002.
Q. Okay. Was this conveyance from your wife to you tied to any agreement in connection with your divorce?
A. Yes.
Q. And could you tell me about the terms of that agreement, please?
MR. FISH: With respect to real estate, Counsel?
MS. KAPPLER: With respect to, with respect to any matters.
Q. (By Ms. Kappler) Let's, let's deal with the disposition of any property, real and personal.
A. What does that have to do with the, the lake lots?
Q. The question is simply to determine what the terms of the divorce were. So we can understand what the backdrop was for the conveyance of this property.
MR. FISH: Well, Counsel, this is a divorce, just so we don't have any objections,



maybe you could be more specific on questions. Recite the general nature of all agreements in the divorce, some that may or may not be relevant? Maybe you could focus in on what you're so interested in.
MS. KAPPLER: I think the problem we have here is that the consideration for this conveyance is undoubtedly swept within the entire terms of the divorce agreement.
Q. (By Ms. Kappler) So what I'm trying to determine, essentially, is -- and I'll be very pointed about it: what did she get? You got, virtually, her interest in every property in this area, did you not?
A. Uh-huh.
Q. What did she get?
MR. FISH: Well, hold on, Counsel, are you trying to ask Mr. Bailey if he bought her interest in some property or whether some property was given -- was titled in her name as the -- of the -- as a result of some agreement, some property was --
MS. KAPPLER: Let me, let me back up.
Q. (By Ms. Kappler) Attachment one



lists numerous parcels.
Did your wife retain an interest in any property in this area in northern Minnesota?
A. No.
Q. Did she convey her interests as a joint owner of these properties --
A. Yes.
Q. -- to you?
A. You have --
Q. Entirely?
A. Yeah, you have it there in front of you.
Q. So what I'm trying to determine is: did she retain an interest in any property?
A. No.
Q. Okay. What -- she didn't do this for nothing. Am I right?
MR. FISH: Do what, Counsel? Please clarify.
Q. (By Ms. Kappler) What did she get in connection with the divorce decree that made her willing to give you her, her interests as a joint owner in many, many different parcels?
MR. FISH: Counsel, I'm going to

object to the form of that question, you're assuming that she -- Mr. Bailey traded something for that property. Your, your -- the, the question you're asking is argumentative now.

MS. KAPPLER: Well, that's --

MR. FISH: If, if you want to know what she received as a result of the divorce, maybe you should --

MS. KAPPLER: That was my first question. That's why I was trying to ask it broadly.

MR. FISH: You understand my objection. You're, you're implying that Mr. Bailey paid Mrs. Bailey for her interest in property.

MS. KAPPLER: What I'm trying to understand is what the nature and the terms of the divorce were that would lead someone to convey their interests as a joint owner in countless property interests.

Q. (By Ms. Kappler) So what I'm -- what -- my question is: what were the terms of the divorce? Back to my original question.

MR. FISH: So you're simply asking:



what did she receive?

Q. (By Ms. Kappler) Well, what did she receive? We can put it that way.

A. Well, yeah, I don't know why you need to know that, but I, I mean, dollars -- in dollars --

Q. Yes.

A. -- ten years from now? I mean, --

Q. Yes, what did she receive?

A. (No verbal response.)

Q. It goes to the value of this property. That's the point of these questions.

MR. FISH: Oh, I'll object to that then, Counsel. If you want a copy of a divorce decree, that's a public record. There is no tie-in between the real estate and the division of any cash assets the parties held.

MS. KAPPLER: Okay.

A. That's between me and her and how the whole divorce developed and got resolved, I guess.

Q. (By Ms. Kappler) But --

A. I mean, --

Q. -- this is, this is a perfectly legitimate line of inquiry.



What I'm trying to determine is what the value of these assets were. And that information is, is something that can be gleaned or discerned from the totality of the divorce --

MR. FISH: Well, Counsel, --

Q. (By Ms. Kappler) -- agreement.

MR. FISH: -- how about this, Counsel, how about we stipulate, we'll, we'll go to the district courthouse, we'll obtain a copy of the divorce decree, which outlines what Mr. Bailey received and what Ms. Bailey received, so he doesn't have to guess --

MS. KAPPLER: Okay.

MR. FISH: -- at the exact nature of any, you know, cash that he received, cash that she received and land that he received. And I think --

MS. KAPPLER: Okay.

MR. FISH: -- that's about --

MS. KAPPLER: That is fine, I will accept that.

Q. (By Ms. Kappler) But let me ask this question: do you have any other agreements with your wife regarding any future



proceeds that you might receive in connection with any of the properties --

A. No.

Q. -- listed here?

A. No.

Q. So, for instance, if you were to recover --

A. Any --

Q. -- any funds in this -- let me finish the question so that we don't confuse --

A. Okay.

Q. -- the reporter.

If you were to recover any interests in this legal action from The United States, do you have any agreement with your ex-wife that she would be able to receive a portion of any proceeds?

A. No, I don't.

Q. Okay. Has she given up her right to receive any proceeds in connection with any of these properties?

A. Both, both the right for that and the right for paying the, the bills for getting up to that point.

Q. Okay.

Did you -- was the property that was the subject of the deeds that cover parcels 2 through 14, the subject of --
MS. KAPPLER: Well, strike that.
Q. (By Ms. Kappler) Were, were the parcels listed in any particular listing price?
A. I think they were, I think they were pretty much all the same.
Q. Do you know what the listing price was?
A. I mean, it, it pretty much was the price that they all paid for their lots. There was no movement up or down on them for --
Q. Everybody paid $25,000 a lot, didn't they?
A. Yes.
Q. That, that was consistent across all of the lots?
A. Yeah. I mean, I'd have to look at all of them, but I'm sure that's what it was.
Q. And you believe that is the price that they were offered for sale at?
A. Uh-huh.
Q. You're aware that some of these individuals put some fill on their property,



are you not?
A. I'm, I'm aware that they bought the culvert from the County and made access to their property, yes.
Q. You're aware that they attempted to obtain permits from the Corps for certain activities on these properties?
A. I've been to county board meetings where they approached the board to get a variance and been -- they don't know what to tell them, I guess that's, that's where I've been.
I don't know if they approached the Corps, as far as getting any permits.
Q. Are you aware of any steps that any of these individuals have taken to restore their property?
A. No.
Q. What logging, if any, did you do on the property as we've defined it, the property that is -- includes what you've described as Sandy Shores Drive in the platted areas?
A. Took out about ten loads of wood out of there. And it's -- kind of left some of the ash trees and cut down the big poplar trees



before they blew down. And there's still, there's still some blown down in there.
Q. It's your understanding that you're permitted to do logging on wetlands, is it not?
A. Yeah, I mean, --
Q. Your answer is: yes?
A. Yes.
Q. Mr. Bailey, you have brought a legal action against the state and local authorities related to this property, have you not?
A. Yes.
Q. And it's your position that they took your property, is it not?
A. Well, the panel of experts was eight different agencies, I guess you could blame each one of them, they're all going to be together.
Q. You're seeking to be compensated for the value of this property by the state and local authorities, are you not?
A. I believe we have a lawsuit in that, in that regard, yes.
Q. You said you'd taken about ten truckloads of, of logs off of the property.



First of all, was the logging done on the access road?
A. Log -- well, all the trees were taken off the access road.
Q. Okay. And what was the value of the logs that you cleared there?
A. '98 prices, probably between 5 and $600 a truckload.
Q. You've been involved in logging for many, many years, have you not?
A. Yes, I have.
Q. Okay. You have a lot of experience with pricing --
A. Yes, --
Q. -- of, --
A. -- I do.
Q. -- of logs.
Could you give me a sense of how the pricing has changed from the mid-'80s, to the current day?
MR. FISH: What type of log, Counsel?
MS. KAPPLER: Let me clarify that.
Q. (By Ms. Kappler) Is there a, a big difference in --

A. Species.
Q. -- the price of logs based on the species?
A. Yes.
Q. What kinds of logs are the most valuable?
A. Probably anything you can make a saw bolt out of, or saw --
Q. What species would that include?
A. That, that can be any kind of species on, on saw bolts.
Q. Saw bolt?
A. Anything you can saw lumber out of.
Q. Uh-huh.
That would be the most valuable?
A. Yes.
Q. Okay.
A. And --
Q. And --
A. -- pine, pine probably be the most, aspen being the last.
Q. Aspen being the least valuable, --
A. Least.
Q. -- pine being the most?
A. Uh-huh.



Q. Is there value in timber that you can't make a saw bolt out of?
A. Well, that's -- I predominantly cut wood for pulp, and that, that goes to paper mills or to chipboard mills --
Q. Okay.
A. -- to make chipboard.
Q. And the trees in the area that you've identified as, as the, the property for purposes of this action, what kind of trees are there?
A. There's a little ash, most -- mostly aspen and balm of Gilead.
Q. And in terms of value, you put pine at the top and aspen at the bottom. Where, where does ash fit in there?
A. If you can find a market for it, it's, it's upwards around pine, but --
Q. Uh-huh.
A. -- you, you need a market for it.
Q. And what have the other one -- you mentioned ba -- balm --
A. Uh-huh.
Q. Balm --
A. Balm of Gilead.



Q. And, and in terms of its value, how does it fit into the continuum between pine and aspen?
A. It goes in as a -- an aspen species, but if you log it by itself, it's, it's worth less than what the aspen is. It's the lowest one on the totem pole there.
Q. What kinds of trees were among the trees that you cleared?
A. That's what I said was most -- mostly aspen.
Balm of Gilead, a little ash, birch.
Q. What about birch, where does that fit in?
A. Birch, --
(Whereupon, Ms. Rita E. Fish-Whitlock entered the room.)
A. -- since the mills aren't using it, now it falls in about where balm is.
Q. (By Ms. Kappler) You're saying the mills -- that's used for pulp?
A. Yes, that's for pulp.
Q. Okay.
(Whereupon, Ms. Rita E.



Fish-Whitlock left the room.)
Q. (By Ms. Kappler) So have you done any logging on any other area of the property that we -- that you acquired in that transaction back in 1989?
A. No.
Q. You've done logging in the area that we described as the Elk Ranch property, --
A. Yes.
Q. -- haven't you.
What kinds of trees are there?
A. Predominantly aspen, again.
A lot of pine.
Q. Okay. The -- you indicated that in '98 the value of those ten truckloads was somewhere between 500 and 600 --
A. Yes.
Q. -- a truckload; is that correct.
What'd values for these kind of species look like ten years before?
A. Ten years before --
Q. '98.
A. -- '98?
Q. Yes.
A. In '88.

The -- well, when we first came up here, poplar, just, just to give you stumpage prices, probably anywheres from 50 cents to $2.
Q. In terms of truckloads; let's --
A. Truckloads.
Q. -- work with the same volume.
A. Well, --
Probably --
MR. FISH: I'm going --
A. It's really hard --
MR. FISH: -- to --
Clarify your question, Counsel. Are you asking the value that is paid at market or are you, are you asking the value that's paid a landowner for the stump -- stumpage? Or are you asking for --
MS. KAPPLER: I -- I am -- I'm trying to work in the same way that Mr. Bailey described this, being 500 and $600 a truckload. I, I don't know --
A. That is --
MS. KAPPLER: -- if it's a market price.
A. No, that's delivered to the mill.
Q. (By Ms. Kappler) Okay.



A. That includes hauling and logging and everything there.
Q. So using that as our gauge here, --
A. Uh-huh.
Q. -- what, what did values look like by the truckload back in '88?
A. (No verbal response.)
Q. The same kind of mix of trees.
A. Probably, I don't know, I would say around 400 or something, somewheres in that -- stumpage is what's gone up so much.
Q. What do you mean by: stumpage?
A. What you pay for a tree on a stump before it's physically cut.
Just, just to give you the same light, those same trees now are, are -- where they were worth $600, the, the stumpage is probably worth that in today's price.
Q. I want to make sure I understand what you mean by stumpage. You're talking about the area below the cut?
A. No, no, no, I'm talking about the standing tree.
Q. So just buying the land with the trees -- or buying the timber rights?



A. Yep. Just buying the timber rights has gone from -- back in early '80s -- or '86, around there, there, the DNR was actually logging trees up here and letting them fall down and regrow. They're at 50 cents a cord. Now, they're up to 40, $50 a cord for that same tree that was worth 50 cents on a stump, that's how much timber stumpage has gone up.
Q. Here you own the whole property, not just the timber rights?
A. Right.
Q. So you have the benefit of the stumpage, the, the logs themselves, everything?
A. That's what I do. I'm -- my property, I planted half a million trees, you know, to let them grow.
Q. So the stumpage right -- I'm assuming that when you give me the, the value for -- let me, let me rephrase that question.
We're going to set aside the issue of the stumpage and the, the, the timber rights. Just in terms of the marketability of the logs, how have values changed from the mid to late '80s to the current time?
A. (No verbal response.)



Q. Has it been a straight line up?
A. Almost vertical.
Q. Really?
A. I mean, --
Q. Much more valuable now?
A. Yes, yes.
Q. Is that something you foresaw back in the mid-'80s?
A. Nobody did. People, people up here were clearing land and, and bulldozing it up and burning it, actually. Now, the, the wood on it is worth more than what their land is worth today.
Q. Do you have an understanding of why there's been this dramatic shift in the market?
A. Just, just the world market and Minnesota has the highest timber prices in the whole world.
It's, it's really a unique deal. I talk -- that's what I do, is broker wood.
But I, I talk to all these guys and they, they can't keep up. Some of these mills are going to fold because they can't keep up with the high stumpage price.
Q. Because they can't afford to, to

lease men -- or timber rights or to acquire them?

A. Well, just, just other parts of the world are cheaper for, for doing the same thing we're doing here. So that, that mix is going to go somewheres else if, if we keep spending what we're doing for stumpage. I mean, it --

We're in a place now where there's -- you can sell all the board you make, but as soon as that changes, then, then the mills would start going back into the red, I guess.

COURT REPORTER: Can we go off the record for a second?

MS. KAPPLER: Sure.

COURT REPORTER: I just need to change paper.

MS. KAPPLER: Okay, that's fine. I'm, I'm going to be done shortly, I think.

COURT REPORTER: Thank you.

Q. (By Ms. Kappler) Mr. Bailey, in connection with your application for an after-the-fact permit, Exhibit 9, you prepared a wetland replacement plan application, did you not?

A. With the help of SWCD again.



Q. And that was one -- such wetland plan replacement application is the one that we've premarked as Exhibit 10. Isn't that correct?

A. I filled that out with the help of Les Lemm.

Q. And who is Mr. Lemm?

A. He was the, the new guy in the SWCD.

Q. This wetland replacement plan application was submitted on 5-19-99.

A. Uh-huh.

Q. And that's almost a year after your application was submitted. Is that correct?

A. That could be.

Q. What, what dealings, if any, did you have with state, federal and local officials relating to your application during that year?

A. Like I said, when we first went in to do the road, they kicked us out. Then had after-the-fact permits, which they said I could go back in. And it was all to the point of being signed off and I had to do 2.91 acres of mitigating on my property. Which I started.



And during that whole process, the County told me what else I had to do to make the road come into County standards so they could accept it as a county road. They, they outlined what I had to do, what it would cost.

And they said if I didn't do it, that they would do it. But if I did it, I had to bond for that amount, which I did, at the bank.

Q. Yet, you acquired a surety bond or had a letter of credit?

A. No, I had to actually go to the bank and put $10,000 aside, the bond, for -- in case they had to make the road up to the county specs.

I, I did everything they told me to do. The County accepted the road as theirs, they released my bond.

Mr. Lockner stated that since they now own the road, that they'd take care of the 2.91 acres under their wetland bank credits that they had.

I, I quit doing anything up at my property for that 2.91 acres.

Everybody got in a big rue, saying



that the Lake of the Woods couldn't do that. And essentially it's been in litigation ever since.

Q. During that period, did the Corps ask you to provide any documentation in support of your application?

A. I, I don't believe so.

Q. Were you dealing directly with the Corps or were you dealing with them through the County?

A. Dealing through, through the County.

Q. Did you have an understanding of certain documentations -- documentation that you needed to submit in advance of the issuance of a Public Notice?

A. I believe we did all that, because the Public Notice was in the paper and -- (no further response.)

Q. What I'm asking is: did you have some understanding of what documentation you needed to submit in support of your application before a Public Notice could issue?

A. Not, not prior to talking to SWCD, or -- it, it wasn't -- Les Lemm was way after

169

the fact. The person prior to him is the one that we did the after-the-fact permit with.
Q. Okay. And who was that?
A. That's the person I was trying to --
Q. Walter Leu?
A. No, no, no. Walter Leu is the county engineer.
Q. Okay.
A. SWCD person before Les Lemm.
Q. My, my question, though, was -- is really separate from that.
A. Okay.
Q. I'm trying to determine if you had an understanding, before the Public -- that -- before the Public Notice could issue, you needed to provide certain documentation?
A. I guess I got that information from, from SWCD.
Q. Okay. You got what information?
A. What we had, what we had to submit for after-the-fact.
Q. Okay. What did you believe or understand you needed to submit in support of your application?

170

A. Just a detailed -- what we were going to do with the property, I guess I -- (no further response.)
Q. While the -- your application was pending, did you have dealings with the Minnesota Pollution Control Agency?
A. Like I said, there was like eight or nine different agencies that we had to go through to, to get the okay from, and, and it -- started that out with the marina.
Q. You knew you had to obtain a 401 certification from the Minnesota Pollution Control Agency, did you not?
A. I -- there again, I -- whatever the County said I had to do is what, what I did.
Q. You're familiar with what a 401 certification is?
A. Can I look at that one?
Q. Let me show you what's been premarked as Exhibit 16, it's a letter from the MPCA to Char Hauger at the CO-R, at the Corps, December of 1999.
A. They, they did give me a permit.
Q. Okay. You, you understood that you

171

needed a 401 certification in order to develop this property?
A. I'm saying I did whatever the County told me to do and I --
Q. Okay. I'm not asking what the County said, I'm asking whether you understood a 401 certification was required in order to develop this property?
A. I'm not sure if I did or not.
Q. In August, 2000, wetland delineation was done of your property. Is that correct?
A. I'm not sure of the timeline, but it was at one point.
Q. Were you around when that happened?
A. I -- well, --
I -- the, the crew of whatever it was -- I mean, I was out there more than once.
Q. And following that delineation, was provided to the MPCA, wasn't it?
A. I, I believe so.
Q. Okay. Showing you what was premarked as Exhibit 18. Do you have an understanding of what this letter is?
A. Well, I, I know at the County, at

172

one time, I was thinking there was -- it was defined, 150-foot setback. And their argument over what was -- who was right, who was wrong, I just stayed out of it.
Q. You understand that the MPCA revoked the 401 certification it had previously issued, do you not?
A. Yep.
Q. And you understand that the Corps is not in a position to issue a 404 permit without a -- either a 401 certification or some sort of waiver by the MPCA?
A. (No verbal response.)
Q. Do you understand that?
A. No, I don't.
Q. In connection with the development of the property you claim was taken by The United States, do you assign a value to the road separate from the parcels?
A. I, I think it'd have to be in conjunction with the parcels.
Q. Well, each of these parcels was sold for a certain amount, wasn't it?
A. That's true. You have --
Q. Okay.

A. -- to have access to it.
Q. Each one was sold for $25,000, wasn't it?
A. With access.
Q. Okay. Well, --
A. Take the road out, there wouldn't be an access to it.
Q. Okay.
A. You --
Q. What I'm trying to determine is: is there a separate value for that road?
A. There has --
MR. FISH: Object -- I'm going to object, Counsel. You -- at your demand, we've bifurcated the issues in this case. And I think you've, you've characterized the discovery to date as threshold issues.
And I've asked numerous Interrogatories and questions relating to road valuations experts and the like, all which have gone unresponded to as being threshold issues, premature.
So I think if we're going to be discussing threshold issues, you know, we should discuss when that's going to be done by



the Army Corps of Engineers, as well as Mr. Bailey.
MS. KAPPLER: Okay. Well, the issue bears on the economic impact and also bears on the, the, the parcel as it's described. And, and that, that Mr. Bailey claims was taken.
Q. (By Ms. Kappler) So it's my understanding, Mr. Bailey, that you claim this entire piece of property was taken from you by The United States. Is that correct?
MR. FISH: And, again, Counsel, you're looking at Exhibit No. 22?
MS. KAPPLER: I am.
Q. (By Ms. Kappler) I'm looking at Exhibit 22.
MR. FISH: And you're referring to all, in your -- by say -- the word: this, you're referring to all ends of Exhibit 22?
MS. KAPPLER: I'm referring to what, what we understand the -- to be the entire platted subdivision.
Q. (By Ms. Kappler) Is that correct?
A. Well, along with the adjacent land, too, I mean, there, there --



Q. Let me show you Exhibit 20.
Is it your testimony that you're claiming The United States took all of the land that we've -- that you've outlined at the top and tied to Exhibit 23?
A. No.
Q. Could you identify the specific land that you claim The United States took when it denied you the after-the-fact permit?
A. Same -- the, the land less -- it is 56 acres of field, just what I put down on there.
Q. Okay. So you're talking about the -- some of the land that's on the other side of Sandy Shores Drive?
MR. FISH: By: other, Counsel, you're meaning west?
MS. KAPPLER: Yes, west.
A. Yes.
Q. (By Ms. Kappler) That property wasn't acquired by any of these individuals who purchased the parcels, was it?
A. No, but I could sell it.
If, if --
Q. The individuals didn't purchase



Sandy Shores Drive?
A. They purchased with the knowledge access would be to that lot.
Q. Now, Mr. Bailey, have you contacted the Realtors that you identified for me for documents related to this action and as requested by the defendant?
A. What documents are those?
Q. Have you sought to obtain documents relating to the sale of the property? Listing agreements, any of the sort?
A. I have all their purchase agreements.
Q. I'm not talking about -- when you say: purchase agreements, you mean the documents that we've marked as Exhibits today, or do you mean something different?
MR. FISH: Counsel, this is more of a legal question.
I advised you prior to the hearing that we had not only the recorded documents that we would -- we call contract for deeds, but also what's -- what are called purchase agreements, which we've been able to assemble, we will provide you.

177

Q. (By Ms. Kappler) Have you obtained any documents in the nature of notes or records of communications with these real estate agents?
A. No.
Q. Have you sought to obtain such documents?
A. No.
MS. KAPPLER: Give me two minutes, I'd just like to chat with my clients and --
MR. FISH: Uh-huh.
MS. KAPPLER: -- I'll, I'll be ready to wrap up.
(Whereupon, a one-minute recess was taken.)
(Whereupon, Mr. Jeffrey Koschak is no longer present.)
MS. KAPPLER: Okay.
Well, with that, I'm ready to conclude.
Subject to Mr. Fish's cross-examination.
MR. FISH: I'm not going to put anything on the record today with Mr. Bailey.
MS. KAPPLER: Okay.

178

COURT REPORTER: Read and sign?
MR. FISH: Sure.
COURT REPORTER: Thank you.
(Whereupon, the deposition was concluded at 2:59 o'clock p.m.)

179

I, GARY BAILEY, do hereby certify that the foregoing 178 pages contain a full, true and correct transcript of the testimony as given by me at the aforesaid time and place with corrections, if any, as noted on the attached sheet or sheets.

Gary Bailey

Dated this day of , 2004.

180

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA )
) ss
COUNTY OF POLK )

I, JOY FILIPSKI, a Notary Public within and for the County of Polk and State of Minnesota, do hereby certify:

That prior to being examined the afore-named witness was by me sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition, consisting of 178 pages of typewritten materials, was taken down by me in Stenotype at the time and place therein named, and was thereafter reduced to typewriting under my direction.

I further certify that I am neither related to any of the parties or counsel nor interested in this matter directly or indirectly.

WITNESS my hand and seal this day of

Joy Filipski
Notary Public
Polk County, Minnesota

My Commission expires January 31, 2005.