STATE OF MINNESOTA DISTRICT COURT

COUNTY OF LAKE OF THE WOODS NINTH JUDICIAL DISTRICT

CASE TYPE: Inverse Condemnation
Negligent Misrepresentation
Breach of Contract

Gary Bailey,

Plaintiff,

vs.

Minnesota Pollution Control Agency, an agency of the State of Minnesota, Lake of the Woods County, a political subdivision of the State of Minnesota, and Department of Natural Resources, an agency of the State of Minnesota,

Defendants.

Court File No.: C5-04-209
The Honorable Charles H. LeDuc, II

**DEFENDANT MINNESOTA POLLUTION CONTROL AGENCY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Defendant Minnesota Pollution Control Agency (MPCA) submits this memorandum of law in support of its motion to dismiss, or alternatively, motion for summary judgment. The MPCA moves this Court to dismiss Plaintiff Gary Bailey's claims for estoppel and inverse condemnation based on MPCA's revocation of a section 401 certification.

Bailey's estoppel claims should be dismissed because the Complaint fails to state a claim on which relief can be granted. Bailey bases his estoppel claim on an unfounded legal theory that county platting preempts all other state agency regulatory decisions; the claim is not based on any MPCA affirmative misconduct. This Court also lacks subject matter jurisdiction to estopp MPCA's revocation decision because only the Court of Appeals can review MPCA's final

decision. Bailey's estoppel claim is also barred by res judicata because it is a claim previously litigated in Bailey's 2003 contested case hearing.

Bailey's taking claim should be dismissed on several bases. First, the taking claim should be dismissed because Bailey did not bring the inverse condemnation claim through a petition for mandamus. Second, this Court does not have subject matter jurisdiction because only the Court of Appeals can determine if a takings occurred as a result of MPCA's quasi-judicial revocation decision. Third, this Court lacks subject matter jurisdiction because the claim is not ripe. It is well settled law in Minnesota that a regulatory takings claim is not ripe for adjudication unless the property owner has sought a variance or submitted alternative proposals for the use of the property to the decision maker. In this case, Bailey has failed to seek any variances and he submitted only one application to the MPCA; consequently, there has been no final MPCA determination regarding the application of MPCA regulations to the reasonable uses of the Bailey property. Fourth, MPCA's decision was based on a public-harm prevention regulatory program and Bailey's project was causing MPCA rule violations and nuisances. Accordingly, no taking occurred because MPCA was using its police powers to stop and prevent nuisances.

Finally, Bailey's claims should be dismissed under the doctrine of unclean hands. Bailey has repeatedly failed to disclose relevant information regarding his project and failed to comply with certification conditions. Accordingly, the MPCA should not be forced to compensate Bailey for the consequences of his wrongful actions and his failures to act.

**DOCUMENTS APPRISING THE RECORD**

The following documents comprise the record on which MPCA's motion is made:

1. The affidavits and exhibits of Lawrence Zdon and Richard P. Cool submitted with this Memorandum of Law; and

2. All of the pleadings, submittals and orders that are a part of the Court's files in this matter.

## STANDARD OF REVIEW

MPCA moves this Court for an order dismissing Bailey's claims against MPCA on various legal and equitable bases, including Bailey's failure to state a claim upon which relief can be granted. On a motion to dismiss, the only question before the Court is whether the complaint states a legally sufficient claim for relief. *Elzie v. Commissioner of Public Safety*, 298 N.W.2d 29, 32 (Minn. 1980). It is immaterial to the Court's deliberations whether or not the plaintiff can prove the facts alleged. *Id.*

MPCA's motion for dismissal of Bailey's estoppel claim, in part, and of Bailey's taking claim is supported through MPCA affidavits that present facts outside Bailey's Complaint. Accordingly, the MPCA's motion should be treated as a motion for summary judgment. Minn. R. Civ. P. 12.02 (2007). Summary judgment is appropriate under Rule 56.03 of the Minnesota Rules of Civil Procedure when it is "show[n] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995). Summary judgment is mandatory when the record reflects a complete lack of proof of an essential element of the plaintiff's claim. *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997).

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Bailey's Property And Sunny Beach.

The property that Bailey claims has been taken by the MPCA is an approximate 13.2 acre parcel located in Lake of the Woods County, identified as Sunny Beach ("Sunny Beach" or "the Property"). Complaint, ¶¶ 1 and 5; Gary Bailey Deposition, Dec. 13, 2005 at 114-15, Ex. 19

("Bailey 12/05") (deposition and Ex. 19 attached as Exs. 1 and 2 respectively to Cool Aff.). The Property has been subdivided into 14 lots and includes a road ("the Road"). Complaint, ¶¶ 4-5 and 7-8; Bailey 12/05, Ex. 19. Bailey had the Road constructed in 1998. Gary Bailey Deposition, Dec. 1, 2004 at 51-52, 121, 123 ("Bailey 12/04") (deposition attached as Ex. 6 to Cool Aff.).

The lots on the Property have different land owners. *See* Complaint, ¶ 11. For example, Lots 7, 8 and 11 are owned in fee simple by landowners other than Bailey, ownership having been transferred by Bailey by warranty deed to these other landowners. Complaint, ¶ 11; Bailey 12/05 at 107-08. Lots 2 and 3 are owned by the Thomsons under a contract for deed. Complaint, ¶ 11; Bailey 12/05 at 104. Lot 14 is owned by the Fish Family Lake Lot Trust (April Stavig, trustee) under a contract for deed. Complaint, ¶ 11; Bailey 12/05 at 110. Bailey had the lots sold at a price of $25,000 per lot. Bailey 12/05 at 102.

Sunny Beach is only a small portion of a much larger area originally purchased by Bailey in June, 1989. In June, 1989, Bailey purchased 206 contiguous acres from the Lewises that included Sunny Beach. Bailey 12/05 at 22-23. Bailey's purchase included three 40-acre parcels (i.e. 120 acres) on the west side of County Highway 53 and an 86 acre parcel on the east side of County Highway 53, contiguous to the 120 acres.[1] *Id.* at 22-23, Exs. 20 and 21 (Exs. 20-21 attached as Exs. 3-4 to Cool Aff.). Bailey eventually sold the three 40-acres parcels (i.e. 120 acres) on the west side of County Highway 53 to Dahl. *Id.* at 25-26, Ex. 21.

The 86 acre parcel east of County Highway 53 consists of a 56-acre farm field and a 30-acre wooded parcel, with the Road nearly bisecting the 30-acre wooded area. Bailey 12/04

[1] Bailey indicated the purchase price was approximately $130,000 - $140,000. Bailey 12/05 at 117.

at 53-56; Bailey 12/05 at 23, 26, 115, Exs. 10 and 20 (Exs. 10 and 20 attached as Exs. 5 and 3 respectively to Cool Aff.). Bailey established the Road in the 30-acre wooded area for access and logging. Bailey 12/04 at 129-31; Bailey 12/05 at 45. Bailey has already removed approximately ten (10) truckloads of logs from the wooded parcel at an estimated price of $500-$600 a truckload.[2] *Id.* at 154-56. The 56-acre farm field was historically used to raise small grains (e.g. oats, barley, wheat). Bailey 12/05 at 89-90. Bailey has the field enrolled in a Farm Service Agency set-aside program. *Id.* at 93-94. However, the field is still farmable land. Bailey 12/04 at 55. Bailey has also raised hay (e.g. beef cattle forage) on the field and sold the hay to persons who did the harvesting. Bailey 12/05 at 94-95; Bailey 12/04 at 55-56. Bailey keeps the field worked so that he can plant something on it if he wanted to. Gary Bailey Deposition, Nov. 17, 2006 at 78-79 ("Bailey 11/06") (attached as Ex. 7 to Cool Aff.).

The 86 acre parcel has recreational uses, in addition to small lot development, logging and farming uses. In the winter, the parcel is used for snowmobiling and for lake access for ice fishing, and in the summer, for lake and beach access. Bailey 11/06 at 78-79 and 133-34. The parcel also provides wild game habitat for sharp-tail grouse and the parcel is located in a very productive big buck area for deer hunters. Bailey 12/05 at 27 and 131.

Bailey has also conceived development plans for low density residential uses for the 86 acre parcel that entail approximate 5-acre plots running in an east-west direction from County Highway 53 to the lake. Bailey 12/05 at 74, 96-97. According to Bailey, more people are interested in bigger plots of land with lake access rather than small parcels. *Id.* at 97. Under this

[2] Bailey indicated that aspen was the primary tree in the wooded area, trees that could be logged at any time. Bailey 12/04 at 100.

low density development option, Bailey anticipates upwards of seven (7) plots could be developed. *Id.* at 97.

Finally, Bailey could easily sell the non-Sunny Beach portion of the 86 acre parcel (i.e. approx. 73 acres) if he wanted to sell. Bailey 12/05 at 130-31. Bailey said this remaining 71-73 acre parcel would be in demand, in part because it is close to the lake, its adjacent to the road (County Highway 53) and it has access to electricity. *Id.* at 131-32. Bailey says this land could sell for $800-$1000 per acre. *Id.* at 131; Bailey 11/06 at 15.

## II. LEGAL AND REGULATORY BACKGROUND.

Minnesota's State Water Pollution Control Act is a comprehensive statute designed to prevent pollution and to abate existing pollution of waters of the state, including discharges that create nuisance conditions or render the waters actually or potentially harmful or detrimental to designated uses. *See, e.g.*, Minn. Stat. §§ 115.01, subd. 13; 115.03, subd. 1(a) - 1(c) and 115.42 (2006). MPCA's pollution prevention authorities address potential polluting conditions resulting from human activity that could alter the chemical, physical and biological integrity of waters, including wetlands. Minn. Stat. § 115.01, subds. 13 and 22 (2006). To accomplish these duties, MPCA has permit and certification programs designed to impose appropriate, site-specific conditions on regulated projects to ensure compliance with all applicable state and federal environmental laws, including surface and ground water quality standards. *See, e.g.*, Minn. Stat. § 115.07 (2006); Minn. R. 7001.0150, 7001.1030, subp. 1 and 7001.1470 (2005).

The MPCA has adopted comprehensive surface and ground water quality standards to protect surface waters and ground water from pollution. These standards include a prohibition on the discharge of untreated sewage into any surface waters and a prohibition on nuisance conditions caused by any sewage discharges. Minn. R. 7050.0210, subps. 1-2 (2005). Regarding

individual sewage treatment systems (ISTSs), MPCA's standards require that an ISTS not discharge or seep sewage or sewage tank effluent to the ground surface or to surface waters. Minn. R. 7080.0065, subp. 4 (2005). Sewage discharges are also prohibited to the unsaturated zone (i.e. the zone between the land surface and the water table). Minn. R. 7060.0600, subp. 2 (2005). Sewage is also prohibited from being deposited in such place, manner or quantity as to actually or potentially preclude or limit the use of the underground water as a potable water supply. Minn. R. 7060.0600, subp. 2 (2005).

MPCA's water quality standards for wetlands include a nondegradation rule to protect wetlands from the impacts caused by physical alterations. Minn. R. 7050.0185, subp. 9 and 7050.0186 (2005). This rule incorporates a wetland mitigative sequence to avoid and minimize wetland impacts from regulated projects and if needed, requires compensatory mitigation for unavoidable impacts. Minn. R. 7050.0186, subps. 2-6 (2005).

The MPCA's Section 401 certificate program at issue here has its regulatory basis in the federal Clean Water Act ("CWA"). The CWA is also a comprehensive water quality statute designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve these goals, the CWA establishes distinct roles for federal and state governments. For example, the CWA prohibits the discharge of any pollutant into U.S. waters unless authorized by a federal permit or specific exception under the CWA. *See* 33 U.S.C. §§ 1311(a), 1362(12). The states, however, have the primary responsibility for enforcing the applicable water quality standards on intrastate waters. 33 U.S.C. § 1319(a).

The CWA's Section 401 requires states to provide a water quality certification before a federal permit or license can be issued for activities that may result in a pollutant discharge to surface waters. 33 U.S.C. § 1341(a). Section 401 allows the state to impose limitations,

monitoring requirements and other terms and conditions in the certificate to assure that the applicant will comply with the state's water quality standards and with any other appropriate requirement of state law. 33 U.S.C. § 1341(d). The certification's limitations, requirements, terms and conditions then become conditions on the applicable federal permit or license. *Id.*

MPCA has procedural rules to implement its Section 401 certification program. Minn. R. 7001.1400-.1470 (2005). Under these rules, MPCA can issue a Section 401 certification only if "there is a reasonable assurance that the activity will be conducted in a manner that will not violate applicable water quality standards." Minn. R. 7001.1470, subp. 1.C. (2005). MPCA is also authorized to revoke a Section 401 certificate if such revocation is supported by any of the findings in Minn. R. 7001.0140, subp. 2. Minn. R. 7001.1450, subp. 1.B. (2005).

The federal regulatory program that provides the backdrop for MPCA's Section 401 decision in this case is the U.S. Army Corps of Engineers ("COE") CWA Section 404 permit program. Section 404 authorizes the COE to issue permits for the discharges of dredged and fill material into U.S. waters, including wetlands. 33 U.S.C. § 1344(a). COE and U.S. Environmental Protection Agency ("EPA") regulations govern the processing and issuance procedures of Section 404 permits. *See* 33 C.F.R. pts. 320-25; 40 C.F.R. pt. 230. In the COE's evaluation of a Section 404 permit application, the COE conducts a "public interest" review that considers the full public interest by balancing the favorable impacts against the detrimental impacts of the project. 33 C.F.R. § 320.1(a).

The COE can also consider an application for an *after-the-fact* Section 404 permit where the dredge or fill discharge has already occurred. 33 C.F.R. § 326.3(e). The COE follows a similar public interest review and decision procedure for after-the-fact permit applications as it does for pre-discharge permit applications, including the solicitation of public comments on the

project proposal, a public interest review that includes an analysis of whether the discharge complies with the wetland guidelines, and a determination of whether the fill material will be allowed to remain in place. *See* 33 C.F.R. § 326.3(e)(1)-(2). After completing the after-the-fact application review and analysis, COE may issue or deny the permit. *Id.* The COE's permit decision is subject to judicial review under the federal Administrative Procedure Act.

## III. BAILEY'S ROAD CONSTRUCTION AND SECTION 401 CERTIFICATION PROCESS.

Approximately five years before Bailey constructed the Road, the COE notified Bailey that the Property contained wetlands. In August, 1993, the COE sent a letter to Bailey notifying him that his lakeshore property included wetlands, and that the COE had become aware of Bailey's intentions to place fill or dredged material from the marina project into this wetland area to develop residential lots. Bailey 12/04 at 75-76, Depo. Ex. 5 (Depo. Ex. 5 attached as Ex. 8 to Cool Aff.). Bailey received the COE letter. *Id.* at 75. In this letter, the COE explained that if Bailey intended to place fill or dredged material into the wetland area for residential lot development, he needed another COE Section 404 permit for this activity. Bailey 12/04, Ex. 5.

Bailey, by his contractor, initiated Road construction in the spring of 1998. Bailey 12/04 at 121-23. During the Road's construction, COE staff inspected the Property and notified Bailey he should stop work on the Road until the COE's Section 404 permit violations were cleared up. *Id.* at 124-25; Koschak Test., MPCA Contested Case Hearing ("CCH") Tr. 354 (CCH Transcript is Ex. 6 to the Zdon Aff.). Bailey was also apprised that he would have to apply for a COE Section 404 after-the-fact permit. Bailey 12/04 at 124.

Bailey completed the Section 404 permit application in June, 1998. Bailey 12/04 at 126-27; Depo. Ex. 9 (Local-State-Federal Project Notification Form) (Depo. Ex. 9 attached as Ex. 9 to Cool Aff.). Bailey's application described the project as "construct road for access -

logging." Cool Aff., Ex. 9. Bailey completed the Road construction in 1999. Bailey 12/04 at 127.

In late October 1998, Bailey submitted the Sunny Beach plat application to Lake of the Woods County. Bailey 12/05 at 55-57. In December, 1998, the Lake of the Woods County Board ("the County") approved Bailey's plat application for Sunny Beach. Complaint, ¶ 5. Bailey began selling lots in December, 1998. *See, e.g.* Bailey 12/04 at 40, 45. By June, 1999, Bailey had sold the 13 lots.[3] Bailey 12/04 at 66.

The MPCA first became aware of Bailey's Sunny Beach project when MPCA received the COE's June 24, 1999 public notice regarding Bailey's after-the-fact Section 404 permit application. Zdon Test., CCH Tr. 31-32. The COE's public notice was treated by MPCA as the section 401 certificate application. *Id.* at 32.

The COE's public notice included a Sunny Beach plat map indicating the presence of a Type 7 wetland in the platted area. Zdon Test., CCH Tr. 34, Hrg. Ex. 2 (attached as Ex. 7 to Zdon Aff.). There was no indication of any floodplain on the plat map included in the public notice. Zdon Test., CCH Tr. 34. The MPCA's initial concerns about the Bailey project centered on whether acceptable, compliant septic systems (i.e. individual sewage treatment systems or ISTS) could be installed on the Property in compliance with MPCA's ISTS rules, Minn. R. chapter 7080 and the extent of wetland impact from lot development. *Id.*, CCH Tr. 36-37.

After an initial review of the Bailey project and public notice, the MPCA issued a request for information ("RFI") on July 23, 1999 to Bailey requesting additional information regarding septic system compliance and wetland impacts. Zdon Test., CCH Tr. 42-44. MPCA's RFI

---

[3] Bailey retained ownership of Lot 1. *See* Complaint, ¶ 7.

indicated that drainfield septic systems must not occur in wetlands or be placed in fill (such as a mound system) over a wetland in order for the system to be in conformance with Minn. R. chapter 7080, the ISTS rules. *Id.*, Hrg. Ex. 6 (attached as Ex. 8 to Zdon Aff.). The RFI expressly requested that Bailey should respond by indicating how compliance with Minn. R. chapter 7080 for septic systems for the individual lots will be demonstrated. *Id.*, Hrg. Ex. 6, p. 2. Bailey did not respond to the MPCA's RFI on the ISTS issue. Zdon Test., CCH Tr. 50, 94-95, 147.[4]

The MPCA's RFI also requested that Bailey submit a layout of the entire project showing existing wetlands on the Road site and existing wetlands on the lot sites and submit an evaluation of the potential wetland impacts from lot development as a means to determine the project's total wetland impact. *Id.*, Hrg. Ex. 6, p. 2. Bailey did not respond to the MPCA's RFI on these two wetland issues. Zdon Test., CCH Tr. 50, 94-95, 147.

MPCA staff continued its section 401 analysis of the Bailey project with informational exchanges with COE and County staff, including MPCA's receipt of a letter from the County regarding a September 29, 1999 Property inspection. *See, e.g.* Zdon Test., CCH Tr. 51-54, 61-68, 71-74 and Hrg. Ex. 10 (attached as Ex. 10 to Zdon Aff.). The COE staff indicated that the project area appeared to be all Type 7 wetland but that COE-proposed ditch filling would eliminate some wetland impacts. *Id.*, CCH Tr. 53, 74-75.

Subsequent MPCA evaluations focused on the issues related to whether there existed unsaturated soils within a 100-foot band of the Property's lakeshore and the adequacy of space for proper ISTS siting, and on wetland impacts including reducing the impacts to just 1.58 acres

[4] Bailey responded to MPCA's RFI by sending a letter to the COE about MPCA's reference to trout waters. Zdon Test., CCH Tr. 50, Hrg. Ex. 8 (attached as Ex. 9 to Zdon Aff.). This was the only Bailey response MPCA received to its RFI. *Id.*, CCH Tr. 50.

of impact by filling in the road ditches. Zdon Test., CCH Tr. 76-77. Based on these evaluations, the MPCA issued its Section 401 Certification on December 17, 1999. *Id.*, CCH Tr. 77, Hrg. Ex. 12 (attached as Ex. 11 to Zdon Aff.). The MPCA certification was conditioned, in part, on the implementation of the wetland mitigation plan that had been previously approved by the County's Soil and Water Conservation District ("SWCD"). *Id.*, CCH Tr. 76-77, Hr. Ex. 12.

In July, 2000, the County requested Bailey to conduct a wetland delineation of the Property, including a determination of the type, extent and location of wetlands. Hrg. Ex. 27 (attached as Ex. 23 to Zdon Aff.). Bailey did not conduct the requested wetland delineation. Lemm Test., CCH Tr. 176-79.

Approximately 8 months after MPCA issued the certification, MPCA was notified that the COE was going to perform a wetland delineation of the Property in late August 2000. Zdon Test., CCH Tr. 79-80. MPCA was later informed the delineation had occurred, was apprised of some of the delineation results, and received e-mails and a fax from the COE regarding the COE's delineation results. *Id.*, CCH Tr. 80-81, 89-93, Hrg. Exs. 13, 14, 15 (attached as Exs. 12, 13 and 14 to Zdon Aff.). Steve Eggers, the COE's wetland expert, determined that upwards of 99% of the project site was wetlands prior to the unauthorized fills. Hrg. Ex. 14, p. 2 (Sept. 13, 2000 e-mail). Eggers also determined the existence of an upland island (i.e. non-wetland) on Lots 3 and 4. *Id.* Eggers determined that the only non-wetland (excluding recent fill areas) was on the Property's south end caused by the lateral draining effect of the ditch. *Id.* MPCA staff confirmed that the COE's delineation demonstrated there was not a 100-foot band of upland near the shoreline. Zdon Test., CCH Tr. 95.

After further evaluation and deliberation regarding the new information resulting from the COE delineation, the MPCA determined there had been a lack of full disclosure regarding the

Sunny Beach project and that the COE's new information showed that the wetlands and wetland impacts were more extensive than previously identified. Zdon Test., CCH Tr. 96. In addition, MPCA determined that if the project proceeded, it created potential endangerment to public health, including nuisance conditions, because septic systems installed in saturated wetland soils would fail and discharge untreated sewage to the ground surface, the lake, and groundwater. *Id.*, CCH Tr. 97. MPCA determined that failing septic systems could result in untreated sewage contaminating groundwater and nearby wells, creating health problems for drinking water in that area. *Id.*, CCH Tr. 97. MPCA determined that due to the uncertainty of any potential Bailey response to the COE's delineation information, a modification of the certification was not possible but that if Bailey reapplied for another certificate, the Bailey's responses to the COE's delineation information could be evaluated at that time. *Id.*, CCH Tr. 98-99.

Subsequent to these evaluations, MPCA revoked the Section 401 certification on October 4, 2000. Zdon Test., CCH Tr. 94-100, Hrg. Ex. 16 (attached as Ex. 15 to Zdon Aff.). The MPCA revocation noted that the lots had no upland (i.e. non-wetland) available on which to locate ISTSs based on the COE delineation. Hrg. Ex. 16, p. 2. The MPCA revocation also noted the Road project had 6.55 acres of wetland impacts. *Id.* This 6.55 acre impact is in comparison to the 2.91 acres of wetland impact initially identified in the COE's July 1999 public notice. Zdon Aff., Hrg. Ex. 2. The MPCA revocation expressly notified Bailey that if he chose to reapply for another certificate based on the updated COE wetland delineation, he should provide a total wetland impacts evaluation and information on how compliance with the ISTS rules, Minn. R. chapter 7080, for the individual lots was going to be achieved. *Id.*

Bailey never responded to MPCA's October 2000 letter and never provided information on the ISTS and wetland issues raised in the letter. Zdon Test., CCH Tr. 101-02.

Subsequent to the October 2000 revocation, the MPCA received new, relevant information about the Property that had not been previously divulged to MPCA by Bailey. First, the MPCA found out that Bailey's SWCD-approved mitigation plan had expired and that the required mitigation was not completed. Zdon Test., CCH Tr. 102. Failure to implement the mitigation plan results in violations of MPCA water quality standards. *Id.*, CCH Tr. 104-07. Second, the MPCA obtained information that portions of the Property were in a floodplain which raised further MPCA concerns because siting ISTSs in a floodplain increased the opportunity for ISTS failure, with resulting endangerment to the public health. *Id.*, CCH Tr. 103-04.

**IV. BAILEY'S FIRST FEDERAL TAKINGS LAWSUIT.**

In March 2002, Bailey sued the COE, MPCA, the County and the Minnesota Department of Natural Resources (MDNR) in federal court. *See Bailey v. United States Army Corps of Engineers, et al.*, Civ. No. 02-639 (RHK/RLE); Cool Aff., Ex. 13 (Complaint). In that case, Bailey claimed that MPCA's revocation decision was a takings and that pursuit of MPCA administrative remedies was futile. Complaint, ¶¶ 47, 50.

In MPCA's motion to dismiss, the MPCA argued the takings claim was not ripe because Bailey had failed to meet the two ripeness requirements in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the *final decision* requirement and the *state's-takings exhaustion* requirement. With regard to the *Williamson* final decision requirement, the MPCA pointed out that MPCA's October 2000 revocation expressly stated that Bailey could reapply for another certification and that the MPCA revocation identified the types of information Bailey needed to supply with any future application. Cool Aff., Ex. 15 at 10. MPCA also pointed out that Bailey had not availed himself of the MPCA variance

procedures, an option that was still available to Bailey in order to address the *Williamson* final decision requirement. Cool Aff., Ex. 14 at 15-16; Ex. 15 at 10.

The federal court dismissed Bailey's taking claim against the MPCA. Cool Aff., Ex. 16 at 25, 31. Bailey then initiated this action against the MPCA in August 2004. *See* Complaint. Bailey has also initiated a takings lawsuit in August 2002 against the United States in the federal court of claims. *See Gary Bailey v. United States*, Civ. No. 02-1078L (Fed. Ct. Cl.).

## V. BAILEY'S CONTESTED CASE HEARING.

Bailey requested a contested case hearing on the MPCA decision to revoke Bailey's section 401 certification. Hrg. Exs. 18 and 19 (attached as Exs. 16 and 17 to Zdon Aff.). MPCA responded to Bailey's hearing request with a request for further information and at the same time, notified Bailey again of his opportunity to submit another certificate application and of the ISTS/wetland informational needs that were identified in MPCA's October 2000 revocation decision. Hrg. Ex. 20, p. 2 (attached as Ex. 18 to Zdon Aff.). The MPCA letter also notified Bailey about MPCA's variance option and the variance procedures. *Id.* In responding to MPCA's request for hearing-related information, Bailey stated:

> We believe the main issue to be addressed in the hearing is that MPCA did not have the power to revoke the 401 certification given the local government units [sic] decision to plat the property as residential and decision to allow septic systems pursuant to experiment variances. *In essence according to law, the State of Minnesota is bound by the previous decision of the local government unit.*

Hrg. Ex. 21 (attached as Ex. 19 to Zdon Aff.)(emphasis added).

Mr. Fish identified this same estoppel argument in his opening statement at the MPCA's contested case hearing (CCH) to the Administrative Law Judge:

> As far as the issues as I see them here today, Your Honor, first of all is whether the revocation by the MPCA, whether they even have the authority and power to revoke this based on the local government unit's approval of the plat, the ownership of this property by multiple entities, their previous approval of the plat

> - of the - project, Your Honor, the availability of sewer systems onsite as determined by a plan by the local government officials.
>
> Fish Test., CCH Tr. 15.

Bailey was notified a CCH was scheduled. Hrg. Ex. 22 (attached as Ex. 20 to Zdon Aff).

At the hearing, the SWCD district manager testified that the SWCD-approved wetland mitigation plan had not been implemented and that the plan was no longer valid. Lemm Test., CCH Tr. 170-76, Hrg. Exs. 25-26 (attached as Exs. 21-22 to Zdon Aff.). Steve Eggers, the COE's senior ecologist, testified extensively about the COE's wetland delineation, including testimony regarding issues addressed in the COE's decisional documents that Eggers assisted in preparation.[5] *See, e.g.* CCH Tr. 234-342, Hrg. Exs. 35-36 (attached as Exs. 24-25 to Zdon Aff.). The COE's decisional document stated, with regard to Bailey's SWCD-approved mitigation plan, that:

> Also, Mr. Bailey recently informed the Corps that he is not going to perform the above compensation since he considers himself as just another lot owner.
>
> Hrg. Ex. 36 at 10 (COE 0541).

Mark Wespetal, MPCA's ISTS expert and licensed professional soil scientist, testified extensively about the Property's wetland soils and how those soils were not adequate for an ISTS mound system that had been proposed by Bailey. Wespetal Test., CCH Tr. 382-466. Wespetal analyzed the soils at all COE transect locations and none of the soils analyses showed soils adequate for standard mound systems. *Id.*, CCH Tr. 419, 426. Wespetal testified that, given these inadequate soils, these mound systems would weep and seep untreated or partially treated sewage to the ground surface and nearby waters. *Id.*, CCH Tr. 406-07, 446-49. Such conditions

---

[5] Eggers is a certified professional wetland scientist. Eggers Test., CCH Tr. 235.

would be considered an imminent public health threat. *Id.*, CCH Tr. 447. Such conditions could result in untreated pathogens entering the groundwater and nearby lake creating similar public health problems. *Id.*, CCH Tr. 447-48. Under such conditions, Wespetal testified that several MPCA rules would be violated, including rules prohibiting sewage discharges to ground surface and nuisance conditions. *Id.*, CCH Tr. 406-07, 449.

Wespetal also analyzed the Property to determine whether there was sufficient land area on each lot for two standard ISTS systems. Wespetal Test., CCH Tr. 426-42, Hrg. Ex. 50 (attached as Ex. 26 to Zdon Aff.). MPCA ISTS rules and the Minnesota Department of Natural Resource's shoreland management rules require land area sufficient for two standard systems. *Id.*, CCH Tr. 428. This two-system area requirement is needed because even well designed, properly maintained ISTSs have a finite life (e.g. 25-50 years before plugging occurs) so a replacement land area is needed. *Id.*, CCH Tr. 428-29. Wespetal's evaluation showed that six lots did not have sufficient area for two standard systems. *Id.*, CCH Tr. 433-34, Hrg. Ex. 50. Wespetal's evaluation also showed that another four lots were very small and required additional site-specific investigation work to determine whether those 4 lots could comply with the two-standard system requirement. *Id.*; ALJ's Report at 13-14, ¶ 37.

## VI. ALJ'S REPORT AND MPCA FINAL DECISION.

The administrative law judge (ALJ) issued Findings of Fact, Conclusions and Recommendation ("ALJ's Report"). Zdon Aff., Ex. 3. The ALJ recommended that MPCA's certification revocation be affirmed. ALJ's Report, Ex. 3 at 15. The ALJ found that MPCA's revocation "expressly notified Bailey that if he chose to reapply for a certificate, Bailey needed to submit additional information" regarding the extent of wetlands on the Property and a demonstration on how Bailey was going to comply with the MPCA's ISTS rules and MPCA's

wetland nondegradation mitigation rule. *Id.*, ¶ 29. The ALJ also found that Bailey had failed to respond to the MPCA's June 1999 RFI regarding "these three substantive issues." *Id.*, ¶¶ 10-12.

The ALJ's Report made numerous findings regarding the COE's wetland delineation, including the COE's determination that the Sunny Beach site was virtually all (i.e. 99%) wetlands consisting of a high quality wooded wetland. ALJ's Report, ¶ 26. The ALJ also found that the experts from the COE and the U.S. Department of Agriculture's Natural Resources Conservation Service (NRCS) had determined that the 100-foot-corridor-of-upland theory was not supported by the experts' field observations. *Id.*, ¶ 24. The ALJ adopted the COE's August 2000 wetland delineation findings and determinations as the ALJ's own. ALJ's Report, ¶ 26.

The ALJ determined that the Bailey project "endangers human health and the environment" because "sewage is likely to be discharged without adequate treatment." ALJ's Report at 15, ¶ 6. The ALJ also found that MPCA had demonstrated that six lots did not have sufficient land area to meet the two-standard system requirements of MPCA rules and MDNR's shoreland management rules, and that another four lots were very small and required additional site-specific investigation work to determine whether those 4 lots could comply with the two-standard system requirement. *Id.*, at 13-14, ¶ 37.

The ALJ determined that Bailey did not comply with applicable MPCA rules and conditions of Bailey's Section 401 certification conditions by failing to meet the SWCD-approved mitigation plan implementation deadline and by Bailey's position that he will not implement that mitigation plan. ALJ's Report, at 15, ¶ 4; *see also* ALJ's Report Findings of Fact, at 6-7, ¶ 15. The ALJ also determined the following:

> The agency has demonstrated by a preponderance of the evidence that Bailey has failed to disclose fully all facts relevant to the activity. He failed to disclose the extent of the wetland and the extent of the impact. Information on these items was requested by the July, 1999 request for information, but it was not supplied.

> In addition, the request for information asked Bailey for an explanation of how he was going to comply with the ISTS rule, which he failed to do. He failed to fully disclose the actual depths and draw down data concerning his ditches, which affects the amount of wetland compensation needed. He also failed to indicate that a significant portion of the plat is floodplain.

*Id.* at 15, ¶ 5.

The MPCA Commissioner issued the MPCA's final decision, adopting the ALJ's Report. Zdon Aff., Ex. 4 (MPCA Findings of Fact, Conclusions and Order). With regard to Bailey's issue that a county platting decision preempts MPCA section 401 decisions, the MPCA determined as follows:

> The MPCA has the legal authority to make Section 401 certification decisions, including a revocation decision, in this matter notwithstanding the county's plat decision. MPCA's Section 401 authority, including its authority to make a certificate revocation determination, is not pre-empted, supplanted or limited by the county plat decision.

Zdon Aff., Ex. 4 at 4, ¶ 9.

The MPCA's final decision also identified several current ongoing MPCA wetland rule violations resulting from the failure of implementation of the SWCD-approved wetland mitigation plan. Zdon Aff., Ex. 4 at 4-5, ¶ 11. Finally, the MPCA's final decision stated:

> *The agency has proven, by a preponderance of the evidence, that the proposed Sunny Beach project endangers human health and the environment and that the danger cannot be eliminated by modifying the Section 401 certification. In particular, sewage is likely to be discharged without adequate treatment. This situation exists because there is no evidence of the existence of soil conditions at the Sunny Beach project site that comply with MPCA's individual sewage treatment system (ISTS) rules. The discharge of sewage without adequate treatment will create nuisance conditions and an imminent public health threat and violate other MPCA rules (e.g., Minn. R. 7050.0210, subps. 1-2, Minn. R. 7060.0600, subp. 2, Minn. R. 7080.0065, subp. 4).* Even if compliant ISTS soils existed (they do not), several lots in the Sunny Beach plat do not have adequate area to comply with the two-standard ISTS system requirements of MPCA ISTS rules and MDNR shoreland regulations and these conditions endanger human health and the environment. In addition, the completion of the road and ditches, without adequate compensation, has harmed the environment,

> and has induced the clearing and filling of lots without appropriate permits or mitigation.

Zdon Aff., Ex. 4 at 5, ¶ 15 (emphasis added).

The MPCA issued an Order affirming MPCA's revocation of the certification. Zdon Aff., Ex. 4 at 6. The MPCA's Order also expressly stated: "This Order may be appealed to the Minnesota Court of Appeals in the manner provided in Minn. Stat. § 14.63 to Minn. Stat. § 14.69 (2002) if filed and served not more than 30 days after receipt of this Order." *Id.,* Ex. 4 at 6. Bailey did not appeal MPCA's decision to the Court of Appeals. Zdon Aff., ¶ 4.

## VII. POST-MPCA DECISION DEVELOPMENTS.

In March 2004, Bailey's attorney sent a draft complaint for a takings action against the MPCA, MDNR and the County. Zdon Aff., ¶ 7, Ex. 1. The Bailey letter stated in part:

> It is my understanding all administrative remedies have been exhausted with the DNR, Lake of the Woods County as well as the MPCA and I would merely confirm this with you at this time. If I do not hear from you, I will assume you agree with this.

*Id.,* Ex. 1.

The MPCA responded to the Bailey attorney's letter by letter dated March 18, 2004. Zdon Aff., ¶ 8, Ex. 2. In response to Mr. Fish's assertion that all MPCA administrative remedies had been exhausted, the MPCA expressly disagreed and stated there was no factual basis for his conclusions. *Id.,* Ex. 2. The MPCA letter summarized at least three specific instances where MPCA had apprised Bailey of the availability of being able to reapply for another section 401 certification with the various types of information needed for the Sunny Beach project and of the ability to avail himself of the MPCA variance procedures. *Id.,* Ex. 2. As of the March 2004 MPCA letter, Bailey had not sought any section 401 reapplication nor had he availed himself of MPCA's variance procedures. *Id.,* Ex. 2.

Bailey has never sought or applied for any variances from MPCA water quality standards with regard to Sunny Beach. Bailey 12/05 at 133. Bailey has not applied for any variances from any MPCA rules, including ISTS rules. *Id.*, at 133-34. No person, including Bailey, has filed any variance application with the MPCA regarding Sunny Beach. Zdon Aff., ¶ 5. Bailey has not submitted a second section 401 certificate application with the MPCA regarding his preferred Sunny Beach project with the additional information MPCA requested or another use or development option for the Property, other than Bailey's original Road plan that was incorporated into the COE's June 1999 after-the-fact Section 404 permit public notice. *Id.*, ¶ 6.

## ARGUMENT

### I. THIS COURT SHOULD DISMISS BAILEY'S ESTOPPEL CLAIM BECAUSE: (A) THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED; (B) THIS COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW BAILEY'S ESTOPPEL CLAIM; AND (C) BAILEY IS BARRED FROM RELITIGATING THE ESTOPPEL CLAIM BY THE RES JUDICATA DOCTRINE.

MPCA moves this Court to dismiss Bailey's estoppel claim on three bases. First, Bailey's estoppel claim should be dismissed under Minn. R. Civ. P. 12.02(e) because the Complaint fails to state a claim upon which relief can be granted. Second, MPCA moves to dismiss Bailey's estoppel claim because the Court lacks subject matter jurisdiction to review MPCA's decision. MPCA's certification decisions can only be reviewed by the Court of Appeals. Finally, Bailey is barred by the res judicata doctrine from relitigating this estoppel claim because it is the same claim that was raised and determined in Bailey's contested case hearing on the certification revocation.

**A. Bailey's Complaint Fails To State A Claim On Which Relief Can Be Granted Because There Has Been No Affirmative MPCA Misconduct.**

Under Minn. R. Civ. P. 12.02(e), dismissal is proper if there are no facts consistent with the pleading that support the relief demanded. *See Brakke v. Hilgers*, 374 N.W.2d 553, 555 (Minn. App. 1985).

Bailey asserts that MPCA is estopped from revoking the certification "due to LOW's official act of platting the parcel and determining the lots suitable for residential buildings." Complaint, ¶ 14. Bailey's estoppel claim has nothing to do with MPCA conduct. Bailey's claim is based solely on an unfounded legal theory that County platting decisions preempt and supplant all other state agency regulatory requirements. Under Bailey's theory, once a county approves a plat, all state agencies would be legally bound to rubberstamp their respective regulatory decisions in accord with the county decision or face an automatic court finding that these state agency decisions are an error of law and subject to automatic estoppel.

Counties are distinct legal entities that are organized as subordinate agencies of the state. *Kasch v. Clearwater County*, 289 N.W.2d 148, 151 (Minn. 1980). A fundamental rule of statutory construction is that the state is not bound by the passage of a law unless named therein, or unless the words of the act are so plain, clear, and unmistakable as to leave no doubt as to the intention of the legislature. Minn. Stat. § 645.27 (2006). The rationale for this rule lies in the doctrine of sovereign immunity. *Lienhard v. State,* 431 N.W.2d 861, 864 (Minn. 1988). Bailey has not cited any statute or definitive case law that County platting decisions create such a legally binding and preemptory effect on other state agency regulatory programs.

Bailey's claim is based solely on the County's platting decision, not any affirmative MPCA wrongful conduct. In fact, the Complaint fails to allege any MPCA misconduct.

To establish a claim of equitable estoppel against the government, a party must prove: (1) the agency made a misrepresentation of material fact; (2) the agency knew the representation was false; (3) the agency intended that its representation be acted upon; (4) the other party did not know the facts; and (5) the other party relied on the agency's misrepresentation to their detriment. *REM-Canby, Inc. v. Minn. Dep't of Human Servs.*, 494 N.W.2d 71, 74 (Minn. App. 1992). Affirmative misconduct, rather than simple inadvertence, mistake or imperfect conduct is required. *Id.* Equitable estoppel should be applied sparingly and only if the wrongful conduct threatens to work a serious injustice. *Ridgewood Dev. Co. v. State,* 294 N.W.2d 288, 292 (Minn. 1980). A party has a heavy burden of proof to establish estoppel. *Id.* Wrongful conduct is the most important element of an estoppel case. *Id.,* at 293.

There has been no wrongful MPCA conduct and no MPCA official knowingly made any false misrepresentations. The only relevant facts underlying Bailey's estoppel claim is the County's platting decision. Therefore, Bailey's estoppel claim should be dismissed because he has not stated a claim upon which relief can be granted.

**B. Only The Minnesota Court Of Appeals Has Jurisdiction To Review MPCA's Certification Decisions.**

MPCA moves to dismiss Bailey's estoppel because it is merely a subterfuge to get this Court to review and *rescind* or *nullify* MPCA's revocation. The Court lacks subject matter jurisdiction because MPCA's decisions can only be reviewed by the Court of Appeals.

Judicial review of MPCA's certification decisions are governed by the Minnesota Administrative Procedure Act (APA), Minn. Stat. §§ 14.63-.69. Minn. Stat. § 115.05, subd. 11 (2006); *see In re Winona County Municipal Solid Waste Incinerator*, 442 N.W.2d 344, 347 (Minn. App. 1989) (judicial review of MPCA decision is obtained under APA). MPCA's judicial review statute provides in relevant part:

> Judicial review. Any person aggrieved by any final decision of the agency or of the commissioner may obtain *judicial review thereof pursuant to sections 14.63 to 14.69* if the final decision is made pursuant to the agency's or the commissioner's authority under section 115A.914, this chapter, chapter 116, or the rules adopted thereunder, and if the decision is a final decision pertaining to:
>
> (1) *issuance, amendment, or denial of a permit, license, or certification*; . . . .

Minn. Stat. § 115.05, subd. 11(2006) (emphasis added).

Under the APA, a person aggrieved by a final agency decision must file a writ of certiorari with the Court of Appeals. Minn. Stat. § 14.63 (2006). The writ must be filed and served not more than thirty days after the person receives the final agency decision. *Id.* Appeals under the APA are to be heard by the Court of Appeals, not the district court. *Counties of Blue Earth, et al. v. Minnesota Department of Labor and Industry*, 489 N.W.2d 265, 268 (Minn. App. 1992). The APA, section 14.63, also provides for certiorari review by the Court of Appeals of a final decision in a contested case hearing made by an agency with statewide jurisdiction. *Heideman v. Metropolitan Airports Commission,* 555 N.W.2d 322, 323 (Minn. App. 1996).

The Court of Appeals has exclusive jurisdiction over certiorari review absent express statutory language in the governing statute vesting judicial review in the district court. *Township of Honner v. Redwood County*, 518 N.W.2d 639, 641 (Minn. App. 1994), *rev. denied* (Minn. Sept. 16, 1994). There are no provisions in MPCA's statutes, Minn. Stat. chapters 115 and 116, that authorize review of MPCA certifications in the district court. Consequently, only the Court of Appeals has jurisdiction, under section 115.05, subd. 11, to review MPCA's decision.

Bailey's contested case hearing was held in July 2003 and the ALJ's report was issued in October, 2003. Zdon Aff., Exs. 3-6. MPCA's final decision was issued on January 16, 2004. *Id.*, Ex. 4. MPCA's final decision expressly stated that judicial review could be obtained through Minn. Stat. §§ 14.63-.69 in the Court of Appeals. *Id.*, Ex. 4 at 6 (Order). Bailey did not appeal

that decision to the Court of Appeals. Zdon Aff., ¶ 4. Bailey cannot collaterally attack that MPCA decision by seeking *rescission* or *nullification* of MPCA's decision using an estoppel claim in this Court. In sum, Bailey's claim should be dismissed because this Court does not have jurisdiction to review and rescind or nullify MPCA's decision.

### C. Bailey's Estoppel Claim Is Barred By The Doctrine Of Res Judicata.

Bailey's estoppel claim was raised and resolved in Bailey's contested case hearing. The Court lacks jurisdiction to address the estoppel claim because that administrative proceeding is res judicata as to the estoppel claim in this suit.

A claim is barred under the res judicata doctrine when: (1) the prior litigation resulted in a final adjudication on the merits; (2) both proceedings involve the same cause of action[6]; and (3) both proceedings involve the same parties. *Demers v. City of Minneapolis,* 486 N.W.2d 828, 830 (Minn. App. 1992). The application of res judicata constitutes an absolute bar to a second suit for the same cause of action and is conclusive between the parties "not only as to every matter which was actually litigated, but also as to every matter which might have been litigated." *Id.*; *see Nelson v. Am. Family Ins. Group,* 651 N.W.2d 499, 511 (Minn. 2002) (absolute bar as to every matter that might have been litigated in prior proceeding). Therefore, successive litigation is barred involving claims that arise from the "same operative nucleus of facts," regardless of the labels. *Anderson v. Werner Continental, Inc.*, 363 N.W.2d 332, 335 (Minn. App. 1985).

Res judicata will apply to administrative decisions when an agency acts in a quasi-judicial capacity. *Graham v. Special Sch. Dist. No. 1,* 472 N.W.2d 114, 115-16 (Minn. 1991). A

---

[6] A cause of action is a situation or state of facts which would entitle a party to sustain action and give him a right to seek judicial review. *Surf and Sand, Inc. v. Gardebring*, 457 N.W.2d 782, 787 (Minn. App. 1990). The common test is to inquire whether the same evidence will sustain both actions. *Id.*

contested case hearing conducted according to the Minnesota Administrative Procedure Act is a quasi-judicial proceeding. *Bahr v. City of Litchfield*, 420 N.W.2d 604, 607 (Minn. 1988). In addition, the doctrine is applicable if agency resolves disputed issues properly before it which the parties have had the opportunity to litigate. *Surf and Sand, Inc. v. Gardebring*, 457 N.W.2d 782, 787 (Minn. App. 1990), *review denied* (Minn. Sept. 20, 1990). To apply res judicata in an administrative context, the judicial remedy must include either administrative determinations or access to a state appellate court. *Id.* In the *Surf* case, the appellate court ruled that that both remedies existed based on the prior contested case hearing (CCH) by an administrative law judge (ALJ) and appellate review of the subsequent agency decision. *Id.* at 784 (citing prior appellate decision challenging agency decision based on the CCH) and 787.

Like the *Surf* case, both remedies were available to Bailey. Bailey requested and participated in the CCH before the ALJ. Bailey raised the estoppel issue in the CCH. *See supra* pp. 15-16 (Part V.). MPCA's final decision expressly addressed Bailey's estoppel issue by finding that MPCA's section 401 authority was not pre-empted, supplanted or limited by the County plat decision. Zdon Aff., Ex. 4 at 4, ¶ 9. Bailey had the right to have appellate court review of MPCA's decision on that issue. *See* Minn. Stat. § 14.63 (judicial review by writ).

Bailey's estoppel claim is the same legal claim he made in the CCH. Both estoppel claims involve the same cause of action as both claims arise out of the same operative nucleus of facts, MPCA's section 401 decision. Therefore, Bailey's estoppel claim should be dismissed because the Court is barred by the doctrine of res judicata from asserting jurisdiction.

## II. THIS COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW BAILEY'S INVERSE CONDEMNATION CLAIM BECAUSE THE CLAIM WAS NOT BROUGHT THROUGH A PETITION FOR MANDAMUS.

MPCA moves this Court, under Minn. R. Civ. P. 12.02(a), to dismiss Bailey's claim for inverse condemnation because the claim was not brought through a petition for mandamus.

Actions for inverse condemnation must be brought to the court through an action in mandamus. *Thomsen v. State,* 284 Minn. 468, 474, 170 N.W.2d 575, 580 (1969); *see Dale Properties, LLC v. State*, 638 N.W.2d 763, 765 (Minn. 2002) (taking, in the constitutional sense, must be brought by petition for a writ of mandamus); *Gibson v. Comm'r of Highways*, 287 Minn. 495, 499, 178 N.W.2d 727, 730 (1970) (whether taking occurred must be decided in a mandamus proceeding by mandamus court). Mandamus is an extraordinary legal remedy awarded, not as a matter of right, but in the exercise of sound judicial discretion and upon equitable principles. *See County of Swift v. Boyle,* 481 N.W.2d 74, 77 (Minn. App. 1992).

Bailey failed to initiate the proper action for his takings claim by failing to file a petition for a writ of mandamus. Consequently, this Court lacks subject matter jurisdiction to consider the takings claim and it should be dismissed.

## III. THIS COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW BAILEY'S INVERSE CONDEMNATION CLAIM; ONLY THE COURT OF APPEALS CAN REVIEW MPCA'S QUASI-JUDICIAL DECISION TO DETERMINE WHETHER A TAKING OCCURRED.

MPCA moves this Court to dismiss Bailey's inverse condemnation claim for lack of subject matter jurisdiction. Bailey claims MPCA's revocation is a takings. Bailey can only challenge MPCA's decision to determine whether a taking occurred through a writ of certiorari to the Court of Appeals because MPCA's action was a quasi-judicial decision. Accordingly, this Court lacks jurisdiction to determine whether MPCA's decision resulted in a takings.

A contested case hearing conducted according to the Minnesota Administrative Procedure Act (APA), Minn. Stat. ch. 14, is a quasi-judicial proceeding. *Bahr v. City of Litchfield*, 420 N.W.2d 604, 607 (Minn. 1988).[7] The APA provides for certiorari review by the Court of Appeals of a final decision in a contested case hearing. Minn. Stat. § 14.63. It is a general rule that absent an explicit statutory or appellate rule authorizing review in the district court, judicial review of all administrative quasi-judicial decisions must be invoked only by writ of certiorari in the Court of Appeals. *Tischer v. Housing & Redev. Auth. of Cambridge,* 675 N.W.2d 361, 363 (Minn. App. 2004), *aff'd*, 693 N.W.2d 426, 429 (Minn. 2005).

Jurisdiction to review whether an agency's quasi-judicial decision constitutes a taking is in the Court of Appeals by a writ of certiorari. *City of Minneapolis v. Meldahl*, 607 N.W.2d 168, 172 (Minn. App. 2000); *see Farrell v. City of Minneapolis*, 2004 WL 885692 at *2 (Minn. App. April 27, 2004) (where appellant seeks to bring damage claims that require inquiry into the facts surrounding an agency's quasi-judicial decision, jurisdiction is only by writ of certiorari) (case is attached as Ex. 11 to Cool Aff.).

In *City of Minneapolis*, the appellant sought inverse condemnation for the city's quasi-judicial decision determining his building was a nuisance warranting demolition. *City of Minneapolis*, 607 N.W.2d at 172. The Court of Appeals found that appellant's assertion that he was entitled to a trial on damages was premature because there had been no determination of a taking, and that the determination of whether the city's quasi-judicial decision constituted a

---

[7] *See In re Chisago Lakes School District,* 690 N.W.2d 407, 409-10 (Minn. App. 2005)(decision based on a contested case hearing is a quasi-judicial decision); *In re Excess Surplus Status of Blue Cross and Blue Shield of Minnesota,* 606 N.W.2d 697, 707 (Minn. App. 2000), *reversed by* 624 N.W.2d 264 (Minn. 2001)(when a contested case hearing is used to gather and evaluate evidence, an agency is acting in a quasi-judicial role).

taking could only be established by the Court of Appeals through a petition for writ of certiorari. *Id.* The Court reasoned that the takings claim is not separate and distinct from the city's quasi-judicial decision because an inquiry into the facts surrounding the takings claim would involve an inquiry into the city's quasi-judicial decision to demolish the structure. *Id.* Accordingly, the Court held that such judicial inquiries, including any takings determination, must be in the Court of Appeals by writ of certiorari alone. *Id.*

In *Farrell*, the appellant sought damages for the city's decision to revoke his rental dwelling license. *Farrell,* 2004 WL 885692 at *1. The Court found that determining whether appellant was entitled to damages necessarily required an inquiry into whether the city's quasi-judicial decision was correct; in essence, the damage claim is not separate and distinct from the quasi-judicial decision to revoke his license because the inquiry into the facts surrounding the damages claim would involve an inquiry into the city's decision to revoke the license. *Id.*, at *2. The Court held that the appellant may challenge the city's quasi-judicial decision and all claims arising from that decision, including damages claim, only through a writ of certiorari. *Id.*, at *3.

As the case law demonstrates, some takings claims are not reviewable in the district court. The jurisdiction for judicial review of takings claims depends upon the underlying action being challenged. The determining factor is not the claim itself, but the activity complained about. The manner in which the claim is characterized in the complaint doe not change the jurisdictional analysis. *Dietz v. Dodge County*, 487 N.W.2d 237, 239-40 (Minn. 1992).

In this case, Bailey's taking claim arises out of a common nucleus of operative facts with the revocation decision. MPCA's decision was a quasi-judicial decision, the result of a contested case hearing before an ALJ. Zdon Aff., Ex. 5 (Notice and Order for Hearing). Bailey's taking claim is not separate and distinct from MPCA's quasi-judicial decision. It does not matter

whether or not Bailey properly pled a claim for inverse condemnation. His takings claim depends upon a challenge to MPCA's quasi-judicial decision; he can make no claim of taking without challenging MPCA's Findings, Conclusions and Order. Accordingly, Bailey's taking claim should be dismissed because jurisdiction to determine whether MPCA's revocation decision created a takings is by writ of certiorari only in the Court of Appeals.

## IV. BAILEY'S TAKINGS CLAIM IS NOT RIPE BECAUSE BAILEY HAS NOT APPLIED FOR ANY VARIANCES FROM MPCA RULES AND HE HAS FAILED TO SUBMIT A SECOND APPLICATION AND HE CANNOT PROVE THESE OPTIONS ARE FUTILE.

Even if this Court has jurisdiction, Bailey's taking claim is not ripe because he has not sought any final MPCA decision through a second application or through variance procedures, and Bailey cannot prove these procedures are futile.

### A. Bailey's Takings Claim Is Not Ripe Because There Has Been No Final Application Of The MPCA Water Quality Standards And Related Rules.

In Minnesota, landowners seeking to compel inverse condemnation have the burden of proving that the governmental action denies *all reasonable uses of his land*. *Czech v. City of Blaine,* 312 Minn. 535, 539, 253 N.W.2d 272, 274 (1977). Consequently, a takings claim challenging governmental regulation is not ripe for judicial review until the governmental entity charged with implementing the regulations has reached a *final decision* regarding the application of the regulations to the land. *Palazzolo v. Rhode Island,* 533 U.S. 606, 618 (2001) (quoting *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186 (1985).[8] A taking claim is ripe "once . . . the permissible uses of the property are known [by

[8] This action is also not ripe because no taking has resulted from MPCA's revocation. The Road was fully constructed at the time of MPCA's revocation. The Road continues to exist, providing access to Bailey's Property and all lots. The Road's continued presence makes any calculation of damages impractical, conjectural and speculative. What would this Court be compensating Bailey for given the Road's existence and use? Therefore, Bailey's takings claim is not ripe.

the court] to a reasonable degree of certainty." *Id.* at 620. Whether a regulation has gone "too far" cannot be measured "until the administrative agency has arrived at a final, dispositive position regarding how it will apply the regulation to the particular land in question." *Hunkins v. City of Minneapolis*, 508 N.W.2d 542, 544 (Minn. App. 1994) (quoting *Williamson*).[9]

The lack of ripeness deprives this Court of subject matter jurisdiction over Bailey's takings claim. *See Samaad v. City of Dallas*, 940 F.2d 925, 934 (5th Cir. 1991) (the ripeness analysis of *Williamson* is a jurisdictional requirement that cannot be waived).

In *Williamson*, the Supreme Court found that the landowner had not met the finality requirement because he failed to seek a variance from the ordinance. *Williamson*, 473 U.S. at 187-190. The Court held that resort to the variance procedures would result in a conclusive determination by the planning commission whether it would allow development in any manner proposed by the landowner, and that absent a commission decision on a variance request, there was not a final, reviewable decision. *Id.* at 194.

Minnesota courts adhere to the *Williamson* finality requirement, requiring variance applications or at least a second plan where the first plan is rejected. *See, e.g. Wheeler v. City of Wayzata*, 533 N.W.2d 405, 407 (Minn. 1995) (takings claim is not ripe where landowner neither perfected their rezoning application nor applied for a variance); *see also County of Pine v. Minn. Dep't of Natural Res.*, 280 N.W.2d 625, 630 (Minn. 1979) (judicial review of takings claim

---

9 The U.S. Supreme Court has clearly established this finality requirement noting that its cases "uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations purporting to limit it." *Hunkins*, 508 N.W.2d at 544 (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)).

denied where owner failed to exhaust remedies by applying for a variance from the ordinance).[10]

In *Hay v. City of* Andover, 436 N.W.2d 800, 804 (Minn. App. 1989), the Court, citing *Williamson*, held that for a takings claim to be ripe, the owner "must apply for a variance from the regulations which might have allowed development of the property." In affirming the trial court's decision that the takings claim was not ripe because no variance had been sought, the Court held it was not futile for the owner to at least ask the city to allow property development "in some other manner" than originally proposed as a mobile home park. *Id.*, at 805.

In addition, a takings claim is not ripe where only one plan is rejected and no other plan is proposed. *See Thompson v. City of Red Wing,* 455 N.W.2d 512, 516 (Minn. App. 1990), *rev. denied* (Minn. June 26, 1990) (*citing Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 136-37 ((1978)). In *Thompson*, the Court held that the takings claim was not ripe because the owner had only submitted a plan for a gravel extraction and failed to submit plans for developing alternative uses of the land consistent with the statute. *Id.*, at 516. Where only the gravel mining use had been denied, the Court held "it is purely speculative to conclude that all reasonable use is denied." *Id.*; *see also Larson v. County of Washington,* 387 N.W.2d 902, 907-08 (Minn. App. 1986), *rev. denied* (Minn. Aug. 20, 1986) (to establish a taking, the owner bears the burden of showing not only that all primary uses are unavailable, but also that no reasonable secondary uses (e.g. ones permitted by special use permit *or variance*) are available).

Like the land owners in the previous cases, Bailey has never sought or applied for any variances from MPCA water quality standards or MPCA rules. Bailey 12/05 at 133-34. No one

[10] *See State v. Regitschnig*, 1991 WL 276185 (Minn. App. 1991) (taking claim not ripe because owner failed to seek a variance to allow some other use other than his initial proposed mobile home park expansion), *attached* to Cool Aff., Exh. 12.

has filed any variance application regarding Sunny Beach. Zdon Aff., ¶ 5. Bailey has not submitted a second section 401 certificate application regarding the Sunny Beach project with the additional information MPCA requested or another application for the Property, other than Bailey's original Road plan that was incorporated into the COE's June 1999 after-the-fact permit public notice. *Id.*, ¶ 6.

The undisputed evidence shows that numerous uses are already being made of Bailey's 86-acre parcel. *See, supra* pp. 3-6. For example, Bailey's property development plan succeeded in part because 6 of the 13 lots were sold, at $25,000 a lot, and are currently owned by other individuals. *See* Complaint, ¶ 11. Bailey has used and can continue to use the 56 acre farm field for agriculture crops (e.g. small grains and hay). Bailey 12/04 at 55. Bailey is also getting inquiries from potential buyers on the other 71 acres, acreage which he indicates he could sell for upwards of $800-$1000/acre. Bailey 12/05 at 130-31; Bailey 11/06 at 15. Bailey has logged and can still log inside the forested area, an area that provides recreational uses like hunting and lake access. Bailey has also conceived low density residential plans for developing the property with larger 5-acre plots with access to the west on County Highway 53. Bailey 12/05 at 74, 96-97. The uncontroverted evidence demonstrates that Bailey's primary development uses exist, other reasonable uses exist, and there are other potential reasonable uses that could be addressed in a section 401 reapplication or variance process.

The *Williamson* final-decision requirement has not been met because Bailey has submitted only one certificate application and he has failed to apply for any variances or reapply for another certification. The permissible uses of Bailey's 86-acre parcel have not been determined by a final MPCA decision with any reasonable degree of certainty. The evidence demonstrates that reasonable uses of the 86-acre parcel exist and that "it is purely speculative to

conclude that all reasonable use is denied." *See Thompson*, 455 N.W.2d at 516. Accordingly, the Court should dismiss Bailey's taking claim because it is not ripe.

**B. Bailey Cannot Prove That A Reapplication For A Section 401 Certificate Or A Variance Application To The MPCA Would Be Futile.**

Bailey asserts that available administrative remedies are futile. Complaint, ¶ 10. However, the burden is on Bailey to prove that pursuing variances or a section 401 reapplication with MPCA would be futile. *See Pine County*, 280 N.W.2d at 630 (reversing trial court's ruling that enforcement of ordinance was a regulatory taking where owners failed to request variance or show that it would be futile to do so). If a landowner bypasses available administrative remedies, the landowner must demonstrate that seeking redress through the administrative process would have been futile or impossible. *NSPEA v. Minn. Dep't of Admin.*, 2003 WL 139717, at *3 (Minn. App. 2003), *attached* Cool Aff., Ex. 10). As one federal court stated, in evaluating a futility argument in a takings analysis:

> . . . the mere possibility, or even the probability, that the responsible agency may deny the permit should not be enough to trigger the [futility] excuse. To come within the exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so).

*See Gilbert v. Cambridge*, 932 F.2d 51, 61 (1st Cir. 1991). The filing of one meaningful, additional application will ordinarily be necessary, although not alone sufficient, as a precondition to invoking the futility exception, the same approach used by the Seventh and Ninth Circuits. *Id.*[11]

---

[11] The Minnesota courts have adopted a similar high "refusal-must-be-certain" standard. *See Ellingson & Assocs., Inc. v. Keefe*, 410 N.W.2d 857, 860 (Minn. App. 1987) (no exhaustion required if administrative bodies have unequivocally committed themselves to a position); *see also Amcon Corp. v. City of Eagan*, 348 N.W.2d 66, 72 (Minn. 1984) (no exhaustion required when city's demonstrated attitude makes it clear that administrative relief will not be forthcoming). The uncertainty of success before an administrative agency does not prove futility. (footnote continues on next page)

Bailey cannot prove that a section 401 reapplication or a variance application would be futile because the MPCA has repeatedly apprised Bailey that it would consider these applications. *See supra* pp. 14-15, 20-21. The MPCA's October 2000 revocation stated Bailey could reapply for another certification with information regarding total site wetland impacts and how compliance with the MPCA ISTS rules and other MPCA wetland rules would be accomplished. Zdon Aff., Ex. 15. During Bailey's 2002 federal lawsuit, MPCA's pleadings reiterated that Bailey could reapply for another certification and use the MPCA's variance processes. Cool Aff. Exs. 14-15. MPCA's rules have variance standards and procedures. *See* Minn. R. 7000.7000 and 7050.0190, subp. 1 (2005).

In February 2003, the MPCA again notified Bailey of the certificate re-application option and identified the available MPCA variance rules and procedures. Zdon Aff., Ex. 18. In March 2004, in response to Mr. Fish's erroneous declaration that all administrative remedies had been exhausted, the MPCA notified Bailey again that he had not availed himself of the reapplication or variance options. Zdon Aff., Exs. 1 and 2.

The evidence shows that MPCA has repeatedly told Bailey that a variance application and a certificate reapplication would be considered. Consequently, Bailey cannot prove that availing himself of these MPCA variance or certificate reapplication options would be futile.

## V. THERE IS NO TAKING BECAUSE BAILEY'S PROJECT VIOLATES WATER QUALITY STANDARDS AND RELATED RULES, AND CREATES NUISANCE CONDITIONS.

Under Part III of this memorandum, the MPCA asserts that this Court does not have subject matter jurisdiction to determine whether MPCA's decision is a takings. If this Court has

---

*Schuyler v. Metro. Transit Comm'n,* 374 N.W.2d 453, 456 (Minn. App. 1985) (failure to appeal discharge through administrative process is not justified on the basis that the agency would not help him and that he thought he would not be successful).

jurisdiction, the MPCA argues here, in the alternative, that the MPCA's revocation did not create a takings because Bailey's project violates MPCA rules and creates nuisance conditions. The MPCA properly exercised its police powers to prevent nuisance conditions. Accordingly, as a matter of law, there has been no taking and Bailey's taking claims should be dismissed.[12]

### A. Bailey Is Barred From Re-litigating Any Facts, Issues and Claims Regarding MPCA's Revocation Under The Doctrines Of Res Judicata And Collateral Estoppel.

Bailey cannot collaterally attack MPCA's final decision in this inverse condemnation action. The facts, issues and claims resolved in Bailey's CCH and the MPCA's final decision can be conclusively applied in this summary judgment motion because Bailey is precluded from relitigating those facts, issues and claims under the doctrines of res judicata and collateral estoppel.[13] This situation is precisely the type in which the doctrines of res judicata and collateral estoppel are most necessary to prevent collateral attacks in order to protect the separation of powers doctrine, to protect the MPCA from unnecessary, duplicative proceedings, and to prevent a drain of resources of the parties and the judiciary. Matters determined in an administrative agency's permitting process, from which no appeal was taken, cannot be

---

[12] Bailey claims a regulatory taking. Regulatory takings claims fall into two categories. One, recognized in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003 (1992), turns on whether the property has effectively no remaining economic value. In that event, a *per se* or categorical taking arises. A second takings type arises when the property retains some economic value. In that event, the circumstances may be assessed using the factors in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). Here, the evidence shows that Bailey's 86 acre parcel has reasonable uses and substantial economic value. *See, supra* pp. 3-6.

[13] The applicability of res judicata to Bailey's CCH proceeding was addressed previously and will not be repeated here. *See supra* pp. 25-27. The application of res judicata is equally applicable to all of the claims related to Bailey's compliance with MPCA rules and other legal requirements applicable to the project. *See Nelson*, 651 N.W.2d at 511 (res judicata bars claims actually litigated as well as every matter that might have been litigated).

collaterally attacked in an eminent domain action. *Minneapolis Gas Co. v. Dahle,* 171 N.W.2d 813, 815 (Minn. 1969); *see City of Rochester v. Peoples Cooperative Power Ass'n, Inc.*, 505 N.W.2d 621, 624 (Minn. App. 1993)(collateral attack on underlying annexation decision is impermissible in eminent domain proceeding).

The doctrine of collateral estoppel applies to administrative decisions when made in a quasi-judicial capacity. *Graham v. Special Sch. Dist. No. 1,* 472 N.W.2d 114, 115-16 (Minn. 1991); *Falgren v. State, Board of Teaching*, 545 N.W.2d 901, 905 (Minn. 1996). Collateral estoppel precludes litigants from raising issues of fact or law that are identical with the issues previously litigated and which were necessary and essential to the former decision. *See Aufderhar v. Data Dispatch, Inc.*, 452 N.W.2d 648, 650 (Minn. 1990). For collateral estoppel to apply, five factors must be met:

> 1. the issue to be precluded must be identical to the issue raised in the prior agency adjudication;
>
> 2. the issue must have been necessary to the agency adjudication and properly before the agency;
>
> 3. the agency determination must be a final adjudication and properly before the agency;
>
> 4. the estopped party was a party or in privity with a party to the agency determinations; and
>
> 5. the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Graham*, 472 N.W.2d at 116. The collateral estoppel requirements are satisfied here.

The issues to be precluded are identical to the factual and legal issues resolved in the CCH, which included those issues identified in the MPCA's Notice and Order for Hearing. Zdon Aff., Ex. 5 Those issues include Bailey's estoppel issue and whether there was any factual basis

for any of the findings in Minn. R. 7001.0140, subps. 2.A., 2.C. and 2.D. which provide in relevant part:

> The following findings of the agency constitute justification for the agency to . . . revoke a section 401 certification without reissuance:
>
> A. with respect to the facility or activity to be certified, the proposed certificate holder will not comply with all applicable state and federal pollution control statutes and rules administered by the agency, or conditions of the section 401 certification; . . .
>
> C. that the certificate holder has failed to disclose fully all facts relevant to the facility or activity to be certified, or that the certificate holder has submitted false or misleading information to the agency or the commissioner;
>
> D. that the certified facility or activity endangers human health or the environment and that the danger cannot be removed by a modification of the conditions of the section 401 certification. . . .

Minn. R. 7001.0140, subp. 2.[14] These issues, the related facts and application of facts to MPCA rules demonstrated that water quality standards are being violated, that ISTS rules would be violated and that nuisances exist.[15] The resolved issues also include Bailey's failure to respond to MPCA's 1999 request for information (RFI) and Bailey's failure to fully disclose all relevant facts, issues that relate to the MPCA rule criteria underlying MPCA's revocation. Accordingly, the first *Graham* factor is met based on this common nucleus of issues.

---

[14] In applying parts 7001.0010 to 7001.0210 to the processing of section 401 certifications, the word "permit" shall be construed to mean "section 401 certification" and the term "permittee" shall be construed to mean "certificate holder." Minn. R. 7001.1400. The text above has been modified to account for these constructions.

[15] The MPCA Notice and Order for Hearing identified relevant laws and rules on these issues, including Minn. R. ch. 7001 (MPCA certification processing rules), Minn. R. 7001.1400-.1470 (the 401 rules), Minn. R. chs. 7050 and 7060 (ground and surface WQ standards) and Minn. R. ch. 7080 (ISTS rules). *See* Zdon Aff., Ex. 5.

The second *Graham* factor is met because, as identified in part 7001.0140 above, the issues were necessary to MPCA's adjudication of the revocation and properly before the MPCA. The remaining *Graham* factors are met because Bailey was a party, represented by counsel, in the contested case hearing which was heard by an ALJ in accordance with APA hearing requirements and MPCA's final decision was subject to judicial review in the Court of Appeals.[16]

Accordingly, under the doctrines of res judicata and collateral estoppel, the facts, claims and issues determined in Bailey's CCH and MPCA's final decision are controlling here.

**B. Minnesota's Common Law And Statutory Law Prohibit Nuisances Caused By Water Pollution.**

A government regulatory action is not deemed to be a taking if it prohibits what would or legally could be a nuisance because the state is merely acting to protect the public under its inherent police powers. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1029 (1992) (state law principles of nuisance already inhere in every property owner's title). Here, the courts must inquire into the degree of harm posed by the landowner's proposed activities. *Id.*

It is a settled principle of takings law that under the *Penn Central* analytic framework, the government may defend against liability by claiming the regulated activity constituted a state law nuisance without further regard to the other two *Penn Central* factors. *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 351 (2002); *Mugler v. Kansas*, 123 U.S. 623, 662-69 (1887); *Brace v. United States*, 48 Fed.Cl. 272, 278 (2000) (a government regulation is not deemed to be a taking if it prohibits what would or legally could be

---

[16] Contested case hearings are quasi-judicial proceedings subject to judicial review which by definition meet the third and fifth *Graham* factors. *See Graham*, 472 N.W.2d at 116; *see also Bahr,* 420 N.W.2d at 607 (CCH is a quasi-judicial proceeding); Minn. Stat. § 14.63 (judicial review of CCH in court of appeals by writ of certiorari).

a nuisance). If the regulatory action prevents what would or legally could have been a nuisance under state nuisance law, then no taking has occurred because the state is merely acting to protect the public under its inherent police powers. *Crepple v. United States*, 41 F.3d 627, 631 (Fed. Cir. 1994). Accordingly, if state nuisance law justifies the restraint, the court does not proceed to the remaining two *Penn Central* factors. *Id.*

Minnesota appellate courts adhere to the same principles that where the regulation is genuinely designed to prevent harm to the public and it likely to achieve that goal, the courts will not find a taking. *Zeman v. City of Minneapolis*, 552 N.W.2d 548, 555 (Minn. 1996); *see City of Minneapolis v. Meldahl*, 607 N.W.2d 168, 172 (Minn. App. 2000) (when state properly uses its police powers to abate nuisance, no taking occurs and the landowner is not entitled to compensation).[17] In applying the *Penn Central* factor regarding the character of the government action, the Minnesota Supreme Court stated:

> Under this factor, we must examine the regulation at issue, with emphasis on its purpose and the possibility of achieving that purpose with this regulation. *While this is always an important consideration in a takings analysis, in cases involving a regulation aimed at the protection of the public health and safety, it becomes paramount.* If the state regulation appears genuinely designed to prevent harm to the public and is likely to achieve that goal and the harm suffered by the property owner does not appear to be one that should be borne by the entire community, we will not find a taking.

*Id.*, at 554 (emphasis added).

---

[17] The rights of private property are subservient to the public right to be free from nuisances which may be abated without compensation. *State v. Guliford*, 174 Minn. 457, 465, 219 N.W. 770, 773 (1928). The state's police powers include the right to abate a public nuisance and property so affected is not taken for public use, and therefore, there is no obligation to make compensation. *Id.*; *see State Fire Marshall v. Sherman*, 201 Minn. 594, 277 N.W. 249 (1938) (nuisance abatement is not a taking of private property; the public takes nothing, it simply causes on who maintains land that endangers life and property to remove it).

In *Zeman*, the Court was reviewing a takings claim based on the revocation of Zeman's rental dwelling license. *Id.*, at 551. The city argued the underlying ordinance was a valid exercise of municipal power to ameliorate a nuisance. *Id.*, at 553. The Court's analysis drew comparisons to other nuisance-prevention cases (e.g. destruction of infected trees, strict regulation of coal mining) and stated that a harm-prevention regulation designed to protect "the public from noxious harm or illegal activity, is a powerful rationale militating against find a taking." *Id.*, at 554 (emphasis added). The Court found no taking because the ordinance restricted uses that were properly treated as part of the common burden of citizenship and it served the public harm prevention purpose. *Id.*, at 555.

The MPCA's 401 regulatory program serves a public-harm prevention purpose because it is designed to prevent water pollution and related nuisance conditions. Water pollution, especially sewage discharges, has always been an actionable nuisance under Minnesota common and statutory law. The state's police powers extend to control pollution and the disposal of sewage. *Minnesota Energy & Econ. Dev. Auth. v. Printy*, 351 N.W.2d 319, 341-42 (Minn. 1984); *County of Pine v. State, Dep't of Natural Resources*, 280 N.W.2d 625, 629 (Minn. 1979)(limiting pollution is a valid exercise of police powers).

"Anything is nuisance at the common law which renders the enjoyment of life and property uncomfortable." *City of St. Paul v.* Gilfilin, 36 Minn. 298, 299, 31 N.W. 49, 50 (1886). The right to be free from nuisance created by water pollution has long been recognized by Minnesota law.[18] A classic instance of harm from nuisance is where sewage is deposited on

[18] Minnesota's statutory law of nuisance is declaratory of the common law of nuisance. *Hall v. Stokely-Van Camp, Inc.*, 259 Minn. 101, 103, 106 N.W.2d 8, 10 (1960) (Minn. Stat. § 561.01); *Lead v. Inch*, 116 Minn. 467, 471, 134 N.W. 218, 219 (1912) (Rev. Laws 1905, § 4446); *see also* (footnote continues on next page)

neighboring property, sewage being unhealthy and offensive to the senses. *Highview North Apartments v. County of Ramsey*, 323 N.W.2d 65, 71 (Minn. 1982) (sewage deposits on a neighboring property is a classic instance of a harm from nuisance); *see Huber v. City of Blue Earth*, 213 Minn. 319, 6 N.W.2d 471 (1942) (city's raw sanitary sewage and canning factory effluent discharge to stream causing pollution, creating actionable nuisance); *Hughes v. Village of Nashwauk*, 177 Minn. 547, 225 N.W. 898 (1929) (city's sewage discharges to premises is enjoinable nuisance); *Nienow v. Village of Mapleton*, 144 Minn. 60, 174 N.W. 517 (1919) (village's sewage discharge into ditch extending onto plaintiff's land is enjoinable nuisance); *Joce v. Village of Janesville*, 132 Minn. 121, 155 N.W. 1067 (1916) (polluted discharges of surface water, city filth and sewage onto plaintiff's land is nuisance). Human-induced groundwater contamination is also a nuisance. *See, e.g., Nelson v. Swedish, etc., Cemetery Ass'n*, 111 Minn. 149, 126 N.W. 723 (1910) (enjoinable nuisance may result if cemetery is so situated that burial will contaminate water of wells or springs).[19]

Moreover, the State Water Pollution Control Act, Minn. Stat. chapter 115, MPCA's water quality standards rules and MPCA's ISTS rules merely codify the nuisance harm prevention principles reflected in Minnesota's nuisance common law. For example, section 115.03 requires

---

M.S.A. ch. 561, V.35-37 (2000), pp. 377-78 (showing historical derivations of current section 561.01). For example, Mason's Minn. St.1927, § 9580 (M.S.A. § 561.01) gave district courts jurisdiction to abate private nuisances arising from water pollution. *Satren v. Hader Cooperative Cheese Factory*, 202 Minn. 553, 279 N.W. 361 (1938).

[19] Actionable nuisance is also created by sewage mixed with industrial water pollution. *See, e.g., Herrmann v. Larson*, 214 Minn. 46, 7 N.W.2d 330 (1943) (nuisance created by septic tank effluent and creamery's waste water discharging to neighboring property); *Johnson v. City of Fairmont*, 188 Minn. 451, 247 N.W. 572 (1933) (city septic tank discharge and factory waste discharges to creek and slough then to plaintiff's farm causing actionable nuisance).

the MPCA to adopt and enforce standards to prevent and abate water pollution. *See, e.g.*, Minn. Stat. § 115.03, subd. 1(e) (2006). Water pollution is defined as:

> "Pollution of water," "water pollution," or "pollute the water" means: (a) the discharge of any pollutant into any waters of the state or the contamination of any waters of the state so as to create *a nuisance or render such waters unclean, or noxious, or impure so as to be actually or potentially harmful or detrimental or injurious to public health, safety or welfare,* to domestic, agricultural, commercial, industrial, recreational or other legitimate uses, or to livestock, animals, birds, fish or other aquatic life; or (b) the alteration made or induced by human activity of the chemical, physical, biological, or radiological integrity of waters of the state.

Minn. Stat. § 115.01, subd. 13. Waters of the state include both surface and ground waters. *See, Id.*, subd. 22. MPCA is also required to adopt surface water standards for quality and purity which indicate polluted conditions which are actually or potentially deleterious, detrimental, harmful or injurious to the public health, safety or welfare. Minn. Stat. § 115.44, subd. 3-4; *see* Minn. R. 7050.0210, subp. 2 (nuisance conditions prohibited); Minn. R. 7080.0010 (improper location of ISTS adversely affects the public health, general welfare and safety by discharge of inadequately treated sewage to ground surface, surface and ground waters). Finally, any violation of a MPCA rule or standard constitutes a public nuisance that may be enjoined by legal actions. Minn. Stat. § 115.071, subd. 4 (2006).

Water pollution is an abatable nuisance under Minnesota common and statutory law. By administering the section 401 program as MPCA did in the Bailey project, MPCA exercised its police powers to protect public health and the environment from nuisances. Bailey does not have a right to maintain nuisance conditions on the Property under either common or statutory law.

A Maryland appellate court found that a regulatory agency's denial of an ISTS permit was in accordance with a regulatory program designed to prevent nuisances and accordingly, the permit denial was not a takings. *Erb. v. Maryland Dept. of Environment*, 110 Md.App. 246, 676

A.2d 1017, 1026-28 (Md. App. 1996) (attached as Ex. 17 to Cool Aff.). Private nuisance law can abate sewage disposal systems that are detrimental to the public health; consequently, public regulation designed to prevent these same nuisances is not a taking. *Id.*, 676 A.2d at 1027.

### C. MPCA's Decision Conclusively Shows That Bailey's Project Violates Water Quality Standards And Related Rules, And Creates Nuisances.

In the CCH, the MPCA's licensed soil scientist testified about the site's wetland soils and how the wetland soils were not adequate for standard ISTS mound systems that had been proposed by Bailey. Wespetal Test., CCH Tr. 382-466. None of the soils analyses showed soils adequate for a standard mound system. *Id.*, CCH Tr. 419, 426. The MPCA scientist testified that, given the inadequate soils, these mound systems would likely result in the weeping out or seeping out of untreated sewage from the mounds to the ground resulting in nuisance conditions and violations of MPCA rules. *Id.*, CCH Tr. 406-07, 446-49.

The ALJ found that the Bailey project endangered human health and the environment because "sewage is likely to be discharged without adequate treatment." Zdon Aff., Ex. 3, ALJ's Report, at 15, ¶ 6. The MPCA determined this endangerment was caused in part due to site limitations because there was no evidence of soil conditions at Sunny Beach that would comply with MPCA ISTS rules. Zdon Aff., Ex.4, at 5, ¶ 15. The MPCA found that the discharge of sewage without adequate treatment will create nuisance conditions and an imminent public health threat. *Id.*, Ex. 4, at 5, ¶ 15. These sewage discharges would also result in violations of several MPCA rules including Minn. R. 7050.0210, subps. 1-2 (prohibition on discharge of untreated sewage and on nuisance conditions), 7060.0600, subp. 2 (prohibition on sewage discharges into unsaturated zone polluting ground water) and 7080.0065, subp. 4 (prohibitions on seepage to ground surface and on discharges of sewage or sewage tank effluent to ground surface or surface waters). *Id.*

The MPCA scientist also evaluated the complications of siting ISTSs where a significant portion of the Property is floodplain. The MPCA scientist conducted an evaluation to determine whether sufficient land area existed for mound systems (assuming no soils constraints which MPCA did not find). Wespetal Test., CCH Tr. 426-446. MPCA only learned that a significant portion of the Property was in the floodplain after the revocation. ALJ's Report, ¶¶ 35-36. Bailey had failed to apprise MPCA that the plat included significant areas of floodplain. *Id.*, Concl. ¶ 5. With the floodplain constraints and applicable MPCA and MDNR shoreland management requirements (i.e. lot sizes need to accommodate two standard systems), the MPCA scientist determined that six lots did not have sufficient land area to meet MPCA and MDNR rules and another four sites were very small and required additional site-specific investigation work to determine whether the sites were large enough for two standard systems. *Id.*, at 13-14, ¶ 37. The MPCA determined that these limiting lot conditions (i.e. inadequate area for two systems) endangered human health and the environment. Zdon Aff., Ex. 4, at 5, ¶ 15.

In addition, the County SWCD district manager testified that the SWCD-approved wetland mitigation plan had never been implemented. Lemm Test., CCH Tr. pp. 175-76. This testimony corroborated the COE's decisional document which indicated that Bailey had informed the COE that he was not going to implement the SWCD-approved mitigation plan because he considered himself as just another land owner. ALJ's Report, ¶ 15. The MPCA's section 401 certification was expressly conditioned on Bailey's implementation of the mitigation plan. Zdon Aff., Ex. 11 (Dec. 1999 Certificate); ALJ's Report, ¶ 20. Bailey's failure to implement the mitigation violated Minn. R. 7050.0186, subp. 6.D. and the section 401 certification condition

itself.[20] Zdon Aff., Ex. 4, MPCA Findings, at 4-5, ¶ 11. The lack of wetland mitigation means there are ongoing violations of MPCA's wetland nondegradation standards and related wetland rules at the Property. *Id.*

Bailey's CCH proceeding conclusively demonstrated that there was no reasonable assurance that Bailey's project would meet applicable water quality standards. The CCH evidence conclusively demonstrated there were ongoing violations of MPCA water quality standards and likely violations of ISTS rules creating nuisance conditions and the likelihood of imminent public health and safety problems if septic systems were installed into the Property's wetland soils. The MPCA properly exercised its police powers to abate and prevent these nuisances by its certification revocation. Consequently, as a matter of law, there has been no taking and Bailey's taking claims should be dismissed.

## VI. BAILEY'S CLAIMS ARE BARRED BY THE EQUITABLE DOCTRINE OF UNCLEAN HANDS.

Even if Bailey were to seek mandamus, Bailey has unclean hands and his claims should be barred. Mandamus is granted on equitable principles and an applicant for such a writ, who has unclean hands, is guilty of illegal conduct, or who has violated the equitable principles, may be rejected. *State v. Magie,* 235 N.W. 526, 527 (Minn. 1931) (mandamus is granted on equitable principles; its purpose is to remedy a wrong, not to promote one). A party that engages in a course of continued nondisclosure has unclean hands and cannot avail themselves of equitable relief. *Sanborn v. Sanborn,* 503 N.W.2d 499, 504 (Minn. App. 1993).

---

[20] Bailey's acceptance of the certificate in 1999 constitutes waiver of the right to belatedly contest the validity of those conditions. *See McNamara v. Office of Strategic and Long Range Planning,* 628 N.W.2d 620, 625 (Minn. App. 2001), *rev. denied* (Minn. Aug. 22, 2001) (challenge to the validity of dedication fees is waived where the challenger failed to challenge the fees prior to final action on the application).

In this case, Bailey initiated Road construction resulting in wetland filling without the required Section 404 permit in the face of the COE's 1994 letter notifying Bailey of the permit requirements. *See supra* p. 9. Bailey engaged in continued nondisclosure by failing to respond to the MPCA's 1999 RFI which sought relevant data about the extent of Property wetlands, total wetland impacts, and information about ISTS rule compliance. Zdon Aff., Ex. 6; CCH Tr. 42-45, 49-50, 95-96; ALJ's Report, ¶¶ 10-12 and Concl. ¶ 5. Bailey also failed to disclose the actual depths and draw down data concerning the road ditches, which affected the amount of wetland compensation needed. ALJ's Report, ¶ Concl. ¶ 5. Bailey failed to indicate that a significant portion of the plat was located in floodplain. *Id.*; Zdon Ex. 4 (MPCA Findings) ¶ 12. In July 2000, the County requested that Bailey conduct a wetland delineation on the entire plat to determine the type, extent and locations of all wetlands in an effort to respond to COE concerns about the accuracy of site information; but Bailey did not conduct the delineation and did not submit the requested information. Lemm Test., CCH Tr. 176-79; ALJ's Report, ¶ 22. Bailey failed to disclose to the MPCA that he was not going to implement the wetland compensatory mitigation, an enforceable condition within Bailey's section 401 certificate, and in fact, Bailey did not comply with that certificate condition. ALJ's Report, ¶ 35, Concl. ¶ 5.

Bailey engaged in a pattern of illegal conduct and continued nondisclosure of key facts integral to MPCA's certification decision. Bailey violated the equitable principles he now seeks to enforce against the MPCA. Because Bailey has unclean hands, Bailey should be precluded from availing himself of the equitable remedy of mandamus.

## CONCLUSION

For the foregoing reasons, MPCA respectfully requests that the Court grant MPCA's motion to dismiss, or in the alternative, MPCA's motion for summary judgment dismissing Bailey's claims against the MPCA.

Dated: 5/16/07

Respectfully submitted,

LORI SWANSON
Attorney General
State of Minnesota

RICHARD P. COOL
Assistant Attorney General
Atty. Reg. No. 17497X

445 Minnesota Street, Suite 900
St. Paul, Minnesota 55101-2127
(651) 296-7347 (Voice)
(651) 296-1410 (TTY)

ATTORNEYS FOR PLAINTIFF MINNESOTA POLLUTION CONTROL AGENCY

AG: #1791670-v1