Page 2

APPEARANCES

On Behalf of the Plaintiff:
ALAN FISH, P.A.
102 2nd Avenue Northwest
Roseau, Minnesota 56751
By: RITA FISH-WHITLOCK, ATTORNEY AT LAW

On Behalf of the Defendant:
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
P. O. Box 663
Washington, DC 20004
By: JAMES D. GETTE, TRIAL ATTORNEY

Taken By: Ruth Ann Johnson, RPR

Page 3

CONTENTS

DEPONENT: PAGE
APRIL STAVIG
Examination by . . . Mr. Gette 4
Examination by . . . Ms. Fish-Whitlock 68
Examination by . . . Mr. Gette 92
Examination by . . . Ms. Fish-Whitlock 96

EXHIBITS*

EXHIBITS MARKED
No. 1 -- Copy of letter to April Stavig from James D. Gette, 2-6-08, with attached subpoena 5
No. 2 -- Copy of Right-of-Way Easement 13
No. 3 -- Copy of payments made 24
No. 4 -- Copy of Basic Application with attachments 38
No. 5 -- Copy of letter to April Stavig from Les Lemm, 10-26-99 52
No. 6 -- Copy of Restoration Order 55
No. 7 -- Copy of Petition for Appeal 62
No. 8 -- Copy of 1999 Fish Family Lake Lot Trust Position Statement 67
No. 9 -- Copy of Memo to Lake of the Woods County Board of Commissioners, 12-27-02 83
(*Exhibits attached to ttranscript.)

Page 4

PROCEEDINGS

APRIL STAVIG,

of Roseau, Minnesota, called as a witness by the Defendant, being first duly sworn by Ruth Ann Johnson, RPR, a Notary Public within and for the State of Minnesota, was examined and deposed on her oath as follows:

EXAMINATION

BY MR. GETTE:

Q. Good morning, Miss Stavig. We met just earlier, my name is Jim Gette, I'm a lawyer with the Department of Justice. I represent the United States in a lawsuit that has been filed by Gary Bailey against the United States. As you're probably aware, you were subpoenaed to be here today for your deposition.

Let me first ask you, have you ever had a deposition taken before?

A. I don't recall.

Q. Okay. Given that, let me give you some ground rules, just so that the day goes as easy as possible.

As you can see, our court reporter

Page 5

is taking down everything we say, which means that we need not to talk over top of each other. So I'll work very hard at not cutting off your answers and if you'll do the same in terms of letting me finish my questions before you answer. Is that okay?

A. Yes.

Q. Okay. The other thing is, is that it's really important that you understand my questions. If at any time you don't understand what I'm asking or any question isn't clear to you, just let me know that. Okay?

A. Okay.

Q. The only final instruction is that I tend to take a lot of breaks during depositions, but sometimes lawyers get kind of tunnel vision and we kind of just keep charging along. If at any time you feel like you'd like a break, just let me know and we'll take a break. Okay?

A. Okay.

MR. GETTE: Let's start by having this marked as Deposition Exhibit 1.

(Whereupon, Deposition Exhibit No. 1, Stavig, was marked for identification.)

 ©2008

Page 6

Q. (By Mr. Gette) I'm handing you what's been marked as Deposition Exhibit 1 for your deposition. Do you recognize this document?
A. Yes, I do.
Q. Okay. And is this a letter and a subpoena that was sent to you requesting that you appear for your deposition today?
A. Yes, it was.
Q. Okay. If you'll turn to the last page of that document. You see there's an Attachment A dash April Stavig, that is a list of documents that you were requested to bring to your deposition today. Did you review that list before coming to your deposition today?
A. Yes, I did.
Q. Okay. And did you endeavor to collect documents that were responsive to that list?
A. Endeav -- oh, yes I did.
Q. Okay. Let me ask it a little more, did you collect documents that you thought were responsive to this list?
A. Yes, I did.
Q. Okay. And did you bring all of the

Page 7

documents that you thought were responsive to this list to your deposition today?
A. Yes, I did. All documents that I had in my possession.
Q. Were there any documents that you thought might be responsive to this request that were not in your possession?
A. There could be. I'm not sure if I have the abstract. I don't believe I do.
Q. Anything else?
A. I don't believe I still have a copy of the original contract for deed that was recorded with the Lake of the Woods County Courthouse.
Q. Did you have a copy of that deed at one point in time?
A. At one point I did, yes. Sorry.
Q. And what did you do with that deed?
A. I do not recall.
Q. Are there any other documents that you believe might be responsive to this list that you did not bring with you today?
A. I've got approximately six months worth of bank statements, the most recent ones, that are still in my possession, that are in my

Page 8

to do pile, that I have not had a chance to sort through, but those can be made available to you as well.
Q. Okay. And anything else?
A. Nothing that I can recall.
Q. That's good, you can set that aside.
A. Okay.
Q. Now I'd like to ask you some questions regarding the Fish Family Lake Lot Trust. When was that trust established?
A. It was established shortly before we signed the contract for deed agreement purchasing the property.
Q. And is the property you're referring to Lot 14 in the Sunny Beach Plat on Lake of the Woods?
A. Yes, it is.
Q. Who created the trust?
A. Who created the trust, specifically?
Q. Well, let me ask this first. Who are the beneficiaries of the trust?
A. The beneficiaries of the trust are myself, April Stavig, and three of my relatives, their names are Edward Fish, Kevin Fish and Alan Fish.

Page 9

Q. And what is your relationship to each of the other three beneficiaries?
A. Edward Fish is my first cousin.
MS. FISH-WHITLOCK: I'm going to be objecting as to relevancy at this point.
Q. (By Mr. Gette) Okay.
A. Kevin Fish is my first cousin.
MS. FISH-WHITLOCK: Same objection.
A. Alan Fish is my brother.
Q. (By Mr. Gette) Now was the -- well, let me ask it more broadly. What was the purpose of establishing the trust?
A. I guess I don't understand.
Q. Okay. Was the trust created solely to purchase this property?
A. It is my understanding that, yes, it was.
Q. Okay. Does the trust own any other assets?
A. With the exception of a small amount of money held in a checking account, no.
Q. And do each of the four beneficiaries hold an equal interest in the trust?
A. I'm not sure. I, I'm not sure if I


©2008

Page 10

can answer that question.
Q. Do you have any documents that evidence the creation of the trust?
A. Yes, I believe that we do have the trust document.
Q. When you say we, who do you mean?
A. It's held between, some of the documents are, were in my possession, some of them were in the possession of my brother Alan Fish.
MS. FISH-WHITLOCK: That's within our office. And you should be aware that at this point we are, I am here in a representative capacity of Gary Bailey, I'm also here in a representative capacity of the Fish Family Lake Lot Trust.
MR. GETTE: Okay. So you are representing the witness at this deposition today?
MS. FISH-WHITLOCK: Yes, I am.
Q. (By Mr. Gette) Okay. Now, Miss Stavig, am I correct that you are a trustee of the trust?
A. That is correct.
Q. Are there any co-trustees?

Page 11

A. Yes, there is.
Q. Okay. And who are the co-trustees?
MS. FISH-WHITLOCK: I'd object to relevancy.
Q. (By Mr. Gette) You can still answer it.
A. Alan Fish is a co-trustee.
Q. Any others?
A. No.
Q. Okay. Do, do all of the beneficiaries use the property from time to time?
A. Yes, they do.
Q. And I'd like to ask you a little bit about the current use of the property. Let's start with you. How, currently, are you using the property?
A. Specifically, in the recent past or in the past year, 12 months, do you mean?
Q. Well, let's start with the past 12 months.
A. Myself, I've used it to take my family out camping and we use it for family gatherings.
Q. In the last 12 months, how many

Page 12

times would you say you've taken your family to the property?
A. I would say at least a dozen.
Q. And when you say camping, do you use a camper, tents or both?
A. We have used both.
Q. And do you personally have a camper?
A. Yes, I do.
Q. Okay. What kind of camper is that?
A. It's a travel trailer, pull-behind.
Q. And do you take that to the property when you go camping?
A. Yes, I do. Most of the time.
Q. And do you -- I assume that most of the camping is during the summer months?
A. Yes.
Q. And do you leave the camper up there during the summer?
A. Occasionally, for short periods of time.
Q. Okay. Other than camping, is there any, and other than family gatherings, is there any other uses of the property in the last 12 months?
A. I think my husband went bird hunting

Page 13

up there last fall.
Q. Do you know what he hunts for?
A. Grouse.
Q. Do the other beneficiaries of the trust also go camping on the property?
A. Yes, they do. I've seen them all camping there when I've been there.
Q. And does each of them have a camper?
A. Yes, they do.
Q. Okay. So there are times in fact that you'll have four campers on the property at a given time?
A. Yes.
Q. Okay. Is there electrical service to the property?
A. Yes, there is.
MR. GETTE: I'd have this marked as Deposition Exhibit 2.
(Whereupon, Deposition Exhibit No. 2, Stavig, was marked for identification.)
MR. GETTE: Rita, this is a document I got yesterday, so you're welcome to take a look, but it's the only copy that I have.
MS. FISH-WHITLOCK: This was for North Star.

 ©2008

Page 14

Q. (By Mr. Gette) Miss Stavig, I'm handing you what's been marked as Exhibit 2 to your deposition. Take a moment and look at that and let me know if you recognize that document?
A. Yes, I do.
Q. Okay. What is that document?
A. It's a right-of-way easement for, to allow North Star Electric to install electric service to our property.
Q. Okay. And it looks like that deed was executed in March of 2000. Is that correct?
A. That's correct.
Q. Okay. And were you involved in arranging the easement so that North Star could provide electricity to the property?
A. My involvement consisted of contacting North Star Electric and requesting electric service to the property.
Q. Okay. Did the folks at North Star tell you that they would be filing an easement to accomplish that?
A. Yes, they did.
Q. And did you give them your approval

Page 15

to have that easement filed?
A. Yes, I did.
Q. Now when was the electrical service established?
A. I do not recall exactly when it was installed. I would imagine, or I would guess that it was shortly after this easement document was signed.
Q. And is the electrical service simply on a pole so that you can hook your campers up to the electrical outlet, is that how that works?
A. There is a main service that comes onto the property, that the meter is attached to, and then we have a pigtail, underground line running north and south within the property where we have, oh, let's see, three RV posts with RV hookups and the electrical services attached.
Q. Now we talked about how often you visited the property in the past 12 months. What about the other beneficiaries, how often would you say that they have visited and spent time on the property?
A. I could not say, because I wasn't on

Page 16

the property at the same time that they were, necessarily. I would, I would, I would say probably almost or as much as I did.
Q. Now we talked about the past 12 months. Prior to the past 12 months, has your use of the property, in terms of number of visits, changed in any appreciable respect?
A. Well, there's been a few years where we've had some weather in the summer months where either you couldn't be out there because of the bugs or it was just simply too cold or the lake levels were too high to make it not conducive to swimming. But that was very few, I mean, I don't think it was more than a couple of years over the span of the last nine that we've owned it.
Q. So is it fair to say that any changes in the frequency of use of the property by you and your family has been dictated by weather conditions predominantly?
A. For the most part, weather would be the only thing that would change our use of the property, yes.
Q. And other than as a result of weather, has there been any change in use of

Page 17

the property by the other beneficiaries over the years?
A. Not that I'm aware of, no.
Q. I just want to ask you a few questions about yourself, actually.
A. Um-hum.
Q. What is your profession?
A. I actually have two professions. I'm a real estate broker and I'm an accountant. I do income tax preparation and bookkeeping for local businesses.
Q. Must be getting into the busy time of year for you?
A. I'm very busy right now.
Q. Okay. How long have you been a -- are you a, you may have said this, are you a licensed real estate broker?
A. Yes, I am.
Q. And is that licensed by the state of Minnesota?
A. Yes, it is.
Q. Okay. And how long have you been a licensed real estate agent in the state of Minnesota?
A. Agent meaning broker or salesperson?

 ©2008

Page 18

Q. Are there two different sorts of licenses?
A. Yes, there is.
Q. Okay. Educate me a little here again. What are the two different kinds of licenses?
A. There's real estate broker and there's real estate salesperson.
Q. And have you held both different types of licenses at different times?
A. Yes.
Q. Which license did you obtain first?
A. My real estate salesperson's license.
Q. When did you obtain that license?
A. I think it was 1997 or 1998.
Q. And then at some point after that -- well, let me ask you this.
Is it, are there greater responsibilities that come with a broker's license as opposed to a salesperson's license?
A. Yes, there is.
Q. Okay. And at some point in time did you step up to a broker's license?
A. Yes, I did.

Page 19

Q. Okay. And when did that occur?
A. In 2006.
Q. How long have you lived in -- well, let me ask you this. Where, your year-round residence, where is that located?
A. Within the city limits of Williams, Minnesota.
Q. And can you give me the actual address?
A. My home address is 410 Pine Street.
Q. Okay. And how long have you -- is that in -- what county is that in?
A. Lake of the Woods County.
Q. And how long have you lived in Lake of the Woods County?
A. Off and on or consistently?
Q. When did you first move to Lake of the Woods County?
A. I first moved to Lake of the Woods County when I was six years old.
Q. And would it be fair to say it's been your predominant residence over the years since then?
A. Yes.
Q. How did you come to be aware of the

Page 20

property on Lake of the Woods that we've been discussing?
A. The real estate company that I worked for, as a salesperson at the time, had an open listing on this property, meaning that our real estate company as well as most other real estate companies in Lake of the Woods and Roseau County were able to market and sell these lots on behalf of the owner.
Q. And what real estate agency was that?
A. That was Lake Country Realty.
Q. And are you still affiliated with Lake Country Realty?
A. Yes, I am.
Q. And what's your relationship?
A. I'm the broker-owner of Lake Country Realty.
Q. You said as an open listing you could market and sell on behalf of the owner. Is it fair to say, then, that in any transactions that you brokered, you represented the seller as opposed to the buyer?
A. In this particular transaction, I was a salesperson for Lake Country Realty. I

Page 21

also was the listing agent, so I was representing the seller in this transaction when we purchased the last available lot in this plat.
Q. And your lot was numbered Lot 14, correct?
A. That's correct.
Q. And was I right to understand this was the last lot to sell?
A. Yes, it was.
Q. Okay.
A. That was available for sale.
Q. Do you know whether the owner had retained any lots?
A. I believe he did retain a couple of lots.
Q. How many of the lots did Lake Country Realty broker?
A. I don't recall.
MS. FISH-WHITLOCK: If you don't know, at that time she wasn't the owner of the business at that time, if you don't know, you don't know.
A. No, I don't recall.
Q. (By Mr. Gette) That's fine. And


©2008

Page 22

anytime I don't know or I don't recall is a fine answer. Okay?
A. Um-hum.
Q. Great.
What was the purchase price of Lot 14?
A. The purchase price was $25,000.
Q. And was the purchase financed in any way?
A. Yes, it was.
Q. How was that?
A. It was financed by the seller, Gary Bailey, with a contract for deed.
Q. I'm going to show you what's been previously marked as Bailey Deposition Exhibit 41.
MS. FISH-WHITLOCK: Are you going to be entering this as a deposition exhibit here?
MR. GETTE: I think we'll just refer to it as a prior designated exhibit.
Q. (By Mr. Gette) Showing you that exhibit that's been marked as Bailey Deposition Exhibit 41. Do you recognize that document?
A. Yes, I do.
Q. What is that?

Page 23

A. I believe that is the contract for deed that Gary Bailey and myself signed to purchase Lot 14.
Q. And that indicates a, a sales price of $25,000, correct?
A. Yes, it does.
Q. Okay. And does it also indicate a down payment of $2,500 had been made?
A. Yes, it does.
Q. Okay. And is it your recollection that that $2,500 had indeed been paid at the time that you entered the contract for deed?
A. Yes, it was.
Q. Okay. How did the trust collect the, the money that it used to, to enter into the purchase agreement?
A. As far as I know, the four recipients of the trust all came up with the funds necessary between the four of them to produce the down payment and the closing costs.
Q. And since that point in time, since the point in time when the contract for deed was entered, has the trust continued to make payments under the contract for deed?
A. Yes, it has.

Page 24

Q. Okay.
MR. GETTE: Let me have this marked as Deposition Exhibit 3.
(Whereupon, Deposition Exhibit No. 3, Stavig, was marked for identification.)
MR. GETTE: Do you need to see that?
MS. FISH-WHITLOCK: No, that's fine.
Q. (By Mr. Gette) Okay. I'm handing you what's been marked as Deposition Exhibit 3. Do you recognize that document?
A. Yes, I do.
Q. What is that document?
A. That is a document that I produced from my QuickBooks program yesterday showing the records that I have of the payments that were made to Gary Bailey for the contract for deed for the purchase of the property.
Q. And is it fair to say that the payments indicated there began in July of 1999?
A. I believe that was when the first installment payment became due.
Q. And how often are payments made?
A. They are scheduled to be made every three months.
Q. And has the trust been paying them

Page 25

on time every three months?
A. No, they have not.
Q. Okay. And how often have the payments been untimely?
A. Oh, I guess it depends on what time of the year it is. When it gets close to the spring, everybody seems to hurry up and catch up on their payments.
Q. Was there ever a point in time when payments ceased or were they simply late at certain times?
A. They were simply late. I've got one or two people in my trust that just don't pay on time, so we, we're not able to gather the funds together to make the payments to Mr. Bailey.
Q. Okay. We won't call those folks out at this point.
And it appears that the quarterly payments that are made are in the amount of $894.88. Is that correct?
A. Yes. That's the payments that we've been making for the last several years.
Q. Okay. How many remaining payments are there before the contract for deed will be

Page 26

paid in full?
A. Oh, 40 payments, and there's, it appears that there is 34 payments made, so -- (no further response.)
MS. FISH-WHITLOCK: Do you know the payoff of the contract for deed at this time?
MR. GETTE: Objection.
THE DEPONENT: No, I don't.
MR. GETTE: Objection. I have a question pending. Don't instruct the witness while a question is pending. If you have an objection, that's fine.
Q. (By Mr. Gette) From the document that's been marked as Deposition Exhibit 3, does it appear that 34 payments have been made to date?
A. Yes, it does.
Q. Okay. And under the contract for deed are there 40 payments due?
A. Yes, there is.
Q. Okay. Now Deposition Exhibit 3, in the final column on the page indicates what appears to be a running balance of the funds owed. Is that correct?
A. That running balance is not correct.

Page 27

Q. Okay. And that's why I asked. At the bottom it appears that there's actually a negative balance owed. I assume that that is not correct?
A. That's, you're correct, that is not correct.
Q. Okay. See if we can get one more doc -- one more correct in there.
When the trust purchased the lot, what was the intention of the trustees, on behalf of the trust, in terms of development, if any, of the property?
MS. FISH-WHITLOCK: Objection, vague.
A. I guess we didn't really have any, anything absolute. We were hoping to be able to develop it, being that we did purchase this property with the understanding that it was a platted residential lot, and, unfortunately, it didn't turn out that way. After we purchased it, we started being told by local units of government that we could not use the property for its intended purpose.
Q. (By Mr. Gette) And when you say develop the property, what do you mean by that?

Page 28

A. Whatever development we, the four of us would agree upon.
Q. At the time of purchase you didn't have a specific development plan then. Is that fair to say?
A. Nothing on paper, no.
Q. As a beneficiary and trustee of the trust, did you have anything in your mind regarding what you hoped in terms of development for the property?
A. I was hoping that we could build on the property and improve the value.
Q. And what specifically did you consider building?
A. For its intended purpose, when the county platted and approved the plat, residential development.
Q. You said that you were apprised at some point by local units of government that it could not be developed for its intended purposes?
A. Yes.
Q. Specifically, who told you that?
A. Mr. Gary Lockner verbally informed me of that the first time I went in to try to

Page 29

get a building permit.
Q. When did you first attempt to obtain a building permit?
A. I do not recall, but it was early on in the ownership of the property.
Q. Did you submit an application for a building permit?
A. Eventually, yes, we did submit an application, an after-the-fact permit.
Q. Let me go back to the point in time when you met with Mr. Lockner. Did you actually submit an application for a building permit at that time?
A. No, I did not.
Q. And why did you not submit a building permit application at that time?
A. Because he verbally informed me that he would not accept one.
Q. Had you prepared a building permit application to submit at that time?
A. No. I had asked for an application and he told me at the time that he was not going to accept it, so I didn't have the application to submit.
Q. Okay. Did he tell you why he would

Page 30

not accept an application for a building permit?
A. He did, but I do not recall exactly what his reasons were.
Q. Do you recall generally?
A. No, I don't.
Q. And, again, you said that this conversation took place sometime in the early period of ownership of the property?
A. Yes, it did.
Q. Were there any other individual or government units that said that you could not develop the property?
A. Yes, there were. In so many words there were. We've received notices from the DNR, Department of Natural Resources, and the United States Army Corps of Engineers and Lake of the Woods County.
Q. Other than that conversation that we've already talked about between you and Gary Lockner, have you had any other conversations with him regarding development of the property?
A. I believe I've had one or two conversations with Mr. Lockner that was early on in the ownership of the property. Mr.

Page 31

Lockner retired shortly after we took title to the property and they had a new environmental services officer in place at the time.
Q. Do you know his name?
A. I believe Steve Sindelir took over for Mr. Lockner for a period of time and then Mr. Josh Stromland took over for Mr. Sindelir.
Q. And did you have conversations with either of those gentlemen regarding development of the property?
A. Yes, I have.
Q. Okay. Let's start with Mr. Sindelir. When did you first discuss development of the property with him?
A. Shortly after Mr. Lockner retired.
Q. And what was your purpose for talking to Mr. Sindelir?
A. I do not recall, but all of my conversations with Lake of the Woods County Environmental Services have dealt with attempts to obtain approval to improve the property.
Q. And, again, here, when you say develop the property, what specifically do you mean?
A. Whatever we could do. We've

Page 32

attempted to request information to install a septic system, we've attempted to request information on what permits we needed, if any, to install a driveway and a parking lot.
I have requested information on our electric service installation.
I have also requested information about the possibility of installing a boat access for the property.
And I have requested information for obtaining a building permit for construction of a residential building.
Q. Were you ever provided applications or application instructions for any of the various development plans that you just listed for me?
A. Sometimes I was provided applications and sometimes I was told I was not going to be provided applications.
Q. Other than Mr. Lockner, who has told -- what individuals have told you that they would not provide you applications?
A. Mr. Lockner, Mr. Stromland and Mr. Sindelir.
Q. Talk a little bit about the

Page 33

different development items that, that you listed. You first talked about the possibility of installing a septic system. When did you first approach local government officials about a septic system?
A. That was when Mr. Lockner was still employed with Lake of the Woods County.
Q. And what did Mr. Lockner tell you with respect to septic system installation?
A. He said he would not allow any septic systems to be installed on that property.
Q. Did he tell you why?
A. I don't recall his reasons why.
Q. Did you ever retain any professionals to design or provide you consultation on design of a septic system?
A. I was actually told by the Lake of the Woods County Board of Commissioners to, that I could work with Mr. Steven Sindelir and the wetland people in Bemidji, I can't remember their names. BWSR, Board of Soil and Water Resources.
The two were instructed to work with me to develop a plan that could meet the

Page 34

approval of the DNR and the Army Corps of Engineers and Lake of the Woods County.

After several attempts to meet with the Board of Soil and Water and Mr. Sindelir, and several canceled meetings that were canceled by Mr. Sindelir, I stopped making attempts to meet with them.

Q. So is it fair to say that no meetings of the type you just described ever took place?

A. That is correct.

Q. Okay. When you say Lake of the Woods county commissioners told you, did they tell you at a meeting of the commission itself or were these individual members telling you that this group would work with you?

A. This was, this was told at our hearing that we had for our permit application that was denied by the county board of commissioners.

Q. Okay. Initially I'd asked you a question regarding whether you had retained anyone to assist you in the design or consult with you on the design, and I want to go back to that question, because you gave me very

Page 35

important information, but I don't think you quite answered that question.

Did you actually hire someone on your own to provide you any consultation or designs for a septic system on Lot 14?

A. I hired no private companies, no.

Q. Aside from government officials, have you ever asked anyone to investigate the possibility of constructing a septic system on Lot 14?

A. Yes, I have.

Q. And who is that?

A. I have spoken to one individual who is, was at the time a licensed septic installer and designer, and he indicated to me that he believed that we could put a holding tank on the property.

Q. And who is that individual?

A. His name is Tim Fish.

Q. Any relation?

A. He's one of my cousins.

Q. Did he -- let me ask that differently.

Had he ever been on the property?

A. I, I'm not sure.

Page 36

Q. And when he referenced holding tank, did you understand that to be the kind of tank that has to be emptied periodically and taken off site?

A. A holding tank, from what I understand, is generally a tank that is buried in the ground and is pumped periodically.

Q. And do you know whether there are any state restrictions that would prevent you from using a holding tank on Lot 14?

MS. FISH-WHITLOCK: Objection, it calls for a legal conclusion.

Go ahead.

A. I don't know. I was told there wasn't, but, again, I, I don't know for absolute certain if there is or not.

Q. (By Mr. Gette) And when you say you were told there wasn't, who told you that?

A. I don't recall that, but it was somebody that, at the time, would have had knowledge of, of the rules. I've talked to, well, many people and I'm fairly certain it was someone who was licensed as a designer or an installer. I've spoken to a few of them informally.

Page 37

Q. What individuals, who are licensed installers, have you spoken to informally?

A. Besides Tim Fish, I'm not absolutely sure which ones, which other ones I've spoken to. It's been many years since I've worked with this.

Q. Go back to the payments that the trust has made to Mr. Bailey. It appears that there may be another year and a half worth of payments to go. Does the trust current -- strike that.

Is it currently the trust's intention to complete its payment obligations under the contract for deed with Mr. Bailey?

A. Yes, it is.

Q. Are you aware that there is a road that was constructed by Mr. Bailey that runs adjacent to Lot 14?

A. There are two roads that run adjacent to Lot 14. You would have to be more specific about which road you're speaking of.

Q. Okay. I mean the road that runs north-south.

A. It is my understanding that Mr. Bailey constructed it. I was not present and I

Page 38

didn't have knowledge of it at the time. I believe that was, that was put in before these lots were put on the market.
Q. Okay. Now to access your lot, do you need to use the road that runs north-south that you understand Mr. Bailey may have installed?
A. No, we don't.
Q. Okay. It's fair to say you access it from an east-west road that comes off of Sandy Shores Drive?
A. That's correct.
MR. GETTE: Have this marked as Deposition Exhibit 4.
(Whereupon, Deposition Exhibit No. 4, Stavig, was marked for identification.)
Q. (By Mr. Gette) Miss Stavig, I'm handing you what's been marked as Deposition Exhibit No. 4. Do you recognize this document?
A. Yes, I do.
Q. Okay. What is that?
A. That is the application that was given to me by Lake of the Woods County Environmental Services for an after-the-fact permit I was told I had to have.

Page 39

Q. Who told you you had to have that permit?
A. Lake of the Woods County Environmental Services told me this.
Q. And do you recall which individual there?
A. No, I do not. It may have been Steve Sindelir, I don't recall which one of them was in charge at the time.
Q. Okay. You'll notice that in the lower right-hand corner there's some numbers stamped LWC followed by a number.
A. Um-hum.
Q. I think those are numbers that were added for purposes of a separate lawsuit.
A. Um-hum.
Q. But just for ease of reference, if you turn back to the one that ends in 364.
A. Okay.
Q. Okay. What is that page?
A. It appears to be a partial plat map of Sunny Beach.
Q. And does that show your lot?
A. Yes, it does.
Q. And it appears that there are some

Page 40

lines that have been drawn onto Lot 14. Did you prepare that drawing?
A. I do not recall.
Q. Do you recall seeing this drawing when you submitted your application for a permit?
A. I'm absolutely sure that I probably did see it at the time, being that I was the one that submitted this application.
Q. Okay. Is -- could you tell me what the drawing on Lot 14 represents?
A. I believe it represents the gravel that we installed on the property, the area that we installed the gravel on so that we could park our campers and vehicles on the property.
Q. Okay. And it looks like there may also be a, a small driveway to access that parking area. Is that correct?
A. Yes.
Q. Okay. Did the trust have gravel installed for purposes of creating the parking area and the driveway?
A. Yes, we did.
Q. When did the trust do that?

Page 41

A. I would have to look at my check register to know that exact time. It was very early in the ownership of the property, though.
Q. Is your check register something that you brought with you today?
A. Yes, it is.
Q. Okay. Let me hand you the documents you brought with you and ask you to see if you can locate that?
MR. GETTE: And, actually, this is as good as any time for a quick break, so why don't we go off the record.
(Whereupon, a brief recess was taken.)
MR. GETTE: Let's go back on the record.
Q. (By Mr. Gette) Okay. Miss Stavig, while we took a break, you were nice enough to look through the documents that you brought with you and it appears that the check register that you referenced is not among those documents. Is that correct?
A. That's correct.
Q. Okay. I'll just ask you, if you could, we made arrangements before we went on

Page 42

the record to have you copy some of the documents after we leave here today and provide those. If you could please just provide a copy of that register at that time.
A. I can do that, that's not a problem.
Q. Okay. Great.
We were talking about some gravel installation on the property. Did you contact anyone, any of the local government officials, to request permission to install that gravel or to seek a permit before the installation of the gravel was completed?
A. No. I wasn't aware that we needed a permit at the time. It was my understanding that we just needed a permit to build, not to bring gravel on the property.
Q. And prior to the installation of the gravel, was there any clearing done on the property to create the parking area?
A. Yes. The first year we owned it we did clear some brush and a few trees, not very many.
Q. And when you say we, who actually did that work?
A. The four of us that are the

Page 43

recipients of the trust and our spouses and family members.
Q. And had you obtained any permits to conduct clearing on the property?
A. No. We weren't aware we needed any.
Q. Now I'd like to go back to what's been marked as Exhibit No. 4, which has the drawing on it.
A. Um-hum.
Q. And you see next to Lot 14 there's a corridor that's marked Public Access. Do you see that?
A. Yes.
Q. And is that the road from which you gain access onto Lot 14?
A. Yes, it is.
Q. And does that road go all the way down to Lake of the Woods?
A. It goes all the way to the high water mark of the lake, yes.
Q. And is there a boat access at the end of that road?
A. Well, it depends on who you're talking to. No, really, no, there isn't.
Q. So there's no boat ramp for example?

Page 44

A. No. No, no developed ramp.
Q. Have you seen individuals put in there?
A. A few brave ones, yes.
Q. From your property, how far would you need to go if you wanted to put a boat into the water?
A. Well, we could put a boat into the water on our property, depending on the slope of the sand and that, the time of year, the water level. Otherwise we would have to drive approximately three miles north to Long Point Resort or we could go to Winterset, which is approximately two miles south, there's a private boat ramp there that we could probably access. We've never used it, though.
Q. Okay. Do you have a boat?
A. Yes.
Q. Where do you usually put in?
A. Anywhere where the fish are. Zippel Bay, the Rainy River, Wheeler's Point boat access, Long Point. We have several different areas of the lake we've used our boat, the public access.
Q. Okay. And at Long Point Resort, you

Page 45

indicated, is there a boat ramp there?
A. Yes. It's a private boat ramp.
Q. Is there a fee for the use?
A. Yes, there is.
Q. Okay. What is the fee?
A. The last time I was there I think it was $5.
Q. And you said there's also a private boat ramp about two miles south of your property. Is that correct?
A. Yes.
Q. And is there a fee to use that?
A. I don't know. I've never used that one.
Q. Okay. What about at Zippel Bay, is there a fee there?
A. Yes, there is.
Q. What's the fee at Zippel Bay?
A. Whatever the daily park fee is. I think it goes up every year.
Q. So as long as you pay the park fee you can also use the boat ramp?
A. Yes.
Q. And what about at Wheeler's Point, is there a fee there?

Page 46

A. No, there's no fee.
Q. Do you know who maintains -- is there a boat ramp at Wheeler's Point?
A. Yes. That's a DNR boat ramp.
Q. Okay. And how far is that from your property?
A. I suppose 15 miles, I'm guessing.
Q. Do you own or rent a boat slip anywhere for your boat?
A. No.
Q. Have you ever?
A. No.
Q. If you wanted to, what's the closest marina facility you could use for that?
A. I don't know. I know there's some on the Rainy River. I don't know if any of the resorts closer to our lake lot offer that service or not.
Q. Prior to the trust's purchase of the lot, did you have any conversations personally with Mr. Bailey?
A. Prior to purchase?
Q. Correct.
A. I believe I did in the capacity of inquiring about the purchase of the property.

Page 47

Q. And did you ask Mr. Bailey if the lots could be developed?
A. I don't recall asking that question.
Q. Okay. Without having asked the question, did that subject come up, to your recollection, in your conversation with Mr. Bailey?
A. Not that I can recall, no.
Q. Did you discuss the road access to the lots with Mr. Bailey?
A. Not that I can recall.
Q. Tell me what you do recall about that conversation with Mr. Bailey.
A. I think mostly it was just about negotiating the, the terms of the contract and whether or not he'd be willing to take us on as buyers, because it was my understanding that these were platted residential lots, so I didn't feel it necessary to go into anymore detail and questions about buildability, because I assumed they were buildable.
Q. How did you become aware that these were platted residential lots?
A. There was a story in the newspaper. I was also an abstractor at the time and so I

Page 48

had access to Lake of the Woods county recorder's office and I reviewed the plat, the preliminary plat at the time there, and I was familiar with the progress of it, because I was interested in, in buying one of them.
Q. So is it fair to say that your interest developed even before Mr. Bailey had listed them for sale?
A. Yes. As a, as a buyer I was interested, I knew that they were going to be platted and that the county was just in the process of approving the plat and so that -- and then I'd been told through the grapevine what Mr. Bailey was planning on asking for the lots, so I decided at this time that I was probably going to be interested in purchasing one of them.
Q. Turning back to Exhibit No. 4, which you have in front of you, which was an after-the-fact permit application. Is that correct?
A. That's correct.
Q. And other than that permit application that's been marked as Exhibit No. 4, are there any other permit applications

Page 49

that the trust has actually filed for Lot 14?
A. Not that I'm aware of, no.
Q. Have you -- let me ask it separately.
Has the trust ever had any design drawings prepared for residential development on the property?
A. No, we've never done that.
Q. Okay. Have you had any design drawings done for any other type of development on the property?
A. No.
Q. Previously we talked about a conversation with Mr. Lockner in which he indicated that he would not accept a permit application for the property and then you also indicated that Mr. Sindelir and Mr. Stromland had, at different times, similarly made such indications. Is that correct?
A. No, that's not correct.
Q. Okay. It is correct that Mr. Lockner at some point in time told you he would not accept an application for a permit. Is that correct?
A. That is correct.

Page 50

Q. Okay. Did Mr. Sindelir make any similar representations to you?
A. He discouraged me. He was not helpful and he seemed unwilling to provide any information on the development or -- of this property.
Q. Did you ever ask him why he was being unhelpful?
A. Yes, I did. And I think, I don't recall his exact words, but I believe that he knew that the county was probably going to have legal issues over this controversy with the plat being approved and then the owners not being able to develop it, and he was kind of, I believe he kind of probably felt that he was getting put in the middle of this, so he was very hesitant to offer any information.
Q. Did he ever make any references to the Corps of Engineers and their involvement in permitting of the property?
A. He may have. I don't recall.
Q. Okay. Let's move on to Mr. Stromland. Did he ever indicate to you that he would not accept a permit application on the property?

Page 51

A. No, he did not. He was just very unhelpful.
Q. And did you ever have occasion to ask him why he was being unhelpful?
A. I didn't feel that it was a necessary question to ask.
Q. Did he ever make any references to the Corps of Engineers?
A. He may have. I don't recall. It's been several years since we've had any conversations with him about this.
Q. When the fill was placed on the property for the driveway and the parking area, do you know how much fill was placed?
A. No, I don't recall that.
Q. Did you contract with someone to install that fill?
A. I believe we used our own equipment to haul the fill and then we hired, I think all we paid for was the, the actual gravel itself out of the pit. We might have paid for loading, I guess I don't remember. It was several year ago.
Q. Did, did you and the other beneficiaries of the trust and their families

Page 52

actually spread the fill?
A. I wasn't present when the fill was brought on, so I guess I don't know who specifically did the work.
Q. Okay. Do you know whether you, whether the trust paid anyone to spread the fill?
A. I don't believe we did, no.
MR. GETTE: Have this marked as Deposition Exhibit 5.
(Whereupon, Deposition Exhibit No. 5, Stavig, was marked for identification.)
Q. (By Mr. Gette) Miss Stavig, I'm handing you what's been marked as Exhibit 5 to your deposition. If you could take a moment and look at that and then let me know if you recognize that document?
A. Oh, I forgot about Mr. Lemm.
Yes, I do. I remember seeing that.
Q. Okay. And this is a letter that is addressed to you. Did you receive this letter?
A. Yes, I did.
Q. Okay. And it's dated October 26 of 1999. Do you believe you would have received it at about that time?

Page 53

A. Most likely would have received it about that time, yes.
Q. Okay. At the point in time that you received this letter, had you placed the fill on your property for the parking area and the driveway?
A. I guess I don't remember if it was -- I would have to look at my check register before I would know the answer to that. It was, it was in, around that period of time.
Q. You see in the middle of paragraph two it says, A replacement plan must be approved before any wetland impacts take place.
Did you understand what that sentence meant when you received this letter?
A. No, I did not understand it.
Q. Did you contact Mr. Lemm, after having received this letter, to discuss it?
A. I may have. I don't believe I got very far with him, though.
Q. Do you recall any specifics regarding the content of any conversation you had with Mr. Lemm at about this time?
A. No. I do remember that it was not a very productive conversation, though.

Page 54

Q. When you say not very productive, what do you mean by that?

A. Well, what it means was Mr. Lemm was not very helpful in giving me information on what we needed to do and I guess I can't remember any other, any other specifics about it.

Q. Okay. When I use the term fill, do you know what that term means?

A. That's kind of a loose term. It could mean anything, any kind of a, of a material.

Q. As a real estate agent, when someone says they're going to place fill on their property, what do you understand that to mean?

A. Well, in general terms, I guess it means if you're going to fill a property, it means you're going to fill low spots so you can create a level surface. That's my general understanding of fill, yeah.

Q. At this point in time, back in 1999, as, in your capacity as a real estate agent, had you ever had, been involved in the sale or purchase of a property that included the need to obtain permitting for wetland fills?

Page 55

A. No, I had not.

MR. GETTE: Have you mark this Exhibit No. 6.

(Whereupon, Deposition Exhibit No. 6, Stavig, was marked for identification.)

Q. (By Mr. Gette) Handing you what's been marked as Exhibit 6 to your deposition, do you recognize that document?

A. Yes, I do.

Q. Okay. What is that document?

A. That is a document that I was sent, I believe by the DNR, ordering me to restore the property to its original condition.

Q. And when did you receive this notice?

A. Probably shortly after it was dated.

Q. Okay. And it looks like it was dated in November of 2001?

A. That's correct.

Q. Okay. If you look on the second page, it says Attachment A. Do you recall reviewing Attachment A at the time you received this notice?

A. Yes, I do.

Q. Okay. And just in the last

Page 56

paragraph, the first sentence, it says, Since construction of the access road, approximately 5,734 square feet of unauthorized fill was placed in Lot 14.

Do you see that sentence?

A. Yes, I do.

Q. And did you understand what they meant by that sentence?

A. It was my understanding that they made an assumption and they were trying to create a -- to, to consider it fact.

Q. Can you explain to me what you mean by that?

A. What I mean is I'm -- I contested that in my hearing.

Q. And what aspect of that did you contest?

A. I don't recall, but I guess I was going to contest the amount, because they -- it was my assumptions, based on statements they made in the hearing, that they, they had no basis in fact of their, their guesstimate of the square footage of fill that was put on the property.

Q. Have you ever measured the area on

Page 57

which you placed fill on Lot 14?

A. I personally have never measured the area, no.

Q. Do you know whether any of the other beneficiaries of the trust have?

A. I don't know.

Q. Do you know of anyone in particular who has conducted a measurement of the fill placed on Lot 14?

A. I'm sure someone did, but it was not anybody that I can recall specifically.

Q. You've never hired anyone to take such a measurement?

A. No.

Q. Let me ask you to turn back to Exhibit No. 4, where the drawing is contained on the page that has the Bates number LWC 364.

It appears that next to the drawings of the driveway and the parking area there are some measurements indicated. Do you see those?

A. Yes, I do.

Q. Okay. Do you have any reason to believe that those measurements are incorrect?

A. It is my understanding, when we were preparing this document, that we were taking

Page 58

measurements based on what we believed to be our parking area.
Q. Okay. So these were estimates that you had made at that time?
A. I believe so.
Q. And did you personally make those estimates?
A. I don't recall. I may have had some help.
Q. Okay. But those measurements were a part of the application that you submitted, correct?
A. Yes, they were.
Q. Okay.
A. Actually, now that I remember, I think Mr. Lemm did help me with this application.
Q. This application being Exhibit No. 4?
A. Yes.
Q. Okay. And in what way did he help you with that application?
A. It's been so many years it's hard to remember, but I think he did remember, he did help me with some of the specific technical

Page 59

language involved in the application.
Q. Can you point me to any areas, at this point, that you know he assisted you with?
A. It's been a long time. Maybe this wasn't the one that he helped me with.
Oh, the watershed number.
Q. What page is that on?
A. 357.
Q. So the, the chart on page 357, he assisted you with that?
A. He may have. Unless there was another application that we worked on that we -- that never was submitted. Again, this has been so many years.
Q. As I look through the document, it appears that the handwriting is fairly consistent throughout.
A. Most of it --
Q. Is that your handwriting?
A. Most of it is my handwriting, yes.
Q. Let me refer you to a specific page, page 355, --
A. Okay.
Q. -- and this is an answer to question 14, and it's a separate attachment to your

Page 60

application. Do you recall preparing this attachment?
A. Oh, question 14, where is that?
Q. It's on the previous page, actually, 354. It's the immediately preceding page.
A. What alternatives to this proposed -- okay.
Yes, I did prepare this, this attachment.
Q. Okay. And you see under item number two, it says, Sold property. You indicate, This was also not feasible, as we discovered that there are no willing buyers for a property that the state and federal government agencies involved have conducted a land taking of.
When you say this was not feasible, what are you referring to?
A. Question 14.
Okay. List at least two alternatives, one of which may be no build or do nothing.
Alternative one is parking cars on the road, alternative two is selling the property.
Q. Okay. So when you say this was not

Page 61

feasible, you were talking, you're referring to a sale of the property?
A. Yes. I think my intention there was selling the property for what we had purchased it for, which was $25,000, and that was not feasible. My, I believe my intent there was that I didn't believe we would be able to sell the property for what we paid for it, after we discovered the restrictions that the government was putting on the property that we were not aware of when we purchased it.
Q. Did the trust ever list the property for sale?
A. No. We didn't want to get into a laundry list of legal issues for starters. There would have been no end to it.
Q. Did you ever discuss potential sale of the property to anyone?
A. I believe we did discuss putting it on the market and we decided that it was an exercise in futility.
Q. Did you do any research at this time regarding what lakeside lots that were not platted had sold for?
A. That's kind of ambiguous, because

Page 62

Lake of the Woods has a mix of platted and unplatted residential property and there's a lot of different variations in the values of these properties simply because of the type of lakeshore they've got.
And so platted versus unplatted, as we found out after we bought this property, means nothing.
Q. Okay. My question was at the time did you conduct any research regarding the sales prices of nonplatted properties?
A. No, we didn't feel that it was necessary. We were confident, based on sales in the immediate area, what waterfront had been selling for, that we were getting a good buy.
Q. Now the sales in the immediate area that you're referring to, those would have been of platted properties, correct?
A. As far as I know, yes.
MR. GETTE: Have this marked as Exhibit No. 7.
(Whereupon, Deposition Exhibit No. 7, Stavig, was marked for identification.)
Q. (By Mr. Gette) Miss Stavig, I'm handing you what has been marked Exhibit 7.

Page 63

A. Um-hum.
Q. Do you recognize that document? And take a moment.
I think I actually gave you a bit too much there.
A. Yeah.
Q. Let me, the last two pages I'm going to remove here, my paralegal copied those together, and on the flight out here I removed them from my copy, not your copy.
MS. FISH-WHITLOCK: Is that LWC 00381 and 00382?
MR. GETTE: Correct.
Q. (By Mr. Gette) Now having cleaned up the, what's been marked as Deposition Exhibit 7, do you recognize that document?
A. This looks like a Petition for Appeal.
Q. And was that submitted on your behalf regarding Lot 14?
A. I believe so.
Q. And was it Miss Fish-Whitlock that prepared that for you?
A. Yes.
Q. By the way, let me finish the circle

Page 64

out here.
What is your relationship, if any, to Miss Fish-Whitlock?
A. Oh, as far as being related?
Q. Yeah.
A. She's my sister.
Q. Okay. I was pretty darn sure, you two look --
A. We don't, we look nothing alike.
Q. Okay. I always say that about my siblings too.
Did you review this petition for appeal at or around the time it was submitted to Lake of the Woods County?
A. I may have. I don't recall.
Q. Okay. Let me ask you to look at paragraph six on page one.
It says, Lake of the Woods County previously platted this parcel as residential, which required a determination that the land was suitable for building residential structures.
And it continues, The act of platting the parcel as residential and changing the zoning classification from natural resource

Page 65

was in violation of the laws of Minnesota and constituted a procedural error in violation of Minnesota Rule 6120.35.
Did you understand that the act of Lake of the Woods, of platting the parcel, was in violation of Minnesota law?
MS. FISH-WHITLOCK: Objection, you're asking her legal questions that I don't believe she's going to have the capacity to answer.
A. No, I don't believe I can answer that question.
Q. (By Mr. Gette) Okay. Did you question, when you received this document, did you question the accuracy of anything that was contained in it?
A. To my knowledge, I didn't believe there was anything inaccurate.
Q. That's fine.
Let me ask you one other question about this document. In paragraph ten you indicate that the prior decision regarding permitting of the property did not take into account the number of people who own and use the lot.

Page 66

Related to that, do you know whether there are any limitations under county regulations regarding how many individuals can use platted parcels or live on platted parcels?
A. You know, I believe that this issue came up during our appeal hearing before Lake of the Woods County Board, and neither representatives of the county, their employees or their attorney could come up with a, a limit.
Q. So as far as you know, there are no limits under current county law. Is that correct?
A. At the time no one that represented Lake of the Woods County, which is who we were appealing to, could come up with any limits, no.
Q. Okay. When the trust purchased the property, had you had any discussions with anyone who suggested that the Lot 14 may have wetlands on it?
A. No, I don't, not that I can recall.
Q. Had you had any discussions with Mr. Bailey in which he indicated there was any concern about wetlands on any of the platted

Page 67

properties?
A. Not that I can recall, no.
MR. GETTE: Have this marked as Stavig Exhibit 8.
(Whereupon, Deposition Exhibit No. 8, Stavig, was marked for identification.)
Q. (By Mr. Gette) Miss Stavig, I'm handing you what has been marked as Exhibit 8 to your deposition, and take a moment to look at that document and let me know if it's a document you recognize.
A. Okay.
Q. Okay. Having reviewed Stavig Exhibit No. 8, do you recognize that document?
A. No, I have never seen this.
Q. Okay.
MR. GETTE: I have no further questions for you this morning.
Counsel.
MS. FISH-WHITLOCK: Okay. I'd like to take just a five-minute break and organize my, my thoughts on where I need to go.
MR. GETTE: Okay.
(Whereupon, a brief recess was taken.)

Page 68

EXAMINATION
BY MS. FISH-WHITLOCK:
Q. First I'd like to talk about the use that this property has been put to since the 1999 Fish Family Lake Lot Trust has purchased it.
And you previously testified that you estimate that your family utilizes the property approximately 12 outings per year?
A. On average, yes.
Q. Okay. And Mr. Gette asked you concerning your personal knowledge of the three other beneficiary families as far as how often they used the property in any given year since ownership. Do you have, do you have personal knowledge as to the specific number of visits that each beneficiary utilizes the property?
A. No, I do not.
Q. Obviously it's fair to say that some beneficiaries use the property probably more than, than some of the others?
A. Oh, yes.
MR. GETTE: Objection as to form, leading.

Page 69

Q. (By Ms. Fish-Whitlock) All right. Now with regard to Deposition Exhibit No. 4, this is -- what is your understanding what this document was to be?
A. It was my understanding that this was an application that we needed to submit to Lake of the Woods County in order to be approved for an after-the-fact permit. We were led to believe by submitting this application that we could use wetland credits to mitigate the gravel that we installed on the lot.
Q. All right. Now this application was in response to a document that you received by the Department of Natural Resources?
MR. GETTE: Objection, leading.
A. It's my -- I don't recall the exact order this was, this happened, but I did receive a document in the form of a ticket from the Department of Natural Resources and somewhere along the line, after that ticket was received, I was told by another individual, whether they were from the county or Board of Soil and Water, I don't remember, that we could mitigate this or apply for an after-the-fact permit to resolve the situation.

Page 70

Q. (By Ms. Fish-Whitlock) Okay. Now this Deposition Exhibit No. 4, a basic application for the Minnesota -- what was, what was your understanding, when you applied for this, made this application as marked in Exhibit 4, what, what were you applying for?
A. We were basically following the direction of employees of the county, the local government. We were told that we needed to apply for this after-the-fact permit in order to validate the installation of the gravel that we put on the property and basically it would, it was our understanding that this would put us in compliance and that the ticket that I received would be dropped.
Q. All right. Now you previously testified that you believed that Les Lemm assisted you in, in completing this application?
A. I believe he did. I'm pretty sure that he was the one that said he would help me with this thing. I'm not absolutely sure, though, --
Q. Okay.
A. -- because it's been several years

Page 71

since we did this.
Q. And you requested that you purchase wetland banking credits in lieu of actual, actually conducting the replacement of wetlands elsewhere. Is that right?
A. Yes.
Q. Now there's several attachments on this application. Did you gather these attachments personally for the application?
A. I don't recall. I do know that I had some assistance from either Les Lemm or the Environmental Services office in putting this application together.
Q. Okay. Now I'd direct your attention to the page number that indicates LWC 00361.
A. Okay.
Q. Is that something that you would have had in your possession to attach to this basic application?
MR. GETTE: Objection, calls for speculation.
A. I don't recall.
Q. (By Ms. Fish-Whitlock) All right. Do you believe that you personally gathered this, this, looks to me like a plat map or a

Page 72

plat drawing, noted as LWC 00361?
A. I know that is not my handwriting, so it came from someone else.
Q. All right. And turning to the next page, LWC 00362, in what appears to be a, a map of some sort of Prosper Township, do you recall whether you attached this document to the basic application?
A. No, I don't recall.
Q. All right. Do you have any idea why this is attached to your basic application?
A. I'm assuming it's to determine overall where the location of this property is.
Q. Okay. And can you state with personal knowledge whether you attached this document, as noted as LWC 00362, or whether that was done by someone else?
A. I can't say for sure that, if I attached it or if someone else did.
Q. All right. And turning to the next page, LWC 00363, it appears to be a plat map of Sunny Beach that had certain markings on it.
Do you recall personally attaching this to your application?
A. I don't recall whether I did or did

Page 73

not.
Q. Okay. Does that document at all look familiar to you as far as there's, it appears as though there's certain markings along the plat map through Lot 12, through Lot 9, and it looks like in between Lot 5 and 6 and somewhat within Lot 3, do you have any personal knowledge as to what those markings mean?
A. It appears to me that this was a plat map that was marked up by someone who is familiar with elevations.
Q. You don't know who did that, though?
A. I don't know who did it, but --
MR. GETTE: Objection, --
A. -- it wasn't me.
Q. (By Ms. Fish-Whitlock) All right.
MR. GETTE: Objection, not allowing the witness to finish her answer.
Q. (By Ms. Fish-Whitlock) So do you have any idea where this document, LWC 00363, came from?
A. I don't remember, no.
Q. Okay. Do you believe, or did you, in preparing for this application, did you obtain information from anywhere else other

Page 74

than the assistance of Les Lemm?
A. I don't recall. I may have, I may not have. I guess I don't remember.
Q. All right. Would you have obtained any sort of assistance from the Environmental Services director or any employee of Lake of the Woods County in completing this application?
MR. GETTE: Objection, asked and answered.
A. It's possible that I did.
Q. (By Ms. Fish-Whitlock) Okay. Turning to page, on Exhibit, Deposition Exhibit No. 4, indicated with LWC 00364, do you recall this particular page being attached to your application when you submitted it?
A. I don't recall, but I don't remember ever -- I don't remember the specifics of the application process. It's been too many years.
Q. Okay. So as far as any suggestions that were made that you drew this little map on Lot 14, that would -- you're not testifying that you drew this map. Is that correct?
MR. GETTE: Objection, leading and mischaracterizing.

Page 75

A. I don't recall whether I did or did not draw this map.
Q. (By Ms. Fish-Whitlock) Okay. In looking at the handwriting on the drawn map on Lot 14, indicated on LWC 00364 in Deposition Exhibit No. 4, is that your handwriting?
A. It may be, it may not be.
Q. Okay. Turning to page 00365 of Deposition Exhibit No. 4. Do you know what this document is?
A. No, I don't.
Q. Okay. Do you recall attaching this document to your application?
A. No, I don't.
Q. Okay. Do you have any idea who attached this document to your application?
A. No, I don't. If they did, it was, it could have been -- it wasn't me that generated it, I know that.
Q. Okay. Do you have any personal knowledge as to whom attached this to your application?
A. No.
Q. All right. Turning to LWC 00366. Do you know that document is?

Page 76

A. No, I don't.
Q. All right. Do you recall attaching this to the Fish Family Lake Lot basic application?
A. No, I do not.
Q. Okay. Do you believe you attached it to your basic application?
A. If I did, then it was information I most likely got from the county and they told me that this was information that I would probably need would be my guess.
Q. Okay. So it wasn't necessarily your choice?
MR. GETTE: Objection, --
A. I don't recall.
MR. GETTE: -- vague.
Q. (By Ms. Fish-Whitlock) Now you also indicated that you believed that as far as the previous use of the property, that you believed your husband may have went bird hunting last fall?
A. I believe he did, yes.
Q. Okay. Do you have personal knowledge as to, you know, specifically where he went bird hunting as far as, you know,

Page 77

whether he was in a field or whether he was in a wooded area or whether he was -- I guess I'd like you to clarify your answer. It's my understanding that the Fish Family Lake Lot Trust owns a one-acre lot?
A. Um-hum.
Q. Okay. Do you know whether he was hunting on that specific lot or he just went out to the general Sandy Shores area and attempted to bird hunt?
A. No, I don't. I guess I don't recall.
Q. All right. You don't know whether, basically what my question is, is you don't know, you don't have personal knowledge as to whether he went hunting on Lot 14?
A. No. I wasn't there, --
Q. Okay.
A. -- so I don't know if he was standing in the lot or if he was standing on the road that doesn't exist, so -- (no further response.)
Q. Now moving on to Deposition Exhibit No. 6. You testified that this was the, a Restoration Order that you received from the

Page 78

Department of Natural Resources. Is that right?
A. Yes.
Q. All right. I'd like you to turn to the second page of Exhibit Number 6.
Now the basis for the Restoration Order was that the Army Corps of Engineers was going to be removing the access road. Is that your understanding of the findings on why you were issued a Restoration Order?
A. It was my understanding, I was sent a copy of my Restoration Order and the Restoration Order that was given to Gary Bailey, and Gary Bailey's Restoration Order was that he was to completely remove the road that he installed.
Q. The access road?
A. The access road.
Q. Now it's very clear that Lot 14 is not dependent upon, you know, the access road, though. Is that right?
A. That is correct.
Q. All right.
A. So -- yeah.
Q. All right. But you were issued a

Page 79

Restoration Order despite that?
MR. GETTE: Objection, vague.
A. This Restoration Order, I believe, doesn't, isn't entirely accurate, because it indicates that removal of the road will leave no access to the Sunny Beach lots. That is not true, because we do not need this road to access our lot.
Q. (By Ms. Fish-Whitlock) All right. Now the, Attorney Gette also questioned you on what your, as to your knowledge of the remaining payments that are, are owed to Gary Bailey at this time.
Do you know the exact payoff of what is owed to Mr. Bailey pursuant to that contract for deed?
A. No, I don't.
Q. Okay. Are you aware of whether interest has accrued as a result of late payments made by the trust?
A. I would imagine that Mr. Bailey would expect us to pay additional interest for the late payments, yes.
Q. Now you previously testified that, I want to make, I want to make this very clear,

Page 80

you were never able to submit a building permit to Lake of the Woods County?
A. I was, I was discouraged --
Q. Okay.
A. -- from submitting a building permit.
Q. All right. And there was at one point where you were refused, they would not -- or they refused to accept a building permit from you?
A. Early on, very early on, I requested a permit for a septic system and Mr. Lockner refused to give me the application because he told me he was not going to approve it anyway.
Q. Now after the issuance of the Restoration Order to remove the fill, there were state criminal charges brought as a result, where the state was alleging that you were violating a criminal law by not removing the fill. Is that right?
A. That is my understanding from the traffic ticket I received in the mail from the Department of Natural Resources.
Q. And that has, that has, that was in fact dismissed by -- that was dismissed?

Page 81

A. Yes, it was.
Q. All right. Now after the after-the-fact permit application to keep the fill on the property, there were still communications with local government officials in trying to resolve the issues as far as trying to assist you in finding what, how you can use this property. Is that right?
MR. GETTE: Objection, vague and leading.
A. Between the period of time when I submitted the application and the hearing was conducted, there was no communication. We were simply waiting for the results of the, of the application.
After that point, after the hearing, then I made several attempts to follow the request of the County Board of Commissioners to meet with BWSR and the local soil and water people and all of those attempts were rebuffed, or my, all of my, three, at least three of my scheduled meetings were canceled by the other party.
Q. (By Ms. Fish-Whitlock) Do you recall the dates of those communications?

Page 82

A. I have saved e-mails from Mr. Sindelir regarding those communications, but I don't recall the exact dates.
Q. All right. One of the issues in the denial of the wetland replacement plat application was that the, technically, the evaluation panel felt that the amount of gravel was excessive. Do you recall that issue?
A. I recall that coming up in the hearing, yes.
Q. All right. And do you recall what the response of the Environmental Services director was to our notification of the number of families that utilize this lot for camping purposes, for parking campers and rigs?
A. I believe his response was that he wasn't aware that there was four families using the property.
MR. GETTE: Object to the question as calling for hearsay.
Q. (By Ms. Fish-Whitlock) I'm showing you a letter dated December 27, 2002, I'd like you to review that, please.
MR. GETTE: Are you going to mark that as an exhibit?

Page 83

MS. FISH-WHITLOCK: No, I'm not going to mark it. It's not necessary.
MR. GETTE: It is necessary. If you're going to show the witness an exhibit, it needs to be marked as an exhibit.
I may have copies that you can use, in fact.
MS. FISH-WHITLOCK: Fine.
MR. GETTE: What's the date of the letter?
MS. FISH-WHITLOCK: December 27, 2002.
MR. GETTE: If you'd like to use this, you're welcome to.
MS. FISH-WHITLOCK: Thank you.
MR. GETTE: You can keep your original and then we can mark one of those.
(Whereupon, Deposition Exhibit No. 9, Stavig, was marked for identification.)
Q. (By Ms. Fish-Whitlock) Showing you what's been marked as Exhibit 9, I'd like you to review that. In particular, I'd like to, to direct your attention to paragraph five on page two.
A. Paragraph five, page two. Okay.

Page 84

Okay.
Q. Now after you've reviewed that document, do you recall why, the response of Lake of the Woods County to your indication, or your, your information that was provided of the number of campers and vehicles that utilize this lot, in requesting the decision makers take that into consideration in your application?
MR. GETTE: Objection, vague.
A. I guess what I do recall Mr. Sindelir stating in the hearing process is his determination that the city of Baudette zoning ordinance was the guideline that he used to determine the excessive amount of fill that we placed in the lot.
Basically he took the city of Baudette's minimum amount of parking space allowed, which is 300 square feet, and he determined that anything over and above the city of Baudette's minimum was considered excessive.
Q. (By Ms. Fish-Whitlock) Okay.
A. Which we objected to at the time.
Q. And the reason why that was objected

Page 85

to is because Lake of the Woods County is not in the city of Baudette. Is that right?
MR. GETTE: Objection, leading.
A. The reason we objected to it is the fact that he used the city of Baudette's minimum amount, not maximum, but minimum, and the city of Baudette has absolutely nothing to do with Lake of the Woods County as far as zoning and planning.
Q. (By Ms. Fish-Whitlock) Has any person from the Department of Natural Resources, the Board of Water and Soil Resources, the Army Corps of Engineers, or any other governmental agency, ever requested permission to enter your property to conduct a delineation or site investigation?
A. No.
Q. Do you know whether you can put a dock on Lot 14?
A. I was told by Gary Lockner early on that I would have to check with the DNR. I did check with the DNR and I was told that we could pour all the concrete we wanted in Lake of the Woods as long as it was below the high water mark and they had no problem with us putting a

Page 86

dock on the property as long as we made application to them. We never did, however.
Q. All right. Is there any docks located along the shoreline, I'm going to characterize it as Sandy Shores, the mile south and the mile north of where Lot 14 is located, are you aware of any docks that are located in that area?
A. There are no permanent docks.
Q. Now there's been some, I'm going to characterize it as conflicting information between various governmental agencies when it comes to Lot 14. Would that be a fair statement?
A. (No response.)
Q. I'll rephrase.
Has any agency given you an indication that they would accept any, an application for the placement of fill that is now in existence should you obtain approval, approval from another government agency?
A. Yes. In fact, I was led to believe, when I applied for this after-the-fact permit, that I would not have a problem getting approval of it, that it was just a, simply a

Page 87

matter of filing the application and paying the $2,200 that it would cost us to purchase the wetland credits.
And so we didn't, we didn't think there was going to be a problem at that point.
Q. Okay.
A. And somewhere along the line, during this process and shortly thereafter, was where we started running into problems with Lake of the Woods County telling us they would approve our after-the-fact permit if the Army Corps of Engineers approved.
And then the Army Corps of Engineers decided that, telling us that they would approve it if the local government approved us, which basically put us at a stalemate, and we just decided to, to drop it and -- because there was no, there was no place to go at that point.
Q. You were simply going in circles at that point?
A. We were, we were traveling in circles, yeah.
Q. Now how long have you lived in Lake of the Woods County?

Page 88

A. I've lived in Lake of the Woods County off and on since the first grade.
Q. Okay. Do you, do you have, do you feel that you have knowledge or do you feel as though you can distinguish between a wetland and a nonwetland?
A. As much as the, a common person could, yes.
Q. Okay. When you purchased Lot 14, the first 100 feet, did it appear to you to be wetland?
A. The waterside or the, or the roadside?
Q. The waterside.
MR. GETTE: Objection, calls for an expert opinion.
A. I guess I really couldn't say. It didn't, it didn't look swampy. I mean, --
Q. (By Ms. Fish-Whitlock) What sort of trees were on it?
A. There was birch, there was ash, there was a couple pine trees and some, a mix of other trees I guess I'm not familiar with.
Q. All right. Did you have any conversations with Gary Lockner on his opinion

Page 89

on whether wetlands existed on that property?
A. Early on, when Gary told me that he was not going to issue any permits for septic systems out there, he said the reason he wasn't going to do it is because he believed that it was a wetland. As far as I can recall, he said he wasn't, he -- and I can't remember his exact wording, but he said it was too much of a hot potato and he wasn't going to, he wasn't going to start butting heads with --
Q. Okay. Did you have --
A. -- larger units of government.
Q. Did you have any conversations with any local government officials who indicated to you that they believed that the first 100 foot of shore land was not wetlands?
A. I may have. I don't recall --
Q. Okay.
A. -- those conversations, though.
Q. Now you're a real estate agent and now a broker?
A. Yes.
Q. As far as the value of Lot 14, since the date you purchased the property to the present, has that diminished?

Page 90

A. When we purchased Lot 14, we were five or six years into passage of the Wetland Conservation Act and basically the state wetlands law, which was passed in 1992, up and to the point that we purchased that property, that wetlands law had not been enforced.

There was, it was so complicated and so all-encompassing that local units of government, to my knowledge, were still trying to get their hands around this act to determine just what it encompassed and, and where, where it started and where it stopped. So there was very little or no enforcement that had gone on up to that point.

Q. As far as you're aware?

A. As far as I was aware as a real estate professional and as a, a resident of the county.

It appeared to me that our particular situation was being used as, or it seemed to me, based on the reactions I was getting, that we were being used as a test case, or a Guinea pig, for the state wetlands law. That was the, that was the impression I was getting from the local units of government,

Page 91

because the local people were still fighting it to a point, because it was bad for the local government, it was bad for growth, it was bad for, it was costing them an enormous amount of time and resources and money trying to enforce something that they didn't totally understand.

And, but they were being told by people in higher positions than they were that they had to do this, they didn't have a choice. So, unfortunately, they were being stuck between a rock and a hard place. They, they had to do this, but they didn't know how far they had to, to push it.

And to make a long story short, this, it created a perfect storm, a mess of sorts, that nobody wanted to be involved in. But I believe, it's my opinion that the Army Corps of Engineers is the one that's been pulling the levers here, they're the ones that have been pushing this, instructing the state of Minnesota, the DNR and the local units of government, either through coercion or just plain this is the way it's going to be, to put our, put us in a situation where we can do absolutely nothing with our property besides

Page 92

stand on the road and look at it.

MR. GETTE: Objection, nonresponsive.

MS. FISH-WHITLOCK: I have no further questions.

EXAMINATION

BY MR. GETTE:

Q. Okay. I have a few follow-up questions.

Miss Stavig, do you have any formal training in identifying wetlands?

A. No, I don't.

Q. Do you have any education in how you identify wetlands?

A. None.

Q. This is just to make sure I heard you right. Did you say that it would be $2,200 to purchase wetland credits?

A. That's what I was told by one of the county employees at the time, when I was completing the after-the-fact permit application, that the cost of the credit, based on what we were applying for, would be approximately $2,200.

Page 93

Q. Okay. And from whom did you understand you were buying the credits?

A. It was my understanding that Lake of the Woods County had some wetlands banked and that we could purchase them directly from the county.

Q. You indicated in response to a question that there were no permanent docks along Sandy Shores in the area of Lot 14. Is that correct?

A. That's correct.

Q. Okay. Do people place temporary docks in the summertime?

A. Yes, they do.

Q. Have you ever placed a temporary dock off of Lot 14?

A. No, we have not.

Q. Based upon your conversation with the DNR regarding docks, do you understand that you could place a temporary dock along Lot 14, in the summer, if you wish to?

A. That was my understanding, yes.

Q. You indicated that you had saved some e-mails from a Mr. Sindelir regarding meetings that were canceled. Do you recall

Page 94

that?
A. Yes.
Q. Do you still have those e-mails?
A. I believe I do, yes.
Q. Okay. Would you be willing to produce those?
A. I could do that.
Q. Okay. You said that early on in the application process you were led to believe that you could purchase these wetland credits. Who told you that?
A. I believe it was either Mr. Lemm or Mr. Sindelir that told me that.
Q. And when would they have told you that?
A. I would say most likely during the process of building the application or putting together the information that we needed to apply for the after-the-fact permit.
Q. Miss Stavig, do you know who has responsibility for enforcement of the Wetland Conservation Act?
A. I was told that the enforcement lies with the Minnesota Department of Natural Resources.

Page 95

Q. You said it's your opinion that the Army Corps of Engineers is, you used the phrase pulling the levers?
A. Yes.
Q. What's the basis for that understanding?
A. Because every inquiry I've made to Lake of the Woods County and the DNR has pointed me towards the Army Corps of Engineers making statements and issuing orders that they don't want to object to.
Specifically, the, the ticket that was mailed to me, was sent to me, it was my understanding, on orders of a representative from the Army Corps of Engineers to the Department of Natural Resources.
Q. Did someone at DNR tell you that?
A. No, they didn't. I was, I was told that by someone else and I don't recall who it was. It could have been the, the lady that wrote the ticket that, that told me that.
Q. Do you know what organization she worked for?
A. She was from the DNR, she was out of Detroit Lakes, I believe.

Page 96

Q. Do you remember her name?
A. No. But her name's on the ticket, which is, I think, I believe in, in the file.
Q. Earlier I asked you whether at a specific time you had put your property on the market for sale. Have you ever placed Lot 14 on the market for sale?
A. No, we have not.
MR. GETTE: I don't have any further questions.

EXAMINATION
BY MS. FISH-WHITLOCK:
Q. Do you have any personal knowledge as to what the estimated tax value of Lot 14 is right now?
A. I might be a thousand or two off, but I believe the last property tax statement I received had it valued at $4,400.
Q. And that was for the year 2008 or 2007?
A. I think it was '07. 44 or 5400, I believe. It's been hanging right there for several years.
It went from a high of 28,000, the

Page 97

year after we purchased it, down to the four or 5,000 it's valued at now.
MS. FISH-WHITLOCK: I don't have any other questions.
MR. GETTE: I'd just like to put on the record, earlier we had discussed, you brought some documents with you today, Miss Stavig, you've agreed to copy certain documents out of that file as well as to produce some e-mails with Mr. Sindelir --
THE DEPONENT: Um-hum.
MR. GETTE: -- and a check register as well. Is that correct?
THE DEPONENT: That's correct.
MR. GETTE: Okay.
MS. FISH-WHITLOCK: I'd like to be specific on, on what -- e-mails from Mr. Sindelir, check register?
MR. GETTE: Correct.
MS. FISH-WHITLOCK: And --
MR. GETTE: And the documents identified in the folder that she brought with her here today.
MS. FISH-WHITLOCK: That's, that's my question, which documents?

Page 98

MR. GETTE: The documents that have been turned sideways in the folder.

MS. FISH-WHITLOCK: Okay. Okay. Understood.

MR. GETTE: Let's go off the record.

MS. FISH-WHITLOCK: We're going to read and sign, by the way.

(Whereupon, the deposition was concluded at 12:30 o'clock p.m.)

Page 99

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA )
) ss
COUNTY OF POLK )

I, RUTH ANN JOHNSON, a Notary Public within and for the County of Polk and State of Minnesota do hereby certify:

That prior to being examined the afore-named witness was by me sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition, consisting of 98 pages of typewritten materials, was taken down by me in Stenotype at the time and place therein named, and was thereafter reduced to typewriting under my direction.

I further certify that I am neither related to any of the parties or counsel nor interested in this matter directly or indirectly.

WITNESS my hand and seal this day of

Ruth Ann Johnson
Notary Public
Polk County, Minnesota
My Commission expires January 31, 2012.

Page 100

ACKNOWLEDGEMENT OF DEPONENT

I, APRIL STAVIG, do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes or corrections, if any, appear in the attached errata sheet signed by me.

Date APRIL STAVIG

Page 101

Alan Fish
102 Second Avenue, Northwest
Roseau, Minnesota 56751
IN RE: Gary Bailey vs. The United States
Dear Mr. Fish:

Enclosed please find your copy of the deposition of APRIL STAVIG, along with the original signature page. As agreed, you will be responsible for contacting the witness regarding signature.

Within 30 days of receipt, please forward errata sheet and original signed signature page to James D. Gette.

If you have any questions, please do not hesitate to call. Thank you.

Yours,

Ruth Ann Johnson
Reporter/Notary

cc: James D.Gette