DEPARTMENT OF THE ARMY
ST. PAUL DISTRICT, CORPS OF ENGINEERS
190 FIFTH STREET EAST
ST. PAUL, MN 55101-1638

REPLY TO ATTENTION OF

June 7, 2005

Operations
Regulatory (MVP-2001-5667-JKA)

Mr. Bruce Hasbargen
Public Works Director
Lake of the Woods County
P.O. Box 808
Baudette, MN 56623

Dear Mr. Hasbargen:

This letter is in response to your letter of May 25, 2005, regarding the after the fact initial proffered permit for Sandy Shores Drive adjacent to Lake of the Woods. I forwarded the initial proffered permit to you for your consideration on March 28, 2005. In your letter, you stated objections over the ratio at which the wetland impacts are to be mitigated and the scope of the impacts that are addressed by the required mitigation.

I have considered your objections and offer the following explanation for the District's determination as well as a potential resolution of this matter. Many of the wetland fills that have occurred to date on the lots adjacent to Sandy Shores Drive were reasonably foreseeable and would not have occurred but for the County's construction of the road. Therefore, these impacts would have been considered in a permit evaluation for the road had one been conducted prior to construction. In light of this, we have considered these impacts in our after-the-fact permit process and our mitigation requirement of 25.38 acres includes adequate offsets for the direct, indirect, induced, and cumulative impacts of the road to date.

As compensation for the direct, indirect, cumulative, and induced wetland impacts caused to date by construction of Sandy Shores Drive, I will accept the proposed 25.38 acres of wetland mitigation to be conducted on the Graceton Wildlife Management Area. Any future fills, including the County's proposed improvements to Sandy Shores Drive or further residential development on lots adjacent to the road, will be addressed through separate permit applications. The cumulative impacts analysis of any future permit applications will consider the aquatic impacts already caused by the construction of Sandy Shores Drive and its associated development. The initial proffered permit under consideration is no assurance that future permits will be issued or, if so, an indication of the type or amount of compensatory mitigation that would be required.

EXHIBIT 27

I believe this proposal adequately addresses your concerns over the initial proffered permit. I respectfully request that you consider the information contained in this letter and provide a written response within 30 days of the date of this letter. If you have any questions, contact Mr. Jon Ahlness in our St. Paul office at (651) 290-5381. In any correspondence or inquiries, please refer to the Regulatory number shown above.

Sincerely,

Robert J. Whiting
Chief, Regulatory Branch

Copy Furnished:

Josh Stromlund, LOW County

# *Lake of the Woods County*
# *Public Works Department*

*Phone:* *218/634-1767*
*Fax:* *218/634-1768*
*An Equal Opportunity Employer*
*306 8th Avenue S.E.*
*P.O. Box 808*
*Baudette, MN 56623*

May 25, 2005

MSP 27 May 2005

RECEIVED
MAY 27 2005
CORPS OF ENGINEERS
ST. PAUL DISTRICT
REGULATORY BRANCH

U.S. Army Corps of Engineers
Colonel Michael Pfenning
District Engineer and Commander
190th 5th St. E
St. Paul MN 55101-1638

Dear Colonel Pfenning,

This letter is a formal objection to the permit dated March 28, 2005; regarding the mitigation site for Township Road #381 (Sandy Shores Drive). The reasons for this objection are the ratio at which the road is to be replaced and the exclusion of the private landowners as originally agreed upon by the county and Mr. Jon Ahlness.

The county has been trying to upgrade Sandy Shores Drive since the original application dated July 5, 2001. This road was constructed between 1978 and 1988 when this area was developed into residential lots. Mr. Jeff Koschak, who was the Corps representative at the time the application was submitted, said nothing regarding Corps involvement pertaining to this maintenance application. We believe that the developer of the Sunny Beach subdivision also played a role in this situation by asking why the Corps is involved with his illegally constructed road and not Sandy Shores Drive.

We also object to the idea that we are not going by the regulations that were in place 17-27 years ago when the original road was constructed. We believe that this issue is well beyond the statute of limitations regarding this project. Instead of ignoring this problem, the county and the Corps met and discussed several options to resolve this matter. We have taken the recommendations from Mr. Koschak and have decided to plug a ditch, Judicial Ditch #16, for the mitigation. A 1.5 mile segment of the ditch will be plugged and abandoned to serve as mitigation for Sandy Shores Drive.

During the summer of 2004, the county and the Corps had several discussions pertaining to the landowner projects that have taken place within the subdivisions and also Sandy Shores Drive. We identified that some of the landowners did not receive Corps approval on their various projects. After some discussion it was agreed that projects conducted by a landowner prior to June 1998, a Nationwide Permit 29 would have been issued and therefore no mitigation is required. It was

also agreed that projects conducted from June 1998, to April 1, 2004, the landowners would be responsible to obtain a Corps permit and from April 1, 2004, the county and the Corps would work together in addressing individual projects in the future. During these discussions the county said that we would be willing to accept responsibility for the landowners that did not have Corps approval between the dates of June 1998, to April 1, 2004, and include their impacts in the mitigation site. The amount of impact was to be determined at a later date by Mr. Ahlness. Since there was excess mitigation after the road deduction, the private landowners were then added to the mitigation site. Mr. Ahlness thought that this was a great idea to resolve past issues.

An after the fact application was submitted to the Corps dated September 13, 2004, for the original road construction of 17.98 acres of wetland impact. The mitigation site would restore 25.65 acres of wetland and the remaining 7.67 acres would serve as mitigation to satisfy the landowner impacts. This idea was brought to the attention of Mr. Bob Whiting and he did not have a problem with it as long as the county did not receive any monetary gain from the mitigation site. The county will not use any portion of this mitigation site as a wetland bank. If there would be any acreage left over after the road and landowner portions are deducted, it would be used as excess mitigation as a good faith effort in starting from a clean slate. The application was for a 1:1 mitigation ratio for the road since; it has been 17-27 years since the original road construction. Also, the landowner portion was at the same ratio because of the length of time that has passed.

During the comment period the MNDNR noted that private landowners should not be allowed to use this mitigation site for their benefit since the mitigation site is located on the Graceton Wildlife Management Area. The County talked with Mr. Ahlness and Ms. Kelly Urbanek regarding this issue and they both assure the County that we still could make the original application work by addressing the landowner's projects under the mitigation site in the future. They said that it would take creativity in addressing this issue but, it could be done.

Mr. Ahlness and the County had discussions regarding the provisional permit requirements. The county had no problem with the requirements set forth by Mr. Ahlness so he pushed the permit up the chain of command. After review by Mr. Whiting and Ms. Marita Valencia, the provisional permit was sent back to Mr. Ahlness with a comment stating that a 1:1 mitigation ratio was not adequate to address the impacts associated with Sandy Shores Drive. The reason for this was because of temporal loss and partial out-of-kind replacement. The impacts associated with the road are to Types 6 & 7 wetlands and the mitigation site would be a Type 6. This was a shock to us because at no time did anyone say anything about an increased mitigation ratio, temporal loss, out-of-kind replacement, or Section 401 approval by the Minnesota Pollution Control Agency (MPCA). We were lead to believe that we would resolve all past issues by accomplishing this mitigation project.

After talking with Mr. Ahlness about the changes to the permit, we asked the question of, "What set of regulations are we going by, current or when the original road construction took place?" The answer that we got from Mr. Ahlness was that he was going by the original date of construction but, he was told otherwise. We believe that this is not legal. You can not use current regulations to address an issue that happened 17-27 years ago. The county feels that we have worked in good faith with the Corps in addressing this issue and have taken a proactive approach in dealing with the past and future projects.

This past summer, with the cooperation of a local landowner the county accomplished an eighty (80) acre wetland restoration site. This site has been identified in the Lake of the Woods Comprehensive Local Water Management Plan (CLWMP) as a high priority area within the county. This site was a converted agricultural field at the headwaters of Bostic Creek, which leads to Lake of the Woods. The goal of this project was two fold: stop sedimentation to Lake of the Woods and restore wetlands within the county. Also, this restoration site can be used to offset the temporal loss issue that the Corps deals with. We are in the process of having the Corps acknowledge this restoration site.

The above is a summary of what Lake of the Woods County has gone through in the past four (4) years in trying to resolve this issue. Considerable amounts of time and money have been invested in this project. We would appreciate if you would look into this matter and approve the original application that was submitted on September 13, 2004. This would be a great benefit to the county and the landowners if the original application is approved.

Sincerely,

Bruce Hasbargen
Public Works Director

# Lake of the Woods County

## Office of Land and Water Planning

Josh Stromlund
Land & Water Planning Director
PO Box 808
Baudette, MN 56623
Phone (218) 634-1945
Fax (218) 634-2509

April 27, 2005

U.S. Army Corps of Engineers
Colonel Michael Pfenning
District Engineer and Commander
190th 5th St. E
St. Paul MN 55101-1638

Dear Colonel Pfenning,

This letter is in reference to the Sandy Shores road mitigation site located on the borders of s. 35&36, T. 162N, R. 33W (Zippel Township), and s. 1&2, T. 161N, R. 33W (McDougald Township), in Lake of the Woods County. We are frustrated with the U.S Army Corps of Engineers (Corps) and feel that we have been mislead throughout this whole process. A provisional permit has been issued but, is not the original plan that the county or the representative from the Corps had been working towards. The end to this long and complicated project is within site but, individuals within the Corps feel the need to keep putting up additional hurdles in order to extend the process. We have tried to work with the Corps to the best of our ability to resolve all past issues and now we will not be able to accomplish the original plan which would provide our residents with the proper mitigation. If you are not familiar with this situation, here is an explanation of what has taken place:

> An application dated July 5, 2001, was submitted to the Corps by the Lake of the Woods County Highway Engineer for the maintenance of Township Road #381 (Sandy Shores Drive). According to aerial photos the original road was constructed in phases between 1978 and 1988 when this area of the county was developed. The Corps representative at the time when this application was submitted knew about the history of the road and said nothing regarding Corps involvement. Also, the developer of Sunny Beach, a subdivision located to the south, constructed a road without authorization and starting asking questions of why the Corps is involved with his road and not the Sandy Shores Road. We believe that this is the reason why the Corps feels the need to come after the county twenty-seven (27) years later. Doesn't statue of limitation come into play?

A letter that is dated August 12, 2002, states that we must seek DA authorization for the original road construction concurrent with authorization of any additional regulated work on this road, signed by Mr. Robert Whiting, Regulatory Branch Chief. Instead of ignoring this problem and completing the maintenance of the road, the county met with the Corps and discussed several options to resolve this matter, since this road is nearly impossible to travel on every spring. Lake of the Woods County has numerous drainage ditches and it was recommended by the Corps, that a ditch plug would be the best option to satisfy the mitigation requirements. The County identified a ditch that is located in the Graceton Wildlife Management Area (WMA), Judicial Ditch #16, as a viable site to plug. A 1.5 mile segment of the ditch would be plugged and abandoned to serve as mitigation for Sandy Shores Drive. The county had a difficult time in getting permission from the Minnesota Department of Natural Resources (MNDNR); to plug this segment of ditch since it is located within the boundaries of a WMA. The MNDNR finally agreed to allow this project to take place with certain restrictions.

During the summer of 2004, the county and the Corps had several discussions pertaining to the landowner projects that have taken place within the subdivisions and also the road. We identified that the some of the landowners did not receive Corps approval on their various projects. After some discussion it was agreed that projects conducted by a landowner prior to June 1998, a Nationwide Permit 29, would have been issued and therefore no mitigation is required. It was also agreed that projects conducted from June 1998, to April 1, 2004, the landowners would be responsible to obtain a Corps permit and from April 2004, the county and the Corps would work together in addressing individual projects in the future. Also, during these discussions, the county said that we would be willing to accept responsibility for the landowners that did not have Corps approval between the dates of June 1998, to April 1, 2004, and include their impacts in the mitigation site. The amount of impact for these landowners was to be determined at a later date. Since there was going to be excess mitigation after the road deduction, the private landowners were then added to the mitigation site. The representatives from the Corps thought that was a great idea to resolve past issues.

An after the fact application was submitted to the Corps dated September 13, 2004, for the original road construction of 17.98 acres of impact. The mitigation site would restore 25.65 acres of wetlands and the remaining 7.67 acres would serve as mitigation to satisfy the landowner impacts. This idea was brought to the attention of Mr. Whiting and he did not have a problem with it as long as the county did not receive any monetary gain from it. The county will not use any portion of this mitigation site as a wetland bank. If there would be any acreage left over after the road and landowner portions are deducted, it would be used as excess mitigation as a good faith effort in starting from a clean slate. The application was for a 1:1 mitigation ratio for the road since; it has been twenty-seven years since the original road construction. Also, the landowner portion was at the same ratio because of the length of time that has passed.

During the comment period the MNDNR noted that private landowners should not be allowed to use this mitigation site for their benefit since the mitigation site is on public land administered by the MNDNR. The Corps representative and I talked regarding this issue and assured me that we still could make the original application work by addressing the landowner's projects under the mitigation site in the future.

The Corps representative and I recently had a discussion regarding the provisional permit requirements. The county had no problem with these requirements so the representative pushed this permit up the chain of command. After review by Mr. Whiting and Ms. Marita Valencia, the provisional permit was sent back down to the Corps representative and their comments stated that a 1:1 mitigation ratio is not adequate to address the impacts associated with Sandy Shores Road. The reason for this is because of temporal loss and partial out of kind replacement. The impacts associated with the road are to Types 6 & 7 wetlands and the mitigation site would be a Type 6. This was a shock to us because at no time did anyone say anything about an increased mitigation ratio, temporal loss, out-of-kind replacement, or Section 401 approval, from the Minnesota Pollution Control Agency. We were lead to believe that we would resolve all past issues by accomplishing this mitigation project.

The question that was asked to the Corps representative was, "What set of regulations are we going by, current or when the original road construction took place?" The answer that we got from the Corps representative was going by the original date of construction but, **he was told otherwise**. This is not legal. You can't use current regulations to address an issue that happened twenty-seven years ago. Are we dealing with a personal opinion by a couple representatives from the Corps or a professional opinion? The county feels that we have worked with the Corps in addressing this issue and has taken a proactive approach in dealing with future projects.

This leaves the county in a dilemma of what to do next. Do we ignore the Corps, move forward with the project and take our chances? Do we agree to allow all the mitigation to be used for the road and leave the landowners on their own to deal with the regulations of the Corps? Do we appeal this decision? Does the county have to do another mitigation site to resolve the issues for the landowners? It may take another four (4) years, or longer, to resolve this issue again. How are the landowners going to resolve their issues? The county doesn't have an adequate amount of wetland acres within our wetland bank. Also, if the landowners were to go out of the county to purchase wetland credits, the county would require an increase ratio for wetland credits. We believe that it is not appropriate or fair to the landowners that received an exemption under the Wetland Conservation Act (WCA). Furthermore, the county along with a private landowner accomplished an eighty (80) acre wetland restoration site this past summer. This site was a converted agricultural field at the headwaters of a tributary that leads into Bostic Bay of Lake of the Woods, an area identified as high priority by our Local Water Management Plan. The goal of this project was two fold: stop sediment from entering the lake and to restore wetlands within the county. This restoration site has not been acknowledged by the Corps.

The above is a summary of what Lake of the Woods County has gone through in the past four years to accomplish this project. Considerable amounts of time and money have been invested trying to accomplish this project. We would like to meet with you and discuss this issue further at your earliest convenience. In the eyes of the county and some individuals within the Corps, agree that this is a great opportunity for the county and the Corps to resolve the past issues with one project.

Sincerely,

Josh Stromlund

Cc:

Lake of the Woods County Commissioners
Lake of the Woods County Soil and Water Conservation District Board of Supervisors
Lake of the Woods County Soil and Water Conservation District staff
Lake of the Woods County Highway Engineer
Honorable Collin Peterson, U.S Representative
Honorable Mark Dayton, U.S Senator
Robert Whiting, U.S. Army Corps of Engineers
Marita Valencia, U.S Army Corps of Engineers
Jon Ahlness, U.S. Army Corps of Engineers
Kelly Urbanek, U.S Army Corps of Engineers
Ron Harnack, Executive Director, Board of Water and Soil Resources
Ron Shelito, Regional Director, Board of Water and Soil Resources
Dale Krystosek, Wetland Specialist, Board of Water and Soil Resources
Bill Best, Board Conservationist, Board of Water and Soil Resources

Lake of the Woods County
Office of Environmental Services

Steven Sindelir
Assistant Zoning Administrator
PO Box 808
Baudette, MN 56623
Phone (218) 634-1945
Fax (218) 634-2509

RECEIVED
MAR 15 2004
CORPS OF ENGINEERS
ST. PAUL DISTRICT
REGULATORY BRANCH

March 12, 2004

Jon Ahlness✓
USACOE – 190 5th Street East
St. Paul MN 55101-1638

Dear Mr. Ahlness:

As requested in our telephone conversation yesterday, I am sending you copies of the 2003 aerial photos of the Birch Beach (2 ea.) and Sandy Shores Plats (5 ea.). I talked to Brent, our GIS person, and he said that he e-mailed the names and addresses that you had also requested. I was unable to obtain any information regarding the issue of any fill activity prior to lots being sold. Below please find the month and year that each of these plats were approved:

| | |
|---|---|
| Birch Beach Resort | - June, 1926 |
| Birch Beach Resort #2 | - October, 1963 |
| Sandy Shores | - October, 1975 |
| Sandy Shores 1st Addition | - November, 1978 |
| Sandy Shores 2nd Addition | - October, 1985 |
| Sandy Shores 3rd Addition | - April, 1990 |
| Sandy Shores 4th Addition | - April, 1990 |

If I can be of any further assistance, please call me at the above phone number.

Sincerely,

Steven Sindelir

Steven Sindelir
Lake of the Woods County

Enc: 2003 Aerial Photos – Birch Beach and Sandy Shores



N

| | | | |
|---|---|---|---|
| hese data are provided on an<br>AS IS" basis, without warranty<br>f any type, expressed or implied,<br>cluding but not limited to any<br>arranty as to their performance,<br>erchantability, or fitness for any<br>articular purpose. | **Sandy Shores**<br>**2003 Aerial Photo** | | |
| | 1"=800 Feet | A-342 | 03-11-2004 |








| | | |
|---|---|---|
| ese data are provided on an IS IS" basis, without warranty any type, expressed or implied, cluding but not limited to any rranty as to their performance, erchantability, or fitness for any rticular purpose. | **Sandy Shores 1st-S of 3rd**<br>**2003 Aerial Photo** | |
| | 1"=350 Feet | 03-11-2004 |



N

hese data are provided on an
AS IS" basis, without warranty
f any type, expressed or implied,
ncluding but not limited to any
warranty as to their performance,
nerchantability, or fitness for any
articular purpose.

# Sandy Shores 2nd-Mid-3rd

2003 Aerial Photo

1"=300 Feet | A-344 | 03-11-2004



N

hese data are provided on an AS IS" basis, without warranty f any type, expressed or implied, icluding but not limited to any arranty as to their performance, erchantability, or fitness for any articular purpose.

# Sandy Shores 4th-N of 3rd

2003 Aerial Photo

| | |
|---|---|
| 1"=300 Feet | 03-11-2004 |






| | | |
|---|---|---|
| hese data are provided on an \S IS" basis, without warranty f any type, expressed or implied, icluding but not limited to any arranty as to their performance, erchantability, or fitness for any articular purpose. | **Birch Beach Resort #2**<br>**2003 Aerial Photo** | |
| | 1"=300 Feet · A-346 · 03-11-2004 | |






These data are provided on an "AS IS" basis, without warranty of any type, expressed or implied, including but not limited to any warranty as to their performance, merchantability, or fitness for any particular purpose.

# Birch Beach Resort

## 2003 Aerial Photo

1"=300 Feet | A-347 | 03-11-2004

**Lake of the Woods County**
**Office of Environmental Services**

Gary Lockner, Director
PO Box 808
Baudette, MN 56623
Phone (218) 634-1945
Fax (218) 634-2509

January, 8 1998

Jeffrey Koschak
US Army Corps of Engineers
8896 E Gull Lake Dr NW
Brainerd, MN 56401

Jeff:

Attached you will find a list of current property owners on the north end of Sandy Shores in Prosper Township. I have also included a list of Building Permits that have been issued in the area. I hope this information will help you for the public notice you plan on mailing. If you have any questions, I can be reached at 634-4536.

Sincerely,

Brent Birkeland
Asst. Zoning Administrator

C:\MYDOCU~1\Permits Database.xls

| | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Last_Name | First_Name | Fee | Permit | Action | Twp_Name | Sec | Twp | Range | Date | Lot_Block | Notes |
| 66 | Atkinson | Eugene | | 8127 | BP | Prosper | 17 | 163 | 33 | | | |
| 406 | Cripe | Jerry & Sharon | | 9047 | BP | Prosper | 17 | 163 | 33 | | | |
| 520 | Erdahl | Elton | | 9036 | BP | Prosper | 17 | 163 | 33 | | | |
| 622 | Gazda | Kenneth | | 8701 | BP | Prosper | 17 | 163 | 33 | | | |
| 752 | Hedlund | Jan M. | | 8305 | BP | Prosper | 17 | 163 | 33 | 2/23/87 | Govt. Lot 2, Lot 5, Block 1, Sandy Shores S | Ben Trottier now owns, 93-99 |
| 822 | House | David | | 8227 | BP | Prosper | 17 | 163 | 33 | | | |
| 880 | Johnson | Roger G. | | 9106 | BP | Prosper | 17 | 163 | 33 | | | |
| 1029 | Larson | Charles | 75 | 9517 | BP | Prosper | 17 | 163 | 33 | | | |
| 1036 | Lauglug | Bruce L. | | 8116 | BP | Prosper | 17 | 163 | 33 | 6/8/95 | Lot 3,Blk 1 Sandy Shores Fourth | |
| 1199 | Meade | Joel | | 8216 | BP | Prosper | 17 | 163 | 33 | | | |
| 1201 | Meade | Joel | | 9731 | BP | Prosper | 17 | 163 | 33 | | | |
| 1337 | North Sandy Shores Corp | | | | IP | Prosper | 17 | 163 | 33 | 7/9/97 | | |
| 1338 | North Sandy Shores Corp | | | | IP | Prosper | 17 | 163 | 33 | 3/11/85 | Govt lots 1 & 2 | Sandy Shores 2nd & 3rd Additions |
| 1621 | Senty | Mike | Unk. | 8204 | BP | Prosper | 17 | 163 | 33 | 12/12/88 | Govt Lts 1,2,& 3 | Hearing for North Sandy Shores 4th Add |
| 1675 | Snustead | Erwin | 75 | 9677 | BP | Prosper | 17 | 163 | 33 | 4/2/82 | Sandy Shores, Block 1, Lot 6 | Ronald Ditsch now owns |
| 1721 | Starren | Jon M. | | 93104 | BP | Prosper | 17 | 163 | 33 | 9/24/98 | Lot 5 Sandy Shores 4th | |
| 1722 | Starren | Jon | 75 | 9642 | BP | Prosper | 17 | 163 | 33 | 9/27/93 | Lot 13, Sandy Shores 2nd Addn. | |
| 1835 | Trottier | Ben | None | 9399 | BP | Prosper | 17 | 163 | 33 | 6/10/98 | Lot 14 Sandy Shores 4th | |
| 1865 | Vieira | Theodore A. | 50 | 9308 | BP | Prosper | 17 | 163 | 33 | 9/20/93 | Lot 6, Blk 1, Sandy Shore 2nd Addn. | Update of 8701 |
| 1919 | Welin | Roger | 75 | 9638 | BP | Prosper | 17 | 163 | 33 | 4/7/93 | Lot 15, Block 1, Sandy Shores 3rd Addn. | |
| 1995 | Zimney | Ronald S. | | 8629 | BP | Prosper | 17 | 163 | 33 | 10/20/98 | Lot 9 Sandy Shores 4th | |
| 1997 | Zimney | Ronald | | 9627 | BP | Prosper | 17 | 163 | 33 | 6/13/96 | Lot 6, Block Sandy Shores Second Addition<br>Lot 6 Sandy Shores 2nd | |

DAVID MEADE CHILDREN'S TRUST
PO BOX 351
BLACKDUCK MN 56630

JON M. STARREN ETUX
2723 KNIGHT DR
GRAND FORKS ND 58201

CAROL J. TOMBERLIN
3620 S 37 AVE
MINNEAPOLIS MN 55406

JOEL MEADE ETUX
53 SANDY SHORES DR
WILLIAMS MN 56686

ROBERT L. WAAG ETUX
RR1 BOX 108E
GENESEE ID 83832

DAVID MEADE CHILDREN'S TRUST
PO BOX 351
BLACKDUCK MN 56630

PAUL T. WEIMER ETUX
817 W ORANGE AVE
ST PAUL MN 55117

DELLA SNUSTEAD ETUX
507 NE 6 AVE
ROSEAU MN 56751

DAVID A. HAGEN TR UA 9/4/92
956 PINE VIEW CT
EASTERN HEIGHTS MN 55119

THEODORE A. VIEIRA ETUX
PO BOX 128
WILLIAMS MN 56686

DOROTHY R. CUOZZO
71 SANDY SHORES DR
WILLIAMS MN 56686

CRAIG W. VALENTIK ETUX
1844 W MCANDREWS RD
BURNSVILLE MN 55337

HARVEY W. SCHMIDT ETUX
54 BIRCH BEACH DR
WILLIAMS MN 56686

NORTH SANDY SHORES CORP.
53 SANDY SHORES DR
WILLIAMS MN 56686

BEN TROTTIER ETUX
64 SANDY SHORES DR
WILLIAMS MN 56686

JERRY D. LARSON
PO BOX 2189
FARGO ND 58108

HARVEY W. SCHMIDT ETUX
54 BIRCH BEACH DR
WILLIAMS MN 56686

GARY D. MILLER ETUX
7234 S LAMAR AVE
COTTAGE GROVE MN 55016

BRUCE LAUGTUG
46 SANDY SHORES DR
WILLIAMS MN 56686

GEORGE O. P. LEE ETUX
5225 THURMAN DR
SIOUX FALLS SD 57106

ELTON I. ERDAHL ETUX
14115 WOODHAVEN RD
MINNETONKA MN 55345

CHARLES A. LARSON ETUX
3425 GOLFVIEW DR #312
EAGAN MN 55123

ROGER WELIN ETUX
RR2 BOX 175A
ROSEAU MN 56751

GERALD L. TOMBERLIN ETUX
3620 S 37 AVE
MINNEAPOLIS MN 55406

NORTH SANDY SHORES CORP.
53 SANDY SHORES DR
WILLIAMS MN 56686

JAMIE MCENELLY ETUX
49 SANDY SHORES DR
WILLIAMS MN 56686

ROGER HITES
51 SANDY SHORES DR
WILLIAMS MN 56686

# Minnesota Pollution Control Agency

April 28, 2005

RECEIVED MAY 02 2005

K.V(X) R.W(Z)

Mr. Robert J. Whiting
Regulatory Branch, St. Paul District
U.S. Army Corps of Engineers
190 Fifth Street East
St. Paul, MN 55101-1638

Mr. Josh Stromlund
Office of Land and Water Planning
Lake of the Woods County
P.O. Box 808
Baudette, MN 56623

RE: CENCS-CO-R-01-5667-JKA
Lake of the Woods County – Sandy Shores Drive
Lake of the Woods County
Section 401 Waiver

Dear Messrs. Whiting and Stromland:

This letter is submitted by the Minnesota Pollution Control Agency (MPCA) under authority of Section 401 of the Clean Water Act (33 USC 1251 et seq.), Minn. Stat. chs. 115 and 116, and Minn. R. 7001.1400-.1470. The referenced project involves a proposal to retain 17.98 acres of fill in wetlands adjacent to Lake of the Woods as part of the original project to construct Sandy Shores Drive (Township Road 381) which was progressively constructed during the period of 1978 - 1988. The project is located in the SW ¼ of Section 16, and the E ½ of Section 17, T 163 N, R 33 W, Lake of the Woods County, Minnesota. This application is for an After the Fact Clean Water Act Section 404 Permit for the original road construction measuring 5,900 feet in length and about 35 to 40 feet wide that took place during that 1978-1988 time period.

The MPCA staff have reviewed the application, related documents and obtained other information about the project through other sources. The MPCA staff believe the application accurately depicts the road project based on the information gathered and reviewed.

The wetland compensatory mitigation for the road construction will consist of constructing two ditch plugs in an existing Judicial Ditch # 16 located in Section 35 and 36, T 162 N, R 33 W, and Section 1 and 2, T161 N, R 33 W. The mitigation will restore hydrology to a 1.5 mile length of the ditched wetland providing a calculated 25.38 acres of restored wetland. It is MPCA's understanding that the applicant is committed to fully implementing this compensatory mitigation and that the mitigation will be an enforceable part of any Section 404 Permit. Given the current status of this road project, the proposed mitigation will satisfy the requirements of Minn. R. 7050.0186, including subp. 2 and 6. If the proposed mitigation proposal is changed substantially, the proposal must be submitted to the MPCA for further review.



520 Lafayette Rd. N.; Saint Paul, MN 55155-4194; (651) 296-6300 (Voice); (651) 282-5332 (TTY); www.pca.state.mn.us
St. Paul • Brainerd • Detroit Lakes • Duluth • Mankato • Marshall • Rochester • Willmar
Equal Opportunity Employer • Printed on recycled paper containing at least 20 percent fibers from paper recycled by consumers.

St. Paul District
U. S. Army Corps of Engineers

**DEPARTMENT OF THE ARMY PERMIT
EVALUATION AND DECISION DOCUMENT**

APPLICATION NUMBER: MVP-2001-5667-JKA

APPLICANT: Lake of the Woods County

PROJECT: Retain fill material placed for the purpose of providing access to the Sandy Shores residential developments

## PART I - INTRODUCTION

This document includes an environmental assessment, as required by the National Environmental Policy Act; the District Engineer's statement of findings, including a determination regarding compliance with the Section 404(b)(1) guidelines (if appropriate) and the need for an environmental impact statement; and the District Engineer's determination as to whether or not the project is contrary to the public interest. (NOTE: The Corps of Engineers permit regulations are at Title 33 of the Code of Federal Regulations (CFR), Parts 320 through 330.)

A public notice describing the project and its location is attached (Attachment A).

## PART II - ENVIRONMENTAL ASSESSMENT

PROJECT PURPOSE.

The purpose of the project is to provide access to the Sandy Shores residential developments.

PARTICIPANTS IN THE PUBLIC INTEREST REVIEW.

The public notice was sent to all known interested parties, including the appropriate Federal, State, and local agencies. A public notice mailing list is included in the permit file. A summary of comments follows:

U.S. Environmental Protection Agency (EPA). No comments were received during the comment period.

U.S. Fish and Wildlife Service (FWS). No comments were received during the comment period.

State Department of Natural Resources (DNR). The DNR provided the following comments:

Because the road has facilitated significant lakefront development, removal of the fill is not a viable option. We therefore recommend that the impact be mitigated through new wetland creation or wetland restoration. The Minnesota Department of Natural Resources has consented to allow restoration to occur on the Graceton State Wildlife Management Area, provided that the following conditions are incorporated in the Department of the Army permit:

A. All wetland restoration plans shall be reviewed and approved by DNR Area Wildlife Manager Jeff Dittrich prior to start of construction.
B. Lake of the Woods County shall agree to be responsible for all future maintenance of the ditch plugs.
C. A maintenance agreement with the DNR shall be developed prior to construction that identifies County responsibilities for future maintenance, describes future use and management of the restored wetlands, and requires that the County be responsible for all corrective measures that may be ordered by the U.S. Army Corps of Engineers.
D. The two-mile portion of Judicial Ditch 16 located between County Road 105 and County Road 4 shall be abandoned prior to construction.

In a follow-up letter dated January 24, 2005, the DNR stated that it is opposed to use of the Wildlife Management Area for mitigation beyond that required for the 17.98-acre violation.

Minnesota Pollution Control Agency (MPCA). No comments were received during the comment period. However, MPCA provided a letter to the Corps dated April 28, 2005 stating, "The MPCA waives its authority to certify the referenced project application."

State Historic Preservation Officer (SHPO). SHPO provided the following comment:

Based upon available information, we conclude that no properties eligible for or listed on the National Register of Historic Places are within the project's area of effect.

ALTERNATIVES KEY.

Throughout the remainder of Part II of this document, the proposed project and its alternatives will be identified according to the following key:

P = Project as described in the public notice (or as subsequently modified).

D = Denial of the permit.

MITIGATION AND THE SECTION 404(B)(1) RESTRICTIONS ON DISCHARGE.

Guidelines issued by the U.S. Environmental Protection Agency (EPA) pursuant to Section 404(b)(1) of the Clean Water Act restrict discharges of dredged or fill material under certain circumstances (see 40 CFR 230.10). These circumstances include specified types of environmental harm that would be caused by the discharge under review.

The guidelines also restrict discharges when there are feasible, less environmentally-damaging alternatives available. In general, this portion of the guidelines corresponds to the definition of mitigation found in the guidelines issued by the Council on Environmental Quality to implement the National Environmental Policy Act (see 40 CFR 1508.20). The policies and procedures for implementing the 404(b)(1) guidelines were set forth in a Mitigation Memorandum of Agreement (MOA) issued by the EPA and the Corps on February 7, 1990. According to the MOA, "The Corps will strive to avoid adverse impacts and offset unavoidable adverse impacts to existing aquatic resources, and for wetlands, will strive to achieve a goal of no overall net loss of values and functions." To carry out this policy, the Corps will, in general, evaluate Section 404 applications by gathering and reviewing all information on a project, including potential mitigation, at the same time. Then the Corps makes the following sequence of determinations:

1) Avoidance - The Corps first makes a determination that potential impacts have been avoided to the maximum extent practicable. To determine the availability of alternatives that would avoid impacts, one of the following two criteria must be applied:

a) If the project is in a special aquatic site (such as a wetland), and if the project does not need to be in or near the special aquatic site to fulfill its basic purpose (i.e., the project is not "water dependent"), then the Corps is required to

assume that there are practicable alternatives that do not involve special aquatic sites. To overcome this presumption, the applicant must clearly demonstrate to the Corps that practicable alternatives are not available. If the presumption is not overcome, the Corps must deny the permit application.

b) If the project is not in a special aquatic site and/or is water dependent, the Corps is not required to assume that there are practicable upland alternatives. However, if the Corps identifies such alternatives, the applicant must clearly demonstrate that they are not feasible. If such a demonstration cannot be made, the Corps must deny the permit application.

2) <u>Minimization</u> - The Corps will next mitigate unavoidable impacts, to the extent appropriate and practicable, by requiring steps to minimize those impacts.

3) <u>Compensation</u> - Finally, the Corps will mitigate unavoidable impacts, to the extent appropriate and practicable, by requiring steps to compensate for aquatic resource values.

In determining "appropriate and practicable" measures to offset unavoidable impacts, such measures should be appropriate to the scope and degree of those impacts and practicable in terms of cost, existing technology, and logistics in light of overall project purposes. The Corps will give full consideration to the views of the resource agencies when making this determination.

(NOTE: It may be appropriate to deviate from the above sequence when the discharge is necessary to avoid environmental harm or when the proposed discharge can reasonably be expected to result in environmental gain or insignificant environmental losses.)

The following is a summary of the mitigation sequence as it pertains to the proposal (Alternative P) and, if applicable, its alternatives (A1, A2, etc.). If denial of the permit (Alternative D) is not specifically addressed, the reader may assume that no discharge subject to Section 404(b)(1) sequencing would result from such action.

<u>Avoidance</u>. The purpose of this project is to provide access to the Sandy Shores residential developments. This is not a water-dependent activity because a road does not need to be located within a special aquatic site to fulfill its basic purpose. Furthermore, the project site contained wetlands, which are special aquatic sites. Therefore, the Corps must assume that there were practicable alternatives available that would have avoided wetland impacts. However, given the residential

development that has occurred along the road since its construction was completed in 1988, removal of the fill for the road is not a viable option at this time.

Minimization. Discharge of fill into 17.98 acres of wetland occurred during the construction of Sandy Shores Drive. The fill impact for the road is about 5,900 feet long and 35 to 40 feet wide. The wetland fill that was discharged to construct the road is the minimum needed to provide adequate access to the Sandy Shores residential developments.

Compensation. A total of 17.98 acres of wetland were filled to construct the road. However, the presence of the road induced additional wetland impacts by adjacent lot owners who filled wetlands for driveway and home construction. As wetland replacement, the applicant has proposed to conduct compensatory wetland mitigation at a site on the Graceton Wildlife Management Area in Sections 35 and 36, T. 162N., R. 33W., and Sections 1 and 2, T. 161N., R. 33W., in Lake of the Woods County approximately 10 miles south southeast of the project site. The mitigation would consist of constructing two ditch plugs in an existing judicial ditch to restore hydrology to a 1.5-mile length of shrub-carr (Type 6) wetland that has been hydrologically altered by the ditch. Lateral effect calculations for the site were conducted by Jon D. Hodgson, a Professional Engineer for the North Central Minnesota Joint Powers Board, in order to determine the area where wetland hydrology would be restored (mitigation area). The mitigation area was calculated to be 25.38 acres. In addition, the applicant has investigated the potential for abandonment and plugging of an additional 0.5-mile of the ditch just east of the proposed 1.5-mile segment. A private landowner owns the land on the south side of that portion of the ditch. The landowner has indicated that he may want to plug the ditch to create a wetland mitigation bank on his property. If that were approved, an additional 0.5-mile length of ditch would be plugged and wetland hydrology would be restored on both sides of the ditch. The DNR has requested that the entire 2-mile length of ditch be abandoned.

For a summary of all elements of Sec. 404(b)(1) compliance (including the alternatives criteria discussed above), see the matrix that follows the list of Technical Evaluation Factors.

GENERAL PUBLIC INTEREST FACTORS.

IMPACT KEY:
- B = Beneficial effect.
- A = Adverse effect.
- 0 = No effect.

NOTE: The absence of narrative under any heading with a "B" or "A" in the parenthesis indicates that, although there would be an impact, it would be a very minor one. If assessing more than one alternative, the impacts for each alternative will be shown in separate parentheses. However, if none of the alternatives would have an impact (either beneficial or adverse) on a given factor, a single (0) will be used after that factor.

Noise levels. D(0) P(A) Noise levels have likely increased on and near the site, temporarily during construction and permanently as a result of vehicular traffic on the road and residential use of the adjacent lots that were developed as a result of the project.

Aesthetic values. D(0) P(A) Many people consider converting a wetland from its natural condition to a developed use as an adverse impact to aesthetic values. In this case, a road was constructed through an undeveloped hardwood swamp and shrub-carr wetland. The road enabled the development of lakeshore lots, many in wetlands, along a stretch of previously undeveloped Lake of the Woods shoreline. However, it is likely that the lot owners are appreciative of the aesthetic values provided by their lots.

Recreation. D(0) P(B) The road and adjacent lots have provided numerous recreational opportunities for many residents. Those opportunities include boating, fishing, birding, relaxation, etc. Without the road for access, the site would provide recreational opportunities for a very limited number of people.

Transportation. D(0) P(A) The existence of Sandy Shores Drive and the adjacent lots has likely generated increased automobile and truck traffic on the local road system.

Public health. (0)

Safety. (0)

Community growth. D(0) P(B) The road provided access to the Sandy Shores residential developments, which resulted in the construction of homes and an increase in the population of the area.

Business/home relocations. (0)

Existing/potential land use. D(0) P(A) The site was undeveloped hardwood swamp and shrub-carr wetland. The area to the north and

south were residential developments along the shore of Lake of the Woods. The area south of the site, but away from the lakeshore was agricultural land. The area north of the site, but away from the lakeshore and the area west of the site were undeveloped hardwood swamp and shrub-carr wetlands. The new roadway construction impacted 17.98 acres of undeveloped wetland, and it enabled the development of numerous residential lots, many of which were also in wetlands.

Property values. D(0) P(B) The road provided access to numerous lakeshore lots, which greatly increased the value of the property.

Tax revenues. D(0) P(B) The road resulted in increased property values and increased tax revenues.

Public facilities and services. D(0) P(B) A public roadway was constructed, and it provides a public service.

Employment. D(0) P(B) The construction work provided temporary employment.

Business activity. (0)

Farmland/food supply. (0)

Flooding. (0)

Energy. (0)

Mineral needs. (0)

Air quality. D(0) P(A) There was likely a minor temporary effect on air quality during construction.

Terrestrial habitat. (0) Very little terrestrial habitat was impacted because most of the road was constructed in wetlands.

Aquatic habitat. D(0) P(A) Lot and shoreline modifications by lot owners along the road have likely resulted in an increase in chemical runoff into Lake of the Woods and a decrease in water quality. This could result in the loss of some habitat for portions of the lake's fishery.

Habitat diversity and interspersion. D(0) P(A) The project site provided primarily wetland habitat. The wetland fill for road construction resulted in a loss of wetland habitat in the subwatershed and potentially provided an opening where exotic and invasive species could become established; however, the proposed

wetland mitigation would replace 25.38 acres of wetland habitat at an offsite location.

Water quality. D(0) P(A) The placement of fill in the wetlands has caused permanent loss of the functions and values that the wetlands provided. The lost functions include assimilation of nutrients by wetland vegetation and the removal of suspended sediments from water moving through the wetlands. In addition, fertilizers, herbicides and pesticides from the landscaped portions of the adjacent residential lots are likely discharging into Lake of the Woods.

Water supply. (0)

Groundwater. (0)

Soils. (0)

Shoreline processes. (0)

Wetlands. D(0) P(A) The project has resulted in the filling of 9.93 acres of hardwood swamp (Type 7 wetland) and 8.05 acres of shrub-carr wetland(Type 6 wetland). The total wetland fill direct impact was 17.98 acres. In addition, the project resulted in induced wetland impacts on adjacent lots for the construction of driveways and residential buildings. Approximately 7.36 acres of induced wetland impacts occurred before June of 1998, and would have been covered under Nationwide Permit 29 without required mitigation. Approximately 6.72 acres of wetland impacts occurred between June of 1998 and April 1, 2004. Permits and mitigation would have been required for those impacts.

The dominant vegetation in the hardwood swamp was ash, aspen, and sedge. The dominant vegetation in the shrub-carr wetland was willow and sedge. The applicant has proposed to conduct compensatory wetland mitigation at a site on the Graceton Wildlife Management Area in Sections 35 and 36, T. 162N., R. 33W., and Sections 1 and 2, T. 161N., R. 33W., in Lake of the Woods County. The mitigation would consist of constructing two ditch plugs in an existing judicial ditch to restore hydrology to a 1.5-mile length of wetland that has been hydrologically altered by the ditch. Lateral effect calculations for the site were conducted by Jon D. Hodgson, a Professional Engineer for the North Central Minnesota Joint Powers Board, in order to determine the area where wetland hydrology would be restored (mitigation area). The mitigation area was calculated to be 25.38 acres. The proposed mitigation would restore hydrology to a shrub-carr wetland (Type 6 wetland). The predominant vegetation expected in the mitigation area would be willow and sedge.

Secondary and cumulative effects. D(0) P(A) Secondary effects of this project have previously been discussed under "Aquatic habitat" and "Water quality." In addition, the road has provided opportunities for private development of lots adjacent to the road. Much of the lot development has adversely impacted wetlands. Cumulative effects would include the direct loss of 17.98 acres of wetland within the project subwatershed. In addition, approximately 6.72 acres of induced wetland impacts occurred between June of 1998 and April 1 of 2004. However, the applicant has proposed 25.38 acres of wetland mitigation in Lake of the Woods County within the Lake of the Woods watershed. Therefore, there would be no net loss of wetland acreage.

PUBLIC INTEREST FACTORS MERITING SPECIAL CONSIDERATION.

Navigation. (0)

Endangered species. (0) The U.S. Fish & Wildlife Service did not comment on potential impacts to endangered species.

Historical/archaeological. (0) SHPO stated that no properties eligible for or listed on the National Register of Historic Places are within the project's area of effect.

Wild and scenic rivers. (NA) None are present in the area.

Tribal Trust resources. (NA)

State listed impaired (Section 303(d)) waters. (NA) None are present in the area.

Section 176(c) of the Clean Air Act General Conformity Rule Review.

The proposal has been analyzed for conformity applicability pursuant to regulations implementing Section 176(c) of the Clean Air Act. It has been determined that the activities proposed under this permit will not exceed de minimis levels of direct emissions of a criteria pollutant or its precursors and are exempted by 40 CFR Part 93.153. Any later indirect emissions are generally not within the Corps continuing program responsibility and generally cannot be practicably controlled by the Corps. For these reasons, a conformity determination is not required for this permit.

THE ENVIRONMENTAL PROTECTION AGENCY'S 404(B)(1) GUIDELINES.

As explained above, the discharge of dredged or fill material will be evaluated in accordance with guidelines developed by the EPA. The guidelines are found at Title 40, Code of Federal Regulations, Part 230.

Testing.

The Section 404(b)(1) guidelines require testing of the extraction site for contaminants except under certain circumstances. These include the existence of prior test results, scientific research and/or experience that indicates that contaminants are not present in the material to be discharged. Testing may also be omitted if the discharge site is adjacent to the extraction site and subject to the same sources of contaminants, and materials at the two sites are substantially similar. Testing may also be omitted if constraints are available to reduce contamination to acceptable levels, and if the potential discharger is willing and able to implement such constraints. In this case, testing is not required because the fill was obtained from a nearby State-owned site.

Technical Evaluation Factors.

In making our findings on compliance with the Section 404(b)(1) guidelines, we have considered the potential impacts of the project (and alternatives, if any) on the physical and chemical characteristics of the aquatic ecosystem. These characteristics are listed in Subparts C - F of the guidelines, 40 CFR Part 230.20 - 230.54, as found on pp. 85350 - 85354 of the Federal Register, Vol. 45, No. 249. The characteristics include substrate, suspended particulates/turbidity, water, current patterns and water circulation, normal water fluctuations, salinity gradients, threatened and endangered species, fish, crustaceans, mollusks, and other aquatic organisms in the food web, other wildlife, sanctuaries and refuges, wetlands, mud flats, vegetated shallows, riffle and pool complexes, municipal and private water supplies, recreational and commercial fisheries, water-related recreation, aesthetics, parks, national and historical monuments, national seashores, wilderness areas, research sites, and similar preserves.

CEMVP-OP-R (2001-5667-JKA)
APPLICANT: Lake of the Woods County

Section 404(b)(1) compliance summary matrix.

P = Proposal. D = No action (denial). A1, A2 = Additional alternatives, if any. Where only a P is shown, it indicates that all alternatives meet compliance criteria for that item. An unknown is a noncompliance; this will be designated with a U in the DOES NOT COMPLY column.

| | | MEETS CRITERIA | DOES NOT COMPLY |
|---|---|---|---|
| 1. | The applicant must overcome the presumption that a practicable, less environmentally damaging alternative site, outside special aquatic sites, exists. If the project is water dependent, OR is not in a special aquatic site, enter only N/A (not applicable). | D,P | |
| 2. | There must be no alternative that is practicable, is less damaging to the aquatic ecosystem, and has no other significant, adverse environmental effects. | D,P | |
| 3. | The discharge must not violate state water quality standards or Clean Water Act Section 307 toxic effluent standards or bans. | D,P | |
| 4. | The project must not jeopardize the continued existence of an endangered species. | D,P | |
| 5. | The project must not cause significant adverse effects on municipal water supplies, plankton, fish, shellfish, wildlife, special aquatic sites, or other aspects of human health or welfare. | D,P | |
| 6. | The project must not cause significant adverse effects on life stages of aquatic life and other wildlife dependent on aquatic ecosystems. | D,P | |
| 7. | The project must not cause significant adverse effects on ecosystem diversity, productivity, or stability. | D,P | |
| 8. | The project must not cause significant adverse effects on recreational, aesthetic or economic values. | D,P | |

| | | |
|---|---|---|
| 9. All appropriate and practicable steps, to minimize potential adverse effects of the discharge on the aquatic ecosystem, must be taken. | D,P | : |

<u>OTHER AUTHORIZATIONS</u>.

Water-quality certification: MPCA waived its authority for Section 401 water quality certification in a letter dated April 28, 2005.

**PART III - SUMMARY AND STAFF RECOMMENDATION**

**GENERAL EVALUATION.**

<u>The relative extent of the public and private need for the proposed work.</u>

There was no public need for the road. Rather, the road construction project has helped satisfy private desire for access to additional lakeshore lots on Lake of the Woods. The applicant has received a benefit from the additional taxes paid on the increased value of the private properties adjacent to the road.

<u>The practicability of using reasonable alternative locations and methods to accomplish the objective of the structure or work.</u>

The road was constructed from 1978 to 1988 without Clean Water Act Section 404 authorization. The road has facilitated significant lakefront development. Because of that development, a search for alternative locations and removal of the fill for the road are no longer practicable alternatives.

<u>The extent and permanence of the beneficial and detrimental effects that the proposed structure or work is likely to have on the public and private uses to which the area is suited.</u>

The discharge of fill into 17.98 acres of wetland for construction of Sandy Shores Drive has resulted in a permanent loss of wetland functions and values at the site. However, the applicant would conduct wetland mitigation at a site on the Graceton Wildlife Management Area to restore hydrology to 25.38 acres of wetland. The wetland mitigation work should provide long-term benefits. In addition, numerous lot owners have

received long-term benefits because the road has provided them an opportunity to develop and utilize lakeshore lots on Lake of the Woods.

STAFF RECOMMENDATION. Based on an evaluation of all data submitted or gathered during the public interest review, it is the recommendation of the Regulatory Branch that a permit be granted for the proposed project.

July 7, 2005
Date

Jon K. Ahlness
Jon K. Ahlness
Project Manager

July 7, 2005
Date

For Ralph H. Augustin
Robert J. Whiting
Chief, Regulatory Branch

PART IV - FINDINGS AND DECISION OF THE DISTRICT ENGINEER

I have considered the foregoing facts, analysis, and recommendation. The following are my views on this permit application:

FINDING OF NO SIGNIFICANT IMPACT.

Having reviewed the information provided by the applicant, the comments submitted by interested parties, and the environmental assessment contained in this document, I find that this permit action will not have a significant impact on the quality of the human environment. Therefore, an environmental impact statement will not be required.

SECTION 404(B)(1) COMPLIANCE/NON-COMPLIANCE DETERMINATION.

The discharge complies with the guidelines, with the inclusion of appropriate and practicable conditions to minimize pollution or other harmful impacts to the affected ecosystem.

PUBLIC HEARING REQUEST.

No public hearing request was received.

CEMVP-OP-R (2001-5667-JKA)
APPLICANT: Lake of the Woods County

DECISION.

I have reviewed and evaluated, in light of the overall public interest, the documents and factors concerning this permit application as well as the stated views of other interested agencies and the concerned public. In doing so, I have considered the possible consequences of this project in accordance with regulations published in 33 CFR Part 320 to 330 and 40 CFR Part 230. I find that issuance of a Department of the Army permit (with special conditions):

___X___ would not be contrary to the public interest.

_______ would be contrary to the public interest.

I have determined that this permit will be issued if the State issues a Section 401 Water Quality Certification or waiver.

July 7, 2005
Date

Michael F. Pfenning
Colonel, Corps of Engineers
District Engineer

DEPARTMENT OF THE ARMY
ST. PAUL DISTRICT, CORPS OF ENGINEERS
190 FIFTH STREET EAST
ST. PAUL, MN 55101-1638

REPLY TO ATTENTION OF
Operations
Regulatory (MVP-2001-5667-JKA)

MAR 28 2005

Mr. Bruce Hasbargen
Lake of the Woods County
P.O. Box 808
Baudette, MN 56623

Dear Mr. Hasbargen:

We have completed our review of your project to retain fill material in 17.98 acres of wetland adjacent to Lake of the Woods. The project site is in the SW ¼ of Sec. 16 and the E ½ of Sec. 17, T. 163N., R. 33W., Lake of the Woods County, Minnesota.

By Federal law, no Department of the Army (DA) permit can be issued until a State Section 401 Water Quality Certification has been issued or the requirement for the certification has been waived. As of this date the Minnesota Pollution Control Agency (MPCA) has not issued a Section 401 Water Quality Certification for your proposed work. If the MPCA does not issue or waive certification by October 5, 2005, the Section 401 Certification requirement will be automatically waived.

Enclosed is a **"PROVISIONAL PERMIT."** The provisional permit is **NOT VALID** and does **not** authorize you to do your work. The provisional permit describes the work that will be authorized, and the General and Special Conditions which will be placed on your final Department of the Army (DA) permit, if the Section 401 Water Quality Certification requirements are satisfied as described below. **No** work is to be performed in the waterway until you have received a validated copy of the DA permit.

Conditions of the State 401 Water Quality Certification will become conditions to the final DA permit. Should the State's action on the required certification preclude validation of the provisional permit in its current form, a modification to the provisional permit will be evaluated and you will be notified as appropriate. Substantial changes may require a new permit evaluation process, including issuing a new public notice.

Once the State has issued the required Section 401 Water Quality Certification or the date above has passed without the State issuing or waiving certification, and you agree to the terms and conditions of the provisional permit, you should sign and date both copies and return them to us. Your DA permit will not be valid until we have returned a copy to you bearing both your signature and the signature of the appropriate Corps official.

If the State denies the required Section 401 Water Quality Certification, then the DA permit is denied without prejudice. If you should subsequently obtain a Section 401 Water

Quality Certification, you should contact this office to determine how to proceed with your permit application.

If you have any questions concerning your State Section 401 Water Quality Certification, please contact Mr. Larry Zdon of the MPCA at (651) 297-8219.

If your project will require off-site fill material that is **not** obtained from a licensed commercial facility, you must notify us at least five working days before start of work. A cultural resources survey may be required if a licensed commercial facility is not used.

If you disagree with the enclosed jurisdictional determination, you may provide new information. Please follow the directions in Section D of the enclosed Notification of Administrative Appeal Options and Process and Request for Appeal.

If this provisional permit is not acceptable and you would like to appeal the permit decision, please follow the directions in Section A of the enclosed Notification of Administrative Appeal Options and Process and Request for Appeal.

The decision regarding this action is based on information found in the administrative record, which documents the District's decision-making process, the basis for the decision, and the final decision.

If you have any other questions concerning your application for a DA permit, please contact Jon K. Ahlness in our St. Paul office at (651) 290-5381. In any correspondence or inquiries, please refer to the Regulatory number shown above.

Sincerely,

Robert J. Whiting
Chief, Regulatory Branch

Copy furnished:

Josh Stromlund, LOW County

Construction Operations
Regulatory (MVP-2001-5667-JKA)

**PROVISIONAL PERMIT**

**NOT VALID**

**DO NOT BEGIN WORK**

This **PROVISIONAL PERMIT** is **NOT VALID** until:

1. You obtain:__X__a Section 401 Water Quality Certification from the Minnesota Pollution Control Agency.

2. You sign and return the enclosed provisional permit with the State Section 401 Water Quality Certification and the appropriate permit fee as indicated below.

__X__ No Fee Required

3. The Corps signs the permit and returns it to you.

Your permit is denied without prejudice if the State denies your Section 401 Water Quality Certification and/or does not concur with your Coastal Zone Consistency determination.

**DO NOT BEGIN WORK**

**NOTIFICATION OF ADMINISTRATIVE APPEAL OPTIONS AND PROCESS AND REQUEST FOR APPEAL**

| Applicant: Lake of the Woods County | | File Number: 2001-5667-JKA | Date: MAR 28 2005 |
|---|---|---|---|
| Attached is: | | | See Section below |
| X | INITIAL PROFFERED PERMIT (Standard Permit or Letter of Permission) | | A |
| | PROFFERED PERMIT (Standard Permit or Letter of Permission) | | B |
| | PERMIT DENIAL | | C |
| X | APPROVED JURISDICTIONAL DETERMINATION | | D |
| | PRELIMINARY JURISDICTIONAL DETERMINATION | | E |

**SECTION I** - The following identifies your rights and options regarding an administrative appeal of the above Decision. Additional information may be found at http://usace.army.mil/inet/functions/cw/cecwo/reg or Corps regulations at 33 CFR Part 331.

**A. INITIAL PROFERRED PERMIT:** You may accept or object to the permit.

- **ACCEPT:** If you received a Standard Permit, you may sign the permit document and return it to the district engineer for final authorization. If you received a Letter of Permission (LOP), you may accept the LOP and your work is authorized. Your signature on the Standard Permit or acceptance of the LOP means that you accept the permit in its entirety, and waive all rights to appeal the permit, including its terms and conditions, and approve jurisdictional determinations associated with the permit.

- **OBJECT:** If you object to the permit (Standard or LOP) because of certain terms and conditions therein, you may request that the permit be modified accordingly. You must complete Section II of this form and return the form to the district engineer. Your objections must be received by the district engineer within 60 days of the date of this notice, or you will forfeit your right to appeal the permit in the future. Upon receipt of your letter, the district engineer will evaluate your objections and may: (a) modify the permit to address all of your concerns, (b) modify the permit to address some of your objections, or (c) not modify the permit having determined that the permit should be issued as previously written. After evaluating your objections, the district engineer will send you a proffered permit for your reconsideration, as indicated in Section B below.

**B. PROFFERED PERMIT:** You may accept or appeal the permit.

- **ACCEPT:** If you received a Standard Permit, you may sign the permit document and return it to the district engineer for final authorization. If you received a Letter of Permission (LOP), you may accept the LOP and your work is authorized. Your signature on the Standard Permit or acceptance of the LOP means that you accept the permit in its entirety, and waive all rights to appeal the permit, including its terms and conditions, and approved jurisdictional determinations associated with the permit.

- **APPEAL:** If you choose to decline the proffered permit (Standard or LOP) because of certain terms and conditions therein, you may appeal the declined permit under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer. This form must be received by the division engineer within 60 days of the date of this notice.

**C. PERMIT DENIAL:** You may appeal the denial of a permit under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer. This form must be received by the division engineer within 60 days of the date of this notice.

**D. APPROVED JURISDICTIONAL DETERMINATION:** You may accept or appeal the approved JD or provide new information.

- **ACCEPT:** You do not need to notify the Corps to accept an approved JD. Failure to notify the Corps within 60 days of the date of this notice, means that you accept the approved JD in its entirety, and waive all rights to appeal the approved JD.

- **APPEAL:** If you disagree with the approved JD, you may appeal the approved JD under the Corps of Engineers Administrative appeal Process by completing Section II of this form and sending the form to the division engineer. This form must be received by the division engineer within 60 days of the date of this notice.

A-369

**E. PRELIMINARY JURISDICTIONAL DETERMINATION:** You do not need to respond to the Corps regarding the preliminary JD. The Preliminary JD is not appealable. If you wish, you may request an approved JD (which may be appealed), by contacting the Corps district for further instruction. Also you may provide new information for further consideration by the Corps to reevaluate the JD.

## SECTION II - REQUEST FOR APPEAL or OBJECTIONS TO AN INITIAL PROFFERED PERMIT

REASONS FOR APPEAL OR OBJECTIONS: (Describe your reasons for appealing the decision or your objections to an initial proffered permit in clear concise statements. You may attach additional information to this form to clarify where your reasons or objections are addressed in the administrative record.)

ADDITIONAL INFORMATION: The appeal is limited to a review of the administrative record, the Corps memorandum for the record of the appeal conference or meeting, and any supplemental information that the review officer has determined is needed to clarify the administrative record. Neither the appellant nor the Corps may add new information or analyses to the record. However, you may provide additional information to clarify the location of information that is already in the administrative record.

## POINT OF CONTACT FOR QUESTION OR INFORMATION

| If you have question regarding this decision and/or the appeal process, you may contact: | If you only have questions regarding the appeal process you may also contact: |
| --- | --- |
| Jon K. Ahlness<br>U.S. Army corps of Engineers, Regulatory Branch<br>190 Fifth Street East<br>St. Paul, MN 55101-1638<br>Telephone: (651) 290-5381 | Division Engineer<br>C/o Martha s. Chieply, Appeal Review Office<br>CEMVD<br>P.O. Box 80<br>Vicksburg, Mississippi 39181-0080<br>Telephone: (601) 634-5820 |

RIGHT OF ENTRY: Your signature below grants the right of entry to Corps of Engineers personnel, and any government consultants, to conduct investigations of the project site during the course of the appeal process. You will be provided a 15 day notice of any site investigation, and will have the opportunity to participate in all site investigations.

| | | |
| --- | --- | --- |
| _______________<br>Signature of appellant or agent. | Date: | Telephone number: |

JURISDICTIONAL DETERMINATION
U.S. Army Corps of Engineers

Revised 8/13/04

DISTRICT OFFICE: St. Paul District
FILE NUMBER: MVP-2001-5667-JKA
PROJECT LOCATION INFORMATION:

State: Minnesota
County: Lake of the Woods
Center coordinates of site (latitude/longitude): Lat: 48.9382043202 Lon: -94.9196242217
Approximate size of area (parcel) reviewed, including uplands: 18 acres.
Name of nearest waterway: Lake of the Woods
Name of watershed: Lake of the Woods

JURISDICTIONAL DETERMINATION

**Completed:** Desktop determination ☐ Date:
Site visit(s) ☒ Date(s): July 7, 2004

**Jurisdictional Determination (JD):**

☐ Preliminary JD - Based on available information, ☐ *there appear to be* (or) ☐ *there appear to be no* "waters of the United States" and/or "navigable waters of the United States" on the project site. A preliminary JD is not appealable (Reference 33 CFR part 331).

☒ Approved JD – An approved JD is an appealable action (Reference 33 CFR part 331).
Check all that apply:

☐ *There are* "navigable waters of the United States" (as defined by 33 CFR part 329 and associated guidance) within the reviewed area. Approximate size of jurisdictional area:

☒ *There are* "waters of the United States" (as defined by 33 CFR part 328 and associated guidance) within the reviewed area. Approximate size of jurisdictional area: 18 acres

☐ *There are "isolated, non-navigable, intra-state* waters or wetlands" within the reviewed area.
☐ Decision supported by SWANCC/Migratory Bird Rule Information Sheet for Determination of No Jurisdiction.

BASIS OF JURISDICTIONAL DETERMINATION:

**A. Waters defined under 33 CFR part 329 as "navigable waters of the United States":**

☐ The presence of waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.

**B. Waters defined under 33 CFR part 328.3(a) as "waters of the United States":**

☐ (1) The presence of waters, which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide.
☐ (2) The presence of interstate waters including interstate wetlands[1].
☐ (3) The presence of other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate commerce including any such waters (check all that apply):
  ☐ (i) which are or could be used by interstate or foreign travelers for recreational or other purposes.
  ☐ (ii) from which fish or shellfish are or could be taken and sold in interstate or foreign commerce.
  ☐ (iii) which are or could be used for industrial purposes by industries in interstate commerce.
☐ (4) Impoundments of waters otherwise defined as waters of the US.
☐ (5) The presence of a tributary to a water identified in (1) – (4) above.
☐ (6) The presence of territorial seas.
☒ (7) The presence of wetlands adjacent[2] to other waters of the US, except for those wetlands adjacent to other wetlands.

**Rationale for the Basis of Jurisdictional Determination (applies to any boxes checked above).** *If the jurisdictional water or wetland is not itself a navigable water of the United States, describe connection(s) to the downstream navigable waters. If B(1) or B(3) is used as the Basis of Jurisdiction, document navigability and/or interstate commerce connection (i.e., discuss site conditions, including why the waterbody is navigable and/or how the destruction of the waterbody could affect interstate or foreign commerce). If B(2, 4, 5 or 6) is used as the Basis of Jurisdiction, document the rationale used to make the determination. If B(7) is used as the Basis of Jurisdiction, document the rationale used to make adjacency determination:* Fill was discharged into an unnamed wetland adjacent to Lake of the Woods, which is a navigable water of the United States.

**Lateral Extent of Jurisdiction:** (Reference: 33 CFR parts 328 and 329)

- ☐ Ordinary High Water Mark indicated by:
  - ☐ clear, natural line impressed on the bank
  - ☐ the presence of litter and debris
  - ☐ changes in the character of soil
  - ☐ destruction of terrestrial vegetation
  - ☐ shelving
  - ☐ other:
- ☐ High Tide Line indicated by:
  - ☐ oil or scum line along shore objects
  - ☐ fine shell or debris deposits (foreshore)
  - ☐ physical markings/characteristics
  - ☐ tidal gages
  - ☐ other:
- ☐ Mean High Water Mark indicated by:
  ☐survey to available datum; ☐physical markings; ☐ vegetation lines/changes in vegetation types.

☐Wetland boundaries, as shown on the attached wetland delineation map and/or in a delineation report prepared by:

**Basis For Not Asserting Jurisdiction:**

- ☐The reviewed area consists entirely of uplands.
- ☐Unable to confirm the presence of waters in 33 CFR part 328(a)(1, 2, or 4-7).
- ☐Headquarters declined to approve jurisdiction on the basis of 33 CFR part 328.3(a)(3).
- ☐ The Corps has made a case-specific determination that the following waters present on the site are not Waters of the United States:
  - ☐ Waste treatment systems, including treatment ponds or lagoons, pursuant to 33 CFR part 328.3.
  - ☐ Atificially irrigated areas, which would revert to upland if the irrigation ceased.
    Artificial lakes and ponds created by excavating and/or diking dry land to collect and retain water and which are used exclusively for such purposes as stock watering, irrigation, settling basins, or rice growing.
  - ☐ Artificial reflecting or swimming pools or other small ornamental bodies of water created by excavating and/or diking dry land to retain water for primarily aesthetic reasons.
  - ☐ Water-filled depressions created in dry land incidental to construction activity and pits excavated in dry land for the purpose of obtaining fill, sand, or gravel unless and until the construction or excavation operation is abandoned and the resulting body of water meets the definition of waters of the United States found at 33 CFR 328.3(a).
  - ☐ Isolated, intrastate wetland with no nexus to interstate commerce.
  - ☐ Prior converted cropland, as determined by the Natural Resources Conservation Service. Explain rationale:
  - ☐ Non-tidal drainage or irrigation ditches excavated on dry land. Explain rationale:
  - ☐ Other (explain):

**DATA REVIEWED FOR JURSIDICTIONAL DETERMINATION (mark all that apply):**

- ☒ Maps, plans, plots or plat submitted by or on behalf of the applicant.
- ☒ Data sheets prepared/submitted by or on behalf of the applicant.
  - ☒ This office concurs with the delineation report, dated **10-25-02**, prepared by (company): **Lake of the Woods Soil & Water Conservation District**
  - ☐ This office does not concur with the delineation report, dated prepared by (company):
- ☐ Data sheets prepared by the Corps.
- ☐ Corps' navigable waters' studies:
- ☐ U.S. Geological Survey Hydrologic Atlas:
- ☒ U.S. Geological Survey 7.5 Minute Topographic maps:
- ☐ U.S. Geological Survey 7.5 Minute Historic quadrangles:
- ☐ U.S. Geological Survey 15 Minute Historic quadrangles:
- ☒ USDA Natural Resources Conservation Service Soil Survey:
- ☒ National wetlands inventory maps:
- ☐ State/Local wetland inventory maps:
- ☐ FEMA/FIRM maps (Map Name & Date):
- ☐ 100-year Floodplain Elevation is: (NGVD)
- ☒ Aerial Photographs (Name & Date): **FSA 2003**
- ☐ Other photographs (Date):
- ☐ Advanced Identification Wetland maps:
- ☒ Site visit/determination conducted on: **July 7, 2004**
- ☐ Applicable/supporting case law:
- ☐ Other information (please specify):

[1]Wetlands are identified and delineated using the methods and criteria established in the Corps Wetland Delineation Manual (87 Manual) (i.e., occurrence of hydrophytic vegetation, hydric soils and wetland hydrology).

[2]The term "adjacent" means bordering, contiguous, or neighboring. Wetlands separated from other waters of the U.S. by man-made dikes or barriers, natural river berms, beach dunes, and the like are also adjacent.

JA 3-7-05