IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| GARY BAILEY<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | COPY<br>Civil No. 02-1078L<br>Honorable Victor J. Wolski |

DEPOSITION OF DENNIS THOMSON

February 21, 2008

. . . The following is the Deposition of DENNIS THOMSON, taken at the request of the Defendant in the above-entitled cause, pending in the United States Court of Federal Claims, pursuant to Notice and the Federal Rules of Civil Procedure, before Ruth Ann Johnson, RPR, a Notary Public within and for the State of Minnesota, at the AmericInn, Highway 11 West, Roseau, Minnesota, on Thursday, February 21, 2008, at 1:25 o'clock p.m., at which time counsel appeared as hereinbefore set forth . . . .


©2008

Page 2

APPEARANCES

On Behalf of the Plaintiff:

ALAN FISH, P.A.
102 2nd Avenue Northwest
Roseau, Minnesota 56751
By: RITA FISH-WHITLOCK, ATTORNEY AT LAW

On Behalf of the Defendant:

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
P. O. Box 663
Washington, DC 20004
By: JAMES D. GETTE, TRIAL ATTORNEY

Taken By: Ruth Ann Johnson, RPR

Page 3

CONTENTS


| DEPONENT: | PAGE NO. |
|---|---|
| DENNIS THOMSON | |
| Examination by . . . Mr. Gette | 4 |
| Examination by . . . Ms. Fish-Whitlock | 21 |
| Examination by . . . Mr. Gette | 45 |

| EXHIBITS | MARKED |
|---|---|
| No. 1 -- Copy of plat | 12 |
| No. 2 -- Copy of letter to Mr. and Mrs. Thomson from Rita Fish-Whitlock, 5-31-05, with attachments | 17 |
| No. 3 -- Invoice for culvert | 20 |


(*Exhibit 3 retained by counsel.)
(*Exhibits attached to transcript.)

Page 4

PROCEEDINGS

DENNIS THOMSON,

of Warroad, Minnesota, called as a witness by the Defendant, being first duly sworn by Ruth Ann Johnson, RPR, a Notary Public within and for the State of Minnesota, was examined and deposed on his oath as follows:

EXAMINATION

BY MR. GETTE:

Q. Mr. Thomson, my name is Jim Gette, we've spoken on the phone and met just prior to your deposition today. I represent the United States in a lawsuit that has been brought by Gary Bailey regarding some property down in, along Lake of the Woods, and I've subpoenaed you to, to give your deposition here today.

Let me start by asking you, have you ever had your deposition taken before?

A. No, I haven't.

Q. Okay. A few quick instructions just to help things move along as smoothly as possible.

As you notice, the court reporter is here and she's taking down everything that both

Page 5

I and you say and that, therefore, it's important that we not talk over top of each other. So I'll work very hard not to interrupt your answers, if you could try to do the same with respect to my questions. Okay?

A. All right.

Q. The second thing is that it's important that you understand any questions that I ask you today. Sometimes my questions may not be as clear or as understandable as necessary and if you find that to be the case, just let me know that you don't understand the question and I'll be happy to rephrase it for you. Okay?

A. Okay.

Q. The final thing is any time, if you want a break, you just let me know that and we'll do that. All right?

A. All right. Sounds good.

Q. First off, give me your name and your address?

A. Name is Dennis James Thomson, address is 304 Virginia Avenue Northeast, Warroad, Minnesota, 56763.

Q. Now at some point in time did you

Page 6

purchase some property along Lake of the Woods?
A. Yes, I did.
Q. Okay. And about when was that?
A. I believe it was around 1998.
Q. And was this property in what is called the Sunny Beach Plat?
A. Yes, it is.
Q. Okay. And are you aware that there are 14 platted lots in that development?
A. Yes, I am.
Q. Okay. And how many of those did you buy?
A. Two.
Q. Okay. And what are the numbers of your platted lots?
A. I believe mine are two and three. There's one on the end.
Q. Did you work through any real estate agent in purchasing the property?
A. I did. I'm not -- I can't remember the real estate agent's name, but it is on the, one of the forms, the deeds, he brought it into the store.
Q. Okay. Does Patrick LaValla --
A. Yes, that's it.

Page 7

Q. Okay. And did you understand, during the process of buying the property, whether Mr. LaValla was acting as your agent or Mr. Bailey's agent?
A. Yeah. Mr. LaValla said that he was selling the land for Gary Bailey.
Q. Now prior to your -- let me lay the foundation for that. From whom did you purchase the property?
A. It was all written up and I paid the deposit to Mr. LaValla.
Q. Do you know who the owner of the property was, from whom you were buying the property?
A. It did come up at some time that I would be making payments to Gary Bailey.
Q. Now prior to your purchase of the property, had you ever met Mr. Bailey?
A. No. And I haven't met him yet.
Q. Okay. Have you ever spoken with Mr. Bailey?
A. Yes, we've talked on the phone.
Q. Sometimes I get so automated when I'm doing these depositions that I ask for your address and then forget to listen. What town

Page 8

do you live in?
A. Warroad, Minnesota.
Q. And how far is that from the property up on the Lake of the Woods?
A. Must be about 20 miles. It's 20 minutes or so to get out there.
Q. Okay. When did you first have occasion to talk to Mr. Bailey on the phone?
A. I just, I remember calling him to, when I started getting some of the notices that there were problems with whether it was wetlands or not, and we discussed it and he said he was working on taking care of that.
Q. Prior to your purchase of the property, did anyone inform you that there were any questions regarding wetlands on the property?
A. No. In fact, it was brought to my attention that it was more or less a continuation of the road from Sandy Shores and it was listed as farmland on the county records, so it did not indicate anywhere along the line that it was wetlands.
Q. How much did you pay for your two lots?

Page 9

A. $50,000.
Q. And were you required to make a down payment?
A. It was $500 at the close of the deal, a check for $500.
Q. And then did you finance the remainder of the purchase?
A. The rest of it went on contract for deed with monthly payments.
Q. Do you know offhand how much your monthly payments are?
A. $594 and some change.
Q. And are you current with your payments under the contract for deed?
A. Actually, I'm a little bit behind, but we've discussed that and he's not worried about it, so I've been doubling up a little bit in the last few months to catch back up.
Q. Are you able to estimate approximately how many months you're behind?
A. That would be about eight to ten months, because I, there for one year I wasn't paying much.
Q. During the period that you testified you weren't paying much, what was the reason

Page 10

for that?
A. We, things got a little tight at the store, we didn't have a lot of extra cash, and I opened a Radio Shack and that took some of the money, and then I bought the building, and with 11 apartments, that just kind of made cash flow a little bit slow.
Q. Throughout that period was it always your intention to become current with your payments?
A. Yes. Yes.
Q. And under the initial duration of the contract for deed, would your payments be -- how much longer would your payments run?
A. It ran for ten years, from the, October of 2008 -- I mean of 1998 to, now it should be in October of this year, but it, it might be yet. I'm working on that.
Q. And at this point Mr. Bailey has indicated that he's comfortable with your attempts to come current with your payments?
A. Yes. He says he's not worried a bit.
MR. GETTE: This is off the record.
(Whereupon, there was discussion off

Page 11

the record.)
Q. (By Mr. Gette) When you purchased the property, what were your intentions with respect to how you would use the property?
A. Michele and I were planning on putting a summer cabin out there.
Q. And was it your intention that the summer cabin would include a septic system?
A. Yes. That type of area, because of the depth and stuff of the sand, it would have had to have been a mound system, but they have built them on other parts of the lake, so we didn't think there would be any problem with that.
Q. Have you ever had any drawings built with respect to construction on the property?
A. No, we haven't drawn anything up.
Q. Have you ever hired anyone to investigate whether a septic system could be installed on the property?
A. No, we haven't done that.
Q. Has anyone ever told you that a septic system could or could not be placed on the property?
A. The way I understand it with the

Page 12

wetlands and everything, now it's not acceptable. They, one of the neighbors brought in a port-a-pot type of thing is what they had to eliminate their waste with.
Q. Do you know what neighbor that was?
A. That was just the next one to the, the, it would have been the -- west of me. I just happened to see him do it when he was out there fishing and stuff, so -- (no further response.)
Q. Okay. Let's --
A. I don't know if that one may, that person may have sold it or not, I'm not sure.
Q. Okay.
MR. GETTE: Let's mark this as Thomson Exhibit 1.
(Whereupon, Deposition Exhibit No. 1, Thomson, was marked for identification.)
Q. (By Mr. Gette) Mr. Thomson, I'm handing you a copy of what will be Exhibit 1 to your deposition, that is a copy of the plat of the properties we've been talking about. Have you seen a copy of this plat before?
A. Yes, I have. I have seen it.
MS. FISH-WHITLOCK: I'm going to

Page 13

object to characterization as a copy of a plat.
MR. GETTE: Okay.
Q. (By Mr. Gette) And you see where Lots 2 and 3 are located toward the bottom of the plat?
A. Right. I'm, I'm thinking now maybe I'm three and four, because there's the road here (indicating) and then a partial of two. I --
Q. The, the only -- with respect to the, with respect to the port-a-potty that was placed, in which direction on this would it have been?
A. It would have been -- it's -- would have been to the, is this marked as north and stuff (indicating), how is this?
Q. Let's just take toward the top of the page versus toward the bottom.
A. Toward the top from my property, be the next one towards the top.
Q. Okay. So it would be have been the property toward the top of the page as you head away from your property?
A. Right.
Q. Okay. That's all I wanted on that,

Page 14

I just wanted to make sure we had the right property.
Now you indicated that it was your understanding that with the wetlands septic systems would not be allowed. How did you come to that understanding?
MS. FISH-WHITLOCK: Objection, mischaracterization of his testimony.
Go ahead.
A. I, I didn't think any -- well, what I understood was there could be no development of the land or nothing built on it and I just assumed that would include any kind of a septic system or, or a house, so -- (no further response.)
Q. (By Mr. Gette) How did you understand there would be no development allowed?
A. Because it was wetlands and they wouldn't allow any construction.
Q. Did you have any conversations with the local government officials regarding the development of the property?
A. No, I haven't.
Q. Have you had any conversations with

Page 15

representatives of the United States Corps of Engineers?
A. No.
Q. Is it currently your intention to complete the payments that are called for under the contract for deed?
A. Yes, I plan on completing those payments.
Q. Have you ever made any attempts to sell this property?
A. No. I have been approached by people, but I have not tried to sell it.
Q. Who has approached you about the property?
A. Just I had people call me on the phone, I had no idea who they were, and they just stated that they knew I owned some land out on the lake and they wanted to know if I was interested in selling and I just said no.
Q. Approximately when did those calls come to you?
A. I think the last one was about a year and a half ago.
Q. And approximately how many of these calls do you think you've received?

Page 16

A. Altogether it was just three.
Q. Do you recall when the first two calls occurred?
A. That was about midway through, so it would have been about five years after I'd been paying on the land. And about that time I was about halfway through and I think about -- then I received the first call.
Q. So the first call, would it be fair to say it was somewhere in the vicinity of 2003?
A. Yes.
Q. When was the last time you were out to the property?
A. It's been about three years now.
Q. What are your current plans in terms of development of the property or use of the property?
A. I'm actually waiting to find out what happens. I know some efforts have been made to set aside different wetlands and to get that taken off the wetland list and right now I'm just waiting to find out what's going to happen before I do anything.
Q. In the three telephone calls that

Page 17

you received, did any of those purchasers indicate they were aware that the property was wetlands?
A. No, they never brought that up.
Q. Did you bring that up in your conversations with them?
A. No. The conversation wasn't very long, because as soon as they said what they wanted, I just said I'm not interested.
Q. Have you ever applied for any building or land use permits for the property?
A. No.
MR. GETTE: Let's mark this as Exhibit 2.
(Whereupon, Deposition Exhibit No. 2, Thomson, was marked for identification.)
Q. (By Mr. Gette) Mr. Thomson, I'm handing you what's been marked as Exhibit 2 to your deposition. Do you recognize --
MS. FISH-WHITLOCK: Before -- I'm going to be objecting to relevancy.
MR. GETTE: Okay.
Q. (By Mr. Gette) Do you recognize that document? And you can take some time to look at it.

Page 18

A. No. I -- let's see here.
Is this -- just the top one?
Q. Yeah. Let's start with the top page.
A. Okay.
Q. Do you recognize that letter?
A. I don't remember seeing it.
Q. Okay. I'd ask you to flip back two pages and take a look at that document.
A. Oh, okay. That was when there was some other people -- okay. I remember this now.
This is, I thought this was -- let me see, let's see, there -- I remember seeing something that -- but it wasn't, it wasn't addressed to Michele or I, there were some other parties that he was taking to court, that they never -- they didn't pay anything at all from the, from the beginning.
Q. Okay. Let me, the document aside, let me ask you this. Did, did you ever become aware at any point -- strike that. I don't like that characterization.
Did you ever believe that Mr. Bailey had instituted any legal action against you for

Page 19

failure to make payments?
A. No.
Q. Okay. Have you placed any gravel or done any improvements on the lot?
A. The only thing I did was put in the culvert system with a road going down off the road that he built.
Q. When you say the road he built, the road Mr. Bailey built?
A. Mr. Bailey built, yes.
Q. And did you hire someone to do that work?
A. Yeah. I bought the culvert and then somebody from out in that area, that has a sand pit or something, brought out the, the fill to put over the top of the culvert.
Q. And then did you also say that you put a driveway in?
A. Yeah. That was, that was over the culvert, that's right.
Q. Okay. How deep into the property from the roadway did the driveway go?
A. Well, it just, actually it was just what they did to cover the culvert to get onto the land.

Page 20

Q. Mr. Thomson, I'm going to show you a, one of the documents that you brought with you today. Does that receipt relate in any way to the placement of the culvert that we were just discussing?
A. Yeah. That's, that's where they put the crossing in, so they -- that was the charge and stuff to, to get it taken care of.
Q. Okay. I'm going to have the court reporter mark this with an exhibit sticker, and I'll let you take this with you and you can copy and send it back to us, but that way we'll, --
A. Okay.
Q. -- we'll know what was being referred to.
A. I need to get a copy of this, too, because I don't know why I'm making payments if this took place (indicating), because I --
Q. And by this you're referring to Deposition Exhibit 2?
A. Yes.
Q. Okay.
MR. GETTE: Let's go off the record a second.

Page 21

(Whereupon, Deposition Exhibit No. 3, Thomson, was marked for identification.)
MR. GETTE: Okay. Back on the record.
Q. (By Mr. Gette) So, Mr. Thomson, then, what's been marked as Deposition Exhibit 3, just so I'm clear, that is a copy of the invoice that you were billed for the installation of the culvert on your property?
A. Right.
Q. Is that correct?
A. Yes, it is.
Q. Okay.
MR. GETTE: I don't have any other questions for you right this minute, but Mr. Bailey's counsel may.

EXAMINATION
BY MS. FISH-WHITLOCK:
Q. Mr. Thomson, my name is Rita Fish-Whitlock, I'm an attorney representing Mr. Bailey in these proceedings. I don't think that we've ever had the pleasure of meeting, kind of unusual --
A. No.

Page 22

Q. -- in our small area.
I guess, first, some of the questions that I have to ask you -- had to ask you had to do with your answers to some of Mr. Gette's questions to you.
So, again, if you don't understand any of the questions that I'm asking you, please state so. You know, there's no need to speculate. If you're not sure of an answer to a question, that's fine, too, you know.
A. Um-hum.
Q. I know a lot of these activities took place several years ago and it's perfectly understandable, sometimes we can refresh our memories through reviewing documents, and I'll try to do that with you as well. So, again, if you don't understand one of my questions, please tell me and I'll rephrase.
Now you indicated that when you first purchased the property you didn't know who was selling it. Is that correct?
A. No. I was approached by Mr. LaValla that some land was for sale out there. And at that time I was interested in the land, but before I purchased it, I did find out who.

Page 23

Q. Okay.
A. He told me who, who owned it and who I'd be making payments to, so -- (no further response.)
Q. Okay. So Mr. LaValla must have known that you were in the market to purchase lakeshore property?
A. I --
MR. GETTE: Objection.
Q. (By Ms. Fish-Whitlock) Go ahead.
A. I was looking for, I had talked to some people about getting some land out by Sandy Shores or so, and it might have gotten back to them, because I was approached by him.
Q. Okay. All right. Now as far as the price that you paid for these lots in 1998, did you feel as though that was, that you were getting good value for two lakeshore lots at that time?
A. Yes.
MR. GETTE: Objection, calls for expert speculation.
Go ahead.
Q. (By Ms. Fish-Whitlock) Go ahead.
A. I thought I was getting a fairly

Page 24

good deal based on what I knew people were selling lots for further up the side of the lake there.
Q. As far as, are you speaking about empty lots or vacant lots?
A. Yeah. Empty lots that hadn't been developed yet.
Q. Okay. Do you recall any specific examples of sales of vacant lots up in that area during that time?
A. I believe somebody that had a lot about, a little less than full size of mine, got about $30,000 for it, and they had, at the time they bought it, they bought it for like $8,000 or something, so I figured that it was a very good chance that the property along the lake would increase in value.
Q. All right. So just to clarify, what you're testifying to is when you were, you were searching for lakeshore property, you had personal knowledge at that time of a vacant lot near Sandy Shores selling for $30,000?
MR. GETTE: Objection, leading.
Answer.
Q. (By Ms. Fish-Whitlock) Go ahead and

Page 25

answer.
A. Yes. Okay. I had heard somebody talking about how they'd sold it for -- and made a good profit.
Q. Okay. In, as far as your in -- I'd like to get into what your investment expectations were when you decided to purchase these two lakeshore lots.
Was it at all your expectation that these lots would appreciate in value?
A. I --
MR. GETTE: Objection as to relevancy.
Q. (By Ms. Fish-Whitlock) Go ahead.
A. But I, when, when I purchased that, I was hoping that the land would become valuable and if Michele and I weren't able to build there or decide to build someplace else, I would be able to sell it and make a profit on it, yes.
Q. Okay. Now much of, obviously, the agreement between you and Mr. Bailey is of record between the recorded contract for deed and you don't dispute anything that can -- everything is of record and recorded in the

Page 26

county recorder's office, as far as your aware. Is that correct?
A. Yes. As far as I know, everything was recorded and taken care of.
Q. Now you mentioned earlier that you, it was your intent to build a, a summer cabin on this property when you purchased it in 1998?
A. Yes. Um-hum.
Q. At the time that you purchased it, did you have any sort of expectations or a guideline or a goal as to when you wanted that summer cabin to be built?
A. Actually, Michele and I were, after we got the road in there, we were going in there, we were starting to clear some of the brush away to make it drivable to the lake area and probably use it for a while to, with tents and camping out and things like that. We had not set any date to build anything.
Q. Okay. So initially you were going to use the property for camping?
A. Right.
Q. But at some time in the future it was your intent to build a summer cabin?
A. Yes.

Page 27

Q. Okay. But as far as specifically, you hadn't devised a, a goal at that point?
A. No, we hadn't.
Q. All right. Now Mr. Gette asked you if you had any drawings made up to place a septic system on the land that you own out in, on Sunny Beach. Why is that?
MR. GETTE: Objection, calls for speculation as to why I would ask a question.
MS. FISH-WHITLOCK: Not -- let me rephrase then.
Q. (By Ms. Fish-Whitlock) Mr. Gette previously asked you if you had any drawings made up for placing a septic system on the property. Do you recall that question?
A. Yes, I do.
Q. Okay. Why is it that you have not had any drawings made up?
A. We were in the process yet of still kind of clearing brush away and getting ready to take down a tree that was partially fallen when we started getting notices and stuff that it was wetlands and at that point I decided not to do anything further with it.
Q. Okay. When you said that you

Page 28

decided not to do anything further with it, did you believe that it would have been futile?
A. I just, I was under the impression from some of the people, some of the things people said about wetlands, that I could not take -- I could cut a tree down, but I could not remove roots and things like that on wetland, so for me to just get rid of a tree that was partially fallen, if I had to leave the stump and the roots there, it just didn't make sense to me.
Q. Okay. And do you recall who these people were that were giving you those types of ideas?
A. I'm, I'm not sure. I did talk to some of the people that, there was a fellow from Ace Hardware that also bought some land out there not too far from mine, and we discussed a little bit about it and he said that you can't do any -- you can take out, you know, trees level, but you can't remove roots and do all kinds of stuff.
I believe that's -- I never checked into it to find out if that was true or not, but I took his word for it.

Page 29

Q. So you were mostly kind of relying on just another person from the area and not really looking into local government officials' determinations with regard to that?
A. I had no contact with any of the government people at all involved, so -- (no further response.)
Q. Now Mr. Gette previously asked you whether or not you had any drawings made up for building your summer cabin. Do you recall that question?
A. Yes, I do.
Q. Okay. Why is it that you haven't had any drawings made up to build your summer cabin?
A. When we decided not to do it at that time, we looked at a lot of pictures and stuff of things we liked, but we never went to get any kind of drawings, which costs money to do, so we instead got a house, I have some acreage down in Motley, we got house plans to build down there.
Q. Now do you have any, I'd like to know what your personal knowledge is as far as status of the extension of Sandy Shores Drive,

Page 30

as it sits today?
A. I'm -- after talking to Gary Bailey about everything, he said that all along Sandy Shores there it was black humus soil and stuff, so they had to bring in a lot of fill.
He went to the county there --
Q. I guess that's not really what my question is.
MR. GETTE: Objection.
Q. (By Ms. Fish-Whitlock) Are you, my question is, are you, are you aware that this, that the extension of Sandy Shores Drive has been ordered to be removed?
A. I, they have told me that, in fact, he has informed me, Gary, that he is supposed to be taking, taking that road out, yes.
Q. Okay. And should this road be removed, you won't have access to your lots. Is that right?
A. That's right. I would not be able to get to my lot.
Q. All right. Now as it sits today, is there any use that you can put that lot to?
A. Yeah. I can, I could put a roll-out dock and stuff there and I could also build

Page 31

something that was not structured so that it would be taking out any, anything.
I think I could, I was looking into that, I might be able to put something that would be flat on the land and not -- and I don't know whether or not I could put any septic system in, but it would not have to be necessary, I don't imagine, if we just went out there and camped overnight or something.
Q. Okay. So at this point, even if the road is removed pursuant to the Army Corps of Engineers' order, you would simply utilize the lake to access your property?
A. That would be the only way I could get there and there are -- well, I don't have a dock, but that would be the only way I could get to the lake -- or get to that land is by the lake.
Q. Now you, previously Mr. Gette asked you a question with regard to, it had to do with your intentions of, of developing the property, and you stated that it was your understanding that no development would be allowed in wetlands. Who told you that?
A. That was just all, all the people

Page 32

that were, that owned the land out there and stuff. And the, and the man, I can't remember his name, Michele would know it, from Ace Hardware, said that you could not develop the land if it was considered wetlands.
Q. Okay. So you're not --
A. I have no contact with anybody that, one way or the other, whether they know -- nobody that really knows, I guess.
Q. Okay.
A. No.
Q. So you haven't, as far as -- do you know at this point -- or what is your understanding of what agency is preventing development of your property, upon your understanding?
A. I think it's the DNR.
Q. Okay. You believe it's the DNR that's preventing development of your property?
A. Yes. I really don't -- I've never talked to anybody that has identified themselves as preventing the development of the land.
Q. Okay. So your understanding that no development is going to be allowed on this

Page 33

property is simply that knowledge you've gained from just speaking with another lot owner?
A. Yes.
MR. GETTE: Objection, asked and answered.
Q. (By Ms. Fish-Whitlock) Now if you're not, I mean, not being able to put the summer cabin on this property is in direct contradiction to your, what you intended when you purchased it. Is that a fair statement?
MR. GETTE: Objection, leading.
A. Yeah. My intention was to put a summer cabin there when I purchased the land and then when the developments took place, that it looked like they weren't going to allow any development of the land, I just kind of disregarded those thoughts and quit, quit planning for it.
Q. (By Ms. Fish-Whitlock) Okay. You also mentioned you've had a couple of, of phone calls by people inquiring into whether you would be willing to sell your lakeshore lots.
Did you, did it appear at all that the people who called you on the phone knew about the regulations that were being placed on

Page 34

that property at that time?
A. I think conversation never went that deep. They mostly consisted of do you own some lake frontage property out by Sandy Shores and I said I did. And they said would you be interested in selling it and I said no, I wouldn't.
And that was pretty much the conversation, nothing about prices or anything like that came up, because I just didn't want to even discuss it with them, so -- (no further response.)
Q. Okay. Did you not want to discuss it with them because of the regulations that were being placed on the property or because you did not feel as though anyone would purchase the property given the regulations?
MR. GETTE: Objection, suggests that one of those two is the correct answer and it's leading.
A. One of my thoughts were that these people may know that the land was being, being set aside as wetlands and were trying to get a bargain, to pay much less than I originally paid for it, and I, that's the indication I

Page 35

got, that I just didn't even want to deal with it.
Q. (By Ms. Fish-Whitlock) Okay. You said you haven't been to the property for the last three years?
A. It's been about that long since I've been out there. We kind of stopped going out there when we couldn't do anymore developing to get ourselves to be able to drive into the land.
Q. Okay. Did you receive a Restoration Order to remove the culvert that you had placed for your driveway?
A. I never -- I, I don't remember getting anything where it said -- there was talk from someone that they had, somebody had contacted them about removing a culvert, but I didn't get, I don't remember getting any notice myself.
Q. Okay. So you still have your culvert in place?
A. It was the last time I was out there.
Q. Okay. Since it's been three years, you don't even know, do you?

Page 36

A. I don't know.
Q. That's all right.
Okay. Do you have any knowledge as to where the culvert was purchased from?
A. I had to, I contracted -- or I con -- from, Ace Hardware had a source and I went through him. He got his at the same place, so I -- and he had them delivered out there, so that's, that's as much as I know about it. I just paid the money.
Q. Okay.
A. Seemed easier that way.
Q. So I want to be clear. As far as the development activity that did occur on the property, basically you put in a culvert in the ditch and then fill, placed sand over that to create a driveway into your lots?
A. Yeah.
Q. And the driveway didn't extend very far?
A. No. It, when we would pull in, we'd just parked at the end of the part that we built over the ditch. Otherwise we wouldn't be, wouldn't be able to get across without going through the ditch, which usually had a

Page 37

little water in it.
Q. Okay. Do you recall at all having to apply for a culvert permit with Lake of the Woods County?
A. I don't really remember doing it.
Q. Okay. I'd like to get into your opinions of how the, the effect of the regulations that have been, that have been placed on your property has had an effect on the value. Do you believe that it's affected the value?
MR. GETTE: Objection, calls for expert testimony and speculation. He's not qualified to offer opinions.
You can go ahead and answer.
A. Okay. What I have, the land has been valued at in tax purposes, went from $400, when it was considered farmland, up to $45,000, and now it's back down to 10,500 for tax purposes. So I show, in my, in my thoughts, it sounds like it's being depreciated back down again, because of not being able to be developed is what I think.
Q. (By Ms. Fish-Whitlock) Okay. And do you have any understanding as to why or what

 ©2008

Page 38

regulation is preventing development of your property?
A. Just the fact that it was termed wetlands, which all I have to go by is what happens to people when, that you see in California, when they're trying to build, say a high-rise someplace and it comes across some snail or something, that they find that's a -- some -- something that's getting ready to be extinct and all of a sudden they consider it, to stop all the work on the development of that area because it's considered a, getting rid of a, some kind of an animal or something that is becoming extinct.
And that's just, that's kind of the same way I feel about it when they say wetlands, it means you have to leave it like it is, and that's where I come from.
I don't know from any personal experience or talking to anybody what all the regulations are concerning wetlands, but I have seen them stop a lot of other construction and stuff by -- we've tried to get something through the marsh in Warroad and there's some kind of snail in this crick bed, so we can't

Page 39

dredge it out to make an entry point to the lake.
And that's, they just won't let us even take out any of the grass and stuff there, so that's the kind of stuff I see as when they condemn it.
Q. Is when they condemn it?
A. It's like being condemned there, so you can't do anything with it.
Q. Do you consider that your property, as far as Lots 2 and 3, are being condemned?
A. From further development, they're pretty much condemning it to stay the, you know, status quo, it's not going to go anywhere else.
Q. All right. Do you have an economical viable use for Lots 2 and 3 at this time?
A. Right now I don't have.
MR. GETTE: Objection, calls for expert testimony.
You can go ahead.
A. I don't have any, I'm not making any plans to use it in any way right now.
Q. (By Ms. Fish-Whitlock) You're not

Page 40

making any plans to use it in any way right now. Do you have, at this point, any way to make money off of Lots 2 and 3?
A. No. If I was to sell it at the present time I would lose a considerable amount of money.
Q. Okay. And is it big enough for agricultural purposes?
A. It, it has trees and stuff on it that would have to be, that would all have to be cleared for, to make it agricultural, but -- (no further response.)
Q. All right. As far as how much you paid for the property, if you had to estimate the acreage of Lots 2 and 3, how much would that be?
A. It's a couple hundred feet on the, on the lakefront and whatever that depth and stuff like that, it can't be more than a couple acres in there.
Q. Maybe two acres you'd estimate?
A. Probably.
Q. Okay. And you paid $50,000 for that two acres. Is that right?
A. Right.

Page 41

Q. Do you believe that you could put a crop in there to make a reasonable return on that investment of $50,000, utilizing it as agricultural land?
MR. GETTE: Objection, lacks foundation, calls for an expert opinion.
A. Not unless it was something illegal.
Q. (By Ms. Fish-Whitlock) Okay. All right. Are you aware of whether there is anything, are you aware of any other use that you can put the property to?
A. No. Actually, that, that land right there would be mostly a vacation spot for somebody or a summer area where they could stay there and enjoy the lake and things like that. It's not, not really a place where you, you would be making any money off of anything, like growing any crop or, or anything like that.
It would have to be --
Q. I guess my question to you is as it sits right now with the, the road is being, is being ordered removed, is there any use to that property that you can think of?
MR. GETTE: Objection, asked and answered.

Page 42

A. Nothing that I, that I know of that, that could be done with it. If the road is removed, you can't bring anything in there to have a trailer, anything, you'd have to come by boat to, to a dock that you would have, to find some way to get out in there.
And then once you had your dock and had your boat there, there would be no place to stay overnight or do anything, so it would be not worthwhile doing.
Q. (By Ms. Fish-Whitlock) Okay. Not conducive for even camping purposes?
MR. GETTE: Objection.
A. To try to get, try to get, without a road in there, to try to get camping tents and stuff in there, you'd have to hike in quite a ways.
Q. (By Ms. Fish-Whitlock) Have you received any correspondence from the Army Corps of Engineers, other than what you brought here today?
A. As far as I know, everything that I have from them concerning wetlands is, is here. I haven't -- I don't think, I can't remember anything else that was sent to me.

Page 43

Q. Do you recall whether the Army Corps of Engineers has ever instructed you not to conduct any activity until such time as a permit has been obtained from them?
MR. GETTE: Objection, vague --
A. No.
MR. GETTE: -- as to what you mean by activity.
A. Yeah. I haven't --
Q. (By Ms. Fish-Whitlock) You understood what I mean by activity on the property?
A. Right. I, I haven't received anything that stops me from doing anything out there. And the only thing that stopped me from trying to do anything like remove brush and trees and stuff was that, my understanding that I couldn't do that from -- and it wasn't from anybody in real knowledge of the deal, I'd never talked to anybody in the -- any professional, you know.
Q. So there has been no governmental agency that has provided you any sort of letter or correspondence stating that you are not to develop that property?

Page 44

MR. GETTE: Objection, he's answered the question three times now.
A. Yeah, not that I know of. I haven't seen anything.
Q. (By Ms. Fish-Whitlock) Do you have, I guess, what are your plans, should -- you know, obviously the, the, the Army Corps of Engineers has ordered that the extension of Sandy Shores Drive be removed, you indicated earlier that you're just kind of waiting to find out what happens.
MR. GETTE: Objection.
Q. (By Ms. Fish-Whitlock) At what point are you going to, do you have any idea, do you have any plan at this point?
A. No. Actually, what I want to do is instead of losing all the money I've invested so far is just finish off paying what I owe and then hold onto the land and see what develops.
Hopefully something will change, but the taxes at this rate are very minimal and so I'll just hope that something down the line changes.
I have, I did talk to some people, nobody in the know, again, that if it's

Page 45

possible sometimes to set aside land someplace else, if it's available, as wetlands, and then convert your land to nonwetlands, I didn't find out what any of the prices would be, but that was another option I had.
Q. Okay. And you haven't yet?
A. I haven't explored that any further.
Q. Have you spoken with any of the other lot owners on their attempts to do just that?
A. My wife Michele had talked to the gentleman from Ace Hardware and he was working on some things, but all of a sudden we just quit communicating and I have no further knowledge of what, what may have developed. We got busy with everything else we're doing and it just kind of faded away.
Q. Sure. Okay.
MS. FISH-WHITLOCK: I don't have any further questions for you.

EXAMINATION
BY MR. GETTE:
Q. Okay. Just a couple of follow-up things.

Page 46

Earlier you testified that a friend in the general vicinity of your lot had sold a lot that was slightly smaller than yours for $30,000. Is that correct?
A. It was not in the vicinity of the area where I am. It was further down in the developed, by the developed areas down from Sandy Shores, where it goes along the lake there, it was a lot he had owned in the, in the Sandy Shores area. It was a wooded lot that he sold, so it was in that area, not very far, maybe a, less than a half a mile from where I am.
Q. Is that, do you know whether that was further north up the lake or further south?
A. It would be further, towards the top of the page, going down the road along Sandy Shore, so --
Q. Okay.
A. -- whatever those distance -- or directions are (indicating).
Q. Okay. Further toward the top of what has been marked Exhibit No. 1?
A. Yes. And I, I believe this, to the right of those lots faces north, so it would be

Page 47

more to the, to the west, southwest, --
Q. Okay.
A. -- up in that area.
Q. All right. But it's definitely in the direction toward the top of the page of Exhibit 1?
A. Yes, it is.
Q. Okay. And when did that sale take place?
A. That was actually -- when I started looking for some land to buy on a lake is when I had heard that he had sold this land for that amount and then, so that would have been in '9 -- probably early '98 or so, in that range.
Q. And that was a lakefront lot?
A. Yes, it was.
Q. And did that have road access?
A. Yes. The, the Sandy Shores road went right by it.
Q. Was the property developed in any way?
A. No. It was all wooded.
Q. You talked at one point about tents and camping. Have you ever camped out on that property on Lake of the Woods?

Page 48

A. No. We just went out there during the daytimes, we took a picnic table out there and had that there for awhile and just did picnics, but we didn't stay overnight.
Q. Okay. Talk a little bit further about the three phone calls you received on the property.
Was price ever discussed in any of those telephone conversations?
A. No. They asked me whether or not I had land on the lake and I said I had. And I may have been wrong, but I, I just got the feeling they were looking to buy the land at a cheap price and I just kind of, maybe just shut off on them right there and I just said, no, I don't want to sell.
Q. Okay. But they never mentioned a price?
A. No money was never brought up about it.
Q. And they never mentioned the fact there were regulations prohibiting development on the property?
A. No. The conversation never got that far.

Page 49

Q. So your sense that they were trying to get a bargain was just an assumption on your part. Is that correct?
A. It was just an assumption on my part, yes, it was.
Q. Do you have any experience as a real estate professional?
A. No, I don't.
Q. Okay. Do you have any expertise as appraiser?
A. No, I don't.
Q. Have you had the property that you own on Lake of the Woods appraised at any time?
A. No, I haven't.
MR. GETTE: Okay. That's all I have.
MS. FISH-WHITLOCK: Mr. Thomson, you have the right to review your deposition to ensure that the court reporter is accurate. You can review the deposition and make sure everything is accurate, otherwise you can waive the deposition, the reading of the deposition. That's entirely up to you.
THE DEPONENT: I, I'll waive it. I don't believe I have --

Page 50

MS. FISH-WHITLOCK: That's fine.
THE DEPONENT: -- anything to --
MR. GETTE: Okay. One last thing before we go off the record.
You did bring some documents with you today --
THE DEPONENT: Yes, I did.
MR. GETTE: -- and you've agreed to make some copies for us, after you leave here today, and we'll indicate which documents that I need copied, and then you have my card and you can send them to us. Okay?
THE DEPONENT: Okay. Send them to the 601 D Street?
MR. GETTE: That's it.
THE DEPONENT: Okay.
(Whereupon, the deposition was concluded at 2:31 o'clock p.m.)
(Whereupon, the original Deposition Exhibit No. 3, Thomson, was retained by Mr. Thomson.)

Page 51

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA )
) ss
COUNTY OF POLK )

I, RUTH ANN JOHNSON, a Notary Public within and for the County of Polk and State of Minnesota do hereby certify:

That prior to being examined the afore-named witness was by me sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition, consisting of 50 pages of typewritten materials, was taken down by me in Stenotype at the time and place therein named, and was thereafter reduced to typewriting under my direction.

I further certify that I am neither related to any of the parties or counsel nor interested in this matter directly or indirectly.

WITNESS my hand and seal this day of

Ruth Ann Johnson
Notary Public
Polk County, Minnesota
My Commission expires January 31, 2012.

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA )
) ss
COUNTY OF POLK )

I, RUTH ANN JOHNSON, a Notary Public within and for the County of Polk and State of Minnesota do hereby certify:

That prior to being examined the afore-named witness was by me sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition, consisting of 50 pages of typewritten materials, was taken down by me in Stenotype at the time and place therein named, and was thereafter reduced to typewriting under my direction.

I further certify that I am neither related to any of the parties or counsel nor interested in this matter directly or indirectly.

WITNESS my hand and seal this 5th day of March

Ruth Ann Johnson

Ruth Ann Johnson
Notary Public
Polk County, Minnesota

My Commission expires January 31, 2012.