Page 2

APPEARANCES

On Behalf of the Plaintiff:

ALAN FISH, P.A.
102 2nd Avenue Northwest
Roseau, Minnesota 56751
By: RITA FISH-WHITLOCK, ATTORNEY AT LAW

On Behalf of the Defendant:

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
P. O. Box 663
Washington, DC 20004
By: JAMES D. GETTE, TRIAL ATTORNEY

Also Present: Marilyn Lundgren

Taken By: Ruth Ann Johnson, RPR

Page 3

CONTENTS


| DEPONENT: | PAGE |
|---|---|
| RAYNARD LUNDGREN | |
| Examination by . . . Mr. Gette | 4 |
| Examination by . . . Ms. Fish-Whitlock | 17 |
| Examination by . . . Mr. Gette | 39 |
| Examination by . . . Ms. Fish-Whitlock | 40 |
| Examination by . . . Ms. Gette | 44 |
| Examination by . . . Ms. Fish-Whitlock | 44 |

EXHIBITS*

| EXHIBITS | MARKED |
|---|---|
| No. 1 -- Copy of subpoena | 8 |
| No. 2 -- Payment list | 9 |
| No. 3 -- Copy of letter to Gary Bailey from Raynard Lundgren, 5-5-01 | 11 |
| No. 4 -- Copy of Notice of Cancellation of Contract for Deed | 13 |
| No. 5 -- Copy of letter to Raynard Lundgren from the Department of the Army, Corps of Engineers, 2-6-02 | 22 |
| No. 6 -- Copy of letter to Mr. and Mrs. Raynard Lundgren from Gary and Kathy Bailey, 5-10-01 | 38 |
| No. 7 -- Letter to Raynard Lundgren from the Department of the Army, Corps of Engineers, 6-12-01 | 44 |


(*Exhibits attached to transcript.)

Page 4

PROCEEDINGS

RAYNARD LUNDGREN,

of Roseau, Minnesota, called as a witness by the Defendant, being first duly sworn by Ruth Ann Johnson, RPR, a Notary Public within and for the State of Minnesota, was examined and deposed on his oath as follows:

EXAMINATION

BY MR. GETTE:

Q. Afternoon, Mr. Lundgren.

A. Yeah.

Q. We've talked on the phone before and just a little earlier today, my name is Jim Gette, I'm a lawyer for the Department of Justice, I represent the United States in a lawsuit that Gary Bailey has filed against the United States and specifically the, the United States Army Corps of Engineers.

I'm going to ask you a series of questions here today in your deposition and let me begin by first asking you whether you've ever had your deposition taken before?

A. Yes, I have.

Q. Okay. And what, under what

Page 5

circumstances did you have your deposition taken?

A. My employer.

Q. So it was an employment related issue?

A. Yes.

Q. Okay. And was it a lawsuit in which you were a party?

A. No.

Q. Okay. So your employer was being sued by someone else?

A. Yes.

Q. Okay. And how long ago was that, that you gave a deposition?

A. I'm guessing 15, 20 years.

Q. Okay. All right.

Okay. Let me remind you, then, of a few of the ground rules, since it's been quite awhile.

The reporter is taking down everything that we say, so it's important that we not talk at the same time. So if you'll wait until I finish my questions, I'll do my best to wait until you finish your answers. Okay?

Page 6

A. (No verbal response.)
Q. Rule number two is that to get everything down, it has to be a verbal response, so when I do ask questions, make sure you give a verbal response yes, no, whatever the answer may be. Okay?
A. Okay.
Q. And it's also important that you understand whatever questions I ask you. I think the questions today will be pretty straightforward, but if I ask anything that you don't understand, will you agree to tell me so that I can fix the question and then ask a question that you understand?
A. Yes, I will.
Q. Okay. And the final thing is that I'm happy to take a break at any time, if you would like. So if at any point you would feel you would like a break, hopefully this won't be too long, but if you feel you need a break at any time, just let me know and we'll take one.
A. I will do that.
Q. Okay. Mr. Lundgren, in December of 1998 did you purchase a property up on Lake of the Woods?

Page 7

A. Yes.
Q. Okay. And was that property a plat in the, what's called the Sunny Beach Development?
A. Yes.
Q. Okay. Do you know what your lot number was?
A. 14.
Q. 14.
Is it possible it was nine?
A. Oh, yes. It was nine.
Q. And what did you pay for that property?
A. It was on a contract for deed for $25,000.
Q. Okay. Do you remember whether you had to put any money down?
A. Yes.
Q. Okay. Do you remember how much?
A. No, I don't recall the exact amount right now, but -- (no further response.)
MS. FISH-WHITLOCK: Can I provide a document to refresh his memory?
MR. GETTE: I'm going to do that.
Q. (By Mr. Gette) Okay. I'm going to

Page 8

show you a copy of the contract for deed, which has been previously marked as Bailey Deposition Exhibit 31, and ask you to turn to the second page of that, toward the top, and take a quick look.
First of all, do you recognize that document?
A. Yes.
Q. And is that the contract for deed that you executed to buy the property from Mr. Bailey?
A. Yes.
Q. Okay. And I believe it indicates toward the top that you put 2,500 down and then the rest was financed on the contract for deed. Does that sound right?
A. That is correct.
Q. Okay. Now I'm going to have a document that you brought --
MR. GETTE: First of all, let me have this marked as Deposition Exhibit 1.
(Whereupon, Deposition Exhibit No. 1, Lundgren, was marked for identification.)
Q. (By Mr. Gette) Mr. Lundgren, let me ask you, do you recognize the document that's

Page 9

been marked as Lundgren Exhibit 1?
A. Yes, I do.
Q. Okay. And what is that document?
A. It's asking me to appear for a deposition on February 21 at 3:00 o'clock.
Q. Okay. And the last page of that document there is a list of documents that were, you were requested to bring with you. Is that correct?
A. Yes.
Q. Okay. And did you bring certain documents with you in response to that request?
A. Yes, I did.
Q. Okay.
MR. GETTE: I'm going to have this document marked as Exhibit No. 2.
(Whereupon, Deposition Exhibit No. 2, Lundgren, was marked for identification.)
Q. (By Mr. Gette) Mr. Lundgren, I'm handing you what's been marked as Exhibit No. 2 to your deposition. Is that one of the documents that you brought with you today?
A. Yes, it is.
Q. Okay. And can you identify that document for me?

Page 10

A. It's the payment list of, of the amounts and when we've made payments of each month for the property.
Q. Okay. So is this a document that you obtained at the time that you entered into the contract for deed?
A. Yes.
Q. Okay. And subsequent to that, did you, or someone on your behalf, make certain notations on that document?
A. Yes.
Q. Okay.
A. My wife has made notations on here.
Q. Okay. And do those handwritten notations indicate the, the date on which you made payments to Mr. Bailey?
A. Yes, that is correct.
Q. Okay. And do the notations also indicate the date on -- that's what I just asked.
Do those notations also indicate a check number for each payment that you made to Mr. Bailey?
A. Yes, it does.
MR. GETTE: Have that marked as

Page 11

Exhibit 3.
(Whereupon, Deposition Exhibit No. 3, Lundgren, was marked for identification.)
Q. (By Mr. Gette) I'm showing you what's been marked as Exhibit 3 to your document. Do you recognize this document, Mr. Lundgren?
A. Yes, I do.
Q. Okay. Is this a copy of a letter that you sent to Mr. Bailey?
A. Yes, it is.
Q. Now it's dated May 8 of 2001. Would that have been when you sent the letter to Mr. Bailey?
A. Yeah, within a day or two.
Q. Fair enough.
It indicates in the letter that you're requesting a refund from Mr. Bailey. Is that correct?
A. Yes.
Q. Okay. Why were you requesting the refund?
A. We had found out that we weren't able to build on this property and it was, I don't remember for sure all the issues with it

Page 12

at that time, but there was different statements or -- that were made as to, from the, I believe the Army Corps of Engineers, that that was -- we weren't going to be able to build on this land because it was considered wetland.
Q. Now at about the time that you sent the letter that's been marked as Deposition Exhibit 3 to Mr. Bailey, did you also stop making payments on your contract for deed at that time?
A. That is correct.
Q. Okay. And showing you what's been marked, again, as Deposition Exhibit 2, from that document can you tell me when the last payment you made to Mr. Bailey was?
A. March 18, 2001.
Q. Now from the time that you entered the contract for deed until March 18, 2001, had you made all the payments that were due to Mr. Bailey up to that point?
A. Yes, we had.
Q. And in your letter you indicate, which is Exhibit No. 3, you indicate that you're seeking a refund of $10,528.16. How did

Page 13

you come up to that figure?
A. I believe it was adding up all the payments that we had made and I don't remember for sure if it included property tax or not. And I don't remember for sure if it included the cost of a culvert and gravel.
Q. Have you ever received a refund from Mr. Bailey in any amount?
A. No, we have not.
Q. And do you still own that Lot 9 on Lake of the Woods?
A. I do not believe I do, because the taxes were not paid.
Q. Do you know whether --
MR. GETTE: Well, actually, let's mark this as Lundgren Exhibit 4.
(Whereupon, Deposition Exhibit No. 4, Lundgren, was marked for identification.)
Q. (By Mr. Gette) Okay. Mr. Lundgren, I'm showing you a document that's now been marked as Exhibit 4 to your deposition. Is this a document that you recognize?
A. Yes, I do.
Q. Okay. And at some point in time did you understand that Mr. Bailey was seeking to

Page 14

take the, the property back under the contract for deed?
A. Yes.
Q. Okay. And does this document relate to that effort by Mr. Bailey?
A. Yes.
Q. Let me step back for a second to this document that we marked as Exhibit 3, which is your letter to Mr. Bailey.
After you sent this letter to Mr. Bailey, did you have any communication with him?
A. I don't believe I did.
Q. Okay. Have you ever talked to Mr. Bailey?
A. One time on the telephone.
Q. Do you recall what you discussed with him?
A. It was something to the effect that I had heard that this property was, that we weren't going to be able to build on this property.
And Mr. Bailey told me that we would be able to build and that if I had any, any issues with anybody that they should contact

Page 15

Mr. Bailey.
Q. Now when Mr. Bailey instituted action to take the property back, did you seek legal counsel at that point?
A. Yes.
Q. Okay. And did you ultimately reach any agreement with Mr. Bailey regarding how the property was going to be handled?
A. Back up a moment, --
Q. Okay.
A. -- if you can.
Q. Sure.
A. The, on your statement, or your question earlier about seeking legal counsel, --
Q. Um-hum.
A. -- can you explain that a little bit more for me, please?
Q. Sure.
What we marked as Exhibit 4, did you receive that in the mail at some point, a notice of, of nonpayment?
A. Yes.
Q. Okay. And did you, at that point, contact any lawyers to help you out with the

Page 16

situation?
A. I cannot remember for sure when it was, but we did contact another lawyer firm to see if it would be beneficial for us to pursue this to try and get our money back or to -- mainly to get our money back, I guess.
Q. Okay. Now we had moved on to a new area. When, once you received the notice that Mr. Bailey was attempting to take the property back, did you reach any agreement with Mr. Bailey regarding how that was going to occur?
A. No. No.
Q. Okay. And did you have any conversations with Mr. Bailey or lawyers for Mr. Bailey?
A. No.
Q. All right. If we turn back to what's been marked as Exhibit No. 3.
In the first paragraph there you ask Mr. Bailey to, Please provide me with a copy of the permits you informed me you had when I contacted you on this matter or the information you had allowing this land to be developed.
Had you had some, the conversation you referenced earlier, had that conversation

Page 17

taken place before you sent this letter to Mr. Bailey?
A. Yes.
Q. Okay. And at that time had he said something to you regarding a permit?
A. Yes. In part of our conversation he had indicated, Mr. Bailey, that he had obtained all the correct permits required to be able to build and develop this property.
Q. And did you later learn that that representation was incorrect?
A. Yes.
MS. FISH-WHITLOCK: I'm going to object to the form of the question.
MR. GETTE: Okay. I don't have any further questions right now, Mr. Lundgren. Counsel for Mr. Bailey might have some questions.

EXAMINATION
BY MS. FISH-WHITLOCK:
Q. Mr. Lundgren, my name is Rita Fish-Whitlock, and I am an attorney representing Gary Bailey in proceedings against the United States government with regard to

Page 18

regulations that have been placed on the subdivision known as Sunny Beach.
We've never met and first what I would like to do in questioning you is mostly just address some of the questions that Attorney Gette has asked you and just to clarify some of your answers, so I have a good understanding of, of what those answers meant.
As I always explain to anybody who I'm about to ask questions for, if you don't understand any of my questions, please tell me that you don't understand, I'll rephrase as best that I can. Okay?
I tend to, I tend to make, I understand I, sometimes I tend to make my questions long and a little bit compound, and I'm working on that, that's just something, it's one of my tendencies, and I just ask the persons that are being deposed to, to watch for that. If you don't understand a question, please feel free.
Are you from the area, Mr. Lundgren?
A. Yes, I am.
Q. And where do you live?
A. Six miles west of Roseau.

Page 19

Q. Okay. So you're a Roseau resident?
A. Yes.
Q. How long have you been in Roseau?
A. 63 years. 62 years.
Q. Okay. All right. Now you purchased the property, it appears, in about October 28 of 1998. Does that sound about right?
A. That sounds right.
Q. Okay. Now the purchase agreement indicates that there was a purchase price of $25,000 and you made a $2,500 down payment. Does that, does that sound right?
A. That is right.
Q. All right. And the remainder of the balance was financed through a contract for deed that you entered into with Mr. Bailey. Is that correct?
A. That is correct.
Q. Okay. Now it looks to me like there may have been some confusion as to the monthly amount of payments that were due at first, but do you recall what specifically your payments on the contract for deed were, monthly payments?
A. No, I do not.

Page 20

Q. It's your understanding that your payment amount was to be $297.34 per month?
A. Yes.
Q. Okay.
MR. GETTE: Let the record reflect they're referring to Deposition Exhibit No. 2.
MS. FISH-WHITLOCK: Correct.
Q. (By Ms. Fish-Whitlock) Now you've documented, each of these notations that are in handwriting in lieu of typewritten font indicate a record of when you paid Mr. Bailey payments on those contract for deeds. Is that what the handwritten notations represent?
A. Yes, that is handwritten notes.
Q. Okay. So this indicates that the last payment that you made on that contract for dead was made on March 18 of 2001?
A. I believe that is correct.
MR. GETTE: Continuing objection to the replowing old ground, but go ahead.
Q. (By Ms. Fish-Whitlock) Now at this point you decided to quit making payments on the contract for deed?
A. That is correct.
Q. Okay. And what was the reasoning on

Page 21

why, that you decided to quit making those payments?
A. Because we had found out that we were not going to be able to build on this property.
Q. Okay. And how did you find out that you were not going to be able to build on this property?
A. I, I can't remember for sure if it was the Army Corps of Engineers or if it was Lake of the Woods County for sure who we obtained that information from.
Q. Okay. You've received correspondence from the Army Corps of Engineers with regard to your property on Sunny Beach?
A. Please restate that?
Q. You've received some correspondence from the Army Corps of Engineers with regard to your property on Sunny Beach?
A. Yes, I believe I have.
MS. FISH-WHITLOCK: Okay. You wouldn't have, happen to have an extra copy of this, would you (indicating)?
MR. GETTE: What's the date on it?
MS. FISH-WHITLOCK: February 6,

Page 22

2002.
(Whereupon, Deposition Exhibit No. 5, Lundgren, was marked for identification.)
Q. (By Ms. Fish-Whitlock) I show you what's been marked as Deposition Exhibit 5, I'd like you to review that document.
Do you recall receiving that document from the Army Corps of Engineers?
A. Yes, I do.
Q. Okay. Would, do, do you recall the time that you received the document?
A. No.
Q. Okay. Now your own records indicate that you ceased payments on the contract for deed in March of 2001. Is that right?
A. Um-hum.
Q. And then you received notice from the Army Corps of Engineers that this property was undevelopable pursuant to their regulations. So was it the Army Corps of Engineers that informed you that you wouldn't be able to do anything with this property?
MR. GETTE: Objection to the characterization, objection because it's leading.

Page 23

A. I don't recall.
Q. (By Ms. Fish-Whitlock) Okay. Okay.
MS. FISH-WHITLOCK: You already have the Notice of Cancellation of Contract for Deed in the record, correct?
MR. GETTE: Correct. It is Exhibit No. 4.
MS. FISH-WHITLOCK: Okay.
Q. (By Ms. Fish-Whitlock) Now do you recall being personally served this document on June 1 of 2005?
A. Yes.
Q. The sheriff's deputy came up and handed you a document?
A. That is correct.
Q. And that is this document (indicating)?
A. Yes.
Q. Okay. Now did you dispute any of the allegations that were made in this Notice of Cancellation of Contract for Deed that you had not paid payments due and payable on May 1, 2001, all the way through May 5 of 2005?
A. No.
Q. I mean, did you have any, any sort

Page 24

of dispute as far as these allegations?
A. No.
Q. Okay. Now you also had not paid property taxes on this parcel for a considerable number of years as of 2005 as well. Is that correct?
A. That's correct.
Q. And there is a risk that the property was going to go back to the, the state through tax forfeiture proceedings. Do you have any idea as to the status, whether that was going to happen?
A. Yes. I knew if, if I didn't pay taxes that, that I would, there was a possibility I would lose the property.
Q. Okay. Did you have any intentions on paying taxes and investing anymore money into this property at the time that you received this, this cancellation?
A. Can you restate that again? I'm kind of --
Q. Sure.
After you received this cancellation of contract for deed, did you have any intentions of making anymore investments into

Page 25

Lot 9?
A. No.
Q. All right. So you had no intentions of paying property taxes on that lot, on Lot 9?
MR. GETTE: Objection, asked and answered.
Q. (By Ms. Fish-Whitlock) Go ahead, you can answer the question.
MR. GETTE: You can answer, if you can.
A. It was based on if this land could be developed or not.
Q. (By Ms. Fish-Whitlock) Okay. And at this point you did not believe that the land, with the regulations that were being imposed on it, could be developed?
A. That is correct.
MR. GETTE: Objection, leading.
Q. (By Ms. Fish-Whitlock) Go ahead and answer the question.
A. That's correct.
Q. Okay. I do note one discrepancy between your documentation of the payments that you made to Mr. Bailey under the contract for deed and our allegations on the cancellation

Page 26

for contract for deed.
We believe that your payments ceased in May, but that's not correct, according to your own documentations, your last payment was in March, so there's actually an April payment that was missing as well, you, you did not make the April 1, 2001, payment?
A. I don't recall if these payments that look like a payment that was made on 3-21 of '01 was for March --
Q. Or April?
A. -- or if that had been for April.
Q. Okay. All right. That clarifies things for me.
Okay. When you were initially seeking lakeshore property in the Sandy Shores area and you -- well, tell me, how did you go about finding this lot? Were you actively seeking a lakeshore property or was there a real estate agent that approached you and, and informed you of this, was this a word of mouth thing?
A. It was --
MR. GETTE: Objection, compound.
You can answer if you can.

Page 27

A. I believe it was a word of mouth.
Q. (By Ms. Fish-Whitlock) You heard that there was some lakeshore property for sale?
A. Yes.
Q. Okay. And when you purchased the property, did you feel as though that was a good price for a platted lakeshore lot?
A. Yes.
Q. Did you feel as though you were getting good value for the amount that you paid?
A. Yes.
Q. Okay. Were you, I guess I'm getting, I'm getting into whether you were a smart shopper or not, but did you do any research or did you have any personal knowledge as to the amounts that similar vacant lakeshore property in that general vicinity of the Sandy Shores area was selling for at the time --
MR. GETTE: Objection, --
Q. (By Ms. Fish-Whitlock) -- when you purchased this property?
MR. GETTE: Objection, compound.
A. No.

Page 28

Q. (By Ms. Fish-Whitlock) Okay. When you purchased this lakeshore property, what were your expectations for it, what did you want to do?
A. I was going to build a lake home.
Q. Okay. And was this going to be a year-round lake home or were you planning on using it as a little more of a seasonal lake home or --
A. It would have been a year-round lake home that I would have retired to.
Q. Okay. Okay. Now did you place any -- did you begin developing your real estate on Sandy Shores?
A. Yes. I put in a culvert.
Q. Okay. And where did you buy the culvert from, do you recall?
A. I don't recall for sure who I bought it from.
Q. Okay. Is that, you, were you one of the people that hired Rex Block to install the culvert for you, did you hire anybody to do it?
A. Yes, I believe it was Rex Block.
Q. Do you recall whether you had to apply for a culvert permit in order to install

Page 29

that culvert?
A. No, I do not.
Q. Okay. Did you ever submit a building application to the Environmental Services director at Lake of the Woods County for the property?
A. No, I do not believe I filled out an application. I believe it was a telephone call to Lake of the Woods County.
Q. Okay. So you made a telephone call. Who did you speak with?
A. I believe it was Lockhart.
Q. Gary Lockner?
A. Gary Lockner.
Q. And do you recall what that conversation was about?
A. No -- well, yes, I do. It, it pertained to if it was beneficial to proceed with an, an application.
Q. For?
A. For building on this property.
Q. And what was Mr. Lockner's response?
A. If I remember correctly, he indicated that at this time it wouldn't be valuable or accepted, I guess.

Page 30

Q. He stated that your application to build wouldn't be accepted?
A. Accepted is probably not the correct word. As things were going, it didn't seem like it would, the application would get approved.
Q. So is it best to, would you characterize this as Gary Lockner informed you that a building permit would be futile?
A. No.
Q. Okay. Did he invite you to apply for a building permit?
A. I can't remember for sure what, what the full conversation or the full details of the discussion were.
Q. Okay. Did it appear in that conversation that he was discouraging it?
A. Not necessarily discouraging it, just that there was activity going on, on this property at the time that, I don't know how to say it, unsettled differences.
Q. Okay. Okay. When you made your last payment, what sort of use of the property were you able to make of it?
MR. GETTE: Objection, vague.

Page 31

A. What do you mean by use?
Q. (By Ms. Fish-Whitlock) Okay. I'm going to ask you this. Did you receive a Restoration Order to remove a culvert placed for a driveway onto your lot?
A. I don't believe I did.
Q. Okay.
A. I don't recall at least.
Q. Did you remove -- you did place a culvert, you do recall placing a culvert in the driveway, though, right?
A. A culvert was placed in the driveway, yes.
Q. Okay. And my question was, is -- okay. Is that culvert still there today as far as you're aware?
A. Yes.
Q. All right. When was the last time you were out to the property?
A. Two years ago.
Q. Okay. And two years ago that was still out there, the culvert --
A. Yes.
Q. -- that you placed in there.
All right. Now as far as your

Page 32

investment, your expectations when you purchased this property were, was to build a summer home, what do you feel, I mean, did you feel as though you can continue with those initial expectations?
MR. GETTE: Objection, mischaracterizes his prior testimony.
Q. (By Ms. Fish-Whitlock) You can answer the question.
A. Would you rein -- restate that?
Q. Sure.
You testified earlier that the, your expectations, when you purchased the property, was to build a residential home. Is that right?
A. Yes.
Q. Okay. As of March 20, 2001, did you believe that you would be able to fulfill those expectations of building a residential home?
A. That is correct.
Q. You, you did believe that you would be able to build a residential home at that time?
A. When we made our last payment, yes.
Q. Okay. You, you felt that it was

Page 33

still a possibility?
A. Slim, but a possibility.
Q. Okay. At what point did you decide that there, it was not a possibility for you to build a residential home on that property?
MR. GETTE: Objection, includes an unfounded assumption.
You can go ahead and answer.
A. About that same time frame.
Q. (By Ms. Fish-Whitlock) About that same time frame?
A. Um-hum. Shortly after that time frame, that's why we didn't make anymore payments.
Q. The reason why you didn't make anymore payments, then, was because you were unable to fulfill your expectation of building a summer home on that property?
MR. GETTE: Objection, leading.
You can answer the question.
Q. (By Ms. Fish-Whitlock) And I'm trying to understand, you know, your thought processes in purchasing a property, making payments and then ceasing payments, and the reasons for that.

Page 34

And it has to also do, also do with what you were, what your expectations were on this property when you first purchased it and that's really what I'm focusing on.

And we have it pretty well established that your expectations, when you purchased this property, was to build a residential home?

MR. GETTE: Counsel, I think we've been over this. I mean, he's indicated what his expectations are. He's also indicated why he stopped making payments, because he couldn't build a home on the property. I don't know why we have to put the witness through going through this the third or fourth time.

MS. FISH-WHITLOCK: And that might be, I may be very, you know, not understanding what he's saying, so, you know, that's why we're very careful about what we do.

Q. (By Ms. Fish-Whitlock) So at this point it was when you felt that the expectations of building a summer home were, were gone?

MR. GETTE: Objection, leading, putting words in the witness's mouth. Why

Page 35

don't you just ask him why he, why he stopped making payments.

Q. (By Ms. Fish-Whitlock) Okay. Why did you stop making payments?

A. Because there was a, in my opinion, a slim chance that we would be able to build a home and develop this property and I didn't want to invest anymore money into something that I was going to get absolutely no value out of.

Q. Okay. Thank you.

Now as far as you're aware, do you have knowledge as to what regulations were being placed on this property that prevented you from achieving your expectations?

MR. GETTE: Objection, it's been asked and answered.

Q. (By Ms. Fish-Whitlock) You can answer the question.

A. The --

Q. Do you recall what information that you received that gave you that idea?

MR. GETTE: Objection, again, asked and answered.

Q. (By Ms. Fish-Whitlock) I'll -- let

Page 36

me, let me put it this way.

Was Gary Bailey telling you that you could not develop this property?

A. No.

Q. Okay. So it was some other governmental agency or some other agency that was telling you that you could not develop this property?

A. Yes.

Q. Okay. Do you recall which agency that was?

A. No, I do not.

Q. Okay. Do you have any personal knowledge as to the Army Corps of Engineers' decision to remove the extension of Sunny -- of Sandy Shores Drive, that runs through the Sunny Beach Plat, that provides your property with access?

MR. GETTE: Objection, vague.

A. Very little if any.

Q. (By Ms. Fish-Whitlock) Okay. I understand that you received some public notices from the Army Corps of Engineers that they were considering an after-the-fact permit application?

Page 37

MR. GETTE: Objection.

A. Yes.

Q. (By Ms. Fish-Whitlock) Do you recall whether or not, was there a concern that you were going to lose access to this property as a result of that public notice?

A. Say that again, please?

Q. Did you recall whether it was a concern of yours that you were going to lose access to your property?

A. Yes.

Q. Okay. I'd like to go back to the conversation that you had with Gary Lockner.

You indicated that you spoke with Gary Lockner inquiring into applying for a building permit application. Did Gary Lockner in any way state that he would not accept a permit application from you?

MR. GETTE: Objection, asked and answered.

Q. (By Ms. Fish-Whitlock) And there is a distinction between willing to accept and --

MR. GETTE: Objection, --

Q. (By Ms. Fish-Whitlock) -- providing information of what he believes is going to

Page 38

happen if you submit one.
MR. GETTE: Objection, it's not even a question.
A. The telephone conversation was a long time ago and I don't remember for sure.
Q. (By Ms. Fish-Whitlock) Okay. That's okay.
(Whereupon, Deposition Exhibit No. 6, Lundgren, was marked for identification.)
Q. (By Ms. Fish-Whitlock) Showing you what's been marked as Exhibit 6. Do you recognize that document?
A. Yes, I do.
Q. Okay. This is a document that you received from Mr. Gary Bailey. Is that correct?
A. Yes.
Q. And that was in response to your letter to Mr. Bailey dated May 8, 2001?
A. May 10, 2001.
Q. So this, you know, the document, Exhibit 6, is dated May 10, so is, my question is, is Gary's letter to you a response to your letter to him?
A. Yes, I believe it is.

Page 39

Q. All right. I just want to be sure you've never received a Restoration Order by either the Army Corps of Engineers or the Department of Natural Resources?
A. Stating?
Q. That you have to remove any fill or culverts that were placed on your property.
A. I do not recall --
Q. Okay.
A. -- receiving a letter.
Q. Okay.
MS. FISH-WHITLOCK: I have no further questions.

EXAMINATION
BY MR. GETTE:
Q. Okay. Mr. Lundgren, I just have a couple of questions.
Looking, again, back at Exhibit No. 2, does that indicate that your last payment on the property was on March 18 of 2001?
A. Our, our handwritten date is March 20, 2001.
Q. March 20, 2001.
A. Yeah.

Page 40

Q. Okay. Thank you.
And showing you Exhibit No. 5, showing you what's been marked Exhibit No. 5, this is a letter that you indicated you received from the Army Corps of Engineers, correct?
A. Yes.
Q. Okay. And what is the date of that letter?
A. February 6, 2002.
Q. Okay. Do you have any reason to believe that date is inaccurate?
A. No, I do not.
MR. GETTE: All right. I have no further questions.

EXAMINATION
BY MS. FISH-WHITLOCK:
Q. Just a couple of follow-up questions.
You were, Mr. Lundgren, were receiving notices by the Army Corps of Engineers on a permit application for the extension of Sandy Shores Drive through the Sunny Beach Subdivision. Is that right?

Page 41

Do you recall receiving any notices mailed to you by the Army Corps of Engineers?
A. None other than the one I had here, I believe.
Q. Okay. I was going to ask you about this, and I'm not going to mark it quite yet, but this is a public notice for fill in the Middle River-Snake area on, on land that really doesn't appear at all to be in any way relevant to the Sunny Beach. Why did you provide this document here today?
A. It was some information that I had received in the last period of time since '98 and --
Q. Okay.
A. -- it was in the file and --
Q. Had to do with the Army Corps of Engineers, so I --
A. -- I didn't know if it was, pertained to this or not, so -- (no further response.)
Q. Okay. I'm going to be showing you a document that you brought here today pursuant to Mr. Gette's subpoena and the letter dated February 6, 2002, the one you brought, actually

Page 42

has a copy of the Restoration Order of the Department of the Army's October 22, 2001, order to remove the Sandy Shore Drive.

Had you ever seen the October 21, 2001, Department of the Army order to Mr. Bailey to remove the access road or the extension of Sandy Shores Drive prior to February 6, 2002?

A. I looked through that, I must have.

Q. Okay. I want to be clear on your answer to this. Had you ever, had you ever seen this Department of the Army letter dated October 22, 2001, dated to Gary Bailey, ordering him to remove the Sandy Shores Drive through Sunny Beach?

A. Say that one more time.

Q. Okay. Prior to February 6, 2002, had you ever seen this document?

A. I do not recall for sure.

Q. Okay. I know that there's more documentation within here that you brought, so . . .

I'm showing you a June 12, 2001, letter dated to you from the Army, Department of the Army, Corps of Engineers, indicating

Page 43

that discharge and fill material has been placed in wetlands on your lot and in the Sunny Beach development.

Do you recall, do you recall receiving this letter?

A. Yes, I do.

Q. Okay. Do you recall what your thoughts were after you received that letter?

A. No, I do not.

Q. Okay. What do you understand that letter to be?

MR. GETTE: Objection, the letter speaks for itself.

MS. FISH-WHITLOCK: Okay.

A. I understand that the reason is to cease all activity on the property.

Q. (By Ms. Fish-Whitlock) On your property?

A. Yeah.

Q. Is this the document that prompted you to cease payments on the contract for deed?

MR. GETTE: Objection.

A. I do not know.

Q. (By Ms. Fish-Whitlock) Okay.

MS. FISH-WHITLOCK: I have no

Page 44

further questions.

MR. GETTE: I'd like to have that marked.

(Whereupon, Deposition Exhibit No. 7, Lundgren, was marked for identification.)

EXAMINATION

BY MR. GETTE:

Q. Mr. Lundgren, I've had marked as Exhibit 7 the letter you were just referring to in your testimony in response to questioning by Ms. Fish-Whitlock.

What is the date of that letter?

A. June 12, 2001.

Q. Do you have any reason to believe that you received that letter at any time other than on or about June 12, 2001?

A. No, I do not.

MR. GETTE: Okay. I have no further questions.

EXAMINATION

BY MS. FISH-WHITLOCK:

Q. Mr. Lundgren, were you typically up to date on making your payments for the

Page 45

contract for deed in a timely manner or was it, were you ever behind at any time, prior to your ceasing payments completely?

MR. GETTE: Objection, asked and answered.

A. I don't know for sure.

MS. FISH-WHITLOCK: Okay.

MR. GETTE: You finished?

MS. FISH-WHITLOCK: Yeah.

MR. GETTE: Okay. While we're still on -- actually, let's take care of this off the record.

(Whereupon, there was discussion off the record.)

MR. GETTE: Mr. Lundgren, once the court reporter puts together what we said here today, you'll have an opportunity, if you would like, to look at it and make corrections to anything or you can waive that right and trust that she'll get it right.

So I'd leave that decision up to you, whether you'd like to review it and make corrections or whether you would waive the right to do that.

MS. FISH-WHITLOCK: For the most

Page 46

part, the court reporters are very accurate.

THE DEPONENT: Um-hum.

MR. GETTE: It's really your call.

MS. FISH-WHITLOCK: It's really your call.

THE DEPONENT: I'll, I'll waive. Thank you.

(Whereupon, the deposition was concluded at 4:39 o'clock p.m.)

(Whereupon, the original Deposition Exhibit Nos. 2 and 7, Lundgren, were retained by Mr. Lundgren.)

Page 47

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA )
) ss
COUNTY OF POLK )

I, RUTH ANN JOHNSON, a Notary Public within and for the County of Polk and State of Minnesota do hereby certify:

That prior to being examined the afore-named witness was by me sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition, consisting of 46 pages of typewritten materials, was taken down by me in Stenotype at the time and place therein named, and was thereafter reduced to typewriting under my direction.

I further certify that I am neither related to any of the parties or counsel nor interested in this matter directly or indirectly.

WITNESS my hand and seal this day of

Ruth Ann Johnson
Notary Public
Polk County, Minnesota

My Commission expires January 31, 2012.