IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

GARY BAILEY,

Plaintiff,

v. Court File No. 02-1078L

Honorable Victor Wolski

THE UNITED STATES,

Defendant.

---

DEPOSITION of THOMAS WOITALLA, taken before Shirley A. Hosch, a Notary Public in and for the County of Washington, State of Minnesota, on Thursday, the 6th day of March, 2008, commencing at approximately 11:08 a.m., at the Army Corps of Engineers, 190 East 5th Street, in the city of St. Paul, Minnesota.

* * *

APPEARANCES

JAMES D. GETTE, ESQ.
U.S. Department of Justice Environment & Natural Resources Division,
601 D Street, NW
P.O. Box 663,
Washington, DC 20044-0663
Representing the Defendant.

STEVEN P. ADAMSKI, ESQ., of the
U.S. Army Corps of Engineers,
190 Fifth Street East,
St. Paul, Minnesota 55101-1638,
Representing the Defendant.

ALAN B. FISH, ESQ.
Alan B. Fish, P.A., Attorneys and Counselors at Law
102 2nd Avenue Northwest,
Roseau, Minnesota 56751,
Appeared via the telephone
Representing the Plaintiff.

* * *



CONTENTS

| EXAMINATION BY MR. GETTE: | PAGE |
|---|---|
| Woitalla Ex. 1, Subpoena | 6 |
| Woitalla Ex. 2, Building layout | 8-11, 19 |
| Woitalla Ex. 3, Basic Application | 12-14, 16-17, 31 |
| Woitalla Ex. 4, 7/22/99 Invoice for gravel | 14-15 |
| Woitalla Ex. 5, 8/3/00 Invoice for gravel | 15-16 |
| Woitalla Ex. 6, 4/5/01, New electrical service | 17-19 |
| Woitalla Ex. 7, Warranty Deed | 21 |
| Woitalla Ex. 8, Residential Mortgage | 21-22 |
| Woitalla Ex. 9, Amortization Schedule | 22-26, 28 |
| Woitalla Ex. 10, 8/3/04 Restoration order | 26-27 |
| Woitalla Ex. 11, 10/19/04 invoice to remove driveway | 27-28, 35 |
| Woitalla Ex. 12, 5/25/05 default letter | 29-30 |
| Woitalla Ex. 13, Replacement Plan Decision denied | 31-32 |
| Woitalla Ex. 14, Letter from the Woitalla's | 32-33 |
| Woitalla Ex. 15, Approach permit application | 34 |
| Woitalla Ex. 16, 10/27/04 complete restoration | 35 |
| Woitalla Ex. 17, 6/30/05 Letter of Christensen | 36-37 |
| Woitalla Ex. 18, Photocopy of check 6191 | 38 |
| EXAMINATION BY MR. FISH: | 39 |
| OBJECTIONS BY MR. GETTE: | 39, 41, 42, 46, 47 |



* * *
(The following proceedings were duly had:)
* * *

THOMAS WOITALLA,
after having been first duly sworn, deposes and says as follows:

EXAMINATION

BY MR. GETTE:
Q. Good morning, Mr. Woitalla.
A. Good morning.
Q. First of all, am I pronouncing that right?
A. Close enough.
Q. My name is Jim Gette. We met earlier this morning before we began the deposition, as well as I have talked to you before on the phone. Let me start by asking you if you've ever had a deposition taken before?
A. No, I haven't.
Q. Let me give you a few of the ground rules. As you see, the court reporter is here today and she is taking down everything that both of us say,



because of that it's important that we not talk at the same time. So I would ask you to make sure that you wait until you are sure I've finished my question before you answer and I will try to wait until you complete your answers before I pose the next question; is that okay?
A. Okay.
Q. The second thing is, because we're putting this down on paper, nods of the head or different movements, don't count. So you need to give me a verbal answer or an oral answer to each question, okay?
A. Yes.
Q. And I will point out to you that it's important for her that you keep your voice up too, so that she can hear everything you say?
A. Okay.
Q. And two additional instructions. The first is that it's real important that you understand my questions. If at any time I ask a question that isn't clear to you, would you please ask me to repeat the question or rephrase the question, so it's understandable?
A. Yes.
Q. And the final thing is if you want to take a break

Page 6

at any point, just let me know and we will do
that?
A. All right.
Q. Let's start off by having you state your full
name?
A. Thomas L. Woitalla.
Q. And what is your address, Mr. Woitalla?
A. 16723 59th Street Northeast, Elk River, Minnesota.
Q. Now, I'm going to have the court reporter mark
Exhibit 1 to your deposition.
(Woitalla Deposition Exhibit 1
marked for identification.)
Q. I will hand that to you, Mr. Woitalla and ask you
to take a quick look at that?
A. (Witness reviews document.)
Q. Is that a copy of a Subpoena that was served on
you, to appear at this deposition today?
A. Yes, it is.
Q. And if you turn to the last page of that there is
a list of documents that you were requested to
identify and bring with you if you had them
available; is that correct?
A. Yes.
Q. Did you bring with you some documents today?
A. Yes, I did.

Page 7

Q. As we indicated before we were on the record, we
will make copies of all of those and provide them
to Plaintiff's Counsel, as well. Some of those
documents we've already copied and faxed to
Plaintiff's Counsel and he will have some
questions for you a little bit later this morning,
okay?
A. (Witness nods.)
Q. In 1999 did you buy a property on Lake of the
Woods?
A. Yes, I did.
Q. At the time you purchased that property, had you
been looking for property in the area?
A. No. A friend of mine told me about it.
Q. And did you go up to take a look at the property
before you purchased it?
A. Yes, I did.
Q. How many times did you do that?
A. We went up there once.
Q. Who was the friend that told you about the
property being available?
A. Carl Pierson.
Q. Had he purchased property in the Sunny Beach
development?
A. Yes, he did.

Page 8

Q. And did you work with some real estate agent with
respect to your purchase of that property?
A. Yes, I did.
Q. Who was that?
A. I believe her name was Francine Fish.
Q. Before buying the property, who did you talk to
about the property?
A. In regards to . . ?
Q. Fair enough, Let me ask this: You had talked to
Mr. Pierson about the property, obviously; is that
correct?
A. Yes.
Q. And did you talk to Ms. Fish about the property?
A. Yes, I did.
Q. Were there any other individuals, Mr. Bailey, who
is the owner of the property or other individuals
you talked to about the property?
A. No.
Q. Do you recall what you discussed with Ms. Fish
before you purchased the property?
A. Yes. She went over the property, showed us some
papers on the property and showed us that one
document with the proposed housing layout.
MR. GETTE: Let me have this marked
as Woitalla Exhibit 2.

Page 9

(Woitalla Deposition Exhibit 2
marked for identification.)
Q. (By Mr. Gette, continuing) Mr. Woitalla, I'm
handing you what's been marked as Exhibit 2 to
your deposition. Is this one of the documents
that you brought with you this morning?
A. Yes, it is.
Q. Can you tell me what that documents is?
A. It's basically the building or a building layout
for the septic system, the driveway and the house
and garage.
Q. How did you come to receive what's been marked a
Exhibit 2?
A. We got this when we went and talked to the
realtor, Francine Fish.
Q. So did you actually receive this from Francine
Fish?
A. Yes.
Q. And if you see there is a box marked 40 feet by 40
feet on the exhibit?
A. Yes.
Q. Can you tell me what that box represents?
A. The house.
Q. And there is another box that's marked with 26
feet by 30 feet. Can you tell me what that box

Page 10

represents?
A. The garage.
Q. There are certain setbacks noted on the document. Were those explained to you at all?
A. Uh-huh, that's 75 feet from the water's edge or whatever.
Q. And there is also what appears to be 20 feet along the edges of the property; is that correct?
A. Yes.
Q. Was that also explained to you as a setback that was required?
A. Yes.
Q. Do you know the source of those requirements; federal law, state law, local zoning ordinances?
A. That I do not know.
Q. Okay. There is also a box with a smaller dotted line box inside of it on Exhibit 2. Do you know what that represents?
A. That was supposed to be for the septic system.
Q. And I notice that the exhibit says "Proposed house, garage, well and septic mound system." Was there a well on the property?
A. This right there, that thing right there (indicating).
Q. Okay. You are pointing on Exhibit 2 to a circle?

Page 11

A. A crosshatch.
Q. With a crosshatch in it, okay. Now, was that well actually already installed on the property?
A. No, there is nothing on there.
Q. And during the time you owned the property, did you ever install a well?
A. No.
Q. Now, when this document says septic mound system, do you understand what a mound system is?
A. Yes.
Q. What is that?
A. It's a system where the water is pumped up into a mound of dirt that they have built up on the property.
Q. Did anyone explain to you why a mound system was being considered?
A. No.
Q. During the time you owned the property, did you investigate the possibility of installing a septic system?
A. No, I did not.
Q. Did you talk to any of the other lot owners who had investigated a septic system?
A. No.
(Cell phone rings.)

Page 12

MR. GETTE: Let's go off the record.
(Off the record.)
Q. (By Mr. Gette, continuing) Mr. Woitalla, I'm going to have another document marked as Exhibit 3 to your deposition.
(Woitalla Deposition Exhibit 3 marked for identification.)
Q. It's a multi-page document, if you would take a second and look through that and let me know when you have done that?
A. (Witness reviews document.) Okay.
Q. Okay. Do you recognize that document?
A. Yes. I filled that out.
Q. Is that your handwriting on that document?
A. Yes.
Q. And this was an application that you made for wetlands, a replacement plan?
A. Yes.
Q. And how did it come about that you submitted this application?
A. I don't remember which guy gave -- one of the guys up there, I don't remember if it was Lockner or whoever was the head of soil and water up there in Lake of the Woods County, gave us these papers to fill out to try to get an approval for this --

Page 13

I'm at a loss for words.
Q. That's okay, let me try to help you through this. First of all, this was somebody at the Soil and Water Conservation District?
A. Yes. I forget what his name was, there was a couple of them. There was one there first and then another guy took over after he quit and I don't remember their names.
Q. Was one of them Les Lemm?
A. Yes, there you go.
Q. And do you recall whether it was Les or the other gentleman who suggested this application?
A. Boy, I don't remember.
Q. That's a number of years. "I don't remember" is a fine answer, whatever you can recall. Was this an application for replacement of wetlands that had already been impacted on your property?
A. Yes.
Q. And if you turn back to in the lower right-hand corner a document that's stamped page 954; do you have that in front of you?
A. Yes, I do.
Q. It appears to be a drawing of work on your lot; is that correct?
A. Yes, that's correct.

Page 14

Q. And it indicates Lot 13, was that your lot?
A. Yes.
Q. And on that it says, "Work already completed"; is that your handwriting?
A. Yes.
Q. Did you make this drawing?
A. Yes, I did.
Q. And what is the drawing intended to represent?
A. It's my driveway that I wanted put in up to a deck that I had on the front of the property.
Q. And when did you install -- when did you have the driveway installed?
A. I would have to look at my documents, I'm not sure. It's one of those invoices.
MR. GETTE: Let me have this marked as Woitalla Exhibit 4.
(Woitalla Deposition Exhibit 4 marked for identification.)
Q. (By Mr. Gette, continuing) I'm handing you what's been marked as Woitalla Exhibit 4, do you recognize that document?
A. Okay. This one here is for the driveway approach.
Q. Okay. This is an invoice from Lake Area Construction, Rex Block; is that correct?
A. Yes.

Page 15

Q. And did you hire Mr. Block to do some work for you on the property?
A. Yes, I did.
Q. And this indicates this was done in June of 1999; is that correct?
A. Yes.
Q. And what was this specific work again?
A. This is the approach going into the lot from off the road.
Q. So did this include installing a culvert?
A. Yes.
Q. It appears that you paid Mr. Block $385 for that work?
A. Yes.
MR. GETTE: Now, I will have this marked as Exhibit 5 to your deposition.
(Woitalla Deposition Exhibit 5 marked for identification.)
Q. (By Mr. Gette, continuing) I will hand that to you and take a look at that invoice. Now, again, this is another invoice from Lake Area Construction, Rex Block, correct?
A. Yes.
Q. And it's dated August 3 of 2000?
A. Yes.

Page 16

Q. What was this invoice for?
A. This is the gravel that I used to put in the driveway.
Q. And did Mr. Block actually install the driveway for you?
A. Yes.
Q. What did that entail?
A. All he had to do was dump the gravel and push it in with the Cat.
Q. So with some sort of a dozer?
A. Yes, a bulldozer.
Q. And does that date seem right to you, August of 2000, when that would have been installed?
A. Yes, that sounds right. I'm sorry.
Q. Now, going back to what we had marked as Exhibit 3 and the drawing that you prepared, does that drawing represent the driveway that you had Mr. Block install for you?
A. Yes, it does.
Q. Now, it also indicates at the very end or toward the lakeside of the lot, the word "deck" is written in?
A. Uh-huh, that's where I had a deck.
Q. What kind of deck was it?
A. It was just a wood deck that I put in there.

Page 17

Q. Did you put that in or did you have somebody install that for you?
A. I put it in.
Q. Now, during this time period, 1999 to 2000, were you using the property?
A. Yes.
Q. About how often?
A. Probably a couple times a month.
Q. So mostly on weekends?
A. Yes.
Q. Summertime or year-round?
A. Mainly summer, but I was up there twice during the winter.
Q. And would you stay on the property when you went up there?
A. Yes.
Q. Camping?
A. Yes.
Q. Camper or --
A. I had a motor home.
Q. Now, did you have electricity on the property?
A. Yes, I did.
MR. GETTE: I'm going to have this marked as Exhibit 6.
(Woitalla Deposition Exhibit 6

Page 18

marked for identification.)
Q. Mr. Woitalla, I'm handing you what's been marked as Exhibit 6 to your deposition, take a quick look at that?
A. Okay.
Q. Do you recognize this document?
A. Yes, I do.
Q. Was this one of the documents you brought with you today?
A. Yes.
Q. What is that document?
A. It's my paper from the North Star Electric Cooperative that they gave me for the prices for installing the meter and the . . .
Q. And that was in April of 2001?
A. Yes.
Q. And is that when you had electric service installed on the property?
A. Yes.
Q. And did North Star Electric Cooperative actually do the installation?
A. Yes. They put the meter loop in and then from there I wired it from there to a box.
Q. And how did they actually run the lines to your property?

Page 19

A. The meter was actually on Lot 14 and then I just put a post in on the property line and I ran an extension cord to my vehicle.
Q. So North Star brought it from Lot 14 up to your property line?
A. Yes.
Q. Do you know whether North Star ever extended that beyond Lot 13 into the other lots?
A. No, they didn't.
Q. Now, I'd like to go back a little bit in time to when you were considering purchasing the property again and if you would look at Exhibit 2, that was the drawing that had been provided to you by the real estate agent, correct?
A. Yes.
Q. Did you indicate to the real estate agent what you intended to do with the property once you purchased it?
A. Not really, no.
Q. Did the real estate agent indicate to you that it was available for residential development?
A. Yes, she did.
Q. Now, aside from camping up there, are you a fisherman?
A. Yes, I was or am.

Page 20

Q. Did you go out on the lake to fish up there?
A. Yes.
Q. Did you have a boat?
A. Yes.
Q. Where would you put in?
A. Right off our lot mainly. I had a track system that I put up for the boat.
Q. What kind of boat is it?
A. A 16-foot Lund.
Q. And did you put in there at your lot over the course of a couple of years?
A. Well, actually, I didn't put the boat in on the lot. I went up to the resort north of us and I kept the boat on my lot, to clarify that.
Q. So you would go in and put in up at the resort?
A. Yeah, just north of our lot. It was -- I forget the name of it.
Q. Morrison?
A. No. Long Point Resort, I believe.
Q. Okay. And when you say you kept the boat on the property, how would you get it --
A. I had a little track system that we made that could pull the boat up onto the lot or out of the water.
Q. So you would pull it up onto the property and it

Page 21

would actually sit on the property?
A. Yes.
Q. Did you ever have any problems with that system using that system on your property?
A. Now and then logs would come rolling up and knock the feet out from underneath it and stuff, but for the most part it worked pretty good. And there was one year the water was too low, so I couldn't use it.
MR. GETTE: Mark this as Exhibit 7.
(Woitalla Deposition Exhibit 7 marked for identification.)
Q. (By Mr. Gette, continuing) Mr. Woitalla, I'm handing you what's been marked as Exhibit 7 to your deposition. Do you recognize that document?
A. Yes, I do.
Q. What is that document?
A. That was the paper that we signed for the deed.
Q. Is this a copy of the deed for the purchase of the property?
A. Yes.
MR. GETTE: I will have this marked as Exhibit 8.
(Woitalla Deposition Exhibit 8 marked for identification.)

Page 22

Q. (By Mr. Gette, continuing) Handing you what's been marked as Exhibit 8, Mr. Woitalla, is that a copy of a mortgage that you executed at the time you purchased the property?
A. (Witness reviews document.) Yes, it is.
Q. And if you would look on page one -- first of all, let me ask you, what was the total purchase price of the property?
A. $25,000.
Q. And did you put some amount down?
A. Yes, I did.
Q. Do you remember how much?
A. I think I gave you a receipt. It was $2,133, I believe. I might not have given that one to you.
Q. Okay. We will see if we can find it at a break. Now, it indicates that if you look on the bottom of the mortgage there, which is Exhibit 8, that the mortgage was for $22,500; is that correct?
A. Yes.
Q. And your monthly payments were to be $297.42; is that correct?
A. Yes.
MR. GETTE: Now, let me have this marked as Exhibit 9.
(Woitalla Deposition Exhibit 9

Page 23

marked for identification.)
Q. (By Mr. Gette, continuing) Handing you what's been marked as Exhibit 9, do you recognize that document?
A. Yes, I do.
Q. And is that a copy of the amortization schedule for your mortgage?
A. Yes, it is.
Q. And again it indicates the payments were going to be $297.42?
A. Yes.
Q. Now, there is some handwriting on this document; do you recognize that handwriting?
A. Yes, it's mine.
Q. And down the left-hand side of that document, there are certain numbers that have been calculated and are written in your handwriting; do you know what those are?
A. I'm guessing that's the interest amount, without calculating it.
Q. Now, most importantly on this document, on the second page, there is some handwriting that looks like it says "last payment"?
A. Yes.
Q. Is that what that says?

Page 24

A. Yes, it does.
Q. And that again is in your handwriting?
A. Yes.
Q. Does that indicate to you what the last payment you made on the property was?
A. Yes, it does.
Q. And when was that?
A. July 7th of '02.
Q. So were you timely with your payments, from the time of purchase, up to July 7th of 2002?
A. I know we missed -- we were late on one or two, I know, I remember.
Q. The payments that you were late on, did you ultimately make those payments?
A. Yes, we did.
Q. Other than those couple of late payments, were you otherwise timely with your payments from the time you purchased up to July 7th, 2002?
A. Yes.
Q. Did you ever miss any payments completely during that time period?
A. None that I'm aware of.
Q. Do you recall when you marked this paper to indicate when your last payment was?
A. No, I don't. I do have the last check, though,

Page 25

that I wrote (indicating).
Q. So you've just handed me a check that indicates that your last payment was July 7th of 2002. We will get that copied and include that as an exhibit to your deposition at the next break.
A. Okay.
Q. Now, am I correct that the mortgage was held by Mr. Bailey?
A. Yes, it was.
Q. And so you would make payments directly to him?
A. Yes.
Q. Have you ever had any conversations with Mr. Bailey?
A. Yeah, I've talked to him a few times.
Q. What led you to contact him?
A. Well, when the property wasn't looking like it was going to be buildable or anything, I called him and asked him if we could escrow my payments into an escrow account in case this thing did go back and I could just get my money back for it.
Q. And what was his response?
A. He said "no."
Q. Do you know about when that conversation would have occurred?
A. No, I don't remember. I didn't document that

Page 26

down.
Q. Was that before you actually ceased making payments on the mortgage?
A. Yes, it was.
Q. What ultimately led you to decide to stop making payments on the property?
A. Well, it didn't look like things were going very well and I just decided rather than putting more good money into bad, I just quit paying for it.
Q. And when you say "it didn't look like things were going very well," what do you mean by that?
A. Well, we were being forced to pull all of our gravel off and none of our -- when we filed for these applications to put fill in, nothing was approved and it just didn't look like things were going very well.
MR. GETTE: Mr. Woitalla, I'm going to have this marked as Exhibit 10.
(Woitalla Deposition Exhibit 10 marked for identification.)
Q. (By Mr. Gette, continuing) Handing you, Mr. Woitalla, what's been marked as Exhibit 10 to your deposition, when you referenced just a minute ago having to remove the gravel, is this a notice of the requirement of that restoration work?

Page 27

A. Yes, it is.
Q. And did you receive this letter?
A. Yes, I did.
Q. What actions did you take in response to this order to restore the property and remove the gravel?
A. At that point, I called up Rex Block and I had him remove the gravel.
Q. Now, this letter that's been marked as Exhibit 10 is dated August 3, 2004, does that seem about right, as to when you would have received it?
A. Yes.
Q. Any reason to believe that's not the right date?
A. No.
MR. GETTE: And let's have this marked as Exhibit 11.
(Woitalla Deposition Exhibit 11 marked for identification.)
Q. (By Mr. Gette, continuing) I'll hand you what's been marked as Exhibit 11, Mr. Woitalla; do you recognize that document?
A. Yes, I do.
Q. And is that one of the documents you brought with you today?
A. Yes.

Page 28

Q. What is that document?
A. This is the invoice for the gravel removal by Rex Block.
Q. So you actually retained Mr. Block to remove the driveway?
A. Yes, I did.
Q. And the invoice indicates it's dated October 19th of 2004. Do you have any reason to believe that that isn't when he actually conducted the work?
A. To my knowledge, that's the day he did it.
Q. And it indicates that you paid Mr. Block $300 for that work; is that correct?
A. Yes, I did.
Q. Mr. Woitalla, I'm showing you again what was marked as Exhibit 9 to your deposition. This is the amortization schedule?
A. Sure.
Q. Now, if you would look at the third column on that sheet, it says "payment amount"; do you see that?
A. Yes.
Q. And it indicates again for each month the payment amount was going to be $297.42, correct?
A. Yes.
Q. Is that in fact what you paid Mr. Bailey each month while you were making payments?

Page 29

A. Yes.
Q. If we add up the amounts in that column from the first payment on June 7th, 1999 through July 7th of 2002, would that total the amount that you paid to Mr. Bailey on the mortgage?
A. Yes.
Q. Okay. And then in addition to that amount, you would have also paid him the amount of your down-posit, correct?
A. Yes.
Q. Do you currently own that property?
A. No, I don't.
Q. And can you tell me what transpired? Did you sell the property?
A. No, I gave it back to -- well, first, Mr. Bailey gave us a -- I don't know what the word for it is -- but that we were delinquent on our payments. Oh, a foreclosure notice on our property.
MR. GETTE: Let's have this marked as Exhibit 12.
(Woitalla Deposition Exhibit 12 marked for identification.)
Q. (By Mr. Gette, continuing) Mr. Woitalla, showing you what's been marked as Exhibit 12 to your deposition, if you would take a moment and just

look over that document?
A. Yes, I recognize this document.
Q. It appears to be a letter that was sent to you; did you receive this letter?
A. Yes, I did.
Q. And what was this letter?
A. It was about my default on my loan or mortgage on my property.
Q. And what did you do in response to receiving this letter?
A. I hired a lawyer.
Q. And can you describe for me how the -- what occurred after you received this notice?
A. Well, I hired a lawyer and he gave me some documents telling me what could happen if I defaulted on this loan and not paid off the total balance and from there we just tried to negotiate with Mr. Bailey and as an end result, we gave back the property to Bailey.
Q. Now, was some agreement reached that would protect your credit?
A. Yes. They agreed not to wreck my credit and they just took it back.
Q. So as you understand it, did they employ some method by which they would recoup the property



without actually doing a type of foreclosure that would impact your credit?
A. To be honest with you, my lawyer handled that end of it and I don't know exactly how that went.
Q. Now, in the process by which you gave the property back, did you receive any refunds or monies from Mr. Bailey?
A. No.
Q. Did you receive any reimbursements for development that you had done on the property?
A. No.
Q. Mr. Woitalla, I would ask you to look back again at Exhibit 3?
A. Okay.
Q. That's the permit application that you filed for wetland replacement, correct?
A. Yes.
Q. And what was the result of that permit application?
A. I was denied.
MR. GETTE: Can I have this marked as Exhibit 13
(Woitalla Deposition Exhibit 13 marked for identification.)
Q. (By Mr. Gette, continuing) I'll have you take a



look at Exhibit 13, Mr. Woitalla, is that a copy of the notice of denial of your permit application?
A. Yes, it is.
Q. Other than the wetland replacement application that you submitted, did you submit any other applications for permits for that property?
A. Not that I recall.
Q. Did you ever submit an application for a permit to install a septic system?
A. No.
Q. Any actual application for construction of a home?
A. No.
Q. Now, when you purchased the property, what was your intention, with respect to use of the property?
A. At the beginning, we were just going to use it for a camping lot and then maybe later on put a cabin up there.
MR. GETTE: I'll have this document marked as Exhibit 14.
(Woitalla Deposition Exhibit 14 marked for identification).
Q. (By Mr. Gette, continuing) Mr. Woitalla, I'm showing you what has been marked as Exhibit 14,



take a moment and look at that document?
A. (Witness reviews documents.) Yes, I remember this document.
Q. What is this document?
A. Well, we were writing to try to plead with these guys to let this thing go through, let the permits go through for Mr. Bailey.
Q. Do you know to whom you wrote that letter?
A. I think it was the County, Lake of the Woods County.
Q. And did you write this letter?
A. Yes, I did.
Q. In the last paragraph, it begins, "When we bought Lot 13, it was not disclosed this area was a wetland"; is that an accurate statement?
A. Yes, it is.
Q. When did you first become aware that there were wetlands on the property?
A. I believe it was when we started -- when we first filed for a permit to put our approach in and then problems started.
Q. So is it fair to state it was on or shortly after your filing for the permit for the approach?
A. Yes. I think we were denied at first and then somehow later on they got it approved to put it

Page 34

in.

MR. GETTE: Let's have this marked as Exhibit 15.

(Woitalla Deposition Exhibit 15 marked for identification.)

Q. (By Mr. Gette, continuing) I'd ask you to take a look at Exhibit 15, Mr. Woitalla?
A. Yes.
Q. Is that your permit for the approach -- your application for the approach permit?
A. Yes, it is.
Q. And did you sign that document?
A. Yes, I did.
Q. And it indicates it's dated May 17th of 1999?
A. Yes.
Q. So would it have been on or around that time that you first became aware that there were wetland issues with the property?
A. I believe it was right after we filed for this. No, actually, it was before this was approved.
Q. Let me ask you this: How did you first become aware? Who told you of the wetland issues?
A. I don't remember who told us.
Q. That's fine.
A. Oh, can I, on this document 14, we sent that paper

Page 35

to the Army Corps in St. Paul.
Q. Okay.

MR. GETTE: I will have this marked as Exhibit 16.

(Woitalla Deposition Exhibit 16 marked for identification.)

Q. (By Mr. Gette, continuing) Mr. Bailey, I will show you what's been marked as Exhibit 16 to your deposition, take a minute and look that over and I will ask you some questions?
A. (Witness reviews document.) Yes, I remember this document.
Q. What is that document, Exhibit 16?
A. This is the approval for my gravel removal.
Q. So after you had Mr. Block remove the gravel, did you receive this from someone?
A. Yes, I did.
Q. Do you know who sent this to you?
A. I can't read his writing.
Q. Yeah, that's why I asked. The signature is hard to make out, isn't it?
A. Yes, it is.
Q. Do you know whether this was from the county or from the which organization sent this to you?
A. It must have been from Lake of the Woods County.

Page 36

Q. And referring back to Woitalla Exhibit 11, how much did it cost you to comply with the restoration order?
A. It was $300.
Q. Were there any other expenses other than what you paid to Mr. Block to remove the driveway?
A. No.

MR. GETTE: Have this marked as Exhibit 17.

(Woitalla Deposition Exhibit 17 marked for identification.)

Q. (By Mr. Gette, continuing) Mr. Woitalla, I'm showing you what's been marked as Exhibit 17 and ask you to actually take a quick look through that document. It's a three-page letter, so it may take you a few minutes, but take your time?
A. (Witness reviews document.)
Q. Okay. Did you have a chance to take a look at that document?
A. Yes, I did.
Q. This appears to be a letter from your lawyer to Ms. Rita Fish-Whitlock; is that correct?
A. Yes.
Q. Did you receive a copy of this letter at the time your lawyer wrote it?

Page 37

A. Yes, I did.
Q. Now, if you look on the second page of that document, there is a large paragraph in the second half of the document that starts, "The first offer is"; do you see that?
A. Yes, I do.
Q. And it says, "The first offer is that Mr. Woitalla will agree to pay Mr. Bailey the sum of $4,000 to fully and finally complete the purchase of Mr. Woitalla's lot in Sunny Beach." Was this an offer to Mr. Bailey that you had approved your lawyer making?
A. Yes, it was.
Q. And am I correct in understanding that you would pay Mr. Bailey $4,000, in addition to what you had already paid him to date, at that point?
A. Yes.
Q. And in turn, at that point you would own the property outright, if he accepted the offer?
A. Yes.
Q. And you were making that offer at this point in time, which this letter is dated June 30, 2005, knowing that there were issues related to wetlands on the property, correct?
A. Correct.



 (C) 2008

Page 38

Q. And also knowing at this time that the Corps of Engineers had denied Mr. Bailey's permit for the road application, correct?
A. Yes.
Q. And did Mr. Bailey accept your offer?
A. No.
MR. GETTE: Alan, I think I'm finished with my questions, but I'm going to ask to take just a brief break to look through my notes to make sure I've covered everything I want to.
MR. FISH: That's fine.
MR. GETTE: So let's take five minutes.
(Recess.)
MR. GETTE: Let me have this marked as Exhibit 18.
(Woitalla Deposition Exhibit 18 marked for identification.)
Q. (By Mr. Gette, continuing) Mr. Woitalla, I'm handing you what's been marked as Exhibit 18 to your deposition, a two-page document. Are these copies of the front and back of the final check that you sent to Mr. Bailey?
A. Yes, it is.

Page 39

Q. And that's dated July 7th of 2002?
A. Yes, it is.
MR. GETTE: That's all I have, Alan.

EXAMINATION

BY MR. FISH:
Q. Mr. Woitalla, I have just have a couple of questions. First, you received communication from the Army Corps of Engineers essentially restricting your use of this property; is that right?
A. Yes.
Q. And was that one of the or I guess the primary reason you stopped making payments on the property?
A. Yes. I'd have to say so.
Q. And is it your understanding that that is why the County of Lake of the Woods and the DNR stopped, I guess, being cooperative with permitting people to use this for residential or camping purposes?
MR. GETTE: Objection; calls for the witness to speculate.
Q. Go ahead.
A. Do you want to rephrase or ask that question

Page 40

again?
Q. I will ask it to you again. Until the Army Corps asserted their jurisdiction, calling this wetland, did you have any problems with Lake of the Woods like getting your culvert permit or anything like that?
A. We had a little problem at first getting the permit.
Q. Okay.
A. They didn't give it to us right away, because they had said that there was some problems with it.
Q. All right, and was the problem the Army Corps of Engineers?
A. At that point, I can't answer that. I don't remember what it was.
Q. All right. Regardless, has the Army Corps of Engineers permitted you to do any activity on that property?
A. No.
Q. And have you applied to the Army Corps of Engineers to conduct any activity or appealed any of their requests?
A. Yes, I did.
Q. And what was their response?
A. They denied all of our applications.

Page 41

Q. Okay. And based on that, was that a basis to stop making payments to Mr. Bailey?
A. Yes, it was.
Q. And would you say that that affected your property, is that why you stopped making payments?
A. Say that again?
Q. Would you say that the Army Corps' regulation of this property affected the value of your property?
MR. GETTE: Objection; calls for an expert opinion.
Q. Go ahead.
A. Do you want to repeat that one more time?
Q. When the Army Corps rejected your application, do you believe that made your property worth less money?
A. I would have to say --
MR. GETTE: Same objection; go ahead.
A. I would have to say "yes."
Q. And did it limit your uses of the property?
A. At that point really, no, it didn't.
Q. And that's based on what the county had already -- or the DNR had already said you could or could not do; is that right.
MR. GETTE: Objection; vague.
Q. Well, let me rephrase the question. I won't make

you answer that one, Mr. Woitalla. First of all, were you aware that the MPCA and Lake of the Woods County were claiming that they could not permit uses of this property, because of the Army Corps -- the Army Corps' wetland determination?
A. Not at first I wasn't.
Q. Are you aware of that -- I mean, did you become aware of that at some time?
A. Later on.
Q. Did you understand it was the Army Corps' work on that property that resulted in Lake of the Woods County and the State of Minnesota being resistant to further development?
MR. GETTE: Objection; calls for speculation.
Q. Go ahead.
A. I'm not going to answer.
Q. You have to answer the question.
MR. GETTE: If you know the answer --
A. Run that by me again?
MR. FISH: First of all, I would admonish Counsel not to be suggestive to the witness, by saying, "If you can answer." You are in direct violation of deposition rules, Counsel and I will



ask you not to do that again.
MR. GETTE: I'm not in violation of anything, Alan. You can ask the witness whatever questions you want.
MR. FISH: And you heard my admonishment, Counsel?
MR. GETTE: I'm on the phone, Alan. I can hear what you are saying.
MR. FISH: Actually, I'm going to have the court reporter read the question back.
(The previous question was read by the court reporter.)
A. The Army Corps' work?
Q. Yeah. Do you understand the question, Mr. Woitalla?
A. No, I don't.
Q. All right. Were you aware that the Army Corps had done what's called a wetland delineation on that property, after you purchased it?
A. Yes, I did.
Q. And were you aware that after that decision or that was submitted to the State of Minnesota and the County of Lake of the Woods, that they then refused further permitting of development on the property?



A. Yes.
Q. And so prior to that wetland delineation, the County permitted you to put fill on the property in the form of your culverts; is that right?
A. Yes.
Q And after that point in time, they did not permit you to do any other activity?
A. Yes.
Q. And as far as your use of the property, you were just using if for camping. Is it your understanding that you simply couldn't use it for camping after the Army Corps asserting their jurisdiction on the property?
A. I guess I wasn't really aware of that, because we were just parked there and nobody told me I had to take off my motor home. Even after I had the gravel pulled out of there, I still had my motor home there.
Q. Okay. So you weren't told that if you drive a motor vehicle on the property and you disturb the soil in any manner that you will be violating Army Corps of Engineers regulations?
A. I would have to say nobody, that I recall, told me that, no.
Q. Now, I have to ask you this question: After you



removed your gravel pad, when you drove your motor vehicle to try to camp on the property, would it in fact depress the soil or disturb the soil in any manner whatsoever?
A. Yes, it would.
Q. And as far as uses of the property, do you believe building a permanent dock out there would be feasible, given the ice and wind conditions?
A. No.
Q. And did any of your neighbors up and down within say a mile or a quarter mile, have any permanent docks that lasted year-round out there?
A. No.
Q. And why is that?
A. Because the ice would tear it out, as it would in any lake.
Q. And how about the boat launching, you said one year you couldn't get your boat to the shore or maybe you could expand on that?
A. I could get my boat to shore, but I had that track system that I had to put my boat on. At that point, the water was too low to use that.
Q. All right. And the size of boat you used on the water, how large was that?
A. It was a 16-foot Lund.

Page 46

Q. Okay, so like an aluminum boat?
A. Yes.
Q. Now, when you purchased the lot, you understood i had been platted, that Lake of the Woods County had accepted the plat for it?
A. That's what I was assuming, yes.
Q. When that was done, were you aware that Lake of the Woods County had to confirm that it was suitable for building and residential purposes?
MR. GETTE: Objection; calls for speculation.
Q. Go ahead and answer.
A. I just assumed that everything was clear to go.
Q. And were you further aware that the Army Corps of Engineers had verbally represented that mitigation would be allowed on the property to Lake of the Woods County?
A. Yeah, I do recall something, but I don't remember at which point I was told that.
Q. Okay. Who do you think would have told you that, would that have been Mr. Lockner?
A. It was either Lockner or Les Lemm, I believe, one of the two.
Q. All right. So you were aware that Lockner or Les Lemm were dealing with the Army Corps of

Page 47

Engineers?
A. Yes.
Q. And it was your understanding through -- and Lockner and Les Lemm, I think Les Lemm works for the Soil and Water Conservation District and Mr. Lockner for the County; is that right?
A. Yes.
Q. And it's your understanding that the Army Corps of Engineers had represented to the county that they would allow mitigation?
A. At a given point, I remember somebody saying that, yeah.
Q. And that was -- you are saying that was either Les Lemm or Gary Lockner?
A. Yes. It was too long ago to remember which one it was.
Q. All right. You believe it was one of those two anyway?
A. Yes.
Q. Well, tell me this: What do you believe is the best use of that property if it were not regulated?
MR. GETTE: Objection; calls for speculation and an expert opinion, but go ahead.

Page 48

A. I would say a cabin or basically a recreational lot.
Q. So either recreational lots or residential lots or both, you are saying?
A. Yeah.
Q. And do you believe the regulations that were imposed on you, have prevented the ability to use it as a recreational or residential lot, to the extent you understand the regulations?
A. Yes.
MR. FISH: I have no other questions.
MR. GETTE: I have no further questions for Mr. Woitalla, so we will go off the record and we're all finished. Mr. Woitalla, you have the opportunity to receive a copy of your deposition, to read it and to mark any corrections and then sign it or you can waive that right, it's up to you, whichever you prefer?
THE WITNESS: Well, what would be to my best interest?
MR. GETTE: I'm not your lawyer in this, but if you feel more comfortable making sure that we got it all right.

Page 49

THE WITNESS: I will take a copy.
MR. GETTE: Okay. The reporter will send that to you with some instructions and you will just read through it. There will be a sheet where you mark your corrections and then you can send that back to the court reporter, okay?
THE WITNESS: Okay.
(At 12:40 p.m., the foregoing deposition was terminated.)

Page 50

STATE OF MINNESOTA )
) SS.
COUNTY OF WASHINGTON )

I hereby certify that I reported the deposition of THOMAS WOITALLA, on the 6th day of March, 2008, in St. Paul, Minnesota and that the witness was by me first duly sworn to tell the whole truth;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the reading and signing of the deposition by the witness were performed (unless indicated to the contrary on the following page).

WITNESS MY HAND AND SEAL this 21st day of March, 2008.

------------------
(Seal) Shirley A. Hosch
Court Reporter

Page 51

Capital Reporting Company
1821 Jefferson Place, Northwest
Third Floor
Washington, DC 20036

ERRATA SHEET

TITLE: Gary Bailey v The United States
VENUE: US Court of Federal Claims FILE NO: 02-1078L
WITNESS: Thomas Woitalla - 3/6/08 REPORTER: S. HOSCH
*********************************************************
Pg/Line | Change Reason
*********************************************************

______________________ ______________
Signature of Witness Date

Page 52

Mr. Thomas Woitalla
16723 59th Street, N.E.
Elk River, MN 55330

IN RE: Bailey v The United States
Dear Mr. Woitalla:

This letter is to advise you that the original transcript of your deposition taken in the above matter will be available in our office, Capital Reporting Company, located at 1821 Jefferson Place, Northwest, Washington, D.C., for signature.

Pursuant to the rules, the transcript will be available for 30 days beginning with your receipt of this letter. Please contact the Capital Reporting Company office, at (202) 857-3376, in order to arrange for your review of the transcript.

If you have any questions, please do not hesitate to call. Thank you.

Yours,

Shirley A. Hosch
Reporter/Notary

cc: James Gette, Esq.
Alan Fish, Esq.

STATE OF MINNESOTA )
) SS.
COUNTY OF WASHINGTON )

I hereby certify that I reported the deposition of THOMAS WOITALLA, on the 6th day of March, 2008, in St. Paul, Minnesota and that the witness was by me first duly sworn to tell the whole truth;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the reading and signing of the deposition by the witness were performed (unless indicated to the contrary on the following page).

WITNESS MY HAND AND SEAL this 21st day of March, 2008.

SHIRLEY A. HOSCH
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2010

(Seal)

Shirley A. Hosch