IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

GARY BAILEY,

Plaintiff,

v. Court File No. 02-1078L
Honorable Victor Wolski

THE UNITED STATES,

Defendant.

---

DEPOSITION of DAVID WOLF, via the telephone, taken before Shirley A. Hosch, a Notary Public in and for the County of Washington, State of Minnesota, on Thursday, the 6th day of March, 2008, commencing at approximately 9:00 a.m., at the Army Corp. of Engineers, 190 East 5th Street, in the city of St. Paul, Minnesota.

* * *

A P P E A R A N C E S:

JAMES D. GETTE, ESQ.,
U.S. Department of Justice
Environment & Natural Resources Division,
601 D Street, NW
P.O. Box 663
Washington, DC 20044-0663,
appeared representing the DEFENDENT.

STEVEN P. ADAMSKI, ESQ.,
U.S. Army Corps of Engineers
190 Fifth Street East,
St. Paul,Minnesota 55101-1638
appeared representing the DEFENDENT.

ALAN B. FISH, ESQ.,
Alan B. Fish, P.A., Attorneys and Counselors at Law
102 2nd Avenue, Northwest
Roseau, Minnesota 56751,
appeared via the telephone representing the
PLAINTIFF.

* * *



EXAMINATION OF DAVID WOLF


EXAMINATION BY MR. GETTE: PAGE
Wolf Ex. 1, Subpoena 6-7
Wolf Ex. 2, Purchase Agreement 21-22
Wolf Ex. 3, Contract for Deed 22-23
Wolf Ex. 4, 5/12/99 letter 23-24
Wolf Ex. 5, 10/26/99 letter from Mr. Lemm 15-20
Wolf Ex. 6, Wetland Conservation Act
Restoration Order (Exhibit not used)

Wolf Ex. 7, 6/20/01 letter to
Col. Kasprisin 25-27
EXAMINATION BY MR. FISH: 27
EXAMINATION BY MR. GETTE: 37
OBJECTIONS BY MR. GETTE: 28, 29, 30, 31, 32, 34,
36, 37


* * *



(The following proceedings were duly had:)

* * *

(Exhibits 1-7 pre-marked by Mr. Gette)

DAVID WOLF,
after having been first duly
sworn, deposes and says as
follows:

EXAMINATION

BY MR. GETTE:
Q. Mr. Wolf, my name is Jim Gette. We've talked over the phone several times previously. Let me begin simply by asking you, is this the first time that you've had your deposition taken?
A. No.
Q. How many times previously have you had the opportunity to be deposed?
A. I think only once.
Q. And did that relate in any way to your property up in Lake of the Woods or was that something else?
A. That was something else.
Q. Since you've only been through this once and



particularly since we're doing this by telephone, let me go through a couple of ground rules for the deposition with you. First, it's going to be very important today, even more than normal, that we be very careful to wait until the other person finishes talking before we begin to respond, so that the court reporter can get down everything we're saying. Can you join me in trying to work very hard at doing that today?
A. Yes, I can.
Q. Great. The other thing is that you will need obviously -- since you are on the phone, this one will be easy today -- to give us verbal responses. Also, it's very important that you understand any questions that I'm asking you?
A. Okay.
Q. So I would ask you, if there is any point that you feel like the question is not clear to you or that you don't understand it, that you ask me to rephrase it; would you do that?
A. Yes.
Q. Great. And finally at any point that you want to take a break -- I think this is going to be a very short deposition -- but if at any point you would like to take a break, simply let me no know and we

Page 6

will do that, okay?
A. Okay.
Q. Now, did you receive a Subpoena to appear for this deposition today?
A. Yes.
Q. Okay. And prior to this deposition did you receive a set of documents that I sent to you to be used at the deposition today?
A. Yes.
Q. And if you will take the document that was marked as Deposition Exhibit 1?
A. Okay.
Q. Do you have that in front of you?
A. Yes, I do.
Q. And is that a copy of the Subpoena that you were served directing you to appear for this deposition today?
A. Yes.
Q. If you turn to the last page of that document there is a list of documents that you were requested to produce, as well. Have you endeavored to locate documents responsive to that list?
A. Yes, we have. And everything that we could locate has been -- I believe it's been mailed to you or

Page 7

sent to you probably, excuse me, like today or yesterday or something like that.
Q. Okay. And as I understand from my paralegal, you were sending that here in St. Paul to the Corps of Engineers office; is that correct?
A. Yeah, whatever address you put down. My wife has taken care of that. She's very efficient at that kind of stuff, so I would guess wherever it says is where it's going.
Q. Okay, great.
MR. GETTE: And, Alan, obviously once we receive that we will make a copy available for you.
MR. FISH: Yes.
Q. (By Mr. Gette, continuing) Now, Mr. Wolf, I would like to ask you some questions about the property that you purchased back in 1999 up in Lake of the Woods County. How did you become aware of the availability of that property?
A. Actually, we were driving by, noticed the realty signs on those pieces of property. We were kind of looking for something at the time to build on and we seen those. We contacted North Border Realty, Pat LaValla, and that kind of started the proceeding, I guess.

Page 8

Q. Now, you said at the time you were looking for property; is that correct?
A. That's correct.
Q. How long have you had been looking for property in -- first of all in what region and area were you looking for the property?
A. Around Lake of the Woods.
Q. And were you specifically looking for lakefront property?
A. Yes.
Q. And how long -- at the point that you saw the for sale sign on this property, for how long before that had you been looking?
A. Probably on-and-off for a couple of years probably.
Q. Had you actually looked at other lakefront properties that were available during that two-year period?
A. Yes, we did.
Q. And why did you not -- well, let me ask you this: Did you put offers on any of those other properties?
A. No. There were not a lot of other open lots for sale.
Q. So is it fair to say that several of the other

Page 9

properties that you had looked at already had residences constructed on them?
A. That's correct.
Q. Were any of the other properties that you looked at vacant lots?
A. I can't recall.
Q. Okay. Now, let me jump ahead. At some point in time, did you reach an agreement with -- well, first of all, you ultimately did purchase the property at issue here from Mr. Bailey, correct?
A. That's correct.
Q. And how many lots did you buy from Mr. Bailey?
A. Three.
Q. Do you recall the lot numbers?
A. No, I don't. I know five was one of them. I think it might have been four, five and six. Yeah, I think it was four, five and six.
Q. Now, ultimately, did you reach some agreement with Mr. Bailey whereby he repurchased those properties from you?
A. Where they purchased them back, you mean?
Q. Correct.
A. Yes.
Q. And since the time that he repurchased those, have you purchased any other property in Lake of the

Page 10

Woods?
A. Yes, we did.
Q. Where is that property?
A. That property is on Grayson Beach Road. It's lakeshore property and it had a cabin on it, not what we wanted, but -- and probably a little bit to the south and to the east of where the other property was.
Q. How long have you owned that property?
A. I believe seven years, I think, something like that, six or seven years, I think.
Q. So that would put the purchase of that property somewhere around 2001/2002?
A. I believe so. I'm not positive. We were just talking the other day, I thought we had been there six or seven years.
Q. Now, how much property, approximately, did you purchase there on your current location?
A. I believe the lakeshore width is up around 130 feet, I believe.
Q. And do you know what the total acreage of the lot is?
A. No, I'm not sure.
Q. And you said it does have a cabin on it?
A. Yes, it does.

Page 11

Q. Have you had made any changes or improvements to the cabin?
A. Not at this time.
Q. And can I ask you, how much did you pay to purchase this property, including the cabin?
A. I believe it was around $130,000.
Q. And can you give me some sense of the size of the cabin, the number of bedrooms?
A. It's relatively small. It's a 30 by 40 with a loft and with a front porch on it, so it's 1200 plus the porch, plus the loft, I guess.
Q. Now, do you spend a substantial amount of time at the property on Lake of the Woods?
A. I try to, yes, I do.
Q. And about how much time a year would you estimate you spend up there?
A. In regards to weekends, I would say we probably spend, you know, upwards of 15 to 20 weekends a year here.
Q. Do you own a boat?
A. Yes, we do.
Q. And where do you keep -- did you keep that boat on the lake?
A. We keep the boat on the property here and then we launch it. It's hard to keep boats on the lake

Page 12

here, because of the wind and things like that, so they almost have to be harbored.
Q. And you don't have a harbor spot for it?
A. No.
Q. So do you launch from your property actually or go to a public boat ramp?
A. Most of the time we go to a resort and launch there.
Q. Which resort is that?
A. Morris Point Lodge.
Q. And is there a put-in fee when you use that facility?
A. Yes, there is.
Q. And do you know what that is?
A. I would say it's in that $6 range.
Q. Now, I want to go back again to the point where you were first looking for properties up in Lake of the Woods. How would you say the price of the property that you purchased from Mr. Bailey compared to the other properties you were looking at on the lake?
A. I would say they were priced about the same. Meaning, that you know that the price of the lot in proportion to what the whole property would be, if you found a place with a cabin on it, I presume

Page 13

the cabin is worth so much and the lot is worth so much, but I would say they were priced about on-the-market at the time there.
Q. Now, before you purchased the property from Mr. Bailey, did you speak to anyone regarding your intentions for the use of the property?
A. The realtor, Pat LaValla?
Q. And was Mr. LaValla acting as your agent or Mr. Bailey's agent in that transaction?
A. Mr. Bailey's agent.
Q. And what did you tell Mr. LaValla regarding your anticipated use of the property?
A. That we wanted to build a cabin on it and we talked at length about setbacks and how far from the water that they would let you build and all such things. And I don't know if they had electricity in at that time or not, I know that somewhere along this whole process, the power was already in, the underground power was in in front of the lot, things like that and that's about all I remember about that, but there is no question about it that he knew very well we were going to build on that property.
Q. Now, before the actual purchase of the property and when you went to closing, did you have any


© 2008



5790936c-fefd-4516-b509-8faf42892b64

Page 14

opportunity to speak to Mr. Bailey up to that point in time?
A. To the best of your recollection, I don't believe I've ever talked to Mr. Bailey.
Q. Now, when you were speaking to Mr. LaValla, did he make any indications regarding wetland issues related to the property?
A. Not prior to sale.
Q. Did you -- since you became aware of the property based on a for sale sign, I'm assuming that you had seen the property before you had closed on it?
A. Yes. We walked the property and looked things over and we had a choice of lots, so I think about half of them were for sale at that point. And we wanted a block where we could put like three of them together, that way we would have a buffer on each side, because of the fact that up here you could get someone with old -- park an old trailer house next to you and I don't think there was a lot of covenances and things like that, connected with it.
Q. And when you actually walked the property, was there an access road to the property already constructed?
A. No. There was a trail, but there was a tree

Page 15

across it. There probably was vehicles in there, but it was a trail.
Q. Now, by the time that you closed on the property -- or let me ask you this: when was the road that provided access to the lot finished?
A. After we purchased it.
Q. Now, at some point in time, did you become aware that there were issues related to wetland problems with the property?
A. Yes, we did.
Q. Do you know about when you became aware of that?
A. Well, I think this is part of one of your exhibits here. I think there is a letter here from Les Lemm of the Soil and Water. I don't know if that's in here or not, but I thought I saw a copy of it someplace.
Q. Yeah, if you pull out Exhibit 5.
A. Okay, I have that.
Q. Take a moment and just scan that over and let me know if that's the letter you were referring to?
A. Yes, it is.
Q. And was your receipt of this letter the first time you became aware of the wetland concerns related to the property?
A. To the best of my knowledge, it was.

Page 16

Q. Now, what if anything did you do in response to this letter?
A. Talked to Mr. LaValla. I think this probably would have been my first phone call and then I talked to Mr. Lemm. And you know there again it's nine years ago, so it's a little bit foggy, but that would have been -- I believe that was my process on it.
Q. Do you recall what Mr. Lemm told you about the wetland issues and what you could do with the property?
A. Well, I learned what a type 7 woodland wetland was I never heard of that before and that it was basically -- I was told don't do anything further to the property before things get resolved. But that the option was that the county had wetland credits to be able to purchase and that is also I believe what Mr. Lavalla, when I first became aware of what that was and I can't remember what the cost was, 10 cents a foot or something, that the county would go ahead and -- because they had a wetland credits that you could buy and things like that. And so then -- but we were going to wait and not do anything further to the property in the way of making anymore of a road into it or

Page 17

anything like that and we didn't.
Q. At that point in time, had you made any -- or let me ask that differently. At that point in time, had you done anything to the property?
A. We did. We did some clearing, brush clearing and things like that and we had a driveway put in. I had contacted Mr. Lavalla about that. He referred me to the county. I think a Mr. Lockner was the planning guy. He referred me to another office. I think it might have been -- I'm not exactly sure if it was like the road or Highway Department or whatever. I went in and applied and obtained a permit to put the access road and the driveway in and I contacted Mr. Rex Block who had already -- I think there were a couple of access roads and driveways in and I believe he had already put in some of the other ones. And you had to get a permit as to the size of the culvert. The county was very specific on the size of the culvert that they wanted in there and things like that. And so we did all that and it was approved and over time -- I can't remember if Mr. Block got at it right away, but over time, he constructed -- put the culvert in, constructed the access road and the driveway and after that we just used it as a -- we

 © 2008



5790936c-fefd-4516-b509-8faf42892b64

Page 18

kind of cleared it and we parked a camper on there and things like that.
Q. So for some period of time, you were using the property for camping?
A. Yes.
Q. Do you know about how long that lasted?
A. Oh, I don't know, it strikes me as maybe being the time between Les Lemm's letter and the time that we went through all the grief of trying to figure out whether it ever would be able to be built upon and then probably from up until a year before -- probably the last year, before it was repurchased by Mr. Bailey, that we probably -- we probably didn't use it the last year. We were kind of sick of the whole deal by then so.
Q. Now, in terms of developing the property and putting in a cabin, did you ever have any designs prepared for that?
A. Not professionally. We did a lot of stuff on our own. We were shopping for the type of construction that it would be and where it would be placed. We had some stakes in there and things like that, because we had hopes, even as we found out about the wetland issues, but they told us credits would be available, so I was in there

Page 19

measuring how many dollars worth of credits I would have to buy in order to put the cabin on it and things like that. I had that all pretty well figured out.
Q. And that was measurements and staking that you did personally?
A. That's correct.
Q. Did you ever talk to any professionals about installing a septic system on the property?
A. We talked to -- there was a lot of discussion on septic symptoms with Mr. Lockner from the County here and then I also talked to someone from the MPCA. You might see that in the notes here someplace and -- because as it was, he seemed -- according to my memory here, as it was evolving, it seemed like that was going to be the second issue was that after, yeah, you could buy the credits to put the cabin on it, but then they may not allow you to put any sewer in. Well, that also was not the intent, so it sort of evolved, well, maybe you would have to put your own in-ground tank in and have it pumped from time to time. And then of course you know they were talking about the mound systems at that time and Gary Lockner said that he kind of thought that

Page 20

maybe they were going to try to make all the residents there operate -- or connect to one mound system that would be located -- centrally located on the property. But it was very messy, at that point and you really don't want to spend a lot of money building a cabin if you don't have a sewer system, but that's what I remember about that.
Q. So you had, is it fair to say, at least a couple of conversations with Mr. Lockner about those issues?
A. No, many. I would say a half-a-dozen probably.
Q. And at any point, did he say that he would provide you a permit to install a septic system?
A. Well, I think the option of just installing a tank and then having it pumped -- to the best of my recollection, I do think that was an option, but I don't think that would be anyone's first choice, but I really can't recollect that well as to what our options were at the time.
Q. Now, did you explore at all the different costs of the different systems that Mr. Lockner had discussed with you regarding septic systems?
A. Well, I may have talked to Rex Block to find out what the costs was, but I can't say that I did for sure, but I know that mound systems at that time

Page 21

were somewhere in that $6,000 or $7,000 range. I think you could put a tank in the ground for somewhat less than that, but then you would always be pumping it all the time, but that's about all I recollect on that.
Q. Now, is it fair to say you never had any septic system designs prepared for the property?
A. Yes.
Q. Now, aside from the driveway and the culvert access that you talked about previously, was there any other development that you actually did on the property?
A. No.
Q. Okay. Mr. Wolf, I would like to go back in time a bit now to when you actually did purchase the property. If you will take a look at what was marked as Exhibit 2. Do you have that in front of you?
A. Yes, I do.
Q. Do you recognize that document?
A. Yes, I do.
Q. What is that?
A. That look looks like and is the purchase agreement.
Q. And that indicates that the purchase price for

Page 22

these three lots was $75,000; is that correct?
A. That's correct.
Q. And it also indicates that you put a down-posit of $7,500; is that correct?
A. I believe that's correct.
Q. Now, how did you finance the purchase of the property?
A. They were sold as an option to a cash option. They were sold on a Contract for Deed, which according to my recollection was 10 percent down and 10 percent interest on a Contract for Deed. I don't remember exactly what the term was and things like that.
Q. Okay. If you will take a look at Exhibit 3 and is that a copy of the Contract for Deed that you executed for the purchase of the property?
A. Yes, it is.
Q. And if you turn to page three of that document, I think it confirms the details that you just indicated that there was a 10 percent interest rate and you had put the $7,500, 10 percent down payment, correct?
A. That's correct.
Q. And it indicates that then your monthly payments moving forward were going to be $892.02; is that

Page 23

correct?
A. That's correct.
Q. Now, once you executed this Contract for Deed, did you begin making those monthly payments?
A. I believe we made some. I am just trying to look here, according to your Exhibit 4, I think we made a few payments and then we later decided to -- because the interest rate was pretty excessive at the time -- that we decided to seek other ways to finance it.
Q. If you look at Exhibit 4?
A. Yes.
Q. Is this a handwritten letter that you prepared?
A. This is my wife's writing and I signed it and she signed it also.
Q. Okay. And it's dated May 12, 1999, correct?
A. That's correct.
Q. And it indicates that you are making a complete and full payment on the Contract for Deed, correct?
A. That's correct.
Q. So at that point in time, did you simply use your own cash to do that or did you find an alternative financial source that you used?
A. I don't recollect, but I believe we used our own

Page 24

cash, but we may have done some other financing to get that cash. I can't recall.
Q. Now, up to that point in time in May of 1999, the previous payments and in fact this final payment, included some components of interest, correct?
A. That's correct.
Q. Now, at some point later then you decided that you wanted to get out of this property; is that fair to say?
A. That's correct.
Q And when did that occur?
A. I don't -- I can't really remember, but it looks like it was May 12 of '99 and the purchase price was February 5th, so you are asking -- rephrase your question once?
Q. Sure. When did you decide that you wanted to have Mr. Bailey take this property back from you?
A. Oh, okay. I thought you were looking for when did we want to get rid of the Contract for Deed. We decided later on that, after we were pretty sure that it was unbuildable and even if it would have been ultimately buildable some day, it wouldn't have been buildable the way we wanted to, that we decided to seek to try to get our money back.
Q. How did you go about that?

Page 25

A. We hired an attorney from the Brink, Sobolik Law Firm from Hallock, Minnesota and I believe his name was Jeff Hane and he went ahead and filed suit and got some of our money back.
Q. Now, if you look at Exhibit 7, is that a letter that your lawyer prepared on your behalf?
A. That's correct.
Q. And it appears that that was in response to a notice that you had received regarding whether the access road would be able to be retained; is that correct?
A. That's correct.
Q. I would like you to look at the final sentence on the first page of the Exhibit 7, it says "Gary Bailey understood that the sole purchase of the lots was to build lake cabins."
A. Yes, I see that.
Q. Is that a fair statement, in your estimation?
A. Mr. LaValla, represented Mr. Bailey. Mr. LaValla knew what our intentions were. Like I said before, I don't believe I've ever spoke to Gary Bailey.
Q. Now, there is one other sentence that I would like to ask you about too and that is on page two. It's the next to the last paragraph, the final

 © 2008



5790936c-fefd-4516-b509-8faf42892b64

Page 26

sentence in that paragraph. It says, "Mr. Lockner also told Dave Wolf that he had previously warned Gary Bailey that he had to get the lots properly examined and officially classified." Is that an accurate statement by your lawyer?
A. Yes.
Q. When did Mr. Lockner tell you that?
A. I don't remember. I had so many conversations with Mr. Lockner that I maybe have something in some notes someplace, but that is what he had told me. I remember that, otherwise I wouldn't have told my lawyer that that's what he told me.
Q. Now, whatever notes you have related to this property, are those among the documents that you have forwarded onto me?
A. Yes, they are.
Q. Now, ultimately, how did you resolve your conflict with Mr. Bailey?
A. Mr. Hane, from the law firm, filed some proceedings and got the $75,000 back, I believe. I don't remember exactly what the numbers were, but I think that's what was settled on. You know, we were short all the money we put in in improvements. We were short a lot of stuff, but we were pretty nervous at the time. We kind of

Page 27

felt that probably everyone would be trying to get their money back and that we would rather be first in line instead of last in line, so.
Q. So ultimately your recollection is that you received $75,000 back?
A. Yes, I think so. I don't have that right in front of me, the exact amount, but that's somewhere in these documents, I'm sure.
MR. GETTE: Mr. Wolf, right now that's all the questions I have for you. Alan, did you have anything?
MR. FISH: Yes.

EXAMINATION

BY MR. FISH:
Q. Mr. Wolf, I represent Gary Bailey and I have for many years on this matter. I don't have very much, as far as questions, but I would like to ask you a few things first. When this property that you bought was initially sold to you on the Contract for Deed, was it platted, at that time?
A. Yes, it was.
Q. Okay. And as far as you were aware, this plat was approved by Lake of the Woods County; is that

Page 28

right?
A. I believed it was, yes.
Q. And you are aware that it had been rezoned by Lake of the Woods County as suitable for residential use?
A. I don't know about that action, but it -- you know, I believed that it was available for residential use, yes.
Q. Were you aware that by accepting and platting this property, Lake of the Woods County had to first confirm that the property was suitable for residential use?
MR. GETTE: I'm going object; calls for a legal conclusion.
Q. Go ahead and answer.
A. Why don't you repeat the question.
Q. Were you aware that by accepting the plat Lake of the Woods County was under an obligation to confirm that the property was suitable for residential use?
MR. GETTE: And I will repeat my objection.
A. I guess that's -- as a purchaser, I don't think that I could be aware of something like that.
Q. And where you aware likewise, of Gary Lockner's

Page 29

work on the property, prior to it being platted, where he represented it was suitable for residential uses?
A. I guess I could not have any knowledge of that either.
Q. Well, in your discussions with Mr. Lockner, did he ever explain to you how it ended up getting platted, if it had all these wetland problems, as alleged by the Army Corps?
A. I had no knowledge that it had any wetland problems.
Q. No, no, I understand you didn't have knowledge of that.
A. Prior to -- you are talking about -- why don't you repeat the question.
Q. During the time frame you were speaking with Mr. Locker, so this would have been after your purchase of the property?
A. Okay.
Q. Did he ever explain to you how it could have got this far into it and accepted by the Lake of the Woods County, have been platted, have been sold off and a County road built, without there being any advanced knowledge or discussion of these wetland problems?

Page 30

MR. GETTE: I'm going to object; vague and compound, but you can answer, Mr. Wolf.
A. I guess I can't -- I don't understand the question, I guess.
Q. Well, did he ever talk -- did Mr. Lockner ever talk to you about how these wetland problems arose so far into the --
A. I don't recall that, him going into a lot of detail on that, no.
Q. And in your opinion, would you agree that this property, the best use of this property would be for lakeshore residential purposes?
A. Yes, I would.
Q. And from your experience at looking at cabins and so forth along Lake of the Woods, is the lakeshore the most valuable property in the area?
MR. GETTE: I'm going to object to calling for an expert opinion, but you can go ahead and answer, Mr. Wolf.
A. Yes, I do.
Q. And as far as wetlands or wetter areas, obviously you have some knowledge of that now, but in what you looked at of the remainder of Mr. Bailey's property, did it appear consistent throughout or

Page 31

were there high ridges or consistent vegetation throughout the property?
MR. GETTE: Objection; compound.
Q. Go ahead.
A. I believe it looked similar.
Q. So the same Ash trees and ferns and things like that were pretty consistent throughout his property?
A. I believe so. I don't really remember a lot of differences.
Q. And as I guess one of the types of purchasers in Lake of the Woods, if you are purchasing a small lot, is it more preferable to be on the lake or say a half a mile or three quarters of a mile off of the lake?
A. More preferable to be on the lake.
Q. And this may be self evident, but is the value of the lots on the lake, from what you've observed in your experience in Lake of the Woods, substantially different, once you leave the waterfront?
MR. GETTE: Objection; vague, with respect to "substantially."
Q. Go ahead.
A. Yes.

Page 32

Q. Substantially lower away from the lake?
A. It's lower away from the lake.
MR. GETTE: Same objection.
Q. Go ahead.
A. Yes. It's substantially cheaper away from the lake.
Q. And the property that you purchased, you travel to an access and pay I think you said about $6 to launch your boat?
A. That's correct.
Q. Now, the harbor you launch at, this is a natural harbor; is that right?
A. Yes.
Q. And it's I guess a few miles to the south of Mr. Bailey's property?
A. Yes, yes. From Mr. Bailey's property to where I launch now?
Q. Yes.
A. Yeah, quite a ways. I would guess 10, 12 miles, something like that.
Q. Now, the property that you have, this abuts Lake of the Woods; is that accurate?
A. That's correct, yes.
Q. And the property you are currently using, you say it's not suitable for launching or docking boats?

Page 33

A. Well, I do have a DNR approved regulated size small launch down the front there, not a cement pad or anything, where you could launch a small boat if you had to. But most, you know, as with a lot of the lakeshore, the water is fairly shallow and most places you prefer a deep water launch.
Q. And is it pretty comparable, the water in front of your lot, to what it's like in front of Mr. Bailey's?
A. Yes.
Q. And this DNR approved device, is this like a couple of rails you could pull your boat up on?
A. It's a what they call a landing mat. You see it in the DNR a lot, use them all over. It's a steel matting that's connected together. They used in Vietnam and --
Q. Oh, to drive your boat off the edge?
A. Yes, that's all it is.
Q. And it's not feasible for larger boats you are saying?
A. No.
Q. And is it affected by water levels at all, the launching of the boats?
A. Oh, definitely.
Q. Are there times when you simply can't launch boats

Page 34

off of this part of Lake of the Woods?
A. Yes.
Q. And from a commercial standpoint, would it be feasible for a person to put a commercial boat launch in an area where you were or obviously where Mr. Bailey was, which is similar?
MR. GETTE: Objection; calls for expert opinion and speculation.
Q. Go ahead.
A. There weren't very many launches that were near that property.
Q. And in fact this entire -- we'll call it this northeast facing shore of Lake of the Woods and we will say from Morris Point on to Long Point; do you know that area?
A. A little bit.
Q. You fish out in that area?
A. Once in a while.
Q. You launch from Morris point; is that right? Where do you normally fish?
A. It depends on where the fish are, but it could be either direction.
Q. Okay. So you would go up north towards Mr. Bailey sometimes?
A. Sometimes we would fish in that direction, yes.

Page 35

Q. And the normal topography out there is it's quite shallow out for several hundred yards from the shoreline going up many, many miles north; would that be accurate?
A. That's correct.
Q. Maybe starting out at a couple of feet and staying that way and gradually dropping off to several more feet as you get several hundred yards out?
A. That's how most of it is.
Q. And along that strip are there any areas that you would say a person -- well, first of all, was there any commercial boat launching facilities that are not natural harbors in that strip?
A. Not commercial, no.
Q. And are there any permanent boat launching facilities, you know, such as a dock?
A. A few people have docks, many people along that stretch have put their own little pads in, cement pads in, to launch their boats off the front of their property.
Q. Have you ever seen a permanent dock along that strip, that sandy face of Lake of the Woods?
A. Very few.
Q. And are you aware of ice problems and heaves and so forth along there?

Page 36

A. Yes.
Q. Do you have that in the winter, too?
A. Oh, yes.
Q. Does it come up to your shore and build up ice heaves several feet high?
A. Sometimes.
Q. Do you feel that you could put a permanent dock out there?
A. It would have to be made out of some pretty tough stuff.
Q. And the area that Mr. Bailey is in, do you know if the Federal Government would even permit a vehicle to drive on that property, so you could launch a boat?
A. I don't know that.
MR. GETTE: Objection; calls for a legal conclusion.
Q. What's your understanding, from what the government told you?
A. Oh, that you couldn't drive on it or what?
Q. What's your understanding of what the Federal Government was going to allow you to do on your lot, once you received correspondence from the Corps of Engineers?
A. Well, the only thing, it seemed like it would be

Page 37

impossible to get a building permit, but I'm not very well versed in what else you can do involving a type 7 wetland. I guess, I don't know that.
Q. Okay. Well, from your experience of launching boats and operating motor vehicles, if the track of your vehicle disturbed the soil, do you think it would be possible to launch a boat from the Bailey plat, if the Federal Government prohibited that?
MR. GETTE: Objection; calls for him to speculate.
Q. Go ahead.
A. No.
Q. Okay, it would not be possible.
MR. FISH: Well, that's all the questions I have for you, unless the government has some more.
MR. GETTE: Just a couple of questions, Mr. Wolf.

EXAMINATION

BY MR. GETTE:
Q. Are you a real estate agent?
A. No.

Page 38

Q. Do you have any expertise in real estate appraisal?
A. No.
MR. GETTE: That's all I have, Mr. Wolf.
MR. FISH: That's all I have, too. Thank you, sir.
MR. GETTE: We will go off the record now. David, you have the right to receive a copy of this deposition and to read it and to note any corrections or you can waive that right.
THE WITNESS: No, I would like that.
MR. GETTE: Okay. So the witness will read and sign. So you will receive it from the court reporter with a letter giving you instructions on how to accomplish that.
THE WITNESS: Okay.
MR. GETTE: For that purpose, can you give her your address?
THE WITNESS: David J. Wolf, P.O. Box 128, 600 Second Street West, Jordan, Minnesota 55352.
MR. GETTE: Okay, great, that's all

Page 39

we need.
THE WITNESS: Okay.
MR. GETTE: Thank you, Mr. Wolf.
(At 9:50 a.m., the foregoing deposition was terminated.)

Page 40

STATE OF MINNESOTA )
) SS.
COUNTY OF WASHINGTON )

I hereby certify that I reported the deposition of DAVID WOLF, on the 6th day of March, 2008, in St. Paul, Minnesota and that the witness was by me first duly sworn to tell the whole truth;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the reading and signing of the deposition by the witness were performed (unless indicated to the contrary on the following page).

WITNESS MY HAND AND SEAL this 21st day of MARCH, 2008.

------------------
(Seal) Shirley A. Hosch
Court Reporter

Page 41

Capital Reporting Company
1821 Jefferson Place, NW
Third Floor
Washington, D.C. 20036
(202)857-3376

ERRATA SHEET

TITLE: Gary Bailey vs. The United States
VENUE: U.S. Court of Federal COURT FILE NO: 02-1078L
WITNESS: David Wolf - 3/6/08 REPORTER: S. HOSCH
****************************************************************
Pg/Line | Change Reason
****************************************************************

______________________ ______________
Signature of Witness Date

Page 42

ACKNOWLEDGEMENT OF DEPONENT

I, DAVID WOLF, do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct, and complete transcription of the testimony given by me, and any changes or corrections, if any, appear in the attached errata sheet signed by me.

________ ____________________

Date David Wolf

Page 43

Mr. David J. Wolf
P.O. Box 128
600 Second St. W.
Jordan, MN 55352

IN RE: Gary Bailey v. The United States

Dear Mr. Wolf:

This letter is to advise you that the original transcript of your deposition taken in the above matter will be available in ouroffice, Capital Reporting Company, located at 1821 Jefferson Place, Northwest, Washington, D.C., for signature per the request of Ms. Nana Babington

Pursuant to the rules, the transcript will be available for 30 days. Please call us at (202)857-3376 to obtain a copy for review.

If you have any questions, please do not hesitate to call. Thank you.

Sincerely,

Sara Freeman
Assistant Director of Operations

cc:JAMES D. GETTE, ESQ.
ALAN FISH, ESQ.

 © 2008



5790936c-fefd-4516-b509-8faf42892b64

STATE OF MINNESOTA )
) SS.
COUNTY OF WASHINGTON )

I hereby certify that I reported the deposition of DAVID WOLF, on the 6th day of March, 2008, in St. Paul, Minnesota and that the witness was by me first duly sworn to tell the whole truth;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the reading and signing of the deposition by the witness were performed (unless indicated to the contrary on the following page).

WITNESS MY HAND AND SEAL this 21st day of MARCH, 2008.

SHIRLEY A. HOSCH
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2010

(Seal)

Shirley A. Hosch
Court Reporter