# In the United States Court of Federal Claims

No. 02-1078L

(Filed May 29, 2014)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                              \*
**GARY BAILEY,**                              \*
                                              \*          Fifth Amendment; regulatory takings;
Plaintiff,                                    \*          summary judgment; Section 404 of the
                                              \*          Clean Water Act; 33 U.S.C. § 1341;
v.                                            \*          Minnesota Pollution Control Agency;
                                              \*          background principles of state law;
**THE UNITED STATES,**                        \*          motion for reconsideration; standing
                                              \*          of subsequent acquirer.
Defendant.                                    \*
                                              \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Alan B. Fish*, Roseau, Minnesota, for plaintiff.

*Joshua P. Wilson*, Natural Resources Section, Environment and Natural Resources Division, Department of Justice, with whom was *Ignacia S. Moreno*, Assistant Attorney General, Washington, D.C., for defendant. *Steven P. Adamski*, United States Army Corps of Engineers, St. Paul, Minnesota, of counsel.

## MEMORANDUM OPINION AND ORDER

WOLSKI, Judge.

This is an action brought pursuant to the Takings Clause of the Fifth Amendment. Plaintiff alleges that the United States, acting through the Army Corps of Engineers (the Corps), has so restricted his use of property as to have taken it without payment of just compensation. This regulatory takings claim concerns plaintiff's platted waterfront property, which he was in the process of selling for residential development. *See Bailey v. United States*, 78 Fed. Cl. 239, 241 (Fed. Cl. 2007) (*Bailey*). In an earlier opinion the Court denied-in-part and granted-in-part a motion by defendant for summary judgment, and denied its motion to dismiss. *See id.*

Pending before the Court are defendant's second motion for summary judgment, which argues that plaintiff's property could not have been taken because

plaintiff did not possess the right to develop the property into residential lots under background principles of Minnesota law; and defendant's motion for reconsideration of the Court's denial of defendant's first motion for summary judgment, in light of the Federal Circuit's decision in *CRV Enterprises, Inc. v. United States*, 626 F.3d 1241 (Fed. Cir. 2010). As is explained below, defendant's second motion for summary judgment is **DENIED**, and its motion for reconsideration is also **DENIED**.

## I. FACTUAL BACKGROUND[1]

Plaintiff purchased land abutting the Lake of the Woods, Lake of the Woods County, Minnesota, in 1989. Most of the upland property, further from the lake, was used for agricultural purposes, but plaintiff intended to develop all of his approximately fourteen hundred feet of shoreline into residential lots. Def.'s Mot. for Summ. J. Based upon Background Principles, App., (Def.'s 2nd App.), Attach. 1 at 1–3, ECF No. 88-1. Plaintiff named this portion of his land "Sunny Beach" and began preparing it for development around 1998. *Id.* at 3.

Plaintiff first applied to the County Board of Lake of the Woods County to plat the property into fourteen separate lots. *Id.* On December 22, 1998, the County Board approved the proposal, which created lots bordered by the lake to the east and plaintiff's newly constructed road to the west. *Id.* Though plaintiff's plat was approved by the County Board, he did not have the required Section 401 certification or Section 404 permit when he began improving his property. *Id.*

Section 401 certifications are issued by the Minnesota Pollution Control Agency (MPCA) in order to ensure development proposals meet Minnesota's applicable water standards. *See* Minn. R. 7001.1400–.1470, subp.1.C. (2007). Section 404 permits, on the other hand, are issued by the Corps and are required in order to begin construction in a wetland. *See* Federal Water Pollution Control Act, § 404, 33 U.S.C. § 1344. Section 404 permits cannot be issued until the appropriate state agency has certified the proposed development (here the MPCA's Section 401 certification). *See* Clean Water Act, 33 U.S.C. § 1341(a)(1) (2006) ("Any applicant for a federal permit to conduct any activity . . . which may result in any discharge into navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates").

Plaintiff did not attempt to obtain either a Section 401 certification or a Section 404 permit before he "roughed in a road" connecting his proposed lots with Sandy Shores Drive during the summer of 1998. Def.'s Mot. for Summ. J., App., (Def.'s App.) at 74, ECF No. 48. Plaintiff subsequently applied for an after-the-fact

---

[1] A more complete discussion of the factual and procedural background is set out in the Court's earlier opinion. *See Bailey* 78 Fed. Cl. at 241–247.

Section 404 permit from the Corps for this road.  Def.'s 2nd App., Attach. 1 at 4. This application also functioned as an application for a Section 401 certification and prompted the MPCA to issue a request for more information (RFI) to plaintiff.  *Id.* at 5.  Despite plaintiff's failure to respond to any of the MPCA's RFIs, the MPCA issued an after-the-fact Section 401 certification for plaintiff's access road on December 17, 1999.  *Id.* at 6–7; Def.'s App. at 135–37.

In late August 2000, based on concerns regarding plaintiff's development, the Corps conducted a "formal on-site wetland delineation" of Sunny Beach.  Def.'s 2nd App., Attach. 1 at 9.  The Corps determined that the site was "99 percent . . . high quality wetland."  *Id.*  On October 4, 2000, due in significant part to the Corps's new information and wetland delineation, the MPCA revoked plaintiff's Section 401 certificate.  Def.'s App. at 137–38.

The MPCA's Section 401 certification revocation did not preclude all future development of plaintiff's waterfront lots.  *Id.* at 138.  The MPCA explained that plaintiff could reapply for permitting if he included information concerning the extent of wetlands on the property; how septic systems would comply with state regulations; and how wetland impact would be minimized in accordance with state law.  *Id.*  The revocation letter also specifically noted three possible ways in which an Individual Sewer Treatment System (ISTS) could be permitted on the site, though the MPCA later determined that at least six of the lots could not support an ISTS.  *Id.*; Def.'s 2nd App., Attach. 1 at 14.

On June 12, 2001, following further analysis of the potential environmental impact of plaintiff's proposed project, the Corps denied plaintiff's after-the-fact Section 404 permit application to extend Sandy Shores Drive, on the basis that the road project --- which "cannot be separated from lot development" --- was contrary to the public interest.  Def.'s App. at 213, 224.  The Corps believed that "[r]etention of the dredged and fill material would contribute to unacceptable degradation of a valuable wetland resource and the adjacent Lake of the Woods," and noted that "[t]he hardwood swamp impacted by the project has high functional values for water quality protection, shoreline protection, wildlife habitat, and floristic diversity/integrity."  *Id.*  The Corps explained:

> The purpose of the unauthorized road is to facilitate potential residential development in a hardwood swamp.  Thirteen of the 14 proposed lots are composed of wetlands with the exception of a small upland island in lots 3 and 4.  Roads and residential development are not water-dependent activities and the presumption that less environmentally damaging alternatives exist (e.g., upland sites) has not been rebutted.

*Id.* at 214.

An accompanying report by Corps staff found that plaintiff's property was a valuable wetland resource "poorly-suited to residential development." *Id.* at 225. Thus, in contrast to the MPCA, the Corps's rejection left little or no possibility that a Section 404 permit might be issued under different circumstances. The Corps's evaluators opined:

> Overall, [plaintiff's property] is a poorly-sited development proposal that would likely be subject to flooding, septic system failure, high building maintenance costs, and shoreline erosion. A less environmentally damaging alternative would be to seek an alternate, upland development site that is more suitable for lakeshore development.
> . . . .
> [I]t is the recommendation of the Regulatory Branch that a permit be denied for the proposed project [and the alternative project]. Further, the staff recommends complete restoration . . . .

*Id.* at 245.[2]

The relevant decision maker, the Corps's District Engineer, found "[t]here are presumed to be practicable alternatives to the discharge that would have less adverse effect on the aquatic ecosystem, and these alternatives would not have other significant adverse environmental consequences." *Id.* at 246. He found this "presumption has not been rebutted," and that "[t]he discharge would result in significant degradation of the aquatic ecosystem" and "does not include all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem." *Id.* at 246–47.

Three months later the Corps ordered plaintiff to remove the access road and its ditches and return the Sandy Beach lots to their natural wetland condition. Def.'s App. at 308–09. The order stated:

> Restoration would confer maximum environmental benefits by reestablishing wetland functions and values of high quality wetlands adjacent to an internationally important waterbody. Restoration would be equitable in that the Corps informed you of the need for a Section 404 permit before the project . . . . Furthermore, you profited from the sale of lots associated with the unauthorized work.

---

[2] The staff report recognized the possibility that a public sewer line could serve the property, but noted that there were not "any plans submitted proposing such public systems." Def.'s App. at 230.

*Id.* at 308.  The order required plaintiff to remove all dredged material (except for the southernmost 123 feet of road abutting lots 1 and 2), fill the associated ditches, seed the area with a certain seed mix, and control for invasive weed species.  *Id.* at 308–09.  This restoration was to be completed between July 1 and August 15, 2002.  *Id.*  Removal of this road would deny plaintiff vehicular access to lots 3 to 13.  *Id.* at 219.

After plaintiff contested the MPCA's denial of his Section 401 certification, the MPCA held a public hearing, conducted by an administrative law judge (ALJ), from July 23 to 25, 2003.  Def.'s 2nd App., Attach. 1.  The ALJ produced a report which contained his findings of fact and concluded that the plaintiff had failed to disclose all relevant information to the MPCA; that the proposed development would potentially discharge sewage into the soil and water; and that the road, as built, harmed the environment.  *Id.* at 2–15.

The Commissioner of the MPCA later reviewed the ALJ's report and issued a document titled "statement of the issue, findings of fact, conclusions and order."  Def.'s 2nd App., Attach. 16.  The Commissioner largely adopted the ALJ's findings of fact with some minor modifications.  *Id.* at 2–5.  ("[T]he proposed Sunny Beach project endangers human health and the environment. . . .  [T]here is no evidence of the existence of soil conditions at the Sunny Beach project site that comply with MPCA's individual sewage treatment ISTS rules.  The discharge of sewage without adequate treatment will create [a] nuisance . . . .").  Based on the foregoing the Commissioner affirmed the MPCA's revocation of the Section 401 certification.  *Id.* at 6.  Plaintiff then filed suit against the MPCA, but the case was dismissed on a motion for summary judgment and was unsuccessfully appealed.  *See Bailey v. Minnesota Pollution Control Agency*, No. A07-2255, 2008 WL 4777917 (Minn. App. Nov. 4, 2008).

In the midst of this permitting process, starting after the plat was approved in December 1998, plaintiff began selling the fourteen Sunny Acre lots (numbered 1–14) to various purchasers.  There are two dates when plaintiff's interests in the lots are relevant: June 12, 2001, when the after-the-fact permit was denied; and October 22, 2001, when the restoration order was issued.  On June 12, 2001 plaintiff had a fee simple interest in lot 1; a security interest in lots 2, 3, 9, 10, and 12–14; and no interest in lots 4–7, 8, and 11.  *See Bailey*, 78 Fed. Cl. at 257.  By October 22, 2001 plaintiff had a fee simple interest in lots 1, 4–6, and 10, as well as a security interest in lots 2, 3, 9, and 12–14 (but still no interest in lots 7, 8, and 11).  *Id.*

## II.  PROCEDURAL BACKGROUND

Plaintiff filed a complaint with the United States Court of Federal Claims on August 29, 2002.  Following a stay of proceedings to allow resolution of a parallel

district court action,[3] on February 16, 2005, defendant filed a motion to dismiss the case under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), and for summary judgment under RCFC 56. Defendant offered several arguments in support of its motion. *See* Def.'s Mot. to Dismiss (Def.'s Mot.) at 16–25. First, defendant argued that because plaintiff questioned the validity of the Corps's restoration order on the basis that Lake of the Woods County was responsible for the road, plaintiff could not assert a taking. *Id.* at 17–18. Second, defendant argued that plaintiff did not have a property interest in thirteen of the fourteen lots at the time of the alleged taking and therefore lacked standing to seek compensation. *Id.* at 17, 19–24. Similarly, defendant also claimed that the plaintiff did not own the road at the time of the permit denial, and thus, lacked standing. *Id.* at 19–20. Last, defendant argued that because the Corps's alleged taking involved denial of an after-the-fact permit there could be no taking: the road, according to the defendant, "continues to exist." *Id.* at 24–26.

The Court granted defendant's motion for summary judgment regarding lots 7, 8, and 11 because plaintiff owned neither a fee simple interest nor a security interest, but denied defendant's motion for summary judgment regarding all other lots. *Bailey*, 78 Fed. Cl. at 275, 281. The Court held that plaintiff could "seek compensation for the alleged taking of the fee simple interest in lots [1,] 4, 5, 6, and 10, even were the Section 404 permit denial the basis for the takings claims." *Id.* at 274 (citation omitted). The Court also held that plaintiff possessed a vendor's lien and legal title as security for lots 2, 3, 9, 12 and 14 and a security interest as the mortgagee of lot 13. *Id.* at 276. The government's motions were denied in all other respects. *See id.* at 253, 256, 280.

After the close of fact discovery, defendant filed its second motion for summary judgment. *See* Def.'s Mot. for Summ. J. Based upon Background Principles (Def.'s 2nd Mot.), ECF No. 88. The government argues that, in revoking plaintiff's Section 401 certification, the state of Minnesota determined that plaintiff's proposed residential use of the Sunny Beach property would create a nuisance, and thus such use is not included among his property interests. Mem. in Supp. of Def.'s 2nd Mot. (Def.'s Br.) at 1–2, 18–25.[4] While this motion was pending, defendant has moved for reconsideration of the Court's denial of summary judgment regarding the fee simple interests in lots 4, 5, 6, and 10, on the ground that this result is compelled by the decision in *CRV Enterprises*. *See* Supp'l Br. and Mot. for

---

[3] In district court, plaintiff unsuccessfully challenged the MPCA's revocation of his 401 certification. *Bailey v. U.S. Army Corps of Engineers*, No. Civ. 02-639, 2003 WL 21877903 (D. Minn) (Aug. 7, 2003).

[4] The government's supporting memorandum is part of the document containing its motion, ECF No. 88, beginning at page 8 of that filing. Citations are to the internal pagination of that portion of the filing.

Recon. (Def.'s Mot. for Recons.) at 1–7 (discussing *CRV Enters.*, 626 F.3d at 1248–50), ECF No. 123.

## III. DISCUSSION

### A. Defendant's Motion for Reconsideration

In the previous opinion in this case, the Court considered defendant's argument that plaintiff would lack standing to sue for the taking of lots sold by him prior to the date of the alleged taking and reacquired afterwards. *See Bailey*, 78 Fed. Cl. at 258–75. The rule cited by the government stated: "It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001). But the case expressing that rule did not involve a regulatory taking and a post-taking acquirer, and the other two precedents cited by the government concerned physical takings. *See Bailey*, 78 Fed. Cl. at 259, 268–69 (discussing *United States v. Dow*, 357 U.S. 17, 18–23 (1958), *Wyatt*, 271 F.3d at 1096, and *Cavin v. United States*, 956 F.2d 1131, 1134–35 (Fed. Cir. 1992)). A thorough canvassing of binding precedents revealed none that applied the rule to a post-regulatory-taking acquirer, and established that the rule was based on the reasoning that the permanent physical occupation of real property by the government, or the completion of eminent domain proceedings, removes the affected property interests from private ownership. *Id.* at 259–64, 268–74.[5]

That the rule was based on the presumption of the *permanent* physical use or occupation of real property by the government was confirmed by the Court of Claims opinion in *Eyherabide v. United States*, 170 Ct. Cl. 598 (1965), in which the physical use of real property by the federal government was intended to be temporary and a subsequent purchaser was found to be entitled to just compensation. *See Bailey*, 78 Fed. Cl. at 269–70 (discussing *Eyherabide*, 170 Ct. Cl. at 605–08). And the basis for the rule was found to be of particular significance in

---

[5] The rule has been applied in avigation easement cases involving the physical use of private airspace. *See*, *e.g., Lacey v. United States*, 219 Ct. Cl. 551, 560–61 (1979); *Vroman v. United States*, 147 Ct. Cl. 285, 287–88 (1959). While Federal Circuit precedent suggests that such takings may be based on the imposition of an uncompensated nuisance, and thus not necessarily involve a direct physical invasion, *see Argent v. United States*, 124 F.3d 1277, 1282–84 (Fed. Cir. 1997), "the resulting taking still more resembles a physical than a regulatory taking." *Bailey*, 78 Fed. Cl. at 269 n.54. Even if such a hybrid taking were viewed as of the regulatory variety, the context of a military decision to locate and operate jet aircraft at a particular location could normally be assumed permanent for takings purposes. *Cf. Speir v. United States*, 202 Ct. Cl. 1020, 1026 (1973) (finding wartime helicopter training was not intended to be permanent).

light of developments in regulatory takings jurisprudence, as both the Supreme Court and the Federal Circuit have recognized that governments found liable for regulatory takings retain the option of loosening the restriction at issue, converting the taking to a temporary one that is less costly to the public fisc. *See id.* at 270 (citing, *inter alia*, *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 318–19, 321 (1987), and *Seiber v. United States*, 364 F.3d 1356, 1365 (Fed. Cir. 2004)). Thus, the presumption that "when the government makes physical use of private property, by flooding it, or running a road or a pipe line through it, or burdening it with the interference from a squadron of jets," *id.* at 272, such use is of a permanent nature, would not seem to apply in the regulatory taking context. In other words, the notion that the prospect of permanent takings liability could induce the government to change course is more easily indulged when the relevant activity is issuing a command on paper, rather than erecting a physical structure for the government's use.

Since the "owner at the time" rule rests on a presumption of permanence that does not normally obtain in the regulatory takings context, the extension of the rule to cover regulatory takings in general would seem to be unfounded and, thus, arbitrary, in the absence of some other justification. This would explain the absence of any binding precedents applying the rule to a party who obtained property after a regulatory taking was alleged to occur. The Court denied defendant's motion, holding that "just compensation for the regulatory taking of real property interests may be owed to owners who have acquired their property interests after the onset of the taking." *Bailey*, 78 Fed. Cl. at 274. The Court permitted plaintiff to seek compensation for the alleged regulatory taking of lots 1, 4, 5, 6, and 10, which plaintiff possessed in fee simple at the time the restoration order was issued, as well as for taking security interests in lots 2, 3, 9, 12, 13, and 14. *Id.* at 274, 279. The Court granted defendant's motion to dismiss plaintiff's claims regarding lots 7, 8, and 11, which he sold before the Corps's permit denial and never reacquired. *Id.* at 275. Then it came to the Court's attention that the rule was subsequently applied in the context of a regulatory taking in *CRV Enterprises, Inc. v. United States*, 626 F.3d 1241, 1249–50 (Fed. Cir. 2010), and the Court requested briefing on the subject.

In *CRV Enterprises*, the appellants purchased property accessible via waterway after the Environmental Protection Agency (EPA) issued a final record of decision (ROD) stating that it would install a log boom blocking boat access to appellants' property, but before the EPA actually installed the log boom. *Id.* at 1243–45. Appellants brought suit after the log boom was installed. *Id.* at 1245. The Circuit held that the regulatory takings claim ripened when the agency issued its ROD, since it represented a final agency decision, and not when the log boom was actually installed. *Id.* 1249–50. Because appellants purchased the parcel after the ROD issued, the Circuit held that plaintiffs lacked standing to bring a regulatory takings claim. *Id.* at 1250.

In response to the Court's order that the parties file supplemental briefs on the relevance of *CRV Enterprises*, defendant filed a brief and the pending motion for reconsideration of the Court's previous denial summary judgment motion "with respect to Lots 4, 5, 6, and 10." Def.'s Mot. for Recons. at 1–2. Defendant argues that *CRV Enterprises* "confirms the United States' summary judgment position that plaintiff lacks standing to pursue a regulatory takings claim with respect to property interests that he did not hold at the time his alleged claim accrued." *Id.* (citing *CRV Enters.*, 626 F.3d at 1250). Defendant argues that because the Court previously held that plaintiff did not own lots 4, 5, 6, or 10 on the date of the denial of the after-the-fact Section 404 permit by the Corps, and acquired the property later, the situation is analogous to the one in *CRV Enterprises*. *Id.* at 4–5. As a result, defendant asks the Court to reverse its previous ruling and dismiss the plaintiff's claims with respect to lots 4, 5, 6, and 10 of Sunny Beach and hold that plaintiff lacks standing to pursue regulatory takings claims with respect to those lots. *Id.* at 7. Plaintiff opposes reconsideration of this ruling, *see* Pl's Supp'l Reply at 1–2, 5–8, ECF No. 124; *see also* Pl.'s Supp'l Br. at 1–7, ECF No. 122.

The Court may reconsider its August 10, 2007 ruling pursuant to RCFC 54(b), which allows the court to reconsider any order or decision that adjudicates fewer than all the claims prior to issuance of judgment on all the claims. Reconsideration under RCFC 54(b) is available "as justice requires," and granting a motion to reconsider may be done under a "less rigorous" standard than a motion to reconsider a final judgment. *Martin v. United States*, 101 Fed. Cl. 664, 670–71 (2011) (quotation marks omitted). When controlling legal authority upon which a court relied changes during the course of litigation, a court may and should address any effect this change in authority or precedent may have. *See L-3 Commc'ns Integrated Sys., L.P. v. United States*, 98 Fed. Cl. 45, 48–49 (2011).

After carefully considering the previous ruling and the Federal Circuit's decision in *CRV Enterprises*, the Court concludes that reconsideration is not warranted. As was discussed above, *CRV Enterprises* involved a claim by property owners that their property was taken without just compensation when the Environmental Protection Agency (EPA) erected a log boom preventing the property owners from using a slough adjacent to their property. *CRV Enters.* 626 F.3d at 1241. The Federal Circuit analyzed the alleged taking as both a physical taking and as a regulatory taking, rejecting the claim either way. The Federal Circuit rejected a physical takings argument because the log boom was not on the appellants' property and there was no physical appropriation or destruction of water that the appellants had a right to use. *Id.* at 1246–48. It also held that the appellants lacked standing to challenge the restriction on their use of the slough under a regulatory takings framework because the plaintiffs purchased the property after the EPA issued the ROD "requir[ing] the installation of a log boom." *Id.* at 1250.

The Court finds that *CRV Enterprises* is not inconsistent with the earlier opinion in this case. As was recounted above, the "owner at the time" rule turns on the presumed permanence of takings accomplished by the physical construction of roads, dams, landing fields and the like. Even when analyzed as a regulatory taking that ripened upon the issuance of a piece of paper, the ROD, the restriction on the property owners' use of water rights in *CRV Enterprises* was not any command governing their behavior, but the decision to install a log boom to protect a Superfund site. *Id.* This, then, would still come under the rule that when the government makes physical use of property by building a structure, any property interests taken by this activity are permanently appropriated by the government at that time. *See, e.g., Dow*, 357 U.S. at 22 (explaining that compensation is due "[t]he owner at the time the Government takes possession"); *Danforth v. United States*, 308 U.S. 271, 284, 286 (1939) (explaining that a taking "in actuality" occurs upon "such construction as would put upon this land a burden, actually experienced"); *Transp. Co. v. Chicago*, 99 U.S. 635, 642 (1879) (explaining a "permanent flooding" of property resulted in a taking when "there was a physical invasion of the real estate of the private owner, and a practical ouster of his possession"). Indeed, the possibility that the log boom would be only a temporary interference with use of the slough was not even entertained in the *CRV Enterprises* opinion, which stressed that after the ROD issued "it was clear the United States' action would be permanent." *CRV Enters.*, 626 F.3d at 1250.

Moreover, none of the cases relied upon by the *CRV Enterprises* opinion involved the question of a subsequent acquirer of a property interest bringing a regulatory takings claim. In addition to *Wyatt*, the opinion cites *Huntleigh USA Corp. v. United States*, 525 F.3d 1370 (Fed. Cir. 2008), a case in which the ownership of valid property interests at the time of the taking was undisputed, *id.* at 1378, and two cases which concerned the very existence of protected interests, not the timing of their acquisition. *See CRV Enters.*, 626 F.3d at 1249 (citing *Bair v. United States*, 515 F.3d 1323, 1327 (Fed. Cir. 2008) and *Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003)). Thus, when the Federal Circuit concludes that "[b]ecause the claim accrued and ripened before plaintiffs acquired the property, plaintiffs cannot state a regulatory takings claim," *id.* at 1250, the Court finds no reason for extending this rule beyond the particular circumstances of the physical construction of a structure that is presumed to permanently interfere with property usage.[6]

---

[6] The Court also notes, as did plaintiff, *see* Pl.'s Supp'l Br. at 2, ECF No. 122, that the application of the "owner at the time" rule was conceded by the property owners in *CRV Enterprises*, and thus its relevance to regulatory takings was not actually at issue in the case. *See CRV Enters.*, 626 F.3d at 1249.

Accordingly, the Court is satisfied that the earlier opinion correctly applied the law.  The motion for reconsideration is **DENIED**.

## B.  Defendant's Second Motion for Summary Judgment

Defendant's second motion for summary judgment rests on the argument that plaintiff cannot demonstrate that he possessed any property interest in the lake front lots.  Def.'s Br. at 1–2.  More specifically, defendant contends that the MPCA, acting on behalf of the state, prohibited all residential development of Sunny Beach due to the application of nuisance law, and thus the Corps's permit denial could not have been a taking --- as it could not deprive plaintiff of something he did not possess.  *Id.* at 1.[7]  Defendant argues that "applying its own intrinsic law, the state determined that neither plaintiff, nor any other owner, could possess a stick in their bundle of property rights that would allow them to locate residential development on the lake front lots at issue in this case."  *Id.*  But, as will be seen, the background principle established by the MPCA is that plaintiff does not have the right to develop his property as proposed using a mound ISTS.  Whether plaintiff has other rights under Minnesota law to develop residential lots on Sunny Beach remains a genuine issue of material fact.

Defendant's argument is predicated on two assumptions:  that the MPCA (or another state law or agency) prohibited any residential development of plaintiff's waterfront property on the basis that plaintiff's proposed development would necessarily create a nuisance; and, second, that the Corps did not impose any greater limitations on plaintiff's property than those imposed by the state.  Otherwise stated, plaintiff would have lacked a viable right to use his property at the time the Corps denied plaintiff's Section 404 permit if the state of Minnesota, applying its own background principles of nuisance law, had prohibited any development of Sunny Beach.  Defendant's factual support for these two assumptions is set forth below.

---

[7]  This motion was extensively (and exhaustively) briefed.  *See, e.g.*, Def.'s Br.; Def.'s Prop. Findings of Fact, ECF No. 89; Pl.s Mem. in Opp'n (Pl.'s Opp'n), ECF No. 93; Aff. of Alan Fish, ECF No. 94; Reply in Supp. of Def.'s Mot. (Def.'s Reply), ECF No. 97; Pl.'s Resp. to Prop. Findings of Fact, ECF No. 102; Pl.'s Supp'l Br., ECF No. 103; Def.'s Supp'l Br., ECF No. 107; Def.'s Resp. to Pl.'s Supp'l Br., ECF No. 109; Pl's Supp'l Reply, ECF No. 110;  Def.'s Notice of Supp'l Auth., ECF 113; Pl.'s Resp. to Supp'l Auth., ECF No. 115; Def.'s Resp. to Pl.'s Mem., ECF No. 117.  Although all filings have been considered, for the sake of convenience not all are referenced in this opinion.

### 1. The MPCA's Section 401 Certification Denial

Plaintiff's proposed development requires a Section 401 certification from the state and a Section 404 permit from the Corps. Section 401 certifications ensure compliance with the state's water quality standards and other requirements of state law. Although the MPCA first conditionally approved plaintiff's Section 401 certification on December 17, 1999, it later revoked plaintiff's Section 401 certification on October 4, 2000, based on its greater understanding of the nature of plaintiff's property. As a result of the revocation, plaintiff is prohibited from developing his lake front property in the manner originally proposed.

Defendant argues that the MPCA's revocation prohibited plaintiff from all "residential development on the lake front lots" because the soil was "not adequate for the septic system that [plaintiff] proposed." Def.'s 2nd Mot. at 15–16, (citing Def.'s 2nd App., Attach. 11 at 8–31). In addition to the inadequacy of the soil for ISTS, defendant argues that the MPCA also found that "six of the lots did not have sufficient area [for the ISTS] and that another four required [additional analysis]." Def.'s 2nd Mot. at 9, Def.'s 2nd App., Attach. 11 at 21. Defendant cites the MPCA Commissioner's conclusions, which state in part:

> In particular, sewage is likely to be discharged without adequate treatment. This situation exists because there is no evidence of the existence of soil conditions at the Sunny Beach project site that comply with MPCA's individual sewage treatment system (ISTS) rules. The discharge of sewage without adequate treatment will create nuisance conditions and an imminent public health threat and violate other MPCA rules . . . .

Id. at 21 (citing Def.'s 2nd App., Attach. 16 at 5).

### 2. The Corps's Section 404 Permit Denial

On June 12, 2001 the Corps denied plaintiff's after-the-fact Section 404 permit request to extend Sunny Beach Drive on the basis that it was "contrary to public interest." Def.'s App. at 213. The Corps determined that "[r]etention of the dredged and fill material would contribute to unacceptable degradation of a valuable wetland resource" and believed that the possibilities of residential development using "less environmentally damaging alternatives exist (e.g., upland sites)." Def.'s App. at 213–14. The Corps specifically noted that the proposed road would be used to access residential development of a "valuable wetland" and that the Corps also considered the impact of the total development in evaluating the permit for the road. Id. at 214, 220. The Corps's staff report described the site itself as "poorly suited to residential development" and believed that "the

presumption that less environmentally damaging alternative are available has not been rebutted." *Id.* at 225–26.

The Corps's staff explored alternatives available to the plaintiff, noting that "sale of the property could generate funds towards purchase of upland lakeshore property." *Id.* at 226. Additionally, the staff report did not believe that the plaintiff could successfully mitigate the effects of his development through offsite mitigation. *Id.* at 226–228 ("The proposed compensatory mitigation would not adequately replace the functions lost or adversely impacted by the project . . . . Offsetting loss of a hardwood swamp through in-kind compensation would take a minimum of 25 years . . . . Such compensation is high risk as successfully creating or restoring forested wetlands is difficult."). The report concluded that immitigable environmental harms "would exist as long as the road and lakeshore lots would be used." *Id.* at 245.

The report also expressed concern that Lake of the Woods is an area of growing development. *Id.* at 241. ("The Corps recently reviewed four other additional permit applications . . . . [The] 519 acres south of the project site may be proposed for a similar lakeshore development."). Denial of plaintiff's development was significant, in part, because approval "would likely set a precedent for approval of similar projects resulting in adverse, cumulative impacts that would contribute to the depredation of Lake of the Woods." *Id.* at 245. Finally, the staff report not only rejected the plaintiff's proposal but recommended "complete restoration" of the site. *Id.* at 246.

After reviewing and considering the recommendation of the staff, the Corps's District Engineer denied the after-the-fact permit, for three reasons. First, he found unrebutted the presumption that there existed "practicable alternatives . . . that would have less adverse effect on the aquatic ecosystem" and "would not have other significant adverse environmental consequences." *Id.* Second, he felt approval "would result in significant degradation of the aquatic ecosystem." *Id.* at 247. And finally, he believed the "discharge" for which approval was sought "does not include all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem." *Id.*

Determining whether a plaintiff has alleged a cognizable property interest first requires "identify[ing] what, if anything, was the subject of the alleged taking." *Acceptance Ins. Cos. Inc. v. United States,* 583 F.3d 849, 855 (Fed. Cir. 2009). A court must identify "the use interest proscribed by the governmental action" and determine whether that use "was part of the owner's title to begin with, *i.e.,* whether the land use interest was a 'stick in the bundle of property rights' acquired by the owner." *M & J Coal Co. v. United States,* 47 F.3d 1148, 1154 (Fed. Cir.1995) (citing *Lucas v. South Carolina Costal Council*, 505 U.S. 1003, 1027 (1992)).

Determining the permissible uses of property requires a court to analyze "existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law, [to] define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." *Air Pegasus of D.C., Inc. v. United States,* 424 F.3d 1206, 1212–13 (Fed. Cir. 2005) (internal quotation marks omitted). For defendant to rely on state background principles of nuisance and property law it must do no more than replicate the limitations embedded in state law. *Lucas*, 505 U.S. at 1029; *John R. Sand & Gravel Co. v. United States*, 62 Fed. Cl. 556, 589 (2004), *vacated on other grounds*, 457 F.3d 1345 (2006), *aff'd* 1522 U.S. 130 (2008); *Rith Energy, Inc. v. United States*, 44 Fed. Cl. 108, 115 (1999), *aff'd on other grounds*, 247 F.3d 1355 (Fed. Cir. 2001). Defendant must show that it is undisputed that plaintiff had no right to use his property for residential development. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Should the evidence be inconclusive as to this material fact, defendant's motion for summary judgment must fail. *Id.*; *see also* RCFC 56(a), (c).

### *3. There Is a Genuine Issue of Material Fact Concerning Plaintiff's Right to Develop Sunny Beach under Minnesota Law*

Defendant's argument fails because it is predicated on an unsupported assumption, namely, that the state's revocation of the 401 certification forecloses all residential uses of the property. In its motion for summary judgment defendant argues that ISTS cannot be installed on plaintiff's property because the soil is inadequate on all lots and because some lots have insufficient upland area to support the systems. Def.'s Br. at 29–31. Additionally, defendant argues that plaintiff cannot show that an alternative septic system could feasibly work on the Sunny Beach lots. Def.'s Reply at 9. Defendant relies primarily on three sources: the testimony of Mr. Wespetal, the MPCA's soil scientist; the ALJ's report; and the MPCA Commissioner's order. *Id.* Each of these sources suffers the same deficiency: it only addresses the use of ISTS on plaintiff's property as proposed by plaintiff and not the right to develop residential lots using alternative septic systems or plans.

Indeed, the record contains some evidence showing that the extent of plaintiff's ability to develop Sunny Beach into residential lots under Minnesota state law is uncertain. Plaintiff argues that the residential development immediately north of his proposed development has an MPCA approved septic system. Pl.'s Opp'n at 12–13. This is consistent with the Corps's description of the area in its after-the-fact permit denial. Def.'s App. at 219–46. The presence of a development on Lake of the Woods, immediately adjacent to Sunny Beach, suggests that there may be an alternative septic system that would allow plaintiff to develop his land into residential lots. *See* Fish Aff., Ex. 14, at A-332 to A-372, ECF No. 94-15. Plaintiff also claims that the local government previously informed him that

sewers could be used on the property.  Pl.'s Opp'n at 13.[8]  The MPCA itself has publicly taken the position that Mr. Bailey may still seek a variance or propose another development option, *see* Fish Aff., Ex. 5 at A-156 to 57, and its revocation of the Section 401 certification identified three ways in which the ISTS requirements could potentially be satisfied.  Def.'s 2nd App. at 2.

Further, evidence has been submitted that alternative development plans could comply with Minnesota state law.  For example, the Corps's after-the-fact permit denial notes that lots 3 and 4 have a small upland island that is not wetland and that lot 1 is effectively drained by an old drainage ditch.  Def.'s App. at 231.  And plaintiff has also identified at least two alternative approaches to sewage treatment that might satisfy the state requirements.  *See* Fish Aff., Ex. 4 at A-133 to 36.

Moreover, Mr. Wespetal's testimony was limited to the use of a mound system, which was "the type of system commonly used in areas with wet soils."  Def.'s 2nd App., Attach. 11 at 29.  He testified that there are at least eleven types of septic treatment systems and that he did not explore the use of any of them other than the mound system.  *Id.* at 26; Pl.'s Opp'n at 11.  When plaintiff's counsel asked him if he had considered off-site septic systems, he said he had not.  Def.'s 2nd App., Attach. 11 at 29.  And Mr. Wespetal even left open the possibility that some of the Sunny Beach lots may have enough upland area to support a mound system.  *Id.* at 21.  Given these limitations the Court cannot extrapolate from Mr. Wespetal's testimony the conclusion that no septic system exists which could conform to Minnesota law and support residential development on plaintiff's property.

This evidence establishes that plaintiff is prohibited by Minnesota's background principles of nuisance law[9] from developing Sunny Beach into

---

[8]  As noted above, *see* n.2, supra, the Corps' staff recognized the possibility that a public sewer line could serve the property.  Def.'s App. at 230.

[9]  Although collateral estoppel may attach to the MPCA Commissioner's affirmance of the Section 401 certification revocation, that decision did not consider all possible residential development, just the proposal using the mound ISTS.  In any event, if the appeal had considered other possible residential development of Sunny Beach, those considerations do not bind the Court.  Under Minnesota law, the issue to be precluded must be necessary for agency adjudication and properly before the agency.  *Graham* v. *Special Sch. Dist. No. 1*, 472 N.W.2d 114, 117 (Minn. 1991).  Additionally, for issue preclusion to apply the issue to be precluded must also be the same as the issue raised in the prior agency adjudication.  *Id.* at 116.  A determination whether any septic system would comply with state law if used within the confines of Sunny Beach was not the issue before the MPCA, and

residential lots using the proposed plan and using a mound ISTS.  But it is far from clear that plaintiff has no right under Minnesota law to develop Sunny Beach into residential lots.

That residential development of Sunny Beach is not necessarily precluded by the MPCA decision is of significance, as the Corps's denial of the Section 404 permit appears to have rested on much broader grounds than any nuisance that would be created by the specific proposal.  As was detailed above, while the staff report discussed the MPCA's revocation of the Section 401 certification, *see* Def.'s App. at 221–22, and noted the possibility of septic system failure, *id*. at 225, 230–31, 236, 245, the decision of the District Engineer rested on the presumption that Mr. Bailey could obtain other (non-wetland) property that it believed was better suited for residential development, and on general concerns of the impact on "the aquatic ecosystem" associated with his wetlands, *id*. at 213–14, 246–47.  How much more restrictive the Corps's decisions were compared to the MPCA's, and the types and value of uses that may remain to Mr. Bailey under those decisions, are factual questions that cannot be resolved on the record before the Court.  That uncertainty cuts in plaintiff's favor when he opposes summary judgment, but will become his problem when he attempts to satisfy his burden at trial.

Defendant has failed to satisfy its burden of showing that there is no genuine issue of material fact concerning the extent of plaintiff's property rights under background principles of state law.  Specifically, it has not shown that background principles of state law preclude all "residential development on the lake front lots at issue in this case."  Def.'s 2nd Mot. at 1.  Thus a question of material fact remains.  Defendant's motion for summary judgment is **DENIED**.

### III.  CONCLUSION

Defendant's motion for reconsideration is **DENIED**.  Defendant's motion for summary judgment is **DENIED**.  The parties shall file a joint status report proposing a schedule for further proceedings on or by **Thursday, June 12, 2014**.

**IT IS SO ORDERED.**

s/ Victor J. Wolski
**VICTOR J. WOLSKI**
Judge

---

reaching such a determination was not necessary to its evaluation of plaintiff's proposal.